# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| CAMBRIDGE RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>                Plaintiff,<br><br>      v.<br><br>JELD-WEN HOLDING, INC., MARK A. BECK, L. BROOKS MALLARD, GARY S. MICHEL, ONEX CORPORATION, ONEX PARTNERS MANAGER LP, ONEX PARTNERS III LP, ONEX PARTNERS III GP LP, ONEX US PRINCIPALS LP, ONEX PARTNERS III PV LP, ONEX PARTNERS III SELECT LP, ONEX BP CO-INVEST LP, ONEX ADVISOR III LLC, ONEX AMERICAN HOLDINGS II LLC, ONEX BP FINANCE LP, and ONCAP,<br><br>              Defendants. | Civil Action No.  3:20cv00112<br><br><br>**CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Cambridge Retirement System ("Cambridge" or "Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by JELD-WEN Holding, Inc. ("Jeld-Wen" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Jeld-Wen; and (d) other public information regarding the Company, including the public record in

the following litigations against Jeld-Wen: *Steves and Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-00545-REP (E.D. Va.); *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-00718-JAG (E.D. Va.); and *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, No. 3:18-cv-00850-JAG (E.D. Va.).

## INTRODUCTION

1.      This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired shares of Jeld-Wen's common stock between January 26, 2017 and October 15, 2018, inclusive (the "Class Period").  The claims asserted herein are alleged against Jeld-Wen,  certain of the Company's current and former senior executives, and controlling shareholder Onex, as defined herein (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      Jeld-Wen is one of the world's largest door and window manufacturers. Headquartered in Charlotte, North Carolina, the Company designs, produces, and distributes a range of doors, windows, and related products.

3.      The interior molded door is the most popular type of interior door in North America. Manufacturers produce interior molded doors by joining two door skins between a wood frame filled with a hollow or solid core.  Door skins are the principal component of interior molded doors, accounting for up to 70% of the cost to manufacture a molded door.

4.      Jeld-Wen and its primary competitor, Masonite Corporation ("Masonite"), are the two largest manufacturers of interior molded doors in the United States.  In October 2012, Jeld-Wen acquired another manufacturer of interior molded doors and door skins, CraftMaster Manufacturing, Inc. ("CMI").  As a result of that acquisition, Jeld-Wen gained ownership of CMI's flagship door skin manufacturing plant in Towanda, Pennsylvania, and removed CMI as the third

source of door skin supply in the interior molded doors market.

5.     After the acquisition, Jeld-Wen and Masonite became the only two manufacturers of door skins in the United States and controlled 85% of the market for interior molded doors. Because the manufacturers comprising the other 15% of the interior molded doors market did not independently manufacture door skins, domestically, they were left with no choice but to purchase door skins from either Jeld-Wen or Masonite.

6.     Prior to its acquisition of CMI, Jeld-Wen had aggressively competed with Masonite for the sale of door skins to other interior door manufacturers.  In late 2012, however, shortly after Jeld-Wen acquired CMI, Jeld-Wen and Masonite began imposing uniform price increases on interior molded doors.  At least nine different times between 2012 and 2018, Jeld-Wen and Masonite increased the prices of their interior molded doors in the same or similar percentage increments, either simultaneously or in brief succession of each other.

7.     In early 2014, Jeld-Wen announced that it had implemented a new pricing strategy, shifting from its old strategy to grow volumes and increase market share that "often led to competing on price" to a new strategy that emphasized "pricing optimization" to increase product profitability on a per unit basis.

8.     Just several months later, in June 2014, Masonite abruptly and inexplicably stopped selling door skins to other door manufacturers, making Jeld-Wen the market's sole supplier of door skins.  Around the same time, Jeld-Wen began taking adverse actions against independent door manufacturers with which the Company had long-term agreements to supply door skins by, among other things, raising prices.  In response to Jeld-Wen's price increases, in June 2016, one of those independent door manufacturers, Steves and Sons, Inc., filed a lawsuit against Jeld-Wen, Inc., a wholly owned subsidiary of Jeld-Wen, in the Eastern District of Virginia, alleging that the

Company's acquisition of CMI and Jeld-Wen's subsequent price increases for its interior molded doors and door skins violated federal antitrust laws (the "Steves Litigation"). *Steves and Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va.) (ECF No. 1).

9.      On or around January 27, 2017, Jeld-Wen conducted an initial public offering of the Company's common stock (the "IPO").  Four months after the IPO, on or around May 24, 2017, Jeld Wen conducted a secondary public offering of the Company's common stock (the "First SPO").  Then, six months after the First SPO, on or around November 15, 2017, Jeld-Wen conducted another secondary public offering of the Company's common stock (the "Second SPO").

10.     Throughout the Class Period, Defendants engaged in a scheme to defraud and made materially false and misleading statements, as well as failed to disclose material adverse facts, regarding the Company's business, operations, growth prospects, and competitive positioning. Specifically, Defendants stated that Jeld-Wen products, including doors, compete against other manufacturers on price, and described the market in which the Company sells its doors as "highly competitive."  Defendants also attributed Jeld-Wen's strong margins and anticipated margin growth to legitimate business factors, such as "making strategic pricing decisions based on an analysis of customer and product level profitability" and increasing its emphasis on "pricing optimization."  These and similar statements made by Defendants during the Class Period were false and misleading because Defendants knew that Jeld-Wen was engaged in a price-fixing conspiracy with another door manufacturer to artificially increase or maintain prices of interior molded doors.  As a result of Defendants' misrepresentations, shares of Jeld-Wen's common stock traded at artificially inflated prices throughout the Class Period.

11.     On February 15, 2018, the Company announced that a jury returned a verdict

4

against Jeld-Wen in the Steves Litigation, finding that Jeld-Wen's conduct violated the U.S. antitrust laws. However, the true breadth of Jeld-Wen's misconduct and the financial impact it had on the Company's business continued to be concealed from investors. Moreover, Jeld-Wen continued to assure investors that it participated in a highly competitive market.

12.     On August 7, 2018, a veteran industry analyst at J.P. Morgan slashed his estimates for Jeld-Wen's earnings in 2018 and 2019 and lowered his price target for Jeld-Wen's stock, based, in part, on the "ongoing Steves and Sons litigation." In response to the J.P. Morgan report, Jeld-Wen's stock price declined by 10%, from $26.33 per share to $23.71 per share, on high trading volume.

13.     On October 5, 2018, the Judge presiding over the Steves Litigation ruled that Jeld-Wen would be required to divest the door skin facility the Company had obtained in connection with its acquisition of CMI. This disclosure, which spurred several analyst downgrades, caused the price of Jeld-Wen shares to decline by nearly 5%.

14.     Then, on October 15, 2018, after the market closed, Jeld-Wen announced that the Company expected its third quarter 2018 financial results to include a $76.5 million charge related to the ongoing Steves Litigation. The Company also announced the resignation of its CFO, Brooks Mallard. In response to these disclosures, Jeld-Wen's stock price declined from $21.31 per share to $17.28 per share, on high trading volume, a decline of 19%.

## JURISDICTION AND VENUE

15.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

5

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Jeld-Wen transacts business in Virginia, including in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.  In addition, related actions filed against Jeld-Wen are currently pending in this District.  *See Steves and Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va.); *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-00718-JAG (E.D. Va.); *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, No. 3:18-cv-00850-JAG (E.D. Va.).

## PARTIES

### A.     Plaintiff

17.     Plaintiff Cambridge Retirement System is a contributory retirement system for active and retired employees of the City of Cambridge, Massachusetts, the Cambridge Housing Authority, the Cambridge Public Health Commission, and the Cambridge Redevelopment Authority.  As of September 30, 2019, Plaintiff manages approximately $1.3 billion in assets on behalf of approximately six thousand participants.  As indicated on the certification submitted herewith, Cambridge purchased Jeld-Wen common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.     Defendants

18.     Defendant Jeld-Wen is incorporated in Delaware and maintains its corporate headquarters at 2645 Silver Crescent Drive, Charlotte, North Carolina.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "JELD."  As of November 4, 2019, Jeld-Wen had over 100 million shares of common stock outstanding, owned

by hundreds or thousands of investors.

19.     Defendant Mark A. Beck ("Beck") served as Jeld-Wen's President and Chief Executive Officer ("CEO") from November 2015 until February 27, 2018.  He also served as a member on the Company's Board of Directors from May 2016 until February 27, 2018.

20.     Defendant L. Brooks Mallard ("Mallard") served as Executive Vice President and Chief Financial Officer ("CFO") of Jeld-Wen from November 2014 until November 8, 2018.

21.     Defendant Gary S. Michel ("Michel") has served as Jeld-Wen's President and CEO, as well as a member of the Company's Board of Directors, since June 2018.

22.     Defendants Beck, Mallard, and Michel are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Jeld-Wen, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

23.     Defendant Onex Corporation is a Toronto, Canada-based investment manager and private equity firm.  Onex Corporation and its affiliated funds acquired a majority of Jeld-Wen's voting interests in 2011, and, as of September 24, 2016, Onex and its affiliated funds owned approximately 84% of Jeld-Wen's outstanding common stock on an as-converted basis.  As set

forth herein, Onex and its affiliated funds—including the following entities: Onex Partners Manager LP, Onex Partners III LP, Onex Partners III GP LP, Onex US Principals LP, Onex Partners III PV LP, Onex Partners III Select LP, Onex BP Co-Invest LP, Onex Advisor III LLC, Onex American Holdings II LLC, Onex BP Finance LP, and ONCAP—(collectively, "Onex") had the power to control, and did control Jeld-Wen, throughout the Class Period.

## **BACKGROUND**

24.     Jeld-Wen is one of the largest door and window manufacturers in the world. Among the Company's "highest volume products" are interior molded doors, which are produced by joining two door skins between a wood frame filled with a hollow or solid core.

25.     Jeld-Wen and its primary competitor, Masonite, are the two largest interior molded door manufacturers in the United States.  In October 2012, Jeld-Wen acquired another manufacturer of interior molded doors and door skins, CMI.  After the acquisition, Jeld-Wen and Masonite became the only two manufacturers of door skins in the United States and controlled 85% of the market for interior molded doors.

26.     Prior to the acquisition of CMI, Jeld-Wen had aggressively competed with Masonite for the sale of door skins to other interior molded door manufacturers.  In late 2012, however, following the Company's acquisition of CMI, Jeld-Wen and Masonite began imposing uniform price increases on interior molded doors.  Then, in early 2014, Jeld-Wen implemented a new pricing strategy that emphasized "pricing optimization" to increase product profitability on a per unit basis, replacing its old strategy to grow volume and increase market share that had "often led to competing on price."

27.     In June 2014, Masonite mysteriously halted sales of door skins to other door manufacturers, making Jeld-Wen the sole supplier of door skins to the interior molded door market.  Around the same time, Jeld-Wen began hiking the price of door skins it sold to

independent door manufacturers with which the Company had long-term supply agreements.  In June 2016, in response to Jeld-Wen's price increases, one of those door manufacturers sued Jeld-Wen, alleging that the Company's acquisition of CMI and Jeld-Wen's subsequent price hikes for its interior molded doors and door skins violated federal antitrust laws.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

28.     The Class Period begins on January 26, 2017, when the SEC declared Jeld-Wen's registration statement for the IPO effective (the "IPO Registration Statement").  On or around January 27, 2017, Jeld-Wen conducted an IPO pursuant to the IPO Registration Statement.  On January 30, 2017, Jeld-Wen filed a prospectus for the IPO with the SEC on Form 424B4 (the "IPO Prospectus"), which incorporated and formed part of the IPO Registration Statement (collectively, the "IPO Offering Materials").

29.     The IPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading. Specifically, in the IPO Offering Materials the Company represented that Jeld-Wen "operate[s] in a highly competitive business environment" and Jeld-Wen described Masonite as among its "major competitors" for the Company's North American interior doors business.  The IPO Offering Materials further stated that "[w]hile we operate in a competitive market, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins."

30.     The IPO Offering Materials also represented that in early 2014, the Company changed its pricing strategy by "making strategic pricing decisions based on analysis of customer and product level profitability" and "increasing our emphasis on pricing optimization" and "[a]s a result, our operations during 2014 and 2015 benefitted from improved pricing, particularly in North America."  Furthermore, the Company stated that "[g]oing forward, if the housing market

9

continues to grow and economic factors remain positive, we believe that we will continue to benefit from a positive pricing environment."

31.     In the IPO Offering Materials, the Company also touted its "continued pricing optimization" as a strategic initiative to "deliver profitable organic revenue growth," stating that Jeld-Wen "will continue to employ a strategic approach to pricing our products."  The IPO Offering Materials also stated that "[w]e are in the early stages of implementing our strategic initiatives" and "[o]ur initial actions in North America have already helped us to realize higher profit margins over the last two years" and "[w]e believe that our focus on operational excellence will result in the continued expansion of our profit margins and free cash flow as we systematically transform our business."

32.     On February 22, 2017, Jeld-Wen issued a press release announcing its financial results for the fourth quarter and full year 2016.  In the press release, which was also filed with the SEC on Form 8-K, Defendant Beck is quoted as saying that "[o]ur annual outlook predicts continued margin expansion in 2017 by executing on the initiatives of our operating model, focusing on achieving savings through operational excellence programs and driving profitable revenue growth."

33.     In a presentation filed as an exhibit to the Company's 8-K, Jeld-Wen emphasized a "Balanced Approach to Margin Expansion," highlighting several drivers for revenue growth and margin expansion.  Among those drivers, the Company listed "Profitable Organic Growth" from, among other things, "Strategic pricing."

34.     That same day, Jeld-Wen held an earnings call to discuss the Company's 2016 fourth quarter and full year financial results.  During the call, Defendant Beck emphasized the factors that "drive our long-term target adjusted EBITDA margin of 15% or more."  In describing

those factors, Defendant Beck stated that "[w]e expect to see profitable revenue growth" from "pricing," among other things.  Defendant Beck also stated that "[w]e've made significant progress improving our operations and profitability, including more than 600 basis points of margin expansion since 2013" and "[w]e believe there is a long runway ahead for further improvements."

35.     On May 9, 2017, Jeld-Wen held its first quarter 2017 earnings call.  During the call, in response to an analyst's question about pricing, Defendant Beck stated that "if you go back for the last couple of years, we were doing larger than market price increases as we were playing catch up and trying to reset pricing where we thought they should be."

36.     On or around May 24, 2017, Jeld-Wen conducted the First SPO pursuant to a registration statement (the "First SPO Registration Statement").  On May 26, 2017, Jeld-Wen filed a prospectus for the First SPO with the SEC on Form 424B4 (the "First SPO Prospectus"), which incorporated and formed part of the First SPO Registration Statement (collectively, the "First SPO Offering Materials").

37.     The First SPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading.  Specifically, in the First SPO Offering Materials the Company emphasized three levers to grow earnings, including "initiatives to drive profitable organic sales growth" which included "pricing optimization," among other things.  The Company represented that "[t]hese actions have begun to lead to significant improvements in our profitability over the last three years, which we expect will continue."  Moreover, the First SPO Offering Materials stated that "[w]e are focused on profitable growth and will continue to employ a strategic approach to pricing our products" and "[o]ver the past three years we have realized meaningful pricing gains by increasing our focus on customer- and product-level profitability in order to improve the profitability of

11

certain underperforming lines of business."  In addition, in the First SPO Offering Materials the Company represented that Jeld-Wen "operate[s] in a highly competitive business environment" and described Masonite as among its "major competitors" for the Company's North American interior doors business.  The First SPO Offering Materials further stated that "[w]hile we operate in a competitive market, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins."

38.     On August 8, 2017, Jeld-Wen held its second quarter 2017 earnings call.  During the call, in response to an analyst's question about pricing gains, Defendant Mallard stated that "when we look at our entire manufacturing network and the demand that's coming in, we look at all the levers and we figure out which one we think is going to pull the most profitability for us. And so I would say we'd probably been pulling more on the price lever in the first half of the year, as opposed to the volume lever . . . and then that's resulted in nice margin accretion."

39.     On November 7, 2017, Jeld-Wen held its third quarter 2017 earnings call.  During the call, Defendant Beck stated that the Company was "well positioned to continue delivering operational and financial improvement in 2017 and beyond" and that "[f]rom a margin improvement standpoint, we continue to expect EBITDA margin improvement in the range of 100 to 150 basis points."  During the call, Defendant Mallard stated that "[w]e've been very focused on margin repair, very focused on driving gross margins through pricing and through operational improvements."

40.     The statements set forth above in ¶¶ 29-39 were materially false and misleading because Defendants misrepresented and failed to disclose the following adverse facts about the Company's business, operations, growth prospects, and competitive positioning, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants: (1) falsely

represented that the Company's products, including doors, competed against other manufacturers on price; (2) falsely described the market in which the Company sells its doors as "highly competitive"; (3) falsely attributed Jeld-Wen's strong margins and anticipated margin growth to changes they had made in the Company's business operations and strategies; and (4) concealed the Company's anticompetitive conduct.  Because of the foregoing, Defendants' statements about the Company's business, operations and prospects lacked a reasonable basis.

41.     On or around November 15, 2017, Jeld-Wen conducted the Second SPO pursuant to a registration statement (the "Second SPO Registration Statement").  On November 17, 2017, Jeld-Wen filed a prospectus for the Second SPO with the SEC on Form 424B4 (the "Second SPO Prospectus"), which incorporated and formed part of the Second SPO Registration Statement (collectively, the "Second SPO Offering Materials").

42.     The Second SPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading.  Specifically, in the Second SPO Offering Materials the Company emphasized three levers to grow earnings, including "initiatives to drive profitable organic sales growth" which included "pricing optimization," among other things.  The Company represented that "[t]hese actions have begun to lead to significant improvements in our profitability over the last three years, which we expect will continue."  Moreover, the Second SPO Offering Materials stated that "[w]e are focused on profitable growth and will continue to employ a strategic approach to pricing our products" and "[o]ver the past three years we have realized meaningful pricing gains by increasing our focus on customer- and product-level profitability in order to improve the profitability of certain underperforming lines of business."  In addition, in the Second SPO Offering Materials the Company represented that Jeld-Wen "operate[s] in a highly competitive business environment"

and Jeld-Wen described Masonite as among its "major competitors" for the Company's North American interior door business. The Second SPO Offering Materials further stated that "[w]hile we operate in a competitive market, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins."

43. On February 15, 2018, the Company issued a press release announcing that a jury in the Steves Litigation had returned a verdict that was unfavorable to Jeld-Wen. The jury awarded Steves approximately $58 million in past damages (including overcharges) and lost profits, which was trebled to total approximately $174 million. However, Defendants continued to conceal the true extent of their anticompetitive misconduct and the financial impact it had on the Company's business, assuring investors that Jeld-Wen participated in a highly competitive market.

44. On March 6, 2018, Jeld-Wen filed its annual report with the SEC on Form 10-K for the fourth quarter and full year 2017. The Company's 10-K represented that Jeld-Wen "operate[s] in a highly competitive business environment" and Jeld-Wen described Masonite as among its "major competitors" for the Company's North American interior door business. The 10-K stated further that "while we operate in competitive markets, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins." In addition, the 10-K stated that the Company "will continue to employ a strategic approach to pricing our products."

45. The statements set forth above in ¶¶ 42-44 were materially false and misleading because Defendants misrepresented and failed to disclose the following adverse facts about the Company's business, operations, growth prospects, and competitive positioning, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and misleading statements and/or failed to disclose that: (1) they were engaged in anticompetitive conduct through a price-fixing conspiracy with another door manufacturer to artificially increase

or maintain prices of interior molded doors; and (2) as a result of the foregoing, Defendants' statements about the Company's business, operations and prospects lacked a reasonable basis.

46.     On August 7, 2018, a veteran industry analyst at J.P. Morgan slashed his estimates for Jeld-Wen's earnings in 2018 and 2019 and lowered his December 2018 price target for Jeld-Wen's stock, based, in part, on the "ongoing Steves and Sons litigation."  In response to the analysis in the J.P. Morgan report, Jeld-Wen's stock price declined by 10%, from $26.33 per share to $23.71 per share, on high trading volume.

47.     On October 5, 2018, the Judge presiding over the Steves Litigation ruled that as part of the resolution of that case, Jeld-Wen would be required to divest the Towanda, Pennsylvania door skin facility the Company had obtained as part of its acquisition of CMI.  This disclosure caused several securities analysts to downgrade Jeld-Wen stock over the ensuing trading days, with analysts at Baird noting that the divestiture is "among the worst case scenarios." Analysts at RBC Capital Markets commented that up to 33% of Jeld-Wen's global door skin manufacturing capacity would be lost by the divestiture of the Towada plant.  These disclosures caused Jeld-Wen's stock price to fall from $24.09 on October 5, 2018 to $22.91 on October 9, 2018, a decline of nearly 5%.

48.     Then, on October 15, 2018, after the market closed, Jeld-Wen announced that the Company expected its third quarter 2018 financial results to include a $76.5 million charge related to the ongoing Steves Litigation, and reflected the judgment anticipated to be entered against Jeld-Wen, as recent rulings in the case "now provided sufficient detail for the company to estimate future liabilities if the appeal process is unsuccessful."  The Company also announced the sudden resignation of its CFO, Defendant Mallard.  In response to these disclosures, Jeld-Wen's stock price declined from $21.31 per share to $17.28 per share, or 19%, on high trading volume.

49.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## LOSS CAUSATION

50.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Jeld-Wen's common stock and operated as a fraud or deceit on the Class (as defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Jeld-Wen's stock fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their purchases of Jeld-Wen's stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of Jeld-Wen during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Jeld-Wen and their families and affiliates.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of November 4, 2019, Jeld-Wen had over 100 million shares of common stock outstanding, owned by hundreds or thousands of investors.

53.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which

predominate over questions which may affect individual Class members include:

      (a)     Whether Defendants violated the Exchange Act;

      (b)     Whether Defendants omitted and/or misrepresented material facts;

      (c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      (d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

      (e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

      (f)     Whether Defendants' conduct impacted the price of Jeld-Wen's common stock;

      (g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

      (h)     The extent of damage sustained by Class members and the appropriate measure of damages.

54.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

55.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

57.     Jeld-Wen's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

58.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Jeld-Wen who knew that the statement was false.   None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

59.     At all relevant times, the market for Jeld-Wen common stock was an efficient market for the following reasons, among others:

(a)     Jeld-Wen common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Jeld-Wen filed periodic public reports with the SEC and the NYSE;

(c)     Jeld-Wen regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

18

(d)     Jeld-Wen was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

60.     As a result of the foregoing, the market for Jeld-Wen common stock promptly digested current information regarding Jeld-Wen from all publicly available sources and reflected such information in the price of Jeld-Wen common stock.   Under these circumstances, all purchasers of Jeld-Wen common stock during the Class Period suffered similar injury through their purchase of Jeld-Wen common stock at artificially inflated prices and the presumption of reliance applies.

61.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Jeld-Wen's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Jeld-Wen's interior molded doors business, as alleged above, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Jeld-Wen common stock at artificially inflated prices.

64.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Jeld-Wen common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

66.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Jeld-Wen's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

the market, they paid artificially inflated prices for Jeld-Wen's common stock.  Plaintiff and the

Class would not have purchased the Company's common stock at the prices they paid, or at all,

had they been aware that the market prices for Jeld-Wen's common stock had been artificially

inflated by Defendants' fraudulent course of conduct.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases of the

Company's common stock during the Class Period.

70.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act

and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants and Onex

71.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth

above as if fully set forth herein.

72.     The Individual Defendants acted as controlling persons of Jeld-Wen within the

meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions,

participation in and/or awareness of the Company's operations, direct involvement in the day-to-

day operations of the Company, and/or intimate knowledge of the Company's actual performance,

and their power to control public statements about Jeld-Wen, the Individual Defendants had the

power and ability to control the actions of Jeld-Wen and its employees.  By reason of such conduct,

the Individual Defendants are liable under Section 20(a) of the Exchange Act.

73.     Onex acted as a controlling person of Jeld-Wen within the meaning of Section 20(a)

of the Exchange Act.  By reason of its voting power, ownership, rights as against Jeld-Wen, and/or

specific acts, Onex had the power to control Jeld-Wen's operations and its decision-making

processes.  By reason of such control, Onex is liable under Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

74.     WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## **JURY DEMAND**

75.     Plaintiff demands a trial by jury.

DATED: February 19, 2020                      Respectfully submitted,

/s/ Susan R. Podolsky
Susan R. Podolsky (Va. Bar No. 27891)

**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandra, VA 22314
Tel:     (571) 366-1702
Fax:     (703) 647-6009
spodolsky@podolskylaw.com

*Liaison Counsel for Plaintiff*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Avi Josefson, *pro hac vice* forthcoming
Michael D. Blatchley, *pro hac vice* forthcoming

1251 Avenue of the Americas
New York, NY 10020
Tel:      (212) 554-1400
Fax:      (212) 554-1444
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiff*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Ellen K. Philbin, on behalf of Cambridge Retirement System ("Cambridge"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Cambridge. I have reviewed the complaint and authorize its filing.

2. Cambridge did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Cambridge is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Cambridge's transactions in the JELD-WEN Holding Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Cambridge has served as a representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *In re Willis Towers Watson plc Proxy Litigation*, No. 17-cv-1338 (E.D. Va.)
   *In re EQT Corporation Securities Litigation*, No. 19-cv-0754 (W.D. Pa.)

6. Cambridge has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *Cambridge Retirement System v. Mednax, Inc.*, No. 18-cv-61572 (S.D. Fla.)

7. Cambridge is currently serving as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *Wagner v. Spectrum Brands Legacy, Inc.*, No. 19-cv-00178 (W.D. Wis.)

8.  Cambridge will not accept any payment for serving as a representative party on behalf of the Class beyond Cambridge's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14 day of February, 2020.

Ellen K. Philbin
Executive Director
*Cambridge Retirement System*

**Cambridge Retirement System**
**Transactions in JELD-WEN Holding, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/31/2017 | 900 | 32.8755 |
| Purchase | 9/15/2017 | 1,100 | 32.5800 |
| Purchase | 11/20/2017 | 500 | 38.4307 |
| Purchase | 6/22/2018 | 500 | 28.6804 |
| Sale | 2/23/2018 | (380) | 33.8300 |
| Sale | 6/7/2018 | (400) | 29.4600 |