**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-112-JAG<br><br>Judge John A. Gibney, Jr.<br><br>CLASS ACTION<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     NATURE OF THE ACTION ..................................................................................2

      A.     Beginning in 2012, Jeld-Wen Has Been Engaging in
           Anticompetitive Conduct ...............................................................................2

      B.     Defendants Consistently Misled Investors, Telling Them That the
           Company's Success Was Due to Legitimate and Lawful Specific
           Pricing Strategies .........................................................................................5

      C.     Facts About Jeld-Wen Began to Come to Light When the Court in
           the Steves & Sons Litigation Issued Findings Implicating Jeld-Wen
           in Anticompetitive Conduct and Deemed Divesture of the
           Towanda Plant Among Appropriate Possible Remedies .........................7

      D.     Additional Facts About Jeld-Wen's Anticompetitive Conduct
           Came Fully to Light When the Company Acknowledged a Likely
           $76.5 Million Judgment in the Steves & Sons Litigation .........................8

II.    JURISDICTION AND VENUE ............................................................................8

III.   PARTIES ...............................................................................................................9

      A.     Lead Plaintiffs ...............................................................................................9

      B.     Defendants ...................................................................................................10

           1.     Corporate Defendant ......................................................................10

           2.     Individual Defendants .....................................................................10

      C.     Onex Defendants .........................................................................................12

      D.     Relevant Third Parties ................................................................................13

IV.    SUBSTANTIVE ALLEGATIONS OF FRAUD ...............................................15

      A.     Production of Interior Molded Doors ........................................................15

      B.     Industry Consolidation in the Doorskins and Interior Molded
           Doors Market ...............................................................................................16

      C.     Premdor Attempts to Acquire Masonite and the Department of
           Justice Intervenes .......................................................................................17

D.      Jeld-Wen Enters Into Long-Term Doorskin Supply Agreements With Independent Door Manufacturers ................................................................19

E.      Jeld-Wen Announces Its Intention to Purchase CMI, Including the Towanda Doorskins Manufacturing Facility ...........................................................21

F.      As a Result of the Substantially Lessened Competition, Jeld-Wen Begins to Engage in Anticompetitive Conduct.......................................................23

      1.      Jeld-Wen Increases Doorskin Prices for Independent Door Manufacturers, Breaching the Long-Term Supply Agreements ....................................................................................24

      2.      Jeld-Wen and Masonite Begin Imposing Uniform Price Increases on Interior Molded Doors .........................................26

G.      Defendants' Incomplete Disclosures Attributed Jeld-Wen's Success to Only Lawful and Legitimate Business and Pricing Strategies............................................................................................................29

H.      Defendants Maintained That They Operated in a Competitive Environment and Doubled Down on the Source of Jeld-Wen's Financial Success Despite a Negative Jury Verdict.................................................32

I.      Additional Facts About Jeld-Wen's Anticompetitive Conduct Begin to Emerge When Judge Payne Enters An Order Detailing Jeld-Wen's Specific Anticompetitive Conduct.......................................................36

J.      Even More Facts Are Revealed Regarding Jeld-Wen's Anticompetitive Conduct When the Company Finally Admits That it Will Face a $76.5 Million Liability in the Steves & Sons Litigation........................................................................................................38

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................................39

January 26, 2017 – IPO Offering Materials.......................................................................40

February 22, 2017 – 4Q 2016 Earnings Call and Investor Presentation...........................42

March 3, 2017 – 2016 Form 10-K .....................................................................................44

May 9, 2017 – Press Release, 1Q 2017 Earnings Call and Investor Presentation............45

May 12, 2017 – 1Q 2017 Form 10-Q ................................................................................47

May 24, 2017 – First SPO Offering Materials..................................................................47

August 8, 2017 – 2Q 2017 Form 10-Q ..............................................................................49

August 8, 2017 – 2Q Earnings Call and Investor Presentation...........................................49

September 14, 2017 – RBC Capital Markets Global Industrials Conference...................50

November 7, 2017 – Press Release, 3Q 2017 Earnings Call and Investor Presentation..........................................................................................................51

November 8, 2017 – 3Q 2017 Form 10-Q.......................................................................52

November 8, 2017 – Robert W. Baird Conference...........................................................52

November 15, 2017 – Second SPO Offering Materials....................................................53

February 15, 2018 – Press Release .................................................................................54

February 21, 2018 – 4Q 2017 Earnings Call ..................................................................56

March 6, 2018 – 2017 Form 10-K...................................................................................56

May 8, 2018 – 1Q 2018 Earnings Call ...........................................................................58

May 9, 2018 – 1Q 2018 Form 10-Q ...............................................................................58

August 7, 2018 – 2Q 2018 Form 10-Q ...........................................................................58

August 7, 2018 – 2Q Earnings Call ................................................................................59

October 6, 2018 – Press Release......................................................................................59

VI.    FACTS ABOUT THE FULL IMPACT OF DEFENDANTS'
       ANTICOMPETITIVE CONDUCT ARE GRADUALLY REVEALED ........................61

VII.   LOSS CAUSATION.............................................................................................63

       A.    October 5, 2018 – First Partial Disclosure.............................................64

       B.    October 15, 2018 – Final Partial Disclosure..........................................67

VIII.  ADDITIONAL INDICIA OF SCIENTER .........................................................70

       A.    Defendants Were Aware of Antitrust Problems With the CMI
             Acquisition and Knew That the DOJ Would Object Absent the
             Long-Term Supply Agreements ...............................................................70

       B.    Jeld-Wen's Sales Practices Were Critical to Its Core Operations .........72

       C.    Defendants' Statements Support a Strong Inference of Scienter............73

     D.     The Individual Defendants Were Directly in Charge of Setting
Price Increases ........................................................................................75

     E.     The Timing and Circumstances of Defendant Mallard's Departure
Support a Strong Inference of Scienter ...................................................76

IX.     CONTROL PERSON ALLEGATIONS...........................................................76

X.     CLASS ACTION ALLEGATIONS .................................................................78

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-
THE-MARKET DOCTRINE ...........................................................................80

XII.     NO SAFE HARBOR .......................................................................................82

XIII.     CAUSES OF ACTION .....................................................................................83

     COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against Jeld-Wen and the Individual Defendants ............................................83

     COUNT II Violation of Section 20(a) of the Exchange Act Against All
Individual Defendants and Onex Defendants ..................................................85

PRAYER FOR RELIEF ...........................................................................................87

JURY DEMAND .....................................................................................................87

Court-appointed Lead Plaintiffs Public Employees' Retirement System of Mississippi ("Mississippi PERS") and the Plumbers and Pipefitters National Pension Fund ("P&P Pension Fund") (collectively, "Lead Plaintiffs") and additional Plaintiff Wisconsin Laborers' Pension Fund, individually and on behalf of all persons and entities who or which, during the period from January 26, 2017 through October 15, 2018, inclusive (the "Class Period"), purchased the publicly traded common stock of Jeld-Wen Holding, Inc. ("Jeld-Wen" or the "Company") and were damaged thereby (the "Class"), bring this Consolidated Class Action Complaint against Defendants Jeld-Wen, several of Jeld-Wen's senior executives—former President and Chief Executive Officer ("CEO") Mark A. Beck, former Executive Vice President and Chief Financial Officer ("CFO") L. Brooks Mallard, former Interim CEO Kirk S. Hachigian, current President and CEO Gary S. Michel (the "Individual Defendants"), and controlling shareholder Onex, as defined herein (together with its affiliated funds, the "Onex Defendants" and, together with Jeld-Wen and the Individual Defendants, "Defendants").[1]

Lead Plaintiffs' claims are brought upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Jeld-Wen with the Securities and Exchange Commission; (2) reports issued by analysts covering or concerning Jeld-Wen and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Jeld-Wen, its business, and the Individual and Onex Defendants; (4) court documents filed in antitrust litigations pending in the United States District Court for the Eastern District of

---

[1] The following are excluded from the Class: (1) Defendants; (2) members of the immediate family of any Defendant who is an individual; (3) any person who was an officer or director of Jeld-Wen during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) Jeld-Wen's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

Virginia, including *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va.) ("Steves & Sons Litigation"); (5) an investigation conducted by Mississippi PERS', P&P Pension Fund's, and Wisconsin Laborers' Pension Fund's attorneys, including interviews with former Jeld-Wen employees; and (6) other publicly available information concerning Jeld-Wen, its business, and the allegations contained herein.  Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiffs have a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

### A.      Beginning in 2012, Jeld-Wen Has Been Engaging in Anticompetitive Conduct

1.      This is a securities fraud class action arising out of Defendants' consistent misrepresentations and omissions intended to mislead the investing public by falsely attributing the source of the Company's financial success to legitimate and lawful pricing strategies.  In reality, however, Defendants were engaged in anticompetitive conduct in violation of federal antitrust laws which was artificially propping up the Company's sales and was actually the true cause of Jeld-Wen's success.

2.      Jeld-Wen is one of the world's largest door and window manufacturers. Headquartered in Charlotte, North Carolina, the Company designs, produces, and distributes a range of doors, windows, and related products.

3.      The interior molded door is the most popular type of interior door in North America.  Manufacturers produce interior molded doors by joining two doorskins between a wood frame filled with a hollow or solid core.  Doorskins are the principal component of interior molded doors, accounting for up to 70% of the cost to manufacture a molded door.

4.      Jeld-Wen and its primary competitor, Masonite Corporation ("Masonite"), are currently and have in the recent past been the two largest manufacturers of interior molded doors

and doorskins in the United States.  As of 2012, there was only one other competitor in the doorskin market – Craftmaster Manufacturing, Inc. ("CMI").

5.      In October 2012, Jeld-Wen sought to acquire CMI.  Through that acquisition (the "CMI Acquisition" or the "Acquisition"), Jeld-Wen was poised to gain ownership of CMI's flagship doorskin manufacturing plant in Towanda, Pennsylvania, thereby removing CMI as the third source of doorskin supply in the interior molded door market and removing CMI as a competitor in the market for sale of interior molded doors.

6.      Prior to Jeld-Wen's attempt to acquire CMI, the Department of Justice ("DOJ") had recently objected to another company's attempt similarly to acquire ***the exact same Towanda manufacturing plant***, noting that the proposed acquisition would "***tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers***."  As a result, the DOJ permitted that earlier acquisition to go forward only after the Towanda doorskin plant was completely divested and spun off to create CMI as a third stand-alone competitive force in the interior molded doors and doorskins market.

7.      Armed with the knowledge that the DOJ would likely assert a similar objection to the CMI Acquisition because it would create the same anticompetitive concerns, Jeld-Wen developed a plan to enter into ostensibly competitive long-term supply agreements with independent door manufacturers (the "Independent Door Manufacturers") for the supply of doorskins.

8.      Jeld-Wen did so precisely to eliminate its doorskin customers' potential objections to the Acquisition and thereby alleviate the DOJ's concerns about the Acquisition's possible anticompetitive effect.  Indeed, by entering into these long-term supply agreements

*many months before intentionally approaching the DOJ to seek approval of the Acquisition,* Jeld-Wen squashed potential objections by Independent Door Manufacturers, including Steves & Sons, by intending for them to believe that it would not use its increased market power to diminish the quality of doorskins or raise prices, except pursuant to contractually agreed upon terms.

9.     As expected, receiving no objections from Jeld Wen's customers, the DOJ did not object to the Acquisition, which closed on October 24, 2012 and left only two dominant door manufacturers with the ability to exploit their dominant market power—the precise situation of which the DOJ had previously been concerned.

10.    And that is exactly what Jeld-Wen did.  After the Acquisition, Masonite abruptly exited the doorskins market in June 2014.  This left Jeld-Wen as the market's sole supplier of doorskins to Independent Door Manufacturers and gave Jeld-Wen the sole power to set the price of those doorskins.

11.    Exploiting the Company's enhanced market power following the CMI Acquisition and Masonite's exit from the doorskins market, Jeld-Wen and then CEO, Defendant Hachigian began to engage in anticompetitive conduct against the Independent Door Manufacturers with which it had long-term agreements to supply doorskins.   All of the Independent Door Manufacturers were direct competitors of Jeld-Wen in the market for interior molded doors, including Jeld-Wen's largest doorskins customer and second largest doors competitor (after Masonite), Steves & Sons.

12.    Jeld-Wen developed a plan to "kill-off" that competition.  Specifically, despite Defendants' knowledge and intention that the supply agreements had persuaded the DOJ to approve the CMI Acquisition, in 2014, Defendant Hachigian directed the Company to breach

4

those supply agreements by, among other things, raising prices and, in turn, substantially lessening competition in the market for sale of interior molded doors.  Thus, by raising the price of doorskins, Jeld-Wen was able to both increase its revenues for sale of those doorskins and lessen competition in the market for sale of interior molded doors by limiting its competitors' ability to manufacture those doors.

13.    In conjunction with Jeld-Wen's breach of the supply agreements, Jeld-Wen and Masonite—now the two dominant manufacturers of interior molded doors facing significantly less competition as a result of Jeld-Wen's actions—began imposing uniform price increases on interior molded doors.  At least nine different times between 2012 and 2018, Jeld-Wen and Masonite increased the prices of their interior molded doors in the same or similar percentage increments, either simultaneously or in brief succession of each other.  As confirmed by numerous former employees, these price increases came directly from the CEO and CFO, specifically, Defendants Hachigian, Beck, Michel, and Mallard.

14.    As a result of Jeld-Wen's anticompetitive conduct, in June 2016, Steves & Sons filed suit in federal court in the Eastern District of Virginia against Jeld-Wen, Inc., a wholly owned subsidiary of Jeld-Wen, alleging that the Company's acquisition of CMI and subsequent conduct in breaching the supply agreements violated federal antitrust laws.

**B.      Defendants Consistently Misled Investors, Telling Them That the Company's Success Was Due to Legitimate and Lawful Specific Pricing Strategies**

15.    Notwithstanding Defendants' extensive and undisclosed anticompetitive conduct, Defendants represented to investors that the Company operated in a "***highly competitive business environment***," and regularly touted the source of Jeld-Wen's financial success as the result of legitimate and lawful business and pricing strategies.

16.    Indeed, despite **knowing** all along that the true source of the Company's success was its anticompetitive conduct as described above, Defendants continually represented that its success was driven by legitimate and lawful strategies such as "**pricing optimization**," "**pricing discipline**," "**strategic pricing**," and "**favorable pricing**."  Defendants made similar statements about their financial success on at least twenty-one different occasions throughout the Class Period.  Of course, Defendants always failed to make any mention of the Company's extensive and significant anticompetitive conduct in connection with these statements.

17.    On February 15, 2018, the jury in the Steves & Sons Litigation returned a verdict against Jeld-Wen, finding that Jeld-Wen violated federal antitrust laws.  Yet, Defendants reassured the market, insisting that the verdict was "**erroneous**," and that "**the facts underlying th[e] dispute do not establish either a violation of the antitrust laws or a breach of contract**," further relying upon the DOJ's refusal to intervene in the Acquisition as evidence of Defendants' supposed good faith and lawful behavior.

18.    Notably, since the verdict form contained no specific findings of fact detailing Defendants' bad conduct, there was no public information available to contradict Defendants' story.  Therefore, the extent and context of their anticompetitive conduct, as well as that conduct's significance to Jeld-Wen's ostensible financial success, remained concealed from investors.

19.    Investors and analysts bought Defendants' story, believing that the DOJ's choice not to intervene in the Acquisition demonstrated Jeld-Wen's adherence to federal antitrust laws.  For instance, Bank of America noted that "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition prior to its consummation in 2012."  RBC Capital Markets echoed these

sentiments, stating that "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the CMI [A]cquisition twice.  JELD does not believe that a loss is probable or estimable."

20.     Having assuaged investor concerns, Defendants continued to falsely attribute Jeld-Wen's success to legitimate and lawful pricing strategies, reiterating to the market that the Company "***operate[s] in a highly competitive business environment***," and claiming that the Company was able to "achieve profitable growth" through legitimate and lawful strategies such as "***pricing discipline***," "***strategic pricing***," and "***pricing optimization***."

### C.     Facts About Jeld-Wen Began to Come to Light When the Court in the Steves & Sons Litigation Issued Findings Implicating Jeld-Wen in Anticompetitive Conduct and Deemed Divesture of the Towanda Plant Among Appropriate Possible Remedies

21.     On October 5, 2018, the judge presiding over the Steves & Sons Litigation— Judge Robert E. Payne—issued a Memorandum Opinion containing previously undisclosed facts about Jeld-Wen's anticompetitive conduct that surprised the market.  In particular, the court made factual findings that "the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin industry," ultimately "depriving the [Independent Door Manufacturers] of that key component of a reliable supply source."  Moreover, Judge Payne found that Jeld-Wen had "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers] knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

22.     Judge Payne further found that divestiture of the Towanda doorskins manufacturing plant would be an appropriate remedy for Jeld-Wen's antitrust violations.  In response to this decision, Jeld-Wen's stock dropped another $1.18 per share, or 5% of its value.

23.     While Defendants knew that the decision correctly portrayed their conduct, they continued to reassure investors that the verdict was "*incorrect*," with "*multiple flawed rulings during the trial process*."  Analysts again believed Defendants.  For example, Bank of America noted once again that "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

### D.     Additional Facts About Jeld-Wen's Anticompetitive Conduct Came Fully to Light When the Company Acknowledged a Likely $76.5 Million Judgment in the Steves & Sons Litigation

24.     However, just ten days later on October 15, 2018, Jeld-Wen stunned the market when it admitted that the Company would likely face a significant judgment from the Steves & Sons Litigation—*to the tune of $76.5 million*—for its anticompetitive conduct.  In addition, the Company announced that Defendant Mallard was unexpectedly resigning with little other explanation than to "pursue other career interests."  In response to these shocking revelations, on October 16, 2018, Jeld-Wen's stock plummeted another $4.03 per share, *or 19%*, on unusually high trading volume.

## II.     JURISDICTION AND VENUE

25.     These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Jeld-Wen transacts business in Virginia, including in this District.  In connection with the acts alleged in this Complaint, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.  In addition, other antitrust actions filed against Jeld-Wen are currently pending in this District.  *See Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va.); *In re Interior Molded Doors Antitrust Litig*., No. 3:18-cv-718 (E.D. Va.); *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, No. 3:18-cv-850 (E.D. Va.).

III.   **PARTIES**

   A.   **Lead Plaintiffs**

28.   Lead Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS") was established in 1952 and provides retirement and related benefits for Mississippi state and public education employees, officers of the Mississippi Highway Safety Patrol, and certain elected officials, among others.  As of June 30, 2019, Mississippi PERS oversaw approximately $28.7 billion on behalf of more than 335,914 of members and their beneficiaries. As set forth in the attached certification (Exhibit A), Mississippi PERS purchased Jeld-Wen securities at artificially inflated prices during the Class Period and was damaged upon revelation of the alleged corrective disclosures and/or materialization of the risks.

29.   Lead Plaintiff Plumbers and Pipefitters National Pension Fund ("P&P Pension Fund") manages the pension assets for P&P Pension Fund participants and their families.  P&P Pension Fund is one of the nation's largest Taft-Hartley funds established in 1968 with more than 148,000 participants and beneficiaries and assets of approximately $6 billion.  P&P Pension Fund is committed to protecting its participants from losses due to securities fraud.  As set forth in the attached certification (Exhibit B), P&P Pension Fund purchased Jeld-Wen securities at artificially inflated prices during the Class Period and was damaged upon revelation of the alleged corrective disclosures and/or materialization of the risks.

9

30.     Additional Plaintiff Wisconsin Laborers' Pension Fund is a multi-employer defined benefit plan with approximately $700 million in assets under management.  As set forth in the attached certification (Exhibit C), Wisconsin Laborers' Pension Fund purchased Jeld-Wen securities at artificially inflated prices during the Class Period and was damaged upon revelation of the alleged corrective disclosures and/or materialization of the risks.

### B.     Defendants

#### 1.     Corporate Defendant

31.     Jeld-Wen is a vertically-integrated global manufacturer and distributor of doors and windows that operates facilities in 20 countries.  Jeld-Wen is incorporated in Delaware and maintains its corporate headquarters at 2645 Silver Crescent Drive, Charlotte, North Carolina. The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "JELD."  Jeld-Wen filed periodic reports, including Forms 10-K and 10-Q, with the SEC pursuant to Exchange Act Section 13(a) and related rules thereunder.  As of May 4, 2020, Jeld-Wen had over 100 million shares of common stock outstanding, owned by hundreds or thousands of investors.

#### 2.     Individual Defendants

32.     Defendant Mark A. Beck ("Beck") was the former President and Chief Executive Officer ("CEO") of Jeld-Wen from November 2015 until February 27, 2018.  He also served as a member on the Company's Board of Directors from May 2016 until February 27, 2018.  In his role as President and CEO of Jeld-Wen, Defendant Beck participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the source of Jeld-Wen's financial success and Jeld-Wen's competitive positioning in the interior molded door and doorskins markets.  Defendant Beck also

signed Jeld-Wen's SEC Form 10-K for the year ended December 31, 2016, which contained materially false and misleading statements and omissions of material fact as detailed below.

33.     Defendant L. Brooks Mallard ("Mallard") was the former Executive Vice President and Chief Financial Officer ("CFO") of Jeld-Wen from November 2014 until November 8, 2018.  In his role as CFO, Defendant Mallard participated in earnings calls with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the source of Jeld-Wen's financial success.  Defendant Mallard also signed all of Jeld-Wen's SEC Form 10-Ks and 10-Qs during the Class Period, which contained materially false and misleading statements and omissions of material fact as detailed below. Simultaneous with Jeld-Wen's announcement that the Company would likely face a $76.5 million judgment in the Steves & Sons Litigation, Defendant Mallard abruptly "resigned," with no explanation other than to "pursue other career interests."

34.     Defendant Kirk S. Hachigian ("Hachigian") was the former Interim CEO of Jeld-Wen from February 27, 2018 until June of 2018.  He previously served as President and CEO of Jeld-Wen from March 2014 until November 2015.  Defendant Hachigian also served as Executive Chairman of Jeld-Wen's Board of Directors from November 2015 until December 2016 and as Chairman from December 2016 until May 2019.  In his role as Interim CEO of Jeld-Wen, Defendant Hachigian participated in earnings calls with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the source of Jeld-Wen's financial success.  Defendant Hachigian also signed Jeld-Wen's SEC Form 10-Ks for the years ended December 31, 2016 and December 31, 2017, which contained materially false and misleading statements and omissions of material fact as detailed below.

11

35.     Defendant Gary S. Michel ("Michel") is the current President and CEO of Jeld-Wen, as well as a member of Jeld-Wen's Board of Directors.  Defendant Michel assumed this position in June 2018.  In his role as President and CEO of Jeld-Wen, Defendant Michel participated in earnings calls with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the source of Jeld-Wen's financial success.

36.     Together, Defendants Beck, Mallard, Hachigian and Michel are referred to herein as the "Individual Defendants."  The Individual Defendants, by virtue of their high-level positions at Jeld-Wen, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition, as alleged herein.

### C.     Onex Defendants

37.     Defendant Onex Corporation is a Toronto, Canada-based investment manager and private equity firm.  Onex Corporation and its affiliated funds, including Defendants Onex Partners Manager LP, Onex Partners III LP, Onex Partners III GP LP, Onex US Principals LP, Onex Partners III PV LP, Onex Partners III Select LP, Onex BP Co-Invest LP, Onex Advisor Subco III LLC, Onex American Holdings II LLC, OAH Wind LLC, BP EI LLC, and BP EI II LLC (together, the "Onex Defendants") acquired a majority of Jeld-Wen's voting interests in October 2011, and, as of September 24, 2016, Onex and its affiliated funds owned approximately 84% of Jeld-Wen's outstanding common stock on an as-converted basis.  The Onex Defendants had the power to control, and did control, Jeld-Wen throughout the Class Period.

D.      **Relevant Third Parties**[2]

38.      **Confidential Witness ("CW") 1** worked at Jeld-Wen's Charlotte, North Carolina headquarters from April 2017 to June 2018 as a Senior Planner in the doors division.  As a Senior Planner, CW 1 worked on commodities forecasting and ordering raw materials used to construct Jeld-Wen doors.  He also communicated to Jeld-Wen factories on quantities to manufacture.  CW 1 reported to Business Process Managers Amber Brockmeyer and Raul Gutierrez, who reported to Chief Procurement Officer Mark Dixon.  CW 1 observed that price increases did not correspond with material cost increases and that Jeld-Wen employees were always aware of what Masonite was charging for its products.

39.      **CW 2** worked at Jeld-Wen from December 1993 until September 2018. Beginning in 1996, CW 2 worked in the sales division in the Southeastern United States.  From 2013 or 2014 until September 2018, CW 2 worked as the National Sales Manager – East for national accounts.  In that role, he worked to negotiate the sales contracts with national retailers. CW 2 reported to National Account Manager Scott Hiett, who reported to Senior Vice President of Sales John Tracy.  CW 2 observed that price increases were signed off on by the CEO.  He further explained that in 2014 it was Defendants Hachigian, as President and CEO, and Mallard, as CFO, who directed the Company to implement a price increase and break the long-term doorskin supply agreements.

40.      **CW 3** worked at Jeld-Wen from November 2003 until December 2016.  From November 2003 to March 2006, CW 3 worked as marketing manager in the Company's Klamath Falls, Oregon location.  From March 2006 until June 2008, he worked as a national sales manager.  Beginning June 2008, CW 3 worked as a general manager for Jeld-Wen's door

---

[2] All Confidential Witnesses are referred to with male pronouns, regardless of gender, to protect their identity.

replacement systems.  And from November 2013 until May 2015, he worked as the Strategic Sourcing Manager.  In May 2015, CW 3 was promoted to Product Line Manager, exterior doors, in which position he worked until he left the Company in December 2016.  In that role, he was in charge of profitability of the exterior door product lines.  CW 3 reported to Lennie Rhoades, Senior Vice President – Doors.  CW 3 explained that pricing decisions for all products, including interior doors, were made by a pricing group, of which he was a part, which included the CEO, the CFO—which was, during his tenure, Defendants Beck and Mallard—and Product Line Managers, among others.  CW 3 further observed that Steves & Sons had begun winning bigger contracts and buying up the market, which created the pressure to compete with them.

41.     **CW 4** worked at Jeld-Wen from 2013 until 2017 in Jeld-Wen's Pricing Department.  CW 4 observed that price increases were not tied to a rise in the cost of raw materials to manufacture doors, and noted that Defendants Hachigian and Beck were very hands-on with pricing.

42.     **CW 5** worked at Jeld-Wen from October 2011 until October 2017 as Vice President of Sales.  In that role, CW 5 worked to establish sales contracts of all products with customers in the Eastern United States, specifically focusing on customers who were distributors and dealers.  CW 5 recounted that prior to the CMI Acquisition, CMI had been a relatively big competitor of Jeld-Wen and that Jeld-Wen purchased CMI in order to gain its doorskin manufacturing plant.

43.     **CW 6** worked at Jeld-Wen from December 2011 until February 2017 as an executive assistant, first at the Company's Oregon location and later at the Company's Charlotte, North Carolina headquarters.  In that role, he prepared documents and managed the meetings and administrative work of his supervisors, including Vice President of Operations Bryan Settje,

14

CEO Philip Orsino, CEO Kirk Hachigian, Chief Operations Officer Mark Thurman, and Senior Vice President of Doors Lennie Rhoades.  CW 6 recounted how the Company had frequent interactions with Masonite, including at Company-sponsored meetings held at Jeld-Wen headquarters, and that Jeld-Wen often had access to Masonite price lists.  CW 6 further corroborated that the CEOs, including Defendants Beck and Hachigian, approved all price increases.

## IV.    SUBSTANTIVE ALLEGATIONS OF FRAUD

### A.    Production of Interior Molded Doors

44.     Jeld-Wen is one of the world's largest door and window manufacturers.  Headquartered in Charlotte, North Carolina, the Company designs, produces and distributes a range of doors, windows, and related products.

45.    The interior molded door is the most popular type of interior door in North America.  It simulates the aesthetics of solid wood doors but can be manufactured and sold at significantly lower prices.  Interior molded doors are made by sandwiching a wood frame and a hollow or solid core between two doorskins.

46.    Doorskins are formed from a fibrous material, such as wood chips or sawdust, which is softened in a digester, refined with wax and resin, and then formed into a mat.  The mat is cut into sheets and then loaded into a hot press.  After coming off the press, the resulting doorskins are sized, trimmed, primed or painted, packed and shipped to an interior molded door manufacturer.

47.    Doorskins are the principal component of interior molded doors, accounting for up to 70% of the cost to manufacture a molded door.

**B.      Industry Consolidation in the Doorskins and Interior Molded Doors Market**

48.      Jeld-Wen began manufacturing interior molded doorskins in the early 1970s. Since that time it has owned and operated nine doorskin manufacturing plants, six of which Jeld-Wen built.  Until the 1990s, Jeld-Wen supplied doorskins to domestic manufacturers of interior molded doors, but did not manufacture completed interior molded doors.

49.      In the 1990s, Jeld-Wen began to manufacture and sell interior molded doors as well as doorskins for those doors, making Jeld-Wen a "vertically-integrated" manufacturer. Shortly thereafter, Jeld-Wen began to buy up smaller manufacturers of interior molded doors, including Michigan Birch Door and its Doorcraft division, an interior molded door manufacturing plant from Young Door, and Morgan Door Co.

50.      At that time, the only other major manufacturer of doorskins was Masonite, which was wholly owned by International Paper.  Masonite was not yet vertically-integrated, meaning that it did not sell completed interior molded doors.  Instead, Masonite only manufactured doorskins to sell to independent, non-vertically integrated interior molded door manufacturers.

51.      As a result, Masonite and Jeld-Wen dominated the doorskins market in 2000.  A third entity, Fibramold, a Chilean joint venture, accounted for less than 10% of the doorskins used for the manufacture of interior molded doors in the United States.  These were the only three firms with significant sales of doorskins in the United States at that time, with a very small number of other manufacturers, which each sold less than one percent of the doorskins purchased in the United States.

52.      At that time, the largest manufacturer of interior molded doors was Premdor, Inc. ("Premdor"), which maintained more than 40% of the market.  Like Jeld-Wen, Premdor was also a vertically-integrated interior molded door manufacturer that, according to the DOJ, was a "small, but significant" competitor in the doorskins market.

16

C.      **Premdor Attempts to Acquire Masonite and the Department of Justice Intervenes**

53.     On September 30, 2000, International Paper announced its intention to sell Masonite to Premdor.  At the time, Masonite owned two doorskins plants in the United States – one in Towanda, Pennsylvania and another in Laurel, Mississippi.

54.     On August 3, 2001, the DOJ filed a civil antitrust action seeking to block the merger, alleging that Premdor's acquisition of Masonite and its related assets would violate Section 7 of the Clayton Act.  *United States v. Premdor, et al.*, No. 1:01-CV-01696 (D.D.C.).

55.     As the DOJ explained, allowing Premdor to acquire Masonite's doorskins business would remove the third supplier of doorskins and leave only two vertically-integrated door manufacturers, thereby harming competition in the market for interior molded doors by creating incentives to limit the supply of doorskins.  According to the DOJ, the proposed merger would "tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers."

56.     In particular, the DOJ stated:

Masonite acts as a significant competitive constraint in the interior molded door market.  Premdor and the non-party firm [Jeld-Wen] have an incentive to attempt to coordinate pricing by reducing output.  Coordination would reduce the output of interior molded doors, and lead to higher door prices.  However, such an output reduction would also reduce the output of interior molded doorskins sold in the United States, harming Masonite.  Thus, Masonite would have an incentive to disrupt such coordination through increased sales to the other non-vertically integrated door manufacturers.  After the proposed transaction, a vertically integrated Premdor/Masonite combination will not have the same incentive to defeat coordination in the interior molded door market by increasing sales to the non-integrated door manufacturers since the combined company would be competing against those door manufacturers, and would benefit from an increase in the price of interior molded doors.

57.     The DOJ further clarified that a vertically-integrated Masonite/Premdor would have an incentive to coordinate with the already vertically-integrated Jeld-Wen:

Documentary evidence obtained from the defendants suggests that the non-party firm [Jeld-Wen], as a fully vertically integrated manufacturer, has certain cost advantages over Masonite and Premdor that it has used to lower prices to build market share. This differing cost structure among the dominant firms is an impediment to coordination. The evidence from the defendants suggests that post-acquisition, the cost structures of the two vertically integrated firms would be more closely aligned, decreasing the opportunity for the non-party firm [Jeld-Wen] to increase its market share profitably through lower prices, and thus increasing the non-party firm's incentive to coordinate with the combined Premdor/Masonite. In fact, Masonite recognized that the non-party firm's [Jeld-Wen's] incentive to gain market share by lowering price would diminish if it faced a strong, integrated competitor.

58.     The same day it filed suit, the United States also filed a proposed final judgment that would permit the acquisition to take place, but only if the Towanda doorskin plant was divested from Masonite and spun off to a buyer acceptable to the United States. Following the required public comment period, the judgment became final, including the divestiture provision, and was entered by the court on April 5, 2002. Following this conditional approval, Premdor acquired Masonite and, going forward, operated the combined businesses under the name "Masonite."

59.     This divestiture resulted in the creation of CMI as a stand-alone competitive force. On March 29, 2002, CMI purchased the Towanda doorskins plant and became a third major competitor in the doorskins market, selling doorskins to independent interior molded door manufacturers in competition with Jeld-Wen and Masonite. The divestiture was intended to allow CMI to manufacture and sell all the designs and sizes of interior molded doorskins that Masonite had sold at that time in the United States, with the stated aim of maintaining competition in the domestic interior molded door market.

60.     Following the acquisition of Masonite by Premdor and the creation of CMI, there was substantial additional consolidation that eroded competition in the interior molded door and doorskins markets by eliminating competing doorskin manufacturers. In 2002, Masonite

18

acquired the remaining interests in Fibramold, which was the only other doorskin manufacturer besides Jeld-Wen and Masonite that the DOJ considered to be significant when evaluating Premdor's acquisition of Masonite.

61.     Consolidation in the interior molded door and doorskins markets continued as Jeld-Wen, Masonite, and CMI each acquired smaller interior molded door manufacturers.  For example, CMI acquired C&S Door in 2005, making it another vertically-integrated doorskins and interior molded door company (in addition to Masonite and Jeld-Wen).  It also acquired Illinois Flush Door Co. in 2010.  At the same time, Masonite acquired two additional interior door manufacturers, including Ledco, Inc. and Lifetime Doors, Inc.  Jeld-Wen also continued to acquire interior molded door companies, including CMI in 2012, *see supra* Section IV.E., Karona, Inc. in 2015, Milliken Millwork, Inc. in 2017, and American Building Supply, Inc. in 2018.

62.     This industry consolidation resulted in Jeld-Wen and Masonite controlling a commanding share of the market for interior molded doors, respectively 40% and 42%, with CMI and an additional manufacturer, Steves & Sons, controlling 7% each.  The remainder of the market was controlled by a few additional small, regional interior molded door manufacturers. Notably, while Jeld-Wen, Masonite and CMI were all vertically-integrated companies that produced both doorskins and completed interior molded doors, Steves & Sons only produced completed doors, meaning it had to purchase its doorskins from one of its direct competitors.

> **D.     Jeld-Wen Enters Into Long-Term Doorskin Supply Agreements With Independent Door Manufacturers**

63.     Years later, in 2012, Jeld-Wen sought to purchase CMI, including the Towanda doorskins manufacturing facility at issue in the 2001 Premdor-Masonite acquisition.  Knowing that the acquisition of CMI, like the Premdor-Masonite merger, would implicate antitrust

concerns, in an attempt to ameliorate concerns from Independent Door Manufacturers that Jeld-Wen would exploit its market power over the supply of doorskins and as part of the Company's plan to appease the DOJ, Jeld-Wen began to enter into supply agreements with other Independent Door Manufacturers for sale of doorskins.  The purpose of the supply agreements was to assure the DOJ that Jeld-Wen would continue to sell doorskins at competitive prices to competing interior molded door manufacturers, and that therefore there would be continued competition in the door market.

64.     On May 1, 2012, Jeld-Wen entered into a long-term supply agreement with its largest doorskins customer, Steves & Sons (the "Supply Agreement"), for a substantial percentage of its doorskin purchases.

65.     That Supply Agreement was to be in effect through December 31, 2019, with automatic renewals of seven-year terms unless either party terminated the contract.  The contract could be terminated by Steves & Sons for any reason upon two-year written notice to Jeld-Wen, or by Jeld-Wen upon seven-year written notice to Steves & Sons.

66.     The doorskin prices that Jeld-Wen could charge Steves & Sons under the Supply Agreement varied according to a ***contractually defined formula*** based on Jeld-Wen's key input costs, which included raw material or energy costs.  The Supply Agreement obligated Jeld-Wen to give Steves & Sons annual notice of the prices and input costs for the coming year by November 30, and Jeld-Wen could not impose any price increases if it failed to do so.

67.     In addition to the Supply Agreement, Jeld-Wen had long-term doorskin supply agreements with several other door customers.  However, according to CW 5, Steves & Sons was Jeld-Wen's largest external purchaser of doorskins.

E.     **Jeld-Wen Announces Its Intention to Purchase CMI, Including the Towanda Doorskins Manufacturing Facility**

68.     Then, on or about June 18, 2012, six weeks ***after executing the Supply Agreement***, Jeld-Wen publicly announced its intent to merge with and acquire CMI, the completion of which was now contingent upon regulatory approval by government agencies.

69.     CW 5 explained that prior to the CMI Acquisition, CMI had been a relatively big competitor of Jeld-Wen and that the Company entered into the CMI Acquisition to gain market share in the doors market.  As Judge Payne later found, this was part of Jeld-Wen's plan to "kill off some of the independent door makers that were its doorskin customers."

70.     Early in 2012, Jeld-Wen and CMI decided to request approval of the transaction from the DOJ.  Executives from both companies had been involved in Premdor's acquisition of Masonite and the divestiture of the Towanda facility in 2001, and were therefore aware of the problems that the DOJ review could pose.

71.     Because of its knowledge of this likely DOJ hurdle—and as Judge Payne later found following an evidentiary hearing in the Steves & Sons Litigation—Jeld-Wen intentionally approached the DOJ ***only after*** it had entered into the long-term supply contracts with the Independent Door Manufacturers.  Indeed, as Judge Payne noted, Jeld-Wen engaged in this "oft-used tactic" in order to "assuage the concerns of the DOJ and the [Independent Door Manufacturers] about [the] anticompetitive effects of the proposed [Acquisition]."

72.     Specifically, this tactic limited the DOJ's ability to secure evidence necessary to block the merger for the simple reason that customers with supply agreements are more willing to accept a merger proposed by their supplier because they do not have reason to feel threatened.

73.     In fact, as Judge Payne later explained, according to Jeld-Wen's internal documents, the Company considered it a "tactical error to even call [the DOJ]" before entering

21

into those supply agreements, as Jeld-Wen was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go."  Further demonstrating its knowledge that in the absence of prophylactic measures the CMI Acquisition would implicate serious antitrust concerns, Jeld-Wen retained highly-qualified antitrust counsel from one of the nation's largest law firms, O'Melveny & Myers, to advise the Company in connection with its request for DOJ approval.

74.     After Jeld-Wen approached the DOJ, the agency's Antitrust Division notified Jeld-Wen that it had opened a preliminary investigation into the proposed CMI Acquisition. Representatives of CMI and Jeld-Wen then gave presentations to the DOJ about the acquisition. The presentations of course emphasized that Jeld-Wen had entered into the long-term supply contracts with the Independent Door Manufacturers.

75.     As admitted by James Morrison, former Executive Vice President and Chief Operating Officer of Jeld-Wen, the purpose of entering into such contracts was "to alleviate" customer concerns about not having a supply and "to assure the customers of CMI, who might eventually become customers of Jeld-Wen, that Jeld-Wen was committed to their continued supply."

76.     At around the same time, DOJ began to contact the external door manufacturers with which Jeld-Wen had long-term supply agreements to ask if they had a problem with Jeld-Wen purchasing CMI and, with it, the doorskins plant.

77.     When Steves & Sons—Jeld-Wen's largest doorskins customer—was contacted about the proposed acquisition, it informed the DOJ that it did not oppose the acquisition because it believed that the Supply Agreement would prevent Jeld-Wen from taking any anticompetitive actions.  According to the complaint filed in the Steves & Sons Litigation, the other smaller

22

Independent Door Manufacturers with which Jeld-Wen had supply agreements also did not object to the Acquisition.

78.     The Antitrust Division subsequently closed its investigation on September 28, 2012, and the CMI Acquisition closed on October 24, 2012.

79.     After the Acquisition, Jeld-Wen and Masonite became the only two manufacturers of doorskins in the United States.  Moreover, they now controlled 85% of the market for interior molded doors.  Compounding that market dominance, the manufacturers comprising the other 15% of the interior molded doors market (among them Steves & Sons) were not vertically-integrated and had no choice but to purchase doorskins from either Jeld-Wen or Masonite.

80.     The competitive landscape that emerged in the wake of the CMI Acquisition thus consisted of two dominant, vertically-integrated door manufacturers with incentives to collude, which is exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in the first place.

**F.      As a Result of the Substantially Lessened Competition, Jeld-Wen Begins to Engage in Anticompetitive Conduct**

81.     Prior to its acquisition of CMI, Jeld-Wen had aggressively competed with Masonite for the sale of doorskins to other interior molded door manufacturers.  Following the CMI Acquisition, however, and as a result of its greater market power, Jeld-Wen began engaging in anticompetitive conduct to drive up the price of interior molded doors.

82.     In early 2014, now that the market for interior molded doorskins was limited to Jeld-Wen and Masonite, Jeld-Wen announced that it had implemented a new pricing strategy. This new strategy was a departure from its old, high volume/low margin strategy which emphasized growth and increased market share.  That strategy "often led to competing on price."

Jeld-Wen's new lower volume/higher margin strategy instead emphasized "pricing optimization," to increase product profitability on a per unit basis.

83.     Just several months later, in June 2014, Masonite abruptly stopped selling doorskins to other door manufacturers, making Jeld-Wen the market's sole supplier of doorskins to Independent Door Manufacturers.  Masonite announced this decision during a presentation to its investors on June 25, 2014 (the "June 2014 Masonite Presentation"), where it explained that "[o]nly Masonite and JELD-WEN service the entire North American market," but with Masonite having determined not to sell doorskins to their competition, "that only leaves one other outlet for them to get their facings [*i.e.*, doorskins] from in North America."

### 1.     Jeld-Wen Increases Doorskin Prices for Independent Door Manufacturers, Breaching the Long-Term Supply Agreements

84.     Armed with the knowledge that Independent Door Manufacturers had no other place to turn for doorskins, Jeld-Wen began exploiting its market power by engaging in anticompetitive conduct against the Independent Door Manufacturers with which the Company had executed long-term supply agreements for the supply of doorskins by, among other things, extra-contractually raising prices.  These Independent Door Manufacturers included Steves & Sons, its largest doorskins customer.  According to CW 3, Steves & Sons—a competitor of Jeld-Wen—had begun winning bigger contracts for the sale of interior molded doors and buying up the market, creating the pressure to compete with them.  And according to CW 2, Defendants Hachigian, as President and CEO, and Mallard, as CFO, specifically directed the Company to implement these price increases in 2014 and break all of its doorskin supply agreements.

85.     For example, in July 2014, Defendant Hachigian sent Steves & Sons the June 2014 Masonite Presentation announcing its decision to no longer sell doorskins externally.  In

sending this presentation to Steves & Sons, Defendant Hachigian characterized it as "*a very informative document for our discussions*."

86.     Then Jeld-Wen breached the Supply Agreement by improperly increasing the prices that it charged Steves & Sons to purchase doorskins.  These increases were prohibited by the Supply Agreement, which only permitted price increases that were tied to the rise in cost of raw materials.  But, in fact following the CMI Acquisition, Jeld-Wen's key input costs declined every year, negating the only defensible justification for price increases under the Supply Agreement.  Jeld-Wen charged even higher supra-competitive prices to other Independent Door Manufacturers with which the Company did not have any supply agreements.

87.     Jeld-Wen's pricing decisions were a consequence of Jeld-Wen's enhanced market power following the CMI Acquisition.  Following the merger, Jeld-Wen and Masonite were the only two doorskin suppliers in the United States.  Thus, by using its market dominance to unlawfully raise the price of doorskins, Jeld-Wen was able to both artificially increase its revenues for sale of those doorskins and improperly lessen competition in the market for sale of interior molded doors by limiting Steves & Sons' ability to manufacture them.

88.     Moreover, Jeld-Wen attempted to add a "capital charge" to the normal doorskin prices under the Supply Agreement, which was purportedly intended to help offset the cost of making capital improvements to Jeld-Wen's facilities that made the doorskins sold to Steves & Sons.  However, this capital charge was not permitted pursuant to the contractual pricing provisions of the Supply Agreement.

89.     Although Steves & Sons rejected this charge, as Judge Payne later found, Jeld-Wen was successful in extracting new contracts from other Independent Door Manufacturers requiring them to pay this charge, under threat of either termination of the supply contracts or

loss of doorskin supply. Jeld-Wen was able to extract these new contracts as a result of the lessened competition in the doorskins market, since by this time Jeld-Wen was the only supplier of doorskins to Independent Door Manufacturers in the United States.

90. In 2014, Jeld-Wen also changed its approach to dealing with defective doorskins, significantly limiting reimbursements under the Supply Agreement. Before that time, if a customer of Steves & Sons rejected a door as defective because of a defective doorskin, Steves & Sons would give the customer credits for the purchase price of the door, and then seek reimbursement from Jeld-Wen for the full cost of the door which had the defective doorskin. Jeld-Wen would typically pay the entire amount.

91. However, in late 2014 or early 2015, Jeld-Wen adopted a policy to reimburse Steves & Sons only for the defective doorskins, rather than for the full cost of the doors. Although not contractually required by the Supply Agreement, because of the substantially lessened competition caused by the merger, Jeld-Wen no longer felt that it was competitively necessary to extend this benefit to Steves & Sons in 2015 and thereafter.

### 2. Jeld-Wen and Masonite Begin Imposing Uniform Price Increases on Interior Molded Doors

92. Following the CMI Acquisition, and in conjunction with its breach of the long-term supply agreements, in late 2012 Jeld-Wen and Masonite began imposing uniform price increases on interior molded doors.

93. Critically, Defendants Beck, Mallard, Hachigian, and Michel were all involved in and had the ultimate authority during their tenure with the Company to approve and implement these price increases. CW 3 explained that price increases were discussed and approved by a pricing group, which included the CEO and the CFO, as well as Controllers, product line

managers, the sales team, and operations personnel.  During CW 3's tenure with Jeld-Wen, this included Defendants Beck, Mallard, and Hachigian.

94.     This was corroborated by multiple former employees, including CWs 2, 4 and 6, all of whom unambiguously confirmed that price increases were always approved by the CEO. Further, CW 4 expanded upon this, noting that Defendant Hachigian was hands-on with regards to pricing, and Defendant Beck was "very, very" hands-on in this regard.

95.     According to the allegations and underlying documentation set forth in the complaints filed in the DPP and IPP Litigations pending against Jeld-Wen and Masonite, the price increases that Jeld-Wen and Masonite began imposing in 2012 were larger and in a different form than prior price increases.  Historically, price increases would be in amounts such as 25 cents or $1 per door.  Beginning around 2012, Jeld-Wen and Masonite began increasing prices by significant percentages.[3]

| Company | Notice Date | Effective Date | Increase |
|---|---|---|---|
| Jeld-Wen | 11/15/2012 | 02/04/2013 | 3%-5% |
| Masonite | 12/06/2012 | 03/18/2013 | 3%-6% |
| Jeld-Wen | 08/06/2013 | 10/07/2013 | 4% |
| Masonite | 08/13/2013 | 09/30/2013 | 5% |
| Masonite | 10/31/2013 | 02/03/2014 | 5% |
| Jeld-Wen | 11/18/2013 | 01/27/2014 | 5% |
| Jeld-Wen | 06/09/2014 | 08/11/2014 | 9.5% |
| Masonite | 06/17/2014 | 08/18/2014 | 8% |
| Masonite | 12/01/2014 | 03/02/2015 | 5% |
| Jeld-Wen | 12/03/2014 | 03/02/2015 | 5% |
| Masonite | 10/26/2015 | 02/01/2016 | 3%-5% |
| Jeld-Wen | 10/28/2015 | 02/01/2016 | 3%-5% |
| Masonite | 10/04/2016 | 01/01/2017 | 5%-7% |
| Jeld-Wen | 10/18/2016 | 01/03/2017 | 5% |
| Jeld-Wen | 03/06/2018 | 05/07/2018 | 6% |
| Masonite | 03/2018 | 06/01/2018 | 6% |
| Jeld-Wen | 10/08/2018 | 12/17/2018 | 7% |

---

[3] Lead Plaintiffs are in possession of documentation supporting this chart, with the exception of the October 4, 2016, March 2018, and October 8, 2018 price increases by Masonite.

| Masonite | 10/08/2018 | 12/15/2018 | 7%-9% |

96.    By comparison, inflation (as measured by the Consumer Price Index) ranged between a high of 2.1% in 2012 and a low of 0.1% in 2015 for this same period.

97.    Jeld-Wen and Masonite's steady, lock-step price increases were not the result of competitive market forces, such as cost or demand factors.  In particular, the largest input cost of interior molded doors is doorskins.  However, since Jeld-Wen and Masonite are vertically-integrated, they control those costs and their price increases outpaced any increase in their raw material and other costs.  And CWs 1 and 4 confirmed that price increases did not correspond with material cost increases.  Rather, these increases are more likely attributable to an explicit or tacit agreement to fix prices.

98.    According to CW 6, Jeld-Wen had frequent interactions with Masonite, including during Company-sponsored meetings held at Jeld-Wen headquarters.  Moreover, according to CW 1, Jeld-Wen employees were "always aware what Masonite was charging" its customers.  This would have provided the companies with opportunities to coordinate pricing.

99.    As a result of this anticompetitive conduct, in 2015, Steves & Sons requested that the DOJ once again examine Jeld-Wen's conduct.  Steves & Sons gave a presentation to the DOJ in December 2015, and then produced documents a month later, in response to a civil investigative demand.  On April 7, 2016, Jeld-Wen also made a presentation to the DOJ, and on May 18, 2016, the DOJ closed its investigation without taking any action.

100.    Thereafter, on June 29, 2016, Steves & Sons filed a lawsuit against Jeld-Wen alleging that the Company's acquisition of CMI and Jeld-Wen's subsequent price increases for its interior molded doors and doorskins violated federal antitrust laws, specifically, Section 7 of the Clayton Act, which prohibits, in relevant part, mergers and acquisitions where the effect may

28

be to substantially lessen competition."  Complaint, *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va. June 29, 2016), ECF No. 1.

### G. Defendants' Incomplete Disclosures Attributed Jeld-Wen's Success to Only Lawful and Legitimate Business and Pricing Strategies

101.    Throughout the Class Period, Defendants represented that the Company operated in a highly competitive environment, and regularly touted the source of Jeld-Wen's financial success as the result of legitimate and lawful business strategies.  Indeed, despite ***knowing all along*** that the true source of the Company's success was its anticompetitive conduct in entering into the long-term supply agreements in order to obtain DOJ approval of the CMI Acquisition, and with the clear intention to flout those agreements by driving up the price of doorskins once the CMI Acquisition was complete, Defendants continually represented that the Company's success was driven by legitimate and lawful strategies such as "pricing optimization," "pricing discipline," "strategic pricing," and "favorable pricing."

102.    The Class Period begins on January 26, 2017, when the SEC declared Jeld-Wen's registration statement for its initial public offering (the "IPO") effective.  Pursuant to the offering materials filed with the Company's IPO, Defendants represented that Jeld-Wen "***operate[s] in a highly competitive business environment***," and further described Masonite as among its "***major competitors***" for the Company's North American interior doors business.  The offering materials further stated that "***[w]hile we operate in a competitive market, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins***."

103.    The offering materials also represented that in early 2014—around the time that Defendant Hachigian was actually directing the Company to break its long-term supply agreements by implementing extra-contractual price increases—the Company changed its pricing strategy by "***making strategic pricing decisions based on analysis of customer and***

*product level profitability*" and "*increas[ing] our emphasis on pricing optimization*," and that, as a result, "*our operations during 2014 and 2015 benefitted from improved pricing, particularly in North America*."

104.    The Company further touted its "*continued pricing optimization*" as a strategic initiative "*to deliver profitable organic revenue growth*," stating that Jeld-Wen "*will continue to employ a strategic approach to pricing our products*."

105.    As the Class Period progressed, Defendants maintained this story.  For example, on February 22, 2017, during Jeld-Wen's earnings call for the fourth quarter and full year 2016 ("4Q 2016"), Defendant Mallard falsely attributed the Company's increase in adjusted EBITDA to legitimate and lawful strategies, including "*favorable pricing*, improved cost productivity, and the favorable impact of recent acquisitions."  Defendant Mallard also noted that the improvement in Jeld-Wen's revenues was driven, in part by "*our pricing optimization strategy in all three segments*."

106.    In a presentation filed in connection with that February 22, 2017 earnings call, Jeld-Wen emphasized a "Balanced Approach to Margin Expansion," highlighting several drivers for revenue growth and margin expansion.  Among those drivers, the Company listed "*Profitable Organic Growth*," from, among other things, "*Strategic Pricing*" and "*Pricing Optimization*."

107.    Then, on May 9, 2017, Jeld-Wen held its first quarter 2017 ("1Q 2017") earnings call.  During the call, in response to an analyst's question about pricing, Defendant Beck stated that "*if you go back for the last couple of years, we were doing larger than market price increases as we were playing catch up and trying to reset pricing where we thought they should be*."

108.    Defendants kept up this charade throughout the Class Period.  When asked point-blank by an analyst during the RBC Capital Markets Global Industrials Conference on September 14, 2017 whether the current competitive environment in North America was a "rational pricing environment" with "people behaving," Defendant Beck unambiguously responded "*Yes*."

109.    And on November 8, 2017, at the Robert W. Baird Global Industrial Conference, Defendant Beck discussed the trajectory and cause of the Company's growth, stating: "***What got us from 4% to almost 12% was – about 70% to 75% of that came on the back of price discipline.  When the transformation began, pricing responsibility existed with plant managers, with salespeople, and we've centralized that.  We have a central pricing analytics group, and we've centralized the authority to set pricing.  And we've been very, very disciplined***."

110.    However, these and other statements touting the competitive environment in which Jeld-Wen purportedly operated and attributing the Company's financial success to legitimate pricing strategies, as set forth in Section V, *supra*, were all false and misleading. Contrary to Defendants' statements, Jeld-Wen did not "***operate in a highly competitive business environment***," and the true source of its financial success was not an "***increas[ing] [] emphasis on pricing optimization***," or legitimate and legal "***strategic pricing decisions***," but was, rather, the result of Jeld-Wen's anticompetitive conduct.

111.    As further discussed in paragraphs 127-31 *supra*, as set forth in the evidentiary findings of fact by Judge Payne in the Eastern District of Virginia, Defendants knew that the CMI Acquisition and the Company's subsequent breach of the long-term supply contracts was a violation of the federal antitrust laws.  In particular, in light of the DOJ's objection to the 2001

Premdor-Masonite acquisition, Defendants were aware that the CMI Acquisition would implicate those same antitrust concerns by creating a market which consisted of two dominant, vertically-integrated door manufacturers with incentives to collude.

112.    In order to mitigate those concerns, Jeld-Wen developed a plan to enter into the long-term supply agreements with the Independent Door Manufacturers for the sale of doorskins. Only *after* it had entered into those agreements did Jeld-Wen approach the DOJ for approval of the CMI Acquisition, knowing that this tactic would appease the DOJ and the Independent Door Manufacturers about any possible anticompetitive effects of the Acquisition.  However, immediately following the completion of the CMI Acquisition, and as a result of Jeld-Wen's then-increased market power, Defendants proceeded to breach those supply agreements by extra-contractually raising the price of doorskins in order to drive the Independent Door Manufacturers out of the market for interior molded doors and then proceed to exponentially raise the cost of interior molded doors.

### H.    Defendants Maintained That They Operated in a Competitive Environment and Doubled Down on the Source of Jeld-Wen's Financial Success Despite a Negative Jury Verdict

113.    Despite Defendants' awareness that Jeld-Wen's anticompetitive conduct, including the purchase of CMI to solidify its market standings and kill off its competitors in the interior molded door market, with the specific intention to flout the long-term doorskin supply agreements that they had entered into in order to secure DOJ approval of that Acquisition, was the true reason for Jeld-Wen's financial success, Defendants continued to attribute that success to legitimate and lawful business strategies.

114.    On February 15, 2018, after nearly two years of litigation, the Company announced that a jury had returned a verdict against Jeld-Wen in the Steves & Sons Litigation, finding that Jeld-Wen's conduct violated Section 7 of the Clayton Act and disclosed that the jury

had awarded Steves & Sons damages in the total amount of $176 million, including past damages and future lost profits.  The verdict form returned by the jury contained no additional clarifying factual detail or explanation for that decision and, notably, the vast majority of the Steves & Sons Litigation docket is sealed or redacted, making it impossible to glean specific details about Jeld-Wen's anticompetitive conduct.

115.    Yet Defendants still continued to conceal the true breadth of Jeld-Wen's misconduct and the financial impact it had on Jeld-Wen's business.  In a press release on that same date, the Company rejected the accuracy of the jury verdict, stating that "***[t]he Company continues to believe that the facts underlying this dispute do not establish either a violation of the antitrust laws or a breach of contract***."

116.    Relying explicitly on the fact that the Antitrust Division of the DOJ had reviewed the CMI Acquisition and did not challenge it, Jeld-Wen doubled down on its innocence, noting that it would "vigorously oppose" the judgment.  The Company further noted that the ultimate outcome of the Steves & Sons Litigation would not have a "material impact" on the Company.

117.    These statements were demonstrably false.  Indeed, Defendants omitted to inform the market that Jeld-Wen had entered into the long-term supply agreements with the Independent Door Manufacturers, including Steves & Sons, in order to assuage the DOJ of any anticompetitive concerns it may have had regarding the CMI Acquisition, while simultaneously *intending* to flout those supply agreements as soon as the CMI Acquisition was completed. Defendants further failed to inform the market that because of their knowingly anticompetitive conduct, an adverse judgment in the Steves & Sons Litigation was probable and likely to "material[ly] impact" Jeld-Wen.

118.    The market credited Defendants' reassurances that the decision was erroneous based on the DOJ's refusal to intervene.  For example, Bank of America wrote in a February 16, 2018 analyst report that:

> *It seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition prior to its consummation in 2012*.  Furthermore, during the period between the acquisition closing and the filing of the complaint by Steves, the DOJ was once again asked to review the JELD/CMI transaction and maintained its original opinion that no antitrust issues existed.

119.    Bank of America further reported that "we believe the fundamental positive stock story remains intact."  Gabelli echoed these sentiments on February 20, 2018, noting that "we see any divestitures with regard to CMI as unlikely.  *This deal was reviewed twice by the DOJ and passed without issue in 2012*."

120.    On an earnings call held just days later on February 21, 2018, Defendant Beck reiterated this position, stating that Jeld-Wen "*continue[s] to believe that the claims asserted in the [Steves & Sons] litigation lack merit*," and that the Company "*[had] acted in good faith and in compliance with our contractual agreements*."  In making this assertion, he continued to rely on the DOJ's failure to intervene in the CMI Acquisition, stating that "the Department of Justice reviewed our acquisition of CMI twice and declined to take any action."  He also continued to double down on the Company's claim that it did "*not believe that a loss is probable and estimable for the reasons that we've just described*."

121.    Analysts continued to buy into Defendants' false reassurances.  For example, analyst RBC Capital Markets noted on February 22, 2018 that "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the CMI Acquisition twice.  JELD does not believe that a loss is probable or

estimable."  Thus, despite the verdict, market participants were still lulled into a false sense of security by Defendants' continuing misstatements.

122.    Just days later, on February 28, 2018, the Company announced the resignation of Defendant Beck as President and CEO, and as a member of Jeld-Wen's Board of Directors, effective February 27, 2018.  Defendants provided no substantive explanation for Defendant Beck's resignation.  He was replaced by Defendant Hachigian as interim CEO.

123.    Having assuaged investors' concerns, Defendants continued to falsely attribute Jeld-Wen's success to legitimate pricing strategies.  On March 6, 2018, Defendants filed with the SEC their Annual Report on Form 10-K for the year ended December 31, 2017 in which they reiterated to the market that the Company "***operate[s] in a highly competitive business environment***."  Defendants again asserted that they were able to "achieve profitable growth" through legitimate and lawful strategies such as "***pricing discipline***," "***strategic pricing***," and "***pricing optimization***."

124.    On May 8, 2018, during Jeld-Wen's first quarter 2018 ("1Q 2018") earnings call, Defendant Hachigian confirmed that the Company's financial success since the CMI Acquisition was a result of "***primarily getting rid of bad-margin business, taking pricing actions to get us back to price points that were prerecession***."  The next day, the Company filed its 1Q 2018 10Q, once again stating that the Company's increase in gross margin and gross margin as a percentage of net revenues was a result of lawful means, including "***favorable pricing***, cost-saving initiatives and contribution from recent acquisitions."

125.    For the remainder of the Class Period, Defendants reiterated this position, continuing to misattribute Jeld-Wen's financial success to competitive conduct and lawful business strategies.  In its second quarter 2018 ("2Q 2018") 10-Q, filed August 7, 2018,

Defendants claimed that the increase in gross margin and net revenues was due to "*favorable pricing*," and Defendant Michel echoed this on the earnings call of the same date, stating that the Company's "strong revenue growth" was due, in part, to "*improved pricing in all 3 regions*."

126.    Further, when he provided an update about the jury verdict in the Steves & Sons Litigation, Defendant Michel continued to mislead investors by offering false assurances, stating yet again that "*JELD-WEN believes that the jury verdict in this case is erroneous.*"

> **I.    Additional Facts About Jeld-Wen's Anticompetitive Conduct Begin to Emerge When Judge Payne Enters An Order Detailing Jeld-Wen's Specific Anticompetitive Conduct**

127.    On October 5, 2018, the judge presiding over the Steves & Sons Litigation—Judge Robert E. Payne—issued a Memorandum Opinion following an evidentiary hearing that surprised the market by specifically detailing Jeld-Wen's clear anticompetitive conduct.   In particular, Judge Payne found that "the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin industry," ultimately "depriving the [Independent Door Manufacturers] of that key component of a reliable supply source."

128.    Critically, Judge Payne concluded, Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

129.    Judge Payne further found that:

[I]t is necessary to remember that JELD-WEN was aware at the time of the merger that the antitrust issues associated with the CMI Acquisition were significant.  Indeed, having calculated market concentration as a consequence of the forthcoming acquisition and the Herfindahl-Hirschman[4] indices for markets impacted by the merger, JELD-WEN retained highly-qualified antitrust counsel

---

[4] The Herfindahl-Hirschman Index is a commonly-accepted measure of market concentration used by the Department of Justice to assess market competitiveness.

from one of the nation's largest law firms, O'Melveny & Myers.  In sum, and as the record shows, Jeld-Wen knew full well of the merger's antitrust implications.

Mindful of those implications, Jeld-Wen pursued an established merger strategy to assuage any possible concerns from the DOJ, from CMI's customers, and from JELD-WEN's own customers (including Steves).   Specifically, JELD-WEN developed a plan to enter into long-term supply agreements with [I]ndependent [D]oor [M]anufacturers in the United States. . . .  As part of its strategy, JELD-WEN deliberately decided not to approach the DOJ about the proposed CMI Acquisition until those long-term agreements had been entered.  In fact, Jeld-Wen's internal documents show that the company considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, and that JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go."

130.   Judge Payne went on:

And, when JELD-WEN did approach the DOJ about the CMI Acquisition, it emphasized its long-term supply agreements with Steves, Lynden, and others.  And [James] Morrison, who led the [C]ompany's presentation to the DOJ, admitted that the purpose of entering into such contracts was "to alleviate" customer concerns about not having a supply and "to assure the customers of CMI, who might eventually become customers of JELD-WEN, that JELD-WEN was committed to their continued supply."

131.   Finally, Judge Payne concluded that divestiture of the Towanda, Pennsylvania doorskins facility was an appropriate remedy for Jeld-Wen's Clayton Act violations.

132.   This decision caused several securities analysts to lower their price targets on Jeld-Wen stock over the ensuing trading days, with analysts at RBC Capital Markets noting on October 8, 2018 that up to 33% of Jeld-Wen's global doorskin manufacturing capacity would be lost by the divestiture of the Towanda plant.  Analyst Bank of America further commented on October 8, 2018 that the divestiture "could be the worst case scenario."  On this news, the price of Jeld-Wen common stock declined over the course of two days by $1.18 per share, or nearly 5%, to close at $22.91 on October 9, 2018.

133.   Critically, however, the market was not able to fully appreciate the extent of Jeld-Wen's anticompetitive conduct and the impact it had on the Company's apparent financial

success, as Defendants continued to reassure investors that "***JELD-WEN firmly maintains that it has not violated any antitrust laws***," and that the October 5, 2018 decision was "***incorrect due to multiple flawed rulings during the trial process***."

134.   The Company further reiterated that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

135.   The market once again bought Defendants' story.  For example, as Bank of America reported on October 8, 2018, "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

**J.    Even More Facts Are Revealed Regarding Jeld-Wen's Anticompetitive Conduct When the Company Finally Admits That it Will Face a $76.5 Million Liability in the Steves & Sons Litigation**

136.   Just ten days later, after the markets closed on October 15, 2018, Jeld-Wen shockingly admitted that the Company would likely face a significant judgment as a result of the Steves & Sons Litigation.  Although the Company had previously maintained that a loss was neither probable nor estimable, the Company announced that it expected its third quarter 2018 ("3Q 2018") financial results to include a $76.5 million charge which reflected the judgment anticipated to be entered against Jeld-Wen in the Steves & Sons Litigation, as recent rulings in the case "now provided sufficient detail for the [C]ompany to estimate future liabilities."

137.   This was the first time that Defendants disclosed that Jeld-Wen was likely to face an adverse decision in the Steves & Sons Litigation, contrary to its continued reassurances that Defendants had done nothing wrong and the previous rulings in the case were "***erroneous***" and

"*incorrect*."  Moreover, it was the first time that the market was made aware that the Steves & Sons Litigation would have a material impact on Jeld-Wen's business, despite Defendants' statements to the contrary.

138.    On the same date, Jeld-Wen announced the sudden resignation of its CFO, Defendant Mallard, effective November 8, 2018, "to pursue other career interests."  Defendant Mallard was replaced by Senior Vice President, Corporate Development and Investor Relations, John Linker.

139.    This news stunned the market and caused Jeld-Wen's stock to plummet *19% in a single day* on unusually high trading volume.  On October 17, 2018, Gabelli published a report on Jeld-Wen, stating that "[i]n retrospect, we underestimated the challenges JELD faced in 2018 from litigation."  On November 7, 2018, RBC Capital Markets agreed, noting that "[w]e think investor concerns regarding both the current management transitions and the unfavorable legal litigation with Steves & Sons are warranted."

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

140.    Lead Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of Jeld-Wen's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

141.    Throughout the Class Period, Defendants made a series of misrepresentations concerning the source of their revenues and the existence of competition in the market for interior molded doors, while intentionally omitting crucial details about their anticompetitive conduct that was stifling any competition in the market and artificially propping up their

revenues, including their motivations and intentions with regard to the CMI Acquisition and subsequent conduct.

**January 26, 2017 – IPO Offering Materials**

142.    The Class Period begins on January 26, 2017, when the SEC declared Jeld-Wen's registration statement for the IPO effective (the "IPO Registration Statement").  On or around January 27, 2017, Jeld-Wen conducted an IPO pursuant to the IPO Registration Statement.  On January 30, 2017, Jeld-Wen filed a prospectus for the IPO with the SEC on Form 424B4 (the "IPO Prospectus"), which incorporated and formed part of the IPO Registration Statement (collectively, the "IPO Offering Materials").

143.    In the IPO Offering Materials, the Defendants represented that "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market.  Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

144.    Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]e are focused on profitable growth and will continue to employ a strategic approach to pricing our products.  Pricing discipline is an important element of our effort to improve our profit margins and earn an appropriate return on our invested capital*."

145.    Defendants continued to attribute their success to a "*strategic[] change [in] our pricing strategy in several key areas*," including a "*focus[] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*," and an "*increased [] emphasis on pricing optimization*."

40

146.    Then, in discussing the Company's recent increase in net revenues, Defendants stated that the increase was due, in part, to "***an increase in pricing as a result of implementing our pricing optimization strategy***."

147.    Defendants' statements in the IPO Offering Materials that Jeld-Wen operated in a competitive business environment and attributing Jeld-Wen's pricing optimization strategy and financial success to legitimate and lawful business factors and strategies were false and materially misled investors because Defendants failed to disclose that Jeld-Wen was engaged in anticompetitive conduct through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers.

148.    Specifically, as alleged elsewhere herein, Jeld-Wen purchased CMI with the intention to consolidate market share and "kill off" other competitors in the production of interior molded doors.  With knowledge that the DOJ had taken issue with such consolidation of the market in the recent past, including specifically with regard to the Towanda doorskin manufacturing facility Jeld-Wen sought to acquire with CMI, Defendants entered into long-term supply agreements with Independent Door Manufacturers for the purchase of doorskins.

149.    Defendants entered into these supply agreements in order to circumvent DOJ objection to the Acquisition and with the intention to flout those agreements once they had secured DOJ approval.  Having received that approval and following the closure of the CMI Acquisition, Jeld-Wen and Masonite were left as the only two doorskin suppliers in North America.  After Masonite announced that it would no longer sell doorskins to Independent Door Manufacturers, leaving Jeld-Wen as the only doorskin supplier, Jeld-Wen proceeded to break its supply agreements by, among other things, extra-contractually raising prices for doorskins.

150.    Analysts reacted favorably to Defendants' positive statements regarding the Company's financial success in a highly competitive market. For example, on February 2, 2017, analyst Wedbush reported that the Jeld-Wen team, led by Defendant Beck, "is making transformation change through the use of a proven track record including improved pricing discipline, establishment of operational excellence (productivity tracking metrics), investment in building growth infrastructure and inorganic strategic growth."

151.    On February 21, 2017, analyst Barclays further credited Defendants' statements, stating that "[w]e think it's important to note where the EBITDA growth is coming from, and where it isn't.  Price was a key tenet of the initial margin repair under the new management team, beginning in 2014.  Price has been a significant driver of positive sentiment around the door industry since then[.]"

**February 22, 2017 – 4Q 2016 Earnings Call and Investor Presentation**

152.    On February 22, 2017, Jeld-Wen held an earnings call discussing the Company's fourth quarter and full year 2016 financial results (the "February 22, 2017 Earnings Call"). During that call, Defendant Mallard attributed those results, including specifically the Company's increase in adjusted EBITDA and EBITDA margins, to legitimate and lawful strategies, including "***favorable pricing***, improved cost productivity, and the favorable impact of recent acquisitions."  Defendant Mallard went on to say that the improvement in Jeld-Wen's revenues "***was driven by a 5% core growth comprised of a 2% benefit from our pricing optimization strategy in all three segments***."

153.    In connection with the February 22, 2017 Earnings Call, Defendants released a presentation for investors (the "February 22, 2017 Investor Presentation") in which Jeld-Wen further emphasized its "Balanced Approach to Margin Expansion" and its "World-Class Performance and Returns," highlighting several drivers for its revenue growth and margin

expansion.   Among those drivers, the Company listed "***Profitable Organic Growth***" from, among other things, "***Strategic Pricing***" and "***Pricing Optimization***."

154.    Defendant Mallard's statements on the February 22, 2017 Earnings Call, as well as the Company's statements in the February 22, 2017 Investor Presentation, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

155.    Defendant Beck elaborated further on the February 22, 2017 Earnings Call by touting Jeld-Wen's "number one position by net revenues in the majority of countries and markets we serve."  He attributed the Company's leading market position to "***offering well-designed, high-quality products through strong and valued brands, and by reaching consumers through multiple channels.***"

156.    Defendant Beck's statement on the February 22, 2017 Earnings Call attributing Jeld-Wen's leading market position to well-designed, high-quality products and the Company's marketing efforts was materially false and misleading because Defendants failed to disclose that its leading market position was due, in large part, to Jeld-Wen's anticompetitive conduct through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers, as further described in paragraphs 147-49, herein.

157.    Once again, analysts credited the statements Defendants made in the February 22, 2017 Earnings Call and related February 22, 2017 Investor Presentation.  For example, on February 22, 2017, analyst Wells Fargo reported that the Company's success over the "[p]ast couple years [was] driven by pricing strategies," including "[f]avorable [p]ricing."  On February 24, 2017, Bank of America stated "[r]egarding pricing, JELD recently established a pricing analytics group and is focusing its pricing strategy on driving return on invested capital[.]"

**March 3, 2017 – 2016 Form 10-K**

158.    On March 3, 2017, Defendants filed with the SEC their Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K"), which was signed by Defendants Beck, Mallard and Hachigian.  In discussing the competitive environment in which the Company operates, Defendants stated, "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market.  Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

159.    Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]hile we operate in a competitive market, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins.  Our strategies also include incentivizing our channel partners to sell our higher margin products, and a renewed focus on innovation and the development of new technologies, which we believe will increase our sales volume and the overall profitability of our product mix.*"

160.    Defendants continued to attribute their success to a "*strategic[] change [in] our pricing strategy in several key areas*," including a "*focus[] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*, and  an "*increased [] emphasis on pricing optimization*."

161.    Defendants' statements in the 2016 10-K, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

162.    Analysts continued to react favorably to Defendants' statements regarding the source of Jeld-Wen's success, with analyst Wedbush noting on March 31, 2017 that "[w]e expect JELD-WEN Holdings to continue to benefit from the transformation under CEO Mark Beck including improved pricing discipline in 2015/2016[.]"

**May 9, 2017 – Press Release, 1Q 2017 Earnings Call and Investor Presentation**

163.    On May 9, 2017, Jeld-Wen issued a press release announcing its financial results for the first quarter 2017 (the "May 9, 2017 Press Release").  In the press release, which was also filed with the SEC on Form 8-K, the Company stated that "*[c]ore growth[5] increased primarily as a result of increased shipping days in the quarter and positive pricing*," leading to an "*increase in gross margin*."

164.    That same day, Jeld-Wen held an earnings call discussing the Company's first quarter 2017 financial results (the "May 9, 2017 Earnings Call").  During that call, Defendant Mallard attributed those results, including specifically the Company's increase in adjusted EBITDA, to legitimate and lawful strategies, including "*favorable pricing*" and "*profitable growth*," among others.

165.    Then, in response to an analyst's question about pricing, Defendant Beck stated that "*if you go back for the last couple of years, we were doing larger than market price increases as we were playing catch up and trying to reset pricing where we thought it would be*."

166.    In connection with the May 9, 2017 Earnings Call, Defendants released a presentation for investors (the "May 9, 2017 Investor Presentation") in which Jeld-Wen further emphasized its "Balanced Approach to Margin Expansion" and its "World-Class Performance

---

[5] The Company defines core growth as "the increase in net revenues, excluding the impact of foreign exchange and acquisitions completed in the last twelve months."

and Returns," highlighting several drivers for revenue growth and margin expansion. Among those drivers, the Company listed "***Profitable Organic Growth***" from, among other things, "***Strategic Pricing***" and "***Pricing Optimization***."

167. Defendants Beck and Mallard's statements on the May 9, 2017 Earnings Call, as well as the Company's statements in the May 9, 2017 Press Release and May 9, 2017 Investor Presentation, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

168. Defendant Beck elaborated further on the May 9, 2017 Earnings Call by touting Jeld-Wen's "number one position by net revenues in the majority of countries and markets we serve." He attributed the Company's leading market position to "***offering well-designed, high-quality products and by reaching consumers through multiple channels***."

169. Defendant Beck's statement on the May 9, 2017 Earnings Call attributing Jeld-Wen's leading market position to well-designed, high-quality products and the Company's marketing efforts was materially false and misleading for the same reasons set forth in paragraph 156, herein.

170. Analysts reacted positively to the May 9, 2017 Press Release and related May 9, 2017 Earnings Call and May 9, 2017 Investor Presentation. For example, on May 10, 2017, analyst J.P. Morgan reported that "adjusted EBIDTA margins were above our estimate, we believe mostly driven by better price." Barclays echoed these sentiments, stating that "we are encouraged by the $5 mn increase to FY EBITDA guidance and think this could still reflect some conservatism given the continued progress on cost and productivity initiatives and potential for additional pricing to cover material cost inflation. We continue to view JELD as one of our

most compelling ideas given its unique 'self-help' margin opportunity over the next several years."

**May 12, 2017 – 1Q 2017 Form 10-Q**

171.    On May 12, 2017, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended April 1, 2017 ("1Q 2017 10-Q"), which was signed by Defendant Mallard.  In discussing the Company's increase in net revenue in North America, Defendants stated that this was driven, in part, by an "***increase in pricing [which] was the result of implementing our pricing optimization strategy***."

172.    Defendants' statement in the 1Q 2017 10-Q attributing Jeld-Wen's pricing optimization strategy and increase in net revenues for North America to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**May 24, 2017 – First SPO Offering Materials**

173.    On or around May 24, 2017, Jeld-Wen conducted a secondary public offering of the Company's common stock (the "First SPO").  Jeld-Wen conducted the First SPO pursuant to a registration statement (the "First SPO Registration Statement").  On May 26, 2017, Jeld-Wen filed a prospectus for the First SPO with the SEC on Form 424B (the "First SPO Prospectus"), which incorporated and formed part of the First SPO Registration Statement (collectively, the "First SPO Offering Materials").

174.    In the First SPO Offering Materials, the Defendants represented that "***[t]he door and window industry is highly competitive and includes a number of regional and international competitors***," with "***Masonite and several smaller independent door manufacturers***" among its "***major competitors***" in the North American interior door market. Defendants went on to state that "***[w]e operate in a highly competitive business environment***."

175.    Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]e are focused on profitable growth and will continue to employ a strategic approach to pricing our products.  Pricing discipline is an important element of our effort to improve our profit margins and earn an appropriate return on our invested capital*."

176.    Defendants continued to attribute their success to a "*strategic[] change [in] our pricing strategy in several key areas*," including a "*focus[] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*," and   an "*increased [] emphasis on pricing optimization*."

177.    Then, in discussing the Company's recent increase in net revenues, Defendants stated that the increase was due, in part, to "*an increase in pricing as a result of implementing our pricing optimization strategy*."

178.    Defendants' statements in the First SPO Offering Materials that Jeld-Wen operated in a competitive business environment and attributing Jeld-Wen's pricing optimization strategy and financial success to legitimate and lawful business factors and strategies were demonstrably false and materially misled investors for the same reasons set forth in paragraphs 147-49, herein.

179.    Analysts credited Defendants' statements that the Company was operating in a competitive environment, with analyst Credit Suisse stating on June 22, 2017 that "[s]ince 2015, management has worked to drive greater pricing discipline across its North American business," facilitated by "[i]ts leading position and the competitive dynamics in residential interior doors."

**August 8, 2017 – 2Q 2017 Form 10-Q**

180.    On August 8, 2017, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended July 1, 2017 ("2Q 2017 10-Q"), which was signed by Defendant Mallard.  In discussing the Company's increase in gross margin and gross margin as a percentage of net revenues, Defendants stated that the increase "*was due to favorable pricing*, cost saving initiatives and the contribution from recent acquisitions."

181.    Defendants' statement in the 2Q 2017 10-Q attributing Jeld-Wen's increase in gross margin and gross margin as a percentage of net revenues to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**August 8, 2017 – 2Q Earnings Call and Investor Presentation**

182.    On August 8, 2017, Jeld-Wen held an earnings call discussing the Company's second quarter 2017 financial results (the "August 8, 2017 Earnings Call").  During that call, Defendant Mallard attributed those results, including specifically the Company's increase in gross margin and adjusted EBITDA, to legitimate and lawful strategies, including "*favorable pricing,* operational cost savings, improved mix and the impact of our recent acquisitions." Defendant Mallard went on to say that "when we look at our entire manufacturing network and the demand that's coming in, we look at all the levers and we figure out which one we think is going to pull the most profitability for us. *And so I would say we'd probably been pulling more on the price lever in the first half of the year*, as opposed to the volume lever . . . *and then that's resulted in nice margin accretion*."

183.    In connection with the August 8, 2017 Earnings Call, Defendants released a presentation for investors (the "August 8, 2017 Investor Presentation") in which Jeld-Wen further emphasized its "World-Class Performance and Returns," highlighting several drivers for

revenue growth and margin expansion.  Among those drivers, the Company listed "***Profitable Organic Growth***" from, among other things, "***Pricing Optimization***."

184.    Defendant Mallard's statements on the August 8, 2017 Earnings Call, as well as the Company's statements in the August 8, 2017 Investor Presentation, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

185.    Defendant Beck elaborated further on the August 8, 2017 Earnings Call by touting Jeld-Wen's "#1 position by net revenues in the majority of countries and markets we serve."  He attributed the Company's leading market position to "***offering well-designed, high-quality products***."

186.    Defendant Beck's statement on the August 8, 2017 Earnings Call attributing Jeld-Wen's leading market position to well-designed, high-quality products was materially false and misleading for the same reasons set forth in paragraph 156, herein.

187.    Analysts again reacted positively to Defendants' statements.  For example, on August 8, 2017 analyst Wells Fargo stated that "JELD's [m]argin expansion is truly the crux of this story, and on that front, the [C]ompany has performed admirably."

**September 14, 2017 – RBC Capital Markets Global Industrials Conference**

188.    On September 14, 2017, Jeld-Wen participated in the RBC Capital Markets Global Industrials Conference (the "September 14, 2017 RBC Conference").  Defendant Beck spoke on behalf of Jeld-Wen.  When asked by an analyst if he felt that the current competitive environment in North America was a "rational pricing environment" with "people behaving," Defendant Beck replied "***Yes***."

189.    Defendant Beck's statement during the September 14, 2017 RBC Conference that the current competitive environment was rational and that people were behaving was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**November 7, 2017 – Press Release, 3Q 2017 Earnings Call and Investor Presentation**

190.    On November 7, 2017, Jeld-Wen issued a press release announcing its financial results for the third quarter 2017 (the "November 7, 2017 Press Release").  In the press release, which was also filed with the SEC on Form 8-K, the Company stated that in North America "*[t]he core revenue growth was primarily due to favorable pricing*."

191.    That same day, Jeld-Wen held an earnings call discussing the Company's third quarter 2017 financial results (the "November 7, 2017 Earnings Call").  During that call, Defendant Beck reiterated the Company's position, stating that "*[w]e are delivering core revenue growth with positive pricing*."

192.    Defendant Mallard elaborated further by attributing the Company's third quarter 2017 financial results, including specifically the Company's increase in gross margin and gross margin percentage, as well as its increase in adjusted EBITDA and margin, to legitimate and lawful strategies, including "*favorable pricing* and operational cost savings."

193.    In connection with the November 7, 2017 Earnings Call, Defendants released a presentation for investors (the "November 7, 2017 Investor Presentation") in which Jeld-Wen further emphasized its "World-Class Performance and Returns," highlighting several drivers for revenue growth and margin expansion.  Among those drivers, the Company listed "*Profitable Organic Growth*" from, among other things, "*Pricing Optimization*."

194.    Defendants Beck and Mallard's statements on the November 7, 2017 Earnings Call, as well as the Company's statements in the November 7, 2017 Press Release and November 7, 2017 Investor Presentation, attributing Jeld-Wen's successful financial results to legitimate

and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**November 8, 2017 – 3Q 2017 Form 10-Q**

195.   On November 8, 2017, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended September 30, 2017 ("3Q 2017 10-Q"), which was signed by Defendant Mallard on November 7, 2017.  In discussing the Company's increase in gross margin and gross margin as a percentage of net revenues, as well as the Company's increase in adjusted EBITDA in North America, Defendants stated that the increase was "***due to favorable pricing*** and cost-saving initiatives."

196.   Defendants' statement on the 3Q 2017 10-Q attributing Jeld-Wen's increase in gross margin and gross margin as a percentage of net revenues and adjusted EBITDA to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

197.   Analysts reacted positively to Defendants' statements in the November 7, 2017 Press Release, November 7, 2017 Earnings Call, November 7, 2017 Investor Presentation and the 3Q 2017 10-Q.  For example, on November 7, 2017, analyst Credit Suisse reported that "the continued execution of Jeld-Wen's multi-year turnaround strategy—centered on the development of a lean manufacturing culture, the evolution of its product offerings, and leveraging its leading market positioning—will be reflected in results over time."  And on November 8, 2017, analyst RBC Capital Markets further noted that "[s]olid revenue performance reflects positive price/volume trends augmented by acquired revenues."

**November 8, 2017 – Robert W. Baird Conference**

198.   On November 8, 2017, Jeld-Wen participated in the Robert W. Baird Global Industrial Conference (the "November 8, 2017 Robert W. Baird Conference").  Defendant Beck

spoke on behalf of Jeld-Wen.   When discussing the trajectory and cause of the Company's growth, Defendant Beck stated, "*[w]hat got us from 4% to almost 12% was – about 70% to 75% of that came on the back of price discipline.   When the transformation began, pricing responsibility existed with plant managers, with salespeople, and we've centralized that.   We have a central pricing analytics group, and we've centralized the authority to set pricing.   And we've been very, very disciplined*."

199.     Defendant Beck's statement at the November 8, 2017 Robert A. Baird Conference attributing Jeld-Wen's financial success to legitimate and lawful business factors and strategies, including price discipline and centralized pricing, was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**November 15, 2017 – Second SPO Offering Materials**

200.     On or around November 15, 2017, Jeld-Wen conducted another secondary public offering of the Company's common stock (the "Second SPO").   Jeld-Wen conducted the Second SPO pursuant to a registration statement (the "Second SPO Registration Statement").   On November 17, 2017, Jeld-Wen filed a prospectus for the Second SPO with the SEC on Form 424B4 (the "Second SPO Prospectus"), which incorporated and formed part of the Second SPO Registration Statement (collectively, the "Second SPO Offering Materials").

201.     In the Second SPO Offering Materials, the Defendants represented that "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market. Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

202.     Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating

53

that "*[w]e are focused on profitable growth and will continue to employ a strategic approach to pricing our products. Pricing discipline is an important element of our effort to improve our profit margins and earn an appropriate return on our invested capital*."

203.    Defendants continued to attribute their success to a "*strategic[] change [in] our pricing strategy in several key areas*," including a "*focus[] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*," and an "*increased [] emphasis on pricing optimization*."

204.    Then, in discussing the Company's recent increase in net revenues, Defendants stated that the increase was due, in part, to "*an increase in pricing as a result of implementing our pricing optimization strategy*."

205.    Defendants' statements in the Second SPO Offering Materials that Jeld-Wen operated in a competitive business environment and attributing Jeld-Wen's pricing optimization strategy and financial success to legitimate and lawful business factors and strategies were demonstrably false and materially misled investors for the same reasons set forth in paragraphs 147-49, herein.

**February 15, 2018 – Press Release**

206.    On February 15, 2018, Jeld-Wen issued a press release (the "February 15, 2018 Press Release") in which it announced that a jury in the United States District Court for the Eastern District of Virginia, Richmond Division, had returned a verdict in the lawsuit filed by Steves & Sons finding Jeld-Wen's wholly owned subsidiary Jeld-Wen Inc. liable for violation of Section 7 of the Clayton Act and breach of the parties' supply agreement.  The press release further disclosed that the jury had awarded Steves & Sons damages in the total amount of $176 million, including past damages and future lost profits.  The verdict form returned by the jury contained no additional clarifying factual detail or explanation for that decision and, notably, the

vast majority of the Steves & Sons Litigation docket is sealed or redacted, making it impossible to glean specific details about Jeld-Wen's anticompetitive conduct.

207.   The Company downplayed the import and accuracy of the jury verdict, stating that:

> ***The Company continues to believe that the facts underlying this dispute do not establish either a violation of the antitrust laws or a breach of contract.***  The Company notes that both before and after the CMI acquisition, the Antitrust Division of the Department of Justice reviewed the transaction and did not challenge it.  JELD-WEN believes that multiple pretrial and trial rulings were erroneous and improperly limited the Company's defenses, and that judgment in accordance with the verdict would be improper for several reasons under applicable law.  JELD-WEN intends to vigorously oppose entry of an adverse judgment, and to appeal any adverse judgment that may be entered.  Accordingly, ***the Company does not believe that the ultimate outcome of this matter will have a material impact on its ability to operate in the ordinary course of business***.

208.   These statements in the February 15, 2018 Press Release were demonstrably false and materially misled investors because Defendants failed to disclose that Jeld-Wen was engaged in anticompetitive conduct in violation of Clayton Act Section 7 through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers and that, therefore, a final ruling against Jeld-Wen was likely and would likely have a material impact on Jeld-Wen's business.

209.   The market bought Defendants' story.  Bank of America noted on February 16, 2018 that:

> It seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition prior to its consummation in 2012.  Furthermore, during the period between the acquisition closing and the filing of the complaint by Steves, the DOJ was once again asked to review the JELD/CMI transaction and maintained its original opinion that no antitrust issues existed.

210.   Bank of America further reported that "we believe the fundamental positive stock story remains intact."  Gabelli echoed these sentiments on February 20, 2018, noting that "we see

any divestitures with regard to CMI as unlikely.  This deal was reviewed twice by the DOJ and passed without issue in 2012."  Thus, despite the verdict, market participants were still lulled into a false sense of security by Defendants' continuing misstatements.

**February 21, 2018 – 4Q 2017 Earnings Call**

211.   On February 21, 2018, Jeld-Wen held an earnings call discussing the Company's fourth quarter and full year 2017 financial results (the "February 21, 2018 Earnings Call"). During that call, Defendant Beck further addressed the jury verdict in the Steves & Sons Litigation, stating that "*we continue to believe that the claims asserted in the litigation lack merit*.  I will note that the Department of Justice reviewed our acquisition of CMI twice and declined to take any action.  *Furthermore, we believe that we acted in good faith and in compliance with our contractual agreements*."  Defendant Beck further noted that despite the verdict, "[a]t this time, we have not reserved for any judgment related to this matter, *as we do not believe that a loss is probable and estimable for the reasons that we've just described*."

212.    Defendant Beck's statements on the February 21, 2018 Earnings Call denying Defendants' anticompetitive behavior were materially false and misleading for the same reasons set forth in paragraphs 147-49, 208, herein.

213.   Analysts credited Defendants' statements made during the February 21, 2018 Earnings Call regarding the Steves & Sons Litigation.  For example, analyst RBC Capital Markets noted the next day that "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the CMI [A]cquisition twice. JELD does not believe that a loss is probable or estimable."

**March 6, 2018 – 2017 Form 10-K**

214.   On March 6, 2018, Defendants filed with the SEC their Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K"), which was signed by Defendants

Mallard and Hachigian.  In discussing the competitive environment in which the Company operates, Defendants stated, "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market.  Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

215.   Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]hile we operate in competitive markets, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins.  Our strategies also include incentivizing our channel partners to sell our higher margin products, and we believe a renewed focus on innovation and the development of new technologies will increase our sales volume and the overall profitability of our product mix*."

216.   Defendants continued to attribute their success to a "*strategic[ ] change [in] our pricing strategy in several key areas*," including a "*focus[ ] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*," and an "*increased [] emphasis on pricing optimization*."

217.   Then, in discussing the Company's increase in gross margin and gross margin percentage and its increase in adjusted EBITDA in North America, Defendants stated that these increases were "*due to favorable pricing*," among others.

218.   Defendants' statements in the 2017 10-K, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**May 8, 2018 – 1Q 2018 Earnings Call**

219.    On May 8, 2018, Jeld-Wen held an earnings call discussing the Company's first quarter 2018 results (the "May 8, 2018 Earnings Call").   When discussing the trajectory and cause of the Company's growth, Defendant Hachigian stated, "***I think the path from 4% to 12% has been primarily getting rid of bad-margin business, taking pricing actions to get us back to price points that were prerecession***."

220.    Defendant Hachigian's statement on the May 8, 2018 Earnings Call attributing Jeld-Wen's financial success to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**May 9, 2018 – 1Q 2018 Form 10-Q**

221.    On May 9, 2018, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended March 31, 2018 ("1Q 2018 10-Q"), which was signed by Defendant Mallard on May 8, 2018.   In discussing the Company's increase in gross margin and gross margin as a percentage of net revenues, Defendants stated that the increase was "***due to favorable pricing***, cost-saving initiatives and contribution from recent acquisitions."

222.    Defendants' statement in the 1Q 2018 10-Q attributing Jeld-Wen's increase in gross margin and gross margin as a percentage of net revenues to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**August 7, 2018 – 2Q 2018 Form 10-Q**

223.    On August 7, 2018, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended June 30, 2018 ("2Q 2018 10-Q"), which was signed by Defendant Mallard.   In discussing the Company's increase in gross margin and net revenues in North

America, Defendants stated that the increase was "***due to favorable pricing***," among other things.

224.    Defendants' statement in the 2Q 2018 10-Q attributing Jeld-Wen's increase in gross margin and net revenues in North America to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

## August 7, 2018 – 2Q Earnings Call

225.    On that same day, Jeld-Wen held an earnings call discussing the Company's second quarter 2018 financial results (the "August 7, 2018 Earnings Call").  During that call, Defendant Michel attributed the Company's "strong revenue growth," in part, to legitimate and lawful strategies, including "***improved pricing in all 3 regions both compared to [the] prior year as well as sequentially compared to the first quarter***."

226.    Defendant Michel's statement on the August 7, 2018 Earnings Call attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

227.    On the same call, when asked about the Steves & Sons verdict, Defendant Michel reiterated that "***JELD-WEN believes that the jury verdict in this case is erroneous***."

228.    Defendant Michel's statement on the August 7, 2018 Earnings Call denying Defendants' anticompetitive behavior was materially false and misleading for the same reasons set forth in paragraphs 147-49, 208, herein.

## October 6, 2018 – Press Release

229.    On October 5, 2018, the Judge presiding over the Steves & Sons Litigation released his findings of fact following an evidentiary hearing on the issue of divestiture which specifically detailed Jeld-Wen's anticompetitive conduct, including, among other things, that

Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."   The Judge further ruled that as part of the resolution of that case, Jeld-Wen would be required to divest the Towanda, Pennsylvania doorskin facility that the Company had obtained as part of its acquisition of CMI.

230.    Yet, rather than admit to investors that Jeld-Wen had been engaged in anticompetitive conduct and that this conduct was the source of the Company's financial success, Defendants continued to reassure the market as to their innocence.

231.    On October 6, 2018, Jeld-Wen issued a press release addressing the October 5, 2018 decision (the "October 6, 2018 Press Release").   In the press release, which was also filed with the SEC on Form 8-K on October 9, 2018, the Company stated that "***JELD-WEN firmly maintains that it has not violated any antitrust laws***," and that the October 5, 2018 ruling was "***incorrect due to multiple flawed rulings during the trial process***."

232.    The Company further reiterated that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

233.    Defendants' statements in the October 6, 2018 Press Release denying the Company's anticompetitive behavior and claiming that the October 5, 2018 decision was incorrect were materially false and misleading for the same reasons set forth in paragraphs 147-49, 208, herein.

234.    Analysts were reassured by Defendants' statements.  For example, as Bank of America reported on October 8, 2018, "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

## VI.    FACTS ABOUT THE FULL IMPACT OF DEFENDANTS' ANTICOMPETITIVE CONDUCT ARE GRADUALLY REVEALED

235.    As set forth in Section VII, *supra*, the full extent of Defendants' fraud was gradually revealed through the disclosure of new information about Jeld-Wen's antitrust violations and the effect they would have on the Company.  On October 5, 2018, Judge Payne released his findings of fact following an evidentiary hearing on the issue of divestiture which specifically detailed Jeld-Wen's anticompetitive conduct, including, among other things, that Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."  The Judge further ruled that as part of the resolution of that case, Jeld-Wen would be required to divest the Towanda, Pennsylvania doorskin facility that the Company had obtained as part of its acquisition of CMI.

236.    This decision caused several securities analysts to lower their price targets on Jeld-Wen stock over the ensuing trading days, with analysts at RBC Capital Markets noting on October 8, 2018 that up to 33% of Jeld-Wen's global doorskin manufacturing capacity would be lost by the divestiture of the Towanda plant.  Analyst Bank of America further commented on October 8, 2018 that the divestiture "could be the worst case scenario."

237.    In response to the October 5, 2018 ruling, Jeld-Wen's stock price declined over the course of two days by $1.18 per share, or nearly 5%, to close at $22.91 on October 9, 2018.

238.    Still, the Company's stock price remained artificially inflated even after this ruling, as Defendants continued to reassure the market that "JELD-WEN firmly maintains that it has not violated any antitrust laws," and that the October 5, 2018 ruling was "incorrect due to multiple flawed rulings during the trial process."   The Company further reiterated that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

239.    Analysts were reassured by Defendants' statements.   For example, as Bank of America reported on October 8, 2018, "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

240.    Then, on October 15, 2018, more facts concerning Defendants' anticompetitive conduct were fully revealed and/or materialized.   On that date, Jeld-Wen admitted that the Company expected its third quarter 2018 financial results to include a $76.5 million charge related to the Steves & Sons Litigation, which reflected the judgment anticipated to be entered against Jeld-Wen, as recent rulings in the case "now provided sufficient detail for the [C]ompany to estimate future liabilities."   The Company also announced the sudden resignation of its CFO, Defendant Mallard, to be replaced by Senior Vice President, Corporate Development and Investor Relations, John Linker.

241.   Analysts were shocked by the admission that Jeld-Wen would likely be required to pay a penalty for antitrust violations, despite their repeated assurances to the market that the Company did not violate any laws and that the decision would be overturned on appeal.  For example, J.P. Morgan noted on October 16, 2018 that "[n]et net, we expect the stock to react negatively tomorrow."  The next day, Gabelli reported that "[i]n retrospect, we underestimated the challenges JELD faced in 2018 from litigation."  RBC Capital Markets agreed, noting on November 7, 2018 that "[w]e think investor concerns regarding both the current management transitions and the unfavorable legal litigation with Steves & Sons are warranted."

242.   As a result of the shocking news, Jeld-Wen's stock fell precipitously by $4.03 per share, or *19%*, to close at $17.28 on October 16, 2018, on unusually high trading volume of 6.9 million shares.

## VII.   LOSS CAUSATION

243.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Jeld-Wen common stock and operated as a fraud or deceit on Class Period purchasers of Jeld-Wen common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

244.   Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Jeld-Wen common stock at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased Jeld-Wen stock at the artificially inflated prices at which it traded during the Class Period.

245.   The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between October 5, 2018 and October 15, 2018.  During this period, Jeld-Wen's stock fell precipitously as the

artificial inflation caused by Defendants' unlawful conduct exited Jeld-Wen's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on October 15, 2018 that the full truth was known to the market, such that there was no longer any artificial inflation in Jeld-Wen's stock price attributable to the fraud.

246.    The declines in Jeld-Wen's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

247.    As a result of their purchases of Jeld-Wen common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Jeld-Wen common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $42.27 per share on January 5, 2018.

248.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Jeld-Wen's business. As the truth about the Company and the extent of the fraud was revealed to the market, the price of Jeld-Wen common stock fell significantly. These declines removed the inflation from the price of Jeld-Wen common stock, causing real economic loss to investors who had purchased Jeld-Wen common stock during the Class Period.

### A.    October 5, 2018 – First Partial Disclosure

249.    On October 5, 2018, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized after the close of trading, when Judge Payne, the Judge presiding over the Steves & Sons Litigation, released his findings of fact following an

evidentiary hearing on the issue of divestiture which specifically detailed Jeld-Wen's

anticompetitive conduct, including, among other things, that Jeld-Wen "decided to approach the

DOJ only after it had entered into long-term supply contracts with the [Independent Door

Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and the

[Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

250.    Judge Payne further found that:

[I]t is necessary to remember that JELD-WEN was aware at the time of the
merger that the antitrust issues associated with the CMI Acquisition were
significant.  Indeed, having calculated market concentration as a consequence of
the forthcoming acquisition and the Herfindahl-Hirschman indices for markets
impacted by the merger, JELD-WEN retained highly-qualified antitrust counsel
from one of the nation's largest law firms, O'Melveny & Myers.  In sum, and as
the record shows, JELD-WEN knew full well of the merger's antitrust
implications.

Mindful of those implications, JELD-WEN pursued an established merger
strategy to assuage any possible concerns from the DOJ, from CMI's customers,
and from JELD-WEN's own customers (including Steves).  Specifically, JELD-
WEN developed a plan to enter into long-term supply agreements with
[I]ndependent [D]oor [M]anufacturers in the United States. . . .  As part of its
strategy, JELD-WEN deliberately decided not to approach the DOJ about the
proposed CMI Acquisition until those long-term agreements had been entered.  In
fact, JELD-WEN's internal documents show that the [C]ompany considered it a
"tactical error to even call [the DOJ]" before entering into those supply
agreements, and that JELD-WEN was fully aware that having those contracts in
place would "be very positive for us [at the DOJ] if we ever go."

251.    Judge Payne went on:

And, when JELD-WEN did approach the DOJ about the CMI Acquisition, it
emphasized its long-term supply agreements with Steves, Lynden, and others.
And [James] Morrison, who led the [C]ompany's presentation to the DOJ,
admitted that the purpose of entering into such contracts was "to alleviate"
customer concerns about not having a supply and "to assure the customers of
CMI, who might eventually become customers of JELD-WEN, that JELD-WEN
was committed to their continued supply."

252.    Finally, Judge Payne ruled that as part of the resolution of that case, Jeld-Wen would be required to divest the Towanda, Pennsylvania doorskin facility that the Company had obtained as part of its acquisition of CMI.

253.    The October 5, 2018 decision requiring divestiture of the Towanda facility and finding, as a matter of law, the specific anticompetitive actions undertaken by Defendants, was a foreseeable consequence of, and within the zone of risk concealed by, the Defendants' misrepresentations and omissions concerning the true source of Jeld-Wen's financial success— Defendants' anticompetitive conduct, including the Company's motivation behind the CMI Acquisition and its plan to enter into the long-term doorskin supply arrangements with Independent Door Manufacturers in order to get approval from the DOJ for the CMI Acquisition and with the intention to break those contracts thereafter.

254.    Moreover, the October 5, 2018 decision revealed new information that Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market.  This decision partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the source of the Company's financial success, including that the cause of that success was not "pricing optimization" and "pricing discipline," as Defendants claimed, but was rather due to that anticompetitive conduct.

255.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Jeld-Wen common stock declined over the course of two days by $1.18 per share, or nearly 5%, to close at $22.91 on October 9, 2018.

256.     This decision caused several securities analysts to lower their price targets on Jeld-Wen stock over the ensuing trading days, with analysts at RBC Capital Markets noting on October 8, 2018 that up to 33% of Jeld-Wen's global doorskin manufacturing capacity would be lost by the divestiture of the Towanda plant.  Analyst Bank of America further commented on October 8, 2018 that the divestiture "could be the worst case scenario."

257.     Still, the Company's stock price remained artificially inflated even after this ruling, as Defendants continued to reassure the market that "JELD-WEN firmly maintains that it has not violated any antitrust laws," and that the October 5, 2018 ruling was "incorrect due to multiple flawed rulings during the trial process."   The Company further reiterated that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

258.     Analysts were reassured by Defendants' statements.  For example, as Bank of America reported on October 8, 2018, "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI acquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

**B.     October 15, 2018 – Final Partial Disclosure**

259.     On October 15, 2018, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized.   On that date, Jeld-Wen finally admitted that the Company expected its third quarter 2018 financial results to include a $76.5 million charge related to the Steves & Sons Litigation, and reflected the judgment anticipated to be entered

against Jeld-Wen, as recent rulings in the case "now provided sufficient detail for the [C]ompany to estimate future liabilities." The Company simultaneously announced the resignation of its CFO, Defendant Mallard.

260. The October 15, 2018 disclosures that Jeld-Wen now expected to be held liable for violation of the Clayton Act and that it expected a $76.5 judgment to be entered against them, in addition to the resignation of Defendant Mallard, were foreseeable consequences of, and within the zone of risk concealed by, the Defendants' misrepresentations and omissions concerning the true source of Jeld-Wen's financial success—Defendants' anticompetitive conduct, including the Company's motivation behind the CMI Acquisition and its plan to enter into the long-term doorskin supply arrangements with Independent Door Manufacturers in order to get approval from the DOJ for the CMI Acquisition and with the intention to break those contracts thereafter.

261. Moreover, the October 15, 2018 disclosures revealed new information that Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the source of the Company's financial success, including that the cause of that success was not "pricing optimization" and "pricing discipline," as Defendants claimed, but was rather due to that anticompetitive conduct.

262. On this shocking news, the price of Jeld-Wen stock fell precipitously by $4.03 per share, or *19%*, to close at $17.28 on October 16, 2018, on unusually high trading volume of 6.9 million shares. Analysts were surprised by this revelation, with Gabelli noting on October 17, 2018 that "[i]n retrospect, we underestimated the challenges JELD faced in 2018 from

68

litigation."  RBC Capital Markets agreed, noting on November 7, 2018 that "[w]e think investor concerns regarding both the current management transitions and the unfavorable legal litigation with Steves & Sons are warranted."

263.    Each decline in the price of Jeld-Wen common stock, as detailed above, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

264.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Jeld-Wen common stock and the subsequent significant decline in the value of Jeld-Wen common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

265.    The market for Jeld-Wen common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 769,536 during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, Jeld-Wen's common stock traded at artificially inflated prices.  Lead Plaintiffs and other Class members purchased Jeld-Wen common stock relying upon the integrity of the market relating to Jeld-Wen common stock and suffered economic losses as a result thereof.

266.    The declines in Jeld-Wen's common stock price on October 8-9, 2018 and October 16, 2018 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the markets closed on October 5, 2018, and October 15, 2018.  The timing and magnitude of Jeld-Wen's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was

caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

## VIII.   ADDITIONAL INDICIA OF SCIENTER

267.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Jeld-Wen and the Individual Defendants' materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *infra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A.    Defendants Were Aware of Antitrust Problems With the CMI Acquisition and Knew That the DOJ Would Object Absent the Long-Term Supply Agreements

268.    *First*, Defendants were aware that absent the long-term supply agreements, the DOJ would object to the CMI Acquisition as anticompetitive.  In particular, in 2001, Premdor sought to acquire Masonite, creating a vertically-integrated manufacturer of both doorskins and interior molded doors.  The DOJ, recognizing the strong incentive by manufacturers to collude to increase the price of interior molded doors, filed suit to block the merger, alleging that Premdor's acquisition of Masonite would violate Section 7 of the Clayton Act.  In fact, the DOJ only agreed to permit the acquisition on the condition that Premdor be ordered to divest the exact same Towanda, Pennsylvania doorskins manufacturing plant at issue in the CMI Acquisition.

269.    Defendants thus knew that the DOJ was concerned about anticompetitive conduct stemming from a market consisting of only two vertically-integrated interior door manufacturers. And in fact, the competitive landscape that resulted from the CMI Acquisition—two dominant,

vertically-integrated interior molded door manufacturers with incentives to coordinate—was exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in 2001.

270.    Notably, on October 5, 2018, following an evidentiary hearing, the Judge presiding over the Steves & Sons Litigation—Judge Payne—specifically found that "Jeld-Wen *was aware at the time of the merger that the antitrust issues associated with the CMI Acquisition were significant*."    Judge Payne went on that, "having calculated market concentration as a consequence of the forthcoming acquisition and the Herfindahl-Hirschman indices for markets impacted by the merger, Jeld-Wen retained highly-qualified antitrust counsel from one of the nation's largest law firms, O'Melveny & Myers.  In sum, and as the record shows, *Jeld-Wen knew full well of the merger's antitrust implications*."

271.    Armed with this knowledge of the potential antitrust issues that could be implicated by the CMI Acquisition, Judge Payne found that Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], *knowing that this oft-used tactic would assuage the concerns of the DOJ* and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

272.    Specifically:

JELD-WEN pursued an established merger strategy to assuage any possible concerns from the DOJ, from CMI's customers, and from JELD-WEN's own customers (including Steves).  Specifically, JELD-WEN developed a plan to enter into long-term supply agreements with [I]ndependent [D]oor [M]anufacturers in the United States. . . .  As part of its strategy, JELD-WEN deliberately decided not to approach the DOJ about the proposed CMI Acquisition until those long-term agreements had been entered.  In fact, JELD-WEN's internal documents show that the [C]ompany considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, and that JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go."

273.    Moreover, Judge Payne found that when Jeld-Wen ultimately did approach the DOJ, "it emphasized its long-term supply agreements with Steves, Lynden and others."   As further admitted by James Morrison, the Company's former Executive Vice President and Chief Operating Officer, who led the Company's presentation to the DOJ, "the purpose of entering into such contracts was 'to alleviate' customer concerns about not having a supply and 'to assure the customers of CMI, who might eventually become customers of JELD-WEN, that JELD-WEN was committed to their continual supply.'"

274.    In response to these representations by Jeld-Wen, the DOJ began to contact the external door manufacturers with which Jeld-Wen had long-term supply agreements and asked those manufacturers if they had any problems with the Acquisition.

275.    Based on the belief that Jeld-Wen would honor the Supply Agreement, Steves & Sons informed the DOJ that it did not object to the CMI Acquisition.  According to the complaint filed in the Steves & Sons Litigation, the other smaller Independent Door Manufacturers with which Jeld-Wen had supply agreements also did not object to the Acquisition.

276.    Notwithstanding their representations to the DOJ and their clear knowledge that the DOJ did not object to the CMI Acquisition only in reliance upon those long-term supply agreements, Defendants, including specifically Defendant Hachigian during his tenure as President and CEO in 2014, directed the Company to implement price increases and break the long-term doorskin supply agreements.  Thus, Defendants were aware that their conduct was directly in contravention of federal antitrust laws.

**B.      Jeld-Wen's Sales Practices Were Critical to Its Core Operations**

277.    *Second*, the Individual Defendants' knowledge that the Company's anticompetitive conduct was a major source of its financial success can be inferred because interior molded doors were a core product, the sale of which was critical to Jeld-Wen's business.

Specifically, the sale of doors constituted a significant portion of Jeld-Wen's business, accounting for approximately 67% of Jeld-Wen's revenues during the Class Period.

278.    Moreover, Steves & Sons filed its lawsuit in 2016, seeking to hold Jeld-Wen liable for treble damages under the Clayton Act, and further seeking divestiture of the Towanda, Pennsylvania doorskins manufacturing facility, which alone accounts for up to 33% of Jeld-Wen's doorskin manufacturing capacity.  As analysts have noted, the success of Steves & Sons in obtaining the divestiture of the Towanda facility "could be the worst case scenario."

279.    Given the importance of the sale of interior molded doors to Jeld-Wen's business, as well as the materiality of the Towanda facility to Jeld-Wen's ability to manufacture those interior molded doors, knowledge of the Company's sales practices for interior molded doors and doorskins, including the Company's anticompetitive conduct as described above, can therefore be imputed to the Individual Defendants.

### C.    Defendants' Statements Support a Strong Inference of Scienter

280.    *Third*, as discussed above, the Individual Defendants spoke at length during the Class Period about the source of the Company's financial success, attributing it to "***pricing optimization***," "***favorable pricing***," "***strategic pricing***," and "***pricing discipline***," among other legitimate and lawful factors.  Defendants further spoke directly to the underlying merits and validity of the Steves & Sons antitrust claims.

281.    These false and misleading statements, and others like these, provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing about Jeld-Wen's antitrust violations, which were a major source of Jeld-Wen's financial success that Defendants neglected to disclose.  Accordingly, Defendants breached their duty under the federal securities laws by speaking on these topics and failing to fully disclose all relevant material information while doing so.

282.    During the Class Period, each of the Individual Defendants unambiguously informed investors that the source of the Company's financial success was legitimate and lawful pricing strategies.  For example, during the February 22, 2017 Earnings Call, Defendant Mallard attributed the Company's fourth quarter and full year 2016 financial results, including specifically the Company's increase in adjusted EBITDA and EBITDA margins, to "*favorable pricing, improved cost productivity, and the favorable impact of recent acquisitions*."  He went on to say that the improvement in Jeld-Wen's revenues "*was driven by a 5% core growth comprised of a 2% benefit from our pricing optimization strategy in all three segments*."  On the November 7, 2017 Earnings Call, Defendant Beck stated that "*[w]e are delivering core revenue growth with positive pricing*."

283.    Defendant Hachigian made a similar statement about the Company's success on the May 8, 2018 Earnings Call, stating, "*I think the path from 4% to 12% has been primarily getting rid of bad-margin business, taking pricing actions to get us back to price points that were prerecession*."   Likewise, on the August 7, 2018 Earnings Call, Defendant Michel attributed the Company's "strong revenue growth," to, among others, "*improved pricing in all 3 regions both compared to [the] prior year as well as sequentially compared to the first quarter*."

284.    Even after the February 15, 2018 jury verdict in the Steves & Sons Litigation, Defendants Beck and Michel assured investors that the ruling was erroneous and the allegations lacked merit.  Specifically, on February 21, 2018, Defendant Beck stated that "*we continue to believe that the claims asserted in the litigation lack merit.  I will note that the Department of Justice reviewed our acquisition of CMI twice and declined to take any action.  Furthermore, we believe that we acted in good faith and in compliance with our contractual agreements*."

Similarly, Defendant Michel stated on the August 7, 2018 Earnings Call, "**JELD-WEN believes that the jury verdict in this case is erroneous**."

285.    By repeatedly insisting that Jeld-Wen's success was due to legitimate and lawful pricing strategies, and that the Steves & Sons Litigation lacked merit, Defendants either: (1) knew that the Company had been participating in anticompetitive conduct through the CMI Acquisition and the Company's subsequent actions, and that this was a major source of the Company's financial success; or (2) were reckless in not knowing or investigating that this was the case.   Under either scenario, there is a strong inference that Defendants made these statements with scienter.

### D.    The Individual Defendants Were Directly in Charge of Setting Price Increases

286.    *Fourth*, Defendants Beck, Mallard, Hachigian, and Michel were all in charge of approving and implementing price increases and thus had intimate knowledge, or were reckless in not knowing, that those price increases were a result of coordination with Masonite to drive up the cost of interior molded doors.

287.    Indeed, multiple former employees confirmed that this was true.   Specifically, CW 3 explained that price increases were discussed and approved by a pricing group, which included the CEO and the CFO, as well as Controllers, product line managers, the sales team, and operations personnel.   Similarly, CWs 2, 4 and 6, all unambiguously confirmed that price increases were always approved by the CEO.

288.    CW 4 expanded upon this, noting that during his tenure Defendant Hachigian was hands-on with regards to pricing, and Defendant Beck was "very, very" hands-on in this regard.

289.    In late 2012, shortly after Jeld-Wen acquired CMI, Jeld-Wen and Masonite began imposing uniform price increases on interior molded doors.   At least nine times between 2012

and 2018, Jeld-Wen and Masonite increased the prices of their interior molded doors in the same or similar percentage increments, either simultaneously or in brief succession of each other.

290.     With their authority to ultimately approve and implement these price increases, all of the Individual Defendants knew, or were reckless in not knowing, that those increases were the result of coordination and/or collusion with Masonite to drive up the cost of interior molded doors.

> **E.     The Timing and Circumstances of Defendant Mallard's Departure Support a Strong Inference of Scienter**

291.     *Fifth*, the timing and circumstances of the resignation of Defendant Mallard, the CFO at Jeld-Wen throughout the Class Period, is highly suspicious.  That this resignation is temporally connected to disclosures of the Company's fraud further supports that inference.

292.     Throughout the entire Class Period, Defendant Mallard, as CFO of Jeld-Wen, was in charge of the Company's finances and spoke regularly about the Company's financial success and the purported reasons for that success.  Defendant Mallard further signed all of Jeld-Wen's 10-Ks and 10-Qs during the Class Period, which contained materially false and misleading statements and omissions of material fact regarding the competitive environment in which Jeld-Wen operated and attributed the source of Jeld-Wen's success to legitimate factors such as "pricing optimization" and "pricing discipline."  His sudden resignation ***on the same day*** that the Company admitted that it would likely be liable to Steves & Sons for violations of the Clayton Act in the amount of $76.5 million, with no previous public warning, supports a strong inference of scienter.

## IX.     CONTROL PERSON ALLEGATIONS

293.     The Individual Defendants and the Onex Defendants, by virtue of their high-level and controlling positions at Jeld-Wen, directly participated in the management of the Company,

were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

294.    Defendants Beck, Mallard, Hachigian, and Michel, as senior executive officers of Jeld-Wen, Defendants Beck, Hachigian, and Michel as directors of Jeld-Wen, and the Onex Defendants as controlling shareholder of Jeld-Wen—a publicly-held company whose common stock was, and is, traded on the NYSE, and governed by the federal securities law—each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Jeld-Wen's publicly traded common stock would be based on accurate information.   The Individual Defendants and the Onex Defendants each violated these requirements and obligations during the Class Period.

295.    Defendants Beck, Mallard, Hachigian, and Michel, because of their positions of control and authority as senior executive officers of Jeld-Wen, Defendants Beck, Hachigian, and Michel, as Jeld-Wen directors, and the Onex Defendants, as the controlling shareholder of Jeld-Wen, were able to and did control the content of Jeld-Wen's SEC filings, press releases, and other public statements issued by or on behalf of Jeld-Wen during the Class Period.  Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or

cause them to be corrected.  Accordingly, the Individual Defendants and the Onex Defendants are responsible for the accuracy of the public statements alleged herein.

296.    The Individual Defendants and the Onex Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Jeld-Wen common stock by disseminating materially false and misleading information, and concealing and omitting material adverse facts.  The scheme deceived the investing public regarding Jeld-Wen's business, operations, and management, and the intrinsic value of Jeld-Wen's common stock, and caused Lead Plaintiffs and members of the Class to purchase Jeld-Wen common stock at artificially inflated prices.

## X.    CLASS ACTION ALLEGATIONS

297.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded securities, including common stock, of Jeld-Wen during the Class Period and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Jeld-Wen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Jeld-Wen's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

298.    The members of the Class are so numerous that joinder of all members is impracticable.  According to its quarterly and annual reports filed with the SEC, during the Class Period, Jeld-Wen had over 100 million shares of common stock outstanding and was actively traded on the NYSE under the ticker symbol "JELD."   While the exact number of Class

members is unknown to Lead Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed geographically.  Record owners and other members of the Class may be identified from records maintained by Jeld-Wen and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

299.    Lead Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

300.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

301.    Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)    Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    Whether, and to what extent, the market price of Jeld-Wen common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)      Whether the Individual Defendants and the Onex Defendants were controlling persons of Jeld-Wen; and

(f)      Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

302.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

303.    To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      the Company's securities traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)      Lead Plaintiffs and other members of the Class purchased Jeld-Wen's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)      Jeld-Wen's stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)      as a regulated issuer, Jeld-Wen filed periodic public reports with the SEC and the NYSE;

(h)      Jeld-Wen regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)      Jeld-Wen was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Wells Fargo Securities, J.P. Morgan, Jefferies, RBC Capital Markets, Deutsche Bank, Barclays, Bank of America, Credit Suisse Gabelli, Wedbush and SunTrust Robinson Humphrey, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

304.    As a result of the foregoing, the market for Jeld-Wen's securities promptly digested current information regarding Jeld-Wen from publicly available sources and reflected such information in Jeld-Wen's securities price(s).  Under these circumstances, all persons and entities who or which purchased or otherwise acquired Jeld-Wen's securities during the Class Period suffered similar injuries through their purchase of Jeld-Wen at artificially inflated prices and thus, the presumption of reliance applies.

305.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Jeld-Wen common stock.

306.     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of Jeld-Wen's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

307.     To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Jeld-Wen's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII.   NO SAFE HARBOR

308.     The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.   First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions.   Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.   Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

309.     To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

310.     In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from

82

those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

311.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.   To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.  As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Jeld-Wen was engaged in anticompetitive conduct which led to increased revenues on interior molded doors and doorskins.

312.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Jeld-Wen who knew that the statement was false when made.

## XIII.   CAUSES OF ACTION

### COUNT I

#### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
#### Against Jeld-Wen and the Individual Defendants

313.    Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

314.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Jeld-Wen and the Individual Defendants.

315.    As alleged herein, throughout the Class Period, Jeld-Wen and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Jeld-Wen and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially inflate and maintain the price of Jeld-Wen common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase Jeld-Wen common stock at artificially inflated prices.

316.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

317.    As set forth above, Jeld-Wen and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased Jeld-Wen common stock during the Class Period.

318.    In ignorance of the false and misleading nature of Jeld-Wen and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or

upon the integrity of the market price for Jeld-Wen common stock, Lead Plaintiffs and other members of the Class purchased Jeld-Wen common stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiffs and members of the Class would not have purchased Jeld-Wen common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Jeld-Wen common stock declined precipitously and Lead Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Jeld-Wen common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

319.     By virtue of the foregoing, Jeld-Wen and the Individual Defendants are liable to Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Individual Defendants and Onex Defendants

320.     Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

321.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants and the Onex Defendants.

322.     The Individual Defendants had control over Jeld-Wen and made the material false and misleading statements and omissions on behalf of Jeld-Wen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive leadership positions and positions as directors of Jeld-Wen, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements

which Lead Plaintiffs contend were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

323.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

324.    The Onex Defendants had control over Jeld-Wen and made the material false and misleading statements and omissions on behalf of Jeld-Wen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their voting power, ownership, rights as against Jeld-Wen, and/or specific acts, as alleged above, the Onex Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend were false and misleading.  The Onex Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

325.    By reason of such wrongful conduct, the Individual Defendants and Onex Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants and Onex Defendants' wrongful conduct, Lead Plaintiffs and

the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.  Determining that this action is a proper class action, and certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel for the Class;

B.  Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.  Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: June 22, 2020                    Respectfully submitted,

                                        */s/ Steven J. Toll*
                                        **COHEN MILSTEIN SELLERS
                                        & TOLL PLLC**
                                        Steven J. Toll (Va. Bar No. 15300)
                                        1100 New York Avenue, N.W. Suite 500
                                        Washington, D.C. 20005
                                        Telephone: (202) 408-4600
                                        Facsimile: (202) 408-4699
                                        stoll@cohenmilstein.com

                                        *Liaison Counsel for the Class*

87

**LABATON SUCHAROW LLP**
James W. Johnson (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac vice*)
Margaret A. Schmidt (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
mschmidt@labaton.com

*Counsel for Co-Lead Plaintiff Public*
*Employees' Retirement System of Mississippi*
*and for the Class*

**ROBBINS GELLER RUDMAN**
**& DOWD LLP**
Robert Rothman (admitted *pro hac vice*)
58 S. Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
rrothman@rgrdlaw.com

*Counsel for Co-Lead Plaintiff Plumbers and*
*Pipefitters National Pension Fund, Additional*
*Plaintiff Wisconsin Laborers' Pension Fund and*
*for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 22, 2020, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Steven J. Toll*
Steven J. Toll
