**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-00112<br><br>Judge John A. Gibney, Jr.<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT JELD-WEN HOLDING, INC. AND THE INDIVIDUAL DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Sandra C. Goldstein, P.C.
Rachel M. Fritzler
Jacob M. Rae
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

Brian C. Riopelle
Brian E. Pumphrey
Brian D. Schmalzbach
Garrett H. Hooe
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1000

*Attorney for Defendants JELD-WEN Holding, Inc., Mark A. Beck, L. Brooks Mallard, Kirk S. Hachigian, and Gary S. Michel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 3

    A.    JELD-WEN Acquires CMI Following DOJ Review of the Transaction, Brings in New Management, and Changes Its Pricing Strategy. ........................... 4

    B.    Steves Requests a Second DOJ Review, the DOJ Reviews the Merger Again and Takes No Action, and Steves Files Suit. ............................................... 5

    C.    JELD-WEN Goes Public and Discloses the *Steves* Litigation. .............................. 6

LEGAL STANDARD ............................................................................................................... 8

ARGUMENT ........................................................................................................................... 10

I.     THE COMPLAINT FAILS TO PLEAD ANY ACTIONABLE OMISSION .................. 10

II.    THE COMPLAINT FAILS TO PLEAD FALSITY ......................................................... 12

    A.    The Pricing, Competitiveness, and Quality Statements Were Not False. .............. 13

        1.    The Pricing Statements ............................................................................... 14

        2.    The Competitiveness Statements ............................................................... 14

        3.    The Quality Statements .............................................................................. 16

    B.    The Pricing and Quality Statements Were Puffery and Are Not Actionable. ......................................................................................................... 16

    C.    The Litigation Statements and Beck's "Yes" Answer to an Analyst Question Were Opinions, Not Actionable, and Not False. ................................... 17

III.   THE COMPLAINT FAILS TO PLEAD SCIENTER. ..................................................... 20

IV.   THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION. ...................................... 24

    A.    The Complaint Does Not Plead a Loss Caused by the Purported Existence of a Price-Fixing Conspiracy. ................................................................ 25

    B.    The Complaint Has Not Pled Any Corrective Disclosure. ................................... 26

V.    THE CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS. .................... 29

VI.   THE COMPLAINT FAILS TO PLEAD A SECTION 20(A) CLAIM. .......................... 30

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)..................................................................................16

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*,
2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) .......................................................17

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020)..................18, 19

*In re BearingPoint, Inc. Sec. Litig.*,
525 F. Supp. 2d 759 (E.D. Va. 2007),
*aff'd in part, rev'd in part and remanded sub nom.*
*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ................................................................................24

*Brumbaugh v. Princeton Partners*,
985 F.2d 157 (4th Cir. 1993) .................................................................................29

*In re Cable & Wireless, PLC*,
321 F. Supp. 2d 749 (E.D. Va. 2004) ....................................................................16

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).....................................................................10

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)..................................................................................14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)..................................................................................11

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
129 F. Supp. 3d 48 (S.D.N.Y. 2015).................................................................18, 19

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...........................................................17

*In re Cree, Inc. Securities Litigation*,
2005 WL 1847004 (M.D.N.C. Aug. 2, 2005),
*aff'd sub nom. Teachers' Ret. Sys. of LA v. Hunter*,
477 F.3d 162 (4th Cir. 2007) .....................................................................25, 26, 27

*In re Datatec Sys., Inc. Sec. Litig.*,
　2006 WL 3095951 (D.N.J. Oct. 30, 2006)................................................................17

*In re DXC Tech. Co. Sec. Litig.*,
　2020 WL 3456129 (E.D. Va. June 2, 2020) ............................................................16

*In re Galena Biopharma, Inc. Sec. Litig.*,
　2019 WL 5957859 (D.N.J. Nov. 12, 2019) .............................................................11

*Gamm v. Sanderson Farms Inc.*,
　2018 WL 1319157 (S.D.N.Y. Jan. 19, 2018) ..........................................................15

*GO Computer, Inc. v. Microsoft Corp.*,
　508 F.3d 170 (4th Cir. 2007) .............................................................................10, 30

*Herman v. Legent Corp.*,
　50 F.3d 6, 1995 WL 115879 (4th Cir. 1995) ..........................................................23

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
　42 F.3d 204 (4th Cir. 1994) .............................................................................11, 15

*Hirtenstein v. Cempra, Inc.*,
　348 F. Supp. 3d 530 (M.D.N.C. 2018),
　*aff'd sub nom. Janies v. Cempra, Inc.*,
　2020 WL 2770554 (4th Cir. May 28, 2020) .......................................................21, 24

*Hurtado v. Gramercy Prop. Tr.*,
　425 F. Supp. 3d 496 (D. Md. 2019).........................................................................8

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
　432 F. Supp. 2d 571 (E.D. Va. 2006) ...........................................................10, 23, 24

*In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*,
　859 F. Supp. 2d 572 (S.D.N.Y. 2012).....................................................................17

*Katyle v. Penn Nat. Gaming, Inc.*,
　637 F.3d 462 (4th Cir. 2011) ....................................................................... *passim*

*Knox v. Yingli Green Energy Holding Co.*,
　2016 WL 6609210 (C.D. Cal. May 10, 2016) .........................................................17

*Latham v. Matthews*,
　662 F. Supp. 2d 441 (D.S.C. 2009)........................................................................29

*Lewis v. YRC Worldwide Inc.*,
　2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) ........................................................17

iii

*Longman v. Food Lion, Inc.*,
    197 F.3d 675 (4th Cir. 1999) ................................................................................12

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
    876 F.3d 541 (4th Cir. 2017) ...............................................................9, 20, 22, 24

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ................................................................................22

*In re Maximus, Inc. Sec. Litig.*,
    2018 WL 4076359 (E.D. Va. Aug. 27, 2018)................................................25, 26, 28

*McCauley v. City of Chi.*,
    671 F.3d 611 (7th Cir. 2011) ..................................................................................8

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010)........................................................................................29, 30

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)..................................................................................................8

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .............................................................................26

*In re Neustar Sec.*,
    83 F. Supp. 3d 671 (E.D. Va. 2015) .....................................................................29

*Nolte v. Capital One Fin. Corp.*,
    390 F.3d 311 (4th Cir. 2004) ................................................................................17

*In re Novan, Inc.*,
    2018 WL 6732990 (M.D.N.C. Nov. 30, 2018).......................................................24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015).....................................................................................9, 18, 19

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
    353 F.3d 338 (4th Cir. 2003) ................................................................................20

*Proter v. Medifast, Inc.*,
    2013 WL 1316034 (D. Md. Mar. 28, 2013)..........................................................23

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
    551 F.3d 305 (4th Cir. 2009) .............................................................................9, 20

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
    2020 WL 571724 (D. Md. Feb. 4, 2020) ..........................................................14, 15

iv

*Singer v. Reali,*
883 F.3d 425 (4th Cir. 2018) ...................................................................................11

*Teachers' Ret. Sys. of LA v. Hunter,*
477 F.3d 162 (4th Cir. 2007) ........................................................................ *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ....................................................................................3, 8, 9, 20

*In re TransDigm Grp., Inc. Sec. Litig.,*
2020 WL 820823 (N.D. Ohio Feb. 19, 2020) ................................................26, 27

*In re Triangle Capital Corp. Sec. Litig.,*
2019 WL 1083777 (E.D.N.C. Mar. 7, 2019) ...........................................................19

*In re Tyson Foods Inc. Sec. Litig.,*
275 F. Supp. 3d 970 (W.D. Ark. 2017)....................................................................15

*Yates v. Municipal Mortg. & Equity, LLC,*
744 F.3d 874 (4th Cir. 2014) ...............................................................................8, 24

**Statutes**

15 U.S.C. § 18.............................................................................................................6

15 U.S.C. § 78u–4(b)(2) ............................................................................................9

28 U.S.C. § 1658(b)(1) ..............................................................................10, 29, 30

## PRELIMINARY STATEMENT

The securities laws do not punish companies for losing litigation they have fully disclosed to the market.  But that is exactly what Plaintiffs aim to do.  When it went public, JELD-WEN Holding, Inc. ("JELD-WEN" or the "Company") was defending a lawsuit brought by a customer of its doorskin products, Steves & Sons, Inc. ("Steves").  Steves filed a complaint on June 29, 2016 in this District before Judge Robert E. Payne, alleging that JELD-WEN's 2012 acquisition of CraftMaster, Inc. ("CMI") (the "Merger") violated Section 7 of the Clayton Act because it substantially reduced competition in the doorskins market.  Based in no small part on the fact that the Merger had been twice reviewed by the Department of Justice Antitrust Division (the "DOJ")—once before the Merger closed in 2012, and a second time at Steves' request in 2015— JELD-WEN was confident the claims lacked merit.  Nevertheless, as part of its initial public offering, in each of its periodic financial statements, and as part of two secondary public offerings, JELD-WEN disclosed to investors the nature of the *Steves* allegations and the relief sought.

On February 15, 2018, following a public trial, the jury found that the Merger was anticompetitive and that JELD-WEN was liable for over $50 million in damages to Steves.  Even though JELD-WEN promptly issued a press release informing the market of the jury verdict, Plaintiffs insist that the market remained in the dark as to JELD-WEN's alleged misconduct. Instead, Plaintiffs claim that the market did not begin to learn the truth until Judge Payne issued a decision eight months later, on October 5, 2018, on the appropriateness of a divestiture remedy.[1]

In reality, the truth was known throughout the putative class period because JELD-WEN disclosed it, repeatedly.  JELD-WEN told the truth about having changed its pricing strategy in

---

[1]   Plaintiffs no doubt take that position because JELD-WEN's stock did not drop at all on the news of the jury verdict (because of the Company's prior disclosures).  (*See* Ex. 39.)

1

2014; it told the truth about Steves having brought litigation alleging that the Merger and JELD-WEN's doorskins pricing were anticompetitive; and JELD-WEN told the truth when it disclosed the jury's verdict and simultaneously expressed its intention to vigorously dispute that result.

Nonetheless, Plaintiffs attempt to leverage the outcome of the *Steves* litigation into a claim for securities fraud, relying principally on the flawed premise that it was fraud for JELD-WEN and four of its officers (the "Individual Defendants") not to admit to liability during the pendency of the *Steves* litigation. That effort fails. The Complaint should be dismissed for five reasons.

*First*, Plaintiffs fail to identify any actionable omission because the *Steves* Complaint was publicly available and had already survived a motion to dismiss before the putative class period began. Instead, Plaintiffs claim that JELD-WEN's statements are actionable because the Company did not *admit liability*. But that is not the law, and the supposed omissions are not actionable.

*Second*, Plaintiffs fail to plead falsity with the requisite particularity, or even to allege *why* the statements were false. Those statements also are either immaterial puffery or nonactionable opinions premised on JELD-WEN's belief that the Merger and its pricing conduct were lawful.

*Third*, Plaintiffs have failed to plead scienter because the Complaint does not support a strong inference that Defendants acted with severe recklessness or an intent to defraud. Far from alleging facts showing that any JELD-WEN employee, or any Individual Defendant, believed the Merger or the Company's pricing conduct was unlawful, the Complaint points to the opposite conclusion: that Defendants believed the Merger and the Company's pricing conduct were lawful.

*Fourth*, Plaintiffs have failed to plead loss causation because the alleged corrective disclosures revealed nothing more than the adverse outcome to the *Steves* litigation, a known risk.

*Finally*, Plaintiffs' claims are barred by the two-year statute of limitations for Rule 10b-5 claims. This action was initiated on February 19, 2020, more than two years after the February 15,

2018 jury verdict in the *Steves* litigation—the last possible date by which a reasonably diligent investor would have discovered Plaintiffs' allegations.

## FACTUAL BACKGROUND[2]

JELD-WEN is one of the world's premier door and window manufacturers. (Compl. ¶ 2; Ex. 4 at 1 (the "Prospectus").)[3] From a family-run company founded in 1960, JELD-WEN has grown into an independently managed global organization that designs, produces, and distributes an extensive range of interior and exterior doors; wood, vinyl, and aluminum windows; and related products for use in residential and nonresidential buildings. (Prospectus at 1-2.)

One of JELD-WEN's doors products is the "interior molded door," which is "the predominant residential interior door type" in North America. (*Id.* at 9.) Interior molded doors are a low-cost product manufactured by joining two "doorskins" with a wooden frame and a core. (*Id.* at 101; Compl. ¶ 3.) JELD-WEN manufactures its own doorskins for use in its interior molded doors, but also sells doorskins to customers who use them to produce their own doors. (Prospectus at 101; Compl. ¶¶ 49, 67.) Those customers then compete with JELD-WEN in the market for doors. (Ex. 9 at 9.) Doorskins are an ancillary product for JELD-WEN; its business focuses on windows and doors. This is reflected in analyst coverage of the Company, which rarely discusses

---

[2]   Defendants accept all allegations in the Complaint as true for the sole purpose of their Motion to Dismiss, except to the extent the allegations are contradicted by the Complaint or documents incorporated therein. JELD-WEN and the Individual Defendants deny any wrongdoing.

[3]   References to "Ex. _" are to exhibits accompanying the declaration of Jacob M. Rae. Under the Private Securities Litigation Reform Act (the "PSLRA"), "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The exhibits cited herein consist of SEC filings, investor call transcripts, investor presentations, pleadings, and analyst reports that are integral to the Complaint, as well as publicly available docket entries from *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545-REP (E.D. Va. June 29, 2016) (the "*Steves* litigation" or the "*Steves* Docket").

doorskins (except in reference to the *Steves* litigation), and, when it does, discusses doorskins as a component of JELD-WEN's doors rather than as a stand-alone product. (*See, e.g.*, Ex. 14 at 18.)

**A.    JELD-WEN Acquires CMI Following DOJ Review of the Transaction, Brings in New Management, and Changes Its Pricing Strategy.**

In July 2010, Steves, a door manufacturer, began efforts to negotiate a "long-term supply agreement" for doorskins and invited Masonite International Corporation ("Masonite"), JELD-WEN, and CMI to bid for that contract. (Ex. 2 ¶ 52 (the "*Steves* Complaint").) Steves and JELD-WEN executed such an agreement in May 2012 (the "Supply Agreement"). (Compl. ¶¶ 64-66.)

In 2011, while Steves was still seeking a supply agreement, CMI's owners "decided to sell the company by putting it up for auction." (Ex. 32 at 14 (the "Divestiture Decision").) In 2012, JELD-WEN agreed to acquire CMI (the "Merger"). (Compl. ¶ 68.) The DOJ investigated the proposed Merger and spoke with JELD-WEN customers, including Steves. (Compl. ¶¶ 74-77.) Steves did not object to the Merger (*id.* ¶ 77), the DOJ closed its investigation without objecting to the Merger (*Steves* Compl. ¶ 60), and the Merger closed on October 24, 2012 (Compl. ¶ 78).

Following the Merger, the Company underwent a reorganization and "transformation of [its] business from a family-run operation to a global organization." (Prospectus at 2.) Part of that process was hiring a "new senior management team strategically recruited from a number of world-class industrial companies," including, in 2014, Hachigian and Mallard.[4] (*Id.*) This process began in the wake of the "severe downturn" that the global economy, and especially "the U.S. residential and non-residential construction industry," endured from mid-2006 to late 2011. (*Id.* at 20.) That

---

[4]    None of the Individual Defendants worked at JELD-WEN between 2011 and 2012 when the Supply Agreement was entered and the Merger took place. Hachigian was hired as JELD-WEN's President and CEO in March 2014. (Compl. ¶ 34.) Mallard was hired as JELD-WEN's CFO in November 2014. (*Id.* ¶ 33.) Beck was hired as President and CEO in November 2015. (*Id.* ¶ 32.) And Michel was not hired as President and CEO until June 2018. (*Id.* ¶ 35.)

downturn resulted in "unfavorable pricing trends, particularly in the North American door market," driven by "decreased demand and an increasingly competitive environment." (*Id.* at 62.)

As these "unfavorable pricing trends" began to wane, in 2014 JELD-WEN's "new management team began to strategically change [its] pricing strategy in several key areas." (*Id.*) Those changes included "making strategic pricing decisions . . . to restore profitability" and increasing the "emphasis on pricing optimization." (*Id.*)  As a result, JELD-WEN began to see "pricing return[] to pre-crisis levels" in some products and some markets. (*Id.*)

**B.      Steves Requests a Second DOJ Review, the DOJ Reviews the Merger Again and Takes No Action, and Steves Files Suit.**

The Complaint alleges that in June 2014, one of JELD-WEN's competitors, Masonite, announced that it was no longer interested in selling doorskins to its competition in the doors market, and would be using its doorskin capacity only for its own door manufacturing.  (Compl. ¶ 83; *see* Ex. 1 at 8.)  As Masonite told the market, that decision left JELD-WEN as the only domestic source of doorskins for door manufacturers that did not manufacture their own.  (Ex. 1 at 8.)  JELD-WEN later took certain actions that Steves believed to be in violation of the Supply Agreement, including allegedly increasing prices despite declining costs.  (Compl. ¶¶ 86-91.)

Rather than moving to enforce the contract, in 2015, Steves asked the DOJ to conduct a second antitrust review of the Merger based on Steves' assertion that JELD-WEN's doorskin pricing was anticompetitive.  (*Id.* ¶ 99.)  The DOJ agreed to conduct that second review and allowed Steves to submit documents and present its views to the DOJ.  (*Id.*)  JELD-WEN also presented to the DOJ, and in May 2016, the DOJ concluded its six-month investigation with no finding of wrongdoing or challenge to the Merger.  (*Id.*; *see* Ex. 26 at 9.)

About a month after the DOJ closed its second investigation of the Merger, on June 29, 2016, Steves filed a lawsuit alleging that the Merger and JELD-WEN's conduct subsequent to the

Merger violated Section 7 of the Clayton Act, "which prohibits, in relevant part, mergers and acquisitions where the effect may be to substantially lessen competition." (Compl. ¶ 100 (quoting *Steves* Compl.); *see also* 15 U.S.C. § 18.) The *Steves* Complaint was filed publicly, with certain confidential details of the Supply Agreement redacted. (*See generally Steves* Compl.)

### C.    JELD-WEN Goes Public and Discloses the *Steves* Litigation.

In early 2017, JELD-WEN conducted an initial public offering (the "IPO"). (Compl. ¶ 102.) JELD-WEN's Prospectus disclosed the *Steves* litigation, the substance of the *Steves* allegations, and the relief sought. (Prospectus at 110 ("The complaint alleges that our acquisition of CMI, together with subsequent price increases . . . violated antitrust laws . . . . The complaint seeks injunctive relief, ordinary and treble damages, and declaratory relief."); *id.* at F-99.) Stock analysts also consistently noted the *Steves* litigation as a risk. (*See, e.g.*, Ex. 6 at 3, 19; Ex. 5 at 2.)

Following its IPO, JELD-WEN continued to remind investors about the *Steves* litigation, its allegations, and the relief sought. (*See* Ex. 9 at 36, F-45; Ex. 12 at 26, 46-47; Ex. 13 at 104; Ex. 15 at 28, 49.) As the litigation progressed, JELD-WEN provided investors with additional detail about it. (*See* Ex. 21 at 30, 57 (disclosing Steves' estimated damages); Ex. 23 at 106.)

After a public trial, on February 15, 2018, a jury entered a verdict for Steves, finding that the Merger violated Section 7 of the Clayton Act and that JELD-WEN had breached the Supply Agreement. (Ex. 24.) JELD-WEN filed a press release the same day disclosing the jury verdict. (Ex. 25.) The full trial record was publicly filed on February 21, 2018. *See Steves* Docket at ECF Nos. 1026-39. JELD-WEN expressed its disagreement with the verdict, emphasizing that "the Department of Justice reviewed our acquisition of CMI twice and declined to take any action." (Compl. ¶ 211; Ex. 26 at 9.) In subsequent SEC filings, JELD-WEN reminded investors of the adverse verdict, the damages awarded, and the risk damages could be trebled. (Ex. 27 at 35, F-47-48; Ex. 29 at 33-34, 48; Ex. 30 at 34-35, 50.) At the same time, JELD-WEN continued to dispute

6

Steves' claim that a divestiture was warranted and reiterated its intent to "vigorously oppose entry of an adverse judgment, and to appeal any adverse judgment that may be entered." (*Id.*)

After a hearing on Steves' request for equitable relief, on October 5, 2018, Judge Payne issued a decision requiring the divestiture of JELD-WEN's doorskin manufacturing facility in Towanda, PA. (Compl. ¶ 131; Divestiture Dec. at 148.) Judge Payne emphasized that the jury had found that, "as a consequence of the merger and JELD-WEN's conduct in 2014 and thereafter, competition was substantially lessened in the doorskin market and that, as a result, Steves sustained injuries of the type that the antitrust laws were designed to prevent." (Divestiture Dec. at 4.) JELD-WEN promptly disclosed the Divestiture Decision in a press release the next day. (Ex. 34.)

Ten days later, as a result of "lower than expected revenues and related operational inefficiencies," as well as "unfavorable channel mix impacting price realization," the Company released below-guidance preliminary third quarter financial results and "lowered its full-year 2018 EBITDA guidance by 9% at the midpoints," which followed a 2% reduction accompanying its second quarter results. (Ex. 37 at 1; *see also* Ex. 38 at 1 (noting that the windows market was a primary "[d]river[] of weakness").) JELD-WEN also announced that, following the Divestiture Decision, its potential liabilities were sufficiently known that it could estimate the scope of its likely liability, and it booked a $76.5 million charge related to the *Steves* litigation. (Ex. 35 at 1 (the "Earnings Pre-Release").) The Company independently announced that Mallard would be resigning as CFO. (Ex. 36.) JELD-WEN has continued to maintain that the jury verdict and Divestiture Decision were in error, and has appealed both. The appeal is fully briefed and was argued on May 29, 2020. *See Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 19-01397 (4th Cir.).[5]

---

[5] In addition to the *Steves* appeal, JELD-WEN continues to defend itself in other antitrust proceedings in the Eastern District of Virginia. On February 14, 2020, Steves filed a new complaint (again alleging violations of Section 7 of the Clayton Act and breach of contract claims,

**LEGAL STANDARD**[6]

Satisfying the pleading requirements applicable to federal securities fraud claims "is no small task." *Hurtado v. Gramercy Prop. Tr.*, 425 F. Supp. 3d 496, 516 (D. Md. 2019). Allegations of securities fraud are subject to the "most stringent pleading requirement in American civil law." *McCauley v. City of Chi.*, 671 F.3d 611, 625 (7th Cir. 2011); *see also Tellabs*, 551 U.S. at 313. Ordinarily, claims of fraud are subject to the heightened pleading requirements of Rule 9(b), which requires that a plaintiff plead "the circumstances constituting fraud . . . with particularity." *Tellabs*, 551 U.S. at 319. Not satisfied with that standard, Congress enacted the PSLRA to reign in "abuses of the class-action vehicle" that were "injur[ing] the entire U.S. economy" by imposing strict gatekeeping requirements on securities fraud claims. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006).

To plead a securities fraud claim under Section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014).

Under the heightened standards of the PSLRA, to adequately plead "that the defendant made a false or misleading statement," a complaint must state "*sufficient facts* to permit a *reasonable* person to find that the plaintiff satisfied th[at] element." *Teachers' Ret. Sys. of LA v.*

---

among others, against JELD-WEN), which has since been settled and dismissed with prejudice. *See Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 3:20-cv-98-REP (E.D. Va.). And in late 2018, two lawsuits premised on allegations that JELD-WEN and Masonite were engaged in a price-fixing conspiracy in the interior molded doors market were brought in this Court. *See In re Interior Molded Doors Antitrust Litig.*, 3:18-cv-718-JAG (E.D. Va.); *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, 3:18-cv-850-JAG (E.D. Va.).

[6]   Unless otherwise noted, all internal quotations and citations are omitted throughout this brief.

*Hunter*, 477 F.3d 162, 173 (4th Cir. 2007).  This is a markedly different standard from traditional notice pleading, where the court "must account for the possibility that a noticed claim could become legally sufficient if the necessary facts were to be developed during discovery." *Id.* at 170. It is not enough for plaintiffs merely to allege facts that plausibly support an inference of wrongdoing; they must allege facts that would carry their burden of proof that the challenged statements were materially false or misleading.  *Id.* at 172-73.

And where the statement is an opinion, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).

Similarly, to adequately plead scienter, "the plaintiff must, 'with respect to each act or omission alleged to violate this chapter, state with particularity *facts giving rise to a strong inference* that the defendant acted with the required state of mind.'"  *Teachers'*, 477 F.3d at 172 (quoting 15 U.S.C. § 78u–4(b)(2)).  In this context, "a strong inference 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent.'"  *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 306 (4th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 324).  Moreover, the basis for that "strong inference" must be *factual*.  *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017).  "[S]tacking inference upon inference . . . violates the statute's mandate that the strong inference of scienter be supported by facts, not other inferences."  *Id.*

Loss causation must also be alleged with "sufficient specificity," a standard "largely consonant with Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be pled with particularity." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 & n.5 (4th Cir. 2011).  To do

so, a plaintiff must allege a "causal link" between the alleged fraud and the alleged loss, which requires a plaintiff to allege facts showing "that the misrepresentation or omission was one substantial cause of the investment's decline in value." *Id.* at 472.

Finally, claims alleging violations of Rule 10b-5 must be brought within two years of "discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1).

## ARGUMENT

Plaintiffs have failed to meet their heavy burden of adequately pleading a securities fraud claim for five independent reasons. *First*, Plaintiffs fail to identify any actionable omission. (Section I.) *Second*, Plaintiffs fail to plead falsity with the requisite particularity, and the alleged misstatements are either puffery or honestly held opinions, neither of which is actionable. (Section II.) *Third*, Plaintiffs fail to plead facts supporting a strong inference that Defendants acted with scienter—*i.e.*, with severe recklessness or an intent to defraud. (Section III.) *Fourth*, Plaintiffs have failed to plead loss causation. (Section IV.) *Fifth*, Plaintiffs' claims are time-barred because this litigation was initiated more than two years after a reasonably diligent plaintiff would have discovered Plaintiffs' allegations. (Section V.)

## I.   THE COMPLAINT FAILS TO PLEAD ANY ACTIONABLE OMISSION.

"[F]ederal securities laws do not require a company to accuse itself of wrongdoing." *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 586 (E.D. Va. 2006) (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)). That is because "wrongdoing is not a straightforward matter of fact, and it is not fraud to deny it." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007). Here, Plaintiffs' theory of fraud hinges on the claim that JELD-WEN was required to confess to the wrongdoing alleged in *Steves* while that litigation was ongoing. But JELD-WEN fully satisfied its disclosure obligations by repeatedly disclosing the existence and relevant details of the *Steves* litigation.

"Disclosure is not a rite of confession." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  To the extent the Complaint alleges that JELD-WEN did not confess to having "engaged in anticompetitive conduct" (Compl. ¶ 147; *see id.* ¶¶ 156, 208), that cannot sustain a claim of securities fraud.  In *UBS*, the plaintiffs argued "that in addition to disclosing the existence of an investigation, defendants were required to disclose that UBS was, in fact, engaged in an ongoing tax evasion scheme."  752 F.3d at 184.  Here, too, Plaintiffs allege that JELD-WEN was not only required to disclose the existence of the allegations against it, but to admit that the Merger violated the Clayton Act.  (Compl. ¶¶ 147, 156, 208.)  But as the Second Circuit held in *UBS*, where the Company "disclos[es] its involvement in . . . legal proceedings" and the risk that those legal proceedings could lead to monetary damages, injunctive relief, and other relevant adverse consequences, it "complie[s] with its disclosure obligations."  752 F.3d at 184; *see also In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *10-11 (D.N.J. Nov. 12, 2019).  This makes sense; it would not benefit investors if companies were forced to concede defeat in litigation at the outset or risk securities liability if they lost.[7]

By repeatedly disclosing the *Steves* allegations and directing investors toward the publicly filed *Steves* Complaint,[8] JELD-WEN satisfied its disclosure obligations.  "The securities laws require disclosure of information *that is not otherwise* in the public domain, not information that has already been publicly—indeed, officially—disclosed by the company."  *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir. 1994); *UBS*, 752 F.3d at 184.

---

[7]   *Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018), is not to the contrary.  There, the Fourth Circuit held that "the duty to disclose may extend to uncharged and unadjudicated illegal conduct" where there was no way for the public to know about the alleged wrongdoing.  *Id.* at 441; *see also id.* at 435 (pre-disclosure complaint was sealed).  *Singer* does not impose a confessional obligation where, like here, the Company repeatedly disclosed allegations made in a public complaint.

[8]   *See* Prospectus at 110, F-99; Ex. 9 at 36, F-45; Ex. 12 at 26, 46-47; Ex. 13 at 104; Ex. 15 at 28, 49; Ex. 21 at 30, 57; Ex. 23 at 106; Ex. 27 at 35, F-47-48; Ex. 29 at 33-34, 48; Ex. 30 at 34-35, 50.

11

*Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999), is directly on point. There, the Fourth Circuit affirmed dismissal where the company had made "rosy statements about employee compensation and benefits" and denied its engagement in "illegal employment practices" despite a publicly filed complaint alleging the company had done just that. *Id.* at 684-85. The Fourth Circuit held that the market already "had a full opportunity to evaluate th[o]se claims and to reflect their risk in the market price for [the defendant-company's] stock." *Id.* at 685. So too here. Plaintiffs admit that the *Steves* litigation was disclosed and that market analysts assessed that risk. (*See* Compl. ¶¶ 118-121.)[9] Just as in *Longman*, Plaintiffs cannot allege a securities fraud claim based on the omission of information contained in an already-public complaint, particularly when the Company disclosed those allegations. *See* 197 F.3d at 685. Because JELD-WEN fully disclosed the existence and allegations of the *Steves* Complaint, the only information that Plaintiffs can claim was "omitted" from JELD-WEN's statements is a confession of wrongdoing—which the securities laws do not require. Thus, the Complaint pleads no actionable omission.

## II.   THE COMPLAINT FAILS TO PLEAD FALSITY.

The Complaint sets out 47 allegedly false and misleading statements across 27 different SEC filings, press releases, conference calls, and investor presentations. These statements fall into four categories: (1) descriptions of JELD-WEN's pricing strategy, including terms like "pricing discipline," "pricing optimization," "positive pricing," "favorable pricing," and "strategic pricing" (the "Pricing Statements"); (2) descriptions of the competitive nature of the doors and windows

---

[9]   Plaintiffs attempt to escape this fact by arguing that "the vast majority" of the *Steves* "docket is sealed or redacted, making it impossible to glean specific details about Jeld-Wen's anticompetitive conduct." (Compl. ¶ 206.) But the factual basis of Plaintiffs' Complaint is virtually identical to the unredacted portions of the *Steves* Complaint. (*Compare* Compl., *with*, *Steves* Compl.) And while the *Steves* docket contains many sealed filings, it also contains a vast set of public briefs, orders, and hearing transcripts, including full transcripts of the jury trial. *See Steves* Docket at ECF Nos. 1026-39.

industry (the "Competitiveness Statements"); (3) statements about the quality of JELD-WEN's product offerings (the "Quality Statements"); and (4) statements expressing JELD-WEN's opinions on the merits of the *Steves* litigation (the "Litigation Statements").[10]

### A.     The Pricing, Competitiveness, and Quality Statements Were Not False.

Under the PSLRA, to plead falsity, a plaintiff must do more than just identify with particularity the statements alleged to be false or misleading; she must also allege with particularity the facts that render those statements false or misleading. *See Teachers'*, 477 F.3d at 174-75. "[S]imply repeating a formulaic set of allegations" without factual basis is not enough. *Id.* Here, the Complaint sets forth no factual basis *why* the Pricing, Competitiveness, and Quality Statements were false, let alone facts sufficient to "support a reasonable belief" in their falsity.

Plaintiffs' only support for falsity is a repeated boilerplate allegation that the statements were materially false and misleading because they failed to include a confession that the Merger, which had twice been cleared by the DOJ, had been unlawful. (*See* Compl. ¶¶ 147, 156.)[11] Plaintiffs then double down on this approach, alleging that subsequent alleged misstatements were "materially false and misleading for the same reasons set forth" in either paragraphs 147-49 or paragraph 156. (*Id.* ¶¶ 154, 161, 167, 169, 172, 178, 181, 184, 186, 189, 194, 196, 199, 205, 218, 220, 222, 224, 226.) Such "formulaic" allegations of falsity are insufficient to meet Plaintiffs' pleading burden. *See Teachers'*, 477 F.3d at 174-75. Moreover, a review of the remainder of the Complaint demonstrates the alleged misstatements were not false.

---

[10]   Due to the repetitive nature of the misstatement allegations, the chart in Appendix A to this memorandum of law categorizes each alleged misstatement and the reasons it is not actionable.

[11]   As previously discussed, Plaintiffs' omission theory is not actionable. (*See supra* Section I.)

### 1.     The Pricing Statements

Plaintiffs assert that statements about the Company's implementation of "strategies such as 'pricing optimization,' 'pricing discipline,' 'strategic pricing,' and 'favorable pricing'" were false.  (*See, e.g.*, Compl. ¶ 16 (emphasis omitted); App'x A at 1-6.)   But these statements "accurately convey[ed]" the Company's pricing strategy and therefore "were not false or misleading."  *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 173 (3d Cir. 2014); *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *19 (D. Md. Feb. 4, 2020) ("literally true" statements were "not false or misleading").  Plaintiffs admit that, beginning in 2014, JELD-WEN "implemented a new pricing strategy" that "was a departure from its old, high volume/low margin strategy which emphasized growth and increased market share" and "often led to competing on price." (Compl. ¶ 82.)  By contrast, this "new lower volume/higher margin strategy . . . emphasized 'pricing optimization,' to increase product profitability on a per unit basis."  (*Id.*)  This is the exact strategy described in the Pricing Statements; and Plaintiffs never claim that JELD-WEN was not actually focused on lower volume/higher margins or on "pricing optimization."  Accordingly, the Pricing Statements were not false or misleading, and are not actionable.

### 2.     The Competitiveness Statements

The Complaint's falsity allegations relate to the allegedly undisclosed impact of the Merger and JELD-WEN's subsequent pricing conduct for *doorskins*, not doors and certainly not windows.  (*See* Compl. ¶ 147 (referencing JELD-WEN's post-Merger "conduct towards Independent Door Manufacturers"); *id.* ¶ 156 (same).)   But none of the Competitiveness Statements make any reference to the market for *doorskins*.  Instead, the Competitiveness Statements refer to the general "business environment" or "competitive environment" in which JELD-WEN operates, the general nature of the "door and window industry," or a description of the "major competitors" to JELD-WEN in the North American interior doors market.  (Compl. ¶¶ 143, 158, 174, 188, 201, 214; *see,*

14

*e.g.*, Prospectus at 21, 105; Ex. 18 at 18.)[12]  Because the Competitiveness Statements do not even mention doorskins, they could not possibly have misled a reasonable investor about the competiveness of the doorskins market.

Nor would a reasonable investor have misunderstood the competitive nature of the doorskins market.  As the Complaint makes clear, the market knew JELD-WEN to be the only domestic seller of doorskins; in June 2014, Masonite publicly announced it would no longer sell doorskins "into a competition" and that JELD-WEN would be the only remaining seller of doorskins in North America.  (Compl. ¶ 83; Ex. 1 at 8.)  The *Steves* Complaint also emphasized that fact.  (*Steves* Compl. ¶ 23.)  As a result, a reasonable investor would not have been misled about the competitiveness of the doorskins market.  *See Hillson*, 42 F.3d at 212.  That is particularly true here, where the alleged misstatements do not even mention doorskins.

Plaintiffs also cannot plead the Competitiveness Statements were false based on the Complaint's threadbare allegations of a purported conspiracy to fix prices of interior molded doors. (*See* Compl. ¶¶ 92-98.)  Confidential witness allegations that do not "describe any concrete examples of conduct consistent with a price-fixing scheme" and unproven allegations taken from a price-fixing complaint are not enough to plead a conspiracy's existence with the requisite particularity.  *Sinclair*, 2020 WL 571724, at *20; *see also Gamm v. Sanderson Farms Inc.*, 2018 WL 1319157, at *3 (S.D.N.Y. Jan. 19, 2018); *In re Tyson Foods Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 983-85 (W.D. Ark. 2017).  In any event, the Complaint does not plead the Competitiveness Statements were false on that basis.  (*See, e.g.*, Compl. ¶¶ 147, 156.)  Nor could it.[13]

---

[12]  This makes sense because JELD-WEN's statements were focused on JELD-WEN's business as a whole, not the small segment related to selling doorskins to other door manufacturers.

[13]  The alleged corrective disclosures say nothing about a conspiracy.  (*See infra* Section IV.A.)

### 3.    *The Quality Statements*

Plaintiffs also allege that Beck's statements that JELD-WEN offered "well-designed, high-quality products through strong and valued brands, and by reaching consumers through multiple channels" were false and misleading.  (Compl. ¶ 155; *see also id.* ¶¶ 168, 185; App'x A at 7.)  But nowhere in the Complaint are there any facts alleged refuting the statement that JELD-WEN's products are "well-designed" or "high-quality," or otherwise addressing the substance of the Quality Statements.  This complete absence of any pled facts showing the Quality Statements were false is fatal to Plaintiffs' claims based on such statements.  *See Teachers'*, 477 F.3d at 174-75.

### B.    **The Pricing and Quality Statements Were Puffery and Are Not Actionable.**

The allegations about the Pricing and Quality Statements also are not actionable because "soft, puffing business communications and statements . . . do not demonstrate falsity."  *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004).  Courts recognize the market is familiar with the commonplace usage of "rosy affirmation[s]" and "loosely optimistic statements," such that "no reasonable investor could find them important to the total mix of information available."  *Id.* at 766-67.  Because the Pricing and Quality Statements are common affirmations and vague statements that constitute puffery, they are not actionable.

"[O]blique references to . . . pricing policy" that are "too vague to ascertain anything on which a reasonable investor might rely" are puffery that is not actionable.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010); *see also In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *9 (E.D. Va. June 2, 2020) (statements relating to "Defendants' strategy to optimize their workforce" were "immaterial puffery").  The same conclusion applies here.  The challenged Pricing Statements are generic, puffing statements "that are so vague, so lacking in specificity" that no reasonable investor could rely on them.  *See Cable & Wireless*, 321 F. Supp. 2d at 766-67.

16

For example, statements like "pricing discipline is an important element of our strategy to achieve profitable growth" (*see, e.g.*, Compl. ¶ 159), that the Company was "making strategic pricing decisions," or that it was emphasizing "pricing optimization" (*see, e.g.*, *id.* ¶ 145), convey no meaningful information upon which an investor could have reasonable relied.  Courts routinely dismiss claims based on exactly these sorts of generic descriptions of pricing strategy.  *See, e.g.*, *Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, at *13 (N.D.N.Y. Mar. 27, 2020) (statement that "'[o]ur pricing strategy remains focused on profitability' . . . clearly constitute[d] inactionable puffery"); *Knox v. Yingli Green Energy Holding Co.*, 2016 WL 6609210, at *14 (C.D. Cal. May 10, 2016) (statement that company would "continue to optimize our customer portfolio and improve the profitability level of our sales in China" was "nonactionable puffery"); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013) (statements that project had "positioned the Company for sustained growth" and "optimized [the Company's] operations" were "devoid of substantive factual material and constitute puffery").

The Quality Statements are also quintessential puffing statements that are not actionable. *See, e.g.*, *In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 12001262, at *10 (S.D. Fla. Sept. 4, 2015) (statement on "delivery of high-quality compliance services" was puffery); *In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (statement on offering "high quality career-based education" was "typical corporate puffery"); *In re Datatec Sys., Inc. Sec. Litig.*, 2006 WL 3095951, at *17 (D.N.J. Oct. 30, 2006).

C.      **The Litigation Statements and Beck's "Yes" Answer to an Analyst Question Were Opinions, Not Actionable, and Not False.**

"[T]o plead that an opinion is a false factual statement . . . the complaint must allege that the opinion expressed was different from the opinion actually held by the speaker" and that the opinion expressed was objectively false.  *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315

17

(4th Cir. 2004). "[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect"; instead, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. "That is no small task for an investor." *Id.* at 194.

The challenged Litigation Statements are quintessential opinions. The Litigation Statements relate to JELD-WEN's "*belie*[*fs*]" about the merits of the litigation, the correctness of the jury verdict, and whether JELD-WEN's conduct was not in violation of antitrust laws (*See* App'x A at 7-8; Compl. ¶¶ 207, 211, 227, 231 (emphasis added).) Statements opining that pending claims lack merit are routine features of corporate filings that are rarely challenged by investors. Where they have been challenged, however, courts have treated them as opinions and held them to not be actionable. *See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 756-57 (S.D.N.Y. 2018) (statements that a complaint's allegations were "unfounded and without merit" were opinions and not actionable), *aff'd*, 806 F. App'x 35 (2d Cir. 2020); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 81-82 (S.D.N.Y. 2015). Here, the Complaint sets forth no facts alleging that either the Individual Defendants or JELD-WEN did not honestly believe in the truth of those statements at the time when they were made. That defect is fatal.

The Supreme Court's decision in *Omnicare* is instructive. The Court explained that where a company made a statement about its legal compliance, an investor might expect that the speaker had "consulted a lawyer" and that the statement was not made "in the face of [a] lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view." *Omnicare*, 575 U.S. at 188. To adequately allege such a statement was false, the plaintiff must plead that the

18

facts an investor would reasonably infer from the statement were in fact not true:  for example, that the company did not consult a lawyer, that the advice it received was contrary to its statements, or that it knew that the federal government opposed its position.  *Id.*

Here, the Complaint sets forth no claim that JELD-WEN lacked a reasonable basis for its opinions on the litigation's lack of merit.  Plaintiffs do not say, for example, that JELD-WEN had not consulted with attorneys; such an allegation would be nonsensical since JELD-WEN was (and is) actively litigating Steves' allegations and challenging the jury verdict.  Plaintiffs also do not allege—because they cannot—that the DOJ had taken a contrary view; in fact, the DOJ had twice investigated the Merger and twice decided to take no action.  (*See* Compl. ¶ 211; Ex. 26 at 9.) Because the Complaint pleads no facts that "go to the basis for defendants' opinion" regarding the merits of the *Steves* litigation, the Complaint fails to satisfy *Omnicare*.  *See Axar*, 308 F. Supp. 3d at 757; *see also City of Westland*, 129 F. Supp. 3d at 82.

Similarly, Beck's one-word "Yes" answer to an analyst question (*see* Compl. ¶ 188) is an opinion that is not adequately alleged to have been either objectively incorrect or not honestly held. The analyst asked:  "And do you feel that the current competitive environment in which – in North America and Europe, do you feel it's a rational pricing environment, are people behaving?" (Ex. 18 at 18.)  Beck's answer, speaking to his personal "feel[ings]," is a clear statement of opinion. *See In re Triangle Capital Corp. Sec. Litig.*, 2019 WL 1083777, at *11 (E.D.N.C. Mar. 7, 2019).

Moreover, Beck was answering a question about "the current competitive environment . . . in North America and Europe," which is not targeted at doorskins, or even doors specifically; and in any event, the Complaint has not adequately pled the answer was false.  (*See supra* Section II.A.2.)  Even if it were adequately pled to be false, "an executive's use of a single *possibly ambiguous* word on a live analyst call" is not actionable under the securities laws.  *See, e.g.*,

19

*Maguire*, 876 F.3d at 549.  And Plaintiffs plead no facts supporting an inference that Beck did not believe the truth of his statement.  (*See infra* Section III.)

## III.    THE COMPLAINT FAILS TO PLEAD SCIENTER.

To adequately plead scienter, a complaint must allege facts supporting a "strong inference" of "either intentional or severely reckless conduct."  *Maguire*, 876 F.3d at 546-47.  Recklessness is "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff."  *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003).  "Such severe recklessness is, in essence, a slightly lesser species of intentional misconduct."  *Id.* at 344.  And the requisite "strong inference 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent.'"  *Deloitte*, 551 F.3d at 306 (quoting *Tellabs*, 551 U.S. at 324).

In assessing whether a strong inference of scienter has been pled, the Court must consider the alleged *facts* as a whole.  *Ottmann*, 353 F.3d at 344-45.  The PSLRA does not permit "stacking inference[s] . . . the strong inference of scienter [must] be supported by facts, not other inferences."  *Maguire*, 876 F.3d at 548.  Here, no strong inference of scienter is possible for five reasons.

*First*, Plaintiffs allege no motive for any Defendant to engage in the alleged fraud.  *Second*, Plaintiffs' theory that the Individual Defendants knew, or recklessly disregarded, that the Merger was anticompetitive is inconsistent with their factual allegations.  The more compelling inference is that the Individual Defendants believed that the Merger and JELD-WEN's subsequent pricing conduct were lawful because the DOJ had twice signed off on the Merger, once before it was consummated, and again over a year after the challenged pricing conduct had begun.  *Third*, scienter cannot be pled as to the Individual Defendants based on "group pleading" or by attempting to impute alleged corporate knowledge to individuals.  *Fourth*, scienter cannot be pled based on stacking the inference of knowledge of pricing policy upon an inference of knowledge of

20

anticompetitive conduct in order to further infer fraudulent intent.  *Fifth*, Mallard's resignation does not support an inference of scienter.

*First*, while a plaintiff is not required to articulate a motive to show scienter, the absence of any plausible theory of motive weighs heavily against any inference of scienter.  *See Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 560-61 (M.D.N.C. 2018), *aff'd sub nom. Janies v. Cempra, Inc.*, 2020 WL 2770554 (4th Cir. May 28, 2020).  Here, the Complaint contains no allegations that relate to, or even mention, a motive for the alleged fraud.

*Second*, Plaintiffs allege that scienter should be inferred because "Defendants were aware that absent the long-term supply agreements, the DOJ would object to the CMI Acquisition as anticompetitive."  (Compl. ¶ 268.)  But Plaintiffs' allegations relate to a DOJ investigation from the 2001 merger of Premdor, Inc. and Masonite (*id.* ¶ 269) and rest on the fact that a single JELD-WEN employee—who is neither an Individual Defendant nor alleged to have ever communicated with any Individual Defendant—stated that he believed that the Company had entered into long-term supply agreements as part of its 2012 antitrust strategy for approval of the Merger (*id.* ¶¶ 270-75), purportedly to trick the DOJ into approving an anticompetitive merger.  Plaintiffs then allege that, beginning in 2014, "Defendants, including specifically Defendant Hachigian," undertook certain doorskins pricing strategies in tension with those supply agreements.  (*Id.* ¶ 276.)  Missing from this theory are any allegations showing that any of the Individual Defendants knew *anything* about the Company's antitrust clearance strategy in 2012, years before they began working for JELD-WEN.  (*See* Compl. ¶¶ 32-35.)  Nor are there any allegations that any Company employee who was involved in the Merger played any role in the alleged misstatements.[14]  And

---

[14]   The only individual at JELD-WEN that the Complaint alleges to have had knowledge of the Company's antitrust strategy related to the Merger is James Morrison.  Morrison, however, is not alleged to have worked at JELD-WEN during the period of the alleged misstatements or, indeed,

because "corporate liability derives from the actions of its agents," Plaintiffs' failure to plead that any individual acted with scienter also vitiates their allegations of scienter against the Company. *Teachers'*, 477 F.3d at 184.  Because the Complaint fails to "allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation," it fails to plead corporate scienter.  *Id.*; *see also Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009).

Instead, the allegations show that when Hachigian, Mallard, and Beck began working for JELD-WEN in 2014 and 2015, they knew that the DOJ had reviewed the Merger and signed off on it.  (*See* Compl. ¶ 78.)  And before any of the alleged misstatements, and well before Michel joined JELD-WEN, the DOJ *again* reviewed the Merger—in the context of Steves' complaint about JELD-WEN's post-Merger conduct—and *again* took no action.  (*Id.* ¶¶ 99-100.)  Based on those facts, the most compelling inference is that the Defendants believed the Merger and the Company's post-Merger pricing conduct were lawful.  But even if the allegations could support the inference that any Defendant knew the Merger was anticompetitive when the alleged misstatements were made, that inference could not, as a matter of law, support a *second* level of inference that the Defendants acted with an intent to defraud investors.  *See Maguire*, 876 F.3d at 548 ("[S]tacking inference upon inference in this manner violates the statute's mandate that the strong inference of scienter be supported by facts, not other inferences.").

*Third*, the Complaint repeatedly attempts to plead scienter based on generalized allegations as to what "Defendants" purportedly knew or were aware of (*see* Compl. ¶¶ 268-69, 276, 280-81, 285), what JELD-WEN purportedly "knew" or "decided" (*see id.* ¶¶ 270-73), or what "the

---

to have ever communicated with any of the Individual Defendants, let alone communicated his knowledge of the Company's antitrust strategy.  (*See* Compl. ¶¶ 75, 130, 251, 273.)  There is no basis to impute Morrison's knowledge to the Individual Defendants.

22

Individual Defendants" knew (*see id.* ¶¶ 277, 279-80, 286-87, 290).  But that "group pleading" is impermissible because "holding an executive position alone does not necessarily lead one to infer that the Individual Defendants knew that the alleged omissions were false or misleading."  *Iron Workers*, 432 F. Supp. 2d at 592; *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *12 (D. Md. Mar. 28, 2013) (rejecting "generic pleading" as "insufficient to raise a strong inference of scienter").

To the extent the Complaint alleges facts particular to any Individual Defendant, they either relate to knowledge of price-setting, discussed below, or rest solely on the fact that certain Individual Defendants made certain of the alleged misstatements.  (Compl. ¶¶ 282-84.)  And despite Plaintiffs' insinuation to the contrary (*id.* ¶ 281), bare allegations that an individual made false or misleading statements do not support a strong inference of scienter.  *See Herman v. Legent Corp.*, 50 F.3d 6, 1995 WL 115879, at *9 (4th Cir. 1995) (table decision) (scienter was not pled where there was no "evidence supporting an inference that [the speaker] knowingly spoke in bad faith or with the intention to deceive, manipulate, or defraud").  In other words, it is not enough to be wrong or even to speak falsely; the plaintiff also must allege that the speaker did so with intent.

*Fourth*, the Complaint next relies on even more attenuated inference-stacking.  It sets forth a series of allegations that purport to provide a factual basis from which the Court could infer that the Individual Defendants knew or controlled how the Company established pricing for doors.[15]  Even setting aside the weakness of those inferences, each of those scienter theories requires the Court to make multiple inferential leaps from the facts pled.  For example, that the Individual

---

[15]  *See* Compl. ¶¶ 277-79 (claiming that "doors constituted a significant portion of JELD-WEN's business" and asking for an inference that the Individual Defendants knew of "the Company's sales practices for interior molded doors and doorskins"); *id.* ¶¶ 282-85 (identifying statements by the Individual Defendants relating to pricing—or the correctness of the *Steves* jury verdict—and asking for an inference that the Individual Defendants knew the Merger was anticompetitive); *id.* ¶¶ 286-90 (identifying confidential witness allegations that JELD-WEN's CEOs approved price increases and asking the Court to infer knowledge of a price-fixing conspiracy on that basis).

Defendants allegedly exercised control over door pricing might support an inference that they knew the Company's pricing strategy. But to arrive at an inference that they knew their statements were false and misleading, the Court would need to then *infer from that inference* that their knowledge of pricing strategy implied knowledge of the existence of the purported price-fixing scheme, and then *infer from that inference* that the Defendants intentionally omitted that fact from the Pricing Statements in order to defraud investors. Such attenuated inferential steps cannot support the requisite strong inference of scienter. *See Maguire*, 876 F.3d at 548; *see also Yates*, 444 F.3d at 890 (rejecting reliance on the core operations doctrine in the absence of factual allegations "establishing the defendant's actual exposure to the . . . problem").

*Fifth*, Mallard's resignation is not probative of scienter, because "[s]ubsequent resignations by executives are insufficient to support a strong inference of scienter." *Iron Workers*, 432 F. Supp. 2d at 593; *Hirtenstein*, 348 F. Supp. 3d at 561; *In re Novan, Inc.*, 2018 WL 6732990, at *14 n.9 (M.D.N.C. Nov. 30, 2018). The Complaint does not allege that Mallard "departed under a cloud of illegality or accusations of fraud," nor does it allege any particularized facts connecting Mallard's resignation "to any prior fraudulent statement or omission." *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 778 (E.D. Va. 2007), *aff'd in part, rev'd in part and remanded sub nom. Matrix*, 576 F.3d 172.

## IV.    THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION.

To adequately plead loss causation, the Complaint must allege facts establishing the "necessary causal link" between the alleged fraud and the alleged loss with "sufficient specificity." *Katyle*, 637 F.3d at 471-72. A plaintiff may establish that "necessary causal link" by pleading either the existence of "corrective disclosures" or that a concealed risk "materialized." *Id.* An alleged corrective disclosure must present to the market "new facts" that were "publicly revealed for the first time, because if investors already know the truth, false statements won't affect the

24

price." *Id.* at 473. To plead a concealed risk materialized, a plaintiff must show that a drop in stock price "was caused by the revelation of new information previously concealed by defendants' alleged fraud." *In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359, at *17 (E.D. Va. Aug. 27, 2018). Both approaches require that the market learn *new information* from the disclosing event.

The Complaint does not specify upon which theory of loss causation it relies. (*See* Compl. ¶¶ 28-30, 240, 245-46, 249, 255, 259.) But under either theory, loss causation is not adequately pled. *First*, neither corrective disclosure said anything about a price-fixing conspiracy related to interior molded doors. *Second*, neither corrective disclosure revealed any new facts related to the Merger or its impact on the competitiveness of the doorskins market. And the market knew the risk of divestiture and the financial risk of the *Steves* litigation long before either the Divestiture Decision or the Earnings Pre-Release.

### A. The Complaint Does Not Plead a Loss Caused by the Purported Existence of a Price-Fixing Conspiracy.

Plaintiffs do not base their claims on the existence of a price-fixing conspiracy. (*See* Compl. ¶¶ 147, 156, 208.) But to the extent any portion of their claims is premised on their threadbare allegations of such a scheme (*see id.* ¶¶ 92-100, 269, 286, 290), loss causation is not adequately pled. Losses must derive from a "corrective disclosure" that "reveal[s] to the market in some sense the fraudulent nature of the practices about which a plaintiff complains," not "some other negative information about the company." *Katyle*, 737 F.3d at 473. Here, neither alleged corrective disclosure even addresses a conspiracy to fix prices of interior molded doors.

This case is similar to *In re Cree, Inc. Securities Litigation*, 2005 WL 1847004 (M.D.N.C. Aug. 2, 2005), *aff'd sub nom. Teachers'*, 477 F.3d 162. There, the plaintiffs claimed various statements concealed facts about transactions between Cree and six other companies. *Id.* at *12. But the alleged corrective disclosure was "devoid of factual allegations" related to transactions

25

with five of those six companies and thus "failed to demonstrate a direct relationship" as to losses claimed based on the alleged misrepresentation of transactions with those five companies. *Id.* at \*12-13. Here, too, both the Divestiture Decision and the Earnings Pre-Release are "devoid of factual allegations" related to the purported conspiracy. *See id.* Because no decline in JELD-WEN's stock price could be caused by a purported conspiracy the alleged corrective disclosures do not even mention, any attempt to base Plaintiffs' claim on that purported conspiracy fails.

## B.    The Complaint Has Not Pled Any Corrective Disclosure.

Neither the Divestiture Decision nor the Earnings Pre-Release disclosed "new facts" to the market related to the Merger's impact on competition in the doorskins market. For loss causation to be pled, there must be a "revelation of new information" that unmasked a "previously concealed risk" or revealed prior statements "to have been fraudulent." *Teachers'*, 477 F.3d at 187 & n.3. Where "no such facts were disclosed," loss causation is not adequately pled. *Id.* at 188; *see also Meyer v. Greene*, 710 F.3d 1189, 1199 n.10 (11th Cir. 2013) (disclosure must reveal "something previously hidden or actively concealed"); *In re TransDigm Grp., Inc. Sec. Litig.*, 2020 WL 820823, at \*23-24 (N.D. Ohio Feb. 19, 2020) (disclosures were "public information that was already available to the market"); *Maximus*, 2018 WL 4076359, at \*17.

Well before either alleged corrective disclosure, before JELD-WEN went public, and before any of the alleged misstatements were made, the *Steves* Complaint was publicly filed and revealed the substance of the same facts underlying Plaintiffs' claims. (*Compare* Compl., *with*, *Steves* Compl.) Subsequently, JELD-WEN repeatedly told investors about the *Steves* litigation, the nature of the claims, and the damages sought. (*See* Ex. 9 at 36, F-45; Ex. 12 at 26, 46-47; Ex. 13 at 104; Ex. 15 at 28, 49; Ex. 21 at 30, 57; Ex. 23 at 106.) Analysts noted the risks presented by the litigation. (Ex. 6 at 3, 19; Ex. 5 at 2.) And on February 15, 2018, after a public trial, a jury verdict was handed down finding JELD-WEN liable for violations of Section 7 of the Clayton Act

26

and over $58 million in damages, which amounted to over $175 million once trebled. (*See* Exs. 24, 25.) All of this was known to the market well before either alleged corrective disclosure.

Plaintiffs claim that the Divestiture Decision "revealed new information that Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market" about the fact that "the Company's financial success" was not due to "'pricing optimization' and 'pricing discipline' . . . but was rather due to that anticompetitive conduct." (Compl. ¶ 254.) But that was not new. The market had known that Steves alleged the Merger and JELD-WEN's doorskins pricing were anticompetitive and even knew that a jury had found Steves liable on that basis. (*See, e.g.*, Ex. 25 at 1.) "[P]ublic information that was already available to the market" is not "new information" that can serve as a corrective disclosure. *TransDigm*, 2020 WL 820823, at *23-24; *see also Cree*, 2005 WL 1847004, at *12.

Even the details from the Divestiture Decision that the Complaint highlights in an effort to wring something "new" out of it are unavailing. The Complaint highlights portions of the Divestiture Decision that address JELD-WEN's antitrust clearance strategy in 2012. (Compl. ¶¶ 249-51.) But that detail was not new. Steves' opposition to JELD-WEN's motion to dismiss in *Steves* set forth that argument over two years earlier. (*See* Ex. 3 at 7-8 & n.7 ("In light of the Antitrust's Division's challenge to the nearly identical Premdor/Masonite transaction just 10 years earlier, it is likely that JELD-WEN entered into long-term supply agreements with Steves and other door manufacturers in an attempt to dissuade the Antitrust Division from challenging its acquisition of Craftmaster.").) And the portions of the Divestiture Decision the Complaint relies upon are based on the public trial record (*see* Divestiture Dec. at 128-30), the full transcripts of which were made publicly available on February 21, 2018, almost eight months before the Divestiture Decision. *See Steves* Docket at ECF Nos. 1026-39. In truth, the only "new"

27

information that was revealed in the Divestiture Decision was that Judge Payne found divestiture was appropriate.  And even that was not news to the market.  There had already been "a growing belief/fear that [a divestiture order] would be the outcome."  (Ex. 33 at 1.)

Plaintiffs next claim that the Earnings Pre-Release disclosed a $76.5 million litigation contingency that "revealed new information" and was "within the zone of risk concealed." (Compl. ¶¶ 260-61.)  Plaintiffs do not attempt to identify *what* new information was revealed— none was.  The Earnings Pre-Release announced the booking of a contingent liability for the *Steves* litigation in case the "appeal process is unsuccessful."  (Earnings Pre-Release at 1.)  It did not "correct" JELD-WEN's prior statements about pricing, competition, or quality.  And it *confirmed* JELD-WEN's belief that the jury verdict and Divestiture Decision were wrong.  (*Id.*)  Since no "new facts" were revealed, loss causation is not adequately pled.  *See Katyle*, 637 F.3d at 473.

Nor can Plaintiffs reasonably argue that the $76.5 million loss contingency was a "concealed" risk.  Nearly a year earlier, JELD-WEN informed investors that Steves' expert witnesses had testified that "the damages suffered by Steves range from $36 million to $60 million, a portion of which Steves asserts is subject to trebling in the event Steves prevails on its antitrust claims." (Ex. 21 at 30, 57.)  Almost eight months earlier, JELD-WEN informed investors that it had actually been held liable for over $58 million in antitrust damages, which were subject to trebling.  (Ex. 25 at 1.)  And on October 5, 2018, Judge Payne did the math for investors, calculating that the total trebled damages amounted to over $175 million. (Divestiture Dec. at 4.) No reasonable investor could view the announcement of a $76.5 million loss contingency (less than half the trebled damages amount) as a "concealed" risk.  Nor was it "new information previously concealed by defendants' alleged fraud" since there is no allegation that the *amount* of damages liability JELD-WEN potentially faced was concealed.  *Maximus*, 2018 WL 4076359,

28

at \*17.  In any event, the outcome of the *Steves* litigation is currently on appeal, so no "risk" has materialized.  *See In re Neustar Sec.*, 83 F. Supp. 3d 671, 679–80 (E.D. Va. 2015) (loss causation not pled where regulator had not yet made a "final determination").

## V.    THE CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Securities fraud claims under the Exchange Act must be brought within "2 years after the discovery of the facts constituting the violation," 28 U.S.C. § 1658(b)(1), or after "a reasonably diligent plaintiff would have discovered the facts constituting the violation," *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010).  Before *Merck*, the Fourth Circuit used an "inquiry notice" standard that was "triggered by evidence of the possibility of fraud."  *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993).  That standard "required a reasonable investigation of the possibility of misrepresentation once an individual has been placed on inquiry notice of wrongdoing," *id.*, and remains "useful to the extent that [it] identif[ies] a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating."  *Merck*, 559 U.S. at 653.

Plaintiffs' claims are time-barred—either in whole or at least as they relate to the Pricing, Competitiveness, and Quality Statements—because a reasonably diligent plaintiff would have discovered the alleged facts underlying Plaintiffs' claims no later than February 15, 2018, the date of the *Steves* jury verdict and the Company's press release disclosing it.  (Exs. 24, 25.)  In fact, because the *Steves* Complaint "contained specific factual allegations which would place a reasonable investor on notice that a federal securities claim may exist," investors were on notice throughout the putative class period of the need to investigate their claims.  *See Latham v. Matthews*, 662 F. Supp. 2d 441, 455 (D.S.C. 2009).

In *Latham*, "the 'multiplicity and specificity of the information' [in prior public complaints] demonstrated that the plaintiffs had knowledge 'of a pattern of particular actions that a defendant has taken against him'" and put the plaintiffs on notice of their claims.  *Id.* at 452

29

(quoting *GO Computer*, 508 F.3d at 179). The same is true here. The *Steves* Complaint detailed the same anticompetitive conduct related to the Merger and JELD-WEN's subsequent pricing conduct that Plaintiffs claim demonstrates the allegedly false and misleading nature of the alleged misstatements. (*Compare, e.g.*, Compl. ¶¶ 81-100 (describing alleged anticompetitive impact of the Merger), *with*, *Steves* Compl. ¶¶ 62-81 (same); Compl. ¶¶ 95 (chart of announced price increases for interior molded doors), *with*, *Steves* Compl. ¶¶ 90 (same); Compl. ¶¶ 53-80 (describing background to the Merger), *with*, *Steves* Compl. ¶¶ 42-61 (same).) And to the extent any facts in the Complaint are drawn from the Divestiture Decision, those facts were available in public *Steves* filings and fully available to a reasonably diligent investor. (*Compare* Compl. ¶¶ 127-131, 250-52 (describing fact findings related to JELD-WEN's antitrust strategy related to the Merger), *with*, Ex. 3 at 7-8 & n.7 (arguing in a publicly filed brief in August 2016 that JELD-WEN pursued that same antitrust strategy).)

Based on this public information, "a reasonably diligent plaintiff would have discovered the facts constituting the violation" when the challenged statements were made. *Merck*, 559 U.S. at 653. To the extent Plaintiffs' claims are instead based on JELD-WEN being found liable in the *Steves* litigation, Plaintiffs knew that on February 15, 2018, the date of the jury verdict. (*See* Exs. 24, 25.) Accordingly, February 15, 2018 is the latest date by which a reasonably diligent plaintiff would have discovered Plaintiffs' claims, and because this suit was not filed until over two years later, on February 19, 2020, Plaintiffs' claims are barred. *See* 28 U.S.C. § 1658(b)(1).

## VI.   THE COMPLAINT FAILS TO PLEAD A SECTION 20(a) CLAIM.

Because Plaintiffs have failed to adequately plead a violation of Section 10(b), the Section 20(a) claims against the Individual Defendants fail, too. *See Teachers'*, 477 F.3d at 188.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

30

Dated: July 29, 2020                          Respectfully submitted,

                                               /s/ Brian C. Riopelle
                                              Brian C. Riopelle (Va. Bar No. 36454)
                                              Brian E. Pumphrey (Va. Bar No. 47312)
                                              Brian D. Schmalzbach (Va. Bar No. 88544)
                                              Garrett H. Hooe (Va. Bar No. 83983)
                                              **MCGUIREWOODS LLP**
                                              Gateway Plaza
                                              800 East Canal Street
                                              Richmond, VA 23219
                                              Tel.: (804) 775-1084
                                              Fax.: (804) 698-2150
                                              briopelle@mcguirewoods.com
                                              bpumphrey@mcguirewoods.com
                                              bschmalzbach@mcguirewoods.com
                                              ghooe@mcguirewoods.com

                                              Sandra C. Goldstein, P.C. (*pro hac vice*)
                                              Rachel M. Fritzler (*pro hac vice*)
                                              Jacob M. Rae (*pro hac vice*)
                                              **KIRKLAND & ELLIS LLP**
                                              601 Lexington Avenue
                                              New York, New York 10022
                                              (212) 446-4800
                                              sandra.goldstein@kirkland.com
                                              rachel.fritzler@kirkland.com
                                              jacob.rae@kirkland.com

                                              *Attorney for Defendants JELD-WEN Holding,*
                                              *Inc., Mark A. Beck, L. Brooks Mallard, Kirk*
                                              *S. Hachigian, and Gary S. Michel*

31

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 29th day of July, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to all

counsel of record in this case.

      */s/ Brian C. Riopelle*

Brian C. Riopelle (Va. Bar No. 36454)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1084
Fax.: (804) 698-2150
briopelle@mcguirewoods.com

32