# EXHIBIT 2



UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| STEVES AND SONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JELD-WEN, INC.,<br><br>Defendant.<br><br>Serve: CT Corporation<br>4701 Cox Road, Suite 285<br>Glen Allen, Virginia 23060 | Civil Action No. 3:16-cv-545<br><br>Jury Trial Demanded |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND SPECIFIC PERFORMANCE

### REDACTED VERSION FILED PUBLICLY

This is an action in antitrust, contract, breach of warranty, and tort.

Defendant JELD-WEN, INC. ("JELD-WEN") manufactures and sells interior molded doorskins (hereafter "doorskins") – an essential input to door manufacturers like Plaintiff Steves and Sons, Inc. ("Steves"). JELD-WEN also manufactures and sells finished doors, in competition with Steves. Steves has never manufactured doorskins, so it has historically purchased doorskins from JELD-WEN and others.

In June 2012, JELD-WEN announced its pending acquisition through a merger with one of only two other companies that also manufactured and sold doorskins to Steves and others (the "2012 Merger"). Six weeks earlier, in May 2012, JELD-WEN and Steves had entered into a long-term doorskin supply agreement (the "Supply Agreement"). Through the 2012 Merger, JELD-WEN acquired both market power and the increased ability to coordinate with its one

remaining doorskin competitor. As a result, JELD-WEN has raised prices above competitive levels and reduced quality and output below competitive levels in the markets for both doorskins and doors.

Steves has been damaged by JELD-WEN's anticompetitive behavior since the 2012 Merger. In this Complaint, Steves is seeking an injunction requiring JELD-WEN to divest such assets as would be sufficient to restore competition to the doorskins and doors markets comparable to that which existed before the illegal 2012 Merger. Steves is further seeking treble damages for harm suffered as a result of the 2012 Merger, as well as damages for JELD-WEN's breaches of its Supply Agreement and its associated warranties, declaratory relief, an order requiring specific performance of the Supply Agreement, and damages for tortious destruction of property.

## SUMMARY

1.      The unlawful 2012 Merger has harmed, and threatens to continue to harm, millions of consumers across the United States. At the "upstream" level of doorskins, it has substantially reduced the availability of doorskins; caused the remaining supply of doorskins to be of lower quality, and higher price, than they would have been but for the merger; and made it much more difficult for any competitor to enter and strengthen competition. At the "downstream" level of doors, it has caused additional price increases, not only when higher doorskin prices are incorporated into higher prices for finished doors, but also because it has given JELD-WEN the power, unilaterally and in coordination with the other largest remaining competitor, to raise prices for finished doors to levels substantially higher than they would be but for the merger.

2.      The merger threatens to cause even more substantial harm to competition in the future, as JELD-WEN uses its control of doorskins supply to impose costs on Steves and restrict

2

the supply of doorskins available to Steves, with the goal of ultimately forcing Steves out of business and obtaining even greater power to raise prices for finished doors.

3. JELD-WEN's anticompetitive behavior has been manifested, in part, by its breaches of the Supply Agreement. JELD-WEN has repeatedly breached the Supply Agreement by, *inter alia*, raising prices higher than ███████████████████████████ ███████ refusing even to provide contractually mandated ██████████████████████ ██████████████ refusing to pay for full losses caused by its defective products; and undertaking to terminate the Supply Agreement almost two years earlier than allowed by the clear contractual language. JELD-WEN has even gone so far as to tortiously destroy Steves' property when JELD-WEN's inspectors, while purporting to examine certain of Steves' doors manufactured using JELD-WEN's defective doorskins, painted orange streaks on over 2,000 doors, rendering them commercially worthless. JELD-WEN has refused to pay for the damage.

4. Founded in San Antonio, Texas in 1866 by a German immigrant, Steves is a family-owned business, now in its sixth generation, that has manufactured and supplied high quality, reasonably priced doors for generations of American consumers.

5. Around the time of the postwar housing boom in the 1950s, Steves and other door manufacturers began to make doors, not just out of solid wood, but also using a key input known as molded doorskins (the terms "interior" and/or "molded," incorporated into the above defined term "doorskin," are repeated here and occasionally below for emphasis). Molded doorskins are a "facing" molded from synthetic materials that are much less expensive than wood. Two facings may be glued over a wooden frame to make a hollow core or solid door that is much less costly than a solid wood door. This lawsuit involves only molded doorskins, not flush doorskins that are more readily available but do not possess the aesthetically appealing features of molded doorskins.

3

Case 3:16-cv-00545-REP   Document 1   Filed 06/29/16   Page 4 of 47 PageID# 4

6.      Although the finished product is relatively inexpensive, there are high barriers to entry into the market for doorskins, including significant capital investment in manufacturing facilities and substantial time (at least four years) to design, build, and start up a new facility.

7.      Steves does not manufacture doorskins.

8.      Before the 2012 Merger, there were three sources of doorskins in the United States: JELD-WEN and Masonite (the two companies that remain in the market today), and Craftmaster (the company that JELD-WEN acquired in the 2012 Merger). Steves and others bought doorskins from all three.

9.      Both JELD-WEN and Masonite are vertically integrated, meaning that they manufacture not only doorskins, but finished doors as well. Thus, while they can make money selling doorskins to Steves and other smaller door fabricators, their customers in the doorskins market are also their competitors in the doors market. But in the doors market, the merger created what several stock market analysts have repeatedly referred to as a "duopoly," in which the two duopolists, JELD-WEN and Masonite, have the power to raise prices. Under these conditions, JELD-WEN has an incentive to constrain or eliminate the supply of doorskins available to its customers, and to raise doorskin prices, all in order to make it more difficult for its customers to compete with it in the sale of doors.

10.     As of May 2012, Craftmaster was also vertically integrated. Included among Craftmaster's assets was a doorskin manufacturing plant, located in Towanda, Pennsylvania, which Craftmaster acquired in 2002 after the United States Department of Justice's Antitrust Division (the "DOJ") filed suit the previous year to block a merger of Masonite and Premdor, Inc. ("Premdor"). Before that proposed merger, Masonite owned the Towanda plant. Before the proposed merger, Premdor manufactured and sold primarily doors, but it also had a limited doorskins manufacturing capability. At that time, Masonite did not manufacture doors.

4

11.     The purpose of the merger was to create a new vertically integrated company, which was to be called Masonite. At that time, JELD-WEN was already vertically integrated, making and selling its own doorskins and doors.

12.     The suit brought by the DOJ in 2001 was resolved according to the terms of a consent decree requiring that Masonite spin off its Towanda plant, such that going forward there would be three sources of doorskins in the United States. In its Competitive Impact Statement, the DOJ stated that the divestiture would "create an independent manufacturer of interior molded doorskins that will impede [Masonite's] ability to coordinate with [JELD-WEN]." That new "independent manufacturer" was Craftmaster.

13.     From 2001 until October 2012, there was vigorous and healthy competition in both the doorskins and the doors markets. But then, in the 2012 Merger, JELD-WEN acquired Craftmaster and, with it, the Towanda plant that had until the 2001/2002 divestiture been owned by Masonite.

14.     In 2001, the DOJ was concerned that one of the two firms (JELD-WEN and Masonite) might restrict doorskin sales to downstream door manufacturers; this concern prompted the DOJ to require the creation of a third firm (Craftmaster). Without the Towanda divestiture in 2001/2002 and the subsequent competition by Craftmaster, the market then would have been essentially identical to today's competitive landscape – two sources of doorskins, with the only difference being that Towanda would then have been owned by Masonite, rather than by JELD-WEN. In fact, and as set forth in greater detail below, the looming anticompetitive effects that stimulated the DOJ lawsuit, but were prevented by the divestiture, have now come to pass.

15.     Commencing in 2011, Steves began negotiating with all three companies (JELD-WEN, Craftmaster, and Masonite) for the purpose of securing a long-term supply agreement. As noted, over the previous 10 years, Steves had bought doorskins from all of them.

5

16.     Throughout these negotiations, the existence of three potential suppliers served as a competitive constraint on the terms each offered. In other words, each supplier, knowing that Steves had recourse to obtain doorskins from two other suppliers, negotiated vigorously with Steves in an effort to win the business.

17.     Steves ultimately selected JELD-WEN, and the two parties executed the Supply Agreement on May 1, 2012. A copy is attached to this Complaint as Exhibit A. The Supply Agreement specifies that it was to be deemed effective as of January 1, 2012, and that its initial ▮▮▮▮ term would expire on ▮▮▮▮▮▮. It also has an "evergreen" clause, by which the contract automatically extends for successive ▮▮▮ year terms if, by the end of any term, neither party has exercised its right to terminate in accordance with the contract. The termination clause specifies that any termination by JELD-WEN must be in writing and will not take effect until ▮▮▮ years after such written notice of termination.

18.     On information and belief, at the time it executed the Supply Agreement with Steves in May 2012, JELD-WEN already intended to acquire Craftmaster. On June 18, 2012, JELD-WEN announced that it would acquire Craftmaster through a merger of the two companies.

19.     The 2012 Merger closed on October 24, 2012. This acquisition removed Craftmaster as the third source of doorskin supply and left in place JELD-WEN and Masonite as a "duopoly" at both levels of the market. At the doorskins level, JELD-WEN and Masonite together controlled 100% of the market. At the doors level, JELD-WEN and Masonite controlled (and still control) a combined 75% to 80% of the market and are routinely referred to by stock market analysts as a "duopoly" with pricing power. Since the 2012 Merger, they are the only two door makers that are vertically integrated and therefore control their own source of doorskins.

6

20. The 2012 Merger has caused anticompetitive effects throughout both the doorskins and doors markets.

21. Because the 2012 Merger reduced horizontal competition among doorskin manufacturers, Steves has been harmed as a customer of JELD-WEN for doorskins. After the 2012 Merger, JELD-WEN had an incentive to raise prices for doorskins to Steves, despite the existence of the Supply Agreement, and it did so. As explained in more detail below, the Supply Agreement sets prices based on a ███████████████ but beginning with the 2014 prices, determined in November 2013, JELD-WEN charged higher prices than the Supply Agreement permitted; it has done so ever since. Upon information and belief, doorskin prices to other independent door manufacturers have also been higher than they would have been but for the merger.

22. Around the time of the merger, Steves also began to experience issues with the quality of the doorskins JELD-WEN provided pursuant to the Supply Agreement.

23. These issues were exacerbated by Masonite's exit from the doorskins market. Around the time of the 2012 Merger, Masonite began to withdraw from the doorskins market. On June 25, 2014, Masonite publicly confirmed that it would no longer supply doorskins to third parties, effectively cementing JELD-WEN's monopoly in the doorskins market. Less than a month later, on July 12, 2014, JELD-WEN's CEO sent Steves a copy of Masonite's public announcement, and did so explicitly in support of JELD-WEN's wrongful efforts to coerce Steves into amending the Supply Agreement in ways that would threaten Steves' ability to remain in business.

24. Knowing that Steves has no other source for doorskins, JELD-WEN has refused to honor the terms of the Supply Agreement. For example, JELD-WEN has charged higher prices than those established by the Supply Agreement and refused to issue refunds for defective

7

products as required by the Supply Agreement.  JELD-WEN has put Steves on notice of its intention to terminate the Supply Agreement on December 31, 2019, which is 21 months earlier than the Supply Agreement permits.  JELD-WEN has demanded that Steves agree to a new ▮▮▮▮▮▮▮▮▮ that would raise doorskin prices by at least 10%.  JELD-WEN has refused to sell to Steves a certain popular doorskin design that JELD-WEN is using itself and selling to others unless Steves agrees to pay a price twice that set forth in the Supply Agreement.  JELD-WEN's behavior has increased Steves' costs, reduced Steves' profits, and limited Steves' ability to be as competitive as it would otherwise be if an alternate source of doorskin supply were available.

25.     Steves has also been harmed by vertical effects resulting from the 2012 Merger. Before the merger, even though JELD-WEN competed with independent door manufacturers downstream, it had an incentive to sell doorskins to independent door manufacturers, because it would not benefit from cutting off supply to the independent door manufacturers.  As a result of the merger, JELD-WEN has an incentive to coordinate to restrict the supply of doorskins to independent door manufacturers while also coordinating to raise the price of doors.  Both have occurred, with the result of restricting doorskin supply and raising prices in the doors market.

26.     By this lawsuit, Steves seeks injunctive relief to restore competition in the markets for doorskins and doors, treble damages to compensate it for the harm suffered to date, declaratory relief, an order for specific performance to ensure JELD-WEN's future compliance with the Supply Agreement, and compensatory damages for JELD-WEN's breaches of the Supply Agreement and associated warranties and destruction of property.

## THE PARTIES, JURISDICTION, VENUE, AND INTERSTATE COMMERCE

27.     Steves is a Texas corporation headquartered in Texas.  For purposes of 28 U.S.C. § 1332(a), Steves is a citizen of Texas.

Case 3:16-cv-00545-REP Document 1 Filed 06/29/16 Page 9 of 47 PageID# 9

28. Steves owns a door manufacturing plant in Henrico County, Virginia, for which Steves purchases doorskins and other inputs in interstate commerce from several states other than Virginia and ships doors in interstate commerce throughout the East Coast.

29. Steves also owns door manufacturing plants in San Antonio, Texas and Lebanon, Tennessee, for both of which Steves purchases doorskins and other inputs in interstate commerce and ships doors in interstate commerce across the United States, except in certain areas of the West Coast.

30. At the time it executed the Supply Agreement, JELD-WEN was an Oregon corporation headquartered in Oregon, and the Supply Agreement so represents. As of the date of this Complaint, JELD-WEN is a Delaware corporation with its principal place of business in either Oregon or North Carolina. For purposes of 28 U.S. C. § 1332(a), JELD-WEN is a citizen of Delaware and either Oregon or North Carolina.

31. JELD-WEN sells doorskins, doors, and other products in interstate commerce across the United States, including in Virginia. JELD-WEN regularly ships doorskins to Steves' plant in Henrico County, as well as to the other two Steves plants. JELD-WEN regularly does business with other customers throughout this District and Division.

32. JELD-WEN and Steves are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Among other things, increased prices for doorskins and doors caused by JELD-WEN's unlawful conduct are ultimately paid by customers throughout the United States and across state lines.

33. This Court has subject matter jurisdiction over the antitrust claims in this action pursuant to 15 U.S.C. §§ 15 and 26; 28 U.S.C. § 1331; and/or 28 U.S.C. § 1337(a).

Case 3:16-cv-00545-REP Document 1 Filed 06/29/16 Page 10 of 47 PageID# 10

34. This Court has subject matter jurisdiction over the breach of contract, breach of warranty, declaratory judgment, specific performance, and trespass to chattels claims in this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy on those claims exceeds $75,000.00, exclusive of interest and costs, and the parties are citizens of different states.

35. This Court has personal jurisdiction over JELD-WEN under: (a) Virginia Code § 8.01-328.1.A.1 and 2 because the causes of action asserted in this Complaint arise from JELD-WEN's transacting business in Virginia and contracting to supply doorskins to Steves in Virginia; (b) Va. Code § 8.01-328.1.A.3 because JELD-WEN caused tortious injury by an act or omission in Virginia; and (c) 15 U.S.C. § 22 because JELD-WEN may be found and transacts business in this District. The effects of the 2012 Merger have been and will continue to be felt throughout the United States, including in this District.

36. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c), because JELD-WEN regularly transacts business in this District, including by shipping doorskins to Steves' plant in Henrico County, Virginia; JELD-WEN contracted to supply services or things to Steves in Virginia; and a substantial part of the events or omissions giving rise to Steves' claims, including JELD-WEN's destruction of Steves' property, occurred in this District.

## FACTUAL BACKGROUND

**A.    The Products**

### 1.    Interior Molded Doorskins

37. A doorskin is the component which makes up the front and back of an interior molded door.

38.     Doors used in the interiors of new homes throughout the United States are predominantly molded doors, which are significantly less expensive than solid wood doors. An interior molded door is made by sandwiching a wood frame and a hollow or solid core between two doorskins.

39.     A doorskin is formed from fibrous material such as wood chips or sawdust, which are softened in a digester, refined with wax and resin, then formed into a mat. The mat is cut into sheets and loaded into a hot press containing die sets to form paneled designs and textures. Separate die sets produce each design, size, and texture of a doorskin. After coming off the press, the resulting doorskin is sized, trimmed, primed or painted, packed, and shipped to a door manufacturer.

40.     Doorskins account for more than 70% of the material input cost of hollow core interior doors.

### 2.     Interior Molded Residential Doors

41.     Interior molded residential doors are the most popular type of interior doors in North America; the vast majority of interior doors sold in North America are molded doors, and that share has consistently grown over time. Interior molded doors simulate the aesthetics of solid wood doors, but at lower prices.

### B.     Industry History

42.     As of September 30, 2000, JELD-WEN was a door manufacturer that was vertically integrated, i.e., that manufactured both interior doorskins and interior molded doors. Premdor was a second door manufacturer that was somewhat vertically integrated; according to the DOJ, it was a "small, but significant" competitor in the doorskin market. Masonite was also in the business at that time, but it then made only doorskins (not doors) and sold its doorskins to

11

Case 3:16-cv-00545-REP Document 1 Filed 06/29/16 Page 12 of 47 PageID# 12

independent door manufacturers such as Steves. Moreover, at that time Masonite was wholly owned by another company (International Paper).

43. Such market conditions made for a competitive market. At the downstream level of interior molded doors, it was not feasible for the two major players, JELD-WEN and Premdor, to coordinate their price on doors. If they did, and raised prices, Masonite would have had an incentive to increase production of interior doorskins, which would have allowed its downstream door customers to reject the price increase and instead purchase more doorskins from Masonite.

44. At the upstream level of doorskins, Masonite had an incentive to maximize production of doorskins, because it did not sell doors. The existence of that source of doorskin supply also created an incentive for the other two doorskin manufacturers, JELD-WEN and Premdor, to sell doorskins at reasonable prices to independent door manufacturers.

45. On September 30, 2000, Masonite's then-parent company, International Paper, and Premdor announced their intention for International Paper to sell Masonite to Premdor. At the time, Masonite owned two doorskin plants in the United States: the Towanda, Pennsylvania plant, and a second plant in Laurel, Mississippi.

46. On August 3, 2001, the United States filed suit to enjoin the merger. *United States v. Premdor, et al.*, No. 1:01CV01696 (D.D.C.).

47. In its Complaint, the United States alleged that the merger would harm competition in the markets for both interior molded doorskins and interior molded doors. Among other aspects of competitive harm, the United States alleged that:

> Presently, non-vertically integrated door manufacturers can purchase doorskins from Masonite and thereby increase production of interior molded doors in the event that Premdor and [JELD-WEN] seek to raise prices or reduce output. Post-merger, Masonite would no longer be independent, and Premdor would have the incentive to raise doorskins prices and/or restrict doorskin

> sales to non-vertically integrated firms, thereby increasing the
> benefits to Premdor and [JELD-WEN] of coordinated interaction.

Complaint at ¶ 35.

48. The same day it filed suit, the United States also filed a proposed final judgment that would permit the merger to take place, but only if the Towanda doorskin plant were divested from Masonite and spun off to a buyer acceptable to the United States. Following the required public comment period, this judgment became final and was entered by the court on April 5, 2002. With the merger thus approved, Premdor acquired Masonite and, going forward, operated the combined businesses under the name of "Masonite."

49. On March 29, 2002, Craftmaster purchased the Towanda doorskin plant. After that acquisition, Craftmaster was a vertically integrated doorskin and door company, producing doorskins for itself, selling doorskins to independent door manufacturers such as Steves, and selling doors in competition with JELD-WEN, Masonite, Steves, and other smaller independent door fabricators.

## C. The JELD-WEN/Steves Doorskin Supply Relationship

50. Following the spin-off of the Towanda plant to Craftmaster, Steves regularly purchased doorskins from each of the three existing suppliers: JELD-WEN, Masonite, and Craftmaster.

51. Steves and JELD-WEN were parties to a Molded Doorskin Product Agreement effective January 1, 2003. That agreement, and subsequent amendments to it, provided for the sale of doorskins from JELD-WEN to Steves but, as of 2009, left Steves free to purchase substantial quantities of doorskins from other manufacturers, which Steves did.

52. In or about July 2010, Steves determined that it would be best served by entering into a long-term supply agreement that committed a more substantial portion of its doorskin

purchases to a single manufacturer. Thereafter, Steves engaged in protracted negotiations with each of the three doorskin manufacturers—JELD-WEN, Masonite, and Craftmaster—for the purpose of securing such an agreement. The presence of three potential suppliers forced each of those suppliers to compete to offer attractive price and other terms to Steves.

53. Steves ultimately selected JELD-WEN, and the parties executed the Supply Agreement on May 1, 2012.

54. The Supply Agreement requires Steves to purchase █████████████████ ████ of its molded doorskin products requirements from such products that are manufactured and offered by JELD-WEN."

55. The Supply Agreement provides that it █████████████████████ ████████████████████████████████████████████████ unless terminated by either party in accordance with the Termination provisions of this Agreement."

56. The Supply Agreement requires JELD-WEN to give Steves written notice of termination ████ years before the termination is to take effect. The purpose of the ████ year notice requirement is to afford Steves adequate time to secure an alternative source of doorskins in the event of termination by JELD-WEN.

**D.     JELD-WEN's Acquisition of Craftmaster in the 2012 Merger**

57. Approximately six weeks after execution of the Supply Agreement, on or about June 18, 2012, JELD-WEN publicly announced its intent to merge with and acquire Craftmaster.

58. In August 2012, Steves was contacted by the DOJ and asked if Steves had any objection to JELD-WEN's proposed acquisition of Craftmaster. As of that time, Masonite had served as a competitive constraint on JELD-WEN. Steves had purchased over 2.5 million doorskins from Masonite between 2006 and 2012 and had been offered favorable terms for a

14

Case 3:16-cv-00545-REP   Document 1   Filed 06/29/16   Page 15 of 47 PageID# 15

long-term supply agreement by Masonite (before ultimately signing the Supply Agreement with JELD-WEN).

59.     Based on the reasonable, but mistaken, belief that JELD-WEN would honor its promises in the Supply Agreement, Steves told the DOJ that it did not object to JELD-WEN acquiring Craftmaster.  On information and belief, the DOJ made similar inquiries of other smaller door manufacturers with which JELD-WEN had long-term doorskin supply contracts.  On information and belief, these other smaller door manufacturers also did not object to the merger because, like Steves, they did not foresee the anticompetitive effects that would follow the removal of Craftmaster as an alternative source of doorskin supply.  Nor did they foresee that, less than two years later, Masonite would no longer sell doorskins to independent door manufacturers.

60.     On information and belief, during the several months that preceded the 2012 Merger, JELD-WEN assured the DOJ that, because of its long-term doorskin supply agreements with Steves and other smaller door manufacturers, competition at both the doorskins and the doors level would not be impaired.  In reliance on these and other assurances from JELD-WEN, the DOJ advised JELD-WEN that it had no objection to the merger.

61.     JELD-WEN's acquisition of Craftmaster closed on or about October 24, 2012.  By that acquisition, JELD-WEN gained ownership of the Towanda plant, leaving only two potential suppliers of interior doorskins in the United States:  JELD-WEN and Masonite.  As noted, with Masonite's withdrawal from the doorskins market, JELD-WEN has, and for the foreseeable future will continue to have, an effective monopoly in that market.

Case 3:16-cv-00545-REP   Document 1   Filed 06/29/16   Page 16 of 47 PageID# 16

### E.     The 2012 Merger and Its Anticompetitive Effects

#### 1.     Relevant Markets

##### a.     Interior Molded Doorskins

62.     For the production of interior molded doors, there are no close substitutes for interior molded doorskins. A small but significant increase in the price of interior molded doorskins for use in manufacturing interior molded doors would not cause a significant number of purchasers of interior molded doorskins to substitute other doorskins.

63.     Because they are molded, interior molded doorskins display various patterns that consumers find aesthetically pleasing and want to display in their homes. Thus, although inexpensive "flush," or flat, doorskins also exist, consumers (and thus distributors and door manufacturers) do not view them as a substitute for molded doorskins.

64.     The sale of interior molded doorskins in the United States for use in manufacturing interior molded doors is a line of commerce and relevant product market within the meaning of Section 7 of the Clayton Act.

65.     The relevant geographic market within the meaning of the Clayton Act for interior molded doorskins is the United States. The vast majority of interior molded doorskins purchased by U.S. door manufacturers are produced in the United States.

66.     Interior molded doorskins manufactured outside of the United States are used to a limited extent in the United States, but the availability of those foreign-produced doorskins is not sufficient to defeat a small but significant price increase by U.S. manufacturers of interior molded doorskins.

67.     Steves has searched across the globe for an alternate source of doorskins, but has not identified any global supplier that can provide sufficient doorskins to meet Steves' needs. For example, one foreign supplier with which Steves has negotiated has only one press and a

16

Case 3:16-cv-00545-REP Document 1 Filed 06/29/16 Page 17 of 47 PageID# 17

limited number of designs. But Steves currently offers, and its customers demand, a full range of products, currently consisting of 23 design families with 523 separate length and width permutations.

68.     Moreover, foreign interior molded doorskins manufacturers have significantly higher delivered costs of sales in the United States compared to U.S. producers. This cost disadvantage, combined with long delivery times, quality concerns, political instability, and capacity limitations, as well as the above described limited numbers of product styles, means that foreign manufacturers of interior molded doorskins cannot expect to sell enough additional interior molded doorskins to make a small but significant price increase by U.S. manufacturers of interior molded doorskins unprofitable.

### b.      Interior Molded Doors

69.     No close substitutes exist for interior molded doors. Solid wood doors and stile and rail doors are not close substitutes for molded doors because they are significantly more expensive and are typically used only in the most expensive homes. Flush doors are not close substitutes for molded doors, as they lack aesthetically pleasing designs and are therefore less attractive to consumers.

70.     A small but significant increase in the price of interior molded doors in the United States would not cause a significant numbers of purchasers of interior molded doors to substitute other doors.

71.     The sale of interior molded doors in the United States is a line of commerce and relevant product market within the meaning of Section 7 of the Clayton Act.

72.     The relevant geographic markets within the meaning of the Clayton Act for interior molded doors are regional markets emanating from the plants at which the doors are manufactured. These regional geographical markets for interior molded doors are smaller than,

17

and located in, the United States, although some regional markets may cross the U.S./Canadian border. Due to transportation costs, interior molded doors are not ordinarily shipped farther than about 600 miles from the point of manufacture. The number of imported interior molded doors sold in the United States is negligible.

73.   A small but significant increase in the price of interior molded doors for sale in the United States would not cause a significant number of customers to purchase molded doors produced outside of their regional market.

### 2.   Market Structure

#### a.   Interior Molded Doorskins

74.   Before the 2012 Merger, there were three suppliers of interior molded doorskins in the United States. Those suppliers, and their approximate national shares of total United States sales of interior molded doorskins, were as follows: Masonite with 47%, JELD-WEN with 43%, and Craftmaster with 10%.

75.   Following the 2012 Merger, there were only two suppliers of interior doorskins in the United States. Those suppliers, and their approximate national shares of total United States sales of interior doorskins, were as follows: Masonite with 48% and JELD-WEN with 52%. But then Masonite stopped selling doorskins to companies like Steves that were wholly dependent on JELD-WEN and Masonite for this essential input, leaving JELD-WEN as the only source of doorskin supply.

76.   At the time JELD-WEN acquired Craftmaster, the market for interior doorskins was already highly concentrated. It became an effective monopoly when Masonite elected to no longer sell doorskins to others.

### b.     Interior Molded Doors

77.     Before the 2012 Merger, Craftmaster competed with three other suppliers of interior molded doors in all regions of the United States except the West Coast. All four suppliers competed in the South, Southeast, Mid-Atlantic, Northeast, and Midwest regions of the United States. Their shares of total sales of interior molded doors in each region were approximately: 42% for Masonite, 40% for JELD-WEN, 7% for Craftmaster, and 7% for Steves. There are also two regional door manufacturers, Haley Brothers and Lynden, that sell doors only on the West Coast.

78.     Following the 2012 Merger, JELD-WEN's and Masonite's combined share has increased.

79.     At the time JELD-WEN acquired Craftmaster, the market in each relevant region for interior molded doors was already highly concentrated. Following the 2012 Merger, it became substantially more concentrated.

### 3.     Anticompetitive Effects

80.     The effect of the 2012 Merger has been and will continue to be substantially to lessen competition, or to tend to create a monopoly, in the markets for interior molded doorskins in the United States and for interior molded doors in the regional markets emanating from the plants at which they are produced. The merger has had unilateral, coordinated, and vertical effects, as described below.

### a.     Unilateral Effects

### i.     Interior Molded Doorskins

81.     As described below, JELD-WEN raised prices to Steves by failing to adhere to the pricing provisions of the Supply Agreement. JELD-WEN has also sought to raise prices even further by demanding changes to the contractual mechanism for setting prices.

19

82.     As described below, JELD-WEN gave Steves written notice of termination of the Supply Agreement in ████████████. Although the Supply Agreement clearly states that any such termination by JELD-WEN does not become effective for ████ years (in other words, September 2021), JELD-WEN has taken the position that the Supply Agreement expires at the end of 2019, which is 21 months earlier than allowed by the Supply Agreement.

83.     Since the 2012 Merger, JELD-WEN has unilaterally reduced quality by reducing building materials in doorskins sold to Steves, such that each doorskin is thinner than before. Since the 2012 Merger, JELD-WEN has reduced quality by eliminating the protective packaging for doorskins sold to Steves, causing many more to be damaged in transit than were before. Since the 2012 Merger, JELD-WEN has failed to meet the quality specifications of the Supply Agreement, resulting in numerous product defects. On information and belief, JELD-WEN has similarly reduced the quality of and packaging for its doorskins sold to other smaller independent door manufacturers, such as Haley Brothers and Lynden Doors, with which JELD-WEN is also in competition at the doors level. On information and belief, the reductions in the quality of doorskins JELD-WEN sells to Steves and others have also happened with respect to doorskins JELD-WEN uses in its own doors.

84.     To the extent quality defects have adversely affected Steves' manufacturing process and sales of its doors, JELD-WEN's actions have had the practical effect of reducing the usable output of the doorskins it is contractually bound to provide to Steves.

85.     As described below, JELD-WEN has stated that it will refuse to ship doorskins FOB to any Steves plant other than the three that currently exist.

86.     As described below, JELD-WEN has refused to sell to Steves a popular style of doorskin, the Monroe, as required by the Supply Agreement, unless Steves agrees to pay a price that is twice that set forth in the Supply Agreement. Because consumers demand, and Steves'

20

competitors offer, this design, Steves is forced to purchase it at the price JELD-WEN demands. Moreover, as explained below, the increased price of this doorskin hampers Steves' ability to compete downstream in the market for interior molded doors.

87.     Since the 2012 Merger, JELD-WEN has closed two of its doorskin plants and opened one new plant.

88.     Since the 2012 Merger, JELD-WEN has notified Steves that it is discontinuing a prefinished white product line, while telling Steves' customers that it will continue to supply the customers directly with that product line.

### ii.      Interior Molded Doors

89.     Since the 2012 Merger, JELD-WEN has been the first to announce price increases for interior molded doors on three separate occasions. One of these increases (of 9.5%), announced in June 2014 (the same month that Masonite announced that it would no longer sell doorskins to independents), was the largest list price increase by any door manufacturer in more than a decade. On three other occasions, JELD-WEN has quickly followed Masonite's lead in announcing price increases. On the two most recent such occasions, JELD-WEN's announcements came a mere two days after Masonite's.

90.     The following chart shows JELD-WEN's and Masonite's announced price increases for molded interior doors since the 2012 Merger:

| Company | Notice Date | Effective Date | Increase |
|---------|-------------|----------------|----------|
| JELD-WEN | 11/15/2012 | 02/04/2013 | 3% - 5% |
| Masonite | 12/06/2012 | 03/18/2013 | 3% - 6% |
| JELD-WEN | 08/06/2013 | 10/07/2013 | 4% |
| Masonite | 08/13/2013 | 09/30/2013 | 5% |
| Masonite | 10/31/2013 | 02/03/2014 | 5% |
| JELD-WEN | 11/18/2013 | 01/27/2014 | 5% |
| JELD-WEN | 06/09/2014 | 08/11/2014 | 9.5% |
| Masonite | 06/17/2014 | 08/18/2014 | 8% |

21

| Masonite | 12/01/2014 | 03/02/2015 | 5% |
| JELD-WEN | 12/03/2014 | 03/02/2015 | 5% |
| Masonite | 10/26/2015 | 02/01/2016 | 3% - 5% |
| JELD-WEN | 10/28/2015 | 02/01/2016 | 3% - 5% |

Copies of JELD-WEN's and Masonite's announcements of their price increases, on which this chart is based, are attached to the Complaint as Exhibit B.

91. In an August 2014 meeting with Steves personnel, JELD-WEN CEO Kirk Hachigian touted JELD-WEN's June 9, 2014 price increase of 9.5% as something that was good for doormakers and complained that Masonite had followed with "only" an increase of 8%. Steves did not engage in any discussion of door pricing.

92. The across-the-board reductions in the thickness and quality of JELD-WEN's doorskins, as described above, have necessarily impaired the quality of the doors sold by Steves, by other smaller independents, and by JELD-WEN itself, to the detriment of the consumers who buy them.

**b.    Coordinated Effects**

93. In its 2001 suit seeking to block the industry consolidation that would have resulted without the divestiture of the Towanda plant, the DOJ alleged that the proposed merger might in the future "tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers."

94. The 2012 Merger has resulted in exactly such coordinated interaction by JELD-WEN and Masonite, because industry concentration has made such conduct feasible and profitable.

22

### i.    Interior Molded Doorskins

95.    On June 25, 2014, Masonite stated, during a public presentation to industry analysts, as follows:

> Only Masonite and JELD-WEN service the entire North American market. And other door assembly companies are smaller and much more regionally focused. And importantly, the other smaller . . . door assembly manufacturers have to get their facings [i.e., doorskins] from somebody else. They're not vertically integrated in their facings. And we, at Masonite, have determined that we will not sell our facings into – to competition. So, that only leaves one other outlet for them to get their facings from in North America.

96.    Both before and after this public announcement, JELD-WEN knew, or expected, that this was or would be Masonite's position, and, armed with such knowledge, (a) reduced the quality of its output of doorskins; (b) raised the price of its doorskins sold to Steves; (c) demanded that Steves agree to change key price and other provisions in the Supply Agreement; and (d) threatened to terminate the Supply Agreement if Steves did not agree to such changes, and, when Steves did not so agree, in fact terminated the Supply Agreement.

97.    On July 12, 2014, JELD-WEN's CEO (Kirk Hachigian) sent Steves a copy of the Masonite presentation, characterized it as "a very informative document for our discussions," and stated that the Supply Agreement "gives us essentially zero return" on JELD-WEN's "capital investment" in its doorskin manufacturing business.

98.    During a meeting on October 2, 2014 Masonite informed Steves that it would no longer sell doorskins to Steves.

99.    As described more fully below, the Supply Agreement sets prices pursuant to a ███████████████████████████ As of July 12, 2014, JELD-WEN had been using its alleged cost of capital in doorskin manufacturing as a pretext to demand changes to the Supply Agreement to cause Steves to pay prices higher than those to which JELD-WEN agreed when it

23

signed the Supply Agreement on May 1, 2012. JELD-WEN's reference on July 12, 2014 to Masonite's publicly stated decision to no longer supply doorskins to third parties, and other conduct before and after that date, amounted to coordination with Masonite that would not have taken place but for the 2012 Merger.

### ii. Interior Molded Doors

100. As noted above, on three occasions since the 2012 Merger, Masonite has quickly followed price increase announcements by JELD-WEN. On three other occasions, Masonite took the lead and was promptly followed by JELD-WEN. In the three years since the 2012 Merger, the six increases in the announced prices of interior molded doors led by JELD-WEN and Masonite have resulted in a substantial cumulative price increase.

101. Additional coordinated interaction between Masonite and JELD-WEN is likely to occur in the future.

### c. Vertical Effects

102. By breaching and terminating its contract with Steves, JELD-WEN is effectively capitalizing on its increased market power to foreclose Steves' access to a competitively priced supply of doorskins. JELD-WEN would not enjoy this market power but for the 2012 Merger.

103. Because it knows that Masonite does not plan to sell interior doorskins to independent door manufacturers such as Steves, JELD-WEN likely intends to cut off or substantially curtail its supply of interior doorskins to those independents.

104. Indeed, according to a June 22, 2016 analyst report, Masonite's stock is a recommended "buy" because of JELD-WEN's recent public announcement of the termination of one of its doorskin supply contracts – which those knowledgeable about the industry, including Steves' customers, immediately understood to be the Steves Supply Agreement. The analyst found this to be

24

Case 3:16-cv-00545-REP   Document 1   Filed 06/29/16   Page 25 of 47 PageID# 25

very encouraging, as it implies [that JELD-WEN] may terminate all of its molded door skin contracts when they expire against companies which "compete against [JELD-WEN] in the marketplace." If JELD-WEN were to decide not to renew all of its molded door skin contracts when they come up for renewal, that would represent a clear positive for Masonite, as it would force these smaller players to source door skins overseas or make significant investments in building their own door skin manufacturing plants.

105.    JELD-WEN has already refused to sell Steves the Monroe doorskin at the price required by the Supply Agreement, forcing Steves to pay approximately double that price and sell the resulting doors at a loss, thus significantly hampering its ability to compete in the market for interior molded doors.

106.    JELD-WEN's actual breach of its contract with Steves, and its unlawful termination of that contract (as described in more detail below), as well as its likely cutting off or curtailing the supply of interior doorskins to other independents all have had or will have the effect of foreclosing access to doorskins by independent door manufacturers, which will in turn further restrict competition in the regional markets for interior molded doors.

### 4.    Barriers to Entry

107.    The barriers to entry in the doorskin manufacturing business are formidable.  As was explained in the June 25, 2014 Masonite investor presentation, the interior doorskins business "is not easy to replicate" and takes approximately four years and a $100 to $150 million capital investment.

108.    Steves' own independent analysis is consistent with Masonite's comments, and suggests that construction of a new doorskin manufacturing facility, with necessary molds and other capital equipment, could involve capital investments substantially in excess of $100 million, take over four years, and be subject to substantial uncertainties.

109.    A new entrant could not successfully enter with a single style of doorskins, but rather would have to offer the range of styles currently demanded by consumers, each of which requires substantial capital investment in a mold.  This is because home improvement centers and other doors customers demand a range of product to be able, in turn, to offer their own customers a range of choices.  For Steves, there are currently 23 different and distinct active styles, comprised of 523 separate widths and lengths.

110.    Any hypothetical entrant would need to capture essentially all the business of the non-vertically integrated molded door manufacturers to achieve efficient, competitive scale and to make a reasonable return on its investment in entry.  In fact, no new entrant has entered the market since the 2012 Merger, and future entry is unlikely to be timely or sufficient to deter further coordination between JELD-WEN and Masonite.

111.    Even if a new entrant had adequate resources to commit to the development of a new doorskin business, such an entrant might then be subject to protracted and expensive patent litigation brought by JELD-WEN or Masonite.

112.    In a recent filing with the United States Securities and Exchange Commission, JELD-WEN represented that:

> We rely primarily on patent, trademark, copyright, and trade secret laws and contractual commitments to protect our intellectual property and other proprietary rights.

113.    Similarly, in a 2016 filing with the United States Securities and Exchange Commission, Masonite represented that:

> We protect the intellectual property that we develop through, among other things, filing for patents in the United States and various foreign countries. In the United States, we currently have 213 design patents and design patent applications and 172 utility patents and patent applications.  We currently have 197 foreign design patents and patent applications and 283 foreign utility patents and patent applications.

26

Case 3:16-cv-00545-REP Document 1 Filed 06/29/16 Page 27 of 47 PageID# 27

114. On information and belief, JELD-WEN and Masonite own or have licenses to numerous patents relating to the design and/or manufacture of the most popular doorskin products. Given the public posture of JELD-WEN and Masonite concerning their intellectual property rights, any potential entrant must contend with the threat of intellectual property litigation.

115. According to the American Intellectual Property Law Association's ("AIPLA") 2015 Report of the Economic Survey, the median cost of litigating through trial a patent infringement lawsuit in which more than $25 million is at risk is $5 million. Additionally, according to PwC's 2015 Patent Litigation Study and Lex Machina, the median length of a patent infringement litigation through trial is 2.4 years.

116. There is no reason to believe that either JELD-WEN or Masonite would be willing voluntarily to license to a new entrant the rights to the their intellectual property and to do so at price that would otherwise be available in a fair and competitive market.

**F. JELD-WEN's Past and Ongoing Breaches of the Supply Agreement and its Associated Warranties**

117. Since acquiring Craftmaster, JELD-WEN has engaged in the following series of contract and warranty breaches that have had the effect of increasing the price and reducing the quality of doorskins supplied to Steves.

27

1. **JELD-WEN has breached the contract and its associated warranties by failing to pay for full losses caused by its defective products, causing Steves to incur costs related to such defective products, and causing Steves to issue credits to Steves' own customers when defective JELD-WEN doorskins were incorporated into finished Steves doors.**

118. The Supply Agreement, at section 8, provides as follows regarding product quality:



119. The doorskins sold by JELD-WEN to Steves are also subject to an implied warranty of merchantability.

120. In numerous instances set forth below, JELD-WEN has shipped defective products to Steves and failed to compensate Steves as required by the Supply Agreement and/or in the manner that it would have done but for the unlawful anticompetitive effects of the merger.

a. **Defective products and products damaged by JELD-WEN during the course of inspection that are the subject of vendor debit memoranda**

121. Doorskins are susceptible to structural and cosmetic defects. Structural defects include cracks or breaks, warping, misshaped doorskins, missing primer, inconsistent thickness (caliper) along length of the doorskin, and issues with "cleavage," which is how effectively the doorskin stays affixed to a surface to which it is attached. Cosmetic defects include scuffs, dents, blisters, bubbles, light primer, heavy primer, oil or resin spots, spots from production trash, fiber pop, fiber transfer, wavy doorskins, unbalanced doorskins, and water stains.

28

Case 3:16-cv-00545-REP Document 1 Filed 06/29/16 Page 29 of 47 PageID# 29

122.    Beginning in late 2012, and continuing through the present, JELD-WEN has shipped to Steves substantial amounts of defective product, in the range of hundreds of thousands of doorskins. Although JELD-WEN has agreed with Steves that many of these products are defective, and issued refunds, JELD-WEN has failed and refused to issue refunds for tens of thousands of defective doorskins. As of June 2, 2016, Steves had demanded, and JELD-WEN had refused to issue refunds for, 37,349 defective doorskins. The total amount of the refunds due and owing is at least $171,354. JELD-WEN's reasons for denying refunds, in breach of its contractual and other legal duties, include that aesthetic issues such as poor primer, or spots below eye level, do not warrant a refund. In fact, such defects make the product unfit for its intended purpose and inconsistent with quality requirements imposed both by the Supply Agreement and applicable law.

123.    Moreover, even as to refunds already paid, Steves has been damaged because the refund amount is not the original invoice amount but instead is a lower amount reflecting Steves' discount for prompt cash payment. But in each such case, JELD-WEN has held Steves' cash for several months while it conducts inspections.

124.    JELD-WEN has demanded a physical inspection of each defective doorskin by its own personnel before providing Steves with the contractually required reimbursement. JELD-WEN has further demanded unnecessary and cumbersome weekly reports. At JELD-WEN's request, Steves set the defective products aside and made them available for inspection, even though at Steves' two largest plants JELD-WEN has failed to make the requested inspection for months. As a result Steves has incurred substantial storage and other administrative costs in an amount to be proved at trial.

125.    During the course of such inspections, JELD-WEN personnel have caused additional damage to finished doors that had been manufactured by Steves using JELD-WEN

29

doorskins. On January 29 and 30, 2015, during an inspection of finished doors at Steves' plant in Henrico County, Virginia, JELD-WEN representatives, in a purported effort to ensure that finished doors were "catalogued and counted," painted orange streaks on 2,238 doors, thereby ruining them and causing damage in excess of $75,000. JELD-WEN has failed and refused to pay Steves the value of these doors.

126. In addition, Steves has incurred substantial labor costs associated with handling the defective product.

### b. Costs associated with JELD-WEN's repeated shipment of defective products to Steves

127. The substantial increase in defective doorskins shipped to Steves by JELD-WEN since the 2012 Merger has required Steves to spend additional time inspecting doorskins and to slow its manufacturing processes to increase the chances of discovering that a doorskin is defective before it is incorporated into a finished door.

### c. Credits issued to Steves' customers after selling doors incorporating defective doorskins with latent defect

128. In numerous instances when the defects were with the doorskin itself, or with the doorskin cleavage, and were not visible or otherwise reasonably discoverable by Steves before those defective doorskins were incorporated into a finished door, Steves has accepted and paid JELD-WEN for such defective doorskins and incorporated them into finished doors that were then sold and shipped to customers.

129. When such latent defects in the doorskins have become visible to the customers, they have demanded refunds or credits from Steves for the full prices that the customers had paid. In such instances, it has been commercially reasonable for Steves to issue credits to its customers, reimbursing them for the full price paid. The total amount of such credits Steves has

Case 3:20-cv-00112-JAG Document 79-1 Filed 07/29/20 Page 32 of 48 PageID# 1170

issued to its customers from January 2015 through June 21, 2016 exceeds $1,030,000 and will be proved with more specificity at trial.

130. These defective doors, including the defective doorskins, have no material salvage value.

131. Steves has provided commercially reasonable notice to JELD-WEN of such latent defects and demanded reimbursement from JELD-WEN for such credits.

132. JELD-WEN has refused full reimbursement for many such credits. For those instances in which JELD-WEN agreed that there was a defect, JELD-WEN has issued credits to Steves, but only for what it paid for the defective doorskins, which is much less than the damages suffered by Steves when it issued credits to its customers for the entire price of the finished, albeit defective, doors. For example, in several cases in which thousands of doors have been ruined, JELD-WEN has acknowledged a defect in its doorskins but has only agreed to refund the much lower cost of the doorskins at issue, which is approximately one fifth of the price of the doors. This is contrary to custom and practice in the industry.

    **2.    JELD-WEN has breached the contract by raising prices in violation of the contractually required** ▮▮▮▮▮▮

    **a.    The Pricing Provisions of the Supply Agreement**

133. The Supply Agreement sets a specific initial price for doorskins from its effective date of January 1, 2012 until it is changed based on the ▮▮▮▮▮▮ and pursuant to the contract notice requirements.

134. For 2013, and thereafter, the Supply Agreement provides that prices be set using the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**b.    JELD-WEN'S failure to abide by the pricing provisions and obfuscation regarding** ███████████

139.    In or about November 2012, JELD-WEN notified Steves that, pursuant to ████████ ███████████████████████████, the 2013 prices would be reduced by ████%.  Prices were in fact so reduced.

140.    In or about November 2013, JELD-WEN notified Steves that, pursuant to the Supply Agreement, the 2014 prices would be reduced again.  Subsequently, JELD-WEN provided Steves with the ███████████████████████████████████████

█████████████████████ the price reduction should have been larger than JELD-WEN had previously stated.

141.    JELD-WEN did not actually implement the contractually required price reduction in 2014.

142.    In December 2014, JELD-WEN sent Steves a letter stating that ████████████ ██████████████████████████ the 2015 price would accordingly increase by █████████ JELD-WEN did not provide Steves with the ███████████ ███████████████████.

143.    Steves requested ███████████████████████ █████████████████████████ On January 7, 2015, JELD-WEN sent Steves a letter containing a spreadsheet that purported to show, ████████ ███████████████████ That spreadsheet showed a █████████ ███████████████%, which, if it were correct, would result in a price increase of ██%.

144.    Steves again requested the ███████████████ and the parties scheduled a face-to-face meeting to discuss this and other matters. At that meeting, on or about January 28, 2015, Steves was provided with a spreadsheet containing ███████ ████. That spreadsheet did not contain the ███████████████████, but instead contained ████████████████████ which were different from the ████████ ████████ on the January 7 document. The alleged net resulting ████████ increases were ██% and ██%, respectively.

145.    Thus, by this point, JELD-WEN had provided Steves with three different sets of ████████████████████████████ with each set showing a

greater increase than the set prior, but without ever providing the ████████████████████

███████████████████████████████

146.    During the January 28, 2015 meeting, Steves again requested the ██████████ ██████ directing its request this time to JELD-WEN's Senior Vice President for Fiber Composites, Bruce Fedio, who was present at the meeting. Mr. Fedio verbally provided ██ ██ which was then handwritten on the document that had just been handed to Steves containing the alleged percent increase without the dollar amount. He then signed his name below the handwritten dollar amounts. This was the fourth set of figures JELD-WEN provided to Steves.

147.    The dollar figures provided by Mr. Fedio showed that each of the three prior alleged percentage changes were not only wrong, but also too high. When Mr. Fedio's ██ ████████████████████████████████████████ ████████████████████ the contractually required 2015 price should be ██% *lower* than 2014, instead of being higher, as claimed by JELD-WEN's three sets of false and conflicting calculations (showing increases of ██%, ██%, or ██%).

148.    During 2015, JELD-WEN in fact invoiced Steves for price increases ranging from ██% to ██%. Steves, being totally dependent on JELD-WEN as the only possible source for doorskins, paid the increase under protest.

149.    In summary, Steves received no price decrease for 2014, even though Steves was entitled to a price decrease for that year. In 2015, Steves paid under protest price increases ranging from ██% to ██%, even though the Supply Agreement, based on the ████████████ ██████ and the latest data provided by Mr. Fedio of JELD-WEN, required a ██% decrease.

34

150. Although JELD-WEN has not attempted to raise its prices in 2016, Steves has still been paying (under protest) the incorrect and inflated prices JELD-WEN began charging in 2015.

151. JELD-WEN has refused to provide to Steves any ▮▮▮▮▮▮▮▮. If ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ then Steves is entitled to a price reduction as provided in the Supply Agreement. The total difference between what Steves paid in 2014, in 2015, and through April 30, 2016, compared to what the Supply Agreement requires, is at least $2 million. Steves' damages from these erroneous prices are ongoing and will be proven with specificity at trial.

152. But for the 2012 Merger and its resulting anticompetitive effects in the doorskins market, JELD-WEN would not have breached the pricing provisions of the Supply Agreement and would have provided the contractually mandated price reductions.

### 3. JELD-WEN's wrongful attempt to accelerate the termination date by 21 months



 Nothing in

the Supply Agreement affords JELD-WEN the unilateral right to shorten the ▮▮-year

termination period.

> **4.      JELD-WEN has breached the contract by attempting to force Steves to accept price increases and other changes to the terms and condition of the Supply Agreement.**

158.      Commencing in or about April 2014, JELD-WEN began attempting to force

Steves to agree to new and unfavorable terms to the Supply Agreement, especially as to the

methodology for adjusting the pricing for doorskins.

> **a.      JELD-WEN's demand to add its cost of capital to the list of cost inputs specified in the Supply Agreement**

159.      On April 21, 2014, one month after Hachigian became JELD-WEN's President

and CEO, the parties met to discuss certain issues that had arisen in connection with their

business dealings.  At that meeting, and in a letter the next day, JELD-WEN demanded "better

defined pricing mechanics," even though the pricing had been fixed by ▮▮▮▮▮▮▮▮

▮▮▮▮▮ the Supply Agreement.

160.      As described above, on July 12, 2014, Hachigian sent to Steves the Masonite

investor presentation stating that Masonite would no longer supply doorskins to independents.

That presentation also described the "capital intensive" nature of doorskin manufacturing and

stated that a new doorskin plant would cost at least $150 million and take four years to build. In transmitting that presentation, Hachigian referenced these statements regarding capital investment, stated that "our agreement gives us essentially zero return on this capital investment," and added that the Masonite presentation "gives us some important detail to discuss."

161.   The parties again met in August 2014, and at that meeting and in a follow up letter dated August 26, 2014, JELD-WEN demanded that Steves pay a "capital charge" of approximately $▮▮ per doorskin, or about ▮ percent of the roughly $▮▮ cost of a doorskin.

162.   The price adjustment mechanism to which the parties agreed when they executed the Supply Agreement could have included JELD-WEN's cost of capital among the ▮▮▮▮▮ ▮▮▮▮▮, but it did not. JELD-WEN is entirely without justification in demanding this material change to the agreed terms.

### b.   Miscellaneous other contract revisions demanded by JELD-WEN

163.   During this time period, JELD-WEN requested, in meetings and correspondence with Steves' management, numerous other changes to the Supply Agreement. Those terms include, without limitation, restrictions on Steves' use of the JELD-WEN brand; provision by Steves of quarterly forecasts of its demand for doorskins (even though the Supply Agreement explicitly provides only for annual forecasts); and exploring "additional structures on termination" (even though the Supply Agreement already contains commercially reasonable termination provisions).

37

### c. JELD-WEN's unlawful terms and conditions document

164. On or about May 15, 2015, JELD-WEN demanded that Steves agree to a full page, single-spaced document that would add 12 new paragraphs of terms and conditions to the contractual relationship between the parties. Steves refused.

165. On or about July 28, 2015, JELD-WEN began to include a similar "terms and conditions" document with the routine order confirmation materials issued in connection with its doorskin shipments.

166. The terms and conditions demanded of Steves in both instances include items that are different from terms and conditions that are the explicit subject of the Supply Agreement, such as a "warranty" section which contains new and different language from that in the "quality" section of the Supply Agreement, and a "miscellaneous" section in the May 15, 2015 demand which purports to choose Oregon law even though the Supply Agreement explicitly chooses ████████ law.

167. On July 30, 2015, Steves informed JELD-WEN by letter that Steves "object[s] to these new terms and conditions and rejects their addition to the Doorskin Product Agreement signed May 1, 2012."

### d. JELD-WEN's refusal to sell Monroe doorskins at the contract price

168. Paragraph 1 of the Supply Agreement states that: ████████████████

████████████████████████████

Nowhere in the Supply Agreement is there any language limiting the application of this sentence to only those molded doorskin products that JELD-WEN was manufacturing as of May 1, 2012.

169. In January 2015, JELD-WEN began to offer a new doorskin design called "Monroe." JELD-WEN is selling this style of door to its customers. It is very popular. Upon

38

information and belief, JELD-WEN is selling Monroe doorskins to other small door manufacturers. Steves has placed purchase orders for Monroe doorskins. JELD-WEN has refused to sell Monroe doorskins to Steves at the price set in the Supply Agreement, contending that because this particular style was not offered by JELD-WEN when the Supply Agreement was signed, it is a "new" offering and therefore not covered.

170. JELD-WEN is pricing the Monroe doorskin for Steves at approximately twice the price required by the Supply Agreement, even though, upon information and belief, there is no material difference in the cost of this product for JELD-WEN, and has even attempted to condition any future sales of these doorskins to Steves on Steves' waiving its right to claim that they should be priced per the Supply Agreement. Steves has been and will continue to be damaged by the overcharges from JELD-WEN for Monroe doorskins, in an amount to be proven at trial.

### e. JELD-WEN's overcharges for Madison doorskins

171. Commencing in approximately January 2013, JELD-WEN began overcharging Steves for a popular style of doorskin called the "Madison." The prices charged by JELD-WEN were substantially higher than allowed by the Supply Agreement. Even though Steves did not agree to the prices, it has paid what JELD-WEN demanded because it had no alternative source of supply for the Madison doorskins. The aggregate amount of these overcharges exceeds $280,000 as of May 31, 2016, and will be proved in more detail at trial.

### f. JELD-WEN's unilateral decision to no longer sell certain doorskins to Steves

172. On information and belief, JELD-WEN recently decided to no longer offer for sale to Steves certain styles of doorskins that JELD-WEN has previously sold to Steves upon receipt of a valid Steves purchase order. On further information and belief, JELD-WEN is

continuing to sell such doorskins to its other customers. JELD-WEN's refusal to sell to Steves JELD-WEN's full line of doorskins has injured and will continue to injure Steves, in an amount to be proven at trial.

G.

## COUNT ONE

(Clayton Act, Section 7, 15 U.S.C. § 18)

175. The foregoing allegations are incorporated as though re-alleged herein.

176. The effect of the 2012 Merger has been, and will continue to be, substantially to lessen competition or to tend to create a monopoly in the markets for interior molded doorskins in the United States, and interior molded doors in the regional markets emanating from the plants at which such doors are manufactured, in violation of Section 7 of the Clayton Act.

177. Within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15, Steves has been injured in its business or property by reason of the lessening of competition described above, including without limitation JELD-WEN's refusal to supply to Steves an essential input for its door manufacturing business except on anticompetitive terms and conditions, and JELD-WEN's wrongful efforts to accelerate termination of the Supply Agreement to a date 21 months

earlier than prescribed by the Supply Agreement. Steves is entitled to recover treble damages for such injuries, in an amount to be proved at trial.

178. Steves is threatened with further loss or damage by reason of the actual or likely lessening of competition described above and is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 sufficient to restore competition to the doorskins and doors markets comparable to that which existed before the illegal 2012 Merger.

## COUNT TWO

### (Breach of Contract)

179. The foregoing allegations are incorporated as though re-alleged herein.

180. The Supply Agreement is a valid and enforceable contract under which JELD-WEN agreed to sell to Steves doorskins, and Steves agreed to purchase doorskins, all in accordance with the Supply Agreement's terms and conditions. The Supply Agreement constitutes the parties' entire agreement and so specifies.

181. As described in this Complaint, JELD-WEN has breached and is continuing to breach this contract in numerous ways, including without limitation its refusal to abide by its pricing obligations, its sale to Steves of defective doorskins, its attempt to terminate the Supply Agreement 21 months earlier than allowed, and its refusal to inspect and credit Steves for defective product.

182. As a result of JELD-WEN's repeated breaches of the Supply Agreement, many of which are ongoing, Steves has suffered damages substantially in excess of $75,000 in an amount to be shown at trial.

## COUNT THREE

### (Breach of Warranty)

183. The foregoing allegations are incorporated as though re-alleged herein.

41

184. By virtue of the obligations under the Supply Agreement and by operation of law, the doorskins manufactured by JELD-WEN and sold by it to Steves are covered by the Supply Agreement's express warranty and by an implied warranty of merchantability.

185. By delivering and selling to Steves doorskins that were defective at the time of sale, JELD-WEN has breached and is continuing to breach these warranties.

186. Steves has provided commercially reasonable notice to JELD-WEN of these breaches and Steves' financial injuries caused by them.

187. JELD-WEN's breaches of its warranties have proximately caused Steves to suffer incidental and consequential damages in an amount substantially in excess of $75,000, to be proven at trial.

## COUNT FOUR

### (Declaratory Judgment)

188. The foregoing allegations are incorporated as though re-alleged herein.

189. An actual controversy has arisen and now exists between Steves and JELD-WEN concerning, *inter alia*, the effective termination date of the Supply Agreement. Steves alleges that the contract's "evergreen" termination provision clearly states that JELD-WEN may terminate the contract *only* on ▮▮▮ years' notice. JELD-WEN contends that the termination provision is ambiguous, and has asserted its belief that it may cancel the contract effective December 31, 2019 at the ▮▮▮▮▮▮▮▮▮ Steves claims that JELD-WEN must sell to Steves any doorskin made by JELD-WEN, and must do so according to terms and conditions of the Supply Agreement. JELD-WEN contends that the Supply Agreement does not apply to doorskin products that JELD-WEN was not offering as of the date of the Supply Agreement.

190. Although Steves contends that (a) the termination provision is not ambiguous and that JELD-WEN must provide ▮▮▮ years' notice to terminate the contract and (b) that the

42

Supply Agreement covers any and all of JELD-WEN's doorskins, no matter when first introduced, the uncertainty created by JELD-WEN's stated intent to cancel the contract at the end of 2019 and its refusal to sell Monroe doorskins to Steves except at inflated prices is harming Steves now and threatens to destabilize Steves' interior molded door business in the months and years ahead.

191. An actual controversy has also arisen regarding JELD-WEN's obligation to ship doorskins FOB to any Steves plant other than the three that currently exist.

192. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Steves is entitled to a declaration that (a) the Supply Agreement is a lawful and binding contract; (b) there is no basis in law or fact for JELD-WEN to demand that any of the terms and conditions of the Supply Agreement be changed; (c) because JELD-WEN provided written notice of termination on ████████████ the effective termination date is September 10, 2021; (d) JELD-WEN must sell to Steves any doorskin product ordered by Steves and made by JELD-WEN at any time during the life of the Supply Agreement, and must do so according to the prices and other terms and conditions of the Supply Agreement, and no other terms and conditions except those to which the parties may agree in writing in conformity with paragraph 18 of the Supply Agreement; (e) JELD-WEN must immediately provide Steves with all information required to make a determination ████████████ required by the Supply Agreement, and continue to do so for the life of the Supply Agreement by ████████ of each year; (f) pursuant to the Supply Agreement, any ████████████████████ will be put into effect, and the ████████████████████ (g) pursuant to paragraph 20 of the Supply Agreement, Steves is entitled to conduct an ████████████████████ ████████████████████ .

and (h) such other relief as the needs of justice may require.

## COUNT FIVE

### (Specific Performance)

193.    The foregoing allegations are incorporated as though re-alleged herein.

194.    The Supply Agreement is a valid and enforceable contract under which JELD-WEN agreed to sell to Steves doorskins, and Steves agreed to purchase doorskins, all in accordance with the Supply Agreement's terms and conditions.  The Supply Agreement constitutes the parties' entire agreement and so specifies.

195.    As described in this Complaint, JELD-WEN has breached and is continuing to breach this contract in numerous ways, including without limitation its refusal to abide by its pricing obligations, its sale to Steves of defective doorskins, its attempt to terminate the Supply Agreement 21 months earlier than allowed, and its refusal to inspect and credit Steves for defective product.

196.    Steves has fully complied with its obligations under the contract and is prepared to continue to perform its contractual obligations.

197.    Specific performance would not be inequitable to JELD-WEN.

198.    The balance of the equities tips in favor of specific performance on the contract.

199.    Doorskins are uniquely available to Steves through JELD-WEN's performance of the Supply Agreement because there is no other source for doorskins available that can meet Steves' needs.

200.    Steves is entitled to specific performance on the contract.

44

## COUNT SIX

### (Trespass to Chattels)

201.   The foregoing allegations are incorporated as though re-alleged herein.

202.   While conducting an inspection at Steves' plant in Henrico County, Virginia, JELD-WEN painted orange streaks on Steves' doors, rendering them commercially worthless, and refused to pay for the damage.

203.   JELD-WEN, through its agents and employees, intentionally caused this conduct, which was not authorized by Steves or the Supply Agreement.

204.   JELD-WEN's conduct caused Steves' property to be impaired as to condition, quality, and value.

205.   As a result of JELD-WEN's conduct, Steves has suffered damages in excess of $75,000 in an amount to be shown at trial.

206.   Steves is entitled to recover damages from JELD-WEN for trespass to chattels.

### PRAYER FOR RELIEF

Wherefore, Plaintiff, Steves and Sons, Inc., requests that the Court grant it the following relief:

1.   Under Count One, for (a) appropriate injunctive relief against JELD-WEN, including without limitation an order that it divest such assets, whether possessed originally by JELD-WEN, Craftmaster, or both, sufficient either to enable the creation of a separate, distinct, and viable competing firm that can replicate Craftmaster's competitive significance in the marketplace before the 2012 Merger, or otherwise to restore competition to the molded doorskins and doors markets comparable to that which existed before the illegal 2012 Merger and (b) three times the damages sustained by Steves because of JELD-WEN's violation of the antitrust laws, in an amount to be proven at trial;

45

2.     Under Count Two, for the damages sustained by Steves because of JELD-WEN's breaches of the Supply Agreement, in an amount to be proven at trial;

3.     Under Count Three, for the damages sustained by Steves because of JELD-WEN's breaches of its express and implied warranties, in an amount to be proven at trial;

4.     Under Count Four, for appropriate declaratory relief as set forth therein;

5.     Under Count Five, for an order requiring specific performance on the contract;

6.     Under Count Six, for the damages suffered by Steves because of JELD-WEN's trespass to chattels, in an amount to be proven at trial;

7.     For an award of Steves' reasonable attorney's fees and costs in this action, pursuant to Sections 4 and 16 of the Clayton Act and ██████████████████████████;

8.     For pre-judgment and post-judgment interest; and

9.     For such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Steves demands a trial by jury for all issues triable by a jury.

Dated:  June 29, 2016

Respectfully submitted,

STEVES AND SONS, INC.

By: _Lewis F. Powell III_

Lewis F. Powell III (VSB No. 18266)
John S. Martin (VSB No. 34618)
John E. Beerbower (VSB No. 83644)
Alexandra L. Klein (VSB No. 87711)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
lpowell@hunton.com
martinj@hunton.com

Case 3:16-cv-00545-REP   Document 1   Filed 06/29/16   Page 47 of 47 PageID# 47

jbeerbower@hunton.com
aklein@hunton.com

Richard A. Feinstein (to be admitted pro hac vice)
Nicholas A. Widnell (to be admitted pro hac vice)
BOIES, SCHILLER & FLEXNER, LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Telephone:    (202) 237-2727
Facsimile:    (202) 237 6131

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
PIPKIN LAW
10001 Reunion Place, Suite 6400
San Antonio, TX  78216
Telephone:    (210) 731-6495
Facsimile:    (210) 293-2139

*Of Counsel*