# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| STEVES AND SONS, INC., | ) | |
| Plaintiff, | ) ) | |
| | ) ) | |
| v. | ) ) | Civil Action No. 3:16-CV-00545-REP |
| JELD-WEN, INC., | ) ) | |
| Defendant. | ) ) | |
| | ) | |

## PLAINTIFF STEVES AND SONS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT JELD-WEN, INC.'S MOTION TO DISMISS COUNT ONE OF THE COMPLAINT

### REDACTED VERSION FILED PUBLICLY

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

I.     THE JUSTICE DEPARTMENT CHALLENGED A NEARLY IDENTICAL MERGER IN 2001 TO ENSURE THE EXISTENCE OF A COMPETITIVE DOORSKIN SUPPLY. ......................................................................................5

II.    THE VARIOUS DOORSKIN SUPPLIERS COMPETED FOR BUSINESS BETWEEN 2002 AND 2012. ...................................................................................6

III.   JELD-WEN'S ACQUISITION OF CRAFTMASTER HAS SUBSTANTIALLY LESSENED COMPETITION, CAUSING HARM TO COMPETITION AND TO STEVES AND OTHER DOOR MANUFACTURERS. ...................................................7

ARGUMENT ......................................................................................................................10

I.     STEVES HAS ADEQUATELY ALLEGED "INJURY" IN THE MARKET FOR INTERIOR MOLDED DOORS. ...................................................................................14

II.    STEVES HAS ALLEGED THAT THE 2012 MERGER WAS A "MATERIAL CAUSE" OF ITS INJURIES AS A PURCHASER OF DOORSKINS. ...........................19

III.   DIVESTITURE IS AN AVAILABLE REMEDY BASED ON THE ALLEGATIONS IN THE COMPLAINT. ...................................................................24

     A.    The Validity of JELD-WEN's Laches Defense Is Not Properly Addressed at the Motion to Dismiss Stage. .............................................................................25

     B.    Steves' Claim for Injunctive Relief Is Presumptively Timely. ............................28

CONCLUSION ...................................................................................................................29

i

Case 3:16-cv-00545-REP Document 41 Filed 08/19/16 Page 10 of 37 PageID# 386

Steves merely because JELD-WEN has declared it so. A plaintiff has no obligation to predict and plead facts contrary to affirmative defenses a defendant may choose to assert. And, in any event, there are facts alleged in the Complaint—and more that will be proved at trial—showing that the laches defense is meritless. Accordingly, the viability of the laches defense should not be decided at the motion to dismiss stage.

For these reasons, set forth more fully below, JELD-WEN's motion should be denied.

## FACTUAL BACKGROUND

In 1866, Edward Steves founded a lumberyard in San Antonio, Texas. Compl. ¶ 4. Today, that business is run by Mr. Steves' great-great-great grandsons, Edward and Sam Steves. *Id*. Over the years, the business evolved from a lumberyard to a manufacturer of doors. Today, a substantial majority of Steves' business is manufacturing interior molded residential doors, the most popular type of interior door sold in the United States. *Id*. ¶ 41. The principal component of an interior molded door is the doorskin—a molded board produced with different designs, sizes, and textures—which makes up the front and back of an interior molded door. *Id*. ¶¶ 37-39. The doorskin represents approximately 70% of the cost of materials that go into an interior molded door. *Id*. ¶ 40.

Steves does not manufacturer its own doorskins. *Id*. ¶ 7. The production of doorskins requires a complex and expensive factory that could cost between 100 and 150 million dollars to build and outfit, and take four years to construct. *Id*. ¶¶ 107-108. For many years prior to JELD-WEN's acquisition of Craftmaster in 2012, Steves and other door manufacturers relied on three different suppliers of doorskins. *Id*. ¶¶ 8, 12. The head-to-head competition among the three doorskin suppliers was essential to ensure that Steves and other door manufacturers could purchase doorskins to compete in the market for interior molded doors.

4

I.      **THE JUSTICE DEPARTMENT CHALLENGED A NEARLY IDENTICAL MERGER IN 2001 TO ENSURE THE EXISTENCE OF A COMPETITIVE DOORSKIN SUPPLY.**

In 2000, there were only three significant manufacturers of doorskins: JELD-WEN, Premdor, and Masonite. *Id*. ¶ 42; *see also* Complaint, *United States v. Premdor Inc.*, No. 01-1696, ¶ 1 (D.D.C. Aug. 3, 2001) ("DOJ Complaint").[4] JELD-WEN was vertically integrated, that is, it manufactured both doorskins and doors. Premdor manufactured doors, and, according to the Antitrust Division of the United States Department of Justice ("Antitrust Division"), was also a small but significant manufacturer of doorskins. Compl. ¶ 42. Masonite manufactured doorskins, but not doors, and supplied doorskins to Steves, Premdor, and other American manufacturers of interior molded doors (but not to JELD-WEN). *Id*. In late 2000, Premdor announced its intention to acquire Masonite, which would result in the vertical integration of Premdor's door manufacturing and Masonite's doorskin manufacturing, eliminating the only non-vertically integrated doorskin manufacturer in the United States—Masonite. *Id*. ¶ 45.

The Antitrust Division challenged the proposed merger, finding that it would substantially lessen competition in the "upstream market" for the production of interior molded doorskins and the "downstream market" for interior molded doors. *Id*. ¶¶ 46-47; *DOJ Complaint* ¶¶ 30-41.[5] The stated concern of the Antitrust Division was that the proposed merger would reduce the number of doorskin manufacturers from three to two, with the remaining two also competing in the downstream doors market. Compl. ¶ 14. In the Antitrust Division's view, that reduction in competition would provide the combined Premdor/Masonite "with the incentive to

---

[4] The filings by the Antitrust Division are available at https://www.justice.gov/atr/case/us-v-premdor-inc-et-al.

[5] *See also United States v. Premdor Inc.*, No. 01-1696, Competitive Impact Statement, at 2 & 6-9 (D.D.C. Aug. 3, 2001) ("DOJ Competitive Impact Statement").

raise doorskins prices and/or restrict doorskin sales to non-vertically integrated firms, thereby increasing the benefits to [Premdor/Masonite] and [JELD-WEN] of coordinated interaction." Compl. ¶ 47 (quoting *DOJ Complaint* ¶ 35).[6]

To resolve the Antitrust Division's concerns, Premdor and Masonite agreed to divest Masonite's doorskin manufacturing plant in Towanda, Pennsylvania, along with any intellectual property or other assets needed, so that a new company could enter the market as a "viable doorskin manufacturer." *See DOJ Competitive Impact Statement* at 2; Compl. ¶ 48. That new company was Craftmaster. Compl. ¶ 49. The required divestiture to Craftmaster ensured that Steves and other doors manufacturers would have the benefit from meaningful competition among at least three different doorskin suppliers.

## II. THE VARIOUS DOORSKIN SUPPLIERS COMPETED FOR BUSINESS BETWEEN 2002 AND 2012.

For a decade following the divestiture of the Premdor/Masonite assets to Craftmaster, the three suppliers of doorskins (Masonite, Craftmaster, and JELD-WEN) competed head-to-head. *Id*. ¶ 50. Steves regularly purchased doorskins from each of them during that time period. *Id*. With such a reliable supply of doorskins from three sources, Steves was able to purchase quality doorskins at reasonable and competitive prices. *Id*. ¶ 51.

---

[6] One of the most well-recognized anticompetitive effects from a merger that leaves just two remaining firms in the market is the likelihood that those two will engage in increased coordination, either by actual agreement or otherwise, on prices and/or output. This includes express coordination (*e.g.*, the type of price-fixing agreements condemned by Section 1 of the Sherman Act), as well as the type of tacit collusion on prices and/or output that may be beyond the reach of Section 1 but nevertheless harms competition and consumers. *See H&R Block*, 833 F. Supp. 2d at 77 (explaining "coordinated effects" of a merger); U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*, at 24-26 (Aug. 19, 2010) ("*Merger Guidelines*") (explaining the various types of anticompetitive "coordinated effects" that may result from a merger).

In mid-2010, Steves decided that it would be in its best interest to secure a new long-term supply agreement with one manufacturer, and Steves embarked on discussions with each doorskin manufacturer to obtain the most favorable terms. *Id.* ¶ 52. The three doorskin manufacturers competed vigorously with each other to offer Steves the most attractive prices and other terms. *Id.* ¶¶ 16, 52. Steves ultimately decided to enter a long-term supply agreement with JELD-WEN on May 1, 2012. *Id.* ¶ 53 (the "Supply Agreement").

The Supply Agreement provides that it will be effective through ▮▮▮▮▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ unless terminated by either party in accordance with the provisions of the Agreement. *Id.* ¶¶ 53-55. If JELD-WEN decides to terminate, the Supply Agreement requires it to give Steves written notice ▮▮▮▮▮ before the termination is to take effect. *Id.* ¶¶ 56, 153-57. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. *Id.* ¶¶ 155-57. These terms were intended to provide Steves with a reliable and predictable supply of doorskins, as well as adequate time to secure an alternative source of doorskins in the event that JELD-WEN ever decided to terminate. *Id.* ¶ 56.

## III. JELD-WEN'S ACQUISITION OF CRAFTMASTER HAS SUBSTANTIALLY LESSENED COMPETITION, CAUSING HARM TO COMPETITION AND TO STEVES AND OTHER DOOR MANUFACTURERS.

Just six weeks after the Supply Agreement was executed, JELD-WEN announced its intention to acquire Craftmaster. *Id.* ¶ 57 (the "2012 Merger"). Given the timing, it is reasonable to assume that when JELD-WEN executed the Supply Agreement, it already knew that it would be acquiring Craftmaster. *Id.* ¶ 18. In light of the Antitrust Division's challenge to the nearly identical Premdor/Masonite transaction just 10 years earlier, it is likely that JELD-WEN entered into long-term supply agreements with Steves and other door manufacturers in an attempt to dissuade the Antitrust Division from challenging its acquisition of Craftmaster. *Id.*

¶¶ 18, 60.[7]  Given its reasonable, albeit mistaken, belief that JELD-WEN would comply with the

newly inked Supply Agreement and that Masonite would remain an alternative source of

doorskins, Steves did not object to JELD-WEN's proposed acquisition of Craftmaster.  *Id*. ¶ 59.

When the 2012 Merger closed in October 2012, the effect was to create a duopoly in the

production of interior molded doorskins with JELD-WEN having approximately 52% market

share and Masonite approximately 48% market share.  *Id*. ¶¶ 74-75.  The result in the market for

interior molded doors was similar:  JELD-WEN and Masonite each had a dominant position,

with each controlling more than 40%, while Steves and a few other door manufacturers shared

the remainder of the market.  *Id*. ¶¶ 77-78.

Unfortunately, the Supply Agreement provided Steves with no protection from the

anticompetitive behavior enabled by the enhanced market power JELD-WEN gained through the

2012 Merger.  For example,

- JELD-WEN has insisted that Steves pay significantly more for doorskins than the

  Supply Agreement permits.  *Id*. ¶¶ 3, 21, 24, 81, 105, 140-50, 171.  JELD-WEN

  has demanded that Steves agree to ███████████ that would raise

  doorskin prices substantially.  *Id*. ¶¶ 24, 99, 158-62.

- JELD-WEN has reduced the quality of its doorskins by, among other things,

  making the doorskins thinner and decreasing the protective packaging used to

---

[7] Antitrust practitioners often advise a merging party to enter into long-term supply contracts with principal customers before announcing a merger, because these contracts can then be used to quell the most likely source of objections (those same customers).  *See* M. Sean Royall & Adam J. Di Vincenzo, *When Mergers Become a Private Matter:  An Updated Antitrust Primer*, 26 ANTIRUST 41 (2012) (entering or extending the terms of supply contracts "may help deflect arguments" that existing supply arrangements "will be affected by the merger and allay any third party concerns about the merger when it is announced").  *See also Merger Guidelines* at 5 (discussing customers of the merging parties as one of the most common sources of valuable information about the merger's likely competitive effects).

ship the doorskins, causing increased instances of damage during shipping to Steves. *Id*. ¶¶ 22, 83, 92. JELD-WEN has refused to issue refunds for defective products, *id*. ¶¶ 120-126, and to credit Steves when a defective doorskin has caused the return of an entire door. *Id*. ¶¶ 128-132. JELD-WEN has also refused to acknowledge that tens of thousands of doorskins are defective, claiming, for example, that damage below eye level does not justify a refund. *Id*. ¶ 122.

- JELD-WEN has refused to sell Steves a certain style of doorskin unless Steves agrees to pay twice the price set forth in the Supply Agreement. *Id*. ¶¶ 24, 168-170. JELD-WEN also informed Steves that it will no longer supply Steves with a particular doorskin product line, while simultaneously telling Steves' customers that they could obtain the line directly from JELD-WEN. *Id*. ¶¶ 88, 172.

These actions by JELD-WEN have increased the prices, lowered the quality, and reduced the output of doorskins to Steves. This has significantly impaired Steves' ability to compete in the doors market. *Id*. ¶¶ 2, 9, 24, 86, 105, 171-172. Moreover, these actions are a stark contrast to JELD-WEN's behavior before the 2012 Merger, and certainly were not expected by Steves at the time that it entered the Supply Agreement in May 2012. *Id*. ¶¶ 52, 59.

The harms to Steves from the 2012 Merger will increase in the future. Following the 2012 Merger, Masonite announced that it would no longer supply doorskins to other door manufacturers, including Steves. *Id*. ¶¶ 23, 75. That decision effectively made JELD-WEN a monopolist in the supply of doorskins to other door manufacturers. *Id*. ¶ 75. JELD-WEN immediately used Masonite's decision—sending a copy of Masonite's announcement to Steves—as leverage to coerce Steves into agreeing to amend the Supply Agreement in ways that would threaten Steves' ability to remain in business. *Id*. ¶¶ 23, 160. With no alternative supplier

of doorskins, Steves has no recourse for combatting JELD-WEN's destructive exercise of its market power. *Id*. ¶¶ 24, 171.

In the ultimate threat to Steves' survival, JELD-WEN now has notified Steves of its intention to terminate the Supply Agreement. *Id*. ¶¶ 82, 153-57.  The Supply Agreement provides that "JELD-WEN may terminate . . . ██████████████████████████████████."  *See* Compl. Ex. A, ¶ 3(a)(2)(b).  JELD-WEN ████████████████████████████████████ ████████████████████████████████████.  *Id*. ¶¶ 153-157. Unless the competition that thrived before the 2012 Merger is restored, JELD-WEN eventually will drive Steves from the doors business. *Id*. ¶¶ 2, 23, 190.

## ARGUMENT

JELD-WEN does not argue that Steves has not sufficiently alleged that the 2012 Merger violated Section 7 of the Clayton Act.  Instead, JELD-WEN argues for dismissal of Count One because Steves supposedly has not plausibly alleged (a) that it was injured in the market for interior molded doors, (b) that its injury in the market for doorskins was caused by the 2012 Merger, and (c) that its request for divestiture is not barred by laches.  Before addressing why these arguments are without merit, it is necessary to dispel the misconceptions in JELD-WEN's papers regarding the substance and enforcement of Section 7.

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18 (1996).  *See California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) ("Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect 'may be substantially to lessen competition.'").  Section 7 may be enforced by the Antitrust Division, the Federal Trade

10