# EXHIBIT 32

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division**


STEVES AND SONS, INC.,

    Plaintiff,

v.                                    Civil Action No. 3:16cv545
                                      **PUBLIC SEAL**

JELD-WEN, INC.,

    Defendants.


**MEMORANDUM OPINION**

This matter is before the Court on PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR EQUITABLE RELIEF (ECF No. 1191), which the parties addressed through briefs before and after the evidentiary hearing on equitable remedies ("the Remedies Hearing"). For the reasons set forth below, PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR EQUITABLE RELIEF (ECF No. 1191) will be granted in part and denied in part.

**GENERAL BACKGROUND**

On June 29, 2016, Steves and Sons, Inc. ("Steves") filed this action against JELD-WEN, Inc. ("JELD-WEN") by filing a COMPLAINT FOR INJUNCTIVE AND DELCARATORY RELIEF, DAMAGES AND SPECIFIC PERFORMANCE (ECF No. 1). The Complaint contained six counts, including COUNT ONE which alleged a violation of Section 7 of the Clayton Act, § 15 U.S.C. § 18, and sought damages under

summarize the evidence upon which the jury found that JELD-WEN had violated Section 7 of the Clayton Act.

The product at issue in this litigation is called an interior molded doorskin. It is created by pouring a moist, softened fibrous material (treated with resin and wax) into a mold and then subjecting it to heat and pressure. The doorskin is a component part of an interior molded door which is made with a four-sided wooden frame and certain filling material to which the molded doorskin is glued. The doorskin provides the decorative covering for the front and the back of the door. The end product resembles a solid wood door but is much lighter and can be made and shipped at a considerably lower cost than a solid wooden door.

Steves and JELD-WEN both sell interior molded doors. JELD-WEN also makes doorskins, some of which it uses to make its own doors, and some of which it sells to independent door manufacturers (the "Independents") of which Steves is one. Steves has never made its own doorskins and has to purchase doorskins from doorskins manufacturers.

From 2001 to 2012, there were three manufacturers from which the Independents, including Steves, could purchase doorskins: Masonite Corporation, JELD-WEN, and Craftmaster International ("CMI"). All three were vertically integrated manufacturers of doorskins and interior molded doors. In 2011,

3

Steves was negotiating for possible long-term supply contracts with all three manufacturers.  In May 2012, JELD-WEN and Steves entered into a long-term supply agreement (the "Supply Agreement") that was to last for seven years and that contained an evergreen provision by which the contract was automatically renewed annually if notice of termination was not given in accord with the provisions of the Supply Agreement. In June 2012, JELD-WEN announced that it intended to acquire CMI and the acquisition was completed in October 2012.

The jury found that, as a consequence of the merger and JELD-WEN's conduct in 2014 and thereafter, competition was substantially lessened in the doorskin market and that, as a result, Steves sustained injuries of the type that the antitrust laws were designed to prevent.  Thereupon, the jury awarded Steves $58,632,454.00 in antitrust damages which, when trebled as required by statute, amounts to antitrust damages in the amount of $175,897,362.00. The jury also found that JELD-WEN had breached Sections 1, 6, and 8 of the Long Term Supply agreement and awarded damages in the amount of $12,151,873.00 on account of those breaches. That award will be reduced by $2,188,271.00 because the Court granted JELD-WEN, INC'S MOTION FOR JUDGMENT AS A MATTER OF LAW AGAINST STEVES & SONS, INC. (ECF No. 1773).

As a primary equitable remedy, Steves asks the Court to order JELD-WEN to divest Towanda (formerly part of CMI) to

4

restore competition in the doorskin market.  Steves also asks the Court to impose certain so-called "behavioral" or "conduct" remedies, including restrictions and obligations on JELD-WEN, to the end that the divested entity will be able to successfully operate as a stand-alone independent business or to be successfully combined with the assets of the acquiring party so as to become an effective competitor. To those ends, Steves contends that the equitable remedy of divestiture must be accompanied by the following conduct remedies:

> (1) transfer of all tangible assets and likes necessary to develop, manufacture, and sell doorskins at Towanda;
>
> (2) a transfer of licensing of all intangible assets used in the development, manufacturing, and sale of molded doorskins at the Towanda facility to include:
>
>> • Transfers or licenses to the purchasing entity of patents used to make doorskins, schematics or designs used to manufacture doorksins, customer lists, vendor lists, and know-how in trade secrets to operate the facility
>
> (3) an Order assuring that the acquiring entity can retain the services of the employees currently operating the Towanda facility;
>
> (4) an Order prohibiting JELD-WEN from hiring their employees for at least two-year transitional period;
>
> (5) a provision requiring the divested entity to offer an eight-year long-term supply agreement to Steves at reasonable prices and terms (based on the LTSA);

5

The record is not entirely clear as to the provenance of PTX 341 and 342, but the record does prove that JELD-WEN prepared these figures based both on historical CMI records (for 2009 through 2012) that were acquired in the merger and on JELD-WEN's own records thereafter. And, JELD-WEN used these documents to make business and strategy decisions. Thus, even though their provenance is not entirely clear, the record shows that they are reliable and probative of the state of the doorskin business at Towanda for the period involved.

JELD-WEN takes the view that the profitability of Towanda in 2011 and 2012 should be determined by CMI's audited financial statements, DTX 191, and by the information that JELD-WEN gave to the DOJ in August 2012, DTX 60. And, JELD-WEN says that the most important evidence on that point came from the testimony of Bob Merrill at the Remedies Hearing where Merrill testified that the figures in PTX 341 and 342 were not consistent with documents that he had seen.

The Court does not credit DTX 191 or DTX 60 on the issue of the profitability of the doorskin business at Towanda because those documents reflect information about CMI as a whole, not just Towanda's doorskin business. And, CMI had other businesses such as the door business and the trim business (MiraTEC and Extira) and locations other than Towanda.

13

Case 3:16-cv-00545-REP   Document 1783   Filed 10/05/18   Page 14 of 149 PageID# 53583

Nor can the Court credit Merrill's testimony. If, as he said was the case, Merrill had documentary evidence to refute the proofs that appeared in PTX 341 and 342, those refuting documents would have, indeed should have, been produced. They were not. As a result, Merrill's testimony on the profitability of the doorskin business at Towanda for the time period involved is rejected as not reliable.

The evidence on this issue is probative in the remedial phase of these proceedings because, to find that divestiture is an appropriate remedy, the Court must be satisfied that a divested Towanda can operate competitively and profitably in the doorskin market. And, the fact that Towanda did that in the past, even in the face of adverse market conditions, is evidence that supports a finding that a divested Towanda could do so now.

In any event, it is not disputed that CMI, as an entity, was in difficult financial straits in 2011 and 2012 before the merger. CMI certainly was not profitable then, even with a slightly positive EDITDA from the doorskin business and a positive contribution from the Miratec and Exitera lines.

Indeed, by 2011, CMI's owners had been forced to invest their own funds into CMI to support its cash flow. Thus, after exploring several options, they decided to sell the company by putting it up for auction. As part of that process, they engaged an investment firm that worked with CMI's management to

14

prepare offering documents, send out teaser memos to prospective buyers, and solicit bids from interested entities. One such entity was Steves, which, in October 2011, offered to invest [ ] in CMI in exchange for a minority ownership stake in the company. See DX-462 at 6. CMI's owners rejected the offer, and Steves did not pursue that possibility any further. CMI then identified what management considered to be the "serious prospective buyers" (either four or five) that had submitted purchase bids, and selected JELD-WEN and Masonite as the finalists. JELD-WEN was ultimately chosen as the buyer because of concerns about Masonite's intentions for CMI's door manufacturing plants.

In sum, CMI's doorskin business was quite profitable, and CMI was a competitive factor in the doorskin market from the time of its creation until the housing crisis. Even during the housing crisis, the doorskin component of CMI's business (i.e., Towanda) fared adequately (with slightly positive EBITDA). But, by 2011, it was necessary to put the entirety of CMI up for sale. And, even under those conditions, there were several serious buyers.

### 3. JELD-WEN's Acquisition of CMI and Execution of the Supply Agreement with Steves

JELD-WEN was interested in acquiring CMI for three main reasons: (1) the availability of doorskins of a certain height

15

Case 3:16-cv-00545-REP    Document 1783    Filed 10/05/18    Page 18 of 149 PageID# 53387

basis, Supply Agreement § 8, such that they were never mandatory.

Finally, any disputes under the Supply Agreement were to be resolved under a rather protracted alternative dispute resolution process. Only when that process was exhausted could a party begin litigation. That process would begin with an internal conference between the parties' senior executives. If they could not reach a resolution within thirty days of the dispute being submitted, the parties would have to proceed to mediation. A lawsuit could then be filed only where mediation had failed to yield a solution to the parties' disagreement. Id. § 10.

On July 18, 2012, soon after executing the Supply Agreement, JELD-WEN publicly announced the CMI Acquisition, Stip. ¶ 9, the completion of which was contingent on regulatory approval by government agencies, see PTX-115 ¶ 5; DX-50 § 6.1. Early in 2012, JELD-WEN and CMI had decided to preemptively request approval of the transaction from the DOJ because executives from both companies had been involved in Premdor's acquisition of Masonite, and were therefore aware of the problems that DOJ review could pose. The record is clear that JELD-WEN decided to approach the DOJ only after it had entered into long-term supply contracts with the Independents, knowing that this oft-used tactic would assuage the concerns of the DOJ

18

and the Independents about anticompetitive effects of the proposed merger.

After JELD-WEN approached the DOJ, the agency's Antitrust Division notified JELD-WEN that it had opened a preliminary investigation into the proposed CMI Acquisition. Representatives of CMI and JELD-WEN—Merrill and James Morrison ("Morrison"), respectively—then gave presentations to the DOJ about the Acquisition. See DX-60; DX-54. That presentation emphasized that JELD-WEN had entered into long-term supply contracts with the Independents. Thereafter, the DOJ also contacted Steves, which told the DOJ that it did not oppose the merger because it believed that the Supply Agreement would prevent JELD-WEN from taking any anticompetitive actions. The Antitrust Division subsequently closed its investigation on September 28, 2012, see DX-48, and the Acquisition was completed on October 24, 2012. Stip. ¶ 8. The final purchase price paid by JELD-WEN was [  ].

### 4.   JELD-WEN's Integration of CMI's Operations

Following the merger, JELD-WEN made some general administrative changes. For instance, it closed CMI's head office in Chicago and two of CMI's four door manufacturing plants, and transitioned CMI's human resources, payroll, insurance, safety, environmental, and health and benefits functions into JELD-WEN's organizational structure. DX-933 at 2.

19

Case 3:16-cv-00545-REP Document 1783 Filed 10/05/18 Page 74 of 149 PageID# 55443

likelihood of Steves going out of business is foreclosed by the verdict.

Moreover, given the factual overlay between the legal and equitable relief, the Court finds, by a preponderance of the evidence, that it is not likely that JELD-WEN will continue to supply Steves with doorskins after the Supply Agreement terminates. Indeed, part of JELD-WEN's pricing plan was to kill off some of the independent door makers that were its doorskin customers. And, the Court finds that JELD-WEN's conduct toward Steves (demanding price increases two years after the Supply Agreement was executed even though costs had decreased, engaging in evasive, sharp, and deceptive conduct over the calculation of input costs under Section 6 of the Supply Agreement, and in its general bullying conduct toward Steves) shows that JELD-WEN regarded Steves, a significant player in the interior door market, to be an independent to be killed off.

Further, the Court, as finder of the fact in the remedies phase of the case, finds that Steves has proved that, absent equitable relief, it will be forced out of business when the Supply Agreement terminates in 2021 (See Section II.A.3.(a), infra). And, as found above, JELD-WEN is still engaging in the conduct that led the jury to conclude that the merger had

---

possibility of doing so. That is no different than what the evidence at the antitrust trial showed. <u>See</u> Def. FOF ¶¶ 265-78.

Case 3:16-cv-00545-REP   Document 1783   Filed 10/05/18   Page 109 of 149 PageID# 53478

JELD-WEN's costs have gone down because improvements have been made at Towanda, thereby lowering the cost of manufacturing the doorskins. Further, the evidence establishes that the key input costs at Towanda have declined.  The ultimate conclusion from this information is that the margin has gone up.

Accordingly, there are three substantial reasons for concluding that a divestiture of Towanda is likely to be competitive and profitable.  First, there is the fact that Towanda was profitable before the significant housing downturn and that it has returned significantly to profitability. Second, the EBITDA numbers show that, even during the rough periods during the housing crisis, Towanda's EBITDA for doorskins was positive, albeit not large.  Third, the margin figures indicate that a substantial profit can be made.

### (4)   Divestiture Will Remedy the Lessened Competition Found by the Jury

Here, as the jury found, and the record shows, the merger substantially reduced competition in the doorskin industry. Less than two years after the merger reduced the number of suppliers from three to two, one of those suppliers essentially withdrew from the market, thereby depriving the Independents of that key component of a reliable supply source.  Masonite made that decision known to its investors and to JELD-WEN in a public telephone conference.  Not long thereafter, the other supplier,

109

With these principles in mind, the first task is to ascertain the period of delay that is involved here. This action was filed on June 29, 2016, slightly more than four years after JELD-WEN announced that it was going to acquire CMI and a few months before the fourth anniversary of the consummation of the merger. Therefore, at its maximum reach, the period of delay was equivalent to the four-year statute of limitations set by Section 4B for damages claims. Thus, the filing of the antitrust action was within the guideline period as outlined in ITT and King v. Richardson. That does not, however, resolve the reasonable delay analysis.

To begin, as explained below, the period from April 2012 to August 2014 cannot be included in the period of delay in the laches calculus. Thus, it is necessary to remember that JELD-WEN was aware at the time of the merger that the antitrust issues associated with the CMI Acquisition were significant. PTX-90. Indeed, having calculated market concentration as a consequence of the forthcoming acquisition and the Herfindahl-Hirschman indices for markets impacted by the merger, JELD-WEN retained highly-qualified antitrust counsel from one of the nation's largest law firms, O'Melveny & Myers. In sum, and as the record shows, JELD-WEN knew full well of the merger's antitrust implications.

128

Mindful of those implications, JELD-WEN pursued an established merger strategy to assuage any possible concerns from the DOJ, from CMI's customers, and from JELD-WEN's own customers (including Steves). Specifically, JELD-WEN developed a plan to enter into long-term supply agreements with independent door manufacturers in the United States (notably Steves, Lynden, and Haley), see PTX-93; PTX-139. As part of its strategy, JELD-WEN deliberately decided not to approach the DOJ about the proposed CMI Acquisition until those long-term agreements had been entered. In fact, JELD-WEN's internal documents show that the company considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, and that JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go." PTX-160. As Shapiro explained at trial, acquiring firms often enter into long-term contracts with customers in order to prevent a challenge to the merger. That tactic limits the DOJ's ability to secure evidence necessary to block a merger because customers with supply agreements are less willing to oppose a merger proposed by their supplier and because customers do not have reason to be threatened.

And, when JELD-WEN did approach the DOJ about the CMI Acquisition, it emphasized its long-term supply agreements with Steves, Lynden, and others. And Morrison, who led the company's

presentation to the DOJ, admitted that the purpose of entering into such contracts was "to alleviate" customer concerns about not having a supply and "to assure the customers of CMI, who might eventually become customers of JELD-WEN, that JELD-WEN was committed to their continued supply." See PTX-139.

Based on these facts, the Court finds that before, and at the time of, the merger in 2012, Steves had no reason to believe that there would be anticompetitive effects from the merger because JELD-WEN designed its pre-merger strategy to create that state of mind. To the contrary, Steves had a positive relationship with JELD-WEN through its CEO, Phillip Orsino, and had a recently signed long-term contract with JELD-WEN which Orsino described as a lifetime arrangement. And, although Steves did not take that assurance literally, under all the known circumstances, it was reasonable for Steves to believe that the merger would not produce a substantial lessening of the competition that had produced the favorable terms in the Supply Agreement.

The record here establishes, and the Court finds, that Steves did not know, and could not reasonably have known, that JELD-WEN's conduct violated Section 7 until August 2014 at the earliest. JELD-WEN is right that Steves learned of the CMI Acquisition in April 2012, and it knew that the merger would reduce the number of doorskin suppliers from three to two. But

130

Accepting JELD-WEN's theory would mean that where, as here, the lessening of competition occurs after the merger, a party thereby injured simply could never seek equitable redress to restore competition.  For the reasons previously explained, the rules of antitrust injury and antitrust standing as well as the fundamental principles of equity foreclose such a result.

**CONCLUSION**

For the reasons, and to the extent, set forth above, PLAINTIFF STEVES AND SONS, INC.'S MOTION FOR EQUITABLE RELIEF (ECF No. 1191) will be granted in part and denied in part.  The motion will be granted to require that JELD-WEN divest itself of the Towanda facility and, to the extent set out in Section II.B, to grant the conduct remedies necessary to the success of the divested entity as a manufacturer of interior molded doorskins. The motion will be denied as to the requested conduct remedies not necessary to that purpose.

To assure, to the extent reasonably possible, that JELD-WEN receives a fair price for Towanda, and to assure that divestiture produces a competitive entity that is likely to restore competition, the process specified by the Supreme Court in <u>Brown Shoe</u>, will be followed so as to assure that the divestiture is conducted in a realistic setting that is conducive to attracting qualified buyers who will pay a fair

price for Towanda.   To assure the success of that process, a

Special Master will be appointed.

It is so ORDERED.

/s/    _REP_

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  October  _5_ , 2018

149