THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Richmond Division)

| | | |
|---|---|---|
| In re JELD-WEN HOLDING, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. 3:20-cv-00112-JAG <u>CLASS ACTION</u> |
| This Document Relates To: ALL ACTIONS. | ) ) ) ) ) | |

**OMNIBUS MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

                                                                                                    **Page**

I.      INTRODUCTION .....................................................................................................1

II.     STATEMENT OF FACTS ........................................................................................4

        A.      Jeld-Wen Has Been Engaging in Anticompetitive Conduct Since 2012 .................4

        B.      Defendants Consistently Misled Investors, Telling Them that the
                Company's Success Resulted from Lawful Pricing Strategies ...............................6

        C.      Jeld-Wen's Misconduct Began to Come to Light When Judge Payne
                Issued Findings of Fact Recognizing the Company's Anticompetitive
                Conduct, and Deemed Divesture of the Towanda Plant an Appropriate
                Remedy .....................................................................................................................8

        D.      Jeld-Wen's Anticompetitive Conduct Fully Came to Light When
                Defendants Acknowledged a Likely $76.5 Million Judgment in the *Steves*
                Litigation..................................................................................................................9

III.    ARGUMENT..............................................................................................................9

        A.      Motion-to-Dismiss Standards ...................................................................................9

        B.      Plaintiffs Plead Material Omissions......................................................................10

                1.      Defendants' Representations that Jeld-Wen Operates in a Highly
                        Competitive Market Were Misleading Because They Failed to
                        Disclose Defendants' Anticompetitive Conduct.........................................11

                2.      Defendants' Representations About Lawful Pricing Strategies
                        Were Misleading Because They Failed to Acknowledge
                        Defendants' Illegal Efforts to Raise Prices.................................................12

                3.      Defendants Have No Credible Response to *Singer* ...................................13

                4.      Defendants' Hodgepodge Falsity Arguments Lack Merit ..........................18

        C.      Plaintiffs Plead a Strong Inference of Scienter.....................................................20

                1.      The JW Defendants Pursued an Intentional Scheme ..................................21

                2.      The Individual Defendants' Many Statements About Jeld-Wen's
                        Core Operations Support a Strong Inference of Scienter............................23

                3.      Other Facts Support a Strong Inference of Scienter ..................................24

                4.      Plaintiffs' Inference Is at Least as Compelling as Defendants'................26

**Page**

D.      Plaintiffs Plead Loss Causation ...............................................................26

E.      Plaintiffs Plead Control-Person Claims Against the Onex Defendants and
        Individual Defendants......................................................................................30

        1.      Plaintiffs Plead a Primary Violation ........................................................32

        2.      Plaintiffs Plead "Control" ........................................................................32

F.      Plaintiffs' Claims Are Timely................................................................................34

IV.   CONCLUSION....................................................................................................35

# TABLE OF AUTHORITIES

**Page**

## CASES

*ACA Financial Guaranty Corp. v. City of Buena Vista*,
  917 F.3d 206 (4th Cir. 2019) ...................................................................................34

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) .....................................................................................33

*Arnlund v. Deloitte & Touche LLP*,
  199 F. Supp. 2d 461 (E.D. Va. 2002) ......................................................................25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................31

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................31

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...............................................................................25, 26

*Brown v. City of Richmond Sch. Bd.*,
  2016 WL 10567164
  (E.D. Va. July 21, 2016) ..........................................................................................10

*Burt v. Maasberg*,
  2013 WL 1314160
  (D. Md. Mar. 31, 2013).............................................................................................35

*Carlton v. Cannon*,
  2016 WL 3959164
  (S.D. Tex. July 22, 2016)..........................................................................................33

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)..................................................................................13, 14

*Cooke v. Manufactured Homes, Inc.*,
  998 F.2d 1256 (4th Cir. 1993) ..........................................................................3, 15, 16, 18

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018)...................................................................28, 29

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..............................................................................................26, 27

**Page**

*Epstein v. World Acceptance Corp.*,
   2015 WL 2365701
   (D.S.C. May 18, 2015)........................................................................................................10

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016).....................................................................................25

*Frazier v. Cooke*,
   2017 WL 5560864
   (E.D. Va. Nov. 17, 2017) ....................................................................................................10

*Goodman v. Praxair, Inc.*,
   494 F.3d 458 (4th Cir. 2007) ..............................................................................................35

*Grupo Verzatec S.A. de C.V. v. RFE Inv. Partners*,
   2019 WL 1437617
   (S.D.N.Y. Mar. 29, 2019) ...................................................................................................33

*Hirtenstein v. Cempra, Inc.*,
   348 F. Supp. 3d 530 (M.D.N.C. 2018) ...............................................................................21

*In re Allergen Generic Drug Pricing Sec. Litig.*,
   2019 WL 3562134
   (D.N.J. Aug. 6, 2019)..........................................................................................................19

*In re BearingPoint, Inc. Sec. Litig.*,
   525 F. Supp. 2d 759 (E.D. Va. 2007) .................................................................................30

*In re Cree, Inc. Sec. Litig.*,
   2005 WL 1847004
   (M.D.N.C. Aug. 2, 2005)...............................................................................................29, 30

*In re Digital Island Sec. Litig.*,
   223 F. Supp. 2d 546 (D. Del. 2002)....................................................................................33

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) .....................................................................23, 24, 32

*In re Henry Schein, Inc. Sec. Litig.*,
   2019 WL 8638851
   (E.D.N.Y. Sept. 27, 2019)...................................................................................................19

*In re Massey Energy Co. Sec. Litig.*,
   883 F. Supp. 2d 597 (S.D. W. Va. 2012).............................................................................15

**Page**

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................................23

*In re Mut. Funds Inv. Litig.*,
 566 F.3d 111 (4th Cir. 2009), *rev'd on other grounds*,
 *Janus Capital Grp., Inc. v. First Derivative Traders*,
 564 U.S. 135 (2011).................................................................................. *passim*

*In re Novan, Inc.*,
 2018 WL 6732990
 (M.D.N.C. Nov. 30, 2018)..................................................................................25

*In re Qualcomm Inc. Sec. Litig.*,
 2019 WL 1239301
 (S.D. Cal. Mar. 18, 2019).....................................................................................19

*In re Signet Jewelers Ltd. Sec. Litig.*,
 2019 WL 3001084
 (S.D.N.Y. July 10, 2019) .....................................................................................29

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
 2020 WL 571724
 (D. Md. Feb. 4, 2020) ....................................................................................11, 12

*In re Sotheby's Holdings, Inc.*,
 2000 WL 1234601
 (S.D.N.Y. Aug. 31, 2000) .....................................................................................11

*In re STEC Inc. Sec. Litig.*,
 2011 WL 2669217
 (C.D. Cal. June 17, 2011) ....................................................................................16

*In re Willis Towers Watson Plc Proxy Litig.*,
 439 F. Supp. 3d 704 (E.D. Va. 2020) ..................................................10, 31, 32, 34

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
 432 F. Supp. 2d 571 (E.D. Va. 2006) ..................................................................25

*Johnson v. Mueller*,
 415 F.2d 354 (4th Cir. 1969) ...............................................................................10

*Katyle v. Penn Nat'l Gaming, Inc.*,
 637 F.3d 462 (4th Cir. 2011) ...............................................................................27

**Page**

*KBC Asset Management NV v. 3D Systems Corp.*,
   2016 WL 3981236
   (D.S.C. July 25, 2016) ......................................................................................................15, 24

*Kiken v. Lumber Liquidators Holdings, Inc.*,
   155 F. Supp. 3d 593 (E.D. Va. 2015) ...................................................................24, 30, 31, 32

*Latham v. Matthews*,
   662 F. Supp. 2d 441 (D.S.C. 2009).............................................................................................33

*Longman v. Food Lion, Inc.*,
   197 F.3d 675 (4th Cir. 1999) ...........................................................................................17, 18, 19

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ......................................................................................................22

*Masterson v. Commonwealth Bankshares, Inc.*,
   2 F. Supp. 3d 824 (E.D. Va. 2014) .................................................................................30, 32, 34

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ......................................................................................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)........................................................................................................................9

*McCleary-Evans v. Maryland Department of Transportation*,
   780 F.3d 582 (4th Cir. 2015) ......................................................................................................34

*Menaldi v. Och-Ziff Capital Management Group LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016).........................................................................................14

*Menkes v. Stolt-Nielsen S.A.*,
   2006 WL 1699603
   (D. Conn. June 19, 2006).............................................................................................................11

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010)...............................................................................................................34, 35

*Nolte v. Capital One Fin. Corp.*,
   390 F.3d 311 (4th Cir. 2004) ......................................................................................................29

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)....................................................................................................................19

**Page**

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019) ....................................................................................11

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
918 F.3d 312 (4th Cir. 2019) ................................................................................................19

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
551 F.3d 305 (4th Cir. 2009) ................................................................................................20

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ....................................................................................................16

*Sciolino v. City of Newport News, Va.*,
480 F.3d 642 (4th Cir. 2007) ................................................................................................35

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ........................................................................................ *passim*

*Sourceone, Inc. v. ESI, Inc. of Tenn.*,
2020 WL 4283927
(E.D. Va. July 27, 2020) ...................................................................................................9, 10

*Taylor v. First Union Corp. of S.C.*,
857 F.2d 240 (4th Cir. 1988) ................................................................................................14

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ...................................................................................10, 26, 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................................................21, 23

*United States S.E.C. v. Ustian*,
2019 WL 7486835
(N.D. Ill. Dec. 13, 2019) ......................................................................................................15

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ................................................................................................24

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597 (4th Cir. 2015) ................................................................................................20

**Page**

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78j(b) .................................................................................................................. *passim*
   §78t(a) .................................................................................................................. *passim*
   §78u-4(b)(1) ......................................................................................................................10
   §78u-4(b)(2) ......................................................................................................................20

Federal Rules of Civil Procedure
   Rule 12(b)(6) ............................................................................................................9, 10, 35
   Rule 15(a) ..........................................................................................................................35
   Rule 15(a)(2) ......................................................................................................................35
   Rule 10(b)(5) ......................................................................................................................34

17. C.F.R.
   §240.10b-5 .......................................................................................................................9, 10

28 U.S.C.
   §1658(b) ............................................................................................................................34

Clayton Act .........................................................................................................7, 8, 12, 28

## LEGISLATIVE HISTORY

Private Securities Litigation Reform Act of 1995
   Pub. L. No. 104-67, 109 Stat. 737 (1995) ...............................................................................10

## SECONDARY AUTHORITIES

Conference Report:
   H.R. Rep. No. 73–1383 (1934) ..............................................................................................31

## I.      INTRODUCTION[1]

In this securities class action, Plaintiffs allege that Defendants had a duty to disclose, but did not, a course of intentionally anticompetitive conduct that: (1) has been found to violate federal antitrust laws; (2) warranted an award of more than $50 million in damages (before trebling); and (3) resulted in the presiding judge, the Honorable Robert E. Payne, concluding that substantial equitable relief was justified (the "Divestiture Decision").

Specifically, Plaintiffs allege a long-planned scheme by Jeld-Wen to "kill off" competition in the interior-molded-door market, where Jeld-Wen is a leading manufacturer.[2]  Jeld-Wen planned to acquire CMI—one of the only two other makers of doorskins, the principal component of interior molded doors—leaving only itself and another company, Masonite, to supply doorskins to independent door manufacturers ("IDMs").  To lull IDMs into complacency about the proposed transaction, as well as to deceive the DOJ about the anticompetitive nature of the transaction, which could threaten IDMs' ability to compete, Jeld-Wen entered into favorable, long-term contracts with those IDMs months before the Acquisition.  After the plan worked—the DOJ permitted the Acquisition, which the IDMs had not opposed—Jeld-Wen began engaging in unfair competition by, among other things, raising the price of doorskins in breach of those long-term contracts.  As a

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Consolidated Class Action Complaint (ECF No. 73; the "Complaint").  "Plaintiffs" shall refer to Public Employees' Retirement System of Mississippi, Plumbers and Pipefitters National Pension Fund, and Wisconsin Laborers' Pension Fund.  "JW Defendants" shall refer to Jeld-Wen and the Individual Defendants together.  "JW Mem." shall refer to the JW Defendants' memorandum in support of their motion (ECF No. 78).  "Onex Mem." shall refer to the Onex Defendants' memorandum in support of their motion (ECF No. 76).  And "¶" and "¶¶" shall refer to paragraphs in the Complaint.

[2]    "Kill off" is the term Judge Payne used repeatedly in his October 5, 2018 Divestiture Decision. *See* ¶¶12, 69, 113, 148.  Because the JW Defendants have submitted excerpts from the Divestiture Decision (*see* Ex. 32 to 7/29/20 Rae Decl. (ECF No. 79))—which contains more than 50 pages of findings of fact—Plaintiffs submit the entire decision as Ex. 1 to the Declaration of Robert M. Rothman ("Rothman Decl."), dated August 28, 2020.  *See* Ex. 1 at 34, 74, 110 ("kill off").  Unless otherwise indicated, "Ex. __" shall refer to exhibits to the Rothman Decl.

result, the largest of the IDMs, Steves & Sons, requested a second DOJ review of the Acquisition and then sued Jeld-Wen (the "*Steves* litigation"), eventually culminating in a jury verdict and the Divestiture Decision.

Plaintiffs allege misstatements and omissions relating to this willful course of anticompetitive conduct, recognized as a matter of *fact* in the *Steves* litigation.[3] The JW Defendants consistently and misleadingly attributed their success in the "highly competitive" door and window market to lawful "pricing strategies," among other attributes. But this assertion of success failed to acknowledge the critical role of their *illegal* antitrust scheme, the very goal of which was to *reduce* competition. When questioned by financial analysts about negative developments in the *Steves* litigation, they also vehemently, repeatedly, and falsely denied engaging in anticompetitive behavior.

Defendants assert a number of defenses—principally that "[d]isclosure is not a rite of confession," JW Mem. at 11, and that the JW Defendants were not required "to admit to liability during the pendency of the *Steves* litigation." *Id.* at 2. They also argue that the Company "disclosed to investors the nature of the *Steves* allegations and the relief sought," *id.* at 1, purportedly absolving them of §10(b) liability because the securities laws do not require disclosure of information that is "otherwise in the public domain." *See, e.g.*, *id.* at 11.

But because the JW Defendants' failure to disclose their misconduct made their *other* statements—regarding the competitiveness of the industry and the Company's use of lawful pricing strategies—misleading or false, Fourth Circuit law *did* require them to disclose it. *See Singer v. Reali*, 883 F.3d 425, 441, 449 (4th Cir. 2018). Moreover, the JW Defendants repeatedly denied antitrust liability and reminded the market that the DOJ had failed to oppose the CMI Acquisition

---

[3]   *See, e.g.*, Ex. 1 at 74 ("[P]art of JELD-WEN's pricing plan was to kill off some of the independent door makers that were its doorskin customers. And, the Court finds that JELD-WEN's conduct toward Steves . . . shows that JELD-WEN regarded Steves, a significant player in the interior door market, to be an independent to be killed off.").

not once, but *twice*, all the while concealing that Jeld-Wen intentionally misled the DOJ. These assurances were sufficient to fool even sophisticated securities analysts, who continued to believe antitrust liability was "unlikely"—*even after the Steves jury rendered its verdict for the plaintiff. See* ¶119 (Gabelli: "we see any divestitures with regard to CMI as unlikely. *This deal was reviewed twice by the DOJ and passed without issue in 2012*.").[4]

Thus, the Court cannot rule, as a matter of law, that the JW Defendants' disclosure of the existence of the *Steves* litigation was sufficient to apprise investors of their willful, anticompetitive conduct. *See, e.g.*, *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993) ("The impression that this mix of information conveyed cannot be resolved as a matter of law.").

The JW Defendants also contest the sufficiency of Plaintiffs' allegations of scienter, loss causation, and control-person liability, as well as the timeliness of the Complaint. As to scienter, however, Judge Payne found that Jeld-Wen's anticompetitive conduct was *intentional*: knowing "full well of the merger's antitrust implications" (¶250), the Company *planned* to "kill off" the competition. ¶¶12, 69, 113, 148; Ex. 1 at 74 ("plan"). To facilitate that plan, it entered into long-term supply contracts with IDMs (¶21), a strategy "*intended* to give Steves comfort." Ex. 1 at 147. And the Individual Defendants, who centralized pricing decisions under their own control (¶¶109, 198), *directed* the Company to breach the long-term contracts by raising prices. ¶¶12, 84.

Defendants' other arguments are similarly deficient. Plaintiffs have alleged: (1) corrective disclosure dates sufficient to plead loss causation (*see* §III.D below); (2) both elements of a control-person claim—a primary securities violation and control (*see* §III.E below); and (3) facts sufficient to show that the statute of limitations had not run (*see* §III.F below).

In short, because the JW Defendants were required to disclose their anticompetitive conduct

---

[4]   Unless otherwise noted, internal quotation marks and citations are omitted from quoted material.

to the market, but failed to do so, and for all the additional reasons herein, Plaintiffs respectfully request that the Court deny those motions in their entirety.

## II.   STATEMENT OF FACTS

### A.   Jeld-Wen Has Been Engaging in Anticompetitive Conduct Since 2012

Jeld-Wen, one of the world's largest door and window manufacturers, makes and sells interior molded doors, the most popular type of interior door in North America. ¶¶2-3, 44-45. As a vertically-integrated company (¶31)—that is, one that owns or controls its own supply chain (¶49)—Jeld-Wen also manufactures doorskins, which are the principal component of interior molded doors, and which account for up to 70% of the cost of making those doors. ¶¶3, 47. Today, Jeld-Wen is the only supplier of doorskins to IDMs. ¶89.

As recently as 2012, however, two other vertically-integrated companies manufactured and supplied doorskins to the market: Masonite, Jeld-Wen's primary competitor in the interior-molded-door market, and CMI. ¶¶4, 62. But in June of that year, Jeld-Wen announced its intention to acquire CMI and, through the Acquisition, CMI's flagship doorskin manufacturing plant in Towanda, Pa. (the "Towanda Plant"). ¶¶5, 68. As a result of the Acquisition, which closed on October 24, 2012 (¶¶9, 70), Jeld-Wen removed CMI both as the third source of doorskin supply in the interior-molded-door market, and as a competitor in the market for sale of those doors. ¶5.

As it was planning the Acquisition, however, Jeld-Wen faced a problem. Years before, another door manufacturer—Premdor—had already sought to acquire the then owner of the Towanda Plant, Masonite. Although Premdor, which at the time was the largest manufacturer of interior molded doors (¶52), ultimately acquired Masonite in 2002,[5] the deal closed only after Masonite divested itself of the Towanda Plant, as required by the DOJ. ¶58. The DOJ had objected

---

[5]   After the acquisition, the combined business operated under the name "Masonite." ¶58.

to the proposed acquisition on the ground that it would "*tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers.*" ¶¶6, 55. To address that concern, Masonite spun off the Towanda Plant to create CMI as a third, stand-alone competitive force in the interior molded doors and doorskins market. ¶¶6, 59.

Aware that the DOJ would likely assert a similar objection to its intended acquisition of CMI (based on the same concerns), Jeld-Wen developed a plan to enter into ostensibly competitive long-term supply agreements with the IDMs to which it supplied doorskins. ¶¶7, 63. By entering into these contracts many months before approaching the DOJ to seek approval of the CMI Acquisition, Jeld-Wen hoped to induce IDMs and the DOJ to believe it would not use its increased, post-Acquisition market power to diminish the quality of doorskins or raise prices, except pursuant to contractually agreed upon terms. ¶¶8, 64-67. That is, Jeld-Wen hoped to forestall any objections to the proposed transaction.

The ploy worked. Given the long-term supply agreements and absence of objections from IDMs (¶¶76-77), the DOJ did not oppose the Acquisition. ¶9. The transaction closed, with DOJ sign-off, on October 24, 2012 (¶78), and reduced the number of door manufacturers with dominant market power from three to two (Masonite and Jeld-Wen)—the precise situation about which the DOJ had previously been concerned. ¶¶9, 79-80. Making matters worse, Masonite abruptly exited the doorskins supply market in June 2014 (¶83), leaving Jeld-Wen as the only supplier of doorskins to IDMs, and giving it the sole power to set the price of those doorskins. ¶10.

With a plan to "kill off" the competition (as recognized by Judge Payne (¶¶12, 69)), then-CEO Hachigian and CFO Mallard directed Jeld-Wen to exercise that power against the very IDMs with which it had long-term doorskin supply agreements. ¶¶84, 87. Those IDMs, which competed

- 5 -

directly with Jeld-Wen in the market for interior molded doors, included Jeld-Wen's largest doorskins customer and second largest doors competitor (after Masonite), Steves & Sons. ¶11. Hachigian directed the Company to breach those supply agreements by, among other things, raising the price of doorskins, making it substantially more expensive for IDMs to manufacture interior molded doors. By raising the price of doorskins, Jeld-Wen was able both to increase its revenues from the sale of doorskins, and to reduce the ability of IDMs to compete with Jeld-Wen. ¶¶12, 148.

In the wake of these developments, Jeld-Wen and Masonite (which still manufactured doorskins for its own use) became the two dominant manufacturers of interior molded doors, and began imposing uniform price increases on those doors. ¶92. On at least nine different occasions between 2012 and 2018, Jeld-Wen and Masonite increased the prices of their interior molded doors in the same or similar percentage increments, either simultaneously or in brief succession. ¶95. As confirmed by numerous former employees, these price increases came directly from the CEO and CFO—specifically, Individual Defendants Hachigian, Beck, Michel, and Mallard. ¶¶13, 93-94, 96.

In response to this anticompetitive conduct, Steves & Sons first requested that the DOJ conduct another review of the CMI Acquisition, to which it again raised no objections (¶99), and then sued Jeld-Wen in a private civil action in federal court in this District in June 2016. Steves & Sons alleged that the Company's acquisition of CMI and subsequent conduct in breaching the supply agreements violated federal antitrust laws. ¶¶14, 99-100.

**B.     Defendants Consistently Misled Investors, Telling Them that the Company's Success Resulted from Lawful Pricing Strategies**

Although the true source of the Company's success in the interior molded door market was the anticompetitive conduct described above (¶¶111, 127-31), Defendants continually represented to the investing public that Jeld-Wen operated in a "highly competitive business environment" (¶¶101-02, 143), and that its success was driven by legitimate and lawful strategies such as "***pricing***

- 6 -

*optimization*," "*pricing discipline*," "*strategic pricing*," and "*favorable pricing*."  ¶¶103-09, 144-46. Defendants made similar statements about their financial success on at least 21 occasions throughout the Class Period.  ¶¶152-53, 155, 158-60, 163-66, 168, 171, 174-77, 180, 182-83, 185, 188, 190-93, 195, 198, 201-04.  Of course, Defendants never acknowledged the Company's extensive and significant anticompetitive conduct—the true source of its success.  ¶¶15-16, 147, 154, 156, 161, 167, 169, 172, 178, 181, 184, 186, 189, 194, 196, 199, 205.

On February 15, 2018, the jury in the *Steves* litigation returned a verdict, finding that Jeld-Wen had violated federal antitrust laws.  ¶¶17, 114, 206.  Although the jury awarded damages totaling $176 million, including past damages, future loss profits, and trebling (¶¶114, 206), Defendants downplayed the result, insisting that the verdict was "*erroneous*," and that "*the facts underlying th[e] dispute do not establish either a violation of the antitrust laws or a breach of contract*."  ¶¶17, 115.  Defendants relied retrospectively on the DOJ's refusal to intervene in the Acquisition as evidence of Defendants' supposed good faith and lawful behavior.  ¶¶116, 207.  But because the verdict form contained no specific findings of fact detailing Defendants' misconduct, there was no public information contradicting Defendants' story.  Thus, the extent and context of their anticompetitive conduct, as well as its significance to Jeld-Wen's ostensible financial success, remained concealed from investors.  ¶¶18, 114, 206.

Investors and analysts bought Defendants' story, believing that the DOJ's decision not to intervene in the Acquisition demonstrated Jeld-Wen's adherence to the federal antitrust laws.  ¶19. Bank of America, for example, observed that "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the [DOJ] approved the CMI [A]cquisition prior to its consummation in 2012."  ¶¶19, 118, 209.  RBC Capital Markets echoed these sentiments, stating that "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal

and notes that the DOJ reviewed the CMI [A]cquisition twice.  JELD does not believe that a loss is probable or estimable." ¶¶19, 121, 213.

Having assuaged investor concerns, Defendants continued to misattribute Jeld-Wen's success to legitimate and lawful pricing strategies, reiterating to the market that the Company "*operate[s] in a highly competitive business environment*," and claiming that it was able to "achieve profitable growth" through legitimate and lawful strategies such as "*pricing discipline*," "*strategic pricing*," and "*pricing optimization*." ¶¶20, 123-26, 214-17, 219, 221, 223, 225.

## C. Jeld-Wen's Misconduct Began to Come to Light When Judge Payne Issued Findings of Fact Recognizing the Company's Anticompetitive Conduct, and Deemed Divesture of the Towanda Plant an Appropriate Remedy

On October 5, 2018, Judge Payne, after a three-day evidentiary hearing on potential equitable remedies for Steves & Sons, issued the Divestiture Decision, with findings of previously undisclosed fact about Jeld-Wen's anticompetitive conduct. ¶¶21, 229.  In particular, the court found that "the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin industry," ultimately "depriving the [IDMs] of that key component of a reliable supply source." ¶¶21, 127. Judge Payne also found that Jeld-Wen had "decided to approach the DOJ only after it had entered into long-term supply contracts with the [IDMs], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [IDMs] about anticompetitive effects of the proposed merger." ¶¶21, 128, 229.  And Judge Payne found that divestiture of the Towanda Plant would be an appropriate remedy for Jeld-Wen's antitrust violations. ¶¶22, 131, 229.  In response to this decision, Jeld-Wen's stock dropped $1.18 per share, or 5%. ¶¶22, 132, 237.

Although Judge Payne's decision correctly portrayed their conduct, Defendants continued to reassure investors that the verdict was "*incorrect*," with "*multiple flawed rulings during the trial process*." ¶¶23, 133, 231, 238, 257.  Analysts again believed them.  Bank of America, for example, noted that "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the

- 8 -

fact that the [DOJ] approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012." ¶23.

> **D.    Jeld-Wen's Anticompetitive Conduct Fully Came to Light When Defendants Acknowledged a Likely $76.5 Million Judgment in the *Steves* Litigation**

Just ten days later, however, on October 15, 2018, Jeld-Wen finally admitted that the Company would likely face a significant judgment from the *Steves* litigation—approximately *$76.5 million*—for its anticompetitive conduct. ¶¶24, 136, 240. In addition, the Company announced that defendant Mallard was unexpectedly resigning to "pursue other career interests." ¶¶24, 138. In response to these revelations, on October 16, 2018, Jeld-Wen's stock fell $4.03 per share, *or 19%*, on unusually high trading volume. ¶¶24, 139, 242.[6]

## III.    ARGUMENT

To state a claim under §10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). "Relatedly, section 20(a) is the vehicle for imposing liability on control persons," and is "derivative of—and dependent upon—liability of a controlled person under section 10(b)." *Singer*, 883 F.3d at 438.

### A.    Motion-to-Dismiss Standards

"A Rule 12(b)(6) motion gauges the sufficiency of a complaint without resolving any factual discrepancies or testing the merits of the claims." *Sourceone, Inc. v. ESI, Inc. of Tenn.*, 2020 WL 4283927, at *2 n.2 (E.D. Va. July 27, 2020) (Gibney, J.). "In considering the motion, a court must accept all [factual] allegations in the complaint as true and must draw all reasonable inferences in

---

[6]    Additional relevant facts, including facts about the Onex Defendants and the JW Defendants' scienter, are discussed in the Argument below.

favor of the plaintiff." *Id.* A claim should be sustained when the factual allegations, taken as true, "raise a right to relief above the speculative level and render [the claim] plausible . . . ." *Brown v. City of Richmond Sch. Bd.*, 2016 WL 10567164, at *2 (E.D. Va. July 21, 2016) (Gibney, J.). A motion to dismiss for failure to state a claim for relief "should not be granted unless it 'appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim.'" *Frazier v. Cooke*, 2017 WL 5560864, at *5 (E.D. Va. Nov. 17, 2017) (quoting *Johnson v. Mueller*, 415 F.2d 354, 355 (4th Cir. 1969)).

### B.   Plaintiffs Plead Material Omissions

The PSLRA requires plaintiffs to "'specify each statement alleged to have been misleading'" and "'the reason or reasons why the statement is misleading.'" *In re Willis Towers Watson Plc Proxy Litig.*, 439 F. Supp. 3d 704, 711 (E.D. Va. 2020) (quoting 15 U.S.C. §78u-4(b)(1)). Although "section 10(b) and SEC Rule 10b-5 do not create an affirmative duty to disclose any and all material information," disclosure "is required when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Singer*, 883 F.3d at 440. When a plaintiff alleges "'*sufficient* facts to support a *reasonable belief* in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this misrepresentation element.'" *Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at *5 (D.S.C. May 18, 2015) (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007); emphasis by Fourth Circuit).

Plaintiffs allege three principal categories of misleading statements: (1) those representing that Jeld-Wen operates in a "highly competitive" environment;[7] (2) those attributing Jeld-Wen's

---

[7]   *See, e.g.*, ¶¶143, 158-59, 174, 201, 214-15. For example, Jeld-Wen represented that "[t]he door and window industry is highly competitive and includes a number of regional and international competitors." ¶143.

success to lawful pricing strategies (or other attributes);[8] and (3) those denying anticompetitive conduct.[9]   All three are misleading because, as alleged in ¶¶147-49, 156, and 208, the JW Defendants failed to disclose the anticompetitive conduct Plaintiffs assert.

### 1. Defendants' Representations that Jeld-Wen Operates in a Highly Competitive Market Were Misleading Because They Failed to Disclose Defendants' Anticompetitive Conduct

A party that characterizes the market in which it operates as competitive, while illegally subverting that competition, can be held liable under the federal securities laws if the plaintiff pleads the anticompetitive conduct with the required particularity.  *See, e.g.*, *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 161 (D. Conn. 2019) ("[T]he material differences between what Teva was doing regarding competition and what it was saying about competition were misleading and would have been viewed by the reasonable investor as having significantly altered the total mix of information made available, and, therefore, those statements and omissions are actionable at the motion to dismiss stage."); *Menkes v. Stolt-Nielsen S.A.*, 2006 WL 1699603, at *4 (D. Conn. June 19, 2006) ("defendants had a duty to disclose information regarding their anti-competitive conduct as a result of their own public statements set forth herein referencing competition in the marketplace").[10]

Just this year, Judge Catherine C. Blake of the District of Maryland recognized the availability of §10(b) liability for misrepresentations about competition but dismissed the complaint because the plaintiff failed to plead an anticompetitive scheme with particularity.  *See In re Sinclair*

---

[8]   *See, e.g.*, ¶¶144-46, 152-53, 159-60, 163-66, 171, 175-77, 180, 182-83, 188, 190-93, 195, 198, 202-04, 215-17, 219, 221, 223, 225.  This category includes other explanations for the Company's success, such as "well-designed, high-quality products," "valued brands," and a "renewed focus on innovation," without acknowledging the important role of Defendants' anticompetitive conduct. *See, e.g.*, ¶¶155, 159, 168, 185, 215.

[9]   *See, e.g.*, ¶¶207, 211, 227, 231.

[10]   *See also In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (statements about "intense competition" give rise to duty to disclose anti-competitive agreement).

*Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *20 (D. Md. Feb. 4, 2020).  Here, by contrast, Plaintiffs plead Judge Payne's detailed findings of fact from the Divestiture Decision, in which the court concluded, by a preponderance of the evidence, that Jeld-Wen reduced competition, raised doorskin prices, and violated the Clayton Act.  *See, e.g.*, Ex. 1 at 2, 7-8.  Thus, they have provided the requisite particularity.  *See, e.g.*, ¶¶21-22, 69, 71, 73, 89, 111, 127-31, 229, 235, 249-54, 270-73.

### 2.    Defendants' Representations About Lawful Pricing Strategies Were Misleading Because They Failed to Acknowledge Defendants' Illegal Efforts to Raise Prices

For the same reason the Fourth Circuit recognized an obligation to disclose illegal conduct in *Singer*, the JW Defendants were required to disclose their illegal conduct here: without that disclosure, the statements they *did* make—about their use of lawful pricing strategies—were "utterly misleading."  *Singer*, 883 F.3d at 440.

In *Singer*, defendant TranS1 was a medical device company that relied heavily on Medicare and state reimbursement for its revenue.  *Id.* at 429.  Although its surgical system was originally coded as Category I under the AMA's reimbursement coding system, virtually guaranteeing payment, the AMA later required the system to be coded as an experimental treatment under Category III, putting payment in jeopardy.  *See id.* at 430.  In response, the defendants embarked on a "fraudulent reimbursement scheme" to "coach[] surgeons to improperly avoid the mandatory Category III code."  *Id.* & *id.* at 432.  Although the defendants disclosed both the fact of the training and their expectation of "continuing reimbursements," they "did not explain that the reason they expected continuing reimbursements was that the Company was coaching surgeons to improperly avoid the [required] code."  *Id.* at 432.  Nor did they disclose their reliance on the "scheme to generate a substantial portion of [the company's] continuing revenues."  *Id.* at 439.

The Fourth Circuit found these failures to disclose actionable.  "[B]y choosing to inform the market that it was training surgeons on how to obtain reimbursements . . . in the wake of the AMA's

- 12 -

[new] coding requirement, the Company was obliged to further disclose its fraudulent reimbursement scheme . . . ." *Id.* at 440. "At bottom, . . . by choosing to speak about its reimbursement practices, the Company possessed a duty to disclose its alleged illegal conduct." *Id.* at 442. "Otherwise, the Officers' statements about the Company's training efforts were utterly misleading." *Id.* at 440.

Just so here: by repeatedly representing "strategic pricing," "pricing optimization," "pricing discipline," and similar concepts as the vehicles for Jeld-Wen's "increase in pricing" and "profitable growth," *see, e.g.*, ¶¶144-46,[11] the JW Defendants were required to disclose the critical role of their anticompetitive scheme in raising prices. *See, e.g.*, ¶¶87, 101. Otherwise their various pricing representations were, as the Fourth Circuit put it, "utterly misleading."

### 3.    Defendants Have No Credible Response to *Singer*

Defendants contend that "[d]isclosure is not a rite of confession," JW Mem. at 11 (quoting *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("*UBS*")), and that the JW Defendants were not required "to admit to liability during the pendency of the *Steves* litigation." *Id.* at 2. They also argue that Jeld-Wen "disclosed to investors the nature of the *Steves* allegations and the relief sought" during the Class Period, *id.* at 1, purportedly relieving them of any further disclosure obligation because the securities laws do not require disclosure of information that is "otherwise in the public domain." *Id.* at 11.

As explained above, however, in *Singer* the Fourth Circuit expressly held that there *is* a "duty to disclose . . . illegal conduct"—even conduct that is "uncharged and unadjudicated"—when the failure to disclose it would make other statements misleading. 883 F.3d at 441. Although the JW Defendants, who relegate their only mention of *Singer* to a footnote, latch onto the "uncharged and

---

[11]    *See also* paragraphs cited in footnote 8 above, quoting similar language.

unadjudicated" language in an attempt to distinguish *Singer*, *see* JW Mem. at 11 n.7, that effort fails. The Fourth Circuit did not hold that the duty to disclose illegality is *limited* to uncharged and unadjudicated illegal conduct. Rather, it said the duty may "*extend*" to such conduct. 883 F.3d at 441. Thus, whether Defendants' conduct is uncharged and unadjudicated is irrelevant to the applicability of *Singer*. But even if it were relevant, Defendants' conduct was never criminally charged, and was not civilly adjudicated until, at the earliest, February 15, 2018, over a year into the Class Period, when the jury rendered its verdict against Jeld-Wen. ¶¶17, 114.[12]

Indeed, even the *dissent* in *Singer* recognized that the very holding on which Defendants rely—that "'[D]isclosure is not a rite of confession'" (883 F.3d at 449 (quoting *UBS*, 752 F.3d at 184))—is "not an absolute rule": "For example, if the corporation's silence on a subject 'would make other [of its] statements misleading or false,' then it must speak." *Id.* (quoting *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 243-44 (4th Cir. 1988)). But that is the very allegation here: that the JW Defendants were required to disclose their anticompetitive conduct, which was specifically intended to reduce competition and raise prices, to render their representations of a "highly competitive market" and lawful "pricing optimization" not misleading.

Moreover, whether the Company's disclosure of the *Steves* litigation was, as Defendants

---

[12]  Significantly, in ruling that the duty to disclose illegal conduct may extend to uncharged and unadjudicated illegal conduct, the majority in *Singer* relied on *Menaldi v. Och-Ziff Capital Management Group LLC*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016). *See Singer*, 883 F.3d at 441 (citing *Menaldi*). There the district court recognized three independent circumstances in which the duty to disclose arises, two of which are present here: "First, a duty to disclose . . . can arise when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *Menaldi*, 164 F. Supp. 3d at 581. The JW Defendants attributed their success to lawful pricing strategies, while failing to disclose their anticompetitive conduct. *See* n.9 above. "Second, a duty to disclose may arise when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring." *Id.* In every one of Jeld-Wen's disclosures of the *Steves* litigation, the Company denied any wrongdoing. *See, e.g.*, Rae Decl. Ex. 4 (Prospectus for Jeld-Wen's IPO) at 110 ("We believe Steves' claims lack merit and intend to defend vigorously against this action."); *see also* ¶¶17, 23, 115-16, 120, 133, 207, 211, 227, 230-32, 238, 257, 284.

claim, sufficient to absolve Defendants of §10(b) liability presents a question of fact not resolvable on this motion. In *Cooke*, for example, the plaintiffs asserted §10(b) claims based on defendant MH's alleged misrepresentations about its "financial prosperity," and the defendants responded that MH's "troubled" financial situation had been fully apparent to the market, precluding liability. 998 F.2d at 1259. The Fourth Circuit recognized a question of fact about the sufficiency of the available information:

> This total mix of information of failing finances and fiscal growth . . . sufficiently gives rise to different interpretations as to whether the representations and/or omissions made by MH were materially misleading to the market. . . . *The impression that this mix of information conveyed cannot be resolved as a matter of law*.

*Id.* The Court therefore permitted the relevant claims to proceed. *See id.* at 1265.

Similarly, in *KBC Asset Management NV v. 3D Systems Corp.*, the defendant asserted a "truth-on-the-market" defense, under which "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market" (2016 WL 3981236, at *11 (D.S.C. July 25, 2016))—in other words, the very defense Defendants assert here. But because the court was "unconvinced that the entire truth was on the market" after the disclosures in question, *id.*, and because the defense is "intensely fact-specific and [] rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality," the Court was "unprepared to hold that Defendants made [their] disclosures with such intensity and credibility that it counter-balanced any alleged misleading information given by the Company earlier." *Id.* It thus allowed the claims to proceed.[13]

Here, as in *Cooke*, "[t]he impression that [the] mix of information conveyed [to the market]

---

[13]   *See also In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 616-17 (S.D. W. Va. 2012) (same; rejecting defense); *United States S.E.C. v. Ustian*, 2019 WL 7486835, at *36 (N.D. Ill. Dec. 13, 2019) (same; rejecting defense).

cannot be resolved as a matter of law." 998 F.2d at 1262. The allegations in the *Steves* litigation were made not by a governmental authority, but by a self-interested competitor—raising a question about their credibility[14]—and in every instance that Jeld-Wen disclosed the litigation, it also denied the allegations.[15] Those consistent denials of partisan allegations, combined with Defendants' reminders to the market that the (deliberately misinformed) DOJ approved the Acquisition *twice*,[16] were sufficient to convince even sophisticated securities analysts that the *Steves* litigation lacked merit—*even after a jury verdict in Steves & Sons' favor. See, e.g.*, ¶119 (Gabelli: "we see any divestitures with regard to CMI as unlikely. *This deal was reviewed twice by the DOJ and passed without issue in 2012*."); ¶121 (RBC Capital Markets: "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the CMI Acquisition twice.").[17]

One need only consider the reaction of Jeld-Wen's stock price to the Steves & Sons jury verdict to appreciate the actual "impression" that the available "mix of information" about the lawsuit "conveyed" to the market, to use the language of *Cooke*. After the verdict was rendered on February 15, 2018, the Company's stock price declined a penny and rose the following day, *see* Rae Decl. Ex. 39, reflecting the market's contemporaneous impression—based on the JW Defendants' own denials (¶207)—that the suit lacked merit, *despite* the verdict. In these circumstances, the Court

---

[14] *See, e.g.*, *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("[I]n a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made *credibly* available to the market by other sources.").

[15] *See, e.g.*, Rae Decl. Ex. 4 at 110 ("We believe Steves' claims lack merit and intend to defend vigorously against this action."); *see also* Rae Decl. Ex. 9 at 36; Ex. 12 at 26; Ex. 13 at 104; Ex. 15 at 28; Ex. 21 at 30; Ex. 23 at 106; Ex. 25 at 1; Ex. 26 at 9; Ex. 27 at 35; Ex. 29 at 34; Ex. 30 at 34; Ex. 31 at 8; Ex. 35 at 1.

[16] *See* ¶¶120, 134, 207, 211, 232, 238, 257, 284.

[17] *See In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed.").

can hardly conclude, as a matter of law, that the JW Defendants' periodic acknowledgment of the *Steves* litigation adequately apprised the market of their anticompetitive conduct.[18]  To the contrary, one can conclude the *opposite*, because Jeld-Wen's stock price declined in earnest only upon the later issuance of the Divestiture Decision and its explicit findings of fact regarding Defendants' anticompetitive behavior, after which the price fell nearly 5% (¶255), and then even more with Defendants' announcement of a loss reserve at the end of the Class Period, resulting in a 19% drop (¶262).  Thus, it was only with the issuance of the Divestiture Decision that the market began to appreciate the true nature of Defendants' misconduct.

Finally, the JW Defendants rely on *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999), in which the Fourth Circuit affirmed *summary judgment* as to §10(b) claims based on labor misconduct that was, the Court concluded (based upon a fully developed factual record), already "well known to the market." *Id.* at 684.  More than a year before the plaintiffs filed their securities fraud actions in November 1992, *id.* at 681, the United Food and Commercial Workers Union, which was engaged in a public campaign to organize Food Lion workers, "announced that it had filed a lengthy complaint with the Department of Labor, accusing Food Lion of widespread labor violations in tacitly encouraging employees to work 'off the clock' without pay." *Id.* at 678 (September 11, 1991 announcement).  In response, Food Lion issued two press releases denying the allegations, *id.* at 679, made additional public comments over the coming months, *id.*, and publicly announced an internal investigation into the allegations in July 1992. *Id.* at 680.  Four months later, "after all of the publicity about Food Lion's ongoing labor disputes," *id.*, ABC broadcast a PrimeTime Live episode about off-the-clock work by Food Lion employees. *Id.*  Within a week, securities class actions were

---

[18]   The post-verdict reaction stands in stark contrast to the reaction at the end of the Class Period, when Defendants finally announced a $76.5 million charge related to the *Steves* litigation, after which the stock price fell *19%.  See* ¶¶259, 262.

filed.  *Id.* at 681.

Based on the factual record developed during the litigation, the Fourth Circuit concluded that the labor misconduct at issue was "well known to the market before the PrimeTime Live broadcast," *id.* at 684, based on "all of the publicity about Food Lion's ongoing labor disputes," *id.* at 680, and so not material: "In short, the off-the-clock violations disclosed during [the broadcast] were already publicly available and, therefore, were not material either to Food Lion's earnings or the price of its stock."  *Id.* at 685.

Here, by contrast, Jeld-Wen disclosed the *Steves* litigation in the prospectus for its IPO and later SEC filings.  But unlike "all of the publicity about Food Lion's ongoing labor disputes," *id.* at 680, culminating in a PrimeTime Live broadcast, those disclosures got little public attention. Anyone investigating the *Steves* litigation would have discovered a private lawsuit, pleading contract claims and antitrust allegations about a transaction that—as Defendants have underscored to the market—was approved by the DOJ *twice*.  In stark contrast with *Food Lion*, these facts were insufficient to apprise the market of the truth, as in *Cooke* and the other truth-on-the-market cases cited above, and at best raise a question of fact.

### 4.    Defendants' Hodgepodge Falsity Arguments Lack Merit

The JW Defendants devote most of their falsity section to strawman arguments that assume the omissions Plaintiffs plead are not actionable and may therefore be disregarded.  *See* JW Mem. at 12-20.  Because, as demonstrated above, Plaintiffs *have* alleged actionable omissions, Defendants' miscellaneous falsity arguments fail.

In addition, the JW Defendants contend that no reasonable investor would "have misunderstood the competitive nature of the doorskins market."  JW Mem. at 15.  This conclusory leap ignores, however, the reality that no reasonable investor would have understood the JW Defendants' representations of a "competitive market" (*see, e.g.*, ¶102) to mean they were actually

- 18 -

engaging in illegal conduct specifically designed to "kill off" the competition.

The JW Defendants also contend their pricing representations were mere puffery. JW Mem. at 16-17. Even if pricing statements can, in some contexts, be considered puffery, the Fourth Circuit held in *Longman* that "[w]hile opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *Longman*, 197 F.3d at 683. Because the JW Defendants repeatedly cited their "pricing strategy" as an important basis for their financial success, all the while failing to disclose their significant efforts to raise prices through anticompetitive means, their pricing representations cannot be deemed to be puffery.[19]

Finally, the JW Defendants hope to avoid liability for their assurances regarding the *Steves* litigation by characterizing them as opinion. JW Mem. at 18-20. But "the Supreme Court has held that statements of opinion may be actionable if the statement omits material facts and if 'those facts conflict with what a reasonable investor would take from the statement itself....'" *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)). Here, the JW Defendants' denials of antitrust liability omitted the material facts, recognized by a preponderance of the evidence by Judge Payne, that they had engaged in an intentional scheme to limit the supply of

---

[19] *See, e.g.*, *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *12 (E.D.N.Y. Sept. 27, 2019) ("When viewed in context, Defendants' statements describing Schein's distribution market as 'highly competitive' and 'characterized by … intense competition' cannot be considered puffery" where the plaintiff alleged the defendant "did not actually operate in a competitive market and instead colluded with [defendants'] competitors to fix prices and block group purchasing organizations from entering the market."); *In re Allergen Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *10 (D.N.J. Aug. 6, 2019) ("representations that [the company's] ability to take price increases was due to factors such as its 'strong supply chain and the reliability of high-quality supply,' 'diverse portfolio,' and the 'uniqueness' of its 'pipeline and product line'" were not puffery where plaintiff alleged the defendant failed to disclose facts about its anticompetitive conduct); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *8 (S.D. Cal. Mar. 18, 2019) (the defendants' statements touting a "pro-competitive . . . model" did not constitute puffery where the plaintiffs alleged that the defendants were "engaging in policies that actually blocked competition").

doorskins for the express purpose of raising prices and "killing off" the competition, including Steves & Sons. Because a reasonable investor would deem those omitted facts to conflict with their stated opinion that they would not face antitrust liability in the *Steves* litigation, the statements in question are actionable, or at least raise a question of fact.[20]

### C.    Plaintiffs Plead a Strong Inference of Scienter

To plead scienter, "a plaintiff must show that the defendant acted with a mental state embracing intent to deceive, manipulate, or defraud." *Zak v. Chelsea Therapeutics Int'l, Ltd*., 780 F.3d 597, 606 (4th Cir. 2015). "Allegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss." *Id*. The Fourth Circuit has "defined a reckless act in the §10(b) context as one so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).

Allegations of securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). "To evaluate the strength of scienter inferences, courts engage in a comparative analysis." *Zak*, 780 F.3d at 606. "After comparing the malicious and innocent inferences cognizable from the facts pled, a complaint will not be dismissed so long as the malicious inference is at least as compelling as any opposing innocent inference." *Id.* Courts must "consider the scienter allegations holistically and accord those allegations the inferential weight warranted by context and common sense." *Id.* And because allegations are considered holistically, the "absence of a motive allegation is not fatal."

---

[20]    For the same reason, Beck's statement about the current competitive environment in North America being a "rational pricing environment" (¶188) is actionable. JW Mem. at 19. A reasonable investor would deem the omitted fact of price manipulation to be inconsistent with the stated opinion.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007).[21]

### 1.    The JW Defendants Pursued an Intentional Scheme

Plaintiffs allege a willful scheme, perpetrated by the JW Defendants, to—in Judge Payne's words—"***kill off some of the independent door makers that were [Jeld-Wen's] doorskin customers***," including Steves & Sons, which was "***an independent to be killed off***." Ex. 1 at 74. To accomplish this goal, Jeld-Wen had a plan to acquire CMI, thereby reducing the number of doorskin manufacturers from three to two (*id.* at 6); a "***strategy . . . to give Steves comfort***" (*id.* and 147), lulling it and the other IDMs into complacency; and a "***plan to raise doorskin prices***" (*id.* at 110), through which to force IDMs out of the market.  Everything about this plan was intentional.

As Judge Payne stated, Jeld-Wen was "***aware*** at the time of the merger that the antitrust issues associated with the CMI Acquisition were ***significant***." ¶250.  Jeld-Wen "***knew full well of the merger's antitrust implications***," and accordingly "retained highly-qualified antitrust counsel." *Id.*  "***Mindful of those implications***, JELD-WEN ***pursued an established merger strategy to assuage any possible concerns*** from the DOJ, from CMI's customers, and from JELD-WEN's own customers (including Steves)." *Id.*  Judge Payne then chronicled the Company's "***plan*** to enter into long-term supply agreements with [IDMs]," the Company's "***deliberate[] deci[sion]*** not to approach the DOJ about the [Acquisition] until those long-term agreements had been entered," Jeld-Wen's determination that it would have been a "***tactical error***" even to call the DOJ before entering those agreements, and the ***admission*** by Jeld-Wen personnel that "the purpose of entering into such contracts was 'to alleviate' customer concerns about not having a supply . . . ." ¶251.  In the end, "'the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin

---

[21]    Citing *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 560-61 (M.D.N.C. 2018), the JW Defendants argue that the absence of motive "weighs heavily" against scienter. JW Mem. at 21. But *Hirtenstein* holds no such thing, finding only that the motive allegations, *as pled*, were insufficient.

industry,'" ultimately "'depriving the [IDMs] of that key component of a reliable supply source.'" ¶127 (quoting Divestiture Decision). To remediate this intentional conduct, Judge Payne ruled that the Company would be required to divest the Towanda Plant it had obtained as part of the Acquisition. ¶252.

Attempting to distance themselves from this scheme, the Individual Defendants argue that they were not employed by the Company at the time of the Acquisition. JW Mem. at 21-22. But whether or not they initiated the plan, the Individual Defendants were critical to the scheme's fulfillment. The Complaint alleges that defendants Hachigian and Mallard directed the Company to breach the very supply agreements Jeld-Wen had used to induce the DOJ to permit the CMI Acquisition. ¶¶12, 84, 149. By breaching those contracts by increasing doorskin prices, *inter alia*, the Company was able to substantially reduce competition, give itself an advantage in the interior-molded-door market, and accomplish the goal of "killing off" the competition. ¶¶12, 148.

Moreover, defendant Beck has *admitted* the critical change at the Company that made those breaches possible: taking pricing decisions away from plant managers and salespeople and giving them to a centralized pricing analytics group. ¶¶109, 198. With that change in place, the Individual Defendants were able to commandeer pricing decisions, as multiple CWs have confirmed, *see* ¶¶39-41, 43, including by approving and implementing price increases in lockstep with Masonite. *See* ¶¶93-94 (alleging involvement of Beck, Mallard, Hachigian, and Michel). In short, Jeld-Wen's fraudulent scheme to "kill off" competition could not have been accomplished without the knowledge and active participation of the Individual Defendants.[22]

---

[22] Although the JW Defendants accuse Plaintiffs of trying to allege scienter through "group pleading" (JW Mem. at 22-23)—a legal concept that has nothing to do with scienter, *see Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 190 (4th Cir. 2009) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008))—the Complaint details the roles of each Individual Defendant in the alleged fraud and scheme, and the speaker or speakers of each material misstatement. *See generally* ¶¶142-234.

### 2. The Individual Defendants' Many Statements About Jeld-Wen's Core Operations Support a Strong Inference of Scienter

Knowledge of facts critical to a business's core operations may be attributed to the company and its key corporate officers. *See*, *e.g.*, *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 784 (E.D. Va. 2015) (core-operations allegations are "certainly relevant to the Court's holistic analysis"); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 639 (E.D. Va. 2000) ("[P]roblems . . . with a major impact on revenues are more likely to help support a strong [inference] of scienter," and "certainly make[] less credible the inference that the Defendants were not aware of or did not recklessly disregard the [undisclosed facts].").

The Complaint alleges that interior molded doors are a core Jeld-Wen product, a fact the JW Defendants do not deny. *See* ¶277 (door sales constituted approximately 67% of Jeld-Wen's Class Period revenues); Rae Decl. Ex. 27 at 9 ("molded interior doors" one of Jeld-Wen's "highest volume products"); JW Mem. at 24 (addressing core-operations doctrine). Given the importance of interior molded doors to Jeld-Wen's business, as well as the materiality of the Towanda Plant to Jeld-Wen's ability to manufacture doorskins, knowledge of the Company's pricing and sales practices as to those doors, including the anticompetitive conduct described above, can be imputed to the Individual Defendants, especially because they controlled pricing decisions (as confirmed by Beck and the CWs). ¶¶39-41, 43, 189, 279, 286-90.[23]

---

[23] The JW Defendants' attempt to muddy the allegations of the Complaint, through an argument that Plaintiffs are engaging in "inference stacking," must fail. JW Mem. at 23-24. The Complaint is clear: Judge Payne found that Jeld-Wen knowingly engaged in anticompetitive conduct (¶¶127-31); the Individual Defendants controlled pricing decisions, including price increases (¶¶12-13, 189, 286-90); the interior-door segment was material to Jeld-Wen's business (¶¶277-79); and the Individual Defendant knew, or were reckless in not knowing, about Jeld-Wen's antitrust violations, which were a major source of Jeld-Wen's success, and which they failed to disclose. ¶281. Moreover, the Supreme Court has expressly admonished courts against treating allegations of scienter in isolation, as the JW Defendants attempt to do. *Tellabs*, 551 U.S. at 326. Rather, scienter must be judged holistically. *Id.*

Moreover, "[b]olstering the inference that Individual Defendants knew about these core operations are the allegations that they repeatedly spoke on these issues at conferences, on conference calls, and in press releases." *KBC Asset Mgmt.*, 2016 WL 3981236, at \*9 (when a defendant is "specifically asked, directly and repeatedly about these core operations, denials of any issues can support a strong inference of scienter"); *see also Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 606-07 (E.D. Va. 2015) (core operations allegations supported scienter where company's "key product," which "drove the company's margins," was the subject of "repeated public discussion").

Plaintiffs allege the Individual Defendants' repeated attribution of Jeld-Wen's financial success to lawful "pricing strategies" and similar concepts, when in reality anticompetitive behavior, not lawful conduct, permitted the Company's price increases and financial success. *See, e.g.*, ¶¶280-83. At the same time, the Individual Defendants repeatedly downplayed the outcome of the *Steves* litigation, asserting that the verdict was "erroneous," that the facts did not establish a violation of law, that the DOJ twice reviewed acquisition of CMI, and that a loss was not "probable and estimable." *See, e.g.*, ¶¶115-16, 120, 133-34. As discussed above, the market accepted these assurances. *See, e.g.*, ¶¶118-19, 121, 135. Collectively, these repeated statements about core company matters support a strong inference of scienter.

### 3.      Other Facts Support a Strong Inference of Scienter

The Complaint alleges numerous other facts supporting a strong inference of scienter. *First,* allegations regarding the Individual Defendants' positions within the company are "relevant to the court's holistic analysis of scienter." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014); *see also In re Genworth*, 103 F. Supp. 3d at 785 (that the defendants held senior executive positions "augments the other allegations of intimate involvement pleaded elsewhere in the [] Complaint"). The Individual Defendants were all senior executives, who were in charge of

approving and implementing price increases, and thus had knowledge of, or were reckless in not knowing, that the Company's price increases were the result of anticompetitive conduct orchestrated by Hachigian and others.  ¶¶12-13, 32-36, 39-41, 43, 189, 279, 286-90.[24]

*Second*, the resignation of senior executives supports an inference of scienter.  *See, e.g.*, *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016).  The timing and circumstances of Beck's resignation, on the heels of the adverse *Steves* verdict, and Mallard's resignation the same day Jeld-Wen revealed an expected $76.5 million *Steves*-related charge, both without warning, support a strong inference of scienter.  ¶¶122, 136, 291-92.[25]

*Third*, the temporal proximity between Defendants' misleading statements and the revelation of the truth supports a strong inference of scienter.  *See Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 482 (E.D. Va. 2002) ("An inference of scienter can be supported by the temporal relationship among several events.").  On October 5, 2018, Judge Payne released his findings of fact in the *Steves* litigation, specifically detailing Jeld-Wen's anticompetitive behavior.  ¶¶249-52.  In response, Defendants reassured the market of the Company's innocence, protested that the October 5, 2018 ruling was incorrect, and reiterated the DOJ's approval of the CMI Acquisition.  ¶¶231-32.  Just 10 days later, however, Jeld-Wen admitted that it expected its third-quarter 2018 results to include a $76.5 million charge related to the anticipated judgment in the *Steves* litigation.  ¶259.  The proximity of these events supports a strong inference of scienter.  *See Berson v. Applied*

---

[24]   The JW Defendants' reliance on *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 592 (E.D. Va. 2006) is unavailing.  JW Mem. at 23.  The court there found executive positions, *standing alone*, were insufficient to allege scienter.  *Id*.  Here, Plaintiffs allege more—including the Individual Defendants' directive to breach the contracts with IDMs and their role in product pricing.  ¶¶12, 127-31, 189, 279, 286-90.  These are more than "bare allegations" that the Individual Defendants "made . . . misstatements" while in executive positions.  JW Mem. at 23.

[25]   The JW Defendants argue that resignations are not probative of scienter.  JW Mem. at 24 (citing cases).  The cases they rely on, however, stand for the proposition that allegations of resignations, *standing alone and without more*, are insufficient to support a strong inference of scienter.  *See, e.g.*, *In re Novan, Inc.*, 2018 WL 6732990, at *14 n.9 (M.D.N.C. Nov. 30, 2018).

*Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008) (temporal proximity of just two weeks between misleading statement and corrective disclosure bolstered inference).

### 4.    Plaintiffs' Inference Is at Least as Compelling as Defendants'

Considered altogether and accepted as true, as they must be, Plaintiffs' allegations plead an intentional scheme to defraud investors that is at least as compelling as Defendants' competing, non-culpable inference.  Fully appreciating that the acquisition of CMI would raise antitrust concerns, Jeld-Wen, with the participation of the Individual Defendants: (1) utilized the subterfuge of long-term contracts with IDMs to allay those concerns; (2) succeeded in acquiring CMI and reducing the number of doorskin suppliers from three to two; (3) transferred pricing authority to the Individual Defendants; (4) began breaching its long-term contracts with IDMs by raising the price of doorskins, *inter alia*; (5) entered into lockstep pricing arrangements with Masonite; and (6) repeatedly denied culpability in the *Steves* litigation, citing the approvals it had received from the DOJ—*all the while representing "**strategic pricing**" as the reason for its success in a competitive marketplace*.

By contrast, and despite the findings of Judge Payne, the JW Defendants' competing inference is that they believed their conduct was lawful.  JW Mem. at 20.

Plaintiffs respectfully submit that, because their inference of scienter need only be *equally* compelling as Defendants', but is in fact far *more* compelling, they have adequately alleged the scienter of the Individual Defendants and, as a result, of Jeld-Wen itself.[26]

### D.    Plaintiffs Plead Loss Causation

To plead loss causation, a plaintiff must allege "a causal connection between the material misrepresentation and the loss," providing "[the] defendant with some indication of the loss and the causal connection that the plaintiff has in mind," which "should not prove burdensome." *Dura*

---

[26]   *See Teachers' Ret. Sys.*, 477 F.3d at 184 (corporate scienter alleged through "facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents").

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 347 (2005). The plaintiff need only provide "sufficient specificity to enable the court to evaluate whether the necessary causal link exists" between the material misrepresentations or omissions and the economic loss. *Teachers' Ret. Sys.*, 477 F.3d at 186. "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 128 (4th Cir. 2009), *rev'd on other grounds*, *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). The inquiry is "fact-dependent." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011).

Courts in the Fourth Circuit recognize that loss causation can be alleged under the corrective-disclosure theory or the materialization-of-the risk theory. *Singer*, 883 F.3d at 445. "[U]nder the corrective disclosure theory, a complaint may allege that the defendant company itself made a disclosure that . . . the company perpetrated a fraud on the market," while under the "materialization of a concealed risk theory, a complaint may allege that news from another source revealed the company's fraud." *Id.* Plaintiffs allege both. ¶¶243-66.

On October 5, 2018, Judge Payne released his findings about Jeld-Wen's anticompetitive conduct (¶249), including that Jeld-Wen: (i) approached the DOJ only after it had entered into long-term contracts with IDMs to secure their non-opposition to the proposed Acquisition (*id.*); (ii) was aware of the antitrust issues at the time of the proposed Acquisition (¶250); (iii) retained experienced antitrust counsel (*id.*); and (iv) admitted its strategy for the long-term contracts to the DOJ in a presentation regarding the Acquisition. ¶251.

These and related findings of fact—as opposed to the allegations in the *Steves* litigation[27]—began apprising the market, for the first time, that anticompetitive behavior was the true reason for

---

[27]   The jury verdict in the *Steves* litigation did not contain any findings of fact. ¶18.

the Company's success, not "pricing optimization" and "pricing discipline," as Defendants had claimed. ¶254. The Divestiture Decision also began to counteract the market's misimpression that the jury verdict, rendered months before, was incorrect—a misimpression resulting from Jeld-Wen's repeated denials of liability (*see, e.g.*, ¶¶115-16; n.15 above) and the two DOJ reviews of the Acquisition. *See, e.g.*, ¶¶118-21. As a result of the Divestiture Decision, Jeld-Wen common stock declined by $1.18 per share, or nearly 5%, to close at $22.91 on October 9, 2018 (¶255).

Even then, however, the JW Defendants continued to deny liability in the *Steves* litigation (¶133), again relying upon the two separate DOJ reviews of the Acquisition (¶134), and the market continued to believe them, finding it "unlikely" that "a Clayton Act ruling would ultimately be rendered." ¶135. But just 10 days later, on October 15, 2018, the truth was fully and finally revealed to the market when the Company admitted that it expected to record a $76.5 million charge related to the *Steves* litigation (¶259), and announced the sudden resignation of then-CFO Mallard (to "pursue other career interests") (¶¶33, 260). ¶261. On this news, the price of Jeld-Wen stock fell by $4.03 per share, or *19%*, to close at $17.28 on October 16, 2018. ¶262.[28]

Defendants argue that the information disclosed on October 5 and 15 was already made publicly available in the *Steves* litigation. JW Mem. at 26-28. Mere allegations, however, such as those in the *Steves* complaint, do not constitute facts sufficient to alert the market to the existence of a securities fraud. *See DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 437-39 (S.D.N.Y. 2018) ("the incriminating nature of the documents was not confirmed, and a reasonable investor provided with this tidbit of information would not be able to plead a Section 10(b) claim with particularity"; "absent more detailed allegations of the bribery scheme, these complaints cannot

---

[28] To the extent the JW Defendants argue that the October 15 stock drop was caused by Company's reduced guidance (JW Mem. at 7), that reduction was itself attributable, at least in part, to the *Steves* litigation charge, *see* ¶139 (Gabelli: "[i]n retrospect, we underestimated the challenges JELD faced in 2018 from litigation"), or at a minimum presents a question of fact.

have provided Plaintiffs with notice of the securities-law violation"); *see also Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 n.* (4th Cir. 2004) ("Although the filing of an SEC complaint against Willey is indisputable, the facts alleged therein are not.").

But even if the Court were to construe the *Steves* allegations as facts, "[w]here, as here, a purported 'disclosure' is accompanied by a corporate denial, it is no 'disclosure' at all, since such a denial is counteractive, misleading, and can cause investors to doubt the contents of the purported disclosure." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *16 (S.D.N.Y. July 10, 2019); *see also DoubleLine Capital*, 323 F. Supp. 3d at 437-38 ("express denials of the reported allegations could have allayed a reasonable investor's concerns"). During the Class Period, Defendants repeatedly denied any anticompetitive conduct and liability for the *Steves* allegations, specifically pointing to the two DOJ reviews, and the market believed them. ¶¶115-21, 133-35; *see also* n.15 & 16, above.

The JW Defendants also argue that, because the alleged corrective disclosures do not explicitly disclose a conspiracy to fix the prices of interior molded doors, they cannot form the basis of a corrective disclosure. JW Mem. at 25-26. But loss causation does not require a fact-for-fact disclosure: "in the context of corrective disclosures, neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation (although either may be sufficient)." *Singer*, 883 F.3d at 446. Further, "the disclosure or series of partial disclosures need not precisely identify the misrepresentation or omission about which the plaintiff complains . . . ." *Id.* at 446. Allegations need only "demonstrate that the exposure of the Company's fraud was at least one substantial cause of the investment's decline in value." *Id.* at 447.[29] Thus, Plaintiffs have satisfied the pleading requirement by alleging a stock

---

[29]  In *In re Cree, Inc. Securities Litigation*, 2005 WL 1847004 (M.D.N.C. Aug. 2, 2005), on which the JW Defendants rely, the plaintiff attempted to use the filing of a lawsuit as a disclosure date

price decline as a result of the revelation of the information provided in both the October 5 and

October 15 disclosures.  ¶¶255, 262.

###### E.  Plaintiffs Plead Control-Person Claims Against the Onex Defendants and Individual Defendants

To plead a *prima facie* case of control-person liability under §20(a), a plaintiff need only

allege: (1) the existence of a primary securities violation by the controlled person; and (2) the

defendants' control over the primary violator.  *In re Mut. Funds*, 566 F.3d at 129-30.  The Fourth

Circuit "has determined that a plaintiff is not required to allege 'culpable participation' as an element

of the *prima facie* case for 'control person liability.'"  *Kiken*, 155 F. Supp. 3d at 602 (citing *In re*

*Mut. Funds*, 566 F.3d at 129-30).[30]  Nor must a plaintiff plead that the control person acted with

scienter or was directly liable for the fraud.  *Id*. at 603.  Notice-pleading standards apply.  *Id*.

Moreover, the Fourth Circuit has recognized that control-person liability presents a "complex

factual question" that is "not ordinarily subject to resolution on a motion to dismiss."  *In re Mut.*

---

related to the defendant company's transactions with six third parties.  *Id.* at *12.  The court, however, found that the complaint was "devoid of factual allegations" related to transactions with five of the six third-parties, and thus did not support loss causation.  *Id.*  Here, the Divestiture Decision and the October 15 litigation-charge announcement, although not explicit admissions of a price-fixing conspiracy or related misconduct, reveal both findings of fact and acknowledgments of potential liability for Jeld-Wen's anti-competitive conduct.

The JW Defendants also argue that the October 5 and October 15 disclosures are "devoid of factual allegations."  JW Mem. at 25.  But the Divestiture Decision contains more than 50 pages of findings of fact, *see* Ex. 1 at 6-61, and the October 15 disclosure established Jeld-Wen's expectation of a $76.5 million charge related to the *Steves* litigation, finally counteracting their many previous denials.  ¶¶259-60.

[30]   The Onex Defendants' citation to *In re BearingPoint, Inc. Securities Litigation*, 525 F. Supp. 2d 759, 780-81 (E.D. Va. 2007), for the suggestion that Plaintiffs must show culpable participation, is antithetical not only to their own admission to the contrary, *see* Onex Mem. at 6 (acknowledging burden shift to defendants "to show lack of culpable participation" after prima facie showing of control), but also to Fourth Circuit law.  *See also Masterson v. Commonwealth Bankshares, Inc.*, 2 F. Supp. 3d 824, 829-30 (E.D. Va. 2014) (analyzing circuit split but concluding that culpable participation is not required for a plaintiff's affirmative case in the Fourth Circuit).  In any event, neither the Onex Defendants nor the Individual Defendants argue that Plaintiffs failed to show culpable participation.

*Funds*, 566 F.3d at 130; *see also In re Willis Towers*, 439 F. Supp. 3d at 717 (same); *Kiken*, 155 F. Supp. 3d at 603 (same).  Rather, courts adopt a "liberal construction whereby dismissal is granted only when a plaintiff cannot plead *any* facts from which it can be reasonably inferred that the defendant was a 'control person.'"  *Id.* at 603.

The SEC defines "control" as "possession, direct *or indirect*, of the *power to direct or cause the direction* of the management and policies of a person, whether *through the ownership of voting securities*, by contract, or otherwise."  *In re Mut. Funds*, 566 F.3d at 130; *see also* H.R. Rep. No. 73–1383, at 26 (1934) ("[W]hen reference is made to 'control', the term is intended to include actual control as well as what has been called legally enforceable control.").  "In making the determination of whether a defendant possessed the requisite control, the courts have given heavy consideration to the power *or potential power* to influence and control the activities of a person, as opposed to the actual exercise thereof."  *In re Mut. Funds*, 566 F.3d at 130.  To plead control, a plaintiff must "plead[] facts showing that the controlling defendant had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."  *Id*. (alterations in original).

The Onex and Individual Defendants oppose Plaintiffs' §20(a) claims on two baseless grounds.  First, they argue that Plaintiffs have failed to adequately allege a primary violation of the Exchange Act.  *See* Onex Mem. at 4; JW Mem. at 30.  Second, the Onex Defendants argue that Plaintiffs have failed to adequately allege "control over the specific policy or statement resulting in the primary liability."  Onex Mem. at 5-8.[31]  But because Plaintiffs have satisfied each of the

---

[31]   The Onex Defendants also argue that Plaintiffs have failed to plead control with sufficient specificity under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Onex Mem. at 6-7.  In the wake of *Twombly* and *Iqbal*, however, courts in this circuit have continued to apply—and, as discussed herein, Plaintiffs have met—the liberal pleading

elements of §20(a), the Onex Defendants' and Individual Defendants' motions to dismiss Plaintiffs' control-person claims should be denied.

### 1.    Plaintiffs Plead a Primary Violation

For all the reasons herein, Plaintiffs have stated a primary violation against the JW Defendants for falsely attributing the Company's financial success to lawful pricing strategies, when in truth Jeld-Wen's success was due to anticompetitive practices.  For that reason alone, Plaintiffs' §20(a) claims should be sustained.  *See In re Genworth*, 103 F. Supp. 3d at 790–91 ("On a motion to dismiss, a Section 20(a) claim will [] stand or fall based on the court's decision regarding the Section 10(b) claim."); *see also Kiken*, 155 F. Supp. 3d at 609.

### 2.    Plaintiffs Plead "Control"

As an initial matter, the Individual Defendants do not challenge the control element of Plaintiffs' §20(a) claims *at all*.  And the Onex Defendants effectively concede that, by virtue of their "aggregate economic and voting power," they had the ability "to control the general affairs of Jeld-Wen." Onex Mem. at 5.  Indeed, because the Onex Defendants owned approximately 84% of Jeld-Wen's outstanding common stock on an as-converted basis (¶37), that is hardly a surprise. Moreover, Jeld-Wen has *admitted* it is a "'controlled company' within the meaning of the corporate governance standards of the New York Stock Exchange" because of the Onex Defendants' stock ownership of the Company.  Onex Mem. Ex. A at 1 (ECF No. 76-1); *see also id*. at 38 ("[w]e are a 'controlled company' within the meaning of the rules of the New York Stock Exchange").  Thus, the Onex Defendants had the power to control the general affairs of Jeld-Wen.

Yet the Onex Defendants contend they did not have the power to control or influence, directly or indirectly, the specific corporate policy resulting in the primary liability.  Onex Mem. at

---

standard for §20(a) claims.  *See e.g.*, *In re Willis Towers*, 439 F. Supp. 3d at 717; *Kiken*, 155 F. Supp. 3d at 603; *Masterson*, 2 F. Supp. 3d at 831.

6-9. But the legal authority they cite—nearly all from outside this circuit—rests largely on the failure to prove *actual control*, a requirement that does not exist in the Fourth Circuit, given that the "plain language of [§20(a)] refers to the '*power*' to control, not the actual involvement of a defendant in any particular act or omission." *Latham v. Matthews*, 662 F. Supp. 2d 441, 469 (D.S.C. 2009).[32] And the lone Fourth Circuit case the Onex Defendants do cite addressing §20(a) claims—*In re Mutual Funds—upheld* the plaintiffs' claims. 566 F.3d at 130-31.

Nonetheless, the Onex Defendants argue that the Complaint contains "nothing even close to th[e] level of factual specificity" alleged in *In re Mutual Funds* regarding the Onex Defendants' "direct involvement" in Jeld-Wen. Onex Mem. at 8. But the Court's finding of control in *In re Mutual Funds* relied on circumstances similar to those present here, including that the controlling entity owned the controlled entity, and acknowledged that "a corporation may be a controlling person when it *owns the majority of the shares* of another corporation." 566 F.3d at 130. The court's finding also relied on overlapping management in the controlled and controlling entities, including a shared director and executive. *Id*. at 131.

Here, two of the Onex Defendants' employees—Anthony Munk and Matthew Ross—served as Jeld-Wen directors, and Jeld-Wen admitted that the Onex Defendants "appointed the majority of [Jeld-Wen's] board of directors." Onex Mem. Ex. A at 59. Moreover, as in *In re Mutual Funds*, 566

---

[32] The Onex Defendants' cited "control" cases discussing actual control are therefore inapposite. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002) (control element requires the controlling person to "actually exercise control over the company"); *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002) (§20(a) requires that "a defendant must possess actual control over the transactions in question"); *Grupo Verzatec S.A. de C.V. v. RFE Inv. Partners*, 2019 WL 1437617, at *7 (S.D.N.Y. Mar. 29, 2019) ("[t]he SAC does not allege facts that a [sic] draw a reasonable inference that RFE had control over the misrepresentations in the Agreements"); *Carlton v. Cannon*, 2016 WL 3959164, at *4 (S.D. Tex. July 22, 2016) (in analyzing control, the Fifth Circuit considers whether the defendant had effective day-to-day control of the corporation and actually exercised power over the controlled person). The Onex Defendants' remaining out-of-jurisdiction "control" authority is likewise not controlling here. Onex Mem. at 7-9.

F.3d at 131, the Onex Defendants had, at a minimum, indirect power over the corporate policy—*i.e.*, pricing decisions—at issue.  Indeed, Jeld-Wen acknowledged that "*[b]ecause Onex controls the majority of our common stock, it may control all major corporate decisions*."  Onex Mem. Ex. A at 38 (emphasis in original); *see also id*. at 114-15 (noting Munk and Ross's "extensive knowledge of [Jeld-Wen's] business," including "corporate governance issues" and the "markets in which [Jeld-Wen] operate[s]").

Perhaps most significantly, Munk and Ross, as employees of the Onex Defendants serving on Jeld-Wen's Board, *signed the Company's Forms 10-K* issued during the Class Period containing the false and misleading statements about Jeld-Wen's financial success.  Exs. 2 at 101 & 3 at 68.[33] Courts in this Circuit place considerable weight on such certifications in analyzing control— "otherwise, the signatures on such financial statements would be meaningless."  *Masterson*, 2 F. Supp. 3d at 833-34 ("*Most tellingly*, . . . defendant[s] seeking dismissal signed at least two financial statements alleged to have been fraudulent") (emphasis in original); *see also In re Willis Towers*, 439 F. Supp. 3d at 718.[34]

### F.    Plaintiffs' Claims Are Timely

Under 28 U.S.C. §1658(b), a Rule 10(b)(5) claim "may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  "'[D]iscovery' refers not only to a plaintiff's *actual* discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered."  *See Merck & Co. v. Reynolds*,

---

[33]   For this reason, the Onex Defendants' suggestion that they neither drafted, supervised, nor reviewed "even one of Jeld-Wen's challenged statements" is false.  Onex Mem. at 7.

[34]   Given the extent of control by the Onex Defendants over Jeld-Wen and the liberal pleading standard for §20(a) claims discussed above, the Onex Defendants' reliance on non-securities cases— *McCleary-Evans v. Maryland Department of Transportation*, 780 F.3d 582, 587-88 (4th Cir. 2015) and *ACA Financial Guaranty Corp. v. City of Buena Vista*, 917 F.3d 206, 215 (4th Cir. 2019)—for the notion that Plaintiffs' allegations rest on speculation or are otherwise conclusory is misplaced.

559 U.S. 633, 644 (2010) (emphasis in original).  Because a limitations defense "often entails a fact intensive inquiry," it is "rarely appropriate" for resolution on a Rule 12(b)(6) motion.  *Burt v. Maasberg*, 2013 WL 1314160, at *31 (D. Md. Mar. 31, 2013) (citing *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)).

The JW Defendants contend that a reasonably diligent plaintiff would have discovered the facts underlying Plaintiffs' claims no later than February 15, 2018—the date of the *Steves* jury verdict.  JW Mem. at 29.  But while a reasonably diligent plaintiff would have become aware of the *allegations* against Jeld-Wen, as well as the fact of the verdict, that plaintiff could not have discovered any findings of fact, as there were none.  ¶18.  It was almost another eight months before Judge Payne issued the Divestiture Decision on October 5, 2018, containing extensive findings. ¶¶249-58.  Moreover, at the time of the verdict, the Company continued to deny the allegations against it (¶¶115-16), and reminded the market that the DOJ had reviewed the Acquisition twice for antitrust concerns, but permitted it to proceed—assurances that the market credited.  *See* ¶¶118-21. Thus, there is a question of fact about what a reasonable investor would have discovered from the available facts.  For the same reasons the Court should reject the JW Defendants' assertion of a truth-on-the-market defense, *see* §III.B.3 above, it should reject their limitations defense.[35]

## IV.    CONCLUSION

For the reasons above, Lead Plaintiffs respectfully request that the Court deny the motion.[36]

---

[35]   The JW Defendants do not appear to assert a limitations defense as to claims based upon what they characterize as "Litigation Statements."  *See* JW Mem. at 13, 29.

[36]   If the Court dismisses all or part of the Complaint, Plaintiffs respectfully request leave to amend, which should be freely given.  *See* Fed. R. Civ. P. 15(a)(2); *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 651, (4th Cir. 2007) ("Rule 15(a) instructs that leave to amend shall be freely given when justice so requires.").

DATED: August 28, 2020

Respectfully submitted,

COHEN MILSTEIN SELLERS & TOLL PLLC
STEVEN J. TOLL (VSB No. 15300)
JOSHUA HANDELSMAN (DC Bar only)


*/s/ Steven J. Toll*
STEVEN J. TOLL

1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005
Telephone: 202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com
jhandelsman@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*

ROBBINS GELLER RUDMAN
   & DOWD LLP
ROBERT M. ROTHMAN (Admitted *pro hac vice*)
MARK T. MILLKEY (Admitted *pro hac vice*)
WILLIAM J. GEDDISH (Admitted *pro hac vice*)
VINCENT M. SERRA (New York Bar only)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
mmillkey@rgrdlaw.com
wgeddish@rgrdlaw.com
vserra@rgrdlaw.com

*Counsel for Co-Lead Plaintiff Plumbers and
Pipefitters National Pension Fund, Additional
Plaintiff Wisconsin Laborers' Pension Fund, and
the Class*

- 36 -

LABATON SUCHAROW LLP
JAMES W. JOHNSON (Admitted *pro hac vice*)
MICHAEL H. ROGERS (Admitted *pro hac vice*)
MARGARET A. SCHMIDT (Admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
jjohnson@labaton.com
mrogers@labaton.com
mschmidt@labaton.com

*Counsel for Co-Lead Plaintiff Public Employees'
Retirement System of Mississippi and the Class*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on August 28, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Steven J. Toll*

STEVEN J. TOLL (VSB No. 15300)

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005
Telephone: 202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com