**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-00112 |
| | Judge John A. Gibney, Jr. |
| | **ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT JELD-WEN HOLDING, INC. AND THE INDIVIDUAL DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

Sandra C. Goldstein, P.C.
Rachel M. Fritzler
Jacob M. Rae
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

Brian C. Riopelle
Brian E. Pumphrey
Brian D. Schmalzbach
Garrett H. Hooe
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1000

*Attorney for Defendants JELD-WEN Holding,
Inc., Mark A. Beck, L. Brooks Mallard, Kirk
S. Hachigian, and Gary S. Michel*

**TABLE OF CONTENTS**

LEGAL STANDARD.............................................................................................................. 2

ARGUMENT ......................................................................................................................... 3

I.     THE COMPLAINT FAILS TO PLEAD ANY ACTIONABLE OMISSION.................... 3

    A.     The Competitiveness Statements Were Not False and Were Not
       Misleading......................................................................................................... 4

    B.     JELD-WEN Was Not Obligated to Preemptively Concede the *Steves*
       Litigation and *Singer* Does Not Hold Otherwise. ...................................... 5

    C.     Disclosure of the *Steves* Complaint Was Sufficient, as a Matter of Law, to
       Apprise the Market of the Allegations Made Therein. .......................... 7

II.    THE COMPLAINT FAILS TO PLEAD FALSITY............................................................. 9

    1.     The Competitiveness Statements .............................................................. 9

    2.     The Pricing and Quality Statements ........................................................ 10

    3.     The Litigation Statements ......................................................................... 10

III.   THE COMPLAINT FAILS TO PLEAD SCIENTER. ...................................................... 11

    A.     The Complaint Does Not Allege a Scheme to Defraud Investors. ...................... 12

    B.     The Core Operations Doctrine Does Not Create a Strong Inference of
       Scienter. .......................................................................................................... 13

    C.     Plaintiffs' Remaining Theories Do Not Support a Strong Inference of
       Scienter. .......................................................................................................... 14

    D.     The Most Compelling Inference Is That Defendants Acted Without
       Scienter. .......................................................................................................... 15

IV.    THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION. ...................................... 15

V.     THE CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS. .................... 19

CONCLUSION...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Axar Master Fund, Ltd. v. Bedford*,
   308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020)........................11

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014).............................................................................................1, 5, 6

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   129 F. Supp. 3d 48 (S.D.N.Y. 2015)......................................................................................11

*Cooke v. Manufactured Homes, Inc.*,
   998 F.2d 1256 (4th Cir. 1993) .....................................................................................7, 8, 20

*DoubleLine Capital LP v. Odebrecht Fin. Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018)...............................................................................16, 17

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016)........................................................................................14

*In re eSpeed, Inc. Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006)....................................................................................18

*In re Galena Biopharma, Inc. Sec. Litig.*,
   2019 WL 5957859 (D.N.J. Nov. 12, 2019) ..............................................................................5

*Glaser v. Enzo Biochem, Inc.*,
   2005 WL 6952273 (E.D. Va. July 14, 2005),
   *aff'd*, 464 F.3d 474 (4th Cir. 2006).......................................................................................16

*GO Computer, Inc. v. Microsoft Corp.*,
   508 F.3d 170 (4th Cir. 2007) ...................................................................................................4

*In re Henry Schein Inc. Sec. Litig.*,
   2019 WL 8638851 (E.D.N.Y. Sept. 27, 2012) .......................................................................10

*Holwill v. AbbVie Inc.*,
   2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ...............................................................6, 16, 17

*In re IMAX Sec. Litig.*,
   587 F. Supp. 2d 471 (S.D.N.Y. 2008).....................................................................................17

*Katyle v. Penn. Nat'l Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ...............................................................................15, 19

*KBC Asset Mgmt. NV v. 3d Sys. Corp.*,
2016 WL 3981236 (D.S.C. July 25, 2016) ....................................................................8

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) .........................................................................13

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)........................................................................................19

*Longman v. Food Lion, Inc.*,
197 F.3d 675 (4th Cir. 1999) .............................................................................8, 9, 10

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
876 F.3d 541 (4th Cir. 2017) ............................................................................. *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
513 F.3d 702 (7th Cir. 2008) ......................................................................................13

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
716 F.3d 229 (1st Cir. 2013)........................................................................................18

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W. Va. 2012)........................................................................8

*In re Maximus, Inc. Sec. Litig.*,
2018 WL 4076359 (E.D. Va. Aug. 27, 2018)...........................................................15, 16

*Menkes v. Stolt-Neilsen S.A.*,
2005 WL 3050970 (D. Conn. Nov. 10, 2005) ...............................................................4

*Nolte v. Capital One Fin. Corp.*,
390 F.3d 311 (4th Cir. 2004) ......................................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)......................................................................................................11

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019)........................................................................5, 16

*Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
551 F.3d 305 (4th Cir. 2009) ........................................................................................3

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084 (S.D.N.Y. July 10, 2019) ...............................................................18

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) ......................................................................... *passim*

*In re Sotheby's Holdings, Inc.*,
   2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ........................................................5

*Teachers' Ret. Sys. of LA v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ......................................................................... *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................3

The securities laws do not require companies to accurately forecast the outcome of pending litigation. They also do not require companies to choose between vigorously defending themselves in litigation—risking securities fraud liability if they lose—or sacrificing the right to defend themselves by confessing to the allegations. That makes sense. The securities laws were not intended to create a double penalty anytime a company loses litigation or to deprive companies of their due process rights by forcing them to admit liability while defending themselves.

Yet Plaintiffs argue that JELD-WEN had no choice but to concede the fight the moment Steves[1] filed its Complaint. They argue that it was not enough that JELD-WEN told investors that Steves was alleging conduct that violated the Clayton Act or that JELD-WEN told investors that a jury had found JELD-WEN liable in the *Steves* litigation. Instead, Plaintiffs assert that JELD-WEN's disclosures had to adopt the factual characterizations of the *Steves* Complaint even though the Company firmly believes it has done nothing wrong. Of course, if JELD-WEN had adopted Steves' allegations, it would have made admissions in the *Steves* litigation that would have eviscerated JELD-WEN's ability to defend itself. More broadly, adopting the confessional requirement Plaintiffs demand would throw the U.S. legal and economic systems into upheaval as public companies would become targets of litigation against which they could not defend.

The Second Circuit has addressed exactly this issue and held that there is no requirement to "confess"—it is enough for companies to disclose allegations made against them and the risks related thereto. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Plaintiffs try to dodge that holding by pointing to the Fourth Circuit's decision in *Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018). But that case only addressed when *disclosure*, not confessional, obligations exist. JELD-WEN's repeated disclosure of the *Steves* allegations more

---

[1]    Unless noted otherwise, Defendants use the same defined terms herein as in their opening brief.

than satisfied the securities laws—particularly here, where Plaintiffs cannot argue any of the alleged misstatements were false.

Plaintiffs' theory of scienter is also flawed, claiming that scienter under the PSLRA can be inferred from their allegations that the Individual Defendants knowingly or recklessly violated the Clayton Act.  But none of the Individual Defendants had *any* role in the Merger, nor even worked for JELD-WEN until long after it closed, and so cannot be linked to the alleged anticompetitive conduct at the heart of Plaintiffs' Complaint.  And, in any event, the Fourth Circuit has expressly ruled that the PSLRA bars inference stacking of the sort required to conclude that Defendants acted with scienter.  *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017).

Plaintiffs also fail to plead loss causation.  The events they claim to have been corrective disclosures—the Divestiture Decision and the Earnings Pre-Release—only repeated facts already known to the market through the *Steves* Complaint, public filings, the public trial, the subsequent jury verdict, and JELD-WEN's disclosure of that verdict.  And because that jury verdict preceded this lawsuit by over two years, Plaintiffs' claims are time-barred.[2]

## LEGAL STANDARD

Plaintiffs fundamentally misstate the relevant legal standard under the PSLRA, instead relying on a much lower standard—the ordinary Rule 12(b)(6) standard—from a civil rights case. (Opp. at 9-10).  The Fourth Circuit has rejected that standard for cases under the PSLRA, which requires that "the complaint shall state *with particularity all facts*" that show a challenged statement was false or misleading as well as "sufficient facts to raise a *strong inference* of scienter."  *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007).  Under that "'all

---

[2]  Plaintiffs also request leave to amend (Opp. at 35 n.36), but do not explain how amendment could cure the fatal defects in their claims.  The Complaint should be dismissed with prejudice.

facts' standard," the court "must ascertain whether the complaint states *sufficient facts* to permit a *reasonable* person to find" that the elements of Plaintiffs' claim have been "satisfied." *Id.* at 173.

Similarly, Plaintiffs wrongly argue that a court "must draw all reasonable inferences in favor of the plaintiff." (Opp. at 9-10 (quoting the standard from a contract dispute).) But the "strong inference of scienter" required by the PSLRA "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 306 (4th Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). And the Fourth Circuit has made clear the basis for that "strong inference" must be "*facts*, not other inferences." *Maguire*, 876 F.3d at 548 (emphasis added).

## ARGUMENT

### I.   THE COMPLAINT FAILS TO PLEAD ANY ACTIONABLE OMISSION.

Plaintiffs argue that JELD-WEN's alleged misstatements "failed to disclose the anticompetitive conduct Plaintiffs assert." (Opp. at 11.) But Plaintiffs do not contest that "the factual basis of Plaintiffs' Complaint is virtually identical to the unredacted portions of the *Steves* Complaint." (Br. at 12 n.9; *see also id.* at 26, 30.) Nor do they dispute that the market was aware of those allegations because JELD-WEN repeatedly disclosed their substance and because the *Steves* Complaint was publicly filed well before the class period began. (*See* Opp. at 17.) Indeed, nowhere in their 325-paragraph Complaint or 35-page Opposition do Plaintiffs identify any fact that was unavailable to the public via the *Steves* litigation before the putative Class Period.

Because Plaintiffs cannot dispute that the *facts* underlying Defendants' alleged anticompetitive conduct were fully disclosed, they rest their omission claims on the extraordinary theory that Defendants were required to confess to the alleged wrongdoing before the *Steves* case was adjudicated. (*See* Opp. at 2, 13-14.) But Plaintiffs identify no case law holding that a company

3

must confess to alleged wrongdoing—rather than apprise the market of allegations thereof—before it is adjudicated. And the Fourth Circuit has explicitly held that "wrongdoing is not a straightforward matter of fact, and it is not fraud to deny it," *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007), a holding that Plaintiffs' Opposition ignores.

### A. The Competitiveness Statements Were Not False and Were Not Misleading.

The Complaint hinges on the theory that Defendants omitted "that they had engaged in an intentional scheme to limit the supply of doorskins," *i.e.*, that Defendants engaged in anticompetitive conduct in the *doorskins* market. (Opp. at 19-20; *see also* Opp. at 1 (emphasizing that JELD-WEN's allegedly anticompetitive conduct related to "raising the price of doorskins").) But as Plaintiffs admit, the Competitiveness Statements related to the "door and window market," *not* the doorskins market. (Opp. at 2; *see also* Br. at 14.) And a reasonable investor would not have understood the Competitiveness Statements to refer to the doorskins market, because (as Plaintiffs admit) JELD-WEN was "the only supplier of doorskins to IDMs" after Masonite "abruptly exited the doorskins supply market in June 2014" (Opp. at 5), and it is undisputed that Masonite publicly informed the market that it had done so (Br. at 15; Compl. ¶ 83; Ex. 1 at 8).

Instead of engaging with these dispositive facts, Plaintiffs insist a complaint can plead a Rule 10b-5 claim based on statements about competitiveness. (Opp. at 11-12.) But as Plaintiffs' authority shows, "generic description[s] of the state of the market as a whole"—or, here, statements about *other* markets—that lack "any direct connection" to the allegedly unlawful conduct are not actionable. *Menkes v. Stolt-Neilsen S.A.*, 2005 WL 3050970, at *8 (D. Conn. Nov. 10, 2005).[3] Thus, assertions that the Merger "reduced competition" in the doorskins market and

---

[3] Plaintiffs ignore this decision without explanation and cite a later decision that refused, without analysis, to revisit the determinations made on the initial motion to dismiss. (*See* Opp. at 12.)

4

that JELD-WEN "raised doorskin prices" (Opp. at 12) cannot show that statements about competition in *different markets* were misleading. Plaintiffs cannot cite any contrary authority.[4]

### B. JELD-WEN Was Not Obligated to Preemptively Concede the *Steves* Litigation and *Singer* Does Not Hold Otherwise.

Plaintiffs argue that this case is just like the Fourth Circuit's decision in *Singer*, and that Defendants therefore were required to "disclose their illegal conduct" (Opp. at 12-14). But *Singer* does not require confessions to *disclosed* allegations and is therefore inapplicable to the facts of this case. And Plaintiffs have identified no authority holding that a company facing allegations of illegal conduct must not only disclose the existence of those allegations to the market, but must further abandon any defense and *confess* to them.[5]

Plaintiffs make *Singer* the lynchpin of their argument, but they stretch its holding too far. By contrast, and as Defendants argued in their opening brief (*see* Br. at 11), the *UBS* decision is directly on point, holding that a company is not required to *confess wrongdoing* before it has been adjudicated in addition to disclosing allegations of that wrongdoing, 752 F.3d at 184.[6] *Singer*

---

[4]   *See Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 158-61 (D. Conn. 2019) (statements about "'intense' or 'fierce' competition on price in the U.S. market for generic drugs" were adequately alleged to be false or misleading" where it was alleged the defendant conspired to set prices *for generic drugs*); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (statements about "'intense' competition" between Sotheby's and Christie's were adequately alleged to be misleading where it was alleged that a "price-fixing agreement *between Sotheby's and Christie's* had eliminated price competition" (emphasis added)).

[5]   Contrary to Plaintiffs' assertion, Defendants do not argue that the disclosure duty described in *Singer* is limited to "uncharged and unadjudicated" conduct. (*See* Opp. at 13-14.) *Singer* holds that the disclosure obligation is independent of whether misconduct has been alleged. 883 F.3d at 441. But once misconduct is alleged or charged, a company's disclosure obligation is limited to disclosing those allegations, not confessing to them. *See UBS*, 752 F.3d at 184.

[6]   *See also In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *10-11 (D.N.J. Nov. 12, 2019) (rejecting argument that "a company must also make a complete *mea culpa* when disclosing the investigation and its potential legal implications").

5

addressed an entirely different question:   whether undisclosed misconduct and non-public allegations of wrongdoing need to be disclosed when a company disclaims wrongdoing of the same nature.  The answer is yes, they do.  *Singer*, 883 F.3d at 441-42.  But *Singer* also confirms that disclosing allegations informs the market of the supposed wrongdoing.  *Id.* at 433 (discussing stock drop upon disclosure of Department of Health and Human Services investigation)[7]; *see also Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *6 (N.D. Ill. Sept. 1, 2020) (public complaints revealed allegations).  Here, the *Steves* Complaint was available to the public and Defendants reminded investors of it in each filing, disclosing the allegations in the Prospectus, and repeatedly thereafter.  (*See* Br. at 11 n.8.)  No further disclosure was required.  *UBS*, 752 F.3d at 184.

Moreover, *Singer* only held that a disclosure duty is triggered when a defendant chooses to speak in detail on the same subject as the alleged omissions.  *See* 883 F.3d at 442 (detailed comments on how company was training physicians on how to make sure it would continue to be reimbursed triggered duty to disclose that the training allegedly taught fraudulent reimbursement coding practices); *see also AbbVie*, 2020 WL 5235005, at *3 (statement that performance of drug was "exclusively . . . due to the promotional programs we have in place" was misleading where it did not disclose that those "promotional programs" included an allegedly illegal kickback scheme).  But under this principle, in order to find that JELD-WEN omitted to mention its alleged

---

[7]   In *Singer*, the defendant company was a medical device manufacturer who had seen the reimbursement coding for one of its devices change in a way that made it significantly harder to get paid.  883 F.3d at 430.  The defendant company "downplayed" the financial consequences of that change and also represented to investors that they were training physicians in methods to attain "'appropriate'—*i.e.*, legal—reimbursements."  *Id.* at 439.  And when a *qui tam* complaint that "fully explain[ed] the scheme's alleged illegality" was filed under seal, the company did *not* tell investors about it while that complaint remained unavailable to the public for years.  *Id.* at 433-34, 441.  Instead, the market discovered the alleged wrongdoing only after a federal investigation was launched, which the defendant company disclosed six months after the filing of the *qui tam* complaint.  *Id.* at 433-34.  Here, by contrast, the *Steves* Complaint was both available and fully disclosed to the market from the beginning.

anticompetitive conduct in the doorskins market, it first would have had to *speak* on those subjects. Here, the Complaint does not allege that the Pricing and Competitiveness Statements had anything to do with the lawfulness of the Merger or its competitive impact on the doorskins market—nor could it. Instead, Plaintiffs challenge generic assertions about the Company's overall pricing strategy, which are not the sort of detailed statements that trigger a disclosure obligation. *Singer*, 883 F.3d at 441-42.

### C. Disclosure of the *Steves* Complaint Was Sufficient, as a Matter of Law, to Apprise the Market of the Allegations Made Therein.

Plaintiffs argue that whether the *Steves* Complaint fully disclosed the alleged conduct presents a question of fact that the Court cannot resolve at this stage. (Opp. at 14-15.) But Plaintiffs' own cases show that they are wrong. Once the market is "fully apprised" of the allegedly omitted information—whether via new articles, press releases, the filing of a complaint or launch of an investigation, or other means—any claims related to subsequent statements fail "as a matter of law." *See Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993).[8]

In *Cooke*, the Fourth Circuit affirmed the lower court's grant of summary judgment to defendants as to claims about statements made *after* the market knew about the financial decline of the company—which was disclosed in news articles that detailed the "financial straits" of the company as well as a company press release—because post-disclosure statements are not

---

[8]  Though *Cooke*, like *Longman* (*see* Opp. at 17), is a summary judgment decision, that should not impact the Court's ability to rely upon either case on this motion to dismiss. Those cases addressed the same question presented here: Do the *facts* before the Court—here those pled in the Complaint, present in documents incorporated therein, or otherwise subject to judicial notice— demonstrate as a matter of law that the allegedly concealed information was already known to the market? As in both *Cooke* and *Longman*, they do, and the claims here fail.

7

actionable.  *Id.* at 1261-63.[9]  Here, it is uncontested that the *Steves* Complaint was publicly filed before any of the allegedly misleading statements were made, that its allegations focused on the same conduct Plaintiffs allege was concealed from the market, and that JELD-WEN repeatedly alerted the market to those allegations.  Thus, like in *Cooke*, the public here was "fully apprised" of allegations made against JELD-WEN.  All of Plaintiffs' claims should be dismissed.

The other cases relied upon by Plaintiffs do not apply, as none address circumstances, like here, where a complaint was publicly available, disclosed to investors, and identified the *exact same conduct* that the securities plaintiff alleged was concealed.  *See KBC Asset Mgmt. NV v. 3d Sys. Corp.*, 2016 WL 3981236, at *6, 11 (D.S.C. July 25, 2016) (rejecting argument that disclosure of product shipment delays revealed company's problems integrating acquisitions); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 616-17 (S.D. W. Va. 2012) (rejecting argument that investors were aware of mine safety violation data accessible through a government website where the company had not alerted investors about those violations).

Plaintiffs try to deflect from the applicability of *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999).  (*See* Opp. at 17-18.)  *Longman* held that where a labor union had issued a press release describing a complaint it had filed with the U.S. Department of Labor, the market was afforded "a full opportunity to evaluate" the labor union's claims.  197 F.3d at 685.  Plaintiffs argue that the market was better informed in *Longman*, as opposed to here, where the *Steves* Complaint was disclosed and publicly available, due to "all of the publicity about Food Lion's ongoing Labor disputes."  (Opp. at 18 (quoting *Longman*, 197 F.3d at 680).)  But Plaintiffs ignore what comprised that "publicity":  the labor union's press release and two subsequent press releases

---

[9]   The Fourth Circuit held that press releases issued by the defendant from early 1988 presenting a "promising financial outlook" could be found to be misleading only during the period *before* the disclosing news articles and press release were published.  *Id.* at 1261-62.

by Food Lion denying those allegations. *Longman*, 197 F.3d at 679-80. If a *press release* announcing the substance of a privately filed complaint was sufficient to educate investors as to the facts underlying those allegations, then the *Steves* Complaint must also suffice. That is particularly true here, where the allegations in the *Steves* Complaint are virtually identical to the allegations here (*see* Br. at 30) and where the *Steves* Complaint was disclosed to investors repeatedly. The market "had a full opportunity to evaluate [*Steves'*] claims and to reflect their risk in the market price" for JELD-WEN stock. *See Longman*, 197 F.3d at 685.

## II.    THE COMPLAINT FAILS TO PLEAD FALSITY.

Plaintiffs do not contest that the alleged misstatements were not false. (*See* Br. at 13-20.) In the absence of any actionable omission or false statement, Plaintiffs' claims fail.

### 1.    *The Competitiveness Statements*

With respect to the Competitiveness Statements, Plaintiffs offer no explanation how a reasonable investor could have understood statements regarding the competitive nature of the windows and doors markets to refer to the *doorskins* market. Instead, Plaintiffs identify an isolated statement that is vague as to what market is being described as "competitive," and imply that it refers to doorskins. (*See* Opp. at 18 (quoting Compl. ¶ 102 (quoting Prospectus at 61)).) In context, that statement from the Prospectus refers to the doors and windows markets, not doorskins. (*See* Prospectus at 102 ("We operate within the global market for residential and non-residential *doors and windows* with sales spanning 82 countries.") (emphasis added); *id.* at 103 ("In our North America segment, we primarily compete in the market for residential *doors and windows* in the United States and Canada.") (emphasis added).) A claim by Steves that the doorskins market was anticompetitive (which JELD-WEN strongly denies) cannot demonstrate that statements about *other*, larger markets being competitive were false.

### 2.    *The Pricing and Quality Statements*

Plaintiffs then argue that the Pricing and Quality Statements[10] *could* be material, misleadingly citing to cases where statements regarding competitiveness—not pricing—were held to not be puffery in light of alleged anticompetitive conduct.  (*See* Opp. at 19 & n.19.)[11]  But statements just like the Pricing and Quality Statements at issue here are routinely deemed immaterial puffery that are not actionable.  (*See* Br. at 17.)  Moreover, in all of the cases Plaintiff identifies, it was alleged that the statements regarding competition were false.  *See, e.g.*, *In re Henry Schein Inc. Sec. Litig.*, 2019 WL 8638851, at *12 (E.D.N.Y. Sept. 27, 2012) (plaintiff argued that the defendant "did not actually operate in a competitive market").  Here, there is no debate about the truthfulness of the Pricing and Quality Statements.  Plaintiffs agree that JELD-WEN employed the pricing strategy described in the Pricing Statements.  (*See* Br. at 14.)  And Plaintiffs do not contest that the Quality Statements were not false.  (*See id.* at 16.)

### 3.    *The Litigation Statements*

Plaintiffs do not contest that the Litigation Statements were opinions but argue that they omitted material facts about Judge Payne's findings made later in time in the Divestiture Decision. (Opp. at 19-20.)  But contrary to Plaintiffs' theory, "a statement of opinion is not misleading just because external facts show the opinion to be incorrect"; instead, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and

---

[10]    Plaintiffs treat the Quality Statement as being in the same category as the Pricing Statements despite the fact that it makes no reference to pricing. (*See* Opp. at 10-11 & n.8.)

[11]    For this proposition, Plaintiffs rely on *dicta* from *Longman*.  197 F.3d at 683.  But the examples the Fourth Circuit gave in *Longman* related only to how an *opinion*, not puffery, can be actionable. *Id.*  And *Longman* itself ultimately held that challenged statements relating to the cleanliness of stores, and "Food Lion's Extra Low Prices" were puffery and not actionable.  *Id.* at 685-86.

in context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  Here, the Litigation Statements disclosed what was known to Defendants at the time they were made.  (*See, e.g.*, Ex. 28 at 7; Ex. 31 at 8.)  The only thing Plaintiffs allege was not disclosed in the Litigation Statements was what Judge Payne would decide in the future.  (*See* Opp. at 19-20.)  Nothing in the securities laws requires companies to predict and disclose future events.

Notably, Plaintiffs do not challenge the basis of any of the opinions actually stated in the Litigation Statements.  They do not contest that JELD-WEN believed, and continues to believe, the jury verdict was erroneous; they do not contest that Judge Payne's ordering of a post-Merger divestiture in a private antitrust litigation was unprecedented; and they do not contest that JELD-WEN planned to appeal, and has.  Nor have Plaintiffs identified a single case where a court held that a company's opinion regarding the merits of ongoing litigation was actionably false.  In the rare instances courts have been called upon to address this theory, they have found opinions on the merits of ongoing litigation not to be actionable.  *See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 756-57 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 81-82 (S.D.N.Y. 2015).

## III.   THE COMPLAINT FAILS TO PLEAD SCIENTER.

Plaintiffs rest their allegations of scienter on a theory of recklessness, which they recognize requires them to allege conduct that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff."  (Opp. at 20 (quotation omitted).)  But Plaintiffs fail to support the critical element:  "a strong inference that [Defendants] intentionally or recklessly deceived, manipulated, or defrauded *investors*" that is "at least as compelling" as the inference that Defendants acted innocently or with some lesser degree of *mens rea*.  *Maguire*, 876 F.3d at 547 (emphasis added).

11

### A.   The Complaint Does Not Allege a Scheme to Defraud Investors.

Plaintiffs argue that "the JW Defendants" engaged in a "willful scheme" to kill off competition. (Opp. at 21-22.) But even if they had adequately pled the existence of such a scheme, Plaintiffs do not argue that the alleged scheme was *intended* to deceive *investors*, or that Defendants were reckless in not knowing it could. Plaintiffs instead claim that JELD-WEN—*two years before any of the Individual Defendants even worked for JELD-WEN* and over five years before the putative class period begins—acted in a manner designed to deceive Steves, other unnamed doors manufacturers, and the DOJ. (*Id.*) But the critical question under the securities laws is whether Defendants acted with an intent *to mislead investors*. Nothing about Plaintiffs allegations relates to investors or an intent to deceive them. As the Fourth Circuit has stated, "[a]n inference that an executive had enough knowledge to be aware that he was making an inaccurate statement might support an inference that he made a material misrepresentation but does not necessarily suggest an intent to mislead." *Maguire*, 876 F.3d at 548.

In *Maguire*, the Fourth Circuit rejected the plaintiff's argument that facts permitting "an inference that [a defendant] knew his statement was false" could support the next step of "*infer[ing] from that inference* that [the defendant] acted with scienter." *Id.* Plaintiffs present an even more attenuated theory of scienter than that rejected by the Fourth Circuit. They do not seriously contest that none of the alleged misstatements were false (*see supra* Part II), let alone that any Defendant knew as much. Instead, Plaintiffs merely identify a purported "scheme" to deceive Steves and other door manufacturers that they argue could not have been accomplished without the knowledge and active participation of the Individual Defendants." (Opp. at 22.)[12] To

---

[12]  Plaintiffs' claim that "'group pleading' . . . has nothing to do with scienter" is another red herring. The Fourth Circuit has made clear that plaintiffs must "allege facts that support a 'strong inference' that *each* defendant acted with at least recklessness in making the false statements." *Teachers'*, 477 F.3d at 184. And Defendants' opening brief clearly demonstrated Plaintiffs' failure

infer scienter, the Court would be required to (1) infer a "scheme" to impact doorskins competition from the allegation that the Individual Defendants *knew* that their statements regarding the doors and windows markets (not the doorskins market) could mislead investors on the topic of doorskins competition, and (2) further infer that Individual Defendants therefore *intended* to mislead investors. This "stacking inference upon inference" was rejected in *Maguire*. 876 F.3d at 548. Tellingly, Plaintiffs do not attempt to distinguish *Maguire* beyond vaguely insinuating (*see* Opp. at 23 n.23) that it is contrary to a Supreme Court decision *Maguire* repeatedly relies upon. *See* 876 F.3d at 546-51 (citing *Tellabs* nine times).

**B.     The Core Operations Doctrine Does Not Create a Strong Inference of Scienter.**

Plaintiffs argue the Court should ignore their failure to plead particularized facts supporting a strong inference of scienter because "interior molded doors are a core Jeld-Wen product." (Opp. at 23-24.)[13] But the truth the Complaint alleges was concealed (and then later allegedly revealed in the Divestiture Decision) was that the Merger and JELD-WEN's subsequent pricing of *doorskins* was unlawful. (*See, e.g.*, Divestiture Dec. at 6 (Dkt. No. 87-1).) Thus, to establish the applicability of the core operations doctrine here, Plaintiffs would need to plead that *doorskin sales* were a core operation of JELD-WEN. For example, in *Kiken v. Lumber Liquidators Holdings, Inc.*, a case upon which Plaintiffs rely, the court held that where defendants indicated that a "key

---

to do so. (Br. at 21-24.) Rather than engage with that point, Plaintiffs cite to over 90 paragraphs in the Complaint that do not specify how any Individual Defendant intended to defraud investors. (*See* Opp. at 22 n.22.) And Plaintiffs are wrong. The relationship between group pleading and scienter is that group pleading "is inconsistent with the 'strong inference' requirement." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). (*See also* Br. at 22-23.)

[13]   Plaintiffs later repeat this same theory under a different guise by arguing that the Individual Defendants' status as "senior executives, who were in charge of approving and implementing price increases" supports a strong inference of scienter. (*See* Opp. at 24-25.) That reformulation fails too. As previously discussed, the inference stacking necessary to make the leap from alleged knowledge of pricing conduct to a strong inference of an intent to defraud investors is not permitted in the Fourth Circuit. *Maguire*, 876 F.3d at 548. (*See also* Br. at 23-24.)

product" was "the key driver of the Company's success," that product was part of the core operations of the company.  155 F. Supp. 3d 593, 606-07 (E.D. Va. 2015).  But neither the Opposition nor the Complaint identify any statements indicating doorskins were a key product or primary economic driver for JELD-WEN.  (*See* Opp. at 23 (collecting statements on the significance of interior molded doors—not doorskins—to JELD-WEN's business).)  That is because doorskins were only an "ancillary product." (*See* Prospectus at 3.)

## C.    Plaintiffs' Remaining Theories Do Not Support a Strong Inference of Scienter.

In a final attempt to plead the requisite strong inference of scienter, Plaintiffs put forth two additional theories, neither of which has merit.  (*See* Opp. at 25-26.)  *First*, Plaintiffs argue that the resignations of Beck and Mallard support an inference of scienter.  (Opp. at 25.)  But as Defendants argued in their opening brief, and Plaintiffs do not contest, there is no allegation that Mallard (or Beck)[14] resigned under the sort of circumstances that have been found probative of scienter. (Br. at 24.)  Instead, the only authority Plaintiffs identify merely lists "the resignation of the Company's three most senior executive officers" as a factor the plaintiff "allege[d] indicat[ed] the presence of scienter" and offers no analysis of the probative weight, if any, of that factor.  *See Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016).

*Second*, Plaintiffs argue a new, unpled "temporal proximity" theory.  (Opp. at 25-26.)  That theory is that the Company's disclosure of an estimate of its probable loss from the *Steves* litigation nine days after issuing a press release disclosing the Divestiture Decision and JELD-WEN's intent to appeal is somehow strongly probative of scienter.  (*Id.*)  But that theory is nonsensical.  Nothing in the Earnings Pre-Release indicates that JELD-WEN knew anything it said in its October 6, 2018

---

[14]  The Complaint did not allege Beck's resignation was probative of scienter and also fails to plead any circumstances surrounding his resignation that would be probative of scienter.

14

press release was false. (*Compare* Earnings Pre-Release at 1, *with*, Ex. 34, at Ex. 99.1.) Instead, what JELD-WEN did on October 15, 2018 was simply account for the possibility the "appeal process is unsuccessful." (Earnings Pre-Release at 1.)

> **D.      The Most Compelling Inference Is That Defendants Acted Without Scienter.**

Plaintiffs ultimately argue that an inference of scienter is more compelling than that Defendants' acted innocently, or at least without scienter. (Opp. at 26.) But as shown above, the Complaint is devoid of *facts* from which it can be strongly, or at all, inferred that any of the Individual Defendants intended to defraud investors. Without such facts, Plaintiffs' theory of scienter is nothing more than innuendo and attenuated inference stacking, which is not enough. *See Maguire*, 876 F.3d at 548. Instead, the allegations suggest that the Individual Defendants believed the Merger and subsequent pricing conduct were lawful, and that they would prevail in *Steves*. (*See* Br. at 22.) Because Plaintiffs' scienter arguments as to JELD-WEN are derivative of the allegations as to the Individual Defendants (*see* Opp. at 26), that claim fails too.

## IV.     THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION.

Plaintiffs fail to identify a single case where loss causation was predicated on a later judicial decision on remedies where the company had *already been found liable* in a publicly filed jury verdict that the company *disclosed* to investors, or where a finding of liability caused a securities fraud loss. Instead, Plaintiffs suggest that loss causation is just a bump on the road to successfully pleading securities fraud and not a serious ground for dismissal. (Opp. at 27.) But the loss causation pleading standard is "largely consonant with Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be pled with particularity." *Katyle v. Penn. Nat'l Gaming, Inc.*, 637 F.3d 462, 471 & n.5 (4th Cir. 2011). And courts in this Circuit regularly dismiss securities fraud complaints for failing to sufficiently plead this element. *See Teachers'*, 477 F.3d at 186–87; *In re Maximus,*

*Inc. Sec. Litig.*, 2018 WL 4076359, at \*16 (E.D. Va. Aug. 27, 2018); *Glaser v. Enzo Biochem, Inc.*, 2005 WL 6952273, at \*5 (E.D. Va. July 14, 2005), *aff'd*, 464 F.3d 474 (4th Cir. 2006).

*First*, Plaintiffs assert that "[m]ere allegations" are insufficient to alert the market to the existence of securities fraud. (Opp. at 28 (citing *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004); *DoubleLine Capital LP v. Odebrecht Fin. Ltd.*, 323 F. Supp. 3d 393, 437-39 (S.D.N.Y. 2018)).) This assertion is incorrect, and plaintiffs' authorities contradict their argument.

*Nolte* does not support Plaintiffs' claim that they have adequately pled *loss causation*, because it does not speak to that issue. *Nolte* concerned whether the Fourth Circuit could take *judicial notice* of allegations contained in an SEC complaint filed during the pendency of the plaintiffs' appeal, not whether those allegations were sufficient to alert the market to securities fraud. 390 F.3d at 317 n.\*. The Fourth Circuit held only that it could not "assume the truth of" those allegations against the defendant for purposes of judicial notice. *Id.*

To state the obvious, loss causation does not require judicially noticeable facts. Instead, it involves exposure of "*new information*"—which can include allegations in a complaint—that reveals an alleged fraud. *Maximus*, 2018 WL 4076359, at \*17 (emphasis added). For example, in *Teachers'*, plaintiffs asserted that a complaint revealed the "'true facts'" of the defendant's alleged fraudulent scheme. 477 F.3d at 186. The Fourth Circuit rejected that argument, *but not because the complaint contained "allegations" rather than "facts." Id.* (emphasis added). Rather, the underlying complaint lacked allegations of the fraudulent conduct at issue and thus could not have caused the alleged loss. *Id.* at 186-87. Plaintiffs' cases confirm that complaints can apprise the market of new facts. *See, e.g.*, *AbbVie*, 2020 WL 5235005, at \*6;[15] *Teva*, 432 F. Supp. 3d at 174.

---

[15] *AbbVie*, which Plaintiffs submitted as supplemental authority (*see* Dkt. No. 88), further supports JELD-WEN's argument because the district court concluded that an earlier, publicly available complaint "alleging AbbVie's unlawful kickback scheme *as alleged in this case*" was

*DoubleLine* is equally unhelpful to Plaintiffs, who cite the court's analysis on the statute of limitations (Opp. at 28 (citing 323 F. Supp. 3d at 437-39)), not loss causation. In fact, *DoubleLine*'s loss causation discussion shows that disclosure of information that "*merely confirm[s] what the market already kn[ows]*" cannot cause a securities fraud loss. *See DoubleLine*, 323 F. Supp. 3d at 458-59 (emphasis added). In *DoubleLine*, the court found that "the market already knew" that defendant's CEO was potentially involved in the Petrobras bribery scheme, because there had already been news reports of his arrest in connection with the same scheme. 323 F. Supp. 3d at 458-59. Once those earlier news stories "let the cat out of the bag," subsequent news stories on the topic "were not corrective disclosures." *Id.* at 459.

Here, the *Steves* Complaint provided detailed allegations regarding the allegedly anticompetitive impact of the Merger and JELD-WEN's subsequent pricing conduct on the doorskins market, allegations the same as those plaintiffs assert in this action. (*See* Br. at 30.) And a jury rendered a decision consistent with those allegations well before the Divestiture Decision. (Ex. 24; Ex. 25.) Those events "let the cat out of the bag" long before the alleged class period began; the Divestiture Decision merely "confirmed what the market already knew." *See DoubleLine*, 323 F. Supp. 3d at 459.

*Second*, Plaintiffs assert that JELD-WEN's denials of liability prevented the truth from being known to the market before October 2018. (Opp. at 28-29.) Yet denials—particularly with respect to liability in ongoing litigation—are "irrelevant" to the loss causation analysis after the market learns new information. *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 485–86 (S.D.N.Y. 2008) ("IMAX's denial of accounting irregularities was irrelevant once the SEC inquiry had

---

sufficient to show new information revealing an alleged fraud. 2020 WL 5235005, at *1, 6 (emphasis added). Just like in *AbbVie*, the *Steves* complaint "alleg[ed the same antitrust conduct] as alleged in this case," and so was sufficient to alert the market to the alleged fraud.

alerted the market to their possibility"). This is consistent with the court decisions rejecting defense arguments that simultaneous denials mean that the truth was *not* revealed by disclosures. *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013) (finding that "a defendant's failure to admit to making a misrepresentation, or his denial that a misrepresentation was made" does not preclude loss causation); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006) ("the CBS Marketwatch article could establish that, despite [the] specific denial, the market understood by the end of the putative class period what it did not before").[16]

Unlike these authorities, the authority Plaintiffs rely upon does not even address loss causation, let alone the impact of denials upon loss causation. For example, *In re Signet Jewelers Ltd. Securities Litigation* involved the effect of a denial on the *reliance* element of a Rule 10b-5 claim at the class certification stage, not loss causation. 2019 WL 3001084, at *10, 15-16 (S.D.N.Y. July 10, 2019). Setting that aside, the denial at issue was made in a news article that "did not fully convey the severity of the allegations facing Signet" in a confidential arbitration. *Id.* at *16. On the other hand, later, more detailed, disclosures based on witness declarations in that arbitration *did* alert investors to the severity of those allegations. *Id.* at *6, *15-16. Here, nothing more "fully convey[ed] the severity of the allegations facing" JELD-WEN than the publicly-filed *Steves* Complaint in which those allegations were pled. *See id.* at *16. Thus, to the extent *Signet* is at all relevant here, it proves that when they truth is already "fully conveyed," subsequent disclosures of the same allegations, like the Divestiture Decision, cannot trigger a securities fraud loss.

---

[16] If denials were sufficient to avoid disclosure, then there still has been *no* corrective disclosure, given that JELD-WEN is still contesting (and appealing) the soundness of the verdict and trial court's rulings in *Steves*. (*See also* Br. at 29.)

18

*Third*, Plaintiffs argue that they can plead claims related to alleged price-fixing in the doors market even though neither corrective disclosure says anything at all about price-fixing in the doors market. (*See* Opp. at 29; Br. at 25-26.) Plaintiffs make that argument by quoting language from *Singer* stating that a "fact-for-fact" disclosure is not required to prove loss causation. (Opp. at 29.) But that language relates to the idea that truth can be revealed through a series of partial disclosures, rather than one complete disclosure. *Singer*, 883 F.3d at 446 (quoting *Katyle*, 637 F.3d at 472). Plaintiffs cite no authority holding that a disclosure need not say anything at all about the allegedly undisclosed truth. That is because corrective disclosures must relate to "the fraudulent nature of the practices about which a plaintiff complains," not "some other negative information about the company." *Katyle*, 637 F.3d at 473.

*Fourth*, as discussed in detail above, neither corrective disclosure revealed anything new to the market. (*See also* Br. at 26-27.) And Plaintiffs are completely silent in response to JELD-WEN's argument that the pendency of that appeal means there can be no "materialization of the risk" theory to loss causation. (Br. at 29.) Finally, the asserted corrective disclosures—relating to interior molded doorskins—did not reveal the falsity of JELD-WEN's generalized pricing and competition-related statements. *Katyle*, 637 F.3d at 473; *see Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005).

## V.   THE CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Contrary to Plaintiffs' assertion, no "fact intensive inquiry" is needed to figure out when a reasonably diligent plaintiff could have known that JELD-WEN was engaging in allegedly anticompetitive conduct and that their public statements may have been false. (Opp. at 35.) The evidence was everywhere:

- On June 29, 2016, the Steves Complaint detailed the same anticompetitive conduct Plaintiffs claim shows the misleading nature of the statements at issue (Br. at 30);

19

- A publicly filed brief by Steves in August 2016 outlined the same antitrust strategy explained in the Divestiture Decision (*id.*);

- JELD-WEN often updated investors on the Steves case before the verdict (*id.* at 6); and

- Plaintiffs admit that the Steves litigation was disclosed and that market analysts assessed that risk (Compl. ¶¶ 118-121).

And the jury verdict did, in fact, contain detailed conclusions about the "true reasons" for JELD-WEN's pricing and competitiveness success. It found that "JELD-WEN's acquisition of CMI violated *Section 7 of the Clayton Act*"; that JELD-WEN's violation "caused an injury to Steves that was of the type that the *antitrust laws* were intended to prevent"; and that plaintiff was entitled to damages "for *antitrust injuries*" because JELD-WEN "*overcharge[ed]* Steves for doorskins." (Ex. 24 at 2-3 (emphases added).) In the span of about one page, the verdict reveals that JELD-WEN was found to have committed an antitrust violation (tipping off a potential plaintiff about the potential falsity of the competitiveness statements Plaintiffs now take issue with) and overcharged Steves (same, but for pricing). A reasonably diligent plaintiff would have known by February 15, 2018 about these potential claims, a point Plaintiffs' authorities elsewhere support. *See Cooke*, 998 F.2d at 1263 ("[A]s soon as Appellants were apprised of the possibility of fraud, they were under a duty to investigate any misrepresentations made by [the defendant]").

Last, Plaintiffs' claim that no reasonably diligent plaintiff would have discovered the "findings of fact" made in the Divestiture Decision is irrelevant. Plaintiffs identify no authority holding that the discovery of potential claims of security fraud requires judicial findings of fact. And, the only thing new about the Divestiture Decision was Judge Payne's decision that divestiture was warranted, a risk the market was aware of and prepared for. (*See* Br. at 30.)

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: September 11, 2020

Respectfully submitted,

 */s/ Brian C. Riopelle*
Brian C. Riopelle (Va. Bar No. 36454)
Brian E. Pumphrey (Va. Bar No. 47312)
Brian D. Schmalzbach (Va. Bar No. 88544)
Garrett H. Hooe (Va. Bar No. 83983)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1084
Fax.: (804) 698-2150
briopelle@mcguirewoods.com
bpumphrey@mcguirewoods.com
bschmalzbach@mcguirewoods.com
ghooe@mcguirewoods.com

Sandra C. Goldstein, P.C. (*pro hac vice*)
Rachel M. Fritzler (*pro hac vice*)
Jacob M. Rae (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
sandra.goldstein@kirkland.com
rachel.fritzler@kirkland.com
jacob.rae@kirkland.com

*Attorney for Defendants JELD-WEN Holding,*
*Inc., Mark A. Beck, L. Brooks Mallard, Kirk*
*S. Hachigian, and Gary S. Michel*

21

**CERTIFICATE OF SERVICE**

I certify that on the 11th day of September, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to all counsel of record in this case.

 /s/ Brian C. Riopelle
Brian C. Riopelle (Va. Bar No. 36454)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1084
Fax.: (804) 698-2150
briopelle@mcguirewoods.com