IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


In re:  JELD-WEN Holdings, Inc.

Securities Litigation,


3:20CV112


Before:  HONORABLE JOHN A. GIBNEY, JR.,
United States District Judge


Motion to Dismiss

September 25, 2020
Richmond, Virginia


ZOOM Hearing

**GILBERT F. HALASZ, RMR**
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, Virginia 23219

(804) 916-2248

THE CLERK: Would you like me to call the case?

THE COURT: Yes, please.

THE CLERK: Okay.

Case number 3:20 CV 112 in re: JELD-WEN Holdings, Inc. securities litigation.

The plaintiff, Plumbers and Pipe Fitters National Pension Fund, Public Employees Retirement System of Mississippi, and Labor Pension Fund represented by Robert Rothman and Steven Toll.

The defendants JELD-WEN, Inc, Mark Beck, Brooks Mallard, Gary Michelle and Kirk Hachigian are represented by Mr. Brian Riopelle and Ms Rachel Fritzler.

And defendants Onex Corporation, Onex Partners Manager, LLC, and other Onex individuals are represented by Mr. Roman Lifson and Mr. Peter Simmons.

THE COURT: All right. Good morning, everyone.

Thank you for coming today.

If we could, when you are not talking if you could mute yourself probably would be good because sometimes we get feedback when people have their microphones open when they are not talking.

That includes everybody.

Okay.

Well, then a lot of people don't seem to be muting themselves, or at least it doesn't show up. All right.

Before we go too much farther -- Mr. Strauser, will you please turn on your camera so we can -- I can introduce you to these folks.  Since this case started I have a new clerk.  His name is Matthew Strauser, and he should be on the computer screen for you to see right now.

He is first-rate law student, was a first-rate law student at the College of William and Mary.  And I am very fortunate to have him here.  And he played football at Princeton.

Okay.  So, we are here today on the defendants' motion to dismiss.

Who is going to handle this for the JELD-WEN Holdings and individual defendants?

MR. RIOPELLE:  Brian Riopelle, McGuireWoods.

Rachel Fritzler with Kirkland and Ellis will be handling the securities argument.  And I will be handling the statute of limitations argument.

THE COURT:  Okay.  All right.  So, let me see if I have got this.

Who is going to be handling it for the other defendants?  Is the name of the other company, is it

One Nex or On Nex?

MR. LIFSON:  It is On Nex, Your Honor.

This is Roman Lifson with Christian Barton.

Peter Simmons, who is lead counsel, will be handling the argument for the Onex defendants.

THE COURT:  All right.

All right.  Who is going to be handling it for the plaintiffs in this case?

MR. TOLL:  Your Honor, good morning.  I am Steven Toll with Cohen, Milstein, Sellers and Toll.  And lead counsel, Rob Rothman, will be arguing from the plaintiffs.

THE COURT:  All right.

And you are Mr. Rothman.  All right.

Well, good morning to you all.

Ms Fritzler, I guess you are up.

Go ahead ma'am.

MS FRITZLER:  Good morning, Your Honor.  Rachel Fritzler on behalf of the individual defendants.

As Mr. Riopelle said, I will be addressing why the plaintiffs have failed to state a claim under the securities laws.

At the end of the day the primary reason the plaintiffs' claim fails is because they have taken the allegations of breach of contract and antitrust

violations in the Steves litigation, and they have simply added it as a fraud allegation and dressed it up as a fraud claim in this court.

This law suit is nothing more than an opportunistic attempt to capitalize on the fact that Steves actually prevailed before a jury and is an attempt to secure a second win from JELD-WEN.

The plaintiffs are gambling that this court will agree with the plaintiffs that what JELD-WEN did in its disclosures of the Steves allegations and its continued disclosures of the potential risk of that litigation was not enough. That JELD-WEN actually had to confess to the allegations in the Steves complaint even though JELD-WEN was actively defending that litigation, and even though JELD-WEN believed, and continues to believe that that litigation is meritless.

That is not the law. There is no requirement in the securities laws to preemptively admit to wrong doing. And is not supported by the facts alleged in plaintiffs' complaint.

THE COURT: But what they say is that JELD-WEN kept saying we are in a highly competitive market, and we are making scads of money because we have pricing controls and discipline over who gives

discounts and that sort of thing.  And, in fact, I think the evidence, at least according to Judge Payne, is that it wasn't competitive.  And if I read the evidence correctly in the Interior Molded Doors litigation that is wrapping up, it looks like JELD-WEN and their main competitor kind of teamed up to rig prices on all kinds of products, and they are not saying you have to confess, but you ought to tell people that so that people can know they are making an investment that could go kaplooie in their face.

MS FRITZLER:  Your Honor, especially what the securities laws require is that a company disclose allegations of wrong doing so that the market is aware of it, and that they disclose the possibility of loss.  That is exactly what JELD-WEN did here.

Even in cases, for example, in the UBS case where the bank ended up entering a deferred prosecution agreement and admitting that it engaged in a conspiracy to defraud the IRS, and entered into a settlement agreement for three quarters of a billion dollars, the Second Circuit found that the company had done all that was required under the securities laws because it had disclosed the DOJ investigation timely, and also disclosed the risk of

loss.  The securities law --

THE COURT:  But you are not addressing the question I asked.  Why aren't they required to disclose that they had the sweetheart deal they cooked up with their competitors to rig all kinds of prices?

MS FRITZLER:  Well, in the first instance, Your Honor, to the extent that you are referring to the alleged price fixing conspiracy, there are allegations in the plaintiffs' complaint that touch on the alleged price fixing conspiracy, but that is not the premise of their complaint, and they can't state a claim for securities fraud based on that argument.

THE COURT:  Isn't that pretty strong evidence of the fraudulent activity in this case?

I mean, I don't know why they don't cite it -- of course -- I don't know why they don't cite it a little more heavily, but they don't.

MS FRITZLER:  Your Honor -- I apologize, Your Honor.

THE COURT:  Go ahead.  I'm sorry.

MS FRITZLER:  The reason they don't cite it more heavily, Your Honor, is because they can't connect it to a loss that they have suffered.  They

can't plead loss causation, and they haven't even tried with respect --

THE COURT:  But isn't it strong evidence of the concealment and wrongful conduct in this case, if not the precise conduct, but kind of like 404 evidence.

MS FRITZLER:  Your Honor, their scienter conduct -- sorry -- the scienter analysis here is not whether any of the individual defendants acted with an intent to harm competition or whether they acted to harm competitors.  The question is whether they attempted to defraud investors.  And that is what plaintiffs have not alleged.  It was simply not the case that when companies engage in unlawful activity they are automatically guilty of securities fraud.  The PSLRA requires plaintiffs actually plead facts that lead to a strong and compelling inference of scienter that these individual defendants when they made these alleged misstatements did so with the intent to mislead the market.  And they haven't done that here.

THE COURT:  All right.  Go ahead.

MS FRITZLER:  Your Honor, the plaintiffs cite no cases to support their novel theory that the securities laws require a defendant to preemptively

confess to liability, and that is because there aren't any.  It is because it would turn the legal system on its head, Your Honor, if a company did not have the opportunity to defend itself in litigation. Plaintiffs' rule would create a system where a public company would have to decide whether to rip double liability if it defended in litigation unsuccessfully, regardless of what it believed about the merits of those litigations.  Because if it lost it would then face a securities claim.  So this would put companies in a box so that they had to settle preemptively or else risk double recovery. That is not what the securities laws require.

Here it is also important to note that the competitiveness statements that the plaintiffs claim were false or misleading were all made in the context of JELD-WEN's larger doors and windows market.  They were not specific to doorskins.  So the allegation of anticompetitive conduct here that they have tried to connect to a loss all revolve around the Steves allegations and the alleged anticompetitive merger, the alleged anticompetitive activity in doorskins.

But the statements that were made about competitiveness were about the larger market, they

were not specific to doorskins.  And there is no -- there are no facts that have been pleaded to show why the statements were misleading.

Plaintiffs rely heavily on the Fourth Circuit's decision in Singer to suggest that companies have to preemptively accuse themselves of wrong doing in situations like this.  But that is not what Singer held.  And it stretches the holding too far.

In Singer the defendant company had organized a training committee for surgeons so that it could deliberately train surgeons to miss-code the defendant company's procedure and intentionally deceive insurers.  They even set up a coding hot line for surgeons to call and get advice on how to deceive insurers.  So when the defendant companies specifically spoke about its coding training and didn't disclose that wrong doing, the Fourth Circuit found it was misleading because there were no allegations in the market, there were no complaints, and the market had no reason to believe that there might be some misconduct.

Here this case differs in two important respects.  The first is that distinct allegations in the complaint were filed publicly seven months before JELD-WEN's IPO.  So the very first time that

the company spoke to investors in the prospectus it disclosed the Steves complaint, and analysts from the very beginning were aware of the risk posed by the litigation.  So there was no need to disclose facts that were otherwise hidden from the market.

The other important distinction here, as I said, is that there is a fundamental mismatch.  And what the competitiveness statements were addressing, and what the -- and what the alleged misconduct was, which is specifically in the doorskins market.

Plaintiffs' argument would lock companies into a cycle of endless litigation where the next thing you know if a company were to, you know, if JELD-WEN were to not prevail on this motion to dismiss it would then face a new securities complaint saying that it was fraud for the company to try to defend in this action.  That is not the way the securities laws work.  That is not the way they were designed. And it would frankly be a devastating result to the legal system and to the economy because it would force companies to settle meritless litigation at the outset.

I would like to briefly touch on why the other categories of statements that the plaintiffs allege to have been false are also not actionable.

The pricing and quality statements that are alleged in the complaint are described as false statements. But they are not actually pled to be false. The Fourth Circuit has said under the PSLRA, under the heightened pleading standard, plaintiff has to actually allege facts that are sufficient to show why the statement is false. And it is this why that is actually missing from the complaint.

The pricing -- JELD-WEN's description for its pricing statements and its descriptions of the quality of its products were in fact true, and plaintiffs haven't alleged any facts to say that they weren't.

They are also not actionable for the further reason they are puffery. Puffery is something the courts recognize as vague, rosy affirmations, corporate optimism, things like pricing discipline and pricing strategy. And these are exactly what courts have routinely recognized to be not actionable under the securities laws because no reasonable investor would consider them material.

Lastly, the litigation statements that plaintiffs identify as supposedly false and misleading are not actionable because they are opinions. Generally speaking, opinions are not

actionable under the securities laws because they cannot be shown to be objectively false or true. But OmniCare described a narrow circumstance where opinions may be actionable if a plaintiff can show two things; first, that the opinion actually was objectively false; and two, that there was no reasonable basis for the speaker to hold that opinion.

Plaintiffs haven't alleged either one of these factors.  It is self-evident that the statements that the defendants made about the Steves litigation were opinions.  Their statements about the merits, their statements about the erroneous jury verdicts, and what they viewed to be Judge Payne's erroneous divestiture decision, were all statements of opinion that cannot be proven true or false.  This is something that courts frankly haven't examined very often because it is self-evident that litigation statements are opinions.  But the few courts that have considered it have confirmed it is simply not a matter that is black or white, that you can confirm one way or the other.  And JELD-WEN and the individual defendants absolutely had a reasonable basis to hold the litigation opinions in their view that they would prevail on the litigation.  They

were aware the DOJ had looked at the merger and chosen to take no action before the merger was closed.  They also knew that Steves went to the DOJ and complained of the exact same conduct that is alleged to be anticompetitive in Steves.  And the DOJ looked at the merger again, and it looked at the pricing strategies specifically.  And again the DOJ chose to take no action.

So under these facts it is absolutely reasonable for the defendants to have had -- to honestly believe their opinions that they would prevail in the litigation.

THE COURT:  Let me ask you this.

Do you think it can be proved that it was not a competitive market?

MS FRITZLER:  Your Honor, I think it can be adjudicated, but I think --

THE COURT:  Well, what does that mean?

MS FRITZLER:  Well, Your Honor, I would suggest -- I would say, no, it cannot be proven true or false in the sense that -- in a way that The Court is talking about in OmniCare when it talks about something that is objectively true or objectively false.  Because here, for example, the DOJ twice determined that it was not

anticompetitive.  And then in the Steves litigation Judge Payne concluded that it was.

That suggests to me that it cannot be proven conclusively in a way that takes it outside the realm of opinion.

THE COURT:  Come on.  I mean just because two people reach different conclusions doesn't mean one of them is not right and one of them is not wrong.

MS FRITZLER:  Your Honor, I agree with that statement.

But this is not the way that the Supreme Court considered opinions.  Again, there is a very narrow task for plaintiffs to allege an actionable opinion. And through the litigation --

THE COURT:  It is not an opinion.  It is a fact.  These people were cheating all over the place.

MS FRITZLER:  Your Honor, even if that is true, and even if the defendants were engaged in anticompetitive conduct, plaintiffs' claim still fails because they have not alleged that the defendants acted with an intent to deceive investors.

Again, going back --

THE COURT:  Who were they trying to deceive?

MS FRITZLER:  Your Honor, they may -- I can't speak to that.  I don't believe they were trying to deceive anyone.

THE COURT:  Well, let's assume for a second that they were lying about whether the market was competitive, and that they said that in an earnings call.  Who were they trying to deceive?  Were they hoping by doing that that more people would buy doors?

MS FRITZLER:  Your Honor --

THE COURT:  Doorskins.  Sorry.

MS FRITZLER:  Your Honor, I don't think statements you are suggesting, that statements in an earnings call are directed to investors, I agree.  I agree that that is correct.  But I do not believe that the facts alleged in the complaint support the conclusion that the defendants were lying with the intent to deceive investors.

THE COURT:  Who were they trying to deceive?  Assume for a second they were lying.  Who were they trying to deceive?  Or were they trying to influence?

MS FRITZLER:  Your Honor, I will concede that statements made on earnings calls are statements made to investors.

THE COURT:  Okay.  That may not be your strongest argument.

MS FRITZLER:  Your Honor, with all due respect, I do believe that the pleading standard here is something that plaintiffs have simply not, have not met.  There is simply not a clear and compelling inference of scienter to be drawn that these individual defendants were acting with intent.  But even if The Court finds that they did act with intent, plaintiffs' claim still fails because they have not adequately pleaded loss causation.

THE COURT:  Go ahead.

MS FRITZLER:  In order to plead loss causation plaintiffs would have to plead that the market learned new facts about the fraud, and that as a result of those new facts the stock dropped.

Plaintiffs point to Judge Payne's divestiture decision and to the earnings pre-release call as the corrective discloses whereby the market finally learned the truth.  Setting aside the fact that JELD-WEN had repeatedly disclosed the allegations, had repeatedly disclosed the damages that were sought and the relief that Steves was seeking, and even setting aside the fact that the jury verdict and the jury damages award had already been promptly

disclosed, plaintiffs take the position that it wasn't until the divestiture decision that the market learned of the fraud.

THE COURT: Let me ask you a question about that. I have never tried a securities case. And blessedly -- as a judge. And blessedly nobody ever asked me to try one when I was a lawyer.

How do you prove that a particular statement influenced the market at trial? Do they have experts that come in and testify about that?

MS FRITZLER: Your Honor, that is exactly right. When it is not matter of pleading, which is what we argue here, obviously, they have not met the pleading standard, but if they were to proceed past the motion to dismiss both sides would introduce experts that take a look at the impact on the market and can opine on the materiality and such things.

THE COURT: Thank you.

MS FRITZLER: So in this instance the plaintiffs have not identified any new facts that were not previously known to the market that were included in either the divestiture decision or in the earnings pre-release. Because of that they cannot show what the Fourth Circuit called the causal link. The Fourth Circuit said that what is

required here are facts to show that there is causation with sufficient specificity.  And so they have ordinarily it's analyzed under the rule 9(b) standard.  Plaintiffs have not alleged any specific facts to show that there was new information disclosed to the market.

The cases routinely recognize that complaints, news reports, analyst reports, can all serve as corrective disclosures.  It is not, as plaintiffs suggest, that the market had its head in the sand until there was some final judicial finding of fact.  All of the, along the way the Steves complaints, JELD-WEN's disclosures, analyst reports that were analyzing the litigation, the jury verdict, all of this informed the market there was no new information, and so they cannot connect the loss to anything new.  And that is what the securities law require.

THE COURT:  Okay.

Anything else?

MS FRITZLER:  Not unless Your Honor has further questions.

THE COURT:  Thank you very much.

Mr. Riopelle, let's hear from you, sir.

MR. RIOPELLE:  Do you want -- Your Honor, do

you want to do the statue of limitations now or do you want to hear plaintiffs' rebuttal to the securities claim?

THE COURT:  What I thought we would do would be to hear your argument on the statute of limitations and then Mr. Toll, or whoever, can respond to all of them.

MR. RIOPELLE:  Sure.  Absolutely.  I wanted to make sure that we are on the same page.

THE COURT:  Have you talked about how you want to do this?

MR. RIOPELLE:  No, Your Honor.

THE COURT:  Okay.

Well, go ahead.  Then go ahead.

MR. RIOPELLE:  We want to do however you want to do it.

THE COURT:  Well, that is very kind of you, but go ahead.

MR. RIOPELLE:  So, before I hit the statute of limitations argument, let me make one comment.  And I apologize for going back.  One, on your questions about the market being competitive, and tying it back to Steves, one thing you will recall, and make sure Your Honor understands, is that the market, you know in Steves was doorskins -- and the statements

that were made to investors during the investor calls were not about doorskins, they were about the doors and windows market.  There are no statements to investors in either the calls or disclosures about the doorskins market whatsoever.  So I just from factual point of view I just wanted to make sure you understood that.

THE COURT:  Got you.  Thank you very much.

MR. RIOPELLE:  On the statute of limitations, Your Honor.

So, the starting point for the limitations analysis obviously begins with identifying the commencement of the period.  In other words, you know, when did the clock start ticking?

To help guide us on that we do have two uncontested facts.  We know that plaintiffs filed their complaint on February 19, 2020.  And we know that there is a two-year statute of limitation.  So under Merck, the Supreme Court holding in this, the cause of action begins to accrue, the clock starts ticking, when the plaintiffs did in fact discover, or a reasonably diligent plaintiff would have discovered, the facts constituting the violation.

Your Honor, that is important language, the facts constituting the violation.  Because it is

important to note that in the Merck decision the court held that the facts constituting the violation included the misstatements or omission and scienter.

But the Supreme Court did not hold that the facts constituting the violation included reliance or loss, or loss causation. That is based, frankly, on the statute and the history of the statute.

Under 10(b) a plaintiff has to prove, and I will just quote it, that a defendant made a material misrepresentation or omission in connection with the purchase of a security, and that the defendant acted with scienter. That is what the statute says. And it makes sense. Because if The Court recalls, 10(b) was originally a criminal regulatory statute. It wasn't until later that the Supreme Court found there was an implied right of private action. So it is the private action that brings in loss and loss causation. But under the language of the statute 10(b), and under the language of the statute of limitations, the facts constituting the violation are only the misrepresentation or omission and scienter.

So to put it more basically for this case, is had the plaintiffs, or should of the plaintiffs discovered facts relating to the material

misrepresentations and scienter before February 19, 2018?  And the answer is yes for most of them, but not all, but yes for most of the alleged misrepresentations.

So what is the -- when did the clock start ticking?  The clock actually should have started ticking on January 17th, 2017, is the date of JELD-WEN's prospectus for its IPO.  The securities complaint, the complaint in this case, is based on the anticompetitive aspects of the 2012 merger, JELD-WEN's alleged price increases, or actually JELD-WEN's price increases, JELD-WEN's alleged breach of contract, and then JELD-WEN's denial of liability.

All of this happened and was disclosed before the class period.

And it was known throughout the entire class period.  It was disclosed in the January 2017 prospectus, which referred to the Steves complaint.  The Steves complaint contained allegations about the alleged anticompetitive conduct, Steves complaint had allegations about JELD-WEN's price increases, the Steves complaint had allegations about the breaches of contract, and the prospectus denied liability.  All that was known as alleged and

disclosed to the market as of January of 2017.

But in no event did the clock start ticking later than February 15th, of 2018 when the jury returned a verdict against JELD-WEN in the Steves case.

The verdict, as I know Your Honor knows, the verdict found antitrust liability, the verdict found breach of contract based on increased prices, and the verdict awarded over $58 million in antitrust damages. So when you treble that it is over $175 million, and that was disclosed to the market on February 15 of 2018.

Now --

THE COURT: Was it a specific verdict or general verdict?

MR. RIOPELLE: Under your language I think what you are asking is probably a general verdict. I know it is one of the exhibits to the papers we filed. They did a general verdict. Do you find them liable? So they went through. Did you find them liable for antitrust? Yes. Did you find them liable for breach of contract? Yes. What damages do you award? Actually they break out the damages, if I recall, Your Honor, into like five categories.

THE COURT: Right.

MR. RIOPELLE:  So, I know plaintiffs say in their papers that -- going on your point -- if it was a general verdict it doesn't disclose anything. But under Merck, Your Honor, it doesn't take very much diligence if you get that verdict to go back and get the publicly-available Steves complaint and see what the allegations were.

So, under Merck all of the alleged misstatements before February 19 of 2018 should be dismissed.  The alleged misstatements made before February 19 of 2018 were all statements outside the two-year window, for which plaintiff had contradictory evidence that was disclosed or should have disclosed, they should have known was disclosed, the facts of the violation of the language in Merck.

Again, it is uncontested that the Steves complaint was publicly filed before any of the allegedly misstatements -- alleged misstatements were made.  Uncontested that JELD-WEN consistently disclosed the allegations and referred investors to the Steves complaint.

And the one thing to look at, Your Honor, is the allegations in the Steves complaint focus on the exact same conduct that the plaintiffs allege was

concealed from the market.

So, if you go through the lacy complaint in this case for each one of the alleged misstatements plaintiffs consistently characterized the misstatements -- sorry, let me rephrase -- they consistently characterized it as a misstatement because it failed to disclose the anticompetitive conduct, and it failed to disclose the conduct against the door manufacturer.  For example, if you look at paragraph 147 of the complaint, all of the way throughout the misstatements they consistently say that is the reason and they consistently refer back to paragraph 147.  But both of these allegations were asserted in Steves, and in fact were central to the Steves litigation.

I would say, Your Honor, that the way of handling of this by by getting rid of all the misstatements before February 2019, sorry, February of 2018, is similar to the way you handled it in the price-fixing cases.  If you recall, in the price-fixing cases, the motion to dismiss, you dismissed all of the claims for sales that occurred before four years before the date of the complaint.  That is what you should do here.

So, just so it is clear on the record, the

alleged misstatements that are contained in paragraph 143 to paragraph 208 should be dismissed; and the alleged misstatements in paragraph 211 through 231 survive, at least based on a statute of him limitations argument.

Obviously, as Ms Fritzler argued, we think they should be out.  But those stay.  So just so The Court is clear, that would mean that only purchases that occurred after February 21st of 2018, because that the is next alleged misstatement in the complaint, only purchases occurred after February 21st of 2018 would continue in this case based solely on statute of limitations.

THE COURT:  All right.

MR. RIOPELLE:  I don't know if you have any questions.

THE COURT:  I think I have got it.  Thank you.  All right.

Mr. Toll, would you like to respond to that now, or --

MR. TOLL:  Mr. Rothman will handle the argument.

THE COURT:  Mr. Rothman, let's hear from you.

MR. ROTHMAN:  Is there any particular issue I should address?  Or happy to address all the issues

that defendants raise?

THE COURT:  Well, tell me this.  Mr. Riopelle says that anybody with a little energy can put together the verdict in February 2018 with the allegations in the complaint and figure out what the real facts are.

And he says therefore that anything -- he says that that occurred before the statute of limitations started to run, so that those statements up until two years before the suit was filed are out.

What do you think about that?

MR. ROTHMAN:  With all due respect, I believe he is mistaken under applicable Supreme Court precedent.  Under the Merck case, which he mentioned, the plaintiff needs to be able to know all of the elements of the cause of action, including scienter.  A plaintiff would not have known about the defendants' state of mind or recklessness from a general jury verdict.  Simply because there were allegations in a complaint filed by a competitor, that does not mean that the jury accepted each and every one of those allegations. It was only when Judge Payne issued its 149-page findings of fact that the investors were finally

able to discover who knew what and when.

The jury verdict would not have told them any of that, and without that critical piece of information about that element of our claim, scienter, plaintiff would not have been able to plead a securities law violation prior to that date.

THE COURT:  Let me ask you this.  In your complaint you have a bunch of information that is attributed to confidential witnesses.  Sort of the civil equivalent of informants, I guess.

How did you all find that information out?

MR. ROTHMAN:  Well, Your Honor, after we had learned of the facts contained in Judge Payne's decision we were able to hire an investigator, and we have in-house investigators as well.  We were able to find former employees of the company who disclosed those facts to us.  An investor doesn't have that obligation at the time that a jury verdict comes out when there is no particular finding in that jury verdict.

THE COURT:  Okay.

So that wasn't -- that has no impact on the statute of limitations.

MR. ROTHMAN:  There is no impact on the statute of limitations.

THE COURT:  Go ahead.  Sorry.

MR. ROTHMAN:  I am sorry, Your Honor.

THE COURT:  No, go ahead. If you are stuck with the information that Mr. Riopelle says you are stuck with from paragraph -- after the verdict -- I can't remember what the numbers were -- but they go up to 231.  Can you prove loss causation from that?

MR. ROTHMAN:  We can prove loss causation from these as well, because, again loss --

THE COURT:  What was it, 19 percent?

MR. ROTHMAN:  The 19 percent came out after Judge Payne's decision.  Defendants continued to deny the allegations.  They said Judge Payne got it wrong.  The findings of fact are erroneous.  And then ten days -- and they also said at that point, we can't estimate our probable loss under this.  And then ten days later they came out and said, you know what?, it is 76.5 million.

THE COURT:  I never did understand that.  If the verdict was for 50 million and it is trebled, how do you get to 76?

MR. ROTHMAN:  Your Honor, that --

THE COURT:  I guess he can answer.

MR. ROTHMAN:  That is part of the reason why plaintiffs would not be able to allege a securities

law violation just on the verdict.  Because the amount is still in flux.  No one has admitted anything.  Defendants doubled down after the jury verdict and continued to make their false statements that this is wrong, this is a competitive market, people are behaving rationally, this is price optimization, our success is due to pricing discipline, strategetic pricing, favorable pricing. And then they come out and they say, and don't forget, investors, the DOJ approved this not once but twice.  Without telling investors that they in essence tricked the Department of Justice by entering into long-term supply agreements that they then started to breach.

THE COURT:  Let me ask you this.  What happens if Judge Payne gets reversed?

MR. ROTHMAN:  Your Honor, whether or not what happened in the Steves litigation is a technical violation of the antitrust laws is somewhat irrelevant to our claim.  Our claim is that when they spoke of a highly competitive business environment with rational pricing and people behaving with respect to pricing, whether or not there is a technical antitrust violation those statements are still false and misleading to

investors.

THE COURT: Okay.

MR. ROTHMAN: That is not what was going on in the market regardless of whether or not it amounted to a technical antitrust violation.

THE COURT: Okay. All right. Go ahead. Whatever else you want to cover, Mr. Rothman, I will be happy to hear you.

MR. ROTHMAN: The other issue I wanted to cover was one that the defendant had raised a few times about the market.

That we are somehow confusing the market, it is market, the doorskins that we are complaining about, that they were talking about the market for doors. As Judge Payne found, the defendants' effort to cutoff or restrict the access to doorskins was for the express purpose of eliminating competition in the door market. Doorskins are a critical component to the door market. So by cutting off access to doorskins you can't compete in the door market, which is the market they were talking about. So the markets are interrelated. Their actions in the doorskin market, as Judge Payne found, were for the purpose of eliminating competition in the market they were talking about.

THE COURT: Okay.

MR. ROTHMAN: They never disclose that their strategic and favorable pricing and pricing optimization and discipline was breaching long-term supply agreements for the purpose of eliminating competition in the door market when they were conspiring with their biggest competitor to fix prices.

THE COURT: All right. Okay. Anything else, Mr. Rothman?

MR. ROTHMAN: Not unless Your Honor has any questions.

THE COURT: Thank you.

Ms Fritzler, do you want to respond briefly, as in briefly, to that?

MS FRITZLER: Yes, Your Honor, I will respond very briefly.

First, I would point out that the market loss, the drop that the plaintiffs point to, actually also coincided with negative earnings releases and downward guidance, and so that it is not the case --

THE COURT: All right. We need to stop one second.

MS FRITZLER: Yes, Your Honor.

THE COURT: I apologize for that. My wife is

conducting a ZOOM hearing at our house today.  She is the chairman of the State Bar Disciplinary Board, and they are trying to determine whether someone should be disbarred.  And she said that she can't have the dogs there because they are liable to bark in the middle of it.  So the dogs are here at the courthouse with me, which is one of the advantages of having a job with life-time tenure.  I apologize that my dog just barked.  And they are having a dispute over a rawhide at this moment.  But I think I solved that by giving an extra rawhide.

Ms Fritzler, I am very, very sorry about that. Can you please start your rebuttal again?

MS FRITZLER:  Yes, Your Honor.

I understand disputes over a rawhide are also very important.

THE COURT:  They are highly competitive.  Those are competitive.

MS FRITZLER:  They are in fact.

What I would say is that the -- two things. First is that what the plaintiffs failed to acknowledge is that the divestiture decision -- the stock dropped after the divestiture decision and the earnings pre-release also coincided with the release of negative financial performance metrics and

reduction in guidance that analysts specifically noted was evidence also of operational issues in the windows market. So completely disconnected from what they claimed to be the alleged fraud. So it's not the case that this is connected somehow with new information that the market was learning for the first time.

The other thing that I would say is that Judge Payne's findings as to the intent of JELD-WEN with regard to its competitive in the doors market was part of -- it was not a finding that there was no competition in the doors market. In fact, he didn't make any findings with regard to the relative competitiveness or lack thereof of the doors market. Doorskins is one ancillary product that represents less than eleven percent of JELD-WEN's business as a whole. For it is not misleading for JELD-WEN to describe the doors and windows market as competitive, and there are no facts to suggest that it wasn't.

Finally, just one thing I would say briefly, Your Honor.

THE COURT: If you had been in the other case you would have seen some facts that suggest that it wasn't so competitive.

MS FRITZLER:  Your Honor, that brings me to my last point, which is, I understand that there has been a plethora of litigation regarding JELD-WEN, regarding Steves, regarding alleged anticompetitive conduct.  But that makes it hard in some ways to focus on what the allegations are that plaintiffs plead for securities fraud.  But this not an ordinary rule 12(b)(6) case.  This case is brought under the PSLRA and the securities laws, and it is subject to heightened pleading requirement.  Plaintiff has to connect the dots, they have to allege specific facts, and they have to -- they have to actually show their work.  They are not entitled to ask The Court to read between the lines or draw unreasonable inferences or supplement the facts that they have in fact pleaded.  They have failed to plead specific facts that satisfy the requirements of the securities laws.

THE COURT:  All right.

Thank you very much, ma'am.  I appreciate your point.

Mr. Riopelle, do you want to add anything more on this?

MR. RIOPELLE:  One quick thing, Your Honor.  So Mr. Rothman's reference to having to have knowledge

of all elements is just incorrect.  You can look at for the statute of limitations purposes.  That is at page 649 of the Merck decision.  And so the comments about loss causation for purposes of statute of limitations are irrelevant and don't come in.  It is not what they held.

THE COURT:  Thank you very much.

All right.

Mr. Simmons, do you want to speak on behalf of Onex?

MR. SIMMONS:  Yes.  Thank you, Your Honor.  I will try to be succinct.

Obviously, if the primary claim under 10(b) fails then the secondary claim under section 20(a) fails.  But even if the 10(b) claim were to survive in whole or in part, the claims against Onex under 20(a) still are not sufficient.  20(a) is not a strict liability statute.  And at the end of the day, at trial, the plaintiff has to show culpable participation, because good faith and lack of involvement are a defense.

I will tie this back to the pleading standard in a second.

But the Carpenter case from the Fourth Circuit 40 years ago is still good law on that.  And the

Eastern District in both the BearingPoint and the Cable Wireless cases in 2004 and 2007 reiterated the culpable participation requirement before you can get to a finding of liability.

Under the statute it is an express defense that if the alleged controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action then there is no liability.

Even though that is an affirmative defense, the plaintiff still has to make out a prima facie claim at the pleading stage. And that statutory holding is important. And that brings us to what the Fourth Circuit said in Mutual Funds about the pleading requirement on day one.

Because in order to plead the prima facie case of control for 20(a) purposes, there are two distinct elements.

The power to control the general affairs of the entity, in this case JELD-WEN is alleged to be the primary 10(b)5 violator; and, the second requirement, the power to control or influence the specific corporate policy that resulted in the primary violation. Of course this is an analogue to the statutory requirement that if Onex didn't

directly or indirectly induce the act or acts constituting the violation, we are not liable.

And so it is that second prong for Mutual Fund that this complaint falls on.  It's not enough to say that Onex has economic and voting control, which is all the complaint says, because of the stock holdings.  That would make the second prong of the Mutual Funds test meaningless.

If you get to prong one for purposes of this motion, we are not contesting that Onex's, you know, stock ownership gets them beyond control over the general affairs, but it doesn't get them prong two, control or influence of the specific policy or act that resulted in the 10(b)5 violation.

There is nothing in the complaint that gets them there.  There is no allegation that Onex was involved in any collusion with Masonite, in any of the conduct issues with Steves, or even in the drafting of any of the disclosures.

All they allege, for instance, is well, gee, you know, Onex has access to corporate information generally.  But then maybe they had --

THE COURT:  What about the fact that these fellows filed -- signed the filings with the Securities and Exchange Commission?

MR. SIMMONS:  Well, Your Honor, it is a requirement under SEC rules that at least a majority of the board must sign the 10K.  When you put that together with the cases that we cited in our reply papers that made it clear that the ordinary acts of being a director, and being generally informed about the company are not sufficient to establish control person liability.  Merely doing what the SEC says you must do, and having the majority of the board sign, does not mean that you were directly involved in the particular disclosures that are at issue.  Because otherwise it would just be a matter of saying, well, you are a director, so you are required to sign the SEC documents, therefore you are automatically a 28 control person with liability.  It's not that straight-forward.

You know, obviously (garbled) two directors out of the eleven on the board, it is not a situation where they were dominating everything the company did.  But being a director and discharging your duties as a director doesn't make you a control person.  The Constellation Energy case and the (garbled) Kingdom Morgan case, for instance, that we cited in our papers, are very clear on that point.

THE COURT:  Okay.

MR. SIMMONS:  Notably, as we pointed out in the reply, all the cases that the plaintiffs rely upon involved very specific factual pleadings about the role played by the directors in those instances where directors were found to be control persons, at least for pleading purposes.  In some instances those individuals were not just directors, they were also corporate officers, and they were personally involved in the challenged conduct.

A key factual distinction that is not pled in this complaint.  This complaint has nothing like it.  It is all conclusory.  And it doesn't suffice to get them from the general power, prong one, to the specific power needed in prong two, the control over the specific acts or policies complained of.  And that is really the nub of our argument.

THE COURT:  All right.

MR. SIMMONS:  Their complaint is deficient on prong two.  And on that basis it fails.

THE COURT:  All right.

Thank you.

Mr. Rothman, do you want to respond to that?  He has a point.  There is not a whole lot of fingerprints from Onex or its two guys that were on the board of directors that are in this case.

MR. ROTHMAN:  Your Honor, in the Fourth Circuit culpable participation is not an element of a control person violation.  The defendant cites cases like the BearingPoint case where the control person claim was dismissed because there was no underlying violation of securities laws.  Now in that case the court did in dicta say that control person, that culpable participation was a requirement, but it is dicta.  And if I look through the cites, the cases that that case cites, and then the cases cited by the case that that case cites, it goes back to a Second Circuit decision where a culpable participation is an element.

In the Lumber Liquidators case the court went through this and determined culpable participation is not an element in the Fourth Circuit.  And the Fourth Circuit laid out the elements in the Mutual Fund cases.  And it is just a primary violation and control over the primary violator.

THE COURT:  Well, okay.  So, if I -- so what you are saying is if I own a company, if I own all the stock in a company and the company does some sort of securities violation and I don't have anything to do with it, I can still be liable?

MR. ROTHMAN:  Well, control is defined as

possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through ownership or voting securities, contract, or otherwise.  It doesn't -- you don't have to exercise the power, they just have to have the power.

Here for control we allege that the controlled or they owned 84 percent of outstanding stock which gave them the ability to control the general affairs of the company.  The company admitted it was a controlled company under New York Stock Exchange standards.  That two of their employees served on the board of directors.  It is undisputed that Onex appointed the majority of the board of directors, not just the two employees who served, but the majority of the board was appointed by Onex.

THE COURT:  Right.

MR. ROTHMAN:  JELD-WEN admitted that because Onex controlled the majority of their common stock it may control all major corporate decisions, and the two, the two employees signed the 10K.  If the majority of the board did not control the corporation, what is the board doing?  That is the purpose of the board is to control the corporation. It's not one member of the board.  It is the

majority of the board that owns 84 percent of the stock.  For control purposes it is not a 9(b) standard, it is not PSLRA standard, it is a rule 8 standard.  My allegations just need to be plausible with respect to this element of my claim.  It is certainly plausible that with all of the power that this, that I had over JELD-WEN they had at least the power to control the corporate decision.

THE COURT:  All right.

Okay.  Thank you very much.

Mr. Simmons, do you want to respond briefly to that?  I mean the response I guess what is pretty much what you said the first time around.

MR. SIMMONS:  The response, Your Honor, is after that, which is he is completely ignoring the second part of what the Fourth Circuit said in Mutual Funds, it is 566 F 3d at page 130 where they laid out the two-prong test.  Simply reading out the second prong.

Nobody is saying that Onex, you know, had the power to elect the majority of the board does not mean they were running the company day-to-day. There are were plenty of cases, and we cited them as matter of basic corporate governance, that while the board has supervision over the day-to-day affairs

of -- while the board has supervision over the company it doesn't mean they are running the day-to-day affairs.  So, again, I think that you can't just ignore what the Fourth Circuit said and is trying to gloss it over, you know, if he had pled it differently we might have a different discussion.  But be pled what he pled.  And on that pleading it fails.

THE COURT:  All right.  Thank you.

I will draft a decision in this thing and get back to all of you.  I can tell you that this case is going to go forward in some form.  I have not yet certified a class in this, have I?

MR. ROTHMAN:  No, Your Honor.  Under the Private Securities Ligation Reform Act discovery has been stayed pending the decision on this motion to dismiss.

THE COURT:  Okay.

Well, I will get you something pretty soon.  Don't worry about that.

Let's pick a date to deal with the certification in this case.

I don't know.  It doesn't seem to me like there is a lot of discovery that needs to happen to certify the case.

What do you think about that, Mr. Toll and Mr. Rothman?

MR. TOLL:  Your Honor, in my view you are correct.  We, in fact, the last couple of cases the defendants have, you know, stipulated to a class.  Certainly they have a right to, you know, get documents from the class representative lead plaintiff and depose that person if they want.  In the last case that is what happened and then they stipulated.  But obviously it is their call.  But these cases are regularly certified.

THE COURT:  All right.

Mr. Simmons and Ms Fritzler, and Mr. Riopelle, Mr. Lifson, What do you think about that?

MS FRITZLER:  Your Honor, I am not prepared today to say we don't need any discovery, or that we are going to stipulate to class certification, so I would suggest that some discovery absolutely need to go forward before any class is certified.

THE COURT:  All right.

MR. RIOPELLE:  This is Mr. Riopelle.  I would actually say that we will need to take discovery of the plaintiffs.  We need to take discovery of the plaintiffs' investment advisers.  And we are going to need to do the discovery of all the experts

before we can get to class cert.

THE COURT:  Why do you need the experts?

MR. RIOPELLE:  Because they will opine on some of the aspects that weigh on the class certification decision.

THE COURT:  Like what?

MR. RIOPELLE:  Loss causation, for example. When people bought, when people got out.

MS FRITZLER:  Your Honor, may I also suggest that the parties may have a better sense of what kind of discovery they need and what experts they may need after we see The Court's decision.

THE COURT:  Okay.

MR. ROTHMAN:  I just want to make one point. Loss causation under applicable Supreme Court authority is not something we need to establish for class certification.

MR. SIMMONS:  Price impact is required.

MR. ROTHMAN:  Your defense, it is not my obligation.

THE COURT:  Okay.

MR. RIOPELLE:  Ha ha.

THE COURT:  Easy does it, guys.  It is a competitive market here.

I will set December 21 for the plaintiff to

file a motion to certify the class.

And you all can fight it out with each other as to how far you will -- what kind of discovery you need to do that.

How long do you think, if this case goes to trial how long do you think it will take to try?

Ms Fritzler?

MS FRITZLER:  Your Honor, at the risk -- I don't want you to think I many a punting -- but I think similarly, knowing what claims survived and what the scope of case is moving forward will certainly inform how much time it will take to try.

THE COURT:  I think you can count on a lot of it going forward.

Mr. Riopelle, anything thoughts on that?

MR. RIOPELLE:  I would think it would probably take about two weeks, Your Honor.  I mean, we would not get more than two weeks in EDVA, but there are three separate plaintiffs, and there are other issues, so I would think probably about two weeks.

THE COURT:  All right.

Well, how about if we set it to start on March 29?  And I will set it for -- well, wait a second.  That is not going to work.

How about April 26 as a start date?

MR. RIOPELLE:  This is Mr. Riopelle.

I appreciate that you are trying to get this done quickly, but if the class certs. is being filed on December 21st, it will be all the briefing and then arguments, and then the decision.  And then there is going to be summary judgment.  So I am not sure we will even be ready by April 26.  But I can't -- I confess I haven't sat down.  I did not realize this would be a topic of conversation, so I haven't sat down and talked with plaintiffs or defendants about when we think we could do this.

THE COURT:  I just want to get it on the calendar.

We will push it out a little farther and start May 24 and end June 4.  If that gives any of you -- I mean I realize I didn't ask you to bring your calendars to this, but if you had learned to try cases under the Honorable D. Dortch Warriner you would know you should always bring your calendar to court.  So we will start that day, the 24th, and I will mark off two weeks for it.  And if -- you know, we can look at that again when we get to it because it just appears that there are a million things that can go wrong with scheduling cases these days.

We start with Corona virus and it goes downhill

from there.

All right.  I will have a decision for you pretty quickly on this.  And you can get your discovery started I hope.

All right.  Anything else counsel?

MS FRITZLER:  No.  Thank you, Your Honor.

THE COURT:  Thank you very much.  You will hear from me soon.  Have a good rest of the day.

MR. ROTHMAN:  Thank you, Your Honor.

MR. RIOPELLE:  Thank you, Your Honor.

                    HEARING ADJOURNED


THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.


            GILBERT FRANK HALASZ, RMR

               Official Court Reporter