**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-00112<br><br>Judge John A. Gibney, Jr. |

**JELD-WEN DEFENDANTS' ANSWER AND DEFENSES**
**TO THE AMENDED CLASS ACTION COMPLAINT**

Defendants JELD-WEN Holding, Inc. ("JELD-WEN"), Mark A. Beck ("Beck"), L. Brooks Mallard ("Mallard"), Kirk S. Hachigian ("Hachigian"), and Gary S. Michel ("Michel") (collectively, the "JELD-WEN Defendants"), through their undersigned attorneys, hereby answer the Amended Class Action Complaint dated June 22, 2020 (the "Complaint") filed by Lead Plaintiffs Public Employees' Retirement System of Mississippi ("Mississippi PERS") and the Plumbers and Pipefitters National Pension Fund ("P&P Pension Fund") (collectively, "Lead Plaintiffs").

**General Denial**

JELD-WEN Defendants deny each and every allegation in the Complaint, except as otherwise expressly admitted in Paragraphs 1 through 325 below. Any factual admission herein is admitted only as to the specific facts and not as to any conclusions, characterizations, implications, innuendos, or speculation in any allegation or in the Complaint as a whole. Moreover, JELD-WEN Defendants specifically deny any allegations in the introduction preceding Paragraph 1 and in headings, footnotes, or unnumbered paragraphs in the Complaint. JELD-WEN Defendants specifically deny liability to Lead Plaintiffs, and deny that Lead Plaintiffs have suffered any legally cognizable harm or damages for which JELD-WEN Defendants are

responsible.  Pursuant to Rule 8(b)(6) of the Federal Rules of Civil Procedure, allegations as to which no responsive pleading is required shall be deemed denied.  JELD-WEN Defendants expressly reserve the right to amend and/or supplement their answer, and expressly reserve any and all defenses that may be available.

With respect to all paragraphs in the Complaint in which Lead Plaintiffs pray for damages or other relief, including, but not limited to, Paragraphs (A) through (D) following the title "Prayer for Relief," JELD-WEN Defendants deny that Lead Plaintiffs are entitled to that relief under the law.  By responding to any allegation in the Complaint, JELD-WEN Defendants make no admission that such allegation is an appropriate subject of discovery, and expressly reserve all rights in that regard.

### Specific Responses

1.    This is a securities fraud class action arising out of Defendants' consistent misrepresentations and omissions intended to mislead the investing public by falsely attributing the source of the Company's financial success to legitimate and lawful pricing strategies. In reality, however, Defendants were engaged in anticompetitive conduct in violation of federal antitrust laws which was artificially propping up the Company's sales and was actually the true cause of Jeld-Wen's success.[1]

**RESPONSE TO PARAGRAPH 1:**

JELD-WEN Defendants admit that this action purports to be a federal securities class action.  JELD-WEN Defendants deny the remaining allegations in Paragraph 1.

2.    Jeld-Wen is one of the world's largest door and window manufacturers. Headquartered in Charlotte, North Carolina, the Company designs, produces, and distributes a range of doors, windows, and related products.

---

[1]  JELD-WEN Defendants have included the numbered Paragraphs in the Complaint for the convenience of the Court.  By doing so, JELD-WEN Defendants do not admit any allegations, except to the extent JELD-WEN Defendants do so in their Specific Responses.  Any emphasis (i.e., italics or bolding) in these paragraphs are from the Complaint and were not added by JELD-WEN Defendants.

**RESPONSE TO PARAGRAPH 2:**

JELD-WEN Defendants admit the allegations in Paragraph 2.

3.      The interior molded door is the most popular type of interior door in North America. Manufacturers produce interior molded doors by joining two doorskins between a wood frame filled with a hollow or solid core. Doorskins are the principal component of interior molded doors, accounting for up to 70% of the cost to manufacture a molded door.

**RESPONSE TO PARAGRAPH 3:**

JELD-WEN Defendants admit the allegations in Paragraph 3.

4.      Jeld-Wen and its primary competitor, Masonite Corporation ("Masonite"), are currently and have in the recent past been the two largest manufacturers of interior molded doors and doorskins in the United States. As of 2012, there was only one other competitor in the doorskin market – Craftmaster Manufacturing, Inc. ("CMI").

**RESPONSE TO PARAGRAPH 4:**

JELD-WEN Defendants admit that (1) JELD-WEN is a manufacturer of interior molded

doors and doorskins in the United States, (2) Masonite is a competitor of JELD-WEN with respect

to interior doors in the United States, and (3) CMI sold doorskins prior to its merger with JELD-

WEN, which merger closed on October 24, 2012 (the "Merger").  JELD-WEN Defendants deny

the remaining allegations in Paragraph 4.

5.      In October 2012, Jeld-Wen sought to acquire CMI. Through that acquisition (the "CMI Acquisition" or the "Acquisition"), Jeld-Wen was poised to gain ownership of CMI's flagship doorskin manufacturing plant in Towanda, Pennsylvania, thereby removing CMI as the third source of doorskin supply in the interior molded door market and removing CMI as a competitor in the market for sale of interior molded doors.

**RESPONSE TO PARAGRAPH 5:**

JELD-WEN Defendants admit that in October 2012, JELD-WEN acquired CMI and that,

as a result of the Merger, JELD-WEN acquired a doorskin manufacturing plant located in

Towanda, Pennsylvania.  JELD-WEN Defendants deny the remaining allegations in Paragraph 5.

6.      Prior to Jeld-Wen's attempt to acquire CMI, the Department of Justice ("DOJ") had recently objected to another company's attempt similarly to acquire *the exact same Towanda manufacturing plant*, noting that the proposed acquisition would "*tend substantially to lessen*

*competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers*." As a result, the DOJ permitted that earlier acquisition to go forward only after the Towanda doorskin plant was completely divested and spun off to create CMI as a third stand-alone competitive force in the interior molded doors and doorskins market.

**RESPONSE TO PARAGRAPH 6:**

Paragraph 6 purports to quote a Department of Justice complaint.  JELD-WEN

Defendants refer to that document for its contents.  To the extent Paragraph 6 characterizes or

conflicts with the contents of that complaint, JELD-WEN Defendants deny those allegations.

JELD-WEN Defendants are without information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 6, and therefore deny those allegations.

7.    Armed with the knowledge that the DOJ would likely assert a similar objection to the CMI Acquisition because it would create the same anticompetitive concerns, Jeld-Wen developed a plan to enter into ostensibly competitive long-term supply agreements with independent door manufacturers (the "Independent Door Manufacturers") for the supply of doorskins.

**RESPONSE TO PARAGRAPH 7:**

JELD-WEN Defendants deny the allegations in Paragraph 7.

8.    Jeld-Wen did so precisely to eliminate its doorskin customers' potential objections to the Acquisition and thereby alleviate the DOJ's concerns about the Acquisition's possible anticompetitive effect. Indeed, by entering into these long-term supply agreements *many months before intentionally approaching the DOJ to seek approval of the Acquisition*, Jeld-Wen squashed potential objections by Independent Door Manufacturers, including Steves & Sons, by intending for them to believe that it would not use its increased market power to diminish the quality of doorskins or raise prices, except pursuant to contractually agreed upon terms.

**RESPONSE TO PARAGRAPH 8:**

JELD-WEN Defendants deny the allegations in Paragraph 8.

9.    As expected, receiving no objections from Jeld Wen's customers, the DOJ did not object to the Acquisition, which closed on October 24, 2012 and left only two dominant door manufacturers with the ability to exploit their dominant market power—the precise situation of which the DOJ had previously been concerned.

**RESPONSE TO PARAGRAPH 9:**

JELD-WEN Defendants admit that the DOJ did not object to the Merger, which closed on October 24, 2012. JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9, and therefore deny those allegations.

10.     And that is exactly what Jeld-Wen did. After the Acquisition, Masonite abruptly exited the doorskins market in June 2014. This left Jeld-Wen as the market's sole supplier of doorskins to Independent Door Manufacturers and gave Jeld-Wen the sole power to set the price of those doorskins.

**RESPONSE TO PARAGRAPH 10:**

JELD-WEN Defendants deny the allegations in Paragraph 10.

11.     Exploiting the Company's enhanced market power following the CMI Acquisition and Masonite's exit from the doorskins market, Jeld-Wen and then CEO, Defendant Hachigian began to engage in anticompetitive conduct against the Independent Door Manufacturers with which it had long-term agreements to supply doorskins. All of the Independent Door Manufacturers were direct competitors of Jeld-Wen in the market for interior molded doors, including Jeld-Wen's largest doorskins customer and second largest doors competitor (after Masonite), Steves & Sons.

**RESPONSE TO PARAGRAPH 11:**

JELD-WEN Defendants admit that JELD-WEN competes with several independent door manufacturers, including Steves & Sons, Inc. ("Steves"). JELD-WEN Defendants deny the remaining allegations in Paragraph 11.

12.     Jeld-Wen developed a plan to "kill-off" that competition. Specifically, despite Defendants' knowledge and intention that the supply agreements had persuaded the DOJ to approve the CMI Acquisition, in 2014, Defendant Hachigian directed the Company to breach those supply agreements by, among other things, raising prices and, in turn, substantially lessening competition in the market for sale of interior molded doors. Thus, by raising the price of doorskins, Jeld-Wen was able to both increase its revenues for sale of those doorskins and lessen competition in the market for sale of interior molded doors by limiting its competitors' ability to manufacture those doors.

**RESPONSE TO PARAGRAPH 12:**

JELD-WEN Defendants deny the allegations in Paragraph 12.

13.     In conjunction with Jeld-Wen's breach of the supply agreements, Jeld-Wen and Masonite—now the two dominant manufacturers of interior molded doors facing significantly less competition as a result of Jeld-Wen's actions—began imposing uniform price increases on interior molded doors. At least nine different times between 2012 and 2018, Jeld-Wen and Masonite increased the prices of their interior molded doors in the same or similar percentage increments, either simultaneously or in brief succession of each other. As confirmed by numerous former employees, these price increases came directly from the CEO and CFO, specifically, Defendants Hachigian, Beck, Michel, and Mallard.

**RESPONSE TO PARAGRAPH 13:**

JELD-WEN Defendants deny the allegations in Paragraph 13.

14.     As a result of Jeld-Wen's anticompetitive conduct, in June 2016, Steves & Sons filed suit in federal court in the Eastern District of Virginia against Jeld-Wen, Inc., a wholly owned subsidiary of Jeld-Wen, alleging that the Company's acquisition of CMI and subsequent conduct in breaching the supply agreements violated federal antitrust laws.

**RESPONSE TO PARAGRAPH 14:**

JELD-WEN Defendants admit that on June 29, 2016, Steves filed suit in the Eastern District of Virginia against Jeld-Wen, Inc., which is a wholly owned subsidiary of JELD-WEN (the "*Steves* Litigation").  JELD-WEN Defendants refer to the complaint in that litigation (the "*Steves* Complaint") for its contents.  To the extent Paragraph 14 characterizes or conflicts with the contents of the *Steves* Complaint, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 14.

15.     Notwithstanding Defendants' extensive and undisclosed anticompetitive conduct, Defendants represented to investors that the Company operated in a "***highly competitive business environment***," and regularly touted the source of Jeld-Wen's financial success as the result of legitimate and lawful business and pricing strategies.

**RESPONSE TO PARAGRAPH 15:**

JELD-WEN Defendants deny the allegations in Paragraph 15.

16.     Indeed, despite ***knowing*** all along that the true source of the Company's success was its anticompetitive conduct as described above, Defendants continually represented that its success was driven by legitimate and lawful strategies such as "***pricing optimization***," "***pricing discipline***," "***strategic pricing***," and "***favorable pricing***." Defendants made similar statements about their financial success on at least twenty-one different occasions throughout the Class

6

Period. Of course, Defendants always failed to make any mention of the Company's extensive and significant anticompetitive conduct in connection with these statements.

**RESPONSE TO PARAGRAPH 16:**

JELD-WEN Defendants deny the allegations in Paragraph 16.

17.     On February 15, 2018, the jury in the Steves & Sons Litigation returned a verdict against Jeld-Wen, finding that Jeld-Wen violated federal antitrust laws. Yet, Defendants reassured the market, insisting that the verdict was "***erroneous***," and that "***the facts underlying th[e] dispute do not establish either a violation of the antitrust laws or a breach of contract***," further relying upon the DOJ's refusal to intervene in the Acquisition as evidence of Defendants' supposed good faith and lawful behavior.

**RESPONSE TO PARAGRAPH 17:**

JELD-WEN Defendants admit that on February 15, 2018, the jury in the *Steves* Litigation returned a verdict (the "Jury Verdict").  JELD-WEN Defendants refer to the Jury Verdict for its contents, and deny any allegations inconsistent with that verdict, except that JELD-WEN Defendants deny JELD-WEN's liability under that verdict, which is on appeal.  JELD-WEN Defendants admit that JELD-WEN issued a press release on February 15, 2018 (the "Jury Verdict Press Release"), refer to that press release for its contents, and deny any allegations inconsistent with that press release.  JELD-WEN Defendants deny the remaining allegations in Paragraph 17.

18.     Notably, since the verdict form contained no specific findings of fact detailing Defendants' bad conduct, there was no public information available to contradict Defendants' story. Therefore, the extent and context of their anticompetitive conduct, as well as that conduct's significance to Jeld-Wen's ostensible financial success, remained concealed from investors.

**RESPONSE TO PARAGRAPH 18:**

JELD-WEN Defendants deny the allegations in Paragraph 18.

19.     Investors and analysts bought Defendants' story, believing that the DOJ's choice not to intervene in the Acquisition demonstrated Jeld-Wen's adherence to federal antitrust laws. For instance, Bank of America noted that "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition prior to its consummation in 2012." RBC Capital Markets echoed these sentiments, stating that "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the CMI [A]cquisition twice. JELD does not believe that a loss is probable or estimable."

**RESPONSE TO PARAGRAPH 19:**

Paragraph 19 purports to quote analyst reports from Bank of America and RBC Capital Markets. JELD-WEN Defendants refer to those written analyst reports for their contents and deny any allegations inconsistent with the contents of those reports. JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 19, and therefore deny those allegations.

20. Having assuaged investor concerns, Defendants continued to falsely attribute Jeld-Wen's success to legitimate and lawful pricing strategies, reiterating to the market that the Company "*operate[s] in a highly competitive business environment*," and claiming that the Company was able to "achieve profitable growth" through legitimate and lawful strategies such as "*pricing discipline*," "*strategic pricing*," and "*pricing optimization*."

**RESPONSE TO PARAGRAPH 20:**

JELD-WEN Defendants deny the allegations in Paragraph 20.

21. On October 5, 2018, the judge presiding over the Steves & Sons Litigation—Judge Robert E. Payne—issued a Memorandum Opinion containing previously undisclosed facts about Jeld-Wen's anticompetitive conduct that surprised the market. In particular, the court made factual findings that "the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin industry," ultimately "depriving the [Independent Door Manufacturers] of that key component of a reliable supply source." Moreover, Judge Payne found that Jeld-Wen had "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers] knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

**RESPONSE TO PARAGRAPH 21:**

JELD-WEN Defendants admit that on October 5, 2018, Judge Robert E. Payne issued a Memorandum Opinion in the *Steves* Litigation (the "Divestiture Decision") and refer to the Divestiture Decision for its contents. JELD-WEN Defendants note the Divestiture Decision is currently on appeal. To the extent Paragraph 21 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 21.

22.     Judge Payne further found that divestiture of the Towanda doorskins manufacturing plant would be an appropriate remedy for Jeld-Wen's antitrust violations. In response to this decision, Jeld-Wen's stock dropped another $1.18 per share, or 5% of its value.

**RESPONSE TO PARAGRAPH 22:**

Paragraph 22 purports to describe the Divestiture Decision, which is currently on appeal. JELD-WEN Defendants refer to the Divestiture Decision for its contents.   To the extent Paragraph 22 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants refer to the public record for the price of JELD-WEN's common stock during the referenced time period.  JELD-WEN Defendants deny any allegations inconsistent with the public record regarding the price of JELD-WEN's common stock.  JELD-WEN Defendants deny the remaining allegations in Paragraph 22.

23.     While Defendants knew that the decision correctly portrayed their conduct, they continued to reassure investors that the verdict was "*incorrect*," with "*multiple flawed rulings during the trial process*." Analysts again believed Defendants. For example, Bank of America noted once again that "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

**RESPONSE TO PARAGRAPH 23:**

JELD-WEN Defendants admit that JELD-WEN issued a press release on October 6, 2018 (the "Divestiture Decision Press Release"), and refer to that written document for its contents. JELD-WEN Defendants deny any allegations inconsistent with that press release.  Paragraph 23 purports to quote an analyst report from Bank of America.  JELD-WEN Defendants refer to that written report for its contents.  To the extent Paragraph 23 characterizes or conflicts with that analyst report, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 23.

24.     However, just ten days later on October 15, 2018, Jeld-Wen stunned the market when it admitted that the Company would likely face a significant judgment from the Steves & Sons Litigation—*to the tune of $76.5 million*—for its anticompetitive conduct. In addition, the Company announced that Defendant Mallard was unexpectedly resigning with little other

9

explanation than to "pursue other career interests." In response to these shocking revelations, on October 16, 2018, Jeld-Wen's stock plummeted another $4.03 per share, *or 19%*, on unusually high trading volume.

**RESPONSE TO PARAGRAPH 24:**

JELD-WEN Defendants admit that on October 15, 2018, JELD-WEN issued a press release titled "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call" (the "Earnings Pre-Release") and also issued a press release titled "JELD-WEN Announces the Departure of Brooks Mallard, CFO and the Promotion of John Linker to CFO" (the "Mallard Departure Press Release"), and refer to those written documents for their contents.  JELD-WEN Defendants deny any allegations inconsistent with those press releases. JELD-WEN Defendants refer to the public record for the price of JELD-WEN's common stock during the referenced time period.  JELD-WEN Defendants deny any allegations inconsistent with the public record regarding the price of JELD-WEN's common stock.  JELD-WEN Defendants deny the remaining allegations in Paragraph 24.

25.     These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

**RESPONSE TO PARAGRAPH 25:**

JELD-WEN Defendants admit that Lead Plaintiffs purport to bring this action pursuant to the statutes and rules cited in Paragraph 25.  JELD-WEN Defendants deny the remaining allegations in Paragraph 25.

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

**RESPONSE TO PARAGRAPH 26:**

JELD-WEN Defendants admit that this Court has subject matter jurisdiction and that

Lead Plaintiffs purport to base jurisdiction on 28 U.S.C. § 1331 and Section 27 of the Exchange

Act, 15 U.S.C. § 78aa.

27.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Jeld-Wen transacts business in Virginia, including in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. In addition, other antitrust actions filed against Jeld-Wen are currently pending in this District. See *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va.); *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-718 (E.D. Va.); *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, No. 3:18-cv-850 (E.D. Va.).

**RESPONSE TO PARAGRAPH 27:**

JELD-WEN Defendants admit that JELD-WEN transacts business in Virginia.  The

remaining allegations in Paragraph 27 contain characterizations and/or conclusions of law that do

not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 27.  JELD-WEN Defendants further deny the implication in the fourth

sentence of Paragraph 27 that this action is or purports to be an antitrust action, but admit that the

actions listed in Paragraph 27 are pending in this District.

28.    Lead Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS") was established in 1952 and provides retirement and related benefits for Mississippi state and public education employees, officers of the Mississippi Highway Safety Patrol, and certain elected officials, among others. As of June 30, 2019, Mississippi PERS oversaw approximately $28.7 billion on behalf of more than 335,914 of members and their beneficiaries. As set forth in the attached certification (Exhibit A), Mississippi PERS purchased Jeld-Wen securities at artificially inflated prices during the Class Period and was damaged upon revelation of the alleged corrective disclosures and/or materialization of the risks.

**RESPONSE TO PARAGRAPH 28:**

With regard to the first and second sentences of Paragraph 28, JELD-WEN Defendants

lack knowledge or information sufficient to form a belief as to the truth of the allegations therein,

11

and therefore deny those allegations.  JELD-WEN Defendants admit that Mississippi PERS filed

a certification purporting to evidence the purchase and/or sale of JELD-WEN securities (Dkt.

No. 26-01), and refer to that written document for its contents.  To the extent Paragraph 28

characterizes or conflicts with the contents of that certification, JELD-WEN Defendants deny

those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 28.

29.    Lead Plaintiff Plumbers and Pipefitters National Pension Fund ("P&P Pension Fund") manages the pension assets for P&P Pension Fund participants and their families. P&P Pension Fund is one of the nation's largest Taft-Hartley funds established in 1968 with more than 148,000 participants and beneficiaries and assets of approximately $6 billion. P&P Pension Fund is committed to protecting its participants from losses due to securities fraud. As set forth in the attached certification (Exhibit B), P&P Pension Fund purchased Jeld-Wen securities at artificially inflated prices during the Class Period and was damaged upon revelation of the alleged corrective disclosures and/or materialization of the risks.

**RESPONSE TO PARAGRAPH 29:**

With regard to the first, second and third sentences of Paragraph 29, JELD-WEN

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations therein, and therefore deny those allegations.  JELD-WEN Defendants admit that

P&P Pension Fund filed a certification purporting to evidence the purchase and/or sale of JELD-

WEN securities (Dkt. No. 29-02), and refer to that written document for its contents.  To the

extent Paragraph 29 characterizes or conflicts with the contents of that certification, JELD-WEN

Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in

Paragraph 29.

30.    Additional Plaintiff Wisconsin Laborers' Pension Fund is a multi-employer defined benefit plan with approximately $700 million in assets under management. As set forth in the attached certification (Exhibit C), Wisconsin Laborers' Pension Fund purchased Jeld-Wen securities at artificially inflated prices during the Class Period and was damaged upon revelation of the alleged corrective disclosures and/or materialization of the risks.

**RESPONSE TO PARAGRAPH 30:**

With regard to the first sentence of Paragraph 30, JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations therein, and therefore deny those allegations. JELD-WEN Defendants admit that Wisconsin Laborers' Pension Fund filed a certification purporting to evidence the purchase and/or sale of JELD-WEN securities (Dkt. No. 73-03), and refer to that written document for its contents. To the extent Paragraph 30 characterizes or conflicts with the contents of that certification, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 30.

31.     Jeld-Wen is a vertically-integrated global manufacturer and distributor of doors and windows that operates facilities in 20 countries. Jeld-Wen is incorporated in Delaware and maintains its corporate headquarters at 2645 Silver Crescent Drive, Charlotte, North Carolina. The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "JELD." Jeld-Wen filed periodic reports, including Forms 10-K and 10-Q, with the SEC pursuant to Exchange Act Section 13(a) and related rules thereunder. As of May 4, 2020, Jeld-Wen had over 100 million shares of common stock outstanding, owned by hundreds or thousands of investors.

**RESPONSE TO PARAGRAPH 31:**

JELD-WEN Defendants admit the allegations in Paragraph 31.

32.     Defendant Mark A. Beck ("Beck") was the former President and Chief Executive Officer ("CEO") of Jeld-Wen from November 2015 until February 27, 2018. He also served as a member on the Company's Board of Directors from May 2016 until February 27, 2018. In his role as President and CEO of Jeld-Wen, Defendant Beck participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the source of Jeld-Wen's financial success and Jeld-Wen's competitive positioning in the interior molded door and doorskins markets. Defendant Beck also signed Jeld-Wen's SEC Form 10-K for the year ended December 31, 2016, which contained materially false and misleading statements and omissions of material fact as detailed below.

**RESPONSE TO PARAGRAPH 32:**

JELD-WEN Defendants admit the allegations in the first and second sentences of Paragraph 32. JELD-WEN Defendants further admit that Defendant Beck participated in earnings

calls while serving as President and CEO of JELD-WEN and signed JELD-WEN's SEC Form

10-K for the year ended December 31, 2016.   JELD-WEN Defendants deny the remaining

allegations in Paragraph 32.

33.    Defendant L. Brooks Mallard ("Mallard") was the former Executive Vice President and Chief Financial Officer ("CFO") of Jeld-Wen from November 2014 until November 8, 2018. In his role as CFO, Defendant Mallard participated in earnings calls with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the source of Jeld-Wen's financial success. Defendant Mallard also signed all of Jeld-Wen's SEC Form 10-Ks and 10-Qs during the Class Period, which contained materially false and misleading statements and omissions of material fact as detailed below. Simultaneous with Jeld-Wen's announcement that the Company would likely face a $76.5 million judgment in the Steves & Sons Litigation, Defendant Mallard abruptly "resigned," with no explanation other than to "pursue other career interests."

**RESPONSE TO PARAGRAPH 33:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 33.  JELD-

WEN Defendants further admit that Defendant Mallard participated in earnings calls and signed

JELD-WEN's SEC Form 10-Ks and 10-Qs filed between January 26, 2017 and October 15, 2018

(the "Putative Class Period").   JELD-WEN Defendants deny the remaining allegations in

Paragraph 33.

34.    Defendant Kirk S. Hachigian ("Hachigian") was the former Interim CEO of Jeld-Wen from February 27, 2018 until June of 2018. He previously served as President and CEO of Jeld-Wen from March 2014 until November 2015. Defendant Hachigian also served as Executive Chairman of Jeld-Wen's Board of Directors from November 2015 until December 2016 and as Chairman from December 2016 until May 2019. In his role as Interim CEO of Jeld-Wen, Defendant Hachigian participated in earnings calls with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the source of Jeld-Wen's financial success. Defendant Hachigian also signed Jeld-Wen's SEC Form 10-Ks for the years ended December 31, 2016 and December 31, 2017, which contained materially false and misleading statements and omissions of material fact as detailed below.

**RESPONSE TO PARAGRAPH 34:**

JELD-WEN Defendants admit the allegations in the first, second and third sentences of

Paragraph 34.  JELD-WEN Defendants admit that Defendant Hachigian participated in earnings

14

calls and signed JELD-WEN's SEC Form 10-Ks during the Putative Class Period.  JELD-WEN

Defendants deny the remaining allegations in Paragraph 34.

35.     Defendant Gary S. Michel ("Michel") is the current President and CEO of Jeld-Wen, as well as a member of Jeld-Wen's Board of Directors. Defendant Michel assumed this position in June 2018. In his role as President and CEO of Jeld-Wen, Defendant Michel participated in earnings calls with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the source of Jeld-Wen's financial success.

**RESPONSE TO PARAGRAPH 35:**

JELD-WEN Defendants admit the allegations in the first and second sentences of

Paragraph 35.  JELD-WEN Defendants admit that Defendant Michel participated in earnings calls

in his role as President and CEO of JELD-WEN.  JELD-WEN Defendants deny the remaining

allegations in Paragraph 35.

36.     Together, Defendants Beck, Mallard, Hachigian and Michel are referred to herein as the "Individual Defendants." The Individual Defendants, by virtue of their high-level positions at Jeld-Wen, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition, as alleged herein.

**RESPONSE TO PARAGRAPH 36:**

The allegations in Paragraph 36 contain characterizations and/or conclusions of law that

do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 36, except admit that the Complaint refers to Defendants Beck, Mallard,

Hachigian, and Michel collectively as the "Individual Defendants."

37.     Defendant Onex Corporation is a Toronto, Canada-based investment manager and private equity firm. Onex Corporation and its affiliated funds, including Defendants Onex Partners Manager LP, Onex Partners III LP, Onex Partners III GP LP, Onex US Principals LP, Onex Partners III PV LP, Onex Partners III Select LP, Onex BP Co-Invest LP, Onex Advisor Subco III LLC, Onex American Holdings II LLC, OAH Wind LLC, BP EI LLC, and BP EI II LLC (together, the "Onex Defendants") acquired a majority of Jeld-Wen's voting interests in October 2011, and, as of September 24, 2016, Onex and its affiliated funds owned approximately 84% of Jeld-Wen's outstanding common stock on an as-converted basis. The Onex Defendants had the power to control, and did control, Jeld-Wen throughout the Class Period.

**RESPONSE TO PARAGRAPH 37:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 37, and therefore deny those allegations.

38.     **Confidential Witness ("CW") 1** worked at Jeld-Wen's Charlotte, North Carolina headquarters from April 2017 to June 2018 as a Senior Planner in the doors division. As a Senior Planner, CW 1 worked on commodities forecasting and ordering raw materials used to construct Jeld-Wen doors. He also communicated to Jeld-Wen factories on quantities to manufacture. CW 1 reported to Business Process Managers Amber Brockmeyer and Raul Gutierrez, who reported to Chief Procurement Officer Mark Dixon. CW 1 observed that price increases did not correspond with material cost increases and that Jeld-Wen employees were always aware of what Masonite was charging for its products.

**RESPONSE TO PARAGRAPH 38:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 38, and therefore deny those allegations.

39.     **CW 2** worked at Jeld-Wen from December 1993 until September 2018. Beginning in 1996, CW 2 worked in the sales division in the Southeastern United States. From 2013 or 2014 until September 2018, CW 2 worked as the National Sales Manager – East for national accounts. In that role, he worked to negotiate the sales contracts with national retailers. CW 2 reported to National Account Manager Scott Hiett, who reported to Senior Vice President of Sales John Tracy. CW 2 observed that price increases were signed off on by the CEO. He further explained that in 2014 it was Defendants Hachigian, as President and CEO, and Mallard, as CFO, who directed the Company to implement a price increase and break the long-term doorskin supply agreements.

**RESPONSE TO PARAGRAPH 39:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 39, and therefore deny those allegations.

40.     **CW 3** worked at Jeld-Wen from November 2003 until December 2016. From November 2003 to March 2006, CW 3 worked as marketing manager in the Company's Klamath Falls, Oregon location. From March 2006 until June 2008, he worked as a national sales manager. Beginning June 2008, CW 3 worked as a general manager for Jeld-Wen's door replacement systems. And from November 2013 until May 2015, he worked as the Strategic Sourcing Manager. In May 2015, CW 3 was promoted to Product Line Manager, exterior doors, in which position he worked until he left the Company in December 2016. In that role, he was in charge of profitability of the exterior door product lines. CW 3 reported to Lennie Rhoades, Senior Vice President – Doors. CW 3 explained that pricing decisions for all products, including interior doors, were made by a pricing group, of which he was a part, which included the CEO, the CFO—which was, during his tenure, Defendants Beck and Mallard—and Product Line Managers, among others. CW 3

16

further observed that Steves & Sons had begun winning bigger contracts and buying up the market, which created the pressure to compete with them.

**RESPONSE TO PARAGRAPH 40:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore deny those allegations.

41.    **CW 4** worked at Jeld-Wen from 2013 until 2017 in Jeld-Wen's Pricing Department. CW 4 observed that price increases were not tied to a rise in the cost of raw materials to manufacture doors, and noted that Defendants Hachigian and Beck were very hands-on with pricing.

**RESPONSE TO PARAGRAPH 41:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, and therefore deny those allegations.

42.    **CW 5** worked at Jeld-Wen from October 2011 until October 2017 as Vice President of Sales. In that role, CW 5 worked to establish sales contracts of all products with customers in the Eastern United States, specifically focusing on customers who were distributors and dealers. CW 5 recounted that prior to the CMI Acquisition, CMI had been a relatively big competitor of Jeld-Wen and that Jeld-Wen purchased CMI in order to gain its doorskin manufacturing plant.

**RESPONSE TO PARAGRAPH 42:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, and therefore deny those allegations.

43.    **CW 6** worked at Jeld-Wen from December 2011 until February 2017 as an executive assistant, first at the Company's Oregon location and later at the Company's Charlotte, North Carolina headquarters. In that role, he prepared documents and managed the meetings and administrative work of his supervisors, including Vice President of Operations Bryan Settje, CEO Philip Orsino, CEO Kirk Hachigian, Chief Operations Officer Mark Thurman, and Senior Vice President of Doors Lennie Rhoades. CW 6 recounted how the Company had frequent interactions with Masonite, including at Company-sponsored meetings held at Jeld-Wen headquarters, and that Jeld-Wen often had access to Masonite price lists. CW 6 further corroborated that the CEOs, including Defendants Beck and Hachigian, approved all price increases.

**RESPONSE TO PARAGRAPH 43:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, and therefore deny those allegations.

17

44.    Jeld-Wen is one of the world's largest door and window manufacturers. Headquartered in Charlotte, North Carolina, the Company designs, produces and distributes a range of doors, windows, and related products.

**RESPONSE TO PARAGRAPH 44:**

JELD-WEN Defendants admit the allegations in Paragraph 44.

45.    The interior molded door is the most popular type of interior door in North America. It simulates the aesthetics of solid wood doors but can be manufactured and sold at significantly lower prices. Interior molded doors are made by sandwiching a wood frame and a hollow or solid core between two doorskins.

**RESPONSE TO PARAGRAPH 45:**

JELD-WEN Defendants admit the allegations in Paragraph 45.

46.    Doorskins are formed from a fibrous material, such as wood chips or sawdust, which is softened in a digester, refined with wax and resin, and then formed into a mat. The mat is cut into sheets and then loaded into a hot press. After coming off the press, the resulting doorskins are sized, trimmed, primed or painted, packed and shipped to an interior molded door manufacturer.

**RESPONSE TO PARAGRAPH 46:**

JELD-WEN Defendants admit the allegations in Paragraph 46.

47.    Doorskins are the principal component of interior molded doors, accounting for up to 70% of the cost to manufacture a molded door.

**RESPONSE TO PARAGRAPH 47:**

JELD-WEN Defendants admit the allegations in Paragraph 47.

48.    Jeld-Wen began manufacturing interior molded doorskins in the early 1970s. Since that time it has owned and operated nine doorskin manufacturing plants, six of which Jeld-Wen built. Until the 1990s, Jeld-Wen supplied doorskins to domestic manufacturers of interior molded doors, but did not manufacture completed interior molded doors.

**RESPONSE TO PARAGRAPH 48:**

JELD-WEN Defendants admit the allegations in Paragraph 48.

49.    In the 1990s, Jeld-Wen began to manufacture and sell interior molded doors as well as doorskins for those doors, making Jeld-Wen a "vertically-integrated" manufacturer. Shortly thereafter, Jeld-Wen began to buy up smaller manufacturers of interior molded doors, including Michigan Birch Door and its Doorcraft division, an interior molded door manufacturing plant from Young Door, and Morgan Door Co.

**RESPONSE TO PARAGRAPH 49:**

JELD-WEN Defendants admit the allegations in Paragraph 49.

50.     At that time, the only other major manufacturer of doorskins was Masonite, which was wholly owned by International Paper. Masonite was not yet vertically-integrated, meaning that it did not sell completed interior molded doors. Instead, Masonite only manufactured doorskins to sell to independent, non-vertically integrated interior molded door manufacturers.

**RESPONSE TO PARAGRAPH 50:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50, and therefore deny those allegations.

51.     As a result, Masonite and Jeld-Wen dominated the doorskins market in 2000. A third entity, Fibramold, a Chilean joint venture, accounted for less than 10% of the doorskins used for the manufacture of interior molded doors in the United States. These were the only three firms with significant sales of doorskins in the United States at that time, with a very small number of other manufacturers, which each sold less than one percent of the doorskins purchased in the United States.

**RESPONSE TO PARAGRAPH 51:**

JELD-WEN Defendants deny the allegations in the first sentence of Paragraph 51.  JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny those allegations.

52.     At that time, the largest manufacturer of interior molded doors was Premdor, Inc. ("Premdor"), which maintained more than 40% of the market. Like Jeld-Wen, Premdor was also a vertically-integrated interior molded door manufacturer that, according to the DOJ, was a "small, but significant" competitor in the doorskins market.

**RESPONSE TO PARAGRAPH 52:**

JELD-WEN Defendants admit that Premdor sold, among other things, door and doorskins in the year 2000.  JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 52, and therefore deny those allegations.

53.     On September 30, 2000, International Paper announced its intention to sell Masonite to Premdor. At the time, Masonite owned two doorskins plants in the United States – one in Towanda, Pennsylvania and another in Laurel, Mississippi.

**RESPONSE TO PARAGRAPH 53:**

JELD-WEN Defendants admit the allegations in Paragraph 53.

54.     On August 3, 2001, the DOJ filed a civil antitrust action seeking to block the merger, alleging that Premdor's acquisition of Masonite and its related assets would violate Section 7 of the Clayton Act. *United States v. Premdor, et al.*, No. 1:01-CV-01696 (D.D.C.).

**RESPONSE TO PARAGRAPH 54:**

JELD-WEN Defendants admit that on August 3, 2001, the DOJ filed a complaint and a competitive impact statement in an action titled *United States v. Premdor, et al.*, No. 1:01-CV-01696 (D.D.C.) (respectively, the "*Premdor* Complaint" and the "*Premdor* Competitive Impact Statement"). JELD-WEN Defendants refer to those written documents for their contents. To the extent Paragraph 54 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations.

55.     As the DOJ explained, allowing Premdor to acquire Masonite's doorskins business would remove the third supplier of doorskins and leave only two vertically-integrated door manufacturers, thereby harming competition in the market for interior molded doors by creating incentives to limit the supply of doorskins. According to the DOJ, the proposed merger would "tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers."

**RESPONSE TO PARAGRAPH 55:**

Paragraph 55 purports to quote the *Premdor* Complaint. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 55 characterizes or conflicts with the contents of the *Premdor* Complaint, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants are without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 55, and therefore deny those allegations.

56.     In particular, the DOJ stated:

Masonite acts as a significant competitive constraint in the interior molded door market. Premdor and the non-party firm [Jeld-Wen] have an incentive to attempt to coordinate pricing by reducing output. Coordination would reduce the output of interior molded doors, and lead to higher door prices. However, such an output reduction would also reduce the output of interior molded doorskins sold in the United States, harming Masonite. Thus, Masonite would have an incentive to disrupt such coordination through increased sales to the other non-vertically integrated door manufacturers. After the proposed transaction, a vertically integrated Premdor/Masonite combination will not have the same incentive to defeat coordination in the interior molded door market by increasing sales to the non-integrated door manufacturers since the combined company would be competing against those door manufacturers, and would benefit from an increase in the price of interior molded doors.

**RESPONSE TO PARAGRAPH 56:**

Paragraph 56 purports to quote the *Premdor* Competitive Impact Statement.  JELD-WEN Defendants refer to that written document for its contents.   To the extent Paragraph 56 characterizes or conflicts with the contents of the *Premdor* Competitive Impact Statement, JELD-WEN Defendants deny those allegations.

57.    The DOJ further clarified that a vertically-integrated Masonite/Premdor would have an incentive to coordinate with the already vertically-integrated Jeld-Wen:

Documentary evidence obtained from the defendants suggests that the non-party firm [Jeld-Wen], as a fully vertically integrated manufacturer, has certain cost advantages over Masonite and Premdor that it has used to lower prices to build market share. This differing cost structure among the dominant firms is an impediment to coordination. The evidence from the defendants suggests that post-acquisition, the cost structures of the two vertically integrated firms would be more closely aligned, decreasing the opportunity for the non-party firm [Jeld-Wen] to increase its market share profitably through lower prices, and thus increasing the non-party firm's incentive to coordinate with the combined Premdor/Masonite. In fact, Masonite recognized that the non-party firm's [Jeld-Wen's] incentive to gain market share by lowering price would diminish if it faced a strong, integrated competitor.

**RESPONSE TO PARAGRAPH 57:**

Paragraph 57 purports to quote the *Premdor* Competitive Impact Statement.  JELD-WEN Defendants refer to that written document for its contents.   To the extent Paragraph 57 characterizes or conflicts with the contents of the *Premdor* Competitive Impact Statement, JELD-WEN Defendants deny those allegations.   JELD-WEN Defendants are without information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57, and therefore deny those allegations.

58. The same day it filed suit, the United States also filed a proposed final judgment that would permit the acquisition to take place, but only if the Towanda doorskin plant was divested from Masonite and spun off to a buyer acceptable to the United States. Following the required public comment period, the judgment became final, including the divestiture provision, and was entered by the court on April 5, 2002. Following this conditional approval, Premdor acquired Masonite and, going forward, operated the combined businesses under the name "Masonite."

**RESPONSE TO PARAGRAPH 58:**

JELD-WEN Defendants admit the allegations in Paragraph 58.

59. This divestiture resulted in the creation of CMI as a stand-alone competitive force. On March 29, 2002, CMI purchased the Towanda doorskins plant and became a third major competitor in the doorskins market, selling doorskins to independent interior molded door manufacturers in competition with Jeld-Wen and Masonite. The divestiture was intended to allow CMI to manufacture and sell all the designs and sizes of interior molded doorskins that Masonite had sold at that time in the United States, with the stated aim of maintaining competition in the domestic interior molded door market.

**RESPONSE TO PARAGRAPH 59:**

JELD-WEN Defendants deny the allegations in the first sentence of Paragraph 59. JELD-WEN Defendants admit that CMI purchased the Towanda doorskins plant on March 29, 2002, and that CMI sold, among other products, doorskins to independent interior molded door manufacturers who competed with JELD-WEN. JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 59, and therefore deny those allegations.

60. Following the acquisition of Masonite by Premdor and the creation of CMI, there was substantial additional consolidation that eroded competition in the interior molded door and doorskins markets by eliminating competing doorskin manufacturers. In 2002, Masonite acquired the remaining interests in Fibramold, which was the only other doorskin manufacturer besides Jeld-Wen and Masonite that the DOJ considered to be significant when evaluating Premdor's acquisition of Masonite.

**RESPONSE TO PARAGRAPH 60:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60, and therefore deny those allegations.

61.     Consolidation in the interior molded door and doorskins markets continued as Jeld-Wen, Masonite, and CMI each acquired smaller interior molded door manufacturers. For example, CMI acquired C&S Door in 2005, making it another vertically-integrated doorskins and interior molded door company (in addition to Masonite and Jeld-Wen). It also acquired Illinois Flush Door Co. in 2010. At the same time, Masonite acquired two additional interior door manufacturers, including Ledco, Inc. and Lifetime Doors, Inc. Jeld-Wen also continued to acquire interior molded door companies, including CMI in 2012, *see supra* Section IV.E., Karona, Inc. in 2015, Milliken Millwork, Inc. in 2017, and American Building Supply, Inc. in 2018.

**RESPONSE TO PARAGRAPH 61:**

JELD-WEN Defendants admit that CMI acquired C&S Door in 2005 and Illinois Flush Door Co. in 2010 and that JELD-WEN acquired CMI in 2012, Karona, Inc. in 2015, Milliken Millwork, Inc. in 2017, and American Building Supply, Inc. in 2018.  JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 regarding Masonite, and therefore deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 61.

62.     This industry consolidation resulted in Jeld-Wen and Masonite controlling a commanding share of the market for interior molded doors, respectively 40% and 42%, with CMI and an additional manufacturer, Steves & Sons, controlling 7% each. The remainder of the market was controlled by a few additional small, regional interior molded door manufacturers. Notably, while Jeld-Wen, Masonite and CMI were all vertically-integrated companies that produced both doorskins and completed interior molded doors, Steves & Sons only produced completed doors, meaning it had to purchase its doorskins from one of its direct competitors.

**RESPONSE TO PARAGRAPH 62:**

JELD-WEN Defendants admit that prior to 2012, JELD-WEN, Masonite, CMI, Steves, and some additional manufacturers sold interior molded doors.  JELD-WEN Defendants further admit that Steves did not manufacturer doorskins prior to 2012.  JELD-WEN Defendants deny the remaining allegations in Paragraph 62.

23

63.    Years later, in 2012, Jeld-Wen sought to purchase CMI, including the Towanda doorskins manufacturing facility at issue in the 2001 Premdor-Masonite acquisition. Knowing that the acquisition of CMI, like the Premdor-Masonite merger, would implicate antitrust concerns, in an attempt to ameliorate concerns from Independent Door Manufacturers that Jeld-Wen would exploit its market power over the supply of doorskins and as part of the Company's plan to appease the DOJ, Jeld-Wen began to enter into supply agreements with other Independent Door Manufacturers for sale of doorskins. The purpose of the supply agreements was to assure the DOJ that Jeld-Wen would continue to sell doorskins at competitive prices to competing interior molded door manufacturers, and that therefore there would be continued competition in the door market.

**RESPONSE TO PARAGRAPH 63:**

JELD-WEN Defendants admit that in 2012, JELD-WEN acquired CMI.  JELD-WEN Defendants deny the remaining allegations in Paragraph 63.

64.    On May 1, 2012, Jeld-Wen entered into a long-term supply agreement with its largest doorskins customer, Steves & Sons (the "Supply Agreement"), for a substantial percentage of its doorskin purchases.

**RESPONSE TO PARAGRAPH 64:**

JELD-WEN Defendants admit that JELD-WEN entered into a Supply Agreement with Steves on May 1, 2012.  JELD-WEN Defendants deny the remaining allegations in Paragraph 64.

65.    That Supply Agreement was to be in effect through December 31, 2019, with automatic renewals of seven-year terms unless either party terminated the contract. The contract could be terminated by Steves & Sons for any reason upon two-year written notice to Jeld-Wen, or by Jeld-Wen upon seven-year written notice to Steves & Sons.

**RESPONSE TO PARAGRAPH 65:**

Paragraph 65 purports to describe the terms of the Supply Agreement.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 65 characterizes or conflicts with the contents of the Supply Agreement, JELD-WEN Defendants deny those allegations.

66.    The doorskin prices that Jeld-Wen could charge Steves & Sons under the Supply Agreement varied according to a ***contractually defined formula*** based on Jeld-Wen's key input costs, which included raw material or energy costs. The Supply Agreement obligated Jeld-Wen to give Steves & Sons annual notice of the prices and input costs for the coming year by November 30, and Jeld-Wen could not impose any price increases if it failed to do so.

**RESPONSE TO PARAGRAPH 66:**

Paragraph 66 purports to describe the terms of the Supply Agreement. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 66 characterizes or conflicts with the contents of the Supply Agreement, JELD-WEN Defendants deny those allegations.

67.     In addition to the Supply Agreement, Jeld-Wen had long-term doorskin supply agreements with several other door customers. However, according to CW 5, Steves & Sons was Jeld-Wen's largest external purchaser of doorskins.

**RESPONSE TO PARAGRAPH 67:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 67. JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 67, and therefore deny those allegations.

68.     Then, on or about June 18, 2012, six weeks *after executing the Supply Agreement*, Jeld-Wen publicly announced its intent to merge with and acquire CMI, the completion of which was now contingent upon regulatory approval by government agencies.

**RESPONSE TO PARAGRAPH 68:**

JELD-WEN Defendants admit that on June 15, 2012, JELD-WEN announced that it had entered into a letter of intent to acquire CMI. JELD-WEN Defendants deny the remaining allegations in Paragraph 68.

69.     CW 5 explained that prior to the CMI Acquisition, CMI had been a relatively big competitor of Jeld-Wen and that the Company entered into the CMI Acquisition to gain market share in the doors market. As Judge Payne later found, this was part of Jeld-Wen's plan to "kill off some of the independent door makers that were its doorskin customers."

**RESPONSE TO PARAGRAPH 69:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 69, and therefore deny those allegations. The second sentence of Paragraph 69 purports to quote the Divestiture Decision. JELD-WEN

25

Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the

extent Paragraph 69 characterizes or conflicts with the contents of the Divestiture Decision, JELD-

WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations

in Paragraph 69.

70.     Early in 2012, Jeld-Wen and CMI decided to request approval of the transaction from the DOJ. Executives from both companies had been involved in Premdor's acquisition of Masonite and the divestiture of the Towanda facility in 2001, and were therefore aware of the problems that the DOJ review could pose.

**RESPONSE TO PARAGRAPH 70:**

JELD-WEN Defendants admit that JELD-WEN sought approval of the Merger from the

DOJ in 2012.  JELD-WEN Defendants deny the remaining allegations in Paragraph 70.

71.     Because of its knowledge of this likely DOJ hurdle—and as Judge Payne later found following an evidentiary hearing in the Steves & Sons Litigation—Jeld-Wen intentionally approached the DOJ *only after* it had entered into the long-term supply contracts with the Independent Door Manufacturers. Indeed, as Judge Payne noted, Jeld-Wen engaged in this "oft-used tactic" in order to "assuage the concerns of the DOJ and the [Independent Door Manufacturers] about [the] anticompetitive effects of the proposed [Acquisition]."

**RESPONSE TO PARAGRAPH 71:**

Paragraph 71 purports to describe and quote the Divestiture Decision.  JELD-WEN

Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the

extent Paragraph 71 characterizes or conflicts with the contents of the Divestiture Decision, JELD-

WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations

in Paragraph 71.

72.     Specifically, this tactic limited the DOJ's ability to secure evidence necessary to block the merger for the simple reason that customers with supply agreements are more willing to accept a merger proposed by their supplier because they do not have reason to feel threatened.

**RESPONSE TO PARAGRAPH 72:**

JELD-WEN Defendants deny the allegations in Paragraph 72.

73.     In fact, as Judge Payne later explained, according to Jeld-Wen's internal documents, the Company considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, as Jeld-Wen was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go." Further demonstrating its knowledge that in the absence of prophylactic measures the CMI Acquisition would implicate serious antitrust concerns, Jeld-Wen retained highly-qualified antitrust counsel from one of the nation's largest law firms, O'Melveny & Myers, to advise the Company in connection with its request for DOJ approval.

**RESPONSE TO PARAGRAPH 73:**

Paragraph 73 purports to quote the Divestiture Decision.  JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent Paragraph 73 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants admit that JELD-WEN retained O'Melveny & Myers to advise it in connection with the Merger.  JELD-WEN Defendants deny the remaining allegations in Paragraph 73.

74.     After Jeld-Wen approached the DOJ, the agency's Antitrust Division notified Jeld-Wen that it had opened a preliminary investigation into the proposed CMI Acquisition. Representatives of CMI and Jeld-Wen then gave presentations to the DOJ about the acquisition. The presentations of course emphasized that Jeld-Wen had entered into the long-term supply contracts with the Independent Door Manufacturers.

**RESPONSE TO PARAGRAPH 74:**

JELD-WEN Defendants admit that JELD-WEN and CMI gave presentations to the DOJ about the Merger.  JELD-WEN Defendants deny the remaining allegations in Paragraph 74.

75.     As admitted by James Morrison, former Executive Vice President and Chief Operating Officer of Jeld-Wen, the purpose of entering into such contracts was "to alleviate" customer concerns about not having a supply and "to assure the customers of CMI, who might eventually become customers of Jeld-Wen, that Jeld-Wen was committed to their continued supply."

**RESPONSE TO PARAGRAPH 75:**

JELD-WEN Defendants admit that James Morrison is a former Executive Vice President and Chief Operating Officer of JELD-WEN.  JELD-WEN Defendants deny the remaining

allegations in Paragraph 75, including that the purported quotation and summary in Paragraph 75 accurately characterize remarks by Morrison.

76.     At around the same time, DOJ began to contact the external door manufacturers with which Jeld-Wen had long-term supply agreements to ask if they had a problem with Jeld-Wen purchasing CMI and, with it, the doorskins plant.

**RESPONSE TO PARAGRAPH 76:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76, and therefore deny those allegations.

77.     When Steves & Sons—Jeld-Wen's largest doorskins customer—was contacted about the proposed acquisition, it informed the DOJ that it did not oppose the acquisition because it believed that the Supply Agreement would prevent Jeld-Wen from taking any anticompetitive actions. According to the complaint filed in the Steves & Sons Litigation, the other smaller Independent Door Manufacturers with which Jeld-Wen had supply agreements also did not object to the Acquisition.

**RESPONSE TO PARAGRAPH 77:**

Paragraph 77 purports to describe the *Steves* Complaint.  JELD-WEN Defendants refer to the *Steves* Complaint for its contents.  To the extent Paragraph 77 characterizes or conflicts with the contents of the *Steves* Complaint, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 77, and therefore deny those allegations.

78.     The Antitrust Division subsequently closed its investigation on September 28, 2012, and the CMI Acquisition closed on October 24, 2012.

**RESPONSE TO PARAGRAPH 78:**

JELD-WEN Defendants admit the allegations in Paragraph 78.

79.     After the Acquisition, Jeld-Wen and Masonite became the only two manufacturers of doorskins in the United States. Moreover, they now controlled 85% of the market for interior molded doors. Compounding that market dominance, the manufacturers comprising the other 15% of the interior molded doors market (among them Steves & Sons) were not vertically-integrated and had no choice but to purchase doorskins from either Jeld-Wen or Masonite.

28

**RESPONSE TO PARAGRAPH 79:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 79. JELD-WEN Defendants deny the remaining allegations in Paragraph 79.

80.     The competitive landscape that emerged in the wake of the CMI Acquisition thus consisted of two dominant, vertically-integrated door manufacturers with incentives to collude, which is exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in the first place.

**RESPONSE TO PARAGRAPH 80:**

JELD-WEN Defendants deny the allegations in Paragraph 80.

81.     Prior to its acquisition of CMI, Jeld-Wen had aggressively competed with Masonite for the sale of doorskins to other interior molded door manufacturers. Following the CMI Acquisition, however, and as a result of its greater market power, Jeld-Wen began engaging in anticompetitive conduct to drive up the price of interior molded doors.

**RESPONSE TO PARAGRAPH 81:**

JELD-WEN Defendants admit that JELD-WEN competes with Masonite. JELD-WEN Defendants deny the remaining allegations in Paragraph 81.

82.     In early 2014, now that the market for interior molded doorskins was limited to Jeld-Wen and Masonite, Jeld-Wen announced that it had implemented a new pricing strategy. This new strategy was a departure from its old, high volume/low margin strategy which emphasized growth and increased market share. That strategy "often led to competing on price." Jeld-Wen's new lower volume/higher margin strategy instead emphasized "pricing optimization," to increase product profitability on a per unit basis.

**RESPONSE TO PARAGRAPH 82:**

JELD-WEN Defendants admit that in early 2014, JELD-WEN announced that it had implemented a new pricing strategy that emphasized product profitability on a per unit basis.

JELD-WEN Defendants deny the remaining allegations in Paragraph 82.

83.     Just several months later, in June 2014, Masonite abruptly stopped selling doorskins to other door manufacturers, making Jeld-Wen the market's sole supplier of doorskins to Independent Door Manufacturers. Masonite announced this decision during a presentation to its investors on June 25, 2014 (the "June 2014 Masonite Presentation"), where it explained that "[o]nly Masonite and JELD-WEN service the entire North American market," but with Masonite

having determined not to sell doorskins to their competition, "that only leaves one other outlet for them to get their facings [*i.e.*, doorskins] from in North America."

**RESPONSE TO PARAGRAPH 83:**

JELD-WEN Defendants admit that Masonite hosted an investor call on June 25, 2014, and refer to the transcript of that call for its contents. To the extent Paragraph 83 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 83.

84.     Armed with the knowledge that Independent Door Manufacturers had no other place to turn for doorskins, Jeld-Wen began exploiting its market power by engaging in anticompetitive conduct against the Independent Door Manufacturers with which the Company had executed long-term supply agreements for the supply of doorskins by, among other things, extra-contractually raising prices. These Independent Door Manufacturers included Steves & Sons, its largest doorskins customer. According to CW 3, Steves & Sons—a competitor of Jeld-Wen—had begun winning bigger contracts for the sale of interior molded doors and buying up the market, creating the pressure to compete with them. And according to CW 2, Defendants Hachigian, as President and CEO, and Mallard, as CFO, specifically directed the Company to implement these price increases in 2014 and break all of its doorskin supply agreements.

**RESPONSE TO PARAGRAPH 84:**

JELD-WEN Defendants deny the allegations in the first and second sentences of Paragraph 84. JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84, and therefore deny those allegations.

85.     For example, in July 2014, Defendant Hachigian sent Steves & Sons the June 2014 Masonite Presentation announcing its decision to no longer sell doorskins externally. In sending this presentation to Steves & Sons, Defendant Hachigian characterized it as "*a very informative document for our discussions*."

**RESPONSE TO PARAGRAPH 85:**

Paragraph 85 purports to quote a JELD-WEN letter to Steves. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 85 characterizes or conflicts with the contents of that letter, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 85.

86.     Then Jeld-Wen breached the Supply Agreement by improperly increasing the prices that it charged Steves & Sons to purchase doorskins. These increases were prohibited by the Supply Agreement, which only permitted price increases that were tied to the rise in cost of raw materials. But, in fact following the CMI Acquisition, Jeld-Wen's key input costs declined every year, negating the only defensible justification for price increases under the Supply Agreement. Jeld-Wen charged even higher supra-competitive prices to other Independent Door Manufacturers with which the Company did not have any supply agreements.

**RESPONSE TO PARAGRAPH 86:**

Paragraph 86 contains characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 86.

87.     Jeld-Wen's pricing decisions were a consequence of Jeld-Wen's enhanced market power following the CMI Acquisition. Following the merger, Jeld-Wen and Masonite were the only two doorskin suppliers in the United States. Thus, by using its market dominance to unlawfully raise the price of doorskins, Jeld-Wen was able to both artificially increase its revenues for sale of those doorskins and improperly lessen competition in the market for sale of interior molded doors by limiting Steves & Sons' ability to manufacture them.

**RESPONSE TO PARAGRAPH 87:**

Paragraph 87 contains characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 87.

88.     Moreover, Jeld-Wen attempted to add a "capital charge" to the normal doorskin prices under the Supply Agreement, which was purportedly intended to help offset the cost of making capital improvements to Jeld-Wen's facilities that made the doorskins sold to Steves & Sons. However, this capital charge was not permitted pursuant to the contractual pricing provisions of the Supply Agreement.

**RESPONSE TO PARAGRAPH 88:**

Paragraph 88 contains characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 88, except admit that JELD-WEN representatives met with Steves representatives in

31

August 2014 and discussed a capital charge in connection with discussions regarding a potential new contract.

89.      Although Steves & Sons rejected this charge, as Judge Payne later found, Jeld-Wen was successful in extracting new contracts from other Independent Door Manufacturers requiring them to pay this charge, under threat of either termination of the supply contracts or loss of doorskin supply. Jeld-Wen was able to extract these new contracts as a result of the lessened competition in the doorskins market, since by this time Jeld-Wen was the only supplier of doorskins to Independent Door Manufacturers in the United States.

**RESPONSE TO PARAGRAPH 89:**

Paragraph 89 purports to describe the Divestiture Decision.  JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent Paragraph 89 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 89.

90.      In 2014, Jeld-Wen also changed its approach to dealing with defective doorskins, significantly limiting reimbursements under the Supply Agreement. Before that time, if a customer of Steves & Sons rejected a door as defective because of a defective doorskin, Steves & Sons would give the customer credits for the purchase price of the door, and then seek reimbursement from Jeld-Wen for the full cost of the door which had the defective doorskin. Jeld-Wen would typically pay the entire amount.

**RESPONSE TO PARAGRAPH 90:**

JELD-WEN Defendants deny the allegations in Paragraph 90.

91.      However, in late 2014 or early 2015, Jeld-Wen adopted a policy to reimburse Steves & Sons only for the defective doorskins, rather than for the full cost of the doors. Although not contractually required by the Supply Agreement, because of the substantially lessened competition caused by the merger, Jeld-Wen no longer felt that it was competitively necessary to extend this benefit to Steves & Sons in 2015 and thereafter.

**RESPONSE TO PARAGRAPH 91:**

JELD-WEN Defendants deny the allegations in Paragraph 91, except admit that in those instances where Steves was shipped a defective door skin, JELD-WEN reimbursed Steves for the cost of that defective door skin, and admit that JELD-WEN's reimbursement practices were

consistent with the terms of the Supply Agreement.  JELD-WEN Defendants deny the remaining

allegations contained in Paragraph 91.

92.     Following the CMI Acquisition, and in conjunction with its breach of the long-term supply agreements, in late 2012 Jeld-Wen and Masonite began imposing uniform price increases on interior molded doors.

**RESPONSE TO PARAGRAPH 92:**

JELD-WEN Defendants deny the allegations in Paragraph 92.

93.     Critically, Defendants Beck, Mallard, Hachigian, and Michel were all involved in and had the ultimate authority during their tenure with the Company to approve and implement these price increases. CW 3 explained that price increases were discussed and approved by a pricing group, which included the CEO and the CFO, as well as Controllers, product line managers, the sales team, and operations personnel. During CW 3's tenure with Jeld-Wen, this included Defendants Beck, Mallard, and Hachigian.

**RESPONSE TO PARAGRAPH 93:**

JELD-WEN Defendants deny the allegations in the first sentence of Paragraph 93.  JELD-

WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 93, and therefore deny those allegations.

94.     This was corroborated by multiple former employees, including CWs 2, 4 and 6, all of whom unambiguously confirmed that price increases were always approved by the CEO. Further, CW 4 expanded upon this, noting that Defendant Hachigian was hands-on with regards to pricing, and Defendant Beck was "very, very" hands-on in this regard.

**RESPONSE TO PARAGRAPH 94:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 94, and therefore deny those allegations.

95.     According to the allegations and underlying documentation set forth in the complaints filed in the DPP and IPP Litigations pending against Jeld-Wen and Masonite, the price increases that Jeld-Wen and Masonite began imposing in 2012 were larger and in a different form than prior price increases. Historically, price increases would be in amounts such as 25 cents or $1 per door. Beginning around 2012, Jeld-Wen and Masonite began increasing prices by significant percentages.

| Company | Notice Date | Effective Date | Increase |
|---|---|---|---|
| Jeld-Wen | 11/15/2012 | 02/04/2013 | 3%-5% |
| Masonite | 12/06/2012 | 03/18/2013 | 3%-6% |
| Jeld-Wen | 08/06/2013 | 10/07/2013 | 4% |
| Masonite | 08/13/2013 | 09/30/2013 | 5% |
| Masonite | 10/31/2013 | 02/03/2014 | 5% |
| Jeld-Wen | 11/18/2013 | 01/27/2014 | 5% |
| Jeld-Wen | 06/09/2014 | 08/11/2014 | 9.5% |
| Masonite | 06/17/2014 | 08/18/2014 | 8% |
| Masonite | 12/01/2014 | 03/02/2015 | 5% |
| Jeld-Wen | 12/03/2014 | 03/02/2015 | 5% |
| Masonite | 10/26/2015 | 02/01/2016 | 3%-5% |
| Jeld-Wen | 10/28/2015 | 02/01/2016 | 3%-5% |
| Masonite | 10/04/2016 | 01/01/2017 | 5%-7% |
| Jeld-Wen | 10/18/2016 | 01/03/2017 | 5% |
| Jeld-Wen | 03/06/2018 | 05/07/2018 | 6% |
| Masonite | 03/2018 | 06/01/2018 | 6% |
| Jeld-Wen | 10/08/2018 | 12/17/2018 | 7% |
| Masonite | 10/08/2018 | 12/15/2018 | 7%-9% |

**RESPONSE TO PARAGRAPH 95:**

Paragraph 95 purports to summarize complaints and supporting documentation in other litigations. JELD-WEN Defendants refer to those written documents for their contents. To the extent Paragraph 95 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants further admit that JELD-WEN announced price increases in the amounts and on the dates alleged in Paragraph 95 to certain customers. JELD-WEN Defendants deny that the price of interior molded doors actually increased in the amounts listed in its announcements or, in some cases, that prices increased at all. JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 regarding price increase announcements by Masonite, and therefore deny those allegations. JELD-WEN Defendants further deny any remaining allegations in Paragraph 95.

96.     By comparison, inflation (as measured by the Consumer Price Index) ranged between a high of 2.1% in 2012 and a low of 0.1% in 2015 for this same period.

34

**RESPONSE TO PARAGRAPH 96:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and therefore deny those allegations.

97.     Jeld-Wen and Masonite's steady, lock-step price increases were not the result of competitive market forces, such as cost or demand factors. In particular, the largest input cost of interior molded doors is doorskins. However, since Jeld-Wen and Masonite are vertically-integrated, they control those costs and their price increases outpaced any increase in their raw material and other costs. And CWs 1 and 4 confirmed that price increases did not correspond with material cost increases. Rather, these increases are more likely attributable to an explicit or tacit agreement to fix prices.

**RESPONSE TO PARAGRAPH 97:**

The allegations in Paragraph 97 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Masonite and CWs 1 and 4, and therefore deny those allegations.  JELD-WEN Defendants further deny the remaining allegations in Paragraph 97.

98.     According to CW 6, Jeld-Wen had frequent interactions with Masonite, including during Company-sponsored meetings held at Jeld-Wen headquarters. Moreover, according to CW 1, Jeld-Wen employees were "always aware what Masonite was charging" its customers. This would have provided the companies with opportunities to coordinate pricing.

**RESPONSE TO PARAGRAPH 98:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98, and therefore deny those allegations.  JELD-WEN Defendants note that the allegations in the third sentence of Paragraph 98 are subjective opinion and/or argument, to which no response is required.  To the extent a response is deemed required, JELD-WEN Defendants deny those allegations.

99.     As a result of this anticompetitive conduct, in 2015, Steves & Sons requested that the DOJ once again examine Jeld-Wen's conduct. Steves & Sons gave a presentation to the DOJ in December 2015, and then produced documents a month later, in response to a civil investigative

35

demand. On April 7, 2016, Jeld-Wen also made a presentation to the DOJ, and on May 18, 2016, the DOJ closed its investigation without taking any action.

**RESPONSE TO PARAGRAPH 99:**

JELD-WEN Defendants admit that on April 7, 2016, JELD-WEN made a presentation to the DOJ and that on May 18, 2016, the DOJ closed its second investigation into the Merger without taking any action. JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99, and therefore deny those allegations.

100.   Thereafter, on June 29, 2016, Steves & Sons filed a lawsuit against Jeld-Wen alleging that the Company's acquisition of CMI and Jeld-Wen's subsequent price increases for its interior molded doors and doorskins violated federal antitrust laws, specifically, Section 7 of the Clayton Act, which prohibits, in relevant part, mergers and acquisitions where the effect may be to substantially lessen competition." Complaint, *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va. June 29, 2016), ECF No. 1.

**RESPONSE TO PARAGRAPH 100:**

JELD-WEN Defendants admit that the *Steves* Litigation was initiated on June 29, 2016. Paragraph 100 purports to quote the *Steves* Complaint. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 100 characterizes or conflicts with the contents of the *Steves* Complaint, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 100.

101.   Throughout the Class Period, Defendants represented that the Company operated in a highly competitive environment, and regularly touted the source of Jeld-Wen's financial success as the result of legitimate and lawful business strategies. Indeed, despite ***knowing all along*** that the true source of the Company's success was its anticompetitive conduct in entering into the long-term supply agreements in order to obtain DOJ approval of the CMI Acquisition, and with the clear intention to flout those agreements by driving up the price of doorskins once the CMI Acquisition was complete, Defendants continually represented that the Company's success was driven by legitimate and lawful strategies such as "pricing optimization," "pricing discipline," "strategic pricing," and "favorable pricing."

**RESPONSE TO PARAGRAPH 101:**

JELD-WEN Defendants deny the allegations in Paragraph 101.

36

102.    The Class Period begins on January 26, 2017, when the SEC declared Jeld-Wen's registration statement for its initial public offering (the "IPO") effective. Pursuant to the offering materials filed with the Company's IPO, Defendants represented that Jeld-Wen "*operate[s] in a highly competitive business environment*," and further described Masonite as among its "*major competitors*" for the Company's North American interior doors business. The offering materials further stated that "*[w]hile we operate in a competitive market, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins*."

**RESPONSE TO PARAGRAPH 102:**

JELD-WEN Defendants admit that JELD-WEN's prospectus for its initial public offering is dated January 26, 2017 (the "Prospectus"), and refer to that written document for its contents. To the extent Paragraph 102 characterizes or conflicts with the contents of the Prospectus, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 102.

103.    The offering materials also represented that in early 2014—around the time that Defendant Hachigian was actually directing the Company to break its long-term supply agreements by implementing extra-contractual price increases—the Company changed its pricing strategy by "*making strategic pricing decisions based on analysis of customer and product level profitability*" and "*increas[ing] our emphasis on pricing optimization*," and that, as a result, "*our operations during 2014 and 2015 benefitted from improved pricing, particularly in North America*."

**RESPONSE TO PARAGRAPH 103:**

Paragraph 103 purports to quote the Prospectus.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 103 characterizes or conflicts with the contents of the Prospectus, JELD-WEN Defendants deny those allegations.  Defendants deny the remaining allegations in Paragraph 103.

104.    The Company further touted its "*continued pricing optimization*" as a strategic initiative "*to deliver profitable organic revenue growth*," stating that Jeld-Wen "*will continue to employ a strategic approach to pricing our products*."

**RESPONSE TO PARAGRAPH 104:**

Paragraph 104 purports to quote the Prospectus.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 104 characterizes or conflicts with the

contents of the Prospectus, JELD-WEN Defendants deny those allegations.   JELD-WEN

Defendants deny the remaining allegations in Paragraph 104.

105.    As the Class Period progressed, Defendants maintained this story. For example, on February 22, 2017, during Jeld-Wen's earnings call for the fourth quarter and full year 2016 ("4Q 2016"), Defendant Mallard falsely attributed the Company's increase in adjusted EBITDA to legitimate and lawful strategies, including "*favorable pricing*, improved cost productivity, and the favorable impact of recent acquisitions." Defendant Mallard also noted that the improvement in Jeld-Wen's revenues was driven, in part by "*our pricing optimization strategy in all three segments*."

**RESPONSE TO PARAGRAPH 105:**

JELD-WEN Defendants admit that JELD-WEN held an investor earnings call on

February 22, 2017 (the "Q4 2016 Earnings Call"), and refer to the written transcript of that call for

its contents.  To the extent Paragraph 105 characterizes or conflicts with the contents of that

transcript, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the

remaining allegations in Paragraph 105.

106.    In a presentation filed in connection with that February 22, 2017 earnings call, Jeld-Wen emphasized a "Balanced Approach to Margin Expansion," highlighting several drivers for revenue growth and margin expansion. Among those drivers, the Company listed "*Profitable Organic Growth*," from, among other things, "*Strategic Pricing*" and "*Pricing Optimization*."

**RESPONSE TO PARAGRAPH 106:**

JELD-WEN Defendants admit that JELD-WEN filed presentation materials with the SEC

in connection with the Q4 2016 Earnings Call (the "Q4 2016 Presentation"), and refer to that

written document for its contents.  To the extent Paragraph 106 characterizes or conflicts with the

contents of that presentation, JELD-WEN Defendants deny those allegations.  JELD-WEN

Defendants deny the remaining allegations in Paragraph 106.

107.    Then, on May 9, 2017, Jeld-Wen held its first quarter 2017 ("1Q 2017") earnings call. During the call, in response to an analyst's question about pricing, Defendant Beck stated that "*if you go back for the last couple of years, we were doing larger than market price increases as we were playing catch up and trying to reset pricing where we thought they should be*."

38

**RESPONSE TO PARAGRAPH 107:**

JELD-WEN Defendants admit that JELD-WEN held an investor earnings call on May 9, 2017 (the "Q1 2017 Earnings Call"), and refer to the written transcript of that call for its contents. To the extent Paragraph 107 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations.

108.    Defendants kept up this charade throughout the Class Period. When asked point-blank by an analyst during the RBC Capital Markets Global Industrials Conference on September 14, 2017 whether the current competitive environment in North America was a "rational pricing environment" with "people behaving," Defendant Beck unambiguously responded "***Yes***."

**RESPONSE TO PARAGRAPH 108:**

JELD-WEN Defendants admit that Defendant Beck participated in a Management Discussion on September 14, 2017 at the Royal Bank of Canada Global Industrials Conference (the "RBC Conference"), and refer to the written transcript of that event for its contents.  To the extent Paragraph 108 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 108.

109.    And on November 8, 2017, at the Robert W. Baird Global Industrial Conference, Defendant Beck discussed the trajectory and cause of the Company's growth, stating: "***What got us from 4% to almost 12% was – about 70% to 75% of that came on the back of price discipline. When the transformation began, pricing responsibility existed with plant managers, with salespeople, and we've centralized that. We have a central pricing analytics group, and we've centralized the authority to set pricing. And we've been very, very disciplined***."

**RESPONSE TO PARAGRAPH 109:**

JELD-WEN Defendants admit that Defendant Beck participated in a Management Discussion on November 8, 2017 at the Robert W. Baird Global Industrial Conference (the "Robert W. Baird Conference"), and refer to the written transcript of that event for its contents.  To the extent Paragraph 109 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations.

110. However, these and other statements touting the competitive environment in which Jeld-Wen purportedly operated and attributing the Company's financial success to legitimate pricing strategies, as set forth in Section V, *supra*, were all false and misleading. Contrary to Defendants' statements, Jeld-Wen did not "***operate in a highly competitive business environment***," and the true source of its financial success was not an "***increas[ing] [] emphasis on pricing optimization***," or legitimate and legal "***strategic pricing decisions***," but was, rather, the result of Jeld-Wen's anticompetitive conduct.

**RESPONSE TO PARAGRAPH 110:**

JELD-WEN Defendants deny the allegations in Paragraph 110.

111. As further discussed in paragraphs 127-31 *supra*, as set forth in the evidentiary findings of fact by Judge Payne in the Eastern District of Virginia, Defendants knew that the CMI Acquisition and the Company's subsequent breach of the long-term supply contracts was a violation of the federal antitrust laws. In particular, in light of the DOJ's objection to the 2001 Premdor-Masonite acquisition, Defendants were aware that the CMI Acquisition would implicate those same antitrust concerns by creating a market which consisted of two dominant, vertically-integrated door manufacturers with incentives to collude.

**RESPONSE TO PARAGRAPH 111:**

Paragraph 111 purports to describe the Divestiture Decision. JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents. JELD-WEN Defendants deny the allegations in Paragraph 111.

112. In order to mitigate those concerns, Jeld-Wen developed a plan to enter into the long-term supply agreements with the Independent Door Manufacturers for the sale of doorskins. Only ***after*** it had entered into those agreements did Jeld-Wen approach the DOJ for approval of the CMI Acquisition, knowing that this tactic would appease the DOJ and the Independent Door Manufacturers about any possible anticompetitive effects of the Acquisition. However, immediately following the completion of the CMI Acquisition, and as a result of Jeld-Wen's then-increased market power, Defendants proceeded to breach those supply agreements by extra-contractually raising the price of doorskins in order to drive the Independent Door Manufacturers out of the market for interior molded doors and then proceed to exponentially raise the cost of interior molded doors.

**RESPONSE TO PARAGRAPH 112:**

JELD-WEN Defendants deny the allegations in Paragraph 112.

113. Despite Defendants' awareness that Jeld-Wen's anticompetitive conduct, including the purchase of CMI to solidify its market standings and kill off its competitors in the interior molded door market, with the specific intention to flout the long-term doorskin supply agreements that they had entered into in order to secure DOJ approval of that Acquisition, was the true reason

for Jeld-Wen's financial success, Defendants continued to attribute that success to legitimate and lawful business strategies.

**RESPONSE TO PARAGRAPH 113:**

JELD-WEN Defendants deny the allegations in Paragraph 113.

114.    On February 15, 2018, after nearly two years of litigation, the Company announced that a jury had returned a verdict against Jeld-Wen in the Steves & Sons Litigation, finding that Jeld-Wen's conduct violated Section 7 of the Clayton Act and disclosed that the jury had awarded Steves & Sons damages in the total amount of $176 million, including past damages and future lost profits. The verdict form returned by the jury contained no additional clarifying factual detail or explanation for that decision and, notably, the vast majority of the Steves & Sons Litigation docket is sealed or redacted, making it impossible to glean specific details about Jeld-Wen's anticompetitive conduct.

**RESPONSE TO PARAGRAPH 114:**

JELD-WEN Defendants admit that on February 15, 2018, JELD-WEN filed the Jury Verdict Press Release, and refer to that written document for its contents.  To the extent Paragraph 114 characterizes or conflicts with the contents of that press release, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants admit that Paragraph 114 purports to describe the Jury Verdict, and refer to that written document for its contents.  To the extent Paragraph 114 characterizes or conflicts with the contents of the Jury Verdict, JELD-WEN Defendants deny those allegations, except that JELD-WEN Defendants deny JELD-WEN's liability under that verdict, which is on appeal.  JELD-WEN Defendants deny the remaining allegations in Paragraph 114.

115.    Yet Defendants still continued to conceal the true breadth of Jeld-Wen's misconduct and the financial impact it had on Jeld-Wen's business. In a press release on that same date, the Company rejected the accuracy of the jury verdict, stating that "*[t]he Company continues to believe that the facts underlying this dispute do not establish either a violation of the antitrust laws or a breach of contract*."

**RESPONSE TO PARAGRAPH 115:**

JELD-WEN Defendants deny the allegations in the first sentence of Paragraph 115.

Paragraph 115 purports to quote the Jury Verdict Press Release.  JELD-WEN Defendants refer to

41

that written document for its contents.  To the extent Paragraph 115 characterizes or conflicts with the contents of the press release, JELD-WEN Defendants deny those allegations.

116.    Relying explicitly on the fact that the Antitrust Division of the DOJ had reviewed the CMI Acquisition and did not challenge it, Jeld-Wen doubled down on its innocence, noting that it would "vigorously oppose" the judgment. The Company further noted that the ultimate outcome of the Steves & Sons Litigation would not have a "material impact" on the Company.

**RESPONSE TO PARAGRAPH 116:**

Paragraph 116 purports to describe the Jury Verdict Press Release.   JELD-WEN Defendants refer to that written document for its contents.   To the extent Paragraph 116 characterizes or conflicts with the contents of the press release, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 116.

117.    These statements were demonstrably false. Indeed, Defendants omitted to inform the market that Jeld-Wen had entered into the long-term supply agreements with the Independent Door Manufacturers, including Steves & Sons, in order to assuage the DOJ of any anticompetitive concerns it may have had regarding the CMI Acquisition, while simultaneously *intending* to flout those supply agreements as soon as the CMI Acquisition was completed. Defendants further failed to inform the market that because of their knowingly anticompetitive conduct, an adverse judgment in the Steves & Sons Litigation was probable and likely to "material[ly] impact" Jeld-Wen.

**RESPONSE TO PARAGRAPH 117:**

JELD-WEN Defendants deny the allegations in Paragraph 117.

118.    The market credited Defendants' reassurances that the decision was erroneous based on the DOJ's refusal to intervene. For example, Bank of America wrote in a February 16, 2018 analyst report that:

> ***It seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition prior to its consummation in 2012***. Furthermore, during the period between the acquisition closing and the filing of the complaint by Steves, the DOJ was once again asked to review the JELD/CMI transaction and maintained its original opinion that no antitrust issues existed.

**RESPONSE TO PARAGRAPH 118:**

Paragraph 118 purports to quote a February 16, 2018 Bank of America Analyst Report.

JELD-WEN Defendants refer to that written document for its contents.    To the extent

Paragraph 118 characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 118.

119.   Bank of America further reported that "we believe the fundamental positive stock story remains intact." Gabelli echoed these sentiments on February 20, 2018, noting that "we see any divestitures with regard to CMI as unlikely. ***This deal was reviewed twice by the DOJ and passed without issue in 2012***."

**RESPONSE TO PARAGRAPH 119:**

Paragraph 119 purports to quote a February 16, 2018 Bank of America Analyst Report and a February 20, 2018 Gabelli report. JELD-WEN Defendants refer to those written documents for their contents. To the extent Paragraph 119 characterizes or conflicts with the contents of those report, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 119.

120.   On an earnings call held just days later on February 21, 2018, Defendant Beck reiterated this position, stating that Jeld-Wen "***continue[s] to believe that the claims asserted in the [Steves & Sons] litigation lack merit***," and that the Company "***[had] acted in good faith and in compliance with our contractual agreements***." In making this assertion, he continued to rely on the DOJ's failure to intervene in the CMI Acquisition, stating that "the Department of Justice reviewed our acquisition of CMI twice and declined to take any action." He also continued to double down on the Company's claim that it did "***not believe that a loss is probable and estimable for the reasons that we've just described***."

**RESPONSE TO PARAGRAPH 120:**

JELD-WEN Defendants admit that JELD-WEN held an investor earnings call on February 21, 2018 (the "Q4 2017 Earnings Call"), and refer to the written transcript of that call for their contents. To the extent Paragraph 120 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 120.

121.   Analysts continued to buy into Defendants' false reassurances. For example, analyst RBC Capital Markets noted on February 22, 2018 that "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the CMI Acquisition twice. JELD does not believe that a loss is probable or estimable." Thus,

despite the verdict, market participants were still lulled into a false sense of security by Defendants' continuing misstatements.

**RESPONSE TO PARAGRAPH 121:**

Paragraph 121 purports to quote a February 22, 2018 RBC Capital Markets Analyst Report, and JELD-WEN Defendants refer to that written report for its contents. To the extent Paragraph 121 characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 121.

122. Just days later, on February 28, 2018, the Company announced the resignation of Defendant Beck as President and CEO, and as a member of Jeld-Wen's Board of Directors, effective February 27, 2018. Defendants provided no substantive explanation for Defendant Beck's resignation. He was replaced by Defendant Hachigian as interim CEO.

**RESPONSE TO PARAGRAPH 122:**

JELD-WEN Defendants admit that on February 28, 2018, JELD-WEN issued a press release titled "JELD-WEN Holding, Inc. Announces CEO Leadership Transition, Announces Two Acquisitions, and Updates 2018 Outlook for the Impact of Closed Acquisition," (the "February 28 Press Release"), and refer to that press release for its contents. To the extent Paragraph 122 characterizes or conflicts with the contents of that press release, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 122.

123. Having assuaged investors' concerns, Defendants continued to falsely attribute Jeld-Wen's success to legitimate pricing strategies. On March 6, 2018, Defendants filed with the SEC their Annual Report on Form 10-K for the year ended December 31, 2017 in which they reiterated to the market that the Company "*operate[s] in a highly competitive business environment*." Defendants again asserted that they were able to "achieve profitable growth" through legitimate and lawful strategies such as "*pricing discipline*," "*strategic pricing*," and "*pricing optimization*."

**RESPONSE TO PARAGRAPH 123:**

JELD-WEN Defendants admit that on March 6, 2018, JELD-WEN filed a Form 10-K for the year ended December 31, 2017 (the "2017 10-K"), and refer to that written document for its contents. To the extent Paragraph 123 characterizes or conflicts with the contents of that 10-K,

44

JELD-WEN Defendants deny those allegations.   JELD-WEN Defendants deny the remaining allegations in Paragraph 123.

124.   On May 8, 2018, during Jeld-Wen's first quarter 2018 ("1Q 2018") earnings call, Defendant Hachigian confirmed that the Company's financial success since the CMI Acquisition was a result of "***primarily getting rid of bad-margin business, taking pricing actions to get us back to price points that were prerecession***." The next day, the Company filed its 1Q 2018 10Q, once again stating that the Company's increase in gross margin and gross margin as a percentage of net revenues was a result of lawful means, including "***favorable pricing***, cost-saving initiatives and contribution from recent acquisitions."

**RESPONSE TO PARAGRAPH 124:**

JELD-WEN Defendants admit that JELD-WEN held an investor earnings call on May 8, 2018 (the "Q1 2018 Earnings Call") and that on May 9, 2018 JELD-WEN filed a Form 10-Q for the first quarter of 2018 (the "Q1 2018 10-Q"), and refer to the written transcript of the call and the Q1 2018 10-Q for their contents.  To the extent Paragraph 124 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 124.

125.   For the remainder of the Class Period, Defendants reiterated this position, continuing to misattribute Jeld-Wen's financial success to competitive conduct and lawful business strategies. In its second quarter 2018 ("2Q 2018") 10-Q, filed August 7, 2018, Defendants claimed that the increase in gross margin and net revenues was due to "***favorable pricing***," and Defendant Michel echoed this on the earnings call of the same date, stating that the Company's "strong revenue growth" was due, in part, to "***improved pricing in all 3 regions***."

**RESPONSE TO PARAGRAPH 125:**

JELD-WEN Defendants admit that on August 7, 2018, JELD-WEN filed a Form 10-Q for the second quarter 2018 (the "Q2 2018 10-Q") and that JELD-WEN held an investor earnings call on August 7, 2018 (the "Q2 2018 Earnings Call"), and refer to the written transcript of the call and the Q2 2018 10-Q for their contents.  To the extent Paragraph 125 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 125.

45

126.   Further, when he provided an update about the jury verdict in the Steves & Sons Litigation, Defendant Michel continued to mislead investors by offering false assurances, stating yet again that "***JELD-WEN believes that the jury verdict in this case is erroneous***."

**RESPONSE TO PARAGRAPH 126:**

Paragraph 126 purports to quote the Q2 2018 Earnings Call.  JELD-WEN Defendants refer to the written transcript of that call for its contents.  To the extent Paragraph 126 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 126.

127.   On October 5, 2018, the judge presiding over the Steves & Sons Litigation—Judge Robert E. Payne—issued a Memorandum Opinion following an evidentiary hearing that surprised the market by specifically detailing Jeld-Wen's clear anticompetitive conduct. In particular, Judge Payne found that "the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin industry," ultimately "depriving the [Independent Door Manufacturers] of that key component of a reliable supply source."

**RESPONSE TO PARAGRAPH 127:**

Paragraph 127 purports to quote the Divestiture Decision.  JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent Paragraph 127 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 127.

128.   Critically, Judge Payne concluded, Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

**RESPONSE TO PARAGRAPH 128:**

Paragraph 128 purports to quote the Divestiture Decision.  JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent Paragraph 128 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.

46

129.   Judge Payne further found that:

[I]t is necessary to remember that JELD-WEN was aware at the time of the merger that the antitrust issues associated with the CMI Acquisition were significant. Indeed, having calculated market concentration as a consequence of the forthcoming acquisition and the Herfindahl-Hirschman indices for markets impacted by the merger, JELD-WEN retained highly-qualified antitrust counsel from one of the nation's largest law firms, O'Melveny & Myers. In sum, and as the record shows, Jeld-Wen knew full well of the merger's antitrust implications.

Mindful of those implications, Jeld-Wen pursued an established merger strategy to assuage any possible concerns from the DOJ, from CMI's customers, and from JELD-WEN's own customers (including Steves). Specifically, JELD-WEN developed a plan to enter into long-term supply agreements with [I]ndependent [D]oor [M]anufacturers in the United States. . . . As part of its strategy, JELD-WEN deliberately decided not to approach the DOJ about the proposed CMI Acquisition until those long-term agreements had been entered. In fact, Jeld-Wen's internal documents show that the company considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, and that JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go."

**RESPONSE TO PARAGRAPH 129:**

Paragraph 129 purports to quote the Divestiture Decision.  JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent Paragraph 129 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.

130.   Judge Payne went on:

And, when JELD-WEN did approach the DOJ about the CMI Acquisition, it emphasized its long-term supply agreements with Steves, Lynden, and others. And [James] Morrison, who led the [C]ompany's presentation to the DOJ, admitted that the purpose of entering into such contracts was "to alleviate" customer concerns about not having a supply and "to assure the customers of CMI, who might eventually become customers of JELD-WEN, that JELD-WEN was committed to their continued supply."

**RESPONSE TO PARAGRAPH 130:**

Paragraph 130 purports to quote the Divestiture Decision.  JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent

Paragraph 130 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN

Defendants deny those allegations.

131. Finally, Judge Payne concluded that divestiture of the Towanda, Pennsylvania doorskins facility was an appropriate remedy for Jeld-Wen's Clayton Act violations.

**RESPONSE TO PARAGRAPH 131:**

Paragraph 131 purports to describe the Divestiture Decision. JELD-WEN Defendants refer

to the Divestiture Decision, which is currently on appeal, for its contents. To the extent

Paragraph 131 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN

Defendants deny those allegations.

132. This decision caused several securities analysts to lower their price targets on Jeld-Wen stock over the ensuing trading days, with analysts at RBC Capital Markets noting on October 8, 2018 that up to 33% of Jeld-Wen's global doorskin manufacturing capacity would be lost by the divestiture of the Towanda plant. Analyst Bank of America further commented on October 8, 2018 that the divestiture "could be the worst case scenario." On this news, the price of Jeld-Wen common stock declined over the course of two days by $1.18 per share, or nearly 5%, to close at $22.91 on October 9, 2018.

**RESPONSE TO PARAGRAPH 132:**

Paragraph 132 purports to quote analyst reports from RBC Capital Markets and Bank of

America. JELD-WEN Defendants refer to those written reports for their contents. To the extent

Paragraph 132 characterizes or conflicts with the contents of those reports, JELD-WEN

Defendants deny those allegations. JELD-WEN Defendants refer to the public record for the price

of JELD-WEN's common stock during the referenced time period. JELD-WEN Defendants deny

any allegations inconsistent with the public record regarding the price of JELD-WEN's common

stock. JELD-WEN Defendants deny the remaining allegations in Paragraph 132.

133. Critically, however, the market was not able to fully appreciate the extent of Jeld-Wen's anticompetitive conduct and the impact it had on the Company's apparent financial success, as Defendants continued to reassure investors that "***JELD-WEN firmly maintains that it has not violated any antitrust laws***," and that the October 5, 2018 decision was "***incorrect due to multiple flawed rulings during the trial process***."

**RESPONSE TO PARAGRAPH 133:**

Paragraph 133 purports to quote the Divestiture Decision Press Release. JELD-WEN Defendants refer to that press release for its contents, and deny any allegations inconsistent with the contents of that press release. JELD-WEN Defendants deny the remaining allegations in Paragraph 133.

134. The Company further reiterated that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

**RESPONSE TO PARAGRAPH 134:**

Paragraph 134 purports to quote the Divestiture Decision Press Release. JELD-WEN Defendants refer to that press release for its contents, and deny any allegations inconsistent with the contents of that press release.

135. The market once again bought Defendants' story. For example, as Bank of America reported on October 8, 2018, "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

**RESPONSE TO PARAGRAPH 135:**

Paragraph 135 purports to quote an analyst report from Bank of America. JELD-WEN Defendants refer to that written report for its contents, and deny any allegations inconsistent with the contents of that analyst report. JELD-WEN Defendants deny the remaining allegations in Paragraph 135.

136. Just ten days later, after the markets closed on October 15, 2018, Jeld-Wen shockingly admitted that the Company would likely face a significant judgment as a result of the Steves & Sons Litigation. Although the Company had previously maintained that a loss was neither probable nor estimable, the Company announced that it expected its third quarter 2018 ("3Q 2018") financial results to include a $76.5 million charge which reflected the judgment anticipated to be entered against Jeld-Wen in the Steves & Sons Litigation, as recent rulings in the case "now provided sufficient detail for the [C]ompany to estimate future liabilities."

**RESPONSE TO PARAGRAPH 136:**

Paragraph 136 purports to describe the Earnings Pre-Release.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 136 characterizes or conflicts with the contents of the press release, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 136.

137.    This was the first time that Defendants disclosed that Jeld-Wen was likely to face an adverse decision in the Steves & Sons Litigation, contrary to its continued reassurances that Defendants had done nothing wrong and the previous rulings in the case were "*erroneous*" and "*incorrect*." Moreover, it was the first time that the market was made aware that the Steves & Sons Litigation would have a material impact on Jeld-Wen's business, despite Defendants' statements to the contrary.

**RESPONSE TO PARAGRAPH 137:**

JELD-WEN Defendants deny the allegations in Paragraph 137.

138.    On the same date, Jeld-Wen announced the sudden resignation of its CFO, Defendant Mallard, effective November 8, 2018, "to pursue other career interests." Defendant Mallard was replaced by Senior Vice President, Corporate Development and Investor Relations, John Linker.

**RESPONSE TO PARAGRAPH 138:**

Paragraph 138 purports to quote from the Mallard Departure Press Release.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 138 characterizes or conflicts with the contents of the press release, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 138.

139.    This news stunned the market and caused Jeld-Wen's stock to plummet *19% in a single day* on unusually high trading volume. On October 17, 2018, Gabelli published a report on Jeld-Wen, stating that "[i]n retrospect, we underestimated the challenges JELD faced in 2018 from litigation." On November 7, 2018, RBC Capital Markets agreed, noting that "[w]e think investor concerns regarding both the current management transitions and the unfavorable legal litigation with Steves & Sons are warranted."

50

**RESPONSE TO PARAGRAPH 139:**

Paragraph 139 purports to quote an October 17, 2018 Gabelli analyst report and a November 7, 2018 RBC Capital Markets analyst report. JELD-WEN Defendants refer to those written documents for their contents. JELD-WEN Defendants deny any allegations inconsistent with those reports. JELD-WEN Defendants refer to the public record for the price of JELD-WEN's common stock during the referenced time period. JELD-WEN Defendants deny any allegations inconsistent with the public record regarding the price of JELD-WEN's common stock. JELD-WEN Defendants deny the remaining allegations in Paragraph 139.

140.    Lead Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of Jeld-Wen's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

**RESPONSE TO PARAGRAPH 140:**

The allegations in Paragraph 140 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 140.

141.    Throughout the Class Period, Defendants made a series of misrepresentations concerning the source of their revenues and the existence of competition in the market for interior molded doors, while intentionally omitting crucial details about their anticompetitive conduct that was stifling any competition in the market and artificially propping up their revenues, including their motivations and intentions with regard to the CMI Acquisition and subsequent conduct.

**RESPONSE TO PARAGRAPH 141:**

JELD-WEN Defendants deny the allegations in Paragraph 141.

142.    The Class Period begins on January 26, 2017, when the SEC declared Jeld-Wen's registration statement for the IPO effective (the "IPO Registration Statement"). On or around January 27, 2017, Jeld-Wen conducted an IPO pursuant to the IPO Registration Statement. On January 30, 2017, Jeld-Wen filed a prospectus for the IPO with the SEC on Form 424B4 (the "IPO Prospectus"), which incorporated and formed part of the IPO Registration Statement (collectively, the "IPO Offering Materials").

51

**RESPONSE TO PARAGRAPH 142:**

The allegations in the first sentence of Paragraph 142 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants admit that Lead Plaintiffs' purport to bring a class action with a putative class period beginning on January 26, 2017. JELD-WEN Defendants admit the remaining allegations in Paragraph 142.

143.    In the IPO Offering Materials, the Defendants represented that "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market. Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

**RESPONSE TO PARAGRAPH 143:**

Paragraph 143 purports to quote the Prospectus. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 143 characterizes or conflicts with the contents of the Prospectus, JELD-WEN Defendants deny those allegations.

144.    Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]e are focused on profitable growth and will continue to employ a strategic approach to pricing our products. Pricing discipline is an important element of our effort to improve our profit margins and earn an appropriate return on our invested capital*."

**RESPONSE TO PARAGRAPH 144:**

Paragraph 144 purports to quote the Prospectus. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 144 characterizes or conflicts with the contents of the Prospectus, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 144.

145.    Defendants continued to attribute their success to a "*strategic[] change [in] our pricing strategy in several key areas*," including a "*focus[] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*," and an "*increased [] emphasis on pricing optimization*."

52

**RESPONSE TO PARAGRAPH 145:**

Paragraph 145 purports to quote the Prospectus. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 145 characterizes or conflicts with the contents of the Prospectus, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 145.

146. Then, in discussing the Company's recent increase in net revenues, Defendants stated that the increase was due, in part, to "***an increase in pricing as a result of implementing our pricing optimization strategy***."

**RESPONSE TO PARAGRAPH 146:**

Paragraph 146 purports to quote the Prospectus. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 146 characterizes or conflicts with the contents of the Prospectus, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 146.

147. Defendants' statements in the IPO Offering Materials that Jeld-Wen operated in a competitive business environment and attributing Jeld-Wen's pricing optimization strategy and financial success to legitimate and lawful business factors and strategies were false and materially misled investors because Defendants failed to disclose that Jeld-Wen was engaged in anticompetitive conduct through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers.

**RESPONSE TO PARAGRAPH 147:**

The allegations in Paragraph 147 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 147.

148. Specifically, as alleged elsewhere herein, Jeld-Wen purchased CMI with the intention to consolidate market share and "kill off" other competitors in the production of interior molded doors. With knowledge that the DOJ had taken issue with such consolidation of the market in the recent past, including specifically with regard to the Towanda doorskin manufacturing facility Jeld-Wen sought to acquire with CMI, Defendants entered into long-term supply agreements with Independent Door Manufacturers for the purchase of doorskins.

**RESPONSE TO PARAGRAPH 148:**

JELD-WEN Defendants deny the allegations in Paragraph 148.

149.    Defendants entered into these supply agreements in order to circumvent DOJ objection to the Acquisition and with the intention to flout those agreements once they had secured DOJ approval. Having received that approval and following the closure of the CMI Acquisition, Jeld-Wen and Masonite were left as the only two doorskin suppliers in North America. After Masonite announced that it would no longer sell doorskins to Independent Door Manufacturers, leaving Jeld-Wen as the only doorskin supplier, Jeld-Wen proceeded to break its supply agreements by, among other things, extra-contractually raising prices for doorskins.

**RESPONSE TO PARAGRAPH 149:**

JELD-WEN Defendants deny the allegations in Paragraph 149.

150.    Analysts reacted favorably to Defendants' positive statements regarding the Company's financial success in a highly competitive market. For example, on February 2, 2017, analyst Wedbush reported that the Jeld-Wen team, led by Defendant Beck, "is making transformation change through the use of a proven track record including improved pricing discipline, establishment of operational excellence (productivity tracking metrics), investment in building growth infrastructure and inorganic strategic growth."

**RESPONSE TO PARAGRAPH 150:**

Paragraph 150 purports to quote a February 2, 2017 Wedbush analyst report.  JELD-WEN

Defendants refer to that written document for its contents.  To the extent Paragraph 150

characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those

allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 150.

151.    On February 21, 2017, analyst Barclays further credited Defendants' statements, stating that "[w]e think it's important to note where the EBITDA growth is coming from, and where it isn't. Price was a key tenet of the initial margin repair under the new management team, beginning in 2014. Price has been a significant driver of positive sentiment around the door industry since then[.]"

**RESPONSE TO PARAGRAPH 151:**

Paragraph 151 purports to quote a February 21, 2017 Barclays analyst report.  JELD-WEN

Defendants refer to that written document for its contents.  To the extent Paragraph 151

characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those

allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 151.

152. On February 22, 2017, Jeld-Wen held an earnings call discussing the Company's fourth quarter and full year 2016 financial results (the "February 22, 2017 Earnings Call"). During that call, Defendant Mallard attributed those results, including specifically the Company's increase in adjusted EBITDA and EBITDA margins, to legitimate and lawful strategies, including "*favorable pricing*, improved cost productivity, and the favorable impact of recent acquisitions." Defendant Mallard went on to say that the improvement in Jeld-Wen's revenues "*was driven by a 5% core growth comprised of a 2% benefit from our pricing optimization strategy in all three segments*."

**RESPONSE TO PARAGRAPH 152:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 152.

Paragraph 152 purports to quote a Q4 2016 Earnings Call. JELD-WEN Defendants refer to the

transcript of that call for its contents. To the extent Paragraph 152 characterizes or conflicts with

the contents of that transcript, JELD-WEN Defendants deny those allegations. JELD-WEN

Defendants deny the remaining allegations in Paragraph 152.

153. In connection with the February 22, 2017 Earnings Call, Defendants released a presentation for investors (the "February 22, 2017 Investor Presentation") in which Jeld-Wen further emphasized its "Balanced Approach to Margin Expansion" and its "World-Class Performance and Returns," highlighting several drivers for its revenue growth and margin expansion. Among those drivers, the Company listed "*Profitable Organic Growth*" from, among other things, "*Strategic Pricing*" and "*Pricing Optimization*."

**RESPONSE TO PARAGRAPH 153:**

Paragraph 153 purports to quote an investor presentation. JELD-WEN Defendants refer to

that written document for its contents. To the extent Paragraph 153 characterizes or conflicts with

the contents of the presentation, JELD-WEN Defendants deny those allegations. JELD-WEN

Defendants deny the remaining allegations in Paragraph 153.

154. Defendant Mallard's statements on the February 22, 2017 Earnings Call, as well as the Company's statements in the February 22, 2017 Investor Presentation, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 154:**

The allegations in Paragraph 154 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 154.

155. Defendant Beck elaborated further on the February 22, 2017 Earnings Call by touting Jeld-Wen's "number one position by net revenues in the majority of countries and markets we serve." He attributed the Company's leading market position to "*offering well-designed, high-quality products through strong and valued brands, and by reaching consumers through multiple channels*."

**RESPONSE TO PARAGRAPH 155:**

Paragraph 155 purports to quote an earnings call. JELD-WEN Defendants refer to the transcript of that call for its contents. To the extent Paragraph 155 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 155.

156. Defendant Beck's statement on the February 22, 2017 Earnings Call attributing Jeld-Wen's leading market position to well-designed, high-quality products and the Company's marketing efforts was materially false and misleading because Defendants failed to disclose that its leading market position was due, in large part, to Jeld-Wen's anticompetitive conduct through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers, as further described in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 156:**

The allegations in Paragraph 156 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 156.

157. Once again, analysts credited the statements Defendants made in the February 22, 2017 Earnings Call and related February 22, 2017 Investor Presentation. For example, on February 22, 2017, analyst Wells Fargo reported that the Company's success over the "[p]ast couple years [was] driven by pricing strategies," including "[f]avorable [p]ricing." On February 24, 2017, Bank of America stated "[r]egarding pricing, JELD recently established a pricing analytics group and is focusing its pricing strategy on driving return on invested capital[.]"

**RESPONSE TO PARAGRAPH 157:**

Paragraph 157 purports to quote analyst reports from Wells Fargo and Bank of America, and JELD WEN-Defendants refer to those written reports for their contents. To the extent Paragraph 157 characterizes or conflicts with the contents of those reports, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 157.

158.    On March 3, 2017, Defendants filed with the SEC their Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K"), which was signed by Defendants Beck, Mallard and Hachigian. In discussing the competitive environment in which the Company operates, Defendants stated, "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market. Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

**RESPONSE TO PARAGRAPH 158:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 158. Paragraph 158 purports to quote JELD-WEN's 2016 10-K. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 158 characterizes or conflicts with the contents of the 2016 10-K, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 158.

159.    Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]hile we operate in a competitive market, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins. Our strategies also include incentivizing our channel partners to sell our higher margin products, and a renewed focus on innovation and the development of new technologies, which we believe will increase our sales volume and the overall profitability of our product mix*."

**RESPONSE TO PARAGRAPH 159:**

Paragraph 159 purports to quote JELD-WEN's 2016 10-K. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 159 characterizes or conflicts

with the contents of the 2016 10-K, JELD-WEN Defendants deny those allegations.  JELD-WEN

Defendants deny the remaining allegations in Paragraph 159.

160.    Defendants continued to attribute their success to a "*strategic[] change [in] our pricing strategy in several key areas*," including a "*focus[] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*, [sic] and an "*increased [] emphasis on pricing optimization*."

**RESPONSE TO PARAGRAPH 160:**

Paragraph 160 purports to quote JELD-WEN's 2016 10-K.  JELD-WEN Defendants refer

to that written document for its contents.  To the extent Paragraph 160 characterizes or conflicts

with the contents of the 2016 10-K, JELD-WEN Defendants deny those allegations.  JELD-WEN

Defendants deny the remaining allegations in Paragraph 160.

161.    Defendants' statements in the 2016 10-K, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 161:**

The allegations in Paragraph 161 contain characterizations and/or conclusions of law that

do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 161.

162.    Analysts continued to react favorably to Defendants' statements regarding the source of Jeld-Wen's success, with analyst Wedbush noting on March 31, 2017 that "[w]e expect JELD-WEN Holdings to continue to benefit from the transformation under CEO Mark Beck including improved pricing discipline in 2015/2016[.]"

**RESPONSE TO PARAGRAPH 162:**

Paragraph 162 purports to quote a March 31, 2017 Wedbush analyst report.  JELD-WEN

Defendants refer to that written document for its contents.  To the extent Paragraph 162

characterizes or conflicts with the contents of the report, JELD-WEN Defendants deny those

allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 162.

58

163.    On May 9, 2017, Jeld-Wen issued a press release announcing its financial results for the first quarter 2017 (the "May 9, 2017 Press Release"). In the press release, which was also filed with the SEC on Form 8-K, the Company stated that "*[c]ore growth increased primarily as a result of increased shipping days in the quarter and positive pricing,"* leading to an *"increase in gross margin*."

**RESPONSE TO PARAGRAPH 163:**

JELD-WEN Defendants admit that on May 9, 2017, JELD-WEN issued a press release announcing its financial results for the first quarter 2017, which was filed along with JELD-WEN's Form 8-K, and refer to that written document for its contents.  To the extent Paragraph 163 characterizes or conflicts with the contents of the press release, JELD-WEN Defendants deny those allegations.

164.    That same day, Jeld-Wen held an earnings call discussing the Company's first quarter 2017 financial results (the "May 9, 2017 Earnings Call"). During that call, Defendant Mallard attributed those results, including specifically the Company's increase in adjusted EBITDA, to legitimate and lawful strategies, including "*favorable pricing*" and "*profitable growth*," among others.

**RESPONSE TO PARAGRAPH 164:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 164. Paragraph 164 purports to quote the transcript of the Q1 2017 Earnings Call.  JELD-WEN Defendants refer to that written document for its contents.  JELD-WEN Defendants deny any allegations inconsistent with the contents of the transcript.  JELD-WEN Defendants deny the remaining allegations in Paragraph 164.

165.    Then, in response to an analyst's question about pricing, Defendant Beck stated that "*if you go back for the last couple of years, we were doing larger than market price increases as we were playing catch up and trying to reset pricing where we thought it would be*."

**RESPONSE TO PARAGRAPH 165:**

Paragraph 165 purports to quote the transcript of the Q1 2017 Earnings Call.  JELD-WEN Defendants refer to that written document for its contents.  JELD-WEN Defendants deny any allegations inconsistent with the contents of the transcript.

166.    In connection with the May 9, 2017 Earnings Call, Defendants released a presentation for investors (the "May 9, 2017 Investor Presentation") in which Jeld-Wen further emphasized its "Balanced Approach to Margin Expansion" and its "World-Class Performance and Returns," highlighting several drivers for revenue growth and margin expansion. Among those drivers, the Company listed "***Profitable Organic Growth***" from, among other things, "***Strategic Pricing***" and "***Pricing Optimization***."

**RESPONSE TO PARAGRAPH 166:**

JELD-WEN Defendants admit that JELD-WEN filed presentation materials with the SEC in connection with the Q1 2017 Earnings Call (the "Q1 2017 Presentation"), refer to that written presentation for its contents, and deny any allegations inconsistent with contents of the Q1 2017 Presentation. JELD-WEN Defendants deny the remaining allegations in Paragraph 166.

167.    Defendants Beck and Mallard's statements on the May 9, 2017 Earnings Call, as well as the Company's statements in the May 9, 2017 Press Release and May 9, 2017 Investor Presentation, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 167:**

The allegations in Paragraph 167 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 167.

168.    Defendant Beck elaborated further on the May 9, 2017 Earnings Call by touting Jeld-Wen's "number one position by net revenues in the majority of countries and markets we serve." He attributed the Company's leading market position to "***offering well-designed, high-quality products and by reaching consumers through multiple channels***."

**RESPONSE TO PARAGRAPH 168:**

Paragraph 168 purports to quote comments Defendant Beck made during a May 9, 2017 Earnings call. JELD-WEN Defendants refer to the transcript of that call for its contents, and deny any allegations inconsistent with the contents of that transcript. JELD-WEN Defendants deny the remaining allegations in Paragraph 168.

60

169.    Defendant Beck's statement on the May 9, 2017 Earnings Call attributing Jeld-Wen's leading market position to well-designed, high-quality products and the Company's marketing efforts was materially false and misleading for the same reasons set forth in paragraph 156, herein.

**RESPONSE TO PARAGRAPH 169:**

The allegations in Paragraph 169 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 169.

170.    Analysts reacted positively to the May 9, 2017 Press Release and related May 9, 2017 Earnings Call and May 9, 2017 Investor Presentation. For example, on May 10, 2017, analyst J.P. Morgan reported that "adjusted EBIDTA margins were above our estimate, we believe mostly driven by better price." Barclays echoed these sentiments, stating that "we are encouraged by the $5 mn increase to FY EBITDA guidance and think this could still reflect some conservatism given the continued progress on cost and productivity initiatives and potential for additional pricing to cover material cost inflation. We continue to view JELD as one of our most compelling ideas given its unique 'self-help' margin opportunity over the next several years."

**RESPONSE TO PARAGRAPH 170:**

Paragraph 170 purports to quote analyst reports from J.P. Morgan and Barclays.  JELD-WEN Defendants refer to those written documents for their contents, and deny any allegations inconsistent with the contents of those reports.  JELD-WEN Defendants deny the remaining allegations in Paragraph 170.

171.    On May 12, 2017, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended April 1, 2017 ("1Q 2017 10-Q"), which was signed by Defendant Mallard. In discussing the Company's increase in net revenue in North America, Defendants stated that this was driven, in part, by an "***increase in pricing [which] was the result of implementing our pricing optimization strategy***."

**RESPONSE TO PARAGRAPH 171:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 171. Paragraph 171 purports to quote JELD-WEN's Q1 2017 10-Q.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 171 characterizes or conflicts with

61

JELD-WEN's Q1 2017 10-Q, JELD-WEN Defendants deny those allegations.   JELD-WEN

Defendants deny the remaining allegations in Paragraph 171.

172.   Defendants' statement in the 1Q 2017 10-Q attributing Jeld-Wen's pricing optimization strategy and increase in net revenues for North America to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 172:**

The allegations in Paragraph 172 contain characterizations and/or conclusions of law that

do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 172.

173.   On or around May 24, 2017, Jeld-Wen conducted a secondary public offering of the Company's common stock (the "First SPO"). Jeld-Wen conducted the First SPO pursuant to a registration statement (the "First SPO Registration Statement"). On May 26, 2017, Jeld-Wen filed a prospectus for the First SPO with the SEC on Form 424B (the "First SPO Prospectus"), which incorporated and formed part of the First SPO Registration Statement (collectively, the "First SPO Offering Materials").

**RESPONSE TO PARAGRAPH 173:**

JELD-WEN Defendants admit the allegation in Paragraph 173.

174.   In the First SPO Offering Materials, the Defendants represented that "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market. Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

**RESPONSE TO PARAGRAPH 174:**

Paragraph 174 purports to quote JELD-WEN's First SPO Offering Materials.  JELD-WEN

Defendants refer to those written documents for their contents.  To the extent Paragraph 174

characterizes or conflicts with the contents of the First SPO Offering Materials, JELD-WEN

Defendants deny those allegations.

175.   Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]e are focused on profitable growth and will continue to employ a strategic approach to*

*pricing our products. Pricing discipline is an important element of our effort to improve our profit margins and earn an appropriate return on our invested capital*."

**RESPONSE TO PARAGRAPH 175:**

Paragraph 175 purports to quote JELD-WEN's First SPO Offering Materials. JELD-WEN Defendants refer to those written documents for their contents. To the extent Paragraph 175 characterizes or conflicts with the contents of the First SPO Offering Materials, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 175.

176. Defendants continued to attribute their success to a "*strategic[] change [in] our pricing strategy in several key areas*," including a "*focus[] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*," and an "*increased [] emphasis on pricing optimization*."

**RESPONSE TO PARAGRAPH 176:**

Paragraph 176 purports to quote JELD-WEN's First SPO Offering Materials. JELD-WEN Defendants refer to those written documents for their contents. To the extent Paragraph 176 characterizes or conflicts with the contents of the First SPO Offering Materials, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 176.

177. Then, in discussing the Company's recent increase in net revenues, Defendants stated that the increase was due, in part, to "*an increase in pricing as a result of implementing our pricing optimization strategy*."

**RESPONSE TO PARAGRAPH 177:**

Paragraph 177 purports to quote JELD-WEN's First SPO Offering Materials. JELD-WEN Defendants refer to those written documents for their contents. To the extent Paragraph 177 characterizes or conflicts with the contents of the First SPO Offering Materials, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 177.

178.    Defendants' statements in the First SPO Offering Materials that Jeld-Wen operated in a competitive business environment and attributing Jeld-Wen's pricing optimization strategy and financial success to legitimate and lawful business factors and strategies were demonstrably false and materially misled investors for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 178:**

The allegations in Paragraph 178 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 178.

179.    Analysts credited Defendants' statements that the Company was operating in a competitive environment, with analyst Credit Suisse stating on June 22, 2017 that "[s]ince 2015, management has worked to drive greater pricing discipline across its North American business," facilitated by "[i]ts leading position and the competitive dynamics in residential interior doors."

**RESPONSE TO PARAGRAPH 179:**

Paragraph 179 purports to quote a June 22, 2017 analyst report from Credit Suisse.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 179 characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those allegations.

180.    On August 8, 2017, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended July 1, 2017 ("2Q 2017 10-Q"), which was signed by Defendant Mallard. In discussing the Company's increase in gross margin and gross margin as a percentage of net revenues, Defendants stated that the increase "***was due to favorable pricing***, cost saving initiatives and the contribution from recent acquisitions."

**RESPONSE TO PARAGRAPH 180:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 180. Paragraph 180 purports to quote JELD-WEN's Q2 2017 10-Q.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 180 characterizes or conflicts with the contents of JELD-WEN's Q2 2017 10-Q, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 180.

181.    Defendants' statement in the 2Q 2017 10-Q attributing Jeld-Wen's increase in gross margin and gross margin as a percentage of net revenues to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 181:**

The allegations in Paragraph 181 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 181.

182.    On August 8, 2017, Jeld-Wen held an earnings call discussing the Company's second quarter 2017 financial results (the "August 8, 2017 Earnings Call"). During that call, Defendant Mallard attributed those results, including specifically the Company's increase in gross margin and adjusted EBITDA, to legitimate and lawful strategies, including "*favorable pricing*, operational cost savings, improved mix and the impact of our recent acquisitions." Defendant Mallard went on to say that "when we look at our entire manufacturing network and the demand that's coming in, we look at all the levers and we figure out which one we think is going to pull the most profitability for us. *And so I would say we'd probably been pulling more on the price lever in the first half of the year*, as opposed to the volume lever . . . *and then that's resulted in nice margin accretion*."

**RESPONSE TO PARAGRAPH 182:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 182. Paragraph 182 purports to quote Defendant Mallard during JELD-WEN's August 8, 2017 Earnings Call.  JELD-WEN Defendants refer to the transcript of that call for its contents, and to the extent Paragraph 182 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 182.

183.    In connection with the August 8, 2017 Earnings Call, Defendants released a presentation for investors (the "August 8, 2017 Investor Presentation") in which Jeld-Wen further emphasized its "World-Class Performance and Returns," highlighting several drivers for revenue growth and margin expansion. Among those drivers, the Company listed "*Profitable Organic Growth*" from, among other things, "*Pricing Optimization*."

**RESPONSE TO PARAGRAPH 183:**

Paragraph 183 purports to quote JELD-WEN's August 8, 2017 Investor Presentation. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 183 characterizes or conflicts with the contents of that presentation, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 183.

184. Defendant Mallard's statements on the August 8, 2017 Earnings Call, as well as the Company's statements in the August 8, 2017 Investor Presentation, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 184:**

The allegations in Paragraph 184 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 184.

185. Defendant Beck elaborated further on the August 8, 2017 Earnings Call by touting Jeld-Wen's "#1 position by net revenues in the majority of countries and markets we serve." He attributed the Company's leading market position to "***offering well-designed, high-quality products***."

**RESPONSE TO PARAGRAPH 185:**

Paragraph 185 purports to quote Defendant Beck during JELD-WEN's August 8, 2017 Earnings Call. JELD-WEN Defendants refer to the transcript of that call for its contents, and deny any allegations inconsistent with the contents of that transcript. JELD-WEN Defendants deny the remaining allegations in Paragraph 185.

186. Defendant Beck's statement on the August 8, 2017 Earnings Call attributing Jeld-Wen's leading market position to well-designed, high-quality products was materially false and misleading for the same reasons set forth in paragraph 156, herein.

**RESPONSE TO PARAGRAPH 186:**

The allegations in Paragraph 186 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 186.

187.    Analysts again reacted positively to Defendants' statements. For example, on August 8, 2017 analyst Wells Fargo stated that "JELD's [m]argin expansion is truly the crux of this story, and on that front, the [C]ompany has performed admirably."

**RESPONSE TO PARAGRAPH 187:**

Paragraph 187 purports to quote an August 7, 2017 analyst report from Wells Fargo. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 187 characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 187.

188.    On September 14, 2017, Jeld-Wen participated in the RBC Capital Markets Global Industrials Conference (the "September 14, 2017 RBC Conference"). Defendant Beck spoke on behalf of Jeld-Wen. When asked by an analyst if he felt that the current competitive environment in North America was a "rational pricing environment" with "people behaving," Defendant Beck replied "*Yes*."

**RESPONSE TO PARAGRAPH 188:**

JELD-WEN Defendants admit the allegations in the first and second sentences of Paragraph 188. Paragraph 188 purports to quote from the transcript of the RBC Conference. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 188 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 188.

189.    Defendant Beck's statement during the September 14, 2017 RBC Conference that the current competitive environment was rational and that people were behaving was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 189:**

The allegations in Paragraph 189 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 189.

190.    On November 7, 2017, Jeld-Wen issued a press release announcing its financial results for the third quarter 2017 (the "November 7, 2017 Press Release"). In the press release, which was also filed with the SEC on Form 8-K, the Company stated that in North America "*[t]he core revenue growth was primarily due to favorable pricing*."

**RESPONSE TO PARAGRAPH 190:**

JELD-WEN Defendants admit that on November 7, 2017, JELD-WEN issued a press release announcing its financial results for the third quarter 2017, which was filed with its Form 8-K, refer to that written document for its contents, and deny any allegations inconsistent with the contents of that document.

191.    That same day, Jeld-Wen held an earnings call discussing the Company's third quarter 2017 financial results (the "November 7, 2017 Earnings Call"). During that call, Defendant Beck reiterated the Company's position, stating that "*[w]e are delivering core revenue growth with positive pricing*."

**RESPONSE TO PARAGRAPH 191:**

Paragraph 191 purports to quote Defendant Beck during JELD-WEN's November 7, 2017 Earnings Call. JELD-WEN Defendants refer to the transcript of that call for its contents, and deny any allegations inconsistent with the contents of that transcript. JELD-WEN Defendants deny the remaining allegations in Paragraph 191.

192.    Defendant Mallard elaborated further by attributing the Company's third quarter 2017 financial results, including specifically the Company's increase in gross margin and gross margin percentage, as well as its increase in adjusted EBITDA and margin, to legitimate and lawful strategies, including "*favorable pricing* and operational cost savings."

68

**RESPONSE TO PARAGRAPH 192:**

Paragraph 192 purports to quote Defendant Mallard during JELD-WEN's November 7, 2017 Earnings Call. JELD-WEN Defendants refer to the transcript of that call for its contents, and deny any allegations inconsistent with the contents of that transcript. JELD-WEN Defendants deny the remaining allegations in Paragraph 192.

193.   In connection with the November 7, 2017 Earnings Call, Defendants released a presentation for investors (the "November 7, 2017 Investor Presentation") in which Jeld-Wen further emphasized its "World-Class Performance and Returns," highlighting several drivers for revenue growth and margin expansion. Among those drivers, the Company listed "***Profitable Organic Growth***" from, among other things, "***Pricing Optimization***."

**RESPONSE TO PARAGRAPH 193:**

Paragraph 193 purports to quote JELD-WEN's November 7, 2017 Investor Presentation. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 193 characterizes or conflicts with the contents of that presentation, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 193.

194.   Defendants Beck and Mallard's statements on the November 7, 2017 Earnings Call, as well as the Company's statements in the November 7, 2017 Press Release and November 7, 2017 Investor Presentation, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 194:**

The allegations in Paragraph 194 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 194.

195.   On November 8, 2017, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended September 30, 2017 ("3Q 2017 10-Q"), which was signed by Defendant Mallard on November 7, 2017. In discussing the Company's increase in gross margin and gross margin as a percentage of net revenues, as well as the Company's increase in adjusted EBITDA in

69

North America, Defendants stated that the increase was "*due to favorable pricing and cost-saving initiatives*."

**RESPONSE TO PARAGRAPH 195:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 195. Paragraph 195 purports to quote from JELD-WEN's 3Q 2017 10-Q. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 195 characterizes or conflicts with the contents of that 10-Q, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 195.

196.    Defendants' statement on the 3Q 2017 10-Q attributing Jeld-Wen's increase in gross margin and gross margin as a percentage of net revenues and adjusted EBITDA to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 196:**

The allegations in Paragraph 196 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 196.

197.    Analysts reacted positively to Defendants' statements in the November 7, 2017 Press Release, November 7, 2017 Earnings Call, November 7, 2017 Investor Presentation and the 3Q 2017 10-Q. For example, on November 7, 2017, analyst Credit Suisse reported that "the continued execution of Jeld-Wen's multi-year turnaround strategy—centered on the development of a lean manufacturing culture, the evolution of its product offerings, and leveraging its leading market positioning—will be reflected in results over time." And on November 8, 2017, analyst RBC Capital Markets further noted that "[s]olid revenue performance reflects positive price/volume trends augmented by acquired revenues."

**RESPONSE TO PARAGRAPH 197:**

Paragraph 197 purports to quote a November 7, 2017 analyst report from Credit Suisse and a November 8, 2017 analyst report from RBC Capital Markets. JELD-WEN Defendants refer to those reports for their contents. To the extent Paragraph 197 characterizes or conflicts with the

contents of those reports, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 197.

198. On November 8, 2017, Jeld-Wen participated in the Robert W. Baird Global Industrial Conference (the "November 8, 2017 Robert W. Baird Conference"). Defendant Beck spoke on behalf of Jeld-Wen. When discussing the trajectory and cause of the Company's growth, Defendant Beck stated, "*[w]hat got us from 4% to almost 12% was – about 70% to 75% of that came on the back of price discipline. When the transformation began, pricing responsibility existed with plant managers, with salespeople, and we've centralized that. We have a central pricing analytics group, and we've centralized the authority to set pricing. And we've been very, very disciplined*."

**RESPONSE TO PARAGRAPH 198:**

JELD-WEN Defendants admit the allegations in the first and second sentences of Paragraph 198. Paragraph 198 purports to quote the transcript of the Robert W. Baird Conference. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 198 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 198.

199. Defendant Beck's statement at the November 8, 2017 Robert A. Baird Conference attributing Jeld-Wen's financial success to legitimate and lawful business factors and strategies, including price discipline and centralized pricing, was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 199:**

The allegations in Paragraph 199 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 199.

200. On or around November 15, 2017, Jeld-Wen conducted another secondary public offering of the Company's common stock (the "Second SPO"). Jeld-Wen conducted the Second SPO pursuant to a registration statement (the "Second SPO Registration Statement"). On November 17, 2017, Jeld-Wen filed a prospectus for the Second SPO with the SEC on Form 424B4 (the "Second SPO Prospectus"), which incorporated and formed part of the Second SPO Registration Statement (collectively, the "Second SPO Offering Materials").

71

**RESPONSE TO PARAGRAPH 200:**

JELD-WEN Defendants admit that on November 15, 2017, JELD-WEN conducted another secondary public offering of the Company's common stock, and that on November 17, 2017 JELD-WEN filed a prospectus for the Second SPO with the SEC on Form 424B, and refer to those filings for the contents thereof.

201.    In the Second SPO Offering Materials, the Defendants represented that "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market. Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

**RESPONSE TO PARAGRAPH 201:**

Paragraph 201 purports to quote JELD-WEN's Second SPO Offering Materials. JELD-WEN Defendants refer to the Second SPO Offering Materials for their contents. To the extent Paragraph 201 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations.

202.    Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]e are focused on profitable growth and will continue to employ a strategic approach to pricing our products. Pricing discipline is an important element of our effort to improve our profit margins and earn an appropriate return on our invested capital*."

**RESPONSE TO PARAGRAPH 202:**

Paragraph 202 purports to quote JELD-WEN's Second SPO Offering Materials. JELD-WEN Defendants refer to the Second SPO Offering Materials for their contents. To the extent Paragraph 202 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 202.

203.    Defendants continued to attribute their success to a "*strategic[] change [in] our pricing strategy in several key areas*," including a "*focus[] on making strategic pricing decisions*

72

*based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*," and an "*increased [] emphasis on pricing optimization*."

**RESPONSE TO PARAGRAPH 203:**

Paragraph 203 purports to quote JELD-WEN's Second SPO Offering Materials. JELD-WEN Defendants refer to the Second SPO Offering Materials for their contents. To the extent Paragraph 203 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 203.

204. Then, in discussing the Company's recent increase in net revenues, Defendants stated that the increase was due, in part, to "*an increase in pricing as a result of implementing our pricing optimization strategy*."

**RESPONSE TO PARAGRAPH 204:**

Paragraph 204 purports to quote JELD-WEN's Second SPO Offering Materials. JELD-WEN Defendants refer to the Second SPO Offering Materials for their contents. To the extent Paragraph 204 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations.

205. Defendants' statements in the Second SPO Offering Materials that Jeld-Wen operated in a competitive business environment and attributing Jeld-Wen's pricing optimization strategy and financial success to legitimate and lawful business factors and strategies were demonstrably false and materially misled investors for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 205:**

The allegations in Paragraph 205 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 205.

206. On February 15, 2018, Jeld-Wen issued a press release (the "February 15, 2018 Press Release") in which it announced that a jury in the United States District Court for the Eastern District of Virginia, Richmond Division, had returned a verdict in the lawsuit filed by Steves & Sons finding Jeld-Wen's wholly owned subsidiary Jeld-Wen Inc. liable for violation of Section 7

73

of the Clayton Act and breach of the parties' supply agreement. The press release further disclosed that the jury had awarded Steves & Sons damages in the total amount of $176 million, including past damages and future lost profits. The verdict form returned by the jury contained no additional clarifying factual detail or explanation for that decision and, notably, the vast majority of the Steves & Sons Litigation docket is sealed or redacted, making it impossible to glean specific details about Jeld-Wen's anticompetitive conduct.

**RESPONSE TO PARAGRAPH 206:**

JELD-WEN Defendants admit the allegations in the first and second sentences of Paragraph 206. JELD-WEN Defendants deny the remaining allegations in Paragraph 206.

207. The Company downplayed the import and accuracy of the jury verdict, stating that:

> ***The Company continues to believe that the facts underlying this dispute do not establish either a violation of the antitrust laws or a breach of contract***. The Company notes that both before and after the CMI acquisition, the Antitrust Division of the Department of Justice reviewed the transaction and did not challenge it. JELD-WEN believes that multiple pretrial and trial rulings were erroneous and improperly limited the Company's defenses, and that judgment in accordance with the verdict would be improper for several reasons under applicable law. JELD-WEN intends to vigorously oppose entry of an adverse judgment, and to appeal any adverse judgment that may be entered. Accordingly, ***the Company does not believe that the ultimate outcome of this matter will have a material impact on its ability to operate in the ordinary course of business***.

**RESPONSE TO PARAGRAPH 207:**

Paragraph 207 purports to quote the Jury Verdict Press Release. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 207 characterizes or conflicts with the contents of that press release, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 207.

208. These statements in the February 15, 2018 Press Release were demonstrably false and materially misled investors because Defendants failed to disclose that Jeld-Wen was engaged in anticompetitive conduct in violation of Clayton Act Section 7 through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers and that, therefore, a final ruling against Jeld-Wen was likely and would likely have a material impact on Jeld-Wen's business.

**RESPONSE TO PARAGRAPH 208:**

The allegations in Paragraph 208 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 208.

209.    The market bought Defendants' story. Bank of America noted on February 16, 2018 that:

> It seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition prior to its consummation in 2012. Furthermore, during the period between the acquisition closing and the filing of the complaint by Steves, the DOJ was once again asked to review the JELD/CMI transaction and maintained its original opinion that no antitrust issues existed.

**RESPONSE TO PARAGRAPH 209:**

Paragraph 209 purports to quote a February 16, 2018 analyst report from Bank of America. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 209 characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 209.

210.    Bank of America further reported that "we believe the fundamental positive stock story remains intact." Gabelli echoed these sentiments on February 20, 2018, noting that "we see any divestitures with regard to CMI as unlikely. This deal was reviewed twice by the DOJ and passed without issue in 2012." Thus, despite the verdict, market participants were still lulled into a false sense of security by Defendants' continuing misstatements.

**RESPONSE TO PARAGRAPH 210:**

Paragraph 210 purports to quote a February 16, 2018 analyst report from Bank of America and a February 20, 2018 analyst report from Gabelli. JELD-WEN Defendants refer to those reports for their contents. To the extent Paragraph 210 characterizes or conflicts with the contents of those reports, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 210.

211.    On February 21, 2018, Jeld-Wen held an earnings call discussing the Company's fourth quarter and full year 2017 financial results (the "February 21, 2018 Earnings Call"). During

75

that call, Defendant Beck further addressed the jury verdict in the Steves & Sons Litigation, stating that "*we continue to believe that the claims asserted in the litigation lack merit*. I will note that the Department of Justice reviewed our acquisition of CMI twice and declined to take any action. *Furthermore, we believe that we acted in good faith and in compliance with our contractual agreements*." Defendant Beck further noted that despite the verdict, "[a]t this time, we have not reserved for any judgment related to this matter, *as we do not believe that a loss is probable and estimable for the reasons that we've just described*."

**RESPONSE TO PARAGRAPH 211:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 211. Paragraph 211 purports to quote Defendant Beck during JELD-WEN's February 21, 2018 Earnings Call.  JELD-WEN Defendants refer to the written transcript of that call for its contents, and to the extent Paragraph 211 characterizes or conflicts with the contents of the transcript, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 211.

212.    Defendant Beck's statements on the February 21, 2018 Earnings Call denying Defendants' anticompetitive behavior were materially false and misleading for the same reasons set forth in paragraphs 147-49, 208, herein.

**RESPONSE TO PARAGRAPH 212:**

The allegations in Paragraph 212 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 212.

213.    Analysts credited Defendants' statements made during the February 21, 2018 Earnings Call regarding the Steves & Sons Litigation. For example, analyst RBC Capital Markets noted the next day that "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the CMI [A]cquisition twice. JELD does not believe that a loss is probable or estimable."

**RESPONSE TO PARAGRAPH 213:**

Paragraph 213 purports to quote a February 22, 2018 analyst report from RBC Capital Markets.  JELD-WEN Defendants refer to that written document for its contents.  To the extent

Paragraph 213 characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 213.

214.   On March 6, 2018, Defendants filed with the SEC their Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K"), which was signed by Defendants Mallard and Hachigian. In discussing the competitive environment in which the Company operates, Defendants stated, "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market. Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

**RESPONSE TO PARAGRAPH 214:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 214. Paragraph 214 purports to quote JELD-WEN's 2017 10-K. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 214 characterizes or conflicts with the contents of the 2017 10-K, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 214.

215.   Defendants also described their "competitive" business strategy as one relying on legitimate and lawful practices, including "pricing optimization" and "pricing discipline," stating that "*[w]hile we operate in competitive markets, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins. Our strategies also include incentivizing our channel partners to sell our higher margin products, and we believe a renewed focus on innovation and the development of new technologies will increase our sales volume and the overall profitability of our product mix*."

**RESPONSE TO PARAGRAPH 215:**

Paragraph 215 purports to quote JELD-WEN's 2017 10-K. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 215 characterizes or conflicts with the contents of the 2017 10-K, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 215.

216.   Defendants continued to attribute their success to a "*strategic[ ] change [in] our pricing strategy in several key areas*," including a "*focus[ ] on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business*," and an "*increased [] emphasis on pricing optimization*."

**RESPONSE TO PARAGRAPH 216:**

Paragraph 216 purports to quote JELD-WEN's 2017 10-K.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 216 characterizes or conflicts with the contents of the 2017 10-K, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 216.

217.    Then, in discussing the Company's increase in gross margin and gross margin percentage and its increase in adjusted EBITDA in North America, Defendants stated that these increases were "***due to favorable pricing***," among others.

**RESPONSE TO PARAGRAPH 217:**

Paragraph 217 purports to quote JELD-WEN's 2017 10-K.  JELD-WEN Defendants refer to that written document for its contents.  To the extent Paragraph 217 characterizes or conflicts with the contents of the 2017 10-K, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 217.

218.    Defendants' statements in the 2017 10-K, attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies were materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 218:**

The allegations in Paragraph 218 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 218.

219.    On May 8, 2018, Jeld-Wen held an earnings call discussing the Company's first quarter 2018 results (the "May 8, 2018 Earnings Call"). When discussing the trajectory and cause of the Company's growth, Defendant Hachigian stated, "***I think the path from 4% to 12% has been primarily getting rid of bad-margin business, taking pricing actions to get us back to price points that were prerecession***."

**RESPONSE TO PARAGRAPH 219:**

Paragraph 219 purports to quote Defendant Hachigian during JELD-WEN's May 8, 2018 Earnings Call.  JELD-WEN Defendants refer to the written transcript of that call for is contents.

78

To the extent Paragraph 219 characterizes or conflicts with the contents of that transcript, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 219.

220. Defendant Hachigian's statement on the May 8, 2018 Earnings Call attributing Jeld-Wen's financial success to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 220:**

The allegations in Paragraph 220 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 220.

221. On May 9, 2018, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended March 31, 2018 ("1Q 2018 10-Q"), which was signed by Defendant Mallard on May 8, 2018. In discussing the Company's increase in gross margin and gross margin as a percentage of net revenues, Defendants stated that the increase was "***due to favorable pricing***, cost-saving initiatives and contribution from recent acquisitions."

**RESPONSE TO PARAGRAPH 221:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 221. Paragraph 221 purports to quote from JELD-WEN's 1Q 2018 10-Q. JELD-WEN Defendants refer to that written document for its contents, and deny any allegation that is inconsistent with the contents of that document. JELD-WEN Defendants deny the remaining allegations in Paragraph 221.

222. Defendants' statement in the 1Q 2018 10-Q attributing Jeld-Wen's increase in gross margin and gross margin as a percentage of net revenues to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 222:**

The allegations in Paragraph 222 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 222.

223. On August 7, 2018, Defendants filed with the SEC Jeld-Wen's Report on Form 10-Q for the quarter ended June 30, 2018 ("2Q 2018 10-Q"), which was signed by Defendant Mallard. In discussing the Company's increase in gross margin and net revenues in North America, Defendants stated that the increase was "***due to favorable pricing***," among other things.

**RESPONSE TO PARAGRAPH 223:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 223. Paragraph 223 purports to quote from JELD-WEN's 2Q 2018 10-Q. JELD-WEN Defendants refer to that written document for its contents, and deny any allegations inconsistent with the contents of that document. JELD-WEN Defendants deny the remaining allegations in Paragraph 223.

224. Defendants' statement in the 2Q 2018 10-Q attributing Jeld-Wen's increase in gross margin and net revenues in North America to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 224:**

The allegations in Paragraph 224 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 224.

225. On that same day, Jeld-Wen held an earnings call discussing the Company's second quarter 2018 financial results (the "August 7, 2018 Earnings Call"). During that call, Defendant Michel attributed the Company's "strong revenue growth," in part, to legitimate and lawful strategies, including "***improved pricing in all 3 regions both compared to [the] prior year as well as sequentially compared to the first quarter***."

**RESPONSE TO PARAGRAPH 225:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 225. Paragraph 225 purports to quote Defendant Michel during JELD-WEN's August 7, 2018 Earnings

Call.  JELD-WEN Defendants refer to the transcript of that call for its contents, and deny any

allegations inconsistent with the contents of that transcript.  JELD-WEN Defendants deny the

remaining allegations in Paragraph 225.

226.    Defendant Michel's statement on the August 7, 2018 Earnings Call attributing Jeld-Wen's successful financial results to legitimate and lawful business factors and strategies was materially false and misleading for the same reasons set forth in paragraphs 147-49, herein.

**RESPONSE TO PARAGRAPH 226:**

The allegations in Paragraph 226 contain characterizations and/or conclusions of law that

do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 226.

227.    On the same call, when asked about the Steves & Sons verdict, Defendant Michel reiterated that "***JELD-WEN believes that the jury verdict in this case is erroneous***."

**RESPONSE TO PARAGRAPH 227:**

Paragraph 225 purports to quote Defendant Michel during JELD-WEN's August 7, 2018

Earnings Call.  JELD-WEN Defendants refer to the transcript of that call for its contents.  To the

extent Paragraph 225 characterizes or conflicts with the contents of that transcript, JELD-WEN

Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in

Paragraph 225.

228.    Defendant Michel's statement on the August 7, 2018 Earnings Call denying Defendants' anticompetitive behavior was materially false and misleading for the same reasons set forth in paragraphs 147-49, 208, herein.

**RESPONSE TO PARAGRAPH 228:**

The allegations in Paragraph 228 contain characterizations and/or conclusions of law that

do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 228.

229.    On October 5, 2018, the Judge presiding over the Steves & Sons Litigation released his findings of fact following an evidentiary hearing on the issue of divestiture which specifically

81

detailed Jeld-Wen's anticompetitive conduct, including, among other things, that Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger." The Judge further ruled that as part of the resolution of that case, Jeld-Wen would be required to divest the Towanda, Pennsylvania doorskin facility that the Company had obtained as part of its acquisition of CMI.

**RESPONSE TO PARAGRAPH 229:**

Paragraph 229 purports to describe and quote from the Divestiture Decision.  JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent Paragraph 229 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 229.

230.    Yet, rather than admit to investors that Jeld-Wen had been engaged in anticompetitive conduct and that this conduct was the source of the Company's financial success, Defendants continued to reassure the market as to their innocence.

**RESPONSE TO PARAGRAPH 230:**

JELD-WEN Defendants deny the allegations in Paragraph 230.

231.    On October 6, 2018, Jeld-Wen issued a press release addressing the October 5, 2018 decision (the "October 6, 2018 Press Release"). In the press release, which was also filed with the SEC on Form 8-K on October 9, 2018, the Company stated that "***JELD-WEN firmly maintains that it has not violated any antitrust laws***," and that the October 5, 2018 ruling was "***incorrect due to multiple flawed rulings during the trial process***."

**RESPONSE TO PARAGRAPH 231:**

JELD-WEN Defendants admit the allegations in the first sentence of Paragraph 231.  Paragraph 231 purports to quote from the Divestiture Decision Press Release.  JELD-WEN Defendants refer to that press release for its contents.  To the extent Paragraph 231 characterizes or conflicts with the contents of that press release, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 231.

232.     The Company further reiterated that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

**RESPONSE TO PARAGRAPH 232:**

Paragraph 232 purports to quote from the Divestiture Decision Press Release.  JELD-WEN

Defendants refer to that press release for its contents.  To the extent Paragraph 232 characterizes

or conflicts with the contents of that press release, JELD-WEN Defendants deny those allegations.

JELD-WEN Defendants deny the remaining allegations in Paragraph 232.

233.     Defendants' statements in the October 6, 2018 Press Release denying the Company's anticompetitive behavior and claiming that the October 5, 2018 decision was incorrect were materially false and misleading for the same reasons set forth in paragraphs 147-49, 208, herein.

**RESPONSE TO PARAGRAPH 233:**

The allegations in Paragraph 233 contain characterizations and/or conclusions of law that

do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 233.

234.     Analysts were reassured by Defendants' statements. For example, as Bank of America reported on October 8, 2018, "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

**RESPONSE TO PARAGRAPH 234:**

Paragraph 234 purports to quote an October 8, 2018 analyst report from Bank of America.

JELD-WEN Defendants refer to that written document for its contents.   To the extent

Paragraph 234 characterizes or conflicts with the contents of that report, JELD-WEN Defendants

deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 234.

235.     As set forth in Section VII, *supra*, the full extent of Defendants' fraud was gradually revealed through the disclosure of new information about Jeld-Wen's antitrust violations and the effect they would have on the Company. On October 5, 2018, Judge Payne released his findings

83

of fact following an evidentiary hearing on the issue of divestiture which specifically detailed Jeld-Wen's anticompetitive conduct, including, among other things, that Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger." The Judge further ruled that as part of the resolution of that case, Jeld-Wen would be required to divest the Towanda, Pennsylvania doorskin facility that the Company had obtained as part of its acquisition of CMI.

**RESPONSE TO PARAGRAPH 235:**

Paragraph 235 purports to quote from the Divestiture Decision.  JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent Paragraph 235 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 235.

236.    This decision caused several securities analysts to lower their price targets on Jeld-Wen stock over the ensuing trading days, with analysts at RBC Capital Markets noting on October 8, 2018 that up to 33% of Jeld-Wen's global doorskin manufacturing capacity would be lost by the divestiture of the Towanda plant. Analyst Bank of America further commented on October 8, 2018 that the divestiture "could be the worst case scenario."

**RESPONSE TO PARAGRAPH 236:**

Paragraph 236 purports to quote October 8, 2018 analyst reports from RBC Capital Markets and Bank of America  JELD-WEN Defendants refer to those reports for their contents. To the extent Paragraph 236 characterizes or conflicts with the contents of those reports, JELD-WEN Defendants deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 236.

237.    In response to the October 5, 2018 ruling, Jeld-Wen's stock price declined over the course of two days by $1.18 per share, or nearly 5%, to close at $22.91 on October 9, 2018.

**RESPONSE TO PARAGRAPH 237:**

JELD-WEN Defendants refer to the public record for the price of JELD-WEN's common stock during the referenced time period.  JELD-WEN Defendants deny any allegations inconsistent

with the public record regarding the price of JELD-WEN's common stock.   JELD-WEN

Defendants deny the remaining allegations in Paragraph 237.

238.    Still, the Company's stock price remained artificially inflated even after this ruling, as Defendants continued to reassure the market that "JELD-WEN firmly maintains that it has not violated any antitrust laws," and that the October 5, 2018 ruling was "incorrect due to multiple flawed rulings during the trial process." The Company further reiterated that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

**RESPONSE TO PARAGRAPH 238:**

Paragraph 238 purports to quote from the Divestiture Decision Press Release.  JELD-WEN

Defendants refer to that written document for its contents.   To the extent Paragraph 238

characterizes or conflicts with the contents of that press release, JELD-WEN Defendants deny

those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 238.

239.    Analysts were reassured by Defendants' statements. For example, as Bank of America reported on October 8, 2018, "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

**RESPONSE TO PARAGRAPH 239:**

Paragraph 239 purports to quote an October 8, 2018 analyst report from Bank of America.

JELD-WEN Defendants refer to that written document for its contents.   To the extent

Paragraph 239 characterizes or conflicts with the contents of that report, JELD-WEN Defendants

deny those allegations.  JELD-WEN Defendants deny the remaining allegations in Paragraph 239.

240.    Then, on October 15, 2018, more facts concerning Defendants' anticompetitive conduct were fully revealed and/or materialized. On that date, Jeld-Wen admitted that the Company expected its third quarter 2018 financial results to include a $76.5 million charge related to the Steves & Sons Litigation, which reflected the judgment anticipated to be entered against Jeld-Wen, as recent rulings in the case "now provided sufficient detail for the [C]ompany to estimate future liabilities." The Company also announced the sudden resignation of its CFO, Defendant Mallard, to be replaced by Senior Vice President, Corporate Development and Investor Relations, John Linker.

**RESPONSE TO PARAGRAPH 240:**

Paragraph 240 purports to describe the contents of JELD-WEN's October 15, 2018 Third Quarter Earnings Pre-Release, and JELD-WEN's October 15, 2018 Press Release regarding Brooks Mallard's resignation. JELD-WEN Defendants refer to those written documents for their contents. To the extent Paragraph 240 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 240.

241. Analysts were shocked by the admission that Jeld-Wen would likely be required to pay a penalty for antitrust violations, despite their repeated assurances to the market that the Company did not violate any laws and that the decision would be overturned on appeal. For example, J.P. Morgan noted on October 16, 2018 that "[n]et net, we expect the stock to react negatively tomorrow." The next day, Gabelli reported that "[i]n retrospect, we underestimated the challenges JELD faced in 2018 from litigation." RBC Capital Markets agreed, noting on November 7, 2018 that "[w]e think investor concerns regarding both the current management transitions and the unfavorable legal litigation with Steves & Sons are warranted."

**RESPONSE TO PARAGRAPH 241:**

Paragraph 241 purports to quote analyst reports from J.P. Morgan, Gabelli, and RBC Capital Markets. JELD-WEN Defendants refer to those reports for their contents. To the extent Paragraph 241 characterizes or conflicts with the contents of those reports, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 241.

242. As a result of the shocking news, Jeld-Wen's stock fell precipitously by $4.03 per share, or *19%*, to close at $17.28 on October 16, 2018, on unusually high trading volume of 6.9 million shares.

**RESPONSE TO PARAGRAPH 242:**

JELD-WEN Defendants refer to the public record for the price of JELD-WEN's common stock during the referenced time period. JELD-WEN Defendants deny any allegations inconsistent

with the public record regarding the price of JELD-WEN's common stock. JELD-WEN

Defendants deny the remaining allegations in Paragraph 242.

243. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Jeld-Wen common stock and operated as a fraud or deceit on Class Period purchasers of Jeld-Wen common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

**RESPONSE TO PARAGRAPH 243:**

The allegations in Paragraph 243 contain characterizations and/or conclusions of law that

do not require a response. To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 243.

244. Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Jeld-Wen common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased Jeld-Wen stock at the artificially inflated prices at which it traded during the Class Period.

**RESPONSE TO PARAGRAPH 244:**

The allegations in Paragraph 244 contain characterizations and/or conclusions of law that

do not require a response. To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 244.

245. The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between October 5, 2018 and October 15, 2018. During this period, Jeld-Wen's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Jeld-Wen's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on October 15, 2018 that the full truth was known to the market, such that there was no longer any artificial inflation in Jeld-Wen's stock price attributable to the fraud.

**RESPONSE TO PARAGRAPH 245:**

The allegations in Paragraph 245 contain characterizations and/or conclusions of law that

do not require a response. To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 245.

246.    The declines in Jeld-Wen's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

**RESPONSE TO PARAGRAPH 246:**

The allegations in Paragraph 246 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 246.

247.    As a result of their purchases of Jeld-Wen common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Jeld-Wen common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $42.27 per share on January 5, 2018.

**RESPONSE TO PARAGRAPH 247:**

The allegations in Paragraph 247 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 247.

248.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Jeld-Wen's business. As the truth about the Company and the extent of the fraud was revealed to the market, the price of Jeld-Wen common stock fell significantly. These declines removed the inflation from the price of Jeld-Wen common stock, causing real economic loss to investors who had purchased Jeld-Wen common stock during the Class Period.

**RESPONSE TO PARAGRAPH 248:**

The allegations in Paragraph 248 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 248.

249.    On October 5, 2018, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized after the close of trading, when Judge Payne, the Judge presiding over the Steves & Sons Litigation, released his findings of fact following an evidentiary hearing on the issue of divestiture which specifically detailed Jeld-Wen's anticompetitive conduct,

including, among other things, that Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

**RESPONSE TO PARAGRAPH 249:**

Paragraph 249 purports to describe and quote the Divestiture Decision. JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents. To the extent Paragraph 249 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations. The remaining allegations in Paragraph 249 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 249.

250.    Judge Payne further found that:

[I]t is necessary to remember that JELD-WEN was aware at the time of the merger that the antitrust issues associated with the CMI Acquisition were significant. Indeed, having calculated market concentration as a consequence of the forthcoming acquisition and the Herfindahl-Hirschman indices for markets impacted by the merger, JELD-WEN retained highly-qualified antitrust counsel from one of the nation's largest law firms, O'Melveny & Myers. In sum, and as the record shows, JELD-WEN knew full well of the merger's antitrust implications.

Mindful of those implications, JELD-WEN pursued an established merger strategy to assuage any possible concerns from the DOJ, from CMI's customers, and from JELD-WEN's own customers (including Steves). Specifically, JELD-WEN developed a plan to enter into long-term supply agreements with [I]ndependent [D]oor [M]anufacturers in the United States. . . . As part of its strategy, JELD-WEN deliberately decided not to approach the DOJ about the proposed CMI Acquisition until those long-term agreements had been entered. In fact, JELD-WEN's internal documents show that the [C]ompany considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, and that JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go."

**RESPONSE TO PARAGRAPH 250:**

Paragraph 250 purports to quote the Divestiture Decision. JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents. To the extent

Paragraph 250 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN

Defendants deny those allegations.

251.    Judge Payne went on:

And, when JELD-WEN did approach the DOJ about the CMI Acquisition, it emphasized
its long-term supply agreements with Steves, Lynden, and others. And [James] Morrison,
who led the [C]ompany's presentation to the DOJ, admitted that the purpose of entering
into such contracts was "to alleviate" customer concerns about not having a supply and "to
assure the customers of CMI, who might eventually become customers of JELD-WEN,
that JELD-WEN was committed to their continued supply."

**RESPONSE TO PARAGRAPH 251:**

Paragraph 251 purports to quote the Divestiture Decision.  JELD-WEN Defendants refer

to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent

Paragraph 251 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN

Defendants deny those allegations.

252.    Finally, Judge Payne ruled that as part of the resolution of that case, Jeld-Wen
would be required to divest the Towanda, Pennsylvania doorskin facility that the Company had
obtained as part of its acquisition of CMI.

**RESPONSE TO PARAGRAPH 252:**

Paragraph 252 purports to describe the Divestiture Decision.  JELD-WEN Defendants refer

to the Divestiture Decision, which is currently on appeal, for its contents.  To the extent

Paragraph 252 characterizes or conflicts with the contents of the Divestiture Decision, JELD-WEN

Defendants deny those allegations.

253.    The October 5, 2018 decision requiring divestiture of the Towanda facility and
finding, as a matter of law, the specific anticompetitive actions undertaken by Defendants, was a
foreseeable consequence of, and within the zone of risk concealed by, the Defendants'
misrepresentations and omissions concerning the true source of Jeld-Wen's financial success—
Defendants' anticompetitive conduct, including the Company's motivation behind the CMI
Acquisition and its plan to enter into the long-term doorskin supply arrangements with Independent
Door Manufacturers in order to get approval from the DOJ for the CMI Acquisition and with the
intention to break those contracts thereafter.

90

**RESPONSE TO PARAGRAPH 253:**

The allegations in Paragraph 253 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 253.

254.   Moreover, the October 5, 2018 decision revealed new information that Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market. This decision partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the source of the Company's financial success, including that the cause of that success was not "pricing optimization" and "pricing discipline," as Defendants claimed, but was rather due to that anticompetitive conduct.

**RESPONSE TO PARAGRAPH 254:**

The allegations in Paragraph 254 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 254.

255.   As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Jeld-Wen common stock declined over the course of two days by $1.18 per share, or nearly 5%, to close at $22.91 on October 9, 2018.

**RESPONSE TO PARAGRAPH 255:**

JELD-WEN Defendants refer to the public record for the price of JELD-WEN's common stock during the referenced time period. JELD-WEN Defendants deny any allegations inconsistent with the public record regarding the price of JELD-WEN's common stock. The remaining allegations in Paragraph 255 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 255.

256.   This decision caused several securities analysts to lower their price targets on Jeld-Wen stock over the ensuing trading days, with analysts at RBC Capital Markets noting on October 8, 2018 that up to 33% of Jeld-Wen's global doorskin manufacturing capacity would be lost by

91

the divestiture of the Towanda plant. Analyst Bank of America further commented on October 8, 2018 that the divestiture "could be the worst case scenario."

**RESPONSE TO PARAGRAPH 256:**

Paragraph 256 purports to describe and quote analyst reports from RBC Capital Markets and Bank of America. JELD-WEN Defendants refer to those reports for their contents. To the extent Paragraph 256 characterizes or conflicts with the contents of those reports, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 256.

257.    Still, the Company's stock price remained artificially inflated even after this ruling, as Defendants continued to reassure the market that "JELD-WEN firmly maintains that it has not violated any antitrust laws," and that the October 5, 2018 ruling was "incorrect due to multiple flawed rulings during the trial process." The Company further reiterated that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

**RESPONSE TO PARAGRAPH 257:**

Paragraph 257 purports to quote from the Divestiture Decision Press Release. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 257 characterizes or conflicts with the contents of that press release, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 257.

258.    Analysts were reassured by Defendants' statements. For example, as Bank of America reported on October 8, 2018, "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI acquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

**RESPONSE TO PARAGRAPH 258:**

Paragraph 258 purports to quote an analyst report from Bank of America. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 258

92

characterizes or conflicts with the contents of that report, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 258.

259. On October 15, 2018, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized. On that date, Jeld-Wen finally admitted that the Company expected its third quarter 2018 financial results to include a $76.5 million charge related to the Steves & Sons Litigation, and reflected the judgment anticipated to be entered against Jeld-Wen, as recent rulings in the case "now provided sufficient detail for the [C]ompany to estimate future liabilities." The Company simultaneously announced the resignation of its CFO, Defendant Mallard.

**RESPONSE TO PARAGRAPH 259:**

JELD-WEN Defendants admit that on October 15, 2018, JELD-WEN disclosed its third quarter 2018 financial earnings results, which included a $76.5 million charge related to the *Steves* Litigation, and announced Defendant Mallard's resignation. The remaining allegations in Paragraph 259 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 259.

260. The October 15, 2018 disclosures that Jeld-Wen now expected to be held liable for violation of the Clayton Act and that it expected a $76.5 judgment to be entered against them, in addition to the resignation of Defendant Mallard, were foreseeable consequences of, and within the zone of risk concealed by, the Defendants' misrepresentations and omissions concerning the true source of Jeld-Wen's financial success—Defendants' anticompetitive conduct, including the Company's motivation behind the CMI Acquisition and its plan to enter into the long-term doorskin supply arrangements with Independent Door Manufacturers in order to get approval from the DOJ for the CMI Acquisition and with the intention to break those contracts thereafter.

**RESPONSE TO PARAGRAPH 260:**

The allegations in Paragraph 260 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 260.

261. Moreover, the October 15, 2018 disclosures revealed new information that Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures revealed the relevant truth concealed and/or

93

obscured by Defendants' prior misstatements and omissions surrounding the source of the Company's financial success, including that the cause of that success was not "pricing optimization" and "pricing discipline," as Defendants claimed, but was rather due to that anticompetitive conduct.

**RESPONSE TO PARAGRAPH 261:**

The allegations in Paragraph 261 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 261.

262. On this shocking news, the price of Jeld-Wen stock fell precipitously by $4.03 per share, or *19%*, to close at $17.28 on October 16, 2018, on unusually high trading volume of 6.9 million shares. Analysts were surprised by this revelation, with Gabelli noting on October 17, 2018 that "[i]n retrospect, we underestimated the challenges JELD faced in 2018 from litigation." RBC Capital Markets agreed, noting on November 7, 2018 that "[w]e think investor concerns regarding both the current management transitions and the unfavorable legal litigation with Steves & Sons are warranted."

**RESPONSE TO PARAGRAPH 262:**

Paragraph 262 purports to quote analyst reports from Gabelli and RBC Capital Markets. JELD-WEN Defendants refer to those reports for their contents. To the extent the allegations in Paragraph 262 characterize or contradict the contents of those reports, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants refer to the public record for the price of JELD-WEN's common stock during the referenced time period. JELD-WEN Defendants deny any allegations inconsistent with the public record regarding the price of JELD-WEN's common stock. JELD-WEN Defendants deny the remaining allegations in Paragraph 262.

263. Each decline in the price of Jeld-Wen common stock, as detailed above, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

**RESPONSE TO PARAGRAPH 263:**

The allegations in Paragraph 263 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 263.

264.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Jeld-Wen common stock and the subsequent significant decline in the value of Jeld-Wen common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**RESPONSE TO PARAGRAPH 264:**

The allegations in Paragraph 264 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 264.

265.    The market for Jeld-Wen common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 769,536 during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Jeld-Wen's common stock traded at artificially inflated prices. Lead Plaintiffs and other Class members purchased Jeld-Wen common stock relying upon the integrity of the market relating to Jeld-Wen common stock and suffered economic losses as a result thereof.

**RESPONSE TO PARAGRAPH 265:**

The allegations in Paragraph 265 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 265.

266.    The declines in Jeld-Wen's common stock price on October 8-9, 2018 and October 16, 2018 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the markets closed on October 5, 2018, and October 15, 2018. The timing and magnitude of Jeld-Wen's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

95

**RESPONSE TO PARAGRAPH 266:**

The allegations in Paragraph 266 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 266.

267. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Jeld-Wen and the Individual Defendants' materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *infra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

**RESPONSE TO PARAGRAPH 267:**

The allegations in Paragraph 267 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 267.

268. *First*, Defendants were aware that absent the long-term supply agreements, the DOJ would object to the CMI Acquisition as anticompetitive. In particular, in 2001, Premdor sought to acquire Masonite, creating a vertically-integrated manufacturer of both doorskins and interior molded doors. The DOJ, recognizing the strong incentive by manufacturers to collude to increase the price of interior molded doors, filed suit to block the merger, alleging that Premdor's acquisition of Masonite would violate Section 7 of the Clayton Act. In fact, the DOJ only agreed to permit the acquisition on the condition that Premdor be ordered to divest the exact same Towanda, Pennsylvania doorskins manufacturing plant at issue in the CMI Acquisition.

**RESPONSE TO PARAGRAPH 268:**

JELD-WEN Defendants admit that in 2001 Premdor sought to acquire Masonite, and that on August 3, 2001, the DOJ filed the *Premdor* Complaint and the *Premdor* Competitive Impact Statement, and refer to those written documents for their contents. To the extent Paragraph 268 characterizes or conflicts with the contents of those documents, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants lack knowledge or information sufficient to form a

96

belief as to the truth of the remaining allegations in Paragraph 268, and therefore deny those allegations.

269.   Defendants thus knew that the DOJ was concerned about anticompetitive conduct stemming from a market consisting of only two vertically-integrated interior door manufacturers. And in fact, the competitive landscape that resulted from the CMI Acquisition—two dominant, vertically-integrated interior molded door manufacturers with incentives to coordinate—was exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in 2001.

**RESPONSE TO PARAGRAPH 269:**

JELD-WEN Defendants deny the allegations in the first sentence of Paragraph 269. JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 269, and therefore deny those allegations.

270.   Notably, on October 5, 2018, following an evidentiary hearing, the Judge presiding over the Steves & Sons Litigation—Judge Payne—specifically found that "Jeld-Wen *was aware at the time of the merger that the antitrust issues associated with the CMI Acquisition were significant*." Judge Payne went on that, "having calculated market concentration as a consequence of the forthcoming acquisition and the Herfindahl-Hirschman indices for markets impacted by the merger, Jeld-Wen retained highly-qualified antitrust counsel from one of the nation's largest law firms, O'Melveny & Myers. In sum, and as the record shows, *Jeld-Wen knew full well of the merger's antitrust implications*."

**RESPONSE TO PARAGRAPH 270:**

Paragraph 270 purports to quote the Divestiture Decision. JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents. To the extent the allegations in Paragraph 270 characterize or conflict with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 270.

271.   Armed with this knowledge of the potential antitrust issues that could be implicated by the CMI Acquisition, Judge Payne found that Jeld-Wen "decided to approach the DOJ only after it had entered into long-term supply contracts with the [Independent Door Manufacturers], *knowing that this oft-used tactic would assuage the concerns of the DOJ* and the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

**RESPONSE TO PARAGRAPH 271:**

Paragraph 271 purports to quote the Divestiture Decision. JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents. To the extent the allegations in Paragraph 271 characterize or conflict with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 271.

272.    Specifically:

JELD-WEN pursued an established merger strategy to assuage any possible concerns from the DOJ, from CMI's customers, and from JELD-WEN's own customers (including Steves). Specifically, JELD-WEN developed a plan to enter into long-term supply agreements with [I]ndependent [D]oor [M]anufacturers in the United States. . . . As part of its strategy, JELD-WEN deliberately decided not to approach the DOJ about the proposed CMI Acquisition until those long-term agreements had been entered. In fact, JELD-WEN's internal documents show that the [C]ompany considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, and that JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go."

**RESPONSE TO PARAGRAPH 272:**

Paragraph 272 purports to quote the Divestiture Decision. JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents. To the extent the allegations in Paragraph 272 characterize or conflict with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations.

273.    Moreover, Judge Payne found that when Jeld-Wen ultimately did approach the DOJ, "it emphasized its long-term supply agreements with Steves, Lynden and others." As further admitted by James Morrison, the Company's former Executive Vice President and Chief Operating Officer, who led the Company's presentation to the DOJ, "the purpose of entering into such contracts was 'to alleviate' customer concerns about not having a supply and 'to assure the customers of CMI, who might eventually become customers of JELD-WEN, that JELD-WEN was committed to their continual supply.'"

**RESPONSE TO PARAGRAPH 273:**

Paragraph 273 purports to quote the Divestiture Decision. JELD-WEN Defendants refer to the Divestiture Decision, which is currently on appeal, for its contents. To the extent the allegations in Paragraph 273 characterize or conflict with the contents of the Divestiture Decision, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 273.

274. In response to these representations by Jeld-Wen, the DOJ began to contact the external door manufacturers with which Jeld-Wen had long-term supply agreements and asked those manufacturers if they had any problems with the Acquisition.

**RESPONSE TO PARAGRAPH 274:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 274, and therefore deny those allegations.

275. Based on the belief that Jeld-Wen would honor the Supply Agreement, Steves & Sons informed the DOJ that it did not object to the CMI Acquisition. According to the complaint filed in the Steves & Sons Litigation, the other smaller Independent Door Manufacturers with which Jeld-Wen had supply agreements also did not object to the Acquisition.

**RESPONSE TO PARAGRAPH 275:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 275, and therefore deny those allegations. The second sentence of Paragraph 275 purports to summarize the *Steves* Complaint. JELD-WEN Defendants refer to that written document for its contents. To the extent Paragraph 275 characterizes or conflicts with the contents of that document, JELD-WEN Defendants deny those allegations.

276. Notwithstanding their representations to the DOJ and their clear knowledge that the DOJ did not object to the CMI Acquisition only in reliance upon those long-term supply agreements, Defendants, including specifically Defendant Hachigian during his tenure as President and CEO in 2014, directed the Company to implement price increases and break the long-term doorskin supply agreements. Thus, Defendants were aware that their conduct was directly in contravention of federal antitrust laws.

99

**RESPONSE TO PARAGRAPH 276:**

The allegations in Paragraph 276 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 276.

277. *Second*, the Individual Defendants' knowledge that the Company's anticompetitive conduct was a major source of its financial success can be inferred because interior molded doors were a core product, the sale of which was critical to Jeld-Wen's business. Specifically, the sale of doors constituted a significant portion of Jeld-Wen's business, accounting for approximately 67% of Jeld-Wen's revenues during the Class Period.

**RESPONSE TO PARAGRAPH 277:**

The allegations in Paragraph 277 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 277.

278. Moreover, Steves & Sons filed its lawsuit in 2016, seeking to hold Jeld-Wen liable for treble damages under the Clayton Act, and further seeking divestiture of the Towanda, Pennsylvania doorskins manufacturing facility, which alone accounts for up to 33% of Jeld-Wen's doorskin manufacturing capacity. As analysts have noted, the success of Steves & Sons in obtaining the divestiture of the Towanda facility "could be the worst case scenario."

**RESPONSE TO PARAGRAPH 278:**

JELD-WEN Defendants admit that Steves filed a lawsuit in 2016 seeking to hold JELD-WEN liable for treble damages under the Clayton Act and seeking divestiture of the Towanda, Pennsylvania doorskins manufacturing facility. Paragraph 278 purports to summarize the *Steves* Complaint and purports to quote an analyst report by Bank of America dated October 8, 2018. JELD-WEN Defendants refer to these written document for their contents. To the extent the allegations in Paragraph 278 characterize or conflict with the contents of those documents, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 278.

100

279.   Given the importance of the sale of interior molded doors to Jeld-Wen's business, as well as the materiality of the Towanda facility to Jeld-Wen's ability to manufacture those interior molded doors, knowledge of the Company's sales practices for interior molded doors and doorskins, including the Company's anticompetitive conduct as described above, can therefore be imputed to the Individual Defendants.

**RESPONSE TO PARAGRAPH 279:**

The allegations in Paragraph 279 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 279.

280.   *Third*, as discussed above, the Individual Defendants spoke at length during the Class Period about the source of the Company's financial success, attributing it to "***pricing optimization***," "***favorable pricing***," "***strategic pricing***," and "***pricing discipline***," among other legitimate and lawful factors. Defendants further spoke directly to the underlying merits and validity of the Steves & Sons antitrust claims.

**RESPONSE TO PARAGRAPH 280:**

JELD-WEN Defendants deny the allegations in Paragraph 280.

281.   These false and misleading statements, and others like these, provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing about Jeld-Wen's antitrust violations, which were a major source of Jeld-Wen's financial success that Defendants neglected to disclose. Accordingly, Defendants breached their duty under the federal securities laws by speaking on these topics and failing to fully disclose all relevant material information while doing so.

**RESPONSE TO PARAGRAPH 281:**

The allegations in Paragraph 281 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 281.

282.   During the Class Period, each of the Individual Defendants unambiguously informed investors that the source of the Company's financial success was legitimate and lawful pricing strategies. For example, during the February 22, 2017 Earnings Call, Defendant Mallard attributed the Company's fourth quarter and full year 2016 financial results, including specifically the Company's increase in adjusted EBITDA and EBITDA margins, to "***favorable pricing, improved cost productivity, and the favorable impact of recent acquisitions***." He went on to say that the improvement in Jeld-Wen's revenues "***was driven by a 5% core growth comprised of a 2% benefit from our pricing optimization strategy in all three segments***." On the November 7,

2017 Earnings Call, Defendant Beck stated that "*[w]e are delivering core revenue growth with positive pricing*."

**RESPONSE TO PARAGRAPH 282:**

Paragraph 282 purports to describe and quote statements made by Defendant Mallard during JELD-WEN's February 22, 2017 Earnings Call and statements made by Defendant Beck during JELD-WEN's November 7, 2017 Earnings Call. JELD-WEN Defendants refer to the written transcripts of those calls for their contents. To the extent the allegations in Paragraph 282 characterize or contradict the contents of those transcripts, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 282.

283. Defendant Hachigian made a similar statement about the Company's success on the May 8, 2018 Earnings Call, stating, "*I think the path from 4% to 12% has been primarily getting rid of bad-margin business, taking pricing actions to get us back to price points that were prerecession*." Likewise, on the August 7, 2018 Earnings Call, Defendant Michel attributed the Company's "strong revenue growth," to, among others, "*improved pricing in all 3 regions both compared to [the] prior year as well as sequentially compared to the first quarter*."

**RESPONSE TO PARAGRAPH 283:**

Paragraph 283 purports to quote statements made by Defendant Hachigian during JELD-WEN's May 8, 2018 Earnings Call and statements made by Defendant Michel during JELD-WEN's August 17, 2018 Earnings Call. JELD-WEN Defendants refer to the written transcripts of those calls for their contents. To the extent the allegations in Paragraph 283 characterize or contradict the contents of those transcripts, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 283.

284. Even after the February 15, 2018 jury verdict in the Steves & Sons Litigation, Defendants Beck and Michel assured investors that the ruling was erroneous and the allegations lacked merit. Specifically, on February 21, 2018, Defendant Beck stated that "*we continue to believe that the claims asserted in the litigation lack merit. I will note that the Department of Justice reviewed our acquisition of CMI twice and declined to take any action. Furthermore, we believe that we acted in good faith and in compliance with our contractual agreements*." Similarly, Defendant Michel stated on the August 7, 2018 Earnings Call, "*JELD-WEN believes that the jury verdict in this case is erroneous*."

**RESPONSE TO PARAGRAPH 284:**

Paragraph 284 purports to quote statements made by Defendant Beck during JELD-WEN's February 21, 2018 Earnings Call and statements made by Defendant Michel during JELD-WEN's August 7, 2018 Earnings Call. JELD-WEN Defendants refer to the written transcripts of those calls for their contents. To the extent the allegations in Paragraph 284 characterize or contradict the contents of those transcripts, JELD-WEN Defendants deny those allegations. JELD-WEN Defendants deny the remaining allegations in Paragraph 284.

285.    By repeatedly insisting that Jeld-Wen's success was due to legitimate and lawful pricing strategies, and that the Steves & Sons Litigation lacked merit, Defendants either: (1) knew that the Company had been participating in anticompetitive conduct through the CMI Acquisition and the Company's subsequent actions, and that this was a major source of the Company's financial success; or (2) were reckless in not knowing or investigating that this was the case. Under either scenario, there is a strong inference that Defendants made these statements with scienter.

**RESPONSE TO PARAGRAPH 285:**

The allegations in Paragraph 285 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 285.

286.    *Fourth*, Defendants Beck, Mallard, Hachigian, and Michel were all in charge of approving and implementing price increases and thus had intimate knowledge, or were reckless in not knowing, that those price increases were a result of coordination with Masonite to drive up the cost of interior molded doors.

**RESPONSE TO PARAGRAPH 286:**

The allegations in Paragraph 286 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 286.

287.    Indeed, multiple former employees confirmed that this was true. Specifically, CW 3 explained that price increases were discussed and approved by a pricing group, which included the CEO and the CFO, as well as Controllers, product line managers, the sales team, and operations personnel. Similarly, CWs 2, 4 and 6, all unambiguously confirmed that price increases were always approved by the CEO.

103

**RESPONSE TO PARAGRAPH 287:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 287, and therefore deny those allegations.

288.    CW 4 expanded upon this, noting that during his tenure Defendant Hachigian was hands-on with regards to pricing, and Defendant Beck was "very, very" hands-on in this regard.

**RESPONSE TO PARAGRAPH 288:**

JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 288, and therefore deny those allegations.

289.    In late 2012, shortly after Jeld-Wen acquired CMI, Jeld-Wen and Masonite began imposing uniform price increases on interior molded doors. At least nine times between 2012 and 2018, Jeld-Wen and Masonite increased the prices of their interior molded doors in the same or similar percentage increments, either simultaneously or in brief succession of each other.

**RESPONSE TO PARAGRAPH 289:**

JELD-WEN Defendants deny the allegations in Paragraph 289.

290.    With their authority to ultimately approve and implement these price increases, all of the Individual Defendants knew, or were reckless in not knowing, that those increases were the result of coordination and/or collusion with Masonite to drive up the cost of interior molded doors.

**RESPONSE TO PARAGRAPH 290:**

The allegations in Paragraph 290 contain characterizations and/or conclusions of law that

do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 290.

291.    *Fifth*, the timing and circumstances of the resignation of Defendant Mallard, the CFO at Jeld-Wen throughout the Class Period, is highly suspicious. That this resignation is temporally connected to disclosures of the Company's fraud further supports that inference.

**RESPONSE TO PARAGRAPH 291:**

The allegations in Paragraph 291 contain characterizations and/or conclusions of law that

do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the

allegations in Paragraph 291.

292.    Throughout the entire Class Period, Defendant Mallard, as CFO of Jeld-Wen, was in charge of the Company's finances and spoke regularly about the Company's financial success and the purported reasons for that success. Defendant Mallard further signed all of Jeld-Wen's 10-Ks and 10-Qs during the Class Period, which contained materially false and misleading statements and omissions of material fact regarding the competitive environment in which Jeld-Wen operated and attributed the source of Jeld-Wen's success to legitimate factors such as "pricing optimization" and "pricing discipline." His sudden resignation *on the same day* that the Company admitted that it would likely be liable to Steves & Sons for violations of the Clayton Act in the amount of $76.5 million, with no previous public warning, supports a strong inference of scienter.

**RESPONSE TO PARAGRAPH 292:**

The allegations in Paragraph 292 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants admit that Defendant Mallard signed JELD-WEN's 10-Ks and 10-Qs during the purported Class Period, and that, in his role as CFO, Defendant Mallard made public statements, including on the Company's quarterly earnings calls, and refer to the transcripts of those earnings calls for their contents. JELD-WEN Defendants deny the remaining allegations of Paragraph 292.

293.    The Individual Defendants and the Onex Defendants, by virtue of their high-level and controlling positions at Jeld-Wen, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

**RESPONSE TO PARAGRAPH 293:**

The allegations in Paragraph 293 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 293.

294.    Defendants Beck, Mallard, Hachigian, and Michel, as senior executive officers of Jeld-Wen, Defendants Beck, Hachigian, and Michel as directors of Jeld-Wen, and the Onex Defendants as controlling shareholder of Jeld-Wen—a publicly-held company whose common stock was, and is, traded on the NYSE, and governed by the federal securities law—each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so

105

that the market price of Jeld-Wen's publicly traded common stock would be based on accurate information. The Individual Defendants and the Onex Defendants each violated these requirements and obligations during the Class Period.

**RESPONSE TO PARAGRAPH 294:**

The allegations in Paragraph 294 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 294.

295.    Defendants Beck, Mallard, Hachigian, and Michel, because of their positions of control and authority as senior executive officers of Jeld-Wen, Defendants Beck, Hachigian, and Michel, as Jeld-Wen directors, and the Onex Defendants, as the controlling shareholder of Jeld-Wen, were able to and did control the content of Jeld-Wen's SEC filings, press releases, and other public statements issued by or on behalf of Jeld-Wen during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants and the Onex Defendants are responsible for the accuracy of the public statements alleged herein.

**RESPONSE TO PARAGRAPH 295:**

The allegations in Paragraph 295 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 295.

296.    The Individual Defendants and the Onex Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Jeld-Wen common stock by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Jeld-Wen's business, operations, and management, and the intrinsic value of Jeld-Wen's common stock, and caused Lead Plaintiffs and members of the Class to purchase Jeld-Wen common stock at artificially inflated prices.

**RESPONSE TO PARAGRAPH 296:**

The allegations in Paragraph 296 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 296.

297.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded securities, including common stock, of Jeld-Wen during the Class Period and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Jeld-Wen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Jeld-Wen's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

**RESPONSE TO PARAGRAPH 297:**

JELD-WEN Defendants admit that this action purports to be a class action pursuant to Rule 23 on behalf of persons who purchased JELD-WEN securities during the Putative Class Period, and that Lead Plaintiffs purport to exclude from the putative class the persons described in Paragraph 297.  JELD-WEN Defendants deny the remaining allegations in Paragraph 297.

298.    The members of the Class are so numerous that joinder of all members is impracticable. According to its quarterly and annual reports filed with the SEC, during the Class Period, Jeld-Wen had over 100 million shares of common stock outstanding and was actively traded on the NYSE under the ticker symbol "JELD." While the exact number of Class members is unknown to Lead Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Jeld-Wen and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

**RESPONSE TO PARAGRAPH 298:**

The allegations in Paragraph 298 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants admit that records of record owners are maintained by JELD-WEN's transfer agent and that JELD-WEN securities are listed and traded on the New York Stock Exchange, and refer to the public record for ownership of JELD-WEN common stock.  JELD-WEN Defendants deny the remaining allegations in Paragraph 298, except state that Defendants lack knowledge or

107

information sufficient to form a belief as to the allegations in the third sentence of Paragraph 298 regarding Lead Plaintiffs' knowledge and beliefs, and therefore deny those allegations.

299.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

**RESPONSE TO PARAGRAPH 299:**

The allegations in Paragraph 299 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 299.

300.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

**RESPONSE TO PARAGRAPH 300:**

The allegations in Paragraph 300 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 300.

301.    Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)    Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    Whether, and to what extent, the market price of Jeld-Wen common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)    Whether the Individual Defendants and the Onex Defendants were controlling persons of Jeld-Wen; and

(f)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

**RESPONSE TO PARAGRAPH 301:**

The allegations in Paragraph 301 and subparagraphs 301(a) through 301(f) contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 301 and subparagraphs 301(a) through 301(f).

302.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**RESPONSE TO PARAGRAPH 302:**

The allegations in Paragraph 302 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 302.

303.    To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)    Lead Plaintiffs and other members of the Class purchased Jeld-Wen's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)    Jeld-Wen's stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)     as a regulated issuer, Jeld-Wen filed periodic public reports with the SEC and the NYSE;

(h)     Jeld-Wen regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)     Jeld-Wen was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Wells Fargo Securities, J.P. Morgan, Jefferies, RBC Capital Markets, Deutsche Bank, Barclays, Bank of America, Credit Suisse Gabelli, Wedbush and SunTrust Robinson Humphrey, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

**RESPONSE TO PARAGRAPH 303:**

The allegations in Paragraph 303 and subparagraphs 303(a) through 303(i) contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 303 and subparagraphs 303(a) through 303(i).

304.    As a result of the foregoing, the market for Jeld-Wen's securities promptly digested current information regarding Jeld-Wen from publicly available sources and reflected such information in Jeld-Wen's securities price(s). Under these circumstances, all persons and entities who or which purchased or otherwise acquired Jeld-Wen's securities during the Class Period suffered similar injuries through their purchase of Jeld-Wen at artificially inflated prices and thus, the presumption of reliance applies.

**RESPONSE TO PARAGRAPH 304:**

The allegations in Paragraph 304 contain characterizations and/or conclusions of law that do not require a response.  To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 304.

305.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Jeld-Wen common stock.

**RESPONSE TO PARAGRAPH 305:**

The allegations in Paragraph 305 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 305.

306. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of Jeld-Wen's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

**RESPONSE TO PARAGRAPH 306:**

The allegations in Paragraph 306 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 306.

307. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Jeld-Wen's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**RESPONSE TO PARAGRAPH 307:**

The allegations in Paragraph 307 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 307.

308. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

111

**RESPONSE TO PARAGRAPH 308:**

The allegations in Paragraph 308 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 308.

309.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

**RESPONSE TO PARAGRAPH 309:**

The allegations in Paragraph 309 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 309.

310.    In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

**RESPONSE TO PARAGRAPH 310:**

The allegations in Paragraph 310 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 310.

311.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Jeld-Wen was engaged in anticompetitive conduct which led to increased revenues on interior molded doors and doorskins.

112

**RESPONSE TO PARAGRAPH 311:**

The allegations in Paragraph 311 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 311.

312. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Jeld-Wen who knew that the statement was false when made.

**RESPONSE TO PARAGRAPH 312:**

The allegations in Paragraph 312 contain characterizations and/or conclusions of law that do not require a response. To the extent a response is required, JELD-WEN Defendants deny the allegations in Paragraph 312.

313. Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

**RESPONSE TO PARAGRAPH 313:**

JELD-WEN Defendants incorporate herein by reference each response set forth above.

314. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Jeld-Wen and the Individual Defendants.

**RESPONSE TO PARAGRAPH 314:**

JELD-WEN Defendants deny the allegations in Paragraph 314, except admit that Lead Plaintiffs purport to bring this action pursuant to the statutes and rules cited therein.

315. As alleged herein, throughout the Class Period, Jeld-Wen and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Jeld-Wen and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially inflate and maintain the

113

price of Jeld-Wen common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase Jeld-Wen common stock at artificially inflated prices.

**RESPONSE TO PARAGRAPH 315:**

JELD-WEN Defendants deny the allegations in Paragraph 315.

316.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

**RESPONSE TO PARAGRAPH 316:**

JELD-WEN Defendants deny the allegations in Paragraph 316.

317.    As set forth above, Jeld-Wen and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased Jeld-Wen common stock during the Class Period.

**RESPONSE TO PARAGRAPH 317:**

JELD-WEN Defendants deny the allegations in Paragraph 317

318.    In ignorance of the false and misleading nature of Jeld-Wen and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Jeld-Wen common stock, Lead Plaintiffs and other members of the Class purchased Jeld-Wen common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have purchased Jeld-Wen common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Jeld-Wen common stock declined precipitously and Lead Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Jeld-Wen common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

**RESPONSE TO PARAGRAPH 318:**

JELD-WEN Defendants deny the allegations in Paragraph 318.

319.    By virtue of the foregoing, Jeld-Wen and the Individual Defendants are liable to Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**RESPONSE TO PARAGRAPH 319:**

JELD-WEN Defendants deny the allegations in Paragraph 319.

320.    Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

**RESPONSE TO PARAGRAPH 320:**

JELD-WEN Defendants incorporate herein by reference each response set forth above.

321.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants and the Onex Defendants.

**RESPONSE TO PARAGRAPH 321:**

JELD-WEN Defendants deny the allegations in Paragraph 321, except admit that Lead

Plaintiffs purport to bring this action pursuant to the statute cited therein.

322.    The Individual Defendants had control over Jeld-Wen and made the material false and misleading statements and omissions on behalf of Jeld-Wen within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive leadership positions and positions as directors of Jeld-Wen, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

**RESPONSE TO PARAGRAPH 322:**

JELD-WEN Defendants deny the allegations in Paragraph 322.

323.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

**RESPONSE TO PARAGRAPH 323:**

JELD-WEN Defendants deny the allegations in Paragraph 323.

324.    The Onex Defendants had control over Jeld-Wen and made the material false and misleading statements and omissions on behalf of Jeld-Wen within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their voting power, ownership, rights as against

Jeld-Wen, and/or specific acts, as alleged above, the Onex Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend were false and misleading. The Onex Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

**RESPONSE TO PARAGRAPH 324:**

The allegations in Paragraph 324 are directed at other defendants, and therefore no response is required. To the extent a response is required, JELD-WEN Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 324, and therefore deny those allegations.

325.    By reason of such wrongful conduct, the Individual Defendants and Onex Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants and Onex Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

**RESPONSE TO PARAGRAPH 325:**

JELD-WEN Defendants deny the allegations in Paragraph 325.

**<u>Affirmative and Other Defenses</u>**

JELD-WEN Defendants assert the following affirmative and other defenses. Except where expressly noted, each defense is asserted by each of the JELD-WEN Defendants. In asserting these defenses, JELD-WEN Defendants do not assume the burden of establishing any fact or proposition where that burden properly is imposed on Lead Plaintiffs. JELD-WEN Defendants expressly reserve the right to supplement, amend, or delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

## First Defense

The action is barred, in whole or in part, because Lead Plaintiffs have not suffered any injury or damage, or, in the alternative, because any injury or damage that Lead Plaintiffs claim to have sustained was not caused by JELD-WEN Defendants.

## Second Defense

JELD-WEN Defendants are not liable because they did not make a false or misleading statement of material fact or omission of material fact, and complied with all applicable disclosure requirements.

## Third Defense

JELD-WEN Defendants are not liable because Lead Plaintiffs' claims are barred, in whole or in part, because, assuming there was any untruth or omission as alleged in the Complaint (and JELD-WEN Defendants deny there was any), Lead Plaintiffs knew or should have known of such untruth or omission.

## Fourth Defense

JELD-WEN Defendants are not liable because Lead Plaintiffs' claims are barred, in whole or in part, because Lead Plaintiffs purchased JELD-WEN securities with actual or constructive knowledge of the risks involved in an investment in JELD-WEN securities and thus voluntarily assumed the risk of the losses alleged in the Complaint.

## Fifth Defense

JELD-WEN Defendants are not liable because they acted in good faith and in reasonable reliance upon the work, opinions, information, representations, and advice of others, upon whom JELD-WEN Defendants were entitled to rely.

### Sixth Defense

JELD-WEN Defendants are not liable because they did not act with scienter and did not act knowingly or recklessly as to any alleged misstatement or omission.

### Seventh Defense

JELD-WEN Defendants are not liable because they, at all times, and with respect to all matters herein, acted in good faith, exercised reasonable care, and did not know, and in the exercise of reasonable care could not have known, of the purported untruths, misstatements, and/or omissions alleged in the Complaint.

### Eighth Defense

This action may not properly be maintained as a class action.

### Ninth Defense

JELD-WEN Defendants are not liable because any allegedly untrue statements of material fact, omissions of material fact, misleading statements, or other actions allegedly taken by the JELD-WEN Defendants were not material to the investment decisions of Lead Plaintiffs or any member of any purported class.

### Tenth Defense

JELD-WEN Defendants are not liable because Lead Plaintiffs' claims are barred, in whole or in part, because the purported misrepresentations and omissions alleged in the Complaint did not affect the market price of JELD-WEN securities.

### Eleventh Defense

Lead Plaintiffs' claims are barred, in whole or in part, because Lead Plaintiffs have not pleaded, and cannot prove, loss causation, and/or have not pleaded, and cannot prove, that Lead Plaintiffs suffered damages that can be attributed and/or causally related to the alleged misrepresentations or omissions.

118

Twelfth Defense

Lead Plaintiffs' claims are barred, in whole or in part, because Lead Plaintiffs were not entitled to, and did not, reasonably and/or justifiably rely on any of the statements or omissions alleged in the Complaint in deciding to purchase JELD-WEN securities.

Thirteenth Defense

Lead Plaintiffs cannot recover against JELD-WEN Defendants, in whole or in part, because the "fraud on the market" theory of reliance is unavailable, and Lead Plaintiffs will be otherwise unable to establish that they relied upon the purported misstatements and omissions alleged in the Complaint.

Fourteenth Defense

Lead Plaintiffs cannot recover against JELD-WEN Defendants because Lead Plaintiffs will be unable to establish that the purported misstatements and omissions alleged in the Complaint were the cause of Lead Plaintiffs' decision to purchase JELD-WEN securities or the terms of their investment.

Fifteenth Defense

Lead Plaintiffs cannot recover against JELD-WEN Defendants because the losses, if any, sustained by Lead Plaintiffs were not actually or proximately caused by, and resulted from causes other than, the acts and occurrences alleged in the Complaint.

Sixteenth Defense

Lead Plaintiffs' claims are barred because the injuries alleged by Lead Plaintiffs, to the extent any exist, were caused, in whole or in part, by intervening and/or superseding causes unrelated to the alleged conduct of JELD-WEN Defendants, by the conduct of third parties for whom JELD-WEN Defendants were not responsible, or through forces in the marketplace over which JELD-WEN Defendants have no control.

119

## Seventeenth Defense

JELD-WEN Defendants are not liable because to the extent that Lead Plaintiffs have been damaged, if at all, their failure to mitigate their damages bars recovery.

## Eighteenth Defense

JELD-WEN Defendants are not liable because Lead Plaintiffs' losses, if any, should be reduced, diminished, and/or eliminated under the proportionate liability provisions of the Securities Exchange Act of 1934 to reflect only JELD-WEN Defendants' percentage of responsibility, if any.

## Nineteenth Defense

To the extent Lead Plaintiffs suffered damages, if at all, such damages must be offset by Lead Plaintiffs' gains.

## Twentieth Defense

To the extent Lead Plaintiffs suffered damages, if at all, such damages must be capped pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(e)(1).

## Twenty-First Defense

If and to the extent that JELD-WEN Defendants are found to have made any false or misleading statements or omissions (which JELD-WEN Defendants deny), the actual facts that Lead Plaintiffs allege to have been misrepresented or omitted were in fact known to and entered the securities market through credible sources. Lead Plaintiffs are not entitled to any recovery from JELD-WEN Defendants because the substance of the allegedly material information that Lead Plaintiffs allege to have been omitted or misrepresented was in fact disclosed in the public disclosures of other parties and third parties, in JELD-WEN Defendants' own public filings and announcements, and by other sources that were otherwise publicly available and/or widely known to the market and to the investing community.

### Twenty- Second Defense

The Individual JELD-WEN Defendants are not liable because they acted at all times in good faith and did not directly or indirectly induce the alleged wrongful act or acts, nor were they culpable participants in any of the alleged wrongdoing.

### Twenty- Third Defense

The Individual JELD-WEN Defendants are not liable because none of the Individual JELD-WEN Defendants controlled, or had the ability to control, JELD-WEN and/or any other Defendant.

### Twenty- Fourth Defense

JELD-WEN Defendants deny that Lead Plaintiffs are entitled to recover attorneys' fees, costs, or expenses.

### Twenty- Fifth Defense

The action is barred, in whole or in part, because Lead Plaintiffs lack standing to maintain this action under Article III or other applicable statute or common law.

### Twenty- Sixth Defense

JELD-WEN Defendants are entitled to recover contribution from others for any liability they incur as a result of any of the purported misrepresentations, omissions, and conduct alleged in the claims against JELD-WEN Defendants.

### Twenty- Seventh Defense

JELD-WEN Defendants are not liable because any allegedly untrue statements of material fact or misleading statements were opinion statements that JELD-WEN Defendants honestly, and upon a reasonable basis, believed to be true at the time the alleged statements were made.

Twenty-Eighth Defense

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

Twenty-Ninth Defense

Plaintiffs' claims are barred, in whole or in part, because the purported misstatements and omissions alleged in the Complaint were forward-looking and satisfied the safe-harbor provisions of the Private Securities Litigation Reform Act of 1995, federal securities laws, and/or the "bespeaks caution" doctrine.

Thirtieth Defense

Plaintiffs' claims are barred, in whole or in part, because the Exchange Act cannot be read to violate JELD-WEN Defendants freedom of speech.

Thirty-First Defense

Plaintiffs' claims are barred, in whole or in part, because the Exchange Act cannot be read to violate JELD-WEN Defendants' due process rights.

**Prayer for Relief**

WHEREFORE, JELD-WEN Defendants pray for judgment against Lead Plaintiffs as follows:

1.    Dismissing the entire action with prejudice;

2.    Granting JELD-WEN Defendants their reasonable costs, expenses, and attorneys' fees; and

3.    Awarding JELD-WEN Defendants such other, further, and different relief as the Court deems just and proper.

122

DATED: November 5, 2020

    */s/ Brian C. Riopelle*
Brian C. Riopelle (Va. Bar No. 36454)
Brian E. Pumphrey (Va. Bar No. 47312)
Brian D. Schmalzbach (Va. Bar No. 88544)
Garrett H. Hooe (Va. Bar No. 83983)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1084
Fax.: (804) 698-2150
briopelle@mcguirewoods.com
bpumphrey@mcguirewoods.com
bschmalzbach@mcguirewoods.com
ghooe@mcguirewoods.com

Sandra C. Goldstein, P.C. (*pro hac vice*)
Rachel M. Fritzler (*pro hac vice*)
Lindsey Weiss Harris (*pro hac vice pending*)
Jacob M. Rae (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
sandra.goldstein@kirkland.com
rachel.fritzler@kirkland.com
lindsey.harris@kirkland.com
jacob.rae@kirkland.com

*Attorneys for Defendants JELD-WEN
Holding, Inc., Mark A. Beck, L. Brooks
Mallard, Kirk S. Hachigian, and Gary S.
Michel*

123

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 5th day of November, 2020, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to

all counsel of record in this case.

        */s/ Brian C. Riopelle*
        Brian C. Riopelle (Va. Bar No. 36454)
        **MCGUIREWOODS LLP**
        Gateway Plaza
        800 East Canal Street
        Richmond, VA 23219
        Tel.: (804) 775-1084
        Fax.: (804) 698-2150
        briopelle@mcguirewoods.com