UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Richmond Division)

| | | |
|---|---|---|
| In re JELD-WEN HOLDING, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. 3:20-cv-00112-JAG <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: <br><br> ALL ACTIONS. | ) ) ) ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION .................................................................................................1

II.  STATEMENT OF FACTS ...................................................................................4

    A.  Jeld-Wen Has Been Engaging in Anticompetitive Conduct Since 2012.................4

    B.  Defendants Consistently Misled Investors, Telling Them that the Company's Success Resulted from Lawful Pricing Strategies..............................7

    C.  Defendants Continued to Mislead Investors After Judge Payne Issued Findings of Fact Recognizing the Company's Anticompetitive Conduct, and Deemed Divesture of the Towanda Plant an Appropriate Remedy .................8

    D.  Jeld-Wen's Anticompetitive Conduct Fully Comes Light When Defendants Acknowledged a Likely $76.5 Million Judgment in the *Steves* Litigation.................................................................................................................9

    E.  This Action and the Proposed Class Representatives ............................................9

III.  CERTIFICATION IS PROPER UNDER RULE 23(a) ......................................10

    A.  Legal Standards for Class Certification ..............................................................10

    B.  Class Treatment of Securities Fraud Actions Is Favored.....................................11

    C.  The Class Is so Numerous that Joinder of All Members Is Impracticable ...........11

    D.  Common Questions of Law or Fact Exist for All Class Members ........................12

    E.  The Proposed Class Representatives' Claims Are Typical of Those of The Class.....................................................................................................................14

    F.  The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Class ......................................................................................15

    G.  The Court Should Appoint Plaintiffs' Choice of Counsel ...................................17

IV.  CERTIFICATION IS PROPER UNDER RULE 23(b)(3) .................................17

    1.  Common Questions of Law and Fact Predominate Over Individual Questions.............................................................................................................18

        a.  The "Fraud-on-the-Market" Presumption Applies .........................19

            (1)  Jeld-Wen Common Stock Traded in an Efficient Market During the Class Period.......................................20

**Page**

(i)     Jeld-Wen Shares Experienced a High Weekly Trading Volume........................................21

(ii)     A Sufficient Number of Financial Analysts Covered and Reported on Jeld-Wen During the Class Period........................................21

(iii)     Jeld-Wen Common Stock Traded on the NYSE Under the Supervision of Designated Market Makers with Brokers Standing Ready to Buy and Sell the Shares ..........................22

(iv)     Jeld-Wen Was Eligible to File Form S-3 During the Class Period .........................................23

(v)     The Price of Jeld-Wen's Common Stock Reacted to New Company Specific Information During the Class Period .....................23

(vi)     Jeld-Wen's Market Capitalization and Float .........24

(vii)     The Bid-Ask Spread of Jeld-Wen's Common Stock........................................24

     b.     The Other Relevant Requirements of the Fraud on the Market Presumption Apply.............................................25

     c.     Damages are Measurable on a Class-Wide Basis .........................26

    2.     A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action................................................27

V.     CONCLUSION....................................................................................................29

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................................................18

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
   568 U.S. 455 (2013).......................................................................4, 19, 25, 26

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1998)......................................................................... *passim*

*Bell v. WestRock CP, LLC*,
   2019 WL 1874694
   (E.D. Va. Apr. 26, 2019)........................................................................2, 11, 12, 14

*Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*,
   2014 WL 4403524
   (E.D. Va. Sept. 5, 2014).......................................................................................11

*Berry v. Schulman*,
   807 F.3d 600 (4th Cir. 2015) ..............................................................................10

*Boyce v. Wachovia Sec., LLC*,
   2010 WL 1253737
   (E.D.N.C. Mar. 29, 2010) ...................................................................................11

*Brady v. Thurston Motor Lines*,
   726 F.2d 136 (4th Cir. 1984) ..............................................................................11

*Branch v. Gov't Emps. Ins. Co.*,
   323 F.R.D. 539 (E.D. Va. 2018) .........................................................................12

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ..............................................................................14

*Brown v. Transurban USA, Inc.*,
   318 F.R.D. 560 (E.D. Va. 2016) .........................................................................12

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   2020 WL 6270482
   (E.D. Va. Oct. 26, 2020) ....................................................................................25

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ...................................................................... *passim*

**Page**

*City of Ann Arbor Emps.' Ret. Sys. v. ICG, Inc.*,
   2007 WL 9718299
   (S.D. W. Va. July 18, 2007)...............................................................................................10

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
   270 F.R.D. 247 (D.S.C. 2010) ..................................................................................... *passim*

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
   322 F. Supp. 3d 676 (D. Md. 2018) ....................................................................................16

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)...............................................................................................................26

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   296 F.R.D. 261 (S.D.N.Y. 2014) ........................................................................................26

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)..............................................................................................................11

*Fangman v. Genuine Title, LLC*,
   2016 WL 6600509
   (D. Md. Nov. 8, 2016)..........................................................................................................14

*Fariasantos v. Rosenberg & Assocs., LLC*,
   303 F.R.D. 272 (E.D. Va. 2014) .........................................................................................16

*Gariety v. Grant Thorton, LLP*,
   368 F.3d 356 (4th Cir. 2004) .........................................................................................19, 20

*Gen. Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982)..............................................................................................................14

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003) ...............................................................................................18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)..............................................................................................4, 19, 20, 25

*Hart v. Louisiana-Pac. Corp.*,
   641 F. App'x 222 (4th Cir. 2016) ...................................................................................10, 11

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004)...................................................................................................10

**Page**

*Hewlett v. Premier Salons Int'l, Inc.*,
   185 F.R.D. 211 (D. Md. 1997)........................................................................................18

*In re BearingPoint, Inc. Sec. Litig.*,
   232 F.R.D. 534 (E.D. Va. 2006) ................................................................... *passim*

*In re Comput. Scis. Corp. Sec. Litig.*,
   288 F.R.D. 112 (E.D. Va. 2012) ..................................................................................21

*In re The Mills Corp. Sec. Litig*,
   257 F.R.D. 101 (E.D. Va. 2009) ..................................................................................13

*In re NeuStar, Inc. Sec. Litig.*,
   2015 WL 5674798
   (E.D. Va. Sept. 23, 2015)...............................................................................12, 13, 17

*In re NII Holdings, Inc. Sec. Litig.*,
   311 F.R.D. 401 (E.D. Va. 2015) .................................................................. *passim*

*In re Red Hat Inc., Sec. Litig.*,
   261 F.R.D. 83 (E.D.N.C. 2009) ..............................................................................13, 27

*In re Willis Towers Watson PLC Proxy Litig.*,
   2020 WL 5361582
   (E.D. Va. Sept. 4, 2020)...............................................................................................26

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   2020 WL 4917625
   (E.D. Va. Aug. 21, 2020) .............................................................................................11

*Knurr v. Orbital ATK, Inc.*,
   220 F. Supp. 3d 653 (E.D. Va. 2016) .........................................................................17

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................20, 24, 25

*Lee v. JLN Constr. Servs., LLC*,
   2019 WL 3869412
   (D. Md. Aug. 16, 2019)................................................................................................14

*Minter v. Wells Fargo Bank, N.A.*,
   279 F.R.D. 320 (D. Md. 2012)................................................................................14, 27

*Mylan Labs., Inc. v. Matkari*,
   7 F.3d 1130 (4th Cir. 1993) .........................................................................................11

**Page**

*Smith v. The Baltimore & Ohio R.R. Co.*,
    473 F. Supp. 572 (D. Md. 1979) ........................................................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..........................................................................................................12


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78 ...............................................................................................................................3, 23
    §78j(b) ..............................................................................................................14, 19, 26

Federal Rule of Civil Procedure
    Rule 23 .................................................................................................... *passim*
    Rule 23(a) ................................................................................................. *passim*
    Rule 23(a)(1) ...............................................................................................11, 12
    Rule 23(a)(1)-(4) ..............................................................................................17
    Rule 23(a)(2) .....................................................................................................12
    Rule 23(a)(3) .....................................................................................................14
    Rule 23(a)(4) ..........................................................................................15, 16, 17
    Rule 23(b)(3) ............................................................................................. *passim*
    Rule 23(c) ..........................................................................................................28
    Rule 23(d) ..........................................................................................................28
    Rule 23(g) ..........................................................................................................17
    Rule 23(g)(1)(A) ...............................................................................................17

17 C.F.R.
    §240.10b-5 ...................................................................................................14, 19

Lead Plaintiffs Public Employees' Retirement System of Mississippi ("Mississippi PERS") and Plumbers & Pipefitters National Pension Fund ("PPNPF"), along with Additional Plaintiff Wisconsin Laborers' Pension Fund ("WLPF" and collectively, "Plaintiffs" or "Proposed Class Representatives"), by their counsel, respectfully submit this memorandum of law in support of their motion for an Order: (i) certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; (ii) appointing PPNPF, Mississippi PERS, and WLPF as Class Representatives; (iii) appointing Co-Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Labaton Sucharow LLP ("Labaton Sucharow") as Class Counsel; and (iv) appointing Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Liaison Counsel.

In support of the motion, Plaintiffs submit this memorandum of law, the Declaration of Ta'Shia S. Gordon, Special Assistant Attorney General for Mississippi PERS ("Gordon Decl."), the Declaration of Toni C. Inscoe, Administrator for PPNPF ("Inscoe Decl."), the Declaration of John J. Schmitt, President and Business Manager for WLPF ("Schmitt Decl."), the Declaration of Robert M. Rothman of Robbins Geller ("Rothman Decl."), and a [Proposed] Order, filed concurrently herewith.

## I.   INTRODUCTION

Plaintiffs seek certification of a class, pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), consisting of:

> [A]ll persons and entities who or which, during the period from January 26, 2017 through October 15, 2018, inclusive (the "Class Period"), purchased the publicly traded common stock of Jeld-Wen Holding, Inc.[1]

---

[1]   The following are excluded from the Class: (1) Defendants (defined below); (2) members of the immediate family of any Defendant who is an individual; (3) any person who was an officer or director of Jeld-Wen Holding, Inc. ("Jeld-Wen" or the "Company"), Onex Corporation ("Onex"), or any Onex affiliated fund during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) Jeld-Wen's or Onex's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

"[I]n light of the importance of the class action device in securities fraud suits, the requirements of Rule 23 are to be construed liberally. . . . [and,] [t]hus, any doubts about the propriety of certification should be resolved in favor of certification." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) (Ellis, J.) (internal citations and quotations omitted). This case is no exception and readily satisfies all of the requirements of Rule 23. Certification under Rule 23 is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Rule 23(a); *see also Bell v. WestRock CP, LLC*, 2019 WL 1874694, at *2 (E.D. Va. Apr. 26, 2019) (Gibney, J.). Additionally, where "common" issues of law or fact "predominate over any questions affecting only individual members," and a class action is "superior" to other methods of adjudication, class certification is appropriate. Rule 23(b)(3); *see also Bell*, 2019 WL 1874694, at *2. The proposed Class readily satisfies these elements.

First, during the proposed Class Period, over 100 million shares of Jeld-Wen common stock were outstanding and were actively traded on the New York Stock Exchange ("NYSE"). There are likely thousands of Class members who were harmed by the conduct of Jeld-Wen and certain of its officers and directors (the "Individual Defendants,"[2] and together with the Company, the "Jeld-Wen Defendants") and controlling shareholder Onex (together with its affiliated funds, the "Onex Defendants" and, together with the Jeld-Wen Defendants, the "Defendants").

---

[2]  The Individual Defendants are former President and Chief Executive Officer Mark A. Beck, former Executive Vice President and Chief Financial Officer L. Brooks Mallard, former Interim Chief Executive Officer Kirk S. Hachigian, and current President and Chief Executive Officer Gary S. Michel.

Second, this action involves many common issues of law and fact, readily satisfying Rule 23's commonality requirement. As the Consolidated Class Action Complaint (the "Complaint," ECF No. 73) details, questions of law and fact common to the Class include: (a) whether Defendants violated the federal securities laws by their acts and omissions alleged in the Complaint; (b) whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information; (c) whether, and to what extent, the market price of Jeld-Wen common stock was artificially inflated during the Class Period because of the material misstatements or omissions alleged in the Complaint; (d) whether Defendants acted with the requisite level of scienter; (e) whether the Individual Defendants and the Onex Defendants were controlling persons of Jeld-Wen; and (f) whether the members of the Class have sustained damages as a result of the conduct complained of in the Complaint, and if so, the proper measure of such damages.

Third, the Proposed Class Representatives' claims are typical of the claims of the Class because all of the members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Securities Exchange Act of 1934 (the "Exchange Act").

Fourth, the Proposed Class Representatives will fairly and adequately protect the interests of the members of the Class. No antagonism exists between the Proposed Class Representatives and the Class, and proposed Class Counsel, Robbins Geller and Labaton Sucharow, are competent and experienced in class and securities litigation. Proposed Liaison Counsel, Cohen Milstein, is competent and employs experienced class action litigators within this district.

Fifth, this action also satisfies the predominance requirement of Rule 23(b)(3). Namely, common issues of fact and law – including falsity, materiality, causation, scienter and damages – are subject to common proof and plainly predominate over individual issues. And because the market

for Jeld-Wen common stock, which traded on the NYSE, was efficient during the Class Period, the Class is entitled to the "fraud-on-the-market" presumption of class-wide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1998), *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014) ("*Halliburton II*"), and *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 458 (2013). *See* Rothman Decl. Ex. A (Report on Market Efficiency, Loss Causation and Damages by Steven P. Feinstein, Ph.D., CFA (the "Feinstein Report") at ¶¶18, 155-158).

Finally, the "superiority" factor under Rule 23(b)(3) is satisfied because: (a) joinder of all members of the Class is impracticable; (b) the damages suffered by individual Class members may be relatively small; and (c) the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.

Accordingly, Plaintiffs request certification of the Class, appointment of the Proposed Class Representatives as Class Representatives, and appointment of Robbins Geller and Labaton Sucharow as Class Counsel and Cohen Milstein as Liaison Counsel.

## II.    STATEMENT OF FACTS

### A.    Jeld-Wen Has Been Engaging in Anticompetitive Conduct Since 2012

Jeld-Wen, one of the world's largest door and window manufacturers, makes and sells interior molded doors, the most popular type of interior door in North America. ¶¶2-3, 44-45.[3] As a vertically-integrated company (¶31) – that is, one that owns or controls its own supply chain (¶49) – Jeld-Wen also manufactures doorskins, which are the principal component of interior molded doors, and which account for up to 70% of the cost of making those doors. ¶¶3, 47. Today, Jeld-Wen is the only supplier of doorskins to independent door manufacturers ("IDMs"). ¶89.

---

[3]    All "¶__" or "¶¶__" references are to the Complaint, unless otherwise noted. All emphasis is added and internal citations are omitted, unless otherwise noted. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Complaint.

As recently as 2012, however, two other vertically-integrated companies manufactured and supplied doorskins to IDMs: Masonite Corporation, Jeld-Wen's primary competitor in the interior-molded-door market, and Craftmaster Manufacturing, Inc. ("CMI"). ¶¶4, 62. But in June of that year, Jeld-Wen announced its intention to acquire CMI (the "Acquisition") and, thereby, CMI's flagship doorskin manufacturing plant in Towanda, Pa. (the "Towanda Plant"). ¶¶5, 68. As a result of the Acquisition, which closed on October 24, 2012 (¶¶9, 70), Jeld-Wen removed CMI both as the third source of doorskin supply in the interior-molded-door market, and as a competitor in the market for sale of doors. ¶5.

As it was planning the Acquisition, however, Jeld-Wen faced a problem. Years before, another door manufacturer – Premdor – had already sought to acquire the then owner of the Towanda Plant, Masonite. The DOJ had objected to that proposed acquisition on the ground that it would "*tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers*." ¶¶6, 55. To address that concern, Masonite spun off the Towanda Plant to create CMI as a third, stand-alone competitive force in the interior molded doors and doorskins market. ¶¶6, 59. That deal closed shortly thereafter. ¶58.

Aware that the DOJ would likely assert a similar objection to its intended acquisition of CMI (based on the same concerns), Jeld-Wen developed a plan to enter into ostensibly competitive long-term supply agreements with the IDMs to which it supplied doorskins. ¶¶7, 63. By entering into these contracts many months before approaching the DOJ to seek approval of the CMI Acquisition, Jeld-Wen hoped to induce IDMs and the DOJ to believe it would not use its increased, post-Acquisition market power to diminish the quality of doorskins or raise prices, except pursuant to

contractually agreed upon terms.  ¶¶8, 64-67.  That is, Jeld-Wen hoped to forestall any objections to the proposed transaction.

The ploy worked.  Given the long-term supply agreements and absence of objections from IDMs (¶¶76-77), the DOJ did not oppose the Acquisition.  ¶9.  The transaction closed, with DOJ sign-off, on October 24, 2012 (¶78), and reduced the number of doorskin manufacturers with dominant market power from three to two (Masonite and Jeld-Wen) – the precise situation about which the DOJ had previously been concerned.  ¶¶9, 79-80.  Making matters worse, Masonite abruptly exited the doorskins supply market in June 2014 (¶83), leaving Jeld-Wen as the only supplier of doorskins to IDMs, and giving it the sole power to set the price of those doorskins.  ¶10.

With a plan to "kill off" the competition (as recognized by Judge Payne (¶¶12, 69)), then-CEO Hachigian and CFO Mallard directed Jeld-Wen to exercise that power against the very IDMs with which it had long-term doorskin supply agreements.  ¶¶84, 87.  Those IDMs, which competed directly with Jeld-Wen in the market for interior molded doors, included Jeld-Wen's largest doorskins customer and second largest doors competitor, Steves & Sons.  ¶11.  Hachigian directed the Company to breach those supply agreements by, among other things, raising the price of doorskins, making it substantially more expensive for IDMs to manufacture interior molded doors.  By raising the price of doorskins, Jeld-Wen was able both to increase its revenues from the sale of doorskins, and to reduce the ability of IDMs to compete with Jeld-Wen in the market for interior molded doors.  ¶¶12, 148.

In the wake of these developments, Jeld-Wen and Masonite (which still manufactured doorskins for its own use) became the two dominant manufacturers of interior molded doors, and began imposing uniform price increases on those doors.  ¶92.  On at least nine different occasions between 2012 and 2018, Jeld-Wen and Masonite increased the prices of their interior molded doors

- 6 -

in the same or similar percentage increments, either simultaneously or in brief succession. ¶95. As confirmed by numerous former employees, these price increases came directly from the CEO and CFO – specifically, Individual Defendants Hachigian, Beck, Michel, and Mallard. ¶¶13, 93-94, 96.

In response to this anticompetitive conduct, Steves & Sons first requested that the DOJ conduct another review of the CMI Acquisition, to which it again raised no objections (¶99), and then sued Jeld-Wen in a private civil action in federal court in this District in June 2016. Steves & Sons alleged that the Company's acquisition of CMI and subsequent conduct in breaching the supply agreements violated federal antitrust laws. ¶¶14, 99-100. In addition, a class of door purchasers sued Jeld-Wen and Masonite for pricing fixing.

**B.    Defendants Consistently Misled Investors, Telling Them that the Company's Success Resulted from Lawful Pricing Strategies**

Although the true source of the Company's success in the interior molded door market was the anticompetitive conduct described above (¶¶111, 127-131), Defendants continually represented to the investing public that Jeld-Wen operated in a "highly competitive business environment" (¶¶101-102, 143), and that its success was driven by legitimate and lawful strategies such as "***pricing optimization***," "***pricing discipline***," "***strategic pricing***," and "***favorable pricing***." ¶¶103-109, 144-146. Defendants made similar statements about their financial success on at least 21 occasions throughout the Class Period. ¶¶152-153, 155, 158-160, 163-166, 168, 171, 174-177, 180, 182-183, 185, 188, 190-193, 195, 198, 201-204. Of course, Defendants never acknowledged the Company's extensive and significant anticompetitive conduct – the true source of its success. ¶¶15-16, 147, 154, 156, 161, 167, 169, 172, 178, 181, 184, 186, 189, 194, 196, 199, 205.

On February 15, 2018, the jury in the *Steves* litigation returned a verdict, finding that Jeld-Wen had violated federal antitrust laws. ¶¶17, 114, 206. Defendants aggressively downplayed the result, offering a countervailing message insisting that the verdict was "***erroneous***," and that "***the***

- 7 -

***facts underlying th[e] dispute do not establish either a violation of the antitrust laws or a breach of contract***." ¶¶17, 115.  Defendants relied retrospectively on the DOJ's refusal to intervene in the Acquisition as evidence of Defendants' supposed good faith and lawful behavior. ¶¶116, 207.  But because the verdict form contained no specific findings of fact detailing Defendants' misconduct, there was no public information available contradicting Defendants' story.  Thus, the extent and context of their anticompetitive conduct, as well as its significance to Jeld-Wen's ostensible financial success, remained concealed from investors.  ¶¶18, 114, 206.  Investors and analysts bought Defendants' story, believing that the DOJ's decision not to intervene in the Acquisition demonstrated Jeld-Wen's adherence to the federal antitrust laws. *See, e.g.*, ¶¶19, 118, 121, 209, 213; Feinstein Report ¶93.

Having assuaged investor concerns, Defendants continued to misattribute Jeld-Wen's success to legitimate and lawful pricing strategies, reiterating to the market that the Company "***operate[s] in a highly competitive business environment***," and claiming that it was able to "achieve profitable growth" through legitimate and lawful strategies such as "***pricing discipline***," "***strategic pricing***," and "***pricing optimization***."  ¶¶20, 123-126, 214-217, 219, 221, 223, 225.

C.    **Defendants Continued to Mislead Investors After Judge Payne Issued Findings of Fact Recognizing the Company's Anticompetitive Conduct, and Deemed Divesture of the Towanda Plant an Appropriate Remedy**

On October 5, 2018, Judge Payne, after a three-day evidentiary hearing on potential equitable remedies for Steves & Sons, issued the Divestiture Decision, with findings of previously undisclosed fact about Jeld-Wen's anticompetitive conduct.  ¶¶21, 229.  In particular, the court found that "the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin industry," ultimately "depriving the [IDMs] of that key component of a reliable supply source."  ¶¶21, 127.  Judge Payne also found that Jeld-Wen had "decided to approach the DOJ only after it had entered

into long-term supply contracts with the [IDMs], knowing that this oft-used tactic would assuage the concerns of the DOJ and the [IDMs] about anticompetitive effects of the proposed merger." ¶¶21, 128, 229. And Judge Payne found that divestiture of the Towanda Plant would be an appropriate remedy for Jeld-Wen's antitrust violations. ¶¶22, 131, 229. In response to this decision, Jeld-Wen's stock dropped $1.18 per share, or 5%. ¶¶22, 132, 237.

Defendants once again tried to reassure investors that the verdict was "*incorrect*," with "*multiple flawed rulings during the trial process*." ¶¶23, 133, 231, 238, 257. Analysts again believed them. *See, e.g.*, ¶23; Feinstein Report ¶136.

### D. Jeld-Wen's Anticompetitive Conduct Fully Comes to Light When Defendants Acknowledged a Likely $76.5 Million Judgment in the *Steves* Litigation

Just ten days later, however, on October 15, 2018, Jeld-Wen finally admitted – without the false reassurances, denials, and qualifications seen after the jury verdict and divestiture order – to anticompetitive conduct, informing the market that the Company would likely face a *$76.5 million* judgment in the *Steves* litigation. ¶¶24, 136, 240. In addition, the Company announced that defendant Mallard was unexpectedly resigning to "pursue other career interests." ¶¶24, 138. In response to these revelations, on October 16, 2018, Jeld-Wen's stock fell by approximately *19%*, on unusually high trading volume. ¶¶24, 139, 242; *see also* Feinstein Report ¶¶27, 137-145, 304-346.

### E. This Action and the Proposed Class Representatives

The initial complaint in this matter was filed by Cambridge Retirement System on February 19, 2020. ECF No. 1. On May 8, 2020, Mississippi PERS and PPNPF were appointed as Lead Plaintiffs. ECF No. 57. The Court also approved Robbins Geller and Labaton Sucharow as co-lead counsel, and Cohen Milstein as liaison counsel.

On June 22, 2020, Mississippi PERS and PPNPF filed the Complaint, adding WLPF as an additional plaintiff.[4]  Motion to dismiss briefing followed, and on September 25, 2020, the parties appeared for oral argument.  ECF No. 92.  On October 26, 2020, the Court dismissed the Jeld-Wen Defendants and the Onex Defendants' motions to dismiss in their entirety.  ECF No. 104.

Plaintiffs traded thousands of shares of Jeld-Wen common stock throughout the Class Period, and suffered damages as a result of the violations of the federal securities laws as alleged in the Complaint.  *See* ECF Nos. 73-1, 73-2, 73-3.  As a result, the Proposed Class Representatives seek appointment from this Court to serve as Class Representatives, and appointment of their counsel as Class Counsel.

## III.    CERTIFICATION IS PROPER UNDER RULE 23(a)

### A.    Legal Standards for Class Certification

In order to obtain class certification under Rule 23(a), a party must establish the following four prerequisites: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *See* Rule 23(a); *Hart v. Louisiana-Pac. Corp.*, 641 F. App'x 222, 232 (4th Cir. 2016); *Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015).  "In addition to meeting those requirements of numerosity, commonality, typicality, and adequacy, the proposed class must also satisfy at least one of the requirements of Rule 23(b)."  *Hart*, 641 F. App'x

---

[4]      "[T]he [Private Securities Litigation Reform Act] does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff[s] in representing a class." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004).  Indeed, courts around the county, including in the Fourth Circuit, recognize "it is the lead plaintiff's role to enlist additional named plaintiffs." *City of Ann Arbor Emps.' Ret. Sys. v. ICG, Inc.*, 2007 WL 9718299, at *3 n.2 (S.D. W. Va. July 18, 2007).  Further, this district certifies additional named plaintiffs as class representatives in Private Securities Litigation Reform Act actions. *See, e.g.*, *In re The Mills Corp. Sec. Litig.*, No. 1:06-cv-00077 (E.D. Va. Mar. 31, 2009) (O'Grady, J.).

at 232.  Courts in the Fourth Circuit have construed Rule 23 liberally.  *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *BearingPoint*, 232 F.R.D. at 538.

As demonstrated below, the Proposed Class Representatives satisfy the prerequisites of Rule 23 and the proposed Class should be certified.

### B.  Class Treatment of Securities Fraud Actions Is Favored

The United States Supreme Court and district courts within this Circuit (and throughout the country) recognize the utility and appropriateness of class actions involving violations of the federal securities laws.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace"); *Boyce v. Wachovia Sec., LLC*, 2010 WL 1253737, at *6 n.7 (E.D.N.C. Mar. 29, 2010) ("[i]t is well-recognized that alleged violations of federal securities laws are particularly well suited for class action proceedings and that Rule 23 is to be construed liberally to effectuate that end"); *BearingPoint*, 232 F.R.D. at 538 ("in securities fraud suits, the requirements of Rule 23 are to be construed liberally. . . . [and,] [t]hus, any doubts about the propriety of certification should be resolved in favor of certification").

### C.  The Class Is so Numerous that Joinder of All Members Is Impracticable

Rule 23(a)'s "numerosity" requirement is met if "the class is so numerous that joinder of all members is impracticable."  Rule 23(a)(1).  "No specified number is needed to maintain a class action under Rule 23[.]"  *Bell*, 2019 WL 1874694, at *3; *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 2014 WL 4403524, at *10 (E.D. Va. Sept. 5, 2014) (Spencer, J.) (same) (quoting *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984)).  "Generally, class sizes of forty or more are considered sufficiently numerous to satisfy Rule 23(a)(1)'s numerosity requirement[.]"  *In re Zetia (Ezetimibe) Antitrust Litig.*, 2020 WL 4917625, at *2 (E.D. Va. Aug. 21, 2020) (Smith, J.).

- 11 -

This Court has held a class of at least 260 residents satisfied the numerosity requirement. *See Bell*, 2019 WL 1874694, at *3.

The numerosity requirement is "rarely disputed in securities fraud class actions." *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 406 (E.D. Va. 2015) (Brinkema, J.). Indeed, "a showing that a large number of shares were outstanding and traded during the relevant period would prove that joinder is impractical." *In re NeuStar, Inc. Sec. Litig.*, 2015 WL 5674798, at *3 (E.D. Va. Sept. 23, 2015) (Cacheris, J.).

Jeld-Wen is a publicly traded company listed on the NYSE that had over 104 million shares of common stock outstanding during the Class Period. Feinstein Report ¶58. The average daily trading volume during the Class Period for the Company's common stock was 769,734 shares. *Id.* at ¶172. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Given the number of Jeld-Wen common stock outstanding and traded during the Class Period, joinder of all affected purchasers would be impracticable.

Plainly, Rule 23(a)(1)'s numerosity requirement is satisfied here.

### D.    Common Questions of Law or Fact Exist for All Class Members

Rule 23 requires that "there are questions of law or fact common to the class." Rule 23(a)(2). "Even a single common question" satisfies this requirement. *Bell*, 2019 WL 1874694, at *3; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). The existence of "'[m]inor factual variances' do not prevent a plaintiff from showing commonality as long as the claims arise from the same set of facts and the putative class members rely on the same legal theory." *Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 546 (E.D. Va. 2018) (Payne, J.) (quoting *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 567 (E.D. Va. 2016) (Cacheris, J.)).

Here, the Complaint alleges that Defendants made misrepresentations and omissions regarding the Company's success.  Indeed, all of the foundational factual issues and legal theories alleged are common to the Proposed Class Representatives and the Class members including:

- Whether Defendants violated the federal securities laws by their acts and omissions alleged in the Complaint;

- Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

- Whether, and to what extent, the market price of Jeld-Wen common stock was artificially inflated during the Class Period because of the material misstatements or omissions alleged in the Complaint;

- Whether Defendants acted with the requisite level of scienter;

- Whether the Individual Defendants and the Onex Defendants were controlling persons of Jeld-Wen; and

- Whether the members of the Class have sustained damages as a result of the conduct complained of in the Complaint, and if so, the proper measure of such damages.

Commonality is "not a heavy burden in securities fraud class actions as '[m]embers of a proposed class in a securities case are especially likely to share common claims and defenses.'" *NeuStar*, 2015 WL 5674798, at *3 (quoting *BearingPoint*, 232 F.R.D. at 539).  Courts routinely find securities fraud complaints that allege such common questions as appropriate for class certification. *See*, *e.g.*, *In re The Mills Corp. Sec. Litig*, 257 F.R.D. 101, 105 (E.D. Va. 2009); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 251 (D.S.C. 2010); *In re Red Hat Inc., Sec. Litig.*, 261 F.R.D. 83, 86 (E.D.N.C. 2009); *NII Holdings*, 311 F.R.D. at 406.

"Because various of defendants' acts and omissions are at the center of this case, it follows that there are a number of questions of both law and fact common to all members of the proposed [C]lass," Rule 23's commonality requirement is satisfied.  *See BearingPoint*, 232 F.R.D. at 539.

### E.    The Proposed Class Representatives' Claims Are Typical of Those of The Class

The typicality element requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Rule 23(a)(3).  "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Bell*, 2019 WL 1874694, at *4.[5]  The class representative "must be part of the class and possess the same interest and suffer the same injury as the class members."  *Lee*, 2019 WL 3869412, at *4; (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998)). "Notably, '[f]actual differences will not necessarily render a claim atypical,' provided the named plaintiff's claim is predicated on the same course of conduct and legal theory as the claims of the class." *Minter v. Wells Fargo Bank, N.A.*, 279 F.R.D. 320, 325 (D. Md. 2012) (quoting *Smith v. The Baltimore & Ohio R.R. Co.*, 473 F. Supp. 572, 581 (D. Md. 1979)).

The Proposed Class Representatives' claims, like the Class's claims, are based on the same legal theory: Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Here, the Proposed Class Representatives' and the Class's claims arise from the Defendants' knowing concealment of information concerning their anticompetitive conduct in violation of federal antitrust laws which was artificially propping up the Company's stock price. Neither the facts nor the legal theories on which this action is based are unique to the Proposed Class Representatives because all Class members' claims arise from Defendants' wrongful course of conduct as alleged in the Complaint, and are based on the same legal theories.  The Proposed Class

---

[5]    According to courts in this Circuit, the requirements of commonality and typicality tend to merge: "'Both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected . . . .'" *Lee v. JLN Constr. Servs., LLC*, 2019 WL 3869412, at *4 (D. Md. Aug. 16, 2019) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)); *Fangman v. Genuine Title, LLC*, 2016 WL 6600509, at *10 (D. Md. Nov. 8, 2016).

- 14 -

Representatives and all other Class members allege that they purchased Jeld-Wen common stock at artificially inflated prices during the Class Period as a result of Defendants' material misrepresentations and omissions, and were damaged upon the revelation of the alleged corrective disclosures and/or materialization of the risks as alleged in the Complaint. Thus, because the Proposed Class Representatives' "claims arise out of the same alleged course of conduct undertaken by the defendants which the plaintiff asserts gives rise to its cause of action" they are typical of the proposed Class. *Sonoco*, 270 F.R.D. at 251.

### F. The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Class

The Proposed Class Representatives' interests are entirely aligned with those of the Class. As discussed above, all members of the Class allege claims arising from the same wrongful conduct and are based on the same legal theories advanced by the Proposed Class Representatives. Since their appointment, Mississippi PERS, PPNPF, and WLPF have each taken their roles and obligations to the putative Class seriously and have acted to protect the interests of the Class. Should they be appointed as Class Representatives, they intend to act in a similar fashion in order to protect the best interests of the Class. Through counsel, Plaintiffs have investigated and filed the Complaint, successfully opposed and argued a motion to dismiss the Complaint, and pursued discovery. Gordon Decl. ¶10; Inscoe Decl. ¶10; Schmitt Decl. ¶10. The Proposed Class Representatives also have, or will soon provide deposition testimony that they would appear at trial to similarly testify (or have certified that they are willing and able to provide deposition and trial testimony), and have certified that they will continue to oversee further motion practice, and participate in settlement discussions should they arise. Gordon Decl. ¶8; Inscoe Decl. ¶8; Schmitt Decl. ¶8. The Proposed Class Representatives' actions thus far, and the common interest they share with the Class in seeing this litigation successfully prosecuted, fully satisfy Rule 23(a)(4)'s adequacy standard.

Moreover, the Proposed Class Representatives together owned thousands of shares of Jeld-Wen common stock during the Class Period, so their interests in seeing this action prosecuted to its fullest is directly aligned with that of the Class. *See* Gordon Decl. ¶4; Inscoe Decl. ¶4; Schmitt Decl. ¶4. Because the Proposed Class Representatives and the absent Class members sustained losses as a result of the same alleged material misrepresentations and omissions, as Plaintiffs prove their claims, they will also necessarily prove the claims of thousands of absent Class members. *See Fariasantos v. Rosenberg & Assocs., LLC*, 303 F.R.D. 272, 276 (E.D. Va. 2014) (Payne, J.) (finding proposed class representative adequate under Rule 23(a)(4) where he had no interest antagonistic to the class and was represented by counsel that was well-qualified to prosecute the case in favor of the class).

Plaintiffs have proposed the law firms of Robbins Geller and Labaton Sucharow as Class Counsel in this matter. *See* Firm Résumé of Robbins Geller, attached as Ex. B to the Rothman Decl. and Firm Résumé of Labaton Sucharow, attached as Ex. C to the Rothman Decl. Indeed, "Robbins Geller has been appointed class counsel in hundreds of securities class actions and has competently met its obligations under Rule 23 in those cases." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 693 (D. Md. 2018). Similarly, Labaton Sucharow is "highly-experienced in litigating these types of actions and have a proven track record in prosecuting complex securities actions." *NII Holdings*, 311 F.R.D. at 408.

Robbins Geller and Labaton Sucharow have conducted an extensive investigation into Defendants' conduct and have successfully opposed Defendants' motions to dismiss. *See* ECF Nos. 75-79, 86-92, 104. Since defeating Defendants' motions to dismiss, Robbins Geller and Labaton Sucharow have been actively pursuing discovery. Thus, Robbins Geller and Labaton Sucharow are qualified, and, along with the Proposed Class Representatives, have demonstrated that

they will vigorously protect the interests of the Class.  As a result, the requirements of Rule 23(a)(1)-(4) have readily been satisfied.

### G.    The Court Should Appoint Plaintiffs' Choice of Counsel

In addition to satisfying the adequacy prong of Rule 23(a)(4), Robbins Geller and Labaton Sucharow also satisfy the considerations of Rule 23(g) and should be appointed as Class Counsel.[6]

Robbins Geller and Labaton Sucharow lawyers have been appointed class counsel in hundreds of securities class actions.  Courts in this Circuit and around the country have recognized the expertise and ability of Robbins Geller and Labaton Sucharow lawyers to effectively litigate complex securities class actions.  *Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653, 663 (E.D. Va. 2016) (Ellis, J.) ("There is no question that Robbins Geller is qualified to litigate this class action lawsuit – it has a long record of success in these types of cases."); *NeuStar*, 2015 WL 5674798, at \*13 (finding Labaton Sucharow "satisfies the requirements of Rule 23(g)(1)(A) and 23(g)(4)"). *See also* Rothman Decl. Exs. B and C.[7]  In light of the firms' expertise and the absence of any conflict between the firms and the Class, the Court should honor Plaintiffs' choice of counsel and appoint Robbins Geller and Labaton Sucharow as Class Counsel.

## IV.    CERTIFICATION IS PROPER UNDER RULE 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), the proposed Class also satisfies Rule 23(b)(3)'s requirements of: (1) common questions of law or fact predominate over individual

---

[6]    In appointing class counsel pursuant to Rule 23(g), a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Rule 23(g)(1)(A).  Consideration of all these factors supports the appointment of Robbins Geller and Labaton Sucharow as Class Counsel.

[7]    Proposed Liaison Counsel, Cohen Milstein, is also qualified and experienced in the prosecution of class actions, especially within this district.  *See* Rothman Decl. Ex. D (Cohen Milstein Résumé).

questions; and (2) class action treatment is superior to other methods of adjudication. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). The Class's claims easily satisfy this requirement.

### 1. Common Questions of Law and Fact Predominate Over Individual Questions

Under Rule 23(b)(3), predominance exists where the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "In determining whether the predominance standard is met, courts focus on the issue of liability. If the liability issue is common to the class, common questions are held to predominate over individual ones." *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997). "Damages are less central to the predominance inquiry; courts generally hold that differences in damages among the potential class members do not generally defeat predominance if liability is common to the class." *BearingPoint*, 232 F.R.D. at 542 (internal quotations omitted); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003) ("The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate."). Securities fraud cases "are particularly appropriate candidates for treatment under Rule 23(b)(3), given that the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *NII Holdings*, 311 F.R.D. at 408; *see also Amchem*, 521 U.S. at 591.

The Class's claims depend on the same factual circumstances – *i.e.*, a single wrongful course of conduct will need to be proven for each claim to succeed. The facts and circumstances that underpin each of the false statements or omissions alleged are common to each of the Class members' claims. Plaintiffs allege that this course of conduct inflated the price of Jeld-Wen's common stock. ¶¶28-30, 140, 238, 243-244, 257, 265, 296. When the truth about Jeld-Wen's

anticompetitive conduct came fully to light following Judge Payne's findings of fact in the Steves & Sons Litigation, and the Company's reporting of a $76.5 million charge which reflected the judgment anticipated to be entered against it, Jeld-Wen's common stock price dropped. ¶¶132, 139.

The Class's claims also depend on proof of common legal issues. To establish liability under Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must prove that, in connection with the purchase or sale of a security, (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Gariety v. Grant Thorton*, *LLP*, 368 F.3d 356, 362 (4th Cir. 2004). The Supreme Court has held that questions of whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity and materiality elements of a Section 10(b) claim) and whether the revelations of the alleged fraud proximately caused that company's stock price to decline (*i.e.*, the loss causation element) are each common questions of law and fact that predominate over individualized ones. *Amgen*, 568 U.S. 455, 467-70, 475.

In securities fraud cases, the predominance requirement is easily met because plaintiffs may avail themselves of a class-wide presumption of reliance established by the Supreme Court: the "fraud-on-the-market" theory espoused in *Basic*, which applies here. 485 U.S. at 246-47.

### a.      The "Fraud-on-the-Market" Presumption Applies

The "fraud-on-the-market" theory "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" and that whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).

To invoke the presumption of reliance under this theory, a plaintiff must demonstrate: (1) that the alleged misrepresentations were publicly known; (2) that they were material; (3) that the stock

traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. *Id.* Here, each of the requirements set forth in *Basic* are readily satisfied.

### (1)  Jeld-Wen Common Stock Traded in an Efficient Market During the Class Period

To establish that the market for Jeld-Wen's common stock was efficient, entitling Plaintiffs and the Class to the "fraud-on-the-market" presumption, the following non-exhaustive list of factors, commonly referred to as the *Cammer* factors, are generally considered.

> (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes.

*Gariety*, 368 F.3d at 368 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989)).[8] In addition to the five *Cammer* factors that indicate market efficiency, courts have considered the supplemental tests cited in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). The *Krogman* factors include: (1) the company's market capitalization; (2) the stock's float; and (3) the typical bid-ask spread. *Id*. at 474. Jeld-Wen's common stock, when analyzed in terms of the factors described above, undoubtedly traded in an efficient market during the Class Period. In support of this motion, Plaintiffs submit the Feinstein Report. *See* Rothman Decl. Ex. A. Dr. Feinstein analyzed Jeld-Wen's common stock using both the *Cammer* and *Krogman* factors and concluded that the market for Jeld-Wen common stock was efficient during the Class Period. Feinstein Report ¶¶151-264.

---

[8]    The *Cammer* factors are meant to be a non-exhaustive list of relevant factors, and under Fourth Circuit law, "no one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining whether a market is efficient." *NII Holdings*, 311 F.R.D. at 409.

**(i)      Jeld-Wen Shares Experienced a High
Weekly Trading Volume**

The existence of an actively traded market, as evidenced by large weekly trading volume "suggests there is an efficient market . . . because it implies significant investor interest in the company." *Cammer*, 711 F. Supp. at 1286.  During the Class Period, Jeld-Wen's common stock's average daily trading volume was approximately 769,734 shares, with an average weekly trading volume of 3.65%, with 3.85 million shares outstanding during this timeframe.  Feinstein Report ¶¶172-173.  The large volume of trading in Jeld-Wen's common stock supports a finding that it traded in an efficient market during the Class Period.  *Id.*; *see also Sonoco*, 270 F.R.D. at 256 (finding, *inter alia*, weekly trading volume of 2.61% of total shares outstanding over a class period established that stock traded on an efficient market); *In re Comput. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) (Ellis, J.) (quoting *Cammer*, 711 F. Supp. at 1285-87) ("average weekly trading volume of 2% or more of the outstanding shares 'would justify a strong presumption that the market for the security is an efficient one'")).

**(ii)      A Sufficient Number of Financial
Analysts Covered and Reported on Jeld-
Wen During the Class Period**

During the Class Period, there was comprehensive analyst coverage of Jeld-Wen.  Feinstein Report ¶178.  During the Class Period, 13 different analyst firms issued at least 198 reports.  *Id.* at  ¶176.[9] Major firms including Bank of America Merrill Lynch, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Gabelli, Jefferies, JPMorgan, Macquarie, RBC, SunTrust, WedBush, and Wells Fargo issued analyst reports about the Company.  *Id.*  These reports disseminated public information along with commentary, analyses, and recommendations about the companies they cover.  *Id.* at ¶175.  Information about Jeld-Wen was also disseminated in the form of SEC filings, Company

---

[9]      At least three additional analyst firms also followed the Company.  *Id*. at ¶177.

conference calls, and via news articles.  *Id*. at ¶¶187-189.  In sum, the number of analyst reports and the substantial dissemination of news and other information regarding Jeld-Wen evidences the robust and active market for public information about the Company and supports market efficiency.  *Id*. at ¶190.  *See Cammer*, 711 F. Supp. at 1286 ("[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.  The existence of such analysts would imply, for example, the PMM reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.  In this way the market price of the stock would be bid up or down to reflect the financial information contained in the PMM reports, as interpreted by the securities analysts.").

(iii)    **Jeld-Wen Common Stock Traded on the NYSE Under the Supervision of Designated Market Makers with Brokers Standing Ready to Buy and Sell the Shares**

During the Class Period, Jeld-Wen common stock traded on the NYSE, meaning that trading in the Company's stock was conducted by a highly developed network of brokers and overseen by the "Designated Market Maker" for Jeld-Wen common stock.  Feinstein Report ¶192.  There were at least 120 market makers for Jeld-Wen stock, including Morgan Stanley, UBS, Barclays, Goldman Sachs and JPMorgan.  *Id*. at ¶195.

The fact that Jeld-Wen stock was traded on the NYSE by a large number of major market makers and brokers is strong evidence that Jeld-Wen common stock traded in an efficient market throughout the Class Period.  *Id*. at ¶196; *see Sonoco*, 270 F.R.D. at 256 (finding "sufficient market makers and arbitrageurs exist[ing] during the class period to ensure that the market reacted swiftly to company news and reported financial results," and a "high level of institutional ownership and active trading by these holders" established that securities at issue traded in an efficient market).

**(iv)    Jeld-Wen Was Eligible to File Form S-3
During the Class Period**

A company is eligible for S-3 registration when, among other things, it has filed Exchange Act reports for a specified length of time and has outstanding float above a certain sizable value. Feinstein Report ¶197.  S-3 registration eligibility is indicative of market efficiency because the filing requirement ensures that financial data is available to market participants, and the "public float" requirement indicates that many market participants would have examined the information. *Id*. at ¶200; *see also Cammer*, 711 F. Supp. at 1284-85.  Jeld-Wen satisfied both the original and revised float conditions for S-3 registration throughout the Class Period.  *Id*. at ¶202.[10]  As such, this factor weighs in favor of finding that Jeld-Wen traded in an efficient market.  *See Cammer*, 711 F. Supp. at 1287; *NII Holdings*, 311 F.R.D. at 411.

**(v)    The Price of Jeld-Wen's Common Stock
Reacted to New Company Specific
Information During the Class Period**

Additionally, "one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291.  To study this factor, Plaintiffs' expert economist, Dr. Feinstein, conducted a thorough event study and significant statistical analysis ("Event Study") to determine whether Jeld-Wen's common stock price moved in response to new, material, value-relevant information about the Company.  *See generally* Feinstein Report.  Indeed, after performing the Event Study, Dr. Feinstein determined that there was a cause-and-effect relationship between new, unexpected information and reactions in the market price of Jeld-Wen

---

[10]    Although Jeld-Wen was technically ineligible for S-3 registration for the first year following its IPO, that was only because it did not have a full year history of regular and timely filings.  *Id.* at ¶203.  Despite its initial technical ineligibility for S-3 registration, Jeld-Wen most certainly possessed the characteristics of S-3 registration that the *Cammer* court cited were relevant for market efficiency.  *Id*. at ¶204.

common stock.  Feinstein Report ¶¶222, 229.  This further supports the conclusion that Jeld-Wen traded on an efficient market.  *Id.*

**(vi)**　　　　**Jeld-Wen's Market Capitalization and Float**

In addition to the *Cammer* factors that indicate market efficiency, courts consider the supplemental tests in *Krogman* which further support a finding of efficiency.  *See*, *e.g.*, *NII Holdings*, 311 F.R.D. at 412-13; Feinstein Report ¶208.  Jeld-Wen's sizeable market capitalization throughout the Class Period, is further evidence of the efficiency of the market for Jeld-Wen stock.  *Id*. at ¶210.  During the Class Period, Jeld-Wen's market capitalization ranged between $2.2. billion and $4.4 billion.  *Id*. at ¶209.  The average market capitalization was $3.3 billion.  *Id*.  Jeld-Wen was larger than 82% of all other publicly traded companies in the U.S. as measured by market capitalization.  *Id*. Thus, this factor supports a finding of market efficiency.  *Id*. at ¶210.  On average during the Class Period, there were 49.4 million shares in Jeld-Wen's float and 105.3 million shares outstanding, resulting in an average float of 46.9% of shares outstanding.  *Id*. at ¶212.  While the slight majority of Jeld-Wen's outstanding shares were not in public float, due to the very large number of outstanding shares and the Company's market capitalization, the float was nonetheless extremely large, and therefore large enough to satisfy the *Krogman* float factor throughout the Class Period.  *Id*.

**(vii)**　　　　**The Bid-Ask Spread of Jeld-Wen's Common Stock**

Bid-ask spread is the difference between the bid and ask quotes divided by the average of the bid and ask quotes.  Feinstein Report ¶214; *see also Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.").  Here, the bid-ask spread of Jeld-Wen common stock during the Class Period averaged

- 24 -

approximately .04% which is narrower than the mean level among all stocks traded on U.S. exchanges, supporting efficiency.  Feinstein Report ¶215.

Accordingly, the fact that Jeld-Wen common stock traded on the NYSE, an open and well-developed market, the *Cammer* and *Krogman* factors, and Dr. Feinstein's analysis and additional tests establish that the market for the stock was efficient during the Class period which gives rise to the presumption of reliance under *Basic*.  *See Basic*, 485 U.S. at 241; *Sonoco*, 270 F.R.D. at 256 (applying fraud-on-the-market theory of reliance where stock was listed on the NYSE and had an average weekly trading volume of 2.61% of outstanding shares, coverage by six analysts, sufficient market makers and arbitrageurs, a cause-and-effect relationship demonstrated via an event study, a high level of institutional ownership with active trading, and a narrow bid-ask spread).

### b.   The Other Relevant Requirements of the Fraud on the Market Presumption Apply

This Court held, in the opinion denying Defendants' motions to dismiss, *inter alia*, that Defendants made material misrepresentations to the market by failing to disclose its anticompetitive behavior to the market.  *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 2020 WL 6270482, at *3-*6 (E.D. Va. Oct. 26, 2020).  Thus, the requirement of a public disclosure has been satisfied.  Finally, the Supreme Court has held it would be inappropriate for the Court to determine the materiality of the statements when conducting its class certification analysis.  *Halliburton II*, 573 U.S. at 282 (materiality "should be left to the merits stage because it does not bear on the predominance requirement of Rule 23(b)(3)" because it "is an objective issue susceptible to common, classwide proof"); *Amgen*, 568 U.S. at 455 (finding "[p]roof of materiality is not a prerequisite to certification of a securities-fraud class action").  In addition, as set forth in detail below, the market for Jeld-Wen common stock was efficient during the Class Period.  Finally, it is evident that the Proposed Class Representatives purchased Jeld-Wen common stock during the Class Period, but before the truth was

revealed. *See Basic*, 485 U.S. at 248 n.27; *see also* Gordon Decl. ¶4 and ECF No. 73-1; Inscoe Decl. ¶4 and ECF No. 73-2; Schmitt Decl. ¶4 and ECF No. 73-3. Accordingly, *Basic's* requirements are met.

### c.    Damages are Measurable on a Class-Wide Basis

It is well-settled that damages in Section 10(b) securities fraud actions are subject to a common methodology that can be applied class-wide. *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 271 (S.D.N.Y. 2014) ("[I]n light of the class-wide methodology for calculation of damages, any necessary individual inquiries are a far cry from the scope of individualized issues of proof that would defeat a finding of predominance . . . .").

Plaintiffs have shown that the damages for all members of the proposed Class are capable of measurement on a Class-wide basis using a common formula. Feinstein Report ¶¶345-346; *see also NII Holdings*, 311 F.R.D. at 413 (finding that the Fourth Circuit only requires a showing that a measurement of damages is capable on a class-wide basis using a common formula) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36 (2013)). Although individual damages will be calculable based on when each Class member purchased and, if applicable, sold their Jeld-Wen stock, this does not defeat class certification. *See In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *10 (E.D. Va. Sept. 4, 2020) (Trenga, J.) ("[T]he element of economic loss in this case, based on [p]laintiff's damages model, pertains to an objective question common to the class and resolvable by common evidence. Therefore, 'there is no risk whatsoever that a failure of proof on the common questions of [economic loss] will result in individual questions predominating.'" (third alteration in original) (quoting *Amgen*, 568 U.S. at 467-68)). Therefore, Plaintiffs' proffer of a class-wide approach to calculating damages further supports predominance.

### 2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Rule 23(b)(3) requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Allowing this case to proceed as a class action is plainly a superior method for resolving the Proposed Class Representatives' and the Class's claims and will provide the most efficient and fair adjudication. As noted above, courts in this Circuit recognize that class actions are favorably viewed for adjudicating securities fraud cases. *Red Hat*, 261 F.R.D. at 86; *supra* p. 11. Indeed, "[s]ecurities fraud cases are particularly appropriate candidates for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *BearingPoint*, 232 F.R.D. at 542.

To determine the issue of "superiority," Rule 23(b)(3) sets forth the following factors:

(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

In this case, the Class members' interests in individually controlling the prosecution of separate actions are minimal due to the actions' costs and expenses as compared to the potential individual recoveries. *See Sonoco*, 270 F.R.D. at 257 ("the costs associated with bringing individual actions would be prohibitive when weighed against the potential individual recoveries"). Moreover, the Proposed Class Representatives are not aware of any other pending individual securities fraud actions raising these same issues against the same Defendants. *See Minter*, 279 F.R.D. at 330 ("Allowing Plaintiffs to proceed as a class action meets the requirement of superiority because it promotes justice by providing class members, who would not have sufficient incentive to pursue their claims individually, access to the courts to seek vindication of their rights."). Here, the

Proposed Class Representatives have committed to, and have every incentive to, seek the maximum recovery possible for the Class. Gordon Decl. ¶8; Inscoe Decl. ¶8; Schmitt Decl. ¶8. The Class members' interests would thus be best furthered if their claims could be litigated as a class action.

Additionally, it is without question that the parties and the Court have an interest in this litigation proceeding in a single forum as to prevent inconsistent rulings and promote judicial economy. Jeld-Wen transacts business in Virginia, including in this District. In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. Additionally, other antitrust actions filed against Jeld-Wen have been litigated in this District, and before this Court. *See Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va.); *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-718 (E.D. Va.); *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, No. 3:18-cv-850 (E.D. Va.). Additionally, the Court has already expended judicial resources in this action for months, including by giving a detailed order denying Defendants' motions to dismiss, following extensive legal briefing and oral argument by the parties. Accordingly, the Eastern District of Virginia is the most desirable forum in which to prosecute this action.

Finally, this case does not present any unique difficulties related to the management of the action. Proposed Class Counsel has handled numerous similar actions, and the appropriate procedures and techniques for the management of such suits are well established. In addition, "management of the class litigation should not prove especially difficult as securities cases allow for the easy identification of the class members." *BearingPoint*, 232 F.R.D. at 544-45. Moreover, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management difficulties should they arise. *See* Rule 23(c), (d). Consistent with the requirements of

Rule 23(b)(3), the certification of this action as a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3); (ii) appoint the Proposed Class Representatives as Class Representatives; (iii) appoint Co-Lead Counsel Robbins Geller and Labaton Sucharow as Class Counsel; and (iv) appoint Cohen Milstein as Liaison Counsel.

DATED: January 19, 2021                     Respectfully submitted,

COHEN MILSTEIN SELLERS & TOLL PLLC
STEVEN J. TOLL (VSB No. 15300)
JOSHUA HANDELSMAN (Admitted *pro hac vice*)


                              */s/ Steven J. Toll*
                              STEVEN J. TOLL

1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005
Telephone: 202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com
jhandelsman@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*

ROBBINS GELLER RUDMAN
 & DOWD LLP
ROBERT M. ROTHMAN (Admitted *pro hac vice*)
DEBRA WYMAN (Admitted *pro hac vice*)
MARK T. MILLKEY (Admitted *pro hac vice*)
FRANCIS P. KARAM (Admitted *pro hac vice*)
WILLIAM J. GEDDISH (Admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
debraw@rgrdlaw.com
mmillkey@rgrdlaw.com
fkaram@rgrdlaw.com
wgeddish@rgrdlaw.com

*Counsel for Co-Lead Plaintiff Plumbers and*
*Pipefitters National Pension Fund, Additional*
*Plaintiff Wisconsin Laborers' Pension Fund, and*
*the Class*

LABATON SUCHAROW LLP
JAMES W. JOHNSON (Admitted *pro hac vice*)
MICHAEL H. ROGERS (Admitted *pro hac vice*)
JAMES T. CHRISTIE (Admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
jjohnson@labaton.com
mrogers@labaton.com
jchristie@labaton.com

*Counsel for Co-Lead Plaintiff Public Employees'*
*Retirement System of Mississippi and the Class*

CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2021 I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

/s/ Steven J. Toll
Steven J. Toll
VA Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*