**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-00112-JAG<br><br>Judge John A. Gibney, Jr. |

**JELD-WEN DEFENDANTS' OPPOSITION**
**TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 4

    A.    Plaintiffs' Allegations in the Amended Complaint................................................ 4

        1.    JELD-WEN's Alleged Anticompetitive Conduct...................................... 4

        2.    JELD-WEN's Alleged Misrepresentations and Corrective
                Disclosures.................................................................................................. 6

    B.    The Court Relied on Plaintiffs' Allegations About the Divestiture
        Decision in Denying JELD-WEN Defendants' Motion to Dismiss ..................... 10

    C.    Discovery to Date Undermines Plaintiffs' Claims and Demonstrates Why
        Class Certification Should Be Denied ................................................................. 11

        1.    Plaintiffs' Economics Expert Concludes No Divestiture Decision
                Damages...................................................................................................... 11

        2.    JELD-WEN Defendants' Accounting Expert Explains Why the
                Steves Litigation Contingency Did Not Contain New Information.......... 12

        3.    The Testimony of Plaintiffs' Own Investment Advisors
                Demonstrates Defects in Plaintiffs' Case, and the Proposed Class .......... 13

LEGAL STANDARD.............................................................................................................. 14

ARGUMENT........................................................................................................................ 15

I.    The Proposed Class Does not comport with Rule 23 Because Individual Issues
    Predominate Over common Questions ................................................................. 15

    A.    Because Plaintiffs' Expert Concedes Plaintiffs Cannot Show Any Loss
        Based on the Divestiture Decision, Plaintiffs Have No Common Proof of
        Damages............................................................................................................. 16

        1.    Plaintiffs Cannot Show Class-Wide Damages for the Pricing and
                Competitiveness Statements ...................................................................... 17

        2.    Plaintiffs' Damages Model Related to the Steves Litigation
                Contingency Improperly Includes Damages for the Pricing and
                Competitiveness Statements ...................................................................... 19

    B.    Plaintiffs Fail to Establish a Common Method of Proving Reliance.................... 20

1. Plaintiffs Fail to Establish JELD-WEN's Stock Traded in an Efficient Market During the IPO or the Quiet Period ............................... 21

2. JELD-WEN Defendants Have Rebutted *Basic*'s Presumption of Class-Wide Reliance by Showing the Alleged Misrepresentations Did Not Impact JELD-WEN's Stock Price ............................................... 26

II. IF PLAINTIFFS' INVESTMENT ADVISORS' KNOWLEDGE WAS ATYPICAL, THEN THEY FAIL TO ESTABLISH TYPICALITY ............................... 29

CONCLUSION .............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
 955 F.3d 254 (2d Cir. 2020),
 *cert. granted sub nom. Goldman Sachs Grp. v. AR Teacher Ret.*,
 2020 WL 7296815 (U.S. Dec. 11, 2020) ................................................................................29

*B & R Supermarket, Inc. v. MasterCard Int'l Inc.*,
 2018 WL 1335355 (E.D.N.Y. Mar. 14, 2018) ........................................................................17

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
 222 F.3d 52 (2d Cir. 2000)......................................................................................................30

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)............................................................................................................21, 26

*Berwecky v. Bear, Stearns & Co.*,
 197 F.R.D. 65 (S.D.N.Y. 2000) ..............................................................................................22

*Brown v. Nucor Corp.*,
 785 F.3d 895 (4th Cir. 2015) ..................................................................................................14

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989) ............................................................................................22

*Charron v. Pinnacle Grp. N.Y. LLC*,
 269 F.R.D. 221 (S.D.N.Y. 2010) ............................................................................................17

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
 322 F. Supp. 3d 676 (D. Md. 2018) ........................................................................................18

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)............................................................................................................ *passim*

*In re Enron Corp. Sec. Deriv. & ERISA Litig.*,
 529 F. Supp. 2d 644 (S.D. Tex. 2006) ....................................................................................22

*EQT Prod. Co. v. Adair*,
 764 F.3d 347 (4th Cir. 2014) ..................................................................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 309 F.R.D. 251 (N.D. Tex. 2015) ...........................................................................................29

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
 301 F.R.D. 116 (S.D.N.Y. 2014) ............................................................................................18

*Freeman v. Laventhol & Horwath*,
    915 F.2d 193 (6th Cir. 1990) ..............................................................................22, 23

*Gariety v. Grant Thornton, LLP*,
    368 F.3d 356 (4th Cir. 2004) ..........................................................................14, 15, 22

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ....................................................................................16

*Grace v. Perception Tech. Corp.*,
    128 F.R.D. 165 (D. Mass. 1989) ...............................................................................30

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)..........................................................................................21, 26, 29

*In re Initial Pub. Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) .................................................................................25

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006).............................................................................21, 22, 23

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ...........................................................................22

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir. 2019) ....................................................................................18

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ........................................................................22, 24

*Lienhart v. Dryvit Sys.*,
    255 F.3d 138 (4th Cir. 2001) ....................................................................................30

*Longman v. Food Lion, Inc.*,
    197 F.3d 675 (4th Cir. 1999) ....................................................................................27

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014).........................................................................25

*In re NII Holdings, Inc. Sec. Litig.*,
    311 F.R.D. 401 (E.D. Va. 2015) ....................................................................14, 16, 22, 26

*Petrie v. Elec. Game Card, Inc.*,
    308 F.R.D. 336 (C.D. Cal. 2015)...............................................................................24

*PPM Am., Inc. v. Marriott Corp.*,
    875 F. Supp. 289 (D. Md. 1995)................................................................................16

iv

*In re Safety-Kleen Corp. Bondholders Litig.*,
  2004 WL 3115870 (D.S.C. Nov. 1, 2004) ..................................................................22, 24

*In re SCOR Holding (Switzerland) AG Litig.*,
  537 F. Supp. 2d 556 (S.D.N.Y. 2008)...................................................................23, 24, 26

*Shiring v. Tier Techs., Inc.*,
  244 F.R.D. 307 (E.D. Va. 2007) ..........................................................................................30

*Simpson v. Specialty Retail Concepts*,
  823 F. Supp. 353 (M.D.N.C. 1993) .....................................................................................24

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
  445 F.3d 311 (4th Cir. 2006) ...............................................................................................15

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2018 WL 2958361 (S.D.N.Y. June 13, 2018) ....................................................................13

*Wal-Mart v. Dukes*,
  564 U.S. 338 (2011)......................................................................................................14, 15

*In re Willis Towers Watson PLC Proxy Litig.*,
  2020 WL 5361582 (E.D. Va. Sept. 4, 2020)........................................................................15

**Rules**

Fed. R. Civ. P. 23 ....................................................................................................................14

**Other Authorities**

17 C.F.R. § 230.174(d) ...........................................................................................................23

17 C.F.R. § 242.101(b)(1).......................................................................................................23

**PRELIMINARY STATEMENT**

The Court should deny Plaintiffs' motion for class certification. Plaintiffs' proposed class violates basic class action principles and controlling Supreme Court authority, which require a plaintiff seeking class treatment to use a damages model that matches its *viable* liability theories. They also fail to establish that they can prove the element of reliance on a class-wide basis.

In securities cases, to show class-wide harm from an alleged misrepresentation, class-action plaintiffs must prove "artificial inflation" of a company's stock price due to a misrepresentation by the company at the time class members purchased their shares. The most common way to measure artificial inflation, as Plaintiffs have attempted here, is to determine (1) whether a company's stock price *dropped* when a plaintiff alleges a misrepresentation was corrected, and (2) if it did, whether that stock drop was *caused* by the alleged correction, as opposed to other factors (*e.g.*, the announcement of poor earnings results).

In defending their case against JELD-WEN Defendants' motion to dismiss, Plaintiffs advanced two theories of liability, which the Court accepted as adequately pled. These theories are based on two types of alleged misrepresentations and two disclosures that allegedly corrected them. *See* App'x A (showing timelines of Plaintiffs' two theories of liability). *First*, Plaintiffs allege that beginning on January 26, 2017, JELD-WEN made statements about its pricing practices and the competitiveness of the doors and windows markets (the "Pricing and Competitiveness Statements"), which were false or misleading because JELD-WEN was engaged in anticompetitive conduct. In denying JELD-WEN Defendants' motion to dismiss and allowing Plaintiffs' case to proceed, this Court relied on Plaintiffs' argument that JELD-WEN's anticompetitive conduct was revealed to the market by Judge Payne's October 5, 2018 149-page opinion holding divestiture of a JELD-WEN doorskin facility was an appropriate remedy based on his findings that JELD-WEN had engaged in anticompetitive behavior (the "Divestiture Decision"). Plaintiffs argued this

disclosure corrected the Pricing and Competitiveness Statements.

***Second***, beginning on February 15, 2018, JELD-WEN made statements about whether it believed it would prevail in litigation brought by one of its doorskin customers, Steves & Sons (the "Steves Litigation").  Plaintiffs allege that these statements were false or misleading because JELD-WEN knew the litigation had merit and would cause the Company negative repercussions. Again, in reaching its decision on JELD-WEN Defendants' motion to dismiss, this Court relied on Plaintiffs' argument that JELD-WEN's statements about the Steves Litigation were corrected on October 15, 2018—ten days ***after*** the Divestiture Decision—when JELD-WEN disclosed that it would book a litigation contingency related to the Steves Litigation (the "Steves Litigation Contingency").

Discovery has shown Plaintiffs' first theory of liability is a dead end.  Plaintiffs' own expert, Dr. Steven Feinstein, has conceded he cannot show the Divestiture Decision impacted JELD-WEN's stock price.  That should have led Plaintiffs to jettison the Pricing and Competitiveness Statements, narrow the class period so it starts on February 15, 2018 (the date of the first alleged Steves Litigation Statement), and submit a damages model based solely on their second theory of liability.  But Plaintiffs did not do that.  Instead, in an attempt to secure a longer class period and recover more damages, Plaintiffs now claim the Pricing and Competitiveness Statements were not corrected until the disclosure of the Steves Litigation Contingency—despite previously convincing this Court they were already corrected by the earlier Divestiture Decision.

Plaintiffs' shoehorning maneuver dooms their proposed class.  In light of the record evidence and Plaintiffs' own arguments to the Court in opposing dismissal, there is no basis to tie the correction of the Pricing and Competitiveness Statements to the Steves Litigation Contingency. That mismatch between damages model and viable liability theory means their class certification

motion must fail.  Under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), Plaintiffs bear the burden to demonstrate the existence of a certifiable class, which includes proving that they have a damages model that matches ***only*** their viable liability theories.  Because they have not done so, their motion should be denied.

Plaintiffs' motion for class certification also fails for an independent reason:  They fail to show that the element of reliance can be proven on a class-wide basis.  That is so for two reasons. ***First***, under Supreme Court precedent, Plaintiffs are entitled to a presumption of class-wide reliance on the alleged misrepresentations only if they prove the market for JELD-WEN stock was efficient during the class period.  Here, the class period includes JELD-WEN's IPO and the 25-day "quiet period" that followed.  Courts have consistently held that this post-IPO time period is inefficient as a matter of law, and Plaintiffs' expert fails to properly analyze it for market efficiency.  As a result, Plaintiffs cannot establish class-wide reliance prior to February 21, 2017 (the date the quiet period expired).

***Second***, JELD-WEN Defendants have rebutted any presumption of class-wide reliance by showing there was no price impact from the alleged misrepresentations.  As explained above, Plaintiffs' sole damages theory now hinges on JELD-WEN's disclosure of the Steves Litigation Contingency in a press release on October 15, 2018.  Although that press release included a single paragraph on the Steves Litigation Contingency, its focus was on disappointing Q3 2018 results and downgraded FY 2018 guidance.  JELD-WEN's stock did decline after these announcements, but the Steves Litigation Contingency did not cause that drop because it disclosed no new information about the alleged misrepresentations.  Instead, the Steves Litigation Contingency reflected the accounting impact of the Divestiture Decision, which Judge Payne had issued ten days earlier.  Plaintiffs' own investment advisors testified ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  As a result, any

presumption of market-wide reliance has been overcome by the facts.

For these reasons, the Court should deny Plaintiffs' motion for class certification.

## BACKGROUND

### A.    Plaintiffs' Allegations in the Amended Complaint

Plaintiffs allege that JELD-WEN misled the market about two types of allegedly illegal anticompetitive conduct in two separate product markets.  Specifically, Plaintiffs claim that JELD-WEN substantially reduced competition for doorskins, in violation of the Clayton Act, and that it conspired to fix the price of interior molded doors, in violation of the Sherman Act.  Compl. ¶¶ 1, 92 (Dkt. No. 73).  Plaintiffs claim that JELD-WEN misled investors by (1) falsely attributing its success to legitimate and lawful pricing strategies, rather than its alleged anticompetitive conduct, and by falsely characterizing the markets in which it operated as "competitive," and (2) saying that JELD-WEN believed the allegations in the Steves Litigation that JELD-WEN engaged in anticompetitive conduct regarding doorskins were meritless ("Steves Litigation Statements").  *Id.* ¶¶ 1, 15–18.  Plaintiffs allege that the market learned the truth about JELD-WEN's anticompetitive conduct through two "corrective disclosures":  Judge Payne's October 5, 2018 Divestiture Decision and JELD-WEN's disclosure of the Steves Litigation Contingency on October 15, 2018.  *Id.* ¶¶ 21–24, 245; *see* App'x A (showing timelines of Plaintiffs' two theories of liability).  Plaintiffs allege they were damaged when JELD-WEN's stock price decreased as a result of both corrective disclosures.  Compl. ¶¶ 21–24, 245.

### 1.  JELD-WEN's Alleged Anticompetitive Conduct

Plaintiffs allege that, during the purported class period, and unbeknownst to its investors, JELD-WEN was violating federal antitrust laws by illegally raising the prices of doorskins and

4

interior molded doors.  *Id.* ¶ 112.

### a.    Acquisition of CMI and Doorskin Price Increases

*First,* Plaintiffs allege that JELD-WEN's acquisition of CraftMaster Manufacturing, Inc. ("CMI") violated the Clayton Act because it had the effect of substantially reducing competition for doorskins and thereby caused doorskin prices to rise.  Plaintiffs' allegations regarding JELD-WEN's doorskin price increases largely mirror the allegations in *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va. June 29, 2016) (the "Steves Litigation"), Dkt. No. 1 (the "Steves Complaint").  Plaintiffs allege JELD-WEN's anticompetitive conduct began in 2012, when it acquired CMI, which owned a doorskin manufacturing plant in Towanda, Pennsylvania (the "CMI Merger").  Compl. ¶¶ 5, 81; *Steves* Compl. ¶¶ 19–20.  Although the Department of Justice concluded the CMI Merger was not anticompetitive, Plaintiffs allege the DOJ did not object to the merger in part because JELD-WEN's doorskin clients, including Steves, did not object to the transaction based upon the assurance provided by their long-term doorskin contracts.  *See* Compl. ¶¶ 6–9, 77–78; *Steves* Compl. ¶¶ 58–60.  Plaintiffs allege that after the CMI Merger, JELD-WEN increased doorskin prices to independent manufacturers, like Steves, in violation of its supply agreements.  Compl. ¶¶ 12, 84, 86; *Steves* Compl. ¶ 24.  Based on these doorskin price increases, Steves asked the DOJ to review the CMI Merger again in 2015.  Compl. ¶ 99.  The DOJ conducted a second review and again took no action.  *Id.*

### b.    Interior Molded Door Price Increases

*Second*, Plaintiffs allege that JELD-WEN unlawfully conspired with Masonite Corporation—JELD-WEN's primary competitor for interior molded doors—to fix the prices of interior molded doors, in violation of the Sherman Act.  Plaintiffs' allegations on this score largely mirror plaintiffs' allegations in *In re: Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-718 (E.D. Va. Oct. 19, 2018), Dkt. No. 119 (the "DPP Complaint") and *In re: Interior Molded Doors*

*Indirect Purchaser Antitrust Litig.*, No. 3:18-cv-850 (E.D. Va. Dec. 11, 2018), Dkt. No. 134 (the

"IPP Complaint") (collectively, the "IMD Litigations").  Plaintiffs allege that nine times between

2012 and 2018, JELD-WEN and Masonite imposed price increases on interior molded doors "in

the same or similar percentage increments, either simultaneously, or in brief succession of each

other."  Compl. ¶ 13; *see also* IPP Compl. ¶¶ 102–03; DPP Compl. ¶¶ 84–85.  Plaintiffs allege

these increases were likely "attributable to an explicit or tacit agreement [between Masonite and

JELD-WEN] to fix prices."  Compl. ¶ 97; IPP Compl. ¶ 105; *see also* DPP Compl. ¶ 87.

### 2.  JELD-WEN's Alleged Misrepresentations and Corrective Disclosures

In light of that background, Plaintiffs have advanced two separate theories of liability:

(1) that JELD-WEN's statements about its pricing and competitiveness withheld the truth "that

anticompetitive behavior was the true reason for the Company's success," Pls.' Opp'n to Defs.'

MTD at 27–28 (Dkt. No. 86), and (2) that JELD-WEN's statements that "den[ied] liability in the

*Steves* litigation" were also misleading, *id.* at 28.

### a.  The Pricing and Competitiveness Statements and the Divestiture Decision

Plaintiffs allege JELD-WEN misled investors by making misstatements regarding its

pricing strategy and the competitiveness of the doors and windows industry.  *Id.* at 6–8.  Plaintiffs

say these Pricing and Competitiveness Statements—which first appeared in JELD-WEN's January

26, 2017 Prospectus—misled the market to believe that JELD-WEN had legitimate and sustainable

profitability, when in reality its "extensive and significant anticompetitive conduct [was] the true

source of its success."  *Id.* at 7–8; *see, e.g.*, Dkt. No. 79-4 at 62.  In particular, Plaintiffs allege that

statements attributing JELD-WEN's success to strategies like "pricing optimization" and "pricing

discipline," *see, e.g.*, Compl. ¶¶ 16, 20, 82, were false and misleading because JELD-WEN's

financial success was actually driven by illegal interior molded door price increases,

*see* Dkt. No. 86 at 6–8 ("[T]he true source of the Company's success in the interior molded door market was the anticompetitive conduct."); MTD Op. at 7 (Dkt. No. 103) (concluding that Plaintiffs had adequately pled that "JELD-WEN made a material misrepresentation or omission" when it "publicly touted its legal pricing strategies to explain its success in the highly competitive door and window market" but "did not . . . disclose its anticompetitive behavior").

Similarly, Plaintiffs allege that JELD-WEN's characterizations of the door and window markets as "competitive," Compl. ¶¶ 15, 20, 102, were false and misleading because JELD-WEN and Masonite were engaged in price fixing, and because the CMI Merger was anticompetitive, *see, e.g.*, Dkt. No. 86 at 6 ("Jeld-Wen and Masonite increased the prices of their interior molded doors in the same or similar percentage increments" and this was "the true source of the Company's success in the interior molded door market.").

Plaintiffs contend that it was the Divestiture Decision that revealed the truth of these alleged misstatements to the market. According to Plaintiffs, it was only when Judge Payne issued the Divestiture Decision that "previously undisclosed facts about Jeld-Wen's anticompetitive conduct" were revealed, "surpris[ing] the market," and thereby correcting the Pricing and Competitiveness Statements. Compl. ¶¶ 21–23, 127–31; Dkt. No. 86 at 8. In opposing JELD-WEN Defendants' motion to dismiss, Plaintiffs argued that through Judge Payne's "detailed findings of fact" showing "that Jeld-Wen reduced competition, raised doorskin prices, and violated the Clayton Act," the Divestiture Decision revealed "that anticompetitive behavior was the true reason for the Company's success." Dkt. No. 86 at 12, 27–28; MTD Hr'g Tr. at 28:24–29:1 (Dkt. No. 94) (arguing that after "Judge Payne issued [his] 149-page findings of fact . . . investors were

7

finally able to discover who knew what and when").[1]  Plaintiffs allege in the Complaint that JELD-WEN's stock dropped by 5% "[a]s a direct and proximate result of" the Divestiture Decision's correction of the Pricing and Competitiveness Statements.  Compl. ¶¶ 132, 237, 255.[2]

> **b.    The Steves Litigation Statements and the Steves Litigation Contingency**

Plaintiffs' second theory of liability concerns the Steves Litigation Statements and their subsequent correction by the disclosure of the Steves Litigation Contingency.  Plaintiffs allege that, following the jury verdict in the Steves Litigation on February 15, 2018, JELD-WEN made misrepresentations regarding whether it believed the verdict was wrong, and whether it would ultimately be held liable.  *See* Compl. ¶¶ 114–16.

Steves sued JELD-WEN on June 29, 2016, alleging JELD-WEN violated antitrust law through its acquisition of CMI and breached a contract through subsequent doorskin price increases.  Compl. ¶¶ 14, 100.  On February 15, 2018, the jury in the Steves Litigation returned a verdict against JELD-WEN, finding a breach of contract and an antitrust violation and awarding damages.  *Id.* ¶ 114; Dkt. No. 79-24.  JELD-WEN released a statement explaining the impact of the *Steves* verdict, including the magnitude of the damages it might face.  Dkt. No. 79-25 at 1.  JELD-WEN also stated it believed the verdict was "erroneous" and that it "continue[d] to believe that the facts underlying th[e] dispute do not establish either a violation of the antitrust laws or a breach of contract."  *Id*.  Plaintiffs allege this was a misrepresentation because JELD-WEN knew the Steves Litigation had merit and that JELD-WEN would face liability.  *See* Compl. ¶¶ 114–17.

---

[1]    Plaintiffs also argue that the Divestiture Decision was a partial correction of the Steves Litigation Statements, because it "began to counteract the market's misimpression that the jury verdict . . . was incorrect."  Dkt. No. 86 at 28.

[2]    Curiously, Plaintiffs reiterate this claim, *see* Pls.' Mem. Supp. Mot. Class Cert. at 9 (Dkt. No. 121), even though their expert concluded they cannot show damages caused by the Divestiture Decision.  Feinstein Rpt. ¶ 293 (Dkt. No. 122-1).

Plaintiffs also claim JELD-WEN made misstatements about the Steves Litigation in response to Judge Payne's October 5, 2018 Divestiture Decision finding that divestiture of JELD-WEN's Towanda facility would be an appropriate remedy. Dkt. No. 103 at 3. In a press release issued the next day, JELD-WEN disclosed the decision and reiterated its view that both the verdict and the Divestiture Decision were "incorrect due to multiple flawed rulings during the trial process," that "JELD-WEN firmly maintains that it has not violated any antitrust laws," and that it "intend[ed] to vigorously oppose entry of an adverse judgment and to appeal any judgment that may be entered awarding damages to the Steves."[3] Dkt. No. 79-34 at 4–5. Plaintiffs allege that was misleading because JELD-WEN knew the Steves Litigation had merit and that JELD-WEN would ultimately face liability. Compl. ¶¶ 113–17. Plaintiffs argue these Steves Litigation Statements "fool[ed] even sophisticated securities analysts, who continued to believe antitrust liability was 'unlikely.'" Dkt. No. 86 at 2–3.

Plaintiffs contend that because JELD-WEN continued to state it believed the jury verdict was "incorrect," Compl. ¶ 23, the Steves Litigation Statements were not fully corrected until JELD-WEN announced the Steves Litigation Contingency in a press release on October 15, 2018 (the "Pre-Earnings Release"), *id.* ¶¶ 136–39; *see also* Dkt. No. 86 at 28 ("Even [after the Divestiture Decision], the JW Defendants continued to deny liability in the *Steves* litigation," but "the truth was fully and finally revealed to the market when the Company admitted that it expected to record a $76.5 million charge related to the *Steves* litigation."). Plaintiffs allege that, by announcing the Steves Litigation Contingency, "Jeld-Wen shockingly admitted that the Company would likely face a significant judgment as a result of the Steves & Sons Litigation."

---

[3]  JELD-WEN filed its notice of appeal on April 12, 2019, and argument on JELD-WEN's appeal was held on May 29, 2020. *Steves and Sons, Inc., et al. v. JELD-WEN, Inc.*, No. 19-139 (4th Cir.), Dkt. Nos. 1, 89. JELD-WEN's appeal remains pending.

9

Compl. ¶ 136.  The Complaint alleges that the Steves Litigation Contingency's correction of the Steves Litigation Statements caused JELD-WEN's stock to fall 19 percent.  *Id.* ¶¶ 24, 241–42.[4]

Notably, Plaintiffs' description of the Pre-Earnings Release that disclosed the Steves Litigation Contingency is incomplete and misleading.  JELD-WEN continued to maintain its innocence—using substantially the same language that Plaintiffs argued successfully duped the market into ignoring the full implication of the Divestiture Decision just ten days earlier.  *Compare* Dkt. No. 79-35 at 1 ("[T]he company continues to maintain that it has not violated any antitrust laws."), *with* Dkt. No. 79-34 at 4 ("JELD-WEN firmly maintains that it has not violated any antitrust laws.").  Plaintiffs have not argued or alleged the Steves Litigation Contingency included any new information concerning JELD-WEN's alleged anticompetitive conduct.  Dkt. No. 86 at 30 n.29; Dkt. No. 94 at 30:11–18; Compl. ¶¶ 240–41.  But the Pre-Earnings Release ***did*** contain, and indeed focused on, JELD-WEN's disappointing Q3 2018 results and downgraded FY 2018 guidance.  Dkt. No. 79-35 at 1.  And that same day, JELD-WEN also announced its CFO was leaving the Company.  Dkt. No. 79-36.

**B.    The Court Relied on Plaintiffs' Allegations About the Divestiture Decision in Denying JELD-WEN Defendants' Motion to Dismiss**

On October 26, 2020, this Court denied JELD-WEN Defendants' motion to dismiss.  In so doing, the Court relied on Plaintiffs' specific contentions about the way in which the Divestiture Decision corrected the Pricing and Competitiveness Statements.  *See* Dkt. No. 103 at 4 n.6, 17. For example, the Court held that Plaintiffs had adequately alleged that "the Divestiture Decision revealed that JELD-WEN knowingly engaged in a long-running anticompetitive conspiracy to artificially inflate prices in the doorskin and IMD industry," "revealed the true basis of JELD-

---

4    Again, even Plaintiffs' own expert disagreed.  He concluded that a significant portion of this decline was not fraud-related. Feinstein Rpt. ¶¶ 338–39.

WEN's profitability," and "confirm[ed] that JELD-WEN engaged in an anticompetitive conspiracy to inflate the price of the primary component of IMDs—doorskins—thereby reducing competition in the IMD market." *Id.* at 9, 17, 18. The Court further relied on Plaintiffs' theories of liability to conclude that Plaintiffs had adequately pled that, after the Divestiture Decision, the market understood "the consequences JELD-WEN would face as a result" of its alleged anticompetitive conduct—*e.g.*, the Towanda divestiture and the removal of the source of the Company's pricing power. *Id.* at 19–20 & n.18.

Similarly, the Court relied on Plaintiffs' theory that disclosure of the Steves Litigation Contingency corrected JELD-WEN's prior statements about the Steves Litigation itself. The Court concluded that Plaintiffs adequately alleged disclosure of the Steves Litigation Contingency (which it termed the "Liability Announcement," *id.* at 4) corrected JELD-WEN's previous misrepresentations "that it did not expect Steves to succeed in its lawsuit" by "disclos[ing] new facts to the market—namely that JELD-WEN expected to incur a $76.5 million loss from the *Steves* litigation." *Id.* at 20. The Court held that Plaintiffs adequately pled that after the disclosure of the Steves Litigation Contingency "the market finally realize[d] that," contrary to its prior statements, the Company likely *would* face some liability from the *Steves* action. *Id.* at 18.

### C. Discovery to Date Undermines Plaintiffs' Claims and Demonstrates Why Class Certification Should Be Denied

#### 1. Plaintiffs' Economics Expert Concludes No Divestiture Decision Damages

Plaintiffs have submitted an expert report by Dr. Steven Feinstein on market efficiency, loss causation, and damages. Feinstein opined on three issues relevant here. ***First***, he concluded Plaintiffs cannot formulate any model of damages arising from the Divestiture Decision. Feinstein Rpt. ¶ 296. Despite agreeing it was a corrective disclosure, Feinstein concluded that he could not prove "the 8 October 2018 JELD-WEN stock price decline was caused by the" Divestiture

11

Decision. *Id.* ¶¶ 291, 293–94. As a result, he concluded he must "exclude this stock price decline from damages," *id.* ¶ 296, meaning that Plaintiffs can no longer seek damages purportedly caused by any misrepresentations that were allegedly corrected by the Divestiture Decision.[5] **Second**, Feinstein concluded Plaintiffs **can** model damages arising from the Steves Litigation Contingency (based on the objectively false premise that a litigation contingency is a concession of liability). *Id.* ¶¶ 23, 27, 312. **Third**, Feinstein concluded the market for JELD-WEN securities was efficient during the class period (without analyzing market efficiency during the quiet period, when the market is presumptively inefficient as a matter of law). *Id.* ¶ 20.

### 2. JELD-WEN Defendants' Accounting Expert Explains Why the Steves Litigation Contingency Did Not Contain New Information

JELD-WEN Defendants have submitted an expert report by former SEC enforcement accountant Jason Flemmons to rebut Feinstein's mischaracterization of the Steves Litigation Contingency. As Flemmons explains in his report, Feinstein's loss causation and damages opinions rest on the false premise that by announcing the Steves Litigation Contingency, JELD-WEN was conceding "allegations of illegal anticompetitive behavior had merit and that there would be negative repercussions from that behavior." Feinstein Rpt. ¶ 23; *see also id.* ¶¶ 271, 312. Flemmons explains that (1) a litigation contingency is not an admission of ultimate liability or certain loss, Ex. 2, Flemmons Rpt. ¶¶ 13, 44, 51–52, 55, 76; (2) JELD-WEN did not change its position regarding the merits of the Steves Litigation by booking the Steves Litigation

---

[5]   Feinstein opines that the lack of decline after the Divestiture Decision "may have been due to the countervailing impact of the Company's denials, which would have maintained inflation in the stock price and kept the stock price from falling as much as it otherwise would have." Feinstein Rpt. ¶ 296. But, just pages earlier in his report, Feinstein fails even to consider JELD-WEN's denial made in the same paragraph as the announcement of the Steves Litigation Contingency, *id.* ¶ 291, that "the Company continues to maintain that it has not violated any antitrust laws." Dkt. No. 79-35 at 1; *see* Ex. 1, Feinstein Dep. 133:11–15.

Contingency, *see id.* ¶¶ 13, 52; and (3) JELD-WEN did not "correct" anything by announcing the loss contingency, *id.* ¶¶ 14, 54–55.  To the contrary—and as it stated in the Pre-Earnings Release— the Company's decision to book the loss contingency was based on information already in the market, namely, the Divestiture Decision, which impacted the Company's assessment of whether a loss related to the Steves Litigation was probable and reasonably estimable (the applicable accounting standard for booking a loss contingency).  *Id.*

### 3. The Testimony of Plaintiffs' Own Investment Advisors Demonstrates Defects in Plaintiffs' Case, and the Proposed Class

The testimony of Plaintiffs' own investment advisors demonstrates ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████     *See* Ex. 3, Segall Dep. 157:21–159:8 ██████

████████████████████████████████████████████████████████████████████

████████████████████     Ex. 4, Wellington Dep. 140:6–14 ██████.[6]  Rather, the market saw the Steves Litigation Contingency as a ***non-event***:  ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████     *See* Wellington Dep. 140:15–141:5 ██████████████████

████████████████████████████████████████████████████████     Segall Dep. 168:6–12 ████████████████████████████████████████████████████████████

---

[6] ████████████████████████████████████████████████████████████████

████     *See* Ex. 5, P&P Nat'l Pension Fund Dep. 60:4–12; Ex. 6, Mississippi PERS Dep. 49:13– 50:7; Ex. 7, Wisconsin Laborers' Pension Fund Dep. 70:6–72:12; Segall Dep. 59:15–60:21; Wellington Dep. 90:3–5. ████████████████████████████████████ ████████████████████████████████     Segall Dep. 54:19–56:11; Wellington Dep. 31:9–32:21, 34:7–35:4.  Courts routinely impute "an investment adviser's knowledge to institutional plaintiffs for the purposes of determining whether that plaintiff relied on an alleged misstatement or omission." *Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *5 (S.D.N.Y. June 13, 2018) (collecting cases).



*See* Wellington Dep. 143:22–144:12 *see id.* at 136:8–137:7, 142:22–143:5, *Id.* at 134:15–136:7, 140:6–14

## LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). To obtain class certification, Plaintiffs "must 'establish by a preponderance of the evidence that the action complies with each part of Rule 23.'" *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 405 (E.D. Va. 2015) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 931 (4th Cir. 2015). The proposed class must satisfy the four prerequisites listed in Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—plus one of the provisions of Rule 23(b). *See* Fed. R. Civ. P. 23; *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). Plaintiffs here rely upon Rule 23(b)(3), which requires them to show by a preponderance of the evidence "that [the] questions of law or fact common to the [class members] predominate over any questions affecting only individual members . . . , and . . . that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

14

*Gariety*, 368 F.3d at 362 (internal quotation marks omitted).  Crucially, "it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but [] it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006).

Rule 23 "does not set forth a mere pleading standard," nor can Plaintiffs satisfy their burden by bare allegations or conclusions.  *Wal-Mart*, 564 U.S. at 350–51.  Rather, they must "satisfy through evidentiary proof" Rule 23's requirements.  *Comcast*, 569 U.S. at 33.  "[T]he district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).  Accordingly, "[a]t the class certification phase, the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification . . . even if the issues tend to overlap into the merits of the underlying case."  *Thorn*, 445 F.3d at 319 (quoting *Gariety*, 368 F.3d at 365).

## ARGUMENT

This Court should deny Plaintiffs' motion to certify this class because Plaintiffs fail to establish predominance under Rule 23(b)(3) or typicality under Rule 23(a)(3).

### I.  THE PROPOSED CLASS DOES NOT COMPORT WITH RULE 23 BECAUSE INDIVIDUAL ISSUES PREDOMINATE OVER COMMON QUESTIONS

Plaintiffs cannot show that common questions will predominate over individualized issues, as Rule 23(b)(3) requires.  "Determining whether 'questions of law or fact common to class members predominate' begins with the elements of the underlying cause of action."  *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *8 (E.D. Va. Sept. 4, 2020).  Because this is a securities-fraud action, those elements include damages and reliance; Plaintiffs must show that they can establish each of those elements through class-wide proof.  *See Comcast*, 569 U.S. at 34,

15

39, 40, 41; *NII Holdings*, 311 F.R.D. at 408–09.  They have failed to do so.

A.    **Because Plaintiffs' Expert Concedes Plaintiffs Cannot Show Any Loss Based on the Divestiture Decision, Plaintiffs Have No Common Proof of Damages**

The Supreme Court has held that, to prevail on a class certification motion under Rule 23(b)(3), the plaintiff must "establish that damages are susceptible of measurement across the entire class"; otherwise, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34, 35.  In particular a "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to" the theory of liability that undergirds the plaintiff's case. *Id.* at 35.

Securities law defines the liability theories to which Plaintiffs' damages model must be tied.  In securities cases, "the proper measure of the damages sustained by a defrauded buyer is that buyer's 'out-of-pocket loss,'" which is the difference in value between the amount "paid for the security less the actual value of the security . . . received." *PPM Am., Inc. v. Marriott Corp.*, 875 F. Supp. 289, 302–03 (D. Md. 1995) (citations omitted).  To calculate damages, it is not necessary to "directly measure inflation caused by false statements" at the time they were made. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 416–17 (7th Cir. 2015).  Instead, "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward." *Id.* at 415.  To establish class-wide damages, a plaintiff must show that a drop in stock value is the result of a disclosure that corrected the alleged misrepresentations at issue. *See Comcast*, 569 U.S. at 37 (rejecting a "methodology that identifies damages that are not the result of the wrong" being alleged).

Because Plaintiffs' own expert has conceded that Plaintiffs cannot produce a damages model showing that the Divestiture Decision caused any drop in JELD-WEN's stock price, Feinstein Rpt. ¶¶ 293, 296, Plaintiffs' only viable liability theory relates to the Steves Litigation

16

Contingency. As a result, the proposed class suffers from two fatal problems. *First*, Plaintiffs' remaining liability theory requires a shorter class period, because the first Steves Litigation Statement was not made until February 15, 2018. *See B & R Supermarket, Inc. v. MasterCard Int'l Inc.*, 2018 WL 1335355, at \*12 (E.D.N.Y. Mar. 14, 2018) (noting the class period "must be consistent with the alleged liability theory"); *see also Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("This Court exercises its discretion to carve out an appropriate class from the overbroad class proposed by Plaintiffs."). *Second*, even setting that problem aside, Plaintiffs' damages model does not *match* their remaining liability theory because it seeks to recover damages for the Pricing and Competitiveness Statements and therefore "identifies damages that are not the result of the wrong" tied to the Steves Litigation Contingency. *Comcast*, 569 U.S. at 37. The Court should therefore deny Plaintiffs' class certification motion, or at a minimum, limit the class period to begin on February 15, 2018. *See* App'x A (showing the shorter class period relevant to the Steves Litigation Statements).

### 1. Plaintiffs Cannot Show Class-Wide Damages for the Pricing and Competitiveness Statements

Plaintiffs previously argued that the Divestiture Decision revealed JELD-WEN's Pricing and Competitiveness Statements were false, and this Court relied on that theory in denying JELD-WEN Defendants' motion to dismiss. Dkt. No. 103 at 17; Compl. ¶ 254. But now, Plaintiffs' expert has admitted that they cannot prove that Judge Payne's decision impacted JELD-WEN's stock price at all. Feinstein Rpt. ¶¶ 293, 296; Feinstein Dep. 128:17–129:20 ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As a result—and because the Steves Litigation Contingency could not have corrected either the Pricing or the Competitiveness Statements, *see* Dkt. No. 103 at 18, 20—Plaintiffs' attempt to certify a class for claims based on those statements

should be denied.  *See, e.g.*, *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (denying in part certification of a securities claim under Rule 23(b)(3) where plaintiffs had not shown "that there is a damages model that will permit the calculation of damages on a classwide basis").  Because Plaintiffs' expert concluded Plaintiffs cannot show a stock drop related to the Divestiture Decision, Plaintiffs have no class-wide model to establish damages resulting from the Pricing and Competitiveness Statements.  Feinstein Rpt. ¶¶ 293, 296; Feinstein Dep. 128:17–129:20.

Thus, any Plaintiff seeking to recover for the Pricing and Competitiveness Statements would need to prove individualized damages.[7]  And because such individualized evidence from the "thousands of Class members" Plaintiffs seek to represent, Dkt. No. 121 at 2, will vastly overwhelm Plaintiffs' common or class-wide evidence, no class can be certified as to the Pricing and Competitiveness Statements.  *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655–56 (4th Cir. 2019) (enumerating "damages calculations [that] . . . turn on individual evidence" as a "problem[] that so often plague[s] class actions under Rule 23(b)(3)").

This leaves only the Steves Litigation Statements, which Plaintiffs argued were corrected by the Steves Litigation Contingency.  Because the first of these alleged misrepresentations occurred on February 15, 2018, to the extent the Court does not deny class certification in its entirety, the class period should be narrowed to begin on this date.  *See* App'x A (showing the

---

[7]   JELD-WEN Defendants do not believe damages can be shown on an individualized basis either.  But Feinstein's admission that he cannot model or calculate damages on a class-wide basis means that any effort to prove damages related to the Pricing and Competitiveness Statements can only be shown individually—in which case a class cannot be certified as to those statements.  *See City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 692 (D. Md. 2018) (holding that there is no "rule that plaintiffs in a securities fraud case must put forth any particular damages calculation methodology").

shorter class period relevant to the Steves Litigation Statements).

### 2. Plaintiffs' Damages Model Related to the Steves Litigation Contingency Improperly Includes Damages for the Pricing and Competitiveness Statements

In an effort to save their more expansive damages request (and longer class period), Plaintiffs attempt to shoehorn a correction of the Pricing and Competitiveness Statements into the Steves Litigation Contingency. Contrary to what they previously told the Court, *see* Dkt. No. 86 at 27–28, Plaintiffs now contend it was the disclosure of the Steves Litigation Contingency—not the Divestiture Decision—that revealed the Pricing and Competitiveness Statements were false. *See* Dkt. No. 121 at 9, 18–19; Feinstein Rpt. ¶ 297 (asserting that the Steves Litigation Contingency "effectively acknowledged merit in the antitrust allegations"); Feinstein Dep. 126:20–128:12.

As an initial matter, that theory makes no sense: Booking a loss contingency related to the Steves Litigation—which alleged JELD-WEN illegally raised *doorskin* prices—could not correct alleged misrepresentations regarding purported misconduct that was not adjudicated in that action, *i.e.*, the separate allegation that JELD-WEN illegally raised the prices of *interior molded doors*, an entirely different product. Notably, the IMD Litigations, which did bring claims based on that alleged misconduct, had not even been filed when JELD-WEN booked the Steves Litigation Contingency. Simply put, nothing about the Steves Litigation Contingency announcement remotely suggested that JELD-WEN was correcting the Pricing and Competitiveness Statements.

But more fundamentally, Plaintiffs' new liability theory is at odds with this Court's findings and their own arguments. Based on Plaintiffs' argument, which the Court accepted in allowing this case to proceed, by the time of the Steves Litigation Contingency announcement, the Pricing and Competitiveness Statements *had already been corrected* by the Divestiture Decision's exposure of JELD-WEN's anticompetitive conduct. *See* Dkt. No. 103 at 20–21; *see also supra*

19

Section A.2.a; App'x A.  Plaintiffs cannot now change their theory of the case by claiming it was not the Divestiture Decision after all, but rather disclosure of the Steves Litigation Contingency, that corrected those same statements and caused them damages.

The mismatch between Plaintiffs' damages model and viable theory of liability runs squarely into the Supreme Court's decision in *Comcast*.  In *Comcast*, the plaintiffs initially articulated four theories of liability, but the district court determined that only one theory was "capable of classwide proof and rejected the rest."  569 U.S. at 31.  Although one theory survived, the plaintiffs' damages "model assumed the validity of all four theories." *Id.* at 36.  The Supreme Court held that such a "methodology that identifies damages that are not the result of the [alleged] wrong" fails to establish predominance. *Id.* at 37.  Plaintiffs' damages model suffers from the same flaw identified in *Comcast*.  Because this Court allowed this case to proceed based on the allegation that the Divestiture Decision corrected the Pricing and Competitiveness Statements, the Steves Litigation Statements are the only viable "wrong[s]" that could have been corrected by the disclosure of the Steves Litigation Contingency.  Yet Plaintiffs' damages model purports to attribute most of the damages flowing from the Steves Litigation Contingency to the Pricing and Competitiveness Statements.  In fact, Feinstein's model assigns to the Pricing and Competitiveness Statements nearly ***three quarters*** of the total damages he claims to measure based on the Steves Litigation Contingency ($1.44/share out of a total of $1.99/share). *See* Feinstein Rpt. ¶¶ 337, 339. As in *Comcast*, Plaintiffs have failed to put forward a damages model that "measure[s] only those damages attributable to [their viable] theory" of liability.  569 U.S. at 35.  That mismatch between liability theory and damages model precludes class certification.

### B.      Plaintiffs Fail to Establish a Common Method of Proving Reliance

Plaintiffs' proposed class also fails Rule 23(b)(3)'s predominance requirement because they cannot prove class-wide reliance using common proof.  In many securities cases, plaintiffs

20

can satisfy predominance by creating a "rebuttable presumption" of class-wide reliance, as established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). The *Basic* presumption is based on the "fraud-on-the-market" theory, which holds that a "public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268, 283–84 (2014) ("*Halliburton II*"). In other words, *Basic* holds that in an efficient market, a material misrepresentation will impact a stock's price, so courts will presume anyone who purchased the stock did so in reliance on the misrepresentation. *Id.* at 288.

But in this case, Plaintiffs cannot establish that the *Basic* presumption applies throughout their proposed class period; in fact, during the time of JELD-WEN's IPO and the 25-day quiet period that followed it, the market was presumptively ***inefficient***.

### 1.    Plaintiffs Fail to Establish JELD-WEN's Stock Traded in an Efficient Market During the IPO or the Quiet Period

Plaintiffs bear the burden of proving that the *Basic* presumption applies. *Halliburton II*, 485 U.S. at 277. To do so, they must show that "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Id.* at 277–78. If a plaintiff does not prove that a market is efficient at the time of each purchase during the proposed class period, the *Basic* presumption does not apply and a class cannot be certified because individual questions of reliance predominate. *See, e.g.*, *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42–43 (2d Cir. 2006) ("*In re IPO*").

Plaintiffs cannot satisfy the third element of the *Basic* presumption: that the market was efficient throughout the class period. To determine market efficiency, Fourth Circuit courts rely

21

on five factors listed in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989) (the "*Cammer* factors"). *See, e.g.*, *Gariety*, 368 F.3d at 368 (endorsing use of the *Cammer* factors). These factors are: "(1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, . . . and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes." *Id*. Courts also look to the three "other factors" noted in *Krogman v. Sterritt*: "(1) the capitalization of the company, (2) the bid–ask spread of the stock, and (3) the percentage of stock not held by insiders." 202 F.R.D. 467, 474 (N.D. Tex. 2001); *see also NII Holdings*, 311 F.R.D. at 412–13. Notably, to the extent these factors differ throughout the class period, courts analyze the efficiency of each period separately. *See, e.g.*, *In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115870, at *4–5 (D.S.C. Nov. 1, 2004).

Applying these factors, courts in multiple circuits have held, categorically, that "the market for IPO shares is not efficient." *In re IPO*, 471 F.3d at 42; *see also Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (holding that a primary market "as a matter of law is not efficient"); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 308 (D.N.J. 2007) (holding that "IPO cases fall outside the presumption of reliance enunciated in *Basic*"); *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 529 F. Supp. 2d 644, 771–72, 72 n.148 (S.D. Tex. 2006); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 n.5 (S.D.N.Y. 2000). This is because, as the Second Circuit explained, "a primary market for newly issued [securities] is not efficient or developed under any definition of these terms." *In re IPO*, 471 F.3d at 42 (quoting *Freeman*, 915 F.2d at 199). Beyond the primary market, courts explain that "during the 25–day 'quiet period,' analysts cannot report concerning securities in an IPO, . . . thereby precluding the contemporaneous 'significant number of reports by securities analysts' that are a characteristic of an efficient market" under *Cammer*,

22

and preventing plaintiffs from carrying their burden to establish market efficiency during the quiet period. *Id.* at 43 (quoting *Freeman*, 915 F.2d at 199); *see also In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 575 (S.D.N.Y. 2008) (holding that there is "at least a rebuttable presumption" of market *inefficiency* until the end of the quiet period).

The Court should follow these cases and hold that, because Plaintiffs cannot show the market was efficient at the time of the initial offering or during the 25-day quiet period that follows, the class cannot be certified during that time period. *SCOR*, 537 F. Supp. at 579.[8]  Although Feinstein ████████████████████████████████████████████████████████████ ████████████████████████████████████████████, *see* Feinstein Dep. 49:2–51:25, 59:4–13, he did not do so in his report.[9]  Feinstein Rpt. ¶¶ 171–217.  To the contrary, his report contains ***no analysis*** of whether the initial offering market was efficient, and ████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████  Feinstein Dep. 66:7–13.  As Feinstein himself recognizes, ██████████ ███████████████████████████████████████  Feinstein Rpt. ¶ 158.  ███████████ ███████████████████████████████████████████████████  Feinstein Dep. 66:7–13, thereby proving that "the market for IPO shares [wa]s not efficient," *In re IPO*, 471 F.3d at 42.

Feinstein also fails to analyze separately each *Cammer* and *Krogman* factor during the

---

[8]  The 25-day "quiet period" refers to the 25 days following an IPO, during which analysts affiliated with underwriting banks do not issue reports concerning a newly public company's securities. *See In re IPO*, 471 F.3d at 43; *see also* 17 C.F.R. §§ 230.174(d) and 242.101(b)(1).

[9]  ██████████████████████████████████████████████████████████████████ █████████████████████████████████████████  Feinstein Dep. 52:2–6, 56:8–14; Feinstein Rpt. ¶ 16.

quiet period.  Feinstein Rpt. ¶¶ 171–217.  Instead he separately examines only a single factor, analyst coverage, *id.* ¶¶ 182–83, despite conceding that it would be ***improper*** to perform a market efficiency analysis considering only a single factor.  *See* Feinstein Dep. 40:5–41:4.  Moreover, his conclusion that "even during the quiet period, JELD-WEN satisfied the *Cammer* analyst coverage factor," Feinstein Rpt. ¶ 183, is both wrong as a matter of law and based on unreliable methods.  ***No*** analyst reports were published the day of the initial offering, and only one analyst— Wedbush—published a single report during the quiet period (as compared to at least 16 analysts publishing 198 reports during the class period, *id.* ¶ 178).  Dkt. No. 79-5.  This falls far short of the "significant number" of analysts needed to satisfy *Cammer*.  *See, e.g.*, *Safety-Kleen*, 2004 WL 3115870, at *7 (holding that coverage by "two or three" analysts "does not support a finding of market efficiency"); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 351 (C.D. Cal. 2015) (holding that coverage by a single analyst does not support market efficiency); *SCOR*, 537 F. Supp. 2d at 577–78 (same); *Krogman*, 202 F.R.D. at 475 (same); *Simpson v. Specialty Retail Concepts,* 823 F. Supp. 353, 355 (M.D.N.C. 1993) (holding factor weighed toward a finding of inefficiency despite coverage by three analysts).

To try and address this failure of proof, Feinstein attempts to redefine what qualifies as analyst coverage.  He points to a single anonymous Seeking Alpha blog post published during the quiet period and vaguely references that *FactSet*'s "consensus estimates included one analyst's estimate through January 31, 2017 and two analysts' estimates starting on 1 February 2017" to support his finding of market efficiency.  Feinstein Rpt. ¶ 182.  But neither of these anonymous sources support Feinstein's conclusion.  ██████████████████████████████

████████████████████████████████████████    Feinstein Dep. 71:18–72:2, 72:6–15, ██████

████████████████████████████████████████████████████████████████████

24

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *id*. at 67:7–68:9. ███████████████████████

████████████████████████████████████████ *id*. at 96:20–97:2, ████

████████████████████████████████████████████████████████████████

███████████████████████████████ *see id*. at 67:7–68:9, ████████████████

████████████████████████████ *id.* at 97:12–17.[10]    Similarly, Feinstein relies on an

anonymous blog post, *see* Ex. 8 (Seeking Alpha post by "The Value Investor"), ████████████

████████████████████████████████████ Feinstein Dep. 84:14–85:9. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████ *See id*. 79:25–81:15.    For good reason:

Financial blog posts do not count as analyst coverage and are not sufficient to show market

efficiency under the second *Cammer* factor. *See McIntire v. China MediaExpress Holdings, Inc.*,

38 F. Supp. 3d 415, 432–33 (S.D.N.Y. 2014) (finding that even ***thirty-two*** "reports" from "non-

traditional, online publications such as Seeking Alpha" did not support a "strong showing" under

*Cammer*); *see also In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 99 (S.D.N.Y. 2009)

("disregarding" analyst reports from quiet period "that merely mention the focus case stocks

without providing new, useful information to investors").

Because Plaintiffs have not met their burden of proving market efficiency at the time of

---

[10]    Available evidence also suggests the anonymous consensus estimate was not widely disseminated.  Two days after FactSet picked up the anonymous consensus estimate, Wedbush published an analyst report where they list blank entries for "Cons." EPS and Revenue estimates, showing Wedbush was not aware of this mystery analyst's estimates. Dkt. No. 79-5 at 1.

25

JELD-WEN's initial public offering or in the quiet period that followed, they cannot invoke the *Basic* presumption for those periods. To the extent the Court certifies any class (and does not limit that class to begin after February 15, 2018 for the reasons discussed above), it should limit the class period to purchases of JELD-WEN securities made **after** the quiet period, meaning on or after February 21, 2017. *SCOR*, 537 F. Supp. at 579; *see NII Holdings*, 311 F.R.D. at 409–10 (quoting *Halliburton II*, 573 U.S. at 269); App'x A (showing the portion of the class period that should be excluded prior to the end of the quiet period).

> **2.      JELD-WEN Defendants Have Rebutted *Basic*'s Presumption of Class-Wide Reliance by Showing the Alleged Misrepresentations Did Not Impact JELD-WEN's Stock Price**

Even if plaintiffs show they are entitled to the *Basic* presumption, defendants can rebut that presumption by severing the link between the alleged misrepresentation and the alleged injury. *Basic*, 485 U.S. at 247. The *Basic* presumption is critical to the predominance analysis at class certification because it goes to the heart of whether "a misrepresentation was reflected in the market price at the time of [the] transaction"—that is, whether, by purchasing at that market price, investors relied on the alleged misstatements. *Halliburton II*, 573 U.S. at 283 (internal citation and quotation marks omitted). Here, Feinstein attempts to measure the amount that putative class members allegedly overpaid for JELD-WEN securities (*i.e.*, the amount by which the price of the stock was inflated) by looking at the amount by which JELD-WEN's stock price dropped when Plaintiffs allege the truth revealing the purported misstatements was disclosed. Feinstein Rpt. ¶¶ 301–03.

Plaintiffs' sole damages theory hinges on JELD-WEN's disclosure in its Pre-Earnings Release that it would book the Steves Litigation Contingency, *see id.* ¶¶ 293, 296, but that disclosure could not have impacted the price of JELD-WEN's stock. Although that press release includes a single paragraph on the Steves Litigation Contingency, its focus was on disappointing

Q3 2018 results and downgraded FY 2018 guidance. Dkt. No. 79-35 at 1. That same day, JELD-WEN also announced its CFO was leaving the Company. Dkt. No. 79-36. Although JELD-WEN's stock declined following the Pre-Earnings Release, the testimony of JELD-WEN Defendants' expert and former SEC enforcement accountant, Jason Flemmons, analyst reports, and the testimony of Plaintiffs' own investment advisors demonstrate the disclosure of the Steves Litigation Contingency could not have impacted JELD-WEN's stock price because it did not contain any new material information.

Contrary to Plaintiffs' allegations, as a matter of accounting, booking a loss contingency is not an admission of ultimate liability. Flemmons Rpt. ¶¶ 13, 45, 51–52. As JELD-WEN Defendants' accounting expert explains, a loss contingency is a possible loss that has not yet occurred and that remains dependent on future events—such as the outcome of litigation. *See id.* ¶¶ 21, 24, 33, 45. And, as a factual matter, Plaintiffs' theory ignores the Company's express denial of the merits of the claim in the very same statement. Feinstein Rpt. ¶¶ 137–41, 291 (omitting JELD-WEN's statement in its Pre-Earnings Release that "the company continues to maintain that it has not violated any antitrust laws"); Dkt. No. 79-35 at 1. Rather, the booking of the Steves Litigation Contingency reflected recent rulings, including the Divestiture Decision, which impacted the Company's assessment of whether a loss related to the Steves Litigation was probable and reasonably estimable. Flemmons Rpt. ¶¶ 54–55. Because these rulings were public, the Steves Litigation Contingency itself did not contain any "new information" that could have "corrected" any prior alleged misrepresentation. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 n.1, 684–85 (4th Cir. 1999) (holding that in an efficient market, the price of a security will not change based on the repetition of public information). Moreover, JELD-WEN had already disclosed potential

losses *greater* than the Steves Litigation Contingency it actually booked.[11]

For these reasons, and contrary to Plaintiffs' allegations, the evidence shows analysts were not at all surprised JELD-WEN disclosed the Steves Litigation Contingency when it did.[12]  Instead, analysts expressed continued uncertainty regarding the Steves Litigation (demonstrating analysts did not believe JELD-WEN conceded liability or certain loss).  *See, e.g.*, Dkt. No. 79-37 at 1 (noting "continued uncertainty from the Steves litigation and recent negative ruling").  For example, the majority of analyst reports that followed the Pre-Earnings Release *ignored the disclosure of the Steves Litigation Contingency entirely*, and instead focused on the downgraded FY 2018 guidance and the departure of JELD-WEN's executive.  *See, e.g.*, Ex. 9, October 15, 2018 Barclays analyst report (no mention of Steves Litigation or Steves Litigation Contingency); Ex. 10, October 16, 2018 Wells Fargo analyst report (same); Ex. 11, October 15, 2018 SunTrust analyst report (same).



See Segall Dep. 157:21–159:8; Wellington Dep. 140:6–14.

See, e.g., Wellington Dep. 140:15–141:5 (

see Wellington Dep. 136:8–137:9, 142:22–143:5,

---

[11]   The market already knew that the "verdict award[ed] Steves $12,151,873 for past damages" and "$46,480,581 in future lost profits," that any Clayton Act damages would be trebled, and that Steves would be entitled to attorney's fees.  Dkt. No. 79-25 at 1.

[12]   Although Feinstein claims analysts were "surprised and disappointed" by the loss contingency, he cites *zero* analyst reports to support that claim.  *See* Feinstein Rpt. ¶ 142.

*id.* at 134:15–136:7, 140:6–14; Segall Dep. 157:21–159:8 ███. Because the evidence shows the market did not understand the Steves Litigation Contingency to be corrective of any prior misrepresentation, Plaintiffs cannot carry their burden to establish class-wide reliance on their bare allegations to the contrary. *See Comcast,* 569 U.S. at 33.

Because the Steves Litigation Contingency disclosed no new information regarding the merits of the Steves Litigation, JELD-WEN's liability, or its alleged anticompetitive conduct, any price change following the Pre-Earnings Release could not have been the result of the disclosure of the Steves Litigation Contingency. *See, e.g.*, *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 278–79 (2d Cir. 2020) (Sullivan, J., dissenting) (finding *Basic* rebutted where the evidence "clearly compel[led] the conclusion that the stock drop following the corrective disclosures was attributable to something *other* than the misstatements alleged in the complaint"), *cert. granted sub nom. Goldman Sachs Grp. v. AR Teacher Ret.*, 2020 WL 7296815 (U.S. Dec. 11, 2020). This "showing severs the link between [any] alleged misstatements and the price" Plaintiffs paid for the stock. *Halliburton II*, 573 U.S. at 269. Thus, the *Basic* "fraud-on-the-market" presumption does not apply, and Plaintiffs have no means of proving reliance on a class-wide basis. *Id.* Each stockholder would need to establish their own reliance on a material misstatement, so individualized evidence will overwhelm Plaintiffs' common evidence concerning the Steves Litigation Contingency, and no class can be certified. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 270–74, 280 (N.D. Tex. 2015) (denying certification as to corrective disclosures where "Defendants ha[d] rebutted the *Basic* presumption").

## II. IF PLAINTIFFS' INVESTMENT ADVISORS' KNOWLEDGE WAS ATYPICAL, THEN THEY FAIL TO ESTABLISH TYPICALITY

To the extent Plaintiffs argue that the knowledge of their investment advisors is atypical of the class, the class cannot be certified because Plaintiffs cannot demonstrate typicality. To

establish typicality, a proposed class representative must show that it "possess[es] the same interest and suffer[s] the same injury as the class members." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) (quoting *Lienhart v. Dryvit Sys.*, 255 F.3d 138, 147 (4th Cir. 2001)). "Yet, even where a putative class representative's claim is 'typical,' 'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Id.* (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000). Here, either the proposed class representatives' investment advisors' knowledge was typical of the class *or* they "relie[d] on non-market information that [wa]s not generally available to . . . unnamed class [members]," thus subjecting them to unique defenses. *See id.* In either event, class certification should be denied. *See id*. at 313 (quoting *Grace v. Perception Tech. Corp.,* 128 F.R.D. 165, 169 (D. Mass. 1989))*.*

## CONCLUSION

For the above reasons, JELD-WEN Defendants respectfully request the Court deny Plaintiffs' motion for class certification.

30

February 2, 2021

Respectfully submitted,

JELD-WEN Holding, Inc.
By counsel
/s/Brian C. Riopelle
Brian C. Riopelle (VSB #36454)
Brian E. Pumphrey (VSB #47312)
Brian D. Schmalzbach (VSB #88544)
Garrett H. Hooe (VSB #83983)
MCGUIREWOODS, LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com
bpumphrey@mcguirewoods.com
bschmalzbach@mcguirewoods.com
ghooe@mcguirewoods.com

Sandra Goldstein (*pro hac vice*)
Rachel Fritzler (*pro hac vice*)
Lindsey Weiss Harris (*pro hac vice*)
Jacob Rae (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
Sandra.goldstein@kirkland.com
Rachel.fritzler@kirkland.com
Lindsey.harris@kirkland.com
Jacob.rae@kirkland.com

*Attorneys for Defendants JELD-WEN
Holding, Inc., Mark A. Beck, L. Brooks
Mallard, Kirk S. Hachigian, and
Gary S. Michel*

31

**CERTIFICATE OF SERVICE**

I certify that on the 2nd day of February, 2021, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to

all counsel of record in this case.

/s/ Brian C. Riopelle

Brian C. Riopelle (Va. Bar No. 36454)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1084
Fax.: (804) 698-2150
briopelle@mcguirewoods.com