# EXHIBIT 2

HIGHLY CONFIDENTIAL

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| **IN RE:  JELD-WEN HOLDING, INC. SECURITIES LITIGATION** | **CASE NO. 3:20-CV-00112-JAG** |

### EXPERT REPORT OF JASON S. FLEMMONS, CPA, CFE, CFF, IN OPPOSITION TO THE EXPERT REPORT OF STEVEN P. FEINSTEIN, PH.D., CFA
### FEBRUARY 1, 2021

**HIGHLY CONFIDENTIAL**

# TABLE OF CONTENTS

I.    EXPERT DISCLOSURES ......................................................................................... 1

    A.    Nature of Assignment............................................................................................ 1

    B.    Qualifications and Prior Testimony ..................................................................... 2

    C.    Documents, Materials and Data Considered ..................................................... 4

II.    SUMMARY OF OPINIONS ................................................................................... 4

    A.    Feinstein Mischaracterizes the Nature and Significance of a Loss Contingency. ........... 4

    B.    JELD-WEN's Recognition of the Loss Contingency Did Not Constitute a Correction of an Error, and its Accounting and Disclosures Related to the Steves Litigation were Reasonable Under GAAP. ............................................................................... 5

III.    RELEVANT FACTUAL BACKGROUND......................................................... 5

    A.    Background on JELD-WEN................................................................................... 5

    B.    Door Skin Market in the United States ................................................................ 5

    C.    Relationship with Steves and Ensuing Litigation ............................................ 6

IV.    RELEVANT ACCOUNTING STANDARDS ...................................................... 8

    A.    Loss Contingencies Under GAAP........................................................................ 8

    B.    Accrual of Litigation Contingencies in Practice ............................................. 13

V.    OPINIONS AND ANALYSIS ............................................................................. 18

    A.    Feinstein Mischaracterizes the Nature and Significance of a Loss Contingency. ......... 18

    B.    JELD-WEN's Recognition of the Loss Contingency Did Not Constitute a Correction of an Error, and its Accounting and Disclosures Related to the Steves Litigation were Reasonable Under GAAP. ............................................................................... 21

VI.    SIGNATURE AND RIGHT TO MODIFY ....................................................... 34

HIGHLY CONFIDENTIAL

## I.    EXPERT DISCLOSURES

### A.  Nature of Assignment

1.    I have been engaged by Kirkland & Ellis LLP, counsel for JELD-WEN Holding, Inc. ("JELD-WEN" or the "Company") in connection with the captioned matter.[1]  My report is submitted for use in this case.

2.    Plaintiffs purport to represent all persons and entities who or which, during the period from January 26, 2017 through October 15, 2018 (the "Class Period"), purchased the publicly traded common stock of JELD-WEN.  Plaintiffs allege that JELD-WEN misled the investing public by falsely attributing the source of the Company's financial success to legitimate and lawful pricing strategies while engaging in anticompetitive conduct in violation of federal antitrust laws which artificially propped up the Company's sales and by failing to disclose that it was engaged in that anticompetitive conduct.  Plaintiffs' allegations stem from separate litigation between JELD-WEN and Steves & Sons, Inc. ("Steves") in which Steves claimed that the Company's acquisition of a competitor, CraftMaster, Inc. ("CMI"), and subsequent actions violated antitrust laws and constituted a breach of contract and breach of warranty (the "Steves litigation").

3.    Counsel for Plaintiffs retained Steven P. Feinstein ("Feinstein") to provide expert opinions in a report dated January 4, 2021 (the "Feinstein Report") related to JELD-WEN's stock trading and alleged damages resulting from the claims described above.  I have been asked by counsel for JELD-WEN to review and analyze, and to render opinions in response to, the Feinstein Report as it relates to Feinstein's conclusions concerning, and characterizations of,

---

[1] *In Re: JELD-WEN Holding, Inc. Securities Litigation*, 3:20-cv-112.

1

HIGHLY CONFIDENTIAL

JELD-WEN's accounting and disclosure of its potential exposure arising from the Steves litigation as reported in the Company's press releases and filings with the U.S. Securities & Exchange Commission ("SEC") during the Class Period.

### B.  Qualifications and Prior Testimony

4.  I am a Senior Managing Director in the Investigations and Accounting Advisory practice of Ankura Consulting Group ("Ankura"), where I specialize in complex accounting, auditing, and financial reporting matters.  I have over 25 years of experience as an accounting expert, forensic accountant, regulator, and auditor.  I provide a broad range of expert and consulting services involving accounting advisory, corporate investigations, auditor liability, fraud examination, dispute resolution, and other services.  I am a Certified Public Accountant ("CPA"), a Certified Fraud Examiner ("CFE"), and am credentialed by the American Institute of Certified Public Accountants ("AICPA") as Certified in Financial Forensics ("CFF").

5.  Prior to joining Ankura in May 2016, I was a Senior Managing Director in the Forensic Accounting and Advisory Services practice of FTI Consulting, Inc. from December 2012 to May 2016.

6.  Before that, I served for 12 years in the Division of Enforcement's Office of Chief Accountant at the Washington, D.C. headquarters of the SEC.  During my tenure at the SEC, I was employed in four positions of increasing responsibility, ultimately as the Deputy Chief Accountant of the SEC's Division of Enforcement.  My roles entailed supervising and performing numerous financial fraud investigations involving SEC registrants, senior executives, external auditors, and other third parties.  I routinely consulted with SEC enforcement teams across the country to assess accounting, auditing, disclosure and internal

2

HIGHLY CONFIDENTIAL

control matters relating to potential violations of the securities laws, Generally Accepted Accounting Principles ("GAAP"), International Financial Reporting Standards ("IFRS"), and the standards of the Public Company Accounting Oversight Board ("PCAOB"). Among other things, I worked closely with staff in various divisions throughout the SEC on numerous matters involving the application of Accounting Standards Codification 450 – *Contingencies* ("ASC 450"). Such matters routinely involved the accounting and disclosure of litigation contingencies, including evaluations and investigations of companies' financial reporting of such matters. In addition, I co-chaired the Division of Enforcement's Cross Border Working Group, which coordinated numerous investigations involving accounting and auditing matters involving issuers and auditors located in foreign jurisdictions.

7.     Before my service at the SEC, I supervised numerous forensic accounting engagements as a manager in the Financial Advisory Services practice of PricewaterhouseCoopers LLP. Before that, I worked in the Audit and Business Advisory Services practice of Price Waterhouse LLP, where I performed financial statement audits of both publicly traded and privately held companies in a variety of industries located in the United States and overseas.

8.     From 2015 to 2019, I served on the ten-member Executive Committee of the AICPA's Forensic and Valuation Services section. This Committee is responsible for establishing all standards and guidance for AICPA members in the forensic accounting and valuation services industries, including Statement on Standards for Forensic Services No. 1, of which I was a principal author. From 2012 to 2017, I also served on the AICPA's Fraud Task Force, which provides fraud detection, investigation, and prevention information to AICPA members.

3

HIGHLY CONFIDENTIAL

9.   I am a frequent speaker at SEC enforcement, accounting, and forensic accounting conferences.  A copy of my curriculum vitae, which includes my prior testimony and all publications I have authored or co-authored in the past ten years, is attached as Exhibit 1 to this report.

### C.  Documents, Materials and Data Considered

10.  In performing this engagement, I, and Ankura staff members working under my direct supervision, considered the documents, testimony transcripts, and other data set forth in Exhibit 2 to this report.  The opinions and conclusions throughout this report are based on a review of the documents and other data I considered, as well as my knowledge, training, and experience.

11.  My firm bills fees and expenses in this matter based on hourly rates and expenses incurred.  Ankura is being compensated for my time at a rate of $850 per hour and for the time of other staff members assisting on this engagement at hourly rates ranging from $275 to $850.  No portion of my firm's compensation is dependent on my conclusions or the outcome of this matter.

12.  I performed this engagement in accordance with the AICPA Statement on Standards for Forensic Services No. 1.

## II.   SUMMARY OF OPINIONS

### A.  Feinstein Mischaracterizes the Nature and Significance of a Loss Contingency.

13.  A company's decision to recognize a loss contingency is not a reflection of certain liability, an admission of ultimate liability, or an acknowledgment of the opposing side's position in a lawsuit.  Rather, recognition of a loss contingency represents a point-in-time estimate based on an assessment of the probability of potential loss and is subject to change.

4

HIGHLY CONFIDENTIAL

**B. JELD-WEN's Recognition of the Loss Contingency Did Not Constitute a Correction of an Error, and its Accounting and Disclosures Related to the Steves Litigation were Reasonable Under GAAP.**

14.    JELD-WEN's recognition of a loss contingency related to the Steves litigation was not the correction of an error.  On the contrary, JELD-WEN's accounting rationale and disclosures throughout the litigation – leading up to the trial, after the jury verdict, and after the October 2018 ruling – reflected management's continually updated assessment of probability of loss, including the Company's decision to recognize a loss contingency as required by GAAP.

## III.    RELEVANT FACTUAL BACKGROUND

### A.  Background on JELD-WEN

15.    JELD-WEN is one of the world's largest door and window manufacturers and is headquartered in Charlotte, North Carolina.  JELD-WEN's highest volume products include interior molded doors, which are made from two door skins joined by a wooden frame and filled with solid core material.  JELD-WEN also manufactures door skins, which it both uses for its own interior molded doors and sells to third-party door manufacturers.[2]

### B.  Door Skin Market in the United States

16.    JELD-WEN and its primary competitor, Masonite International Corporation ("Masonite"), are the two largest, vertically integrated manufacturers of interior molded doors and door skins in the United States.[3]  In June 2012, JELD-WEN acquired CMI, one of the few other manufacturers of door skins.[4]  CMI operated a large door skin manufacturing plant in Towanda, Pennsylvania.  The acquisition cleared two separate reviews conducted by the

---

[2] JELD-WEN Form 10-K for the period ended December 31, 2019, Item 1 – Business.

[3] Masonite International Corporation, Investor Presentation, June 25, 2014.

[4] Prospectus pursuant to Rule 424(b)(4), filed January 30, 2017.

5

HIGHLY CONFIDENTIAL

Antitrust Department of the United States Department of Justice ("DOJ") in 2012 and again in 2015, after one of JELD-WEN's door skin customers, Steves, asked the DOJ to conduct an additional investigation.[5]

### C. Relationship with Steves and Ensuing Litigation

17. Steves is a Texas-based door manufacturer that used JELD-WEN door skins as a component in its interior molded doors.[6]  In May 2012, JELD-WEN and Steves entered into a long-term supply agreement under which JELD-WEN supplied Steves with door skins.  The agreement established the quantity and price of door skins Steves was required to purchase and was effective through the end of 2019 with optional extension periods.[7]

18. After the DOJ investigated Steves' allegations and determined not to take any action, Steves filed a complaint against JELD-WEN in the United States District Court for the Eastern District of Virginia, Richmond Division in 2016 alleging that JELD-WEN's acquisition of CMI and subsequent price increases violated antitrust laws and constituted a breach of contract and breach of warranty.[8]  Steves sought declaratory relief, ordinary and treble damages, and injunctive relief, including the divestiture of the former CMI door skin manufacturing facility in Towanda, Pennsylvania.

19. JELD-WEN first disclosed this litigation during the Company's initial public offering ("IPO") process in its amended registration statements beginning in August 2016 and through

---

[5] JELD-WEN Press Release, "JELD-WEN Announces Rulings in Steves & Sons Litigation; No Final Judgment on Antitrust Claim," October 6, 2018; JELD-WEN Press Release, "JELD-WEN Announces Jury Verdict in Steves & Sons Lawsuit," February 15, 2018.

[6] JELD-WEN Form 10-K for the period ended December 31, 2019, Item 3 – Legal Proceedings.

[7] Doorskin Product Agreement between JELD-WEN and Steves and Sons, Inc., dated May 1, 2012.

[8] *See Steves & Sons, Inc. v. JELD-WEN, Inc*., 3:16-cv-545, Complaint for Injunctive Relief, Damages, and Specific Performance, June 29, 2016.

6

**HIGHLY CONFIDENTIAL**

the filing of its prospectus in January 2017.[9]  As discussed further in my report, JELD-WEN disclosed significant developments in the Steves litigation in press releases and in its annual and periodic SEC filings (Forms 10-K and 10-Q) during the Class Period.[10]

20.    For example, in its Form 10-Q for the third quarter of 2017, JELD-WEN disclosed that Steves was seeking divestiture of assets acquired from CMI, including its Towanda door skin facility, that Steves' experts had quantified damages of $36-60 million, a portion of which was subject to trebling, and that Steves sought recovery of legal fees.[11]  In early 2018, on the same day that the jury in the Steves litigation reached an adverse verdict, JELD-WEN disclosed the exact amounts awarded to Steves under the verdict and that Steves was entitled to trebled damages under the Clayton Act, as well as legal fees under both types of claims.[12] Later in 2018, after the judge presiding over the Steves litigation ruled that the divestiture of the Towanda plant was an appropriate remedy, JELD-WEN issued a press release the following day that disclosed the ruling and continued to express its intention to appeal any judgment due to the belief that there were flawed rulings during the trial and that divestiture of CMI was "both unprecedented and fundamentally incorrect as a matter of law."[13]

---

[9] See Amendments Nos. 1-6 to Forms S-1 Registration Statement, filed August 1, 2016 through January 17, 2017; Prospectus pursuant to Rule 424(b)(4), filed January 30, 2017.

[10] While Plaintiffs' complaint also alleges anticompetitive behavior with regards to doors, the litigation contingency was related only to the Steves litigation and those door-related allegations are not incorporated here or relevant to my opinions.

[11] JELD-WEN Form 10-Q for the period ended September 30, 2017, filed November 8, 2017 at pp. 30 and 57.

[12] JELD-WEN Press Release, "JELD-WEN Announces Jury Verdict in Steves & Sons Lawsuit," February 15, 2018.

[13] JELD-WEN Press Release, "JELD-WEN Announces Rulings in Steves & Sons Litigation; No Final Judgment On Antitrust Claims," October 6, 2018.

HIGHLY CONFIDENTIAL

## IV.    RELEVANT ACCOUNTING STANDARDS

### A. Loss Contingencies Under GAAP

21.    GAAP defines a loss contingency, also referred to as a contingent liability, as "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[14]   ASC 450 governs the required accounting treatment of loss contingencies under GAAP, including litigation contingencies.

22.    The accounting treatment for loss contingencies under ASC 450 depends on the degree of assessed likelihood that a loss has been incurred.  Such assessments result in one of several potential treatments for financial reporting purposes, including recognition of an estimated loss in the financial statements, disclosure of an estimated loss or range of loss in the notes to the financial statements, or no recognition or disclosure of an estimated loss at all.

23.    Recognition of a loss contingency in the financial statements entails recording both a liability on a company's balance sheet and a loss, or expense, on the income statement.  Separately, disclosure required by GAAP is the inclusion of additional quantitative and narrative information that accompanies the financial statements to provide readers with more detail and context related to the amounts and accounting methodologies impacting the financial statements.

24.    GAAP requires companies to recognize a loss contingency in their financial statements if two conditions are met: (i) it is "probable" that future events will confirm that a loss has been incurred and (ii) such a loss is "reasonably estimable."[15]   GAAP specifically states that

---

[14] ASC Master Glossary – Loss Contingency.

[15] ASC 450-20-25-2, Recognition – General.

8

HIGHLY CONFIDENTIAL

"virtual certainty" *is not* the standard required for accrual of a loss.[16]  Rather, a lower threshold applies[17] thereby making such determinations inherently subjective - particularly given that such assessments are heavily dependent on the projected outcome of future events.[18]

25.  If a company determines that it is probable that a loss has been incurred, the next step is to determine whether the loss is reasonably estimable.  Based on available information, companies may be able to develop a specific estimate, or a range of potential estimated outcomes, using various scenarios and assumptions.  GAAP requires companies to recognize the "best estimate," and if no amount within a range is better than any other amount, requires recognition of the lowest amount in the range.[19]

26.  By contrast, if a company does not believe a loss is "probable," but there is a "reasonable possibility"[20] of a loss based on the outcome of future events, GAAP does not require recognition of a loss contingency in the financial statements but rather disclosure of both the nature of the contingency and an estimate of the possible loss or range of loss.[21]  GAAP does not require recognition or disclosure of remote contingencies.

---

[16] ASC 450-20-25-3, Recognition – General.

[17] GAAP defines "probable" as "the future event or events are likely to occur."  While the accounting standards do not further define "likely," in my experience, the SEC and the accounting profession typically consider the incurrence of a loss to be likely if, based on an assessment of relevant facts and the expected resolution of future events, there is at least a 75% probability that a liability has been incurred.

[18] ASC 450-20-25-3, Recognition – General.

[19] ASC 450-20-25-4 and -5; ASC 450-20-30-1.

[20] GAAP defines "reasonably possible" as "the chance of the future event or events occurring is more than remote but less than likely" (ASC Master Glossary – Reasonably Possible) where "remote" is defined as "the chance of the future event or events occurring is slight" (ASC Master Glossary – Remote).  In other words, "reasonably possible" is anywhere between slight and likely.

[21] ASC 450-20-50-3 and -4, Disclosure – General.

9

HIGHLY CONFIDENTIAL

| | | Amount of loss reasonably estimable? | |
|---|---|---|---|
| | | Yes | No |
| Likelihood of Incurred Loss | Remote | No recognition or disclosure required | No recognition or disclosure required |
| | Reasonably Possible | Disclosure of nature of the loss and estimated range of loss | Disclosure of nature of the loss |
| | Probable | Disclosure of nature of the loss and recognition of best estimate of the loss or if no estimate within a range is better than any other, recognition of lowest amount within the range. | Disclosure of nature of the loss |

27. Put simply, GAAP recognizes that predicting future events is difficult and that the determination of whether to recognize or disclose a loss contingency is entirely driven by management's opinions of loss probability and its ability to estimate the amount of any such loss.[22]

### i.   Management Considerations for Litigation Contingencies

28. GAAP provides specific guidance regarding the assessment of litigation-related loss contingencies and outlines certain factors to consider when determining whether recognition or disclosure is required.  One factor to consider is when the underlying cause of the litigation

---

[22] GAAP requirements are generally designed around reporting liabilities and expenses earlier than assets and revenues.  ASC 450 is a perfect example.  ASC 450 requires recognition of a loss contingency when it is probable (and reasonably estimable), without waiting to achieve certainty.  But the opposite is true for *gain* contingencies, including gains arising from litigation awards.  ASC 450 specifically prohibits recognizing gain contingencies in the financial statements *until* the prevailing party receives the payment award - that is, when the gain and receipt of payment are certain.  This difference in criteria for recognition of loss and gain contingencies is a hallmark of the conservatism embedded throughout GAAP and illustrates why a company must recognize a loss contingency for probable exposures prior to achieving certainty of any final obligation.

10

**HIGHLY CONFIDENTIAL**

occurred (i.e., the alleged misconduct giving rise to the litigation), which determines the accounting period in which the loss contingency may be recognized.  Other factors include the probability of an unfavorable outcome and the ability to make a reasonable estimate of the amount of loss, both of which are consistent with the criteria for all types of loss contingencies as discussed above.[23]

29.   It is inherently difficult to predict the outcome of litigation, and it is equally difficult to assess the probability of an unfavorable outcome for purposes of determining whether to recognize or disclose a related loss contingency.   GAAP addresses this difficulty and instructs management to consider the following in its assessment of litigation contingencies:

   a.  "The nature of the litigation, claim, or assessment

   b.  The progress of the case (including progress after the date of the financial statements but before those statements are issued or are available to be issued)

   c.  The opinions or views of legal counsel and other advisers, although, the fact that legal counsel is unable to express an opinion that the outcome will be favorable to the entity should not necessarily be interpreted to mean that the condition in paragraph 450-20-25-2(a) [the loss contingency is probable] is met

   d.  The experience of the entity in similar cases

   e.  The experience of other entities

   f.  Any decision of the entity's management as to how the entity intends to respond to the lawsuit, claim, or assessment (for example, a decision to contest the case vigorously or a decision to seek an out-of-court settlement)."[24]

30.   As the language above demonstrates — "estimate," "probable," "likely," "contingent" — judgment is required in the assessment of litigation contingencies given the inherent uncertainty of future events.

---

[23] ASC 450-20-55-10, Implementation Guidance and Illustrations – General.

[24] ASC 450-20-55-12, Implementation Guidance and Illustrations – General.

HIGHLY CONFIDENTIAL

### ii. Loss Contingencies Are Estimates, Which Are Inherently Subject to Change.

31. GAAP acknowledges that estimates are, by nature, expected to change as new information is obtained and updated assessments are performed. GAAP defines a change in estimate as follows:

> A change that has the effect of adjusting the carrying amount of an existing asset or liability or altering the subsequent accounting for existing or future assets or liabilities. **A change in accounting estimate is a necessary consequence of the assessment, in conjunction with the periodic presentation of financial statements, of the present status and expected future benefits and obligations associated with assets and liabilities. Changes in accounting estimates result from new information.** Examples of items for which estimates are necessary are uncollectible receivables, inventory obsolescence, service lives and salvage values of depreciable assets, and warranty obligations.[25]

32. Importantly, GAAP distinguishes between accounting changes arising from a change in estimate as opposed to correction of errors. Changes in estimates are not accounting errors and are not considered by GAAP to be "corrections." GAAP requires changes in estimates to be reported in the same period as the change and prohibits retroactive application to previously issued financial statements.[26] In other words, a company cannot go back and revise its financial statements in order to update an estimate. By contrast, if a company needs to correct an error, then GAAP requires the restatement of prior financial statements that are materially affected.[27] I discuss this in more detail later in my report in connection with Feinstein's false characterizations of JELD-WEN's recognition of a contingent loss of $76.5 million and related disclosure in the third quarter of 2018 as being reflective of "corrective disclosure."[28] This characterization is wrong as a matter of accounting and wrong as a factual

---

[25] ASC Master Glossary – Change in Accounting Estimate. Emphasis added.
[26] ASC 250-10-45-17, Other Presentation Matters.
[27] ASC 250-10-45-23, Other Presentation Matters.
[28] Feinstein Report, par. 22-23.

12

HIGHLY CONFIDENTIAL

matter because recognizing the loss contingency did not render JELD-WEN's prior accounting determinations or disclosures related to the litigation erroneous.

### B. Accrual of Litigation Contingencies in Practice

33. As discussed above, the application of ASC 450 requires a high degree of subjectivity, is based, in part, on the expected resolution of future events, and is based on conservative foundational concepts. Not surprisingly, this paradigm results in significant diversity in practice among companies and between cases as to when and how litigation contingencies are reported. Due to varying facts and circumstances relevant to each case, tailored legal strategies, and the application of management's judgment surrounding the litigation, there is no "one size fits all" practice as to when a company recognizes a litigation contingency, and, depending on the facts and management's judgment, recognition can reasonably occur at different stages of a litigation. ASC 450 does not expressly require a company to record a loss contingency as soon as a lawsuit is filed. In fact, contingent liabilities may be appropriately recognized prior to, upon, or well after a jury verdict or court decision. A jury verdict alone may not present enough evidence for management to determine that a loss contingency meets the probable threshold within GAAP. Indeed, GAAP standards allow, and are heavily dependent on, management judgment, and the facts and circumstances that are determined to meet the probable and reasonably estimable thresholds in one matter may not be determined to meet those same thresholds in another.

34. Management may properly decide to recognize a litigation-related loss contingency prior to adjudication, a jury verdict, or settlement. For example, after the 2010 Deepwater Horizon oil spill, BP Plc ("BP") and associated entities were among the companies named as defendants in more than 400 civil lawsuits. Even though most of these actions remained

13

HIGHLY CONFIDENTIAL

pending in the courts, BP recognized a loss contingency of $40.9 billion during 2010 related to these and future actions.[29]

35.    At the other end of the spectrum, management may not believe that even an unfavorable jury verdict warrants the recognition of a loss contingency based on, for instance, management's view of the probability of success on appeal.  In July 2010, for example, The Walt Disney Company ("Walt Disney") received an adverse jury verdict in a lawsuit brought by a plaintiff alleging breach of contract.[30]  The jury awarded the plaintiff damages of $269.4 million, and Walt Disney actually stipulated to prejudgment interest of $50 million subject to the results of an appeal.[31]  Notwithstanding these negative developments, Walt Disney did not recognize a loss contingency and instead disclosed:

> "…the Company believes the jury's verdict is in error and has moved alternatively for a new trial or for judgment as a matter of law, and intends to vigorously pursue its position on appeal if those motions are unsuccessful.  The Company has determined that it does not have a probable loss under the applicable accounting standard relating to probability of loss for recording a reserve with respect to this litigation and therefore has not recorded a reserve."[32]

36.    In December 2010, Walt Disney's motions for a new trial and for summary judgment were denied.[33]  In its 2011 Form 10-K, Walt Disney continued to disclose that it had not recognized a loss contingency related to this matter because it did not believe that such a loss was probable and that the matter was under appeal.[34]

---

[29] BP, Plc Form 20-F for the period ended December 31, 2010, p. 38 and 130-131.  Note that BP prepares its financial statements in accordance with IFRS rather than U.S. GAAP.  Under IFRS, "probable" is defined as "more likely than not" rather than as "likely to occur" pursuant to U.S. GAAP.  Regardless of this difference, BP's decision serves as an example of recording a loss prior to the adjudication of claims.

[30] The Walt Disney Company Form 10-Q for the period ended July 3, 2010, Note 11 – Commitments and Contingencies.

[31] The Walt Disney Company Form 10-K for the year ended October 2, 2010, Note 15 – Commitments and Contingencies.

[32] Id.

[33] The Walt Disney Company Form 10-K for the year ended October 1, 2011, Note 15 – Commitments and Contingencies.

[34] Id.

14

HIGHLY CONFIDENTIAL

37.   Shortly thereafter, the SEC's Division of Corporation Finance ("SEC Corp Fin") performed a review of Walt Disney's 2011 Form 10-K.  SEC Corp Fin issued a comment letter to Walt Disney which noted the unfavorable jury verdict and denial of the motions and asked the company to explain the basis for its determination that it did not have a probable loss related to this litigation.[35]  Walt Disney's response cited the company's consultations with legal counsel and stated that counsel "advised the Company that the likelihood that the jury's verdict would be upheld on appeal was less than probable as that term is used under the applicable accounting standards."  Walt Disney disclosed that counsel's conclusion "was consistent with the Company's view of the likely outcome of the litigation based on [its] understanding of the facts underlying the claims, the matters of law relating to those claims and the bases available for overturning the verdict."[36]  The SEC closed its review and did not make further comment.[37]

38.   At the end of 2012, the Court of Appeals affirmed the judgment against Walt Disney.  In consideration of the decision, the company recognized a $321 million loss contingency.[38]  In other words, Walt Disney's management did not believe that this litigation-related loss contingency met the GAAP requirements for recognition until the case was lost on appeal and, notably, SEC Corp Fin did not raise further inquiry on this topic.

39.   In between these two extremes are many variations.  Ongoing settlement negotiations, for example, may also lead management to decide to recognize a loss contingency.  For example, facing a lawsuit claiming that it had misclassified employees as non-exempt and failed to

---

[35] SEC Comment Letter, The Walt Disney Company, February 22, 2012.

[36] Response to SEC Comment Letter, The Walt Disney Company, March 23, 2012.

[37] SEC Comment Letter, The Walt Disney Company, April 5, 2012.

[38] The Walt Disney Company Form 10-Q for the period ended December 29, 2012, Note 11 – Commitments and Contingencies.

15

HIGHLY CONFIDENTIAL

compensate them correctly, Provident Financial Holdings, Inc. recognized a loss contingency based on a settlement offer it had made to the plaintiffs during mediation.[39]

40. Management may also determine that a loss contingency meets the probable and reasonably estimable standards under GAAP upon receiving an unfavorable verdict. In October 2019, after receiving an adverse jury verdict in a patent infringement case, Verisk Analytics, Inc. disclosed that it had recognized a loss contingency of $125 million in the third quarter of 2019 for the assessed damages, despite the company's plans to appeal the decision.[40]

41. These examples demonstrate that there is no single, definitive approach in the accounting industry to the timing of recognition of loss contingencies and illustrate the importance of management's judgment and consideration of the unique facts and circumstances surrounding each individual litigation matter.

### i.   Reversal of Previously Recognized Litigation Contingencies

42. Given the level of judgment inherent in assessing loss contingencies, it is common practice for companies to regularly update prior conclusions surrounding loss contingencies by adjusting the amount, including by reversing a recognized loss contingency altogether. Specifically, companies that have recognized contingent liabilities may later reverse them after subsequent favorable developments in litigation.

43. Industry guidance acknowledges this situation and considers when it is appropriate for an entity to derecognize a previously recognized contingent liability when a loss is no longer considered probable.[41] A publication by Deloitte, one of the largest accounting firms in the world, presents an example in which a company, Company S, previously recognized a

---

[39] Provident Financial Holdings, Inc. Form 10-K for the period ended June 30, 2016, Item 3. Legal Proceedings.

[40] Verisk Analytics, Inc. Form 8-K, filed October 29, 2019, Exhibit 99.1.

[41] Deloitte, "A Roadmap to Accounting for Contingencies and Loss Recoveries," 2019, p. 44.

16

**HIGHLY CONFIDENTIAL**

litigation-related loss contingency after a jury found in favor of a competitor and awarded damages. Company S determined that it was "probable that a liability has been incurred despite its intent to appeal the verdict" and recognized the contingent liability. Four years later, the appeals court set aside the original verdict. After obtaining an opinion from legal counsel stating that it had meritorious defenses and the outcome of the new trial was uncertain, Company S derecognized the previously recorded loss contingency "given that it has determined that the evidence supported a conclusion that it was no longer probable that it would incur a loss in accordance with the litigation."[42]

44. This scenario of companies reversing a previously recognized loss contingency is not just conceptual but occurs frequently in practice. Appendix 1 summarizes selected examples of public companies that have disclosed such reversals. These examples illustrate that the recognition of a loss contingency is not an admission of final liability or an acknowledgment that the opposing party's claims have merit. Further, they demonstrate that the amount of a recognized loss contingency does not necessarily correspond to the final amount of actual loss. The frequency of such reversals makes clear that the recognition of a loss contingency represents a point-in-time estimate of probable exposure that companies are required to report regardless of the ultimate outcome.

---

[42] Id.

17

HIGHLY CONFIDENTIAL

## V.    OPINIONS AND ANALYSIS

### A.  Feinstein Mischaracterizes the Nature and Significance of a Loss Contingency.

#### i.    JELD-WEN's Recognition of a Loss Contingency is Not a Reflection of Certain Liability.

45.    According to Feinstein, JELD-WEN's October 15, 2018 announcement regarding the loss contingency informed the market that Steves' allegations "had merit and that there would be negative repercussions from that behavior."[43]  It is inaccurate, however, to characterize the loss contingency as a statement of certain liability.  By definition, a loss contingency is an estimate, not a certainty: GAAP defines a loss contingency as "an existing condition, situation, or set of circumstances *involving uncertainty* as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[44]  GAAP specifically states that "virtual certainty" *is not* the standard required for accrual of a loss.[45]

46.    For this reason, in each and every annual and periodic SEC filing made by JELD-WEN during the Class Period, the Company clearly disclosed that its accounting for contingent liabilities was based on estimates and assumptions that may differ from the ultimate outcomes:

> **Use of Estimates** – The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect amounts reported in the consolidated financial statements and related notes. Significant items that are subject to such estimates and assumptions include, but are not limited to, long-lived assets including goodwill and other intangible assets, employee benefit obligations, income tax uncertainties, **contingent assets and liabilities**, provisions for bad debt, inventory, warranty liabilities, legal claims, valuation of derivatives, environmental remediation and claims relating to self-insurance. **Actual results**

---

[43] Feinstein Report, par. 23.  See also Feinstein Report par. 297 and 343.

[44] ASC Master Glossary – Loss Contingency.  Emphasis added.

[45] ASC 450-20-25-3 Recognition – General.

18

HIGHLY CONFIDENTIAL

**could differ due to the uncertainty inherent in the nature of these estimates**.[46]

47. Because loss contingencies are merely estimates and not statements of certain liability, it is common practice for companies to regularly update prior conclusions surrounding loss contingency accruals by adjusting the amount or even by reversing the contingency altogether. For instance, the Carlyle Group reversed a $25 million contingent liability two years after it was recorded following a litigation victory, and Gilead Sciences reversed a $200 million contingent liability after successfully appealing a jury verdict. *See* Appendix 1. The fact that these companies initially recognized a loss contingency does not mean they thought the losses were certain; indeed, it would not make sense for these companies to continue litigating if that had been their assessment.

48. Similarly, JELD-WEN's recognition of a loss contingency with respect to the Steves litigation was not a reflection that a loss was certain. In the same press release announcing the recognition of the loss contingency, JELD-WEN also noted that the Company intended to appeal—by definition extending the time period before any judgment would be certain and final. JELD-WEN's recognition of the loss contingency merely reflected management's view that recent events in the Steves litigation made it less likely that the company would prevail on certain claims and that the amount of that loss could be estimated.

49. Given the inherent lack of certainty associated with a loss contingency, it was appropriate for JELD-WEN to continue to acknowledge that uncertainty in its disclosures. JELD-WEN's statements that it believed Steves' claims lacked merit, that certain rulings in the Steves litigation were incorrect, and that it intended to appeal were not at odds with its recording a

---

[46] JELD-WEN Form 10-K for the period ended December 31, 2017 and Forms 10-Q for the periods ended April 1, 2017, July 1, 2017, September 30, 2017, March 31, 2018, June 30, 2018, and September 30, 2018. Emphasis added.

HIGHLY CONFIDENTIAL

loss contingency. As JELD-WEN explained in its announcement of the loss contingency, "while the company continues to maintain that it has not violated any antitrust laws and intends to appeal any adverse judgment, recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the appeal process is unsuccessful."[47] The recording of a loss contingency should not be misinterpreted as a recognition of a certain outcome.

### ii. JELD-WEN's Recognition of a Loss Contingency was Not an Admission of Ultimate Liability.

50. I understand that Plaintiffs have alleged that JELD-WEN committed securities fraud by failing to disclose the fact that it was engaged in the fraud alleged by Steves.[48] In this vein, Feinstein asserts that JELD-WEN misrepresented and omitted information concerning the Steves litigation and that these alleged misrepresentations and omissions caused JELD-WEN's stock to be overvalued in the marketplace until corrective disclosures provided investors with the "concealed truth."[49] Specifically, Feinstein suggests that JELD-WEN admitted liability when it announced the loss contingency because "it effectively acknowledged merit in the antitrust allegations."[50]

51. The recognition or disclosure of a loss contingency is not a reflection of ultimate liability, and this is not what the accounting standards purport it to be. Indeed, an estimate of a loss contingency is not indicative of the end-result of litigation and is merely management's best assessment of the probability and amount of a *potential* loss as of a specific point in time as

---

[47] JELD-WEN Press Release, "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," October 15, 2018.

[48] *See In Re: JELD-WEN Holding, Inc. Securities Litigation*, 3:20-cv-112, Consolidated Class Action Complaint, June 22, 2020, par. 15-24, 243-245.

[49] Feinstein Report, par. 21. See also Feinstein Report par. 272, 337, 343.

[50] Id. par. 23, 297.

20

HIGHLY CONFIDENTIAL

required by GAAP. As such, GAAP requires companies to consider the progress of a case to date, the opinions and strategies of legal counsel, and anticipated outcomes of future events in determining whether recognition or disclosure of a litigation-related loss contingency is required. Such loss contingencies are based on estimates made at various points in time and, therefore, will naturally change as the matter proceeds, rulings are issued, and settlements are negotiated and finalized.

52.   It is therefore incorrect to characterize JELD-WEN's announcement on October 15, 2018 regarding the loss contingency as an expression of ultimate liability or even JELD-WEN's acknowledgement of the merits of Steves' allegations in the litigation. Rather, anyone familiar with GAAP and ASC 450 would have understood JELD-WEN's recognition of a loss contingency reflected management's best assessment of the probability and amount of a *potential* loss as of a specific point in time, as required by GAAP.

   **B. JELD-WEN's Recognition of the Loss Contingency Did Not Constitute a Correction of an Error, and its Accounting and Disclosures Related to the Steves Litigation were Reasonable Under GAAP.**

53.   The Feinstein Report further claims that JELD-WEN "misled the market, in part, by vehemently denying the validity of the antitrust charges against it, even after a jury in the Steves antitrust litigation rendered a verdict" and that JELD-WEN's October 15, 2018 disclosure that it would record a $76.5 million contingent liability "stunned the market."[51] Feinstein characterizes this October 15, 2018 disclosure as a "corrective disclosure" that "effectively acknowledged merit in the antitrust allegations."[52] This suggests that JELD-WEN should have recognized the loss contingency as soon as the lawsuit was filed or after

---

[51] Feinstein Report, par. 22.
[52] Id. par. 23, 297.

21

HIGHLY CONFIDENTIAL

the jury verdict was issued, but, as discussed above, this is not what the accounting standards require.

54. As discussed above, management was required under GAAP to incorporate the ongoing developments in the Steves litigation into its assessment of the accounting and disclosure requirements of ASC 450. At the time JELD-WEN recognized the related loss contingency in October 2018, the Company concluded that fact findings associated with the most recent ruling increased the likelihood of loss and triggered the "probable" and "reasonably estimable" criteria prescribed by GAAP for recognition of a loss contingency. Management's decision represented a change in estimate, as defined by GAAP, and Feinstein does not offer any analysis or conclusions to the contrary.

55. JELD-WEN's recognition of the loss contingency in October 15, 2018 was therefore not "corrective" as an accounting matter. To be "corrective," from an accounting perspective, the Company's prior decisions regarding loss recognition would necessarily have to be accounting errors, which is not the case. Nor was the loss contingency an admission of liability or concession that the allegations in the Steves litigation were true. JELD-WEN's recognition of the loss contingency was, instead, a change in estimate regarding a potential loss, based on management's judgments regarding the facts that existed at the time of the change. As illustrated below, recognition of a loss contingency was entirely consistent with JELD-WEN's prior disclosures and management's continued belief that Steves' allegations lacked merit.[53]

---

[53] *See* JELD-WEN Press Release, "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," October 15, 2018.

22

HIGHLY CONFIDENTIAL

### i.    JELD-WEN's Disclosures Leading Up to the Trial

56. In the prospectus for its IPO, filed on January 30, 2017, JELD-WEN disclosed the following regarding the Steves litigation:

> "We sell molded door skins to certain customers pursuant to long-term contracts, and these customers in turn use the molded door skins to manufacture interior doors and compete directly against us in the marketplace. We have given notice of termination of one of these contracts and, on June 29, 2016, the counterparty to the agreement, Steves and Sons, Inc., or 'Steves,' filed a claim against JWI in the United States District Court for the Eastern District of Virginia, Richmond Division. The complaint alleges that our acquisition of CMI, together with subsequent price increases and termination of the contract, violated antitrust laws and constituted a breach of contract, breach of warranty, and tort. The complaint seeks injunctive relief, ordinary and treble damages, and declaratory relief. We believe Steves' claims lack merit and intend to defend vigorously against this action."[54]

57. JELD-WEN included a similar disclosure in its Form 10-K for the period ended December 31, 2016 in both the legal proceedings disclosures required by SEC Regulation S-K and the notes to its consolidated financial statements.[55]  These disclosures also remained consistent in its Forms 10-Q for the first and second quarters of 2017.

58. In its Form 10-Q for the third quarter of 2017, JELD-WEN provided additional updates related to the litigation, including that Steves was seeking divestiture of assets acquired from CMI including its Towanda door skin facility.[56]  JELD-WEN also disclosed that Steves' experts had quantified damages of $36-60 million, a portion of which was subject to trebling, and that Steves sought recovery of attorney fees, which were not quantified.  The Company

---

[54] JELD-WEN Holding, Inc., Prospectus pursuant to Rule 424(b)(4), filed January 30, 2017.

[55] JELD-WEN Form 10-K for the period ended December 31, 2016, filed March 3, 2017.  Note that Item 103 of Regulation S-K requires brief disclosure of certain information related to material legal proceedings.  Such disclosure is unrelated to the GAAP requirements for financial reporting purposes, but the content often contains duplication.

[56] JELD-WEN Form 10-Q for the period ended September 30, 2017, filed November 8, 2017 at pp. 30 and 57.

23

HIGHLY CONFIDENTIAL

continued to disclose its views regarding Steves' claims and its rationale for concluding that a loss was not considered to be probable:

> "…We believe Steves' claims lack merit, Steves' damages calculations are speculative and excessive, and Steves is not entitled in any event to the extraordinary remedy of divestiture. We are defending vigorously against this action.
>
> Management does not believe that a loss in this matter is probable and, therefore, has not accrued a reserve for this loss contingency. Because the operations acquired from CMI have been fully integrated into the Company's other operations, divestiture of those operations would be difficult if not impossible and therefore it is not possible to estimate the cost of any final divestiture order or the extent to which such an order would have a material adverse effect on our financial position, operating results or cash flows. We have filed a motion for summary judgment on several grounds, seeking dismissal of certain of Steves' claims. A hearing on that motion is scheduled to occur on November 16, 2017. Trial of this matter is set to begin on January 8, 2018."[57]

59. Throughout 2017, JELD-WEN's disclosures related to the Steves litigation were consistent with the authoritative guidance in ASC 450 discussed above. The Company conducted assessments of the case developments, determined that a loss was not probable, and concluded that recognition of a contingent liability was not warranted. JELD-WEN's assessments were consistent with the elements required for consideration under ASC 450 such as the progress of the case and management's intended response.[58] As was later disclosed by JELD-WEN, the Antitrust Division of the DOJ had reviewed JELD-WEN's acquisition of CMI both before and after the transaction and took no action,[59] which was a consideration underlying the Company's disclosure that "Steves' claims lack[ed] merit and intend[ed] to defend vigorously against this action."[60] The Company's position and intended

---

[57] JELD-WEN Form 10-Q for the period ended September 30, 2017, Note 23 – Commitments and Contingencies.

[58] ASC 450-20-55-12, Implementation Guidance and Illustrations.

[59] JELD-WEN Press Release, "JELD-WEN Announces Jury Verdict in Steves & Sons Lawsuit," February 15, 2018.

[60] JELD-WEN Holding, Inc., Prospectus pursuant to Rule 424(b)(4), filed January 30, 2017 and JELD-WEN Form 10-Q for the period ended September 30, 2017, respectively, Notes 21 and 23 – Commitments and Contingencies.

24

**HIGHLY CONFIDENTIAL**

response to the litigation were clearly disclosed and were consistent with its assessment that a loss did not meet the probable standard as defined under GAAP.

### ii.    Jury Verdict and Related Disclosures.

60.    On February 8, 2018, JELD-WEN filed a motion for judgment as a matter of law arguing, among other things, that Steves failed to introduce certain evidence related to its antitrust claim, that if Steves' claim for future lost profits was submitted to the jury, Steves should not be permitted to pursue its claim for divestiture, and that Steves had put forth no evidence to support its breach of contract claims relating to door skins defects or breach of the implied warranty.[61]

61.    While JELD-WEN's motion remained outstanding, on February 15, 2018, the jury returned an unfavorable verdict against the Company.  At the time, no judgment had been entered in accordance with the verdict.[62]  In a press release issued that same day, JELD-WEN disclosed the verdict, the damages awarded, and the Company's intentions and expectations for appeal:

> "The verdict was unfavorable to JELD-WEN with respect to Steves' claims that JELD-WEN's 2012 acquisition of CraftMaster, Inc. ("CMI") violated Section 7 of the Clayton Act and that JELD-WEN breached the supply agreement between the parties.  The verdict awards Steves $12,151,873 for past damages under both the Clayton Act and breach of contract claims and $46,480,581 in future lost profits under the Clayton Act claim.  The Company expects that Steves will be required to elect to recover its past damages either under the Clayton Act claims or the contract claims, but not both.  If a judgment is entered under the Clayton Act, any damages awarded will be trebled.  In addition, in a judgment is entered under either theory in accordance with the verdict, Steves will be entitled to an award of attorneys fees.  JELD-WEN's position is that, because future lost profits were awarded, Steves is not permitted to pursue its claim for divestiture of certain assets acquired in the CMI acquisition.

---

[61] *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Mot. for Judgment as a Matter of Law against Steves & Sons, Inc., February 8, 2018.

[62] While the unfavorable jury verdict was returned on February 15, 2018, judgment was not entered in accordance with this verdict until December 14, 2018.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Final Judgment Order, December 14, 2018, amended March 15, 2019.

25

HIGHLY CONFIDENTIAL

The Company continues to believe that the facts underlying this dispute do not establish either a violation of the antitrust laws or a breach of contract. The Company notes that both before and after the CMI acquisition, the Antitrust Division of the Department of Justice reviewed the transaction and did not challenge it. JELD-WEN believes that multiple pretrial and trial rulings were erroneous and improperly limited the Company's defenses, and that judgment in accordance with the verdict would be improper for several reasons under applicable law. JELD-WEN intends to vigorously oppose entry of an adverse judgment, and to appeal any adverse judgment that may be entered. Accordingly, the Company does not believe that the ultimate outcome of this matter will have a material impact on its ability to operate in the ordinary course of business."[63]

62.    Days later, on February 21, 2018, Mark Beck, Chief Executive Officer and President of JELD-WEN, discussed the litigation on JELD-WEN's fourth quarter 2017 earnings call. He reiterated the Company's plan to appeal any judgment entered and its belief that the Company had strong grounds to reverse any judgment on appeal. He also added that the Company had not recognized a contingent liability for any judgment related to this matter because it did "not believe that a loss is probable and estimable."[64]

63.    On March 6, 2018, JELD-WEN filed its Form 10-K for the period ended December 31, 2017 which contained substantial disclosure that repeated much of the information within the press release and also contained the following incremental disclosure:

"We intend to vigorously oppose entry of an adverse judgment, and to appeal any adverse judgment that may be entered. We continue to believe that Steves' claims lack merit, Steves' damages calculations are speculative and excessive, and Steves is not entitled in any event to the extraordinary remedy of divestiture. We believe that multiple pretrial and trial rulings were erroneous and improperly limited the Company's defenses, and that judgment in accordance with the verdict would be improper for several reasons under applicable law. **Accordingly, we do not believe that a loss in this matter is probable and estimable, and therefore, we have not accrued a reserve for this loss contingency.** However, if a judgment is entered in accordance with the verdict and is ultimately upheld after exhaustion of our appellate remedies, it could have a material adverse effect on our financial position, operating results, or cash

---

[63] JELD-WEN Press Release, "JELD-WEN Announces Jury Verdict in Steves & Sons Lawsuit," February 15, 2018.
[64] JELD-WEN Earnings Call Transcript, Q4 2017, held February 21, 2018.

26

HIGHLY CONFIDENTIAL

flows, particularly for the reporting period in which a loss is recorded. Because the operations acquired from CMI have been fully integrated into the Company's other operations, divestiture of those operations would be difficult if not impossible and therefore it is not possible to estimate the cost of any final divestiture order or the extent to which such an order would have a material adverse effect on our financial position, operating results or cash flows."[65]

64.    In its Form 10-Q for the first quarter of 2018, JELD-WEN repeated this disclosure and added that an evidentiary hearing in the matter was scheduled for April 2018.[66]  Kirk Hachigian, Chairman of the Board and Interim CEO of JELD-WEN, also discussed the matter on JELD-WEN's first quarter 2018 earnings call.[67]

65.    Following the unfavorable verdict, JELD-WEN continued to provide substantial public disclosures concerning both the status of the case, details of the jury award, and the basis for its continued belief that a loss was not probable or estimable.  The motion it had filed on February 8, 2018 remained outstanding, and the matter, as well as the Company's understanding and assessment of the probability of a related loss, continued to evolve.

### iii.    SEC Corp Fin Issued Comments to JELD-WEN Regarding the Disclosures and Concluded Its Review.

66.    On July 12, 2018, SEC Corp Fin issued a comment letter to JELD-WEN in reference to its Form 10-K for 2017 and Form 10-Q for the first quarter 2018.  Among other topics, SEC Corp Fin made the following inquiry regarding the Company's conclusions surrounding the accounting and disclosure of the Steves litigation:

"We note your disclosure that you do not believe a loss in the Steves' matter is probable and estimable, and therefore, you have not accrued a reserve for the loss contingency and we note on February 15, 2018 a jury returned a verdict that was unfavorable to you. Please tell us and revise future disclosures to clarify whether no loss has been accrued because you have concluded that a loss is not

---

[65] JELD-WEN Form 10-K for the period ended December 31, 2017, Note 30 – Commitments and Contingencies. Emphasis added.

[66] JELD-WEN Form 10-Q for the period ended March 31, 2018, Note 23 – Commitments and Contingencies.

[67] JELD-WEN Earnings Call Transcript, Q1 2018, held May 8, 2018.

27

HIGHLY CONFIDENTIAL

probable or no loss has been accrued because there are probable losses but the amount of probable loss is not estimable. If there are probable losses that are not estimable, please explain why. In addition, in each case, please further disclose the range of reasonably possible loss or disclose that such an estimate cannot be made."[68]

67.    The Company responded with the following:

"As stated in our disclosure on page F-48, we did not (and do not) believe that a loss in the Steves matter is probable and accordingly have not accrued a reserve for this loss contingency. We continue to believe that Steves' claims lack merit, Steves' damages calculations are speculative and excessive, and Steves is not entitled in any event to the extraordinary remedy of divestiture. We believe that multiple pretrial and trial rulings were erroneous and improperly limited the Company's defenses, and that judgment in accordance with the verdict would be improper for several reasons under applicable law. We intend to vigorously oppose entry of an adverse judgment and to appeal any adverse judgment that may be entered. Additionally, when we filed our Form 10-K (and continuing to today), a number of rulings that impact the range of loss remained pending, including motions related to portions of the jury's award and potential divestitures of an asset. In our disclosure, we outlined the amounts awarded by the jury in the matter, and we noted that if a judgment were entered under the Clayton Act, any damages awarded would be trebled. We believe the statements in our disclosure provided the reader with information necessary to determine the potential range of loss on the matter. In future filings, we will continue to provide transparency in our disclosures with respect to the events and status of this matter and to revise our disclosures consistent with the Staff's comments to the extent the facts and circumstances warrant."[69]

68.    Just a few weeks later, SEC Corp Fin issued a reply to JELD-WEN's response stating that it had completed its review.[70] Based on my experience at the SEC and since working in private practice on SEC accounting advisory and related expert matters, SEC Corp Fin's inquiry, as discussed above, is quite common and does not suggest that JELD-WEN's prior accounting or disclosure was erroneous. Loss contingencies have been a particular focus area of SEC Corp Fin over the last decade, and many public companies have received very similar

[68] SEC Comment Letter, JELD-WEN, July 12, 2018.
[69] Response to SEC Comment Letter, JELD-WEN, July 25, 2018.
[70] SEC Comment Letter, JELD-WEN, August 8, 2018.

28

HIGHLY CONFIDENTIAL

comments during the SEC's filing review process.[71]  In this case, SEC Corp Fin was seeking confirmation from JELD-WEN that it did not believe that a loss was probable and also inquired regarding the Company's estimated range of loss for disclosure purposes.  In response, JELD-WEN re-directed SEC Corp Fin to the previous disclosures made on both points.  Importantly, SEC Corp Fin's inquiry did not result in any revision or restatement to either the amounts or disclosures included in its previously issued financial statements, which provides added validation that the Company's prior accounting and disclosure were neither erroneous nor misleading and, therefore, did not require correction.[72]

### iv. Post-Verdict Activity in the Steves Litigation and JELD-WEN's Updated Accounting Determination.

69. Between April and October of 2018, JELD-WEN and Steves participated in extensive hearings and filed court briefs related to potential remedies associated with the unfavorable jury verdict.  On October 5, 2018, these events culminated in the court issuing an adverse ruling (the "October 2018 Ruling") which made a number of factual findings that further supported the basis for the unfavorable jury verdict and concluded that divestiture of CMI was an appropriate remedy.[73]  The October 2018 Ruling, among other things, also eliminated $2.2 million of damages under Steves' breach of contract claims pursuant to the Court

---

[71] "Litigation Contingency Reporting: Where are we with FASB and the SEC?" Dialogue sponsored by the New York City Bar Association, Comments by Wayne Carnall, Chief Accountant, Division of Corporation Finance, U.S. Securities and Exchange Commission, January 28, 2011.  Carnall states that while ASC 450 "is not a new standard," SEC Corp FIN has "a renewed emphasis on this and we started asking some questions earlier in the year or early last year."  He added that SEC Corp Fin had "gone back and forth" with a number of companies.

[72] SEC Corp Fin closed its review without further action.  In addition, JELD-WEN's independent auditors, Pricewaterhouse Coopers ("PwC") issued a clean audit opinion on the consolidated financial statements included in the 2017 Form 10-K.  PwC's clean audit opinion inherently encompassed and considered JELD-WEN's accounting and disclosure conclusions related to the Steves litigation.  JELD-WEN's Form 10-Qs issued during the Class Period were also subject to review by PwC.

[73] *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Memorandum Opinion, October 5, 2018.

HIGHLY CONFIDENTIAL

vacating a portion of the jury verdict against JELD-WEN.[74]  The October 2018 Ruling further endorsed certain quality claims made by Steves[75] and found the jury's ruling that JELD-WEN had shipped defective door skins to Steves and failed to reimburse Steves for those door skins binding on the court.[76]

70.   The following day, the Company issued a press release announcing the October 2018 Ruling and continued to express its intention to appeal any judgment due to the belief that there were flawed rulings during the trial and that divestiture of CMI was "both unprecedented and fundamentally incorrect as a matter of law."[77]

71.   On October 15, 2018, JELD-WEN issued its earnings release for the third quarter 2018 in which the Company disclosed that the October 2018 Ruling resulted in the Company's decision to recognize a contingent liability in the amount of $76.5 million related to the Steves litigation.[78]  Per the release, the amount reflected "the judgment anticipated to be entered against the company, including the trebling of $12.2 million of past damages under the Clayton Act and estimated legal fees.  While the company continues to maintain that it has not violated any antitrust laws and intends to appeal any adverse judgment, recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the appeal process is unsuccessful."[79]

---

[74] While the opinion vacating a portion of the jury verdict was issued on September 28, 2018, the associated reduction in breach of contract damages was only quantified within the October 5, 2018 opinion.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Memorandum Opinion, September 28, 2018; *Steves & Sons, Inc. v. JELD-WEN, Inc.,* 3:16-cv-545, Memorandum Opinion, October 5, 2018.

[75] Id. at pp. 38 and 110.

[76] Id. at pp. 7-8.

[77] JELD-WEN Press Release, "JELD-WEN Announces Rulings in Steves & Sons Litigation; No Final Judgment on Antitrust Claims," October 6, 2018.

[78] JELD-WEN Press Release, "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," October 15, 2018.

[79] Id.

30

HIGHLY CONFIDENTIAL

72.   JELD-WEN's rationale supporting its decision to recognize the loss contingency is documented in an internal accounting memorandum prepared by Scott Vining, JELD-WEN's Chief Accounting Officer.[80]

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████

████████████████████████████████
████████████████████████████████
████████████████████████

73.   ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

### v.   Analysts' Reaction to JELD-WEN's Recognition of the Loss Contingency.

74.   Feinstein's claim that the market was "stunned" by JELD-WEN's announcement because the Company "acknowledged and quantified" the impact of the Steves litigation for the "first

---

[80] JW-SEC-01109346, JELD-WEN Accounting Topic Discussion Paper, Steve's Litigation, November 6, 2018.

[81] Id.

[82] ████████████████████████████████████
████████████████████████████████████

[83] JW-SEC-01109346, JELD-WEN Accounting Topic Discussion Paper, Steve's Litigation, November 6, 2018.

31

HIGHLY CONFIDENTIAL

time"[84] is inaccurate. The announcement was consistent with JELD-WEN's prior disclosures about the Steves litigation and considered the impact of the October 2018 Ruling. JELD-WEN had disclosed the nature of the litigation and its potential impacts on the Company beginning with its IPO filings.[85] As early as February 2017, analysts had identified the legal proceedings as an investment risk[86] and the outcome of the litigation as a "catalyst" and "data point to watch."[87] By the third quarter of 2017, JELD-WEN disclosed both the litigation and a range of potential loss as calculated by Steves' expert witnesses in the case.[88] At the time the unfavorable jury verdict was rendered in February 2018, JELD-WEN announced the damages amounts awarded by the jury under the Clayton Act claims and breach of contract claims and future lost profits.[89]

75. Notably, none of the three analyst reports issued after JELD-WEN announced that it would recognize a loss contingency liability in October 2018 and cited by Feinstein indicated that the analysts were "stunned" by the event.[90] While all three analysts cited the uncertainty surrounding the Steves litigation as a risk and a reason for their downward adjustments in JELD-WEN's target share price, none expressed "surprise" or "disappointment"[91] at JELD-WEN's recent recognition of the loss contingency, as characterized by Feinstein. One analyst explicitly dismissed the announcement asserting that "investor concerns…pending legal

---

[84] Feinstein Report, par. 142, 291.

[85] Amendments Nos. 1-6 to Form S-1 Registration Statements, filed August 1, 2016 through January 17, 2017; Prospectus pursuant to Rule 424(b)(4), filed January 30, 2017.

[86] JELD-WEN Analyst Presentation, Barclays, dated February 21, 2017.

[87] JELD-WEN Analyst Presentation, Wedbush, dated February 2, 2017.

[88] JELD-WEN Form 10-Q for the period ended September 31, 2017, Note 23 – Commitments and Contingencies.

[89] JELD-WEN Press Release, "JELD-WEN Announces Jury Verdict in Steves & Sons Lawsuit," February 15, 2018.

[90] JELD-WEN Analyst Presentations, Credit Suisse, dated October 15, 2018, J.P. Morgan, dated October 16, 2018, and RBC Capital Markets, dated October 16, 2018.

[91] Feinstein Report, par. 142.

HIGHLY CONFIDENTIAL

litigation with Steve's & Sons are likely overblown."[92]  The absence of a strong reaction in these analyst reports is unsurprising, because anyone familiar with GAAP and ASC 450 would understand that JELD-WEN's decision to recognize a loss contingency while simultaneously appealing the outcome of the Steves litigation was entirely consistent with JELD-WEN's prior statements.

76.  From the time of its IPO through the Class Period, JELD-WEN provided substantial disclosure of the key developments in the litigation as they unfolded, quantification of potential damages as they became known, and the Company's ongoing expectations as to the ultimate outcome of the litigation.  As the facts and rulings in the case evolved and ultimately culminated to a point that, in JELD-WEN's judgment, presented increased risk that the Company may not overcome the antitrust claims on appeal, the Company recorded a contingent liability at the time a loss was deemed to be probable and reasonably estimable as required under GAAP.  Such recognition is not an expression of an admission or perceived certainty about the ultimate outcome of potential loss but rather an acknowledgment of an increase in assessed probability of loss.  The Company's accounting and disclosures related to the Steves litigation were reasonable under GAAP and consistent with the ongoing developments of the litigation.

---

[92] JELD-WEN Analyst Presentation, RBC Capital Markets, dated October 16, 2018.

## VI.    SIGNATURE AND RIGHT TO MODIFY

77.    My opinions are based upon information available to me as of the date of this report.  It is possible that additional information may affect my opinions herein.  I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

Signed this 1st day of February 2021 in Washington, D.C.

Jason S. Flemmons, CPA, CFE, CFF

34

**Exhibit 1**

**ankura**
COLLABORATION DRIVES RESULTS



2000 K Street, NW, Suite 1200
Washington, DC 20006

+1.202.524.8384 Direct

jason.flemmons@ankura.com

### EDUCATION
BBA, Accounting, College of William and Mary

### CERTIFICATIONS
Certified Public Accountant

Certified Fraud Examiner

Certified in Financial Forensics

### AFFILIATIONS
American Institute of Certified Public Accountants ("AICPA")

AICPA Forensic and Valuation Section Executive Committee

AICPA Forensic and Litigation Services Fraud Task Force

Association of Certified Fraud Examiners

Association of Securities and Exchange Commission Alumni

## JASON FLEMMONS
Senior Managing Director

### Former SEC Enforcement; Accounting Investigations & Expert Witness

Jason Flemmons is a Senior Managing Director at Ankura in the Washington, DC office. Jason has over 25 years of experience in forensic accounting, corporate investigations, and technical accounting and auditing matters. He provides a broad range of expert and consulting services involving accounting advisory, auditor liability, fraud examination, dispute resolution, and other services.

Prior to joining Ankura in 2016, Jason was a Senior Managing Director in the Forensic Accounting and Advisory Services practice at FTI Consulting.

Jason is the former Deputy Chief Accountant of the Securities and Exchange Commission's Division of Enforcement, where he supervised and performed numerous financial and accounting fraud investigations involving SEC registrants and other parties. During his 12 years of service in the Division of Enforcement, Jason advised on a wide variety of technical accounting, auditing, disclosure, and internal control matters. He also performed and managed cash-tracing investigations resulting from violations of the Foreign Corrupt Practices Act, asset misappropriations and Ponzi schemes. Jason co-chaired the Division of Enforcement's Cross-Border Working Group, which oversaw and coordinated numerous investigations involving issuers and auditors located in foreign jurisdictions. Jason worked closely with both SEC trial counsel and criminal prosecutors during the litigation of high-profile matters.

Before joining the SEC, Jason was a manager in the Financial Advisory Services practice of PricewaterhouseCoopers where he supervised a variety of forensic accounting investigations. He also performed financial statement audits of both publicly traded and privately held companies in a variety of industries located in the US and overseas in PwC's Audit and Business Advisory Services practice.

From 2015 to 2019, Jason served on the Executive Committee of the AICPA's Forensic and Valuation Services section. The committee provides guidance and establishes standards for practitioners in the forensic accounting and valuation services industry, including Statement on Standards for Forensic Services No. 1, of which Jason was a principal author. Jason also served on the AICPA's Forensic and Litigation Services Fraud Task Force from 2012 to 2017.  Jason is a frequent speaker at SEC enforcement, accounting and forensic accounting conferences nationally and internationally.

**JASON FLEMMONS**

**Selected Professional Experience (2013-present)**

Expert/Consultant – SEC Matters

- **Investigation of Revenue Recognition Issues** - Retained by counsel for audit committee of pharmaceutical company to perform internal investigation of various revenue recognition practices.  Led the document collection and review efforts, assisted counsel in drafting internal report and presented findings to the DOJ and SEC enforcement.

- **Investigation of Various Accounting Issues** - Retained as accounting expert and consultant by counsel for a large retailer in connection with an internal investigation relating to inventory reserves, loan loss reserves, asset impairments, MD&A disclosures and non-GAAP financial measures.  Submitted expert report to SEC enforcement and participated in multiple meetings and presentations to the SEC's Denver regional office.

- **Asset Impairment Accounting Expert** - Retained as accounting expert and consultant by counsel for foreign private issuer based in China relating to accounting for impairment of long-lived assets.  Participated in presentations to the SEC's Washington, DC office.

- **Investigation of Sales Disclosures** – Retained as accounting consultant by counsel for an international car manufacturer in connection with an investigation by the SEC's Washington, DC office involving disclosure of vehicle units sold by dealers.

- **Investigation of Revenue Recognition Issues** - Retained as technical accounting consultant by counsel for a Fortune 10 company in connection with an investigation by the SEC's Chicago regional office involving revenue recognition and shipping practices.

- **Investigation of IFRS Issues** - Retained as technical accounting consultant in connection with an investigation by the SEC's Washington, DC office of a foreign private issuer relating to consolidation under International Financial Reporting Standards.

- **Financial Reporting and Audit Task Force Inquiry** - Retained as technical accounting consultant by counsel for a prominent pharmaceutical company in connection with an inquiry by the SEC's Financial Reporting and Audit Task Force relating to revenue recognition.

- **SEC Non-Financial Metrics Disclosure Case** – Retained as forensic accounting consultant by counsel for multinational automobile manufacturer in connection with an investigation by the SEC's Washington, DC office involving disclosure of certain non-financial metrics.

- **Investigation of Various Accounting Issues** - Retained as technical accounting consultant for a global vehicle manufacturer in connection with an investigation by the SEC's Chicago regional office relating to warranty reserves, deferred tax assets and segment reporting.

- **Investigation of Revenue Recognition Issues** - Retained as accounting expert by counsel for former CFO of an information technology division of a Fortune 150 company in connection with an investigation by the SEC's Fort Worth regional office involving principal-agent considerations.

- **Investigation of Acquisition-Related Reserves** - Retained as accounting consultant by private equity firm in connection with DOJ and SEC investigations of post-acquisition reserve adjustments by a portfolio company in the transportation industry.



2

**JASON FLEMMONS**

- **Investigation of Revenue Recognition Issues** - Retained as technical accounting consultant by counsel for health care technology company in connection with an investigation by the SEC's Chicago regional office involving accounting for payments made by a vendor to a customer.

- **Investigation of Cost Accounting Issues** - Retained as technical accounting consultant by counsel for large aerospace company in connection with an investigation by the SEC's Washington, DC office.

- **SEC Non-Financial Metrics Disclosure Case** - Retained as expert by counsel for oil and gas issuer and its CEO in connection with an SEC administrative proceeding brought by the SEC's Washington, DC office.  Performed an examination of the evidence underlying the SEC's fraud-related allegations and submitted expert report.

- **Investigation of Revenue Recognition Issues** - Retained as technical consultant by counsel for large international software company in connection with an investigation by the SEC's Washington, DC office involving revenue recognition accounting for both hardware and software sales.

- **Investigation of Revenue Recognition Issues** - Retained by counsel for major defense contractor as technical accounting consultant in connection with an investigation by the SEC's Boston regional office involving percentage of completion accounting.

- **Investigation of Revenue Recognition Issues** - Retained by counsel for large pharmaceutical company as accounting consultant and expert to evaluate revenue recognition adjustments and to make multiple presentations to the SEC's Boston regional office.

- **Investigation of Deferred Tax Reporting** – Retained by counsel for major defense contractor as technical accounting consulting in connection with an investigation by the SEC's Washington, DC office involving the reporting of current and deferred taxes.

- **Investigation of Various Accounting Items** – Retained by counsel for manufacturing company as forensic accounting consultant in connection with an investigation by the SEC's Washington, DC office involving reported earnings per share results.

- **Investigation of Revenue Recognition Issues -** Retained by counsel for audit committee of healthcare company as accounting consultant and expert to perform internal investigation of revenue recognition and contractual allowance practices in connection with an investigation by the SEC's Washington, DC office.

- **Investigation of Perquisite Disclosures –** Retained by counsel for manufacturing company as forensic accounting consultant in connection with an SEC investigation involving alleged undisclosed benefits for personal use of corporate airplane.  Participated in presentation to the SEC's Denver regional office.

Expert/Consultant – Other Matters

- **Accounting Expert in Criminal Trial** – Retained by counsel for executives of a biomedical company in connection with criminal trial in the Southern District of New York.  Trial testimony pending.

- **Accounting and Internal Controls Expert in Criminal Trial** – Retained by counsel for former regional sales executive in connection with criminal trial in the District of North Dakota.  Trial testimony pending.



**JASON FLEMMONS**

- **Audit Committee Investigation of Cost of Revenue Issues** – Retained by counsel for audit committee of a telecommunications and internet service provider to perform internal investigation of cost of revenue accounting practices.

- **Post-Acquisition Purchase Price Dispute** - Retained as accounting expert by counsel for large private equity firm in an international arbitration involving percentage of completion revenue recognition issues at portfolio company under International Financial Reporting Standards.

- **Non-GAAP Measures Expert** – Retained as expert by counsel for entities and former executives of a large publicly-traded Real Estate Investment Trust in connection with a plaintiff class action. Issued expert report and provided deposition testimony.

- **Audit Committee Investigation of Revenue Recognition and Other Issues** – Retained by counsel for manufacturing company to assist with internal investigation of whistleblower claims and related revenue recognition, accounts payable and intercompany accounting transactions.

- **Post-Acquisition Purchase Price Dispute** - Retained by counsel for private equity firm to perform forensic accounting and technical accounting evaluation of an acquired portfolio company suspected of providing materially misleading financial statements during purchase price negotiations.

- **Post-Acquisition Purchase Price Dispute** - Retained as accounting expert by counsel for manufacturing company in connection with a purchase price dispute involving revenue recognition issues.

- **Audit Committee Investigation of Percentage of Completion Accounting Issues** - Retained by counsel for audit committee of a global engineering and construction company to investigate the accounting and basis for estimates associated with a large contract.  Interviewed numerous employees and reported findings to the audit committee, management and outside auditors.

- **Accounting Advisory for Insurance Company** - Retained as accounting consultant for privately-held insurance company to perform accounting and disclosure analysis of potential contingent liability related to reinsurance claims.

- **Post-Acquisition Purchase Price Dispute** - Retained as technical accounting expert for sellers of a foreign cable television and telephone service provider in connection with a post-acquisition dispute.

- **Plaintiff Class Action** - Retained as forensic accounting expert by lead plaintiffs in class action litigation to analyze margins on specific product lines and related public disclosures. Issued expert reports and provided deposition testimony.

- **Post-Acquisition Purchase Price Dispute** - Retained by counsel for large private equity firm to perform analyses of earnout calculations and related support related to divested portfolio company.

- **Disclosure of Non-Financial Metrics** – Retained as expert by lead plaintiffs in class action litigation involving a social networking company to analyze certain non-financial metrics and the company's MD&A disclosures.  Issued expert report and provided deposition testimony.

- **Percentage of Completion Accounting Advisory** – Retained by counsel for shipbuilder to perform detail analysis of EAC models for certain periods in connection with issuance of SEC filings.



4

**JASON FLEMMONS**

Auditor Liability

- **Big Four Audit Firm Defense Expert in Civil Litigation** - Retained as expert by counsel for big four audit firm defending a civil lawsuit filed by a former employee.  Submitted expert report in defense of claims of alleged violations of auditing standards.  Trial testimony pending.

- **Audit Firm Defense Expert for Big Four Foreign Affiliate in Civil Litigation** – Retained as expert by a foreign affiliate of a big four auditing firm defending a lawsuit filed by a former audit client. Expert report and testimony pending.

- **Expert in PCAOB Proceeding Against Auditor** - Retained as expert by counsel for an audit engagement partner of a big-four public accounting firm in connection with a PCAOB administrative proceeding.  Submitted expert report to the PCAOB hearing officer.

- **Audit Firm Defense Expert in Civil Litigation** – Retained as expert by a large audit firm defending a civil lawsuit filed by a former audit client related to percentage of completion accounting issues. Expert report and testimony pending.

- **SEC and PCAOB Auditor Investigations** – Retained as accounting and auditing consultant by counsel for audit firm in connection with investigations by the SEC's and PCAOB's Washington, DC offices involving contingent liabilities, percentage of completion accounting, deferred tax assets, and other matters.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and made multiple presentations to SEC and PCAOB enforcement staff.

- **SEC Auditor Investigation** - Retained as accounting expert and consultant by counsel for audit firm in connection with an investigation by the SEC's Denver regional office involving related party, auditor independence and other accounting and footnote disclosure topics.  Submitted expert report to the SEC during Wells process.

- **Auditor Independence Consultant** - Retained as technical consultant by counsel for large international oilfield services company in an auditor independence matter.

- **Audit Firm Defense Expert in Civil Litigation** - Retained as expert by counsel for audit firm defending a civil lawsuit filed by a former audit client.  Assisted counsel in developing accounting and auditing defenses in written briefs and participated in mediation.

- **SEC Auditor Investigation** - Retained by counsel for auditing firm as a technical accounting and auditing consultant in connection with investigations by both the PCAOB and the SEC involving auditor independence and qualifications issues.  Assisted counsel in making presentations to the SEC's Boston regional office and to the Director of the SEC's Division of Enforcement during the Wells process.

- **SEC Auditor Investigation** - Retained by counsel for auditing firm as a consultant in connection with investigation of audits of private equity funds by the SEC's Los Angeles regional office involving fair value accounting of investments and loans.  Participated in Wells presentation to SEC staff.

- **SEC Auditor Investigation** - Retained by counsel for auditing firm as a technical accounting and auditing consultant in connection with investigation by the SEC's Los Angeles regional office involving revenue recognition issues and compliance with PCAOB Auditing Standards.



- **Auditor Independence Consultant** - Retained by counsel for private equity firm to advise on potential auditor independence issues raised by its outside auditor.  Prepared related submissions to the SEC's Office of Chief Accountant.

- **PCAOB Auditor Investigation** – Retained by counsel for auditing firm as a consultant in connection with a PCAOB investigation of the firm's audits of a real estate investment trust. Participated in presentation to PCAOB enforcement staff.

FCPA/Transactional Tracing

- **FCPA Investigation** - Retained by counsel for the special committee of a foreign private issuer in South America to perform an internal investigation of alleged payments made in violation of the Foreign Corrupt Practices Act.

- **Cash Tracing Investigation** - Retained by counsel representing a foreign national government to perform transactional testing and cash-tracing investigation in response to allegations of corruption made by a United Nations monitoring group.

- **Campaign Finance Matter** – Retained as forensic accounting expert by counsel for defendant in connection with criminal trial involving allegations of illegal contributions to state and U.S. Senate election campaigns.  Performed transactional tracing analysis involving numerous personal and corporate accounts.

- **Rebuttal Expert** – Retained as rebuttal expert by counsel for principal of management companies of large hedge fund complex in a bankruptcy proceeding in response to claims by Trustee seeking to claw back funds earned in an alleged Ponzi scheme.  Submitted expert report in bankruptcy court and provided deposition testimony.

- **CTR Compliance** - Retained by counsel for privately-held company to perform cash-tracing analysis and to implement process for preparing and filing Currency Transaction Reports (CTRs) with the IRS and FINCEN.  Assisted counsel in making presentations to the DOJ in connection with its related investigation.

- **Transactional Tracing** – Retained by counsel for registered investment advisor to perform tracing analysis of investor contributions, use of funds and withdrawals.

- **Cash Tracing Investigation** - Retained as forensic accounting consultant by counsel for owners of large food processor in South America to trace cash inflow and outflows from various bank and brokerage accounts located in various countries.

- **Cash Tracing Investigation** – Retained by counsel for large trust company to perform cash-tracing analyses to identify and summarize sources and uses of funds over a multi-year period.

- **Transactional Tracing** - Retained by counsel for private equity fund to perform tracing analysis of investor contributions, use of funds and withdrawals.

Internal Controls

- **Internal Controls and Forensic Accounting** – Retained by counsel for international fruit and vegetable producer as forensic accounting and internal controls expert in derivative civil litigation. Issued rebuttal expert report and provided deposition testimony.



**JASON FLEMMONS**

- **SEC ICFR Investigation** – Retained as accounting consultant by counsel for a client of oil and gas issuer in connection with an investigation by the SEC's Ft. Worth regional office involving assessment of internal control over financial reporting.  Assisted counsel in preparing Wells submission and in Wells presentation to the Director of the SEC's Division of Enforcement.

- **ICFR Remediation Assessment** - Retained by counsel for large pharmaceutical company to assess remediation of material weaknesses and other deficiencies of internal controls over financial reporting.

- **Internal Controls Consulting** - Retained by counsel for publicly traded technology company to assist with the company's internal controls assessments and conclusions surrounding material weaknesses.

**Testimony Experience**

- KBC Asset Management NV, et al vs. Twitter, Inc, et al, Civil Case No. 3:16-cv-05314-JST (Aug. 30, 2019)

- American Realty Capital Properties, Inc. Class Action Litigation, Case No. 1:15-mc-00040-AKH and related case Jet Capital Master Fund, L.P. et al. v. American Realty Capital Properties, Inc. et al., Case No. 1:15-cv-00307-AKH (June 27, 2019)

- Chiquita Brands International, Inc. Alien Tort Statute and Shareholder Derivative Litigation, Case 08-01916-MD-MARRA/JOHNSON and related cases 07-60821-CIV-MARRA, 08-80421-CIV-MARRA, 08-80465-CIV-MARRA,  08-80508-CIV-MARRA,  08-80480-CIV-MARRA,  10-60573-CIV-MARRA,  10-80652-CIV-MARRA, 11-80404-CIV-MARRA, 11-80405-CIV-MARRA, 18-80248-CIV-MARRA, 17-81285-CIV-MARRA, 17-80475-CIV-MARRA (Jan. 16, 2019)

- Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Debtors Petters Company, Inc., and PL Ltd., vs. Westford Special Situations Master Fund, L.P., et al, Court File No. 08-45257, Adv. No. 10-04396 (Nov. 13, 2018)

- Babak Hatamian, et al v. Advanced Micro Devices, Inc., et al, Case No. 4:14-cv-00226-YGR (Feb. 28, 2017)

- Chiquita Brands International, Inc. Alien Tort Statute and Shareholder Derivative Litigation, Case 08-01916-MD-MARRA/JOHNSON and related cases Julin et al. v. Chiquita Brands Int'l, Inc., No. 08-20641-CIV-MARRA; Pescatore et al. v. Chiquita Brands Int'l, Inc., No. 09-80683-CIV-MARRA; Sparrow v. Chiquita Brands Int'l, Inc., No. 11-80402-CIV-MARRA (Dec. 21, 2016)

**Speaking Engagements**

- Securities Docket – Securities Enforcement Forum 2020 (Virtual): "Regulator Spotlight – Q&A with Matt Jacques" (Oct 28, 2020)

- Securities Docket – Securities Enforcement Forum West 2020 (Virtual): "Financial Disclosure and Accounting Fraud" (May 12, 2020)

- AICPA Forensic and Valuation Services Conference (Las Vegas, Nev.): "The New Forensic Standards" (Nov. 4-5, 2019)

- Texas Law Book CLE Event (Dallas, Texas): "SEC Update with Regional Director David Peavler" (October 15, 2019)



**JASON FLEMMONS**

- University of Texas School of Law Government Enforcement Institute (Houston, Texas): "Financial Fraud Enforcement Trends:  A Look Around the Corner" (Sept. 13, 2019)

- AICPA webcast: "Introduction to Forensic Standards – Proposed Statement on Standards for Forensic Services (SSFS1 1)" (Dec. 10, 2018)

- AICPA Forensic and Valuation Services Conference (Atlanta, Ga.): "Professional Standards for Forensic Engagements" (Nov. 6, 2018)

- Securities Docket – Securities Enforcement Forum (Washington, D.C.): "Financial and Accounting Fraud" (Nov. 1, 2018)

- University of Texas School of Law Government Enforcement Institute (Dallas, Texas): "Financial Fraud Enforcement Trends:  A Conversation with the SEC and DOJ" (Sept. 20, 2018)

- Center for Professional Education (McLean, Va.), "SEC Enforcement Initiatives and Trends" (June 15, 2018)

- University of Texas School of Law Government Enforcement Institute (Houston, Texas): "Financial Fraud Enforcement: Public Companies, the SEC and the DOJ" (Oct. 26, 2017)

- SEC Hot Topics Institute (Dallas, Texas): "SEC Enforcement and Litigation, Including Ethical Issues" (September 14, 2017)

- Securities Docket Securities Enforcement Forum West (Palo Alto, Calif.): "Financial and Accounting Fraud" (May 10, 2017)

- AICPA Forensic and Valuation Services Conference (Nashville, Tenn.): "Focusing on the Standard of Care in Consulting Matters" (Nov. 8, 2016)

- University of Texas School of Law Government Enforcement Institute (Houston, Texas): "The Audit Committee and Government Enforcement: Where the Buck Stops" (Sept. 29, 2016)

- Securities Docket webcast: "SEC Enforcement – Key Developments in 2015" (Jan. 15, 2016)

- Practising Law Institute (via webcast): "Accounting Materiality: In Fraud or in Fair Weather" (Nov. 19, 2015)

- AICPA Forensic and Valuation Services Conference (Las Vegas, Nev.): "Forensic Lightning Round" (Nov. 10, 2015)

- American Bar Association 10th Annual National Institute on Securities Fraud (New Orleans, La.): "Financial Fraud: Still a Problem or Gone Forever?" (Oct. 1, 2015)

- Compliance, Governance and Oversight Council (Minneapolis, MN): "FCPA – Proactive Monitoring for Compliance & Risk Management" (Sept. 16, 2015)

- University of Texas School of Law Government Enforcement Institute (Dallas, Texas): "SEC and DOJ Financial Fraud Investigations" (May 13, 2015)

- "Key Issues Facing Board of Directors: New SEC Enforcement Initiatives and Corporate Governance Risks" (Dallas, Texas) (May 12, 2015)

- Securities Docket webcast: "SEC Enforcement – Key Developments in 2014" (Jan. 13, 2015)



**JASON FLEMMONS**

- AICPA Forensic and Valuation Services Conference (New Orleans, La.), "Recent Trends in Regulatory Enforcement" (Nov. 10, 2014)

- University of Texas 2014 Government Enforcement Institute (Dallas, Texas): "Accounting Fraud: The SEC's New Game Plan" (May 22, 2014)

- New York County Lawyers Association (New York, N.Y.): "Professional Responsibility for Lawyers, Accountants and Compliance Professionals" (March 25, 2014)

- Securities Docket webcast: "SEC Enforcement – Key Developments in 2013" (Jan. 8, 2014)

- AICPA Forensic and Valuation Services Conference (Las Vegas, Nev.), "Anatomy of a Regulatory Investigation" (Nov. 10, 2013)

- FTI Consulting and the Federal Bar Association (Washington, D.C.), "SEC Enforcement: Questions for the New Division Co-director on What Lies Ahead" (June 17, 2013)

- AICPA webcast: "Sorting through the FCPA – A Guide for Financial Professionals" (May 2, 2013)

- Association of Corporate Counsel (Houston, Texas), "Navigating Uncharted Water: Anticipating the Cold Winds of Dodd-Frank Enforcement" (Jan. 31, 2013)

- Securities Docket webcast: "SEC Enforcement – Key Developments in 2012" (Jan. 23, 2013)

- Center for Professional Education (McLean, Va.), "SEC Enforcement: The Current Landscape" (Sept. 21, 2012)

- American Law Institute (Chicago, Ill.), "Accountants' Liability: Litigation and Issues in the Wake of the Financial Crisis" (Sept. 14, 2012)

- Center for Professional Education (Shanghai, China), "SEC Enforcement Issues for Asia-Based Companies" and "Panel Discussion on U.S. Regulation" (June 18, 2012)

- SEC Speaks – Practising Law Institute (Washington, D.C.), SEC Chief Accountants' Panel (Feb. 25, 2012)

- Center for Professional Education 1st Annual SEC Reporting Conference (Beijing, China), "SEC Enforcement Update" (via webcast) (Dec. 16, 2011)

- Center for Professional Education (McLean, Va.), "SEC Enforcement Update" (May 24, 2011)

- SEC Speaks – Practising Law Institute (Washington, D.C.), SEC Enforcement Panel (Feb. 4, 2011)

- Center for Professional Education Conference on Revenue Recognition (Philadelphia, Pa.), "SEC Enforcement Actions Involving Revenue Recognition Issues" (Nov. 17, 2010)

- SEC Speaks – Practising Law Institute (Washington, D.C.), SEC Chief Accountants' Panel (Feb. 5, 2010)

- AICPA National Conference on Current SEC and PCAOB Developments (Washington, D.C.), "SEC Enforcement Update", Co-Presentation with the SEC's Division of Enforcement (Dec. 8, 2009)

- Asia Pacific Economic Cooperation: Financial Regulators' Seminar (Manila, Philippines), "Interview Techniques," "SEC Enforcement Jurisdiction," "Common Fraud Schemes," "Anatomy of SEC Auditor Investigations" and "Royal Ahold – An Accounting Fraud Case Study" (Oct. 19-21, 2009)



**JASON FLEMMONS**

- AICPA National Forensic Accounting Conference (Orlando, Fla.), "Ask the Regulators" Panel (Sept. 23, 2009)

- Center for Professional Education (Monarch Beach, Calif.), "SEC Enforcement Update" (June 26, 2009)

- Center for Professional Education (Shanghai, China), "SEC Enforcement Update" (June 8, 2009)

- Baruch College (New York, N.Y.), "Current Developments at the SEC" (Auditor Liability) (April 30, 2009)

- George Washington University (Washington, D.C.), "Royal Ahold – An Accounting Fraud Case Study" (March 4, 2009)

- Center for Professional Education (New York, N.Y.), "SEC Enforcement Update" (Dec. 17, 2008)

- Center for Professional Education (McLean, Va.), "SEC Enforcement Update" (Sept. 23, 2008)

- California Society of CPAs (Las Vegas, Nev.), "Anatomy of an Audit Failure" (May 15, 2008)

**Publications**

- AICPA Statement on Standards for Forensic Services No. 1 (June 2019)

- Top SEC Enforcement Events of 2014, Securities Docket column (Feb. 19, 2015)

- SEC Enforcement Statistics for Fiscal 2014 – Up or Down? Securities Docket column (Jan. 21, 2015)

- AICPA Forensic & Valuation Services Practice Aid "Forensic Accounting – Fraud Investigations" (October 2014)



**EXHIBIT 2**

## Documents, Materials, and Data Considered

The following categorizations are not exclusive:

### Regulations, Standards and Guidance

- Accounting Standards Codification, Master Glossary
- Accounting Standards Codification 250, *Accounting Changes and Error Corrections*
- Accounting Standards Codification 450, *Contingencies*
- AICPA Statement on Standards for Forensic Services No. 1
- Deloitte, "A Roadmap to Accounting for Contingencies and Loss Recoveries," 2019
- FASB Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*, May 1980
- FASB Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*, March 1975
- PCAOB Auditing Standard 2501, *Auditing Accounting Estimates*
- "Litigation Contingency Reporting: Where are we with FASB and the SEC?" Dialogue sponsored by the New York City Bar Association, comments by Wayne Carnall, Chief Accountant, Division of Corporation Finance, U.S. Securities and Exchange Commission, January 28, 2011

### Court Filings and Documents

- *United States of America v. Premdor Inc., Premdor U.S. Holdings, Inc., International Paper Company, and Masonite Corporation*, 1:01CV01696, Complaint, August 3, 2001
- *United States of America v. Premdor Inc., Premdor U.S. Holdings, Inc., International Paper Company, and Masonite Corporation*, 1:01CV01696, Competitive Impact Statement, August 3, 2001
- *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Complaint For Injunctive Relief, Damages, and Specific Performance, June 29, 2016.
- *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Motion for Judgment as a Matter of Law against Steves & Sons, Inc., February 8, 2018
- *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Jury Instructions, February 15, 2018
- *Steves & Sons, Inc. v. JELD-WEN, Inc.,* 3:16-cv-545, Jury Verdict Form, February 15, 2018
- *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Memorandum Opinion, September 28, 2018
- *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Memorandum Opinion, October 5, 2018
- *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, Final Judgment Order, December 14, 2018, amended March 15, 2019
- *In Re: JELD-WEN Holding, Inc. Securities Litigation*, 3:20-cv-112, Consolidated Class Action Complaint, June 22, 2020
- *In Re: JELD-WEN Holding, Inc. Securities Litigation*, 3:20-cv-112, Motion to Dismiss Hearing Transcript, September 25, 2020
- *Cambridge Retirement System v. JELD-WEN Holding, Inc., et al*, 3:20-cv-112, Opinion, October 26, 2020
- *In Re: JELD-WEN Holding, Inc. Securities Litigation*, 3:20-cv-112, Plaintiffs' Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, January 19, 2021

Expert Report of Jason Flemmons – February 1, 2021 – Exhibit 2

**EXHIBIT 2**

### Documents, Materials, and Data Considered

**JELD-WEN's SEC Filings**

- JELD-WEN Forms 10-K for the periods ended:
    - December 31, 2016
    - December 31, 2017
    - December 31, 2018
    - December 31, 2019
- JELD-WEN Forms 10-Q for the periods ended:
    - April 1, 2017
    - July 1, 2017
    - September 30, 2017
    - March 31, 2018
    - June 30, 2018
    - September 30, 2018
- JELD-WEN Forms 8-K as filed on the following dates:
    - May 9, 2017
    - November 7, 2017
    - October 9, 2018
- Other
    - Amendment No. 1 to Form S-1 Registration Statement filed August 1, 2016
    - Amendment No. 2 to Form S-1 Registration Statement filed September 13, 2016
    - Amendment No. 3 to Form S-1 Registration Statement filed November 17, 2016
    - Amendment No. 4 to Form S-1 Registration Statement filed December 16, 2016
    - Amendment No. 5 to Form S-1 Registration Statement filed January 4, 2017
    - Amendment No. 6 to Form S-1 Registration Statement filed January 17, 2017
    - Prospectus pursuant to Rule 424(b)(4) filed January 30, 2017
    - SEC Comment Letter, July 12, 2018
    - Response to the SEC Comment Letter, July 25, 2018
    - SEC Comment Letter, August 8, 2018

**JELD-WEN Presentations**

- JELD-WEN Investor Presentation (Q4 & FY 2016), February 22, 2017
- JELD-WEN Investor Presentation (Q1 2017), May 9, 2017
- JELD-WEN Investor Presentation (Q2 2017), August 8, 2017
- JELD-WEN, Royal Bank of Canada Global Industrials Conference, September 14, 2017
- JELD-WEN Investor Presentation (Q3 2017), November 7, 2017
- JELD-WEN, Robert W. Baird Global Industrial Conference, November 8, 2017

**JELD-WEN Press Releases**

- JELD-WEN Announces First Quarter Results; Raises 2017 Adjusted EBITDA Outlook, May 9, 2017
- JELD-WEN Announces Third Quarter Results; Updates Outlook for 2017 Revenue and Adjusted EBITDA, November 7, 2017
- JELD-WEN Announces Jury Verdict Steves & Sons Lawsuit, February 15, 2018
- JELD-WEN Announces Rulings in Steves & Sons Litigation; No Final Judgment on Antitrust Claims, October 6, 2018

2

Expert Report of Jason Flemmons – February 1, 2021 – Exhibit 2

**EXHIBIT 2**

## Documents, Materials, and Data Considered

- JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call, October 15, 2018
- JELD-WEN Announces the Departure of Brooks Mallard, CFO and the Promotion of John Linker to CFO, October 15, 2018

### JELD-WEN Earnings Call Transcripts

- Q4 2016, held February 22, 2017
- Q1 2017, held May 9, 2017
- Q2 2017, held August 8, 2017
- Q3 2017, held November 7, 2017
- Q4 2017, held February 21, 2018
- Q1 2018, held May 8, 2018
- Q2 2018, held August 7, 2018

### JELD-WEN Analyst Presentations

- Wedbush, February 2, 2017
- Barclays, February 21, 2017
- Wells Fargo, February 22, 2017
- Bank of America Merrill Lynch, February 24, 2017
- Wedbush, March 31, 2017
- Barclays, May 10, 2017
- J.P. Morgan, May 10, 2017
- Credit Suisse, June 22, 2017
- Wells Fargo, August 8, 2017
- Credit Suisse, November 7, 2017
- RBC Capital Markets, November 8, 2017
- Bank of America Merrill Lynch, February 16, 2018
- Gabelli & Company, February 20, 2018
- RBC Capital Markets, February 22, 2018
- Bank of America Merrill Lynch, October 8, 2018
- RBC Capital Markets, October 8, 2018
- Credit Suisse, October 15, 2018
- RBC Capital Markets, October 16, 2018
- J.P. Morgan, October 16, 2018
- Gabelli & Company, October 17, 2018
- RBC Capital Markets, November 7, 2018

### SEC Filings of Other Companies

- Becton, Dickenson, and Company Form 10-Q for the period ended March 31, 2017
- Blackhawk Network Holdings, Inc. Form 10-Q for the period ended June 14, 2014
- BP, Plc Form 20-F for the period ended December 31, 2010
- CalAmp Corp Form 10-K for the period ended February 28, 2018
- CalAmp Corp Form 10-K for the period ended February 28, 2019
- Carlyle Group Inc. Form 8-K filed October 31, 2017

3

Expert Report of Jason Flemmons – February 1, 2021 – Exhibit 2

**EXHIBIT 2**

### Documents, Materials, and Data Considered

- Gilead Sciences, Inc. Form 10-Q for the period ended September 30, 2016
- ION Geophysical Corporation, Form 10-Q for the period ended June 30, 2016
- ION Geophysical Corporation, Form 10-Q for the period ended March 31, 2014
- Jewett-Cameron Trading Company Ltd., Form 10-K for the period ended August 31, 2012
- PEN, Inc. Form 10-K for the period ended December 31, 2018
- Provident Financial Holdings, Inc. Form 10-K for the period ended June 30, 2016
- The Walt Disney Company Form 10-Q for the period ended July 3, 2010
- The Walt Disney Company Form 10-K for the year ended October 2, 2010
- The Walt Disney Company form 10-K for the year ended October 1, 2011
- SEC Comment Letter, The Walt Disney Company, February 22, 2012
- Response to SEC Comment Letter, The Walt Disney Company, March 23, 2012
- SEC Comment Letter, The Walt Disney Company, April 5, 2012
- The Walt Disney Company Form 10-Q for the period ended December 29, 2012
- Valeant Pharmaceuticals International, Inc. Form 10-Q for the period ended March 31, 2015
- Verisk Analytics, Inc. Form 8-K filed October 29, 2019

**Other**

- Deposition of Steven P. Feinstein, Transcript and Exhibits, January 30, 2021
- JW-SEC-01109346, JELD-WEN Accounting Topic Discussion Paper, Steve's Litigation, November 6, 2018
- Masonite International Corporation, Investor Presentation Transcript from Special Call, June 25, 2014
- Masonite International Corporation Investor Presentation, June 25, 2014
- Doorskin Product Agreement between JELD-WEN and Steves & Sons, May 1, 2012
- Report on Market Efficiency, Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA, January 4, 2021

**Exhibits to Feinstein Report**

- FEIN0000001
- FEIN0000002
- FEIN0000004
- FEIN0000006
- FEIN0000008
- FEIN0000009
- FEIN0000010
- FEIN0000011
- FEIN0000012

4

Expert Report of Jason Flemmons – February 1, 2021 – Exhibit 2

**APPENDIX 1**

The following companies disclosed the reversal of previously recognized litigation-related loss contingencies:

| Company | Reason for Reversal | Description |
|---|---|---|
| Becton Dickenson | Success on appeal. | In the first quarter of 2017, Becton Dickenson announced the reversal of a $336 million litigation liability following a favorable appellate antitrust ruling.  The liability, originally $341 million, had been recognized in the fourth quarter of 2013 after a jury returned a verdict against Becton Dickenson and awarded damages to the plaintiff in a monopolization claim.[1] |
| Blackhawk Network Holdings | Success on appeal. | After receiving an unfavorable jury verdict in 2012, Blackhawk Network Holdings had recognized a $3.9 million loss contingency related to a patent infringement lawsuit.  In the second quarter of 2014, an unfavorable ruling was reversed upon appeal, and the entirety of the previously recognized loss contingency was reversed.[2] |
| CalAmp Corp | Other changes in litigation. | As of November 2018, CalAmp had recognized a $19 million litigation-related contingent liability related to a patent infringement lawsuit.  The liability was first recorded in 2016 after a jury awarded the plaintiff damages, and the amount of the liability increased as the case continued.[3]  After the Federal Circuit Court remanded the case for a new trial, CalAmp reversed the entirety of the liability at its 2019 fiscal year end.  The litigation remains ongoing.[4] |
| Carlyle Group | Success in litigation. | In the third quarter of 2017, Carlyle reversed a $25 million contingent liability that had been recorded in 2015 after the company prevailed in litigation related to the insolvency of one of its subsidiaries.[5] |
| Gilead Sciences | Success on appeal. | In the first quarter of 2016, a jury awarded a competitor damages of $200 million in a patent infringement lawsuit, and Gilead recorded a $200 million contingent liability.  Gilead appealed the decision.  In the third quarter of 2016, the verdict was reversed, and Gilead reversed the liability.[6] |

---

[1] Becton, Dickenson, and Company Form 10-Q for the period ended March 31, 2017, Note 5 - Contingencies.

[2] Blackhawk Network Holdings, Inc. Form 10-Q for the period ended June 14, 2014, Note 8 - Commitments and Contingencies.

[3] CalAmp Corp Form 10-K for the period ended February 28, 2018, Note 18 - Legal Proceedings.

[4] CalAmp Corp Form 10-K for the period ended February 28, 2019, Note 19 - Commitments and Contingencies.

[5] Carlyle Group Inc. Form 8-K filed October 31, 2017, Exhibit 99.1

[6] Gilead Sciences, Inc. Form 10-Q for the period ended September 30, 2016, Note 10 - Commitments and Contingencies.

1

Expert Report of Jason Flemmons – February 1, 2021 – Appendix 1

**APPENDIX 1**

| ION Geophysical Corporation | Other changes in litigation. | In 2009, a competitor filed a patent infringement suit against ION Geophysical Corporation. As the matter proceeded, the company increased its contingent liability from $10 million to $120 million and then again to $193.3 million before reducing it to $123.8 million in the first quarter of 2014 as a result of a 2014 Court order.[7] In 2016, the Court issued final judgment against the company, and the liability was further reduced to $22 million.[8] |
|---|---|---|
| Jewett-Cameron Trading Company | Success in litigation. | In 2007, a court awarded a judgment against a Jewett-Cameron subsidiary. The company recorded a contingent liability and appealed. In 2011, the state appellate court ruled against Jewett-Cameron, and the company increased the amount of the liability to reflect the updated judgment amount and interest. In 2012, the Oregon Supreme Court ruled in favor of Jewett-Cameron, and the company reversed its approximately $1.5 million liability.[9] |
| PEN Inc. | Settlement less than loss accrued. | As of the end of 2017, PEN Inc. had recognized a contingent liability of $85,000 related to a legal settlement with an employee. Under a superseding agreement, the matter was settled in December 2018 for $24,000, and the remaining amount of the contingent liability was reversed.[10] |
| Valeant Pharmaceuticals International | Other changes in litigation. | In the fourth quarter of 2013, a court ruled that a subsidiary of Valeant had violated Russian competition law and awarded the plaintiff damages of $50 million. At that time, the subsidiary recognized a contingent liability of $50 million and appealed the decision. In the first quarter of 2014, the appellate court dismissed the plaintiff's claim in full. Valeant concluded that the loss was no longer probable and reversed the liability. The plaintiff then appealed and won another judgment of $31 million in April 2015. As of Q1 2015, Valeant had decided not to recognize a liability as the Company could not "predict the outcome of this appeal."[11] |

---

[7] ION Geophysical Corporation, Form 10-Q for the period ended March 31, 2014, Note 8 - Litigation.

[8] ION Geophysical Corporation, Form 10-Q for the period ended June 30, 2016, Note 7 - Litigation.

[9] Jewett-Cameron Trading Company Ltd., Form 10-K for the period ended August 31, 2012, Note 13 - Contingent Liabilities and Commitments.

[10] PEN, Inc. Form 10-K for the period ended December 31, 2018, Note 11 - Commitments and Contingencies. PEN, Inc. is currently known as Nano Magic, Inc.

[11] Valeant Pharmaceuticals International, Inc. Form 10-Q for the period ended March 31, 2015, Note 15 - Legal Proceedings.

2

Expert Report of Jason Flemmons – February 1, 2021 – Appendix 1