**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | ) ) ) ) |
|  | Civil Action No. 3:20-cv-00112-JAG |
| This Document Relates To: | ) ) ) |
| ALL ACTIONS. | ) ) ) ) ) ) ) |

Civil Action No. 3:20-cv-00112-JAG

CLASS ACTION

**REDACTED**

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF MOTION FOR CLASS CERTIFICATION AND**
**APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF DEFENDANTS' MISCHARACTERIZATIONS OF PLAINTIFFS'
        THEORY OF LIABILITY .................................................................................... 3

        A.      Defendants' Bifurcation of Plaintiffs' Unified Theory of Liability Improperly
                Reframes the Complaint as Actually Pled ............................................................ 3

                1.      The Complaint Alleges a Unified Theory of Liability and Damages ......... 4

                2.      The Court's Order Denying Defendants' Motions to Dismiss Confirms
                        Plaintiffs' Unified Theory of Liability ...................................................... 4

        B.      Plaintiffs' Economic Expert's Report and Testimony Support the Same Unified
                Theory of Liability and Damages ......................................................................... 5

III.    ARGUMENT ...................................................................................................... 6

        A.      Jeld-Wen Stock Traded in an Efficient Market ..................................................... 6

                1.      Defendants Offer No Expertized Evidence Challenging Market Efficiency
                        ................................................................................................................ 6

                2.      Defendants Fail to Rebut Dr. Feinstein's Conclusion that Jeld-Wen Traded
                        in an Efficient Market Throughout the Class Period ................................. 7

                        (a)     The Quiet Period Is Not Inefficient "as a Matter of Law".............. 7

                        (b)     Multiple Analysts Issued Reports During the Quiet Period............ 9

                        (c)     The Other *Cammer* Factors Also Support Market Efficiency ...... 10

        B.      Class-wide Issues of Reliance and Damages Predominate Over Individual Issues
                .............................................................................................................................. 12

                1.      Defendants' Price Impact Arguments Fail............................................... 12

                        (a)     Defendants Improperly Conflate a Lack of Statistical Significance
                                with a Complete Lack of Price Impact ........................................ 12

                        (b)     Defendants' Only Offered Evidence of Price Impact Is Irrelevant
                                to Plaintiffs' Theory of Liability................................................. 13

                                (i)     Flemmons' GAAP Analysis Is Irrelevant......................... 13

                                (ii)    Mr. Flemmons' Analysis Incorrectly Presumes the *Steves*
                                        Litigation Contingency Was Not New Information.......... 14

i

(iii)    Defendants Entirely Ignore Price Movement Related to Jeld-Wen's Reduction of EBITDA Margin ...................... 15

(c)    Defendants' Citation to a Handful of Analyst Reports Does Not Establish a Lack of Price Impact ................................................... 15

(d)    Defendants' Reliance on Plaintiffs' Investment Managers' Testimony Is Misplaced ................................................................ 16

2.    Plaintiffs Set Forth a Unified Theory of Class-Wide Damages ................ 17

(a)    Defendants' Argument Relies Entirely on the False Premise that Plaintiffs Allege Two Separate Theories of Liability ................... 18

(b)    Defendants' Attempts to Manufacture a *Comcast* Argument Must be Rejected ................................................................................ 19

C.    Defendants' Typicality Arguments Fail ................................................................. 20

IV.    CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aranaz v. Catalyst Pharmaceutical Partners Inc.*,
 302 F.R.D. 657 (S.D. Fla. 2014).................................................................................12

*In re BearingPoint, Inc. Sec. Litig.*,
 232 F.R.D. 534 (E.D. Va. 2006) (Ellis, J.)..................................................................20

*Berwecky v. Bear, Stearns & Co.*,
 197 F.R.D. 65 (S.D.N.Y. 2000) ...................................................................................8

*Bing Li v. Aeterna Zentaris, Inc.*,
 324 F.R.D. 331 (D.N.J. 2018), *aff'd sub nom.*
 *Vizirgianakis v. Aeterna Zentaris, Inc.*,
 775 F. App'x 51 (3d Cir. 2019) .......................................................................12, 13, 14

*Cheney v. Cyberguard Corp.*,
 213 F.R.D. 484 (S.D. Fla. 2003)....................................................................................9

*City of Cape Coral Municipal Firefighters' Ret. Plan*
 *v. Emergent Biosolutions, Inc., HQ*,
 322 F. Supp. 3d 676 (D. Md. 2018).............................................................................17

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)..............................................................................2, 6, 17, 19, 20

*In re Enron Corp. Securities Derivative*
 *&"ERISA" Litigation*,
 529 F. Supp. 2d 644 (S.D. Tex. 2006) ...........................................................................8

*Freeman v. Laventhol & Horwath*,
 915 F.2d 193 (6th Cir. 1990) .........................................................................................8

*In re Infineon Technologies AG Sec. Litig.*,
 266 F.R.D. 386 (N.D. Cal. 2009)...............................................................................7, 8

*In re Initial Public Offering Sec. Litig.*,
 471 F.3d 24 (2d Cir. 2006).............................................................................................8

*In re Initial Public Offering Sec. Litig.*,
 260 F.R.D. 81 (S.D.N.Y. 2009) ...................................................................................10

*In re Initial Public Offering Sec. Litig.*,
 544 F. Supp. 2d 277 (S.D.N.Y. 2008)............................................................................9

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ...................................................................................8

*Louisiana Municipal Police Emps. Ret. Sys. v. Dunphy*,
  2008 WL 700181 (D.N.J. Mar. 13, 2008)........................................................................17

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014)................................................................................10

*Monroe County Emps.' Ret. Sys. v. Southern Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019)......................................................................................12

*In re NetSol Technologies, Inc. Sec. Litig.*,
  2016 WL 7496724 (C.D. Cal. July 1, 2016)......................................................................9

*In re NII Holdings, Inc. Sec. Litig.*,
  311 F.R.D. 401 (E.D. Va. 2015) (Brinkema, J.) ........................................................11, 20

*Pearlstein v. BlackBerry Ltd.*,
  2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ....................................................................15

*Petrie v. Electronic Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) .......................................................................................9

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ..................................................................................12, 13

*In re SCOR Holding (Switzerland) AG Litig.*,
  537 F. Supp. 2d 556 (S.D.N.Y. 2008)..............................................................................7, 8

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) ..............................................................13, 14

*Thorpe v. Walter Investment Management, Corp.*,
  2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)..................................................................15

*Todd v. STAAR Surgical Co.*,
  2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ........................................................................6

*Vinh Nguyen v. Radient Pharmaceuticals Corp.*,
  287 F.R.D. 563 (C.D. Cal. 2012).....................................................................................6, 7

*In re Willis Towers Watson PLC Proxy Litig.*,
  2020 WL 5361582 (E.D. Va. Sept. 4, 2020) (Trenga, J.).................................................18

*Wilson v. LSB Industries, Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)................................................................9, 10

iv

*In re Xcelera.com Sec. Litig.*,
  430 F.3d 503 (1st Cir. 2005)..................................................................................................9

*Yi Xiang v. Inovalon Holdings, Inc.*,
  327 F.R.D. 510 (S.D.N.Y. 2018) ..........................................................................................17

## I.   INTRODUCTION[1]

Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Opposition") concedes that Plaintiffs satisfy all but two of Rule 23's requirements—predominance and typicality.  And aside from a passing, and completely unsupported, attack on typicality at the very end of their brief, Defendants' entire Opposition is nothing more than a series of predominance arguments, each formulated to reduce the scope of liability in this action. Moreover, Defendants construct these arguments by inventing a theory of liability predicated entirely on an improper bifurcation of the *unified, single* theory of liability that Plaintiffs *actually* allege in the Complaint.  Indeed, this invented case theory—while suited to the arguments Defendants try to advance—bears no relation to the factual and legal record.  As such, when Defendants' arguments are applied to the *actual* facts, and the Court's *actual* legal holding in rejecting Defendants' Motion to Dismiss, Defendants' attempts to avoid liability unravel.

First, Defendants try to trim damages by insisting—without offering any expert economic analysis—that the market for Jeld-Wen stock was inefficient during the first few weeks of the Class Period after the Company's IPO, known as the "Quiet Period."  Deliberately ignoring whole swaths of Plaintiffs' expert economist, Dr. Steven Feinstein's extensive empirical study— which establishes market efficiency *during the entire Class Period* (including the Quiet Period)—Defendants assert that a handful of factually inapposite cases support their market efficiency argument "as a matter of law."  But Defendants ignore key facts set forth by Dr. Feinstein, including that a significant number of analysts followed Jeld-Wen during the Quiet Period.  Indeed, Dr. Feinstein's conclusions belie any argument that the market was inefficient

---

[1] Unless otherwise stated, all: (i) capitalized terms shall have the meanings ascribed in the Opening Brief; (ii) internal citations and quotations are omitted; and (iii) emphasis is added. Plaintiffs adopt Defendants' defined terms for the purposes of this brief while denying that any distinct categories of statements or corrective disclosures exist in the Complaint.

during the Quiet Period.   In response to this showing, however, Defendants offer nothing. Tellingly, they fail even to offer any expert analysis whatsoever challenging Dr. Feinstein's conclusion, leaving his conclusions of an efficient market throughout the Class Period as the only evidence in the record pursuant to which the Court can base its opinion.

Next, Defendants claim a lack of price impact from both of the corrective disclosures established by Dr. Feinstein.   The *only evidence* Defendants offer to show *Halliburton II's required complete lack* of price impact, however, is the report and testimony of an *accountant*, Jason Flemmons, opining about the propriety, under Generally Accepted Accounting Principles ("GAAP"), of Jeld-Wen's October 15, 2018 announcement that the Company was taking a litigation charge and lowering its financial outlook.   Indeed, Flemmons ends any inquiry into this argument by admitting in sworn testimony that he *never analyzed the nature of the October 15, 2018 price decline*.   Further, Defendants do not address, let alone analyze, the price decline following Judge Payne's October 5, 2018 Divestiture Order.   Defendants therefore do not meet their burden under *Halliburton II*—in order to undercut the predominance element of Rule 23 and therefore defeat class certification—failing to establish that Jeld-Wen's stock price decline after the October 15, 2018 disclosure was unrelated to the concealed fraud.

Then, continuing to rely on their disingenuous reframing of Plaintiffs' unified theory of liability, Defendants manufacture an argument under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), contending that no common proof of damages exists, because Plaintiffs' theory is supposedly mismatched with Dr. Feinstein's damages model.   This is pure fiction.   Dr. Feinstein's damages model tracks the exact same theory of liability alleged in the Complaint and recognized by the Court, thereby establishing a class-wide damages model capable of common

proof.  The Court should not entertain Defendants' attempts to argue otherwise by misconstruing the clear record in this case.

Finally, Defendants argue that Plaintiffs "may" be atypical, based on unspecified "non-public" information their investment managers supposedly possessed.  Such bald and conclusory assertions do not even approach the standard required to defeat typicality, are unsupported by *any* evidence, and should not be indulged.

The Court should grant Plaintiffs' motion for class certification.

## II.    SUMMARY OF DEFENDANTS' MISCHARACTERIZATIONS OF PLAINTIFFS' THEORY OF LIABILITY

### A.    Defendants' Bifurcation of Plaintiffs' Unified Theory of Liability Improperly Reframes the Complaint as Actually Pled

Defendants' entire Opposition is predicated on an improper and incorrect reframing of Plaintiffs' theory of liability.  By selectively misquoting the record, Defendants willfully split the Complaint into two distinct theories of liability.  This bifurcation, however, is based *entirely* on Defendants' own regrouping of the alleged misstatements into two *independent* sets of allegations: one relating to what they call "the Pricing and Competitiveness Statements and the Divesture Decision" and the other relating to "the *Steves* Litigation Statements and the *Steves* Litigation Contingency."  Opp. at 4–10, Appendix A.  But Defendants' subjective association of (i) the Pricing and Competitiveness Statements *only* with one corrective disclosure—the October 5, 2018 Divesture Decision—and (ii) the *Steves* Litigation Statements *only* with the other corrective disclosure—the October 15, 2018 pre-announcement of Jeld-Wen's 3Q18 financial results—is invented whole-cloth, serving nothing but their own strained and otherwise unsupported Opposition.  Once shed of this deceptive cloak, these arguments fail.

3

### 1.    The Complaint Alleges a Unified Theory of Liability and Damages

Defendants simply ignore that the Complaint alleges that what they categorize as the "Pricing and Competitiveness Statements" and "the *Steves* Litigation Statements and Omissions" were **both** false for the **same unified**, underlying reason: Defendants' concealment of the actual source of their apparent success, *i.e.*, their undisclosed anticompetitive conduct. *Compare e.g.* ¶¶161, 194, 224 *with* ¶¶212, 228, 233. Moreover, with respect to the corrective disclosures, the Complaint alleges that the October 5, 2018 Divestiture Decision only **partially** corrected the so-called "Pricing and Competitiveness Statements." *See* ¶¶249–254. Indeed, contrary to Defendants' Opposition (Opp. at 8–10), Plaintiffs also allege that the October 15, 2018 announcement of the so-called "*Steves* Litigation Contingency" **fully** corrected **both** the *Steves* Litigation Statements **and** the Pricing and Competitiveness Statements. *See* ¶¶260–261 (October 15, 2018 disclosure corrected "Defendants' misrepresentations and omissions concerning the true source of Jeld-Wen's financial success—**Defendants' anticompetitive conduct**" and "**revealed new information** . . . surrounding the source of the Company's financial success," namely "**anticompetitive conduct**"). Accordingly, Defendants' assertion that "Plaintiffs have not argued or alleged that the *Steves* Litigation Contingency included any new information concerning JELD-WEN's alleged anticompetitive conduct"—the very basis for the *Steves* litigation—is simply unsupported by the record. Opp. at 10.[2]

### 2.    The Court's Order Denying Defendants' Motions to Dismiss Confirms Plaintiffs' Unified Theory of Liability

Contrary to Defendants' contentions, the Court's Opinion denying Defendants' Motions to Dismiss confirms Plaintiffs' unified theory of liability. Opp. at 10–11; 20. Indeed, while

---

[2] Defendants' cherry-picked quotations from Plaintiffs' Opposition to the Motion to Dismiss and the oral argument transcript fare no better. Opp. at. 9-10. Indeed, neither the Opposition nor the transcript contain any representations that the Divestiture Decision **fully** corrected the so-called "Pricing and Competitiveness Statements."

Defendants selectively quote the Court's discussion of the October 15, 2018 corrective disclosure as it pertains to the $76.5 million litigation charge (Opp. at 11), they conveniently omit what the Court emphasized in denying Defendants' loss causation argument: "*[o]nly after the October 15, 2018* announcements did the market *finally realize* that JELD-WEN had failed to disclose the threat *its anticompetitive practices posed to its financial outlook*." Opinion at 18. Thus, and contrary to one of the main arguments upon which Defendants' entire Opposition rests, the Court *did not* find that the Divestiture Decision *fully* corrected the so-called "Pricing and Competitiveness Statements."[3] Accordingly, Defendants' contention that the Court's Opinion supports their bifurcation theory (and the arguments that rely on that false premise) is wrong and Defendants' misleading portrayal of the Court's Opinion must be rejected.

### B. Plaintiffs' Economic Expert's Report and Testimony Support the Same Unified Theory of Liability and Damages

Plaintiffs' economist, Dr. Feinstein, consistent with Plaintiffs' unified theory of liability and the Court's Opinion, submitted an expert report establishing market efficiency.[4] Instead of relying on an expert to challenge market efficiency, however, Defendants simply misquote, or ignore, Dr. Feinstein's opinion to suit their arguments.

Dr. Feinstein concluded that the Divesture Decision was a partially corrective disclosure. ECF No. 122-1, Opening Br. Ex. A ("Feinstein Rpt.") ¶¶292–296. Nevertheless, because Defendants continued at the time to vehemently deny liability for any alleged anticompetitive conduct, and insisted that Judge Payne and the jury made many serious legal and factual errors, Dr. Feinstein opined that the decline in Jeld-Wen's stock price did not reach the 95% statistical

---

[3] For this reason Defendants' argument that the Class Period should begin on February 15, 2019 must be rejected. Opp. at 18-19.

[4] As required by the Court's Scheduling Order, Dr. Feinstein also tendered opinions on loss causation and damages, which are not issues relevant to market efficiency and class certification.

significance confidence level.  Ex. F ("Feinstein Tr.") 133:16–134:6; Feinstein Rpt. Ex. 8 at 192.

He also concluded that the October 15, 2018 3Q18 pre-announcement was a fully corrective disclosure of the remaining undisclosed falsehoods and omissions, causing Jeld-Wen's stock price to decline approximately 23.25%, a statistically significant decline at the 99.99% confidence level.  Feinstein Rpt. ¶¶297-300 & Ex. 8 at 192.  Dr. Feinstein also set forth a damages model establishing a class-wide methodology to calculate damages, as required by *Comcast*.  Feinstein Rpt. ¶¶301–303, 340–346.  Indeed, Dr. Feinstein created a damages model consistent with Plaintiffs' unified theory of liability by establishing that the October 15 2018 disclosure fully corrected all of Defendants' Class Period misstatements and omissions. Defendants have offered no opposing expert analysis challenging Dr. Feinstein's market efficiency and class-wide damages model opinions.

## III.    ARGUMENT

### A.    Jeld-Wen Stock Traded in an Efficient Market

#### 1.    Defendants Offer No Expertized Evidence Challenging Market Efficiency

Dr. Feinstein submitted an expert report concluding that Jeld-Wen stock traded in an efficient market throughout the Class Period.  Defendants, however, attempt to challenge efficiency with nothing but their own conclusory—and incorrect—assertion that, as a "matter of law," stocks ***never*** trade efficiently during the "Quiet Period" after an IPO.  This notable lack of expert evidence undercuts their attempt to rebut the *Basic* presumption.  *See Todd v. STAAR Surgical Co.*, 2017 WL 821662, at \*10 (C.D. Cal. Jan. 5, 2017) ("Defendants have not brought forth any expert or other evidence to contest Dr. Feinstein's findings," weighing "in favor of finding that [l]ead [p]laintiff has met his evidentiary burden" to establish market efficiency); *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012) (market efficiency

established where "no [d]efendant [] provided an expert's report to contest the analysis by [p]laintiffs' expert").

### 2. Defendants Fail to Rebut Dr. Feinstein's Conclusion that Jeld-Wen Traded in an Efficient Market Throughout the Class Period

Notably, Defendants concede market efficiency for 603 of the 628 days in the Class Period, contending that Jeld-Wen's stock traded in an inefficient market only during the period immediately following the January 26, 2017 IPO, known as the "Quiet Period."  Opp. at 22–23.[5] Defendants' argument relies, however, solely on their unqualified assertion that during the Quiet Period, "analysts cannot report concerning securities in an IPO" and that, therefore, the market was inefficient "as a matter of law."  Opp. at 22–23.  But applying the facts in this case, Dr. Feinstein analyzed multiple factors and empirical evidence in order to establish that the market during the Quiet Period was efficient.  In response, Defendants—offering no supporting expert opinion—ignore Dr. Feinstein's analysis and disagree based only on a handful of factually inapposite cases.  Opp. at 22.

#### (a) The Quiet Period Is Not Inefficient "as a Matter of Law"

Defendants assert that the market during the Quiet Period is inefficient *as a matter of law*.  *Id.*  Defendants are incorrect.  Indeed, Defendants' own cited case, *In re SCOR Holding (Switzerland) AG Litigation*, 537 F. Supp. 2d 556, 575 (S.D.N.Y. 2008) (Cote, J.), held that this argument "goes too far," and instead explained that there is a "rebuttable presumption" of inefficiency during the Quiet Period.  Here, Plaintiffs have rebutted that presumption and established market efficiency under the *Cammer* and *Krogman* market efficiency factors.  *See In*

---

[5] Defendants suggest that the Quiet Period should be 25 calendar days by citing to a rule superseded in 2015.  Opp. at 22.  Dr. Feinstein in his analysis of the Quiet Period cites to the 2015 operative SEC-approved FINRA Rule 2241(b)(2)(I)(i), which reduces the period to a minimum of 10 days.  Feinstein Rpt. ¶181.  Regardless, Dr. Feinstein's analysis establishes market efficiency no matter the length of the Quiet Period.

7

*re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386, 396 (N.D. Cal. 2009) (market efficiency established during Quiet Period when some *Cammer* factors met). Indeed, Dr. Feinstein's report and testimony have established that all relevant *Cammer* and *Krogman* factors were met **during** the Quiet Period. *Infineon*, 266 F.R.D. at 396; *see* Section III.A.2.(b)–(c).[6]

Defendants rely primarily on *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) ("*IPO*") to support their argument. *IPO*, however, based its holding on a Sixth Circuit decision which concerned only the market for municipal bonds. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) ("a primary market for newly issued **municipal bonds** as a matter of law is not efficient"). Although Defendants quote a portion of this holding from *Freeman*, they conveniently omit the critical language that limits the holding to municipal bonds.[7]

A more careful reading of Defendants' purported authority, however, reveals only that the plaintiffs **in those cases** did not establish efficiency at the time of the initial offering or during the subsequent quiet period. Here, however, Dr. Feinstein demonstrates that Plaintiffs did exactly that. In response, Defendants simply rely on other cases where plaintiffs failed to meet their burden with respect to the securities at issue in those cases. The unrebutted evidence **in this case**, however, establishes that the market for Jeld-Wen stock was efficient during the entirety of the Class Period, including at the time of the IPO and during the Quiet Period. *See* Declaration

---

[6] For this very reason, *SCOR* is easily distinguishable from this case because, there, "four of the five *Cammer* factors weigh[ed] against" market efficiency. 537 F. Supp. 2d at 578. As discussed below, here, four of the five *Cammer* factors weigh **in favor** of market efficiency.

[7] For the same reasons, *Freeman*, 915 F.2d 193; *In re Intelligroup Securities Litigation*, 527 F. Supp. 2d 262 (D.N.J. 2007); *In re Enron Corp. Securities Derivative & "ERISA" Litigation*, 529 F. Supp. 2d 644 (S.D. Tex. 2006); and *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000) (Opp. at 22–23) are inapposite. Additionally, Defendants' cases do not even consider all of the *Cammer* factors in concluding those markets were inefficient.

of Dr. Steven Feinstein in Support of Plaintiffs' Motion for Class Certification dated February 8, 2021 ("Feinstein Decl."), at ¶¶ 1-14. Ex. G.

### (b)    Multiple Analysts Issued Reports During the Quiet Period

Recognizing that Plaintiffs have demonstrated all the other relevant factors Defendants attack only *Cammer* factor two—analyst coverage. But as even Defendants recognize (Opp. at 23 n.8), and courts have held, "the only analysts whose reporting is restricted during the [Q]uiet [P]eriod are those affiliated with the issuer or underwriters of the securities," and therefore unaffiliated analysts may issue reports. *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 295–96 (S.D.N.Y. 2008). Here, multiple analysts did just that, satisfying *Cammer* factor two. *See*, Feinstein Tr. 79:8–17, 94:5–18; Feinstein Rpt. ¶182 & Ex. 1 (three reports by Canaccord, one by RBC, one by WedBush, one by Seeking Alpha, and consensus estimates by *FactSet* based on three analysts).[8]

Defendants also criticize Dr. Feinstein's reliance on the Seeking Alpha report, disparaging it as a mere "blog post." Opp. at 24–25. But Defendants are off-base. Courts consider a number of different sources when analyzing *Cammer* factor two, ***including Seeking Alpha reports***. *See, e.g.*, *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *6 (C.D. Cal. July 1, 2016) (*Cammer* factor two supported because four analysts and commentators issued reports, one of which was Seeking Alpha); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *11

---

[8] The cases upon which Defendants rely in arguing that Jeld-Wen was covered during the Quiet Period by too few analysts actually undercut their argument. Opp. at 24. For example, *Petrie v. Electronic Game Card, Inc.*, even noted "[t]here is no bright-line rule regarding" amount of analysts necessary, and acknowledged that one analyst has been considered enough. 308 F.R.D. 336, 350 (C.D. Cal. 2015). *See also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514–15 (1st Cir. 2005) (one analyst issuing a single report); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (two analysts). Here, Dr. Feinstein noted the existence of far more analyst coverage during the Quiet Period.

(S.D.N.Y. Aug. 13, 2018) (second *Cammer* factor met by one "large brokerage firm[,]" and three analysts including those that "were not well-known to the market").[9]

### (c)    The Other *Cammer* Factors Also Support Market Efficiency

Even assuming no analysts covered Jeld-Wen stock during the Quiet Period—an assumption unsupported by the facts—a finding of market efficiency during the Quiet Period would nonetheless be appropriate because *all the other market efficiency factors are met*. In fact, Defendants' cited authority certifies a class "given the strength of the [p]laintiffs' showings toward the *other measures* of market efficiency. Indeed, the *Cammer* factors are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431–32 (S.D.N.Y. 2014). Contrary to Defendants' incorrect claim that "he did not" do so (Opp. at 25), Dr. Feinstein did, in fact analyze each *Cammer* and *Krogman* factor and concluded the market was efficient during the IPO and Quiet Period.[10]

According to Dr. Feinstein, the market for Jeld-Wen stock was efficient during the Quiet Period. Feinstein Tr. 47:2–20; 59:4–9. Indeed, Dr. Feinstein testified that since the day of the IPO there was/were: ███████████████████ market makers in the IPO, factors that satisfy S-3 Registration Statement eligibility, a large market capitalization, a ██████████ float, and trading on the NYSE. Feinstein Tr. 49:20–51:25,

---

[9] Defendants' reliance on *In re Initial Public Offering Securities Litigation*, 260 F.R.D. 81 (S.D.N.Y. 2009) (Opp. at 25) is inapposite. Unlike that case, where the court "disregard[ed] reports during the [Q]uiet [P]eriod that merely mention the focus case stocks without providing new, useful information to investors," 260 F.R.D. at 99, Dr. Feinstein testified that the Seeking Alpha report provided ████████████████████████ ██████ Feinstein Tr. 86:2–10.

[10] Defendants' contention that "Feinstein recognized at his deposition that he should have separately analyzed each *Cammer* and *Krogman* factor at the time of the initial offering and during the quiet period" is yet another example of misquoting the record. Opp. at 23. Indeed, Dr. Feinstein testified that he analyzed the IPO and Quiet Period. Feinstein Tr. 59: 4-13.

10

60:19–23; Feinstein Rpt. ¶¶196, 202, 205, 209 & Ex. 4.  Additionally, Dr. Feinstein performed an empirical analysis under *Cammer* factor five, and found that it supported a conclusion of market efficiency.  Feinstein Tr. 63:3–13; Feinstein Rpt. ¶¶222–261.

Defendants further argue that since there was a 13% increase from the IPO placement price ($23) to the price on the first secondary market trading day (~$26), the market must not have been efficient at the IPO because that day's price did not reflect the information available to the market.  Opp. at 23.  Defendants misinterpret the significance of this fact.  Dr. Feinstein explained (and opined that analysts understood), that the Company and underwriters intentionally priced the IPO ███████████████████████████████████████ ███████████████████  Feinstein Tr. 65:20–66:8.  They did so because they knew the ██████████ ███████████████████████████████████  and the ██████████████████████ ██████████  could thus be compensated for purchasing in the IPO with the difference in price. *Id.* at 66:9–19.  As Dr. Feinstein opined, this in fact was ████████████████████████████ *Id.* at 67: 5–6.

Considering all the relevant factors, Plaintiffs have proved that the market during the *entire* Class Period was efficient.  *See In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 409 (E.D. Va. 2015) (Brinkema, J.) ("[N]o one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining [market efficiency]").  In light of the ample unrebutted expert and factual support Plaintiffs submit in support of market efficiency, the Court should reject Defendants' bald, misleading legal arguments to the contrary.

11

B.      **Class-wide Issues of Reliance and Damages Predominate Over Individual Issues**

1.      **Defendants' Price Impact Arguments Fail**

In order to rebut Plaintiffs' presumption of reliance, "the defendant is burdened with the daunting task of proving" a lack of price impact. *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 673 (S.D. Fla. 2014). "Defendants must demonstrate that the corrective disclosures played *no part* in the decline in the [c]ompany's share price." *Monroe Cty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019) (quoting *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *13 (S.D. Fla. Mar. 16, 2016)). Here, Defendants provide *no expert evidence whatsoever* to demonstrate a lack of price impact. Indeed, the only evidence they do provide— the report and testimony of *accountant* Jason Flemmons, who opines on GAAP treatment of litigation contingencies—is not based on any analysis of the price declines on either of the two corrective disclosure dates. Defendants have therefore failed to meet their burden and concede price impact. *See* Feinstein Decl. at ¶¶ 14-20.

(a)      **Defendants Improperly Conflate a Lack of Statistical Significance with a Complete Lack of Price Impact**

Defendants appear to argue that they need not affirmatively show a lack of price impact for October 5, 2018 merely because the stock price did not decline at a statistically significant level. In doing so, however, Defendants essentially argue that the lack of statistical significance suffices as a proxy for a lack of price impact. Defendants are wrong as a matter of law, and as a matter of economics. Courts routinely hold that the lack of a statistically significant price movement "does *not* prove the absence of price impact." *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018); *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 344–45 (D.N.J. 2018), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51,

12

53 (3d Cir. 2019).[11]  Indeed, while the Divestiture Decision did not result in a statistically significant price movement, it was nevertheless corrective and the stock price accordingly declined.  Feinstein Rpt. ¶291; Ex. 8 at 192.

### (b)    Defendants' Only Offered Evidence of Price Impact Is Irrelevant to Plaintiffs' Theory of Liability

#### (i)    Flemmons' GAAP Analysis Is Irrelevant

Defendants offer Jason Flemmons, an accountant, to analyze the so-called *Steves* Litigation Contingency in terms of GAAP.  Mr. Flemmons opines that the October 15, 2018 announcement did not constitute new information.  ECF No. 134-2, Opp. Ex. 2 ("Flemmons Rpt.") ¶¶13-14.  But this GAAP analysis is completely irrelevant to whether the information communicated in the October 15, 2018 announcement impacted Jeld-Wen's stock price—an analysis Mr. Flemmons admits he did not perform.  Ex. H ("Flemmons Tr.")56:2–3; 67:12–68:10.  Indeed, GAAP is never mentioned in the Complaint or any other place in the record.  Moreover, courts have found that accounting expert reports ***such as this one***, which fail to contain an event study ***assessing price impact***, do not support an assertion of a complete lack of price impact.  *See*, *e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *13 (S.D.N.Y. July 10, 2019) ("Defendants' failure to broaden the scope of [the expert's] assignment or supplement his report with an event study showing the absence of price impact is, on its own, a basis for rejecting Defendants' arguments."); *see also Pirnik*, 327 F.R.D. at 45 (same).

In fact, the only arguably relevant point of Mr. Flemmons' report which relates to price impact is uncontroversial: on October 15, 2018, Defendants ***did*** announce the *Steves* Litigation Contingency, among other corrective information relevant to Plaintiffs' allegations.  Flemmons Rpt. ¶¶45, 71.  Mr. Flemmons' analysis of price impact stops there.

---

[11] Additionally, in this case, the price reaction to otherwise corrective information was likely counteracted by Defendants' continued denials of wrongdoing.  Feinstein Report ¶¶293, 296.

13

Indeed, during his deposition, Mr. Flemmons readily admitted: ███████████

███████████████████████████████████████████████ Flemmons Tr.112:7–9.

Thus, because Defendants "did not perform an independent event study" or "a price impact

assessment," Defendants cannot "demonstrate the absence of a price impact, [and] Plaintiffs'

presumption of reliance stands unrebutted." *Bing Li*, 324 F.R.D. at 345; *Signet*, 2019 WL

3001084, at *13–17.

          **(ii)**    **Mr. Flemmons' Analysis Incorrectly Presumes the**
                  ***Steves* Litigation Contingency Was Not New**
                  **Information**

Further, Defendants' and Mr. Flemmons' contention that the announcement revealed no

new information is inaccurate, and is contradicted by Mr. Flemmons' deposition testimony.

Flemmons Rpt. ¶¶74–76; Opp. at 26–27, 29; Flemmons Tr.111:6–22.  When Jeld-Wen

announced the *Steves* Litigation Contingency on October 15, 2018, Defendants informed

investors, ***for the first time***, that they believed the outcome of the *Steves* litigation was ██████

██████████ and quantified the negative repercussions from the verdict and Divestiture Order

on the Company's EBITDA margins.  Feinstein Rpt. ¶¶142, 271, 297; Flemmons Rpt. ¶72;

Flemmons Tr. 99:18–103:12.  Again, Mr. Flemmons does not contest this fact, and plainly

conceded that Defendants' consideration of the result of the *Steves* litigation as being ████████

████████████ was ***new information on October 15, 2018***.  Flemmons Tr.111:6–22.[12]

Moreover, Mr. Flemmons' citation to one analyst that reported ████████████████████

████████████████████████████████████████████ also fails to demonstrate a

---

[12] Mr. Flemmons also directly contradicts Defendants' argument that investors fully understood the misleading nature of the so-called "*Steves* Litigation Statements" when the October 5, 2018 Divestiture Decision was issued.  Opp. at 27.  Indeed, he admits that the Divestiture Decision was ███████████████████████████████████████ and it would take ████████ ████████████████████████████████ to determine if recognizing a loss contingency was required under GAAP.  Flemmons Tr. 113:19–114:6; 115:23–117:13.

14

complete lack of price impact. Flemmons Rpt. ¶75. As stated below, many analysts were very concerned by the new information revealed by Defendants' announcement of the *Steves* Litigation Contingency and the financial impact of increased competitiveness. *See* Section III.B.1.(c); Feinstein Rpt. ¶¶142–145, 150. Moreover, Defendants' assertion that one analyst's opinion that the reaction was ▮▮▮▮▮ merely underscores the undisputed fact that the market reacted, in a statistically significant way, to the October 15, 2018 news. Indeed, Dr. Feinstein's' unrebutted opinion reaches the same conclusion. Feinstein Rpt. Ex. 8 at 192.

### (iii) Defendants Entirely Ignore Price Movement Related to Jeld-Wen's Reduction of EBITDA Margin

Finally, neither Defendants nor Mr. Flemmons mention, much less demonstrate, a complete lack of price impact attributable to the stock decline related to Jeld-Wen's EBITDA margin reduction, which was announced on October 15, 2018 with the *Steves* Litigation Contingency. Feinstein Rpt. ¶307; *see* Section III.B.1(b)(ii). Instead, in hopes that the Court will adopt their strained bifurcation theory of liability, Defendants simply ignore the portion the stock price movement attributed to the reduction in EBITDA margin. However, such stock price movement is properly included under Plaintiffs' unified theory of liability.

### (c) Defendants' Citation to a Handful of Analyst Reports Does Not Establish a Lack of Price Impact

Without any supporting expert analysis to argue against price impact, Defendants instead rely only on a few cherry-picked analyst reports that purportedly do not mention the *Steves* Litigation Contingency. Opp. at 28. However, "[t]hat market commentary did not mention the corrective disclosure does not by itself mean that the corrective disclosure had no price impact." *Thorpe*, 2016 WL 4006661, at *14; *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *21 (S.D.N.Y. Jan. 26, 2021) ("presence or absence of analyst commentary, while of interest, is not a scientifically accepted method of demonstrating price impact or its absence").

15

Moreover, contrary to Defendants' claim otherwise (Opp. at 28 n.12), Dr. Feinstein cited many analysts who found the announcements on October 15, 2018 of particular importance and shifted their valuations and view of Jeld-Wen accordingly.  Feinstein Rpt. ¶¶142–145, 150 (Credit Suisse: reduced price target by 23.3% –"operational challenges and headwinds related to the outstanding litigation make for greater uncertainty"; JPMorgan: reduced price target by 32.3% – "a more competitive backdrop for the door industry" could "negatively impact both JELD's and DOOR's margins"; RBC: "unfavorable litigation ruling [would] remain an overhang on JELD's valuation"; Deutsche Bank: "Steves legal provision puts a number on the cost of the legal action; however, it doesn't take into account the potentially serious disruption from the forced divestiture of the Towanda plant").

### (d)     Defendants' Reliance on Plaintiffs' Investment Managers' Testimony Is Misplaced

Defendants also erroneously claim that Plaintiffs' investment managers' testimony somehow supports the conclusion that the *entire* "*market* saw the *Steves* Litigation Contingency as a non-event." Opp. at 28.[13]  Defendants' argument is inapposite and does nothing to rebut Dr. Feinstein's economic analysis that the October 15, 2018 news resulted in a statistically significant decline in Jeld-Wen's stock price.  As stated above, analysts *did* consider the revelations on October 15, 2018 important.  *See* Section III.B.1.(c), *supra*.  Accordingly, what Plaintiffs' individual investment managers may have believed is not relevant for price impact purposes, even if such beliefs supposedly contradict Plaintiffs' allegations that the October 15,

---

[13] Contrary to Defendants' argument, Wellington believed Defendants had to ███████ ███████████ and  Defendants' ███████ ██████████████████ ECF No. 134-4, Opp. Ex. 4 ("Wellington Tr.") 140:22–141:5.

2018 announcement revealed new information.[14]  *See Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 531 (S.D.N.Y. 2018) (investment manager's own understanding of the facts related to the fraud does not defeat class certification); *Louisiana Mun. Police Emps. Ret. Sys. v. Dunphy*, 2008 WL 700181, at *5 (D.N.J. Mar. 13, 2008) (certifying class even though testimony of "investment manager contradicts the allegations in the complaint").

### 2. Plaintiffs Set Forth a Unified Theory of Class-Wide Damages

Defendants' argument that Plaintiffs cannot establish class-wide proof of damages must be rejected by the Court because, as with the rest of the Opposition, it is based entirely on the same improper reframing of Plaintiffs' theory of liability.  Opp. at 16–20.  Defendants' motive for recasting Plaintiffs' theory is clear: by inventing two separate theories of liability, they hope to fit the facts of this case into the rare circumstances that defeated class certification in an antitrust case, *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).[15]  In *Comcast*, the complaint alleged four ***different theories*** of liability, three of which were dismissed.  *Id.* at 31.  But because the proposed damages model assumed the applicability of all four theories, the Court found the model incapable of common proof.  *Id.* at 36–37.  However, the Complaint here, and the Court's Opinion denying Defendants' Motions to Dismiss support only one, ***unified*** theory of liability.  *See* Section II, *supra*.  Indeed, this single, unified theory is ***exactly*** what Dr. Feinstein employs in his unrebutted class-wide damages methodology.  *Id.*  Nothing more is required at this stage to

---

[14] For the same reason, Defendants' argument that Plaintiffs' investment manager purchased shares following a corrective disclosure is also irrelevant to price impact.  Opp. at 28.

[15] Courts recognize that *Comcast*'s unique facts render it generally inapplicable to most securities class actions, where damages are predicated on observable stock prices. *See*, *e.g.*, *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 692 (D. Md. 2018) (As an antitrust case*, Comcast* "in no way announced a rule that plaintiffs in a securities fraud case must put forth any particular damages calculation methodology.  *Comcast*, therefore is of no use in critiquing [] Plaintiffs' proposal that classwide calculation of out-of-pocket damages is possible and appropriate in this specific case").

17

establish that damages can be calculated on a class-wide basis.  *See In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at \*11 (E.D. Va. Sept. 4, 2020) (Trenga, J.) (courts need only "determine whether [p]laintiff's damages model sufficiently purports to measure damages on a class-wide basis in a manner 'consistent' with its theory of liability").

> ### (a)    Defendants' Argument Relies Entirely on the False Premise that Plaintiffs Allege Two Separate Theories of Liability

Defendants again fall back on their improper framing of Plaintiffs' theory of the case in attacking common proof of damages through a series of unsupported and misleading assertions. As discussed above, this tactic should not be indulged.  *See* Sections II and III.B.2, *supra*. Adding to their misleading portrayal of the allegations here, Defendants baselessly contend that the October 5, 2018 Divestiture Decision ***fully corrected*** the so-called "Pricing and Competitiveness Statements."  *See* Opp. at 19 ("Based on Plaintiffs' argument, which the Court accepted in allowing this case to proceed, by the time of the *Steves* Litigation Contingency announcement, the Pricing and Competitiveness Statements ***had already been corrected*** by the Divestiture Decision . . . .") (emphasis in original); *see also* Opp. at 16.  Defendants also erroneously challenge Dr. Feinstein's damages model as invalid, claiming that "Plaintiffs' damages model does not ***match*** their remaining liability theory because it seeks to recover damages for the Pricing and Competitiveness Statements" and "because the *Steves* Litigation Contingency could not have corrected either the Pricing or the Competitiveness Statements . . . Plaintiffs' attempt to certify a class for claims based on those statements should be denied." Opp. at 17–18 (emphasis in original).  Defendants' arguments should be summarily rejected.

Indeed, as discussed in Section II, *supra*, Plaintiffs ***never alleged nor argued*** that the October 5, 2018 Divestiture Decision ***fully*** corrected any statements.  Neither do Plaintiffs' Opposition to the Motion to dismiss nor the oral argument transcript state otherwise.  ECF Nos.

86 at 27; 94. Contrary to Defendants' arguments (and conveniently omitted from the Opposition), *the Court expressly endorsed* Plaintiffs' unified theory that the October 15, 2018 announcement revealed new information related to the so-called "Pricing and Competitiveness Statements": "*[o]nly after the October 15, 2018* announcements did the market *finally realize* that JELD-WEN had failed to disclose the threat *its anticompetitive practices posed to its financial outlook*." Opinion at 18.

Because Defendants' attacks on Dr. Feinstein's damages model are predicated on these erroneous assumptions, they must fail. Indeed, consistent with the unified theory of liability, Dr. Feinstein's damages model concluded that the Divesture Order was a *partial* corrective disclosure (Feinstein Rpt. ¶¶292–296) and that the October 15, 2018 announcement *fully* corrected *both* the so-called "Pricing and Competitiveness Statements and the *Steves* Litigation Statements" (*id*. ¶¶297-300). Dr. Feinstein's unrebutted statistical and economic analysis concluded that it would be appropriate to apply a model attributing damages caused by those revelations on a class-wide basis. *Id*. Therefore, the Court should reject Defendants' challenges to Dr. Feinstein's class-wide damages model.

### (b) Defendants' Attempts to Manufacture a *Comcast* Argument Must be Rejected

Relying on their baseless reframing of Plaintiffs' theory, Defendants manufacture a *Comcast* argument, asserting that Plaintiffs' theory of liability and damages model are somehow "mismatch[ed]." Opp. at 17, 20. But, as explained above, no such mismatch exists. *See* Sections II, III.B.2.(a), *supra*. Indeed, Dr. Feinstein's approach for modeling damages is entirely consistent with the unified theory of liability set forth in the Complaint and adopted by the Court. Dr. Feinstein articulates a step-by-step approach to calculate damages by using a universally accepted event study methodology that employs information and evidence common to all Class

19

members—all of which is unrebutted by any expert economic evidence. Dr. Feinstein's model measures both the artificial inflation in Jeld-Wen stock for the entire Class Period and out-of-pocket damages for all Class members. Accordingly, the Court should reject Defendants' attempt to create a *Comcast* argument where there simply is none. *See In re NII*, 311 F.R.D. at 413 (plaintiffs established class-wide damages methodology based on the "standard formula for assessing damages under Rule 10b-5, which is the artificial inflation at the time of purchase" and noting "the Fourth Circuit has not articulated any requirement of a fulsome classwide damages model at the certification stage").

### C. Defendants' Typicality Arguments Fail

Defendants' attempt to portray Plaintiffs as atypical must fail because it is also not supported by any facts in the record. Opp. at 13–14; 29–30. A typical class representative is one who "possess[es] the same interest and suffer[s] the same injury as the class members." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) (Ellis, J.). Despite Defendants' vague assertions to the contrary (and unsupported by a single factual citation), Plaintiffs have suffered the same injury as the rest of the class. Namely, they were harmed by Jeld-Wen's failure to disclose its anticompetitive conduct. Further, while Defendants make a passing reference to "non-market" information Plaintiffs *may* have possessed, they offer *no evidence* showing that either of Plaintiffs' investment managers traded on material, non-public information. Accordingly, Defendants' attacks on Plaintiffs' typicality fails.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3); (ii) appoint the Proposed Class Representatives as Class Representatives; (iii) appoint Co-Lead Counsel Robbins Geller and Labaton Sucharow as Class Counsel; and (iv) appoint Cohen Milstein as Liaison Counsel.

20

DATED: February 8, 2021         Respectfully submitted,

COHEN MILSTEIN SELLERS & TOLL PLLC
STEVEN J. TOLL (VSB No. 15300)
JOSHUA HANDELSMAN (Admitted *pro hac vice*)

*/s/ Steven J. Toll*

Steven J. Toll

1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
Telephone: 202/408-4600
202/408-4699 (fax)
stoll@cohenmilstien.com
jhandelsman@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*

LABATON SUCHAROW LLP
JAMES W. JOHNSON (Admitted *pro hac vice*)
MICHAEL H. ROGERS (Admitted *pro hac vice*)
JAMES T. CHRISTIE (Admitted *pro hac vice*)
PHILIP J. LEGGIO (Admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
jjohnson@labaton.com
mrogers@labaton.com
jchristie@labaton.com
pleggio@labaton.com

*Counsel for Co-Lead Lead Plaintiff Public Employees'*
*Retirement System of Mississippi and the Class*

21

ROBBINS GELLER RUDMAN &
    DOWD LLP
ROBERT M. ROTHMAN (Admitted *pro hac vice*)
MARK T. MILLKEY (Admitted *pro hac vice*)
WILLIAM J. GEDDISH (Admitted *pro hac vice*)
VINCENT M. SERRA (New York Bar only)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
mmillkey@rgrdlaw.com
wgeddish@rgrdlaw.com
vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
    & DOWD LLP
DEBRA J. WYMAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com

*Counsel for Co-Lead Lead Plaintiff Plumbers and
Pipefitters National Pension Fund and additional
Plaintiff Wisconsin Laborers' Pension Fund, and
the Class*

22

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2021, I caused a copy of the foregoing document to be filed with the Clerk of the Court via CM/ECF, which will send a notice of electronic filing to all registered users.

_/s/ Steven J. Toll_

Steven J. Toll
VA Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005

_Liaison Counsel for Lead Plaintiffs_
