IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re: JELD-WEN Holding, Inc.

Securities Litigation                          ,

                    3:20 CV 112

Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge

ZOOM hearing

March 4, 2021
Richmond, Virginia

Rush transcript

Gilbert F. Halasz, RMR
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, Virginia 23219
(804) 916-2248

APPEARANCES


LABATON SUCHAROW LLP

by:  Michael Howard Rogers, Esq.

COHEN MILSTEIN SELLERS & TOLL

by:  Steven Jeffrey Toll, Esq.

James Johnson, Esq.

MCGUIREWOODS LLP

by: Brian Charles Riopelle, Esq.

KIRKLAND & ELLIS LLP

by:  Sandra Goldstein, Esq.

CHRISTIAN & BARTON

by: Roman Lifson, Esq.

ROBBINS GELLAR RUDMAN & DOWD LLP.
by:  Robert Michael Rothman, Esq.


FRIED FRANK HARRIS SHRIVER & JACOBSON

by:  Peter Lawrence Simmons, Esq.

THE CLERK:  Ready to call the case, Your Honor.

THE COURT:  Please call the case.

THE CLERK:  Case number 3:20 CV 112.

In RE: JELD-WEN Holding, Inc. securities litigation.

Mr. Steven Toll, Mr. Robert Rothman, Mr. James Johnson and Mr. Michael Rogers are here on behalf of the plaintiff.

Mr. Brian Riopelle, Sandra Goldstein, Mr. Peter Simmons and Mr. Roman Lifson are here on behalf of the defendants.

Are counsel ready to proceed?

MR. RIOPELLE:  We are.

THE COURT:  All right.  Good afternoon, everyone.  Thank you for assembling today on the internet.

We are here on plaintiffs' motion for class certification, and I will hear from the plaintiffs on it.  I have read the papers.  And I am somewhat familiar -- I mean, pretty familiar with your arguments.

I also have some other questions to ask you. Who is going to be the chief spokesman for the plaintiff today?

MR. ROGERS:  I will be, Your Honor.  Michael

Rogers.

THE COURT:  For the defense?

MR. RIOPELLE:  It Sandra Goldstein for Kirkland Ellis will be handling it.

THE COURT:  Okay.  Great.

Let me just ask you a question that may not be exactly on point to what we are doing today, but does the Fourth Circuit's ruling in the Steves case recently have any effect on this case?  Does it change plaintiffs' claim or the defendants' defenses based on the fact that -- as I understand it -- and I read the decision -- as I think relevant today, to us, is the way the 150 or 170 million-dollar damage award and substitutes -- and puts The Court's imprimatur on the divestiture of the Towanda, Pennsylvania JELD-WEN thing.

Mr. Rogers?  I know this is not anything you are prepared for today, but perhaps you have thought about it some.

MR. ROGERS:  Actually that IS the first sentence in my outline.

I think I need to answer that in A little bit of nuisance manner.  To the extent that it may influence the reason that we are here today, which is certification of the class, I would posit

strongly that it does not.  Doesn't affect things, number one, as Your Honor notes, we are not here to discuss the merits today; secondarily, my esteemed colleague may disagree, but I don't think it has anything to do with the class certification oriented issues.

THE COURT:  What about the case in general?

MR. ROGERS:  On the merits I think I would suggest it probably helps the plaintiffs more in what it doesn't do.  Meaning that perhaps had the Steves Fourth Circuit reversed in some way, that may have at least suggested overarchingly that our theories of falsity and scienter had some problems. But, I think the fact that the circuit has affirmed the ruling of Judge Payne, I think it adds a little additional boltering to our allegation of falsity and of scienter which, as Your Honor knows, are two important prongs of what we have to prove.

I think it also could have some influence on loss causation.  If Your Honor wants to put me on the spot, I am willing to RIF on that a little bit.

THE COURT:  That is okay.

MR. ROGERS:  I would like to think it over.

THE COURT:  Does it affect damages at all?

MR. ROGERS:  I don't believe it does because --

THE COURT:  If it was known at the time would it have --

MR. ROGERS:  Again, arguably it could affect loss causation with the qualifier I would rather not postulate without knowing, it doesn't affect damages.  It is a measure of damages at a very, very high level is merely what was the amount of artificial inflation in the JELD-WEN stock price as a result of the defendants' falsehood and omissions, and what caused harm to the investors when that part of the artificial inflation came out.

So what happened in underlying in that case or what happened to the price of the stock, you know, frankly a few years after the end of the class period I don't believe that is germane to damages at all.

THE COURT:  All right.  Thank you.

Ms Goldstein, did you want to, as Mr. Rogers says, would you like to RIF on that?

MS GOLDSTEIN:  Well, like Mr. Rogers I won't RIF too much, Your Honor.  But I will say that certainly the Clayton Act construct is different than the securities law construct.  So I really don't think there is a, that there is a lot of relationship here, Your Honor.  I believe actually,

Your Honor, I asked Mr. Rothman last time at the motion to dismiss hearing whether he thought the Fourth Circuit decision would have impact on their claim.  And he answered, no.  I agree with that, Your Honor.  I don't think the Fourth Circuit decision has much impact.  As I said, the construct is very different and what has to be shown in this case is very different than what gets shown in a Clayton Act case.

THE COURT:  Okay.

Well then, Mr. Rogers, now you can proceed to RIF on the issues that are before us today.

MR. ROGERS:  I think rather than RIF I will stick more to what I rehearsed and leave the improvisation for my rebuttal.

So, as I begin, Your Honor, my intention is obviously the papers that both parties have submitted are pretty extensive.  I don't attempt to attempt to rehash.  I think what I will do is very briefly sort of summarize why we are here.  And then I will primarily look initially to two of the arguments that the defendants have made.  One regarding the question of whether the market was sufficient throughout the class period; and then secondarily the question of whether class claims

predominate.  With an eye towards the way we have argued the way we have framed our allegations.

THE COURT:  As I see it, there really is not any issue as to numerosity, commonality, adequacy, superiority or maybe -- or ascertainability.  The issue we seem to be litigating here is typicality and predominance.

MR. ROGERS:  That is generally correct, Your Honor.  Although I would say, unless it is a particular question that you want me to deal with or you want me to address, I am going to pretty much allow our papers to stand for what happened in typicality.  As Your Honor knows, the defendants made what I would call frankly a throwaway argument in one paragraph at the end of their brief.  I believe they say that some of the lead plaintiffs may have traded on some non-specified, non-substantiated, non-public information.  So I don't have anything to add to that unless Your Honor has questions, but I will --

THE COURT:  No, I don't.  So let's then -- really we are talking predominance.

MR. ROGERS:  Again, I will just begin by talking about these two general subjects.  I will reserve whatever time for rebuttal if there is

anything that Ms Goldstein says today to respond to.

So in terms of the market sufficiency question I think it is useful to look in the first instance that unlike most of these cases I know Your Honor mentioned in passing at the motion to dismiss argument that you had never either judged or even litigated a securities case.  But, I am sure you have read the voluminous papers that were submitted. It is normal in these cases to have a bit of a battle of the experts.  As you know, under Halliburton II we have a burden of establishing market efficiency, which I will argue in a moment we have got.  When the defendants can occasionally challenge market efficiency they might say some of Cammer or Krogman factors were not met, and if they don't challenge market efficiency, which, again, we argue they did not, then the question goes to price impact, which is the more --

THE COURT:  Do the defendants have an expert on market efficiency?

MR. ROGERS:  They do not, Your Honor.

The expert that they have submitted, loosely speaking, on economic issues, Mr. Shell, who has opined on lost causation of damages, you will see him at Daubert or and summary judgment, but in his

deposition he said, and I quote, "I did not express any opinion one way or the other on the existence or lack of existence of efficient market."

And Justice Roberts himself explained in Halliburton II, which as you know is the economical test that we are following for this issue, he said, Basic, as in Basic Elevetha, made clear that presumption could be rebutted by appropriate evidence. Including evidence that the asserted misrepresentation or correction did not affect the market place of the plaintiffs' stock; nor is there dispute that the defendants may introduce price impact evidence at the class certification stage. Defendants can introduce evidence at class certification of lack of price impact as some evidence that the market is not efficient."

Now, far be it from me to accuse our Chief Justice of being redundant, but he used the word "evidence" five times in that paragraph. He didn't say defendants can rebut the presumption of legal conclusion. He didn't say rebut with citation to case law. Justice Roberts said you can rebut it with evidence. As Your Honor pointed out, they have not put any expert forward for market efficiency. And as I will point out in a few moments, they did

put forth an expert to, I think, support their predominance argument on price impact. But that was an accountant. And he said, I am not here to opine on price fixing. I was a bit confused on that as well. But the important point there is hasn't been any evidence put forward. Nevertheless, the defendants have, you know, have challenged the market efficiency and what is called the quiet period following the IPO.

Their argument seems to be as a matter of law the quiet period is not efficient. Again, there is no evidence to support that, nor expert testimony. But that is just not the case. There is multiple cases we cited in our reply brief, so I won't go into excruciating detail, but case after case, including cases the defendants cited, like Score Holding or the remand of the IPO decision that basically say the opposite.

Again, it is important because, just to conceptualize, it is the use of evidence. Market efficiency can be established in the IPO when some Cammer factors are met. It goes too far to say it is a matter of law, it is a rebuttable presumption. It could be rebutted. Again, efficiency during the quiet period. The IPO remand, the case they cite at

the circuit court level goes into great detail about the amount of evidence you can put forward in order to establish the IPO and the quiet period were efficient.

So, I think you will -- again, I won't belabor this, it is cited to in our reply papers. I can certainly go into more detail if Your Honor wants to, or I need to respond to Ms Goldstein. But our expert, you know, we have put forward Dr. Finestein, an economist, and he opined that the entire class period was sufficient. You know, without looking at the entire question, but even looking to the quiet period there were two reports the day before the IPO. There was one report by Canaccord the day after. Canaccord covered Onex. And the entirety of that report dealt with Onex ownership of JELD-WEN and analyzed assets of JELD-WEN's profitability. The market cap was enormous form the start. I believe there was 660 million shares traded on the first day. The float was very large, the percentage of the market cap. There is no high trading volume disclaimers in the various analysts' report that came later which indicated that -- again I just want to pause for a moment. I am sure The Court understands what needs to be quiet during the quiet

period is commentary by the very people who are underwriting the transaction.

THE COURT:  Not by independent analysts.

MR. ROGERS:  Correct.

So on February 21st UVS and Goldman Sachs, Morgan Stanley, all the usual suspects they immediately started issuing reports and made all sorts of disclaimers indicating that they indeed had underwritten the IPO, which explains why there was such an incredible amount of liquidity.

So from the first day of the class period also you had a company that had been covered in detail before it went public by these same analysts.  All the S-3 eligibility requirements were met.  They were not able to file the S-3 in that first year.  That is a regulatory rule.  But the requirements were met.

And one last point before I move on, unless The Court has a question, is defendants tried to make a big deal over the fact that the IPO price is $23 and then one day later it is bumped up to a little over $26.  There is nothing remotely remarkable about that.  As a matter of fact there is commentary from economists and finance people that say that is not only normal, but the underwriters do that on

purpose.  Basically an IPO, they are doing it because they want liquidity.  They need liquidity for their underwriting, and they set the price deliberately lower as a result -- as an effort to get that liquidity supplied.  I think that also leads to another important point that the defendants haven't really looked to, which is that courts in determining market efficiency are not concerned with what economists might call fundamental efficiency.  Which means, effectively, is the stock price accurate reflection of the underlying cash flow, and the present day valuation of those future cash flows, you know, the types of things that investors need to valuate the stock opts.  It is clear in this case, the case law as well as multiple non-law economic articles indicate, that what matters is informational efficiency.  Is the available information embedded in the stock price?  That happens in this case from the very first day.  Everybody bought at the same price.  The very same underwrites who were quiet during the quiet period, they were, you know, underwriting the initial issuing.  There is no indication based on Dr. Finestein's analysis that there was any informational inefficiency.  So the fact that the

stock the price went up $3 the next day not only is not anything controversial it would have been and should be expected.

THE COURT:  But they say that some of the so-called analysts that you used are possibly internet crackpots, to put it in sort of blunter terms than they do.

MR. ROGERS:  They do that say that.  They don't say internet crackpots.  They certainly meant that.  That is their spin on it.  I have read the seeking out reports in question.  More importantly, Dr. Finestein has read the report.  In his deposition he said -- and I apologize I don't have the quotation, but I swear that I am accurately paraphrasing -- he said if one of my economics students had written that report I would have given him an A.  He opined that the quality of the seeking out reports was top notch, it read like an analyst's report.  It dealt with valuation principals, it dealt with the value of the stock, it dealt with their cash flow, it dealt with all the metrics that you would expect an analyst to look at.  Defendants went to call it a blog.  Dr. Finestein did not agree with that at all.  He calls it an internet platform that hosts various commentary.  And in addition,

again, there is two points I want to make in addition to that. One is there was another report, the Canaccord report, which is a straight analyst report. The defendants don't claim that was not a "real analyst report." There is literature as well as case law that suggests even as much as one analyst could satisfy Cammer II, but in additional you don't look to one Cammer fact, you look at all of them. I think the defendants are conveniently ignoring, again, through their assertion, not through any kind of evidence, but that Dr. Finestein analyzed that and he found that the other factors, like S-3 eligibility, the float, the market cap, the existence of market makers, the satisfaction of Cammer V, which is the economic reaction, all of those were satisfied. But even giving the defendants the argument that perhaps we have to throw out the two seeking out reports, which I strenuously argue we do not have to throw them out, it doesn't change the fact that Dr. Finestein has satisfied this initial burden to establish market efficiency, the defendants have presented no evidence to refute that.

If you don't have any more questions on the IPO and efficiency, I will move on to the second prong.

THE COURT:  Go ahead.

MR. ROGERS:  As we said, again, I hate to belabor this but it is fundamental underpinning of the argument.  Defendants have made effectively two predominance arguments.  One is a what I call Comcast argument, which effectively says that we have not established a damages model that would allow class treatment of damages to predominate over the individual.

And they also make effectively a price impact argument in a bit of disguise.  I think they don't put any evidence forward, and they don't meet their burden via expert evidence or other evidence.  But they do make the argument.

Both of these arguments hinge completely on, I would say a misunderstanding, but I am not going to use the word "misunderstanding," because I think it is a willful misapprehension of what our class case theory is.

I think the way to understand -- again, I know Your Honor is familiar with this from the papers so I will just jump into it -- I think it is useful to look to the complaint, for example.  What were the reasons in the complaint why we allege that the statements were false?  The "pricing and competitive

statement," of course we didn't call it that, that is the label, JELD-WEN was engaged in anticompetitive conduct through its acquisition of CMI and subsequent conduct toward independent door manufacturers and that allowed the company to improve profit margin and earn an appropriate return on investment capital.  That is why we allege that what they frame as the pricing and competitive statements were false.

Now, they also have this label for another state of statements.  The claim it is a separate set statements called the Steves litigation statement. Again, we didn't allege it that way, but for the sake of argument, let's look why the Steves litigation statements were deemed false.

JELD-WEN was engaged in anticompetitive conduct in violation of Clayton Act section VII through its acquisition of CMI and subsequent conduct toward door manufacturers.

If this sounds familiar, it is the same order. And therefore a final ruling against JELD-WEN was likely, and would likely have a material impact on JELD-WEN business.  So all of the statements in the case, the entire case, is based on one, and one and only, set of concealed information which otherwise

would have belied the false statements.  That was that JELD-WEN was engaging in anti competitive conduct which allowed them to give the appearance of having been better margins and the appearance of business success.

That is the only theory of the case, Your Honor.

THE COURT:  Mr. Rogers, that raises another question to me, and I will take you down a road you can RIF on again.

If this case goes to trial will plaintiffs have to prove that Steves case all over again?

MR. ROGERS:  The quick answer to that is no. And the answer is based on two facts.  Again, I don't mean to sound glib, but I have to give an honest answer.  We have to prove our case.  We don't have to prove the Steves case.  We have to prove that there were material misstatements knowingly made that were false that caused damage, you know the rigmarole.

THE CLERK:  But the false statements were that they were engaged in anticompetitive conduct and with respect to Steves, and really the rest of the industry.  That is what Steves had to prove in their case.  Is that what you have got to prove in this

case?

MR. ROGERS:  Well, to prove the element of falsity I will posit that we will have to prove that they were engaged in some kind of anti competitive conduct.  Now, I believe Mr. Rothman said this to you back during the motion to dismiss.  I will give him credit as I repeat it.  Whether there was a violation of Clayton Act VII, or whether there was violation of the Sherman Act.  It is many years since I practiced antitrust law.  I apologize.  We don't have to prove that there were statutory violations whether under a private cause of action like Steves or a public cause of action, but --

THE COURT:  Prove they were lying.

MR. ROGERS:  Yes.  And lying about the fact that the reason for their business success was not from, you know, pricing -- well, it was pricing discipline, but not -- you know it wasn't based on a competitive market, and it wasn't based on their ability to have sales, it was based on the fact that they duped the DOJ to approve the CMI acquisition, they broke the supply agreements with Steves, and they utilized that market power against door manufacturers and that they also cooperated with -- again Your Honor knows this case very well -- they

cooperated with Masonite to fix pricing.  So are the underlying claims going to be similar?  Yes.  To prove falsity would we have to prove many of the same things that Steves litigants had to prove?  Yes.  But I would strenuously argue that, no, we don't have to re-litigate and prove the Steves litigation all over again.

THE COURT:  All right.  Go ahead.  I'm sorry.

MR. ROGERS:  No, no, not a problem at all.

So, again, as I said, is that creation of this two prongs of the case, which doesn't exist.  Once you take the small step back and acknowledge that there is a unified theory of liability here, and that the reason for every misstatement, I mean, Your Honor, it could be one misstatement, or could be 9,000.  In this case it happens to be, I don't have a number off the top of my head, but I think about 15 so, the reason they are false is all the same.

Therefore, price impact is demonstrated by what happened to the price in relation to those statements.  That is what we are here to deal with today.  We will be back with you in a few months for summary judgment, that is where we resuscitate many of these same arguments in favor of loss causation.  We will deal with them again.  But for the moment we

are only looking at price impact.  I want to make it clear, Your Honor, that the defendants have not done anything to break the prima facie demonstration that we have made of market efficiency.  So the burden is on the defendants to, as it was called in Halliburton II, to completely I sever the link between the misstatement and the price.

So the burden is not on the plaintiff.  I am going to go ahead in a moment and I am going to give you a few examples of the ways that we have established price impact as if the defendants had met their burden of production.  And then we are going to persuade you that we have the better of the day.  They haven't even met their burden of production, let alone of persuasion.  They put no expert testimony forward.  I will quote Mr. Perchell.  "I have been asked by counsel for the defendants to analyze the economic evidence," that is very important, "as it relates to Professor Finestein's opinion on loss causation and the amount of the alleged artificial inflation in JELD-WEN's stock price during the quiet period."  That is what causation, Your Honor.  As you Your Honor also knows, under Halliburton I that can't be before the court on the merits.  Defendants don't even claim it

is.  They don't use Mr. Perchell in any way in connection with their price impact argument.  They just don't do it.

You know, there is many cases.  One I can give you, I think it is called Signet Jewelers.  It says "Failure to broaden the scope of an assignment or supplement the expert's report with an event study showing the absence of price impact is on its own a basis for rejecting the defendants' argument."

That is all on all fours to what we have here, Your Honor.  They don't put forth an event study, they don't put forth any evidence to suggest any way that they can sever the, the link between the statements and the price.

What do they do?  They put forth an accountant, Mr. Flemmons.  What did Mr. Flemmons do?  Well, he performed an irrelevant analysis.  What did he do? He looked at GAAP and he determined that JELD-WEN appropriately took their litigation charge under GAAP.  As Your Honor knows there is no GAAP allegation in this case.  This case has nothing to do with GAAP.

THE COURT:  But what they are saying is that is not necessarily a false statement, it is just some accounting mumbo jumbo under GAAP that they have to

do essentially to set up a reserve, I guess.

MR. ROGERS:  And that is --

THE COURT:  It sounds like that is what they are saying.

MR. ROGERS:  What I am trying to suggest is it does not do anything to Halliburton to set up a link between the statement and the price.  It just, again, it is not relevant to what is at issue.  On his deposition when Mr. Flemmons was asked what corrective information was, he used the term "corrective" as it is dealt with in accounting, not the way it is dealt with by economists like Dr. Finestein or like Mr. Perchell, and Mr. Perchell used for many purposes.  Most importantly, Flemmons, Mr. Flemmons admitted that JELD-WEN's decision to announce that losses were probable and estimable -- Your Honor knows that is the GAAP standard for when you look at, (unintelligible), that was new information.  The defendants' whole argument is posited that there is no new information on October 15, 2018.  But their own expert says there was new information.  The new information that he opined on, which is that it was at that moment probable and estimable what the losses would be.

So somehow they don't support the right kind of

expert evidence, but the evidence they put forward, I don't believe it helps them. Again, so what did Mr. Flemmons not do? He did not look at any statements in the case. Not any of them. He did not measure the price impact on either disclosure date. He did not determine what investors knew (inaudible). He did not analyze any of the Cammer or Krogman factors. He did not look at the charge outside of the GAAP context. And he also did not address the effect of JELD-WEN's continued denial.

I would like to seg-way into that point briefly. The defendants, leaving aside their theory, which is that, you know, one kind of misstatement was trick on the 5th and the other kind of misstatement was trick on the 18th, we have already discussed where why that theory does not work. Taking October 5th as it is, there is two points that I want to make there. One is defendants seem to try to suggest that there was no correction, there was nothing, nothing happened on that date. But that is just not true. The price went down, and it went down quite a bit. What it didn't do was drop by what Dr. Finestein considered a statistically significant amount for the purposes of his loss causation or damage analysis, which is not

before us today.

But Dr. Finestein was very clear in his testimony, and the case law is also very clear that the stock price very definitely did drop.  In a moment I will get to why it dropped by the amount it did.  Again, there is many, many, cases.  Many.  The Pentravos case from the Second Circuit, the Monroe County employees, in Northern District of Georgia just last week.

THE COURT:  Well, they say the price dropped because the company had poor earnings.

MR. ROGERS:  They say that for October of '15, Your Honor.  They say that the price did drop on October 5th in reaction to Judge Payne's divestiture order.  But they are saying that because it didn't drop by a statistically significant amount that demonstrates there is no price impact on that day.  That is not true.  The case law does not suggest that, and there is no court --

THE COURT:  Well, if it is not statistically significant, how could you say that it is -- it was caused by that?  I mean, they are saying I guess that it just could have been one of those things that happens in the stock market every once in a while where things go up and down for reasons nobody

knows.

MR. ROGERS:  I think it is interesting to note the use of the word "cause" there.  That is, again we will probably be back in few months dealing with the same issues on loss causation on different argument at that point.  Loss causation is not before us.  Again, at the moment -- and Dr. Finestein has reserved his right to reconsider this as evidence in discovery may change his opinion.  But for the moment as an initial matter what he is saying is he does not have the 95 percent or higher confidence level as to the precise cause of the drop and the breakdown between fraud related and not fraud related information.

THE COURT:  Your expert has reserved the right to change his opinion?

MR. ROGERS:  No.  He has reserved the right to address whether -- well, yes.  In other words, if there is evidence that comes out that would suggest there is a significant reason for the drop, he has a duty to update his report based on evidence.  But for the moment --

THE COURT:  Are all the expert reports in by now?

MR. ROGERS:  Yes, they are.

THE COURT:  And the defense doesn't have an economist, is that what you are telling me, Mr.Rogers?

MR. ROGERS:  They do, but only for loss causation and damages.  In other words for the merits.

THE COURT:  Okay.  They don't have one on the liability issue?

MR. ROGERS:  Well, on these classes they don't have -- none of these classes should putting a price impact on market efficiency.  One point Dr. Finestein did make, and the factual record bears it out, is that on October 5 the defendants coupled their acknowledgment of Judge Payne's divestiture order with the same denial that they had been using all through the class period.  Basically saying that litigation has no merit, we are going to appeal it, we cannot -- we cannot discuss whether the loss is probable or estimable.  So, in Dr. Finestein's opinion one of the explanations for why the price did go down -- again I want to make that clear, Your Honor, the price did drop, there was correct information and price did go down -- the reason he suggested it may not be statistically significant is because unlike October 15th -- and I will get to

that in a moment -- it was coupled with denial.

What was different about the 15th?  On the 15th they no longer denied it, and they took the charge. The charge that they had said all through the class period this Steves litigation is nonsense, it is not good, we don't believe it, we are going to appeal it, we cannot make any kind of an estimate of loss contingency.  Yet within a few days after Judge Payne's divestiture decision now they changed course and actually came out and said that it was probable and estimable.  It is interesting if you look at one of their --

THE COURT:  Mr. Rogers, let me remind you that I have read your brief.  Okay?  You don't need to cover everything that is in it.  Why don't we -- do you have sort of the Readers Digest version of your brief that you can give us now?  And then we can hear from Ms Goldstein.

MR. ROGERS:  You would like the brief version of my brief is what you are saying right now.  Okay.

I will just make one more point, and then I will pass the baton.

During the second quarter of 2018 -- this is just one example -- the defendant said in talking about the Steves litigation, they said, "however, if

a judgment is entered in accordance with the verdict and it is ultimately upheld after exhaustion of our appellate remedies it could have a material adverse effect on our cash flow."  So, in other words, what they are saying to the market is, we are not going to take a charge, we are not going to acknowledge liability, we are not going to acknowledge anything as being probable or estimable until we appeal. But, as we know, they didn't to that.  On October 15 they took the charge.

So the information on October 5 was important and it did impact the stock price.  And then the information that came out on the 15th, which is that they now determined that the liabilities were probable and estimable, and that they were serious, that was additional big news.  And that was very statistically significant stock drop of approximately 99.9 percent.

As Your Honor has hinted, I have a few other points, which I will either save for rebuttal or I will save them for your reread of our brief.

Thank you.

THE COURT:  Thank you very much.  Good job, Mr. Rogers.

All right.  Ms Goldstein.

MS GOLDSTEIN:  Good afternoon, Your Honor. Thank you.

So, since the parties were last here in front of Your Honor on the motion to dismiss there have been a number of important changes, developments in the case that really matter today.  They matter for the case generally and they matter today for class certification.

So, obviously, counsel was talking about the pricing and the competition statements.  Your Honor was familiar with those.  The pricing statements are about pricing discipline, pricing optimization strategy, delivering growth with positive pricing. And those are the statements in the complaint that plaintiffs have said were inaccurate, false and misleading.  And then there is the competition statements along the lines of that the door and windows industry is highly competitive.  Those are the competition statements.

When the parties were here at the motion to dismiss hearing plaintiff's argued that JELD-WEN hid the truth about the alleged anticompetitive conduct until Judge Payne issued detailed factual findings in which he found that JELD-WEN had engaged in anticompetitive conduct.  Your Honor, they said, in

their opposition papers they said it was only with the issuance of the divestiture decision that the market began to appreciate the true nature of defendants' misconduct.  That is at page 17.  They said at pages 27 and 28 that it apprised the market for the first time that anticompetitive behavior was the true reason for the company's success, not pricing optimization and pricing discipline as the defendants had claimed.  They said the divestiture decision at the motion to dismiss hearing, Mr. Rogers said the divestiture decision was when "Investors were finally able to discover who knew what and when."

And they obviously cited to their complaint for a bunch of this as well, Your Honor.

So they took Your Honor in the motion to dismiss briefing and argument down the path, and in the complaint -- down the path that led Your Honor to decide that the divestiture decision is what corrected those pricing competition statements.  So again, there are a lot quotes, Your Honor, I won't read all of them, but for the motion to dismiss decision Your Honor makes clear "The confirmation of the allegations of the Steves allegations by an unbiased source, Judge Payne, constitutes a

disclosure of new facts that an investor could reasonable rely on to make investment decisions."

And your Honor said, "The divestiture decision revealed that JELD-WEN knowingly engaged in a long-running anticompetitive conspiracy to artificially inflate prices in the door skin and INV, interior molded door industry."

That "The divestiture decision revealed the true basis of JELD-WEN's profitability.  And that The Court would require JELD-WEN to divest itself of the Towanda plant."

"Contrary to the defendants' arguments the divestiture decision does say something about the plaintiffs' conspiracy related to interior molded doors because it provides a detailed factual recitation confirming that JELD-WEN engaged in an anti-competitive conspiracy to inflate the price of the primary components of INVs, door skins, thereby reducing competition in the INV market."

And then, Your Honor, I could go on.  Your Honor says, "Only after Judge Payne issued the divestiture decision" --

THE COURT:  Well, okay.  I have some recollection of my decision.

MS GOLDSTEIN:  That is right.  Thank you.

THE COURT:  Thank you for reminding me of it.

MS GOLDSTEIN:  You are welcome, Your Honor.

But it is important, Your Honor, they took you down that path.  That is where Your Honor went.  I totally understand it.  But it turns out, Your Honor, that we now know that the market did not care about the divestiture decision.  There was no statistically significant stock drop, and therefore their expert is not modeling damages around that decision.

Your Honor, that is a gigantic development here because there is no way, there is no way at this point for them to candidly say that the divestiture, that the pricing competition statements, are still in this case.  Because they were all clarified.

Again, Your Honor, we didn't even think that divestiture decision was really clarified anything.  But we are past that.  We lost that argument.  But now it is clear that there is no damages that can possibly result from that.

Your Honor, no damages means no class certification.  So plaintiffs are obviously exceedingly unhappy about that development.

THE COURT:  Here is the thing, Ms Goldstein.  This is what I get in every class action.  You say

that it should not be certified because we are going to win the case.  That is the argument that every defendant makes in a class action, is that we are going to win the case, therefore there should not be a class action.  I don't think that is correct.

MS GOLDSTEIN:  Right, Your Honor.  That is not what I am saying.  I am not saying it should not be certified because we are not going to win the case, because we are going to win the case.  I'm saying it can't be certified because their liability theory and their damages theory don't match.  So at the most --

THE COURT:  Okay.  That is different.  That is saying you are going to win the case, Ms Goldstein.

MS GOLDSTEIN:  It's not, Your Honor.

Your Honor can't certify -- predominance matters.  And this is where, and this is where Comcast comes in, right, this is Supreme court, Comcast --

THE COURT:  Comcast was a case where they had four theories.  They threw three of them out.  And the expert relied on one of them, and he couldn't do that because three fourths of the basis of his opinion was gone.  Right?

THE DEFENDANT:  Yes, but the same thing is

happening, the exact same thing is happening here. And those plaintiffs, these defendants also could have said, we are going to win the case. But that is not what the court said. The court said, and I'm quoting, "It follows that you model purporting to serve as evidence of damages in this action must measure only those damages attributable to that theory. If the model does not even attempt to do that, but cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of rule 23 b 3. Any model supporting a plaintiffs' damages case must be consistent with its liability case." That is what Comcast says.

I think what Your Honor might be getting at is some overlap here. There is no question there is some overlap between what The Court has to look at here and what The Court will ultimately look at on the merits. But Comcast talks about that as well and says there is some overlap with merits. It says, such an analysis will frequently entail overlap with the merits of the plaintiffs' underlying claim. That is because class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiffs' cause of action.

So, sure, there is some overlap.  If we don't win here on this particular issue, sure we are going to argue similar things down the road.  But it is Your Honor's obligation, again Comcast, The Court's duty to take a close look at whether common questions predominate over individual ones.

If the damages model doesn't work, then the class cannot be certified that includes those people.

So, Your Honor, it is absolutely clear that, you know, unlike what Your Honor said about the 149 page decision that clarified the pricing competition statements, what Your Honor said that the litigation contingency, which is the litigation announcement, which Your Honor called the liability announcement -- and it might be helpful, I don't know if Your Honor has it, but if you look at what Your Honor said about that is -- I could -- it is docket 7935, which we will talk about in a minute, But what Your Honor said about it is that announcement --

THE COURT:  What they say, without ten thousand words, is JELD-WEN lied about competition the whole time.  They lied from beginning to end.  And the truth eventually came out in a couple of ways.  And

it affected the market.

MS GOLDSTEIN:  But, Your Honor, that is what they are saying now.  What they said before is that the truth came out on the pricing competition issue.

THE COURT:  What we are dealing with now.  They say JELD-WEN lied from beginning to end, and then JELD-WEN may not have lied, I don't know.  For all I know, candidly, their reaction to Judge Payne's decision strikes me more as a sort of a litigation --

MS GOLDSTEIN:  But your Honor.

THE COURT:  -- but if that is their theory, can't you move forward on that?

THE DEFENDANT:  No.  We have to, you have to -- as The Court said, the Supreme Court said, look closely.  The disclosure on October 15th, as Your Honor noted, really is mostly about some quarter results being bad, and fiscal year guidance being taken down, and the CFO left that day, and that is really why all of this, why the stock went down. But that is for another day.  But there is one paragraph in there, and I am happy to read, I don't know if Your Honor has it, but --

THE COURT:  Don't read it.

MS GOLDSTEIN:  Sorry, Your Honor.

THE COURT: You don't need to read it.

MS GOLDSTEIN: Okay.

So, I won't, Your Honor. But all it does is talk about the charge that is about to be taken. There is no way, there is no way that the words we are going to take this charge for 76 point 5 million dollars corrects the lying that they talk about from beginning to end. You have to in securities litigation match up the alleged misstatements with the ultimate -- right, sure, the ultimate statements, that is the disclosure. If you can't do that then they can't, they can't certify -- the class can't be certified unless the damages and the liability model match.

And they don't here, Your Honor.

THE COURT: All right. What other arguments do you have?

MS GOLDSTEIN: If Your Honor is going to certify -- I missed that.

THE COURT: I said, what other arguments do you have?

MS GOLDSTEIN: Sure. Well, I would say, Your Honor, if Your Honor disagrees with us on complete class certification on this point, at the very least, Your Honor --

THE COURT:  There ought to be -- I ought to limit it to a lesser period.

THE DEFENDANT:  Correct, Your Honor.  Exactly. Because they, at least the model would match up.  If you start it at February 15th, 2018, which is when their first allegation is with respect to the Steves complaint, the Steves litigation, then that would at least match up with the remaining damages model that they have.

THE COURT:  Okay.

MS GOLDSTEIN:  So that -- okay.  Any other issues that, speaking of that one, Your Honor -- and I will speak about this quickly -- but on the price impact point, which is what Halliburton talks about, it's not actually talking about market efficiency, Halliburton is talking about price impact -- what that says is that if we can show -- I am putting aside the pricing and competition statements now, because I am assuming those are out, but for purposes of what remains, which is, you know, with respect to the October 15th disclosure, if we can show that the link between the alleged misstatements and the price plaintiffs paid is severed, then those are out as well, Your Honor.

So, just for that briefly, Your Honor, the --

on that one there is -- excuse me.  I lost my place.

THE COURT:  Take your time.

THE DEFENDANT:  Sure, Your Honor.  Thank you.

So, the evidence that, you know, once the pricing competition statements are out, and we are just talking about the Steves litigation statements, the issue now is that the evidence that we have seen so far, Your Honor, has revealed through discovery that the litigation contingency, which is what we are talking about, the thing that happened on the 15th that was spoken about on the 15th, that the litigation contingency could not have impacted JELD-WEN stock.  If that is the case, then even for those statements the class can be certified.  So what we are saying, Your Honor, is that even though JELD-WEN stock price fell on October 16th, it wasn't because of the litigation contingency.  And if there is no price impact, then plaintiffs can't show reliance on a class-wide basis that I am sure Your Honor is now familiar with.

So how do we know the link has been severed between the stock price that was paid and the alleged misstatement?  Well, a few different ways. I think this is another big development in the case both for class certification and beyond.  One of

those is plaintiffs' own investment advisers uniformly testified at their depositions that the litigation contingency was a non event.  Your Honor, to be clear, when saying investment advisers, we are not talking about 401K or IRA or Roth advisers, these are folks --

THE COURT:  I understand.

MS GOLDSTEIN:  They have --

THE COURT:  That is Goldman Sachs and places like that.

MS GOLDSTEIN:  No.  These investment advisers I am talking about, Your Honor, are the people who -- there are three plaintiffs in the case --

THE COURT:  Oh, you mean the in-house at the company.

MS GOLDSTEIN:  Right.  But they are not in-house exactly, Your Honor, that is almost the point.  These are not, these are people not actually at the company.  These are the people who bought and sold stock on behalf of the company.  So, the plaintiffs themselves who write this complaint, they didn't buy or sell JELD-WEN stock ever once.  They had no say in it.  They had nothing do with it. They had absolutely nothing to do with the purchase or sale of JELD-WEN stock, period, full stop.

The people who did are Wellington, which is an outfit that represents Mississippi Pension Fund here.  And one other -- trying to remember which --

THE CLERK:  We don't need the name.

MS GOLDSTEIN:  Plumbers and Pipefitters.

And then there is Seagle that represents Wisconsin.

So all three plaintiffs in this case are represented by Wellington, who, again, an outside entity, Wellington and Seagle, and we deposed those folks.  Those folks uniformly testified at their depositions that the litigation contingency was a non event.  And again, folks with full authority never spoke once with the plaintiffs about the purchases or sales of JELD-WEN stock.  They had full discretion.  Got no suggestions from the actual plaintiffs.  No contact with the plaintiffs related to JELD-WEN stock.  So they were the ones who did all of the buying and selling.  All the due diligence, they were the ones who did or didn't rely on the statements in the market when they made the acquisitions.  So what do they say?  They said they did not think that the company was changing its position regarding the Steves litigation or correcting prior misstatements.  Prior statements.

They did even after the disclosure of the Steves litigation contingency neither one of those advisers -- and I have cites for all this if Your Honor would like -- but neither one of those advisers believed that JELD-WEN had engaged in anticompetitive conduct.  They did not think that the company was conceding liability when it announced the litigation contingency.

The Steves litigation contingency was not an admission of anticompetitive conduct.  They testified that -- they acknowledge that the Steves litigation contingency was simply a product of GAAP, G-A-A-P, the accounting rules, and not an attempt to correct previous statements that JELD-WEN had made about the Steves litigation.

The Wellington person testified "It was more of an accounting change than an actual change and a thought process."  Both of them testified that they weren't surprised at all by the announcement of the litigation contingency.  And they don't think the 76.5 dollar litigation charge affected JELD-WEN's pricing power.  And they testified they surely cared about pricing power, but they did not think that the litigation charge affected that pricing power whatsoever.

And they do not think that JELD-WEN lied to its investors about competition in the doors industry. In fact, one of the investment advisers even purchased additional shares on behalf of two of the plaintiffs, Plumbers and Pipefitters, and one of the others, shortly after that revelation.

THE COURT:  Okay.

MS GOLDSTEIN:  Your Honor, they are saying there is absolutely no link between the alleged misstatements and the price plaintiffs paid.  That is one -- again, I think this is obviously a gigantic development in the case -- but also for class certification purposes.  Because the alleged misstatements in the complaint with respect to the Steves litigation had nothing do with the price the plaintiffs paid for the stock.

THE COURT:  All right.

MS GOLDSTEIN:  Second set of evidence, Your Honor, very quickly --

THE COURT:  Ms Goldstein, let me remind you, like I reminded your colleague, Mr. Rogers, that I have read the briefs.  So you don't have to --

MS GOLDSTEIN:  Very well, Your Honor.  I appreciate that, Your Honor, so I will move -- I will finish up in two sentences.

Your Honor will also note that the various analyst reports that I think Your Honor might have been referring to before, eight of the 12 of them didn't even mention on the 15th and 16th, didn't even mention the litigation contingency.  And, of course, you know that our expert described what the litigation contingency really is.

So with that, Your Honor, I would just say that on the efficiency point we are not debating efficiency with respect to the bulk of the class period.  We are, however, saying that as a matter of law, as a matter of law the IPO, the day of the IPO -- and there is plenty of case law that we cite -- obviously as a matter of law is not efficient.  There is no active trading on that day, which is what leads to the efficiency, the back and forth trading.  So as a matter of law and that the quiet period that follows is presumptively inefficient, and we don't think they have rebutted that presumption.

But, Your Honor, from our perspective, as you know, we shouldn't -- the class period cannot possibly, the class shouldn't be a class at all, but if there is, it can't possibly begin until February 15 of 2018.

Unless Your Honor, has any other questions, I will cede the floor.

THE COURT:  That was at least eight sentences, but --

MS GOLDSTEIN:  My apology, Your Honor.

THE COURT:  But you were quite succinct, and I appreciate that.

MS GOLDSTEIN:  Thank you, Your Honor.

THE COURT:  Do you want to respond that?

Briefly.

MR. ROGERS:  No.  I will be brief in responding.

Just in the last point that Ms Goldstein raised, I want to reiterate very quickly that courts don't look to fundamental efficiency again.  As Ms Goldstein said, trading, active trading on the first day the back and forth, that is what matters.  No.  What matters is what is information being spread on that day, information being impacted by the stock price.  That is what matters.

Somewhat related, Ms Goldstein made a very impassioned argument effectively saying that in lieu of economic experts that they did not put in to sever the link, that we should instead look to the investment managers that my client and Mr. Rothman's

clients hired to do their investment decision.  I mean, this is at the highest level.  It doesn't really matter what the investment managers believed caused the stock drop, or what information was reflected, and when the price went down.

It just doesn't matter.  That is what Dr. Finestein opined.  That is what the analyst, Mr. Goldstein mentioned eight of 12, but what about the other four?  That is what the other four did talk about.  They opined whether the litigation contingency matters.  It doesn't matter what the investment managers did.

And then very briefly before I move on to the last point.  What the investment managers did may be germane for the purposes of today.  For example, class certification.  Is it a class wide issue?  They rely as a class.  Why do we look at market efficiency?  Because we want to understand was the truth and the non truth embedded in the stock price.  That is the reliance factor.  You rely on in integrity of the stock price.  That is why you get class wide reliance.  So what one individual might have read in one morning, or what he read in the Wall Street Journal, or what he thought about this doesn't matter.  My client, Mr. Rothman's client,

they bought at an inflated stock price.  That is what matters.

And then the last point I will go to is Ms Goldstein began with, which is, again, it is just a re-recitation of the same attempt to bifurcate the theory of the case into two different theories.  As Your Honor was quick to point out, it just doesn't fly.

Just two quick points and I will be done.

October 5 was a partial correct.  So to the extent there is some question of what was corrected and what happened and what didn't, it is only part of it.  The class period ends on October 15th because that was when they took the litigation charge, that is when they acknowledged that liability was estimable and probable.  And that is really what people need to look at.

And one last point, Your Honor, Ms Goldstein said that my colleague led you down the wrong road or lead you done the garden path.  I think she underestimates your ability to parse out what was actually said.

I will close by reading, Your Honor, your own words from your, the motion to dismiss order on page 18.  Your Honor said that the October 15 statement

corrected JELD-WEN's previous misrepresentation, now I am quoting, "That it did not expect Steves to succeed in its law suit by disclosing new facts of the market on the 15th.  Namely, that JELD-WEN expected to incur a 76 million dollar loss in Steves litigation" -- and here is the important part -- "and only after the October 15th, 2018 announcement did the market finally realize that JELD-WEN had failed to disclose the threat if anticompetitive practices posed to its financial outlook."  So, Your Honor, you were not lead down the path by Mr. Rothman.  You understood the theory of the case back in October.  And I hope you understand it now.

THE COURT:  Thank you all very much.

We will have a written decision on this forthwith.  Okay.

Thank you very much.  Goodbye.

Let's adjourn court.

MS GOLDSTEIN:  Thank you, Your Honor.

HEARING ADJOURNED

THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

GILBERT F. HALASZ,OCR

Official Court Reporter