# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

------------------------------x

IN RE: JELD-WEN HOLDINGS, INC.

SECURITIES LITIGATION

CIVIL ACTION NO.

3:20-cv-00112-JAG

------------------------------x

VIDEOTAPE DEPOSITION OF

DANIEL R. FISCHEL

VIA ZOOM VIDEOCONFERENCE

February 26, 2021

10:00 a.m.

Reported by:

Maureen Ratto, RPR, CCR

Page 2

* * *

Videotape deposition of DANIEL R. FISCHEL, held virtually via Zoom Teleconference, hosted from Veritext Legal Solutions, pursuant to notice, before Maureen Ratto, Certified Court Reporter, License No. XI01165, Registered Professional Reporter, License No. 817125, and Notary Public.

* * *

DANIEL R. FISCHEL

academic year.

So I don't want to say I'm convinced that I will teach in the fall but I'm thinking about it.

Q.    COVID has gotten in the way of a lot of things. We can all agree on that.

Would you say currently that 100% of your professional time is devoted to matters with Compass Lexecon?

MS. HARRIS:  Objection.

A.    My professional time I would say that's pretty accurate, between the work that I do in terms of my own cases, other people's cases, running the firm, I'd say that's a full-time job.

Q.    And currently how many cases do you have active?

MS. HARRIS:  Objection.

A.    I don't -- I don't even know how to answer that question. A number, but they're all at various stages. Some cases I've been contacted but nothing has happened on the case and we haven't done

DANIEL R. FISCHEL

anything, I haven't done anything, other cases, I have some involvement, somebody else will be a -- somebody else will be the witness and there's other cases like this where I wind up testifying.

So, you know, I have a very active consulting practice in addition to what other responsibilities I have.

Q.    What is Compass charging the Defendants in this case for your work on this matter?

A.    $1,600 an hour.

Q.    And is that a rate for testimony or is there a different rate for working on the report?

A.    I only have one rate.

Q.    What is Compass charging Defendants for Mr. Keable's time working on this matter?

A.    I could estimate. I actually don't know. You know, I would say a high rate but a significantly lower rate than mine, but I don't know the exact number.

Q.    And how many hours have you

DANIEL R. FISCHEL

about them and nobody has said anything to me.  So I assume they're relatively current but, again, I don't know.

Q.    And what is the total Compass has charged Defendants for your and your staff's work so far?

MS. HARRIS:  Objection.

A.    I don't know the answer to that and certainly the February bill wouldn't even have been sent yet.  So, you know, again, with respect to previous bills, you know, there's an answer to that question but I don't know.

Q.    If you turn back to your report, which is Exhibit 23, and let's go to Appendix B. Are you there?

A.    I have to take the clip off to -- yes. Materials Relied Upon?

Q.    Yes, sir.

A.    Yes, I got it.

Q.    Okay. So Appendix B is entitled Materials Relied Upon.  And does it list all the materials upon which your opinions rely in the report?

DANIEL R. FISCHEL

A.      It should. That's the intention.

Q.      And did you consider materials that you didn't rely on in forming the opinions in your report?

A.      That's very possible.

MS. HARRIS:   Objection.

Q.      Are all the materials that you considered, but maybe didn't rely on, listed in Appendix B?

A.      I don't believe --

MS. HARRIS:   Objection.

A.      I'm sorry. I'm answering too quickly. I don't believe so.

Q.      Okay. What other materials did you consider in forming your opinions that aren't listed on Exhibit B?

A.      I can't think of anything specific but just by virtue of the title of Exhibit B, it's limited to materials relied upon.

Q.      Is there any reason why you didn't list all the materials that you considered?

DANIEL R. FISCHEL

that's one of my criticisms, that that's one of his fundamental errors.

Q.    One of his fundamental errors in your opinion is excluding that 22 cents from his damage calculation as attributable to confounding information?

MS. HARRIS:  Objection.

A.    Yes, correct.

Q.    And why is that an error?

A.    Because, as I said numerous times in my report, I think the most plausible explanation for the price decline, I guess if you want to use that language that you're using in your question and Dr. Feinstein uses, is to exclude the entire amount from any damage calculation because of all the fundamental flaws and basic errors which underlie Dr. Feinstein's analysis.

Q.    Separate and apart from those fundamental errors that you claim Dr. Feinstein undertook, you don't have any disagreement that as part of his calculation he did remove 22 cents from

DANIEL R. FISCHEL

a result of the disclosure and proper methodology is to exclude certain parts, certain components of the price decrease to calculate damages, I think that whole analysis is completely misguided and fundamentally wrong for the reasons that I've described in my report.

Q.    And is that because you believe the entire price decline was due to factors that don't relate to the fraud that Plaintiffs have alleged Jeld-Wen undertook?

MS. HARRIS:  Objection.

A.    You know, again, I prefer the analysis that I did and the conclusions that I reached.  But basically, as I said in my opinion, the most plausible explanation for the price decline was, it was in its entirety caused by factors that are unrelated to any new information that was disclosed on October 15 that had any relationship to the allegations that Plaintiffs have made in this particular case.

Page 84

DANIEL R. FISCHEL

egregious violations of the principles of efficient markets that he purports to be relying on that I can ever remember in an expert report.

Q.    Is it your opinion that the Steves litigation charge is in no way, shape or form related to the alleged misrepresentations and omissions that that Plaintiffs have contained in their Complaint here?

MS. HARRIS:  Objection.

A.    It's not that they're not related, it's just that the information that the litigation charge refers to was the events in the disclosure ten days earlier on October 5th. And when I say that Dr. Feinstein's analysis of the litigation charge is one of the most egregious violations of efficient markets that I can ever remember seeing, particularly in an expert report that espouses and relies on the concept of efficient markets, is the remedy that's the basis for the accounting treatment of

DANIEL R. FISCHEL

egregious violation of the principles of efficient markets and also completely inconsistent with analyst treatment of the two, notwithstanding how Dr. Feinstein attempts to confuse the issue or whether he intends to confuse, that he does confuse the issue.

So, you know, that's all part of my opinion about that, the most plausible interpretation of the price decline on October 15th has nothing to do with anything related to the remedy opinion.

Q.    Prior to October 15th, 2018 Jeld-Wen had told investors that it did not believe a loss in the Steves litigation matter was probable and estimable; correct?

MS. HARRIS:  Objection.

A.    I don't know whether I said that or not.

MS. WYMAN:  John, can we put up Plaintiff's Exhibit 5?

MS. HARRIS:  We've been going

DANIEL R. FISCHEL

A.      You know, I think it's hard to say that so absolutely in the abstract. But in connection with Dr. Feinstein's analysis, yes, I would say that is my opinion.  He does not demonstrate that -- as well as my own analysis of the stock price movements in the analyst reports and the publicly available information, that Dr. Feinstein does not convincingly attribute any part of the stock price decline to the accounting charge, that's right.

Q.      And did you do any analysis to determine if any part of the stock price decline was due to the litigation charge?

MS. HARRIS:  Objection.

A.      Some analysis. You know, first of all -- I'm sorry. I didn't mean to interrupt the objection.

MS. HARRIS:  Just for the record, I objected.

A.      So what I would say is that in light of the facts and circumstances of this case, the principles of efficient

DANIEL R. FISCHEL

markets, the other information that was disclosed on October 15, my analysis of discussions by analysts, that first and foremost, Dr. Feinstein's attribution of the full 55% after tax effect and calling it damages is information that the market participants learned for the first time and attributing not one cent of that to the actual economic event which occurred ten days earlier, which was widely discussed at the time, and under one of the most basic descriptions and explanations of what efficient markets means, I think that Dr. Feinstein even quotes prices for publicly traded securities reflect publicly available information rapidly and without bias, you can't have a situation where something that's disclosed ten days earlier has no effect and the company's accounting treatment of something that was known ten days earlier has all of the effect, that's just, as I said, just a basic fundamental error.  There is no other way

DANIEL R. FISCHEL

to explain it. But I can go beyond that and say the most plausible interpretation of the stock price decline following October 15, taking all the relevant facts and circumstances into account, namely the other information that's disclosed, the nature of the litigation charge, all the public commentary and analyst reports, as well as principles of efficient markets, I would say that the most plausible interpretation of the stock price decline following the October 15th disclosure has nothing to do with the accounting announcement of the litigation charge on October 15.

Q.   Is there any other basis or analysis that you want to add to that answer to support your opinion that the 55 cent litigation charge impact was not responsible for the stock price decline on October 16, 2018?

MS. HARRIS:  Objection.

A.   Well, first of all, I prefer my own phrasing and characterization as

Page 126

DANIEL R. FISCHEL
without the documents in front of me.
You know, you aren't willing to show
me any -- you've limited me to the three
documents I'm allowed to have in front of
me.

Q.    Well, I'll tell you, I've
looked in the public record for a
breakdown of Jeld-Wen's North America
door business and I can't find one.  So
if you -- if you know of where that might
be, I'm happy to look for it and provide
it to you during the course of this
deposition.

A.    Well, as I think I said, I
don't know one way or the other from
memory and I would have to check and I
can't do it because you're not showing me
any documents and what I have in front of
me is limited to what you told me I
should have in front of me.

Q.    Mr. Fischel, have you kept a
list of the documents that you considered
but didn't rely on in this case in
forming your opinions?

Page 127

DANIEL R. FISCHEL

A.    No.

MS. HARRIS:  Objection.

Q.    Would you please turn to paragraph 38 of your report, which is on page 24.

A.    Okay.

Q.    And it's kind of a long paragraph, so I'm not going to read it out loud to you but if you would please read it to yourself and let me know when you're ready, I'd appreciate it.

A.    Okay. Just give me a second.

(Deponent reviews the document.)

A.    Okay.  I've read it.

Q.    And I know you don't like it when I summarize but I'm going to do it anyway.

In this paragraph essentially you criticize Dr. Feinstein's analysis of the analyst's 2019 forecast and multiple reductions and its conclusions that those reductions relate to illegal anticompetitive conduct, correct?

**Page 140**

DANIEL R. FISCHEL

and the fact that the company was

estimating the Plaintiffs' litigation

expenses, again, that was all public

information. So that's really all I

wanted to add.

Q. Okay. No problem.

Okay. If you would please turn

to page 28 of your report.

A. Okay.

Q. And at the top of the page, do

you see a bolded subparagraph B?

A. I do.

Q. And that says, "Jeld-Wen's

stock price decline on October 16th, 2018

can be fully attributed to the company's

disclosure of worse than expected 2018

financial results." Right?

A. Correct.

Q. And so am I correct in

understanding that your opinion is that

the entire $4.42 price decline in

Jeld-Wen's stock observed on October 16,

2018 was due to the company's

announcement of worse than expected 2018

Page 141

DANIEL R. FISCHEL

financial results?

A.    Well, and the rest of what I'll call the non-fraud-related disclosures on that date, there have been no new value-relevant information on that date.  And, again, I prefer to phrase my opinion as what I said in the report multiple times, that the most plausible interpretation of the price decline or really the entire price decline is the information in the preannouncement of financial performance having nothing to do with anything in the October 15th disclosure that related in any way to what the allegations are in the Complaint about the -- and in the previous judicial opinions about the status of the doorskins litigation.

Q.    Okay. If you please look at paragraph 44.

A.    Okay.

Q.    The first sentence, first part of the first sentence says, "The reductions in analyst's 2019 EBITDA