**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

|  |  |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-00112-JAG |
|  | Judge John A. Gibney, Jr. |

**MEMORANDUM OF LAW IN SUPPORT OF JELD-WEN DEFENDANTS' MOTION
TO EXCLUDE THE REPORTS AND TESTIMONY OF DR. STEVEN FEINSTEIN**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ........................................................................................................................ 2

    A.    The Alleged Fraud ............................................................................................ 2

    B.    Feinstein's Opinions ........................................................................................ 4

        1.    Loss Causation ................................................................................... 4

            a.    Corrective Disclosures ................................................. 5

            b.    Event Study ................................................................... 8

        2.    Damages ........................................................................................... 10

            a.    Departure of JELD-WEN's CFO .................................. 10

            b.    Disappointing Q3 Results and Downgraded FY18 Guidance ..................................................................... 10

            c.    Litigation Contingency ................................................. 11

            d.    FY19 Lowered EBITDA Estimates and Valuation Multiples ..................................................................... 12

            e.    Total ............................................................................. 14

        3.    Feinstein's Declaration .................................................................... 14

LEGAL STANDARD ................................................................................................................ 15

ARGUMENT ........................................................................................................................... 15

I.    Feinstein's Loss Causation Opinion Is Unreliable ............................................... 16

    A.    Feinstein's Conclusions Are Based on His Subjective Views, Which Are Contradicted by the Evidence ......................................................... 16

        1.    Feinstein Has No Support for His Opinion the Market Was "Stunned" by the Litigation Contingency ................................................................... 17

2.       Feinstein Has No Support for His Opinion the Litigation Contingency Informed the Market the "Allegations of Illegal Anticompetitive Conduct Had Merit" ........................................................................ 18

B.       Feinstein Failed to Apply a Reliable Loss Causation Methodology ..................... 20

II.       Feinstein's Damages Opinion is Nothing More Than His Say-So ................................. 23

A.       Feinstein's Damages Opinion Is Based on Pure Speculation .............................. 23

B.       Feinstein Failed to Use a Reliable Methodology in Formulating His Damages Opinion ........................................................................................ 26

1.       Feinstein Lacks Any Reliable Methodology for His Arbitrary Damages Calculations ................................................................ 26

2.       Feinstein Applied His Arbitrary Methodology Inconsistently ................. 28

III.       Feinstein's Declaration Should Be Struck ........................................................ 30

CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*In re Bausch & Lomb, Inc. Contact Lens Sol. Prods. Liab. Litig.*,
    2009 WL 2750462 (D.S.C. Aug. 26, 2009) ................................................16, 19, 26

*Belville v. Ford Motor Co.*,
    919 F.3d 224 (4th Cir. 2019) ...................................................................15, 16

*Boyett v. Cty. of Washington*,
    2006 WL 3422104 (D. Utah Nov. 28, 2006), *aff'd*, 282 F. App'x 667 (10th
    Cir. 2008) ......................................................................................16

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
    853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F. 3d 82 (1st Cir. 2014).....................*passim*

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).............................................................................16, 25, 26

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011)................................................................30

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)...........................................................................1, 15, 23, 28

*Finkelstein v. Liberty Digital, Inc.*,
    2005 WL 1074364 (Del. Ch. Apr. 25, 2005) ............................................1, 2, 18, 30

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...........................................................................23

*GoDaddy.com LLC v. RPost Commc'ns Ltd.*,
    2016 WL 2643003 (D. Ariz. May 10, 2016),
    *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017)...........................................................27

*Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*,
    2019 WL 1756292 (W.D. Va. Apr. 19, 2019) ......................................................17

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012).....................................................................28

*Limelight Networks Inc. v. XO Commc'ns, LLC*,
    2018 WL 678245 (E.D. Va. Feb. 2, 2018)..........................................................15, 26

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.
(No II) MDL 2502*, 892 F.3d 624 (4th Cir. 2018) ...................................................28

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Nease v. Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) .................................................................................15, 17

*NetFuel, Inc. v. Cisco Sys. Inc.*,
2020 WL 1274985 (N.D. Cal. Mar. 17, 2020)........................................................28

*Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ..................................................1, 30

*In re Oracle Corp. Sec. Litig.*,
2009 WL 1709050 (N.D. Cal. June 19, 2009),
*aff'd*, 627 F.3d 376 (9th Cir. 2010).....................................................................18

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)............................................................20, 23

*Weisgram v. Morley Co.*,
528 U.S. 440 (2000)..............................................................................................15

*In re Williams Sec. Litig.*,
496 F. Supp. 2d 1195 (N.D. Okla. 2007),
*aff'd*, 558 F.3d 1130 (10th Cir. 2009)................................................................25

*In re: Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*,
2015 WL 7776911 (E.D. Pa. Dec. 2, 2015), *aff'd*, 858 F.3d 787 (3d Cir. 2017) .............20, 26

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) ...............................................................................15

**Statutes**

Clayton Act ...............................................................................................3, 4, 12

**Rules**

Fed. R. Evid. 702 ....................................................................................1, 15, 23

Fed. R. Evid. 702(c)...................................................................................28

Rule 26 ....................................................................................................30

**PRELIMINARY STATEMENT**

JELD-WEN Defendants move to exclude the reports and testimony of Dr. Steven Feinstein, Plaintiffs' expert on market efficiency, loss causation, and damages.  Feinstein's reports and testimony should be excluded here for the same reasons his opinions have been rejected by other courts:  Feinstein's "stubborn desire" to reach a certain result "regardless of the facts" "does not inspire confidence in Feinstein's objectivity." *See Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *16–17 (Del. Ch. Apr. 25, 2005); *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *7 (N.D. Ohio Aug. 14, 2018) ("*OPERS*") (concluding Feinstein's analysis "was entirely improper because you are supposed to hypothesize and then see your results.  You are not supposed to know your results in advance").  The Court should exercise its critical gatekeeping function and exclude Feinstein's unreliable opinions so that he cannot confuse or mislead the jury.

Under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–94 (1993), an expert must base his testimony on sufficient facts, use reliable principles and methods, and reliably apply the principles and methods to the facts of the case.  Fed. R. Evid. 702.  Feinstein's opinions do not meet these standards.

***First***, Feinstein's conclusions in support of his loss causation and damages opinions are based on his subjective views, which are contradicted by the evidence.  Feinstein lacks any support for his suppositions that the market:  (1) was "stunned" by JELD-WEN's announcement of a litigation contingency; (2) believed JELD-WEN conceded the merits of the allegations against it by announcing a litigation contingency; (3) was unable to react to Judge Payne's October 5, 2018 decision for 10 days; or (4) believed that the reasons for JELD-WEN's disappointing FY18 performance would not impact its future performance.  Because Feinstein "eschew[ed] any reliance on the real-world" facts and instead invented his own, his opinions on loss causation and

damages should be excluded. *See Finkelstein*, 2005 WL 1074364, at *16–17.

**Second**, Feinstein failed to use reliable methodologies or apply them reliably to the facts of the case. Instead, his "methodologies" boil down to fancy guesswork. Feinstein assumed his conclusion that the announcement of a litigation contingency caused a stock drop, and "calculated" damages by arbitrarily assigning losses based on pure speculation. Even setting aside his slapdash methodologies, Feinstein did not apply his own "methodologies" consistently. He concluded for the purposes of one analysis that the market did not expect the reasons for JELD-WEN's disappointing FY18 performance to affect future performance, and for another, that the market expected the reasons for JELD-WEN's disappointing FY18 performance to affect every part of JELD-WEN's European and North American business in FY19, except North American doors. Feinstein also arbitrarily attributed stock declines to JELD-WEN's various business segments, purporting to carve away stock drops attributable to JELD-WEN's businesses that were unrelated to the alleged fraud. But Feinstein failed to account for those parts of JELD-WEN's North American door business unrelated to the alleged fraud, thereby inflating the damages he attributed to the alleged fraud. This is not the first time Feinstein has "erroneously inflated" numbers to suit his needs. *Id.* at *16.

For these reasons, and the additional reasons discussed below, the Court should exclude Feinstein's reports and testimony.

## BACKGROUND

### A.    The Alleged Fraud

In this securities fraud action, Plaintiffs allege that JELD-WEN misled investors through two categories of misrepresentations. First, Plaintiffs allege that JELD-WEN's statements about its pricing and competitiveness concealed the fact that anticompetitive behavior was "the true source of the Company's success." Complaint, Dkt. No. 73 ¶ 101. Second, Plaintiffs claim that

2

following an adverse jury verdict in favor of Steves & Sons, Inc. ("Steves"), JELD-WEN misleadingly stated that it had not violated any antitrust laws and would appeal, despite supposedly knowing that the lawsuit (the "Steves Litigation") had merit and that JELD-WEN would ultimately face liability. *Id.* ¶¶ 207–08, 280–85.

Plaintiffs contend these alleged misrepresentations were corrected by two disclosures. *First*, on October 5, 2018, Judge Payne issued a detailed opinion in the Steves Litigation holding that divestiture was an appropriate remedy for Steves' antitrust claims and clarifying the amount of damages likely to be awarded (the "Divestiture Decision"). *Id*. ¶¶ 127–32; Dkt. No. 79-32 at 4, 148. Plaintiffs allege the Divestiture Decision revealed "previously undisclosed facts about Jeld-Wen's anticompetitive conduct." Compl. ¶¶ 21–22, 254; *see also id.* ¶¶ 127–31. JELD-WEN issued a press release the next day disclosing the opinion and maintaining that it had not violated any antitrust laws. *Id*. ¶¶ 231–33; Dkt. No. 79-34 at 4–6. Plaintiffs allege the Divestiture Decision's correction of JELD-WEN's prior misstatements caused JELD-WEN's stock price to drop by five percent. Compl. ¶¶ 132, 255.

*Second*, on October 15, 2018, JELD-WEN issued a Pre-Earnings press release (the "Pre-Earnings Release") announcing reduced FY18 guidance and disappointing Q3 2018 results.[1] Dkt. No. 79-35; App'x A. Along with that bad news, the Company also announced that it would take a loss contingency of $76.5 million based on recent rulings in the Steves Litigation (the "Litigation Contingency"). *Id.* at 1. The charge included "the trebling of $12.2 million in past damages under the Clayton Act, and estimated legal fees." *Id.* JELD-WEN maintained that it had not violated

---

[1]    Specifically, the Company announced Q3 adjusted EBITDA roughly 10 percent below the Company's previous outlook, and downgraded its 2018 adjusted EBITDA guidance by about 10 percent. Dkt. No. 79-35. The Company said these disappointing results were "negatively affected by lower than expected revenues and related operational inefficiencies in North America and Europe, as well as unfavorable channel mix impacting price realization." *Id.* at 1.

antitrust laws and would appeal. *Id.* Plaintiffs allege that, by announcing the Litigation Contingency, JELD-WEN "shockingly admitted that the Company would likely face a significant judgment" in the Steves Litigation. Compl. ¶ 136. Plaintiffs allege that the Litigation Contingency's correction of JELD-WEN's prior misstatements caused JELD-WEN's stock price to drop by 19 percent. *Id.* ¶¶ 241–42.

### B.    Feinstein's Opinions

Plaintiffs asked Feinstein to (1) "determine whether investors who purchased JELD-WEN common stock during the Class Period suffered losses as a result of Defendants' alleged misrepresentations and omissions," Feinstein Rpt., Dkt. No. 122-1 ¶ 2; (2) "quantify compensable damages sustained, if any, on a per share basis," *id.*; and (3) determine whether JELD-WEN's common stock traded in an efficient market from January 26, 2017 through October 15, 2018, *id.* ¶ 1. Feinstein proffered opinions on each of those points.

While this motion primarily focuses on Feinstein's loss causation and damages opinions, the Court should also reject Feinstein's market efficiency opinion for the reasons stated in JELD-WEN Defendants' opposition to Plaintiffs' motion for class certification, including that Feinstein lacks any methodology for concluding the primary market was efficient. Dkt. No. 136. To the contrary, it is inefficient as a matter of law. *Id.*

### 1.    Loss Causation

To determine whether the alleged misrepresentations caused losses to investors, Feinstein analyzed whether the correction of the alleged misrepresentations caused JELD-WEN's stock price to decline. Feinstein Rpt. ¶ 265. The first step of his analysis was to conduct an event study on the alleged corrective disclosure dates. *Id.* "An event study controls for the effects of market and sector factors and thereby measures how much a security price rises or falls in response to new company-specific information." *Id.* ¶ 266. This analysis alone, however, cannot establish *which*

piece of company-specific information caused a stock price to drop. Ex. 1, Feinstein Dep. 189:8–191:4. Instead, after identifying a statistically significant drop with an event study, it is necessary to remove the effect of confounding information. As Feinstein explained:

> [T]o establish loss causation one must determine whether allegation-related information, as opposed to other unrelated company information, was a substantial cause of the security price change. Financial analysis including valuation analysis can account for and thus remove the effect, if any, of confounding information that is unrelated to the alleged fraud. After controlling for confounding information, if any, one can determine whether the revelation of the alleged fraudulently-concealed facts, was a substantial cause of the security price decline.

Feinstein Rpt. ¶ 268.

Supposedly applying this methodology, Feinstein first concluded that the Divestiture Decision and the announcement of the Litigation Contingency were corrective disclosures of material misstatements. *Id.* ¶ 291.[2] Feinstein then performed an event study, which did not find any statistically significant price decline following the Divestiture Decision. *Id.* ¶ 293. Although Feinstein did identify a statistically significant price decline following the announcement of the Litigation Contingency, he failed to disaggregate the effect of JELD-WEN's disappointing Q3 result and downgraded FY18 guidance—announced in the same press release—and instead declared that the Litigation Contingency caused the decline. *Id.* ¶¶ 298–300.

### a.    Corrective Disclosures

Feinstein opined that the Divestiture Decision and announcement of the Litigation Contingency were corrective disclosures. His analysis proceeded as follows: Based on his reading

---

[2]    It is unclear what exactly Feinstein considered to be the second corrective disclosure. He testified at his deposition that the entire Pre-Earnings Release "constitutes the corrective disclosure." Feinstein Dep. 167:16–170:17. But he classified the disappointing Q3 results and downgraded FY18 guidance included in the Pre-Earnings Release as confounding information, unrelated to the alleged fraud. *See* Feinstein Rpt. ¶ 317. So although Feinstein acknowledged that it is necessary to control for confounding information to properly assess whether a corrective disclosure caused an investor loss, *id.* ¶ 268, under Feinstein's definition, the corrective disclosure itself contained confounding information. *See* App'x A.

of Company statements and analyst reports, Feinstein concluded that JELD-WEN's statements about the Steves Litigation, pricing, and profitability were economically material. *Id*. ¶¶ 279–89. Next, Feinstein said that he analyzed "Company news and announcements" during the Class Period to determine "whether the identified corrective disclosures were in fact corrective of the alleged misrepresentations and omissions." *Id*. ¶ 291. Feinstein said that based on his analysis of "a wide variety of information sources," he concurred with Plaintiffs that the Divestiture Decision and Litigation Contingency were corrective disclosures. *Id*.[3]

Feinstein attempted to salvage the Divestiture Decision as a corrective disclosure, even though his event study did not find any statistically significant stock decline associated with it. Feinstein claimed the Divestiture Decision was a corrective disclosure, but that, "before the market could react" to the decision, JELD-WEN negated its effects by issuing a press release maintaining it had not violated antitrust laws and that it would appeal. *Id*. Feinstein noted that despite these denials, some analysts lowered their valuations of JELD-WEN. *Id*.

Regarding the Litigation Contingency, Feinstein claimed in his report, without support, that "JELD-WEN *stunned the market* by disclosing that it would take a charge of $76.5 million that 'reflects the judgment anticipated to be entered against the company' in the *Steves* antitrust litigation, and associated legal fees." *Id*. (emphasis added). At his first deposition, Feinstein testified this conclusion was based on "*explicit commentary in the analyst reports and in news articles*," along with the fact the stock dropped the following day. Feinstein Dep. 29:5–30:3 (emphasis added). But Feinstein did not cite any analyst reports or news articles in his report to support his conclusion, *see* Feinstein Rpt. ¶ 291, and the "Documents and Other Information

---

[3] Although Feinstein purported to rely on this "wide variety of sources," the only sources he cited are three press releases (two from JELD-WEN and one from Steves) and the Divestiture Decision. *Id*. ¶ 291. Feinstein did not explain how the other sources support his conclusions. *Id*.

Considered" section of his report does not list any news articles following the announcement of the Litigation Contingency. *Id.* ¶¶ 118–19 (Exhibit 1).

At his second deposition, Feinstein changed his testimony when confronted with the relevant analyst reports.[4] Feinstein initially agreed that specific reports did not contain the explicit commentary he relied on to reach his opinion that the market was stunned by the Litigation Contingency. *See* Feinstein Dep. 237:4–9 ("Q. Does this report contain the explicit commentary you relied on to reach your opinion the market was stunned by the Steves litigation contingency? A: No. This report does not."); *id.* at 250:20–23 (same). But, as it became increasingly obvious no such "explicit commentary" exists, Feinstein retreated: He claimed that when he referred to "explicit commentary in the analyst reports" at his first deposition, all he meant was that analyst reports were issued following the Pre-Earnings Release. *See, e.g., id.* at 260:11–17 ("By explicit commentary we're talking about, all the analyst reports published after the announcement.").[5] Eventually, Feinstein claimed he never said he relied on explicit commentary in the analyst reports,

---

[4]    Of the 13 analysts who published reports in the days following the Pre-Earnings Release, only five mention the Litigation Contingency. Ex. 2, Fischel Rpt. ¶ 25. Of those that do, not a single report discussed the Litigation Contingency beyond noting that the Company announced it. *See* Ex. 3, Citi report at 1; Ex. 4, Bank of America Merrill Lynch report at 1; Dkt. No. 79-37, J.P. Morgan report at 1; Ex. 5, Deutsche Bank report at 2; Dkt. No. 79-38, Gabelli report at 1.

[5]    Contrary to Feinstein's claim, the existence of these reports does not support his conclusion either, because analysts focused on disappointing Q3 2018 results, downgraded FY18 guidance, and the CFO departure—not the Litigation Contingency. *See* Dkt. No. 136-5, Barclays report ("Windows Reset; Remain OW"); Ex. 6, Credit Suisse report ("Shattered Glass"); Ex. 7, Jefferies report ("JELD-WEN Pre-Announces Q3, Cuts FY Guidance, and CFO Departing"); Dkt. No. 136-7, SunTrust report ("Severe Earnings Warning on Modest Volume Miss"); Ex. 8, RBC report ("Walking on Broken Glass; Lowering PT on Guidance Cut"); Dkt. No. 136-6, Wells Fargo report ("JELD: Still Battling Return to Normal, Another Executive Change"); Ex. 3, Citi report ("Alert: More Bad News: CFO Leaving; Preliminary 3Q18 Results Soft; Guidance Cut"); Ex. 4, Bank of America Merrill Lynch report ("JELD Announces Challenging Preliminary 3Q; John Linker to Replace CFO Mallard"); Dkt. No. 79-37, J.P. Morgan report ("2018 EBITDA Guidance Lowered 9%; CFO Mallard to Exit, Succeeded by SVP-Corp. Dvlpmt, IR Linker"); Ex. 5, Deutsche Bank report ("17% Reduction to 2H18 Guidance May Not Be the End of JELD-WEN's Troubles"); Ex. 9, Baird report ("Negative Q3 Preannouncement; 2018 Guide Reduced; CFO Change").

7

and that what made the announcement "stunning" was his own say-so. *Id.* at 274:25–275:6 ("I never said that any analyst said that explicitly. I said that it was my conclusion that analysts, because it was a stunning announcement, it would stun the market and it did stun the market.").[6]

Feinstein also concluded, without support, that the announcement of the Litigation Contingency informed the market that the "allegations against [JELD-WEN] of illegal anticompetitive behavior had merit and would have serious business performance repercussions." Feinstein Rpt. ¶ 291. In reaching this conclusion, Feinstein ignored the plain language of the Pre-Earnings Release that says, "[t]he Company continues to maintain that it has not violated any antitrust laws." Dkt. No. 79-35 at 1; App'x A. Indeed—despite placing great weight on the Company's prior denial following the Divestiture Decision—Feinstein did not cite, reference, or otherwise acknowledge the Company's simultaneous denial of antitrust liability ***anywhere*** in his report. Feinstein Dep. 131:10–134:15. When asked at his deposition about this, Feinstein claimed to have considered this language but did not explain his failure to acknowledge it in his report. *Id.* at 133:11–134:15 (claiming the denial on October 15, 2018 was a "mixed message").

### b.    Event Study

Feinstein next performed an event study of the first trading date following each purported corrective disclosure. Feinstein Rpt. ¶¶ 292–300. Critically, Feinstein found no statistically

---

[6]    Feinstein also misread analyst reports to manufacture analysis of the Litigation Contingency that does not exist. For example, to support his claim that the Litigation Contingency disclosed that JELD-WEN would face a loss of pricing power in the North American doors market, Feinstein referred to an analyst's statement that a "lingering volume issue in Jeld's North American ***windows*** business manifested in a harsh combination of reduced cost leverage, inability to push pricing, and failure to drive cost productivity." Feinstein Dep. 228:4-6; 230:25–231:18 (referring to the Oct. 15, 2018 Barclays report, Dkt. No. 136-5). Despite the plain language of the report, Dkt. No. 136-5, Feinstein insisted the analyst was not talking about inability to push pricing in the context of the North American windows business. *Id.* at 230:25–231:18. When pressed, he claimed it also applied to North American doors because the analyst did not explicitly say it did not apply to North American doors. *Id.* at 231:19–232:17.

8

significant price decline following the Divestiture Decision, meaning "the stock decline could also reasonably have been caused by random volatility." *Id.* ¶ 293. Feinstein theorized that the lack of a statistically significant price drop may be attributable to the Company's denial, *id.* ¶ 296, but he admitted it was "fair to say" he did not actually know if that is the case, Feinstein Dep. 157:16–158:4. Feinstein also noted some analysts lowered their valuations of JELD-WEN following the Divestiture Decision, *see* Feinstein Rpt. ¶ 295, indicating the market did not believe the Company's denials. At his deposition, Feinstein conceded the lack of decline could also be attributable to the market having already priced in the risk of divestiture before the Divestiture Decision, Feinstein Dep. 327:17–328:16, given the divestiture hearing and related arguments were also public, *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, No. 3:16-cv-545 (E.D. Va. June 29, 2016), Dkt. Nos. 1751–52 (oral argument transcripts), 1767–71 (divestiture hearing transcripts).

Feinstein's event study did show a statistically significant stock price decline on October 16, 2018, following the announcement of the Litigation Contingency, Feinstein Rpt. ¶¶ 298–99, but his analysis is unsound and inconsistent. Feinstein did not disaggregate the effect of the Litigation Contingency from the disappointing 2018 financial results and downgraded guidance (which he later classified as not fraud-related) announced in the same Pre-Earnings Release. *See* App'x A. Instead, he concluded, without explanation, that "[b]ased on the nature" of the Litigation Contingency, it was the correction of the alleged misrepresentations that caused investor losses that day. *Id.* ¶ 300. When deposed about this, Feinstein first claimed that disaggregation at the loss causation stage was not necessary because he determined the corrective disclosures were economically material. Feinstein Dep. 195:22–197:8. After conceding "economically material information does not always cause a statistically significant stock price movement," *id.* at 202:10–

13, he later claimed his disaggregation analysis was merely hidden in the damages section of his report. *Id*. at 212:23–213:20 (citing his report at "paragraphs 316 through 322").

### 2.    Damages

After concluding the Litigation Contingency caused a stock drop on October 16, 2018, Feinstein said he could apportion the $4.42 per share stock decline by identifying Company-specific information released on October 15, 2018, and determining whether each piece of information:  (1) constituted "new valuation-relevant information" that contributed to the stock price decline, and (2) was fraud-related.  Feinstein Rpt. ¶¶ 305–08.

In assessing damages, Feinstein identified four pieces of Company-specific information announced or released on October 15, 2018 after the close of trading:  (1) the departure of JELD-WEN's CFO; (2) the disappointing Q3 results and downgraded FY18 guidance; (3) the Litigation Contingency; and (4) the news that some analysts lowered their FY19 EBITDA estimates and valuation multiples for JELD-WEN following the Pre-Earnings Release and announcement of JELD-WEN's CFO departure. *Id.* ¶ 307.  Feinstein had no consistent methodology for determining the impact of each piece of value-relevant information that he concluded contributed to the stock decline.  *Compare id.* ¶¶ 309–15, *with* ¶¶ 316–22, *and* ¶¶ 326–37.

### a.    Departure of JELD-WEN's CFO

Feinstein concluded that the news that CFO Brooks Mallard would be replaced by John Linker was not value-relevant.  *See id.* ¶ 325.  Accordingly, Feinstein did not attribute any portion of the stock price decline to this announcement.  *Id*.

### b.    Disappointing Q3 Results and Downgraded FY18 Guidance

Feinstein concluded the disappointing Q3 results and downgraded FY18 guidance were not fraud-related, *id.* ¶ 317, and caused a $0.22 per share reduction in JELD-WEN's stock price, *id.*

¶ 320. To reach that conclusion, Feinstein examined the change in analysts' 2018 consensus earnings per share estimates for JELD-WEN, which declined by $0.22 following the disappointing Q3 results and downgraded FY18 guidance. *Id.* Feinstein therefore concluded the news regarding 2018 underperformance caused a $0.22 per share reduction in JELD-WEN's stock price. *Id.* Feinstein did not offer support for this methodology.

Feinstein did not apply a valuation multiple, which would have increased the loss attributable to the disappointing FY18 disclosures, claiming that doing so "would only be appropriate if the reasons for the past performance disappointment were expected to impact future performance and the JELD-WEN CEO said they would not." *Id.* Feinstein based this conclusion on CEO Gary Michel's comments that the Company viewed "2018 financial performance headwinds as temporary in nature" and believed these issues were "capabilities we can fix." Dkt. No. 79-35 at 1. But Michel's comments did not provide any basis for Feinstein to conclude these issues would be fixed in the then-remaining 11 weeks of the fiscal year. *Id.* Analyst reports also contradict Feinstein's conclusion; analysts explicitly attributed their forecast reductions to disappointing Q3 results and downgraded FY18 guidance.[7]

### c.    Litigation Contingency

Feinstein concluded that the full value of the $76.5 million Litigation Contingency should be considered a loss. He claimed the announcement of the contingency was "an unanticipated negative event, particularly given the Company's repeated assurances—even as late as 6 October 2018—that the *Steves* allegations and resulting jury verdict were without merit." *Id.* ¶ 312. In so

---

[7]    *See, e.g.*, Ex. 6 at 1 (Credit Suisse: "Given preliminary 3Q results and updated guidance . . . Our 2019 est. goes to $2.05 from $2.40."); *see also* Feinstein Dep. 233:7–235:23 (conceding Barclays lowered 2019 forecast due to issues which led to disappointing Q3 results and downgraded FY18 guidance); *id.* at 257:25–259:14 (conceding RBC lowered 2019 forecast because of issues which led to disappointing Q3 results and downgraded FY18 guidance).

doing, Feinstein again ignored the language in the Pre-Earnings Release stating, "[t]he Company continues to maintain it has not violated any antitrust laws." Dkt. No. 79-35 at 1; App'x A.

Feinstein calculated that the $76.5 million Litigation Contingency amounted to $0.55 after tax on a per-share basis, Feinstein Rpt. ¶ 314, and that the "direct effect" of the charge on the stock decline amounted to the full $0.55 per share, *id.* ¶ 315. Feinstein did not offer support for this "methodology," which simply assumed that the impact on the stock price was equivalent to the pro-rata share of the charge. He did not analyze the components of the $76.5 million charge, which included the trebling of $12.2 million in past damages under the Clayton Act and an estimated $40 million for Steves' attorneys' fees. *See* Dkt. No. 79-35 at 1.

Nor did Feinstein consider that the market already knew about the likelihood of these damages and fees following the Divestiture Decision. *See* Dkt. No. 79-25; Dkt. No. 79-32 at 4. In his reply report, Feinstein tried to justify his assumption that the stock price did not already reflect this public information by claiming that the market was unable to react to the Divestiture Decision for 10 days because it needed time to understand it. Ex. 10, Feinstein Reply Report ("Reply Rpt.") ¶¶ 50, 53–54.

### d.    FY19 Lowered EBITDA Estimates and Valuation Multiples

Finally, Feinstein concluded that analysts' lowered FY19 EBITDA estimates and valuation multiples for JELD-WEN accounted for the remaining $3.65 in stock drop. He "calculated" that figure by subtracting the $0.55 he attributed to the Litigation Contingency and $0.22 he attributed to the disappointing Q3 results and downgraded FY18 guidance from the $4.42 total drop. *Id.* ¶ 330. He offered no support for this "methodology." Feinstein did not explicitly analyze whether analysts' downgraded FY19 EBITDA estimates and valuation multiples for JELD-WEN were

value-relevant, nor did he attempt to directly measure the impact of analysts' downgrades, as he did with the Litigation Contingency and disappointing Q3 results and downgraded FY18 guidance.

Feinstein conceded that "some of" the remaining $3.65 per share decline "is attributable to business apart from North American doors, which consequently would be not fraud-related." *Id.* To separate the fraud-related decline from the non-fraud-related decline, Feinstein began by excluding Australasia from his analysis altogether—because JELD-WEN "attributed the lower 2018 guidance to inefficiencies in North America and Europe." *Id.* ¶ 331. After excluding Australasia, Feinstein apportioned the $3.65 per share decline based on EBITDA generated by JELD-WEN's North America and Europe segments. *See id.* ¶ 331. On this basis, Feinstein attributed $1.25 per share of the decline to Europe and excluded it as not fraud-related. *Id.* ¶ 332.

Next, Feinstein divided the remaining $2.40 per share decline among JELD-WEN's windows and doors businesses in North America. *Id.* ¶¶ 334–35. Feinstein said that because JELD-WEN's windows business generated about 40 percent of JELD-WEN's North American EBITDA, he excluded another $0.96 per share as not fraud-related. *Id.* ¶ 335. Feinstein was left with $1.44 per share, which he claimed "is attributable to effects of the corrective disclosures on analysts' and investors' changed assessment of the North American door business." *Id.* ¶ 337.

Feinstein's conclusion and related analysis suffers from obvious errors. For example, by apportioning some of the stock decline to Europe and North American windows, Feinstein acknowledged the disappointing Q3 results and downgraded FY18 guidance ***did*** cause analysts to downgrade their FY19 estimates. But he failed to account for how the disappointing Q3 results and downgraded FY18 guidance would have caused a similar downgrade attributable to JELD-WEN's North American doors business. Similarly, Feinstein did not explain why he did not further apportion the $1.44 share price decline he attributed to North American doors between

13

interior molded doors—the only type of door related to the alleged fraud—and all other doors, as he did for Europe and North American windows. *See, e.g.*, Ex. 11, Feb. 21, 2017 J.P. Morgan report at 10 (breaking down JELD-WEN's doors business between external and interior doors). Feinstein's explanation that these non-fraud-related doors were "already excluded" because they were not "responsible for the stock drop" does not make sense. Feinstein Dep. 362:10–13; *id.* at 366:2–5 ("They are naturally excluded from any calculation of the--any portion of the residual price decline."). If Feinstein had intended to exclude those business segments from his analysis because he did not believe they caused any portion of the stock drop, he should have done so at the same time he excluded Australasia.

### e.    Total

Feinstein added the $0.55 per share price decline he attributed to Litigation Contingency to the $1.44 per share price decline he attributed to downgraded analyst estimates and valuation multiples related to the North American doors business, and said that $1.99 per share of the October 16, 2018 stock price decline was attributable to the alleged fraud. Feinstein Rpt. ¶ 339.

### 3.    Feinstein's Declaration

Plaintiffs served Feinstein's report on January 4, 2021. They moved for class certification on January 19, 2021. Dkt. Nos. 120–21. JELD-WEN Defendants deposed Feinstein on class certification issues on January 30, 2021 and submitted their opposition to Plaintiffs' motion for class certification on February 2, 2021. Dkt. No. 136. A week later, Plaintiffs submitted a reply brief in support of their motion, Dkt. No. 142, along with a new declaration from Feinstein, who purported to offer additional expert testimony. Dkt. No. 142-2. Given this timing, Defendants had no ability to question Feinstein on these "opinions" or respond to them.

## LEGAL STANDARD

To qualify as an expert, Feinstein must meet the "exacting" requirements for admissibility of expert testimony under Federal Rule of Evidence 702. *Weisgram v. Morley Co.*, 528 U.S. 440, 442 (2000). Rule 702 permits a qualified expert to testify if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," if those opinions are based on "sufficient facts or data," and if those opinions are derived from "reliable principles and methods" that the expert "reliably applied . . . to the facts of the case." Fed. R. Evid. 702.

The party seeking to admit expert testimony bears the burden of demonstrating its admissibility by establishing "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert*, 509 U.S. at 597); *see also Limelight Networks Inc. v. XO Commc'ns, LLC*, 2018 WL 678245, *1 (E.D. Va. Feb. 2, 2018) ("Under Federal Rule of Evidence 702, an expert must base his testimony on sufficient facts, use reliable principles and methods, and reliably apply the principles and methods to the facts of the case." (citing *Daubert*, 509 U.S. at 597)).

In assessing the admissibility of expert testimony, the court performs a critical "gatekeeping function," to prevent improper expert opinions from confusing or misleading the jury. *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." (quoting *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011))).

## ARGUMENT

This Court should exclude Feinstein's reports and testimony because his opinions fail to meet the "exacting" requirements for admissibility of expert testimony under Federal Rule of Evidence 702. *Weisgram*, 528 U.S. at 442. Feinstein's loss causation opinion is unreliable because

15

it is based on his own subjective views, not a scientific methodology. His damages opinion similarly relies upon his own *ipse dixit*.

## I.   FEINSTEIN'S LOSS CAUSATION OPINION IS UNRELIABLE

Feinstein's loss causation opinion is unreliable because (1) his conclusions are based on his subjective views, which are contradicted by the evidence, and (2) he fails to apply a reliable loss causation methodology.

### A.   Feinstein's Conclusions Are Based on His Subjective Views, Which Are Contradicted by the Evidence

Feinstein's "conclusions" undergirding his loss causation opinion are not supported by the facts—and often are flatly contradicted by the evidence. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also Belville*, 919 F.3d at 229–30, 236 (affirming exclusion of expert report based on "questionable assumptions that lacked evidentiary foundations"). Further, a "failure to address" contradictory information "renders plaintiffs' theory inherently unreliable." *In re Bausch & Lomb, Inc. Contact Lens Sol. Prods. Liab. Litig.*, 2009 WL 2750462, at *14 (D.S.C. Aug. 26, 2009) (excluding expert who failed to address contradictory studies). Feinstein relied on his subjective and cursory review of "a wide variety of information sources" to determine that the Litigation Contingency is a corrective disclosure—without identifying those sources, let alone explaining how he selected them, or what he derived from each one. *See* Feinstein Rpt. ¶ 291; *Boyett v. Cty. of Washington*, 2006 WL 3422104, at *7 (D. Utah Nov. 28, 2006), *aff'd*, 282 F. App'x 667 (10th Cir. 2008) (striking an expert who "vaguely reference[d]" documents in his affidavit "but neglect[ed] to identify which [documents] he reviewed or on what he base[d] his opinion," which made "it impossible to identify which sources,

16

if any, [the expert] relied on to support his claims"). Specifically, Feinstein has no support for his opinions that (1) the market was "stunned" by the Litigation Contingency or (2) the Litigation Contingency informed the market that "the allegations of illegal anticompetitive behavior had merit." Feinstein Rpt. ¶ 291. Those opinions should be excluded.

### 1.    Feinstein Has No Support for His Opinion the Market Was "Stunned" by the Litigation Contingency

In his report, Feinstein concluded that the market was "stunned" by the Litigation Contingency without citation to any authority. *Id.* ¶¶ 22, 291. This conclusion is the lynchpin of Feinstein's opinion that the Litigation Contingency *caused* the October 16, 2018 stock drop. If the market anticipated a litigation contingency was likely following the Divestiture Decision, then Feinstein's entire opinion falls apart—because the Company's stock price would already have reflected the expected charge. *See infra* Argument Section II.A.

Feinstein's conclusion is not supported by the record. Although Feinstein testified his conclusion was based on "***explicit commentary in the analyst reports and in news articles***," Feinstein Dep. 29:12–21 (emphasis added), no such commentary exists, *see supra* note 4. Indeed, when shown the relevant analyst reports, Feinstein reversed his testimony, admitting that he came to this conclusion based on his subjective assessment that it was a "stunning announcement." *See* Feinstein Dep. 269:25–275:15 ("Q: This report does not say that the market was stunned by the Steves litigation contingency, right? A: ***I never said that any analyst said that explicitly. I said that it was my conclusion*** that analysts, ***because it was a stunning announcement***, it would stun the market and it did stun the market." (emphasis added)).

An expert opinion must be "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and [its] inferences must be derived using scientific or other valid methods." *Nease*, 848 F.3d at 229 (citation omitted); *see also Keystone Transp. Sols., LLC v. Nw.*

17

*Hardwoods, Inc.*, 2019 WL 1756292 (W.D. Va. Apr. 19, 2019), at \*7 (excluding expert whose opinions were based upon subjective belief and "merely [Plaintiff's] narrative of the events at issue offered in the guise of expert testimony"). Because Feinstein's assessment that the market was stunned by the announcement of the Litigation Contingency was founded solely on his subjective view of the facts, it is unreliable. And indeed, this is not the first time Feinstein has "eschew[ed] any reliance on the real-world" facts and instead invented his own. *See Finkelstein*, 2005 WL 1074364, at \*16–17 (noting Feinstein's "stubborn desire" to reach a certain result "regardless of the facts" "does not inspire confidence in Feinstein's objectivity").

Feinstein's analysis also committed an elementary logical fallacy; it begs the question. Feinstein ultimately testified that his conclusion that the Litigation Contingency announcement "stunned the market" was based on the stock drop that followed the Litigation Contingency. Feinstein Dep. 29:12–21. But that is the very question Feinstein was supposed to be investigating: ***whether*** the stock drop was caused by the announcement of the Litigation Contingency. Expert opinion that assumes the conclusion it tries to prove is both logically unsound, and legally inadmissible. *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at \*28 (N.D. Cal. June 19, 2009) (excluding expert who "assumes what he sets out to prove" and was unable to point to any evidence supporting his conclusion), *aff'd*, 627 F.3d 376 (9th Cir. 2010).

2.    *Feinstein Has No Support for His Opinion the Litigation Contingency Informed the Market the "Allegations of Illegal Anticompetitive Conduct Had Merit"*

Feinstein's characterization of the Litigation Contingency similarly lacked any factual basis. Feinstein opined that when JELD-WEN announced the Litigation Contingency, "investors and analysts were now informed that the allegations of illegal anticompetitive behavior had merit and that there would be negative repercussions from that behavior." Feinstein Rpt. ¶ 23. To reach

18

this conclusion, Feinstein ignored the plain language in the announcement of the Litigation Contingency, and fundamentally mischaracterized the nature of a litigation contingency.

*First*, the plain language:  In the same paragraph in which JELD-WEN announced the Litigation Contingency, JELD-WEN unequivocally stated, "the Company continues to maintain that it has not violated any antitrust laws." Dkt. No. 79-35; App'x A.  Indeed, despite placing great weight on the Company's *prior* denial of liability following the Divestiture Decision, Feinstein does not cite, reference, or even acknowledge the Company's denial made in the same paragraph as the announcement of the Litigation Contingency *anywhere* in his report.  Feinstein Dep. 131:10–134:6; App'x A.  Feinstein's "failure to address" facts that conflict with his conclusions renders his opinion unreliable.  *Bausch*, 2009 WL 2750462, at *14 (excluding expert who failed to address contradictory studies).

*Second*, Feinstein's characterization of a litigation contingency would be unsupportable even if JELD-WEN had not accompanied it with an express denial.  A litigation contingency is not an admission of ultimate liability or certain loss.  Flemmons Rpt., Dkt. No. 136-3 ¶¶ 13, 44, 51–52, 55, 76.  As Defendants' accounting expert explained, JELD-WEN did not change its position regarding the merits of the Steves Litigation by booking the Litigation Contingency, *see id*. ¶¶ 13, 52, nor did it not "correct" anything by announcing the loss contingency, *id.* ¶¶ 14, 54–55.  To the contrary—and as it stated in the Pre-Earnings Release—the Company's decision to book the loss contingency was based on information already in the market; Judge Payne's holdings in the Divestiture Decision.  *Id*.  Feinstein admitted he does not know the accounting rules governing litigation contingencies, *see* Feinstein Dep. 32:21–33:2, nor did he consult an accountant to inform his opinions in this case, *id*. at 32:12–20.  By mischaracterizing the meaning and significance of the Litigation Contingency, Feinstein not only misidentified it as a corrective

disclosure, he also misconstrued the market's reaction to it. This error bled into his damages opinion, where he claimed—again, without support—that the market's purported reaction to the Litigation Contingency justified damages well beyond the $76.5 million charge itself.

Because Feinstein's identification of corrective disclosures was unreliable, his loss causation analysis premised on those disclosures is flawed and should be excluded. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–74 (S.D. Cal. 2010) (striking loss causation opinion based on flawed identification of corrective disclosures).

### B.    Feinstein Failed to Apply a Reliable Loss Causation Methodology

"It is improper for an expert to take a results-driven approach to a question, molding his methodology and selectively relying upon data so as to confirm his preconceived opinion." *In re: Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, 2015 WL 7776911, at *16 (E.D. Pa. Dec. 2, 2015) (excluding expert in part because he "inconsistently applied methods and standards to the data so as to support his *a priori* opinion"), *aff'd*, 858 F.3d 787 (3d Cir. 2017). Feinstein failed to apply a reliable loss causation methodology in two ways: (1) he treated the two alleged corrective disclosures differently, accounting for the Company's denial of liability with regard to one but not the other; and (2) he failed to disaggregate confounding information before finding loss causation, despite recognizing the need to do so.

*First*, Feinstein's loss causation opinion is unreliable because he treated inconsistently the two corrective disclosures he identified. When considering the Divestiture Decision, Feinstein testified that the jury verdict and Divestiture Decision were both economically material pieces of information, but concluded they did not result in statistically significant stock price declines because the Company denied liability each time. *See* Feinstein Dep. 200:21–201:12; *id.* at 335:19–336:20. But when considering the Litigation Contingency, he entirely ***ignored*** the Company's denial of liability in the same paragraph as its announcement. Feinstein Rpt. ¶ 291; *compare* Dkt.

20

No. 79-34 at 4, *with* Dkt. No. 79-35 at 4.  He therefore failed to analyze whether the Company's denial in the Pre-Earnings Release had the same effect with regard to the Litigation Contingency he said it had with respect to the Divestiture Decision.  If Feinstein had followed his own reasoning based on his analysis of the jury verdict and Divestiture Decision, he would have concluded the Litigation Contingency did not cause the decline in JELD-WEN's stock price on October 16, 2018.

Feinstein also failed to analyze whether a more plausible explanation—that the market had already priced-in risk associated with the Steves Litigation—applied to the jury verdict, the Divestiture Decision, and the Litigation Contingency.  *See, e.g.,* Feinstein Dep. 327:17–328:16 (agreeing that it was possible investors were largely expecting divestiture before the Divestiture Decision); Ex. 12, June 11, 2018 Gabelli report at 1 ("Our view is that the stock fully discounts the potential for divestment.").  "[T]he disclosure of information that was previously understood by market participants would not be expected to affect a security's price in an efficient market because the price would already reflect the value of that information."  Fischel Rpt. ¶¶ 20, 35.

***Second***, although Feinstein acknowledged that it is necessary to control for confounding information to properly assess loss causation, Feinstein Rpt. ¶ 268, he failed to do so.  "To establish a causal link between stock price movement and misrepresentations or corrective disclosures, an economist must control for confounding factors, i.e., other industry- or company-specific information released to the market unrelated to the alleged fraud."  *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) (citation omitted), *aff'd*, 752 F. 3d 82 (1st Cir. 2014).  Feinstein conceded that his event study alone cannot determine ***which*** Company-specific news on October 15, 2018 caused the statistically significant price drop, *see* Feinstein Dep. 189:8–191:4, and claimed that he "looked at each piece of news,

21

applied financial principles to determine whether it was economically material or not, and if so, whether it would have a positive or a negative impact," *id.* at 192:16–193:24.

But the loss causation section of Feinstein's report did not contain this analysis. Feinstein Rpt. ¶¶ 265–300. When asked about this at his deposition, Feinstein first claimed that disaggregation at the loss causation stage was not necessary because he determined the corrective disclosures were economically material. Feinstein Dep. 195:22–197:8. After conceding "economically material information does not always cause a statistically significant stock price movement," *id.* at 201:25–202:13, he later claimed his disaggregation analysis was merely hidden in the damages section of his report, *id*. at 212:23–213:20.

But it *matters* where in his report Feinstein discussed disaggregation because the sequence of analysis is significant. Feinstein had to *first* disaggregate to determine whether the allegedly fraud-related information *caused* any loss, before he could consider what portion of the loss was attributed to the alleged fraud-related information. *See Bricklayers*, 853 F. Supp. 2d at 190 (noting that a "fail[ure] to disaggregate" is "misleading[]" because "the movement could very well have been caused by other information released to the market on the same date"). Feinstein again assumed his conclusion. Because Feinstein classified the announcement of JELD-WEN's disappointing Q3 results and downgraded FY18 guidance as confounding information, Feinstein Dep. 210:13–211:23, he should have disaggregated *before* concluding the Litigation Contingency caused the stock decline on October 16, 2018 and moving on to measure damages. His failure to do so renders his opinion legally inadmissible. "It is not enough to divide each day's economic loss by . . . [events] on that day and attribute a corresponding proportion to the defendants, without demonstrating that the [corrective disclosure] was a substantial cause of the loss." *Bricklayers*, 853 F. Supp. 2d at 195, 190 (noting "[i]t would be just as scientific to submit to the jurors evidence

22

of defendants' alleged fraud and [the company's] stock fluctuations and let them speculate whether the former caused the latter"); *REMEC*, 702 F. Supp. 2d at 1273–74 (excluding expert in part for failure to disaggregate multiple pieces of Company-specific information in one press release).

For these reasons, Feinstein's loss causation opinion should be excluded.

## II.   FEINSTEIN'S DAMAGES OPINION IS NOTHING MORE THAN HIS SAY-SO

Feinstein "calculated" damages by reading the news released on October 15, 2018 and "mak[ing] subjective judgments about which news impacted the stock price." *Bricklayers*, 853 F. Supp. 2d at 190.  That does not satisfy Rule 702.  Feinstein's speculations are not evidence, and neither are the "calculations" he derived from a hodgepodge of contradictory methodologies.

### A.   Feinstein's Damages Opinion Is Based on Pure Speculation

Feinstein arbitrarily and selectively attributed losses to the Company-specific news released on October 15, 2018.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

***First***, Feinstein's conclusion that the Litigation Contingency caused JELD-WEN's stock to drop by $0.55 contradicts his own opinion that JELD-WEN's stock traded in an efficient market and fundamental market efficiency principles.  An efficient market "is a market in which available information is incorporated into the price of a security such that the trading price reflects available information with reasonable promptness."  Feinstein Rpt. ¶ 158.  Here, the market knew the damages awarded by the jury verdict and the Divestiture Decision's clarification that JELD-WEN would likely face a judgment that included the trebling of $12.2 million in past damages, plus divestiture of the Towanda doorskins facility and attorneys' fees.  *See* Dkt. No. 79-25; Dkt. No. 79-34 at 4–6.  Even immediately following the *Steves* jury verdict, analysts at Gabelli "assume[d]

23

a $75 million cash outlay related to the ongoing litigation." Ex. 13, Feb. 22, 2018 Gabelli report at 1.[8] Yet Feinstein assumed that JELD-WEN's stock price did not *at all* reflect publicly available information about the judgment JELD-WEN would likely face as a result of the Divestiture Decision. Fischel Rpt. ¶ 32.

In his Reply Report, Feinstein claimed that none of the risk of the Litigation Contingency could have been known to the market before October 15, 2018. To support that conclusion, Feinstein speculated that "the Company needed ten days to undertake its evaluation [of the Divestiture Decision] and calculate its estimate of the impact." Reply Rpt. ¶ 53; *see also id.* ¶¶ 49–50. Again, Feinstein cited no authority for this view, which contradicts efficient market theory and his own opinion that JELD-WEN stock traded in an efficient market. "Plaintiffs may not at the same time presume an efficient market to prove reliance and an inefficient market to prove loss causation. They may not have their cake and eat it too." *Bricklayers*, 853 F.2d at 190 (excluding expert report that attributed stock drop to defendants when the information released on the corrective disclosure date "was released nine days earlier without any corresponding impact").

Feinstein's assumption that it took the Company 10 days to update its accounting estimates is also factually baseless. *See* Reply Rpt. ¶ 50 (assuming that the Company "needed . . . ten days to estimate the probable dollar amount of the award" based on the timing of the announcement of the Litigation Contingency). Feinstein had no evidence that it actually took the Company 10 days to perform its internal accounting analysis. *See* Feinstein Dep. 315:23–316:15 (admitting he did

---

[8] Feinstein himself accepted that it was possible there was not a statistically significant decline in stock price following the Divestiture Decision in part because investors were largely expecting it. *See* Feinstein Dep. 327:17–328:16. The risk of divestiture and the Litigation Contingency were both remedies stemming from the Steves Litigation and the jury verdict, so "it would make no economic sense for the stock price in an efficient market to simultaneously reflect some discount for the potential divestiture but none for the charge." Fischel Rpt. ¶ 34.

not know what JELD-WEN did with regard to the Litigation Contingency in those 10 days and that the Company may have finished its accounting analysis before October 15, 2018). His damages opinion should be excluded on this basis. *See In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1260, 1269–70, 1294–96 (N.D. Okla. 2007) (excluding expert opinion where public information was reflected in the stock price ***before*** the first alleged disclosure), *aff'd*, 558 F.3d 1130 (10th Cir. 2009).

***Second***, Feinstein artificially limited his valuation of the impact of the disappointing Q3 results and downgraded FY18 guidance. *See* Feinstein Rpt. ¶ 320. Feinstein recognized that if the market expected the reasons for the disappointing FY18 disclosures to impact future performance, then he should have applied a valuation multiple to the $0.22 per share decline he calculated, which would have increased the amount of the stock decline not attributable to the alleged fraud. *See id.* (explaining that "[a]pplying a valuation multiple [to this reduction] would only be appropriate if the reasons for the past performance disappointment were expected to impact future performance"). But without any evidence, he erroneously assumed that the market believed that the disappointing Q3 results and downgraded FY18 guidance would ***not*** impact JELD-WEN's future performance.

Feinstein's assumption "is not supported by sufficient facts to validate it in the eyes of the law." *Brooke Grp.*, 509 U.S. at 242. Feinstein's conclusion is directly contradicted by the analyst reports, which explicitly attributed their FY19 forecast reductions to the disappointing Q3 results and downgraded FY18 guidance. Fischel Rpt. ¶ 44; *supra* note 7. Feinstein claimed he reached this conclusion based on Michel's comments that the Company viewed "2018 financial performance headwinds as temporary in nature" and "capabilities [JELD-WEN] can fix." Dkt. No. 79-35 at 1. But Michel did not say that JELD-WEN could "fix" the issues immediately. *Id.*

Feinstein's conclusion that the disappointing Q3 results and downgraded FY18 guidance caused JELD-WEN's stock price to drop by only $0.22 is therefore contradicted by the evidence. *See Bausch*, 2009 WL 2750462, at \*14 (holding that expert's willingness to disregard contrary evidence rendered her opinion "inherently unreliable").

Feinstein thus overestimated the impact of the Litigation Contingency and underestimated the impact of the disappointing Q3 results and downgraded FY18 guidance on JELD-WEN's stock price based on pure speculation. His damages opinion should be excluded on this basis alone. *See Limelight*, 2018 WL 678245, at \*3 (excluding expert who failed to tie economic model to the facts of the case).

### B. Feinstein Failed to Use a Reliable Methodology in Formulating His Damages Opinion

Feinstein's damages opinion should also be excluded because his "methodology" is "simply fancy guesswork." *Limelight*, 2018 WL 678245 at \*3. Although Feinstein recognized there were multiple reasons why JELD-WEN's stock dropped on October 16, 2018—and purported to analyze each piece of Company-specific information, Feinstein Rpt. ¶ 308—he used a different method to value each piece of information. Because each method is fatally flawed, his damages opinion should be excluded. *Zoloft*, 2015 WL 7776911, at \*16 (excluding expert who "inconsistently applied methods and standards . . . to support his *a priori* opinion").

### 1. Feinstein Lacks Any Reliable Methodology for His Arbitrary Damages Calculations

Feinstein's damages opinion lacks any reliable methodology for apportioning JELD-WEN's October 16, 2018 stock drop. Most egregiously, Feinstein did not even attempt to directly measure the impact of analysts' lowered FY19 EBITDA estimates and valuation multiples—even though he did so with the Litigation Contingency and disappointing FY18 disclosures. Instead, he took the total $4.42 stock decline on October 16, 2018, subtracted the $0.55 he attributed to the

26

Litigation Contingency and the $0.22 he attributed to the disappointing Q3 results and downgraded FY18 guidance, and concluded that the remaining $3.65 was attributable to analysts' lowered FY19 EBITDA estimates and valuation multiples. Feinstein Rpt. ¶ 330. He offered no support for this "methodology," and did not explain why he did not apply the same methodology he used to quantify the impact of the disappointing FY18 disclosures, for example, to quantify the FY19 analyst downgrades. Feinstein's damages opinion should be excluded on this basis alone. *GoDaddy.com LLC v. RPost Commc'ns Ltd.*, 2016 WL 2643003, at *6 (D. Ariz. May 10, 2016) (excluding expert's damages opinion as unreliable because his apportionment of damages attributable was based on evidence that was "conjectural or speculative," not "reliable and tangible"), *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017).

But, even if it were proper for Feinstein simply to lump together the "leftover" stock drop and claim it was all related to analysts' downgraded FY19 EBITDA and lowered valuation multiples, Feinstein arbitrarily apportioned the causes of this decline. Feinstein relied on JELD-WEN's public financial statements, which report adjusted EBITDA by geographic business segments. Feinstein assumed that analysts' decreased expectations for JELD-WEN's FY19 performance were attributable to JELD-WEN's business segments in Europe and North America—but not Australasia—in proportion to EBITDA. *See* Feinstein Rpt. ¶¶ 329–37; Feinstein Dep. 353:18–355:4 ("[I]f a segment has a large contribution typically to EBITDA, then it will make a larger contribution to the surprise."). Feinstein then excluded the stock decline he attributed to Europe and North American windows, because the alleged fraud occurred in only North American doors. Feinstein Rpt. ¶¶ 329, 332. But that is not expert financial or economic analysis; it is just a guess, which Feinstein admits. Feinstein Dep. 353:18–355:4 (claiming he made this assumption because the Company did not publicly explain how its various geographies

and businesses contributed to the downgraded FY18 guidance).  And Feinstein's guesses are not evidence:  Courts exclude expert damages figures that "appear[] to have been 'plucked out of thin air based on vague qualitative notions.'"  *NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, at *7 (N.D. Cal. Mar. 17, 2020) (quoting *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68–70 (Fed. Cir. 2012) (calculating damages based on "overall revenues, which have no demonstrated correlation to the value of the" information at issue, was improper because it "artificially inflate[d]" damages calculation)).  Because Feinstein's damages analysis is untethered from any principled methodology, it fails the *Daubert* test.  *See* Fed. R. Evid. 702(c).

Nor can Feinstein justify excluding Australasia, which accounts for approximately 15% of JELD-WEN's adjusted EBITDA, Dkt. No. 79-30 at 46; Ex. 14, JELD-WEN 10-K for FY18, at 53. Feinstein said he did so because the Company attributed its disappointing FY18 performance to Europe and North America.  *See* Feinstein Rpt. ¶ 331.  This maneuver, which inflated the stock drop Feinstein ultimately attributed to North American doors (and therefore the alleged fraud), is in direct conflict with Feinstein's opinion that the market did not expect the Company's disappointing FY18 performance to impact future performance.  *See id.* ¶ 320; *supra* note 7. Feinstein therefore attributed an inflated figure of 65.8% of JELD-WEN's EBITDA to North America instead of the correct figure of approximately 57%.  *Compare id.* ¶ 332, *with id.* ¶ 335.

### 2.    Feinstein Applied His Arbitrary Methodology Inconsistently

Even if Feinstein's arbitrary approach were methodologically sound, he applied it inconsistently and in a manner designed to inflate damages rather than accurately estimate them. "Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No II) MDL*

28

*2502*, 892 F.3d 624, 634 (4th Cir. 2018).  Feinstein's results-driven damages analysis makes two egregious errors.

*First,* Feinstein assumed analysts thought the reasons for the disappointing Q3 results and downgraded FY18 guidance would affect all of JELD-WEN's European and North American businesses *except* for JELD-WEN's North American door business.  Feinstein did not offer any reason analysts would believe the North American door business would be magically exempt from the causes of a disappointing Q3 and downgraded FY18 guidance.  Nor did he explain why analysts would attribute *all* of the expected problems with JELD-WEN's North American door business to fraud instead.

*Second*, Feinstein ignored the fact that JELD-WEN's North American door business comprises many business segments that are unrelated to the alleged fraud.  These include exterior doors and other types of interior doors besides the *molded* variety.  *See* Dkt. No. 79-4 at 100–01.  Ignoring this distinction, of course, further inflated Feinstein's damages figure.  After excluding the proportion of the decline he attributed to JELD-WEN's European business and its North American window business,[9] Feinstein arrived at a $1.44 decline he attributed to the "North American door business."  *Id.* ¶ 337.  Feinstein failed to then further exclude the portions of JELD-WEN's North American door business that Feinstein conceded are not related to the alleged fraud.  *See* Feinstein Dep. 361:23–362:21; *id.* at 364:20–365:7.  Feinstein claimed these segments were "already excluded because [they were not] responsible for a stock price drop," *id.* at 362:10–13, but that makes no sense and is inconsistent with his stated methodology.  Had Feinstein actually

---

[9]     Even in this aspect of his calculation, Feinstein's damages figure is inflated.  Feinstein identified that "door sales made up 57% of North American sales" but that "analysts estimated that door sales made up 60% of sales and 60% of the North America segment EBITDA" and chose to use the higher 60% figure for his calculation.  Feinstein Rpt. ¶ 335.

intended to exclude exterior doors and other types of interior doors from his analysis because they did not cause the stock drop, he should have excluded them at the same time he excluded Australasia. Feinstein Rpt. ¶ 331. Had he done that, of course, he would have concluded that less of the stock decline was attributable to the alleged fraud. Thus, Feinstein's damages figure is further inflated by the inclusion of these business segments.

This is not the first time Feinstein has "erroneously inflated" numbers to suit his needs. *Finkelstein*, 2005 WL 1074364, at *16 (concluding "Feinstein erroneously inflated the per subscriber revenue" because he included the revenues of another network that shared common ownership with the television channel he was analyzing); *see also OPERS*, 2018 WL 3861840, at *7 (concluding Feinstein's analysis "was entirely improper because you are supposed to hypothesize and then see your results. You are not supposed to know your results in advance") (citation omitted). Here, too, Feinstein's damages opinion should be excluded. *See Finkelstein*, 2005 WL 1074364, at *15–17 (finding Feinstein's ends-driven valuation opinion unreliable for ten reasons "and other reasons too numerous to set forth").

### III. FEINSTEIN'S DECLARATION SHOULD BE STRUCK

Feinstein's declaration should also be struck because he submitted it after his class certification deposition and at the close of class certification briefing, rendering it impossible for Defendants to cross-examine him on, or respond to, the opinions he offered therein. Because Feinstein's declaration "'does not rely [on] any information that was previously unknown or unavailable to him,' it is not an appropriate supplemental report under Rule 26." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 278 (S.D.N.Y. 2011) (citation omitted).

### CONCLUSION

For these reasons, the Court should exclude Feinstein's reports and testimony.

March 5, 2021

Respectfully submitted,

JELD-WEN Holding, Inc.
By counsel
/s/ Brian C. Riopelle
Brian C. Riopelle (VSB #36454)
Brian E. Pumphrey (VSB #47312)
Brian D. Schmalzbach (VSB #88544)
Garrett H. Hooe (VSB #83983)
MCGUIREWOODS, LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com
bpumphrey@mcguirewoods.com
bschmalzbach@mcguirewoods.com
ghooe@mcguirewoods.com

Sandra Goldstein (*pro hac vice*)
Rachel Fritzler (*pro hac vice*)
Lindsey Weiss Harris (*pro hac vice*)
Jeehyeon Jenny Lee (*pro hac vice*)
Jacob Rae (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
sandra.goldstein@kirkland.com
rachel.fritzler@kirkland.com
lindsey.harris@kirkland.com
jenny.lee@kirkland.com
jacob.rae@kirkland.com

Matthew S. Owen (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Phone: (202) 389-5000
Fax: (202) 389-5200
matt.owen@kirkland.com

*Attorneys for Defendants JELD-WEN*
*Holding, Inc., Mark A. Beck, L. Brooks*
*Mallard, Kirk S. Hachigian, and*
*Gary S. Michel*

31

## CERTIFICATE OF SERVICE

I certify that on the 5th day of March, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to all counsel of record in this case.

/s/ Brian C. Riopelle

Brian C. Riopelle (Va. Bar No. 36454)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1084
Fax: (804) 698-2150
briopelle@mcguirewoods.com

32