# EXHIBIT 1

**Page 1**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

------------------------------x

IN RE: JELD-WEN HOLDING, INC.

SECURITIES LITIGATION

CIVIL ACTION NO.

3:20-cv-00112-JAG

------------------------------x

VIDEOTAPE DEPOSITION OF

STEVEN P. FEINSTEIN

VIA ZOOM VIDEOCONFERENCE

January 30, 2021

10:00 a.m.

Reported by:

Maureen Ratto, RPR, CCR

STEVEN P. FEINSTEIN

A.    The allegations in the Steves complaint.

Q.    And the Steves litigation concerns these claims against Jeld-Wen for allegedly overcharging it for door skins?

MR. ROTHMAN:  Objection for.

A.    I believe their allegations were more extensive than that, but that's included among them.

Q.    Are there other allegations you are thinking about?

A.    Yes.

Q.    What are those?

A.    Well, the Steves Complaint also alleged that there was breach of contract and there was some quality issues as well, that the company would either -- I'd have to look at the Steves Complaint to see for sure, but I read it and you read it.  We know what's in there.  It's more than that they overcharged.  It's that they were engaged in anticompetitive behavior that hurt

Page 29

STEVEN P. FEINSTEIN

Steves, breach of contract, overcharging, under-delivering, threatening, these sort of things.

Q.    Okay. You also say in paragraph 22, "The announcement of the $76.5 million charge stunned the market." Is that your -- is that your opinion or an assumption you relied on?

A.    That is a conclusion from the analyst reports.

Q.    Is there any other basis for that conclusion aside from the analyst reports?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    What are your other bases?

A.    Well, we have explicit commentary in the analyst reports and in news articles as well but also in the price reaction.

Once it's established that the market is efficient, it's clear that when there is a known negative announcement the price will fall.  So the price

STEVEN P. FEINSTEIN

falling indicated that the market was surprised, the price of the stock.

Q.     You say in paragraph 23 that "$76.5 charge informed the market 'the allegations of anticompetitive behavior had merit and there were negative repercussions from that behavior.'"

Is that your opinion or an assumption that you relied on?

A.     It's a conclusion from all the evidence in the case. Of course, I'm, I don't want to say paraphrasing, I'm consolidating all the evidence but I'm expressing what is implicit in the market's reaction to that announcement.

Q.     Is that opinion --

A.     I do want to add, because you asked what are the bases for this opinion, there is a judge's order, which the judge concurred with my conclusions that there was a stunning revelation to the market that informed the market about unsustainable behavior.

Q.     Is that opinion based on your

STEVEN P. FEINSTEIN

understanding of what a litigation

contingency is?

MR. ROTHMAN:  Objection.

A.    In part, but only in part.

Q.    What is your understanding of

what a litigation contingency is?

A.    My understanding is that

according to accounting rules if a

company believes a certain cost or charge

is likely or probable, they have an

obligation to declare it and if it hasn't

actually been paid it, to reserve for it.

Q.    What is the basis for your

understanding of what a litigation

contingency is?

A.    Like I said, you know, I've a

Doctorate in Financial Economics, I've --

in the course of my education, and I have

the Chartered Financial Analyst degree,

finance and accounting overlap.  In the

way I described earlier, financial

analysts are consumers of accounting,

not producers but we study what

accounting means.  And in order to know

Page 32

STEVEN P. FEINSTEIN

how to use accounting we have to understand something about what the rules are.

So, again, I don't have the expertise to prepare financial accounting but I have the expertise to read and to interpret it from my education and professional work and my practitioner training and the practitioner designation that I have.

Q.    Did you consult an accountant to inform your opinion in this case?

A.    No, not in this case. I'm sure somewhere along, you know, my 30-year career I've talked to accountant about contingencies and accounting for litigation contingencies but not in this case since I already understand the concept.

Q.    Do you know what accounting rules govern litigation contingency disclosures under GAAP?

A.    No.  I couldn't name chapter and verse but I understand the

STEVEN P. FEINSTEIN

principles.

Q.    If your understanding of the nature of the litigation contingency is wrong, would that change your opinion?

A.    No. Because like I said, there are multiple reasons why I drew that conclusion.

Q.    What does it mean for a market in a particular stock be a --

(Reporter requests clarification.)

Q.    What does it mean for a market in a particular stock to be efficient?

A.    Well, I wrote about that in this report, I've testified about it in numerous cases and I've written about it in published articles.  So we can look at -- I'm looking at the Table of Contents of my report to find exactly where I speak about it. Section 6A is Efficient Market Defined, page 53.

So I'm going to scroll forward to page 53. I remember it's the last paragraph of this section where I sum up

STEVEN P. FEINSTEIN

what the literature says.  So it's page 158, "An efficient market, as defined and discussed by" -- and I name various sources -- "is a market in which available information is incorporated into the price of a security such that the trading price reflects available information with reasonable promptness."

The degree of efficiency that's usually addressed in a securities litigation case is an efficient market is one in which the market doesn't ignore important material valuation, relevant information but rather pays attention to it and that information then becomes reflected in the stock price.

Q.   Do you agree that an expected event will not impact the price of a stock trading in an efficient market?

A.   It depends how you define "expected". I mean, if it's somewhat expected and then it happens for sure it will effect -- it may effect the price.

If it's -- well, I mean so it

Page 130

STEVEN P. FEINSTEIN

marked on this date for

identification.)

A.    Should I look for a new exhibit?

Q.    Yes. If you click in the middle it should be there.

A.    I need to enlarge it a bit. Okay. That works.

Q.    And if you see in the paragraph, "Jeld-Wen announces that quote while the company" -- let me help you find it.

So about halfway down the first page it says, "Additionally, the company expects third quarter results to include a charge of $76.5 for litigation contingency." Do you see that language?

A.    I do.

Q.    Is that -- that's the litigation contingency you focused on on October 15th, 2018?

MR. ROTHMAN:   Objection.

A.    Can I hear the question again?

Q.    Is this the second corrective

Page 131

STEVEN P. FEINSTEIN

disclosure that you focus on in your report?

MR. ROTHMAN:  Objection.

A.   The entire announcement -- it's not the only component of the corrective disclosure, it's an important component of corrective disclosure but it's not the only component.

Q.   Okay. And at the end of that paragraph I just referenced it says, "While the company continues to maintain that it has not violated any antitrust laws and intends to appeal any adverse judgment, recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the appeals process is unsuccessful." Do you see that language?

A.   I do.

Q.   Do you cite this language in your report?

MR. ROTHMAN:  Objection.

A.   I don't remember whether I excerpted it or not but I certainly

Page 132

STEVEN P. FEINSTEIN
considered it. This is important language for my analysis. I reference this document. I don't remember whether I excerpted from it or not but I can look.

Q.    If we look at page 44 paragraph 137 to 141 you discuss the Steves litigation contingency in the background section of your report.

Do you quote that language here?

MR. ROTHMAN:  Objection.

A.    I quote some language from the press release in paragraph 139.

Q.    Right. Do you quote the language that "the company continues to maintain it has in the violated any antitrust laws"?

MR. ROTHMAN:  Objection.

(Deponent reviews the document.)

A.    On page 100, just paragraph 291, I quote from that paragraph that, "The charge reflects a judgment anticipated to be entered against the

Page 133

STEVEN P. FEINSTEIN

company.  Recent rulings --

Q.    Do you --

A.    I also quote, "Recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the -- if the appeal process is unsuccessful." And there in multiple places in the report I cite to that press release, but --

Q.    Do you cite the language, "The company continues to maintain that it has not violated any antitrust laws"?

A.    I don't.  I think the answer is no.

Q.    Okay. So did you consider that language when you prepared your report?

A.    Absolutely. What's going on here is the company -- previously on October 6th the company vehemently denied that there was any merit to the Steves lawsuit and anticipated there would be no negative repercussions from it and that they would essentially have it overturned on appeal. And then so that that's --

Page 134

STEVEN P. FEINSTEIN

well, it's alleged to be a misrepresentation and contain omissions, but it was, you know, a very forceful statement, you know, company talking out of one side of its mouth.

Now what you have on October 15th is the company on the one hand saying we still maintain we didn't do anything wrong but there could be negative repercussions, which it's like a mixed message now. So the message went from being a straightforward denial to now being a mixed message that there would be repercussions.

Q.    Well, it says "it has not violated any antitrust laws and intends to appeal any adverse judgment." Correct?

A.    It does say that.

MS. HARRIS:  Okay.  That's all I have.

MR. ROTHMAN:  Okay. Thank you.

VIDEOGRAPHER:  Will there be a redirect or shall we go off the record?

Page 135

STEVEN P. FEINSTEIN

MR. ROTHMAN:  No redirect, no cross.

VIDEOGRAPHER:  We are off the record at 12:47 p.m., and this concludes today's testimony given by Steven P. Feinstein.

The total number of Media Units used was three and will be retained by Veritext Legal Solutions.

(The proceedings were adjourned at 12:47 p.m.)

**Page 140**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION


-----------------------------x

IN RE: JELD-WEN HOLDING, INC.

SECURITIES LITIGATION

CIVIL ACTION NO.

3:20-cv-00112-JAG

-----------------------------x


VOLUME II

VIDEOTAPE DEPOSITION OF

STEVEN P. FEINSTEIN, Ph.D.

VIA ZOOM VIDEOCONFERENCE

February 22, 2021

10:00 a.m.


Reported by:

Maureen Ratto, RPR, CCR

Page 156

STEVEN P. FEINSTEIN, Ph.D.

divestiture decision reasonably negatively impacted the stock price." Right?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    What is your basis for that statement?

A.    Numerous things. And I explain them in the report and in the reply report. Financial principles, based on financial principles what's well known and generally accepted about how securities are valued, that kind of information in an efficient market should cause the stock price to fall or should put -- should put downward pressure on the stock price and the price might not fall if there is something else holding it up, but it should push the price down, all else equal.

The company previously said that if there was -- well, the company said, in a number of ways, that the -- that if there would be legal

Page 157

STEVEN P. FEINSTEIN, Ph.D.

ramifications from the Steves lawsuit that they would be material.

Analysts said that that kind of information is material and this kind of disclosure would -- of a decision against the company would be adverse to the company.  So I mean company statements, analyst statements, financial principles, the fact that the stock fell every single day for ten days after that, all indicate that it's reasonable that this information, this partial corrective disclosure negatively impacted the stock price that day.

Q.    Okay. And you say, "The reason the stock did not experience a statistically significant decline may have been due to the countervailing impact of the company's denial." Right?

A.    That's right.

Q.    You say that's a possibility, right?

MR. ROTHMAN:  Objection.

A.    Yes.

STEVEN P. FEINSTEIN, Ph.D.

Q.   You don't actually know if that's the case, right?

A.   I think that's fair to say.

Q.   So it may have been due to countervailing, it may not -- sorry. I'll start over.

It may not have been due to the countervailing impact of the company's denial, right?

MR. ROTHMAN:  Objection.

A.   Well, the best explanation, given the facts and circumstances, is that what held the stock price up, what was, in fact, the countervailing impact of the company's denials, I haven't seen -- I mean, within -- the reason I say it's possible is, who knows what else we'll discover through discovery or who knows what else -- maybe I'll be presented with some very compelling argument.

I see no compelling argument, except for this explanation as to why the stock price declined, though, negative,

Page 159

STEVEN P. FEINSTEIN, Ph.D.

was not statistically significant that day. This is the best explanation and the most reasonable explanation.

Q.    But there may be other reasons the stock did not decline in a statistically significant way that day, right?

A.    Within the realm of possibility. I read Mr. Fischel's report and he offered no good explanation, no good alternative.

I see nothing in the record in this case or in the experience of the company that would provide a better explanation than that the market was influenced by the company's adamant denials that there would be negative repercussions.  And I should also say that, you know, when the company finally acknowledged that there would be negative repercussions and that kind of opened the floodgate to the floor dropping out of the stock, sorry to mix metaphors, but I think you understand what I'm saying

Page 166

STEVEN P. FEINSTEIN, Ph.D.

pre-earnings release on October 15th, 2018, right?

A.   Please repeat the question.

Q.   The company announced the litigation contingency in its Q3 2018 pre-earnings press release on October 15th, 2018, correct?

A.   Yes.

Q.   I'm going to refer to the press release as the pre-earnings release. Will you understand that?

A.   Okay. Yes.

Q.   Okay. I'm going to show you what was previously marked as Exhibit 4 in your prior deposition. That should hopefully be available in the Marked Exhibits folder.

(Feinstein Exhibit 4, Jeld-Wen Pre-Earnings Press Release, having been previously marked, is shown to the Deponent.)

A.   Okay. I'm there.

Q.   Okay. And this is the pre-earnings release, correct?

Page 167

STEVEN P. FEINSTEIN, Ph.D.

A.    Yes.

Q.    And you see about halfway down the page the paragraph that starts, "Additionally, the company expects third quarter results to include a charge of $76.5 million for a litigation contingency?"

A.    I see that.

Q.    Okay. That's the announcement of the litigation contingency that you concluded was a corrective disclosure, correct?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    And just so I understand, is that first sentence a corrective disclosure or is the entire paragraph a corrective disclosure?

A.    Well, I think the entire press release constitutes the corrective disclosure. Although, some areas are -- the most corrective section is that paragraph.

Q.    Are there other portions of

Page 168

STEVEN P. FEINSTEIN, Ph.D.

the press release, besides that paragraph, that you believe are corrective as prior misstatements in this case?

A.    Well, yes. The context in which it was made. The company had never in its history issued a warning before or a pre-release of this sort.  Sort of like a news bureau interrupting their regularly scheduled programs to bring a special report.  I mean, there's something important.

So, you know, analysts and investors are looking at this and trying to figure out what was so important that the company had to pre-release. So I mean, the context in which the pre-release is being made, which is why the -- is also part of the corrective disclosure.

Q.    Is there any language outside of the paragraph we looked at that constitutes a corrective disclosure?

A.    Well, I just said, I consider

STEVEN P. FEINSTEIN, Ph.D.

this entire press release, that corrective disclosure, you know, what the company felt was so important that they had to pre-release, it's not -- and then you know, these other bullet points that they add to the announcement, which aren't really all that unusual or all that important, places emphasis on that paragraph that you pointed out as being the key to why this was -- why this pre-release was felt to be necessary by the company.

Q.    Was the preliminary third quarter 2018 revenue announcement, was that a corrective disclosure?

A.    Well, like I said, I mean, the content of that is, in and of itself, not a corrective disclosure but, you know, that the company was still having trouble with some of its operational or production issues, just as they had announced in prior quarters for over a whole year, there's information conveyed by the company, adding that to this

Page 170

STEVEN P. FEINSTEIN, Ph.D.

corrective disclosure press release. I mean, it focuses one's attention on what's really important and what's new and corrective, which is the litigation charge.

Q.   So is there any language in here that is not part of the corrective disclosure?

A.   I said the whole press release is the corrective disclosure.  The information content that's most corrective is the paragraph you highlighted.  And, frankly, I think investors and analysts understood that too that that's the paragraph to be highlighted.

Q.   Were there other corrective disclosures on October 15th, 2018, aside from those contained in this pre-earnings release?

MR. ROTHMAN:  Objection.

A.   Well, in my report I wrote that analysts' reaction to this release also is part of the corrective disclosure

Page 171

STEVEN P. FEINSTEIN, Ph.D.

process. The analysts reacted and wrote down 2019 forecasts, you know, well beyond the 2018 that the company said was essentially over and fixed.

So I think I would include the reaction of the public and -- the public reaction of some market participants as to be a component of the corrective disclosure for the marketplace.

Q. Is there any information in the pre-earnings release that's corrective besides that contained in the litigation contingency paragraph?

MR. ROTHMAN: Objection.

A. I don't -- I don't -- are you saying you did not understand my prior answer or you want me to say the answer again?

Q. No. I'm trying to understand -- this is a press release that is more than a page and there's a single paragraph that talks about the litigation contingency.

So I'm trying to understand if

Page 188

STEVEN P. FEINSTEIN, Ph.D.
analysis.

Q.    Okay. Thank you.

Going back to your report, your original report, we're going to look at paragraph 268 and that's page 88.

A.    Okay.

Q.    An event study can be used to establish a company's specific security price reaction on a corrective disclosure date, correct?

MR. ROTHMAN:  Objection.

A.    I wouldn't -- I didn't and wouldn't say it quite that way.

Q.    So what you say here is, "Once an event study has established a company-specific security price reaction on a corrective disclosure date", right?

A.    I wrote that, yes.

Q.    Okay. So you agree that an event study can establish a company-specific price reaction on a corrective disclosure date, right?

A.    Yes.

Q.    Here your event study found a

STEVEN P. FEINSTEIN, Ph.D. statistically significant stock price movement on October 16, 2018, correct?

A.   Yes.

Q.   An event study doesn't tell you whether an allegation-related -- I'll start over.

An event study does not tell you whether allegation-related information, as opposed to other unrelated company information was a substantial cause of the security price change, right?

MR. ROTHMAN:  Objection.

A.   Well, it depends, you know, how much of the analysis around the statistical work you consider to be part of the event study or outside the event study.

The statistical t-test, by itself, will tell you that company-specific information caused the price movement. It can tell you -- it can provide an indication that it was company-specific information that caused

Page 190

STEVEN P. FEINSTEIN, Ph.D.

the price movement. Additional analysis after that would be undertaken in order to determine which company information, if there was a mix of company information, and I did that analysis.

Q.    Right. So the event study alone doesn't tell you which company-specific information caused the drop, right?

A.    Well, like I said, let's say the regression component, the regression and t-test component of the event study won't tell you, but if the analysis of -- it's I think reasonable to say that the analysis of the news, the news analysis is part of the event study analysis.

If that's the case, then the event study does do that. The additional work beyond the t-test and the regression analysis is what helps you determine which company news caused the price movement, and that could be -- and that reasonably could be considered part of the event study.

Page 191

STEVEN P. FEINSTEIN, Ph.D.

Q.    But the regression analysis alone did not tell you that, right?

A.    Correct.

Q.    Okay. You say financial analysis, including valuation analysis, can account for and thus remove the effect of confounding information, right?

A.    Yes.

MR. ROTHMAN:  Objection.

Q.    How can financial analysis remove the effect of confounding information?

A.    Well, if there is a mix of information that's provided simultaneously, tools of financial analysis will indicate whether that other information is perhaps not even material, not economically material, not the kind of information that reasonably should cause a price movement, in which case you would exclude it from having had any impact on the stock price and that would focus the attribution of the price movement to remaining information.

STEVEN P. FEINSTEIN, Ph.D.

So some financial analysis tells you what's material and what's not material and some financial analysis will tell you if something is positive or negative.

Some be financial analysis would be to read the new disclosure in the context of the history of disclosures to see what's old versus what's new, which also helps assess whether information had an impact or not, different components of potentially confounding information whether they had an impact or not.

Q.   Did you use financial analysis to remove the effect of confounding information on October 16, 2018?

A.   Yes. Yes.

I mean, let me add to the prior answer.  I mean financial analysis can also be used to value what you determine to be material, present and economically material confounding information. Financial analysis can help

Page 193

STEVEN P. FEINSTEIN, Ph.D.

you value it so you can quantitatively deduct it from the total residual price movement.

Q.     What financial analysis did you do to remove the effect of confounding information on October 16, 2018?

A.     Well, essentially all the things I just said. So I looked at each piece of news, applied financial principles to determine whether it was economically material or not, and if so, whether it would have a positive or a negative impact.

I looked at -- I applied the financial principle that old expected news -- old or expected news has less impact or may be even no impact than new unexpected news. I applied the financial principle that transitory effects have little financial valuation effect, especially as compared to persistent ongoing changes and developments.

Q.     What confounding information

Page 194

STEVEN P. FEINSTEIN, Ph.D.
did you account for in using that
financial analysis?

A.    Well, I took out the estimated
financial impact -- estimated valuation
impact of the 2018 guidance change and
quarters -- and third quarter surprise.
I measured it, evaluated it relative to
financial principles and excluded it from
damages.

I identified that it's
possible that some of the longer term
problems that could account for the stock
price drop might have had to do with
Europe, as the company said so, or
windows in North America as opposed to
doors in North America, used valuation
tools to value that information and
exclude it from the entire price drop.

So the entire price drop that
day -- well, I also separated out the
total, from the total drop, the drop that
was caused by company-specific
information.  And then from
company-specific information I subtracted

Page 195

STEVEN P. FEINSTEIN, Ph.D.
-- that would have been $4.42.  I subtracted most of that by attributing it to non-fraud-related factors and ended up with a $1.99 that I determined was caused by the new corrective -- the new information that corrected at least partially some of the market's misunderstandings caused by the misrepresentations and omissions.

Q.    And this analysis that you're describing, that's in the damages section of your report?

A.    Yes.

MR. ROTHMAN:  Objection.

Q.    Is there any of that analysis in the loss causation section of your report?

A.    Probably.

Q.    Can you show me where?

A.    Well, loss causation --

Q.    Where did you remove the confounding effects of other information in your loss causation section?

MR. ROTHMAN:  Objection.

Page 196

STEVEN P. FEINSTEIN, Ph.D.

A.     Well, the -- part of the attribution analysis is to determine what is economically material and what isn't. And starting on page 88, and all the way through page 99, I explain why what the market learned about the competitive environment and the company's behavior was economically material.

So that focuses -- I mean, that basically -- that's what a loss causation does. I mean, I proved that the corrective disclosure components, the non-confounding components were definitely economically material and would and should and did have a negative impact on the stock price that day.

As far as subtracting out the value attributed to the confounding information, well, that's really more appropriately in the damage section, but I think there may be some elements of that in loss causation. Let me check.

Yeah. All right. The loss causation section has the affirmative

Page 197

STEVEN P. FEINSTEIN, Ph.D.

analysis that proves that the corrective disclosure component was economically material.  The determination of economic materiality of potentially confounding factors and quantifying the ones that were found to be economically material is in the damages section.

Q.    Is there anything else you did to remove the effect of confounding information in order to determine whether the revelation of the allegedly fraudulently concealed facts were the substantial cause of the security price decline on October 16, 2018?

MR. ROTHMAN:  Objection.

A.    I mean, your question is baffling. You're saying is there anything else I did besides identifying it, measuring and excluding it? No. That's how you would deal with it.

I identified it, I measured it and if it was confounding information that had a price impact, I excluded it from the damage and inflation measure.

Page 198

STEVEN P. FEINSTEIN, Ph.D.

Q.      How do you determine if a disclosure is economically material?

A.      You did ask that already. I think we should let the record speak for itself.

Q.      I have not and I would appreciate if you answer the question.

A.      That was one of the first questions asked today. It's economically material -- well, I'll say again.

I generally apply four prongs to my analysis.  I look at whether in the context of financial principles the content is economically material, whether the content is identified as being economically material by company statements, I identify whether the content is identified as being economically material by analyst statements, and then I do empirical work to see if there's an identifiable measurable price movement when the information becomes available to the marketplace.

Page 199

STEVEN P. FEINSTEIN, Ph.D.

Q.    Is it your opinion that all of the company's statements about the Steves litigation were economically material?

MR. ROTHMAN:  Objection.

A.    So let's define "economically material". Economically material means that it -- it should cause a reasonable -- that it either has a valuation impact or that it has an impact on reasonable investors' decisions to transact, is what I mean by economically material, and it's consistent with how the term is often used.

I mean, I identified statements that were related to the Steves litigation and I found that they were economically material for the reasons I just described, applying all of that analysis.

I didn't go out of my way to look for non-economically material statements that would have no bearing on price movements or the valuation. I'm afraid that if I say yes or no, that, you

Page 200

STEVEN P. FEINSTEIN, Ph.D.

know, I'll later think of an odd counter-example.

I think it's altogether possible that maybe if they say the same -- well, if they say -- okay. Something could be economically material maybe the first time they say it, but then nth time they say it, you know, if they say it multiple times subsequently, it no longer has a material impact because it's at that point old and stale.

So there's probably examples of that kind of information not being economically material and, therefore, would be an example based on which I can say, as an answer to your question, that some statements may not have been economically material when they were made.

Q. Was the Steves jury verdict economically material?

MR. ROTHMAN: Objection.

A. I think it was.

Q. Was the divestiture decision

Page 201

STEVEN P. FEINSTEIN, Ph.D.

economically material?

A.    Well, based on the analysis I did, I mean, looking at company statements, analyst statements, financial principles, the answer is yes. And the impact it may have had on the stock price, it may have been to maintain the inflation in the stock price on account of things that were also being said that would have muted its more observable movement in the price.

Q.    Did a statistically significant price reaction occur after either of those economically material disclosures?

MR. ROTHMAN:  Objection.

A.    On the day of the disclosure or if the announcements were made after the close the next trading day for each of those two, the price movement was not statistically significant, which does not prove that it was not economically material.

Q.    An economically material

Page 202

STEVEN P. FEINSTEIN, Ph.D.
statement will not always cause a price reaction to the company stock, right?

MR. ROTHMAN:  Objection.

A.    Depends what you mean by "reaction". If by "reaction" you mean any sort of impact?  I mean, a reaction could be that the price doesn't move in the face of countervailing information.  But yes, I would say that economically material information does not always cause a statistically significant stock price movement. That's a true statement.

Q.    So if a price reaction follows an economically material statement, you still need to account for in your move the effect of the confounding information to determine whether or not the economically material statement caused the price reaction, right?

MR. ROTHMAN:  Objection.

A.    Well, you said "need to". It depends what kind of analysis you are doing. Is it market efficiency analysis? Loss causation analysis?  A damages

Page 203

STEVEN P. FEINSTEIN, Ph.D.

quantification?

Q.    Let's say a loss causation analysis.

A.    Well, I mean, if you've got multiple corrective disclosures and one of them proves loss causation, you probably don't need to analyze the others at all.

Q.    If you had multiple disclosures, how can a single disclosure prove loss causation if you haven't accounted for the confounding information?

MR. ROTHMAN:  Objection.

A.    Well, you need not look -- because there may be other disclosures that are cleaner. There may be other disclosures that are cleaner and more obvious that was causing the price movement is the corrective information.

Q.    If there is two economically material disclosures on a single day, how do you determine which one caused the stock to drop?

Page 209

STEVEN P. FEINSTEIN, Ph.D.
what comes to mind, as I sit here now. There may be something additional.

Q.    Do you think there is anything that you reviewed that was an internal company document that isn't listed in Exhibit 1?

A.    As I sit here now, I just don't recall.

MS. HARRIS:  Okay. Let's take a break.

VIDEOGRAPHER:  Thank you. This is the videographer. The time is 11:09. We're going off the record. This is the end of media file 1.

(Recess is taken.)

VIDEOGRAPHER:  We are back on the record. The time is 11:19 a.m. Eastern Time and this is the beginning of media file 2.

Q.    Dr. Feinstein, please turn to page 105 of Exhibit 1, that's your report.

A.    Okay.

Q.    Paragraph 307, for the

Page 210

STEVEN P. FEINSTEIN, Ph.D.
purposes of your damages analysis, you identify four pieces of company-specific information that were released on October 15, 2018 after the close of trading, correct?

A.    Yes.

Q.    The second of those is the Q3 2018 results and fiscal 2018 guidance, right?

MR. ROTHMAN:    Objection.

A.    Yes.

Q.    And you clarify the 2018 performance disclosures as non-fraud-related, correct?

A.    Not really. I explained that earlier.

For purposes of a conservative treatment I treated it as if the drop caused by that component was not a component of inflation or damages.

Q.    In paragraph 317 you say, "I conservatively classify the 2018 performance disclosures as not fraud-related and exclude the party's

**Page 211**

STEVEN P. FEINSTEIN, Ph.D.

impact of that portion of the impact from damages." Is that correct?

A.    Right.

Q.    So --

A.    But I just want to be clear, that was a conservative treatment. It wasn't based on a conclusion that it truly was non-fraud-related. It very well might be.

Q.    For the purposes of your analysis, though, because you clarify it as non-fraud-related, these disclosures were confounding information, right?

A.    Well --

MR. ROTHMAN:  Objection.

A.    -- they may have been. They may have been fraud-related disclosures.

In order to provide a conservative measure of damages, I treated them as if they were confounding information but I didn't conclude that they were.

Q.    And you conclude that these disclosures did cause Jeld-Wen's stock to

Page 212

STEVEN P. FEINSTEIN, Ph.D.

drop, right?

A.    Yes.

Q.    So you concluded the fiscal 2018 performance disclosures were economically material?

A.    I did.

Q.    If we look at paragraph 298 to 299 of your report, that's page 102 --

A.    Okay.

Q.    -- you conclude that there was a statistically significant drop on October 16th, 2018 that could not have been caused by random volatility, right?

A.    Yes.

Q.    And then in the next paragraph, 300, you conclude the alleged misrepresentations and omissions caused the stock drop on October 16th, 2018, right?

MR. ROTHMAN:   Objections.

A.    Yes.

Q.    Where did you remove the confounding effect of fiscal 2018 performance disclosures before reaching

**Page 213**

STEVEN P. FEINSTEIN, Ph.D.

that conclusion?

MR. ROTHMAN:  Objection.

A.    Do you mean temporally, as I was doing my analysis or where I put it in the report as I was sequentially writing my opinions?

Q.    I mean, in writing your opinion at 300 you make that loss causation conclusion, and I'm wondering where before paragraph 300 you removed the confounding effect of the fiscal 2018 performance disclosures?

A.    The 22 cents related to 2018 is described below. I mean, I did all of the analysis before writing the report. How I presented it is an organization that makes the most sense.

So to answer your question, it is in paragraphs 316 through 322.

Q.    Were the fiscal 2018 performance disclosures known negative announcements?

A.    I can't hear you. I couldn't hear you.

**Page 214**

STEVEN P. FEINSTEIN, Ph.D.

Q.    Were the fiscal 2018 performance disclosures known negative announcements?

MR. ROTHMAN:  Objection.

A.    What do you mean by "known"?

Q.    Let's take a look at your transcript from the first deposition.

A.    Which exhibit is this?

Q.    I think we're going to be marking it as Exhibit 6.

(Feinstein Exhibit 6, transcript of Dr. Feinstein, dated January 30, 2021 was received and marked on this date for identification.)

MR. ROTHMAN:  Can you let us know when it's up there so I don't have to keep hitting refresh?

MS. HARRIS:  Sorry. We're having some technical difficulties. Apparently our Exhibit Share is stuck. So let's move on and we'll come back to that.

Let's go off the record and

Page 230

STEVEN P. FEINSTEIN, Ph.D.

fixed.

Q.    Do you see a --

A.    You don't see a 20% drop in the price from a transitory factor.

Q.    Do you see where it says, the second sentence of that paragraph, "A 9% downward revision to fiscal year '18 adjusted EBITDA points largely to persistent operational issues, in our view."

MR. ROTHMAN:  Sorry. Where were you reading from?

MS. HARRIS:  I'm reading from the second sentence of the first paragraph.

A.    I see it.

Q.    And then it says, "Based on these operational issues and unfavorable home center mix this reports predicts a negative stock reaction tomorrow." Right?

A.    Well, you skipped a lot. Where did you read from? What line is the word "based" in?

Q.    If you like I can read the

Page 231

STEVEN P. FEINSTEIN, Ph.D.

whole thing.  "Our sense is lingering volume issues and Jeld-Wen's North American windows business manifested in a harsh combination of reduced cost leverage, inability to push pricing and failure to drive costs productivity. Unfavorable home center mix likely exacerbated these issues. We accordingly expect a negative stock reaction tomorrow." Do you see that?

A.    I do.

Q.    And where it's talking about inability to push pricing it's talking about the North American windows business, right?

A.    Oh, no.  I don't think that's the case.

Q.    The sentence says, "Our sense is a lingering volume issue in Jeld's North American windows business manifested in a harsh combination of reduced cost leverage, inability to push pricing, and failure to drive cost productivity."

STEVEN P. FEINSTEIN, Ph.D.

Is it your interpretation that does not refer to the North American windows business?

A.    I don't think it's exclusively the North American window business.

MR. ROTHMAN:  I think a word got nixed from your answer.

A.    I said I don't think it's exclusively. I think what they're saying is the company told them that there was an inability to push pricing, that north -- they're saying -- yes.  They're saying there is an inability to push pricing in the North American windows but they're not saying that explains the entirety of the inability to push pricing.

Q.    Is this analyst predicting on October 15th, 2018 that the stock will drop on October 16th, 2018 due to the reduced 3Q interest for fiscal '18 guidance ranges?

A.    I don't think you can read this, if you read it correctly, to suggest that the only reason for the drop

Page 233

STEVEN P. FEINSTEIN, Ph.D.
is that component of the announcement.

Q.    Okay. Let's look at the paragraph.  It's the third full one that starts "Lowering estimates".

A.    Okay.

Q.    And Barclays says it's reducing its fiscal '19 EBITDA estimate due to the topline reductions and more conservatism around the persistence of operational issues. Right?

MR. ROTHMAN:  Objection.

A.    They're saying that 2019 is being reduced due to topline reductions and they're going to reduce the EBITDA, which was close to bottom line on account of their reductions in topline.

Q.    And more conservatism around the persistence of operational issues, right?

A.    Right.

Q.    So this analyst does not believe that the fiscal '18 operational issues will be fixed before the beginning of fiscal '19, right?

**Page 234**

STEVEN P. FEINSTEIN, Ph.D.

MR. ROTHMAN:  Objection.

A.    Possibly. I mean, I also took out -- I took out and excluded from damages and inflation the effect on pessimism in 2019 of windows.  North American windows is quantified and excluded from damages for 2019.

I should say it another way. North American window forecast changes. The  North American window forecast for 2019, I quantified them and took them out of damages.

Q.    This report does not say that it is reducing its fiscal '19 EBITDA estimates because of the Steves litigation contingency, right?

A.    Correct.

Q.    It does not say that it's reducing its fiscal '19 EBITDA estimates because Jeld-Wen has conceded liability in Steves litigation, right?

MR. ROTHMAN:  Objection.

A.    Correct. This report focuses on other things.

Page 235

STEVEN P. FEINSTEIN, Ph.D.

Q.    It does not say that it is reducing its fiscal '19 EBITDA estimates because Jeld-Wen is going to experience reduced pricing power in the North American interior doors market, right?

A.    No. That's where I disagree. You know, they do mention inability to push pricing. You know, the corrective disclosures aren't really complete, fulsome corrective disclosures. There is a lot of unknowns in the marketplace still.

Why the company is unable to push pricing is not yet understood, but they do mention that they're observing an inability to push pricing and that's fraud-related.

Q.    Do they mention the doors market where they mention the inability to push pricing?

A.    Not explicitly, but they don't exclude it.

Q.    Does this report contain the explicit commentary you relied on to

STEVEN P. FEINSTEIN, Ph.D.

reach your opinion that the market was stunned by the litigation contingency?

A.     I looked at all the reports. I understand some of the analysts chose not to focus on the somewhat negative, upsetting, embarrassing admission the company had to make, which is understandable, given what their jobs are, but other analysts did so.

This is an example of one trying to draw that fine line between being fair and honest with the readers but also trying to maintain a relationship with the company, seemed to be a little bit more swayed on the side of not doing anything to upset the company.

I mean, investment banks rely on repeat business from these firms and there was a lot of repeat business anticipated from Jeld-Wen given that Onex hadn't completely sold all of its shares, given that they had a lot of debt that would have to be rolled over. You are not

Page 237

STEVEN P. FEINSTEIN, Ph.D.

going to -- under those circumstances, analysts have to be tactful.

Q.    Okay. Answer my question. Does this report contain the explicit commentary you relied on to reach your opinion the market was stunned by the Steves litigation contingency?

A.    No. This report does not.

Q.    This report does not say that the Steves litigation contingency was an admission Jeld-Wen was engaging in anticompetitive conduct, does it?

A.    It does not say that. Correct.

Q.    This report does not even mention the Steves litigation contingency, right?

A.    There were a handful of reports that didn't mention it, that's true, and this is one of them.

Q.    It doesn't even mention the Steves litigation, right?

A.    Correct.

MS. HARRIS:  Okay. I'm going to mark as Exhibit 8 the Credit

Page 238

STEVEN P. FEINSTEIN, Ph.D.

Suisse report from October 15, 2018 for Jeld-Wen Holding, Inc.

(Feinstein Exhibit 8, Credit Suisse report dated October 15, 2018 was received and marked on this date for identification.)

Q.    Are you able to open it?

A.    Yeah. I need a minute, though. Okay.

Q.    And the title of this report is Shattered Glass, correct?

A.    That's right.

Q.    Is this the report you considered in preparing your report?

A.    One of them, yes.

Q.    And it was dated October 15, 2018, right?

A.    Yes.

Q.    So that's just after the pre-earnings release, right?

MR. ROTHMAN:  Objection.

A.    Right.  It is right after the pre-earnings release that they published it.

**Page 249**

STEVEN P. FEINSTEIN, Ph.D. disappointing Q3 results and downgraded Q4 guidance, right?

A.    Correct. And EBITDA margin decline.

Q.    And then the first paragraph the title is Operational Issues Continue to Weigh on Results. Do you see that?

A.    Yes.

Q.    Does that paragraph mention the Steves litigation contingency?

A.    The first paragraph? It does not mention the contingency. It does mention margins stalled, margin expansion stalled.

Q.    Well, where are you looking at that?

A.    In the first paragraph, yeah, "Jeld-Wen needed incremental pricing in 3Q to offset inflationary headwinds and get back to price. Costs neutral but the preliminary results imply EBITDA margin decline of 120 basis points."

Q.    Do you think that's a reference to the Steves litigation

Page 250

STEVEN P. FEINSTEIN, Ph.D.
contingency?

A.    Based on financial principles, it's a reasonable outcome of the company not being able to exercise its unsustainable pricing behavior now that there's more eyes on them, around them.

Q.    Does this report contain the explicit commentary you relied on to reach your opinion the market was stunned by the litigation contingency?

A.    I considered all the reports, including this one.

MR. ROTHMAN:  Lindsey, whenever you think it's an appropriate time to take a break, just let us know.

MS. HARRIS:  Sure. We can take one soon.

Q.    Just to be clear, this report has the explicit commentary you were referring to?

A.    No.

Q.    This report does not say that the market was stunned by the Steves

Page 251

STEVEN P. FEINSTEIN, Ph.D.
litigation contingency, correct?

A.      They don't use those words and that's not how I meant it previously, but correct.

Q.      This report does not say that the Steves litigation contingency was an admission Jeld-Wen was engaging in anticompetitive conduct, right?

A.      No. This report does not say that. It's the company's admission that said that, that there was a higher probability of that.

Q.      This report does not explicitly mention the Steves litigation contingency at all, right?

A.      Explicitly, correct.

Q.      This report doesn't explicitly mention the Steves litigation at all, right?

A.      Didn't we just say that? Explicitly, no.

MS. HARRIS:  Okay. Let's take a break.

VIDEOGRAPHER:  This is the

Page 256

STEVEN P. FEINSTEIN, Ph.D.

(Feinstein Exhibit 12, RBC report dated October 16th, 2018 was received and marked on this date for identification.)

Q.    Let me know when you're able to open that.

A.    I have it open. I want to review it.

(Deponent reviews the document.)

A.    Okay.

Q.    This report is dated October 16, 2018, right?

A.    Yes.

Q.    So it was published after the pre-earnings release, right?

A.    That's right.

Q.    In the first summary paragraph with the heading Our View, does the analyst mention the Steves litigation contingency?

A.    Not explicitly. It mentions margin challenges again, acknowledging that the margin expansion the company had

Page 257

STEVEN P. FEINSTEIN, Ph.D.

experienced appears to have stalled.

Q.    Are you referring to the sentence that says "On continued margin challenges and lower sales primarily related to ongoing operational challenges in windows and price/cost"?

A.    I am. And that's the explanation the company gave.

Q.    Okay. But there is no explicit mention of the Steves litigation contingency, right?

A.    Correct.  In that paragraph.

Q.    Correct.

A.    Others, yes.

Q.    And then under Key Points the headings are -- the first heading is Lowering Estimates and Price Target, the second one is Windows Challenges Still Primarily to Blame, and the third is Continued Margin Headwinds, correct?

A.    Yes. But wait.  Okay. It's just the way it's organized.  The next section is Target Price, Base Case.

Q.    The paragraph that starts

Page 258

STEVEN P. FEINSTEIN, Ph.D.

Continued Margin Headwinds, the report says that, "Downgraded fiscal '19 EBITDA forecasts results due to continued market share challenges in windows cost pressures and channel mix." Right?

A.    That's what it says.

Q.    So this analyst thinks these operational issues will persist into fiscal '19, right?

MR. ROTHMAN:  Objection.

A.    Well, it doesn't say that. It says market share cost pressures and channel mix.

Q.    And it says it's lowering its fiscal '19 forecast because of those issues, right?

A.    Yes.

Q.    That paragraph does not say that it's reducing its fiscal '19 EBITDA estimates because of the Steves litigation contingency, right?

MR. ROTHMAN:  Objection.

A.    Correct.

Q.    It does not say that it's

**Page 259**

STEVEN P. FEINSTEIN, Ph.D.

using its fiscal '19 EBITDA estimates because Jeld-Wen has conceded liability in the Steves litigation, right?

A.    That's not in the paragraph, correct.

Q.    Is does not say that it's reducing its fiscal '19 EBITDA estimates because Jeld-Wen is going to experience reduced pricing power in the North American interior doors market, right?

MR. ROTHMAN:  Objection.

A.    That's in the next paragraph, but that last paragraph doesn't say that.

Q.    Okay. So let's turn the page to the next paragraph. And that says Target Price/Base Case is the title.

A.    Yes.

Q.    It says, the second sentence says, "Our multiple anticipates that the unfavorable litigation ruling will remain an overhang on Jeld's valuation."  Right?

A.    Yes.

Q.    And based on that language you concluded that this analyst was

**Page 260**

STEVEN P. FEINSTEIN, Ph.D. expressing surprise and disappointment over the company's turnabout regarding Steves litigation ruling, right?

A.    Well, I looked at all the analysts reports, what they all said, when they were published, how many were published, what the announcement was that they were responding to, and the rest of this paragraph as well.

Q.    So this includes the explicit commentary that led you to include the market was stunned by the Steves litigation contingency?

A.    By explicit commentary we're talking about, all the analyst reports published after the announcement.

Q.    This report does not say that the market was stunned by the Steves litigation contingency, right?

A.    It doesn't use the word "stunned". It does talk about how the market is exerting downward pressure on the stock price because of the litigation and on its face the announcement was

Page 261

STEVEN P. FEINSTEIN, Ph.D.

stunning and surprising, a complete reversal.

Q.    Does it refer to the litigation contingency or to the unfavorable ruling?

MR. ROTHMAN:  Objection.

A.    Well, it says unfavorable -- okay. It talks about the unfavorable ruling but the liability announcement was a reaction to the unfavorable litigation ruling. The company received the unfavorable litigation ruling, digested it and made a liability announcement. So even the liability announcement is a reaction to the unfavorable litigation ruling.

Q.    So it's your opinion that this language is talking about the litigation contingency?

A.    I think this language includes consideration of that, of that latest development.

Q.    This report does not explicitly mention the Steves litigation

Page 268

STEVEN P. FEINSTEIN, Ph.D.

That was Exhibit 12?

Q.      I'm going to stay on this report. Please answer my question.

A.      Well, I think we established that --

MR. ROTHMAN:  Excuse me.  The witness asked to look at the report that you mentioned in your question. Are you prohibiting the witness from actually examining the report?

MS. HARRIS:  If the witness is unable to answer the question, then he can look at the report. If the witness can answer the question without going to other exhibits, I'd appreciate if he answered the question.

A.      There is implicit reference to the issue, to the central issue of the litigation here. There is a lot of discussion of margins and margin headwinds and new information that suggests there is -- that margin

Page 269

STEVEN P. FEINSTEIN, Ph.D.

headwinds are going to be a problem for the company.

Let me add, there is also -- it's couched among a discussion of explanations that the company offered. You know, I don't think anyone can be really 100% convinced the company was being completely honest with these explanations but, I mean, it makes sense that analysts are going to repeat some of the explanations that the company gave rather than -- well, period. So that's not surprising to me.

Q.    Would you have expected that the analyst would have said something more than what it said in the prior report?

MR. ROTHMAN:  Objection.

A.    Well, they did. They do talk about margin headwinds and where the -- where the pain will be felt to some extent, not as much as other reports but to some extent they do.

MS. HARRIS:  I'm going to mark

**Page 270**

STEVEN P. FEINSTEIN, Ph.D.

as Exhibit 14 a Wells Fargo report from October 16th, 2018 on Jeld-Wen Holding Inc. And the title is Jeld-Wen Still Battling to Return to Normal and Other Executive Change.

(Feinstein Exhibit 14, Wells Fargo report dated October 16th, 2018, was received and marked on this date for identification.)

Q.    Are you able to open the report, Dr. Feinstein?

A.    I see it.

Q.    Is this a report that you considered in preparing your report?

A.    Yes.

Q.    And it's dated October 16, 2018?

A.    Yes. I'm sorry.  What?

Q.    It's dated October 16, 2018?

A.    Right. Okay. I thought you said October 18 for a moment. Yes. That's the date.

Q.    And that is just after the

Page 271

STEVEN P. FEINSTEIN, Ph.D.

pre-earnings release, right?

          A.     Yes.

          Q.     The first bullet paragraph discusses disappointing Q3 results, updated full year 2018 guidance and the departure of the CFO, right?

          A.     It says that, yes.

          Q.     THIS bolded paragraph doesn't mention the Steves litigation contingency, right?

          A.     Correct.

          Q.     I'm sorry. Did you answer?

          A.     I did. I said correct.

          Q.     In the middle of the paragraph it says, "We believe the equity will decline materially today as Jeld-Wen's operational improvement story has hit a serious snag the past year with little likely reprieve for the foreseeable future." Do you see that?

          A.     No, I didn't. Where are you reading again?

          Q.     If you look at the first bolded paragraph and you look at nine

Page 272

STEVEN P. FEINSTEIN, Ph.D.
lines down, the beginning of the line is, "130 GPS year-over-year", and then the next sentence is what I just read.

MR. ROTHMAN:  Objection.

A.    Yeah. They say it is a problem with the foreseeable future. That's what I concluded as well from the announcement, there is a problem for this company for the foreseeable future.

Q.    So Wells Fargo predicts Jeld's stock price will decline materially on October 2018 because of operational issues, right?

MR. ROTHMAN:  Objection.

A.    I don't think you can read it only that way. Equity will decline materially today.  The operational improvements story certainly could have an effect but there is little reprieve for the foreseeable future.  You know, the company didn't give -- the company gave explanations, but in my view and my analysis the best explanation for the foreseeable future was a deterioration of

Page 273

STEVEN P. FEINSTEIN, Ph.D.

the margin improvement story, which is an outcome of not being able to continue with unsustainable anticompetitive practices.

So, I mean, they talk about the foreseeable future. I don't think they're saying here that it's only operational improvement issues that are going to be the problem in the foreseeable future.

Q.    It doesn't predict a stock drop based on the Steves litigation contingency, right?

A.    Well, it says that basically the wind is being taken out of the sails of this company's growth story and this company's story has always been a margin growth story.

One moment. And there is discussions of margins throughout this report.

Q.    Is there somewhere that you are referring to that you think it refers to door margins?

**Page 274**

STEVEN P. FEINSTEIN, Ph.D.

A.      Well, they don't break it out. It's -- door margins are included. Hold on. That's my answer.

Q.      This report doesn't mention the Steves litigation contingency at all, right?

A.      Right. This is one of the ones that doesn't.

Q.      Does this report contain the explicit commentary you relied on to reach your opinion the market was stunned by the Steves litigation contingency?

A.      I looked at all the analyst coverage holistically and that's what I meant.

Q.      And does this report contain that explicit commentary?

A.      It's included. It's included among the things that I examined and considered.

Q.      This report does not say that the market was stunned by the Steves litigation contingency, right?

A.      I never said that any analyst

Page 275

STEVEN P. FEINSTEIN, Ph.D. said that explicitly. I said that it was my conclusion that analysts, because it was a stunning announcement, it would stun the market and it did stun the market.

Q.   This report does not say that the market was stunned by the Steves litigation contingency, correct?

A.   It doesn't have that language, correct.

Q.   In fact, this report doesn't mention the Steves litigation, right?

MR. ROTHMAN:  Objection.

A.   Correct.

MS. HARRIS:  Okay. I'm going to mark as Exhibit 15 the Citi report dated October 15, 2018 on Jeld-Wen Holding, Inc.  Please let me know when you're able to open that.

(Feinstein Exhibit 15, Citi report dated October 15, 2018 on Jeld-Wen Holding, Inc. was received and marked on this date for

Page 276

STEVEN P. FEINSTEIN, Ph.D.

identification.)

A.    Okay. Also open.

Q.    And the title of this report is, "Alert: More bad news.  CFO leaving. Preliminary 3Q '18 results, soft guidance cut."  Correct?

A.    That's the title. That's the subtitle.

Q.    Is this a report you considered in preparing your report?

A.    Yes.

Q.    And this was published just after the pre-earnings release, right?

A.    Right.

Q.    Under What's New it says, "Jeld-Wen announced the departure of its CFO and preliminary Q3 results."  Right?

A.    Yes.

Q.    That paragraph doesn't mention the Steves litigation contingency, right?

A.    No.

Q.    The next paragraph heading says Preliminary Results, right?

A.    Yes.

**Page 314**

STEVEN P. FEINSTEIN, Ph.D.
the financial impact of the jury verdict
on Jeld-Wen?

A.    Some had, some hadn't. The
company said they could not. So it's
reasonable that many market participants
could not, if not most.

Q.    In your reply report you
repeatedly state that the company needed
ten days to undertake its evaluation of
the divestiture decision and calculate
the estimate of the impact, right?

MR. ROTHMAN:  Objection.

A.    That's in my -- that's in the
loss causation report?

Q.    Yes.

A.    I just want to check and make
sure you're reading me correctly. Which
paragraph?

Q.    Exhibit 5, and you have that
paragraph 53, in among other places?

A.    Exhibit 5? Not Exhibit 1?

Q.    Exhibit 5, it's in your reply
report.

A.    Oh. You said paragraph 51?

Page 315

STEVEN P. FEINSTEIN, Ph.D.

Q.      53.

A.      53.

Q.      The one I'm referring to is the final clause in that paragraph that says, "Despite the fact that the company needed ten days to undertake its evaluation and calculate its estimate of the impact." Do you see that?

A.      I do. We know that because that's what the company did, they didn't announce until ten days.

Q.      So the basis of your statement is the fact that there were ten days between the divestiture decision and the pre-earnings release?

A.      Yes.

MR. ROTHMAN:  Objection.

A.      Yes. And then the internal company document from October 7th, 2018 that said that their prior estimate was zero.

Q.      Do you know what the company was doing in those ten days?

A.      That's an odd question. I'm

Page 316

STEVEN P. FEINSTEIN, Ph.D.

sure they were making windows and doors.

No, I don't know everything they were doing in those ten days. I can only tell you what I observed, that they presented to the world what they were doing and had completed.

Q.    Is it possible that Jeld-Wen finished its accounting analysis earlier than October 15 and disclosed it in the pre-earnings release?

A.    It's possible. There is no indication that that's the case. They chose to tell the market on the tenth day.

Q.    Do you know whether the reasons for the pre-earnings release was the litigation contingency or whether it was the announcement of the Q3 -- Q3 results in fiscal -- sorry. I'll start again.

Do you know the reason that the company issued the pre-release was because of the announcement of the litigation contingency or because of the

Page 317

STEVEN P. FEINSTEIN, Ph.D. announcement of other issues in the release?

MR. ROTHMAN:  Objection.

A.     Well, the facts and circumstances that are evident indicate that it was the litigation contingency, because the other items were either not the kind of items that would motivate a pre-release and hadn't previously.

Q.     Have you reviewed internal documents to support that conclusion?

A.     I was not given internal documents. They were not available to me about the company's -- around the company's decision and their computations in the interim. I can only -- the best -- the best conclusion, the best analysis I can do is -- well, I did the best analysis I could do given the information that was provided and available, potentially, from your side.

Q.     Returning to paragraph 53, you say that, "Mr. Fischel erroneously assumed that market participants should

Page 326

STEVEN P. FEINSTEIN, Ph.D.

company's adamant denials and did not yet

have the company's liability

acknowledgment.

MS. HARRIS:  Okay. I'm going

to mark as Exhibit 23, a Goldman

Sachs report from October 8th,

2018.

(Feinstein Exhibit 23, Goldman

Sachs report dated October 8th,

2018 was received and marked on

this date for identification.)

A.     Okay.

Q.     And in the second paragraph

here it says, "Based on our conversations

with investors over the past week, hence

our initiation report where we discuss

the case and the potential EBIT

sensitivity for Jeld we believe that

outcome is largely expected but still may

be somewhat disappointing." Do you see

that?

A.     I see it.

Q.     So according to Goldman, the

divestiture decision was largely expected

Page 327

STEVEN P. FEINSTEIN, Ph.D.

by investors, right?

MR. ROTHMAN:  Objection.

A.    The outcome as of that time, which it did not yet have the company's liability announcement.

Q.    Right. But the divestiture decision, right, was expected by investors?

MR. ROTHMAN:  Objection.

A.    Well, if it was disappointing, it wasn't fully expected.  And as a binomial event analysts -- they're saying here investors are not entirely surprised by it but they're still somewhat disappointed by it.

Q.    If investors largely expected a divestiture condition, could that be a reason that the stock price did not experience a statistically significant decline after that ruling?

A.    Well, to the extent that they had -- to the extent that the change in their forecast, their understanding, was from having some expectations to having

Page 328

STEVEN P. FEINSTEIN, Ph.D. confirmation, the valuation impact would be less.

So it could explain why the stock price drop that did occur was below statistically significant in conjunction with the fact that the company was adamantly denying there would be any negative repercussions from the decision.

So a decision that the company would then successfully appeal is what -- is at issue here in this paragraph, not a decision that the company would ultimately concede has probable and estimable negative financial repercussions.

MS. HARRIS:  I'm going to mark as Exhibit 24 a Gabelli report dated February 22nd, 2018 on Jeld-Wen Holding, Inc.

(Feinstein Exhibit 24, Gabelli & Company report dated February 22, 2018, was received and marked on this date for identification.)

Q.    Are you able to open that?

Page 329

STEVEN P. FEINSTEIN, Ph.D.

A.     No. It's still refreshing. 24, February Gabelli report. I'm there.

Q.     Are you there?

A.     Yes.

Q.     Is this the report you considered in preparing your report?

A.     I believe so.

Q.     And this report is from February 22nd, 2018, right?

A.     Yes.

Q.     And that's about a week after the jury's verdict, right?

A.     Right.

Q.     In the paragraph beginning, "Reasons for comment", about four lines down it states, "As we think about our valuation we take into consideration the 25 million less EBITDA in 2019 and also assume a $75 million cash outlay related to the ongoing litigation. While our estimate of litigation costs in 2019 are a bit arbitrary, we do believe it's worth considering some monetary impact related to this item and as such not make this

Page 334

STEVEN P. FEINSTEIN, Ph.D.

that there was before was commensurate or even smaller than risk overhangs and expectations for further costs subsequently.

Q.    And where do you discuss that in your report?

A.    Here. This is -- this is the rationale for why 76.5 million should be divided into a per share basis and subtracted from the company.

What changed is anything that the company -- anything that market participants were assuming or thinking about was now exacerbated and there would be higher risks and higher -- higher risks, higher probabilities, higher costs going forward, but at a minimum, 76.5 on a per share basis needed to be removed from the value of the company.

Q.    Did you account for the potential damages Jeld-Wen disclosed on February 15, 2018 when it disclosed the jury verdict?

MR. ROTHMAN:  Objection.

Page 335

STEVEN P. FEINSTEIN, Ph.D.

A.    Of course. I accounted for all the information in the case.

Q.    And how did you account for the damages it had already disclosed?

A.    There weren't damages disclosed in February of -- you said February of 2017, right?

Q.    '18.

A.    No. February 2018, the company did not disclose that there would be damages, it did not disclose that it believed that they would have to pay a penny. They did not -- they do not have an emergency profit warning announcing a litigation charge at that point in time. They maintained they wouldn't have to pay anything.

Q.    The company disclosed the potential damages in the press release we just looked at, right?

A.    But they -- well, let's look at the press release. Let's look at the exact language. So what exhibit is that again?

Page 336

STEVEN P. FEINSTEIN, Ph.D.

Q.      I believe that's Exhibit 21.

A.      Third block down says, "The company continues to believe that the facts underlying this dispute did not establish either a violation of the antitrust laws or a breach of contract."

So it's the -- it's the anticompetitive behavior that was making Jeld-Wen liable that the company was denying. So by denying that behavior, by denying the liability, they're denying that they would have to pay anything and there was no litigation contingency reserve at that point in time.

If the company really believed that there would be damages or losses, they would have made the liability announcement then in February instead of in October.

Q.      Do you see the paragraph before that discloses the potential damages, though, correct?

MR. ROTHMAN:  Objection.

A.      Well, I don't see the word

Page 337

STEVEN P. FEINSTEIN, Ph.D.
"potential" in that paragraph anywhere.
There is no word "potential".

Q.   It discloses what the verdict award is, right?

A.   It provides a number that they believe is not going to have to be paid, and they say it's not going to have to be paid.

I mean, it says, "Accordingly, the company does not believe that the ultimate outcome of this matter will have a material impact on its ability to operate in the ordinary course of business." Elsewhere they said that if there would be a charge and would be a cost, it would materially and adversely impact the company's operations.

So you put the two together and the company is clearly saying here they don't expect to pay anything.

Q.   The 55 cents that you calculated was not expected to be paid until the appeals process was exhausted, correct?

Page 352

STEVEN P. FEINSTEIN, Ph.D.

at 2019 revisions based on the negative news the company provided about 2018 and the Steves litigation.

Q.    So I believe it's your opinion that the 2018 underperformance was not expected to impact 2019 performance, correct?

MR. ROTHMAN:  Objection.

A.    Oh, it's conservative. I took -- the company said that it wouldn't. But to be conservative, I paired away a substantial amount of the valuation impact from the fiscal year 2019 change in estimated EBITDA from the marketplace.

Q.    So you excluded Australasia from your analysis in 2019 EBITDA because it didn't have anything to do with performance issues in 2018, right?

A.    And the company gave no indication that Australasia was a problem or surprise or a reason for revising downward profitability. There was no problems in the press release about Australasia that would cause Australasia

Page 353

STEVEN P. FEINSTEIN, Ph.D.
performance going forward to be anything less than what was previously expected.

Q.    You apportion the share price decline between North America and Europe based on their respective proportions of EBITDA generated in the last 12 months ending Q2 2018, right?

A.    Right.

MR. ROTHMAN:  Objection.

A.    The company said there were problems in North America and Europe, and they didn't quantify the breakdown between the two. So the most reasonable assumption is that the problems were commensurate with their prior contributions to EBITDA.

Q.    So what is your basis for assuming that the relationship between regional contributions to EBITDA -- let me start that over.

What is your basis for assuming the relationship between regional contributions to 2019 EBITDA forecast changes are proportional to

Page 354

STEVEN P. FEINSTEIN, Ph.D.

regional contributions to revenue?

MR. ROTHMAN:  Objection.

A.     Well, I, as a financial -- as a forensic financial expert, I'm working with the same numbers that market participants were working with. And the market -- the company kept us all in the dark about the quantification of the problems and the attribution, the division between North America and Europe.

So I wasn't given that information by the company in the press release but neither were any of the market participants.  The most reasonable decomposition would be that if a segment has a small contribution to EBITDA it's going to have a small contribution to the surprise and to the revision. And if a company has a large -- not company -- if a segment has a large contribution typically to EBITDA, then it will make a larger contribution to the surprise. Given, you know, it's conditional on the

Page 355

STEVEN P. FEINSTEIN, Ph.D.

fact that we, "we" being me and analysts in realtime contemporaneously then, were not given a decomposition by the company.

Q.    Doesn't the fact that you give zero attribution to Australasia but Australasia revenues are not zero demonstrate that the relationship between the contribution to revenue and contribution to 2019 EBITDA forecast changes are not necessarily proportional?

MR. ROTHMAN:  Objection.

A.    Not at all. I calculated the ratios correctly. The company didn't say there were any problems in Australasia. The company did say there were problems in North America and Europe. It made sense to divide up the problems proportionate to their shares of contribution to EBITDA. So you add North America and Europe together and you divide -- you figure out the share of each based on its share of that pie.

Q.    You removed the 2019 effects of headwinds in Europe from your

Page 356

STEVEN P. FEINSTEIN, Ph.D.

insulation calculation.

What is your basis for believing that the market thought the North America door headwinds would not affect 2019 but Europe headwinds would affect 2019?

MR. ROTHMAN:  Objection.

A.    I don't think you're characterizing my opinion correctly.

North American door margins are what this case is about. I've concluded that if there is a problem with North American door margins it's because of the attention that it has received from the litigation and that the company could not sustain unsustainable practices.

Whereas, Europe has other reasons. They don't really have to be delved into, they just have to be paired away.

Q.    You apportion the 2.40 share price decline between North American windows and North American doors on the

**Page 360**

STEVEN P. FEINSTEIN, Ph.D.

those other services. I just want to make sure it's clear that I included them in what was being paired away from damages.

Q.    Okay. Within the doors business Jeld-Wen manufactures interior and exterior doors, right?

A.    Right.

Q.    Do any of the fraud allegation pertain to exterior doors?

A.    That's not entirely clear. The allegations I understand them specifically address interior molded doors but also killing off competitors in the door business. I didn't make an allocation in the types of doors.

Q.    So you did not apportion damages attributed to North American doors as between exterior and interior doors?

MR. ROTHMAN:  Objection.

A.    Correct.

Q.    Why didn't you?

A.    I just explained, it's not clear that exterior doors are excluded

Page 361

STEVEN P. FEINSTEIN, Ph.D.

from the allegations because they're related to the door business in which there are exposed facts of anticompetitive behavior. But there is also no facts that say specifically that there were concerns about the exterior door business going forward.

There is some evidence that Europe was cited to have problems and North American windows was cited to have problems and financial principles inform us that interior molded doors would have problems with margins going forward.

There was no evidence from the case that any disappointment to the marketplace derived from the business on exterior doors. So it just didn't make sense to apportion any of the disappointment, any of the revision downward from the marketplace to exterior doors in North America.

So basically that's -- there's a lot of evidence that says no amount of the stock price drop was caused by

STEVEN P. FEINSTEIN, Ph.D.
exterior doors in North America.  So,
therefore, there was no reason to
attribute any of the price drop that did
occur to exterior North American doors.

Q.    But you didn't exclude
exterior doors from your proportional
analysis like you did for Australasia,
right?

A.    It's already excluded because
it wasn't responsible for a stock price
drop, according to the available
evidence.

Q.    Within its interior doors
business, do you understand that Jeld-Wen
manufactures various types of interior
doors?

MR. ROTHMAN:  Objection.

A.    They have a line of doors just
like any company would have a line of
products.

Q.    And one type of those doors
are interior molded doors, right?

A.    I think that's the major
product that they sold with respect to

STEVEN P. FEINSTEIN, Ph.D.

interior doors.

Q.    Right. So my question is, that's one type, is that one type of doors were interior molded doors?

A.    I'd have to look further at that. I didn't see any analysis of any other decomposition of damage numbers by anybody else in this case to suggest that I did anything wrong here.

Q.    Are you aware that Jeld-Wen also manufactures flush doors?

A.    Flush doors?

Q.    Correct.

MR. ROTHMAN:    Objection.

A.    Not specifically, no.

Q.    Are you aware that Jeld-Wen also manufactures stile and rail doors?

MR. ROTHMAN:    Objection.

A.    I'm not well versed in the entire line of doors that Jeld-Wen manufactures, except to the extent that I carefully read the documents produced in this case.

Q.    What documents produced in

Page 364

STEVEN P. FEINSTEIN, Ph.D.

this case have you read?

A.    They're listed. I'm not going to go through the entire list but look at the Documents Reviewed and Relied Upon list in both of my reports.

Q.    I believe in your first report we saw the only document listed is the deposition of Philip Orsino, right?

A.    No. There was news articles and the Judge's opinion, Motion to Dismiss opinion, Judge Payne's opinion.

Q.    Right. But those documents weren't produced in this case, right?

A.    Oh, I'm sorry. I meant -- I guess my definition of "produced" is different from yours. I didn't mean produced from discovery. Available to me to rely on.

Q.    Okay. Do any of the fraud allegations pertain to these other types of interior doors?

MR. ROTHMAN:  Objection.

A.    I didn't -- I'm not entirely sure but to the extent that they don't,

Page 365

STEVEN P. FEINSTEIN, Ph.D.

that would mean that those doors don't have an identifiable persistent problem that's responsible for reduced profitability going forward and, therefore, didn't cause any of the stock price drop.

Q.     Did you apportion damages attributed to North American doors between interior molded doors and other categories of interior doors like flush doors and stile and rail doors?

MR. ROTHMAN:  Objection.

A.     No. No.

Q.     Why not?

A.     For the reason I just gave. There is no indication that there was any problem with profitability going forward on types of doors that have -- that are not -- on types of doors that are not covered by the allegations in this case to have been affected previously by the company's alleged anticompetitive behavior. Therefore, those other types of doors would not contribute to the stock

**Page 366**

STEVEN P. FEINSTEIN, Ph.D.

price decline. They are naturally excluded from any calculation of the -- any portion of the residual price decline.

MS. HARRIS:  Okay. Let's take a break.

VIDEOGRAPHER:  Thank you. This is the videographer. The time is 3:09. We're going off the record. This will be the end of media file 4.

(Recess is taken.)

VIDEOGRAPHER:  We are back on the record. The time is 3:22 p.m. and this is the beginning of media file 5.

Q.    You have testified in over 120 cases, correct?

MR. ROTHMAN:  You're muted.

A.    I think so. Yes.

Q.    Okay.

A.    More than 120.

Q.    Yes. And you testified for the defense in securities cases only twice;

Page 367

STEVEN P. FEINSTEIN, Ph.D.

is that correct?

          A.     Approximately, yes.

          Q.     In your prior testimony have you ever concluded that investors did not suffer a loss?

                 MR. ROTHMAN:  Objection.

          A.     Yes.  From certain alleged misrepresentations or corrective disclosures, yes.

          Q.     Have you ever concluded there was no loss in the case at all?

          A.     No, not that I can think of. Not a case that I've testified in. I mean, if that's what I find, I show that at an early stage to counsel.

          Q.     Have you ever calculated that there were no damages?

                 MR. ROTHMAN:  Objection.

          A.     Again, from specific representations and corrective disclosures, yes.

          Q.     But not in the case -- in the case as a whole?

          A.     I'd have to look at all my