# EXHIBIT 10

CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-112-JAG |

REPLY REPORT ON LOSS CAUSATION AND DAMAGES

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

February 15, 2021

**Exhibit
05**
2/22/2021
Feinstein

**CONFIDENTIAL**

**TABLE OF CONTENTS**

I.    SCOPE OF PROJECT AND REPORT ...................................................................1

II.   CONCLUSIONS.................................................................................................3

III.  CRITIQUE OF THE FISCHEL REPORT ...........................................................7

    A.    Areas of Agreement ...............................................................................7

    B.    Areas of Disagreement..........................................................................11

    C.    Mr. Fischel's Purported Analysis of the 5 October 2018 Disclosure is Flawed...................................................................................................12

    D.    Mr. Fischel's Purported Analysis of the 15 October 2018 Disclosure is Flawed..............................................................................................13

        1.    Mr. Fischel Errs by Asserting That the Company's $76.5 Million *Steves* Litigation Charge Does Not Reflect the Probability the Company Will Win on Appeal ...................................................14

        2.    The Economic Evidence, Including Company Statements and Analysts' Valuation Models, Supports the Economic Materiality of the *Steves* Litigation Charge and Its Consequences...................................16

        3.    Mr. Fischel's Contention That Any Price Impact Stemming from the $76.5 Million Charge Would Be Inconsistent with Market Efficiency Is Contradicted by the Company Itself and Defendants' Expert Mr. Flemmons in Particular ...........................................................21

        4.    The Company's 15 October 2018 Pre-Announcement Contained New, Negative Information About the Company's Performance Expectations Going Forward Stemming from the Illegal Anticompetitive Behavior.................................................................23

        5.    Mr. Fischel's Report Ignores My Loss Causation Analysis and the Impact That the Misrepresentations and Omissions Had on the Price of JELD-WEN Stock ........................................................25

    E.    Mr. Fischel's Report Erroneously Attributes the 15 October 2018 Stock Price Decline to Old, Transient Factors................................................26

IV.   LIMITING FACTORS AND OTHER ASSUMPTIONS.................................................28

**CONFIDENTIAL**

## I.   SCOPE OF PROJECT AND REPORT

1.   In my expert report dated 4 January 2021 ("Feinstein Report"), I examined the common stock of JELD-WEN Holding, Inc. ("JELD-WEN" or the "Company") and the market in which it trades. In particular, I analyzed the factors that are generally accepted as indicative of the efficiency of the market in which a security trades. Based on my analysis of those factors, I concluded that the common stock of JELD-WEN traded in an efficient market during the period from 26 January 2017 through 15 October 2018, inclusive (the "Class Period").

2.   In the Feinstein Report, I showed that each of the *Cammer* and *Krogman* factors supports a finding that JELD-WEN stock traded in an efficient market.[1] Event study analysis showed that JELD-WEN stock demonstrated market efficiency by reacting promptly to new, Company-specific information as the information entered the market.[2] Reacting promptly to new, material information is the hallmark of an efficient market.

3.   In addition, the Feinstein Report contained my analyses and conclusions of loss causation and the quantification of per share damages.[3] I arrived at and presented the following conclusions with respect to loss causation and damages:

   i.   The alleged misrepresentations and omissions concealed from investors that the Company had engaged in illegal anticompetitive behavior, and that the illegal behavior was instrumental in the Company achieving high profit margins and EBITDA growth. On account of the alleged misrepresentations and omissions, investors were unaware that the Company's financial prospects were worse than what investors were led to believe. Specifically, Defendants concealed that the Company would encounter adverse legal consequences and that previously achieved levels

---

[1] Feinstein Report, ¶¶171-264.

[2] Feinstein Report, ¶¶18-20.

[3] Feinstein Report, ¶¶270-346.

1

**CONFIDENTIAL**

of profitability were unsustainable absent the illegal anticompetitive behavior.[4]

ii.   The alleged misrepresentations and omissions were economically material, valuation relevant, and important to investors.[5]

iii.   The misrepresentations and omissions caused JELD-WEN stock to be overvalued in the marketplace until corrective disclosures provided investors and analysts with the concealed truth.[6]

iv.   Event study analysis, which considers and accounts for potentially confounding information, proves that the corrective disclosures on 15 October 2018 caused the price of JELD-WEN stock to fall significantly. The disclosures not only corrected the misinformation in the market, but also simultaneously dissipated the artificial inflation caused by the misinformation.[7]

v.   The misrepresentations and omissions artificially inflated the JELD-WEN stock price, and the corrective disclosures dissipated the artificial inflation, causing the stock price to decline, in turn causing investor losses.[8] The alleged misrepresentations and omissions therefore caused investor losses.[9]

vi.   Financial and statistical analysis shows that on account of Defendants' misrepresentations and omissions, the Company's stock price was inflated by at least $1.99 per share at the start of the Class Period, and throughout the Class Period.[10] Investors in JELD-WEN stock consequently suffered losses of up to $1.99 per share.[11]

---

[4] Feinstein Report, ¶21.

[5] Feinstein Report, ¶284.

[6] Feinstein Report, ¶21.

[7] Feinstein Report, ¶24.

[8] Feinstein Report, ¶25.

[9] Feinstein Report, ¶273.

[10] Feinstein Report, ¶26.

[11] Feinstein Report, ¶27.

**CONFIDENTIAL**

4.　I was asked by Labaton Sucharow LLP and Robbins Geller Rudman & Dowd LLP, Co-Counsel for the Co-Lead Plaintiffs ("Counsel"), to consider, evaluate, and respond to the arguments and conclusions in the Expert Report of Daniel R. Fischel, dated 1 February 2021 (the "Fischel Report"), which was submitted by Defendants in this matter. Mr. Fischel was asked "to analyze the economic evidence as it relates to Professor Feinstein's opinions on loss causation and the amount of alleged artificial inflation in JELD-WEN's stock price during the Class Period."[12] Mr. Fischel does not dispute that JELD-WEN traded in an efficient market throughout the Class Period.

5.　This rebuttal report presents my response to the Fischel Report.

6.　The documents I reviewed and relied upon in the course of this engagement, in addition to those cited in my earlier reports, are listed in Exhibit-1. My credentials and compensation are presented in the Feinstein Report. Testimony that I have provided since the submission of the Feinstein Report is identified in Exhibit-2.

7.　My work on this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work in this matter.

## II.　CONCLUSIONS

8.　The Fischel Report provides no basis for revising my conclusions on loss causation and damages. My analysis conforms with widely used and generally accepted methodologies, is grounded in fundamental principles of finance, and is correctly executed. My conclusions are drawn from this analysis.

9.　My quantification of damages is scientific, consistent with market efficiency, and correctly measures the damages investors suffered on account of the alleged misrepresentations and omissions. My damages attribution analysis was conservative and carefully conducted in accordance with scientific principles and generally accepted and widely used practices.

---

[12] Fischel Report, ¶16.

**CONFIDENTIAL**

10. My analysis, together with the evidentiary record, compels the conclusion that the alleged misrepresentations and omissions caused investor losses. The misrepresentations and omissions artificially inflated the JELD-WEN stock price, and the corrective disclosures dissipated the artificial inflation, causing the stock price to decline and, in turn, causing investor losses.

11. The conclusions in the Fischel Report rely on three primary arguments. First, Mr. Fischel suggests that the misrepresentations and omissions did not cause JELD-WEN investor losses because market participants simply did not believe the Company or consider the alleged misrepresentations and omissions to be economically important. Second, Mr. Fischel contends that the disclosures were not corrective disclosures because they were not mirror image recantations of the prior misrepresentations. In Mr. Fischel's view, because the corrective disclosures did not explicitly declare that the Company had previously lied, they could not have been corrective of prior misrepresentations and omissions. Third, Mr. Fischel argues that the statistically significant price decline in JELD-WEN stock on 16 October 2018 was caused entirely by the Company's announcement of expected poor performance in the second half of 2018, which he contends is entirely unrelated to the alleged misrepresentations and omissions.

12. Mr. Fischel is wrong on all counts. All of Mr. Fischel's opinions are unsupported by – if not directly contradicted by – verifiable financial and economic analysis.

13. Mr. Fischel's contention that no analysts or investors were surprised by the $76.5 million *Steves* litigation charge is erroneous. It is indisputable and fundamental that a market stock price reflects the competing judgments of buyers and sellers. Consequently, for Mr. Fischel's thesis to be valid, it would have to be the case that ***no*** market participants were in any way influenced by the Company's false statements and omissions. This foundational premise of Mr. Fischel's argument is demonstrably false. He overlooks, disregards, or simply ignores analyst commentary that reflected the alleged misrepresentations and omissions.

14. Mr. Fischel improperly dismisses the possibility that false statements and omissions inflated the price of JELD-WEN stock by influencing analysts and investors - perhaps leaving them uncertain of the outcome of the *Steves* litigation rather than certain of the outcome - and subsequently caused investor losses when those false statements and

4

**CONFIDENTIAL**

omissions were corrected. Mr. Fischel repeatedly emphasizes that analysts and investors expressed uncertainty regarding the *Steves* litigation and its impact on the Company's prospects. However, Mr. Fischel's analysis then proceeds to ignore that investors and analysts' uncertainty, rather than pessimism was directly caused by the Company's false statements and omissions. In sum, whether some were pessimistic, some optimistic, or some neutral on the prospective outcome of the *Steves* litigation, Mr. Fischel fails to account for the impact of Defendants' vehement denials of the validity of the antitrust charges against it. This flaw in Mr. Fischel's analysis is fatal, rendering his analysis unreliable and his conclusion wrong.

15.   Mr. Fischel acknowledges the relationship between profitability and competition, or alternatively, anticompetitive behavior. False statements about competitive conditions in the marketplace and the Company's ability to cope with competition affect analysts' and investors' assessments of profitability. This information is necessarily allegation-related, and does affect the JELD-WEN common stock valuation, introducing or maintaining artificial inflation. Mr. Fischel presents valuations from analysts, which he acknowledges are functions of precisely this information.[13] As such, Mr. Fischel implicitly accepts that the misrepresentations and omissions would impact the market's outlook for JELD-WEN (e.g., the Company's future profitability, growth prospects, and condition) which would in turn impact the valuation of the Company and its stock. If the misrepresentations and omissions contributed to the market's uncertainty regarding the Company's company prospects and future outlook, then the misrepresentations and omissions necessarily impacted the JELD-WEN stock price. Mr. Fischel's analysis of loss causation and damages omits any consideration of this linkage and is therefore incomplete and unreliable.

16.   Mr. Fischel simultaneously argues two contradictory theories with respect to Judge Payne's 5 October 2018 decision in the *Steves* litigation. He offers a "truth on the market" argument, asserting that the truth about the impact from the *Steves* litigation was instantaneously perfectly measured and valued by analysts despite the Company's concurrent misrepresentations and omissions, which vehemently denied misconduct and

---

[13] See, e.g., Fischel Report, ¶¶29 and 35.

5

**CONFIDENTIAL**

liability.[14] But, Mr. Fischel also argues that it took the Company ten days "to estimate the probable dollar amount of the award resulting from the jury's verdict."[15] So, what truth was on the market according to Mr. Fischel? Mr. Fischel does not explain. If the Company could not arrive at a quantification of the costs of consequences, neither could the marketplace, so that information was not yet in the market until the Company provided it.

17. Mr. Fischel argues that because analysts and investors did not expect the Company's margins and profitability to decline on account of fallout from the *Steves* litigation until 2019 and beyond, the *Steves* litigation did not have any valuation impact. His position is belied by the fundamentals of financial analysis – valuation is forward looking, informed by current and past information and future expectations (and, in the case of alleged fraud, misinformation). To suggest that there is no link between the past, present, and future is to deny the basis of how valuation is performed in financial markets. Investors form their expectations of the future from information about the present and past.

18. Mr. Fischel cherry-picks analyst commentary and disregards or ignores contrary analyst commentary, which is an especially egregious mistake given that his thesis of no causation depends on 100% unanimity among analysts and investors with respect to disbelieving the Company's representations.

19. Mr. Fischel's thesis that the ***entire*** price decline on 16 October 2018 was due to operational issues in the North America wood windows business that had plagued the Company since its January 2017 IPO is untenable. The operational issues in the Company's North America wood window business were not new information disclosed for the first time on 15 October 2018. The operational issues in the North America wood window business were discussed repeatedly throughout the Class Period.[16] Consequently, my attribution of $0.96 per share of the 16 October 2018 JELD-WEN stock price decline to non-fraud related information concerning the 2019 and beyond expectations for the

---

[14] Fischel Report, ¶32; and Feinstein Report, ¶132.

[15] Fischel Report, ¶24.

[16] Feinstein Report, ¶¶98, 99, 103, 111, 126, 127; and Exhibit-8.

**CONFIDENTIAL**

North America windows business is a treatment that results in a conservatively low damage computation.[17]

20. In sum, Mr. Fischel's analysis of loss causation and damages is flawed and unreliable. His conclusion is demonstrably incorrect. Properly considering all of the empirical evidence and market commentary compels a conclusion opposite to Mr. Fischel's. The evidence supports a conclusion that the misrepresentations and omissions artificially inflated the price of JELD-WEN stock and caused a price decline when corrected. My computation of $1.99 per share inflation and damages is a conservative estimate.

## III.   CRITIQUE OF THE FISCHEL REPORT

### A.   Areas of Agreement

21. Mr. Fischel either agrees with or does not dispute most of the elements of my analysis in this matter.

22. Mr. Fischel takes no issue with the econometric analysis presented in the Feinstein Report. In fact, Mr. Fischel adopts the results of the regression model and event study which I used to evaluate the statistical significance of JELD-WEN's stock price movements on various dates during the Class Period.[18] He also does not dispute that JELD-WEN traded in an efficient market throughout the Class Period.

23. Mr. Fischel does not dispute that, following the announcement that the jury in the *Steves* litigation returned a verdict against JELD-WEN on 15 February 2018 finding that the Company had violated antitrust laws, the Company then assured analysts that it did "not believe that the ultimate outcome of this matter will have a material impact on its ability to operate in the ordinary course of business."[19] Mr. Fischel does not dispute that, six days later, during JELD-WEN's Q4 2017 conference call with investors, CEO Beck averred that management "believe[s] that the claims asserted in the litigation lack merit" and that "based upon the positions we've outlined, we do not believe that the ultimate

---

[17] Feinstein Report, ¶335.

[18] Fischel Report, ¶18.

[19] "JELD-WEN Announces Jury Verdict in Steves & Sons Lawsuit," *Business Wire*, Company press release, 15 February 2018, 6:48 PM.

**CONFIDENTIAL**

outcome will have a material impact on our ability to operate in the ordinary course of business."[20]

24.    Mr. Fischel does not dispute that analysts were assured by the Company's representations during the Class Period.

     i.    BAML analysts noted, "Importantly, while the jury's verdict would result in JELD being required to provide monetary compensation to Steves, management remains confident that it would not be forced to divest any CMI assets."[21]

    ii.    RBC analysts wrote that "JELD is confident that the company has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the [CMI] acquisition twice. JELD does not believe that a loss is probable or estimable." [22]

    iii.    Gabelli analysts noted that "Management believes divestment is unlikely but not impossible."[23]

    iv.    Citi analysts explained that "While we think that a divestiture is less probable given the 6 years since the merger closed and assume JELD will appeal vigorously (particularly after meeting new CEO), we believe the news will be incrementally negative on the stock."[24]

---

[20] "Q4 2017 JELD-WEN Holding Inc Earnings Call," *Thomson Reuters*, edited transcript, 21 February 2018, 8:00 AM, pp. 6 and 7.

[21] "Unfavorable Steves Verdict Likely to be Appealed; Forced Divestitures Unlikely," by John Lovallo II and Peter Galbo, BAML, analyst report, 16 February 2016, p. 1.

[22] Feinstein Report, ¶101; and "4Q17A Earnings Review," by Michael Eisen, RBC, analyst report, 22 February 2018, p. 1.

[23] "Q1 Results – Buy," by Alvaro Lacayo, Gabelli, analyst report, 9 May 2018, p. 1.

[24] Feinstein Report, ¶136; and "Alert: Recent News on JELD vs Steves Litigation," by Scott Schrier and Kenneth Ling, Citi, analyst report, 7 October 2018, p. 1.

**CONFIDENTIAL**

25.  With respect to 5-6 October 2018, Mr. Fischel adopts, or does not dispute, nearly all the elements of my analysis of this event, including that:

     i.    On 5 October 2018 (Friday), after the close of trading, Judge Robert E. Payne issued a memorandum opinion ("Opinion"), granting in part plaintiff Steves' motion for equitable relief.[25]

     ii.    The Court ordered the divestment of the Towanda plant in order to restore competition and ordered certain "conduct remedies necessary to the success of the divested entity as a manufacturer of interior molded doorskins."[26]

     iii.    The company publicly protested and rejected the decision in a press release issued on 6 October 2018.[27]

     iv.    The Company again argued that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI acquisition cleared DOJ review."[28]

     v.    The ruling and the ramifications associated with the Opinion caused some analysts to lower their valuation for JELD-WEN.[29]

     vi.    The Company vehemently denied any misconduct and liability.[30]

     vii.    Some analysts echoed the Company's reassurances.[31]

---

[25] Feinstein Report, ¶130; and Fischel Report, ¶7.

[26] Feinstein Report, ¶130; Memorandum Opinion, filed 5 October 2018, *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-00545-REP, p. 148; "Steves & Sons Wins Antitrust Decision as Federal Judge Orders JELD-WEN to Divest Towanda Plant to Restore Marketplace Competition," *Business Wire*, 5 October 2018, 10:45 PM; and Fischel Report, ¶7.

[27] Feinstein Report, ¶132.

[28] "JELD-WEN Announces Rulings in Steves & Sons Litigation; No Final Judgment on Antitrust Claims," *Business Wire*, Company press release, 6 October 2018, 7:14 AM.

[29] Feinstein Report, ¶¶133-134.

[30] Feinstein Report, ¶136.

[31] Feinstein Report, ¶136.

**CONFIDENTIAL**

26.    With respect to 15 October 2018, Mr. Fischel adopts, or does not dispute, nearly all the elements of my analysis of this event, including that:

    i.    On 15 October 2018, after the close of trading, JELD-WEN pre-announced financial results for Q3 2018 and lowered FY 2018 guidance.[32]

    ii.    The Company disclosed a charge associated with *Steves* for the first time.[33]

    iii.    The Company announced the departure of the Company's CFO, Brooks Mallard, effective 8 November 2018,[34] and noted that "Mr. Mallard's departure is not based on any disagreement with the company or based on any accounting or financial reporting matters."[35]

    iv.    The Company attributed its poor (versus consensus estimates) Q3 2018 results and FY 2018 guidance to transient factors.[36]

    v.    The *Steves* litigation ruling, the impact of which the Company now acknowledged and quantified to the market for the first time, caused some analysts to lower their valuation for JELD-WEN.[37]

    vi.    The residual stock price decline on 16 October 2018 of $4.42 per share was statistically significant at the 99.99% confidence level.[38]

    vii.    The impact of the Company's pre-announcement of its Q3 2018 financial results and the lowering of its FY 2018 financial guidance was a negative $0.22 per share.[39] Mr. Fischel does not contest that I removed this $0.22 per share from the $4.42 per share residual stock price decline, as I

---

[32] Feinstein Report, ¶138.

[33] Feinstein Report, ¶137; and Fischel Report, ¶8.

[34] Feinstein Report, ¶138.

[35] "JELD-WEN Announces the Departure of Brooks Mallard, CFO and the Promotion of John Linker to CFO," *Business Wire*, Company press release, 15 October 2018, 4:22 PM; and Fischel Report, ¶15.

[36] Feinstein Report, ¶140.

[37] Feinstein Report, ¶¶142-145.

[38] Feinstein Report, ¶298; and Fischel Report, ¶43.

[39] Feinstein Report, ¶334.

**CONFIDENTIAL**

deemed the $0.22 per share impact to be caused by confounding information.

viii.    I removed an additional $1.25 per share from the $4.42 per share residual price decline to account for the confounding information of operational inefficiencies in JELD-WEN's European business.[40]

ix.    A large portion of the decline on 16 October 2018 can be attributed to analysts' reducing their estimates for FY 2019 EBITDA.

### B.    Areas of Disagreement

27.    Mr. Fischel contends that the $76.5 million charge was "not new, material information" and therefore did not cause any of the decline in the Company's stock price on 16 October 2018, despite the Company's previous representations that the allegations in the *Steves* litigation lacked any merit and that JELD-WEN would not suffer any material impact on its operations as a result of the litigation. As explained in detail below, his opinion is untenable.

28.    While Mr. Fischel and I agree that the majority of the stock price decline on 16 October 2018 was caused by the decline in consensus estimates for FY 2019 EBITDA and analysts adjusting their valuations for JELD-WEN, Mr. Fischel asserts that ***all*** of this decline was caused by non-fraud related information. Mr. Fischel contends that the decline in consensus estimates and analyst revaluations had nothing to do with the *Steves* verdict, repercussions from the verdict, or JELD-WEN's prior (mis)representations attributing its past success, and its future forecasts to operational improvements, rather than unsustainable anticompetitive behavior.

---

[40] Feinstein Report, ¶334.

11

**CONFIDENTIAL**

### C.     Mr. Fischel's Purported Analysis of the 5 October 2018 Disclosure is Flawed

29.    On 5 October 2018 (Friday), after the close of trading, Judge Robert E. Payne issued the Opinion, granting in part plaintiff Steves' motion for equitable relief. The Court ordered the divestment of the Towanda plant in order to restore competition in the market and ordered certain "conduct remedies necessary to the success of the divested entity as a manufacturer of interior molded doorskins."[41]

30.    JELD-WEN publicly protested and rejected the decision. On 6 October 2018 (Saturday), the Company issued a press release in which it stated that "JELD-WEN firmly maintains that it has not violated any antitrust laws," and that the Opinion was "incorrect due to multiple flawed rulings during the trial process."[42] The Company again argued that the "Antitrust Division of the Department of Justice ('DOJ'), the federal authority entrusted with enforcing antitrust laws in mergers and acquisitions, conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI acquisition cleared DOJ review."[43]

31.    Mr. Fischel suggests that the 8 October 2018 price reaction was not above the threshold for statistical significance because the stock price already reflected some of the negative information and "many analysts believed that the consequences of a Potential Doorskin Plant Divestiture would not necessarily be severe, both of which are based on analysts' independent assessments, not Defendants' denials of alleged misconduct and liability."[44] Mr. Fischel's opinion is contrary to the many analysts who offered commentary on the *Steves* litigation that echoed the Company's misrepresentations and omissions.[45] His opinion is also contradicted by the fact that the Company needed ten days after the Opinion to estimate the probable dollar amount of the charge.

---

[41] Memorandum Opinion, filed 5 October 2018, *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-00545-REP, p. 148; and "Steves & Sons Wins Antitrust Decision as Federal Judge Orders JELD-WEN to Divest Towanda Plant to Restore Marketplace Competition," *Business Wire*, 5 October 2018, 10:45 PM.

[42] "JELD-WEN Announces Rulings in Steves & Sons Litigation; No Final Judgment on Antitrust Claims," *Business Wire*, Company press release, 6 October 2018, 7:14 AM.

[43] "JELD-WEN Announces Rulings in Steves & Sons Litigation; No Final Judgment on Antitrust Claims," *Business Wire*, Company press release, 6 October 2018, 7:14 AM.

[44] Fischel Report, ¶36.

[45] See, e.g., Feinstein Report, ¶136.

12

**CONFIDENTIAL**

32. Consequently, Mr. Fischel provides no valid basis for revising my conclusions regarding the 5 October 2018 disclosure.

### D.  Mr. Fischel's Purported Analysis of the 15 October 2018 Disclosure is Flawed

33. On 15 October 2018, after the close of trading, JELD-WEN announced that it would be taking a charge of $76.5 million for a litigation contingency related to the *Steves* litigation.[46] The Company disclosed that the charge reflected the judgment it anticipated to be entered against it, including the trebling of $12.2 million of past damages pursuant to the Clayton Act and legal fees.[47]

34. In the same press release, the Company also provided preliminary financial results for Q3 2018, and it revised FY 2018 guidance downward. The Company attributed the disappointing quarterly results to "lower than expected revenues and related operational inefficiencies in North America and Europe, as well as from unfavorable channel mix impacting price realization."[48] Despite the disappointing preliminary results and lowered guidance, CEO Michel stated that he believed "that our inconsistent financial performance in 2018 is due to a lack of focus on execution and process discipline in parts of our organization, which are capabilities we can fix."[49]

35. Mr. Fischel contends that: i) the direct impact of the $76.5 million *Steves* litigation charge overstates damages because the Company did not admit guilt;[50] ii) the $76.5 million charge was "not new, material information;"[51] iii) the *Steves* litigation charge and the potential consequences stemming from the litigation were reflected in the stock price prior to 16 October 2018;[52] iv) "the economic evidence contradicts" my claim that

---

[46] "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," *Business Wire*, Company press release, 15 October 2018, 4:20 PM.

[47] "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," *Business Wire*, Company press release, 15 October 2018, 4:20 PM.

[48] "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," *Business Wire*, Company press release, 15 October 2018, 4:20 PM.

[49] "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," *Business Wire*, Company press release, 15 October 2018, 4:20 PM.

[50] Fischel Report, §IV.A.i.

[51] Fischel Report, §IV.A.ii.

[52] Fischel Report, §IV.A.iii.

13

**CONFIDENTIAL**

"market participants reduced their 2019 EBITDA forecasts and valuation multiples due to a perceived decline in 'pricing power' from 'illegal anticompetitive behavior' revealed by the Steves litigation charge;"[53] and v) my "claim that [my] loss causation opinion is 'compelled' by numerous factors is incorrect."[54] Each is dealt with below.

### 1. Mr. Fischel Errs by Asserting That the Company's $76.5 Million *Steves* Litigation Charge Does Not Reflect the Probability the Company Will Win on Appeal

36.   Mr. Fischel suggests that because the Company "did not admit guilt or disclose the alleged 'illegal anticompetitive behavior'" in its 3Q18 pre-announcement, the $76.5 million direct effect of the charge, or $0.55 per share, was overstated.[55] Specifically, he contends that "the entire $0.55 per-share amount is overstated since it does not reflect the probability that the Company will win its appeal."[56] Mr. Fischel is wrong for at least two reasons.

37.   First, Mr. Fischel's assertion is refuted by the Company's internal accounting memorandum which stated that, based on the Opinion, the Company "believes a loss on this contingency is now probable, and if estimable, should be recorded."[57] That JELD-WEN did account for a $76.5 million contingency loss for the *Steves* litigation proves that the $76.5 million figure was deemed by the Company itself as a probable and quantifiable figure. There is also evidence that the $76.5 million is a low estimate and would therefore represent the floor of the ultimate cost of the litigation to the Company, rather than a probability weighted average as Mr. Fischel implies. For example, the Company's internal accounting memorandum concluded that "Divestiture of Towanda fiber plant (not estimable)" in context of attempting to ascertain a "reasonable estimate of loss on the matter."[58] That is, the Company deemed additional losses above the $76.5

---

[53] Fischel Report, §IV.A.iv.

[54] Fischel Report, §IV.A.v.

[55] Fischel Report, p. 13.

[56] Fischel Report, FN34.

[57] "Accounting Topic Discussion Paper; Subject: Steves Litigation," internal Company memorandum, dated 6 November 2018, [JW-SEC-01109346-48 at 47].

[58] "Accounting Topic Discussion Paper; Subject: Steves Litigation," internal Company memorandum, dated 6 November 2018, [JW-SEC-01109346-48 at 48].

14

**CONFIDENTIAL**

million to be probable, though not estimable at that time. Consequently, Mr. Fischel's suggestion that the $76.5 million charge (equal to $0.55 per share) could be too high – i.e., reflecting the worst possible outcome for JELD-WEN – is contradicted by the Company's own accountants. The Company's reduction of total potential damages (including the $176 million in antitrust damages) to a probable and estimable loss of $76.5 million, already took into account the Company's position of its likelihood of success on appeal.[59] Thus, Mr. Fischel's suggestion that I erred by not further discounting that already discounted figure is erroneous.

38.    Second, as explained in the Feinstein Report, an economic analysis of loss causation assumes Plaintiffs' factual allegations to be true and determines if the alleged misrepresentations and omissions or the alleged corrective disclosures affected the stock price.[60] It is my understanding that disclosures do not need to explicitly acknowledge guilt to be corrective of Plaintiffs' allegations. For example, the court in *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-CIV-6728 (CM)(RWL), 2019 WL 3001084 (S.D.N.Y. July 10, 2019) said a disclosure need not "take the form of a 'flashing neon light,' with an explicit message stating that it is intended to cure an earlier fraudulent statement, in order for it to qualify as corrective."[61] The court emphasized that "[t]here is no requirement that the corrective disclosure take a particular form or be of a particular quality,' such that it

---

[59] "The draft order granting Steves relief consisted of the following components: - $10M in contract damages and $176M in antitrust damages under the Clayton Act (consisting of $36.5M contract -related damages and $139.4M lost profits), and - requiring the Company divest its Towanda fiber plant." ("Accounting Topic Discussion Paper; Subject: Steves Litigation," internal Company memorandum, dated 6 November 2018, [JW-SEC-01109346-48, at 48]).

[60] Feinstein Report, ¶¶4 and 268; and see e.g., *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020) and "As Judge Holwell put it in *Vivendi*, although '[a] corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements[,] … the [disclosure] event need not take this form … to prove loss causation.'… It is precisely '[b]ecause corporate wrongdoers rarely admit that they committed fraud' that 'the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.''" ("Loss Causation on Trial in Rule 10B-5 Litigation a Decade After Dura," by Matthew Mustokoff and Margaret Mazzeo, *Rutgers University Law Review*, Vol. 70:175, 2017, pp. 196-197 (internal citations omitted).

[61] *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-CIV-6728 CMRWL, 2019 WL 3001084 (S.D.N.Y. July 10, 2019).

15

**CONFIDENTIAL**

be a 'mirror image tantamount to a confession of fraud.'"[62] Other Courts have reached similar conclusions.[63]

       **2.**     **The Economic Evidence, Including Company Statements and Analysts' Valuation Models, Supports the Economic Materiality of the *Steves* Litigation Charge and Its Consequences**

39. Mr. Fischel argues that "market participants had previously examined and understood the likelihood and magnitude of JELD-WEN's potential liability for the Steves Doorskins Litigation prior to October 16, 2018, including the consequences of the Potential Doorskin Plant Divestiture."[64] As explained below, Mr. Fischel cherry-picks analyst commentary to manufacture a narrative that ***no*** market participant was influenced by the misrepresentations and omissions.

40. Mr. Fischel also contends that "market participants understood that, among other things, the charge was an accounting matter reflecting the impact of the Steves Remedy Opinion on the dollar amount that could be awarded, ***not new, material information***."[65] Mr. Fischel's opinion that analysts did not consider the charge new, valuation-relevant information, is erroneous and demonstrably false when taking into account analyst commentary and Company statements, as must be considered in conducting a reliable valuation analysis.

---

[62] *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-CIV-6728 CMRWL, 2019 WL 3001084 (S.D.N.Y. July 10, 2019).

[63] See, e.g., *Larry Freudenberg v. E*Trade Financial Corporation*, No. 07 Civ. 8538., United States District Court Southern District of New York, Opinion, filed 11 May 2010; *In re Harman International Industries, Inc. Securities Litigation*, No. 14–7017, United States Court of Appeals District of Columbia, Opinion, filed 23 June 2015; *In re Vale S.A. Securities Litigation*, United States District Court Southern District of New York, Opinion and Order, No. 1:15-cv-9539-GHW, signed 23 March 2017; *Massachusetts Retirement Systems v. CVS Caremark Corporation*, United States Court of Appeals First Circuit, Opinion, No. 12-1900, filed 24 May 2013; *Public Employees' Retirement System Of Mississippi v. Amedisys, Inc.*, United States Court of Appeals Fifth Circuit, Opinion, No. 13-30580, filed 2 October 2014; *Pieter Van Dongen v. Cninsure Inc*, United States District Court Southern District of New York, Decision and Order, No. 11 Civ. 7320(VM), filed 24 June 2013; and *Sheet Metal Workers Local 32 Pension Fund v. Terex Corporation*, United States District Court District of Connecticut, Ruling and Order, No. 3:09-CV-2083(RNC), signed 31 March 2018.

[64] Fischel Report, ¶26.

[65] Fischel Report, ¶26.

16

**CONFIDENTIAL**

> **a.    Mr. Fischel's Selection of Analyst Commentary is Cherry-Picked and Creates a False Impression That No Market Participant Was Influenced by the Misrepresentations and Omissions**

41.    Mr. Fischel's selection of analyst quotes is unrepresentative of the breadth of analyst commentary during the Class Period. That no market participants had believed or were even influenced by the alleged misrepresentations and omissions is not only false, but also inconsistent with the content of the very analyst reports Mr. Fischel cites. Analyst excerpts appear to be picked to support the false narrative. However, a more complete review of the analyst reports undercuts Mr. Fischel's offered thesis.

42.    Mr. Fischel cites a handful of analyst reports that state that market participants were aware of the Company's potential liability. Mr. Fischel fails to consider that the Company's denials that it would suffer any adverse consequences from the *Steves* litigation contributed to analyst uncertainty. The very analysts he cites expressed uncertainty about the *Steves* litigation and the potential impact on the Company's future performance.

> i.    Goldman Sachs analysts noted that "several unknowns remain," including "a) the final ruling and any appeals process, b) a prospective buyer of the facility and a transaction price, c) the time and investment required for JELD to shift production to alternative facilities, and d) the reaction of other (non-Steves) door skin customers." The analysts went on to say that "Net, we continue to see a very favorable risk/reward for JELD shares, reiterate our Buy rating, and think the EBIT impact of a potential divestiture of Towanda would be relatively contained."[66]
>
> ii.    Wells Fargo analysts noted that "The uncertainty surrounding the Towanda sale would be the purchaser of the asset and the potential breakdown in industry structure. Would the new entrant cut pricing to

---

[66] Fischel Report, ¶29; and "Court Rules in Favor of Divestiture of Towanda; Final Judgment Expected by Year End," by Doug Clark et al., Goldman Sachs, 8 October 2018, [Fischel-0000247-53 at 47].

17

**CONFIDENTIAL**

drive share gains, or hold the high-margin business and maintain the favorable industry structure?"[67]

iii.    Credit Suisse analysts wrote that "This is a further step in this process, though we expect uncertainty around the divestiture will remain a significant overhang on the stock."[68]

iv.    SunTrust analysts explained that "The court ruling has not settled the Steves & Sons (private) litigation but has put a potential divestiture on the table from this old and complicated case. It comes at the worst time for JELD given the interest rate sell-off of most stocks in our coverage. We believe the overhang is now very difficult to quantify and will remain on the name for some time."[69]

v.    RBC analysts stated, "Our lowered multiple anticipates that the unfavorable litigation ruling will remain an overhang on JELD's valuation."[70]

43.    Notwithstanding the uncertainty that arose from the Company's positive misrepresentations and omissions, without which analysts would reasonably have been more pessimistic, Mr. Fischel cherry-picks analyst quotes and disregards (or ignores) the numerous other analysts who were positively swayed by the Company's misrepresentations and omissions. Many analysts offered commentary on the *Steves* litigation that echoed the Company's alleged misrepresentations and omissions.

---

[67] "JELD: The Steves Saga Continues," by Stephen East et al., Well Fargo, analyst report, 7 October 2018, p. 1.

[68] "Doors Remain Open to Possible Divestiture," by Susan Maklari et al., Credit Suisse, analyst report, 8 October 2018, p. 1.

[69] "Latest Ruling in Steves Litigation," by Keith Hughes and Judy Merrick, SunTrust, analyst report, 8 October 2018, p. 1.

[70] "Lowering PT on Negative Litigation Outcome," by Mike Dahl and Michael Eisen, RBC, analyst report, 8 October 2018, p. 3.

**CONFIDENTIAL**

      i.      BAML analysts explained that "It seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI acquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."[71]

      ii.      Citi analysts wrote that "While we think that a divestiture is less probable given the 6 years since the merger closed and assume JELD will appeal vigorously (particularly after meeting new CEO), we believe the news will be incrementally negative on the stock."[72]

      iii.      Barclays analysts wrote, "While management remains confident that the appeals process (est. 9-36 months after final judgment) will reverse the divestiture ruling, we anticipate an overhang on JELD's stock to persist throughout the process."[73]

      iv.      Jefferies analysts released a report titled "Unfavorable Steves Ruling, But Manageable," in which analysts noted: "JELD confident in ability to prevail in appeals. JELD continues to believe divestiture would not hold up in an appeal."[74]

44.    Clearly, analysts relied on the Company's misrepresentations and omissions to evaluate the Company's business and prospects and to assess the ultimate impact of the *Steves* litigation.

45.    The very evidence that Mr. Fischel puts forth as supporting a conclusion of no loss causation actually indicates that the Company's alleged misrepresentations and omissions had an impact on analysts' outlook.

---

[71] "Court Rules Divestiture a Possible Antitrust Remedy, but JELD Continues to Fight," by John Lovallo II and Peter Galbo, BAML, analyst report, 8 October 2018, p. 1.

[72] "Alert: Recent News on JELD vs Steves Litigation," by Scott Schrier and Kenneth Ling, Citi, analyst report, 7 October 2018, p. 1.

[73] Fischel Report, ¶29; and "Overhang Doesn't Derail OW Thesis," by Matthew Bouley and Marshall Mentz, Barclays, analyst report, 8 October 2018, p. 1.

[74] "Unfavorable Steves Ruling, But Manageable," by Philip Ng et al., Jefferies, analyst report, 7 October 2018, p.1.

19

**CONFIDENTIAL**

   b.   **Mr. Fischel's Assertion That the *Steves* Litigation Charge Was "Not New, Material Information" Is Erroneous**

46. Mr. Fischel also contends that "market participants understood that, among other things, the charge was an accounting matter reflecting the impact of the Steves Remedy Opinion on the dollar amount that could be awarded, ***not new, material information***."[75] Mr. Fischel's opinion that analysts did not consider the charge new, valuation-relevant information is erroneous and undermined by analyst commentary and Company statements.

47. None of the analyst reports which Mr. Fischel relies on draw the far-reaching conclusion that the $76.5 million charge in connection with the *Steves* litigation was merely an accounting charge and "not new, material information." Mr. Fischel ignores the many other analysts who expressed negative surprise by the Company's litigation charge.[76] Lack of unanimity among analyst firms proves nothing, and it especially does not prove that the announcement was not new, material information to the market. Further, the very fact that the Company deemed the $76.5 million charge necessary to disclose to market participants compels a finding that the information ***was*** new and material. Contrary to Mr. Fischel's contention, a handful of analysts stating that they were not surprised by the $76.5 million charge in connection with the *Steves* litigation does not refute or contradict that the information conveyed in the pre-announcement to the market was new, negative information.

48. Moreover, Mr. Fischel ignores that the Company itself stated that until 15 October 2018, it previously had been unable to produce a reasonable estimate of a cost associated with *Steves* verdict.

---

[75] Fischel Report, ¶26.

[76] Feinstein Report, ¶¶142-145.

**CONFIDENTIAL**

### 3. Mr. Fischel's Contention That Any Price Impact Stemming from the $76.5 Million Charge Would Be Inconsistent with Market Efficiency Is Contradicted by the Company Itself and Defendants' Expert Mr. Flemmons in Particular

49. Mr. Fischel speculates that my use of the direct impact of the $76.5 million charge ($0.55 per share) is inconsistent with market efficiency because the charge "would have been quickly reflected in the stock price in an efficient market before the related accounting charge could be booked."[77] That is, Mr. Fischel suggests that the market was prescient and received enough information from JELD-WEN to know the amount of the charge before even the Company itself could produce and disclose the figure. Mr. Fischel's assertion is unfounded, speculative, and contradicted by the Company and Mr. Flemmons (Defendants' accounting expert).

50. Earlier in his report, Mr. Fischel argues that the "inclusion of the Steves Litigation Charge in JELD-WEN's pre- announcement of financial results reflects a *timely* disclosure of an updated accounting decision based on the issuance of the Steves Remedy Opinion *ten days earlier* that allowed the Company to estimate the probable dollar amount of the award resulting from the jury's verdict."[78] If the Company needed the Opinion and ten days to estimate the probable dollar amount of the award with a full set of information, not muddled by misrepresentations and omissions, how could market participants accurately estimate such figures instantaneously? The Fischel Report offers no answers.

51. Further, during the deposition of Mr. Flemmons, he was asked whether "the [C]ompany needed time to digest [the 5 October 2018 Opinion] and do the analysis under ASC 450?"[79] Mr. Flemmons explained that "it's customary in the accounting industry for the need to have time to perform accounting analyses and evaluate the facts, particularly new facts that occur. And it could inform and serve as the basis for either additional disclosure or recognition of a loss contingency."[80] Further, Mr. Flemmons testified that the Opinion "contained a lot of information and was very lengthy. And I would imagine it took some

---

[77] Fischel Report, ¶32.

[78] Fischel Report, ¶24 (emphasis added).

[79] Deposition of Jason Stephen Flemmons, In Re: JELD-WEN Holding, Inc., 5 February 2021, p. 116:13-15.

[80] Deposition of Jason Stephen Flemmons, In Re: JELD-WEN Holding, Inc., 5 February 2021, pp. 116:20-117:4.

**CONFIDENTIAL**

time to work through and assess the impact on the company's accounting determinations."[81]

52.   Mr. Fischel also mischaracterizes my attribution of the decline on 16 October 2018. He erroneously concludes that I "incorrectly attribute[d] RBC's multiple reduction to the Steves Litigation Charge."[82] I never stated that the price decline in reaction to the S*teves* litigation charge was attributable to a reduction in RBC's multiple. Rather, I noted that RBC reduced its price target from $28 to $23 and explained that the "unfavorable litigation ruling [would] remain an overhang on JELD's valuation."[83]

53.   Similarly, Mr. Fischel contends that I incorrectly attributed Deutsche Bank's negative views to the *Steves* litigation charge because Deutsche Bank referenced the Steves' 5 October 2018 press release.[84] However, Deutsche Bank did not publish a report until 16 October 2018 ***after*** both the Opinion and the *Steves* litigation charge were disclosed. In that report, Deutsche Bank acknowledged the likelihood of the forced divestiture for the first time, noting "Finally, the Steves legal provision puts a number on the cost of the legal action; however, it doesn't take into account the potentially serious disruption from the forced divestiture of the Towanda plant - a likely outcome given Steves recent press release."[85] Mr. Fischel erroneously assumes that market participants should have been able to accurately estimate such figures instantaneously following the 5 October 2018 Opinion and the Steves press release, despite the fact that the Company needed ten days to undertake its evaluation and calculate its estimate of the impact.

---

[81] Deposition of Jason Stephen Flemmons, In Re: JELD-WEN Holding, Inc., 5 February 2021, p. 116:7-12.

[82] Fischel Report, ¶30.

[83] Feinstein Report, ¶142; and "Walking on Broken Glass; Lowering PT on Guidance Cut," by Mike Dahl and Michael Eisen, RBC, analyst report, 16 October 2018, p. 2.

[84] Fischel Report, ¶31.

[85] "17% Reduction to 2H18 Guidance May Not be the End of JELD-WEN's Troubles," by Nishu Sood et al., Deutsche Bank, analyst report, 16 October 2018, p. 1.

**CONFIDENTIAL**

54. Mr. Fischel's assertion that analysts and investors should have been able to calculate the amount of the *Steves* litigation charge instantaneously is pure speculation and unreliable given that the Company's own accountants needed ten days to complete and disclose their analysis of the "lengthy" and detailed 5 October 2018 Opinion.[86]

> **4.** **The Company's 15 October 2018 Pre-Announcement Contained New, Negative Information About the Company's Performance Expectations Going Forward Stemming from the Illegal Anticompetitive Behavior**

55. As explained in the Feinstein Report, the Company attributed the lower preliminary results for Q3 2018 and the FY 2018 guidance reduction "to a lack of focus on execution and process discipline in parts of our organization."[87] However, these performance issues did not carry over into the Company's or analysts' forecasts for 2019 and beyond because the Company stated that the 2018 cost-side problems were temporary and would be fixed.[88] As such, any negative forecast for 2019 and beyond would have to be attributed to a persistent problem, and loss of pricing power was the persistent problem now facing the Company on account of the adverse outcome in the *Steves* litigation.

56. Mr. Fischel does not dispute that fundamental financial economic principles dictate that a firm engaged in illegal anticompetitive behavior may be able to (unsustainably) boost apparent profitability, which is a determinant of company value and the value of the company's securities. Instead, Mr. Fischel argues that there is "no evidence" that "any market participants concluded that the Company was engaged in" illegal anticompetitive behavior.[89] Therefore, according to Mr. Fischel, there is "no factual basis" for attributing the Company's reduction in 2019 profitability to Plaintiffs' allegations of concealed illegal, anticompetitive behavior.[90] As explained in ¶38 above, it is my understanding that

---

[86] Deposition of Jason Stephen Flemmons, In Re: JELD-WEN Holding, Inc., 5 February 2021, p. 116:8.

[87] Feinstein Report, ¶316.

[88] Feinstein Report, ¶¶317-318; In the Company's press release CEO Michel assured analysts that he viewed the Company's "2018 financial performance headwinds as temporary in nature, and I am encouraged about our future." ("JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," *Business Wire*, Company press release, 15 October 2018, 4:20 PM).

[89] Fischel Report, ¶39.

[90] Fischel Report, ¶39.

23

**CONFIDENTIAL**

in order for a corrective disclosure to be corrective, it need not be a mirror image. This is confirmed by my own analysis of investors reaction to Company disclosures, where I have observed that investors do not require a mirror-image disclosure or an admission of guilt to conclude that a prior representation was false or misleading.

57.    Mr. Fischel disputes my finding that pricing power for the Company's door products was viewed as unsustainable following the Company's Q3 2018 pre-announcement.[91] There are several flaws in Mr. Fischel's analysis. First, Mr. Fischel's conclusions are fundamentally flawed as they rely on excerpts from three analysts' reports published after the Company's 6 November 2018 announcement of Q3 2018 results, nearly a month after the Company's 15 October 2018 pre-announcement of those results.[92] These analysts were analyzing and commenting on the information provided to them by the Company on 6 November 2018 that was not available in the 15 October 2018 pre-announcement.[93] In fact, Mr. Fischel notes on 6 November 2018 that JELD-WEN "clarified the reasons for the disappointing financial results in the latter half of 2018."[94] Thus, there is no way the Company's "clarification" could have impacted the 16 October 2018 stock price. Second, the analysts Mr. Fischel relies upon stated that it has been "Well over a year" since the Company initially disclosed problems in the North American wood windows business, belying any assertions that it was "new" information on 15 October 2018.[95] Third, Mr. Fischel does not take into account the many other analysts who revised their assessment of the Company, and the valuation of the stock, because of the negative implications for performance expectations going forward.[96] As explained above, lack of unanimity among analyst firms proves nothing, and it especially does not prove that the announcement was "not new, material information" to the market.

---

[91] Fischel Report, ¶40.

[92] Fischel Report, ¶40.

[93] "Footprint Rationalization a Key First Step in Driving Margin Improvement," by Doug Clark et al., Goldman Sachs, analyst report, 6 November 2018, [Fischel-0000110-18]; "JELD: Light Ahead, But Guideposts Needed," by Stephen East et al., Wells Fargo, analyst report, 6 November 2018; and "Footprint Consolidation Encouraging; Supports 2019 Margin Inflection," by Matthew Bouley et al., Barclays, analyst report, 7 November 2018.

[94] Fischel Report, ¶40.

[95] "Footprint Rationalization a Key First Step in Driving Margin Improvement," by Doug Clark et al., Goldman Sachs, analyst report, 6 November 2018, [Fischel-0000110-18 at 12].

[96] Feinstein Report, ¶145.

**CONFIDENTIAL**

58. Mr. Fischel argues that because the impact of any resolution of the *Steves* litigation would not occur until late 2019, at the earliest, it could not be reflected in the Company's 2019 EBITDA estimate and therefore could have no impact on the Company's valuation. Mr. Fischel's supposition is belied by fundamental principles of valuation - that an asset's value is the present value of *all* future cash flows - rendering his criticisms baseless.[97]

### 5. Mr. Fischel's Report Ignores My Loss Causation Analysis and the Impact That the Misrepresentations and Omissions Had on the Price of JELD-WEN Stock

59. The conclusion that the alleged misrepresentations and omissions caused investor losses is compelled by generally accepted principles of valuation, Defendants' own statements, news analysis, analyst reports, documents produced in this litigation to date, and the event study described in the Feinstein Report.

60. In the Feinstein Report, I demonstrated that JELD-WEN stock traded in an efficient market, which Mr. Fischel does not contest. It follows that positive misrepresentations and omissions about the foreseeable risks and financial ramifications of the Company's anticompetitive behavior would skew upwards the market's assessment of JELD-WEN's future profit margins and EBITDA growth. Similarly, I explained that these misrepresentation and omissions also downplayed the likelihood of penalties and divestiture. All of these misrepresentations and omissions would in turn artificially inflated the Company's stock price.[98] Event study analysis focusing on the empirical reaction of the security price to corrective disclosures confirms this conclusion.[99] Disclosures correcting the misrepresentations and omissions, by revealing the truth about the Company's illegal anticompetitive conduct and risks posed by the *Steves* litigation, dissipated the artificial inflation and caused the stock price to decline.[100] Corrective

---

[97] "The intrinsic value of a cash flow-generation asset is a function of how long you expect it to generate cash flows, as well as how large and predictable these cash flows are. This is the principle that we use in valuing businesses, private as well as public, and in valuing securities issued by these businesses. *The Dark Side of Valuation*, by Aswath Damodaran, 3rd edition, Pearson Education, 2018, p. 1.

[98] Feinstein Report, ¶272.

[99] Feinstein Report, ¶272.

[100] Feinstein Report, ¶272.

**CONFIDENTIAL**

disclosures thusly precipitated investor losses caused by the misrepresentations and omissions.[101]

61. Mr. Fischel contends that I did not explain how my analysis of news, internal documents, financial principles, and event study analysis compel a conclusion of loss causation.[102] Mr. Fischel is wrong and disregards the analysis in the Feinstein Report.[103]

### E.      Mr. Fischel's Report Erroneously Attributes the 15 October 2018 Stock Price Decline to Old, Transient Factors

62. Mr. Fischel opines that the "more plausible and compelling cause of the decline [of JELD-WEN stock on 16 October 2018]… is inconsistent with Plaintiffs' claims, namely that JELD-WEN disclosed fundamental *operational issues* in 2018 that reduced the Company's expected future profitability for reasons having nothing to do with alleged 'illegal anticompetitive behavior.'"[104] In essence, Mr. Fischel's thesis is that the entire price decline on 16 October 2018 was due to problems in the wood windows business that had plagued Company since its January 2017 IPO.

63. The operational issues in the Company's wood window business were not new information disclosed for the first time on 15 October 2018. Rather, as outlined in the Feinstein Report, and reported by analysts and management, the wood window business suffered from operational issues repeatedly throughout the Class Period.[105] In fact, when the Company previously discussed the problems with the wood windows business on 21 February 2018, 8 May 2018, and 7 August 2018, the stock price fell by statistically significant amounts.[106]

---

[101] Feinstein Report, ¶272.

[102] Fischel Report, ¶¶42-43.

[103] Feinstein Report, ¶¶274-300.

[104] Fischel Report, ¶23 (emphasis added).

[105] Feinstein Report, ¶¶98, 99, 103, 111, 126, 127; and Exhibit-8.

[106] Feinstein Report, ¶¶75, 84, 85, 98, 99, 103, 111, 126, and 127; and Exhibit-8. The residual returns on 21 February 2018 and 7 August 2018 were indisputably statistically significant and the residual return on 8 May 2018 was statistically significant at the 90% confidence level.

**CONFIDENTIAL**

64.     Lastly, as explained in the Feinstein Report, in response to the disappointing preliminary Q3 2018 results and lowered FY 2018 guidance, CEO Michel stated that he believed "that our inconsistent financial performance in 2018 is due to a lack of focus on execution and process discipline in parts of our organization, which are capabilities we can fix."[107] He assured analysts that he viewed the Company's "2018 financial performance headwinds as temporary in nature, and I am encouraged about our future."[108]

65.     Mr. Fischel's assertion that the operational issues in the wood window business were new information disclosed on 15 October 2018 that accounted for the entire price decline is unsupported by Company statements, analyst reports, and empirical event study analysis, rendering his argument baseless. Consequently, I see no reason to revise my attribution that $0.96 per share of the 16 October 2018 JELD-WEN stock price decline was caused by the information concerning the North America windows business.[109]

66.     In sum, rather than Mr. Fischel's speculative and unsupported take-all approach, the more plausible explanation for the 16 October 2018 price decline is that the negative forecast for 2019 and beyond was attributed to the loss of pricing power that the Company now faced in its North American door business on account of the cessation of the now disclosed anticompetitive conduct revealed as a result of the adverse outcome in the *Steves* litigation. Mr. Fischel presents no valid analysis or argument for modifying my conclusion that $1.44 per share of the residual decline on 16 October 2018 is attributable to the effects of the corrective disclosures on analysts' and investors' changed assessment of the North American door business, which was now expected to become more competitive and less profitable.[110]

---

[107] Feinstein Report, ¶140; and "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," *Business Wire*, Company press release, 15 October 2018, 4:20 PM.

[108] Feinstein Report, ¶318; and "JELD-WEN Announces Preliminary Financial Results for the Third Quarter of Fiscal 2018 and Date of Conference Call," *Business Wire*, Company press release, 15 October 2018, 4:20 PM.

[109] Feinstein Report, ¶335.

[110] As explained in §III.D.3, above, this is in addition to the $0.55 stock price decline caused directly by the announcement of this litigation charge.

**CONFIDENTIAL**

## IV.    LIMITING FACTORS AND OTHER ASSUMPTIONS

67.    This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**

**Documents and Other Information Considered
in Addition to Those Cited in the Feinstein Report**

**EXPERT REPORTS**

- Expert Report of Steven P. Feinstein, Ph.D., CFA, dated 4 January 2021.
- Expert Report of Daniel R. Fischel, dated 1 February 2021.

**DOCUMENTS PROVIDED BY COUNSEL**

- Deposition of Jason Stephen Flemmons, In Re: JELD-WEN Holding, Inc., 5 February 2021.
- Fischel-0000094.
- Fischel-0000110.
- Fischel-0000119.
- Fischel-0000239.
- Fischel-0000247.
- Fischel-0000254.
- JW-SEC-01109346.

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Damodaran, Aswath, *The Dark Side of Valuation*, 3rd edition, Pearson Education, 2018.
- Mustokoff, Matthew L. and Margaret E. Mazzeo, "Loss Causation on Trial in Rule 10B-5 Litigation a Decade After Dura," *Rutgers University Law Review*, Vol. 70:175, 2017.

**LEGAL CASES**

- *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020).
- *In re Harman International Industries, Inc. Securities Litigation*, 791 F.3d 90 (D.C. Cir. 2015).
- *Larry Freudenberg v. E\*Trade Financial Corporation*, 07 Civ. 8538. (S.D.N.Y. 2010).
- *Massachusetts Retirement Systems v. CVS Caremark Corporation*, 716 F.3d 229 (1st Cir. 2013).
- *Pieter Van Dongen v. Cninsure Inc*, 951 F.Supp. 2d 457 (S.D.N.Y. 2013).
- *Public Employees' Retirement System Of Mississippi v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014).
- *Sheet Metal Workers Local 32 Pension Fund v. Terex Corporation*, No. 3:09-CV-2083(RNC) (D. Conn. 2018).

29

**Exhibit-1**

**Documents and Other Information Considered
in Addition to Those Cited in the Feinstein Report**

- *In re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131 (S.D.N.Y. 2019).
- *In re Vale S.A. Securities Litigation*, No. 1:15-cv-9539-GHW (S.D.N.Y. 2017).

**DATA AND DATABASES**

- Bloomberg
- Capital IQ
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva
- FactSet
- Thomson Eikon

**OTHER**

- Other documents cited in my reports.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided Since the Feinstein Report**

In Re Envision Healthcare Corporation Securities Litigation
Civil Action No. 3:17-cv-01112
United States District Court
Middle District of Tennessee
Nashville Division
Deposition Testimony
January 2021

In Re Jeld-Wen Holding, Inc. Securities Litigation
Civil Action No. 3:20-cv-00112-JAG
United States District Court
Eastern District of Virginia
Richmond Division
Deposition Testimony
January 2021