**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-00112-JAG<br><br>Judge John A. Gibney, Jr. |

**MEMORANDUM OF LAW IN SUPPORT OF THE
JELD-WEN DEFENDANTS' MOTION TO EXCLUDE
REPORT AND TESTIMONY OF DR. RUSSELL LAMB**

**TABLE OF CONTENTS**

Page

INTRODUCTION..................................................................................................... 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARD ............................................................................................. 6

ARGUMENT........................................................................................................... 7

    I.    **Lamb's Opinions Should Be Excluded As Irrelevant**....................................... 7

        A.    Lamb's Analysis Is Unrelated To Plaintiffs' Securities Fraud Allegations ........................................................................................... 7

        B.    Lamb's Opinions Should Be Excluded Because He Admits He Cannot Distinguish Between Innocent And Anticompetitive Conduct ........................................................................................... 8

    II.    **Lamb's Qualitative Analysis of Market Structure, Conduct, And Performance Is Not Admissible Expert Opinion** .......................................... 11

        A.    Lamb's Subjective Interpretation Of Communications Between JELD-WEN And Masonite Is Not Proper Expert Testimony................... 11

        B.    Lamb Cannot Opine On JELD-WEN's Intent, Motives, And Knowledge ..................................................................................... 16

        C.    Lamb's Opinions Regarding Cherry-Picked Record Evidence Of Market Structure, Conduct, And Performance Should Be Excluded........ 17

            1.    Structure of the IMD and Doorskin Markets ................................ 17

            2.    Parallel Price Increase Announcements........................................ 19

    III.    **Lamb's Overcharge Opinion Is Irrelevant, And His Regression Analysis Is Unreliable** ..................................................................................... 22

        A.    Lamb's Overcharge Regression Analysis Is Not Relevant To The Task At Hand ...................................................................................... 23

        B.    Lamb Did Not Reliably Apply His Overcharge Regression Analysis ........................................................................................................ 26

            1.    Lamb's Regressions Are Inconsistent With His IMD Litigation Methodology ................................................................ 27

2.    The Regressions in Lamb's Reply Report Demonstrate His Model Is Not Robust ........................................................................ 28

**CONCLUSION** ..................................................................................................................... **30**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Woody*,
2018 WL 2452177 (E.D. Va. May 31, 2018) ...........................................................................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................................2, 9

*Belville v. Ford Motor Co.*,
919 F.3d 224 (4th Cir. 2019) ........................................................................6, 8, 11, 23

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................................................................................................................2, 9

*U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*,
89 F. Supp. 3d 778 (E.D. Va. 2014) ..............................................................................27

*In re C.R. Bard, Inc.*,
948 F. Supp. 2d 589 (S.D. W. Va. 2013)..................................................................................16

*Colonna Shipyard, Inc. v. United States*,
2015 WL 13047569 (E.D. Va. July 30, 2015)....................................................................17, 19

*Daubert v. Merrill Dow Pharms., Inc.*,
509 U.S. 579 (1993).................................................................................................... *passim*

*U.S. ex rel. Dyer v. Raytheon Co.*,
2013 WL 5348571 (D. Mass. Sept. 23, 2013) .........................................................................16

*Eghnayem v. Boston Sci. Corp.*,
57 F. Supp. 3d 658 (S.D. W. Va. 2014)..................................................................................16

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009)......................................................................................16

*In re Interior Molded Doors Antitrust Litigation*,
No. 3:18-cv-00718-JAG (E.D. Va.).........................................................................................3

*Kennedy v. Joy Technologies, Inc.*,
269 F. ......................................................................................................................14, 16

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
910 F.3d 927 (7th Cir. 2018) ...................................................................................................8

*Limelight Networks Inc. v. XO Commc'ns, LLC*,
  2018 WL 678245 (E.D. Va. Feb. 2, 2018)..................................................................7, 8, 11

*Masonite Int'l Corp. v. Coghlan*,
  No. 8:12-cv-02242-SCB-MAP (M.D. Fla. Oct. 3, 2012) ........................................................12

*Nease v. Ford Motor Co.*,
  848 F.3d 219 (4th Cir. 2017) ..................................................................................7, 8, 11

*Nilssen v. Motorola, Inc.*,
  1998 WL 513090 (N.D. Ill. Aug. 14, 1998) ...........................................................................27

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  2017 WL 275398 (E.D. Pa. Jan. 18, 2017)...........................................................................18

*In re Prempro Prods. Liab. Litig.*,
  554 F. Supp. 2d 871 (E.D. Ark. 2008)....................................................................................15

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004)......................................................................................15

*Sardis v. Overhead Door Co.*,
  2019 WL 560273 (E.D. Va. Feb. 12, 2019).............................................................................15

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013)......................................................................................17

*Slavin v. Garrison Property and Casualty Insurance. Co.*,
  2017 WL 2928030 (D. Colo. July 10, 2017), *aff'd*, 805 Fed. Appx. 561 (10th
  Cir. 2020) .................................................................................................................................13

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ...............................................................................................4, 9

*In re Trasylol Prods. Liab. Litig.*,
  709 F. Supp. 2d 1323 (S.D. Fla. 2010) ...................................................................................16

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000)...................................................................................................................6

*In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*,
  858 F.3d 787 (3d Cir. 2017).....................................................................................................27

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  644 F.3d 604 (8th Cir. 2011) .....................................................................................................7

**Rules**

Fed. R. of Evid. 702 ...................................................................................................6, 7, 16, 26

## INTRODUCTION

Plaintiffs' antitrust expert, Russell Lamb, should be excluded from this securities fraud case. His opinions do not bear on the alleged corrective disclosures, or damages theories, Plaintiffs wish to present to the jury at trial. Instead, Lamb has examined an entirely different question:

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████. But in the end, Lamb cannot answer that question. Although he said he believed the record evidence ████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████. Ex. 5, Feb. 15, 2021 Reply Decl. of Russell L. Lamb ¶ 3 ("Lamb Reply Rpt."). Instead, he forthrightly acknowledged that his ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.* (emphasis added). If that is so, then his "analysis and conclusions" are of no assistance to the jury.

Lamb's economic analysis is also methodologically unreliable and resembles a lawyer's trial brief. The lynchpin of his "economic" analysis is his conclusion that, ███████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████. But Lamb has no professional expertise to bring to bear on that question, and nothing to add to the jury's consideration of them. And when that inappropriate foray into the factfinder's role is set aside, nothing else supports his analysis of "anticompetitive" conduct, apart from features of the IMD market that would all be true whether or not JELD-WEN and Masonite fixed prices.

Nor can Lamb's econometric "multiple regression analysis" salvage anything of his opinion. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54 (2007); Ex. 10, Feb. 26, 2021 Dep. of Russell Lamb ("Lamb Dep.") 67:10–13. Besides that, Lamb's regressions failed to fit the facts of this case and were methodologically unreliable. If modified to include adjustments Lamb has previously insisted are necessary, his regressions find their outcomes reversed.

For these and other reasons set forth below, Lamb's opinions are inadmissible.

## BACKGROUND

This is a securities fraud case. Plaintiffs brought this proposed class action on behalf of everyone who acquired JELD-WEN stock between January 26, 2017 and October 15, 2018. Am. Compl. ¶¶ 1, 297. They allege that, unbeknownst to investors, JELD-WEN minimized competition in the IMD market by first consolidating the market for doorskins (a component of IMDs) through its acquisition of CraftMaster Manufacturing, Inc. ("CMI") and then conspiring with one of its IMD competitors, Masonite, to fix the prices of IMDs in violation of the Sherman Act. *Id.* ¶¶ 9–13.[1] Plaintiffs claim that JELD-WEN made misleading statements when it claimed that its "pricing discipline" and "pricing optimization" were the cause of its good financial

---

[1] Plaintiffs use the term "anticompetitive conduct" to refer generally to a wide variety of allegations, often without distinguishing between the Sherman Act and the Clayton Act; the Steves and IMD price-fixing litigations; doorskins and IMD product markets; or the time periods in which they allege JELD-WEN restrained competition in either market.

performance rather than this alleged anticompetitive conduct, and that shareholders were damaged when the alleged misstatements were corrected and JELD-WEN's stock price decreased as a result. *Id.* ¶¶ 21–24, 175–78, 245.

This *Daubert* motion concerns the expert opinions of Russell Lamb. Lamb previously served as plaintiffs' expert in the IMD price-fixing litigation also pending in this Court. *See In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-00718-JAG (E.D. Va.). In that case, Lamb performed a multiple regression analysis, in which he compared the transaction prices of IMDs (produced by the defendants in the IMD litigation and re-produced by the JELD-WEN Defendants in this case), to various control factors, including demand, manufacturing costs, and the 30-year mortgage rate. Ex. 1, Jan. 31, 2020 Class Certification & Trial Expert Report of Dr. Russell L. Lamb ("Lamb IMD Rpt.") at 111, Table 4. Because changes to demand and cost do not immediately affect IMD prices, however, Lamb applied a 12-month trailing average of those figures to "smooth" his regression and avoid errors. *Id.* ¶¶ 200, 203. Lamb concluded that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Ex. 5, Lamb Reply Rpt. ¶ 36, to the tune of 9.5%, Ex. 1, Lamb IMD Rpt. ¶ 261.

Plaintiffs in this case also retained Lamb. His assignment was to ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Ex. 2, Jan. 4, 2021 Decl. of Russell L. Lamb ("Lamb Rpt.") ¶ 8. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ *Id.* ¶¶ 10(a) n.12 (▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3

██████████████████████████████████), 107 ███████████████████████

███████████████████████████████████████████████████████) (emphases

added). It is not unlawful for oligopoly firms to mimic each other's price increases so long as they

do not actually agree to coordinate. That legal behavior is sometimes called "[t]acit collusion" or

"conscious parallelism." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015).

Lamb's analysis proceeds in two main parts. ***First***, ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████" Ex. 2, Lamb Rpt. ¶ 26. Among other things, Lamb's analysis includes setting

forth his own interpretation of record evidence and his private conclusion that particular

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████. *See, e.g., id.* ¶¶ 70–75; Ex. 10, Lamb Dep. 71:13–74:4.

***Second***, Lamb has offered econometric analysis in the form of regressions, supposedly

showing that, ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████. Ex. 2, Lamb Rpt. at 61, Table 3. ████████████████████

███████████████████████████—not in 2012 when Plaintiffs say JELD-WEN began

engaging in anticompetitive conduct it concealed from the market.

Lamb's regressions differ from the ones he ran in the IMD litigation. Here, ████████

███████████████████████████████████████████████████████████

█████████████████████████████████████. Ex. 10, Lamb Dep. 353:3–24. Instead,

Lamb used ████████████████████████████████████████████. *Id.* at 231:11–

17. ███████████████████████████████████████████████████████

███████████████████████████████████████████████. Ex. 5, Lamb

Reply Rpt. at 41, Figure 4; Ex. 10, Lamb Dep. 219:16–20.  Lamb acknowledged, for example, that

███████████████████████████████████████████████████████

███████████████████████████. *See* Ex. 10, Lamb Dep. 222:14–226:22.  And unlike in the

IMD  litigation, ███████████████████████████████████████

███████████████████████████████████████████. Ex. 2, Lamb Rpt.

at 61, Table 3.

Based on these analyses, Lamb's opening report offered four opinions.  He opined that (1)

███████████████████████████████████████████████████████

███; (2) ███████████████████████████████████████████████

███████████; (3) ██████████████████████████████████████

████████████████████████████████; and (4) ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████. Ex. 2, Lamb Rpt.

¶ 10.

Lamb also served a reply report responding to Johnson.  In that report, Lamb explained

that █████████████████████████████████████████████████████

██████████████████████████████████████. Ex. 5, Lamb Reply Rpt. ¶ 3.  He also

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



*Id.* (emphasis added).  Lamb testified that

Ex. 10, Lamb Dep. 39:3–42:16.

Lamb also                                                                    , Ex. 5, Lamb Reply Rpt. at 48, Table 3,

, Ex. 10, Lamb Dep. 344:4–345:8.  In these

*Id.* at 272:7–16.

. Ex. 5, Lamb Reply Rpt. ¶ 75.

*See* Ex. 10, Lamb Dep. 291:20–292:17, 303:14–304:2.

## LEGAL STANDARD

To qualify as an expert, one must meet the "exacting" requirements for admissibility of expert testimony under Federal Rule of Evidence 702.  *See Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000).  Rule 702 permits a qualified expert to testify if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," if those opinions are based on "sufficient facts or data," and if those opinions are derived from "reliable principles and methods" that the expert "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.  The party seeking to admit expert testimony bears the burden of

demonstrating its admissibility by establishing "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)); *accord Limelight Networks Inc. v. XO Commc'ns, LLC*, 2018 WL 678245, at *1 (E.D. Va. Feb. 2, 2018) ("Under [Rule] 702, an expert must base his testimony on sufficient facts, use reliable principles and methods, and reliably apply the principles and methods to the facts of the case.").

In assessing the admissibility of expert testimony, the court performs a critical "gatekeeping function," to prevent improper expert opinions from confusing or misleading the jury. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony.") (quoting *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011)); *Limelight Networks*, 2018 WL 678245, at *1 ("[D]ue to the difficulty in evaluating expert testimony and the risk of misleading a jury, trial courts exercise more control over experts than lay witnesses when weighing the probative value of an expert's opinion against its potential prejudice.").

## ARGUMENT

## I.    LAMB'S OPINIONS SHOULD BE EXCLUDED AS IRRELEVANT

Lamb's opinions will not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, and should be excluded. ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████. His testimony will not aid the jury.

### A.    Lamb's Analysis Is Unrelated To Plaintiffs' Securities Fraud Allegations

Lamb's proffered expert opinions should be categorically excluded because they have

7

nothing to do with the damages theories that Plaintiffs wish to submit for trial.  Expert opinions are only admissible to the extent they are "sufficiently tied to the facts of the case that [they] will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.  Here, Plaintiffs contend that Judge Payne's October 5, 2018 opinion related to the doorskins market revealed the truth and corrected the statements JELD-WEN made about its pricing practices and the competitiveness of the separate doors and windows markets, and that JELD-WEN's October 15, 2018 announcement that it was booking a litigation contingency for the *Steves* litigation revealed the truth and corrected the statements JELD-WEN made about the merits of the *Steves* litigation.  Am. Compl. ¶¶ 1, 15–18, 21–24, 245.  Plaintiffs allege they were damaged when JELD-WEN's stock price decreased as a result of both of those corrective disclosures.  *Id.* ¶¶ 21–24, 245.  But Plaintiffs have no theory of any corrective disclosure or damages model tied to a price-fixing conspiracy, █████████ ████████████████████████████████████████.  Lamb's opinions are therefore irrelevant to the case, likely to confuse the jury, and should be excluded.  *Belville*, 919 F.3d at 232; *Nease*, 848 F.3d at 231; *Limelight Networks*, 2018 WL 678245 at *1.

### B.    Lamb's Opinions Should Be Excluded Because He Admits He Cannot Distinguish Between Innocent And Anticompetitive Conduct

Even setting aside the fact that Lamb's opinions concern a different theory than Plaintiffs are pressing, he has all but acknowledged that he has nothing relevant to offer the jury in this case.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

As an initial matter, ███████████████████████████████████

██████████████████████████████████.  Ex. 10, Lamb Dep. 308:24–309:5.  It is settled in antitrust law that "[e]ach firm in a tight oligopoly might think that it will reap greater profits if it imitates, rather than undermines, its peers' price hikes.  And it might reach that conclusion

8

without any conscious coordination with its competitors.  For that reason, it is not a violation of antitrust law for a firm to raise its price, counting on its competitors to do likewise (but without any communication with them on the subject)."  *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 935–36 (7th Cir. 2018) (internal quotations and citations omitted). ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Ex. 10, Lamb Dep. 41:3–6, and it is legal.  *Twombly*, 550 U.S. at 553–54 ("[C]onscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions not in itself unlawful." (internal quotations and citations omitted)).

Lamb's reports frequently ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. *See, e.g.*, Ex. 2, Lamb Rpt. ¶¶ 30, 34, 61.  But however ominous the phrase may sound, as the Supreme Court has explained, "[t]acit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group*, 509 U.S. at 227; *In re Text Messaging*, 782 F.3d at 879 ("Tacit collusion, also known as conscious parallelism, does not violate section 1 of the Sherman Act.  Collusion is illegal only when based on agreement.").

Lamb acknowledged that when his report refers to ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 10, Lamb Dep. 41:3– 42:16.  Instead, Lamb explained that when he ▮▮▮▮▮▮▮▮ he is

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9



Ex. 2, Lamb Rpt. ¶ 10(a) n.12 (emphasis added);

Ex. 5, Lamb Reply Rpt. ¶ 13 (

) (emphasis added).

The critical point, as Lamb acknowledged,

.     In a perfectly

competitive market,

Ex. 10, Lamb Dep. 44:18–21.  But Lamb acknowledged that,

*Id.* at 67:10–13.  He also acknowledges that

*Id.* at 44:24–46:11; 46:23–47:6.

But in the end, Lamb

.  His reply report admitted that straightforwardly:

Ex. 5, Lamb Reply Rpt. ¶ 3 (emphasis added).

Lamb is right that he

.     His opinion

, Ex. 10, Lamb Dep. 57:10–18,

10



, *id.* at 20:25–22:25.  The regressions that form his econometric analysis ***assume*** that theory is true;

*See id.* at 78:25–82:25, 209:18–218:22.

Lamb's inability to renders his testimony inadmissible.  If the most Lamb can tell the jury is that

Ex. 5, Lamb Reply Rpt. ¶ 3, then his opinions are irrelevant "to the task at hand," *Belville*, 919 F.3d at 232, and likely to confuse or mislead the jury, *Limelight Networks*, 2018 WL 678245, at *1.  The Court should exercise its "gatekeeping function" and exclude them.  *Id.*; *see also Nease*, 848 F.3d at 231.

## II.    LAMB'S QUALITATIVE ANALYSIS OF MARKET STRUCTURE, CONDUCT, AND PERFORMANCE IS NOT ADMISSIBLE EXPERT OPINION

Lamb's analysis of the structure, conduct, and performance of the IMD and doorskins markets should be excluded.  Indeed, much of that analysis is not expert opinion at all.  It is Lamb's own private verdict on this lawsuit—complete with his own assessment of the credibility of witnesses and improper interpretation of documents.  Lamb has no specialized ability to interpret facts and documents, and cannot stand in the shoes of a factfinder whose office he seeks to usurp.  Equally inadmissible are Lamb's purported opinions about JELD-WEN's motives, intent, or knowledge, which invade the province of the jury.  Because Lamb does nothing more than lend an expert's imprimatur to Plaintiffs' summation of the evidence, his opinions must be excluded.

### A.    Lamb's Subjective Interpretation Of Communications Between JELD-WEN And Masonite Is Not Proper Expert Testimony

The heart of Lamb's qualitative analysis is his private conclusion that

11

███████████████. Ex. 10, Lamb Dep. 71:13–74:4; Ex. 2, Lamb Rpt. ¶¶ 70–71.[2] Lamb said ██

████████████████████████████████████████████

███████████████████████████████████ Ex. 10,

Lamb Dep. 106:13–16. But his report went further: Without any evidence that ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████ Ex. 2, Lamb Rpt. ¶ 70. And at his deposition, Lamb confirmed

that by █████████████████████████████████ Ex. 10, Lamb Dep.

73:5–8. But Lamb has no economic expertise, evidentiary basis, or reliable methodology for

determining █████████████████████████████. His analysis of █████████, and

everything that depends on it, is nothing more than mere speculation and should be excluded.

Lamb has no evidentiary basis on which to conclude ████████████████████

████████████████████████████. To the contrary, both Mr.

Hachigian █████████ testified they never spoke about that subject. *See, e.g.*, Ex. 6, Jan. 23,

2020 Dep. of Kirk Hachigian ("Hachigian IMD Dep.") 166:20–167:7 (explaining that he would

"never discuss price or anything close to price" with Masonite's CEO). In fact, █████████ and

Mr. Hachigian each testified, and contemporaneous documents show, ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[2] Lamb's entire regression analysis is balanced on that reed. Lamb Dep. 57:10–59:8. ████████
████████████████████████████████████████████
█████████ Ex. 3, Feb. 1, 2021 Expert Report of Dr. John H. Johnson, IV In Opp'n
to Decl. of Dr. Russell L. Lamb ("Johnson Report") ¶ 99.

████.  Ex. 15, Jan. 23, 2020 Dep. of Frederick Lynch ("Lynch IMD Dep.") 172:7–173:10, 187:23–188:9; Ex. 6, Hachigian IMD Dep. 73:20–74:15, 114:25–115:19, 156:12–157:18; *see also Masonite Int'l Corp. v. Coghlan*, No. 8:12-cv-02242-SCB-MAP (M.D. Fla. Oct. 3, 2012).  And emails correspondence memorializes that JELD-WEN and Masonite discussed other legitimate topics, like potential acquisitions of foreign assets or supplier relationships between the two companies.  Ex. 11, Lamb Dep. Ex. 5 (JW-SEC-01083438).

Lamb evidently does not believe these witnesses' testimony, but he has no expertise, much less evidence, with which to second-guess their credibility.  Lamb acknowledged that ██████ ████████████████████████████████████████ Ex. 10, Lamb Dep. 74:21–22.  He further acknowledged ████████████████████████████████████████████ ████████████████████████████████████████████████

████.  *Id.* at 83:2–18.  As an expert witness, he can have nothing further to add.  Lamb does not possess any expertise or special skills in interpreting facts and documents.[3]  Ex. 4, George Stigler, "What Does an Economist Know?" 33 J. Legal Educ. 311, 311 (1983) ("A reasonable man, and often even an economist, would say that the documents seemed to present a conclusive proof of collusive behavior.  The economist, however, would have no professional basis for reaching such a conclusion: he has no special skill in reading documents and relating them to actual behavior.").[4]

---

[3]   Lamb previously admitted that in purporting to characterize certain documentary evidence, he was "***not*** bringing any economics expertise in reading the English words on the page," and that "[t]he plain English of the document speaks for itself."  Ex. 9, Mar. 4, 2020 Dep. of Russell Lamb ("3/4/20 Lamb IMD Dep.") 181:11–19 (emphasis added).

[4]   *See also* Ex. 3, Johnson Rpt. ¶ 34 ████████████████████ ████████████"); *id.* ¶ 48 ████████████████████ ████████████████; Ex. 7, Feb. 17, 2021 Dep. of John H. Johnson, IV ("Johnson Dep.") 39:5–22 (████████████████████████████████████████ ████████████████████████████████████████████████.

That is the jury's job, *Slavin v. Garrison Property and Casualty Insurance. Co.*, 2017 WL 2928030, at \*6 (D. Colo. July 10, 2017) (expert "may not usurp the jury's fact-finding function"), *aff'd*, 805 Fed. Appx. 561 (10th Cir. 2020), and Lamb's own views are exactly the sort of purported factual narrative in the guise of expert testimony that the Fourth Circuit and the Federal Rules of Evidence prohibit, *see Kennedy v. Joy Technologies, Inc.*, 269 F. A'ppx 302, 312 (4th Cir. Mar. 12, 2008) (affirming exclusion of expert testimony that "merely summarizes the evidence of record" as it is unhelpful to the trier of fact).

But even indulging the fiction that an economist **could** have a scientific methodology for



. At his deposition,

. Ex. 10, Lamb Dep. 84:17–85:25.  But Lamb

—surely the irreducible minimum of scientific inquiry.

. *Id.* at 97:2–12.

, *id.* at 99:10–100:7, which of course proves nothing.

. *Id.* at 119:25–120:14, 131:9–132:14.  Instead, it appears Lamb simply scoured the record for evidence

14

and inferences that might support Plaintiffs' theory.  That is not expert opinion.

As evidence of JELD-WEN and Masonite's alleged conspiracy to fix the prices of *IMDs*,

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ .

Ex. 2, Lamb Rpt. ¶ 24 (emphasis added).  But as Lamb acknowledged, ████████████████

████████████████████████████████████████████████████████

███████████████████████████████████     Ex. 10, Lamb Dep. 168:16–21.

Lamb, however, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ .  *Id.* at 184:8–185:9, 186:7–16, 188:10–17, 189:23–198:18; Ex.

12, MAS-0000000001; Ex. 13, MAS-0000000003.  ████████████████████████████████

████████████████████ , Ex. 10, Lamb Dep. 188:10–17, 197:14–22, ████████████████

████████████████████████████████████████  *Id.* at 175:17–24.

None of this is scientific expert opinion.  Lamb "d[oes] no more than counsel for plaintiff

[would] in argument, *i.e.*, propound a particular interpretation of [defendant]'s conduct."  *In re*

*Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008); *In re Rezulin Prods. Liab.*

*Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (excluding expert testimony that "improperly . . .

assume[d] the role of advocates for the plaintiffs' case by arguing as to the intent or motives

underlying the conduct of [defendant]") (citation omitted).  Indeed, expert testimony that does no

more than "put a patina of science over something that everyone understands," "almost by

definition, can be of no assistance" to the factfinder.  *Sardis v. Overhead Door Co.*, 2019 WL

560273, at *2 (E.D. Va. Feb. 12, 2019); *see also In re Prempro*, 554 F. Supp. 2d at 887 (excluding expert testimony that "summarize[s] . . . document[s] (which [are] just as easily summarized by a jury) with a tilt favoring" the offering party). Thus, as a matter of law, Lamb's own interpretation ███████████████████████████████████████, *e.g.*, Ex. 2, Lamb Rpt. ¶ 71, is useless to the jury—as it is not based on any expert opinion or analysis and is contradicted by the record evidence and witnesses' testimony—and must be excluded. *See* Fed. R. Evid. 702; *Kennedy*, 269 Fed. Appx. at 312.

### B. Lamb Cannot Opine On JELD-WEN's Intent, Motives, And Knowledge

Lamb's opinions about JELD-WEN's intent, motives, or knowledge are also inadmissible. *See, e.g.*, Ex. 2, Lamb Rpt. ¶¶ 32, 61, 62, 73, 90. It is settled law that "the question of (corporate) intent or motive is a classic jury question and not one for experts." *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1338 (S.D. Fla. 2010). A party's "knowledge, state of mind, alleged bad acts, failures to act, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury." *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 611 (S.D. W. Va. 2013); *see also Eghnayem v. Boston Sci. Corp.*, 57 F. Supp. 3d 658, 699 (S.D. W. Va. 2014) (excluding expert opinions on a party's "knowledge" and "state of mind" based on expert's "narrative review of corporate documents" because those are "not appropriate subjects of expert testimony"); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (excluding expert testimony concerning the "knowledge, motivations, intent, state of mind, or purposes" of the defendant or "its employees" because such testimony is "conjecture" and "not a proper subject for expert or even lay testimony"). Lamb offered no explanation of how his expertise lead him to draw these conclusions about JELD-WEN's state of mind. Nor could he. "No level of experience or expertise will make an expert witness a mind-reader." *U.S. ex rel. Dyer v. Raytheon Co.*, 2013 WL 5348571, at *13 (D. Mass.

16

Sept. 23, 2013).  Lamb's opinions regarding JELD-WEN's intentions, knowledge, and state of mind should be excluded.

### C.   Lamb's Opinions Regarding Cherry-Picked Record Evidence Of Market Structure, Conduct, And Performance Should Be Excluded

Lamb's analysis of the structure of the IMD and doorskins markets, and JELD-WEN's IMD pricing behavior, should also be excluded.  Courts routinely exclude expert testimony when they "conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Colonna Shipyard*, 2015 WL 13047569, at *2; *see Andrews v. Woody*, 2018 WL 2452177, *4 (E.D. Va. May 31, 2018) (excluding expert testimony because expert failed to "note *how* his education, training, and experience, or review of the relevant items led him to reach his conclusions" (emphasis added)).  And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Colonna Shipyard, Inc. v. United States*, 2015 WL 13047569, at *2 (E.D. Va. July 30, 2015) (internal quotation omitted).  Lamb's analysis of market structure and price-increase announcement violates the rule that experts should not "become a vehicle for factual narrative" because "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology."  *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013).

### 1.  Structure of the IMD and Doorskin Markets

. Ex. 2, Lamb Rpt. ¶¶ 36–55.  Lamb's analysis is not grounded in any reliable method, and he ignores obvious aspects of those markets that undermine his opinions.

17

*First*, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Ex. 10, Lamb Dep. 167:7–9, ████

████████████████████████████████████████████

████████████████████████████████████████████

████ *id.* at 333:25–334:10.  As Defendants' expert explained, ████████

████████████████████████████████████████████

████████████████ Ex. 3, Johnson Rpt. ¶¶ 62–68. ████████████

████████████████████████████████████████████

████████████████████████████ *Id.* ¶ 62. ████████████

████████████████████████████████████████████

████████████████████████████

*Second*, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████. Lamb Dep.

333:4–14. ████████████████████████████████████,

*id.* at 333:19–24, ████████████████████████, *id.* at 167:2–

11. ████████████████████████████████████

████████████████████████████, *id.* at 335:8–14, ████████████

████████████████████████████████████, *id.* at

336:18–23. ████████████████████████████████

████████████████████████ *Id.* at 337:22–339:7.

*Third*, ████████████████████████████. *In re Pharmacy Benefit*

18

*Managers Antitrust Litig.*, 2017 WL 275398, at *19 (E.D. Pa. Jan. 18, 2017) ("The failure to offer

an opinion on the geographic market renders the conclusion on antitrust impact unreliable.").

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████  Ex. 3, Johnson Rpt. ¶ 70.  ██████████████████████████████

████████████████████████████████████████  Lamb's *ipse dixit* opinions about the IMD and

doorskins markets should be excluded.  *Colonna Shipyard*, 2015 WL 13047569, at *2.

### 2.  Parallel Price Increase Announcements

Lamb's    conclusion    ████████████████████████████████████████████

██████████████████████████████████████████████████.  ***First***, Lamb could

not ██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████  Ex. 10,

Lamb Dep. 319:11–15.  ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████



Ex. 3, Johnson Rpt. ¶¶ 43–45.[5]

**_Second_**, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Ex. 10, Lamb

Dep. 331:5–17, ██████████████████████████████████████

████ .



---

[5]  Lamb posited that ████████████████████████████████

████████████████████████████ Ex. 2, Lamb Rpt. ¶ 67.  This assertion, however, is based on Lamb's own interpretation of subjective statements about ██████ ████████████████████████████████ Ex. 10, Lamb Dep. 142:5–144:13; *see also* Ex. 3, Johnson Rpt. ¶ 48.  At his deposition, Lamb could ████ ████████████████████████████████████████ Ex. 10, Lamb Dep. 143:10–19, 144:2–7, 166:11– 167:11.

20

Ex. 3, Johnson Rpt. ¶ 47.

***Third***, █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ Ex. 10, Lamb Dep. 328:11–17. ███████████████████

██████████████████████████████████████████████, *id.* at 309:11–

20, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ Ex. 5, Lamb Reply Rpt. ¶ 31 (emphasis added), ████████████

████████████████████████████████████████████████████

████████████████████████████ Ex. 10, Lamb Dep. 311:5–11.



Ex. 3, Johnson Rpt. ¶ 46.

21

***Finally***, █████████████████████████████████████████

███████████████████████████████████. *Id*. ¶¶ 50–54. Lamb acknowledged

as much in the IMD litigation, admitting that "the transaction prices [were] negotiated prices here."

Ex. 8, July 16, 2020 Dep. of Russell Lamb 52:24–53:3. Ultimately, █████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ Ex. 3, Johnson Rpt. ¶ 51.

Despite previously testifying that JELD-WEN's and Masonite's IMD customer bases were "large

and varied" and that "the price is a negotiated price," █████████████████████████

███████████████████████████████████████████████████

█████████████████████ *Id*. ¶ 54.

In short, ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ Because that kind of cherry-picking through the record is not proper expert

testimony, Lamb's opinions about JELD-WEN's IMD pricing behavior should be excluded.

## III. LAMB'S OVERCHARGE OPINION IS IRRELEVANT, AND HIS REGRESSION ANALYSIS IS UNRELIABLE

Lamb's econometric analysis—that is, his multiple regression analysis—is unsound and

inadmissible. As designed, Lamb's regression neither fits the facts of this case nor reliably applies

any appropriate methodology. He failed to study: (1) ████████████████████████; (2)

████████████████; and (3) ████████████████████████. When Lamb's model is

adjusted for consistency with his prior work in the IMD litigation, the overcharge disappears.

**A.**      **Lamb's Overcharge Regression Analysis Is Not Relevant To The Task At Hand**

An expert's opinions are inadmissible when they "manifestly do not fit the facts of the case." *General Elec. Co. v. Joiner*, 522, U.S. 136, 152 (1997).  As the Fourth Circuit recently explained, Supreme Court precedent "tasks a district judge with 'ensuring that an expert's testimony . . . is relevant to the task at hand.'" *Belville*, 919 F.3d at 232 (quoting *Daubert*, 509 U.S. at 597).  "This rule requires trial judges to conduct a preliminary assessment of . . . whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Id.*

Lamb's regression analysis is flawed and disconnected from the facts of the case for at least three reasons.  ***First***, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ Am. Compl. Section I.A. ("Beginning in 2012, Jeld-Wen Has Been Engaging in Anticompetitive Conduct"). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See* Ex. 3, Johnson Rpt. ¶ 99.  But while Lamb ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 2, Lamb Rpt. ¶ 8, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* ¶ 107. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, Ex. 10, Lamb Dep. 57:10–18, 185:20–24, 207:20–208:6, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

23

██████████████████████████    Ex. 5, Lamb Reply Rpt. ¶¶ 82–83.

But there is a likely reason ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████    *Id.*   ████████████████████████   Ex. 3, Johnson

Rpt. ¶ 99.   Thus,   ████████████████████████████████████

████████████████████████████████████████   Ex. 7, Johnson Dep.

103:2–5.  Lamb's regression analysis thus does not test Plaintiffs' allegations and cannot aid the

jury.

     *Second*,  ████████████████████████████████████████████

████████████████████████████████████████████████.  Portions of Plaintiffs'

allegations mirror the allegations in the Steves litigation, namely, that the CMI merger

substantially reduced competition in the doorskins market.  Am Compl. ¶ 100.  And while Lamb

████████████████████████████████████████████████████████

████████████████████████   Ex. 2, Lamb Rpt. ¶ 91,   ████████████████████

████████████████████████████████████████   Ex. 10, Lamb Dep.

307:10–18.  His regression analysis is therefore irrelevant to the doorskins allegations that underlie

Plaintiffs' basic securities fraud theories and their damages model.

     *Third*,  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████   Ex. 10, Lamb Dep. 231:2–5.  Here,  ████

████████████████████████████████████   *id.* at 231:7,   ████████

████████████████████████████████████████████████████████

In the IMD antitrust litigation, ███████████████████████████

█████████████████████ Ex. 10, Lamb Dep. 251:23–252:8; Ex. 1, Lamb IMD Rpt. ¶ 198.  In

this case, ███████████████████████████████████

████████████████████.  Lamb Dep. 353:3–24.  Instead, ████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

Ex. 3, Johnson Rpt. ¶ 83; *see also* Ex. 10, Lamb Dep. 219:16–20.  █████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████ Ex. 3, Johnson Rpt.

¶ 87.  At his deposition, ████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████ Ex. 10,  Lamb  Dep.  355:13–356:8.[6]

Nevertheless, ████████████████████████████████.

In his reply report, ██████████████████████████████████

████████████████████████████████████ Ex. 5, Lamb Reply Rpt. ¶ 64.

But even ███████████████████████████████████████████

█████████████████████████████████████████████████

██████████████ *Id.*; *see also* Ex. 10, Lamb Dep. 224:25–225:3.  ████████████████

█████████████████████████████████████████████████

███████.  Ex. 10, Lamb Dep. 226:5–22.  Lamb, however, ██████████████████

---

[6]  Lamb even recognized that the ██████████████████████████████████
███████████████████████████████████████████████████████.  Ex. 10, Lamb
Dep. 119:25–120:8.  To the contrary, █████████████████████████████
███████████████████████████████████ *Id.* at 120:10–12.



*Id.* at 229:6–10.  The result is that Lamb's proposed model ███████████████████████████████████████. *Id.*  Dr. Lamb's regression would therefore ██████████████████████████████████████ ██████████ ███████████████████████████████ ████████████████████ Ex. 7, Johnson Dep. 137:18–138:3.  Accordingly, Lamb's model is irrelevant to the study of IMD products and this action and his opinions should be excluded.[7]

### B. Lamb Did Not Reliably Apply His Overcharge Regression Analysis

Lamb's overcharge regression analysis is also inadmissible because it flunks Rule 702's requirement that it be "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.  Even "[i]f there is a well-accepted body of learning and experience in the field, the expert's testimony must be grounded in that learning and experience to be reliable[.]"  *Nilssen v. Motorola, Inc.*, 1998 WL 513090, at *11 (N.D. Ill. Aug. 14, 1998); *see also U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*, 89 F. Supp. 3d 778, 801 (E.D. Va. 2014) ("The Court does not question . . . the well-recognized and accepted underlying principles of multiple regression analysis. . . .  Rather, at the most basic level, the Court questions whether, given the available data, regression analysis, as a methodology, can be reliably applied to predict prices set under the opaque, unusual and complex price setting mechanism" present in the case).  Improper applications of "generally reliable"

---

[7]  In the IMD litigation, Lamb testified that he used net prices paid by each customer in his analysis because "as a matter of econometrics, that's the variable that's appropriate to measure what customers actually pay" and was "not sure what alternative price you would envision using." Ex. 9, 3/4/20 Lamb IMD Dep. 258:15-25. ████████████████ ████████████████████████████████████████ Ex. 2, Lamb Rpt. ¶¶ 38, 46, 47.

methods must be excluded, because "any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 795–97 (3d Cir. 2017) (citation omitted).

### 1. Lamb's Regressions Are Inconsistent With His IMD Litigation Methodology

Lamb's prior testimony in the IMD litigation proves his regression here is unreliable. Both Lamb's models in the IMD litigation and here concern the same industry (IMDs), the same conduct (alleged price-fixing of IMDs), the same time period (after JELD-WEN's 2012 acquisition of CMI), and the same participants (JELD-WEN and Masonite). ███████████████████████ ██████████████████████████████████████████, Ex. 10, Lamb Dep. 251:23–252:17, that is a red herring. In each case, by his own admission, ███████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████ Ex. 5, Lamb Reply Rpt. ¶ 36. ██████████ ████████████████████████████████████████████████████████ █████████████ ████████████████████████████████████████ ████████████████████████████████████████████████████████

Ex. 3, Johnson Rpt. ¶ 72.

The most conspicuous problem is ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

*See* Ex. 1, Lamb IMD Rpt. ¶¶ 200, 203 (████████████████████████████ ██████████████████████). In the IMD litigation, Lamb himself made this point and he

27

used a trailing average for his demand index; "A twelve-month trailing average of this demand index is used in order to account for the delayed influence that these demand factors have on IMD prices." He testified that using a 12-month trailing moving average is "an appropriate measure of [the] relationship" between changes in demand and changes in prices and that the "lag structure that [he] used here [for the IMD litigation] is appropriate, in part because it accounts for the kind of persistence in demand that is important in this market." *Id.* ¶ 203; Ex. 9, 3/4/20 Lamb IMD Dep. 273:6–274:11.

Ex. 3, Johnson Rpt. ¶¶ 93, 95.

Ex. 7, Johnson Dep. 23:23–24:7.[8]

### 2. The Regressions in Lamb's Reply Report Demonstrate His Model Is Not Robust

In his reply report, Lamb attempted to salvage his regressions but ended up further demonstrating their unreliability.

Ex. 5, Lamb Reply Rpt. ¶¶ 74–76.

*Mortgage Rates*. In the IMD litigation,

---

[8]   In addition,

Ex. 3, Johnson Rpt. ¶ 96.

*Id.*



Ex. 10, Lamb Dep. 260:10–22.

*Id.* at 272:7–11.

, *id.* at 272:19–275:21, . The academic literature in the field of econometrics emphasizes that the signs of regression coefficients that do not align with expectations might indicate that the underlying regression analysis is unreliable, unstable, and requires further investigation.[9]

***Pre-CMI Period.***

. Ex. 10, Lamb Dep. 303:14–304:2. That,

---

[9]  Ex. 14, Peter Kennedy, *A Guide to Econometrics*, 5th Ed., (2003), at 397 ("A remarkably common occurrence when doing applied work is to run an *a priori* favorite specification and discover a 'wrong' sign. Rather than considering this a disaster, a researcher should consider it a blessing—this result is a friendly message that some detective work needs to be done—there is undoubtedly some shortcoming in one's theory, data, specification, or estimation procedure. . . . It is amazing how after the fact economists can conjure up rationales for incorrect signs.").

however, demonstrates the sheer unreliability of Lamb's model.

. Ex. 5, Lamb Reply Rpt. at 48, Table 3.

In short, Lamb just kept running regressions and changing the variables until he gets the answer he wants. In the IMD litigation, he used transactional data to measure IMD prices and purported to find a 9.5% overcharge, but recognized the importance of adjusting for demand and cost lag and concluded mortgage rates have a positive effect on IMD prices. Lamb IMD Rpt. ¶¶ 198, 200, 203, Table 4.

Ex. 5, Lamb Reply Rpt. at 48, Table 3. The right conclusion to draw from all this is that Lamb's model is busted. It is unreliable, of no help to the jury, and should be excluded.

## CONCLUSION

The Court should exclude Lamb's opinions.

March 6, 2021

Respectfully submitted,

JELD-WEN Holding, Inc.
By counsel
*/s/ Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
Brian E. Pumphrey (VSB #47312)
Brian D. Schmalzbach (VSB #88544)
Garrett H. Hooe (VSB #83983)
MCGUIREWOODS, LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com
bpumphrey@mcguirewoods.com
bschmalzbach@mcguirewoods.com
ghooe@mcguirewoods.com

Sandra Goldstein (*pro hac vice*)
Rachel Fritzler (*pro hac vice*)
Lindsey Weiss Harris (*pro hac vice*)
Jeehyeon Jenny Lee (*pro hac vice*)
Jacob Rae (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
sandra.goldstein@kirkland.com
rachel.fritzler@kirkland.com
lindsey.harris@kirkland.com
jenny.lee@kirkland.com
jacob.rae@kirkland.com

Matthew S. Owen (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Phone: (202) 389-5000
Fax: (202) 389-5200
matt.owen@kirkland.com

31

*Attorneys for Defendants JELD-WEN
Holding, Inc., Mark A. Beck, L. Brooks
Mallard, Kirk S. Hachigian, and
Gary S. Michel*

32

**CERTIFICATE OF SERVICE**

I certify that on the 6th day of March, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to the following counsel of record in this case.

> /s/ Brian C. Riopelle
> Brian C. Riopelle (Va. Bar No. 36454)
> MCGUIREWOODS LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, VA 23219
> Tel.: (804) 775-1084
> Fax: (804) 698-2150
> briopelle@mcguirewoods.com

33