# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| IN RE: INTERIOR MOLDED DOORS ANTITRUST LITIGATION | CASE NO. 3:18-CV-00718-JAG |

**Class Certification and Trial Expert Report of Dr. Russell L. Lamb**

President

Monument Economics Group

1530 Wilson Blvd, Suite 560

Arlington, Virginia 22209

January 31, 2020

CLASS CERTIFICATION AND TRIAL EXPERT REPORT OF RUSSELL L. LAMB
CASE NO. 3:18-CV-00718-JAG                          HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL                                JW-SEC-01102748

HIGHLY CONFIDENTIAL

## TABLE OF CONTENTS

I.    Introduction and Summary of Conclusions ................................................................... 1

    A.  Expert Background and Qualifications ................................................................... 1

    B.  Summary of Direct Purchaser Plaintiffs' Allegations ........................................... 2

    C.  Assignment ........................................................................................................... 5

    D.  Materials Reviewed .............................................................................................. 5

    E.  Conclusions .......................................................................................................... 6

        1.  Common evidence demonstrates that the structure of the IMD industry is conducive to the formation and operation of the Cartel. .................................... 6

        2.  Common evidence demonstrates that the Defendants' actions during the period leading up to and during the Cartel Period were inconsistent with firms maximizing profits individually in an environment free of collusive behavior. ................... 7

        3.  Common evidence demonstrates that Defendants' economic performance in the IMD industry during the Effective Cartel Period is consistent with the existence of the Cartel. ......................................................................................................... 8

        4.  The Cartel caused injury to all or nearly all members of the proposed Class. ............... 8

        5.  Damages suffered by the proposed Class as a Whole ................................................ 9

II.   Industry Background ................................................................................................. 9

    A.  Product Overview ................................................................................................. 9

        1.  Interior Molded Doors ....................................................................................... 9

        2.  Demand drivers ............................................................................................... 14

        3.  Cost drivers ..................................................................................................... 16

        4.  Supply chain and sales channels ..................................................................... 17

    B.  Industry History ................................................................................................. 18

        1.  Jeld-Wen ......................................................................................................... 18

        2.  Masonite .......................................................................................................... 20

        3.  Jeld-Wen's acquisition of CMI ...................................................................... 21

        4.  Masonite publicly declares that it would not sell Doorskins to third parties ............... 22

III.  Economic Evidence, Common to the Proposed Class as a Whole, is Consistent with the Operation of the Cartel and Inconsistent with Each Defendant Having Acted According to its Unilateral Self-Interest Absent the Cartel ............................................................ 22

HIGHLY CONFIDENTIAL

JW-SEC-01102749

HIGHLY CONFIDENTIAL

A. The structure of the IMD industry was conducive to the formation of the alleged Cartel 24

  1. Jeld-Wen and Masonite had market power in the upstream Doorskin market and the downstream IMD market ........................................................................................................24

  2. There are high barriers to entry in the IMD and Doorskins markets ...........................29

  3. IMDs are commodity-like products characterized by a high level of interchangeability across Defendants ..................................................................................................................37

  4. Demand for IMDs is inelastic .............................................................................................42

    a. There are no economic substitutes for Doorskins produced in North America ........43

    b. There are no economic substitutes for IMDs...............................................................46

  5. IMD Prices had generally been flat or declining leading up to the start of the Cartel...47

  6. There are many direct customers ......................................................................................51

  7. Defendants had opportunities to engage in collusive communications......................54

    a. Direct contacts between Defendants' high-level executives ......................................54

    b. Trade associations and industry meetings ..................................................................58

    c. Employees of Jeld-Wen and Masonite have switched firms ......................................63

B. Jeld-Wen and Masonite's conduct is inconsistent with each Defendant acting in its unilateral economic self-interest in the absence of the Cartel .............................................65

  1. Defendants' direct high-level communications and surrounding events suggests they shared pricing information...................................................................................................65

  2. That Defendants' price increase announcements during the Cartel Period were larger and more effective than during the benchmark period is consistent with the Cartel and inconsistent with each firm acting in its unilateral self-interest absent an agreement...68

    a. Defendants' price increase announcements cannot be explained by supply and demand conditions and otherwise exhibited characteristics found in collusive price increase announcements ................................................................................................72

    b. Jeld-Wen and Masonite closely monitored and followed each other's price increases and used nearly identical language in their announcements.......................................75

  3. Defendants' decisions to limit price discounting during the Cartel period is inconsistent with each firm acting in its unilateral economic self-interest absent the Cartel, and consistent with the alleged Cartel .....................................................................................76

HIGHLY CONFIDENTIAL

JW-SEC-01102750

**HIGHLY CONFIDENTIAL**

4. Masonite's public announcements that it would not sell Doorskins was against its economic self-interest but for the existence of the Cartel...............79

C. The industry's economic performance is consistent with the existence of the Cartel and inconsistent with a marketplace absent the Cartel ...............87

   1. IMD prices rose despite moderately increasing demand, excess capacity, stable or declining costs, and significant quality issues. ...............88

     a. Market fundamentals do not support the increase in IMD prices...............88

     b. Jeld-Wen had significant quality problems ...............92

     c. Defendants attributed their increased profitability to increased prices and "price discipline"...............94

   2. Multiple regression analysis confirms that IMD prices were artificially inflated during the Effective Cartel Period...............96

D. The Overcharge Regression measures the amount by which Class members were overcharged by the Cartel ...............97

   1. How multiple regression works ...............98

   2. The dependent variable is the net price paid by direct purchasers of IMDs...............100

   3. Independent variables control for factors affecting price ...............101

     a. Demand variables ...............101

     b. Supply variables...............103

     c. Macroeconomic environment ...............107

     d. Indicator variables for shipping costs, products, and purchasers ...............107

   4. Indicator variable to measure the effect of the Cartel...............107

   5. Defendants' transaction data...............108

   6. The results of the Overcharge Model confirm Class Members were overcharged on their purchases of IMDs...............110

IV. Common Economic Evidence and Analysis Demonstrates That All, or Nearly All, Members of the Proposed Class paid Artificially-Inflated Prices for IMDs ...............113

A. There is a pricing structure in the IMD market ...............114

   1. Correlation analysis confirms that there is a structure to IMD prices ...............118

   2. A Characteristics regression confirms that there is a pricing structure ...............120

HIGHLY CONFIDENTIAL

B. Structural characteristics of the IMD market indicate that individual members of the proposed Class could not have avoided the price increases.................................................124

C. Individual members of the proposed Class could not have avoided paying artificially-inflated prices because Defendants strictly enforced the announced price increases.....125

   1. Defendants' price increase announcements were widely disseminated to all, or nearly all, Class members and applied generally..................................................................125

   2. Defendants' price increases were strictly enforced and led to generally higher prices ........................................................................................................................................126

D. Multiple regression analysis confirms that all or nearly all members of the proposed Class paid artificially inflated prices for IMDs during the proposed Class Period ...................129

   1. The predicted but-for prices of my class-wide regression demonstrate that all, or nearly all, members of the proposed Class were impacted by the Cartel. ............................129

      a. Predict but-for prices based on predicted value – overcharge estimate....................130

      b. Calculate the net overcharge based on the sum of (actual – but-for price) * sales quantity ................................................................................................................130

V. Measurement of Class-wide Aggregate Damages...............................................................131

   1. Calculation of Class sales during the Class Period.....................................................131

   2. Measurement of Aggregate Damages suffered by the proposed Class as a Whole.....132

VI. Conclusions ....................................................................................................................132

HIGHLY CONFIDENTIAL

JW-SEC-01102752

HIGHLY CONFIDENTIAL

## I. Introduction and Summary of Conclusions

### A. Expert Background and Qualifications

1.      I am the President and Co-founder of Monument Economics Group ("Monument"), an economic consulting firm based in Arlington, VA. Monument provides economic research and quantitative and statistical analyses to clients in the United States, Canada and elsewhere internationally. I have studied the economics of markets and prices and have consulted on these issues for over 25 years. I previously have been asked to opine on a variety of economic issues in litigation, including the existence of cartel behavior in various markets, damages arising from anti-competitive conduct, and class-wide impact arising from alleged price-fixing and anticompetitive conduct, as well as class-wide injury arising from allegations of consumer fraud or breach of warranty. A copy of my C.V., including a list of the matters in which I have submitted expert testimony in the past four years, is attached to this report as Appendix A.

2.      I graduated from the University of Tennessee, Knoxville in 1987 (summa cum laude, Phi Beta Kappa) as the top graduate in my class in the College of Arts and Sciences. I earned a master's degree in economics from the University of Maryland in 1989. I received the Doctor of Philosophy degree in economics from the University of Pennsylvania in 1994. My economic research has been published in peer-reviewed journals such as *Journal of Econometrics, Journal of Development Economics, CATO Journal, Regulation*, and others. I have also served as a referee for leading economics journals, including the *International Economic Review, Journal of Business and Economic Statistics, Journal of Labor Economics, American Journal of Agricultural Economics*, and *Contemporary Economic Policy*.

3.      Prior to co-founding Monument, I held a variety of positions in government, academia, and other consulting firms, where I conducted economic research on a variety of markets. From 1994 until 1999, I was an Economist (later Senior Economist) with the Federal Reserve System of the United States in Washington, DC and Kansas City, MO. From 1999 until 2004, I taught economics, agricultural economics, and agricultural policy at North Carolina State University in Raleigh, NC. I have also been hired as an economic consultant to the World Bank and the Government of Peru, in addition to being retained on a wide range of economic consulting projects in a variety of contexts.

1

HIGHLY CONFIDENTIAL

JW-SEC-01102753

HIGHLY CONFIDENTIAL

4.       Courts in the United States and Canada have relied upon my economic analyses in certifying classes of direct purchasers in multiple cases involving allegations of anticompetitive conduct, including, for example, in *In re: Domestic Drywall Antitrust Litigation*, *Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.*, *In re: Puerto Rican Cabotage Antitrust Litigation*, *In re: Aftermarket Auto Lighting Products Antitrust Litigation*, *In re: Titanium Dioxide Antitrust Litigation*, *Eugene Allan, et al., v. Realcomp II, Ltd., et al.*, the Canadian *LCD* litigation[1] and the Canadian *Air Cargo* litigation.[2] In addition to my consulting activities, I have more recently taught economics at George Washington University and at the University of Tennessee, where I am an adjunct faculty member in the Department of Economics. I have been retained by in this case by counsel for the Direct Purchaser Plaintiffs ("DPPs" or "Plaintiffs") to serve as a testimonial expert. Monument is being compensated for my work in this matter at my hourly rate of $650 per hour. Monument's compensation in this matter is not contingent upon the content of my testimony or the outcome of this litigation.

### B.  Summary of Direct Purchaser Plaintiffs' Allegations

5.       I understand that Defendants in this case are the two vertically integrated manufacturers of interior molded doors (hereafter "IMDs") in the United States.[3] I also understand that the named Plaintiffs in this action are Grubb Lumber Company, Inc. ("Grubb Lumber") and Philadelphia Reserve Supply Company ("PRSCO") (collectively, "Named Plaintiffs").[4]

---

[1] Ontario Superior Court of Justice, *The Fanshawe College of Applied Arts and Technology, Plaintiff, and LG Philips LCD Co., Ltd, L.G. Philips LCD America, Inc., Samsung Electronics Co. Ltd., Samsung Electronics Canada Inc., Hitachi Ltd., Hitachi Displays, Ltd., Hitachi Canada, Ltd., Hitachi Electronics Devices (USA) Inc., Sharp Corporation, Sharp Electronics Corporation, Sharp Electronics of Canada Ltd., Toshiba Corporation, Toshiba Matsushita Display Technology Co. Ltd., Toshiba America Corporation, Toshiba of Canada Limited, AU Optronics Corporation America, Chi Mei Optoelectronics USA, Inc. Chi Mei Optoelectronics Japan Co. Ltd. And Chunghwa Picture Tubes, Ltd.* 54054CP, 2011.

[2] Ontario Superior Court of Justice, *Airia Brands Inc., Startech.com Ltd. and QCS-Quick Cargo Service GMBH v. Air Canada, AC Cargo Limited Partnership, Societe Air France, Koninklijke Luchtvaart Maatschappij N.V. dba KLM, Royal Dutch Airlines, Asiana Airlines Inc., British Airways PLC, Cathay Pacific Airways Ltd., Deutsche Lufthansa AG, Lufthansa Cargo AG, Japan Airlines International Co., Ltd., Scandinavian Airlines System, Korean Air Lines Co., Ltd., Cargolux Airline International, Lan Airlines S.A., Lan Cargo S.A., Atlas Air Worldwide Holdings Inc., Polar Air Cargo Inc., Singapore Airlines Ltd., Singapore Airlines Cargo PTE Ltd., Swiss International Air Lines Ltd., Quantas Airways Limited, and Martinair Holland N.V.*, 50389CP, 2015.

[3] The term "Defendants" in this Expert Report refers to Masonite Corporation ("Masonite"); and JELD-WEN, Inc. and JELD-WEN Holding, Inc. (collectively "Jeld-Wen"). *See* United States District Court for the Eastern District of Virginia – Richmond Division, *In Re: Interior Molded Doors Antitrust Litigation*, Second Amended Consolidated Complaint, No. 3:18-cv-00718-JAG, April 10, 2019 (hereafter, "Complaint") at ¶¶ 17-19.

[4] Complaint at ¶¶ 15-16. A third named Plaintiff, Len-Co Lumber Corp, has since dismissed its claims and is no longer a named Plaintiff in the case. See United States District Court for the Eastern District of Virginia – Richmond

2

HIGHLY CONFIDENTIAL

JW-SEC-01102754

HIGHLY CONFIDENTIAL

6.    DPPs allege the October 2012 acquisition of CraftMaster, Inc. ("CMI") by Jeld-Wen, which reduced the number of 1) vertically-integrated manufacturers of IMDs from three to two and 2) North American interior molded door facings ("Doorskins") manufacturers from three to two, changed the structure of the IMD market[5] so that it was increasingly vulnerable to anticompetitive actions.[6] I understand that the challenged conduct in this matter is a conspiracy by Defendants to "raise, fix, maintain and or stabilize" the prices of IMDs in the United States.[7] I also understand that Plaintiffs contend that this conspiracy began in March 2014 and has lasted through the present, and has involved a series of anticompetitive acts (the "Cartel" or the "alleged Cartel"). First, as part of the Cartel, Defendants communicated with each other and "shared information [with each other] about their intentions to raise prices and the amount of those price increases before they were known to the public."[8] Second, in furtherance of the Cartel, Defendants announced and implemented price increases for IMDs at very close dates and of very similar magnitudes.[9] DPPs also allege that these price increases were different in magnitude and form than historical price increases, and thus reflected a significant change from prior practice.[10] Third, DPPs claim that Masonite's decision to stop selling Doorskins to independent IMD manufacturers was in furtherance of the conspiracy.[11] DPPs allege that Masonite's announcement that it was going to stop selling Doorskins was against its unilateral

---

Division, *In Re: Interior Molded Doors Antitrust Litigation*, Notice of Voluntary Dismissal, No. 3:18-cv-00718-JAG, July 29, 2019.

[5] The term "market" is commonly used by economists to refer to a distinct set of products or services that are economic substitutes of each other, but which are not economic substitutes for other products or services at competitive prices. In this Report, I use the terms "market," "marketplace," and "industry" interchangeably to describe the set of products that fall within the definition of IMDs, and to distinguish IMDs from non-IMD doors. I also use these terms when discussing Doorskins, which represent a distinct, backwards vertically-integrated component to IMDs. Although I have not conducted a formal analysis of the relevant antitrust product market here, because my assignment does not require one, I have observed below, *inter alia*, that there are 1) no close economic substitutes for IMDs, and 2) high barriers to entry to manufacturing and selling IMDs, which is strong evidence in support of a conclusion that IMDs form a relevant antitrust product market.

[6] Complaint at ¶ 58.

[7] Complaint at ¶ 83. The term "conspiracy" in the context of antitrust is a legal term. Economists generally refer to competitors agreeing among each other to affect price (profit) as "cartel," "collusion," "coordination," "cooperation," or "joint behavior." *See*, for example, the discussion in Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition, Reading, MA: Addison Wesley, 2005 (hereafter "Carlton and Perloff"), pp. 122-154. In this Report, I use these terms and "conspiracy" interchangeably.

[8] Complaint at ¶¶ 74-81.

[9] Complaint at ¶ 58 and ¶ 84.

[10] Complaint at ¶ 85.

[11] Complaint at ¶ 95.

3

HIGHLY CONFIDENTIAL

JW-SEC-01102755

HIGHLY CONFIDENTIAL

economic self-interest in the absence of a conspiracy, as it would have given Jeld-Wen a dominant position in the Doorskin market.[12]

7.      Throughout this Report, I refer to the period beginning in March 2014 and lasting through the present as the "Cartel Period."[13] Further, because the first price increase Plaintiffs contend to have been anticompetitive went into effect no later than August 11, 2014, and because the transaction data and documents I have analyzed end in December 2018, I refer to the period from August 11, 2014 to December 31, 2018 as the "Effective Cartel Period."[14]

8.      I also understand that DPPs seek certification of a Class defined as persons or entities ("Class Members") who purchased IMDs in the United States directly from Defendants, their subsidiaries, affiliates, or joint-ventures during the period from October 19, 2014 to December 31, 2018 (the "Class Period").[15] I also understand that DPPs may seek damages on purchases by Class Members from October 19, 2014 to the date of trial (the "Damages Period").[16]

9.      As I explain later in this Report, the products at issue in this case are IMDs that are commonly referred to as "slabs," which may be sold as a single slab or as "bifolds," which are slabs joined together principally for use in closets. In addition to manufacturing slabs and bifolds, Defendants also provide additional value-added services for these IMDs, such as pre-hanging, which consists of affixing a door frame to an IMD slab for easier installation. I understand from counsel that DPPs are not seeking damages for these pre-hung door units, and therefore I have excluded them from my analysis.[17] Throughout this Report, IMDs will refer to slabs and/or bifolds (the "Class Products") and will not refer to pre-hung door units.

10.     Throughout this Report, I make reference to the following periods:

---

[12] Complaint at ¶¶ 99-101.

[13] While the Complaint alleges the Cartel started "at least as early as 2012" (Complaint at ¶¶ 83, 116), based on discussions with counsel, my review of the record evidence, and in conjunction with my economic analysis, we have determined that the alleged Cartel started in March 2014.

[14] I understand from counsel for DPPs, and my review of the record evidence, that the communications among Defendants began in March 2014 and that the first price increase announcements following those communications were announced in June 2014 and became effective in August 2014.

[15] Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government. I refer to this group as the "Class" in the remainder of this Report. DPPs filed the class action complaint on October 19, 2014 (see, United States District Court for the Eastern District of Virginia – Richmond Division, *Grubb Lumber Company, Inc., v. Masonite Corporation, and Jeld-Wen, Inc.,* Complaint – Class Action, No. 3:18-cv-00718-JAG, October 19, 2018 (hereafter, "Original Complaint")).

[16] As I discuss later in this Report, Defendants produced transactional data through December 2018, so my analysis of class-wide damages is limited to transactions during the Class Period.

[17] Defendants' transaction data shows that over 98 percent of these pre-hung door units were sold to two customers: Home Depot and Lowe's.

4

HIGHLY CONFIDENTIAL                                    JW-SEC-01102756

HIGHLY CONFIDENTIAL

a.  the Cartel Period – which starts in March 2014 and lasts through the present;

b.  the Effective Cartel Period – which starts on August 11, 2014 and lasts through December 2018;

c.  the Class Period – which starts on October 19, 2014 and lasts through December 31, 2018; and

d.  the Damages Period – which starts on October 19, 2014 and lasts through the trial date;

e.  the Benchmark Period – which starts on October 24, 2012 and lasts through August 10, 2014.

## C. Assignment

11.    I have been asked by Counsel for DPPs to determine whether economic evidence and methods common to the Class as a whole are capable of demonstrating the following:

a.  that the structure of the IMD industry was conducive to the existence of the alleged Cartel during the Cartel Period;[18]

b.  that the economic evidence is consistent with the existence of the alleged Cartel during the Cartel Period and inconsistent with each Defendant having acted in its unilateral economic self-interest absent the Cartel;

c.  that the economic performance of the IMD marketplace was consistent with the existence of the alleged Cartel during the Effective Cartel Period and did not reflect the performance of a competitive marketplace;

d.  that the alleged Cartel caused the vast majority of Class members to pay artificially inflated prices for IMDs, i.e., whether "common impact" can be established;

e.  that the Class suffered damages that can be quantified on a Class-wide basis; and if so, the amount of damages suffered by the Class as a whole.

## D. Materials Reviewed

12.    In performing my analyses, I have undertaken economic research and analysis based on publicly-available documents and on materials produced as part of this litigation, in order to understand the IMD and Doorskin industries. I also examined the prices paid for IMDs by members of the Class. I conducted economic and statistical analyses of IMD prices using

---

[18] As part of this analysis, I also considered the structure of the Doorskins industry.

5

JW-SEC-01102757

HIGHLY CONFIDENTIAL

publicly available data as well as transaction-level data provided by the Defendants. In addition, I reviewed documents produced by the various parties in this matter, as well as investor materials, trade press and academic literature. A complete list of the materials I relied upon in forming my opinions is contained in Appendix B.

### E. Conclusions

13.    Based on my analysis of the IMD industry, including documents and materials I have reviewed to date, as well as my training and experience in economics and econometrics, I have reached the following conclusions:

1.  **Common evidence demonstrates that the structure of the IMD industry is conducive to the formation and operation of the Cartel.**

14.    My conclusion that the structural characteristics of the market for IMDs was conducive to the formation and operation of the Cartel is based on the following factors:

   a.  Defendants collectively dominated the U.S. market for IMDs and they could artificially increase prices of IMDs through coordinated actions;

   b.  Defendants also collectively dominated the U.S. market for Doorskins—the most significant input to IMDs—and could therefore constrain the ability of non-vertically integrated IMD manufacturers to compete on price in the IMD market;

   c.  There are significant barriers to entry to selling IMDs. The presence of significant entry barriers facilitates the operation of anticompetitive agreements such as the one alleged here because it makes it difficult or impossible for new suppliers to enter the market to compete by undercutting Defendants' prices that resulted from collusive activities;

   d.  IMDs are commodity products and are interchangeable across IMD manufacturers. Economic theory demonstrates that this characteristic facilitates the cartelization of an industry because 1) it makes it easier for co-conspirators to track prices for each other's products and thus monitor compliance with (or cheating from) an anticompetitive agreement, and 2) when products are interchangeable, the primary way companies can win business is by competing on price. The avoidance of price-

6

HIGHLY CONFIDENTIAL

JW-SEC-01102758

based competition is the primary motivation for forming a cartel.[19] Thus, cartels are more likely when the participants sell interchangeable products;

e.  Demand for IMDs is generally inelastic. There are no economic substitutes for IMDs so Defendants' customers could not have avoided increased prices by switching to other products;

f.  There are many buyers of IMDs, which makes cheating on the alleged Cartel less likely since it lowers the incentives of Defendants to undercut artificially-inflated prices;

g.  Prices of IMDs had been steady or declining leading up to the start of the Cartel Period;

h.  Defendants had numerous opportunities to engage in collusive communications during the Cartel Period.

**2.  Common evidence demonstrates that the Defendants' actions during the period leading up to and during the Cartel Period were inconsistent with firms maximizing profits individually in an environment free of collusive behavior.**

15.  In the period leading up to and during the Cartel Period, Defendants engaged in a series of actions that were consistent with the existence of the Cartel and contrary to each firm's unilateral economic self-interest in the absence of the Cartel. These included:

a.  Defendants' numerous high-level communications provided opportunities to form and maintain the Cartel. Common evidence in the record suggests that information exchanged during these meetings was anticompetitive, inconsistent with unilateral self-interested competitive behavior, and inconsistent with a market free of the Cartel;

b.  The announcement and implementation of very similar and at times nearly identical price increases, and the subsequent limited price competition, which succeeded in raising prices across the board. These price increase announcements were different in magnitude and effectiveness from those implemented by Defendants prior to start of the Cartel Period;

---

[19] See, e.g., Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?," *Journal of Economic Literature*, Vol. 44, March 2006 at p. 43.

JW-SEC-01102759

**HIGHLY CONFIDENTIAL**

c. Masonite's public announcement that it would not sell Doorskins to third parties, thereby ceding a profitable business to Jeld-Wen, does not make economic sense in the absence of the Cartel.

3. **Common evidence demonstrates that Defendants' economic performance in the IMD industry during the Effective Cartel Period is consistent with the existence of the Cartel.**

16.    I also analyzed the Defendants' economic performance in the IMD marketplace, in the form of prices paid by Class members for IMDs, and have concluded that Defendants' economic performance during the Effective Cartel Period is consistent with the alleged Cartel and inconsistent with a marketplace free of the Cartel. That is because:

a. Defendants were able to implement significant price increases in a period of flat or declining costs, modest demand increases, ample capacity, and significant quality problems; and,

b. Multiple regression analysis demonstrates that the increases in prices in the IMD market cannot be explained by demand, supply, and other competitive factors alone.

4. **The Cartel caused injury to all or nearly all members of the proposed Class.**

17.    I have also concluded that common evidence and methods demonstrate that the Cartel artificially inflated prices for IMDs paid by all or nearly all members of the Class. My conclusion that all or nearly all Class members were overcharged on purchases of IMDs is based on the following factors:

a. Common evidence shows that there is a structure to prices for IMDs. This common evidence includes statistical and a multiple regression analysis, which confirm that prices of products paid by Class members tend to move together over time and that prices paid by Class members at any point in time can be principally explained by common characteristics. Where there is a pricing structure, any factor (such as the Cartel at issue here) that raises prices generally would result in higher prices that are broadly paid by all or nearly all purchasers. Thus, because there is a structure to prices for IMDs, the artificially-inflated prices that arose as a result of the Cartel were paid by all or nearly all members of the proposed Class.

HIGHLY CONFIDENTIAL

JW-SEC-01102760

HIGHLY CONFIDENTIAL

b.  Common evidence in the form of certain market factors also indicates that all or nearly all proposed Class members paid higher prices for IMDs as a result of the Cartel. The evidence that these higher prices would have been widely paid by all or nearly all Class members includes: Defendants' collective domination of the IMD market; the commodity-like nature of IMDs; and the presence of significant barriers to entry.

c.  Econometric evidence also demonstrates that prices paid by Class Members for IMDs were artificially inflated as a result of the Cartel. Multiple regression analysis shows that prices of IMDs paid by Class members were higher during the Class Period than could be explained by market forces alone. This analysis shows that all or nearly all Class members were impacted by the Cartel.

**5.  Damages suffered by the proposed Class as a Whole**

18.   Lastly, I have determined that there is a common, reliable, standard methodology which may be used to calculate damages on a class-wide basis, and I have implemented that methodology to calculate the damages suffered by the proposed Class as a whole during the Class Period. Based on this analysis, I have determined that aggregate class-wide damages suffered by Class members during the Class Period (from October 19, 2014 to December 31, 2018) are $243.7 million.[20]

**II.   Industry Background**

  *A.  Product Overview*

  **1.  Interior Molded Doors**

19.   Redacted - Third Party Confidentiality

Redacted - Third Party Confidentiality [21]

As shown in Figure 1 below, in 2013, IMDs accounted for over 60 percent of interior doors sold

---

[20] As I discussed before, DPPs allege that the Cartel is ongoing so I reserve the right to update my analysis of Class-wide damages should more data become available.
[21] FREE-000001-0246 at 081-086; JELD-WEN Holding, Inc., SEC Form 10-K, filed March 6, 2018 (hereafter "JELD-WEN 2017 10-K") at p. 9. *See also* JELD-WEN-00728294 at slide 14, showing that over 60% of interior doors sold in 2013 were IMDs.

9

HIGHLY CONFIDENTIAL

JW-SEC-01102761

HIGHLY CONFIDENTIAL

in North America. According to an internal Jeld-Wen document, the IMD market in North America was estimated to be greater than $800 million as of 2014.[22]

**Figure 1: Interior Door Market**



Source: JELD-WEN-00728294, slide 14.

20.    IMDs are made from two composite Doorskins joined by a wooden or medium density fiberboard ("MDF") frame filled with a hollow honey-cell core or in certain cases solid-core materials, and are primarily used for bedrooms, closets, and hallways.[23] Doorskins provide the outer shell and unique designs of IMDs and account for up to 70% of the material cost of hollow core IMDs.[24] IMD slabs are used principally for bedroom and bathroom doors. Bifolds are two or more (generally) narrower slabs joined together by hinges and are used typically for closets. As discussed in Section II above, these slabs and bifolds represent the "Class Products" at issue in this case.

21.    Doorskins are made of fibrous materials such as wood chips or sawdust, which are softened, refined with wax and resin and turned into a mat. The fibrous mat is then cut up into sheets and treated with a hot press and die sets to give it a specified design and texture, which allows IMDs to have decorative surfaces.[25] Doorskins may be sized, painted, or otherwise altered before being sent to an IMD manufacturer.[26] In North America, Doorskins are solely manufactured by Defendants, who are vertically integrated into the downstream market for IMDs. Defendants use these Doorskins principally for their own manufacture of IMDs, but may

---

[22] JELD-WEN-00286339 at slide 12.
[23] JELD-WEN 2017 10-K at p. 9; Masonite International Corporation, SEC Form 10-K, filed February 27, 2018 (hereafter "Masonite 2017 10-K") at p. 5.
[24] JELD-WEN-00747184; JELD-WEN-00464197.
[25] JELD-WEN-00000289 at slide 20; MAS-0000045380-5413 at 5384.
[26] William Wong, et al., "Masonite - Initiating with Overweight Rating; Price/Mix Drives Solid Sales/Strong Margin Growth at Industry Leader," J.P. Morgan, December 15, 2015 (hereafter "J.P. Morgan Masonite Report") at p. 33.

HIGHLY CONFIDENTIAL

JW-SEC-01102762

**HIGHLY CONFIDENTIAL**

also sell Doorskins to third-party IMD manufacturers.[27] A Masonite investor relations document stated that locating Doorskin manufacturing facilities near a local supply of wood is "critical" because "shipping wood beyond 100 miles is generally cost prohibitive."[28] Figure 2 and Figure 3 below show construction diagrams for Doorskins and for hollow core and solid core IMDs.

### Figure 2



**Molded Door Facing Manufacturing Process**

Wood Chips → Digesting & Refining → Fiber Mat Compression & Separation → Pressing & Drying → Finishing → Shipping to a Door Manufacturer

Source: JELD-WEN-00000289 slide 20.

### Figure 3

Solid Door compared to Hollow Core Construction



Source: Elite Trimworks, "West End Doors – By Masonite," n.d. Available at:

https://www.elitetrimworks.com/Masonite-West-End-Doors/

---

[27] J.P. Morgan Masonite Report at p. 32; United States District Court for the District of Columbia, *United States of America v. Premdor Inc., Premdor U.S. Holdings, Inc., International Paper Company, and Masonite Corporation,* Complaint, No. 1:01CV01696, August 3, 2001 (hereafter "Premdor Complaint") at ¶ 31.
[28] MAS-0000001641-681 at 649.

11

HIGHLY CONFIDENTIAL

JW-SEC-01102763

HIGHLY CONFIDENTIAL

22.  Redacted - Third Party Confidentiality

**Redacted - Third Party Confidentiality**

Redacted - Third Party Confidentiality [29]    **Redacted - Third Party Confidentiality**

Redacted - Third Party Confidentiality [30] The price differential between stile and rail doors and IMDs is substantial, with stile and rail doors frequently selling for 3-4x the price of similar style IMDs.[31]

23.  Flush doors differ from IMDs largely on design, as the sides of the door are flat and design-free.[32] **Redacted - Third Party Confidentiality**

**Redacted - Third Party Confidentiality**

Redacted - Third Party Confidentiality [33] **Redacted - Third Party Confidentiality**

**Redacted - Third Party Confidentiality**

Redacted - Third Party Confidentiality [34]

24.  While some Doorskins are manufactured internationally by Defendants (Masonite has Doorskin facilities in Chile, Canada, Ireland, and Malaysia),[35] assembly for IMDs sold into the U.S. is almost exclusively done in the U.S., due to the high cost of transportation and distribution relative to the potential labor savings.[36] **Redacted - Third Party Confidentiality**

**Redacted - Third Party Confidentiality**

**Redacted - Third Party Confidentiality** [37] An analyst report similarly noted that the doors marketplace is "difficult" for foreign competitors due to "lower product quality, greater difficulty in sourcing raw materials, higher cost supply chains, longer lead times, as well as

---

[29] FREE-000001-0246 at 081-083.
[30] FREE-000001-0246 at 081-084
[31] JELD-WEN-00798391.
[32] Builders Surplus, "Understanding the Basics of Interior Doors," March 28, 2018. Available at: https://builders-surplus.com/understanding-basics-of-interior-doors/.
[33] FREE-000001-0246 at 084.
[34] FREE-000001-0246 at 082.
[35] MAS-0000001641-681 at 643.
[36] MAS-0000005613-5700 at 5642; J.P. Morgan Masonite Report at p. 3.
[37] FREE-000001-0246 at 0024.

12

HIGHLY CONFIDENTIAL

JW-SEC-01102764

HIGHLY CONFIDENTIAL

several practical issues (i.e., ability to resolve problems after installation etc)."[38] In a 2011 memorandum in support of its investment in Jeld-Wen, Onex Corporation also explained that:

> Door manufacturing is predominantly a domestic industry and insulated from low cost imports due in large part to considerations related to the manufacture of composite molded door facings. The manufacture of molded facings is highly automated requiring minimal labor and mitigating the primary cost advantage of Asian manufacturers. Molded facing plants must be located near an ample supply of wood chips, which are difficult to transport, typically situated in the interior of China (and other countries) and generally required for domestic consumption rather than for export through a finished molded door product. The technology required to produce molded door facings is also significant and protected by process patents largely controlled by JELD-WEN, Masonite and CraftMaster, the third vertically-integrated competitor (and a Masonite spin-off). More broadly, the primary channels of distribution in North American and Europe require broad product lines, short lead times and value-added services like pre-hanging before shipping (putting the door on hinges in a frame) that make it difficult for foreign competitors to penetrate domestic markets.[39]

25.    Within the interior door segment (i.e., IMDs, stile and rail, and flush doors), IMDs generate the most revenue and profits for Defendants. For example, Matt Hood, Jeld-Wen's VP of Door Manufacturing, communicated in an email that "[w]e make our money on molded doors, accounts that do not buy a lot of molded are not going to generate a lot of EBITDA."[40] For vertically-integrated IMD manufacturers like Defendants, the manufacture of Doorskins is more profitable than the assembly of IMDs.[41] For example, an analyst report on Jeld-Wen stated that "we think the predominant value of the interior door business is based on the components operation, which includes the production of interior molded door facings."[42] Similarly, Bob Merrill, formerly Jeld-Wen VP of Sales and Marketing, CEO of CMI and Masonite VP of Sales

---

[38] MAS-0000001615-640 at 623.

[39] Reproduction-ThirdParty-0005364-378 at 370.

[40] JELD-WEN-00991889-93. EBITDA refers to earnings before interest, taxes, depreciation, and amortization. It is a commonly used measure of operating performance.

[41] A firm is considered to be vertically integrated if it controls and is engaged in more than one successive step in its supply chain. In this case, Defendants are considered vertically-integrated because not only do they manufacture and distribute IMDs, but they also produce the principal component (Doorskins) used to manufacture IMDs. Independent IMD manufacturers, which do not control their supply of Doorskins, are not vertically-integrated in the production of IMDs. See Carlton and Perloff at p. 419.

[42] MAS-0000045380-5413 at 5384.

13

HIGHLY CONFIDENTIAL

JW-SEC-01102765

HIGHLY CONFIDENTIAL

and Marketing, testified via deposition during the *Steves*[43] case that Doorskins are more profitable than IMDs.[44]

### 2. Demand drivers

26. Demand for IMDs, and interior doors generally, is driven principally by new home construction and spending on repair and remodeling ("R&R"). For instance, analyst reports on Masonite and Jeld-Wen identified that 81% of Masonite's and 90% of Jeld-Wen's net sales were for residential new home construction or R&R use.[45] A 2013 Jeld-Wen lender presentation cited "[s]tronger new residential construction and R&R markets" as reasons for strong growth in Q1 2013.[46] A Masonite investor relations document stated that every 100,000 new homes represents approximately $50 million in door sales, and that the "average" house has approximately 24 doors and is worth approximately "$1,250 of incremental door sales (exterior & interior)."[47]

27. Redacted - Third Party Confidentiality

Redacted - Third Party Confidentiality

Redacted - Third Party Confidentiality [48] Redacted - Third Party Confidentiality

Redacted - Third Party Confidentiality [49] Redacted - Third Party Confidentiality

Redacted - Third Party Confidentiality [50] Following a sharp decline in new home construction

---

[43] Steves and Sons, an independent IMD manufacturer, sued Jeld-Wen in June 2016 alleging that following its acquisition of CMI, Jeld-Wen raised Doorskin prices above competitive levels and "reduced quality and output below competitive levels in the markets for both doorskins and doors." The case went to trial with the jury awarding Steves and Sons $58.6 million ($176 million after trebling). Jeld-Wen was also ordered to divest its Towanda facility. *See* United States District Court for the Eastern District of Virginia – Richmond Division, *Steves and Sons, Inc., v. JELD-WEN, INC.*, Complaint for Injunctive and Declaratory Relief, Damages, and Specific Performance - Redacted Version Filed Publicly, 3:16-cv-00545-REP, June 29, 2016; *see also* United States District Court for the Eastern District of Virginia – Richmond Division, *Steves and Sons, Inc., v. JELD-WEN, INC.*, Verdict Form, 3:16-cv-00545-REP, February 15, 2018; *see also* United States District Court for the Eastern District of Virginia – Richmond Division, *Steves and Sons, Inc., v. JELD-WEN, INC.*, Memorandum Opinion, 3:16-cv-00545-REP, October 5, 2018. Throughout this Report, I refer to this litigation as the "*Steves*" case.

[44] Deposition of Robert Merrill (*Steves*), May 10, 2017 (hereafter "Merrill (*Steves*) Deposition") at 80:20-81:13 ("There's more margin in the manufacture of the skins than there is in the assembly of doors at this point in time."). Also, according to Masonite documents, the sale of Doorskins was a "very profitable business." MAS-0000096078. See also MAS-0000019440-MAS-0000019441 & MAS-0000019442; MAS-0000039695-MAS-0000039708, at MAS-0000039698-700; MAS-0000171952-MAS-0000171954.

[45] Jason A Marcus, et al., "Jeld-Wen - Initiating with a Neutral Rating; Margin Expansion Likely to Be Material, But Valuation Fair," J.P. Morgan, February 21, 2015 (hereafter "J.P. Morgan Jeld-Wen Report") at p. 7; J.P. Morgan Masonite Report at p. 6. See also JELD-WEN-00618221-256 at 224.

[46] JELD-WEN-00406165 at slide 9.

[47] MAS-0000001641-681 at 654, 656.

[48] FREE-000001-0246 at 0017.

[49] FREE-000001-0246 at 0017.

[50] FREE-000001-0246 at 0082.

14

HIGHLY CONFIDENTIAL

during the Great Recession (December 2007 to June 2009),[51] new home construction activity began rebounding, but as of 2018 has not reached pre-Great Recession levels.[52] In 2017, Fred Lynch, fomer Masonite President and CEO, put new home construction levels at "approximately sixty percent of [pre-Great Recession] level[s]."[53]

28.     The R&R segment did not experience the same level of decline during the Great Recession and continues to steadily improve. In a 2011 offering memorandum, Jeld-Wen highlighted that "[a]t current activity levels, we estimate that approximately two-thirds of our total U.S. sales are driven by residential repair and remodeling activity with the remainder driven by new home construction. Our significant exposure to the repair and remodeling market has helped mitigate the impact of the over 70% decline in total housing starts in the United States since 2005."[54] As shown in Figure 4 below, both new home construction and R&R spending grew during the Cartel Period, although, as previously noted, new home construction has yet to reach pre-Great Recession levels(not pictured in Figure 4),, which exceeded 2 million housing starts per year. Figure 5 illustrates Jeld-Wen's IMD and flush door sales by segment.

**Figure 4: Housing Starts and Repair and Remodel Historical and Forecasted Demand**



Source: JELD-WEN-00665278 at slide 17.

---

[51] See National Bureau of Economic Research ("NBER"), "US Business Cycle Expansions and Contractions," available at https://www.nber.org/cycles.html.
[52] MAS-0000107538-7625 at 7557.
[53] JELD-WEN-00942042-054 at 043.
[54] JELD-WEN-01072479-2735 at 2489.

15

   JW-SEC-01102767

HIGHLY CONFIDENTIAL

**Figure 5: Forecast Interior Door Sales to New Home Construction and R&R Segment**



Source: JELD-WEN-00565210 at slide 7.

### 3. Cost drivers

29.    As previously discussed, Doorskins represent up to approximately 70% of the material cost to manufacture IMDs.[55] The primary raw materials used to manufacture Doorskins are "[w]ood chips, logs, resins, binders and other additives."[56] The primary raw materials used to manufacture IMDs, in addition to Doorskins, are wood or medium density fiberboard, used for the interior stile and rails, foam or solid materials used for the core, glue, and paint.[57] Other costs include labor, freight, as well as electricity and natural gas.[58]

30.    Figure 6 below shows the variable cost to manufacture textured six-panel IMDs from the Defendants' transactional data, which are the most popular type of IMD, from October 2012 to December 2018.[59] As the graph illustrates, Defendants' costs have remained fairly flat since October 2012.

---

[55] JELD-WEN-00464197.

[56] Masonite International Corporation, SEC Form 10-K, filed February 26, 2015 (hereafter "Masonite 2014 10-K") at p. 10. See also MAS-0000005613-5700 at 5623; JELD-WEN-00186289; and JELD-WEN-00388165.

[57] JELD-WEN-00464197; J.P. Morgan Masonite Report at p. 34.

[58] JELD-WEN-00464197; J.P. Morgan Masonite Report at p. 34.

[59] The variable costs shown in Figure 6 include material and labor costs for both Jeld-Wen and Masonite as well as variable overhead costs for Masonite.

16

HIGHLY CONFIDENTIAL

JW-SEC-01102768

HIGHLY CONFIDENTIAL



Figure 6: Costs of Textured 6P IMDs
(10/2012 - 12/2018)

Source: Defendants' transaction data.
Note: Jeld-Wen's costs include material and labor costs;
Masonite's costs include material, labor and variable overhead.

### 4. Supply chain and sales channels

31.    There are two types of IMD manufacturers: vertically integrated and non-vertically integrated. Vertically integrated IMD manufacturers produce their own Doorskins for their internal use and assemble IMDs in their IMD manufacturing facilities.[60] Non-vertically integrated IMD manufacturers source Doorskins from Doorskin manufacturers. Since October 2012, in North America the only Doorskins manufacturers have been Jeld-Wen and Masonite.

32.    IMD manufacturers sell IMDs to retailers like Home Depot and Lowe's, as well as to one and two-step distributors.[61] One-step distributors resell IMDs to homebuilders and contractors.[62] Two-step distributors purchase IMDs from manufacturers in bulk and offer value-added services like pre-hanging (adding an IMD to a door frame).[63] Figure 7 below illustrates the distribution process for Masonite.

---

[60] JELD-WEN-00395699; JELD-WEN-00079992.
[61] J.P. Morgan Masonite Report at p. 30.
[62] *Ibid.*
[63] *Ibid.*

HIGHLY CONFIDENTIAL

JW-SEC-01102769

HIGHLY CONFIDENTIAL

**Figure 7: IMD Supply Chain and Distribution Channels**

Source: J.P. Morgan Masonite Report at p. 34.

### B. Industry History

#### 1. Jeld-Wen

33.      Jeld-Wen was founded in 1960 through the acquisition of a millwork facility in Oregon. It opened its first molded door skin facility in 1974, and has grown both organically and through numberous mergers and acquisitions ("M&A").[64] In 2011, private equity firm Onex Corporation ("Onex") acquired a controlling interest in Jeld-Wen.[65] According to a news article from 2011, "[a]fter being close to bankruptcy when the Great Recession and housing market bubble devastated revenues, Onex Corp., a Canadian equity company, kept the company going with a $675 million investment in 2011."[66] According to an analyst report, following Onex's

---

[64] Reproduction-ThirdParty-0065766-69 at 66.

[65] J.P. Morgan Jeld-Wen Report at p. 6.

[66] *Yakima Herald*, "JELD-WEN strategy involves shrinking manufacturing footprint," March 2nd, 2019. Available at: https://www.yakimaherald.com/news/business/local/jeld-wen-strategy-involves-shrinking-manufacturing-footprint/article_b5e559d8-3d73-11e9-afcf-3b6fed5dc895.html. Onex's initial investment ultimately totaled $871 million. Ross Deposition at p. 95; Plaintiffs' Deposition Exhibit 281 at Reproduction-ThirdParty-0041732.

18

HIGHLY CONFIDENTIAL                                                    JW-SEC-01102770

HIGHLY CONFIDENTIAL

investment, Jeld-Wen "exited non-core operations, hired a new management team, improved pricing discipline, began investing in R&D and restarted M&A." Jeld-Wen went public through an initial public offering ("IPO") in January 2017.[67]

34.     In 2011, Onex appointed Philip Orsino, Masonite's former CEO, as President of Jeld-Wen. Soon thereafter, he was named CEO of Jeld-Wen as well. According to Bob Merrill, Jeld-Wen's EVP of Sales and Marketing, Mr. Orsino was "a very dynamic guy. He is very strategic. He created the largest door company in the world, sold it, and then came and helped Onex buy, the second largest door company in the world."[68] According to certain Jeld-Wen documents, under Mr. Orsino's leadership, Jeld-Wen pursued an aggressive growth strategy.[69] In 2013, while revenues increased by $300 million, profits decreased.[70] In March 2014, Mr. Orsino was replaced by Kirk Hachigian, Jeld-Wen's Chairman and the former CEO of Cooper Industries. Under Mr. Hachigian, Jeld-Wen changed its leadership team and pursued significant price increases to enhance profitability.[71] Bob Merrill described Mr. Hachigian's mandate to the Jeld-Wen sales team:

> Q. Why has Jeld-Wen's interior molded doors prices increased since 2014?
>
> A. Well, we had a definitive strategy across all of our products -- not just molded doors, interior doors. Exterior doors, vinyl windows, wood windows, exterior boards, mirror tech trim, to increase our margins to get to acceptable profitability levels and to get an adequate return on investment.
>
> Q. Who defined what was meant by an adequate return on investment within Jeld-Wen?
>
> A. Kirk Hachigian was very clear on what it meant. It meant that the way we were measuring it really, was not necessarily return on investment, but was on EBITDA margins. And then I joined Jeld-Wen in twenty -- 2012, I think our EBITDA margin were a little over 5 percent.
>
> In 2013, they sunk to below 5 percent, I believe, to 4 to 4 and a half percent, in that – when Kirk joined us, he showed us a chart that measured Jeld-Wen against all of our publicly-traded competitors, and the average EBIDTA margin for the

---

[67] J.P. Morgan Jeld-Wen Report at p. 6.

[68] Deposition of Robert Merrill, December 12, 2019 (hereafter "Merrill Deposition") at p. 37:3-14.

[69] Deposition of Mark Beck, December 17, 2019 (hereafter "Beck Deposition") at pp. 141-47; Plaintiffs' Exhibit 105 at pp. 18-19. Contemporaneous documents make clear that Mr. Orsino was also seeking to increase prices from late 2012 until his termination, but Jeld-Wen could not do so due to competition from Masonite. See e.g., Deposition of Philip Orsino, January 24, 2020 (hereafter, "Orsino Deposition), at pp. 50-51; Plaintiffs' Exhibit 392 at p. 9.

[70] Beck Deposition at pp. 141-47; Plaintiffs' Exhibit 105 at pp. 18-19.

[71] Beck Deposition at pp. 141-47; Plaintiffs' Exhibit 105 at pp. 20-21.

HIGHLY CONFIDENTIAL                                    JW-SEC-01102771

HIGHLY CONFIDENTIAL

publicly-traded competitors was 15 percent. So the gap was 11 percent, and that is what he charged us to close.[72]

## 2. Masonite

35.    Masonite, in its current incarnation, was formed in 2001 when Premdor, then the largest non-vertically integrated manufacturer of IMDs, acquired the Masonite division of International Paper.[73] At the time, Masonite was the only non-vertically integrated manufacturer of Doorskins serving the U.S. market and Premdor was its largest customer. At the time of the acquisition, Premdor already had a 48.5% ownership interest in Fibramold S.A. ("Fibramold"), a Chilean manufacturer of Doorskins.[74] I understand that Fibramold supplied a portion of Premdor's Doorskins and Masonite supplied 65 percent.[75] After the merger, Fibramold was acquired outright by Masonite in 2002.[76]

36.    In 2001, the Department of Justice ("DOJ") sued to block the merger between Premdor and Masonite, and required Premdor to divest a manufacturing plant in Towanda, Pennsylvania, along with the exclusive right to the "CraftMaster" name, the exclusive right to Doorskin design names, and a license to all research and development ("R&D") and intellectual property related to the manufacture and sale of Doorskins, among other things.[77] The newly formed entity was called CraftMaster, Inc ("CMI").[78] The DOJ's rationale for requiring the divestment was in part a recognition that without the divestiture, the markets for IMDs and for Doorksins "would be more conducive to anticompetitive coordination of output and price by the market participants."[79]

---

[72] Merrill Deposition at 285:12-286:10.

[73] United States District Court for the District of Columbia, *United States of America v. Premdor Inc., Premdor U.S. Holdings, Inc., International Paper Company, and Masonite Corporation,* Competitive Impact Statement No. 1:01CV01696, August 3, 2001 (hereafter "Competitive Impact Statement"); MAS-0000001641-681 at 642.

[74] Competitive Impact Statement.

[75] Competitive Impact Statement; MAS-0000001642.

[76] Deposition of Lawrence Repar, January 8, 2020 (hereafter "Repar Deposition") at 16:22-16:25. *See also* Masonite International Corporation, SEC Form F-40, May 7, 2003 at p. 3 ("In 2002, the Company purchased the remaining interest in several less than wholly-owned companies, Fibramold S.A. of Chile, Premdor Mexico S.A. de C.V., Megantic Manufacturing Company Inc. and Les Portes Cascade. Subsequent to these acquisitions, Fibramold S.A. changed its name to Masonite Chile S.A. and Premdor Mexico S.A. de C.V. changed its name to Masonite Mexico S.A. de C.V. The Company also made an equity investment in Sacopan, Inc., a molded door facing manufacturing facility in Sacre-Couer, Quebec.").

[77] Competitive Impact Statement.

[78] Competitive Impact Statement.

[79] Competitive Impact Statement.

20

HIGHLY CONFIDENTIAL

JW-SEC-01102772

HIGHLY CONFIDENTIAL

37.     In 2005, Masonite was taken private by KKR, a leading private equity firm.[80] Soon after, due to the Great Recession, the overall U.S. door market entered a decline and in March 2009, Masonite entered bankruptcy after being "slammed by the slide in the housing and construction markets."[81] Masonite emerged from bankruptcy in June 2009 and went public on September 9, 2013.[82]

### 3.  Jeld-Wen's acquisition of CMI

38.     In June 2012, Jeld-Wen announced its intent to purchase CMI.[83] The acquisition of CMI closed in October 2012.[84] I understand that Jeld-Wen acquired CMI for $80 million, of which $16 million was equity and $64 million was debt.[85] I also understand that Jeld-Wen represented to the DOJ that the transaction was $16 million, which was below the threshold that triggers automatic review under the Hart-Scott-Rodino ("HSR") Act.[86] As part of Jeld-Wen's acquisition of CMI, it "entered into long term supply agreements with CMI's door skin customers, including Lynden Door, TM Cobb, Steves & Sons, Woodgrain, Millwork and Excel Door."[87]

39.     A presentation by Jeld-Wen discussing the acquisition of CMI viewed the initial returns as very favorable, noting that, "[i]n November of 2012 we acquired CMI, the only other vertically integrated door manufacturer in North America besides Jeld-Wen and Masonite, for $80 million. With the acquisition we got a large fiber plant and 4 door plants, two of which are operating today. In 2013 the CMI assets had an EBITDA of $36 million."[88] After acquiring CMI, Jeld-Wen shut down its Dubuque, IA and Marion, NC Doorskins manufacturing facilities.[89]

---

[80] Wall Street Journal, "KKR to Buy Masonite in $2.5 Billion Deal," December 24, 2004. Available at: https://www.wsj.com/articles/SB110377319014608099.

[81] Reuters, "Masonite files for pre-arranged bankruptcy," March 16, 2009. Available at: https://www.reuters.com/article/us-masonite/masonite-files-for-pre-arranged-bankruptcy-idUSTRE52F4VM20090316.

[82] J.P. Morgan Masonite Report at p. 6.

[83] Window & Door, "Jeld-Wen to Acquire Craftmaster," June 18, 2012. Available at https://windowanddoor.com/news-item/companies/jeld-wen-acquire-craftmaster.

[84] Jeld-Wen, "JELD-WEN Completes Acquisition of Craftmaster," October 24, 2012. Available at: https://www.globenewswire.com/news-release/2012/10/24/1121730/0/en/JELD-WEN-Completes-Acquisition-of-Craftmaster.html.

[85] JELD-WEN-00379134 at slide 7; Deposition of Kirk Hachigian (Steves), May 16, 2017 (hereafter "Hachigian May 16 (Steves) Deposition") Exhibit 117 at slide 4.

[86] Hachigian May 16 (Steves) Deposition Exhibit 117 at slide 5; JELD-WEN-00006286 at slides 4-5.

[87] JELD-WEN-00883871 at slide 11. As part of long-term supply agreement with Excel Door, prices could be renegotiated annually and were not subject to contractual terms. See JELD-WEN-00080264 at slide 73.

[88] JELD-WEN-00379134 at slide 7.

[89] MAS-0000001641-681 at 649; see also JELD-WEN-00379134 at slide 5.

21

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

### 4. Masonite publicly declares that it would not sell Doorskins to third parties

40.    In 2014, Masonite publicly announced that it would not sell Doorskins "to competition" (that is, independent IMD manufacturers), first at a Wells Fargo Conference on May 8, 2014 and then on an analyst call following a tour of its Laurel, MS Doorskin plant on June 25, 2014.[90] As Masonite's EVP of Global Operations and Europe, Glenwood Coulter, noted:

> What is [sic] the competitive landscape looks [sic] like on the assembly side? And so, you'll see on this slide that only Masonite and JELD-WEN service the entire North America market. And other door assembly companies are smaller and much more regionally focused. And importantly, the other smaller regionally focused door assembly manufacturers have to get their facings from somebody else. They are not vertically integrated in the facing. And we at Masonite have determined that we will not sell our facings into a competition. So that only leaves one other outlet to get their facings from in North America.[91]

41.    Jeld-Wen's EVP of Sales and Marketing Bob Merrill, who was CEO of CMI from 2002 until its acquisition in October 2012, testified that Masonite's May 8 announcement "was a fairly new revelation, and that as a matter of fact, a lot of the pricing that we were dealing with to the independent door manufacturers was the direct result of Masonite trying to take those customers away from me when I was running CraftMaster."[92] When asked if Masonite's decision to exit the Doorskins market made any sense to him, Mr. Merrill replied, "No."[93]

### III.    Economic Evidence, Common to the Proposed Class as a Whole, is Consistent with the Operation of the Cartel and Inconsistent with Each Defendant Having Acted According to its Unilateral Self-Interest Absent the Cartel

42.    I have studied the IMD market (including the upstream Doorskins market) using publicly available materials and other documents and data produced as part of this litigation, as well as certain materials and data that were produced as part of the *Steves* litigation and reproduced for this case. Based on my research into the IMD industry, my review and analysis of documents and data produced in this litigation, the relevant economic literature, and my training and experience in economics, econometrics, and statistics, I have concluded that the economic evidence

---

[90] Hachigian (*Steves*) Deposition Exhibit 124 at p. 8; JELD-WEN-00567167-183 at 172.
[91] JELD-WEN-00567167-183 at 172.
[92] Deposition of Robert Merrill (*Steves*) May 10, 2017 (hereafter "Merrill (*Steves*) Deposition") at 273:6-274:14.; *See also* Merrill Deposition at 117:22-119:11.
[93] Merrill Deposition at 119:4-11.

HIGHLY CONFIDENTIAL

JW-SEC-01102774

HIGHLY CONFIDENTIAL

(including the **structure** of the IMD market, Defendants' **conduct** within the IMD market, and the economic **performance** of the IMD market, especially prices) supports the existence of the Cartel and is inconsistent with each individual firm having acted in its unilateral economic self-interest absent the Cartel.[94]

43.    This conclusion is based in part on evidence showing that the IMD market exhibits a number of features that economists associate with cartel behavior: Defendants' dominance of the IMD and Doorskins markets; the high barriers to entry into the IMD and Doorskins markets; the commodity characteristics of IMDs; the lack of available substitute products for IMDs; the numerous buyers of IMDs; the general decline in IMD prices that occurred from the Great Recession until the start of the Cartel Period; and the ample opportunities that Defendants' executives had to communicate with each other.

44.    I have also reviewed economic evidence establishing that Defendants' conduct was consistent with the Cartel during the Cartel Period and inconsistent with these firms maximizing profits individually in an environment free of collusive behavior. This evidence, all of which is common to the Class, includes the very similar and at times nearly identical price increases announced by Defendants during the Cartel Period; the limited price competition by Defendants that successfully allowed prices to rise during the Cartel Period, in contrast to the relatively ineffective price increases announced before the Cartel Period; evidence demonstrating that Defendants communicated during the Cartel Period; and Masonite's public announcement that it would stop selling Doorskins to independent IMD manufacturers, thereby, ceding a profitable business to Jeld-Wen. The fact that Defendants' actions cannot be explained by their own economic self-interests is further evidence that the Cartel affected prices for IMDs during the Cartel Period (including the Damages Period).

45.    Furthermore, the evidence I reviewed relating to the economic performance of the IMD market is consistent with the existence of the Cartel and inconsistent with its absence. Such evidence includes the successful implementation of price increases despite stable or declining costs, substantial excess capacity, stable demand, and significant quality problems; and the results of my multiple regression analyses, which confirm that IMD prices during the Effective

---

[94] The "structure-conduct-performance" analytical framework is well-established in industrial organization. *See e.g.*, F. M. Scherer and David Ross, *Industrial Market Structure and Economic Performance*, Houghton Mifflin, 1990 (hereafter "Scherer and Ross") at pp. 4-7; *see also* Carlton and Perloff at pp. 26-27, 270-291.

23

HIGHLY CONFIDENTIAL

JW-SEC-01102775

HIGHLY CONFIDENTIAL

Cartel Period were artificially inflated well above competitive levels and cannot be explained by supply and demand factors alone.

### A. The structure of the IMD industry was conducive to the formation of the alleged Cartel

46.    In determining whether a cartel is likely to have existed in a particular market, economists look at the structure of the market in order to establish whether it was susceptible to collusive behavior of the sort alleged here.[95] Based upon my research into the IMD market, including the Doorskins market, and my review and analysis of the documents and data produced in this litigation, in addition to my training and experience in economics, econometrics, and statistics, I have concluded that structural characteristics of these markets were conducive to the formation and operation of the Cartel.

47.    My conclusion is based upon the abundant evidence showing that the markets for IMDs and Doorskins during the Cartel Period exhibited a number of features that economists associate with cartel behavior. These features include the following: Defendants' market dominance, as indicated by the large share of sales in the market they collectively controlled; the presence of significant barriers to market entry; the commodity nature of IMDs (meaning that an IMD produced by one Defendant could be substituted for an IMD of the same size and style produced by the other Defendant); the lack of economic substitutes for IMDs in the uses for which they are sold in the market; the presence of many buyers; the general decline and stability in prices prior to and leading up to the Cartel Period; and the ample opportunities employees of Defendants had to meet and collude, including direct communications between high-level executives, as well as meetings at trade shows and conferences.

### 1. Jeld-Wen and Masonite had market power in the upstream Doorskin market and the downstream IMD market

48.    Economics teaches us that when the market for a product is dominated by a small number of firms, it is easier to form and maintain a cartel or anticompetitive conspiracy over time because coordination among firms is easier.[96] Indeed, the potential benefit of a collusive agreement, such as the alleged Cartel, rests on the ability of individual participating firms to

---

[95] Richard A. Posner, *Antitrust Law*. Second Edition, Chicago, Il: The University of Chicago Press, 2001 (hereafter "Posner") at pp. 69-78.
[96] Posner at pp. 69-71.

24

HIGHLY CONFIDENTIAL                                    JW-SEC-01102776

HIGHLY CONFIDENTIAL

create market power through collusion that each participant would not otherwise possess.[97] Because each cartel member must have the ability to coordinate its behavior, especially with respect to pricing and output, with other members, the costs of coordinating pricing behavior among firms increase substantially as the number of cartel members increases. Market share serves as a commonly used indicator of market power and the ability to form a cartel and maintain it over time.[98] I discuss below the common, class-wide evidence demonstrating that the IMD and Doorskins markets in the U.S. are highly concentrated and that Defendants were able to exercise market power through their collective dominant share of more than 74 percent of the U.S. IMD market and nearly 100 percent of the U.S. Doorskins market.[99]

49.     One measure of industry concentration used by economists is the Herfindahl-Hirschman Index, or HHI.[100] In a perfectly competitive market, which is an industry characterized by numerous firms, each with a negligible share of the market, the HHI tends towards the value of zero. At the opposite extreme, in an industry where there is only one supplier (i.e., a pure monopoly), the HHI takes the value of 10,000.[101] The U.S. DOJ considers markets with HHI between 1,500 and 2,500 to be "moderately concentrated" and markets with an HHI above 2,500 to be "highly concentrated."[102] The market shares I reported in Table 1 below indicate that during the period from 2013 to 2018, the HHI exceeded 3,000 in each of the years, signaling that the IMD market in the U.S. is "highly concentrated." Moreover, I also estimated the HHI for the Doorskins market in the U.S. and determined that during the period from 2013 to 2018, the HHI exceeded 5,000. A highly concentrated industry, such as the IMD industry, can be susceptible to anticompetitive behavior (as is alleged here) because coordination among the dominant firms can impact output and market price.

---

[97] Jeffrey Church and Roger Ware, *Industrial Organization: A Strategic Approach*, McGraw-Hill, 2000 (hereafter "Church and Ware") at p. 314.

[98] Church and Ware at p. 604; Carlton and Perloff at pp. 666-668; Stephen A. Rhoades, "Market Share as a Source of Market Power: Implications and Some Evidence," *Journal of Economics and Business*, Vol. 37, 1985 at pp. 343-363.

[99] As I note elsewhere in this Report, Doorskins represent the most important input to the manufacturing of IMDs.

[100] Carlton and Perloff at p. 279.

[101] Mathematically, the HHI is defined as the sum of squares of each industry participant's market share. *See* U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010 (hereafter "Horizontal Merger Guidelines") at fn. 9.

[102] Horizontal Merger Guidelines at § 5.3.

HIGHLY CONFIDENTIAL

JW-SEC-01102777

HIGHLY CONFIDENTIAL

50.     The evidence also demonstrates that Defendants collectively had market power in the IMD market. For instance, a 2009 Masonite presentation estimated Masonite and Jeld-Wen's combined market share in the IMD market at 72.5 percent.[103] That same presentation estimated that Defendants controlled 100 percent of the Doorskin supply, with Masonite controlling a 35 percent share of the Doorskin supply, Jeld-Wen controlling 43 percent, and CMI (later acquired by Jeld-Wen) controlling the remaining 22 percent.

51.     More recent analyst reports confirm that Defendants collectively have a market share of approximately 80 percent in the U.S. IMD market. A 2014 Wedbush analyst report described the IMD market as a "duopoly," noting that "[w]ith the North America residential door market now essentially a duopoly (the top 2 players each command 40% share), we believe pricing volatility is no longer dependent on economic activity, which should lead to price stability going forward."[104] In December 2014, Jeld-Wen executive John Linker circulated excerpts from an RBC Capital Markets analyst report that stated that "Masonite (market share: 40%) and JELD-WEN (40%) have consolidated the market for residential interior doors by acquiring distressed competitors. The emergence of a functioning duopoly should lead to less risk and enhanced profitability as the recovery unfolds."[105] An April 2015 Macquarie Capital analyst report similarly highlighted the "price discipline" in the IMD and Doorskins market, observing that "the recent transition of JELD-WEN from privately-held to publicly-traded private equity ownership has created a rational duopoly pricing structure. Moreover, the acquisition of Craftmaster in mid-2012 removed a prior spoiler and left a majority of capacity with two participants, JELDWEN and DOOR [Masonite] - together they control 100% of the NA residential facing capacity and 80-85% of the slab business."[106] That same analyst report stated that the observed and expected "[p]rice increases are the key driver to upside EPS [earnings per share] revisions going forward and our Outperform rating."[107]

52.     These analyst reports are consistent with Jeld-Wen's internal analysis of the market. A November 2013 internal presentation from Jeld-Wen described "[i]nterior doors now essentially

---

[103] MAS-0000005761-5831 at 5822.
[104] JELD-WEN-00158512-537 at 514.
[105] JELD-WEN-00736823. In that same email, a Barron's report was also quoted that placed Masonite and Jeld-Wen's market shares at approximately 40 percent each.
[106] JELD-WEN-00185143-188 at 143.
[107] Ibid.

26

HIGHLY CONFIDENTIAL

a duopoly."[108] A 2015 Jeld-Wen interior door strategy document estimated that the U.S. IMD market was approximately $1 billion and that Jeld-Wen's share of the U.S. IMD market was 40 percent and Masonite's was 42 percent.[109] A June 2017 Jeld-Wen interior door strategy document estimated the IMD market at $1.2 billion, with Jeld-Wen accounting for 35 percent of the market and Masonite accounting for 44 percent.[110] Table 1 below shows IMD market shares by unit volume based on an internal Jeld-Wen analysis from 2018. As shown, during the period from 2013 through 2018, Defendants accounted for more than 74 percent of IMD sales in the U.S. Because Jeld-Wen is, practically, the sole supplier of Doorskins to independent IMD manufacturers, it is able to measure those manufacturers' IMD sales with accuracy. In addition, after Masonite's announced exit from the Doorskins market, Jeld-Wen would have also profited from nearly all such sales. Jeld-Wen's Bob Merrill testified that while there are "several independent door manufacturers," the independents are not national in scope like Jeld-Wen and Masonite.[111], [112]

---

[108] JELD-WEN-00468318 at slide 3.

[109] JELD-WEN-00565210 at slide 8.

[110] JELD-WEN-00665372 at slide 4.

[111] Merrill Deposition at 271:12-272:24. ("Q. Would you agree that customers have the option to purchase interior molded doors from those other door manufacturers and not only from Jeld-Wen and Masonite? . . . A. I would agree, but it's by market. None of those individuals [sic] customers has national coverage. The Steves have the broadest coverage because they go from Texas across the southeast up to the northeast. But -- and they have a little bit of coverage in the Midwest, but they don't sell them in California. They don't cover them in Pacific Northwest. Lynden is Pacific Northwest. Haley Brothers is California and the Southwest. Excel Door is southeast. UniDoor is the upper Midwest.").

[112] Jeld-Wen's former Chairman, President and CEO Kirk Hachigian, testified in the *Steves* case that Jeld-Wen's loss of market share in the doors industry was due to a "combination of quality, service." Hachigian May 16 (*Steves*) Deposition at 96:7-21; 103:6-104:6. In fact, when Mr. Hachigian was asked if the share loss was due to "aggressive competition," he stated, "No, because we had coexisted with them before in '10, '11, and '12, right? And I would argue that in '13, again, let me remind you, we went up $300 million in revenue and we took some share that we probably shouldn't have taken from the independents, right? And so I would argue in '14, there wasn't a big concern on our part in giving some of that share back." *Id.* at 104:7-16.

HIGHLY CONFIDENTIAL

JW-SEC-01102779

**HIGHLY CONFIDENTIAL**

**Table 1: IMD Unit Market Share in the U.S. (2013-2018)**

| Company | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Jeld-Wen | 42.7% | 40.3% | 38.4% | 36.7% | 35.4% | 34.8% |
| Masonite | 37.3% | 38.4% | 39.4% | 39.6% | 40.2% | 39.5% |
| Steves | 10.4% | 11.2% | 11.6% | 13.3% | 14.1% | 15.3% |
| Lynden | 3.2% | 3.6% | 3.7% | 4.0% | 4.0% | 5.1% |
| Haley | 1.9% | 1.8% | 1.9% | 1.9% | 1.8% | 1.5% |
| Others | 4.5% | 4.8% | 5.0% | 4.5% | 4.5% | 3.8% |
| **Defendants' Total** | **80.0%** | **78.7%** | **77.8%** | **76.3%** | **75.6%** | **74.3%** |

Note: [1] 2018 numbers are pro-rated from September.
Source: JELD-WEN-00689388.

53.    Defendants' IMD market dominance was further assisted by their dominance of the upstream Doorskins market. I previously noted that Jeld-Wen and Masonite are the only two Doorskin manufacturers in North America. Masonite and Jeld-Wen also dominate the global supply of Doorskins—especially those suitable to the needs of the U.S. IMD market. In a June 25, 2014 "special call," Masonite reported that they and Jeld-Wen account for 75 percent of the global Doorskin capacity, that they operate 8 of the 9 largest Doorskin facilities, and that they are "the only two owners of facing production in the western hemisphere."[113] As I discuss below, foreign manufacturers of Doorskins were not perceived as suitable substitutes for Doorskins manufactured by Defendants. For example, on that same call, Masonite also claimed that "facilities in remote locations produce inferior quality facings that wouldn't likely meet the demand of North American or European customers."[114] By being the only source of the principal input to IMDs, Jeld-Wen and Masonite could exert pricing discipline on their smaller competitors in the downstream IMD market.[115]

54.    Based on my research and analysis into the IMD and Doorskins markets, relevant economic literature, and my training and experience in economics, I have concluded that the Defendants dominated the U.S. markets for IMDs and Doorskins during the Cartel Period. This

---

[113] JELD-WEN-00567167-183 at 170.
[114] *Ibid.*
[115] Deposition of James Hair, January 10, 2020 (hereafter "Hair Deposition") at 230:11-230:19 ("Q. And how would the increase in skins prices have impacted that competitive door manufacturer? A. It could have potentially impacted the material costs of Excel's doors they're manufacturing."), 232:4-233:11, Deposition Exhibits 232 and 233; *see also* JELD-WEN-00355413 (email from Ron Hulse of Excel to Bob Merrill explaining that Jeld-Wen's skin price increase would equate to a 9% price increase in doors).

HIGHLY CONFIDENTIAL                                           JW-SEC-01102780

HIGHLY CONFIDENTIAL

characteristic of the market was conducive to the formation and maintenance of the Cartel as Defendants could have coordinated IMD price increases without being concerned about losing significant sales. Moreover, since Defendants were the exclusive supplier(s) of Doorskins to U.S. independent IMD manufacturers, Defendants could curtail the ability of smaller, independent IMD manufacturer rivals to compete on IMD prices, while at the same time profit themselves by increasing Doorskin prices. As I also discussed above (and explain in more detail later in this Report), this situation was exacerbated when Masonite announced it would stop selling Doorskins to third parties, leaving Jeld-Wen as essentially the sole supplier of Doorskins to U.S. independent IMD manufacturers. Moreover, Masonite did so at a time when Jeld-Wen was experiencing extensive problems with the quality of its Doorskins, the largest input cost in the manufacture of IMDs.[116]

### 2. There are high barriers to entry in the IMD and Doorskins markets

55.     The goal of the Cartel in this matter was to artificially inflate IMD prices above the level that would otherwise have prevailed in a market free of anticompetitive conduct. Absent significant barriers to entry, economic theory predicts that in a market characterized by anticompetitive conduct of the sort alleged here, new firms will enter the industry in response to the supra-competitive prices and profits arising from that cartel. In contrast, when there are high barriers to entry, it is more difficult or even impossible for new suppliers to enter and destabilize coordinated pricing schemes.[117] The significant barriers to entry in the IMD market made it easier to form and maintain the alleged conspiracy because Defendants would have been able to price above competitive levels without fear of new suppliers entering the market and undercutting those prices. Indeed, I reviewed documents indicating that 1) in spite of modest increases in demand, there have been no new entrants into the IMD market since 2011, prior to Jeld-Wen's acquisition of CMI, and 2) since 2003, Masonite or Jeld-Wen acquired, directly or

---

[116] *See* United States District Court for the Eastern District of Virginia, *Steves and Sons, Inc. v. Jeld-Wen, Inc.*, 3:16-cv-00545-REP, Doc. 1028, 2/21/2018, Trial testimony of Sam Bell Steves, II ("Sam Steves Trial Testimony") at 329:9-346:14.

[117] *See* Carlton and Perloff at pp. 97-104; Church and Ware at pp. 513-514; Posner at pp. 72-75. *See also* Dennis W. Carlton, *Barriers to Entry*, Issues of Competition Law and Policy (ABA Section of Antitrust Law 2008) Issue 1, 2008, pp. 601-617.

29

HIGHLY CONFIDENTIAL                                                                JW-SEC-01102781

HIGHLY CONFIDENTIAL

indirectly, eight IMD manufacturers operating in the U.S.[118] Moreover, there have been no new additional Doorskin facilities added since 2012 (by Jeld-Wen in Dodson, LA).[119] Thus, for entrants to meaningfully undercut Defendants' IMD prices, they would need to source Doorskins from non-Defendants -- which was not feasible, as I discuss later in this report. To meaningfully enter the IMD market and undercut Defendants' prices, a new IMD manufacturer would be required to vertically integrate and develop its own Doorskins supply. I discuss the significant barriers to entry in the Doorskins market below.

56.    I reviewed analyst reports that support my conclusion that there are high barriers to entry in the IMD market. For instance, a 2014 Barron's article citing an analyst report stated that "[a]fter the housing downturn, Masonite (ticker: DOOR) and its top rival, Jeld-Wen, acquired some weaker players and have emerged with a nearduopoly [sic]. Each controls 40% of the North American market, and barriers to entry are high."[120] Another analyst report concluded that there are "[s]ignificant barriers to entry" and observed that "[i]t is unlikely that the North American residential interior door industry will see new entrants in the future, as a result of significant barriers to entry. The cost of entering the market is high with an estimated cost of ~$100 MM - $150 MM per facing line."[121] A Macquarie Research analyst report stated that "we do not see any near-term threat of new entrants given the large asset base today and multiple hundred million dollar investment needed to build a new plant."[122] Similarly, a Baird analyst report stated: "a company would need to secure the wood inputs, comply with environment regulations, purchase die plates, and establish scale and distribution. All of this creates a rather large barrier to entry, in our opinion, against two large, vertically integrated manufacturers."[123]

57.    One barrier to entry in the IMD market is the significant level of capital investment required to manufacture Doorskins and IMDs.[124] For example, a 2014 Masonite investor

---

[118] JELD-WEN-00353417. This last entrant was Excel Door in 2011, which I understand entered the IMD market by acquiring a Jeld-Wen plant that had been recently shut down. See JELD-WEN-00647702-03; JELD-WEN-00896592- 93; MAS-0000199846 at slide 2; JELD-WEN-00645802-05. See also https://excelinteriordoor.com/.

[119] Deposition of Fred Lynch (Steves), July 17, 2017 (hereafter "Lynch (Steves) Deposition") at 177:4-177:17.

[120] JELD-WEN-00192587-88 at 87.

[121] MAS-0000001615-640 at 623.

[122] JELD-WEN- 00185143-188 at 147.

[123] MAS-0000003763-793 at 768.

[124] See Michael E. Porter, Competitive Strategy. New York, NY: The Free Press, 1980 (hereafter "Porter") at pp. 9-10. Porter states that "[t]he need to invest large financial resources in order to compete creates a barrier to entry, particularly if the capital is required for risky or unrecoverable up-front advertising or research and development (R&D)."

30

presentation estimated the cost to build a Doorskin facility at $100 to $150 million, with an additional $75 million for die plates to provide a broad product offering.[125] Masonite also estimated that IMD assembly plants cost between $20 and $25 million, excluding value-added services like pre-hanging, which cost an additional $9 to $10 million. Indeed, in the call notes that accompanied the presentation, a Masonite executive touted the "meaningful barriers to entry" in the industry.[126] Fred Lynch, Masonite's former President and CEO, confirmed that there are significant barriers to entry into the U.S. doors market, in part, due to the "significant investment" in building a Doorskins plant.[127]

58.     A related entry barrier is the length of time it takes to enter a market.[128] In the same presentation discussed above, Masonite also explained that it requires up to four years to ramp up to "meaningful production" of Doorskins.[129] Fred Lynch confirmed that assessment, testifying that "[w]e would estimate for us to build a new plant would be in the four year, three to four year range."[130] Any new entrant into the IMD market would have to either source its Doorskins from Defendants or dedicate significant time to meaningfully ramp up production. In either case, the new entrant would be unable to discipline prices.

59.     Masonite's investment estimates were largely confirmed by Jeld-Wen. In a 2014 "Molded Skin Strategy" presentation, for instance, Jeld-Wen highlighted the significant barriers to entry to Doorskin manufacturing, noting that it requires "[s]ignificant capital investment required to build a line" in excess of $100 million.[131] The figures in that presentation are consistent with Jeld-Wen's experience opening its Dodson, LA Doorskins plant in 2012. In a 2011 memorandum, Onex reported that "JELD-WEN invested approximately $85 million in the construction of a new, state-of-the-art molded door skin plant in Louisiana prior to the Onex investment, with another $27 million of capital required to bring the facility on-line."[132] Jeld-Wen's former President and CEO Mark Beck also stated, "[w]e are one of only two North

---

[125] JELD-WEN-00019652-698 at 666. See also Lynch (*Steves*) Deposition at 178:4-178:15. *See also* Deposition of Fred Lynch, January 23, 2020 (hereafter "Lynch Deposition") at 47:5-50:18, 68:11-69:2.

[126] JELD-WEN-00567167-183 at 174.

[127] Lynch (*Steves*) Deposition at 180:12-181:19.

[128] Posner at p. 72.

[129] JELD-WEN-00019652-698 at 667.

[130] Lynch (*Steves*) Deposition at 179:6-179:11.

[131] JELD-WEN-00080264 at slide 16.

[132] Reproduction-ThirdParty-0019692-9739 at 9716.

HIGHLY CONFIDENTIAL

JW-SEC-01102783

HIGHLY CONFIDENTIAL

American molded door manufactures who produce their own door skins. Our door skin plants are large in scale, represent a significant capital investment, and require technical know-how to operate. Producing a full line of skins also requires 100s unique molds - to introduce just a single new door design requires 16 of these molds to produce all the door heights and widths that are expected by consumers. Building a full set of 16 molds takes 4-6 months and costs over $500,000."[133] Further, in a 2015 presentation to Deutsche Bank, Masonite highlighted that "the considerable investments in strategic capital, intellectual property and overall business capabilities have helped to erect formidable barriers to entry."[134] Masonite goes on to say that it believes that "it is highly unlikely that the North American residential interior door industry, now that it has consolidated as a result of the housing recession, would see any capable new market entrants in the future."[135]

60.    Another barrier to entry is the presence of economies of scale in Doorskin production.[136] Economies of scale imply that average costs decline as output increases, because the relatively large fixed costs are spread over larger volumes of output, thereby reducing the average cost.[137] In industries with significant economies of scale, entry is difficult because the entrant's costs will be significantly higher than those of established market participants, making it difficult to compete on price. Evidence from the record in this case confirms the existence of economies of scale in the IMD industry, particularly related to the manufacture of Doorskins, which has a high ratio of fixed to variable costs. As previously discussed, Doorskin facilities require significant capital investment upwards of $100 million, but once those assets are operational, variable costs are less significant. For instance, an Onex memo outlining why foreign competition in the Doorskins market is unlikely observed, "[t]he manufacture of molded facings is highly automated requiring minimal labor and mitigating the primary cost advantage of Asian manufacturers."[138] Jeld-Wen's former CEO Kirk Hachigian, testified that manufacturing Doorskins is a "fixed-cost business."[139]

---

[133] JELD-WEN-00203985-997 at 990.
[134] MAS-0000001682-698 at 687.
[135] *Ibid.*
[136] Porter at pp. 7-9.
[137] Garth Saloner, Andrea Shepard, and Joel Podolny, *Strategic Management*, John Wiley & Sons, 2001 (hereafter "Saloner Shepard and Podolny") at 217.
[138] Reproduction-ThirdParty-0005364-378 at 370.
[139] Hachigian May 16 (*Steves*) Deposition at 142:15-142:22.

HIGHLY CONFIDENTIAL

JW-SEC-01102784

**HIGHLY CONFIDENTIAL**

61.     Yet another barrier to entry stems from established firms' vertical integration, including access to raw materials and in-house processing capabilities. For instance, an analyst report highlighted that "[t]he company benefits from its dominant position and vertically integrated manufacturing facilities. In particular, JELD and DOOR [Masonite] are the only N.A. manufacturers of interior molded door skins, which has created a significant barrier to entry for interior door market participants."[140] A Masonite presentation similarly stated that "[v]ertical integration matters because it gives us surety of supply, a lower cost position, control over quality, and better service to our customers"[141] On the previously-discussed June 25, 2014 call, Masonite's Glen Coulter highlighted that the proximity of Masonite's facilities, both to natural resources on the Doorskin side and to their customers on the finished product side, allowed Masonite the ability to efficiently reach its customers.[142]

62.     One more barrier to entry in the IMD market is the specialized technological knowledge associated with the manufacturing of Doorskins. For instance, Jeld-Wen's Mark Beck explained that in addition to being very expensive to build, Doorskin facilities "require technical know-how to operate."[143] A Jeld-Wen skin strategy presentation indicated that there is an art to die loading and that Doorskin manufacturing requires operating "[t]echnically challenging equipment."[144] Masonite's Fred Lynch echoed that opinion:

> A. ... We deploy tens of, not quite hundreds, but tens of R&D scientists that are constantly looking at how do we improve formulations, how do we improve quality, how do we improve adhesion, you know, all the characteristics associated with the door facing. As the door facing designs become more complex, the ability to actually mold them and to do so in a way that, you know, maintains the integrity of the product at a high enough yield to make it commercially viable takes a lot of work and effort, years sometimes to develop those products. So we put a lot of effort into those, and we believe that knowhow is one of the things that our customers value and pay us for.
>
> Q. Does Masonite believe that that knowhow and everything you've just described gives it a competitive advantage?

---

[140] MAS-0000193427-460 at 429.
[141] JELD-WEN-00203985-997 at 990.
[142] JELD-WEN-00567167-183 at 171.
[143] JELD-WEN-00203985-997 at 990.
[144] JELD-WEN-0022571 at slide 15.

HIGHLY CONFIDENTIAL

JW-SEC-01102785

HIGHLY CONFIDENTIAL

> A. I believe so, yes. I wouldn't do it if it didn't give us a competitive advantage. I mean these are big investments we're making, and our shareholders would expect us to get return from those.[145]

63.    Economic literature also finds that government regulations can act as significant barriers to entry.[146] For instance, Masonite estimated that planning and permitting for a Doorskins facility could take up to 12 months.[147] Masonite also identified "[m]ultipe environmental concerns" as production hurdles.[148] Masonite's Glenn Coulter echoed that point on the June 25, 2014 investor call:

> The next key element is around the environmental requirement. And you probably heard on the tour today, that in 2010, we put about $50 million of capital in for new technology to come in compliance with the maximum available control technology requirements from the EPA. That would be in addition to the cost of the line that would be required. So that also adds not only cost, but construct for the manufacturing, and creates even a more difficult environment to start it up.[149]

64.    Similarly, a November 2011 "Equity Co-Investment Opportunity" memorandum prepared by Onex following its $871 million investment in Jeld-Wen discussed potential environmental costs savings from opening the new Dodson, LA facility and avoiding "$12 million in required environmental capital at the two shuttered plants."[150]

65.    Yet another barrier to entry in production of IMDs is the need for suppliers to develop customer relationships and a strong network of distributors to operate efficiently in the market.[151] For instance, a Macquarie Research analyst report observes that:

> DOOR [Masonite] has very well-established relationships within the wholesale and retail channels as a result of its longstanding commitment to customer service and product innovation. All of its top 20 customers have purchased doors from DOOR for at least 10 years, despite the fact that DOOR generally does not enter into long-term contracts with customers. We believe that these relationships will continue into the future and will enable DOOR to continue to increase its market penetration in all of its various end markets.[152]

---

[145] Lynch (*Steves*) Deposition at 58-59.
[146] Porter at p. 13.
[147] JELD-WEN-00668055-8101 at 8070.
[148] *Ibid.*
[149] JELD-WEN-00567167-183 at 171.
[150] Reproduction-ThirdParty-0019692-9739 at 9716.
[151] Porter at pp. 10-11 (noting that "[a] barrier to entry can be created by a new entrant's need to secure distribution for its product").
[152] JELD-WEN- 00185143-188 at 163.

34

HIGHLY CONFIDENTIAL

JW-SEC-01102786

HIGHLY CONFIDENTIAL

66.    The last type of entry barrier in the IMD industry I discuss in this section is excess capacity. Excess capacity can work as a deterrent to new entrants because incumbents have the ability to increase output in anticipation of market entry, thereby making competition more severe and entry less attractive.[153] In an August 2012 Jeld-Wen presentation to the DOJ, Jeld-Wen argued that its acquisition of CMI should go through as "[c]urrently, there is far too much capacity of molded door facings in North America given declining demand – and industry analysts expect this excess capacity to remain indefinitely."[154] Jeld-Wen's Stephen Fancher testified in the *Steves* case that even through 2017 there still existed an oversupply of Doorskins in the marketplace.[155] Even as recently as September 2018, a Macquarie Capital analyst report explains that excess capacity currently exists in the IMD market: "Given JELD's current manufacturing footprint, mgmt. estimates JELD is operating at around 60-70%."[156]

67.    Defendants' internal documents also indicate that there is excess capacity in the manufacture of IMDs and Doorskins. For example, a 2014 Jeld-Wen "North America Skin Strategy" presentation shows that there is significant excess capacity in the U.S. (see Figure 8 below). Jeld-Wen estimates that excess capacity exceeds 20 million Doorskins per year or 10 million IMDs—roughly 25 percent of IMD production capacity in the US.[157] Moreover, a Masonite document from 2017 similarly shows Defendants' expectation that there will be excess capacity to supply the North American market through 2020, if Masonite uses its international Doorskin plants to supply the North American market.[158]

---

[153] Marvin Lieberman, "Excess Capacity as a Barrier to Entry," Stanford, October 1986 at p. 4.

[154] JELD-WEN-00000289 at Slide 31.

[155] 30(b)(6) Deposition of Stephen Fancher (*Steves*), July 26, 2017 (hereafter "Fancher (*Steves*) Deposition") at 325:5-325:13.

[156] MAS-0000045380-5413 at 5482.

[157] JELD-WEN-00364126 at slide 14. There were approximately 30 million IMDs produced in the U.S. in 2014. *See* JELD-WEN-00689388.

[158] MAS-0000003723-28 at 27.

HIGHLY CONFIDENTIAL

JW-SEC-01102787

HIGHLY CONFIDENTIAL

**Figure 8: North America Supply and Demand of Doorskins (2001-2017)**



Source: JELD-WEN-00079992 at slide 14.

68.    Based on my review of the evidence described above, all of which is common to the Class as a whole, and my training and experience in economics, I have concluded that there are significant barriers to entry in the IMD industry.[159] Economic theory teaches that when there are barriers to entry, it is easier to form and maintain an anticompetitive agreement such as the alleged cartel because it is more difficult for new firms to come into the market to undercut the artificially inflated prices established by co-conspirators. Accordingly, common evidence demonstrating that there are significant barriers to entry further supports my conclusion that the structure of the IMD market was conducive to the formation and maintenance of the alleged Cartel.

---

[159] *See* Lynch Deposition at 62:23-63:23 ("He's talking about the broader industry, so he's saying building product companies that have characteristics similar to those found within our own industry, namely a large amount of assets in the ground, meaningful barriers to entry, a product which has no obvious substitutes, and a limited number of players in the space that are focused on creating shareholder value.")

36

HIGHLY CONFIDENTIAL                                    JW-SEC-01102788

HIGHLY CONFIDENTIAL

3. **IMDs are commodity-like products characterized by a high level of interchangeability across Defendants**

69.    Typically, when a product is commodity-like, competition is based principally on price. For commodity products, coordination is easier because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices are more likely to reflect cheating on the conspiracy than some kind of custom arrangement, e.g., differences in product grade.[160] Scherer and Ross note that "[w]ith perfect homogeneity, there remains only one dimension along which rivalrous actions and counteractions can take place: price. In such cases, oligopolists have a particularly easy task of coordinating their behavior, for they must coordinate along only the one dimension."[161] The characterization of a product as a "commodity" does not mean that there are no differences in the product across categories or dimensions, but rather that what matters is that an industry is more susceptible to cartel behavior if, as was the case here, the output of one supplier may be generally substituted with the output of another supplier within the same category or product dimension. As I discuss below, that is the case here.

70.    Common evidence in the record demonstrates that IMDs are viewed as a commodity products and that competition in the market is driven largely by price. For instance, in a Masonite presentation by Loughlin Meghji and Co. (now part of BDO USA, LLP[162]), IMDs and facings are described as commodity products with only 10 percent considered "differentiated" products.[163] In that same presentation, IMD construction was described as "very similar across manufacturers,"[164] and the authors explained that "[a]ll North American doors meet market requirements," which include strength, durability, water resistance, and appearance and that "[t]o the customer, competitors have similar performance characteristics."[165] A 2016 Northcoast

[160] Posner, pp. 75 – 76. See also George A. Hay and Daniel Kelley, "An Empirical Survey of Price Fixing Conspiracies," *Journal of Law & Economics*, Vol. 17, No. 1, 1974 at p. 15. "Product homogeneity is among the characteristics frequently cited as facilitating collusive behavior [...]. One way to define homogeneity is linked to the elasticity of substitution between competitors' products. If the products (or product lines) of two competitors are perfect substitutes for each other, then the 'product' is homogeneous."

[161] Scherer and Ross at p. 279.

[162] Sally Slater, "BDO USA, LLP expands turnaround and restructuring services through addition of Loughlin Management Partners + Co," Bliss Integrated Communication, July 2019. Available at: https://www.bdo.com/news/2019-july/bdo-usa,-llp-expands-turnaround-and-restructuring

[163] MAS-0000005613-5700 at 5621.

[164] MAS-0000005613-5700 at 5618.

[165] MAS-0000005613-5700 at 5620.

37

JW-SEC-01102789

HIGHLY CONFIDENTIAL

analyst report explained that "almost 80% of doors sold at Home Depot are hollow 6-panel doors which is a commoditized door and sells for $30-$40 at retail."[166] In a presentation outlining the terms of Jeld-Wen's acquisition of CMI, IMDs were described as "priced similarly and are typically the low cost commodity alternatives used in U.S. homes."[167]

71.    Defendants' documents and testimony also confirm that price is the principal means of competition that Defendants would pursue absent the Cartel. In an email from Masonite executive John Beeken to Masonite President and CEO Fred Lynch, he described "taking of interior door business is almost entirely price driven within wholesale...."[168] In a 2011 email from Home Depot to Jeld-Wen, Marty Gallagher explained his opposition to Jeld-Wen's proposed price increases because "we do not believe it is justified as current pricing is higher than where we can buy same/like product elsewhere."[169]

72.    Lawrence ("Larry") Repar, Masonite's former EVP and COO of the Door division, testified that "because designs are somewhat similar, whether you're using a doorskin manufactured by CraftMaster, by Masonite, by JELD-WEN, by any of the numerous offshore players, you know, customers tended to treat interior molded doors as a commodity."[170] Mr. Repar further explained:

> **Q.** When you said that customers would treat interior molded doors as a commodity, what do you mean by that?
>
> **A.** Well, the competition was fierce, so a customer would say, well, you know, if you don't drop your price by -- I'll make something up -- by five percent, I'm going to switch to CraftMaster or I'm going to switch to JELD-WEN or I'm going to switch to Excel or I'm going to switch to Haley or I'm going to switch to Lynden or I'm going to switch to Five Lakes or I'm going to switch. It was a constant barrage of threats to suggest that it -- all we -- as a customer, all we care about is price. Whereas a manufacturer, we care about many more aspects than just the price. We care about marketing and innovation and new product development and service and quality and -- and R&D, etcetera, etcetera, where customers didn't really seem to care much about those aspects, and so they would continually negotiate and threaten and pull business away, change business from one to another. And so we had to try to make assumptions, hence the take rate, of how price changes, up or down, would be -- how those would be adapted into our financial performance.

---

[166] MAS-0000019770-72 at 71.
[167] JELD-WEN-00000289 at slide 19.
[168] MAS-0000019469.
[169] JELD-WEN-00647723.
[170] Repar Deposition at 39:2-39:23.

HIGHLY CONFIDENTIAL

JW-SEC-01102790

HIGHLY CONFIDENTIAL

Q. When you said that the designs were – the skins were similar, what did you mean by that?

A. The designs themselves where the average builder or contractor or homeowner could look at an interior molded door and not have a clue whether it was a Masonite skin, a JELD-WEN skin, a CraftMaster skin, a skin coming from South America, a skin coming from Asia, skins coming from Turkey, a skin coming from Romania, a skin coming from Ireland, a skin coming from Latvia, or anywhere else, only a, you know, a trained door person would be able to tell the difference. So therefore they were deemed to be, in customers' eyes, quite commodity in nature.[171]

73. Similarly, Kirk Hachigian, Jeld-Wen's former Executive Chairman and CEO, testified that IMDs are "a commodity, and so in a commodity business, you have to be very sensitive to the market pricing."[172] Matt Ross, Onex Managing Director and Jeld-Wen board member, testified that he considers the IMD market to be "mature," which he defined as, "A market where the products being bought and sold are generally commodity in nature, subject to supply and demand curves, and less susceptible to rapid innovation."[173] Mr. Ross also called the IMD market a "commodity marketplace."[174]

74. Additional evidence produced by Defendants in this litigation supports the fact that IMDs are interchangeable across suppliers. For instance, several "crosswalk" documents in the record allow both manufacturers and purchasers to determine which IMDs are interchangeable across Defendants. As one example, a CMI document compares IMD models for Masonite, Jeld-Wen, and CMI based on design and product characteristics.[175] Of the sixteen designs in the document, fourteen were manufactured by all three companies and one additional design was manufactured by two of them. The three manufacturers offered the same coating, fire rating options, and similar warranties. Jeld-Wen maintained a similar "Interior Door Cross Reference" document that compared the Jeld-Wen design name with those of CMI and Masonite for the same design.[176]

---

[171] Repar Deposition at 39:24-41:10.

[172] Deposition of Kirk Hachigian, January 23, 2020 (hereafter "Hachigian Deposition") at 178:19-179:15.

[173] Ross Deposition at 120:24-121:11.

[174] Ross Deposition at 280:23-281:16.

[175] JELD-WEN-00311986-87.

[176] Deposition of Derek Brosterhous, January 8, 2020 (hereafter "Brosterhous Deposition") at 62:23-63:8; Exhibit 192.

HIGHLY CONFIDENTIAL

JW-SEC-01102791

HIGHLY CONFIDENTIAL

75.     Another example of a document demonstrating product interchangeability is a 2016 crosswalk document prepared by Jeld-Wen that compares prices of Jeld-Wen and Masonite IMDs by SKU description.[177] A different Jeld-Wen document listed detailed retail and invoice cost comparisons for Jeld-Wen and Masonite by SKU.[178] This document, sourced from Home Depot, establishes that retailers could substitute, for a given design and product characteristics, one supplier's IMD for another.

76.     Further evidence of product interchangeability in the Doorskin and IMD market is the effects of the merger between CMI and Jeld-Wen, which resulted in Doorskin design redundancies due to the overlap in products. In a July 2014 presentation, Jeld-Wen described its efforts to consolidate the legacy CMI and Jeld-Wen designs, observing that "many of the molded interior door designs are similar to that of Jeld-Wen" although in the presentation they point out that to be "direct substitutes" in the market requires them to be unique SKUs.[179] In that same presentation, Jeld-Wen outlined the IMD designs that would be consolidated across the two merged entities (see Figure 9 below). In a December 2012 email, Jeld-Wen's Chris Mercier discussed the need to consolidate CMI and Jeld-Wen designs and proposed using Steves and Sons' Doorskins purchases as a reference guide for which designs to map with Masonite, stating "Steve's [sic] has done a great job in understanding which CMI designs and which JW designs they can use so that they can be either a backup supplier to a Masonite distributor and/or dealer without having inventory issues. We also need to take into consideration that the majority of market share we are going to be taking is Masonite, and having that match is going to save us considerable dollars in switching out inventory."[180] In that same email, Mr. Mercier discussed the interchangeability of certain Doorskins between Jeld-Wen, CMI, and Masonite, observing that a customer would be switching from Masonite to Jeld-Wen on some specific two-panel designs: "[t]hese are mainly the 2 pnl square top (JW Cambridge, CMI Carrara), and the 2pnl round top (JW Continental, CMI Caiman). The CMI skins are a dead match to the Masonite skins."[181]

---

[177] JELD-WEN-00705214. *See also* JELD-WEN-00748963.
[178] JELD-WEN-00749330.
[179] JELD-WEN-00460278 at slide 2.
[180] JELD-WEN-00308797-799 at 798.
[181] JELD-WEN-00308797-799 at 798.

40

HIGHLY CONFIDENTIAL

JW-SEC-01102792

HIGHLY CONFIDENTIAL

### Figure 9: Jeld-Wen and CMI Doorskin designs

Source: JELD-WEN-00460278 at slide 2.

77.    Independent IMD manufacturers, who source their Doorskins from Jeld-Wen, principally, do not provide product differentiation in the IMD market. For instance, the transactional data produced by Jeld-Wen in the *Steves* litigation shows that the large volume products Jeld-Wen sold to independent IMD manufacturers were six-panel textured Doorskins. As discussed above, these are the most common IMD designs and are referred to as "commoditized" products.

78.    Based on the evidence discussed here, all of which is common to the proposed Class, I have concluded that IMDs are commodity-like products characterized by a high degree of interchangeability across suppliers (for a given type of IMD with a given set of product characteristics). Because competition for a commodity occurs primarily on the basis of price, Defendants could have more easily monitored and detected deviations from an anticompetitive agreement. For instance, where products are commodities, and are thus interchangeable across suppliers, if one cartel member learns that another has undercut its price, that would be an

41

JW-SEC-01102793

indication of cheating on the cartel's pricing. The interchangeability of IMDs produced by one Defendant with those produced by another Defendant is further evidence, in the form of market structure, that is consistent with the formation and maintenance of the Cartel.

### 4. Demand for IMDs is inelastic

79.     Another market characteristic identified by economists as facilitating anticompetitive behavior, as alleged in this case, is inelastic demand. Elasticity of demand refers to how responsive consumer purchasing behavior is to a change in price. Demand is said to be "elastic" if the percentage change in quantity demanded following an increase or decrease in price is greater than the percentage change in price, and is said to be "inelastic" if the change in quantity is proportionately less than the change in price. For a product with inelastic demand, it is profitable to increase prices as part of an alleged anticompetitive agreement because the loss in volume is more than compensated by the increase in revenue generated by the higher price. I discuss below how my review of industry reports, academic research, and documents and testimony produced in this litigation indicates that the demand for IMDs is inelastic. My conclusion that demand is inelastic is further supported by the evidence discussed below demonstrating that there are no economic substitutes for IMDs or Doorskins.

80.     For instance, Mark Erceg, Masonite's former CFO and EVP, discussed how IMDs are "very price inelastic."[182] As explained by Mr. Erceg, "the door space really isn't very price-sensitive. If you need a new door, whether you're going to pay $25, $29, $39, you're likely going to pay that, because there's not a lot of substitution that you can bring to bear...."[183] In September 2014, RBC Capital Markets circulated summary notes from a "fireside chat" with Mr. Erceg: "Masonite believes several factors have resulted in a more favorable pricing environment, most notably consolidation which reshaped an industry previously characterized by overcapacity into a duopoly of vertically integrated players. In addition, Masonite has worked closely with retailers to drive the notion that doors have a more inelastic demand than previously thought."[184]

81.     One factor that economists view as contributing to inelastic demand for a product is the lack of economic substitutes, or goods which can be used in place of the subject good if the

---

[182] Hachigian May 16 (*Steves*) Deposition Exhibit 124 at p. 10.
[183] *Ibid.*
[184] JELD-WEN-00566582-83.

JW-SEC-01102794

HIGHLY CONFIDENTIAL

cartel is successful in raising prices. The presence of economic substitutes makes demand elastic and can restrain price increases and temper the effects of a price-fixing conspiracy, because buyers can respond to price increases by switching to cheaper substitute products.[185] Conversely, an industry is more conducive to the formation of a cartel when there are no economic substitutes, because cartel members do not risk losing customers to some alternative product if they raise prices above competitive levels. Common evidence from both the public domain and Defendants' documents demonstrates that there are no economic substitutes for IMDs and Doorskins.

> a.  There are no economic substitutes for Doorskins produced in North America

82.    As discussed in Section II above, Doorksins are an essential component in manufacturing IMDs. Moreover, Doorskin plants require significant capital investment, technical knowhow, and take up to four years to produce meaningful volume of Doorskins. In this section, I discuss common evidence demonstrating that independent IMD manufacturers could not have avoided sourcing their Doorskins from Defendants, since 1) other types of molded door facings, such as "post molded" door skins, are not suitable substitutes for Doorskins, and 2) foreign Doorskin suppliers did not have the design variety or quality required for the U.S.[186] Without an alternative supply of Doorksins, Defendants could discipline the market by constraining independent IMD manufacturers' ability to compete on prices.

83.    An analyst report characterized the door industry as difficult for foreign competition: "[w]e would also point out that the door industry has been difficult for foreign competition with lower product quality, greater difficulty in sourcing raw materials, higher cost supply chains, longer lead times, as well as several practical issues (i.e., ability to resolve problems after installation etc)."[187] A 2011 memorandum by Onex similarly stated:

> Door manufacturing is predominantly a domestic industry and insulated from low cost imports due in large part to considerations related to the manufacture of composite molded door facings. The manufacture of molded facings is highly automated requiring minimal labor and mitigating the primary cost advantage of Asian manufacturers. Molded facing plants must be located near an ample supply of wood chips, which are difficult to transport, typically situated in the interior of

---

[185] Robert C. Marshall and Leslie M. Marx, *The Economics of Collusion: Cartels and Bidding Rings*. Cambridge, MA: MIT Press, 2012 (hereafter "Marshall and Marx"), at pp. 149-150.
[186] Sam Steves Trial Testimony at 393:18-399:2.
[187] MAS-0000001615-640 at 623.

43

HIGHLY CONFIDENTIAL

JW-SEC-01102795

**HIGHLY CONFIDENTIAL**

China (and other countries) and generally required for domestic consumption rather than for export through a finished molded door product.[188]

84.    A Northcoast research analyst report highlighted that while imports could theoretically be a "threat," foreign manufacturers do not offer the Doorskin variety required in the U.S. market:

> Foreign manufacturers lack the breadth of die plates that Masonite and Jeld-Wen possess which makes it difficult for foreign companies to adequately supply the U.S. market. Additionally, the cost positions of foreign firms are not as favorable as the facilities tend to be substantially smaller therefore lacking adequate scale to economically compete (i.e. Masonite and Jeld-Wen collectively own 8 of the largest 9 facings plants worldwide) and the manufacturing process if [sic] largely automated so emerging economies which typically have favorable labor rates are less beneficial.[189]

85.    A J.P. Morgan analyst report on Jeld-Wen discussed the variety of reasons why import competition was limited:

> We note that transportation and distribution expense is cost prohibitive in many instances for foreign producers given the size of the product and necessary lead times, with limited labor savings to offset this expense. Specifically, despite numerous plants spread across its footprint, we estimate distribution and transportation costs represent roughly 8% of JELD's net sales. A company importing product would incur additional shipping and logistics costs which we believe would result in total distribution and transportation costs significantly higher than JELD's, as direct labor savings would be minimal given that a significant portion of the manufacturing process is already automated. Moreover, we note that JELD has invested significant capital in its skins plants and die plates to be able to deliver a full spectrum of products to customers; we note foreign skins plants produce mostly traditional, lower margin six panel doors that have been losing share in the industry over the last five years.[190]

86.    Further, in a Masonite presentation at a Wells Fargo Conference, Masonite's former CFO highlighted that foreign Doorskin manufacturers also have quality issues:

> I think the biggest question is, "Could anyone else enter into that space?" And I think the answer to that is, "Not easily." It would take multiple years for them to get down that path and if you look at us and our principal competitor, on a global basis, we drive a vast majority of the capacity that exists. We have about 80 million pieces of capacity globally. As best we can ascertain, our competitor, our primary competitor, has about the same. And then there's probably 45 million, 50 million pieces of capacity spread out throughout the rest of the entire world. And these tend to be at smaller, subscale facilities that just don't have that good a quality. It would be very difficult to ship those vast distances without having

---

[188] Reproduction-ThirdParty-0005364- 378 at 370.
[189] JELD-WEN-00744137-166 at 149.
[190] J.P. Morgan Jeld-Wen Report at p. 13.

HIGHLY CONFIDENTIAL

JW-SEC-01102796

HIGHLY CONFIDENTIAL

warping issues and other things that go along with shipping those types of products over oceans and things, unless you really have been in that business and know how to do it, as we do.[191]

87.     Sam Steves, President of Steves and Sons, testified at trial in the *Steves* case about the lack of suitable substitutes for Defendant-produced Doorskins. Notably, Mr. Steves testified that he had no choice but to buy Doorskins from Jeld-Wen because there was "no one else to buy molded door skins [from]."[192] Sam's brother Edward Steves, CEO of Steves and Sons, testified at trial that it investigated purchasing from approximately ten to fifteen foreign Doorskin manufacturers, but none was able to meet its product needs because, among other reasons, the foreign manufacturers only sold 20 of the 477 different Doorskin designs required by Steves & Sons' customers.[193] Sam Steves also testified that the designs offered by the foreign Doorskin manufacturers did not satisfy their customers' needs, and added that 25 of Steves and Sons' customers did not purchase any of those 20 designs.[194] Mr. Steves explained that it "tested extensively" two of the foreign Doorskin manufacturers products and experienced quality problems, while another foreign manufacturer's Doorskins contained formaldehyde, making them illegal to sell in the U.S.[195] Mr. Steves further testified that "post-form" or "post molded" Doorskins are not legal to purchase in the U.S,[196] but even if they were, Masonite held patents on "post molded" Doorskins and intended to enforce those patents if foreign manufacturers attempted to import them into the U.S.[197] Edward Steves added that Asian Doorskin manufacturers "don't have any of the right styles and have issues with them," and that the European Doorskin manufacturers have quality issues.[198]

---

[191] Hachigian May 16 (*Steves*) Deposition, discussing *Steves* Exhibit 124 at pp. 12-13.

[192] United States District Court for the Eastern District of Virginia, *Steves and Sons, Inc. v. Jeld-Wen, Inc.*, 3:16-cv-00545-REP, Doc. 1028, 2/21/2018, Trial testimony of Sam Bell Steves, II ("Sam Steves Trial Testimony") at 8:6-10.

[193] United States District Court for the Eastern District of Virginia, *Steves and Sons, Inc. v. Jeld-Wen, Inc.*, 3:16-cv-00545-REP, Doc. 1028, 2/21/2018, Trial testimony of Edward Steves ("Edward Steves Trial Testimony") at 692:19-702:17.

[194] Sam Steves Trial Testimony at 395:21-396:8.

[195] Sam Steves Trial Testimony at 396:9-397:25.

[196] Sam Steves Trial Testimony at 444:5-18.

[197] MAS-0000001510-11 at 10; Merrill (*Steves*) Deposition at 85:1-85:10.

[198] Edward Steves Trial Testimony at 694:18-695:12.

HIGHLY CONFIDENTIAL

JW-SEC-01102797

HIGHLY CONFIDENTIAL

b. There are no economic substitutes for IMDs

88.    Record evidence also demonstrates that there are no economic substitutes for IMDs. For instance, Mark Erceg, Masonite's former CFO and EVP, summarized the recent success in 2014 in obtaining price increases: "that there aren't really a lot of substitutes for door, door-related products and that we should be able to command much better pricing going forward."[199]

89.    One factor which contributes to the lack of substitutes for IMDs manufactured in North America is the high cost to transport them. A Jeld-Wen presentation states that imports of IMDs are not financially viable: "U.S. doors and windows are primarily manufactured domestically and foreign imports are rare because the finished products are generally large and bulky ... and shipping them is expensive."[200] In a Masonite Q&A, those figures were more clearly explained: "~800 doors fit in a sea container and it costs ~$4,500 to ship a sea container from Asia. This adds >$5 per door."[201] For context, the average IMD sold by Defendants during the Cartel Period cost approximately $30. The incremental cost of shipping IMDs makes foreign-produced IMDs unviable.

90.    Economists regard two products as economic substitutes if a nominal change in price for one product results in increased demand for the other product.[202] In this case, the significant price differential between IMDs and stile and rail doors make them unsuitable substitutes. For example, the most popular IMD is a six-panel textured hollow core slab. One price comparison document prepared by Home Depot shows that the invoice price for those IMDs paid to Masonite ranged from $21.35 to $21.73 and that those doors sold at retail for a price between $30.72 to $32.[203] By contrast, a six-panel stile and rail door made from pine purchased from Masonite in 2016 cost between $69.10 and $70.48 and retailed for $109.[204] Both in terms of cost and sales price, the stile and rail door cost over 3 times the amount of the IMD. That IMDs and

---

[199] Hachigian May 16 (*Steves*) Deposition Exhibit 124 at slide 5.
[200] JELD-WEN-00624276-4498 at 4310.
[201] MAS-0000001641-81 at 63.
[202] Robert Pindyck and Daniel Rubinfeld, *Microeconomics*. Eighth Edition, Upper Saddle River, N.J.: Pearson Prentice Hall, 2013 (hereafter "Pindyck and Rubinfeld") at pp. 24-25. Five percent is the number commonly adopted by the U.S. Department of Justice and the Federal Trade Commission when evaluating the competitive effects of mergers. See U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010 at § 4.1.2.
[203] JELD-WEN-0749330, "Cost Comparison" sheet.
[204] *Ibid.*

46

HIGHLY CONFIDENTIAL

stile and rail doors are priced so differently demonstrates that stile and rail doors are not economic substitutes for IMDs.

91.      In Section II, I discussed the aesthetic differences between IMDs and flush doors. Indeed, because flush doors are flat in design, they are not suitable for the same types of projects that require IMDs or stile and rail doors. Flush doors are generally cheaper than IMDs, costing on average $19 for the top selling flush door compared to $23.50 for the top selling IMD, so the preference between one type of door and the other is due to functional and/or aesthetic differences, rather than price. That flush doors and IMDs are not substitute products was further confirmed by Sam Steves' trial testimony:

> Q. You mentioned on Monday something called a flush doorskin. Why couldn't you just shift to flushed door skins instead of molded door skins?
>
> A. Well, we're supplying to our customers what they are ordering from us. And in their particular case, they are supplying downstream to their customers the very same product. So flushed doors are not an alternative for molded doors.[205]

92.      The common evidence discussed above demonstrates that there are no available economic substitutes for either IMDs or Doorskins. The lack of economic substitutes for Doorskins limits the ability of independent IMD manufacturers to compete on price with Defendants. It also establishes that Defendants make profits not only on their own sales of IMDs, but also on the independents' sales of IMDs. Moreover, the lack of economic substitutes for IMDs means that Class members would have found it difficult to avoid paying cartel-inflated IMD prices, because they would have been unable to substitute other types of interior doors.

### 5. IMD Prices had generally been flat or declining leading up to the start of the Cartel

93.      When prices in a market are flat or declining, the resulting low level of economic profits may make a cartel such as the one alleged here more likely to occur. In other words, cartels normally spring from lean times, as opposed to boom times. For example, a 1975 study found that "firms characterized by low profits and low rates of sales growth demonstrate a tendency towards collusive behavior."[206] Carlton and Perloff also find evidence that "suggests that cartels

---

[205] Sam Steves Trial Testimony at 384:10-17.
[206] Peter Asch and Joseph J. Seneca, "Characteristics of Collusive Firms," *Journal of Industrial Economics*, March 1975 at pp. 228, 230.

HIGHLY CONFIDENTIAL

JW-SEC-01102799

HIGHLY CONFIDENTIAL

tend to form in less profitable industries."[207] These characteristics describe the IMD industry, and Defendants in particular, in the period leading up to the start of the Cartel Period.

94.    Figure 10 below shows Jeld-Wen's IMD prices from the *Steves* transaction data (which goes back earlier than the transaction data produced in this case) from 2007 through the start of the Cartel. As Figure 10 below shows, Jeld-Wen's IMD prices had declined following the Great Recession and remained generally flat thereafter through year-end 2013. This is consistent with evidence in the form of deposition testimony and documents in the record confirming that Defendants experienced low prices and profitability leading up to the start of the Cartel. For example, Philip Orsino, Jeld-Wen's President and CEO form 2011 until March 2014, testified that "there had been downward pressure on pricing since 2006."[208] Likewise, Kirk Hachigian, who became Jeld-Wen President and CEO on April 1, 2014, testified that, as of 2014, "[t]he price of a door, upon some reflection, hadn't increased in over ten years, so the price of a door commercially was still below that of 2006."[209] Fred Lynch, Masonite's former President and CEO, similarly testified that prices were flat or declining from 2010 until 2014.[210]

---

[207] Carlton and Perloff at p. 151.
[208] Orsino Deposition at 50:22-51:6.
[209] Hachigian Deposition at 320:10-321:18.
[210] Lynch (*Steves*) Deposition at 26:7-26:16.

48

HIGHLY CONFIDENTIAL

JW-SEC-01102800

HIGHLY CONFIDENTIAL



Figure 10: Jeld-Wen's Gross Prices
(1/2007 - 3/2014)

—— Hollow Core Slab Price

Source: Jeld-Wen Steves transaction data.

95.     This period of flat prices coincides with unsuccessful, unilateral efforts by Defendants to raise prices prior to the beginning of the Cartel. For instance, beginning in late 2012 and through 2013, both Jeld-Wen and Masonite announced price increases.[211] Indeed, Jeld-Wen's former CEO, Philip Orsino, testified that "by 2013, with market conditions slightly improving, with rising costs of materials, rising costs of labor, and in other areas at JELD-WEN, we needed to have a pricing strategy that would include raising prices."[212] In April 2013, Mr. Orsino asked Bob Merrill, Jeld-Wen's EVP of Sales and Marketing, to focus on "[p]rice increases…"[213] Following that directive, Mr. Merrill emailed the sales and product leadership teams with an agenda for a sales meeting scheduled for May 1st through May 2nd, 2013.[214] The meeting agenda included several items related to improving pricing and profitability, such as "Identify product price actions we can take to improve our margins immediately," "Identify customer price actions

---

[211] Brosterhous Deposition Plaintiffs' Exhibits 191, 194 and 196; Repar Deposition Plaintiffs' Exhibits 154, 155 and 156.
[212] Orsino Deposition at 51:16-52:8.
[213] Orsino Deposition at 53:8-54:2.
[214] Brosterhous Deposition at 64:5-64:22.

HIGHLY CONFIDENTIAL

JW-SEC-01102801

HIGHLY CONFIDENTIAL

we can take to improve margins immediately," "Develop Sales and Marketing recommendations for upcoming general price increases," and "Identify issues related to the administration of pricing and develop action plans to rectify the issues."[215]

96.    The economic evidence demonstrates that those price increase announcements had mixed to modest success in the marketplace. In May 2013, Jeld-Wen's Philip Orsino and Matt Maughon communicated about Masonite's success in gaining some retail business due to its aggressive pricing strategy.[216] In August 2013, after both Jeld-Wen and Masonite had announced 4 and 5 percent price increases, respectively, American Building Supply's ("ABS") Mark Ballantyne communicated to Mr. Orsino that Masonite's prices had been "going down, not up."[217] In October 2013, Bill Holt, a VP of Sales at Jeld-Wen, emailed Mr. Orsino field intelligence showing that ABS, a Jeld-Wen customer, had been losing sales to Huttig, a Masonite customer, because "Huttig have been selling at ridiculously low numbers and picking up larger projects that ABS was accustomed to getting. They said our last price increase was a killer to them and have seen a drop off in business due to that. Masonite has rescinded theirs yet again (I've heard two stories...waiting until Nov. 1st and also heard they just wanted JELD-WEN to increase again and they aren't going up at all)."[218] Mr. Orsino reacted to that information by asking his sales executives to "get on the phone with each other and get sales back up."[219] Later in November 2013, Mr. Holt emailed Mr. Orsino to let him know that ABS "believes that we are pushing another increase into the market when the last increase was not taken by Huttig and other Masonite customers. Mark believes that the Feb. 3rd increase is actually a rollover from the last Masonite increase. Mark said he is loosing [sic] business as a result of their price and to expect a 10% or more drop in ABS business for 2014."[220]

97.    *Ex post* analyses by Jeld-Wen of its performance also demonstrate that competition resulted in the lack of meaningful price gains. In a 2014 presentation summarizing 2013

[215] Brosterhous Deposition Plaintiffs' Exhibit 193 at JELD-WEN-00925895.

[216] See Orsino Deposition at 57:20-58:6 ("Q. You wrote, "Matt, one thing we need to think about is that Masonite will continue to try and buy business until they get their sales up." What did you mean when you wrote that to Mr. Maughon on May 10 of 2013? A. . . . We had taken market share from Masonite at JELD-WEN, and I'm making a point here that they will continue to reduce prices in order to get their sales up."); See also Orsino Deposition Exhibit 394 at JELD-WEN-004 06694.

[217] Orsino Deposition Plaintiffs' Exhibit 395 at JELD-WEN -00402916.

[218] Orsino Deposition Plaintiffs' Exhibit 396 at JELD-WEN -00702918.

[219] Ibid at JELD-WEN-00702917.

[220] Orsino Deposition Plaintiffs' Exhibit 397 at JELD- WEN -00374708.

HIGHLY CONFIDENTIAL

JW-SEC-01102802

HIGHLY CONFIDENTIAL

performance, Jeld-Wen discussed the pricing situation in 2013, stating that "[w]e were anticipating a more favorable market environment for pricing improvement in the 1st three quarters of the year. The reality was continued downward pressure led primarily by Masonite."[221] The notes to a presentation by Brooks Mallard, who joined Jeld-Wen as EVP and CFO in 2014, highlight the "low point in 2013, where we grew sales but actually shrank EBITDA." In the presentation, Mr. Mallard cites 1) "pricing concessions on existing business" and 2) taking on "new business at lower pricing" as two of the main reasons Jeld-Wen struggled.[222]

98.    This inability to meaningfully raise prices constituted motivation by Defendants to form the Cartel in order to implement the price increases observed in the Cartel Period.[223]

### 6. There are many direct customers

99.    Economic theory holds that when there are many direct buyers for a product, the market is more susceptible to collusion like that alleged in this case.[224] In a typical cartel, when prices are artificially inflated, cartel members have an incentive to increase their sales by unilaterally cutting prices (i.e., cheating on the cartel). However, those incentives are lower when there are many smaller customers as opposed to a handful of larger customers, because with smaller customers, each potential new customer that could be gained by undercutting the cartel is relatively small, compared to the loss of cartel-inflated profits on the sales to the entire market if the cartel fails. As a result, with many small customers, the costs of disrupting a cartel, and the resulting decline in profits as a lower price is applied to all purchases, are large relative to the value of gaining an additional (relatively small) customer. Thus, when there are many smaller buyers, a cartel member has less incentive to cheat.

100.    The evidence I have reviewed establishes that Defendants maintained a large and varied customer base for IMDs. I previously discussed how Defendants both sold to one- and two-step distributors as well as retailers. In a presentation, Jeld-Wen estimates that it has thousands of

---

[221] JELD-WEN-00379134 at slide 8.
[222] JELD-WEN-00202722 at slide 8.
[223] Hachigian Deposition Plaintiffs' Exhibit 376 (May 22, 2015 email from Jeld-Wen Sales VP to CEO Kirk Hachigian): "It's important they see this, not to blow too much smoke, but this is a drastic difference in the price increases you have driven versus most increases in the past."
[224] Posner at p. 75.

51

HIGHLY CONFIDENTIAL

JW-SEC-01102803

HIGHLY CONFIDENTIAL

distributor customers in addition to a handful of retailers.[225] A 2015 Masonite Annual Report similarly establishes that Masonite had more than 8,000 customers worldwide, with approximately 78 percent of sales occurring in North America.[226] Furthermore, Defendants' own transactional data establishes that Jeld-Wen and Masonite had over 450 direct purchasers during the Class Period.[227] Further, Defendants' transactional data shows that Class members are geographically distributed across the United States. (see Figure 11 below showing Jeld-Wen's and Masonite's sales by state).

---

[225] JELD-WEN-00917160.
[226] Reproduction-ThirdParty-0048742-43 at 42.
[227] This figure is after "parenting" customers, or combining purchases made by a single entity.

52

HIGHLY CONFIDENTIAL

JW-SEC-01102804

HIGHLY CONFIDENTIAL



Figure 11: Defendants' Sales by State
(10/2012 - 12/2018)

Percentage of Total IMDs Sold

Jeld-Wen    Masonite

Source: Defendants' transaction data.

101.    Based on my analysis of the IMD market, relevant economic literature, and my training and experience in economics, I have concluded that the large number of IMD customers would

53

HIGHLY CONFIDENTIAL

JW-SEC-01102805

HIGHLY CONFIDENTIAL

have made it easier to form and maintain the Cartel, as it would have made undercutting a competitors' prices to win business less likely. The potential loss of supra-competitive profits on *all* sales of IMDs would have outweighed the potential profits from additional sales to a handful of small or modestly-sized new customers.

### 7. Defendants had opportunities to engage in collusive communications

102.    Class-wide evidence demonstrates the numerous opportunities that Defendants had to collude (including opportunities to help monitor and implement the Cartel) including: (1) direct contacts between Defendants' high ranking executives; (2) the joint attendance of Defendants' high-level executives at multiple trade associations, industry meetings and other events; and (3) the inter-supplier relationships fostered by former Jeld-Wen and Masonite employees who now are employed at the other firm or at their customers. As I discuss below, in some cases, Defendants also received information from – or provided information to – industry analysts, which could have helped monitor and facilitate the operation of the Cartel.

#### a.    Direct contacts between Defendants' high-level executives

103.    I reviewed evidence demonstrating that certain high-level executives and officers of Defendants—including their respective CEOs and some Jeld-Wen board members—communicated throughout the Cartel Period. While there *may* be legitimate business reasons for competitors to communicate, economics teaches that such communications are likely to lead to anticompetitive outcomes in markets where collusion is relatively easy and there are incentives for firms to collude. I have discussed above the characteristics of the IMD market, including Defendants' control of the Doorskins supply, which make the IMD industry susceptible to collusion. These structural conditions make high-level communications of the sort that took place between Defendants more likely to have led to anticompetitive outcomes.

104.    I understand that Plaintiffs' Counsel have received phone call records, pursuant to subpoenas, for certain employees of Jeld-Wen, Onex, and Masonite. This call-log information shows that employees of Defendants, including its most senior executives, communicated throughout the Cartel Period. For instance, on March 4, 2014, Masonite's President and CEO Fred Lynch spoke with Anthony Munk, a Jeld-Wen director and Onex (Jeld-Wen's owner)

54

HIGHLY CONFIDENTIAL

JW-SEC-01102806

HIGHLY CONFIDENTIAL

executive, for 11 minutes.[228] I also understand from these call logs that Kirk Hachigian, who became Jeld-Wen's CEO in April 2014, called Masonite's Fred Lynch on March 13, 2014.[229] On or around March 19, 2014, the corresponding CEOs, Mr. Lynch and Mr. Hachigian spoke once again.[230] On March 27, 2014, Mr. Lynch called Mr. Hachigian and spoke for 13 to 14 minutes, and on March 28, 2014, Mr. Hachigian called Mr. Lynch and they spoke once again for almost 2 minutes.[231] These communications raise further concerns with respect to anticompetitive conduct because they occurred in the midst of efforts by Defendants to raise prices for IMDs and Doorskins.

105.    In the midst of these communications, Masonite's Fred Lynch circulated a document (which was prepared on March 21, 2014, just after the March 19 call and emails between CEOs Lynch and Hachigian) internally entitled "Reactions to JW Management Changes."[232] The second bullet point in the discussion agenda was titled "Start September/October price increase—Now!"[233] The agenda also included a discussion on facings that did not signal Masonite's intent to exit the Doorskins segment, as the first bullet point was titled, "Should we be more aggressive on pricing for facings"[234] Shortly thereafter, an April 2014 Masonite strategy document highlighted the "[s]trong belief that new leadership at JW will follow" a Masonite price increase announcement.[235]

106.    Call logs also show that Mr. Lynch and Mr. Hachigian spoke again on May 15, 2014,[236] the same day that Jeld-Wen held a pricing strategy meeting where its June 2014 IMD price increase announcement was discussed.[237] In addition, CEOs Lynch and Hachigian spoke once

---

[228] Lynch Deposition at 130:23-136:16; Ross Deposition Plaintiffs' Exhibit 289.
[229] Hachigian Deposition Plaintiff's Exhibit 362.
[230] JELD-WEN-00184142-43.
[231] Hachigian Deposition Plaintiff's Exhibit 362.
[232] MAS-0000005463-64.
[233] MAS-0000005463-64 at 64.
[234] MAS-0000005463-64 at 64.
[235] Hair Deposition Exhibit 223 at p. 61.
[236] Hachigian Deposition Plaintiff's Exhibit 366.
[237] JELD-WEN-00791395 ("Yesterday we held a pricing strategy meeting to discuss potential pricing actions for 2H 2014. In attendance were all members of the Ops, finance, sourcing, sales and product management teams, including Mark and Scott. Attached is the guideline I sent out in advance for the discussion as well as the meeting notes distilling the input from all involved. We had a good, open discussion and vetted all of the issues related to implementing the needed prices as soon as possible. In general, some of the sales VP's are still cautious due to the quality and service problems we had last year in vinyl, and are experiencing this year in interior doors. You will see at the end of the notes the distilled consensus of the team, which is to wait until July to announce the selected price

55

HIGHLY CONFIDENTIAL

JW-SEC-01102807

HIGHLY CONFIDENTIAL

again on October 14, 2014 for 17 minutes.[238] In addition, Mr. Lynch recalled yet another call with Mr. Hachigian, one that was not picked up in the subpoenaed phone records or in a produced email.[239] Nor did Mr. Lynch limit his contacts to fellow CEO Hachigian. Mr. Lynch also called Bob Merrill, Jeld-Wen's VP of Sales, three times in February 2017 and once in July 2017.[240]

107.    Economics teaches that in a commodity market (where competition is principally based on price) where there is excess capacity and low prices, competitors have strong incentives to act collectively to prevent price-based competition from eroding profits. In such an environment, communications between firms, especially between decision-makers (executives) and senior management, increase the likelihood that discussions of price, output or profitability could lead to eroded competition.

108.    Approximately one year after their initial phone calls, Messrs. Lynch and Hachigian emailed each other again on May 21-22, 2015. As part of that email conversation, both executives communicated about continuing discussions through their corporate development and finance executives.[241] These two executives, Chris Virostek (Masonite's SVP of Corporate Development) and John Linker (Jeld-Wen's EVP and CFO), maintained consistent communications between 2015 and Virostek's departure from Masonite in early 2017. For example, an email exchange between Messrs. Linker and Virostek in August 2015 scheduled a "catch up" call.[242] In September 2015, Mr. Linker emailed certain senior Jeld-Wen executives to communicate his intention to reach out to his "counterpart at Masonite."[243] Also, a calendar log from John Linker's files shows that a call was scheduled for November 10, 2016 with "Chris

---

increases and make it effective in September. However, it is up to senior management to take the input and then make the call looking at the broader picture, the competitive landscape and our corporate needs.").

[238] Lynch Deposition at 191-195; Masonite's Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories, January 23, 2020, p. 5.

[239] Lynch Deposition at 193:14-195:5.

[240] Lynch Deposition at 203:4-206:10; Ex. 91.

[241] MAS-0000038761 (Masonite CEO Fred Lynch: "("I have encouraged Chris Virostek (our SVP of corporate development) to stay in touch with [Jeld-Wen executive] John Linker in the event something changes, as well as to interface on any potential current/future sourcing interactions."). I understand that at the time, John Linker was responsible for M&A activities at Jeld-Wen but has since been promoted to EVP and CFO. See Beck Deposition at 24:8-24:14.

[242] JELD-WEN-00758515-16.

[243] JELD-WEN-00877396-97 at 97.

56

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

from Masonite."[244] Months after the May 2015 call, Mr. Hachigian also texted Mr. Lynch on January 19, 2016.[245]

109.    Economics teaches that such direct communications between supposed competitors, particularly when the intent is to communicate strategic direction or financial performance, are rife with the potential for anticompetitive conduct. Such communication is in contrast to purely technical discussions which might concern industry standard setting, for example. To the extent that executives of the two firms shared sensitive, confidential business information concerning prices, production, financial performance, capacity or strategic plans, such communication would not be in each firm's unilateral economic self-interest absent an agreement between the firms to act collectively with respect to pricing and output decisions, *i.e.* absent an agreement to collude. This is so because in an environment free of collusive agreement, each firm could use information about the other's pricing or output decisions, or strategic plans regarding capacity or other variables to that firm's strategic advantage in the market. That is, knowing that the other firm planned, for example, to raise prices 5 percent would allow a firm to increase its prices by less (for example, 3 percent) to its competitive advantage.

110.    There is also evidence that communications between Jeld-Wen and Masonite occurred at various levels of the organization. Bob Merrill, Jeld-Wen's EVP of Sales, testified that he occasionally would exchange text messages with Dale Mayfield, Masonite's VP of Special Projects.[246] Record evidence shows that Mr. Merrill and Mr. Mayfield exchanged text messages in January 2016.[247] Further, on September 26, 2014, a 37-minute phone call was placed from Jeld-Wen's central number at its Charlotte headquarters to Mr. Mayfield.[248] In 2014, a Jeld-Wen

---

[244] JELD-WEN-00821247. See also JELD-WEN-00761219 (November 9, 2016 email from Chris Virostek to John Linker forwarded to Mark Beck (Jeld-Wen CEO) and others with the comment "Fyi ... periodic check in from my counterpart at Masonite."); JELD-WEN-00821242-43 at 42 (November 10, 2016 email from John Linker to Brian Cox, Stephen Sisson, and Lennie Rhodes where Mr. Linker mentions he talked to "Masonite guy" on that day.); Masonite's Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories, January 23, 2020 at pp. 5-7.
[245] Lynch Deposition at 201:17-202:13; Lynch Deposition Plaintiffs' Exhibit 312.
[246] Merrill Deposition at 177:8-10.
[247] Merrill Deposition Plaintiffs' Exhibit 87.
[248] Masonite was unable to identify the Jeld-Wen party that Mr. Mayfield spoke to. See Masonite's Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories, January 23, 2020 at pp. 4-5.

HIGHLY CONFIDENTIAL

JW-SEC-01102809

HIGHLY CONFIDENTIAL

analyst reported to Bob Merrill his discussions with a counterpart from Masonite regarding the challenges finding reliable data to measure market demand.[249]

111.    In contrast to the numerous, multi-level and on-going communications between Defendants during the Cartel Period, I reviewed evidence that CEO to CEO communications did not occur prior to the start of the Cartel Period and that Defendants rejected overtures to communicate. For instance, Fred Lynch, Masonite's former President and CEO, testified that he "avoided having conversations with Philip [Orsino]."[250] In addition, I reviewed a March 2011 email from Ron Saxton to Ron Wendt (Jeld-Wen's CEO until Onex's investment) in which Mr. Saxton relays interest from Masonite to meet to explore areas where the two entities could "legally cooperate" but noting that "I will assume we remain uninterest [sic] in such a meeting or conversation unless you tell me otherwise."[251] In another instance, immediately following the acquisition of CMI, Bob Merrill emailed Philip Orsino, then Jeld-Wen's CEO, on October 25, 2012 and mentioned that Fred Lynch, Masonite's CEO, "has tried to call me about the lawsuit."[252] Mr. Orsino replied: "Do not talk to Fred under any conditions."[253]

### b.    Trade associations and industry meetings

112.    Another way in which certain employees and executives of Defendants were able to facilitate coordination of market activities is through participation in trade association meetings. According to the Organization for Economic Co-operation and Development ("OECD") Competition Committee, "[p]articipation in trade associations' activities… may provide ample opportunities for competitors to meet regularly and to discuss business matters of common interest. Such meetings and discussions, even if meant to pursue legitimate association objectives, bring together direct competitors and provide them with regular opportunities for exchanges of views on the market, which could easily spill over into illegal coordination. Casual

---

[249] JELD-WEN-00368566-68 at 67 ("I talked to my counterpart from Masonite and they have the same challenges with getting good interior door demand. He said that the NAHB did some good work for him with non-residential demand. I reached out to the NAHB and they are supposed to get back with me today on what they already have and what they can get, for both doors and windows. I'll let you know what I find out.").

[250] Lynch Deposition at 122:21-122:25.

[251] JELD-WEN-01089635.

[252] Merrill Deposition at 78:16-79:15; Merrill Deposition Plaintiffs' Exhibit 43.

[253] Ibid.

HIGHLY CONFIDENTIAL                                JW-SEC-01102810

discussion of prices, quantities, and future business strategies can lead to agreements or informal understandings in clear violation of antitrust rules."[254] Additionally, according to Professor John Connor, author of the textbook "Global Price Fixing," "[i]ndustry trade associations are convenient for covering up conspiratorial meetings."[255]

113.    Record evidence shows that employees of both Defendants, including their respective senior executives, attended trade associations, meetings, and other events, which provided numerous opportunities for Defendants' employees to exchange information and ideas and therefore are consistent with allegations of collusion among Defendants. [Redacted - Third Party Confidentiality]

[Redacted - Third Party Confidentiality]

[Redacted - Third Party Confidentiality] [256] The show is the "largest annual light construction show in the world," bringing together "more than 1,400 top manufacturers and suppliers," and is typically held in January or February.[257] Jeld-Wen CEO Kirk Hachigian testified that he would attend the event "just about every year" during his time as CEO and in the first year or two after he became Chairman, including at least every year from 2014 to 2017.[258] When asked whether he saw Masonite employees at the IBS, he added "[o]ne year, I saw Fred [Lynch, Masonite CEO] in his booth and, again, I would assume people from Masonite came through our booth, but I can't remember specifically any conversations [with Fred Lynch]."[259] Mr. Lynch testified that he met Mr. Hachigian "in person" when "he walked into our booth at the International Builders' Show a couple of years ago to look at our products..."[260] Bob Merrill, Jeld-Wen's former EVP of Sales, testified that he had attended the event every year for 32 years, through his tenure at Masonite, CMI, and Jeld-Wen because, "It's a show – it's the biggest industry show. We attend to show our wares to the building community. It's a – the association is for builders, but vendors go there to show their wares to builders."[261] He also stated that Masonite would also typically attend the show, and that he had personally seen employees from

---

[254] OECD Report at p. 8.
[255] Connor at p. 67; See also Carlton and Perloff at pp. 135-136.
[256] Deposition of Christopher Virostek, December 20, 2020 (hereafter "Virostek Deposition") Plaintiffs' Exhibits-121 (NAHB-000001) and 122.
[257] National Association of Home Builders annual International Business Show, "About IBS," Accessed on January 25th, 2020. Available at: https://www.buildersshow.com/generic.aspx?sectionID=1695.
[258] Hachigian Deposition at 37:23-38:20.
[259] Hachigian Deposition at 38:20-39:11.
[260] Lynch Deposition 125:12-126:5.
[261] Merrill Deposition at 57:5-57:11.

HIGHLY CONFIDENTIAL

JW-SEC-01102811

HIGHLY CONFIDENTIAL

Masonite at the show.[262] Mr. Hachigian testified that Mr. Merrill was a member of "these different associations in his capacity as VP of sales and marketing," in response to a question about whether Jeld-Wen had any employees who served on IBS committees.[263] Mark Beck, who succeeded Mr. Hachigian as Jeld-Wen President and CEO, testified that he attended the show each year he was President and CEO because it provided an opportunity to meet with customers and showcase their products.[264] He also confirmed that he knew that Masonite had a booth at the same conference. Other attendees at the IBS show included Matthew Ross, Onex Managing Director and Jeld-Wen board member, who testified that "I recall meeting Fred [Lynch], as I said, at the International Builders Show, it would have been twice, because I go every year...."[265] Larry Repar, Masonite EVP and COO, testified that he "bumped into" Matthew Ross of Onex at an IBS show as part of his regular attendance at the show.[266]

114.    A 2014 Masonite meeting schedule confirms that Fred Lynch (CEO), Larry Repar (EVP and COO), Mark Erceg (EVP and CFO), and John Beeken (VP of Sales) all attended the IBS conference that year, held from February 4th to 6th, with their first meetings the night before the show on February 3rd.[267] The same group attended the IBS trade show in 2013.[268] Mr. Lynch and Mr. Beeken, along with other executives, also attended the conferences in 2016, 2017 and 2018.[269] Jeld-Wen similarly had high-level executives attend the show regularly. For example, Larry Repar testified that he and Fred Lynch were introduced to incoming Jeld-Wen CEO Kirk Hachigian by outgoing CEO Philip Orsino at the February 2014 IBS show.[270] In addition to Mr. Hachigian, Jeld-Wen's 2014 list of attendees to the IBS show included Bob Merrill, Mike Hill (VP of Sales), and Chris Mercier (Regional VP of Sales).[271] In 2016, Kirk Hachigian (Chairman and former President and CEO), Mark Beck, then CEO, Bob Merrill and John Linker (SVP,

[262] Merrill Deposition at 58:2-59:6.
[263] Hachigian Deposition at 41:10-41:15.
[264] Beck Deposition at 46:7-47:6.
[265] Ross Deposition at 19:12-19:23, 23:25-24:14, 181:6-182:2. Mr. Ross is currently Chairman of Jeld-Wen's board of directors. Ibid. at 24:15-21.
[266] Repar Deposition at 74:4-74:9, 82:17-84:7.
[267] MAS-0000496741.
[268] MAS-0000494053.
[269] MAS-0000489478; MAS-0000492480-MAS-000049248585; MAS-0000047795.
[270] Repar Deposition at 23:25-25:6, 80:12-82:5.
[271] JELD-WEN-01013748; JELD-WEN-00776777; JELD-WEN-00240119-120 at 119.

HIGHLY CONFIDENTIAL    JW-SEC-01102812

HIGHLY CONFIDENTIAL

Treasury and Corporate Development) all attended.[272] In 2018, the list of attendees included Mark Beck (CEO), Brooks Mallard (EVP and CFO), and John Linker.[273]

115.    Many of these executives also met at foundation events. For example, James ("Tony") Hair, VP and business leader of North American residential at Masonite, testified that he also met Kirk Hachigian in 2014 at an event for the Home Depot Foundation, in which Mr. Hachigian introduced himself to Mr. Hair.[274] Masonite President and CEO Fred Lynch testified that he met Jeld-Wen President and CEO Mark Beck at a dinner for The Home Depot Foundation.[275] Mr. Lynch also testified that he saw Mr. Beck at "a group called the Public Advisory Board for the Joint Center for Housing Studies," which meets twice per year, once in Washington and once at Harvard, and includes 80 to 100 CEOs., and that he saw Mr. Hachigian at Harvard at the same meeting.[276]

116.    Record evidence also shows that Defendants' executives attended other events. Jeld-Wen CEO Mark Beck testified that he met Masonite CEO Fred Lynch at a dinner hosted by Builders Materials Holding Corporation ("BMC") at their annual BMC Show.[277] Messrs. Beck and Lynch sat at the same table at both this dinner meeting and another.[278] Similarly, Messrs. Linker and Virostek sat next to each other at a dinner hosted by Wells Fargo during the 2015 IBS.[279] Bob Merrill testified that he sometimes attended the Pacific Coast Builders Conference, and that Masonite would typically attend the event as well.[280] Mr. Merrill also testified that Jeld-Wen representatives attend the Wood Millwork Alliance (formerly the Association of Millwork Distributors) meeting, which Mr. Merrill also used to attend as CEO of CML.[281] Mr. Hachigian also testified that he would attend the Association of Millwork Distributors (AMD) event, saying "yes, we would have a booth and display product and I would attend, see customers, yes."[282] Jeld-Wen Regional VP Chris Mercier testified that he would attend the AMD event on an annual

[272] JELD-WEN-00924956.
[273] JELD-WEN-00664934; JELD-WEN-00472137 at slide 3; JELD-WEN-00210242.
[274] Hair Deposition at 92:11-93:13.
[275] Lynch Deposition at 124:10-124:21.
[276] Lynch Deposition at 124:22-126:5.
[277] Beck Deposition at 50:12-52:18; Beck Deposition at 100:21-101:12.
[278] Beck Deposition at 52:21-54:13.
[279] Deposition of John Linker, January 9, 2020 (hereafter "Linker Deposition") at 49:24-51:24; Virostek Deposition at 56:22-59:2.
[280] Merrill Deposition at 59:24-60:9.
[281] Merrill Deposition 60:10-60:25.
[282] Hachigian Deposition at 36:24-37:10.

HIGHLY CONFIDENTIAL            JW-SEC-01102813

HIGHLY CONFIDENTIAL

basis and that at AMD and IBS he would sometimes say hello to competitors because "a lot of us know each other."[283]

117.

**Redacted - Third Party Confidentiality**

**Redacted - Third Party Confidentiality**

**Redacted - Third Party Confidentiality** [284]

118.    The WDMA holds several events throughout the year that are attended by employees of both companies, including high-level executives. One of the annual conferences is an executive management conference "for industry CEOs and senior executives."[285] Redacted - Third Party Confidentiality

**Redacted - Third Party Confidentiality**

Redacted - Third Party Confidentiality [286]

119.    The WDMA also hosts an annual Spring Meeting & Legislative Conference, which Defendants' executives frequently attend.[287] In 2017, for example, three Jeld-Wen executives including Jeld-Wen's EVP of Sales Bob Merrill attended the event, and Bob Lewis of Masonite was included in an email with Mr. Merrill from a WDMA employee urging them to register and attend the event.[288] **Redacted - Third Party Confidentiality**

---

[283] Mercier Deposition at 30:17-30:19, 216:6-218:5.

[284] Window and Door Manufacturers Association, "Board of Directors," Accessed December 31st, 2019. Available at: https://www.wdma.com/page/BoardofDirectors; Masonite, "Robert E. Lewis," Accessed December 31st, 2019. Available at: https://investor.masonite.com/Investors/Corporate-Governance/Board-of-Directors/Person-Details/default.aspx?ItemId=9b8ae83a-a6c8-46b6-a3fa-e839eccce343; WDMA0000053-56 at 56.

[285] Window and Door Manufacturers Association, "WDMA Executive Management Conference," accessed on December 31st, 2019. Available at: https://www.wdma.com/m/event_details.asp?id=1171339.

[286] WDMA00000611-623 at 614.

[287] Window and Door Manufacturers Association, "2019 Spring Meeting and Legislative Conference," accessed on December 31st, 2019. Available at: http://www.leg-con.org/Home/tabid/36/Default.aspx.

[288] JELD-WEN-00672128; JELD-WEN-00678548.

HIGHLY CONFIDENTIAL

JW-SEC-01102814

HIGHLY CONFIDENTIAL

Redacted - Third Party Confidentiality [289]

Redacted - Third Party Confidentiality [290] Another annual

event, the Technical and Manufacturing Conference, takes place each summer and has counted

participation from both companies.[291] For instance, in 2016, the chair of the board of directors of

the WDMA sent an email to several people, including both Bob Lewis and Bob Merrill, thanking

them for their help in making the conference a success.[292] Redacted - Third Party Confidentiality

# Redacted - Third Party Confidentiality

Redacted - Third Party Confidentiality [293] Redacted - Third Party Confidentiality

# Redacted - Third Party Confidentiality

Redacted - Third Party Confidentiality [294] WDMA has also hosted events such as a Winter Conference and

hosts annual winter and summer committee meetings.[295]

c. Employees of Jeld-Wen and Masonite have switched firms

120. Another factor facilitating communication and coordination amongst Defendants is that

employees moved between the two companies, including high level executives. For instance,

Philip Orsino, Jeld-Wen President and CEO between 2011 and 2014, was the CEO of Masonite

until 2005.[296] Bob Merrill worked at Masonite (and Premdor) from 1997 until he became CEO of

CMI in 2002, when Masonite had to divest of its Towanda facility.[297] Following Jeld-Wen's

acquisition of CMI, Mr. Merrill became EVP of Sales and Marketing, and then in 2015, the EVP

---

[289] WDMA0000063-65.

[290] WDMA0000057-58; WDMA0000019.

[291] Window and Door Manufacturers Association, "WDMA Technical & Manufacturing Conference," accessed on December 31st, 2019. Available at: https://www.wdma.com/page/ConfHome.

[292] JELD-WEN-00681552.

[293] WDMA0000110-19 at 14-17; JELD-WEN-00674423-28.

[294] WDMA0000417-18; WDMA0000419-20; WDMA0000421-22; WDMA0000151-53 at 51.

[295] Window and Door Manufacturers Association, "Community Calendar," accessed on December 31st, 2019. Available at: https://www.wdma.com/events/event_list.asp?show=past&group=&start=&end=&view=&DGPCrSrt=&DGPCrPg=2.

[296] Canada's Outstanding CEO of the Year, "2003 Canada's Outstanding CEO of the Year award recipient," Accessed on January 3rd, 2020. Available at: https://ceoaward.ca/philiporsinobio; Window + Door, "Orsino Joins Jeld-Wen," August 19th, 2011. Available at: https://windowanddoor.com/news-item/people/orsino-joins-jeld-wen; Toronto General & Western Hospital Foundation, "Philip Orsino," Accessed on January 3rd, 2020. Available at: https://tgwhf.ca/about-us/our-board-of-directors/philip-orsino/.

[297] Merrill Deposition at 15:19-17:3, 17:18-22:7.

HIGHLY CONFIDENTIAL

JW-SEC-01102815

HIGHLY CONFIDENTIAL

of Sales.[298] Steve Fancher also worked at Masonite from 1996 until 2003, then worked at CMI until Jeld-Wen acquired it and then moved on to Jeld-Wen were he became the VP of international components.[299] In an internal Jeld-Wen email, Chris Mercier (Regional VP of Sales at Jeld-Wen) references his time at Masonite, confirming that he joined Jeld-Wen after earlier working for their competitor.[300] Matt Maughon worked for Jeld-Wen as a VP of Sales after playing an important role at Masonite; Philip Orsino once asked Maughon to emphasize to a Jeld-Wen director in 2013 "how long we have worked together and how we built Masonite."[301] Jeld-Wen's VP of Doorskin Manufacturing, Bruce Fedio, and VP of Door Manufacturing, Matt Hood, also worked at Masonite before coming to Jeld-Wen.[302]

121.    The evidence discussed above demonstrates that not only did Defendants have ample opportunities to discuss a collusive agreement at conferences and trade shows, but that certain Defendants' employees, including each Defendant's then-CEO, communicated with each other. As I discuss in more detail below, to the extent that Defendants' executives and employees discussed confidential business information, such communication among would-be business rivals is consistent with the operation of the Cartel and inconsistent to each firm acting in its unilateral economic self-interest absent an agreement.

122.    As I discussed above, the structural characteristics of the IMD (and Doorskins) market made it susceptible to the Cartel. These characteristics include Defendants' market dominance; the presence of high barriers to entry; the commodity-like nature of IMDs sold by Defendants; the general flatness in prices in the period leading up to the start of the Cartel despite modest growth in demand; the existence of many buyers in the market; and the many opportunities Defendants had to engage in collusive communications. Based on my research in the market for IMDs, my review and analysis of documents produced in this litigation and in the *Steves* litigation, the relevant economic literature, and my training and experience in economics, I have concluded that, taken together, the structural characteristics constitute economic evidence that is consistent with the existence of the Cartel. All of the evidence and analysis needed to reach this conclusion are common to the Class as a whole.

---

[298] Merrill Deposition at 35:3-38:19.
[299] Fancher (*Steves*) Deposition at 15:20-16:21.
[300] JELD-WEN-00319643-44 at 43; JELD-WEN-00289509.
[301] JELD-WEN-00422501. Per Orsino, Mr. Maughon worked with him at Masonite for 15 years. Orsino Deposition at 88:22-89:2.
[302] Merrill Deposition at 87:20-89:11.

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

**B. *Jeld-Wen and Masonite's conduct is inconsistent with each Defendant acting in its unilateral economic self-interest in the absence of the Cartel***

123.   Behavior or conduct that would be contrary to an individual firm's unilateral economic self-interest in the absence of an anticompetitive agreement such as the alleged Cartel is evidence supporting the existence of the cartel or anticompetitive agreement. That is, if firms' actions are not explained by their own economic self-interest, then those actions are indicative of collusion and inconsistent with unfettered competition. During the Cartel Period, many of Defendants' actions were inconsistent with each firm maximizing its profits individually in an environment free of collusive behavior. I discuss these actions that are contrary to economic self-interest below.

### 1. Defendants' direct high-level communications and surrounding events suggests they shared pricing information

124.   The record contains evidence, common to members of the proposed Class, showing that Defendants directly communicated with each other, and had ample additional opportunities to discuss market conditions and pricing. I previously discussed evidence that employees of Masonite and Jeld-Wen, including their top leadership, communicated and seemed to be aware of, at least on several occasions, each other's movements on price prior to those decisions being publicly announced. For example, phone records obtained by DPPs show calls between Defendants' CEOs beginning in March 2014. In the midst of these communications, Masonite's Fred Lynch circulated a document titled "Reactions to JW Management Changes."[303] The second bullet point in the discussion agenda was titled "Start September/October price increase— Now!"[304] Shortly thereafter, an April 2014 Masonite strategy document highlighted the "Strong belief that new leadership at JW will follow" a Masonite price increase announcement.[305] Messrs. Hachigian and Lynch also spoke on May 15, 2014, the same day as a Jeld-Wen pricing strategy meeting, where the June 2014 price increase announcement strategy, including the size of the increase, was discussed.[306]

---

[303] MAS-0000005463-64.
[304] MAS-0000005463-64 at 64.
[305] Hair Deposition Exhibit 223 at p. 61.
[306] Hachigian Deposition Plaintiffs' Exhibit 366; JELD-WEN-00791395.

HIGHLY CONFIDENTIAL

JW-SEC-01102817

HIGHLY CONFIDENTIAL

125.    Notes from an August 2014 meeting between Steves and Sons and Jeld-Wen contain the following: "Kirk [Hachigian, Jeld-Wen CEO] keeps saying he has helped industry by announcing 9.5% increase and complains how stupid Fred [Lynch, Masonite President and CEO] was to only go 8% - very uncomfortable as he brought this to our attention at Spurs game too! We did not engage other than to say their bottom line was bad!"[307] I understand that the aforementioned San Antonio Spurs game took place in June 2014 before the Masonite price increase was announced.[308] This is additional evidence of Jeld-Wen's communication of sensitive pricing and strategic planning information with a competitor.

126.    Another example of Defendants seemingly acting on pricing based on communications occurred on June 5th, 2014 -- a few days before Jeld-Wen announced its 9.5% price increase -- when Masonite was discussing how to communicate their upcoming price increases. As part of that discussion, Masonite's Malcom Bruce said, "I understand that we expect to see something from JW soon in the US?"[309]

127.    At other times, employees sent around proprietary documents from supposed competitors. For example, in December 2014, Jeld-Wen's Chris Mercier, who worked at Masonite from 2002 to 2009, sent to Jeld-Wen's Ray Tomazic a Masonite pricing file to use as a reference when determining "net machining charges."[310] Mr. Mercier also sent 2009 and 2010 Masonite rebate information to Bob Merrill and Tim Kirk in June 2014.[311]

128.    Although Defendants had numerous opportunities for direct communication, as detailed above, communications to and from analysts was another mechanism used by Defendants to disseminate information about price strategies and other market information, and obtain similar information provided by the other Defendant. For example, I previously highlighted Masonite's announcements that it would stop selling Doorskins to third parties. These announcements were disseminated via analyst calls and investor meetings, first at a Wells Fargo Conference on May

---

[307] STEVES-IMD-006932-933 at 932.
[308] Hachigian Deposition at 137:19-138:7.
[309] MAS-0000093476-477 at 477.
[310] JELD-WEN-00245278-281 at 278 ("I've attached some Masonite pricing that will help guide us as well. This was their standard program as of 2011... doubt much has changed. Thanks for taking the ball on this Ray ... much needed. Please keep this pricing confidential..."); Deposition of Christopher Mercier, January 16th, 2020 (hereafter "Mercier Deposition") at 22:9-10 ("Q. How long were you at Masonite? A. From 2002 till late 2009.").
[311] JELD-WEN-00959054-55.

66

HIGHLY CONFIDENTIAL

JW-SEC-01102818

HIGHLY CONFIDENTIAL

8, 2014 and then on an analyst call on June 25, 2014.[312] In other instances, Robert Merrill, Jeld-Wen's EVP of Sales, expressed pleasant surprise at how much information Masonite provided in a 2015 Masonite Investor Day Presentation: "I cannot believe how much information they are sharing at this level, and in how much detail. Revealing far too much," and also, "A lot of their initiatives and strategies mirror ours, they are just 2 -3 years ahead of us."[313] In its Q1 2014 Earnings Conference call on May 7, 2014, Fred Lynch made numerous statements concerning Masonite's pricing and sales, including a statement that "we plan to continue raising prices."[314] In a list of "key takeaways from the Masonite Q1 results call," Jeld-Wen's Derek Brosterhous wrote, "Outlook for remainder of the year is strong… Pricing "trends" improving (signal ?)…Fred Lynch "we still believe that there's room for us to continue to improve pricing in our products to capture fair value."[315] Mr. Brosterhous testified that Masonite's call signaled that "pricing trends are improving."[316] In another case, following a negative Masonite earnings, John Linker called the analyst who attributed Masonite's underperformance, in part, to "[s]ome pockets of competition" to deny the report.[317]

129.    Other examples include communications to analysts that encourage "price discipline." Jeld-Wen used this publicly disclosed information to glean insights about Masonite's pricing situation, and regularly monitored these disclosures. For example, in a June 2016 analyst report, FBR & Co. wrote, "Can Masonite continue to increase prices? We believe additional price increases are possible and probable given more rational competitors[.]"[318] After being sent this and another analyst report, Jeld-Wen CEO Beck wrote, "And they are saying they can continue to drive price in the market."[319] In his deposition, Beck confirmed his email was referring to *Masonite* saying "they" can continue to drive price in the market, and added that he took away from the report as a whole that "Okay, the -- the analysts think that there's still room in this market for additional price increase [sic]." He added, "I would read these -- these analyst reports

[312] Hachigian (*Steves*) Deposition Exhibit 124 at p. 8; JELD-WEN-00567167-183 at 172.

[313] Merrill Deposition Plaintiffs' Exhibit 65 at Bates JELD-WEN-01084341.

[314] Lynch Deposition Plaintiffs Exhibit 315 JELD-WEN-00710886, at JELD-WEN-00710891. See also Lynch Deposition at 233:22-242:16.

[315] Brosterhous Deposition Plaintiffs' Exhibit 197 at JELD-WEN-00697928-JELD-WEN-00697929.

[316] Brosterhous Deposition at 84:14-85:13.

[317] Linker Deposition Plaintiffs' Exhibit 115 at JELD-WEN-00820681.

[318] Beck Deposition Plaintiffs' Exhibit 102 at Bates JELD-WEN-00187099.

[319] Beck Deposition Plaintiffs' Exhibit 102 at Bates JELD-WEN-00187083.

HIGHLY CONFIDENTIAL

JW-SEC-01102819

HIGHLY CONFIDENTIAL

regularly, and if -- on occasion, you know, send them out to the team and say, "This is worth taking a look at."[320] Later in his deposition, when asked how he knew that Masonite CEO Fred Lynch was focused on profitable growth, he responded, "Because I read the analyst reports, and on occasion would listen on his earnings calls. I also had customers tell me that he was -- he was more focused on profit than just volume than perhaps in the past."[321]

2. **That Defendants' price increase announcements during the Cartel Period were larger and more effective than during the benchmark period is consistent with the Cartel and inconsistent with each firm acting in its unilateral self-interest absent an agreement**

130.    While economists recognize that public announcements of price increases are not necessarily anticompetitive, there are certain characteristics of collusive price increase announcements that distinguish them from competitive ones. Because pricing information is generally not publicly available in industrial markets such as the IMD market, public price increase announcements are intended to signal to the market the intent of the seller, and they also serve to mitigate buyer concerns that particular customers are being expressly targeted.[322]

131.    In contrast to innocuous justifications for price increase announcements, in markets with Cartel behavior, public price increase announcements may serve to signal to cartel members each member's compliance with an agreement to raise price and limit competition on the basis of price among cartel members. Further, coordinated price increase announcements by cartel participants serve to lower buyer resistance to higher prices, since market-wide price increases mean that a buyer's competitive position vis a vis other firms is likely not affected much by the price increase.[323] Here again, the public nature of the price increase announcements assures buyers that they are not being singled out and will not be disadvantaged if they accept the price increase. Moreover, when coordinated price increases are issued nearly simultaneously by multiple firms, the "joint" issuance of price increase announcements by more than one firm similarly signals to buyers that there are limited opportunities to avoid the price increases by switching purchases to a competitor. This is significant in an industry like IMDs, where

---

[320] Beck Deposition at 120:5-23.
[321] Beck Deposition at 171:9-171:15.
[322] Marshall and Marx at pp. 112-113.
[323] Marshall and Marx at pp. 114-115.

68

JW-SEC-01102820

HIGHLY CONFIDENTIAL

switching costs, especially for distributors, are not very high.[324] As Jeld-Wen's Bob Merrill testified, "[i]f we announce a price increase and no one else goes up, then more – a lot, most likely, we are not able to have our price increase accepted by our customers."[325] Taken together, these coordinated price increase announcements by multiple sellers in a market can be used to reduce buyer resistance to price increases, thereby boosting collusive profits. When price increase announcements come on the heels of communications among firms, especially among high-level executives, they are more likely to reflect the coordination of pricing strategy among cartel members and to reflect the result of communications about price, production, market share or other key strategic variables. To an economist, such price increase announcements are particularly suspicious. The price increase announcements by Defendants, beginning in June 2014 and following a series of high-level communications between company CEOs, are exactly the type of price increases that raise concerns.

132.    I have analyzed Defendants' very similar and at times nearly identical  price increase announcements and have determined that the magnitude and effectiveness are consistent with the operation of the Cartel. That there is a departure in practice and implementation of these price increases beginning after the high-level communications between Defendants, including CEOs and other senior executives in 2014, from the pattern of price increases observed prior to that date. As I discuss in detail below, during the Cartel Period, price increase announcements are larger in magnitude than prior increases, which is consistent and were with the existence of the Cartel. Moreover, when juxtaposed with the communications between firms and the change in firm policy with respect to discounting (the decision to focus on price rather than volume), these price increase announcements are further evidence of the Cartel.

133.    Table 2 below lists Defendants' price increase announcements by announcement date, effective date, and price increase amount (or range) for IMDs. In total, during the Cartel Period (from March 2014 through December 2018), each Defendant made seven or more price increase announcements that applied to IMDs. Those price increases were usually issued within a few days of each other, had effective dates usually within a few days of each other, and were of very

---

[324] Reproduction-ThirdParty-0090603-06 at 04 ("First, in the wholesale channel, it is relatively easy to switch suppliers.").
[325] Merrill Deposition at 130:5-130:14. See also Repar Deposition at 164-169, Exhibits 149, 150; Brosterhous Deposition at 101:1-21.

HIGHLY CONFIDENTIAL                    JW-SEC-01102821

HIGHLY CONFIDENTIAL

similar magnitudes (or ranges). I am aware of only one announcement that went into effect during the Cartel Period in which Jeld-Wen and Masonite were more than a week apart.

134.    I understand that Jeld-Wen's price increase announcements referenced in Table 2 applied to its "traditional" channel customers—i.e., distributors and wholesalers. I understand that retailers (Home Depot, Lowe's, Menard's) were on separate schedules.[326] For instance, a price increase announcement spreadsheet from Jeld-Wen tracked its price increases announcements issued from 2008 to 2018.[327] That file shows Home Depot receiving price increases on IMDs on February 3, 2014, on June 16, 2014, on January 1, 2015, on March 21, 2016, on March 3, 2017, and in April and June 2018. Lowe's also received price increases on February 2, 2015. I understand that Masonite issued separate price increase announcement letters to wholesalers and distributors and retail customers. In some cases, the announcements occurred at different times than the wholesale channel announcements.[328]

---

[326] Merrill Deposition at 237:8-238:7, 308:13-309:7, 322:4-11. I understand that Jeld-Wen communicated its price increases to retailers in meetings often referred to as "product line reviews." See JELD-WEN-00829689; JELD-WEN-00391821-22.

[327] JELD-WEN-01089703. The file appears to have been created on October 11, 2017 and "last printed" on April 23, 2018, so 2018 information appears to be incomplete.

[328] MAS-0000478959; MAS-0000013471-72.

HIGHLY CONFIDENTIAL                    JW-SEC-01102822

HIGHLY CONFIDENTIAL

### Table 2: Jeld-Wen and Masonite's IMD Price Increase Announcements

| Year | Announcement Date | | Effective Date | | Magnitude | |
|------|---------|----------|----------|----------|----------|----------|
| | Jeld-Wen | Masonite | Jeld-Wen | Masonite | Jeld-Wen | Masonite |
| 2012 | 11/15/2012 | 12/6/2012 | 2/4/2013 | 3/18/2013 | 4.00% | 5.00% |
| 2013 | 8/6/2013 | 8/12/2013 | 10/7/2013 | 9/30/2013 | 4.00% | 5.00% |
| 2013 | 11/18/2013 | 10/31/2013 | 1/27/2014 | 2/3/2014 | 5.00% | 5.00% |
| 2014 | 6/9/2014 | 6/17/2014 | 8/11/2014 | 8/18/2014 | 9.50% | 8.00% |
| 2014 | 12/3/2014 | 12/1/2014 | 3/2/2015 | 3/2/2015 | 5-6%* | 7.00% |
| 2015 | 10/26/2015 | 10/26/2015 | 2/1/2016 | 2/1/2016 | 3.00% | 3-5%* |
| 2016 | 10/18/2016 | 10/4/2016 | 1/3/2017 | 1/1/2017 | 5.00% | 5-7%* |
| 2017 | 9/7/2017 | 8/25/2017 | 11/6/2017 | 10/30/2017 | 5.00% | 5-7%* |
| 2018 | 3/6/2018 | 3/22/2018 | 5/7/2018 | 6/1/2018 | 6.00% | 6.00% |
| 2018 | 10/8/2018 | 9/17/2018 | 12/17/2018 | 12/15/2018 | 7.00% | 7.00% |

Sources: JELD-WEN-00982164, MAS-0000199849, JELD-WEN-00766119, MAS-0000037466, Jeld-Wen-01013953, MAS-0000166731, MAS-0000074199, MAS-0000115427, JELD-WEN-00310330, JELD-WEN-00926015, MAS-0000048895, MAS-0000026845, JELD-WEN-00391578, JELD-WEN-01051099, MAS-0000037896, JELD-WEN-00992532, JELD-WEN-00164103-04, JELD-WEN-00379041, JELD-WEN-00963213, JELD-WEN-00279545, JELD-WEN-00053269, MAS-0000116157, JELD-WEN-00221008, JELD-WEN-01057936, JELD-WEN-01026994, MAS-0000472297, JELD-WEN-00685048, JELD-WEN-01067234, JELD-WEN-00919341, MAS-0000005137, JELD-WEN-00849815, MAS-0000048014, MAS-0000099669.

*Letter provides a range of price increase levels.

135.    I reviewed evidence demonstrating that Defendants' price increase announcements issued prior to the Cartel Period were less frequent, whereas those that were issued during the Cartel period were more frequent, and larger. For example, in a 2011 Masonite price increase announcement letter, Masonite described price increases in the door industry as an uncommon practice, stating that "[a]n annual price increase is a common practice with many building products, yet has not been a normal practice within the door industry."[329] Record evidence also shows that Masonite attempted to implement a 1.75 percent IMD price increase effective on January 16, 2012 but withdrew it because other IMD manufacturers did not follow.[330]

136.    In addition to the increased frequency and very similar and at times nearly-identical magnitude of price increase announcements, both Masonite and Jeld-Wen began to issue larger price increases for IMDs starting in June 2014. For example, Bob Merrill, formerly Jeld-Wen's EVP of Sales and Marketing, testified that Jeld-Wen's 9.5 percent price increase that went into

[329] MAS-0000049088-89 at 88.
[330] STEVES-IMD-006768-778 at 768-771.

71

HIGHLY CONFIDENTIAL

JW-SEC-01102823

HIGHLY CONFIDENTIAL

effect in August 2014 had been the largest in his thirty-year career in the IMD industry.[331] Jeld-Wen's Kirk Hachigian similarly testified that he was not aware of any increases that were larger than the 9.5 percent price increase implemented by Jeld-Wen in August 2014.[332] Jeld-Wen's Matt Maughon likewise described the June 2014 price increase announcement as a significant break, noting that "this is the largest increase in door history ...."[333]

137.    Likewise, Masonite's 8 percent price increase was also significantly higher than their prior announcements (see Table 2 above). Internal Masonite documents show that the rationale for a lower price increase than Jeld-Wen's 9.5 percent increase was due to Masonite's sense that its prices were generally higher than Jeld-Wen's, with one executive stating in an email that "we are a few points higher than [Jeld-Wen]...."[334] Moreover, each Defendant followed those price increases with 5 - 7 percent increases on IMDs approximately six months later,[335] which also represented a significant departure from prior practice.

         a.  Defendants' price increase announcements cannot be explained by supply and demand conditions and otherwise exhibited characteristics found in collusive price increase announcements

138.    Defendants' price increase announcements during the Cartel Period are consistent with the operation of the Cartel and inconsistent with each Defendant acting in its unilateral self-interest. For example, deposition testimony and documents from Defendants indicate that unilateral price increases would not have been successful. Masonite's John Beeken testified that unilateral price increases could be problematic.[336] Mr. Beeken also testified that he could not recall an instance since 2013 where "Masonite's competitors increased prices of that product [IMDs] and Masonite did not similarly implement a price increase somewhere in the U.S. during the same time period"[337] Similarly, Jeld-Wen's Bob Merrill testified that "[i]f we announce a price increase and no one else goes up, then more – a lot, most likely, we are not able to have our

---

[331] Merrill Deposition at 137:19-138:8.
[332] Hachigian Deposition at 172:2-172:6.
[333] JELD-WEN-00576318-322.
[334] MAS-0000018747-49 at 47; MAS-0000093551-52 at 51.
[335] Merrill Deposition Plaintiffs' Exhibits 75 and 76.
[336] Deposition of John Beeken, December 10, 2019 (hereafter "Beeken Deposition") at 214:8-214:14 ("Q. If you are out there on an island with a price increase and the other competitors don't go, that's a problem for you, right? A. Yeah. It depends on segment and many things, but generally that's a fair assertation.").
[337] Beeken Deposition at 95:15-95:23.

HIGHLY CONFIDENTIAL

JW-SEC-01102824

HIGHLY CONFIDENTIAL

price increase accepted by our customers."[338] Kirk Hachigian, Jeld-Wen's former Chairman, President and CEO, similarly testified that Jeld-Wen's success in raising prices depended, in part, on its competitors following suit.[339] Indeed, I understand that Masonite issued a price increase announcement in late 2011 for flush and molded doors, with an intended effective date of January 16th, 2012. When none of Masonite's competitors announced their own price increases, Masonite withdrew its price increase.[140] In contrast to that failed increase attempt, Defendants' price increases during the Cartel Period were generally announced within days of each other, had effective dates within days of each other, and were of very similar magnitudes.

139.    Defendants' announced price increases cannot be explained by changes to supply and demand conditions in the IMD industry. Jeld-Wen's Kirk Hachigian testified that the intent of the price increases was to improve margins.[341] Bob Merrill similarly testified that "Kirk [Hachigian] made it very clear from the very beginning of his tenure, that the number one issue was to improve the profitability of Jeld-Wen across all products, across all customers, in all regions, North America that is the U.S. and Canada, Australia and Asia, and in Europe."[342]

140.    Defendants' customers perceived a disconnect between the IMD price increases Defendants were pushing and supply and demand conditions. For instance, in a January 2016 email, Dyke Industries' Bo McVay emailed Jeld-Wen's Mike Hill to push back on the implementation of a price increase: "I understand [Jeld-Wen] trying to push the market up hoping others will follow, but with material costs going down and transportation costs going

---

[338] Merrill Deposition at 130:5-130:14.

[339] Hachigian May 16 (*Steves*) Deposition at 128:8-128-11 (Q. Do you agree that the success of the increase hinged in part on the rest of the market following what JELD-WEN did with its prices? A. In part, yes."). See also Brosterhous Deposition at 101:1-21 ("I believe if you increase prices and nobody else does, that would be, yeah, difficult.").

[340] MAS-0000074199 (Masonite letter dated January 4, 2012 announcing it will withdraw its price increase); see also, MAS-0000154318 (meeting invite sent by John Beeken on December 19, 2011 to discuss price increases on January 4, 2012).

[341] Hachigian May 16 (*Steves*) Deposition at 74:12-75:8 (Q. And one of the important parts of your strategy in focusing on profits was to raise the price of doors, correct? A. So let me embellish on that. The price of a door, upon some reflection, hadn't increased in over ten years, so the price of a door commercially was still below that of 2006. Having come out of the worst housing recession in 75 years, the volumes in the industry were picking back up. When I went back and looked at wallboard and roofing and every other industry, they managed to recapture the pricing in the margins in those industries to make the businesses economically viable. We hadn't. So correct, I felt that a price increase or getting our pricing back to something even close to 2006 would be a reasonable goal. Q. So part of your strategy was to increase the price of doors, correct? A. Correct. That is correct.").

[342] Merrill Deposition at 121:10-22:7.

HIGHLY CONFIDENTIAL                                    JW-SEC-01102825

HIGHLY CONFIDENTIAL

down it is going to be suicide to try and pass this on right now."[343] Similarly, when Lowe's responded to a price increase request from Jeld-Wen by requesting a price decrease due to lower costs, Jeld-Wen's Bob Merrill responded internally to an email about that by saying that "[w]ow, that is not going to happen. He is missing the entire point of the issue with the pricing."[344] Mr. Merrill testified that the reason for the price increase was "both on increasing cost and our need to improve our profitability."[345]

141.   This disconnect between price increases and underlying market conditions was clearly summarized by Kirk Hachigian, Jeld-Wen's CEO. In response to Bob Merrill forwarding him an email from Stock Building Supply resisting the 9.5 percent price increase due to Jeld-Wen's quality problems, Mr. Hachigian replied that:

> The key here is to have the entire market follow- up....there will be no significant share shift. Anyone comes after us....[sic] we will fire back. Retail is way up....[sic] two step will go up (this helps there [sic] margins as well). The one step guys need to pass this along....[sic] they know they have had their way with us (we have been told this directly by many customers).... Philip took the entire market down by $100M over two years we need to get this back NOW! Will get one crack at it....[sic] need to dig in and be tough.[346]

142.   In December 2014, Masonite's Tony Hair contacted Masonite's John Kufner for material cost information because Masonite was "getting more requests from distribution to justify our increases."[347] Mr. Kufner replied that "not much of a compelling story to support increases based on major material market" as wood cost was "flat" and chemicals were "down dramatically."[348] In December 2015, Masonite's Matthew Johnson asked Masonite's John Kufner and Joe Castain for material cost information to support a price increase to a customer. Mr. Kuffner replied that "current market data on materials will not provide strong support for the increase — most markets at flat to down [year-over-year]...."[349] John Beeken later replied that since cost increases would not justify Masonite's price increases, "[t]hen we want to talk operating income versus EBITDA to continue to paint our poor man story...."[350]

---

[343] JELD-WEN-00269267-272 at 271.
[344] Merrill Deposition Plaintiffs Exhibit 84 at JELD-WEN-00344969.
[345] Merrill Deposition at 220:22-221:1.
[346] Merrill Deposition Plaintiff's Exhibit 57 at JELD-WEN-00956493.
[347] Hair Deposition Exhibit 218 at MAS-0000011103.
[348] Ibid.
[349] MAS-0000019722-25 at 24.
[350] MAS-0000019722-25 at 22.

HIGHLY CONFIDENTIAL

JW-SEC-01102826

143. More recently, Masonite forecasted that growth in demand drivers in North America would be approximately 3 percent for 2018.[351] In that same year, Masonite and Jeld-Wen announced approximately 13 percent in price increases.[352]

144. The evidence discussed above demonstrates that Defendants' price increase announcements have characteristics associated with collusive price increase announcements and inconsistent with a market free of explicit coordination.

> b. Jeld-Wen and Masonite closely monitored and followed each other's price increases and used nearly identical language in their announcements

145. One additional piece of evidence that Defendants' price increases were not tied to actual changes in supply and demand conditions but instead exhibited characteristics consistent with coordinated actions is the similarity in language of the price increase announcements letters. For example, Jeld-Wen's December 2014 price increase announcement cited "increases in the costs of raw materials, wages, benefits and other costs. Therefore, we find it necessary to increase prices for our interior door products."[353] As the price increase announcement is forwarded internally at Masonite, it is called "plagiarism" by Dale Mayfield, to which Masonite's John Beeken responds "[y]our buddy Merrill likes your words...."[354] Moreover, the rationale (increased costs) appears to have been, as discussed in the previous section, pretextual as Masonite was aware that raw material costs had been decreasing leading up to the announcement.[355]

146. In another case, Larry Repar, Masonite's former EVP and COO, stated he "[w]ould like to see the wording used" in Jeld-Wen's June 9, 2014 price increase announcement letter.[356] Jason Caulk, Masonite's former Sr. Director of Business Intelligence, concurred.[357] When discussing how to justify Masonite's price increase on the heels of Jeld-Wen's, Mr. Caulk stated that "[d]o we still cite various inflationary pressures as the main justification... Or just ambiguously say that costs are increasing and that we are reacting to 'market dynamics' — and thus increasing

---

[351] Plaintiffs' Exhibit 221 at p. 4.
[352] Merrill Deposition Plaintiffs' Exhibit 89; Hair Deposition Plaintiffs' Exhibit 216; JELD-WEN-00857607; MAS-0000012589 – 590.
[353] MAS-0000018793-94 at 94.
[354] MAS-0000018793-94 at 93.
[355] Plaintiffs' Exhibit 218 at MAS-0000011103.
[356] MAS-0000093551-52 at 51.
[357] Ibid. MAS-0000169089-9109 at 9090.

HIGHLY CONFIDENTIAL

JW-SEC-01102827

price by 10%."[358] In a different email, Mr. Caulk explained to Larry Repar that "[c]urrent date in the letter mimics the [Jeld-Wen] timing of Aug 11 [2014]."[359]

147.    More recently, John Krause, a Jeld-Wen Product Line Manager for Interior Doors, suggested to Brian Love, Jeld-Wen's Strategic Pricing Manager, that a September 2018 price increase announcement should "[r]eference the Masonite language around Tariff's."[360]

### 3. Defendants' decisions to limit price discounting during the Cartel period is inconsistent with each firm acting in its unilateral economic self-interest absent the Cartel, and consistent with the alleged Cartel

148.    One major difference between the implementation of price increases during the Cartel Period and those announcements issued prior to 2014, is the degree of discounting and special pricing before the onset of the Cartel.  Prior to 2014, Defendants allowed their sales force and sales managers, acting without executive approval, to undercut the proposed price increase, leading to relatively little impact in the market. In contrast, during the Cartel Period, Defendants exhibited greater pricing discipline, with exceptions to price increases more centrally managed and less likely to be granted.

149.    Prior to the Cartel Period, Jeld-Wen's sales managers had significant discretion in determining their customers' price increases. For instance, prior to announcing the February 2013 price increases, Jeld-Wen's Tim Kirk requested that sales managers "submit any suggestions you have for price increase concessions...."[361] Similarly, in September 2013, around the time Jeld-Wen was about to implement a 4% price increase, Bob Merrill, Jeld-Wen's former EVP of Sales, responded to an email from Mike Hill, telling him that "[t]he next step was for each sales manager to review the prices, make adjustments where necessary, and then give the pricing to customers. You can adjust these where you need to and then issue the prices."[362] Jeld-Wen's Chris Mercier requested that his customers be put on the same pricing for CMI design doors as Dyke Knoxville. This pricing was considered "special" because of its favorable

---

[358] Hair Deposition Plaintiffs' Exhibit 218 at MAS-0000011103.
[359] MAS-0000018747-49 at 48.
[360] JELD-WEN-01089698-99 at 98.
[361] JELD-WEN-00309660.
[362] JELD-WEN-00300811-12 at 11.

JW-SEC-01102828

HIGHLY CONFIDENTIAL

terms.[363] Indeed, Mr. Merrill testified regarding the process for determining price increases up to 2013:

> Q. Who determined the amount of Jeld-Wen's price increase for interior molded doors, as reflected in the November 2013 pricing letter?
>
> A. Once again, this was the result of the team effort between my staff, all of the sales leaders, operations leaders, input from finance, some direction from the CEO at the time, Phil Orsino, to develop what we were going to go into the marketplace.[364]

150.    Evidence indicates that this process changed in 2014, as pricing authority became centralized with senior executives. For instance, with regards to Jeld-Wen's June 2014 announcement to raise IMD prices by 9.5 percent, Mr. Merrill testified that "we had some very strong direction from our CEO at the time, Kirk Hachigian, and our COO Mark Thurman."[365] After Kirk Hachigian took over as CEO of Jeld-Wen, price concessions above a certain threshold required COO, CFO, and CEO approval.[366] This centralization allowed Jeld-Wen to hold the line on pricing exemptions. For instance, in a 2016 management presentation, Mark Beck, Jeld-Wen's then-CEO, explained that over the past two years, "pricing has been the single biggest driver of our EBITDA improvement," with Mr. Beck explaining that one of the reasons for this improvement was taking "pricing authority away from the plant managers."[367] This change in policy appears to not have been well received by some members of Jeld-Wen's sales force. I reviewed an email from Matt Maughon who objected to the price increase announcement issued by Mark Thurman, noting that:

> I strongly recommend that the letter concerning the price increase from Mark Thurman last week be looked at differently. In my tenure at Masonite this was the biggest setback when they adapted this policy. It appeared that the VP had lost control and therefore became just an [sic] servicing agent. At Masonite and not [sic] at JW (Ken Hart) you have a system to manage pricing. If you send this decision to the EVP level then it will be apparent to customers that you have lost your VP/Directors to manage this. This is a huge MISTAKE and will cause concern with customers. Please if this is your intention then do it over time. Remember that this is the largest increase in door history and it needs to be managed with some flexibility....[368]

---

[363] JELD-WEN-00299383-87 at 83-84.
[364] Merrill Deposition at 276:15-276:22.
[365] Merrill Deposition at 278:1-278:11.
[366] JELD-WEN-00730451 at slides 2-3.
[367] JELD-WEN-00774871 at p. 99.
[368] JELD-WEN-00576318-322.

HIGHLY CONFIDENTIAL

JW-SEC-01102829

151.    Mark Thurman, Jeld-Wen's former COO, stressed the importance that pricing exceptions

be centralized with the executive leadership of Jeld-Wen, writing in May 2014 that:

> Kirk [Hachigian, CEO] and I were just talking and one of the topics was how we
> handle the upcoming pricing changes. We talked in our last call that there may be
> a few (very few) exceptions that we may have to extend the timing of
> implementation 30-60 days or some other adjustment. We want to make sure
> everyone is very clear on this though, we don't want anyone making these
> adjustments without the full approval of Kirk [Hachigian, CEO], Mark [Thurman,
> COO], Bob [Merrill, former EVP and Head of Sales] and Scott [Cottrill, former
> EVP and CFO]. This means all four of us need to approve also so don't just come
> to one of us separately! NO exceptions. We wanted to get this out to you right
> away so there are no issues later. This is going to have its moments just like every
> price increase or tough business decision we need to make, however it is very
> necessary for the *industry* and certainly for JELD-WEN. Let's stick together to
> make this happen across the board and help get this business turned around.[369]

152.    Masonite similarly had a centralized system for approving exceptions. John Beeken,

Masonite's VP of Sales and Marketing for Residential Distribution, testified that Masonite's

board of directors determines the "levels of authority" for the salesforce.[370] A 2015 document

produced by Masonite outlines the approval requirements for new and existing business (see

Figure 12 below).[371] Notably, Masonite required the approval from the CEO and CFO for

significant exceptions.

---

[369] JELD-WEN-00928624-25 at 24 (emphasis added).
[370] Beeken Deposition at 87:25-90:1.
[371] MAS-0000488399.

JW-SEC-01102830

HIGHLY CONFIDENTIAL

**Figure 12: Masonite Price Exception Approval Form**

Source: MAS-0000488399.

4. **Masonite's public announcements that it would not sell Doorskins was against its economic self-interest but for the existence of the Cartel**

153. In Section II of this Report, I discussed Masonite's 2014 public announcements that it would not sell Doorskins to independent IMD manufacturers. As previously discussed, because of the lack of available substitutes for Doorskins produced by Defendants, such an announcement (if effected) would result in Masonite ceding the U.S. Doorskin market to Jeld-Wen. As I discuss below, Masonite's public announcements that it would stop competing for Doorskins business represented a departure from past practice and was against its economic self-interest in the absence of the Cartel. The bases for this conclusion are that: (1) the Doorskin industry is characterized by high fixed costs and low variable costs and, relatedly, it exhibits

79

HIGHLY CONFIDENTIAL

JW-SEC-01102831

HIGHLY CONFIDENTIAL

economies of scale. When industries exhibit high fixed cost to variable cost ratios, participants are rewarded by increasing output, because average unit costs decrease with additional output units; (2) At the time of the announcement, Masonite had excess Doorskin capacity, so it would have been able to lower its average costs by increasing output; (3) Doorskins represent the main source of value in the IMD industry and are more profitable than IMDs;[372]; and (4) Masonite's decision came at a time when Jeld-Wen's Doorskins quality was poor and thus Masonite could have taken advantage of that, but instead decided not to increase profits and market share. By announcing that it would no longer sell Doorskins to independent IMD manufacturers, Masonite effectively ceded the Doorskin market to Jeld-Wen, which as the sole supplier of Doorskins to independent IMD manufacturers had additional leverage to raise Doorskin prices significantly in an environment where costs were decreasing and there was excess capacity. Moreover, as I further discuss below, Masonite also rejected sourcing Doorskins (or quoted very high prices) to, at least, Steves and Sons and Excel Interior Door ("Excel Door"),[373] which helped Jeld-Wen raise Doorskin prices to those IMD manufacturers. As a result of its announcement, Masonite helped its biggest supposed competitor.

154. The benefit to Masonite from these public announcement was the potential for weaker competition from independent IMD manufacturers. In particular, because Masonite would have derived significant revenue from selling Doorskins to independent IMD manufacturers, it stood to forego significant revenues with its announcement. Instead, Masonite gave Jeld-Wen information (that was contrary to its internal knowledge) that Jeld-Wen could use to raise Doorskin prices. As I discuss further below, these actions make sense only under a broader anticompetitive agreement.

155. Prior to its May and June 2014 announcements that it would not sell Doorskins to independent IMD manufacturers, Masonite was perceived to be an active participant in the Doorskins market. For instance, Jeld-Wen's Bob Merrill testified that during his time as the CEO of CMI, Masonite competed heavily on price and "had very aggressively gone after two of my

---

[372] Merrill Deposition at 105:13-23 ("Well, in the history of the molded door skin business and molded door business, the margins are higher on the skins made in a -- in a very large process manufacturing operation, compared to assembling doors in a low margin, labor intensive manufacturing operation.")
[373] Excel Door is a low-cost independent IMD manufacturer that formed in 2011 operating primarily in the Southeast. See Hair Deposition Exhibit 231 at MAS-0000134099-0101; MAS-0000132646.

HIGHLY CONFIDENTIAL

JW-SEC-01102832

HIGHLY CONFIDENTIAL

customers, actually three of my customers for skins...."[374] Mr. Merrill also testified that Masonite's announcement that it would stop selling Doorskins was a "surprise" that made no sense, and in an email called their decision "a very recent conversion."[375] Sam Steves similarly testified that Masonite's announcement marked a change in Masonite's Doorskins practice.[376] As an example, in a 2011 email, Masonite's Larry Repar stated to Sam and Edward Steves that, "[w]hile Masonite is willing to continue to offer Steve's product on a spot basis as we have in the past, Masonite believes a long term contractual agreement is in the best interest of both parties."[377] Indeed, Masonite produced some limited Doorskins sales data for its "Top Customers" as part of the *Steves* litigation that shows approximately $5 million in Doorskins sales to Steves and Sons in 2011 and 2012, in addition to sales to other IMD manufacturers.[378]

156.    Masonite's announcements that it was stopping Doorskin sales to independent IMD manufacturers was at odds with the excess capacity it had in the Doorskins market. For instance, in a 2012 document, Masonite claimed that "[w]hile there has been considerable consolidation of manufacturing capacity in this space (Masonite alone has shut down 27 plants in N.A.), there is still excess demand and low capacity utilization resulting in difficult pricing realization."[379] Similarly, a 2014 analyst report placed Masonite's capacity utilization at 60-70%.[380] A more recent analysis from Masonite pegged its North American capacity utilization in 2017 above 80% but with additional supply available from its international Doorskins plants.[381] Earlier in this Report, I discussed evidence that demonstrated that Doorskins production had significant economies of scale. When industries exhibit economies of scale, it means that average costs decrease as output increases. Given Masonite's excess capacity in Doorskin production, its announcement that it would stop selling Doorskins to independent IMD manufacturers would have raised its average unit costs above what they would have been, had it continued selling Doorskins to independent IMD manufacturers at pre-2013 levels. Further, by ceding Doorskin sales to Jeld-Wen, Masonite would have been effectively helping Jeld-Wen lower its average costs.

---

[374] Merrill Deposition at 117:22-118:21.

[375] Merrill Deposition at 118:22-119:11.

[376] Deposition of Sam Steves, January 17, 2020 (hereafter "Sam Steves Deposition") at 44:15-45:5.

[377] Sam Steves Deposition Exhibit 42 at STEVES-IMD-002080.

[378] MAS-0000000003.

[379] MAS-0000650000-50268 at 50220.

[380] JELD-WEN-00158512-537 at 514.

[381] MAS-0000003723-28.

81

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

157. Moreover, Doorskins sales are more profitable than sales of IMDs. For instance, Jeld-Wen's Bob Merrill testified that:

> Q. If you look on the second page, the first paragraph, the last sentence in that first paragraph says, "In addition, the whole point was to sell skins where the money was made." What does that mean?
>
> A. Well, in the history of the molded door skin business and molded door business, the margins are higher on the skins made in a -- in a very large process manufacturing operation, compared to assembling doors in a low margin, labor intensive manufacturing operation.[382]

158. Similarly, Jeld-Wen's Stephen Fancher testified in the *Steves* case that Jeld-Wen made "more money off of doorskins than we do off of doors."[383] The testimony referenced above is consistent with Jeld-Wen's financial documents. For example, a 2016 Jeld-Wen document compared profitability of IMDs with "trade" Doorskins—that is, Doorskins sold to third parties. After adjusting for overhead and fixed costs, Doorskins had earnings before interest and taxes ("EBIT") of 3% to 23% from 2013 through 2016. By contrast, Jeld-Wen's EBIT on interior doors during the period ranged from -12% to 6%, an average of 14% less per year than Doorskins.[384] A 2014 Jeld-Wen "Molded Skins Strategy" document also shows the importance of Doorskins sales to Jeld-Wen's profitability. For instance, 40 percent of Jeld-Wen's Towanda plant's revenues came from Doorskin sales to independents, which 1) accounted for 63 percent of the plant's EBITDA, and 2) were the primary driver of the plant's 21 percent profit margin.[385] That same document highlights that increasing Doorskin sales boosts overall revenue and profitability. In a slide titled "Optimize System-wide Profitability," Jeld-Wen states that it was projecting an "[i]ncrease in EBITDA based on selling more external skins to utilize excess capacity."[386]

159. The evidence I discussed above consistently demonstrates that Masonite's announcement that it would exit the Doorskins market stood to benefit Jeld-Wen and may have hurt Masonite in the absence of the Cartel. Masonite's announcement would have allowed Jeld-Wen to both lower

---

[382] Merrill Deposition at 105:13-105:23.

[383] Fancher (*Steves*) Deposition at 342:6-18. (Q. ... isn't that what the bullet points are contemplating? ...A. I never really think that was our intention. It was really about capacity assurance. Again, we -- I'm sure through your findings here, we make more money off of doorskins than we do off of doors. So for us, there's really no direct desire to stop selling to our doorskins.")

[384] JELD-WEN-00839032.

[385] JELD-WEN-00364126 at slide 24.

[386] JELD-WEN-00364126 at slide 47.

HIGHLY CONFIDENTIAL

JW-SEC-01102834

HIGHLY CONFIDENTIAL

its average production costs and sell more Doorskins—which are more profitable than IMDs. For the reasons cited above, Masonite's announcements that it would not sell to independents is inconsistent with Masonite acting in its self-interest in the absence of the Cartel.

160.    The benefit to Masonite from this public announcement is that it would have increased Jeld-Wen's ability to raise the prices of Doorskins paid by Defendants' IMD competitors (by effectively making Jeld-Wen a monopolist). Defendants' documents produced in this case show that independent IMD manufacturers did compete on price and served to restrain Defendants potential price increases.[387] For example, in a March 2014 email to Tony Hair, John Beeken complains about Steves and Sons competing aggressively to win business.[388] Accordingly, by signaling to the market that Masonite was no longer an option for independents to source Doorskins, Jeld-Wen was able to increase Doorskin prices (knowing that independents did not have another source for Doorskins) and restrain independents' ability to compete on price for IMD business. Consequently, Masonite's announced exit from the Doorskins market facilitated the implementation and enforcement of the alleged Cartel by further diminishing the independent IMD manufacturers' ability to undercut Defendants' IMD prices, thereby making it difficult (if not impossible) for customers to avoid Defendants' conspiratorial price increases.

161.    Kirk Hachigian, Jeld-Wen's CEO, used Masonite's public announcement that it would stop selling Doorskins in an attempt to amend Jeld-Wen's agreement with Steves and Sons. In a July 12, 2014 email to Edward and Sam Steves, Mr. Hachigian stated, "I assume you saw this recent presentation by Masonite. I think it a very informative document for our continued discussions. I would focus your attention to page 15 that comments on the capital investment to be in the skin business. Our agreement gives us essentially zero return on this capital investment. Since it [is] a Masonite public document…..gives us some important detail to discuss as long term partners."[389] Mr. Hachigian subsequently pressed for Steves and Sons to pay a "capital charge," an additional fee meant to compensate Jeld-Wen for the capital used to manufacture Doorskins for Steves and Sons, which I understand Steves and Sons rejected.[390] On September 10, 2014, Mr. Hachigian sent notice to Steves and Sons that Jeld-Wen was terminating the long-

---

[387] Hair Deposition Exhibit 231 at MAS-0000134100 (discussing business lost to Excel Doors due to pricing).
[388] MAS-0000011020.
[389] JELD-WEN-00126057.
[390] Sam Steves Deposition Plaintiffs' Exhibit 264 at STEVES-IMD-000784.

83

HIGHLY CONFIDENTIAL

term supply agreement ("LTA").[391] In early October, Edward and Sam Steves met with Fred Lynch and Chris Virostek from Masonite and, were quickly informed by them of Masonite's intent to not sell Doorskins to Steves.[392] As a follow-up to that meeting, in March 2015, Masonite did send the Steves a Doorskins price list for spot-purchases that reflected, per Sam Steves, a 42 percent price increase on the prices paid to Jeld-Wen under the LTA with Jeld-Wen.[393] Mr. Steves further explained that the commodity nature of Doorskins and IMDs made it so that a 42 percent price increase would hurt them in the IMD marketplace:

> Q. But you don't believe that the -- that the price list was a -- a genuine attempt for Masonite to do business with Steves?
>
> A. No.
>
> Q. Why not?
>
> A. Because these are commodity products. You can't be 42 percent high and expect your supplier – if we were selling doors to customers that were 42 percent high, they couldn't compete in the marketplace. And this isn't representative of at least what our LTA was with JELD-WEN, and I should point out very similar economics that we passed on with both CMI and Masonite before we signed the LTA.[394]

162. In another instance, Mr. Hachigian forwarded the same Masonite presentation to Robert Marchbank, the former CEO of Probuild, a large distributor. Along with the presentation, Mr. Hachigian wrote to Mr. Marchbank, "[a]s I mentioned, we are trying to, take a leadership position on earning a reasonable rate of return on the heavy investment we make on the manufacturing side of our business. If we stay disciplined, this will improve margins in distribution as well."[395]

163. Record evidence indicates that Jeld-Wen was able to use Masonite's announcement to raise Doorskin prices, thereby facilitating Defendants' conspiracy to increase IMD prices. In October 2014, Jeld-Wen announced a price increase for its Doorksin customers citing

---

[391] Sam Steves Deposition Plaintiffs' Exhibit 265 at STEVES-IMD-000784.
[392] Sam Steves Deposition at 109:19-111:17 ("That we didn't even get the question out; that they said, If you're here to talk about molded doorskins, we're not doing it.").
[393] Sam Steves Deposition at 114:22:115:13 (A. It's -- well, in the aggregate on the volume of product that we buy, I believe my math says that it's about 42 percent higher than our current LTA. Some items are as much as 80 to 100 percent higher in cost. And then -- Q. Than LTA with JELD-WEN? A. With JELD-WEN, yeah. So, you know, this is a nonstarter, if that's the right way of referring to it. We couldn't buy doorskins at this and make it make sense, even if they would agree to an LTA, but they won't.); see also, Sam Steves Deposition Plaintiffs'Exhibit 269.
[394] Sam Steves Deposition at 116:21:117:14.
[395] Reproduction-ThirdParty-0054918.

84

JW-SEC-01102836

HIGHLY CONFIDENTIAL

"inflationary pressures on raw materials used in the manufacturing of molded door skins," "increased freight, labor, benefit, and energy costs," and the need for profitability "to be restored for manufacturers in the building materials industry..."[396] Following that announcement, Jeld-Wen's Doorskins customers who did not have clauses in their LTA that tied price changes to market conditions experienced significant price increases.[397] For instance, Boccam's Doorskin prices increased from $3.95 per Doorskin to $4.43 (a 12% price increase), Excel Door's prices increased from $4.58 per Doorskin to $5.54 (a 21% increase), Gordon's prices increased from $4.33 per Doorskin to $4.76 (a 10% increase).[398] Record evidence also shows that Unidoor's prices increased by 20 percent.[399] Jeld-Wen also eliminated rebates to Excel Doors, Kent Door and Unidoor, in addition to Lynden and Steves and Sons.[400] Over that period, however, costs to manufacture Doorskins decreased or stayed flat.[401]

164.    Following Jeld-Wen's price increase announcement to its non-contracted Doorskin customers, Excel Door, which previously had not announced a price increase, issued a 9.5 percent increase on interior doors.[402] Masonite's Tony Hair called this announcement "[a] little piece of good news... ."[403] Masonite's John Becken, who in June 2014 complained that Excel Door "screws up all the pricing in the Southeast," and who also complained that Jeld-Wen had not increased Excel Door's prices at the time of its June 2014 9.5 percent price increase announcement and Masonite's May and June 2014 announcements on Doorskins, similarly found the news positive.[404]

165.    Jeld-Wen continued to raise Doorskins prices in 2016. In August 2015, Jeld-Wen's Steve Fancher, whose responsibilities included communicating Doorskin price increases, told Jeld-Wen's Jim Flickinger that Jeld-Wen intended to raise Doorskins prices by "approximately 20%" in 2016 to its customers without long-term supply agreements and 1-3% to those with

---

[396] Hair Deposition Exhibit 233 at MAS -0000000108.0002.0002.
[397] See JELD-WEN-00364126 at p. 23. Haley, WoodGrain, Lynden, and Steves and Sons had annual adjustments to their prices based on certain indices.
[398] Price increases calculated based on JELD-WEN-00666421.
[399] JELD-WEN-00565171 at slide 13.
[400] JELD-WEN-00565171 at slide 13.
[401] Hair Deposition Exhibit 218 at MAS-0000011103; JELD-WEN-00078040.
[402] Hair Deposition Exhibit 234 at MAS-0000168221.
[403] Hair Deposition Exhibit 234 at MAS-0000168219.
[404] MAS-0000132646; Hair Deposition Exhibit 234 at MAS-0000168219; Hair Deposition Exhibit 233 at MAS-0000000108.

HIGHLY CONFIDENTIAL

JW-SEC-01102837

HIGHLY CONFIDENTIAL

agreements (Steves and Sons, WoodGrain, Lynden, and Haley).[405] Jeld-Wen's Bruce Fedio replied to Mr. Fancher, "[w]ith the favorable material pricing we've enjoyed this year, we may be forced to actually lower prices to contracted trade customers."[406]

166.    Around the time that Jeld-Wen was communicating its objective to raise Doorskins prices to non-contracted customers by another 20 percent, Excel Door approached Masonite to discuss purchasing Doorskins from them. Contemporaneous internal emails from Masonite discussing the potential deal reveal that Excel Door's proposal to Masonite would have been expected to "generate a minimum of $2 million in EBITDA annually and possibly as high as $3 million based on forecasts provided Excel."[407] In September 2015, Masonite's Tony Hair emailed Masonite's John Beeken that "we agreed not to supply Excel with any skins. Strategically we'd be going counter to our philosophy of not 'subsidizing' these small players with skin supply while they challenge our pricing with our customers. We've talked publically [sic] about how JW is doing this and we don't think it's appropriate for us to do."[408] In February 2018, Excel Door again reached out to Masonite looking for a supplier of 6-Panel textured Doorskins—the most popular Doorskin design. In response to an email transmitting Excel Door's interest, Masonite's John Beeken replied that Masonite "absolutely don't want to sell them. JW put them on extended lead time (which we confirmed) selling them would just allow excel [sic] to continue to chase down the price at customers like Mcmahon, Stier and other customers where they screw with our pricing."[409]

167.    During this period, Jeld-Wen was able to negotiate capital charges with certain Doorskins customers. Lynden Doors, one of the independent IMD manufacturers under a long-term supply agreement, accepted a $0.40 per Doorskin capital charge in March 2016.[410] Lynden's contracted Doorskins price was $4.20 in 2015, so the capital charge reflected a 9.5 percent increase to Lynden's Doorskins costs.[411]

---

[405] JELD-WEN-00078040; Fancher (*Steves*) Deposition at 72:19-73:5.
[406] JELD-WEN-00078040.
[407] MAS-0000134111-12 at 11.
[408] MAS-0000139275-77 at 75.
[409] MAS-0000065780-81. *See also* MAS-0000102072-73.
[410] Hachigian May 7 (*Steves*) Deposition at 262:19-265:8; *See also* JELD-WEN-00344277; JELD-WEN-00213748 (internal Jeld-Wen email highlighting revenue growth in Doorskins and attributing revenue increase from Lynden to "increase due to 2016price increase (capital charge).").
[411] JELD-WEN-00666421.

HIGHLY CONFIDENTIAL

JW-SEC-01102838

HIGHLY CONFIDENTIAL

168.    The class-wide evidence discussed above demonstrates that, during the Cartel Period, Defendants engaged in conduct that was inconsistent with behavior expected of firms seeking to maximize profits unilaterally, *i.e.*, absent a cartel such as the one alleged here. Specifically, Defendants' top executives communicated at times before or near the announcement of price increases, they made fairly close in time and in some cases nearly simultaneous, nearly identical price increase announcements that were unrelated to supply and demand conditions, and they centralized pricing decision making at the executive level. Moreover, Masonite's announcement that it had exited the Doorskin market and ceded a highly profitable business to its largest competitor would not make economic sense absent the alleged Cartel. Thus, evidence that Defendants engaged in the types of conduct and communications discussed above constitutes common evidence consistent with the existence of the alleged Cartel and inconsistent with each Defendant acting in its own unilateral self-interest absent collusion.

C. *The industry's economic performance is consistent with the existence of the Cartel and inconsistent with a marketplace absent the Cartel*

169.    I discussed above class-wide evidence showing that 1) the structure of the IMD market was conducive to the formation and maintenance of the Cartel, and 2) Defendants' conduct was consistent with the operation of the Cartel and inconsistent with a marketplace absent the Cartel. As a third prong to the analysis, economists often evaluate the *performance* of a market in terms of the prices paid by customers of the alleged cartel, to assess whether market outcomes are consistent with competitive behavior. Put differently, economists examine whether prices are consistent with market forces of demand and supply, or whether another factor, such as a cartel, affected prices. In this section, I discuss evidence that prices in the IMD market rose in a manner that is unexplained by supply and demand factors alone. This includes evidence that (i) IMD prices rose, despite only moderately increasing demand from nearly historically low levels, excess production capacity, and declining costs; and (ii) Jeld-Wen's prices rose despite significant quality problems. This also includes my multiple regression analysis, which demonstrates that IMD prices during the Effective Cartel Period were inflated above competitive levels.

HIGHLY CONFIDENTIAL

JW-SEC-01102839

HIGHLY CONFIDENTIAL

### 1. IMD prices rose despite moderately increasing demand, excess capacity, stable or declining costs, and significant quality issues.

170. Despite the combination of modestly increasing demand from nearly historically low levels, excess capacity, and a lack of growth in costs, Defendants were able to increase IMD prices during the Effective Cartel Period (from August 11, 2014 to December 2018). In contrast to prior attempts to increase IMD prices in the period before the Cartel began, the price increases that went into effect for IMDs beginning in August 2014 were considered to be the largest in history, and had very high "take rates" (that is, the percentage of the potential increased revenue from the price increases that was realized).[412] Jeld-Wen changed its internal company policies shortly after the start of the Cartel Period, which centralized the ability to allow pricing exceptions among its high-level executives. Moreover, Defendants' historically large price increases were followed by other large price increases that Defendants announced and implemented very close to each other and in some cases nearly simultaneously.

171. It is well-established in antitrust economics that periods in which industry demand is weak are also periods in which the likelihood that firms may attempt to form a cartel increases.[413] When demand is weak, whether declining or even stable, market prices are often pushed downward as firms compete to maintain market share. That Defendants were able to raise prices effectively during the Effective Cartel Period despite market fundamentals that did not support these higher prices, as Defendants themselves have acknowledged, is further evidence consistent with the existence of the Cartel and inconsistent with unfettered competition. I discuss this evidence below.

### a. Market fundamentals do not support the increase in IMD prices

172. In Sections II.2 and 3 above, I discussed the determinants of IMD demand and supply. Demand for IMDs is driven by new home construction and R&R activity. As shown in Figures 13 and 14 below, new home construction and completion activity and R&R activity (as reflected

---

[412] Merrill Deposition at 137:19-140:138:8; JELD-WEN-00576318. *See also* Hair Deposition Plaintiffs' Exhibit 211, MAS-0000013084, at 13086 (showing take rates for 2013 increase at 77%), Hair Deposition Plaintiffs' Exhibit 214 – MAS-0000108483, at 108491 (showing take rates for 2014 and 2015 increases at 90%+); MAS-0000007159-MAS-0000007162, at 7160 (12/12/2018 update to board noting wholesale take rate in excess of 90%).
[413] John M. Connor, "Global Price Fixing," Second Edition, Springer-Verlag Berlin Heidelberg, 2008 (hereafter "Connor") at p.38 ("When demand is low and excess capacity high, the threat of entry is reduced making the likelihood of cartel formation (and higher prices) higher."). See also Posner at p.77.

HIGHLY CONFIDENTIAL

JW-SEC-01102840

HIGHLY CONFIDENTIAL

in existing home sales) were at near historically low levels in the period leading up to the start of the Cartel Period and had only modestly began to recover from the low levels that persisted after the Great Recession (December 2007 to June 2009).[414] For example, existing home sales, an indicator of remodeling activity, declined from over 6 million units sold prior to the Great Recession to 3.7 million units sold at the bottom of the crisis.[415] Indeed, in Section II above, I discussed a Masonite earnings press release where Fred Lynch observed that in 2016, Masonite "delivered a 12.8% adjusted EBITDA margin which is close to what we achieved following the last housing peak despite U.S. housing starts still running at approximately sixty percent of that level"[416] In that press release, Masonite cites increases in prices as the driver of profitability. More recently, in a 2018 "Investor Day" presentation, Masonite stated that new housing starts in the U.S. were 17 percent below the 50-year historical average (1968 to 2018) and 8 percent below the 30-year historical average (1988-2018).[417] This data, both from publicly available sources and record evidence, indicates that demand for IMDs is still below historical levels.

173.    As with housing starts, the level of existing home sales activity has not reached pre-Great Recession levels despite year-over-year growth. This is another indicator that while demand is growing, it is still near historical lows. In addition, as I discussed above, there was also significant excess capacity during the period leading to, and including, the Cartel Period. It is well-established in antitrust economics that firms often attempt to form a cartel during periods in which industry demand is weak.[418] That is because when demand is weak, declining or even stable, market prices are often pushed downward as firms compete. That Defendants were operating under significant excess capacity in the period leading up to and including the Cartel Period is confirmed by 1) Defendants' documents, 2) Defendants' executives' testimony, and 3) industry analyst reports.[419] As one advisory firm's presentation to Masonite from 2009 put it: "Door and facings [Doorskins] demand has been negatively impacted by the decline in housing

---

[414] See National Bureau of Economic Research ("NBER"), "US Business Cycle Expansions and Contractions," available at https://www.nber.org/cycles.html.

[415] JELD-WEN-00820751-0987 at 0763.

[416] JELD-WEN-00942042-054 at 043.

[417] MAS-0000107538-7625 at 7557.

[418] John M. Connor, "Global Price Fixing," Second Edition, Springer-Verlag Berlin Heidelberg, 2008 (hereafter "Connor") at p.38 ("When demand is low and excess capacity high, the threat of entry is reduced making the likelihood of cartel formation (and higher prices) higher."). See also Posner at p.77.

[419] JELD-WEN-00000289 at Slide 31; Fancher (Steves) Deposition at 325:5-325:13; JELD-WEN-00364126 at slide 14.

HIGHLY CONFIDENTIAL

JW-SEC-01102841

HIGHLY CONFIDENTIAL

starts" and "[u]nderutilized facings capacity and low door volumes are likely to persist for several years."[420] More recently, a 2018 Masonite presentation stated that Masonite has "Sufficient Molded Skin Capacity to meet anticipated Demand over the next 5 years."[421] In the absence of an anticompetitive agreement as alleged in this case, economics teaches that the presence of excess capacity in an industry, especially for commodity-like products that require significant capital investments, incentivizes industry participants to increase their sales by maintaining or even lowering prices.[422]

Figure 13: Historic Housing Starts and Completions
(1/2001 - 1/2019)



Sources: Census Bureau; Department of Housing and Urban Development.
Note: Seasonally Adjusted Annual Rates.

---

[420] MAS-0000005613-5700 at 5634, 5639.
[421] MAS-0000653566 at slide 5.
[422] Robert Pindyck and Daniel Rubinfeld, *Microeconomics*, Sixth Edition, Pearson Prentice Hall, 2005 (hereafter "Pindyck and Rubinfeld"), pp. 588-589.

90

HIGHLY CONFIDENTIAL

**HIGHLY CONFIDENTIAL**



Figure 14: Historic Existing Home Sales
(1/2005 - 1/2019)

Source: National Association of Realtors.
Note: Seasonally Adjusted Annual Rate.

174.    I previously discussed how excess capacity served as a barrier to entry in the IMD industry. In that section, I discussed internal documents, testimony from Defendants' employees, and analyst reports that confirmed that Defendants were operating under significant excess capacity.[423] More recently, a 2018 Masonite presentation stated that Masonite has "Sufficient Molded Skin Capacity to meet anticipated Demand over the next 5 years."[424] Economics teaches that, in the absence of an anticompetitive agreement such as the alleged cartel, the presence of excess capacity should, in the absence of an agreement among would-be competitors to limit competition, incentivize industry participants to increase their sales by maintaining or even lowering prices, especially for commodity-like products that require significant capital investments.[425]

175.    Another factor that affects the price of a good is the cost of production. When production costs go down, economic theory predicts that, all else equal, in a non-collusive market the price

---

[423] JELD-WEN-00000289 at Slide 31; Fancher 30(b)(6) (*Sieves*) Deposition at 325:5-325:13; JELD-WEN-00364126 at slide 14.
[424] MAS-0000653566 at slide 5.
[425] Robert Pindyck and Daniel Rubinfeld, *Microeconomics*, Sixth Edition, Pearson Prentice Hall, 2005 (hereafter "Pindyck and Rubinfeld"), pp. 588-589.

91

of the good in the market should decrease because output is less costly. As I describe further below, production costs were stable or even declining during most of the Cartel Period. Nevertheless, IMD prices increased. The variable costs to produce IMDs include material costs (namely, lumber, wood pulp, plastics resin, refined petroleum, paint, foam, and adhesive), energy (natural gas and electricity), labor, and transport. As Figure 15 below shows, IMD prices rose significantly more than costs during the Effective Cartel Period. Indeed, while Defendants were announcing their intention to substantially raise IMD prices from June 2014 to December 2018, they were generally facing lower costs in IMD and Doorskin production. For example, one 2015 email discussed the "favorable material pricing" and whether Jeld-Wen would need to lower its Doorskin prices to its contracted customers.[426]



Figure 15: Supply Indices and Net Price
(10/2012 - 12/2018)

Sources: Bureau of Labor Statistics. Defendants' transaction data.
Energy Information Administration.

    b.  Jeld-Wen had significant quality problems

176.    Another factor that supports my conclusion that the economic performance of the IMD market is consistent with the existence of the Cartel is that Jeld-Wen's IMD prices (and profits)

---

[426] JELD-WEN-00078040.

92

JW-SEC-01102844

HIGHLY CONFIDENTIAL

improved despite significant quality problems in its manufacture and delivery of IMDs. For example, in February 2014, just before the start of the Cartel Period, Bob Merrill sent an email to Jeld-Wen executives, including Kirk Hachigian, outlining numerous quality issues, including problems with IMDs; Merrill testified that at the time, some of the problems "actually got worse," and were not fixed before the June 2014 price increase announcement—which represented the largest price increase in history.[427] At the time of the June 2014 price increase announcement, Stock Building Supply wrote "[y]our company has and continues to subject our operations and our customers to subpar quality and service and as a result have not earned the opportunity to ask for a price increase of 3% let alone the one suggested."[428] On July 2014, after Jeld-Wen announced its 9.5 percent increase on IMDs but before it went into effect, another customer, Dubell Lumber Co., put a hold on payments to Jeld-Wen due to significant quality concerns.[429] Per Jeld-Wen's Tom Conroy:

> I just spoke with Bernie, he said customers are returning doors that are literally falling apart, today's instance was a bifold unit. We are well aware that he switched to Masonite but he still has quite a bit of JW inventory in his warehouse. How quickly can you send someone to inspect? He said this can't wait until tomorrow or the next day but has to be addressed now, "it's now embarrassing" in his words. Please get back to me as soon as you can.[430]

177.    When asked how long the service and quality issues extended past early 2014, Bob Merrill responded: "Let me answer that question this way. During my entire time at Jeld-Wen, we had service and quality issues of some level, some magnitude, in all of our products."[431] Mr. Merrill further clarified that "and we got better at doors for a while from ... late 2015 through 2016, and then in 2017 we backslid again. And I imagine in part of 2018, they were having problems as well."[432] Mr. Merrill further testified that Jeld-Wen's price increases were unrelated to underlying market conditions:

> Q. If Jeld-Wen had these quality and service issues with their interior molded doors, why did Jeld-Wen issue price increases?

---

[427] Merrill Deposition at 100:12-16, 109:7-12; Merrill Deposition Plaintiffs' Exhibit 47 at Reproduction-ThirdParty-0065504-505.
[428] Merrill Deposition Plaintiff's Exhibit 2757 at JELD-WEN-00956495.
[429] Brosterhous Deposition Plaintiffs' Exhibit 200 at JELD-WEN-00289277.
[430] Brosterhous Deposition Plaintiffs' Exhibit 200 at JELD-WEN-00289278.
[431] Merrill Deposition at 142:2219-143:6.
[432] Merrill Deposition at 264:22-265:5.

HIGHLY CONFIDENTIAL                                                    JW-SEC-01102845

HIGHLY CONFIDENTIAL

A. Well, we still had our overriding objective. First of all, we had faith that we were going to fix them. We didn't always do so, but we had faith we were going to fix them.

And number 2, we still had our objectives that we had to hit to improve profitability and part of that improved -- included improving our margins.[433]

178.    This represented a change from pricing behavior prior to the start of the Cartel Period when Jeld-Wen struggled to raise prices due to quality problems. For instance, in a series internal Jeld-Wen emails in 2013 outlining quality issues in Doorskin manufacturing, Jeld-Wen's Matt Hood described Jeld-Wen's inability to improve prices, observing, "[w]e remain in an extremely competitive pricing environment. I know the sales side is struggling to get the prices up. In their defense trying to raise prices to customers while we continue to have product failures is a challenge."[434]

        c.    Defendants attributed their increased profitability to increased prices and "price discipline"

179.    As I discussed before, the higher IMD prices that Defendants realized during the Cartel Period are not explained by market fundamentals and are consistent with the operation of the Cartel. One additional aspect of the performance of the market that is consistent with the operation of the Cartel is that profitability increases were not directly tied to productivity improvements. From 2014 to 2015, Jeld-Wen's EBITDA margins on IMDs increased from -1.5% to 10.5%, principally due to increased pricing.[435] For example, in a July 2016 presentation, Jeld-Wen's President and CEO Mark Beck explained that, "[o]ver past 2 years, pricing has been single biggest driver of EBITDA improvement ...."[436] A 2015 Jeld-Wen presentation stated that, "[c]hange in industry structure and JELD-WEN's price leadership resulted in successful industry-wide price increases over the last 18 months with continued momentum," and attributed increased profitability (as measured in EBITDA) to pricing improvements rather than improvements in productivity.[437] In 2016, Jeld-Wen EVP and CFO Brooks Mallard wrote, "[t]he main drivers of the profitability are two of the key initiatives that I detailed out earlier. Pricing

---

[433] Merrill Deposition at 265:23-266:7.
[434] JELD-WEN-00164334.
[435] JELD-WEN-00534198. By June 2018, EBITDA margins on IMDs excluding pre-hung door units was 14.1 percent. See JELD-WEN-00690715.
[436] JELD-WEN-00127671-683 at 671.
[437] Reproduction-ThirdParty-0068165-203 at 8182, 8196.

HIGHLY CONFIDENTIAL

JW-SEC-01102846

HIGHLY CONFIDENTIAL

and Productivity," and "core growth in NA over the past 2 years has come from pricing as we fixed years of poor pricing discipline."[438] More recently, a 2017 investor presentation, discussing the company as a whole, said "[w]e have more than doubled our profitability in the past three years and we see the potential to continue improving at a rapid pace."[439]

180.    Masonite's economic performance also improved during the Cartel Period. From 2013-2015, Masonite's adjusted EBITDA margin grew from 6.1% to 10.9%. By 2018, it had grown to 12.3%.[440] Masonite attributed this growth, principally, to improved pricing. For instance, in a 2014 presentation to investors, Masonite's Glenn Coulter, its EVP of Global Operations and Europe, stated that "we are also committed to increasing price in order to capture fair value for the high-quality products and services, we provide our channel partners and their customers."[441]

181.    More recently, a draft of a 2018 Masonite press release continued to cite pricing as a primary driver of increased profitability into 2018:

> We had another strong quarter with robust year on year growth in net sales, primarily driven by previously announced pricing actions and solid performance from our acquisitions,['] said Fred Lynch, President and Chief Executive Officer. [']We are particularly pleased with our continued margin expansion across all businesses. Pricing actions, coupled with cost management and operational improvements have allowed the organization to expand margins in a rising Inflationary environment.[442]

182.    I understand that the press release was subsequently amended to "more directly connecting pricing to inflation and operational improvements to margin growth" because of concerns raised by an investment professional, who said "[w]e of course want to be accurate and positive, but I worry about our customers' reactions, too. In Fred's quote below, there are five comments in three sentences about our strong performance; pricing actions are mentioned twice."[443]

183.    Analyst reports confirm that Defendants' increased profitability was attributable to increased prices, or to "improved price discipline." For instance, a July 2014 Wedbush Securities analyst report on Masonite observed that "[p]ricing dynamics are a positive tailwind for earnings

[438] JELD-WEN-00202722 at slides 9,11.
[439] JELD-WEN-00773875-JELD-WEN-00773904 at 3885.
[440] MAS-0000029826- 845 at 835.
[441] JELD-WEN-00567167-183 at 173.
[442] MAS-0000662171-MAS-0000662172.
[443] MAS-0000662171-MAS-0000662172.

95

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

and we think share price. One benefit of the 2008 housing downturn is the near-duopoly that now exists for DOOR [Masonite] and JELD-WEN in the manufacturing of North America residential interior doors. The change in structure suggests lower price volatility, greater price visibility and the ability to move price higher. Our earnings model assumes annual price increases of 3-5% from 2014-2016."[444] That same analyst report observed that "DOOR's largest competitor [Jeld-Wen] has changed its entire senior management team in the past 12 months and recent price actions have supported pricing committed to capturing fair value for products. As a result, we have seen the initial benefits of this change in cadence from DOOR's management, which now expects to realize $40 million annual price benefit starting with Q2:CY14."[445]

184.    A 2015 Jeld-Wen "Peer Reporting" analysis of Masonite observed, "Gross margin increased 440 basis points to 16.9%, driven primarily by price," and that they expect Masonite "will remain disciplined with pricing."[446]

185.    A 2015 J.P. Morgan report covering Masonite stated, "[w]e believe the company's recent strong EBITDA margin expansion should continue, driven by further price increases, a continued positive mix shift and modest SG&A leverage. Specifically, we believe pricing will continue as the most important near term driver of EBITDA margin expansion as we believe the company will continue to increase price going forward…"[447]

186.    Based on my analysis of the IMD market discussed above, and my training and experience in economics, the ability of Defendants to raise IMD prices in the face of modestly increasing demand, significant excess production capacity, stable or declining costs, and significant quality problems, is not consistent with each Defendant having acted according to its unilateral economic self-interest, but rather is consistent with the alleged Cartel.

### 2. Multiple regression analysis confirms that IMD prices were artificially inflated during the Effective Cartel Period

187.    Economics teaches that, absent the alleged Cartel, IMD prices would have been determined by the interaction of supply and demand. Using standard econometric methods, I have developed an analysis to determine whether, after controlling for supply and demand, IMD

---

[444] JELD-WEN-00158512-537 at 512.
[445] JELD-WEN-00158512-537 at 514.
[446] JELD-WEN-00189817-18.
[447] Reproduction-ThirdParty-0103921-63 at 939.

HIGHLY CONFIDENTIAL

JW-SEC-01102848

HIGHLY CONFIDENTIAL

prices paid by members of the proposed Class were artificially inflated by the alleged Cartel. The results of this regression analysis indicate that the prices paid for IMDs purchased from Defendants were 9.5 percent higher during the Effective Cartel Period (August 11, 2014 to December 31, 2018) than during the competitive Benchmark Period (October 24, 2012 – August 10, 2014) after controlling for demand and supply factors, as well as other factors shown to contribute to variation in IMD prices. This is further evidence, common to the proposed Class as a whole, that the alleged Cartel artificially inflated IMD prices.

### D. The Overcharge Regression measures the amount by which Class members were overcharged by the Cartel

188.    One standard and widely-used economic method for determining whether price was artificially inflated by an anticompetitive agreement such as a cartel is to compare prices **actually** paid by customers during an alleged "conspiracy period" with the prices that customers **would have paid** in the non-conspiratorial world. Prices that would have prevailed in a world free of an anticompetitive conspiracy are called "but-for" prices. Economists can compute the but-for price using what is known as a "benchmark." A benchmark is a period or a market, of comparison that resembles the market being evaluated, but without the cartel behavior present. The difference between prices actually paid and the prices that would have prevailed but for the anticompetitive conspiracy is called the "overcharge." The presence of a positive and statistically significant difference between actual prices and but-for prices is an indication that a cartel is active and that it caused customers to pay artificially inflated prices (overcharges).

189.    In such a benchmark analysis, the overcharge is calculated by comparing the prices in the market **affected by the Cartel** with the prices for that product in some other market or during some other period of time in which pricing was **not affected by the Cartel**. One commonly used benchmark compares prices for the same product in the same market at different points in time (e.g., during an alleged conspiracy period and during some non-conspiracy period). Such a benchmark is referred to as a "before-during-after" benchmark; two variants of this are the "before-during" and the "during-after" benchmarks. According to Hovenkamp, "[u]nder the 'before-and-after' method the price that prevailed in the cartelized market [or the

HIGHLY CONFIDENTIAL                                                              JW-SEC-01102849

HIGHLY CONFIDENTIAL

market experiencing anticompetitive behavior] before the cartel came into existence or after it fell apart is presumed to be the competitive price."[448]

190.    The benchmark analysis is an accepted method for detecting injury as well as calculating damages in the field of antitrust economics.[449] The before-during-after benchmark analysis has been widely used for many years in calculating damages that arise from collusive pricing of the sort alleged in this case.[450]

191.    In calculating the aggregate overcharge and determining whether prices are inflated above competitive levels, I have used a variant of the benchmark method based on a statistical method known as multiple regression analysis. Below, I 1) explain why multiple regression analysis is useful here, and 2) discuss how multiple regression analysis can indicate the presence of collusion and 3) then measure the degree of artificial price inflation using all the appropriate and available data on the prices paid by customers.

192.    I have chosen the time period from October 24, 2012 to August 10, 2014 as the "Benchmark Period" for analyzing the alleged anticompetitive behavior. I understand that Plaintiffs contend, consistent with the evidence I reviewed, that Masonite and Jeld-Wen's anticompetitive behavior began in March 2014, but the effects of that allegedly anticompetitive behavior did not take effect until August 2014 (when Defendants implemented their historically high price increases supported by centralized pricing authority to mitigate discounting). For that reason, I consider the "Effective Cartel Period" the period from August 11, 2014 (when the first collusive price increase took effect) to December 31, 2018 (the end of the period for which I have data and documents).

### 1.  How multiple regression works

193.    If the only difference in market conditions and firm behavior between the Benchmark Period and the Effective Cartel Period is the effect of the anticompetitive conduct on prices, then a simple comparison of the benchmark prices to the Effective Cartel Period prices could be used to a) indicate the presence of collusion, and then b) calculate the aggregate amount by which the

---

[448] See, for example, Herbert Hovenkamp, *Federal Antitrust Policy The Law of Competition and Its Practice.* St. Paul, MN: West Publishing Co., 1994 (hereafter "Hovenkamp"), at §17.5b.

[449] Daniel Rubinfeld, "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence,* Federal Judicial Center 2000, Second Edition (hereafter "Rubinfeld"), pp. 181-185.

[450] See, for example, Robert B. Bergstrom, "The Role of the Expert in Proving and Disproving Damages in Antitrust Claims," *Antitrust Bulletin*, vol. 11 (1966), pp. 677-706.

HIGHLY CONFIDENTIAL

JW-SEC-01102850

HIGHLY CONFIDENTIAL

customers were overcharged. However, in a market such as the one considered here, it may be necessary to consider factors other than the presence of the Cartel that could have affected prices differently in the two time periods being modeled. This means that factors other than the Cartel might have caused prices in the two time periods to differ. In order to determine whether there was anticompetitive conduct and then isolate its effect, if any, economists use multiple regression analysis to account for other factors that could have affected prices in both periods.

194.    In other words, multiple regression analysis is used to explain the behavior of one variable, called the "dependent variable," based on the behavior of other variables, called "independent variables" or "regressors."[451] Multiple regression analysis is relied upon by economists, econometricians, statisticians, and others conducting statistical inquiry. By using multiple regression analysis, economists can measure the effect of a particular variable on the dependent variable while simultaneously controlling for the effects of other variables.[452]

195.    In litigation contexts, multiple regression analysis has been accepted by courts as a method to "isolate a key relationship or critical influence […] between one variable and a number of others."[453] Due to its ability to isolate possible anticompetitive impact, "[c]ourts are finding, to a greater and greater degree, that reliable statistical evidence [such as multiple regression analysis] can be invaluable in deciding questions of impact, harm, and damages in a range of cases, including antitrust."[454] Many courts have relied upon multiple regression analysis in deciding whether to certify classes in antitrust cases. For example, "[a] regression is a statistical tool designed to express the relationship between one variable, such as price, and explanatory variables that may affect the first variable. [Multiple r]egression analysis can be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price, like cost and demand."[455]

---

[451] William Greene, *Econometric Analysis*, Sixth Edition, Upper Saddle River, NJ: Pearson Prentice Hall, 2008, p. 8 See also, Peter Kennedy, *A Guide to Econometrics*, Sixth Edition, Malden, MA: Blackwell Publishing, 2008 (hereafter "Kennedy") at pp. 41 and 44-45.

[452] Kennedy at pp. 44-45.

[453] Jonathan Baker and Daniel Rubinfeld, "Empirical Methods in Antitrust Litigation: Review and Critique," *American Law and Economics Review*, vol. 1, no. 1/2 1999 (hereafter "Baker and Rubinfeld") at p. 388.

[454] Baker and Rubinfeld at p. 387; Rubinfeld at pp. 181 – 184.

[455] United States District Court Eastern District of Pennsylvania, *In Re: Plastics Additives Antitrust Litigation*, No. 03-cv-02038-LDD, Memorandum Opinion, filed August 31, 2010 at p. 31.

HIGHLY CONFIDENTIAL

JW-SEC-01102851

HIGHLY CONFIDENTIAL

196.    Multiple regression analysis is well established both as a statistical tool and as a tool in econometric analysis.[456] There are a variety of factors that might affect IMD prices, especially those factors which cause the cost of production, or demand in the market, to go up or down. A multiple regression "controls" for the effect of these other variables by isolating the impact of each individual factor on the dependent variable as if everything else were constant. This allows one to examine the effect, or impact, of one factor upon another, *while holding the rest of the world constant*. That is, multiple regression analysis allows me to filter out the effect of all the other factors that might impact the prices customers paid for IMDs, and to determine whether there was a conspiracy that had an impact on price, and what that effect was, as if everything else in the market was the same. The coefficients on individual independent variables reveal the effect of that variable on the dependent variable, holding constant all other independent variables.

197.    I discuss below how I have constructed a multiple regression analysis for IMD prices. Further, I discuss how the empirical results of my analysis demonstrate that IMD prices during the Effective Cartel Period cannot be fully explained by market forces and thus this analysis is a strong indication of the presence of the Cartel.

### 2. The dependent variable is the net price paid by direct purchasers of IMDs

198.    In a multiple regression analysis, the variable whose behavior is to be explained is called the "dependent variable." Here, the dependent variable is the IMD price charged by the Defendants. I have examined the transaction data provided by Defendants from October 24, 2012 through December 2018. This data includes over 10 million usable observations on the actual prices paid by direct purchasers for IMDs. The Benchmark Period I chose for my multiple regression analysis excludes transactions prior to Jeld-Wen's acquisition of CMI, to allow for comparable market structures during the Benchmark and Effective Cartel Periods.[457] These

---

[456] For a discussion of regression analysis in a purely statistical framework, and the properties of multiple regression analysis, see Neil A. Weiss, *Introductory Statistics*. Fifth Edition, Addison Wesley Longman, Inc., 1999 at pp. 819-860.

[457] Jeld-Wen acquired vertically-integrated CMI on October 24, 2012, resulting in one fewer market participant in the supply of Doorskins and IMDs. Economic theory teaches that the presence of one more supplier of Doorskins and one more manufacturer of IMDs would increase competitive pressure in both the upstream product market (i.e., Doorskins) and of the downstream product market (i.e., IMDs) because IMD manufacturers would have more options to source Doorskins and IMD customers would have more manufacturers to purchase from. That added

100

HIGHLY CONFIDENTIAL

JW-SEC-01102852

HIGHLY CONFIDENTIAL

transaction prices form the dependent variable in my multiple regression analysis. In determining whether there was an overcharge, and if so, its level, I use the actual prices paid by each purchaser for each transaction during the period under study. That is, my analysis is not based on an average price paid by a given purchaser or on the average price across all purchasers. In addition, the prices are calculated on a per unit basis, net of freight, discounts, and rebates.[458]

### 3. Independent variables control for factors affecting price

199.    In a multiple regression analysis, the variables that explain the movement of the dependent variable are known as "independent variables." In the analysis that I developed here, the independent variables are ones that would affect IMD prices. These include 1) variables to account for differences in demand for IMDs over time ("demand variables"), 2) variables that measure the cost of manufacturing IMDs ("supply variables"), and 3) interest rates to account for the macroeconomic environment.[459] Multiple regression analysis also allows one to control for additional factors that might influence prices, such as supplier, product, and purchaser characteristics (which may include regional factors).

#### a.   Demand variables

200.    In constructing my multiple regression model, I controlled for individual demand factors that affect the price of IMDs. As I previously discussed, new home construction is an important determinant of demand. To measure this effect, I used data on residential housing starts compiled by the U.S. Census Bureau to measure new construction demand for IMDs.[460] I used data on existing home sales constructed by the National Association of Realtors to measure remodeling and repair activity.[461] As one analyst report put it: "Existing home sales are a key driver for R&R activity with two opportunities for upgrades - the original owner prior to the sale and the new

---

competition would be expected to result in lower competitive prices than in a competitive market (i.e., free of collusive activity) comprised of one fewer Doorskin and one fewer IMD manufacturer.

[458] Rebates for Jeld-Wen customers were only available from 2016 through 2018, that is, solely during the Effective Cartel Period. I have included these rebates in my analysis even though it is likely to understate the impact of the Cartel.

[459] ABA Section of Antitrust Law, *Econometrics*, 2005 (hereafter "ABA Econometrics"), at pp. 221 – 222.

[460] Bureau of Labor Statistics, "Housing Starts: Total: New Privately Owned Housing Units Started." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/HOUSTNSA#0.

[461] National Association of Realtors, "Existing-Home Sales,", accessed on Bloomberg on August 30, 2019, Ticker: ETSLSLNS.

101

JW-SEC-01102853

HIGHLY CONFIDENTIAL

owner after the purchase of the home."[462] A second analyst report similarly stated that "[e]xisting home sales are the best leading indicator for remodeling spending, typically on a five-quarter lag."[463] Because demand for IMDs depends also, in very small part, on manufactured and commercial housing, I also included measures for both. I used data on manufactured housing published by the U.S. Census Bureau.[464] I also used data on commercial construction published by the U.S. Census Bureau.[465] I constructed a demand index that includes housing starts, remodeling activity, manufactured housing, and commercial construction according to their segment ratios of 49, 47, 2, and 2 percent respectively.[466] A twelve-month trailing average of this demand index is used in order to account for the delayed influence that these demand factors have on IMD prices. Figure 16 below shows the demand index over time.



Figure 16: IMD Demand Index
(10/2012 - 12/2018)

—— IMD Demand Index

Sources: Census Bureau, Department of Housing and Urban Development.
National Association of Realtors.
Note: 12 Month Trailing Average is shown.

---

[462] MAS-0000001615-640 at 619.
[463] JELD-WEN-00820751-0987 at 0774.
[464] United States Census Bureau, Shipments of New Manufactured Homes. Accessed on: 8/30/2018. Available at: https://www.census.gov/data/tables/time-series/econ/mhs/shipments.html.
[465] U.S. Census Bureau, Total Construction Spending: Commercial. Accessed on: November 6, 2019. Available at: https://fred.stlouisfed.org/series/TLCOMCONS.
[466] Derived using molded market share estimates for these market segments applied to estimates of interior US door demand. See JELD-WEN-00693927.

HIGHLY CONFIDENTIAL                                    JW-SEC-01102854

HIGHLY CONFIDENTIAL

### b. Supply variables

201.   IMD prices also depend on the costs of inputs used to produce them. The total cost to produce IMDs is comprised of fixed and variable costs, where fixed costs are costs that "remain the same in total dollar amount as the activity base changes" and variable costs "vary in proportion to changes in the activity base."[467] Because fixed costs do not change as output changes, variable costs are more relevant when analyzing the activity of market participants. For IMDs, as identified in Defendants' cost reports, the major component of materials cost are Doorskins, in addition to the costs of stiles, rails, freight, and labor.[468] Regarding the production of Doorskins, the major components of variable cost identified are: (i) raw material inputs, including wood, plastics resin, wax, and primer, and (ii) energy, including electricity and natural gas.[469] Based on different input costs into hollow core and solid core slabs (IMD), I use two different cost indices. Solid slabs require a greater portion of lumber and wood pulp, while hollow core slabs require a greater portion of plastics resin, foam, freight trucking and manufacturing labor. Table 3 combines this information to provide a detailed cost breakdown of variable costs for producing IMDs.[470]

---

[467] Carl S. Warren, James M. Reeve, and Jonathan E. Duchac, *Financial and Managerial Accounting.* Twelfth Edition, Mason, OH: South-Western Cengage Learning, 2014 at pp. 885-886. *See also,* Carlton and Perloff at pp. 53-54.
[468] *See* JELD-WEN-00464197.
[469] *See* JELD-WEN-00186289.
[470] These estimates were based on Jeld-Wen cost data I reviewed. I also compared Jeld-Wen's costs to Masonite's costs and found them to be comparable. See MAS-0000199296.

HIGHLY CONFIDENTIAL

JW-SEC-01102855

HIGHLY CONFIDENTIAL

## Table 3
### Slab Cost Index Components

| Component | Hollow Core Cost Index Weight | Solid Core Cost Index Weight |
|---|---|---|
| Lumber PPI | 9% | 12% |
| Wood Pulp PPI | 22% | 44% |
| Plastics Resin PPI | 11% | 7% |
| Refined Petroleum PPI (Wax) | 4% | 3% |
| Paint PPI | 5% | 3% |
| Natural Gas Spot Price | 3% | 2% |
| Industrial Electricity PPI | 8% | 5% |
| Foam PPI | 3% | 0% |
| Adhesive PPI (Glue) | 2% | 3% |
| Freight PPI | 13% | 9% |
| Manufacturing Labor Cost Index | 16% | 11% |
| Titanium Dioxide PPI | 2% | 1% |
| Extender Pigments PPI | 1% | 1% |
| Paperboard Packaging PPI | 1% | 1% |

Sources: JELD-WEN-00747184, JELD-WEN-00385361, JELD-WEN-00464197.

202.    In my multiple regression analysis, I used data from publicly available sources to capture the cost for the key raw materials identified in Table 3 above.[471] Material components of cost for

---

[471] Both Jeld-Wen and Masonite provided cost information in their transaction data. Jeld-Wen provided labor, material, and freight "standard" costs and "fifo" (first in, first out). The fifo cost information is limited to transactions after 2013. Masonite provided unit costs for labor and material costs as well as variable, fixed, and depreciation overhead costs. As explained by Jeld-Wen in their June 3, 2019 data response letter "The fields 'labor_fifo' and 'labor_std' represent labor costs allocated to each transaction. The field 'labor_fifo' represents allocated labor costs as calculated using JELD-WEN's current methodology, which has been in use since 2014. The field 'labor_std' reflects allocated labor costs as calculated using the allocation methodology prior to 2014." (See June 3, 2019 letter from Tracie Lynn Bryant to Jeffrey J. Corrigan at p. 4). Standard costs are accounting measures of planned or expected costs as opposed to actual costs incurred. As such, they may not reflect actual changes in costs conditions. Moreover, my review of both Jeld-Wen's and Masonite's cost data indicate that the material cost includes the cost to manufacture Doorskins. As shown in JELD-WEN-00484428 and JELD-WEN-00684971, Jeld-Wen uses a transfer price that incorporates inter-company profit into its calculation of the cost of Doorskins so that the material cost information may not reflect the actual cost to produce Doorskins but also may incorporate profit margins. Similarly, Masonite applies a transfer price to its internal transfer of Doorskins See Hair Deposition at 144:6-21 ("Q. When Masonite uses a skin that it has manufactured itself to manufacture an interior molded door, is

HIGHLY CONFIDENTIAL

JW-SEC-01102856

HIGHLY CONFIDENTIAL

IMDs include lumber, wood pulp, plastics resin, refined petroleum, paint, foam, and adhesive. For these materials, the Bureau of Labor Statistics ("BLS") calculated producer price indices ("PPI"). I obtained these data from the Federal Reserve Bank of St. Louis.[472] Energy components of cost include natural gas, collected by the Energy Information Agency ("EIA") and electricity, which is collected by the BLS.[473] Lastly, I used costs for freight trucking and manufacturing

---

there an internal transaction recorded between the skin manufacturing segment of Masonite's business and the door manufacturing segment of Masonite's business?

A. All of our components come at a cost element to us, yes, so – Q. And so I was just more of getting at from an accounting perspective, is there a transfer price that Masonite essentially pays to itself for the skin? A. I believe that's true across all the components, whether it's skins, stiles, rails, core; anything that's manufactured, it's a transaction from different plant entities."). Moreover, Doorskins prices have been challenged in the *Steves* case as artificially inflated and may reflect anticompetitive pricing. For these reasons, I do not rely on the cost data provided in Defendants' transaction data as the measure of costs for my multiple regression analysis.

[472] U.S. Bureau of Labor Statistics, "Producer Price Index by Commodity for Lumber and Wood Products: Lumber." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/WPU081#0; U.S. Bureau of Labor Statistics, "Producer Price Index by Commodity for Pulp, Paper, and Allied Products: Wood Pulp." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/WPU0911#0; U.S. Bureau of Labor Statistics, "Producer Price Index by Industry: Plastics Material and Resins Manufacturing." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/PCU325211325211#0; U.S. Bureau of Labor Statistics, "Producer Price Index by Commodity for Fuels and Related Products and Power: Petroleum Products, Refined." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/WPU057#0; U.S. Bureau of Labor Statistics, "Producer Price Index by Industry: Paint and Coating Manufacturing: Architectural Coatings." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/PCU3255103255101; U.S. Bureau of Labor Statistics, "Producer Price Index by Industry: Urethane and Other Foam Product Manufacturing: Furniture and Furnishings Polyurethane Foam Products." Accessed on: September 10, 2019. Available at: https://fred.stlouisfed.org/series/PCU3261503261504#0; U.S. Bureau of Labor Statistics, "Producer Price Index by Commodity for Chemicals and Allied Products: Adhesives and Sealants." Accessed on: September 11, 2019. Available at: https://fred.stlouisfed.org/series/WPU067904#0. U.S. Energy Information Administration, "Henry Hub Natural Gas Spot Price." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/MHHNGSP#0. U.S. Bureau of Labor Statistics, "Producer Price Index by Industry: Electric Power Distribution: Industrial Electric Power." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/PCU22112222112243#0. U.S. Bureau of Labor Statistics, "Producer Price Index by Industry: General Freight Trucking, Long-Distance Truckload." Accessed on: September 10, 2019. Available at: https://fred.stlouisfed.org/series/PCU484121484121#0. U.S. Bureau of Labor Statistics, "Manufacturing Sector: Unit Labor Cost." Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/ULCMFG#0. Bureau of Labor Statistics, "Producer Price Index industry data for Synthetic dye and pigment manufacturing: All other inorganic pigments, including white extender pigments and ceramic color pigments." Accessed on: October 9, 2019. Available at: https://www.bls.gov/ppi/. Bureau of Labor Statistics, "Producer Price Index industry data for Synthetic dye and pigment manufacturing: Titanium dioxide, composite and pure." Accessed on: October 9, 2019. Available at: https://www.bls.gov/ppi/. Bureau of Labor Statistics, "Producer Price Index industry data for Folding paperboard box manufacturing: Folding paperboard boxes, packaging, and packaging components." Accessed on: October 9, 2019. Available at: https://www.bls.gov/ppi/.

[473] U.S. Energy Information Administration, Henry Hub Natural Gas Spot Price. Accessed on: August 30. 2019. Available at: https://fred.stlouisfed.org/series/MHHNGSP#0; U.S. Bureau of Labor Statistics, Producer Price Index by Industry: Electric Power Distribution: Industrial Electric Power. Accessed on: August 30, 2019. Available at: https://fred.stlouisfed.org/series/PCU22112222112243#0.

105

HIGHLY CONFIDENTIAL

JW-SEC-01102857

labor—data which are also generated by the BLS and are available through the Federal Reserve Bank of St. Louis.[474]

203.    For my multiple regression analysis, I constructed cost indices for solid core and hollow core IMDs using a weighted average of the variable costs identified in Table 3 above, using the proportions of the costs reported for weights. To account for the timing of the response between changes in production costs and changes in IMD prices, I included the twelve-month trailing average of the cost index variable in my regression. Figure 17 below shows my IMD supply cost indices for hollow and solid core IMDs from October 2012 through December 2018. Of note is that variable costs to manufacture IMDs remained below pre-Cartel Period levels until the start of 2018.



Figure 17: IMD Supply Indices
(10/2012 - 12/2018)

Sources: Bureau of Labor Statistics, Energy Information Administration.
Note: 12 Month Trailing Average is shown.

---

[474] "General Freight Trucking" *available at* https://fred.stlouisfed.org/series/PCU484121484121#0, "Manufacturing Sector: Unit Labor Cost" *available at* https://fred.stlouisfed.org/series/ULCMFG#0.

106

JW-SEC-01102858

HIGHLY CONFIDENTIAL

c.  Macroeconomic environment

204.  An additional factor affecting the macroeconomic environment in which Defendants operate is the long-run interest rate. Such a rate is relevant because it impacts both the demand for IMD products and the cost of production. I obtained the 30-year mortgage interest rate from the Federal Reserve and used its twelve-month trailing average in my multiple regression analysis.[475]

d.  Indicator variables for shipping costs, products, and purchasers

205.  In addition to the variables discussed above, I included indicator variables to capture differences in pricing related to specific IMD product characteristics and specific purchasers. I also include an indicator variable to account for the shipping location based on the purchasers' ship-to state, and for the IMD manufacturer (either Jeld-Wen or Masonite). An indicator variable takes the value of either one or zero, depending on whether a specific condition is present or not.[476] By using these indicator variables, I allow for the possibility that different purchasers may have paid different price levels for IMDs because of the location the IMDs were shipped to or because they are large or small purchasers, and that the price level may vary depending on a particular IMD product purchased.

### 4.  Indicator variable to measure the effect of the Cartel

206.  As discussed above, an indicator variable in a regression analysis is one that identifies either the existence (with a value of "1") or absence (with a value of "0") of a specified characteristic, in order to measure the impact of that characteristic. The use of indicator variables to determine the existence of an overcharge arising from anticompetitive conduct, and then measure its degree, is a well-accepted practice in antitrust litigation.[477] As noted above, I used the period from October 24, 2012 through August 10, 2014 as the Benchmark Period to measure the overcharge and determine the amount by which IMD prices were artificially inflated above that which could be explained by economic forces alone in the same market with the same suppliers. In order to account for the difference in prices between the Benchmark Period and the Effective Cartel Period, i.e., the period starting in August 11, 2014 and lasting through December

---

[475] Freddie Mac, "30-Year Fixed Rate Mortgage Average in the United States [MORTGAGE30US]". Accessed on October 3, 2019. Available at: https://fred.stlouisfed.org/series/MORTGAGE30US#0.
[476] Kennedy at pp. 232 – 234.
[477] See, for example, ABA Econometrics at p. 222.

107

HIGHLY CONFIDENTIAL

JW-SEC-01102859

HIGHLY CONFIDENTIAL

31, 2018, after accounting for the determinants of price, such as supply and demand factors, interest rates, and product and customer characteristics, I have incorporated an indicator variable that takes the value of one for the transactions that occurred from August 11, 2014 through December 2018 and zero elsewhere. A positive coefficient for this indicator variable is interpreted as evidence that prices for IMDs during the Effective Cartel Period are elevated above what would be expected after controlling for supply and demand conditions, as well as product and customer characteristics, thereby serving as measure of overcharges.

### 5. Defendants' transaction data

207.    The dependent variable in the multiple regression analysis is the net price paid by direct purchasers for IMDs. In order to calculate these prices, I used Defendants' transaction data, which contains over 26.87 million observations with information including quantity, type of doors sold, price, and customer.[478]

208.    I received transaction-level data on sales of IMDs from each Defendant for the following time periods: Jeld-Wen for the period from January 2, 2009 to December 30, 2018,[479] and Masonite for the period from December 29, 2008 to December 29, 2018.[480]

---

[478] Before I processed the data as described below, it included products, such as pre-hung doors that incorporate IMDs, that as I discussed above, are not part of the proposed Class Products. The data also includes non-transaction items (such as credits and adjustments) that must be processed and allocated to transactions as well as non-transaction items that do not.

[479] I received transaction sales data and monthly rebate data from Jeld-Wen on April 12, 2019 (the "Jeld-Wen IMD data"). Additionally, on April 19, 2019, I received the transaction data Jeld-Wen produced in the *Steves* case (the "Jeld-Wen *Steves* data"). Staff working under my direction sent data questions regarding both the Jeld-Wen IMD data and the Jeld-Wen *Steves* data on May 10, 2019 and received an initial set of responses to these questions on June 3, 2019. Jeld-Wen supplemented its initial response with a June 21, 2019 letter that provided entity code detail information. Additional follow-up questions were sent to Jeld-Wen on July 30, 2019 to request additional product information. Jeld-Wen responded to those questions on September 3, 2019 and provided a replacement of the Jeld-Wen IMD data on September 6, 2019 with additional product information. Jeld-Wen further provided replacement monthly rebate data on December 6, 2019 and on December 26, 2019 to address missing rebate information from certain customers. See December 26, 2019 letter from Tracie Lynn Bryant to Counsel of Record.

[480] I received transaction level sales, adjustments, customer, and product description data from Masonite on April 12, 2019. On May 9, 2019, staff working under my direction sent data questions regarding the Masonite data, and I received answers from Masonite on June 26, 2019. Additional follow-up questions were sent to Masonite on August 1, 2019 regarding the sales and rebates data, and I received Masonite's response to these questions on August 27, 2019. Further questions were sent to Masonite on September 17, 2019 regarding missing product codes (amongst other topics), and I received an initial response on October 21, 2019. After reviewing the data, my staff asked for further clarification on why item codes found in the transaction data were not matching the provided product codes on October 22, 2019, and the revised item master product codes and descriptions were sent by Masonite on October 31, 2019.

HIGHLY CONFIDENTIAL

JW-SEC-01102860

HIGHLY CONFIDENTIAL

209.   In order to use Defendants' transaction-level sales data in my analyses, it was necessary to first process and clean the variables included in some of the datasets produced. Specifically, staff working under my direction cleaned Defendants' transaction-level data by making the following adjustments:

    a.   the identification and exclusion of sales to Defendants' own entities (i.e. intra-company sales), and sales to the other Defendant (*i.e.*, inter-Defendant sales);

    b.   removal of sample and non-sale transactions;[481]

    c.   removal of transactions for non-class products (*i.e.*, pre-hung door units incorporating IMDs and all products other than IMDs);

    d.   removal of purchases that were subsequently returned or canceled;

    e.   removal of foreign transactions;

    f.   matching of rebates,[482] credits/debits, and other adjustments to individual transactions in order to adjust quantity and price where possible;

    g.   identification and consolidation of standard door features, including height, width, thickness, number of panels, overall design family, rail type, and stile type;[483]

    h.   identification of premium door features, including barn doors with mounting hardware, multi-door sets, and fire and solid core doors;

---

[481] For Masonite I also removed transactions classified as "display," "employee," "test," "salvage," and "stock doors."

[482] Jeld-Wen provided rebate data for years 2016-2018 in the April 12, 2019 data production. On May 10, 2019, Plaintiffs requested pre-2016 rebate data. On June 3, 2019, Jeld-Wen notified Plaintiffs that "Data of this kind is only available for the years 2016 through 2018. JELD-WEN is working to determine whether data and/or documents sufficient to show similar information for earlier years is available, and will produce responsive data or documents that exist and can be located after a reasonable search." In their December 6, 2019 and December 26, 2019 productions, Jeld-Wen provided some limited historical rebate contracts for a handful of customers. To date, Jeld-Wen has not provided additional rebate data as had been requested in the May 10, 2019 data questionnaire. The analyses in this Report that are based on Jeld-Wen's net price are based on a price that only includes rebates for the period 2016-2018.

[483] IMD product features, such as stile type and rail type were extracted from Jeld-Wen's frame codes, which are found within Jeld-Wen's item description fields. See JELD-WEN-00938924 for a look-up file with information on Jeld-Wen's frame code components. See also JELD-WEN-00862047 for a more extensive list of options for these frame code components, which are listed under "Core/Type," "Thickness/Rating," "Center Stile/Cutout," "Stile," "Rail," and "Lock Block."

HIGHLY CONFIDENTIAL

JW-SEC-01102861

HIGHLY CONFIDENTIAL

    i.    consolidation of customer names in order to allow for comparison of prices paid by different Class members, whether from the same Defendant or across Defendants; and

    j.    flagging and identifying potential outliers.[484]

210.    At the conclusion of the data cleaning and processing procedures, there were over 10 million transactions remaining to evaluate whether IMD prices paid by Class members were artificially inflated as a result of the Cartel.

### 6. The results of the Overcharge Model confirm Class Members were overcharged on their purchases of IMDs

211.    As discussed above, each observation in my multiple regression analysis is a specific IMD transaction, or sale, from a Defendant to a direct purchaser. The results of the multiple regression analysis are reported in Table 4, below.

---

[484] Outliers were identified as transactions for which the net price was in the top or bottom 0.1 percent of the distribution of net prices within transactions for a given defendant, operating type (bifold or slab), design, dimensions, core composition, fire rating, stile and rail types, MDF, whether the sale was of a barn door with mounting hardware, and whether the door was prefinished.

110

HIGHLY CONFIDENTIAL

JW-SEC-01102862

HIGHLY CONFIDENTIAL

**Table 4**
**Regression Analysis Using Defendants' Data**

| Variables[1] | Coefficient | Standard Error | t Value |
|---|---|---|---|
| Effective Cartel Period Indicator | 0.0909 | 0.0045 | 20.20 |
| Demand Index[2] | 0.1745 | 0.0409 | 4.27 |
| Cost Index[3] | 0.1651 | 0.0326 | 5.06 |
| 30 Year Mortgage Rate[4] | 0.0205 | 0.0038 | 5.44 |
| Overcharge Percentage[5] | 0.0951 | | |
| $R^2$ | | | 0.91 |

| | |
|---|---|
| Number of Observations | 10,749,619 |
| Effective Cartel Period | August 11, 2014 through December 31, 2018 |
| Benchmark Period | October 24, 2012 through August 10, 2014 |

Sources: Defendants' transaction data.

Notes:

[1] Estimates for the intercept and indicator variables for customers, product, manufacturer, and ship-to-state are not shown in the table.

[2] The Demand Index includes new home starts, existing home sales, manufactured homes, and commercial construction. The index is a 12-month trailing average of logged values.

[3] The Cost Index is constructed from cost inputs for both solid core and hollow core IMDs. The index is a 12-month trailing average of logged values.

[4] The 30 Year Mortgage Rate is a 12-month trailing average.

[5] The estimate of the coefficient on the class indicator variable does not represent the Overcharge Percentage. The Overcharge Percentage is calculated as: $\exp(\text{coefficient estimate} - (0.5 * \text{std. error}^2)) - 1$. See Peter Kennedy, "Estimation with Correctly Interpreted Dummy Variables in Semilogarithmic Equations," American Economic Review, Vol. 71, No. 4, September 1981, p. 801.

212. The goodness-of-fit, or $R^2$, of my multiple regression analysis is 0.91, indicating that 91 percent of the variation in IMD prices is explained by the explanatory variables included in the multiple regression model. In other words, the regression analysis explains the vast majority of the variation in IMD prices. Each of these coefficients is statistically significant, indicating that the regression analysis identified a relationship between that variable and the prices paid by

111

HIGHLY CONFIDENTIAL

JW-SEC-01102863

HIGHLY CONFIDENTIAL

direct purchasers.[485] The supply and demand variables also have a positive, directionally correct relationship, meaning that, all else equal, when costs and/or demand increase, the prices of IMDs would be expected to increase.

213.    In the multiple regression analysis, the coefficient on the indicator variable corresponding to the Effective Cartel Period identifies the extent by which IMD prices were artificially inflated as a result of the alleged Cartel. As shown in Table 4, this coefficient is positive and statistically significant, indicating that, as a result of the alleged Cartel, prices during the Effective Cartel Period (which includes the proposed Class Period), were higher than would have been predicted absent the alleged Cartel. Based on the coefficient estimates derived from the multiple regression analysis, during the proposed Class Period, members of the proposed Class were overcharged by 9.5 percent. The results of my multiple regression analysis are further evidence that IMD prices were artificially inflated by the alleged Cartel throughout the entire Class Period.

214.    Based on the analyses discussed above, which are common to the proposed Class as a whole, including my determination that IMDs are a commodity product, and my demonstration through multiple regression analysis that IMD prices during the Effective Cartel Period cannot be explained by supply and demand factors alone, I have concluded that the Cartel was effective in raising IMD prices generally above the level that would have existed absent the Cartel.

215.    As discussed above, based on my research into the IMD market, my review and analysis of Defendants' documents and data, other discovery materials produced in this litigation, publicly available materials, the relevant economic literature, and my training and experience in economics, econometrics, and statistics, I concluded that the economic evidence (including market structure, Defendants' conduct, and economic performance) supports the existence of the alleged Cartel in the IMD market. That is, I concluded that the structural characteristics of the IMD market (including Defendants' dominant market shares; the commodity and interchangeable nature of IMDs (meaning that an IMD produced by one manufacturer could be substituted for an IMD produced by another manufacturer); the presence of significant barriers to market entry; inelastic demand, especially due to a lack of economically substitutable goods; the presence of low prices and profitability leading up to the start of the Cartel Period; the existence of many buyers; and the ample opportunities Defendants had and took to communicate) were

---

[485] To account for the possibility of correlation of errors, I calculate clustered standard errors by product series, customer, and month.

HIGHLY CONFIDENTIAL

JW-SEC-01102864

HIGHLY CONFIDENTIAL

conducive to the formation and maintenance of the alleged Cartel during the Cartel Period. Further, I concluded that common economic evidence is consistent with the existence of the alleged Cartel and inconsistent with a competitive market absent the alleged Cartel. I based this conclusion on evidence of 1) Defendants' conduct that would have been contrary to their respective economic self-interests absent a collusive agreement, as well as 2) the economic performance of the IMD market (including my multiple regression analyses demonstrating that prices cannot be explained by competitive forces alone). All of the evidence and analysis I have relied upon to reach this conclusion is common to the Class as a whole.

IV. **Common Economic Evidence and Analysis Demonstrates That All, or Nearly All, Members of the Proposed Class paid Artificially-Inflated Prices for IMDs**

216.    Having concluded that IMD prices were artificially-inflated during the Effective Cartel Period as a result of the alleged Cartel, I then turned to the question of whether common evidence demonstrates that those artificially-inflated prices were widely-paid by the members of the proposed Class. My analysis of this question included my examination of whether there is class-wide evidence capable of showing that there is a pricing structure in the IMD market. A pricing structure means that prices paid by purchasers for the same product from a single seller, or for interchangeable products from different sellers, tend to move together over time in response to common economic forces. If there is a pricing structure in the IMD market, then the alleged general price inflation shown by my regression as resulting from the alleged Cartel is likely to have artificially inflated prices paid by all, or nearly all, members of the proposed Class. In sum, if there is a pricing structure, it is unlikely that any member of the proposed Class could have avoided paying at least some prices that were artificially inflated by the alleged Cartel during the proposed Class Period. My pricing structure analysis included a qualitative analysis of whether demand and supply factors were common across transactions of members of the proposed Class. I further examined whether Defendants' transaction data supported my pricing structure finding. This analysis included both graphical examination of transactions over time as well as a correlation analysis, to determine whether prices for IMDs sold by different suppliers to different members of the proposed Class were highly correlated. As shown below, this evidence, common to the proposed Class as a whole, is sufficient to conclude that there was a pricing

HIGHLY CONFIDENTIAL

JW-SEC-01102865

HIGHLY CONFIDENTIAL

structure in the IMD market during the entire period under study, *i.e.*, from October 2012 through December 2018.

217.    Having concluded that there is a pricing structure in the IMD market, I then considered whether the IMD market characteristics indicate (along with other evidence) that the artificially-inflated prices that resulted from the alleged Cartel were widespread across the Class. This analysis focused on three market characteristics, which, taken together, support my conclusion that all, or nearly all, members of the proposed Class paid artificially-inflated prices on at least some IMD purchases during the Class Period: (a) Defendants' market dominance; (b) the lack of available economic substitutes; and (c) the existence of barriers to entry.

218.    Further, class-wide evidence demonstrates that Defendants strictly enforced the implementation of the price increase announcements. The evidence shows that even though price increase announcements may be subject to negotiation, Defendants were successful in achieving almost universal acceptance of some level of price increases on IMDs.[486] This is further evidence, common to the proposed Class as whole, that the artificially-inflated prices, which arose as a result of the alleged Cartel, were paid by all, or nearly all, members of the proposed Class.

219.    Lastly, I used multiple regression analysis to show that all, or nearly all, members of the proposed Class paid artificially-inflated IMD prices as a result of the alleged Cartel. To do so, I used my class-wide regression to predict Class Members' "but-for prices" during the Class Period, which I then compared to the prices Class members actually paid on a transaction by transaction basis, and determined that all, or nearly all, members of the proposed Class were overcharged. This analysis provides additional econometric evidence that all, or nearly all, Class members were impacted by the Cartel.

### A. There is a pricing structure in the IMD market

220.    As described above, a pricing structure in a market means that prices paid by purchasers for the same product from a single seller, or for interchangeable products from different sellers, tend to move together over time in response to common economic forces. This means that any economic force that generally affects the price for a given product, such as the alleged Cartel,

---

[486] Bob Merrill, Jeld-Wen's former VP of Sales and Marketing, stated that that the IMD list price set out in the price increase announcement letters to all "Traditional customers," and other price increase notices to retail customers (Big Box) was at least a starting point for negotiations. Merrill Dep at 318:22 – 322:18.

114

HIGHLY CONFIDENTIAL

would result in all, or nearly all, purchasers of that product paying a higher price than they otherwise would have paid. Based on information produced in discovery and publicly available, as well as my training and experience in economics, I have concluded that there is evidence, common to the proposed Class as a whole, capable of establishing that there is a pricing structure in the IMD market. That means that the prices paid by members of the proposed Class tend to move together in response to market forces (such as the presence of an anticompetitive conspiracy), even if individual proposed Class members' prices differ from each other at any point in time. If prices move together over time, as the evidence shows they did here, then it is unlikely that members of the proposed Class were able to avoid the price increases resulting from the Cartel during the proposed Class Period.

221.   My pricing structure analysis began with an analysis of price determinants. Prices for a given product are determined by the relative levels of supply and demand in the market.[487] When goods in a market are subject to common supply and demand forces, prices for those goods are determined by the same market forces, thus creating a pricing structure. As these forces change, the resulting impact on price is common across all firms and all purchasers in the market, i.e., members of the proposed Class. Thus, changes in market forces, such as the alleged Cartel, are common across all transactions in the IMD market during the proposed Class Period and therefore the prices charged by firms to different Class members would have likely moved together over time.

222.   The quantity of a good supplied is the "specific amount [a firm] would choose to sell over some time period, given (1) a particular price for the good; and (2) all other constraints on the firm."[488] Production costs, especially the prices of production inputs, are the primary factor that influences the supply of a good.[489] Evidence, common to the proposed Class as a whole, demonstrates that changes in production costs across Defendants are generally driven by the same factors.

223.   The supply of IMDs is a function of the costs of inputs used in the production of IMDs. The total cost of production is comprised of fixed and variable costs, the latter representing costs

---

[487] Robert Pindyck and Daniel Rubinfeld, Microeconomics, Seventh Edition, Upper Saddle River, N.J.: Pearson Prentice Hall, 2009 (hereinafter "Pindyck & Rubinfeld") at pp. 21 – 25.

[488] Robert E. Hall and Marc Lieberman, *Microeconomics: Principles and Applications*, Third Edition, Mason, OH: Thomson South-Western, 2006 (hereinafter "Hall & Lieberman"), p. 65.

[489] Hall & Lieberman, pp. 69 – 73.

HIGHLY CONFIDENTIAL

JW-SEC-01102867

HIGHLY CONFIDENTIAL

that change with the level of production. As discussed above, for IMDs, variable costs include: (i) raw material costs, including (a) wood pulp, lumber, and resins used to manufacture Doorskins, and (b) lumber and medium density fiberboard used to manufacture the interior of IMDs; (ii) energy costs; and (iii) labor and freight costs.[490] Given that Defendants' production costs are primarily driven by the same factors, IMD prices would be expected to move together in a common manner over time.

224.    The quantity of a good demanded is the "specific amount of a good that all buyers in the market would choose to buy over some time period, given (1) a particular price they must pay for the good; [and] (2) all other constraints."[491] As I described above, the demand for IMDs is derived from two primary end uses: (i) residential construction, (ii) repair and remodeling.[492] According to a Jeld-Wen market share analysis, a small portion of IMD demand (approximately 4% of total demand) is derived from non-residential construction and other markets such as manufactured housing.[493] Given that IMDs sold by Defendants are ultimately used in the same applications, IMD prices would have been impacted by demand forces in a common manner.

225.    My analysis of a pricing structure in the IMD market also included a study of Defendants' transaction data. The results of this analysis are illustrated in Figure 18 below and in Appendices C and D. Figure 18 illustrates the price movement for each Defendant for the three largest product categories (hollow core slabs, solid core slabs, and bifolds) over the period October 2012 – December 2018.

---

[490] See Table 3, above.
[491] Hall & Lieberman, p. 58.
[492] Reproduction-ThirdParty-0044936- 45206 at 44936 ("Our sales derived from two primary sources of door demand: residential repair, renovation and remodeling of existing homes and construction of new homes.").
[493] JELD-WEN-00693927.

116

HIGHLY CONFIDENTIAL                                                    JW-SEC-01102868

**HIGHLY CONFIDENTIAL**

Figure 18: Gross Price by Defendant, Core and Operating Type (10/2012 - 12/2018)



—— JELD-WEN BIFOLD
—— JELD-WEN SLAB HOLLOW CORE
—— JELD-WEN SLAB SOLID CORE
—— MASONITE BIFOLD
—— MASONITE SLAB HOLLOW CORE
—— MASONITE SLAB SOLID CORE

Sources: Defendants' transaction data.

226.    As is clear from Figure 18, the price charged for the same type of IMD exhibits the same movement over time across Defendants. The fact that Defendants' prices moved together over time suggests that both Jeld-Wen's and Masonite's IMD prices were subject to the same economic forces of supply and demand, indicating the presence of a pricing structure in the IMD market.

227.    The figure below (also included in Appendix C) illustrates the weighted average gross price for the top ten IMDs sold by Defendants, over time. As is clear from the figure, IMD prices of different products moved together over time, indicating that prices for IMDs sold by each Defendant are subject to the same economic forces of supply and demand. Similarly, the figures in Appendix D illustrate the prices charged to the top twenty direct purchasers of IMDs with the highest sales, by Defendant. As is clear from each of the figures in Appendix D, the price of the highest ranked IMD product paid by the top twenty direct purchasers also moved together over time, indicating that prices for IMDs sold by Defendants to different customers are subject to the same economic forces of supply and demand. The pricing structure displayed in Figure 18 and Appendices C and D is one more piece of class-wide evidence, common to the proposed Class as

117

**HIGHLY CONFIDENTIAL**

a whole, which establishes that all, or nearly all, members of the proposed Class paid higher prices in the form of overcharges as a result of the Cartel.



Figure 19: Gross Prices for Top 10 IMDs
(10/2012 - 12/2018)

Source: Defendants' transaction data.

### 1. Correlation analysis confirms that there is a structure to IMD prices

228. Having examined IMD prices graphically and concluded that this evidence supported the existence of a pricing structure, I then performed a type of statistical analysis of the transaction prices known as correlation analysis. Correlation analysis is another piece of class-wide evidence supporting my conclusion that a pricing structure exists in the market, and thus that the overcharges reported in Section III.C above would have impacted all, or nearly all, members of the proposed Class. A correlation coefficient is a statistical measure of the relationship between two series of data that can range from negative one to one. The closer the correlation coefficient is to one, the stronger the positive relationship. I undertook a correlation analysis that evaluated the average quarterly IMD slab price paid by the largest 20 members of the proposed Class, by

118

HIGHLY CONFIDENTIAL

JW-SEC-01102870

HIGHLY CONFIDENTIAL

volume of purchases, from October 2012 through December 2018.[494] The results of this correlation analysis are reported in Table 5, below.

Table 5

Pearson Correlation Coefficients for the 20 Highest Volume Customers

| | HD | LOWES | BMC | BFS | HUTTIG | DYKE | LMC | RUGBY | MEN | DW | TUCKER | OREPAC | NVR | LBM | L84 | PATRICK | BROCK | AM | CJ | HDS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HD | 1.00 | | | | | | | | | | | | | | | | | | | |
| LOWES | 0.92 | 1.00 | | | | | | | | | | | | | | | | | | |
| BMC | 0.89 | 0.90 | 1.00 | | | | | | | | | | | | | | | | | |
| BFS | 0.86 | 0.86 | 0.97 | 1.00 | | | | | | | | | | | | | | | | |
| HUTTIG | 0.85 | 0.86 | 0.98 | 0.98 | 1.00 | | | | | | | | | | | | | | | |
| DYKE | 0.87 | 0.90 | 0.98 | 0.97 | 0.98 | 1.00 | | | | | | | | | | | | | | |
| LMC | 0.92 | 0.92 | 0.97 | 0.91 | 0.94 | 0.93 | 1.00 | | | | | | | | | | | | | |
| RUGBY | 0.93 | 0.92 | 0.98 | 0.93 | 0.96 | 0.96 | 0.98 | 1.00 | | | | | | | | | | | | |
| MEN | 0.89 | 0.91 | 0.95 | 0.85 | 0.90 | 0.89 | 0.97 | 0.97 | 1.00 | | | | | | | | | | | |
| DW | 0.90 | 0.89 | 0.98 | 0.94 | 0.96 | 0.96 | 0.98 | 0.98 | 0.94 | 1.00 | | | | | | | | | | |
| TUCKER | 0.81 | 0.82 | 0.94 | 0.94 | 0.94 | 0.91 | 0.92 | 0.92 | 0.87 | 0.92 | 1.00 | | | | | | | | | |
| OREPAC | 0.86 | 0.85 | 0.96 | 0.91 | 0.93 | 0.91 | 0.96 | 0.96 | 0.93 | 0.96 | 0.92 | 1.00 | | | | | | | | |
| NVR | 0.80 | 0.77 | 0.88 | 0.80 | 0.83 | 0.80 | 0.92 | 0.90 | 0.93 | 0.90 | 0.89 | 0.93 | 1.00 | | | | | | | |
| LBM | 0.85 | 0.86 | 0.96 | 0.92 | 0.96 | 0.94 | 0.93 | 0.95 | 0.91 | 0.94 | 0.88 | 0.95 | 0.84 | 1.00 | | | | | | |
| L84 | 0.88 | 0.90 | 0.97 | 0.97 | 0.97 | 0.97 | 0.94 | 0.95 | 0.87 | 0.96 | 0.92 | 0.93 | 0.80 | 0.93 | 1.00 | | | | | |
| PATRICK | 0.92 | 0.91 | 0.99 | 0.94 | 0.96 | 0.96 | 0.98 | 0.99 | 0.96 | 0.98 | 0.93 | 0.98 | 0.91 | 0.95 | 0.95 | 1.00 | | | | |
| BROCK | 0.90 | 0.88 | 0.99 | 0.96 | 0.98 | 0.97 | 0.97 | 0.97 | 0.93 | 0.98 | 0.93 | 0.97 | 0.88 | 0.95 | 0.97 | 0.98 | 1.00 | | | |
| AM | 0.91 | 0.91 | 0.97 | 0.91 | 0.93 | 0.94 | 0.96 | 0.99 | 0.96 | 0.96 | 0.91 | 0.95 | 0.89 | 0.95 | 0.92 | 0.98 | 0.95 | 1.00 | | |
| CJ | 0.86 | 0.82 | 0.94 | 0.92 | 0.93 | 0.93 | 0.92 | 0.93 | 0.90 | 0.93 | 0.93 | 0.92 | 0.87 | 0.89 | 0.92 | 0.94 | 0.95 | 0.89 | 1.00 | |
| HDS | 0.91 | 0.91 | 0.98 | 0.94 | 0.95 | 0.95 | 0.96 | 0.97 | 0.93 | 0.97 | 0.92 | 0.96 | 0.87 | 0.95 | 0.94 | 0.98 | 0.97 | 0.96 | 0.92 | 1.00 |

Source : Transaction-level data.

Notes : Coefficients were calculated based on the quarterly average gross price for Slabs from 10.2012 through 12.2018.
HD - Home Depot, LOWES - Lowe's, BMC - BMC Stock Holdings, Inc., BFS - Builders Firstsource BFS, HUTTIG - Huttig Building Products, DYKE - Dyke Industries, LMC - Lumbermans Merchandising, RUGBY - Rugby APD HQ, MEN - Menards, DW - DW Distribution, TUCKER - Tucker Door and Trim, OREPAC - OREPAC Corporate, NVR - NVR Homes Inc, LBM - US LBM LLC, L84 - 84 Lumber, PATRICK - Patrick Industries Inc, BROCK - Brockway Smith, AM - Mid-AM Building Supply Inc., CJ - Carter-Jones Companies, Inc., HDS - HD Supply.

229.   The correlation analysis shown in Table 3 above analyzes IMD prices from October 2012 through December 2018 for the 20 largest purchasers. Across the 20 customers, the smallest of the 190 price correlation coefficients is 0.77, which suggests a strong, positive relationship.[495] The median price correlation coefficient is 0.93, which means that half of the correlations have a very strong correlation of 0.93 or higher.

---

[494] I used the price paid by customers net of discounts, returns, and adjustments but prior to factoring rebates. That is because rebate data for Jeld-Wen prior to 2016 was unavailable.
[495] For 20 customers, there are 190 price correlations, since 20 (20 - 1) / 2 = 190.

119

HIGHLY CONFIDENTIAL

JW-SEC-01102871

HIGHLY CONFIDENTIAL

230.    Further evidence of a pricing structure and class-wide impact is illustrated by the correlations of prices for the 20 largest IMD products. Similar to the correlation analysis of customers, the relationship between prices for the 20 largest IMD products is strong and positive. The smallest of the 190 price correlations is 0.73 and the median price correlation is 0.94. The results of this correlation analysis are displayed in Table 6 below.

Table 6
Pearson Correlation Coefficients for the 20 Highest Volume Products

| | Product1 | Product2 | Product3 | Product4 | Product5 | Product6 | Product7 | Product8 | Product9 | Product10 | Product11 | Product12 | Product13 | Product14 | Product15 | Product16 | Product17 | Product18 | Product19 | Product20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Product1 | 1.00 | | | | | | | | | | | | | | | | | | | |
| Product2 | 0.93 | 1.00 | | | | | | | | | | | | | | | | | | |
| Product3 | 0.86 | 0.76 | 1.00 | | | | | | | | | | | | | | | | | |
| Product4 | 1.00 | 0.92 | 0.84 | 1.00 | | | | | | | | | | | | | | | | |
| Product5 | 0.94 | 0.99 | 0.77 | 0.95 | 1.00 | | | | | | | | | | | | | | | |
| Product6 | 0.95 | 0.98 | 0.81 | 0.95 | 0.99 | 1.00 | | | | | | | | | | | | | | |
| Product7 | 0.99 | 0.91 | 0.87 | 0.99 | 0.93 | 0.94 | 1.00 | | | | | | | | | | | | | |
| Product8 | 0.91 | 0.98 | 0.77 | 0.92 | 0.99 | 0.98 | 0.91 | 1.00 | | | | | | | | | | | | |
| Product9 | 0.93 | 0.92 | 0.75 | 0.95 | 0.96 | 0.95 | 0.95 | 0.95 | 1.00 | | | | | | | | | | | |
| Product10 | 0.95 | 0.99 | 0.80 | 0.95 | 0.99 | 1.00 | 0.94 | 0.99 | 0.95 | 1.00 | | | | | | | | | | |
| Product11 | 0.93 | 0.99 | 0.76 | 0.93 | 1.00 | 0.99 | 0.92 | 0.99 | 0.95 | 0.99 | 1.00 | | | | | | | | | |
| Product12 | 0.92 | 0.99 | 0.76 | 0.92 | 0.99 | 0.99 | 0.91 | 0.99 | 0.94 | 0.99 | 1.00 | 1.00 | | | | | | | | |
| Product13 | 0.92 | 0.98 | 0.77 | 0.93 | 0.99 | 0.98 | 0.92 | 1.00 | 0.95 | 0.99 | 0.99 | 0.99 | 1.00 | | | | | | | |
| Product14 | 0.99 | 0.91 | 0.87 | 0.99 | 0.94 | 0.94 | 1.00 | 0.92 | 0.95 | 0.94 | 0.93 | 0.91 | 0.92 | 1.00 | | | | | | |
| Product15 | 0.90 | 0.79 | 1.00 | 0.89 | 0.81 | 0.84 | 0.91 | 0.80 | 0.79 | 0.83 | 0.80 | 0.80 | 0.81 | 0.91 | 1.00 | | | | | |
| Product16 | 0.92 | 0.91 | 0.73 | 0.95 | 0.95 | 0.94 | 0.94 | 0.95 | 1.00 | 0.94 | 0.94 | 0.93 | 0.95 | 0.95 | 0.78 | 1.00 | | | | |
| Product17 | 0.91 | 0.98 | 0.76 | 0.92 | 0.99 | 0.98 | 0.91 | 1.00 | 0.96 | 0.98 | 0.99 | 0.99 | 1.00 | 0.92 | 0.80 | 0.95 | 1.00 | | | |
| Product18 | 1.00 | 0.91 | 0.85 | 1.00 | 0.94 | 0.94 | 0.99 | 0.91 | 0.94 | 0.94 | 0.92 | 0.91 | 0.92 | 0.99 | 0.89 | 0.93 | 0.91 | 1.00 | | |
| Product19 | 0.99 | 0.92 | 0.87 | 0.99 | 0.94 | 0.95 | 1.00 | 0.92 | 0.95 | 0.95 | 0.93 | 0.92 | 0.93 | 1.00 | 0.91 | 0.95 | 0.92 | 0.99 | 1.00 | |
| Product20 | 0.94 | 0.99 | 0.79 | 0.95 | 0.99 | 1.00 | 0.94 | 0.99 | 0.96 | 1.00 | 0.99 | 0.99 | 0.99 | 0.94 | 0.83 | 0.95 | 0.99 | 0.94 | 0.95 | 1.00 |

Source : Transaction-level data

Note : Coefficients were calculated based on the quarterly average gross price from 10 2012 through 12 2018.

231.    The correlations shown in Tables 5 and 6 above demonstrate that prices for IMDs paid by members of the proposed Class tend to move together over time and that IMD prices tend to move together over time, such that the same forces (such as the alleged Cartel) will have an effect on all, or nearly, all members of the proposed Class.

## 2.  A Characteristics regression confirms that there is a pricing structure

232.    In Section III.C above, I discussed a statistical method commonly used by economists to explain the behavior of one variable -- in this case the price of the IMDs at issue here -- in terms of another set of variables.  Multiple regression analysis is often used by economists in the analysis of prices because there are a number of factors that affect price.  One type of multiple

120

HIGHLY CONFIDENTIAL

JW-SEC-01102872

HIGHLY CONFIDENTIAL

regression analysis useful to the study of a pricing structure is referred to is "hedonic pricing regression."[496] Hedonic pricing regressions attempt to decompose the price of a product into the effects of various constituent parts or characteristics of that product. So, in a hedonic regression, economists examine how the price of the product reflects physical components. This methodology, which was developed in the 1960s, was used to measure, for example, how the characteristics of automobiles in that time period (automatic transmission or power steering, for example) affected the price of the good. The estimated relationship between product price and each product characteristics provides an implicit or hedonic price that consumers are willing to pay when purchasing products with that particular characteristic.[497]

233.    In my analysis here, I use a hedonic pricing regression to estimate the relationship between prices for IMDs and the IMD characteristics. The purpose of this hedonic regression, or "characteristics regression" is to see if the prices for IMDs can be explained by the characteristics of the IMDs, such as dimensions, design or style, core and so forth. If my characteristics regression demonstrates that the prices for IMDs are largely explained by these characteristics, then this is further evidence of a pricing structure, in which the characteristics of the IMD are critical in the structure of prices. I am less concerned here with the role of any individual characteristic in determining price, than whether the prices *overall* reflect product characteristics. Therefore, the magnitude of the R-squared, which as I explained above measures the proportion of variation in the dependent variable (price) explained by the regressors (product characteristics) is my focus.

234.    The dependent variable in my characteristics regressions is the net price for IMDs and the independent variables include IMD product characteristics, such as door height, width, core, etc. Other common independent characteristics that could influence transactions prices include the distance shipped (for which I use ship to state as a proxy) and the distribution channel.[498] By showing that common product characteristics determine the transaction prices of IMDs (as opposed to idiosyncratic factors such as an individual customer's ability to negotiate prices), I provide further evidence of a pricing structure that affects all direct purchasers of IMDs.

---

[496] Sherwin Rosen, "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition." *Journal of Political Economy*, vol. 82 (1974) pp. 34 55 (hereafter "Rosen") at 34-36.

[497] Rosen 1974 at 45.

[498] Masonite's transaction data identified the sales channel for its customers. If those customers also appear in the Jeld-Wen data, I applied the same sales channel definition to those customers as well.

HIGHLY CONFIDENTIAL

JW-SEC-01102873

HIGHLY CONFIDENTIAL

235.    Put more simply, my characteristics regression decomposes the pricing of IMDs into its characteristics that help explain that price. As an example, if IMDs that are 80 inches high are priced at $20 and those that are 84 inches high are priced at $25, my characteristics regression will value the 4 extra inches to the height of an IMD to be $5. For the transactions in the data, which reflect the IMD prices paid by Class members, my characteristic regression analysis can help explain how much of the variation in transaction prices can be explained by the components of the particular IMD purchased by the Class members.

236.    In my characteristics regression, where the objective is to understand whether common product characteristics explain all, or nearly all, the variation in prices paid by Class members at a given point in time, the concern is with how well the regression explains the variation in transaction prices. The key question is how well the regression explains the variation in prices, (the "goodness of fit"). This can be examined using the R-squared statistic, which shows the share of the total variation in the dependent variable that is explained by the explanatory variables, i.e. the product characteristics.[499] For example, an R-squared of 0 implies that the variables included in a regression explain none of the variation in the variable of interest, whereas an R-squared value of 1 implies that the variables included in the regression explain all of the variation in the variable of interest.

237.    I performed my characteristics regressions for each Defendant for all sales transactions within a given month. That is, I take a monthly snapshot of prices. By taking monthly snapshots of the data, I am implicitly able to control for any factors that affect price which might vary over time, such as changes to supply and demand conditions, and isolate what factors affect price at a given point in time. Because I performed my characteristics regression monthly, I have a number of R-squared statistics which summarize the performance of the characteristics regression in explaining price.

238.    The distribution for the R-squared statistics for each of the monthly characteristics regressions is shown in Table 5 below. The R-squared statistics for the monthly Jeld-Wen regressions range from 0.85 to 0.91 with an average of 0.88. The R-squared statistics for the monthly Masonite regressions range from 0.87 to 0.91 with an average of 0.89. These results suggest that from October 2012 to December 2018, 85 to 91 percent of all variation in the price of IMDs is explained by the common characteristics, suggesting that common factors explain

---

[499] William Greene, *Econometric Analysis*, 7th Ed. Pearson, England, 2012 (hereafter "Greene 2012") at 79-82.

HIGHLY CONFIDENTIAL

JW-SEC-01102874

HIGHLY CONFIDENTIAL

nearly all variation in prices at any given point in time. The high proportion of explained variation in prices (without controlling for differences attributable to different purchasers) provides further evidence of an existing pricing structure and the resulting class-wide impact.

## Table 7
### Jeld-Wen
Summary of R-squared Monthly Characteristics Regressions

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2012 |      |      |      |      |      |      |      |      |      | 0.91 | 0.89 | 0.89 |
| 2013 | 0.90 | 0.89 | 0.88 | 0.88 | 0.88 | 0.90 | 0.90 | 0.90 | 0.89 | 0.88 | 0.87 | 0.89 |
| 2014 | 0.86 | 0.87 | 0.87 | 0.85 | 0.87 | 0.87 | 0.87 | 0.86 | 0.85 | 0.87 | 0.85 | 0.87 |
| 2015 | 0.87 | 0.87 | 0.85 | 0.85 | 0.86 | 0.86 | 0.86 | 0.86 | 0.86 | 0.86 | 0.86 | 0.87 |
| 2016 | 0.88 | 0.87 | 0.89 | 0.87 | 0.87 | 0.87 | 0.89 | 0.88 | 0.88 | 0.89 | 0.89 | 0.88 |
| 2017 | 0.89 | 0.88 | 0.88 | 0.87 | 0.88 | 0.88 | 0.88 | 0.88 | 0.91 | 0.89 | 0.89 | 0.90 |
| 2018 | 0.90 | 0.91 | 0.90 | 0.89 | 0.89 | 0.90 | 0.90 | 0.91 | 0.91 | 0.90 | 0.90 | 0.90 |

### Masonite
Summary of R-squared Monthly Characteristics Regressions

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2012 |      |      |      |      |      |      |      |      |      | 0.88 | 0.88 | 0.87 |
| 2013 | 0.89 | 0.89 | 0.89 | 0.90 | 0.90 | 0.90 | 0.90 | 0.88 | 0.89 | 0.90 | 0.90 | 0.89 |
| 2014 | 0.89 | 0.89 | 0.89 | 0.89 | 0.89 | 0.89 | 0.90 | 0.89 | 0.89 | 0.89 | 0.89 | 0.89 |
| 2015 | 0.89 | 0.89 | 0.89 | 0.89 | 0.90 | 0.90 | 0.90 | 0.91 | 0.89 | 0.90 | 0.89 | 0.90 |
| 2016 | 0.90 | 0.90 | 0.91 | 0.89 | 0.89 | 0.90 | 0.89 | 0.90 | 0.89 | 0.90 | 0.89 | 0.89 |
| 2017 | 0.89 | 0.88 | 0.88 | 0.89 | 0.90 | 0.89 | 0.90 | 0.90 | 0.91 | 0.90 | 0.89 | 0.89 |
| 2018 | 0.90 | 0.90 | 0.90 | 0.90 | 0.89 | 0.90 | 0.89 | 0.89 | 0.90 | 0.90 | 0.89 | 0.88 |

Source: Defendants' transaction data.

Notes: Observations are IMD transactions. Dependent variable is Ln(net price). Independent variables include product and transaction characteristics, including a product identifier (for bifold, design, type of stile, type of rail, fire rating, type of core, thickness, height, width, barn door, mdf, prefinished), distribution type, and ship to state. Hedonic regressions are performed seperately for year and month. Outliers are dropped for the top and bottom 0.1% of observations based on their net price by defendant, and the product identifier.

123

HIGHLY CONFIDENTIAL

JW-SEC-01102875

HIGHLY CONFIDENTIAL

239.    Based on my analysis of the IMD market discussed above, including qualitative, graphical, and statistical analyses, I have concluded that class-wide evidence demonstrates that there is a structure to prices in the IMD market. This means that a factor artificially inflating prices generally, such as the alleged Cartel, would likely have affected prices paid by all, or nearly all, members of the proposed Class. This is one piece of evidence, common to the proposed Class as a whole, that helps establish that all, or nearly all, members of the proposed Class paid the higher prices that arose from the alleged Cartel.

B. *Structural characteristics of the IMD market indicate that individual members of the proposed Class could not have avoided the price increases*

240.    Having concluded that there is a pricing structure in the IMD market, I further analyzed whether market characteristics support a conclusion that all, or nearly all, members of the proposed Class would have paid artificially-inflated prices as a result of the alleged Cartel. My research and analysis focused on three characteristics of the market, which, taken together, support my conclusion that all, or nearly all, members of the proposed Class paid higher prices due to the Cartel: (a) Defendants' market dominance; (b) the lack of available economic substitutes for IMDs; and (c) the existence of barriers to entry.

241.    In Section III.A of this Report, I analyzed the three structural characteristics described above, among others, and concluded that:

    a.  Defendants collectively dominated the U.S. IMD market and they could artificially increase IMD prices through coordinated actions;

    b.  Defendants also collectively dominated the U.S. Doorskin market—the most significant input to IMDs—and could therefore constrain the ability of non-vertically integrated IMD manufacturers to interfere with the objective of the alleged Cartel by competing on price;

    c.  There are significant barriers to entry in the IMD market, which would facilitate the operation of the alleged Cartel, because it would have been difficult or impossible for new suppliers to enter the market and compete to undercut Defendants' prices that resulted from collusive activities;

    d.  There are no economic substitutes for IMDs so Defendants' customers could not have avoided increased prices by switching to other products; and

HIGHLY CONFIDENTIAL                                    JW-SEC-01102876

HIGHLY CONFIDENTIAL

e. Independent IMD manufacturers could not avoid the cost increases from domestic Doorskins suppliers. Because of the absence of suitable foreign Doorskins, independent IMD manufacturers (like Steves and Sons) could not avoid paying higher prices for Doorskins due to Defendants actions in the Doorskins market. That constrained the independents' ability to interfere with the objective of the alleged Cartel by supplying IMDs at competitive prices, and thereby facilitated the alleged Cartel.

C. *Individual members of the proposed Class could not have avoided paying artificially-inflated prices because Defendants strictly enforced the announced price increases*

242.    My conclusion that individual purchasers could not have avoided paying Cartel-inflated prices is consistent with my analysis in Section III.B.1 of this report showing that Defendants strictly enforced the price increases. In particular, Defendants' price increase announcements were disseminated to all, or nearly all, members of the proposed Class and during the Class Period, Defendants implemented a policy of "no exceptions" to price increases. I discuss this evidence below.

1. **Defendants' price increase announcements were widely disseminated to all, or nearly all, Class members and applied generally.**

243.    I reviewed evidence demonstrating that Defendants' price increase announcements were disseminated through email and direct mailings to all, or nearly, all Defendants' customers. For instance, in October 2015, Masonite sent a mass email announcing its February 2016 price increases.[500] This email was promptly forwarded by the recipient to Kirk Hachigian, Jeld-Wen's CEO. Masonite's price increase announcements were often addressed to "Dear Loyal Partner" or sometimes not addressed at all.[501] Jeld-Wen's price increase announcement letters were typically addressed to "JELD-WEN Door Customers."[502] In other instances, Jeld-Wen emailed a price increase announcement widely to customers and included customer names in identifiable form in

---

[500] JELD-WEN-00187867-69.
[501] See e.g., MAS-0000005137, GRUBB-00002494, JELD-WEN-00187867-69, JELD-WEN-00219630-31; JELD-WEN-00795236-37; MAS-0000009334-35; MAS-0000074477; MAS-0000602099.
[502] JELD-WEN-01057936. Other examples of Jeld-Wen addressing price increase announcement letters to all customers include: MAS-0000104626 for a 7% IMD price increase issued on October 8, 2018; See also, JELD-WEN-00509608; JELD-WEN-00165615.

HIGHLY CONFIDENTIAL

JW-SEC-01102877

HIGHLY CONFIDENTIAL

the announcement.[503] Masonite similarly used form letters to disseminate its announcements that could be populated with each customer's address and contact person's name.[504] Large retailers, such as Home Depot and Lowe's, were also subject to price increases—if at times on a different schedule. For example, Masonite sent to Home Depot a letter on August 15, 2018 announcing an 11 percent increase on interior door products.[505] Additionally, the IMD price increase announcements referenced in Table 2 above typically applied the same percentage to all IMD products. This evidence supports the conclusion that the Cartel impacted all, or nearly all, members of the proposed Class.

**2. Defendants' price increases were strictly enforced and led to generally higher prices**

244.    Defendants' documents and testimony demonstrate that their price increase announcements issued during the Cartel Period led to (generally) higher prices for all, or nearly all, members of the proposed Class. As I discussed in Section III.B. above, Defendants' pricing policies, especially their centralization of pricing decisions, made it more difficult for members of the proposed Class to avoid the paying higher IMD prices. Mark Thurman, Jeld-Wen's COO, explained their position in an email, writing that:

> We talked in our last call that there may be a few (very few) exceptions that we may have to extend the timing of implementation 30-60 days or some other adjustment. We want to make sure everyone is very clear on this though, we don't want anyone making these adjustments without the full approval of Kirk [Hachigian, CEO], Mark [Thurman, COO], Bob [Merrill, former EVP of Sales] and Scott [Cottrill, former EVP and CFO]. This means all four of us need to approve also so don't just come to one of us separately! NO exceptions.[506]

245.    Indeed, I reviewed several documents which illustrate Defendants' resistance to granting exceptions to price increases. For example, in October 2015, after Jeld-Wen announced a 3% price increase effective in February 2016, Kirk Hachigian, Jeld-Wen's CEO, emails Eric Ford, a Jeld-Wen regional sales manager: "Eric....going have this tattooed to you [sic] backside if I find any leakage out there!!"[507] Mr. Hachigian explained in deposition that "leakage" meant

---

[503] JELD-WEN-01026994; JELD-WEN-00661457; JELD-WEN-00290114.
[504] See e.g., MAS-0000008636; MAS-0000012516; MAS-0000026845; MAS-0000037896; and MAS-0000048895.
[505] MAS-0000044527.
[506] JELD-WEN-00928624,-25.
[507] Hachigian Deposition Plaintiffs Exhibit 384.

HIGHLY CONFIDENTIAL

JW-SEC-01102878

HIGHLY CONFIDENTIAL

exceptions and that he was "trying to encourage [Mr. Ford] to not come up with a bunch of excuses anymore."[508]

246. In June 2016, Brooks Mallard, Jeld-Wen's EVP and CFO, emails Jeld-Wen's President and CEO, Mark Beck, and President of North America, John Dinger, expressing his view that Jeld-Wen should resist undoing the most recent price increases to a few major customers, observing that "[t]his company was almost bankrupted on giving price concessions. Have to think long term here."[509] Mr. Mallard also explained, "[I]f they want to use Steve as a rabbit to drive us down, good luck with that. We already know Masonite is struggling with some volume."[510]

247. In October 2017, Masonite's John Beeken responded to a request to discuss the price increase issued to Builders First Source by noting, "[t]hese are the rates that we have provided to others in market you compete with (and in fact all others) and are very much in line and in fact lower than rates we have seen from our competitors … this is a year we simply don't have room to move."[511]

248. Similarly, in a 2017 email, Jeld-Wen's Jim Flickinger resists granting an exception, noting that "[w]e have to hold at this level…if they want to buy these through Masonite at lower prices, then Masonite will continued [sic] to get hammered on the street…"[512] In an October 22, 2018 email, Adam Calverley, Masonite's Director of Sales, alerted five employees that "[t]here is a deadline of Nov 1 to submit any price increase exceptions and/or deviations. **The assumption going in is that the price increase numbers will be as stated** with the exception of APD's (and Shusters) getting 5% on non-heritage flush and molded. Need you each to submit a list of customers that may warrant exceptions by Friday so we can discuss before the deadline."[513] In a July 2018 email, Mr. Calverley told Kurt Dallesasse of Hines Supply that "[n]ot having any increase for 2018 is not an option."[514] In an October 2017 email, Masonite's John Beeken tells Masonite's Jon Murphy that "we need to hold firm" and not give up price

---

[508] Hachigian Deposition at 258:22-259:8.
[509] JELD-WEN-00213686-87 at 86.
[510] JELD-WEN-00213686-87 at 86.
[511] MAS-0000068335-36.
[512] JELD-WEN-00843501-02. at 01.
[513] MAS-0000042319 (emphasis added).
[514] MAS-0000105926-27 at 26.

127

HIGHLY CONFIDENTIAL

JW-SEC-01102879

HIGHLY CONFIDENTIAL

increases to Huttig direct customers, at the risk of losing business.[515] Also, in October 2017, Masonite's Shawn Brown emails Masonite's John Beeken, "we needed to hold firm" in response to Builders First Source requesting a smaller price increase because "5% is not aligned with what we are seeing from others...."[516]

249.    A sign that Jeld-Wen had centralized its exception granting process occurred after a price increase exception was approved unilaterally by Bob Merrill. After learning about the exception, Mr. Hachigian expressed frustration and stated that Mr. Merrill, "should not be able to approve these unilaterally!"[517]

250.    Even when Defendants delayed implementation of a price increase, these delays were mostly temporary. For example, Masonite granted United Door & Hardware a two-month delay on the December 15, 2018 price increase (but the full 7 percent price increase took effect thereafter).[518] In that same price increase cycle, FPG Wholesale was granted a two-week delay.[519]

251.    By contrast, Masonite and Jeld-Wen were more willing to grant exceptions and/or delay implementation of price increase announcements prior to 2014. For instance, in a July 2013 email from Bob Merrill to Philip Orsino, Mr. Merrill conveyed the sales managers' request to delay implementation of a price increase. Mr. Orsino agreed to delay the price increase by 30 days.[520] I also discussed above evidence that Masonite gave Huttig (among others) an exception in 2013, which Huttig used to compete against Jeld-Wen's customers.  For example, in October 2013, Bill Holt, a Jeld-Wen VP of Sales, emailed Mr. Orsino that "Masonite has rescinded [price increase] yet again …"[521] In another instance, in November 2013, Mr. Holt reported to Mr. Orsino that "the last increase was not taken by Huttig and other Masonite customers. Mark believes that the Feb. 3rd increase is actually a rollover from the last Masonite increase. Mark said he is loosing [sic] business as a result of their price and to expect a 10% or more drop in ABS business for 2014."[522]

[515] MAS-0000119117-18 at 17.
[516] MAS-0000118745-46 at 45.
[517] JELD-WEN-00843501-02
[518] MAS-0000002228- 230 at 28;228.
[519] MAS-0000002217-18 at 17. See also MAS-0000008174-75; MAS-0000119591 (Masonite granting Menards and Midwest delays in implementation but increasing IMD prices by 5% in late 2017).
[520] JELD-WEN-01051099.
[521] Ibid at JELD-WEN -00702917.
[522] Orsino Deposition Exhibit 397 at JELD- WEN -00374708.

HIGHLY CONFIDENTIAL

JW-SEC-01102880

HIGHLY CONFIDENTIAL

252.    Based on my research into the IMD market, my statistical and econometric analysis of prices in the IMD market, my review and analysis of documents and data produced in this litigation, the relevant economic literature, and my training and experience in economics, econometrics, and statistics, I conclude that the economic evidence supports the conclusion that all, or nearly all, members of the Class paid artificially-inflated prices as a result of the Cartel.

### D. Multiple regression analysis confirms that all or nearly all members of the proposed Class paid artificially inflated prices for IMDs during the proposed Class Period

253.    Although my research and analysis into the IMD market discussed above is sufficient to conclude that all, or nearly all, members of the proposed Class paid artificially-inflated prices as a result of the Cartel, I considered an analysis of the customer-level predicted "but-for" prices (prices that would have been paid "but for" the Cartel) from my class-wide multiple regression analysis. The results of this analysis confirms my conclusion, discussed above, that all, or nearly all, members of the proposed Class paid the higher prices that arose as a result of the Cartel.

### 1. The predicted but-for prices of my class-wide regression demonstrate that all, or nearly all, members of the proposed Class were impacted by the Cartel.

254.    As explained above, multiple regression analysis can be used to estimate relationships between IMD prices (dependent variable) and product characteristics, market and macroeconomic conditions, customers, and manufacturers (explanatory variables). Regression analysis estimates the relationships that best fit the data. The regression methodology, called ordinary least squares ("OLS"), minimizes the squared differences between the actual values and model predictions. This difference between the actual value and the predicted value is called the residual and measures the portion of the price that is not explained by multiple regression analysis.[523] For models that fit well, this difference will contain only idiosyncratic information that cannot be explained by the model, with the actual values being centered around the predicted prices.

255.    My analysis of predicted but-for prices shows that nearly all Class members paid inflated prices during the Class Period. This analysis required me to: a) calculate the but-for prices, or prices that Class members would have paid but-for the Defendants' conduct, for each transaction

---

[523] Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*. Fifth Edition, Mason, Ohio: South-Western Cengage Learning, 2013 (hereafter "Wooldridge") at pp. 27-35.

129

HIGHLY CONFIDENTIAL

JW-SEC-01102881

made by a Class member during the Class Period; and then b) compare the but-for prices to the actual prices paid by the Class members for each transaction. Actual prices that are above the but-for prices during the Class period provide further support for the conclusion that Class members were overcharged for IMD products during the Class period.[524]

    a.  Predict but-for prices based on predicted value – overcharge estimate

256.    But-for prices are derived from the regression results from my class-wide overcharge model. The regression model provides predicted values given the observations' values for explanatory variables in the model, including product characteristics, supply and demand conditions, customers, and manufacturers. The predicted price during the Class Period includes the model's overcharge estimate. The but-for price is therefore estimated by subtracting the overcharge estimate from the predicted price for observations during the Class Period.

    b.  Calculate the net overcharge based on the sum of (actual – but-for price) * sales quantity

257.    The net overcharge paid by Class members illustrates the impact of Defendants' conduct on the Class. First, I calculate the per unit overcharge by transaction as the actual price minus the but-for price. I then categorize Class members based on the aggregate or net overcharge paid to Defendants during the Class Period.[525] Under this analysis, I find that nearly all Class members who made purchases during the Class Period paid net overcharges (99.8 percent or 462 out of 463 Class members). These Class members accounted for nearly 100 percent of class-wide IMD purchases. My analysis also finds that all Class members were overcharged on at least one transaction. Moreover, using the predicted prices approach to estimate class-member specific overcharges, I find that the Named Plaintiffs in this matter (Grubb Lumber and PRSCO) have been impacted by the alleged Cartel.

---

[524] For instances where Courts have accepted regression analysis to show common impact, see Air Cargo (United States District Court Eastern District of New York, *In Re: Air Cargo Shipping Services Antitrust Litigation*, Report and Recommendation, 1:06-md-01775-JG-VVP, October 15, 2014 at pp. 89-98.).

[525] I calculate the net overcharge as sum of the overcharge paid to Defendants. Where the actual and but-for prices are defined as ratios of net sales / sales quantity, I convert the price overcharge to net sales overcharge by multiplying the price overcharge by sales quantity. That is, for customer, $i$, purchasing product, $j$, using transaction, $t$, the sales overcharge is computed as $($actual price$_{t,j,i}$ – but-for price$_{t,j,i}) \times$ sales quantity$_{t,j,i}$. The overall or net overcharge paid by customer, $i$, is computed by summing sales overcharges from all transactions, $t \in T$, for all products, $j \in J$, using the following formula:

$$\text{net overcharge}_i = \sum_{j \in J} \sum_{t \in T} (\text{actual price}_{t,j,i} - \text{but-for price}_{t,j,i}) \times \text{sales quantity}_{t,j,i}$$

130

JW-SEC-01102882

HIGHLY CONFIDENTIAL

258.   The results of this analysis constitute additional evidence in support of my conclusion that all, or nearly all, Class members paid inflated IMD prices as a result of Defendants' alleged Cartel and serves as a secondary check on my conclusion that the Cartel affected all, or nearly all, members of the Class during the Class Period.

259.   Moreover, although for the reasons stated above, my conclusion is that all, or nearly all, members of the Class were impacted by the alleged Cartel, the statistical method of measuring customer-impact allows me to identify the customers for whom the additional statistical evidence does not reinforce the conclusion that those customers were impacted and remove these customers from my analysis. These customers would not change the aggregate class-wide damages in a material way as they are small and collectively account for much less than 1 percent of class-wide purchases.

## V.   Measurement of Class-wide Aggregate Damages

260.   I have been asked by Counsel for Plaintiffs to measure the amount of damages suffered by members of the Class as a whole as a result of the Cartel. As I discussed in Section III.C-D above, I have developed a reliable methodology for measuring such damages based on multiple regression analysis, a standard statistical tool that is often used by economists to measure the relationship between a set of variables. Once I obtain a measure of class-wide overcharges from my overcharge model, I apply it to the Class's IMD purchases from Defendants during the Class Period to measure class-wide aggregate damages.

261.   In Section III.D above, I discussed the multiple regression analysis I used to measure the relationship between IMD prices and the supply and demand factors that determine IMD prices, to isolate the effect of the Cartel on IMD prices paid by members of the Class during the Class and Damages Period. I found that the class-wide overcharges to be 9.5 percent.

### 1.   Calculation of Class sales during the Class Period

262.   In Section III.D.5, I described the transactional data I analyzed in this case. Prior to estimating the class-wide overcharges, I removed inter-Defendant sales or sales to subsidiaries of Defendants during the Benchmark Period and the Cartel Period. I now also remove sales outside of the Class Period. Table 8 below shows the total sales during the Class Period of October 19, 2014 to December 31, 2018 of IMDs for each Defendant. Overall, I find that IMD sales to Class Members during the Class Period were $2.8 billion.

131

HIGHLY CONFIDENTIAL

JW-SEC-01102883

HIGHLY CONFIDENTIAL

Table 8
Defendants Sales of IMDs to Proposed Class
Members
(10/19/2014 -12/31/2018)

| Defendant | Volume (Millions) | Net Sales ($ Millions) |
|---|---|---|
| Jeld-Wen | 37.90 | $ 1,096.33 |
| Masonite | 55.68 | $ 1,709.84 |
| Totals | 93.58 | $ 2,806.17 |

Source : Defendants' transaction data.

## 2. Measurement of Aggregate Damages suffered by the proposed Class as a Whole

263. To measure class-wide damages resulting from the Cartel, I multiplied the overcharge percentage I obtained from the overcharge regression (9.5%, as shown in Table 4 above) by the class-wide sales during the Class Period reflected on Table 8 above. I have calculated aggregate damages to members of the proposed Class as a whole in the amount of $243.7 million.[526]

## VI.   Conclusions

264. Based on my analyses and research into the IMD and Doorskins industries, including the documents and materials I have reviewed to date, as well as my training and experience in economics, econometrics, and statistics, I have concluded that there is common evidence which demonstrates the existence of the Cartel during the Cartel Period. I have also concluded that there is common evidence that establishes that IMD prices were artificially inflated as a result of the Cartel and that class-wide evidence and methods demonstrate that the artificially-inflated IMD prices were paid by all, or nearly all, members of the Class.

265. Lastly, I have developed a commonly-accepted, class-wide methodology for measuring the damages suffered by Class members as a result of the Cartel based on multiple regression analyses. Based on this analysis, I have measured damages on sales of IMDs to Class members during the Class Period of $243.7 million.

---

[526] The overcharge coefficient in Table 4 is measured as a percent above the but-for price. To calculate class-wide damages, I first convert the overcharge coefficient to be as a percent of the as-is price by using the following formula: overcharge % as is = overcharge % but-for / (1 + overcharge % but-for).

HIGHLY CONFIDENTIAL

JW-SEC-01102884

HIGHLY CONFIDENTIAL

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st day of January 2020, at Philadelphia, Pennsylvania.

Russell L. Lamb, Ph. D.

133

HIGHLY CONFIDENTIAL

JW-SEC-01102885