# EXHIBIT 4

What Does an Economist Know?

Author(s): George J. Stigler

Source: *Journal of Legal Education*, June 1983, Vol. 33, No. 2 (June 1983), pp. 311–313

Published by: Association of American Law Schools

Stable URL: https://www.jstor.org/stable/42897861

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms

 is collaborating with JSTOR to digitize, preserve and extend access to *Journal of Legal Education*

This content downloaded from
70.33.178.132 on Mon, 25 Jan 2021 21:40:42 UTC
All use subject to https://about.jstor.org/terms

JOHNSON−0000235

311

# What Does an Economist Know?

George J. Stigler

Suppose that in an antitrust case an economist is confronted with a document of undisputed authenticity, which states:

> Companies $A$, $B$, $C$, and $D$, which together produced 94 percent of the nation's output of trumpets in 1981, were represented at a meeting on February 12, 1982, by their respective chief executive officers. They agreed in writing to reduce their combined output in the five succeeding years to four-fifths of the 1981 total, and share sales equally.

It is also undisputed that they met again on February 19, 1987, and congratulated each other on the faithfulness with which the agreement was observed and stated that it had been an extraordinarily lucrative agreement. What can the economist testify with respect to the commission of a violation of Section 1 of the Sherman Act?

An economist in his professional capacity could testify to two implications of the agreement:

> 1. It described a policy of joint output restriction which, if acted upon, would constitute a clear example of the standard economic concept of a cartel.

> 2. If output of the four companies was reduced below what it would have been in the absence of the agreement, and if outputs of firms outside the agreement did not increase correspondingly during 1982–1986 inclusive, prices were increased during these years by the agreement.

Both are formal propositions: the first is a definition of a form of market organization; the second is a statement of the consequence of a hypothetical situation.

A reasonable man, and often even an economist, would say that the documents seemed to present a conclusive proof of collusive behavior. The economist, however, would have no professional basis for reaching such a conclusion: he has no special skill in reading documents and relating them to actual behavior. In particular his skill in document interpretation is on average inferior to that of a lawyer.

The economist could make studies which were essential to the understanding of the actual behavior of the industry during these five years. He could, let us assume, establish:

George J. Stigler is Charles R. Walgreen Distinguished Service Professor Emeritus, Department of Economics and Graduate School of Business, University of Chicago.

© 1983 by the Association of American Law Schools. Cite as 33 J. Legal Educ. 311 (1983).

This content downloaded from
70.33.178.132 on Mon, 25 Jan 2021 21:40:42 UTC
All use subject to https://about.jstor.org/terms

JOHNSON-0000236

1. The fact that the four firms held their respective annual outputs to the agreed upon level.

2. The high probability, based upon an analysis of the industry's supply and demand conditions, that the output of the four firms would not have fallen from the 1981 level if they had acted competitively.

3. The failure of the remaining firms in the trumpet industry to expand output (if such was the case) would demonstrate that—whatever their documentary records—they acted like the four large firms, and were de facto members of a cartel.

4. The restriction of output (if effected) raised prices.

Of course it is quite possible that all of the factual findings were different, despite the authentic document. (Parts of 2 and 3 and all of 4 are established economic theory, valid whatever the facts proved to be.) This agreement may have been violated, or the firms may have had no market power because of imports, new entrants, etc.

It would be easy to find many examples of economists reaching conclusions on the *facts* of market behavior solely from documents less explicit than the one with which I began. (My own writings would contribute their share.) The essential point to make, however, is that all such deductions and inferences are exercises in economic logic or terminology, not valid economic analyses of the workings of real markets. Of course innumerable documents describe accurately what takes place, but a large number describe only what someone hopes will take place.

Our participation in antitrust discussion, let alone litigation, has corrupted the terminology of economics. There is no established economic content to words such as "collusion", "conspiracy", or "concerted action". Indeed it is a concerted action if you and I go to the Board of Trade to trade, and concerted action if the tires I produce fit the wheels you produce. The mechanism of coordinated behavior (say, by contract) and even the announced or apparent purpose of coordinated behavior is interesting to the economist only to the degree that mechanism and apparent purpose influence actual behavior. There is little presumption that the strongest legal agreements are most faithfully carried out in practice—indeed, the unusual rigor of the agreement arises often out of suspicion of the other party.

Any agreement, written or not, will *always* be ambiguous in the absence of knowledge of the factual setting in which it will operate. Let firms *A* and *B* each announce, and live up to, a promise always to match any reductions in the other firm's price. The resulting behavior is compatible with monopoly pricing in an industry with secularly falling costs of production. The behavior is not compatible with monopoly pricing (unless the pricing behavior is extended to matching price increases) in an industry with rising costs of production.

It is inevitable that economists will use or misuse words and concepts freighted with legal significance, just as it is impossible for lawyers to avoid (or, for that matter, to use precisely) economists' words like "competition"

This content downloaded from
70.33.178.132 on Mon, 25 Jan 2021 21:40:42 UTC
All use subject to https://about.jstor.org/terms

JOHNSON-0000237

and "market". That is nothing to fret about if it does not mislead others—in particular judges and legislators—about what it is that each craft is truly expert in treating.

This content downloaded from
70.33.178.132 on Mon, 25 Jan 2021 21:40:42 UTC
All use subject to https://about.jstor.org/terms

JOHNSON-0000238