# EXHIBIT 6



Deposition of:
# Kirk Hachigian

*January 23, 2020*

In the Matter of:

# Interior Molded Doors Antitrust

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

JW-SEC-01089400

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

IN RE:   INTERIOR MOLDED   ) LEAD CIVIL ACTION:

DOORS ANTITRUST LITIGATION) 3:18-CV-00718-JAG

_____   )

                           )

IN RE:   INTERIOR MOLDED   )  LEAD CIVIL ACTION:

DOORS INDIRECT PURCHASER   )  3:18-CV-00850-JAG

ANTITRUST LITIGATION       )

***HIGHLY CONFIDENTIAL***

ORAL VIDEOTAPED DEPOSITION

KIRK HACHIGIAN

January 23, 2020

ORAL VIDEOTAPED DEPOSITION OF KIRK HACHIGIAN, produced as a witness at the instance of the DIRECT PURCHASER PLAINTIFFS AND THE PROPOSED CLASS and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of January, 2020, from 9:06 a.m. to 5:54 p.m., before Vickie G. Hildebrandt, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Kirkland & Ellis LLP, 609 Main Street, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

JW-SEC-01089401

HIGHLY CONFIDENTIAL

Page 72

A.    I do not.

Q.    This one was never brought to your attention?

A.    No, I don't remember it.

Q.    Can you think of any legitimate reason someone at JELD-WEN would have had for speaking to a senior executive at Masonite for 37 minutes?

MS. BRYANT:  Objection, form, foundation, and also speaks to information that was not in the testimony.

A.    Yeah.  I mean, I don't want to speculate on what the subject matter would be.

Q.    (BY MR. CORRIGAN) But I'm saying, can you think of any legitimate reason why someone at May -- at JELD-WEN would have had a 37-minute call with senior executive at Masonite, Dale Mayfield?

MS. BRYANT:  Same objections, assumes facts not in evidence.

A.    Yeah.  I mean, at the time, Masonite was suing JELD-WEN over our hiring of VP of engineering and theft of some intellectual property.  That could -- I'm -- I'm hypothesizing here, as you asked me to -- that could be a reason for our conversation. I don't remember the specific conversation, and I don't know the gentleman Dale Mayfield.

Q.    (BY MR. CORRIGAN) That wasn't you that made

JW-SEC-01089472

HIGHLY CONFIDENTIAL

Page 73

that call to Mr. Mayfield, correct?

A.    Of course not.

Q.    Why do you say, "Of course not"?

A.    Never heard the name before.

MR. CORRIGAN:    This one has been previously marked as Exhibit 70.

(Previously marked Exhibit No. 70.)

Q.    (BY MR. CORRIGAN) Mr. Hachigian, I'll represent to you that you're not on this document either.    It's the same type of summary record of a phone call that was made on October 14, 2014 between JELD-WEN's main number and between the office number of Fred Lynch, who was the CEO at Masonite.

Do you see that?

A.    I do.

MS. BRYANT:    Same objection as to Plaintiffs' Exhibit 70.

Q.    (BY MR. CORRIGAN) This call was 17 minutes long.

Do you know who made this call from JELD-WEN's central -- central number to Mr. Lynch?

A.    I could not say with certainty.

Q.    Do you think it was you?

A.    It could have been.

Q.    Why do you say, "It could have been"?

JW-SEC-01089473

Page 74

A.    Because this is around the time that we were trying to settle the legal suit that Masonite had at JELD-WEN.

Q.    What legal suit was that?

A.    Philip had hired their VP of engineering, and Masonite had sued us over his bringing over some intellectual property around fiberglass doors.

Q.    What was his name?

A.    I don't remember.

Q.    Was it Coghlan?

A.    Yes.

Q.    What was his first name?

A.    I don't remember.  I had --

Q.    Henry Coghlan?

A.    Yeah, could be, yeah, yeah.

Q.    Mr. Orsino hired Mr. Coghlan from Masonite, and the allegation was he brought trade secrets over from Masonite to JELD-WEN about fiberglass doors; is that what you're saying?

A.    To the best of my recollection, that's what I remember.

Q.    What was Mr. Coghlan's position with JELD-WEN?

A.    So he was out in Klamath Falls, and he was in the engineering group.  I think he was the VP of engineering.

JW-SEC-01089474

HIGHLY CONFIDENTIAL

Page 75

Q.    Was he there at all when you were there at JELD-WEN?

A.    He was for six months into 2014 and part of the settlement, we terminated him, retired him.

Q.    Masonite sued -- did Masonite sue Mr. Coghlan, or did they sue JELD-WEN?

MS. BRYANT:  Objection, foundation.

You can answer.

Q.    (BY MR. CORRIGAN) To your knowledge.

A.    Well, he may have sued both, but I know that he had sued JELD-WEN.  I -- I didn't know about Mr. Coghlan's situation.

Q.    JELD-WEN hired counsel to handle the lawsuit, correct?

A.    It was ongoing when I joined in April of 2014, correct.

Q.    What law firm did JELD-WEN hire to handle this lawsuit?

A.    I don't remember.

Q.    Did you ever talk to lawyers?

A.    Regarding this --

Q.    Yes.

A.    -- is that your question?

Q.    Yes.

A.    I don't -- I don't remember if I did.  I may

JW-SEC-01089475

HIGHLY CONFIDENTIAL

Page 113

Q.   About what?

A.   We had pending litigation on intellectual property.  We had different reasons to discuss different issues, yes.  Thomas & Betts and -- yeah, intellectual property.  We were suing each other on different issues.  Sometimes employees would go to a competitor and -- and violation of employment agreements and non-competes and things like that, yes.

Q.   Were there any other cases you had against Masonite where you spoke to Mr. Lynch about?

A.   No, there was no other pending litigation, just this one.

Q.   And Mr. Coghlan was what, what was his position again?

A.   Again, I don't remember specifically. Pretty much the vice president of engineering.

Q.   What were the -- sorry.

A.   No, vice president of engineering.

Q.   In general, what were the damages that Masonite was looking for from JELD-WEN?

          MS. BRYANT:  Objection, form, foundation.

A.   Yeah, I couldn't recall specifically what they were looking for in their -- in their -- in

JW-SEC-01089513

HIGHLY CONFIDENTIAL

Page 114

their case.  I -- I couldn't recall the damages, the monetary damages.  It was significant though.

Q.    (BY MR. CORRIGAN) So this was a serious piece of litigation then?

A.    I thought it was serious because it really was an obstacle with us moving forward on our design of fiberglass door, so the fiberglass door is a whole new category and so that was an important new product we were working on.  I believe I knew that.

Q.    So it was seri enough -- serious enough so that you and Mr. Lynch spoke to each other on the phone four different times in March of 2014 before you became CEO, correct?

MS. BRYANT:  Objection, mischaracterizes the exhibit.

Q.    (BY MR. CORRIGAN) I'm sorry.  There's three calls on here that were from the phone records, plus the one on the 19th from the E-mail.  That's where I'm getting the four calls.

MS. BRYANT:  Objection, mischaracterizes the witness' testimony.

A.    Yeah, and one of these is 33 seconds.

Q.    (BY MR. CORRIGAN) What about the 14-minute one?

A.    So that one, we were probably talking

JW-SEC-01089514

HIGHLY CONFIDENTIAL

Page 115

more -- I mean, again, I'm -- I'm -- I don't know.  I don't want to speculate.  I don't remember the call specifically.  The only issue that I talked to Fred over this period of time was around resolving the litigation so that my only recollection of this would be resolving the litigation, and, look, if you look at the records, I think we resolved it by the fall or late summer of that year, 2014.

Q.   So what I'm saying is that this was a serious enough case so that you and the CEO of your primary competitor were on the phone four different times in the month before you became CEO, correct?

MS. BRYANT:   Same objection.

A.   I viewed the case as getting rid of another distraction or obstacle before I stepped into the team and -- and since he had reached out and made contact and wanted to move forward on the other constructive dialogue issues, I thought it would be good to settle the case.

Q.    (BY MR. CORRIGAN) Did you talk to him about the doors business?

A.   No.

Q.   Well, you don't remember the calls.  How do you remember you didn't talk to him about the doors business?

JW-SEC-01089515

HIGHLY CONFIDENTIAL

Page 116

MS. BRYANT:  Objection, argumentative.

A.    And I'm pretty disciplined about knowing the rules of engagement and would not.

Q.    (BY MR. CORRIGAN) Well, the rules of engagement, as you set out to your team, was do not have contact with any competitors under any circumstances, correct?

MS. BRYANT:  Objection, misstates the exhibit.

A.    That's the direction to the rank and file, but my general counsel was involved with this pending litigation and so there was a reason to have resolution of this legal issue.

Q.    (BY MR. CORRIGAN) So you were the CEO, so you decided that you calling Fred Lynch and him calling you were not a violation of your instructions to the rank and file, correct?

A.    Along with the general counsel that -- that's resolving this issue, CEO to CEO, because I had gotten some of the history on it -- it was getting messy -- that with a new CEO in the chair, Fred had a horrible distaste for Philip, and that there was an opportunity for me to clear the air on this issue.

Q.    If it was getting messy, why didn't you let the

JW-SEC-01089516

HIGHLY CONFIDENTIAL

Page 155

take a look at what I've had marked as Plaintiffs'
Exhibit 365 which, again, is a phone record, and if
you look at the very last entry on this page, which
is the item 13757, do you see that?

    A.    Uh-huh.

            MS. BRYANT:    Objection to this exhibit
as incomplete.

    Q.    (BY MR. CORRIGAN) And if you follow along
the originating number, that's your cell phone
number, correct?

    A.    It is.

    Q.    And this call was made on May 15th, 2014 and
the call, according to these records, lasted 4 minutes
and 36 seconds.

            Do you see that?

    A.    I do.

    Q.    And our records show that the terminating
number is Fred Lynch's office number.  Does that number
look familiar to you?

    A.    The 813 looks familiar, so it could be.  I
just don't memorize everybody's phone numbers.

    Q.    Okay.  Do you remember a four-and-a-half-minute
call with Mr. Lynch on May 15th, 2014?

    A.    I do not.

    Q.    And you don't recall whether or not a lawyer

JW-SEC-01089555

HIGHLY CONFIDENTIAL

Page 156

was on this call with you?

A.    I don't remember the call.

Q.    Do you recall taking any notes from this call?

A.    I don't remember the call, so I wouldn't have -- I don't remember taking any notes to the call.

MR. CORRIGAN:  Please mark this as 366.

(Exhibit No. 366 marked.)

MS. BRYANT:  Same objection to this Rule 1006 summary.

Q.    (BY MR. CORRIGAN) Please take a look at what I've had marked as Plaintiffs' Exhibit 366, and this is another 1006 summary exhibit summarizing the phone call we just saw from the records.  On the left side there, shows 5-15-2014 call at 10:04 a.m. for 4 minutes and 36 seconds, and that's your cell phone on the left as the originating number, correct?

A.    Yes.

Q.    Okay.  And this document indicates that the terminating number is Fred Lynch's office number, which is (813)739-1823?

MS. BRYANT:  Objection, foundation.

A.    So this is the -- it's the same phone call --

JW-SEC-01089556

HIGHLY CONFIDENTIAL

Page 157

Q.    (BY MR. CORRIGAN) It is.

A.    -- from the prior page, right?

Q.    Yes.  It just summarizes in a way that's a little easier to understand.

A.    And, again, this is around the same time we were discussing the Coghlan litigation, so I'm not sure of your question.

Q.    I'm just -- I'm just showing you what it looks like and asking if you identified your cell phone number.

A.    Yeah, that's my cell phone number.

Q.    You've mentioned a number of times today that you were running a 3 billion-dollar company, correct?

A.    Correct.

Q.    But, yet, you had time to talk to the Masonite CEO a number of times about this Coghlan case, correct?

A.    Because I was trying to get it resolved correct.

Q.    Okay.

          MR. CORRIGAN:  Please re-mark this one as Plaintiffs' Exhibit 53.

          (Previously marked Exhibit No. 53.)

Q.    (BY MR. CORRIGAN) Mr. Hachigian, please take a look at what I've had marked as Plaintiffs' Exhibit 53, and I will represent that you are not on

JW-SEC-01089557

HIGHLY CONFIDENTIAL

Page 158

this document, but it is Bates stamped JELD-WEN-00891798.

The reason I'm showing you this is that it appears to be a memo from a pricing strategy meeting at JELD-WEN, and at least Bob Merrill is at the meeting, Mark Thurman, and if you look in the first page under the Product Category Notes, number of references to Ford, Maughon, Mercier, and Bob is Bob Merrill, correct?

A.    Correct.

MS. BRYANT:  I'm sorry, Mr. Corrigan. Was the entirety of that a question or just the last part about --

MR. CORRIGAN:  Just the last.

MS. BRYANT:  -- Bob being Bob Merrill?

Okay.  The rest of it was a representation?

MR. CORRIGAN:  Yes.

MS. BRYANT:  I understand.

Q.    (BY MR. CORRIGAN) And does this appear to be a memo from a pricing strategy meeting at JELD-WEN on May 15, 2014?

MS. BRYANT:  Objection, foundation.

A.    It looks like it's the notes from North America, full product line, so vinyl windows, wood

JW-SEC-01089558

HIGHLY CONFIDENTIAL

Page 165

you're trying to isolate it to one specific line in a four-page memo. You're just disregarding all the other information on the page.

Q. (BY MR. CORRIGAN) I'm not trying to isolate. I'm specifically asking you a question about this document.

A. You should ask Bob. It's his document, it's his conclusion. I don't know what was in his mind at the time he wrote this.

Q. You're telling me you had no conversations with Bob prior to this where you told him you wanted interior door prices to go up, right?

A. You're -- you're miswording it. What I had told the team is I wanted a detailed analysis of pricing by product line and I wanted to make some concrete decisions about our pricing strategy across the board, across the company and geographically around the world because I believed part of fixing JELD-WEN was getting prices back to a fair and nominal place where we could make money, correct.

Q. And the third bullet point there says, "Target July 1st announcement with a 60-day effective date," and then some other dates in parentheses, and this was ultimately price increase. It was announced in June and then became effective in August, correct?

JW-SEC-01089565

HIGHLY CONFIDENTIAL

Page 166

MS. BRYANT:  Objection, foundation.

A.    Again, without the other subsequent documents, I don't know -- I -- I don't know what the conclusion of this memo was or what Mark and Bob came to me.  We -- we -- we did go up with a price increase in June, early June, and I don't -- and, again, you have all these other product lines here and all these other categories here, so I'm not quite sure if this was a direct correlation to that or it was a by-product of that or that was a separate discussion or decision.  I don't -- I don't really remember.

Q.    (BY MR. CORRIGAN) Now, the previous document, 366, details a phone call you had with Mr. Lynch on May 15th, correct?

A.    366?  Yes.

Q.    And that's the same day of this pricing strategy meeting, correct?

A.    That I did not attend.

Q.    What was the connection between your call with Mr. Lynch and this pricing strategy meeting?

MS. BRYANT:  Objection, assumes facts not in evidence.

A.    None.

Q.    (BY MR. CORRIGAN) So you're saying that

JW-SEC-01089566

HIGHLY CONFIDENTIAL

Page 167

your call with Mr. Lynch on the 15th was complete coincidence that that call took place on the same days as pricing strategy meeting, correct?

MS. BRYANT: Objection, argumentative.

A.    Yeah.  It makes -- absolutely there's no correlation.  We would never discuss price or anything close to price.

Q.    (BY MR. CORRIGAN) So you're --

A.    The customer --

Q.    -- saying the fact that this call --

MS. BRYANT:  Wait, one -- one second, Mr. Corrigan.  Can he just finish his answer?

MR. CORRIGAN:  Sure.

A.    Yeah, if you look at this memo, again, you're still completely disregarding that we're talking about all these other product lines.

Q.    (BY MR. CORRIGAN) Now, you're telling me that the call you had with Fred Lynch on May 15th, it's a complete coincidence that you had the call with him on the same day as the JELD-WEN pricing strategy meeting, correct?

MS. BRYANT:  Objection, argumentative and asked and answered.

A.    And I wasn't at this meeting.

Q.    (BY MR. CORRIGAN) Are you saying it was

JW-SEC-01089567

Page 168

complete coincidence that these two events happened on the same day?

MS. BRYANT:   Same.

A.   Absolutely.

Q.   (BY MR. CORRIGAN) Okay.

MR. CORRIGAN:   Please mark that as Plaintiffs' Exhibit 367.

(Exhibit No. 367 marked.)

Q.   (BY MR. CORRIGAN) Mr. Hachigian, please take a look at what I've had marked as Plaintiffs' Exhibit 367 which is JELD-WEN-00576398, 6399.  I'm just going to ask you about the first page.

A.   Yes.

Q.   You recognize that document?

A.   Yes.

Q.   And that appears to be an E-mail between yourself and Mr. Thurman at the top, and then an E-mail between yourself and Mr. -- is it Maughon?

A.   Maughon.

Q.   Maughon in the middle, do you see that?

A.   I do.

Q.   Okay.  And the E-mail from Mr. Maughon to you is dated May 22nd, 2014, correct?

A.   Correct.

Q.   And he says, "Kirk, you will find challenges

JW-SEC-01089568

HIGHLY CONFIDENTIAL

Page 356

STATE OF TEXAS

COUNTY OF HARRIS

REPORTER'S CERTIFICATE

ORAL VIDEOTAPED DEPOSITION OF KIRK HACHIGIAN

January 23, 2020

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 24th day of January, 2020.

Vickie G. Hildebrandt, CSR

Texas CSR 1363

Expiration:  06/30/22

Veritext Legal Solutions

Firm Registration No. 571

300 Throckmorton, Suite 1600

Fort Worth, Texas  76102

817-336-3042

JW-SEC-01089756