# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

_____
                              : Lead Civil Action No.
IN RE: INTERIOR MOLDED DOORS  : 3:18:-cv-00718-JAG
ANTITRUST LITIGATION          :
_____:
                              :
IN RE: INTERIOR MOLDED DOORS  : Lead Civil Action No.
INDIRECT PURCHASER ANTITRUST  : 3:18-cv-00850-JAG
LITIGATION                    :
_____:

            Videotaped deposition of DR. RUSSELL L. LAMB,

taken pursuant to Notice, was held at the Law Offices of

BERGER MONTAGUE, 1818 Market Street, Philadelphia,

Pennsylvania, commencing March 4, 2020, at 9:23 a.m., on

the above date, before Amanda McCredo, a Court Reporter

and Notary Public in the Commonwealth of Pennsylvania.

CONFIDENTIAL                                      JW-SEC-01102361

information with each other?

MR. CORRIGAN:  Object to the form.

A    I need to correct my prior answer and incorporate, by reference, paragraphs 123 through 168 in my expert report.  I incorrectly narrowed the scope of the paragraphs that I referenced there.

I would say that the -- to answer your question, the inference of a discussion about pricing is supported by the evidence of other actions in the marketplace that are coincident with or very close in proximity to the communications, for example.

So, I talk about here the phone calls, for example, between Mr. Hachigian and Mr. Lynch.  And I note, "In the midst" -- as I point out, quote, In the midst of these communications, Masonite's Fred Lynch circulated a document titled, internal quote, Reactions to JW Management Changes, close internal quote.  The second bullet point in the discussion agenda was titled, internal quote, Start September/October price increase, dash-dash, Now, exclamation point, close internal quote, close quote.

I just point out that that's the kind of evidence, to an economist looking at the conduct in

CONFIDENTIAL

JW-SEC-01102540

this marketplace, where one has communications

followed in close proximity by behavior, which

behavior -- which actions can reasonably be

interpreted as a response to some -- something from

that other communication that's happening at the

same time.

It's that set of evidence taken together --

and we talked about this moments ago, where I noted

that it was surrounding events -- informed my

interpretation of what those communications suggest.

Q    What economic expertise in particular are

you bringing to bear in interpreting the document,

for instance, that you just described in

paragraph 124, that's a -- the document that Fred

Lynch circulated?

MR. CORRIGAN:  Object to the form.

A    The plain English of the document speaks

for itself.  I'm not bringing any economics

expertise in reading the English words on the page.

The expertise that I bring is understanding

how markets work.  And I've studied that for 30

years.  And so, I understand how markets are

supposed to work free of anticompetitive conduct and

the incentives that cause firms, when they can, to

want to circumvent competition for the purpose of

CONFIDENTIAL                                          JW-SEC-01102541

raising prices and increasing profits.

That is economic expertise that goes all the way back to Adam Smith, who highlighted that exact problem in The Wealth of Nations.

And so, the expertise that's brought to bear there is that, here there are opportunities to collude.  And in close proximity to those opportunities to collude, there is a -- an announcement, an internal announcement, to, quote, start the price increase now, exclamation point.

And that's a price increase that is going to happen in -- many months later.  September or October is the date referenced here.

Of course, we know that the first price increase that was implemented after those phone calls was implemented in August of 2014.

So, it's understanding, from an economic perspective, why communicating as would-be rival firms leads to an opportunity -- and there are incentives there -- to try to get prices higher in the marketplace.

That's an analysis that antitrust economists engage in all the time in looking at whether opportunities to collude are surrounded by evidence that there actually has been some sharing

CONFIDENTIAL                                          JW-SEC-01102542

multiple regression analysis is October 24, 2012. And it uses data through December 2018. That was the last date for which data was produced.

Q   You're right. There was data that was produced previous to that going back to 2009, in fact.

Did you review any of the data from Masonite and Jeld-Wen, the traction-level data from 2009 through October 23, 2012, in conducting your multiple regression analysis?

A   I didn't use any of that data in conducting my multiple regression analysis because it wasn't appropriate to do so, for the reasons I testified to earlier.

The structure of the market was different during that time period. That was a period of time when there were more than two firms -- independent firms supplying door skins and doors to the marketplace. And so, the way the market would have worked was different.

Q   Understood.

Later in the same paragraph -- so, still paragraph 198, top of the next page -- you state that, in your analysis, you used the actual prices paid by each purchaser --

CONFIDENTIAL                                    JW-SEC-01102617

Sorry, I see you're still flipping.  So, this is the last two sentences that I'm looking at.

Are you there?

A    I see it.  Yes.

Q    I'm sorry.  Strike that.  The last three sentences.

To restart the question, you say that, in your analysis, you used the actual prices paid by each purchaser for each transaction during the period under study, and that those prices are calculated on a per-unit basis, net of freight, discounts and rebates.

Is that right?

A    Correct.

Q    Why did you use the actual net prices paid by each purchaser in your analysis?

A    Let's -- I'm not sure what alternative price you would envision using, but there is a lot of complexity to answering that question.

I want to try to be efficient with your time.

It's appropriate to use the actual prices because, first of all, as a matter of econometrics, that's the variable that's appropriate to measure what customers actually pay.

CONFIDENTIAL                                          JW-SEC-01102618

It's appropriate to calculate it net of any discounts or rebates, et cetera.  And I've attempted to do that.

And I actually used the log of that price, although that's a kind of technical point that is maybe discussed later, but -- so, I'm basing the analysis on actual prices, not on some posted price or list price or something else in the marketplace.

Q   You mentioned that it was important to calculate the actual prices, net of freight, discounts and rebates.  Why was that important?

A   Well, I believe it's appropriate to, to calculate the net price, taking out the rebates and discounts, so that I'm looking at a measure of price which is not affected by any discounting strategy or rebating strategy that might differ between the two periods.

Q   You'd agree with me that the freight discounts and rebates could significantly alter the price paid by each purchaser for each IMD, right?

MR. CORRIGAN:  Object to the form.

A   It depends how you use the term "significantly."  They can alter the price, that's correct.

Q   In paragraph -- strike that.

CONFIDENTIAL                                    JW-SEC-01102619

Now, you used weights for the demand of 49, 47, 2, and 2 percent, respectively, for housing starts, remodeling activity, manufactured housing, and commercial construction; is that right?

If you're looking for it, it's at the end of your paragraph 200 on the top of page 102. So, it's second -- third-from-the-last sentence.

A    I did, yes.

Q    You hold those weights constant throughout your analysis; is that right?

A    Yes.

Q    Also in paragraph 200, right -- next sentence, you mention that you use a 12-month trailing average of this demand index in your analysis; is that right?

A    Yes.

Q    Now, is 12 months the correct timing of the response between changes in costs and changes in prices?

A    It's an appropriate -- you asked -- let's back up for one second.

You asked about changes in costs. Of course we're discussing demand here. So --

Q    I'm sorry, I should have --

A    -- I think you might have slipped.

CONFIDENTIAL                                                    JW-SEC-01102632

Q    Do you mind if I just reask it?  I don't mean to cut you off --

A    Sure.

Q    -- but you're right, I did ask it the wrong way.

Is 12 months the correct timing of the response between changes in demand and changes in prices?

A    It's an appropriate measure of that relationship.

Q    In terms of economics, should future prices be determined based on past demand or expectations of future demand?

A    Oh, boy, that's a very broad question.

In terms of economics, how one models prices, it depends on the market and depends upon the product in question and how expectations are formed.

As a practical matter, the distinction that your question draws is somewhat -- in many cases, somewhat irrelevant, because expectations of future demand typically reflect realizations of past demand.

So, typically the way most people form expectations are -- in many markets is what we would

CONFIDENTIAL                                                    JW-SEC-01102633

refer to as adaptive expectations.  People look at what's happened before and use what's happened before as an indicator of what's going to happen.

So, there is a lag structure built in that what, what is feeding into one's thinking about the future is what's happened in the past.

But it depends on the market.  I think using the lag structure that I've used here is appropriate, in part because it accounts for the kind of persistence in demand that is important in this market.

Q    You agree with me that it would be reasonable to set prices based, in some part, on anticipated future demand, right?

A    It depends on what you mean in that question by "reasonable" and what you mean by "anticipated future demand."

Q    I mean economically reasonable.  And by "anticipated future demand," I mean not looking at past demand but looking at your expectation of future demand.

MR. CORRIGAN:  Object to the form.

A    Well, in thinking about how one would model that, Counselor, you have to tell me how you're going to form your expectations.

CONFIDENTIAL                                          JW-SEC-01102634

This, this is a very rich, complicated literature in economics, when you think about expectations formation and how expectations get formed.

And as a practical matter, most economists think that expectations about what's going to happen are heavily influenced by what has happened in the past.

So, whether it is reasonable, as a matter of economics, to think -- to use some mechanism for expected demand would depend on how that expectation's -- how that expectations were -- was formed, how agents came to that understanding of what was going to happen in the future.

MR. CORRIGAN:  We should be doing that, not defense.

Q    Are the demand indices you used national?

A    Yes.

Q    Do you know if demand has changed in the same way across different regions or whether there is regional variation in demand?

A    Well, there is -- I haven't analyzed regional demand and supply, because I believe the market is a national market for interior molded doors.

CONFIDENTIAL                                                JW-SEC-01102635

Bill Gasser - Confidential

March 04, 2020

336

C E R T I F I C A T E


I, AMANDA McCREDO, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

_Amanda McCredo_

AMANDA McCREDO

U.S. LEGAL SUPPORT
(877) 479-2484

CONFIDENTIAL

JW-SEC-01102696