# EXHIBIT A

                    IN THE UNITED STATES DISTRICT COURT

                   FOR THE EASTERN DISTRICT OF VIRGINIA

                            RICHMOND DIVISION

------------------------------
                                      :
STEVES AND SONS, INC.,                :    Civil Action No.
                                      :    3:16cv545
vs.                                   :
                                      :    February 7, 2018
JELD-WEN, INC.                        :
                                      :
------------------------------



               COMPLETE TRANSCRIPT OF TRIAL PROCEEDINGS

                  BEFORE THE HONORABLE ROBERT E. PAYNE

                     UNITED STATES DISTRICT JUDGE

APPEARANCES:

Lewis F. Powell, III, Esquire
John S. Martin, Esquire
Maya M. Eckstein, Esquire
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219

Glenn Pomerantz, Esquire
Ted Dane, Esquire
Munger Tolles & Olson, LLP
355 South Grand Avenue
35th Floor                                       VOLUME VII
Los Angeles, California 90071

APPEARANCES: (cont'g)

Kyle Mach, Esquire
Munger Tolles & Olson, LLP
560 Mission Street
27th Floor
San Francisco, California 94105
Counsel for the plaintiff

Margaret M. Zwisler, Esquire
Allyson M. Maltas, Esquire
Latham & Watkins, LLP
555 11th Street NW
Suite 1000
Washington, D.C. 20004

Alfred C. Pfeiffer, Esquire
Latham & Watkins, LLP
505 Montgomery Street
Suite 2000
San Francisco, California 94111

Lawrence E. Buterman, Esquire
Latham & Watkins, LLP
885 Third Avenue
25th Floor
New York, New York 10022

Michael W. Smith, Esquire
Craig T. Merritt, Esquire
Christian & Barton
909 East Main Street
Suite 1200
Richmond, Virginia 23219
Counsel for the defendant

Tucker - Cross

A    Yes.

Q    You could have asked Edward Steves or Sam Steves what the number was through the end of 2017 for in-plant damages, could you not?

A    I wasn't sure that I could based on whatever the procedure was in the case.  At any point in time, you have to cut off your analysis for a trial, and there was a report schedule, and so to meet that report schedule, I had to estimate the last six months.

THE COURT:  You are asking him whether he could have submitted a supplemental report to supplement that with the approval of the Court and with the agreement of both sides or something -- is that what you are asking?

MR. BUTERMAN:  No.  Actually --

THE COURT:  What he's saying is that he had a deadline, that he had to live up to it, and the Court set the deadline upon agreement of the parties, and that's why he chose the time that he chose.  Are you suggesting he should have done something else?

MR. BUTERMAN:  Let me ask this question, Your Honor, because I --

THE COURT:  Sure, try that.

Q    Sir, you actually, in your report, reserved the right to put together updated calculations, did you not?

A    I did, because I thought -- as you know, Jeld-Wen provided

Tucker - Cross

1250

additional information, and we had several reports, and I reserved that right in case the Court said we could issue yet another report.

Q    You did not do any updated calculations?

A    I did not, because I didn't believe I had the right to.

Q    Now, sir, just very, very quickly on this, I think it was mentioned with Mr. Dane, but you are presenting to the jury a damages figure that assumes that Jeld-Wen is responsible for every single door skin defect claimed by Steves; correct?

A    The ones included in their contemporaneous records where they identify the ones that they believe were caused by Jeld-Wen.

Q    Despite the fact that Mr. Gartner testified here that for many of the categories, damages could be caused by Steves or assemblers, you still believe that it was a reasonable thing to do to assume 100 percent that Jeld-Wen is responsible for every single defective door skin; correct?

A    I did for the reasons I described earlier.  He simply said it was a possibility, but I didn't see any evidence, and I haven't seen any evidence there's any significant amount in there that was caused by Jeld-Wen.

Q    Now, sir --

        THE COURT:  Caused by Jeld-Wen or caused by Steves?

        THE WITNESS:  Excuse me.  Thank you.  Caused by Steves.

Tucker - Cross

1257

A    Yes.

Q    And you actually believe that if you look at the input costs, Jeld-Wen should have raised Steves' prices for 2013; is that correct, sir?

A    I did not find that.  Jeld-Wen was unable to provide support for how they calculated the .3, and in this litigation -- for the years that were required for the calculation, so there was no way for me to determine what would happen.  So I accepted the negative .3 cost adjustment.

Q    I want to be clear, sir.  It's not your testimony that you believe that Jeld-Wen actually, using the input formula, should have raised Steves' prices for 2013?

A    It is not my testimony.

Q    And what is that based on, sir?

A    Based on my analysis and determination that Jeld-Wen didn't provide sufficient information for the years to compare. Early on, I think I did do an estimate, but then as Jeld-Wen provided more information the second and third time, it said it did not have the underlying data that they could re-create how they had come up with the .3 percent.

Q    Sir, isn't it true that your initial view was that because the contract required Jeld-Wen to identify price increases by a certain point in time, and Jeld-Wen did not do that, that, therefore, you were okay leaving that number where it was?

A    Yes.  That was first, but that's because Jeld-Wen didn't

Tucker - Cross

provide detail when it was first asked.  So I had my team and I, we went and did our best to figure out what the answer was. That was the result in my first report.

Then the trial continued, and Jeld-Wen produced more information.  Then they were asked to produce more information. Ultimately Jeld-Wen provided everything that they said they had, and they then stated in a response that they were not able to demonstrate how that first year was done, so I just accepted it.

Q    So we agree that your initial calculations included an interpretation of how you believe the contract should operate; correct, sir?

A    I'm sorry.  Could you say that again, because I didn't --

Q    Your initial decision to not include what you thought was the actual correct price of the increase that Jeld-Wen was entitled to but did not take was due to your interpretation of how the contract worked; correct, sir?

A    No, sir.  I did not interpret the contract.  If I determined that Jeld-Wen's cost had increased based on the assumption I was given, I would have said that the prices should go up.

If I determined that the costs went down, I would have determined that the prices should go down, but I didn't interpret the contract.  That was based on the assumption that was given to me.

Tucker - Cross

A    All right.

Q    Now, when you initially presented your calculations for the overcharges on January 30th, 2017, you calculated that Jeld-Wen owed Steves $3,444,003; is that correct, sir?

THE COURT:  Where is this?

MR. BUTERMAN:  Your Honor, this is his first report, paragraph 57.  There's a chart we're going to put on the screen.

Q    Is that correct, sir?

A    Yes, that was based on the limited information from Jeld-Wen that I had at the time.

Q    And then you submitted a supplemental report on May 5th, 2017; correct, sir?

A    Yes.

Q    And by that time, you had changed your damages calculations for the overcharges to $5,692,835; correct, sir?

A    Yes.  Jeld-Wen provided additional details which I then analyzed and determined what the price adjustment and damages would be.

Q    That's an increase of about two and a quarter million dollars; correct, sir?

A    Yes.

Q    Then, sir, you submitted a supplemental damages calculation on August 21st, 2017; is that correct?

A    Yes.

Tucker - Cross

1261

Q    And in that third report, you had changed your damages calculations for the overcharges to $8,620,218; is that correct, sir?

A    That was part of the range, between that and the 9,300 --

Q    I want to do that one next.  To be clear, you also said that the number might actually be $9,933,602; correct, sir?

A    Correct.  By this time, Jeld-Wen had finally provided all of their information necessary for me to do a complete analysis, and this was the ultimate result based on all of the Jeld-Wen underlying documents.

Q    And so in the span of seven months, sir, you changed your damages calculations approximately $6.5 million or 188 percent; is that correct?

A    That is true, and I don't know whether we want to get into a discussion about this, but Jeld-Wen refused to give the information.  We asked for more information.  We did our best. They provided additional information.  It still wasn't all of their information.  Ultimately, when we got our information, I was able to complete my analysis.

Q    Now, sir, of the $9,933,602 that you are now claiming -- excuse me, that you are now presenting as damages related to the overcharges, do you agree that the overwhelming majority of that comes from a failure to decrease pricing under the supply agreement; correct?

A    Majority of that does come from that.