# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

------------------------------x

IN RE: JELD-WEN HOLDING, INC.

SECURITIES LITIGATION

CIVIL ACTION NO.

3:20-cv-00112-JAG

------------------------------x

VIDEOTAPE DEPOSITION OF

STEVEN P. FEINSTEIN

VIA ZOOM VIDEOCONFERENCE

January 30, 2021

10:00 a.m.

Reported by:

Maureen Ratto, RPR, CCR

STEVEN P. FEINSTEIN

inefficient or whether one would be able to prove that it was efficient, maybe even for litigation purposes, I have oftentimes in that context told people, clients that a security either was not efficient or that it would be impossible to prove that it was.

Q.    In your report you rely on the Cammer and Krogman factors to determine market efficiency, correct?

A.    I do, and as well as a couple of additional metrics.

Q.    You rely on the Cammer and Krogman factors because these are the factors that the court considered in reaching a market efficiency determination in security cases, right?

MR. ROTHMAN:  Objection.

A.    The answer to your question is, in part, yes, but that's not the only reason I relied on the Cammer -- I've always called them Krogman factors.  But there are other reasons I relied on the Cammer and Krogman factors besides that.

STEVEN P. FEINSTEIN

Courts have repeatedly relied on it and deemed these to be probative, if not dispositive factors.

Q.    Is any single one of the Cammer or Krogman factors dispositive?

A.    Again, it depends how you define the term "dispositive". I wouldn't rely on any single factor. I look at the factors holistically.

Q.    Are there any factors you can ignore?

A.    I don't ignore any of them and I wouldn't ignore any of them. I would consider all of them.

Occasionally, you'll have some of the factors pointing in one direction and other factors pointing in the other direction with respect to the conclusion on market efficiency.  And I wouldn't ignore the contrary evidence but I would dig deeper and try to find an explanation for why the factors are inconsistent. And if I find the explanation, usually finding that explanation tells you what

STEVEN P. FEINSTEIN

the meaning of the inconsistency is and whether, in fact, the security did trade efficiently or inefficiently.

Q.    Do you consider any of the factors more important than others in determining market efficiency?

A.    I don't consider them -- like I said, I consider them all holistically. So I don't throw any of them out.

I do -- every time I do an efficiency study I consider all of them. But, you know, there are some overlap. For instance, S3 registration has a market cap component and market capitalization is a separate Krogman factor.

So in that sense, and because there is overlap, like when I did my empirical work I looked at market cap and considered that to be a proxy for -- my empirical work for my academic research, I mean. You know, market cap was a pretty good proxy for what the courts were interested in when they talked about S3

STEVEN P. FEINSTEIN

registration, for example.

So I don't throw any of them out but, you know, sometimes you don't have to consider all of them independently because sometimes they do overlap.

Q.    Have you ever offered a report where you concluded the market was efficient without empirical evidence?

MR. ROTHMAN:  Objection.

A.    I believe I have.

Q.    And what case was that?

A.    I don't recall but sometimes when there is a case that has numerous securities, stocks and bonds, some of the bonds might have enough trading data to run the empirical test.  And I'll say that because there are conclusions from similar bonds issued by the company I can draw a conclusion about the bond for which I cannot run the empirical test. I'm quite sure I've done that before.

Q.    Have you ever found an event study in a report that did not support a

STEVEN P. FEINSTEIN

the shares previously or the company might have been -- it would have been privately owned or privately or closely held. Initial Public Offering is where stocks and ownership shares are offered to the public to purchase.

Q.    I'm going to use the abbreviation IPO to refer to Initial Public Offering.  Does that make sense to you?

A.    It does.

Q.    Are you familiar with the concept of a primary market for a security?

A.    Yes.

Q.    Can you define it?

A.    Well, the primary market is the market for the IPO.  It's the market where the shares are being issued by the company via underwriters to the public. The secondary market is the trading of those same shares among investors and market participants subsequently.

Q.    You anticipated my question.

STEVEN P. FEINSTEIN

Are you offering an opinion that the primary market for Jeld-Wen stock was efficient?

A.    With the definition, yes, and given the definition I gave. It's given the Cammer and Krogman factors, given what we know about the nature of this security, the people that owned it, the information available about it, it's unfathomable that one might even suspect the market participants were ignoring the material valuation and relevant information on the IPO date.  So because of that I conclude that the market was efficient even on that first day of the class period.

Q.    What analyses did you do to support that opinion?

A.    I looked at -- well, the Cammer factors.  So we know that subsequently there was -- well, on the first day there is a tremendous amount of volume, by definition. I mean, the entire 600-million-plus new float was offered to

STEVEN P. FEINSTEIN

the public.

So there is tremendous volume. There was tremendous institutional participation, as we know from looking at -- from knowing about how IPOs usually work and who the owners of the stock subsequently were. There was analyst coverage, there was analyst coverage before the IPO there was analyst coverage in the IPO there was analyst coverage immediately after the IPO. Analysts and investors were talking about stock, talking about the valuation, even talking about the company and its history and what made it valuable. We know there were market makers, not only subsequently in the secondary market, but clearly there were underwriters there were market makers in the IPO, many of them sophisticated well known names.

We know that -- looking at S3 registration of course is the -- is the fourth Cammer factor and it's what would make S3 registration -- a company is

STEVEN P. FEINSTEIN

eligible for S3 registration when there is a lot of shares out there, when it's a big company that draws a lot of attention and financial information is available. On the IPO date both of those were satisfied. I mean, S3 eligibility wasn't. But it was a big company with 600-million-plus dollars worth of shares issued and the registration documents gave the public years of prior financial data.

The float was substantial. You know, even though the market cap of the company was much much bigger, but the float alone was, you know, among the 20% biggest companies in the country.

So those are the factors. I mean, those are the all the factors that would indicate that it's just extremely unlikely that these sophisticated market participants were ignoring available information which is the definition, the operative definition of operational market efficiency.

Page 52

STEVEN P. FEINSTEIN

Q.    Have you previously offered an opinion regarding whether the primary market for the stock was efficient?

A.    I'm not sure. I don't think so.

Q.    Do you understand what a quiet period is following an IPO?

A.    I do.  It's written about in my report.

Q.    What is it?

A.    There is a regulation that the underwriters who were underwriting the IPO were prohibited from also issuing analyst reports during a certain period of time. I think it used to be longer but at least in the Jeld-Wen timeframe it was ten days.

Q.    Okay. And you refer to a longer period.  Are you referring to the 25 day customary quiet period?

A.    I recall seeing documentation that it sometimes was as much -- well, it was that or longer. I mean, what was relevant for this case is that I looked

Page 55

STEVEN P. FEINSTEIN

selling.  It doesn't make sense to me.

So it depends what -- it depends on what the nature of the constraint is as to whether or not it can have any impact on the price.

Q.    Is there truth that there may be constraints in short selling early in the quiet period?

MR. ROTHMAN:  Objection.

A.    I'm not sure. It's something I would have to look further at specifically for this time period.

We have -- what's going on in the quiet period, though, is you got many many investors and many many institutions choosing to buy.  So choosing not to buy would have essentially the same effect as -- as -- any of those market participants who might otherwise choose to short sell would be able to essentially vote their opinion by choosing not to buy.

So I'll look at it further. I'll see what your -- it sounds like you got some argument that your expert is

Page 56

STEVEN P. FEINSTEIN

going to try to develop.  When I have a chance to look at it I can critique it better and respond to it.

Q.    Did you analyze any short selling at all during the class period?

A.    I did not.

Q.    Have you offered an opinion before regarding whether a market was efficient during a quiet period following an IPO?

A.    I don't recall that I have. I may have but I don't recall that I've offered an affirmative opinion.

Q.    Are there situations in which it could take some time after an IPO for a stock to begin trading into efficient market?

MR. ROTHMAN:  Objection.

A.    Well, that, again, it depends what you mean by efficient. If by efficient you mean fundamentally efficient where there is an equilibrium where the stock price equals some agreed upon valuation formula, something like a

Page 57

STEVEN P. FEINSTEIN

discounted cash flow formula, yeah, I would say that there may be some period of time before all liquidity effects are dissipated and the only thing affecting the stock price are certain -- certain fundamentals according to certain fundamental valuation principles and valuation models.  That's the concept of fundamental efficiency, but that's not the kind of market efficiency I'm opining about and is relevant in a securities case.

          The kind of informational efficiency, which I am opining about and is relevant to a case, is about whether or not the market is ignoring available information or, alternatively, incorporating and digesting it and incorporating it and considering it. And I don't think there was any period of time in Jeld-Wen's proposed class period that you can say that that market was informationally inefficient, that market participants were either choosing to

Page 58

STEVEN P. FEINSTEIN

ignore available information or unable to trade on it.

Q.    Are you aware that some courts have held that the primary market for IPO shares are inefficient as a matter of law?

A.    No.

Q.    Are you aware that some courts have held that an efficient market cannot be established during a quiet period?

A.    I'm not aware of that.

Q.    If you had known that would that have affected your opinion in any way?

MR. ROTHMAN:   Objection.

A.    Well, I'd investigate to see why those -- well, to see if, in fact, those were the opinions offered by a court, and what the facts were that the court considered, and whether they applied to a specific case or more generally to other cases.

I'm always open to considering other opinions. I saw no good reason to

STEVEN P. FEINSTEIN
conclude other than what I did conclude in this report in this case.

Q.    Why didn't you look at the quiet period separately from the rest of the class period?

MR. ROTHMAN:  Objection.

A.    I did, and I mentioned that I did. I looked to see what analyst coverage there was during the quiet period. That was an important consideration in my drawing this conclusion.

Q.    So you think it is appropriate to look at the quiet period separate from the rest of the class period?

MR. ROTHMAN:  Objection.

A.    I think it's important to see if there's analyst coverage throughout the class period.  And if there is no analyst coverage during the class period, that would be an important consideration.

Here there was analyst coverage during the quiet period. It made the quiet period not really that quiet.

Page 64

STEVEN P. FEINSTEIN

Q.      This is your event study results, correct?

A.      Well, this is actually event study results for every day in the class period, not just the earnings announcement days.

Q.      If you look at the first column which is date.  The first date you include is January 27, 2017, correct?

A.      That's right.

Q.      Why didn't you include the first day of the class period January 26, 2017?

A.      Because that was -- the price that was available that day was the IPO price not a price from the New York Stock Exchange.

Q.      Okay. And the third column, Jeld-Wen prior day closing price, that shows Jeld-Wen's closing stock price on January 26, 2017, following the IPO is $23, correct?

A.      That's right.

Q.      And that's the IPO placement

STEVEN P. FEINSTEIN

price.

A.     Correct.

Q.     The next day, January 27 was the first date of the secondary market, correct?

A.     That's right. Yes.

Q.     So on January 27 after the start of the secondary market the stock was at 26.12, correct?

A.     At the close on January 27th it closed at 26.12, yes.

Q.     And that's about a 13% increase over the IPO price?

MR. ROTHMAN:  Objection.

A.     Approximately.

Q.     What could have caused that increase in the stock price?

MR. ROTHMAN:  Objection.

A.     Well, there is a literature that underwriters and issuers choose to price generally IPO's at a discount from what they anticipate will be the full information equilibrium price.

They do it for a variety of

Page 66

STEVEN P. FEINSTEIN

reasons. There is a vast literature on those reasons. It serves them well to do that. They did do it here apparently.

The analysts -- I told you there was analyst coverage here, the analysts commented on it. The analysts said it was 14% intentional underpricing. But that's what's reflected here. They choose -- you know, it served their purposes to price it at 23, even though the information that was available in the market would push it up to 26.

Investors who bought the stock at 23 were providing liquidity to the underwriters and the company and they got compensated for what they sold to and provided to the marketplace, that liquidity.  That's the difference.

And I just want to add, my conclusion is that had there been full information rather than the alleged misinformation the full equilibrium but-for price would have been lower and, therefore, the IPO price would have been

STEVEN P. FEINSTEIN

lower. So there is no evidence in these two columns that the market was informationally inefficient at the IPO or on the first day. In fact, it's all consistent with market efficiency.

Q.   Okay. I'm going to focus on the second Cammer factor. Why is analyst coverage important in determining whether the market for a stock is efficient?

MR. ROTHMAN:  Lindsey, is now a good time to take a break since you switched factors?

MS. HARRIS:  Absolutely.

MR. ROTHMAN:  You want him to answer that question and then we can come back or do you want to start fresh?

MS. HARRIS:  Why don't you answer that. I think he will be able to answer it.

MR. ROTHMAN:  I do too.

A.   Analysts have access to the company that the individual investors don't have and they have expertise that

Page 68

STEVEN P. FEINSTEIN
individual investors don't have and their covering the company helps digest available information and disseminate available information and share with the marketplace what the benefits of their expertise and information.  They help to digest information which helps make the market efficient.

MS. HARRIS:  Thank you. We can take a break. You guys want to take five minutes or ten minutes?

MR. ROTHMAN:  I think -- how much time do you want to take.

THE WITNESS: Five is good.

MR. ROTHMAN:  Okay. Five minutes.

VIDEOGRAPHER:  We are going off the record. The time is 11:07 a.m. Eastern.

(Recess is taken.)

VIDEOGRAPHER:  We are back on the record. The time is 11:18 a.m. Eastern.

Q.    Is analyst commentary

STEVEN P. FEINSTEIN

to know -- we'd have to know why no one is choosing to read it to know whether there is any effect on that factor being probative of efficiency or not.

Q.    How do you define a securities analyst?

A.    I mean, it's almost just plain English.  It's an analyst who analyzes securities. Generally, these are professionals who -- some work for sell-side banks.  I mean, I wrote in my report that sometimes you have buy-side analyst who work for the institutions, themselves, but it's a financial analyst who focuses on covering and evaluating a security or a group of securities.

Q.    Is anyone who writes about a stock a securities analyst?

A.    Clearly not. I mean, you can imagine a scenario, you know, ad absurdum scenario where someone with no training and no background and no understanding and no information will write some opinion and I wouldn't necessarily call

Page 72

STEVEN P. FEINSTEIN

that person a security analyst.  But that doesn't mean that -- it just means there is a range, there is a range of qualities among security analysts.

Q.    How do you know if somebody writes about a stock is a qualified analyst?

MR. ROTHMAN:  Objection.

A.    There's a number of indicators, who they work for and what they've written about previously, and what is the platform that they're disseminating the writing on.  These are all relevant or can be relevant.

Q.    If you look at paragraph 176 of your report, and that's on page 60.

A.    Yes.

Q.    You list 13 analysts firms that published reports about Jeld-Wen during the class period, correct?

MR. ROTHMAN:  Objection.

A.    Right. These are firms whose analysts wrote and published reports. That's right, but let me check something.

Page 76

STEVEN P. FEINSTEIN

the definition.  Not even that, as characteristics that would -- as a non-exclusive list of characteristics that would indicate that quality.

Q.    Is Seeking Alpha listed among any of the firms listed in paragraphs 176 or 177 of your report?

A.    Seeking Alpha is a platform for analysis. It's not a sell-side firm. These are sell-side firms.

Q.    And what -- Seeking Alpha is a financial blog?

A.    I would say it's a platform, an information platform.  It's not a blog.

Q.    What do you mean by "information platform"?

A.    It's a website where research can be acquired and provided.

Q.    Okay. Let's look at tab 1 of your report. This contains a list of the documents and other information you considered in forming your opinions, correct?

STEVEN P. FEINSTEIN

A.    Yes. Before we move on, though, I want to add one thing, which is what we talked about in paragraph 176 and 177 are just the buy-side analysts. We also have -- I'm sorry.  Those are the sell-side analysts.  And I notice on the heading above paragraph 184 I talk about buy-side analysis.

So we know that over the course of the class period 376 major institutions, these are like major investment companies that manage over $100 million for their clients, 376 of them own Jeld-Wen stock, and in some form or another they all have buy-side analysts, either a dedicated buy-side analyst or a portfolio manager doing analysis on the company as well.

So even though I identified 16 sell-side analysts firms, we also have 376 major institutions that are also providing analysis that goes into the decisionmaking of whether or not to buy or sell Jeld-Wen stock.

STEVEN P. FEINSTEIN

All right. So section --

Q.    Can I draw your attention to 120?

A.    Sure.

Q.    How did you identify the analyst reports in this exhibit?

A.    Well, two or three different ways. It used to be that what we would do is just download from Thomson Eikon all the analysts that according to Thomson Eikon were covering a particular company.

Like I said, I rely on my staff to do the actual execution. My staff has discovered that a more cost effective way of doing it is to first ask the attorneys what reports they have, get them, get all those from the attorneys, and then fill in -- and then see which ones are available on Thomson Eikon that the attorneys couldn't provide.  And that way we have to -- we buy fewer, we spend less money and have to buy fewer analyst reports.

I think that's the process

Page 79

STEVEN P. FEINSTEIN

that was followed here, where we asked the client what they had and then we filled it in from everything that Thomson Eikon had on Jeld-Wen that the client didn't have, the attorneys, Plaintiffs' counsel.

But in addition, we looked to see what was being covered on Seeking Alpha, and we also noticed that Onex, the private equity firm that owned a substantial part, both before the IPO and after the IPO, substantial part of Jeld-Wen had its -- there was analyst coverage on it itself and that analyst coverage also covered Jeld-Wen during this so-called quiet period. So we got Onex reports both from the client and from Thomson Eikon.

Q.    And the Seeking Alpha reports you mentioned, did you receive those from Plaintiffs' counsel or your team found those?

A.    My team.

Q.    The last Seeking Alpha entry

Page 80

STEVEN P. FEINSTEIN

on this list is from January 31st, 2017. Were there no more Seeking Alpha articles after that date?

A.    I don't believe that's the case.

Q.    Why don't you list additional Seeking Alpha articles after that date?

A.    The search was for the initial period to see what was being said about Jeld-Wen during the so-called quiet period and whether there was coverage or not during that quiet period and we found there was.

Q.    What were the parameters you gave your team to look for the Seeking Alpha article?

A.    I don't recall specifically.

Q.    Why didn't you continue to consider Seeking Alpha after the initial period following the IPO?

A.    Well, like I said, the search was to see if there was analyst coverage during this initial period. So the parameters were likely confined to that

Page 81

STEVEN P. FEINSTEIN

earlier period. They could have been expanded.

It wouldn't have changed the results as far as the early period, but that was what I was interested in; was there analyst coverage during this earlier period, and the answer is yes.

Q.    So did you look for Seeking Alpha reports during that time period because you hadn't received reports during that time period from Plaintiffs' counsel?

MR. ROTHMAN:  Objection.

A.    That's one of the reasons.

Q.    Do you agree that if only one analyst is reporting on a certain time period some important information could be overlooked?

MR. ROTHMAN:  Objection.

A.    Overlooked by whom?

Q.    The market.

MR. ROTHMAN:  Objection.

A.    Not this market. I don't believe that would happen with this

Page 83

STEVEN P. FEINSTEIN

at that in the docs reviewed in the Relied Upon exhibit. So yes, this is what I wrote and there's additional support for this conclusion.

Q.    Would you have concluded the Cammer factor was met during the quiet period without the Seeking Alpha reports?

MR. ROTHMAN:  Objection.

A.    I think so because of the Canaccord and Web Bush coverage as well during that same period.

Q.    Okay. Do you know the criteria for creating a post on Seeking Alpha?

A.    I couldn't recite for you, no.

MS. HARRIS:  I'm going to mark as Exhibit 2 the Seeking Alpha report by The Value Investor dated January 31st, 2017.

(Exhibit 2, Seeking Alpha article dated January 31, 2017, was received and marked on this date for identification.)

Q.    Is this one of the Seeking Alpha posts you referenced in paragraph

STEVEN P. FEINSTEIN

182?

A.    How do I see it?

Q.    If you click on marked exhibits, it should refresh and appear in the middle window.

MR. ROTHMAN:  I had to hit back and then hit Marked Exhibits and then go forward.

CONCIERGE:  You could also hit refresh in the Marked Exhibits and that should refresh, Dr. Feinstein.

THE WITNESS: Okay. Yes, it is.

Q.    Who is the author of this post?

A.    Well, an individual who goes by the name the Value Investor, who has 18,000 followers on Seeking Alpha.

Q.    Do you know his or her real name?

A.    I don't.

Q.    Do you know if The Value Investor is a professional analyst?

MR. ROTHMAN:  Objection.

A.    No.

Page 85

STEVEN P. FEINSTEIN

Q.    Do you know what The Value Investor does for a living?

A.    No.  But I know they have 18,000 followers on Seeking Alpha and the report was informative.

Q.    Do you know if The Value Investor has a college degree?

A.    I don't know.

Q.    Looking more closely at this blog post the title is Jeld-Wen:  Leave the Windows and Doors Shut For Now, correct?

MR. ROTHMAN:  Objection.

Q.    Is that the title of the article?

A.    I'm checking. I'm looking to see more. Yes. That is the title of the article.

Q.    And if you scroll down to the second page under Final Thoughts, the author of this post says, "There are few reasons to own the shares in my eyes." Correct?

MR. ROTHMAN:  Objection.

Page 95

STEVEN P. FEINSTEIN

forecast data from FactSet for the class period that we pulled from the database. And this Excel explains the data, exactly how it's exported by FactSet, for the record.

Do you recall looking at this data in preparing your report?

MR. ROTHMAN:  Objection.

A.    I don't think it was exactly in this form but this is -- this is consistent with what I examined and considered.

Q.    Looking at cell G25.

A.    Got it.

Q.    The analyst estimate is listed as beginning on January 23rd, 2017, correct?

A.    Yes.

Q.    And that same estimate runs in the same column until January 31st, 2017?

A.    Say that again, please.

Q.    The same estimate runs in the same column through January 31st, 2017.

A.    Yes.

STEVEN P. FEINSTEIN

Q.    And the information that's given about this estimate is restricted-1.33-01/23/2017, correct?

A.    If I heard you correctly, yes. I see what it says here. It says what it says.

Q.    Okay. Is this the consensus estimate that you reference in paragraph 182 of your report?

A.    Well, what I referenced was in column E, which said, according to FactSet there is an analyst covering, an analyst who reports to the consensus estimate survey that FactSet, who's reporting FactSet elicits -- solicits and that analyst provided -- was covering the stock from even before the IPO and continued to cover it after the IPO.

Q.    Okay. And what can you tell us about the identity of this analyst?

A.    I don't know. I don't know the identity. FactSet does but I don't. What I know is that this tells us that there was the analyst coverage at the IPO and

Page 97

STEVEN P. FEINSTEIN

immediately thereafter.

Q.    Do you know whether a report underlies this estimate?

MR. ROTHMAN:   Objection.

A.    I knew there were reports issued at the IPO and immediately thereafter. I don't know if the reports that I have in that timeframe were produced by the analyst reporting to FactSet.

Q.    Is it possible that this consensus estimate is not part of a larger report?

MR. ROTHMAN:   Objection.

A.    A lot of things are possible. I'd say it's possible. But the estimate is provided for all the world to see here via FactSet.

Q.    If there is a report connected with this consensus estimate can you get a copy of it?

MR. ROTHMAN:   Objection.

A.    Possibly.  Possibly, yes. Possibly no. I mean, I don't have access

Page 126

STEVEN P. FEINSTEIN

about damages, but he's already testified about the existence of the damage model and the parameters of the damage model.

MS. HARRIS:  I am entitled to determine which misstatements his damages model purportedly qualifies the lawsuit from, so I'm just trying to set that up. I only have a few questions.  If you are going to direct him not the to answer please do that.  Otherwise, I would like to ask my questions.

MR. ROTHMAN:  If you only have a few questions I'll give you some leeway on this now but I reserve my right to cut this off as being beyond the scope of our agreement.

Q.    Which of Jeld-Wens' alleged misstatements and omissions were corrected by the Steves litigation contingency?

A.    The allegations are -- the allegations are that misrepresentations

STEVEN P. FEINSTEIN

and omissions at the start of and throughout the class period misled the market about whether or not Jeld-Wen was engaged in unsustainable anticompetitive behavior, whether the reasons and forces driving their success with respect to profitability, profits, growth were derived from expertise and strategic and -- strategic and expert management or alternatively to unsustainable anticompetitive behavior, and that they explicitly made statements throughout the class period that they were -- that it was a competitive market environment and that they were doing nothing wrong, and that they expected -- well, that they were doing nothing wrong and, therefore, their business practices were sustainable and could be projected forward.

So taken holistically, the market learned in increments that that just wasn't the case. They learned some of that on October 5th with the Steves verdict.  They got, you know, the

STEVEN P. FEINSTEIN

probability that they would assign, the market would assign to the realization that what was driving Jeld-Wen's success was unsustainable, was informed by what came out on October 5th, but much more confidence in understanding the truth behind the company's condition and how they were operating in the market came out on October 15 with the company's admission that they were reserving for a loss.

Q.    Do you model damages based on the divestiture decision?

MR. ROTHMAN:  Objection.

A.    On what?

Q.    Do you model damages based on the divestiture decision?

A.    Well, I considered the divestiture decision and I saw that -- and it's reasonable that it was -- it was adverse news and -- I mean, it was adverse news and it's an efficient market.

So it was reasonable that it

Page 129

STEVEN P. FEINSTEIN

had a negative impact on the price which caused losses, but there was not a statistically significant drop in the stock price on October 5th or 8th, rather, 5th or 8th.  So to be conservative I don't incorporate into my calculation of damages, my quantification of damages any loss that was sustained because of inflation dissipation on those days.

So I considered it, I analyzed it and I did statistical work around it and to be conservative did not include the drops that occurred on that day or the day after the 15 day slide following that day.  I didn't include those drops except -- any of those drops that occurred before the October 15th announcement.

Q.    Okay. I'm going to mark this is Exhibit 3, October 15, 2018 press release.  4.

(Exhibit 4, October 15, 2018 press release was received and

Page 132

STEVEN P. FEINSTEIN

considered it. This is important language for my analysis. I reference this document. I don't remember whether I excerpted from it or not but I can look.

Q.    If we look at page 44 paragraph 137 to 141 you discuss the Steves litigation contingency in the background section of your report.

Do you quote that language here?

MR. ROTHMAN:  Objection.

A.    I quote some language from the press release in paragraph 139.

Q.    Right. Do you quote the language that "the company continues to maintain it has in the violated any antitrust laws"?

MR. ROTHMAN:  Objection.

(Deponent reviews the document.)

A.    On page 100, just paragraph 291, I quote from that paragraph that, "The charge reflects a judgment anticipated to be entered against the

Page 133

STEVEN P. FEINSTEIN

company.  Recent rulings --

Q.    Do you --

A.    I also quote, "Recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the -- if the appeal process is unsuccessful." And there in multiple places in the report I cite to that press release, but --

Q.    Do you cite the language, "The company continues to maintain that it has not violated any antitrust laws"?

A.    I don't.  I think the answer is no.

Q.    Okay. So did you consider that language when you prepared your report?

A.    Absolutely. What's going on here is the company -- previously on October 6th the company vehemently denied that there was any merit to the Steves lawsuit and anticipated there would be no negative repercussions from it and that they would essentially have it overturned on appeal. And then so that that's --

Page 134

STEVEN P. FEINSTEIN

well, it's alleged to be a misrepresentation and contain omissions, but it was, you know, a very forceful statement, you know, company talking out of one side of its mouth.

Now what you have on October 15th is the company on the one hand saying we still maintain we didn't do anything wrong but there could be negative repercussions, which it's like a mixed message now. So the message went from being a straightforward denial to now being a mixed message that there would be repercussions.

Q.    Well, it says "it has not violated any antitrust laws and intends to appeal any adverse judgment." Correct?

A.    It does say that.

MS. HARRIS:   Okay.   That's all I have.

MR. ROTHMAN:   Okay. Thank you.

VIDEOGRAPHER:   Will there be a redirect or shall we go off the record?