# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

---------------------------------X

IN RE:  JELD-WEN HOLDING, INC.   : Civil Action No.

SECURITIES LITIGATION            : 3:20-cv-00113-JAG

---------------------------------X


        Videotaped Rule 30(b)(6) Deposition of

               SEGALL BRYANT & HAMILL

     By and through its designated representative,

                    Jeffrey Paulis

                 Conducted Virtually

              Tuesday, January 26, 2021

                   12:06 p.m. EST




Job No.:  348077

Pages 1 - 177

Reported by:  Helen B. Yarbrough, RPR, CCR

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                     54

A    He might.  I don't know.                     13:22:30

Q    In your experience, what is discussed        13:22:39
at an in-person meeting when one takes place       13:22:42
before Segall Bryant signs an agreement to become  13:22:45
an investment manager for an institutional client? 13:22:48

MR. JAEGER:  Objection.                            13:22:53

A    In my experience, we're talking about        13:22:53
the investment strategy, our philosophy, and our  13:22:56
process, and historical performance, as well as   13:23:01
our firm.                                          13:23:15

Q    Is it fair to say that the investment        13:23:16
process is a strategy-by-strategy process?  So for 13:23:19
example, might there be a different investment     13:23:28
process for small cap core versus SMID cap core,  13:23:29
or do all strategies use the same general process? 13:23:33

MR. JAEGER:  Objection.                            13:23:39

A    Our Small Cap ROIC Team uses primarily       13:23:39
the same process.                                  13:23:44

Q    What is your -- what is Segall Bryant's      13:23:46
small cap ROIC investment process?                 13:23:49

MR. JAEGER:  Objection.                            13:23:53

A    It's four-phased.  It starts with idea       13:23:59

discovery or idea generation.  It moves to due
diligence, then risk mitigation, and then final
determination by ourself.

Q    So the final determination for the
small cap core would rest with you, right?

A    Yes.

Q    And what sources of information do you
consult for idea discovery or generation?

A    That's typically screening and what I
call "grass roots research," just knowing your
sector and researching companies in those sectors
and going out and seeing companies' facilities,
things like that.

Q    And what sources does the Small Cap
ROIC Team use for due diligence?

A    That would be (indiscernible) internal
proprietary research.

THE COURT REPORTER:  Repeat, please.
Repeat, please, Mr. --

Q    I'm not asking for anything
proprietary.  But generally, what sources of
information does that entail?

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                    56

A    So, it would be just -- researching
companies.  We have a -- what we call "ROIC
dashboard," which is an Excel-based file that has
all the information we need to analyze a company
from an analytic perspective; talking to research
analysts; reading financial statements; listening
to conference calls; talking to management teams.
That's encompassed in our due diligence.

Q    Would reading SEC filings, 10Ks, and
10Qs fall in the due diligence phase?

A    It could, yes.

Q    Does the Small Cap ROIC Team typically
consult those SEC filings before making an
investment in a company?

MR. JAEGER:  Objection.

A    In some cases, yes.

Q    Do you remember if the Small Cap ROIC
Team consulted Jeld-Wen's SEC filings before
investing in Jeld-Wen?

A    I don't recall.

Q    Do you know who would know the answer
to that question if not you?

13:25:37
13:25:39
13:25:45
13:25:50
13:25:55
13:25:59
13:26:02
13:26:06
13:26:10
13:26:14
13:26:21
13:26:21
13:26:26
13:26:29
13:26:31
13:26:34
13:26:42
13:26:45
13:26:51
13:26:53
13:26:57
13:26:59

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                    57

MR. JAEGER:  Objection.

A    No.

Q    Is it fair to say you are the person most likely to know the answer to that question?

A    Yes.

Q    And what does your risk mitigation process entail?

A    Determining the reward-to-risk of a particular stock, the reward being the upside -- an upside type of price target and risk being downside type of price target based on scenario analysis.

Q    Can you give me an example of how that would work?

MR. JAEGER:  Objection.

A    If you had determined that X, Y, or Z was going to play out in a positive direction, the stock could reach a certain target; and if certain risks that you identified had come into play, it could drive the stock to a certain number.  And you're looking at those against each other, and you're looking for a roughly three-to-one

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                     58

upside-to-downside or reward-to-risk ratio.          13:28:19

Q    Are there any sources that you --           13:28:25
sources of information that you consult at the       13:28:29
risk mitigation stage that are different than the    13:28:31
ones you consult at the due diligence stage?         13:28:36

A    I think I don't understand the              13:28:39
question.                                            13:28:40

Q    So you mentioned a few different            13:28:41
sources of information that you would consult at     13:28:43
the due diligence stage, of which SEC filings        13:28:46
might be an example, right?                          13:28:51

A    Yeah.                                        13:28:54

Q    Are you using those same sources at the     13:28:55
risk mitigation stage, or is there other             13:28:59
information that you're looking to there?            13:29:01

A    There's no -- I don't believe there's       13:29:03
any new information at the risk mitigation stage.    13:29:04
You gathered it in the due diligence stage.          13:29:06

Q    It's just a matter of marshaling that       13:29:09
same data for a different part of the analysis?      13:29:12

A    You're taking the information that you       13:29:15
have and thinking through that and determining       13:29:18

what type of upside potential a stock has and the          13:29:21

downside potential a stock has with that          13:29:25

information that you got.          13:29:30

Q    Do Segall Bryant's clients ever require          13:29:40

Segall Bryant to invest in a specific company?          13:29:43

MR. GEDDISH:  Objection.          13:29:53

A    I don't know.          13:29:55

Q    Has that ever happened, in your          13:29:55

experience?          13:29:57

MR. GEDDISH:  Objection.          13:29:58

A    It has not to me.          13:29:59

Q    Are you aware of it happening to anyone          13:30:01

else at Segall Bryant?          13:30:03

A    I don't recall.          13:30:14

Q    So Wisconsin Laborers, to your          13:30:14

knowledge, never instructed Segall Bryant to          13:30:16

invest in a particular company, right?          13:30:17

A    Yes.  They never instructed -- to be          13:30:22

clear, they never instructed, yes.          13:30:28

Q    Right.  And Wisconsin Laborers never          13:30:30

instructed you not to invest in a specific          13:30:32

company, correct?          13:30:36

A    Can you repeat that or rephrase?    13:30:40

Q    Wisconsin Laborers never instructed you to avoid a specific company, right?    13:30:45 / 13:30:47

A    That's correct.    13:30:51

Q    And Wisconsin Laborers never instructed you to sell stock in a particular company, right?    13:30:56 / 13:30:57

A    That's correct.    13:31:04

Q    Are you aware of any other client that has directed Segall Bryant to sell a particular stock?    13:31:13 / 13:31:16 / 13:31:19

MR. JAEGER:  Objection.    13:31:21

A    I am not.  Personally, I am not.    13:31:23

Q    Has Wisconsin Laborers ever given Segall Bryant advice on whether to invest in a particular company?    13:31:36 / 13:31:39 / 13:31:44

A    Not that I'm aware of, no.    13:31:47

Q    Any other institutional investor client that you're aware of ever give Segall Bryant advice to invest in a particular company?    13:31:52 / 13:31:56 / 13:31:58

MR. JAEGER:  Objection.    13:32:01

A    No.    13:32:02

Q    How often did Segall Bryant communicate    13:32:15

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                    61

with Wisconsin Laborers about their investments?     13:32:18

        MR. JAEGER:  Objection.     13:32:29

    A    I don't know.     13:32:30

    Q    Is there a periodic report that goes     13:32:31
out to separately managed account holders?     13:32:33

    A    There would be account statements that     13:32:37
would go out from Segall Bryant to the client.     13:32:39

    Q    Are those monthly?  Quarterly?     13:32:43

    A    I believe it can be both.  I believe     13:32:47
the client may have a choice whether they want     13:32:48
them monthly or quarterly.  I'm not a hundred     13:32:51
percent sure.     13:32:54

    Q    Do you know which one -- do you know     13:32:55
whether Wisconsin Laborers has requested them     13:32:58
monthly or quarterly?     13:33:01

    A    I do not.  I do not know.     13:33:05

    Q    Has Wisconsin Laborers ever asked     13:33:16
Segall Bryant specific questions about particular     13:33:17
stock purchases?     13:33:20

        MR. JAEGER:  Objection.     13:33:23

    A    Not that I'm aware of.     13:33:24

    Q    So, I want to run through a few     13:33:57

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021

156

A    I don't -- you're asking me to put myself back in 2018 when I'm reading this?

Q    Please.

A    I'm sorry.  You want to know how it would have changed my investment thesis?

Q    Right; for Jeld-Wen.

A    I don't know that the overall thesis would have been all that affected by this in particular; but again, it's hard to target, hard to tell.

Q    If you already knew that there was a jury verdict against Jeld-Wen in the Steves litigation, do you think that the information in this paragraph would have changed your investment thesis?

MR. JAEGER:  Objection.

A    Changing the investment thesis has to do with looking longer -- longer term than the term (indiscernible).

THE COURT REPORTER:  I'm sorry; looking longer -- I'm sorry; I didn't understand.  Longer term than . . .

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                               157

THE WITNESS:  Give me just one minute, please.

I don't know that it would have violated the investment thesis.  While -- while the -- you never want to see a court order like this or any type of charge for a company of Jeld-Wen's size.  I think that -- that size of a charge, while you never want to see it and it likely would have some impact of value to the stock, it's something that Jeld-Wen probably could have overcome just based on its size and financial resources.

Q   So you don't think this -- the information in this paragraph starting with "Additionally" would have changed your investment decisions about Jeld-Wen?

MR. JAEGER:  Objection.

A   It wouldn't have helped -- it wouldn't have helped it, but I don't know that it would have, you know, severely damaged it.

Q   Based on that paragraph starting with "Additionally," do you understand that Jeld-Wen

was admitting that it engaged in anticompetitive    16:32:59

conduct?    16:33:05

          MR. JAEGER:  Objection.  Calls for a    16:33:06

legal conclusion.    16:33:07

     A    I don't recall -- I don't recall the    16:33:10

management team ever admitting that they had    16:33:12

engaged in illegal conduct.    16:33:15

     Q    And nothing in that paragraph starting    16:33:19

with "Additionally" suggests to you that    16:33:22

management is doing that here, right?    16:33:27

          MR. GEDDISH:  Objection.    16:33:31

     A    Yeah, it says the company maintained    16:33:43

that it has not violated any antitrust laws,    16:33:45

according to the company.    16:33:50

     Q    So this paragraph does not change your    16:33:58

view that Jeld-Wen management has never admitted    16:34:00

to anticompetitive conduct, right?    16:34:07

          MR. JAEGER:  Objection.  Asked and    16:34:10

answered.  Counsel, can we start to move forward,    16:34:10

please.    16:34:14

          MR. SCHMALZBACH:  He hasn't answered    16:34:14

it.  That's why I asked the question.    16:34:15

A    Can you repeat the question?    16:34:20

MR. SCHMALZBACH:  Yeah, Helen, can you read it back, please.    16:34:22 16:34:23

(Pending question read.)    16:34:25

THE WITNESS:  Yeah, it does not change my view that they had not admitted -- I don't believe that they had admitted to antitrust conduct.    16:34:47 16:34:49 16:34:52 16:34:56

Q    Mr. Paulis, can you remind me -- do you believe that you did actually read this press release when it came out in October 2018?    16:35:27 16:35:31 16:35:33

A    There's no reason to believe that I did not.    16:35:38 16:35:40

Q    And this is the sort of information you typically would read about companies you had invested in?    16:35:42 16:35:45 16:35:47

A    Yes.    16:35:50

Q    Do you have any reason to think that when you read this information, you believed that Jeld-Wen had lied to investors about its pricing strategy?    16:36:05 16:36:07 16:36:09 16:36:14

MR. JAEGER:  Objection.    16:36:15

A    I don't -- I don't recall what -- I don't recall what I thought.

Q    Have you ever held the view that Jeld-Wen lied to investors about its pricing strategy?

MR. JAEGER:  Objection.

A    I don't recall thinking that.

Q    And so fair to say you don't recall ever believing that Jeld-Wen had lied to its investors about the competitiveness of the door and window industry?

MR. GEDDISH:  Objection.

A    Can you ask that again, please.

Q    Yeah.  The question is about whether you have ever held a specific belief.  And the question is, did you ever believe that Jeld-Wen had lied to investors about the competitiveness of the door and window industry?

A    I don't believe that I would have, no.

Q    If you -- so this is a counterfactual. If you had believed that Jeld-Wen had misled investors about its pricing strategy or the

competitiveness of its markets, would you have continued to invest in Jeld-Wen after you held that belief?

MR. JAEGER:  Objection.

A    I -- I don't -- I don't know.

Q    As a general matter, would you invest in a company that you think is lying to investors about the competitiveness of its industry?

MR. JAEGER:  Objection.

A    Probably not.

Q    And so you have no reason to think that -- withdrawn.

If you thought that Jeld-Wen had misled investors about the Steves litigation, would you have continued to invest in Jeld-Wen?

MR. JAEGER:  Objection.

A    Can you repeat the question?

Q    Sure.  This is another counterfactual question.  If you believed that Jeld-Wen had lied to investors about the merits of the Steves case, would you have continued to invest in Jeld-Wen?

MR. JAEGER:  Objection.

it was kind of a multi-teneted investment thesis.

Q   Right.  But the question was whether the loss of Jeld-Wen's long-term pricing power would make it less attractive to you.

A   Phrased like -- phrased like that, would it make it less attractive?  It would make it less attractive, yes.

MR. SCHMALZBACH:  All right. Can we put tab K back up, please.

Q   Mr. Paulis, you recall this paragraph that we were looking at before starting with "Additionally"?

A   Yes.

Q   Nothing in that paragraph affects your view of Jeld-Wen's long-term pricing power, correct?

MR. GEDDISH:  Objection.

A   I'm sorry; in the paragraph that starts "Additionally," I don't believe so, no.

Q   And your understanding is that this is for a one-time litigation charge of 76.5 million, correct?

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                    168

          MR. PORTEOUS:  Objection.

     A    That's what it appears to look like.
I -- yes.  I'm not sure -- I guess I don't
understand well enough to know whether there could
be more after that or not.

     Q    Isn't that correct that a one-time
litigation charge of 76.5 million would not affect
your investment thesis based on three to five
years out for the company?

          MR. JAEGER:  Objection.

     A    That's fair, given the size of the
company and such.

          MR. SCHMALZBACH:  I'll pass the
witness.

          MR. GEDDISH:  No questions from
Plaintiffs.

          MR. BARON:  I have a few questions on
behalf of the Onex defendants.  Give me one
moment.  I know it's been a long day, so I intend
to ask just a few questions (inaudible).

          THE COURT REPORTER:  Mr. Baron, you are
not coming through loudly and clearly.  Maybe we

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                    169

can go off the record so you can get your audio

cleared up, or we can try and go a little further

and see if it clears up.

MR. BARON:  Can you hear me now?

THE COURT REPORTER:  I can.

MR. BARON:  Let's try to proceed.  I'll

be -- I'll be as loud as I can.

Alex, can you pull up tab I, please.

EXAMINATION BY COUNSEL FOR THE ONEX DEFENDANTS

BY MR. BARON:

Q    Mr. Paulis, you testified earlier that

you viewed this document, and you recognized that

it is the complaint, correct?

A    Just a -- yes.

MR. BARON:  Alex, can we turn to

page 12, please, the page that has paragraph 37 on

it.  Thank you.

Q    Mr. Paulis, can you take a moment to

read for yourself the first six lines of

paragraph 37 up to where it says "the Onex

defendants" and then let me know when you're done.

A    "The Onex defendants" in parentheses