# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

---------------------------x

IN RE:  JELD-WEN HOLDING,   :  Civil Action No.:

INC. SECURITIES LITIGATION  :  3:20-cv-000113-JAG


Video Deposition of WELLINGTON MANAGEMENT COMPANY,

LLP

By and through its Corporate Designee

NATHAN KIEFFER

Conducted Virtually

Wednesday, January 27, 2021

1:34 p.m. EST


HIGHLY CONFIDENTIAL


Job No.: 347138

Pages: 1 - 165

Reported by: Judith E. Bellinger, RPR, CRR

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee
Conducted on January 27, 2021                    30

longer, but if we spend too much time outside of                    13:57:30

the scope of the notice topics I'll instruct you                    13:57:32

not to answer.  But you can go ahead for now.                       13:57:35

    A   Could you repeat the question?     13:57:39

    Q   Can a client provide advice to     13:57:41

Wellington on whether it should invest in a                         13:57:44

particular company or not?                                          13:57:47

    MR. ROFFMAN:  Objection.                       13:57:49

    A   I am not aware of that happening, but I    13:57:51

wouldn't be, necessarily.                                           13:57:54

    MR. PUMPHREY:  And I'll state for the           13:58:24

record that I actually disagree that those                          13:58:26

questions were not within the scope.  They are                      13:58:29

within the scope of several topics, including, but                  13:58:31

not limited to, topic 12.  But we're going to move                  13:58:37

on.                                                                 13:58:39

    Q   As specific to the plaintiffs in this     13:58:54

case, have you ever had discussions -- have you                     13:58:56

ever had discussions with any representative of                     13:59:01

Mississippi PERS or Plumbers about what particular                  13:59:04

stocks should be purchased or sold on their                         13:59:09

behalf?                                                             13:59:11

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                          31

A    No.                                                    13:59:12

Q    All right.  So in connection -- tell me               13:59:13
again the name of your current job title.                  13:59:32

A    Global industry analyst.                              13:59:37

Q    Okay.  In connection with your job as a               13:59:38
global industry analyst, do you perform research           13:59:44
on publicly traded companies?                              13:59:49

A    Yes.                                                  13:59:52

Q    And what types of sources do you use                  13:59:54
for your research?                                         13:59:59

A    I would say industry data, outside                    14:00:07
research, SEC filings, discussions with                    14:00:13
management, proprietary research.  That's not              14:00:16
exhaustive, but that's some of it.                         14:00:23

Q    Do you review publicly available news                14:00:25
stories?                                                   14:00:29

A    Yes.                                                  14:00:30

Q    If applicable, do you review court                   14:00:32
filings?                                                   14:00:35

A    Yes.                                                  14:00:37

Q    Do you review a particular company's                 14:00:40
press releases?                                            14:00:42

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee
Conducted on January 27, 2021

32

A    Yes.  But to all these questions I mean it's not comp -- there are examples where I've done this and I certainly do not read every press release or court filing for every company that I follow.

Q    Understood.

And I think you mentioned this, but do you also review -- would you also review potentially a company's SEC filings?

A    Yes.

Q    Do you ever attend industry conferences?

A    Yes.

Q    And is one of the purposes of doing this research to help you form a conclusion as to what may be a prudent investment on behalf of Wellington clients?

A    Yes.

Q    And you have done research on Jeld-Wen, correct?

A    Yes.

Q    Can you approximate how much time

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                         33

you've devoted to researching or analyzing      14:02:20

Jeld-Wen in a given -- how much you do in a given   14:02:24

year, for example?                              14:02:29

    A   The single-digit percentage.      14:02:31

    Q   Okay.                            14:02:34

    A   I can't be more precise than that.   14:02:36

    Q   And Wellington agrees that it made   14:02:45

investments in Jeld-Wen on behalf of the two lead   14:02:50

plaintiffs here which are Mississippi PERS and   14:02:53

Plumbers and Pipefitters, correct?              14:02:58

    A   Yes.                             14:03:00

    Q   And specifically that it did so in the   14:03:00

years 2017 and 2018?                            14:03:02

    A   Yes.                             14:03:06

    Q   So you mentioned Mr. Garabedian, who's   14:03:12

a portfolio manager, correct?                   14:03:18

    A   Yes.                             14:03:23

    Q   And were both you and Mr. Garabedian   14:03:24

involved in reviewing or analyzing Jeld-Wen during   14:03:28

the 2017 and 2018 time period?                  14:03:34

    A   Yes.                             14:03:37

    Q   Do you know at Wellington whether there   14:03:39

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                    89

Q    Can you remember when you first made that conclusion?

A    No.

Q    Did you account for that fact when making investment decisions on behalf of the lead plaintiffs?

MR. ROGERS:  Objection.  Form.  Time frame.

Q    Ever?

MR. ROGERS:  Same objection.

A    Yes.

Q    All right.

A    It's fair to say I reached -- I reached that conclusion by the time of the IPO.  And I don't know at what point before that.

Q    Would you have reached that conclusion in 2017?

A    Yes.  That was still my conclusion then.

Q    And if I told you that lead plaintiffs claim that at -- at this point about why Jeld-Wen entered into the supply agreements, the real

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                                    90

reason was not revealed until October 5th of 2018,          15:31:38

would you agree or disagree with that?                       15:31:41

        MR. ROFFMAN:  Objection.          15:31:43

        MR. ROGERS:  Objection.  Foundation.          15:31:43

Calls for speculation.          15:31:49

        MR. PUMPHREY:  Stop making speaking          15:31:51

objections.  They are not allowed, they're          15:31:54

inappropriate and I don't like the coaching of the          15:31:54

witness.  So I'm --          15:31:56

        MR. ROGERS:  It's not --          15:31:56

        MR. PUMPHREY:  -- going to ask -- I'm          15:31:56

going to ask the question again without the          15:31:57

speaking objections.          15:31:59

        MR. ROGERS:  It's not my --          15:32:01

    Q    If I told you that lead plaintiffs          15:32:01

claimed at this point about why Jeld-Wen entered          15:32:03

into supply agreements was not revealed until          15:32:06

October 5th, 2018, would you agree or disagree          15:32:09

with that?          15:32:12

        MR. ROGERS:  Objection.  Foundation.          15:32:13

        MR. ROFFMAN:  Objection.          15:32:14

    A    If you told me that it wasn't revealed          15:32:20

why they entered into supply agreements until October 2018, I -- revealed, a lot hinges on the word revealed there. I reached a lot of conclusions that aren't explicitly stated to me. And I had concluded and had my own deal of why this -- these supply agreements were reached which tied to the fact that they helped get the deal through and the fact that when they were reached, volume was really weak and any volume was good volume because the housing market was weak in 2012.

I don't think anyone has ever actually revealed officially what the reason was because that's -- companies don't do that.

So I'm not quite sure how to -- I don't know if it's ever been revealed, I guess. But my conclusion was reached by then.

Q    Okay. And as you stated, this was your view as of at least February 12th of 2018?

A    Yes.

Q    Was Wellington aware in February of 2018 that a court ordered divesture would mean

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                                    133

"The record is clear," do you see that?                16:46:55

    A   Yes.                                              16:47:08

    Q   Here the court wrote, "The record is      16:47:09
clear that Jeld-Wen decided to approach the DOJ        16:47:12
only after it had entered into long-term supply        16:47:16
contracts with the Independents, knowing that this     16:47:19
oft-used tactic would assuage the concerns of the      16:47:23
DOJ and the Independents about anticompetitive         16:47:28
effects of the proposed merger."                       16:47:32

    Do you see that?                                   16:47:36

    A   Yes.                                              16:47:36

    Q   You were aware as early as February of    16:47:48
'18, correct, or at least believed that Jeld-Wen       16:47:49
entered into supply agreements with assemblers         16:47:53
like Steves to grease approval of the Craftmaster      16:47:55
deal, correct?                                         16:47:59

    MR. ROGERS:  Objection.  Form.                     16:48:01

    MR. ROFFMAN:  Objection.                           16:48:04

    A   No, I was not aware.  That was my         16:48:06
hypothesis.                                            16:48:09

    Q   Fair enough.                              16:48:10

    Is this statement from the court                   16:48:31

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021

134

consistent with your hypothesis?

MR. ROGERS:  Objection.  Form.

MR. ROFFMAN:  Objection.

A    Yeah, I -- yes, with the nuance that I thought there were two reasons to enter the long-term supply agreement.  This and the fact that the housing market was very weak in 2012 and any volume is good volume and you tend to sign low-priced deals when you're in a weak profiting market.

Q    So Wellington learned about the divestiture decision in October of 2018, correct?

MR. ROGERS:  Objection.  Form.

A    Yes.

Q    Okay.  When Wellington learned about the divestiture order from the court, did it believe that Jeld-Wen had lied to investors about its pricing strategy?

MR. ROGERS:  Objection.  Form.

MR. ROFFMAN:  Objection.

A    No.

Q    Did it believe that Jeld-Wen had

16:48:32
16:48:34
16:48:36
16:48:41
16:48:43
16:48:45
16:48:47
16:48:54
16:48:57
16:49:00
16:49:05
16:49:09
16:49:13
16:49:17
16:49:18
16:49:21
16:49:27
16:49:31
16:49:33
16:49:35
16:49:36
16:49:37

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee
Conducted on January 27, 2021

135

engaged in anticompetitive conduct of any kind?

MR. ROGERS:  Objection.  Form.

MR. ROFFMAN:  Objection.

A    I believe that they -- based on the definition of the law, no, I do not believe that. I did believe that they had attempted to consolidate the industry in a way that it would be more profitable.

Generally speaking, if the DOJ approves a merger, I put it in the it's happened, it's done, I don't have to think about it camp.  And whether it's right or not, it's happened.  And thus I was operating under that knowing that there was a risk that it might get reversed due to this lawsuit.

Q    When Wellington learned about the divestiture decision, did it believe that Jeld-Wen had lied to investors about its own views on whether it had violated the antitrust laws?

MR. ROGERS:  Objection.  Form.

MR. ROFFMAN:  Objection.

A    No.  Our communications are at a very

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021

136

high level and not very detailed.  It would have been hard for them to have lied because they didn't really tell us very much with certainty and any management teams to talk about these kinds of topics, antitrust in particular, is -- they don't. So there's a lot of inferring into vague statements when you're reaching your conclusions.

Q    Go back to Tab E, the transaction history.

So I want to look at, let's see, one, two, three, four -- the fourth page of the history, the October time frame.

And assuming, again, that this chart is accurate, does it appear that beginning on October 5th of 2018, and continuing through October 16th of 2018, that Wellington purchased thousands of Jeld-Wen shares on behalf of Mississippi PERS?

MR. ROGERS:  Objection.  Form.

A    Yes.

Q    And then on October 18th, Wellington purchased 7,702 shares on behalf of Plumbers and

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee
Conducted on January 27, 2021

137

Pipefitters?

MR. ROFFMAN:  Objection.  Form.

A    Yes.

Q    And it made these purchases after the divestiture decision, correct?

MR. ROGERS:  Objection.  Form.

A    Yes.

Q    I'm sorry.  Yes?

A    Yes.

Q    Would Wellington have continued to purchase Jeld-Wen securities for the lead plaintiffs if it thought it was being misled by Jeld-Wen's public statements?

MR. ROGERS:  Objection.  Foundation.  Calls for speculation.

MR. ROFFMAN:  Objection.

A    There's -- that would be a negative in the investment process.  You obviously don't like it when you're being misled, but there's -- there's gradients of everything and you would also have to factor in what you actually think is going to happen to the business outside of the

16:53:20
16:53:22
16:53:24
16:53:26
16:53:28
16:53:31
16:53:37
16:53:38
16:53:39
16:54:39
16:54:41
16:54:43
16:54:46
16:54:48
16:54:49
16:54:53
16:54:54
16:54:58
16:55:01
16:55:04
16:55:07
16:55:11

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                                139

paragraph in the middle of the page that begins

with the word "Additionally."

A    Okay.

Q    The first sentence says, "Additionally, the company expects third quarter results to include a charge of $76.5 million for a litigation contingency related to a recent court ruling in its ongoing antitrust and trade secrets litigation with Steves & Sons, Inc."

Did I read that correctly?

A    Yes.

Q    And then a couple sentences later it says, "While the company continues to maintain that  it has not violated any antitrust laws and intends to appeal any adverse judgment, recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the appeal process is unsuccessful."

Did I read that correctly?

A    Yes.

Q    Do you understand the $76.5 million

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                    140

charge was for a litigation contingency?                    16:57:42

         MR. ROGERS:  Objection.  Form.                     16:57:44

    Q    I'm sorry.  If you answered I didn't               16:57:52

hear it over the form objection.                            16:57:53

    A    Yes.  Yes, I did.                                  16:57:56

    Q    Okay.  Did you believe by announcing               16:57:57

the litigation contingency that Jeld-Wen was                16:58:00

admitting that it engaged in anticompetitive                16:58:03

conduct?                                                    16:58:06

    A    Did I understand that that was the                 16:58:11

admission of anticompetitive conduct?                       16:58:13

    Q    Yes.                                               16:58:15

    A    Is that the question?  No, I did not               16:58:15

understand that.                                            16:58:17

    Q    Did you believe by announcing the                  16:58:20

litigation contingency Jeld-Wen was changing its            16:58:22

position regarding the merits of the Steves                 16:58:25

litigation?                                                 16:58:27

         MR. ROGERS:  Objection.  Form.                     16:58:28

    A    No, I did not.  I mean, I guess on the             16:58:37

margin you would have to say yes because obviously          16:58:41

you have -- by taking the GAAP charge you have to           16:58:44

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                    141

have some level of belief that it's viable and

obviously their fear of a bad outcome had

increased, but my view was this was more of an

accounting change than an actual change in the

thought process.

     Q    But by announcing the litigation

contingency, did you understand that Jeld-Wen was

admitting that it would ultimately and finally be

held liable to Steves?

        MR. GEDDISH:  Objection to form.

     A    No.  No, I did not.

     Q    And in fact Jeld-Wen stated in this

press release that it intended to appeal, correct?

     A    I don't know.  I don't remember if it's

in this release, but that was my understanding at

the time.

     Q    Right.

        By announcing this litigation

contingency, did you understand at the time that

Jeld-Wen was attempting to correct previous

statements that it had made about the Steves

litigation?

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                    142

MR. ROGERS:  Objection.  Form.

A    Not previous statements, but obviously making an accounting change.  So there's a change there.

Q    By announcing this litigation contingency did you believe that Jeld-Wen was admitting that $76.5 million would be a certain loss?

MR. ROGERS:  Objection.  Form.

A    No.

Q    Were you surprised that Jeld-Wen booked this litigation contingency following the divestiture decision?

MR. ROGERS:  Objection.  Form.

A    No.

Q    The reference in the second sentence I read to "recent rulings" in the middle of that paragraph, did you understand the recent rulings to include the divestiture decision?

MR. ROGERS:  Objection.  Form.

A    Yeah.  Yes.

Q    And it's true that Wellington continued

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021                    143

to purchase Jeld-Wen stock on behalf of both lead                17:01:38

plaintiffs after this press release, correct?                    17:01:42

    A    Yeah.  I mean, I think we sold some at          17:01:46

one point, too, but there were definitely                        17:01:50

purchases after this.                                            17:01:53

    Q    I'm sorry.                                   17:02:14

    A    I didn't hear.  I cut out or somebody        17:02:15

did.                                                             17:02:18

    Q    No, no, no.  I'm sorry.  I may be done,      17:02:18

but I may not be.  I would like to take a five to                17:02:23

seven-minute break and hopefully I will be                       17:02:31

finished.  I'm not promising but I'm certainly                   17:02:34

very close.                                                      17:02:35

    THE VIDEOGRAPHER:  We're going off the          17:02:37

record at 5:02 p.m.                                              17:02:38

    (Recess taken.)                                 17:02:57

    THE VIDEOGRAPHER:  We're going back on          17:15:14

the record at 5:15 p.m.                                          17:15:15

BY MR. PUMPHREY:                                                 17:15:19

    Q    Mr. Kieffer, I'm just about done.  Just     17:15:22

a few more questions.                                            17:15:25

    From the time of the Jeld-Wen IPO in            17:15:27

HIGHLY CONFIDENTIAL

Transcript of Nathan Kieffer, Corporate Designee

Conducted on January 27, 2021

144

January of 2017 up until just before the

divestiture decision in October of 2018, you agree

that there was always a risk of a court ordered

divestiture in the Steves litigation, correct?

       MR. ROGERS:  Objection.  Form.

   Q   I'm sorry, I didn't hear you if you

answered.  You're on mute.

   A   I was muted.  Yes.

   Q   Okay.  And that risk is a risk you

considered when you invested in Jeld-Wen

securities on behalf of Wellington's clients?

   A   Yes.

   Q   Okay.

       MR. PUMPHREY:  I've got nothing

further.

  EXAMINATION BY COUNSEL FOR THE ONEX DEFENDANTS

BY MR. LIFSON:

   Q   Mr. Kieffer, my name is Roman Lifson, I

represent the Onex defendants.  I've got a few

questions for you.  I'll be jumping around because

I don't want to duplicate anything Mr. Pumphrey

asked, so bear with me.