# Exhibit F

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

-----------------------------x

IN RE: JELD-WEN HOLDING, INC.

SECURITIES LITIGATION

CIVIL ACTION NO.

3:20-cv-00112-JAG

-----------------------------x

VIDEOTAPE DEPOSITION OF

STEVEN P. FEINSTEIN

VIA ZOOM VIDEOCONFERENCE

January 30, 2021

10:00 a.m.

Reported by:

Maureen Ratto, RPR, CCR

STEVEN P. FEINSTEIN

Q.    And Jeld-Wen had an Initial Public Offering on January 26, 2017, correct?

A.    That's right.

Q.    So it's your opinion the market for Jeld-Wen stock was efficient on January 26, 2017?

A.    Yes. Informationally to the extent that market participants on that day involved in the IPO were not ignoring available valuation relevant information in making their decisions about whether to participate in the IPO and buy the stock at the IPO price, so the IPO price and the decisionmaking had to be reflective of the available information on that day. That's the degree and form of efficiency that I've concluded for that first day.

Q.    What is an Initial Public Offering?

A.    That's when a stock is initially for the first time offered to the public. Insiders may have owned all

STEVEN P. FEINSTEIN

Are you offering an opinion that the primary market for Jeld-Wen stock was efficient?

A.    With the definition, yes, and given the definition I gave. It's given the Cammer and Krogman factors, given what we know about the nature of this security, the people that owned it, the information available about it, it's unfathomable that one might even suspect the market participants were ignoring the material valuation and relevant information on the IPO date.  So because of that I conclude that the market was efficient even on that first day of the class period.

Q.    What analyses did you do to support that opinion?

A.    I looked at -- well, the Cammer factors.  So we know that subsequently there was -- well, on the first day there is a tremendous amount of volume, by definition. I mean, the entire 600-million-plus new float was offered to

Page 50

STEVEN P. FEINSTEIN

the public.

So there is tremendous volume. There was tremendous institutional participation, as we know from looking at -- from knowing about how IPOs usually work and who the owners of the stock subsequently were. There was analyst coverage, there was analyst coverage before the IPO there was analyst coverage in the IPO there was analyst coverage immediately after the IPO. Analysts and investors were talking about stock, talking about the valuation, even talking about the company and its history and what made it valuable. We know there were market makers, not only subsequently in the secondary market, but clearly there were underwriters there were market makers in the IPO, many of them sophisticated well known names.

We know that -- looking at S3 registration of course is the -- is the fourth Cammer factor and it's what would make S3 registration -- a company is

STEVEN P. FEINSTEIN

eligible for S3 registration when there is a lot of shares out there, when it's a big company that draws a lot of attention and financial information is available. On the IPO date both of those were satisfied. I mean, S3 eligibility wasn't. But it was a big company with 600-million-plus dollars worth of shares issued and the registration documents gave the public years of prior financial data.

The float was substantial. You know, even though the market cap of the company was much much bigger, but the float alone was, you know, among the 20% biggest companies in the country.

So those are the factors. I mean, those are the all the factors that would indicate that it's just extremely unlikely that these sophisticated market participants were ignoring available information which is the definition, the operative definition of operational market efficiency.

STEVEN P. FEINSTEIN
conclude other than what I did conclude in this report in this case.

Q.   Why didn't you look at the quiet period separately from the rest of the class period?

MR. ROTHMAN:  Objection.

A.   I did, and I mentioned that I did. I looked to see what analyst coverage there was during the quiet period. That was an important consideration in my drawing this conclusion.

Q.   So you think it is appropriate to look at the quiet period separate from the rest of the class period?

MR. ROTHMAN:  Objection.

A.   I think it's important to see if there's analyst coverage throughout the class period.  And if there is no analyst coverage during the class period, that would be an important consideration.

Here there was analyst coverage during the quiet period. It made the quiet period not really that quiet.

STEVEN P. FEINSTEIN

Q.      Why did you look at the analyst coverage point separate from the rest of the class period?

MR. ROTHMAN:  Objection.

A.      That's not what I said. Well, I know that what defines a quiet period is the lack of analyst coverage. And here, even though some underwriters -- underwriters were unable to issue reports, I looked to see if the quiet period was operatively quiet or not.  And when I saw there were analysts commenting on the company, analyzing the company, digesting information about the company, I realized that, whereas, in other cases maybe the quiet period is special, here it really wasn't.

Q.      Did you analyze average daily trading volumes during the quiet period?

A.      I looked -- my report has volume numbers in it.  I looked at volumes throughout and it's considerable.

There is nothing unusual -- there was plenty of volume during the

STEVEN P. FEINSTEIN

first ten days.

To answer your question succinctly, no. The event study focused on earnings announcements and earnings announcements were scheduled when they were. But I do want to add that the way this empirical test works is you draw inferences from what you see on the earnings announcement days that reasonably, according to statistical and financial principles, apply to all other days in the class period.

So there are in this case eight specific days that are good for experimentation that then tell you whether the market was developed enough such that investors were not ignoring information on all the other days as well. All the other days being those days that were not ideal candidates for an empirical test.

Q.    Can you look at Exhibit 8, which is page 175, please?

A.    Okay.

Page 65

STEVEN P. FEINSTEIN

price.

A.    Correct.

Q.    The next day, January 27 was the first date of the secondary market, correct?

A.    That's right. Yes.

Q.    So on January 27 after the start of the secondary market the stock was at 26.12, correct?

A.    At the close on January 27th it closed at 26.12, yes.

Q.    And that's about a 13% increase over the IPO price?

MR. ROTHMAN:  Objection.

A.    Approximately.

Q.    What could have caused that increase in the stock price?

MR. ROTHMAN:  Objection.

A.    Well, there is a literature that underwriters and issuers choose to price generally IPO's at a discount from what they anticipate will be the full information equilibrium price.

They do it for a variety of

STEVEN P. FEINSTEIN

reasons. There is a vast literature on those reasons. It serves them well to do that. They did do it here apparently.

The analysts -- I told you there was analyst coverage here, the analysts commented on it. The analysts said it was 14% intentional underpricing. But that's what's reflected here. They choose -- you know, it served their purposes to price it at 23, even though the information that was available in the market would push it up to 26.

Investors who bought the stock at 23 were providing liquidity to the underwriters and the company and they got compensated for what they sold to and provided to the marketplace, that liquidity.  That's the difference.

And I just want to add, my conclusion is that had there been full information rather than the alleged misinformation the full equilibrium but-for price would have been lower and, therefore, the IPO price would have been

STEVEN P. FEINSTEIN

lower. So there is no evidence in these two columns that the market was informationally inefficient at the IPO or on the first day. In fact, it's all consistent with market efficiency.

Q.    Okay. I'm going to focus on the second Cammer factor. Why is analyst coverage important in determining whether the market for a stock is efficient?

MR. ROTHMAN:  Lindsey, is now a good time to take a break since you switched factors?

MS. HARRIS:  Absolutely.

MR. ROTHMAN:  You want him to answer that question and then we can come back or do you want to start fresh?

MS. HARRIS:  Why don't you answer that. I think he will be able to answer it.

MR. ROTHMAN:  I do too.

A.    Analysts have access to the company that the individual investors don't have and they have expertise that

STEVEN P. FEINSTEIN

that was followed here, where we asked the client what they had and then we filled it in from everything that Thomson Eikon had on Jeld-Wen that the client didn't have, the attorneys, Plaintiffs' counsel.

But in addition, we looked to see what was being covered on Seeking Alpha, and we also noticed that Onex, the private equity firm that owned a substantial part, both before the IPO and after the IPO, substantial part of Jeld-Wen had its -- there was analyst coverage on it itself and that analyst coverage also covered Jeld-Wen during this so-called quiet period. So we got Onex reports both from the client and from Thomson Eikon.

Q.    And the Seeking Alpha reports you mentioned, did you receive those from Plaintiffs' counsel or your team found those?

A.    My team.

Q.    The last Seeking Alpha entry

Page 86

STEVEN P. FEINSTEIN

A.    Yes, that's the last sentence. Yes. This -- I have to tell you the -- as a professor I would give a good grade if this were written by a student. This is a good -- this analyst -- this is good information, good coverage, good analysis and a well expressed opinion, a contrary opinion to what other people were saying but this is a good analyst report.

Q.    Do you agree that the view expressed in this report was that Jeld-Wen stock was not a sound investment opportunity?

A.    I don't think it said that. I think it said that it wasn't going to appreciate the way others thought it was going to appreciate, is what The Value Investor is saying, that caution is called for.  One moment.

The company has a nice market position, potential to increase margins and that's reflective of the alleged misrepresentations and omissions. Nonetheless, and he or she points out

Page 94

STEVEN P. FEINSTEIN

A.    No, I don't think so. FactSet is widely used.

Q.    Okay.

A.    But again, it's not that -- not the distribution of the consensus estimate that's driving my -- that's driving support for my opinion here. It's that this is evidence that there's -- that there's an analyst following the stock even at the IPO. This is additional evidence. So we've got evidence from Seeking Alpha, we've got evidence from Conaccord, we've got evidence from the Web Bush analyst report and we also have evidence from FactSet consensus estimates reporting that there was analyst coverage at the IPO and immediately thereafter.

Q.    I'm going to mark as Exhibit 3 FactSet's forecast data for Jeld-Wen.

(Exhibit 3, FactSet forecast data re: Jeld-Wen, was received and marked on this date for identification.)

Q.    This is a copy of Jeld-Wen's

STEVEN P. FEINSTEIN

company.  Recent rulings --

Q.    Do you --

A.    I also quote, "Recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the -- if the appeal process is unsuccessful." And there in multiple places in the report I cite to that press release, but --

Q.    Do you cite the language, "The company continues to maintain that it has not violated any antitrust laws"?

A.    I don't.  I think the answer is no.

Q.    Okay. So did you consider that language when you prepared your report?

A.    Absolutely. What's going on here is the company -- previously on October 6th the company vehemently denied that there was any merit to the Steves lawsuit and anticipated there would be no negative repercussions from it and that they would essentially have it overturned on appeal. And then so that that's --

Page 134

STEVEN P. FEINSTEIN

well, it's alleged to be a

misrepresentation and contain omissions,

but it was, you know, a very forceful

statement, you know, company talking out

of one side of its mouth.

Now what you have on October

15th is the company on the one hand

saying we still maintain we didn't do

anything wrong but there could be

negative repercussions, which it's like a

mixed message now. So the message went

from being a straightforward denial to

now being a mixed message that there

would be repercussions.

Q.    Well, it says "it has not

violated any antitrust laws and intends

to appeal any adverse judgment." Correct?

A.    It does say that.

MS. HARRIS:   Okay.   That's all

I have.

MR. ROTHMAN:   Okay. Thank you.

VIDEOGRAPHER:   Will there be a

redirect or shall we go off the

record?