# EXHIBIT N

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

------------------------------x

IN RE: JELD-WEN HOLDING, INC.

SECURITIES LITIGATION

CIVIL ACTION NO.

3:20-cv-00112-JAG

------------------------------x

VIDEOTAPE DEPOSITION OF

JOHN RAYMOND LINKER

VIA ZOOM VIDEOCONFERENCE

March 9, 2021

10:00 a.m.

Reported by:

Maureen Ratto, RPR, CCR

                    *  *  *

        Videotape deposition of JOHN
RAYMOND LINKER, held virtually via Zoom
Teleconference, hosted from Veritext
Legal Solutions, pursuant to notice,
before Maureen Ratto, Certified Court
Reporter, License No. XI01165,
Registered Professional Reporter,
License No. 817125, and Notary Public.

                    *  *  *

Page 195

JOHN RAYMOND LINKER

bears a Bates JW-SEC-01150366, was received and marked on this date for identification.)

Q.    For our record, Exhibit 109 is an email string from August 8th and 10th of 2018, bears a Bates number of JW-SEC-01150366 through -368.

Once you've had a chance to open it up and look at it, let me know when you're ready.

(Deponent reviews the document.)

A.    Okay.

Q.    Do you recognize what we've marked as Exhibit 109, Mr. Linker?

A.    Yes.

Q.    What is it?

A.    It's an email that I sent.

Q.    And you sent that email on August the 10th, 2018, right?

A.    I did.

Q.    And the email, subject line says "FW", meaning, Forward:  Jeld: Takeaways From Oral Argument on Steves

JOHN RAYMOND LINKER

Request to Divest Towanda Plant.
Correct?

A.    Correct.

Q.    And you forwarded another email that you had received to someone called J. Rapaport; is that right?

A.    Yes.

Q.    And looking at the text of your email, it appears that person's first name is Jeff; is that correct?

A.    Yes.

Q.    Who is J. Rapaport?

A.    Jeff Rapaport is a -- is/was an investor who I spoke to from time to time about Jeld-Wen. I don't know if they were actively invested or interested in investing but I spoke to him.

Q.    And it looks like Mr. Rapaport's email domain is SeaviewLP.com. Do you see that?

A.    I do.

Q.    Do you know what Seaview LP is?

A.    I understand Seaview to be

JOHN RAYMOND LINKER

some sort of investment vehicle.

Q.    Why did you forward the attached email or forward the email to Mr. Rapaport?

MS. HARRIS:    Objection.

A.    I don't remember the exact context but there was some unusual trading activity in our stock the prior week after the research report that I forwarded below had come out and I had received questions from a number of investors in terms of what was driving the unusual trading activity in our stock, and so I would conclude that Jeff had reached out to me and I was providing him a copy of the research report to help him understand some of the trading activity that took place in the stock the prior week.

Q.    And the research report that you are referring to is in the email that's dated August 8th, 2018 that you received from Thomas Claps; is that right?

JOHN RAYMOND LINKER

A.     That's correct.

Q.     Do you know who Thomas Claps is?

A.     Only based off of this email that I forwarded.

Q.     Do you know what Susquehanna Financial Group LLP is?

A.     I understand Susquehanna is a firm that conducts research on publicly traded stocks.

Q.     And you were on Mr. Claps' distribution list for any research reports he was providing to the market; is that right?

MS. HARRIS:   Objection.

A.     No.

Q.     How did you come to have Mr. Claps research report?

A.     I don't recall exactly but it was forwarded to me by someone.

Q.     Who forwarded it to you?

A.     I don't recall.

Q.     How can you be sure that you weren't on Mr. Claps' distribution list?

JOHN RAYMOND LINKER

MS. HARRIS:  Objection.

A.    I don't recall ever receiving any emails directly from Susquehanna.  So I don't recall receiving this email directly from Susquehanna, therefore, I would assume someone forwarded it to me.

Q.    But you don't know for sure and you can't remember when you received it, right?

MS. HARRIS:  Objection.

A.    I don't recall when I received the email or who I received it from.

Q.    And looking at Mr. Claps' email below it says in the first paragraph, "Last Thursday and Friday, August 2 and 3, the court held oral argument on Steve's request to have Jeld divest/unwind its Towanda plant.  We did not attend the August 2 through 3 argument in court, but I have obtained and reviewed a copy of the transcript. The following are the key takeaways from the transcript." Right?

MS. HARRIS:  Objection.

JOHN RAYMOND LINKER

A.     That's what the email says.

Q.     And then below that there is a bullet point that is in bold and underlined and it says, "As stated below, we believe the most likely outcome is a settlement between the parties. If the case does not settle, given Judge Payne's comments at the August 2-3 hearing, we believe the odds of the court ordered divestiture have increased."  Correct?

A.     That's what the email says.

Q.     And then the report goes on to list one, two, three, four different points that the analyst has excerpted and summarized from the transcript, right?

MS. HARRIS:  Objection.

A.     I don't know where specifically the analyst excerpted or made these conclusions but, yes, there is four points and further down in the email.

Q.     The analyst says that they obtained and reviewed a copy of the August 2 and 3 transcript and key

Page 201

                    JOHN RAYMOND LINKER

takeaways from the transcript are below;

is that correct?

          MS. HARRIS:  Objection.

     A.     That's what it says. I didn't

prepare this email.

     Q.     Have you ever reviewed the

transcript from the August 2nd and 3rd

divestiture hearing?

     A.     I don't think I ever reviewed

that one, no.

     Q.     And when you received this

analyst report from whatever source you

received it, did you review it?

     A.     I read it, yes.

     Q.     And is there anything about

this analyst report that you believe is

inaccurate?

          MS. HARRIS:  Objection.

     A.     I don't know. I'd have to

review every word. I didn't write the

research report, so it was someone's --

someone's view. I'm not staking a claim

on the accuracy.

     Q.     Do you recall around this --

Page 202

JOHN RAYMOND LINKER

around this time that there was some, I think you called it, unusual activity in the company's stock, right?

MS. HARRIS:  Objection.

A.    Yes.

Q.    Okay. Let's mark Exhibit 110. You can close Exhibit 109, if you like.

(Linker Exhibit 110, email chain dated August 8 and 9, 2018, Bates JW-SEC-01152032  was received and marked on this date for identification.)

Q.    Okay. Exhibit 110 should be in your Exhibit Share folder.  And just for the record, Exhibit 110 is an email chain from August 8th and 9th, 2018. It bears a Bates number of JW-SEC-01152032 through -33.

Once you've had an opportunity to look at this email, please let me know, Mr. Linker.

(Deponent reviews the document.)

A.    Okay.

Page 203

JOHN RAYMOND LINKER

Q.    Mr. Linker, do you happen to recognize the email chain that we've marked as Exhibit 110?

A.    I see it's an email that I wrote.

Q.    There is two emails on this page, correct?

A.    Yes.

Q.    The top email on the page is from yourself to a man named David Feder on August 9, 2018, correct?

A.    Correct.

Q.    And second email is from Mr. Feder to yourself dated August 8th, 2018, right?

A.    Yes.

Q.    Are these emails that you sent and received at the dates and times that I just read?

MS. HARRIS:  Objection.

A.    I don't recall. I can only assume these dates and times are correct.

Q.    And you were conferring with Mr. Feder as part of your duties as the

Page 204

JOHN RAYMOND LINKER

SVP of Investor Relations and Corporate

Development at Jeld-Wen, right?

MS. HARRIS:   Objection.

A.   Yeah. Mr. Feder wrote to me in

my capacity as SVP of Investor Relations.

Q.   And turning to Mr. Feder's

email on this page, do you know who David

Feder is?

A.   I don't remember him

specifically, no.

Q.   Is Point72 a hedge fund?

A.   Point72 is an investment -- an

investment firm, yes.

Q.   And do you know whether or not

Point72 was invested in Jeld-Wen in

August of 2018?

A.   I don't know.

Q.   In Mr. Feder's email to you he

says "Hi, John. It was great to see you,

Gary and Brooks today at the conference

to discuss the business in depth. Thanks

for taking the time."

Do you recall what conference

he is referring to that you attended in

Page 205

JOHN RAYMOND LINKER

August of 2018?

MS. HARRIS:  Objection.

A.    There was a Barclays conference right around this time. I can't recall if this is the specific one where we met David but I assume that's what he's referring to.

Q.    And is the "Gary" that Mr. Feder is referring to Mr. Michel, the new CEO?

A.    Yes.

MS. HARRIS:  Objection.

Q.    Okay. And if you look at the last paragraph of -- yeah, the last paragraph of Mr. Feder's email to you he says, "Also, I'm not sure why the stock faded so hard at the end of the day but it might have been due to a sell-side report that said the chances of divestiture are higher after reading the court transcript. Did you hear anything different?"  Do you see that?

A.    I do.

Q.    Okay. And if you turn to your

Page 206

JOHN RAYMOND LINKER

email back to Mr. Feder that you sent to him the next day, in the second paragraph you respond to Mr. Feder's question, right?

MS. HARRIS:   Objection.

A.    Yes.

Q.    And there you say to him, "Regarding this afternoon, yes, there was a research note that came out at 2:45 p.m. from Susquehanna that summarized the divestiture remedy hearing last week and it appears to have been the driver in the steep sell-off in the afternoon." Do you see that?

A.    I do.

Q.    Was that -- the steep sell-off in the afternoon, was that the unusual activity in the stock that you were talking about a few minutes ago?

MS. HARRIS:   Objection.

A.    Yes.

Q.    And you attributed that unusual sell-off in the stock to the research report that we looked at and

Page 207

JOHN RAYMOND LINKER

marked as Exhibit 109, right?

MS. HARRIS:  Objection.

A.    Based off of my interaction with other investors at the conference that we were at, who also had received that research report, I formed the opinion that the sell-off in the afternoon of Wednesday, the 8th was primarily due to the Susquehanna research report.

Q.    Okay. And apart from Mr. Feder, do you remember who else approached you about the Susquehanna research report that was issued on the 8th?

MS. HARRIS:  Objection.

A.    I don't remember the specific names or firms, no.

Q.    But it was more than just Mr. Feder that reached out to you, right?

MS. HARRIS:  Objection.

A.    No. I didn't say that. We were at a conference and having back to back multiple meetings throughout the day and

Page 208

JOHN RAYMOND LINKER

this was a topic that came up in some of the meetings after the research report came out. So I don't know -- you know, when you say people approaching me, it was a topic of conversation in these investor meetings so...

Q.    I think you said it was a Barclays conference, correct?

A.    Yes.

Q.    Do you remember who was participating in the meetings with you at this Barclays conference?

MS. HARRIS:  Objection.

A.    Who from Jeld-Wen?

Q.    Let's start there. Well, I think we know from -- from Exhibit 110 that it was at least you, Mr. Michel and Mr. Mallard, right?

A.    The three of us were attendees, yes.

Q.    Was there anyone else from Jeld-Wen that was with you all at that conference?

MS. HARRIS:  Objection.

Page 209

JOHN RAYMOND LINKER

A.    I can't recall if Chris Teachout was there or not but he had recently joined the company so he may have been there, but I can't recall.

Q.    And then as far as the participants in the conference, do you recall, you know, who was attending the Barclays conference to meet with you?

MS. HARRIS:  Objection.

A.    There was a long -- a list of firms that we met with throughout the day. Some of them are one-on-one meetings and some were group meetings with multiple investors.  And no, I don't remember the list of all the investors we met with that day.

Q.    So it was just more than just Barclays research or investment bankers that were at this particular conference, right?

MS. HARRIS:  Objection.

A.    Barclays -- in a conference like this Barclays would set up the conference, host the venue and then set

JOHN RAYMOND LINKER

up meetings for companies to meet with investors.  And so, yes, we would have met with quite a number of investment firms at this conference.

MS. WYMAN: You can close up Exhibit 110. I'm going to mark as Exhibit 111 a document that will be up in your Exhibit Share in a second, it's tab 2.

(Linker Exhibit 111, printout of message, Bates JW-SEC-01153076 was received and marked on this date for identification.)

Q.    Okay. Exhibit 111 should be in your Exhibit Share folder.

For the record, Exhibit 111 is a document Bates numbered JW-SEC-01153076 through -3077. Attached to the first page of this document is a printout of a metadata that was provided by Defendants when they produced this document.

Flipping to the second page of this document, Mr. Linker, will you let me know when you had a chance to look it

JOHN RAYMOND LINKER

over and are ready?

A.    I'm ready. I'd like to speak to Lindsey about this.

MS. HARRIS:  Yeah. I think it's likely that this document is privileged and was produced inadvertently.

MS. WYMAN:  On what basis do you think that's the case?

MS. HARRIS:  I need to talk to John about it, but I believe that this is likely a document which contains comments from Jeld-Wen's counsel.

MS. WYMAN:  Why don't we go off the record for a few minutes and you guys can have a discussion and come back.

MS. HARRIS:  Okay.

VIDEOGRAPHER:  Going off the record at 3:05.  This marks the end of Media Unit 4. Thank you.

(Recess is taken.)

VIDEOGRAPHER:  We are back on

Page 212

JOHN RAYMOND LINKER

the record at 3:15 and this marks the beginning of Media Unit 5.

Q.    Mr. Linker, we were talking about Exhibit 111 and we took a break so you can confer with your counsel concerning potential privilege issues. Is there a resolution about that?

MS. HARRIS:  We believe this document is privileged and shouldn't have been produced.  So we will send you a written note confirming that we're clawing it back.  And I just direct Mr. Linker not to answer any questions about his communications with counsel regarding this document or regarding anyone acting at the direction of counsel.

Q.    Mr. Linker, are you going to take your counsel's advice?

A.    I am.

Q.    I'm sorry. What did you say?

A.    I am. Yes.

Q.    Okay. Well, I'm going to ask

Page 213

JOHN RAYMOND LINKER

you what I believe are questions that are
not implicating the privilege, in that,
can you confirm that you have seen this
document before today?

A.    Yes.

Q.    And can you confirm that you
provided revisions to this document at
some point in time before today?

A.    I have provided comments on
this document to send to counsel in a
privileged discussion.

Q.    And did you send this document
to anybody outside of Jeld-Wen at any
point in time?

MS. HARRIS:  Objection.

A.    Not that I recall, no.

Q.    And what was the purpose of
this document?

MS. HARRIS:  Objection.  To
the extent you would be revealing
any communications with counsel, I
would direct you not to answer but
you can answer to the extent if you
remember what was in your head at

Page 214

JOHN RAYMOND LINKER

the time.

A.      This document was part of the preparation in working with counsel, and that I was appointed by counsel to prepare for a potential op-ed regarding the content that's here in around Steves. And that was the nature of the document and ultimately an op-ed was published later.

Q.      And where was -- through who was the op-ed published?

A.      It's on Seeking Alpha's website.

Q.      How did you make its way to Seeking Alpha?

MS. HARRIS:  Objection.

A.      I don't know.

Q.      Did you send it to Seeking Alpha?

A.      No.

Q.      Do you know who did send it to Seeking Alpha?

MS. HARRIS:  Objection.

A.      I don't.

Page 215

JOHN RAYMOND LINKER

MS. WYMAN:  Okay. I'm going to mark as Exhibit 112 -- you can close up Exhibit 111.

And just so we're clear, Lindsey, I'm going to reserve my rights to sequester that document and object to the clawback to the extent that we need to. So I just want to reserve that now.

(Linker Exhibit 112, Seeking Alpha article by John Burnett was received and marked on this date for identification.)

Q.    It should be -- Exhibit 112 should be in your Shared Exhibits folder.

Exhibit 112 is an August 20, 2018 posting on Seeking Alpha entitled Court Decision Could Chill M & A Activity in U.S., authored by John Burnett.

Mr. Linker, have you seen Exhibit 112 before?

A.    Yes.

Q.    And when is the first time you saw Exhibit 112?

Page 216

JOHN RAYMOND LINKER

MS. HARRIS:  Objection.

A.    When Seeking Alpha published it on August 20th.

Q.    And this Seeking Alpha post is based on the document that we saw in Exhibit 111, right?

MS. HARRIS:  Objection.

A.    I don't know.  I haven't done a comparison to see how close the language is between the two, but -- so same topic.

Q.    It has the same title, doesn't it?

A.    It does.

Q.    And if we were to go through paragraph by paragraph you'd find that there are quite a few similarities, right?

MS. HARRIS:  Objection.

A.    No.  I haven't -- I haven't gone through it paragraph by paragraph for a comparison.

Q.    If you turn to the last page of Exhibit 112, it says in the middle of

**Page 217**

JOHN RAYMOND LINKER

the page, "This article was written by John Burnett." Do you see that?

A.    I do.

Q.    But you and Jeld-Wen actually wrote this article, didn't you?

MS. HARRIS:  Objection.

A.    No.  I did not author the article.

Q.    You provided comments to the article, right?

MS. HARRIS:  Objection.

A.    I provided comments and questions under privilege with counsel that -- I don't recall whether they were incorporated into what was ultimately sent on to this author.

Q.    Was it part of your job as the Senior Vice President of Investor Relations at Jeld-Wen to ghostwrite articles for positive press for the company?

MS. HARRIS:  Objection.

A.    No.

Q.    And how much did Jeld-Wen pay

Page 218

JOHN RAYMOND LINKER

Mr. Burnett to publish this piece?

MS. HARRIS:   Objection.

A.     I don't know.

Q.     Who else did Jeld-Wen pay for positive press?

MS. HARRIS:   Objection.

A.     I'm not aware of anyone Jeld-Wen paid for positive press.

Q.     And Mr. Burnett is the founder and managing director of a company called 1 Empire Group, right?

MS. HARRIS:   Objection.

A.     I don't know that, no.

Q.     Pardon me?

A.     I don't know who John Burnett is and what he does.

Q.     And you know that 1 Empire Group is a consulting group that does risk management services, right?

MS. HARRIS:   Objection.

A.     No.   I don't know that.

Q.     Did Jeld-Wen ever hire 1 Empire Group for its risk management consulting services?

**Page 219**

JOHN RAYMOND LINKER

MS. HARRIS:  Objection.

A.    I'm not aware of Jeld-Wen hiring 1 Empire Group.

Q.    Have you ever spoken to Mr. John Burnett?

A.    Not that I recall, no.

Q.    Have you ever emailed with Mr. John Burnett?

A.    Not that I recall, no.

Q.    Have you ever texted with Mr. John Burnett?

A.    No.

Q.    Instant messagered with Mr. John Burnett?

A.    No.

Q.    Do you know what John Burnett's contact information is?

MS. HARRIS:  Objection.

A.    I don't know what John Burnett's contact information is.

Q.    Did you ever consult with anyone about the legality of ghostwriting a positive press piece for Jeld-Wen?

MS. HARRIS:  Objection.

Page 220

JOHN RAYMOND LINKER

A.     I did not ghostwrite a positive press release for Jeld-Wen.

Q.     That wasn't my question. My question was; did you ever consult with anyone about the legality of doing so?

MS. HARRIS:  Objection.

A.     No.

Q.     Okay. Did you ever consult with anyone about the legality of editing a post like this prior to its publication?

MS. HARRIS:  Objection.

A.     I did not consult with anyone, no.

Q.     Do you know whether or not it is a violation of any SEC Regulation or any other law to -- for a public company to ghostwrite a piece of positive press and pay the author to post it?

MS. HARRIS:  Objection. That's not his testimony.

MS. WYMAN:  I didn't ask him if that was his testimony. I asked him if he knew whether it was a

Page 221

JOHN RAYMOND LINKER

violation.

Q.    My question is this; do you know whether or not it is a violation of any SEC Regulation or any other law for a public company to ghostwrite a piece of positive press and pay the author to post it?

A.    I'm not aware if there is laws, no.

MS. WYMAN:  And given your counsel's objection to the use of Exhibit 111, I'm going to reserve my right to go back and question you, should the privilege not hold, to compare Exhibit 111 and Exhibit 112, but I'm not going to do that right now, Lindsey, because I don't want to upset the privilege objections that you've made.  Okay?

MS. HARRIS:  Yes. Thank you.

Q.    You can close up Exhibit 112.

Now, Mr. Linker, I want you to turn your focus to the October 2018 timeframe.  Okay?