# EXHIBIT Q

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

IN RE JELD-WEN HOLDING, INC. :

SECURITIES LITIGATION          :    3:20-cv-00112-JAG

-----------------------------*

STENOGRAPHIC AND VIDEO-RECORDED

REMOTE VIRTUAL DEPOSITION OF

TIMOTHY L. KIRK

Tuesday, March 9, 2021

10:27 a.m.

Reported by and before:

Josephine H. Fassett, RPR, CCR

KIRK

reported, that I supported, and then had some additional people that had reported to me either directly or dotted line. I guess it really would have only been one additional person that dotted-line reported to me, which was a CRM administrator. And I supported the home center channel on top of the traditional sales channel. And then also Canada as well. And those varied during different time periods of that span of time from 2013 to 2019.

Q. Okay. And so what -- just real quick. What's a CRM manager?

A. That's the customer relationship management software, salesforce.com is the platform that we used.

Q. And can you just describe how you -- how Jeld-Wen used that system?

A. We used it to keep track of our customer accounts, contacts, interactions with the customers. Different -- I'm trying to think. Different processes, workflows, approvals and communication tools.

Q. And all of that went through the Salesforce system?

Page 36

KIRK

A.    All of it -- during different periods we, you know, the Salesforce instance was something that we evolved over time.  So as we continued to evolve the CRM, we added different pieces to it.  But essentially those were involved in the CRM at some point in time during my tenure at Jeld-Wen, yes.

Q.    Would it be fair to call that a database or no, is that wrong?

A.    I think that there -- some might call it that.  I call it a customer relationship management software.

Q.    Okay.  And were you responsible for managing that software?

A.    In conjunction with IT, yes.

Q.    And who else was, just IT and you?

A.    Well, IT and myself, as well as sales leadership to drive adoption amongst our users.

Q.    When you say "sales leadership," who are you referring to?

A.    The people that the sales representatives in the field reported to.  The directors of sales.  The vice presidents of sales. My boss.  So, you know, it's like anything, if you

KIRK

have a tool and you don't utilize the tool, there's not much value in it.  So really it was to try to get everyone to utilize that tool for the functionality that we integrated.

Q.   Okay.  What about customer pricing, was that something that was included in the CRM?

A.   Certain components of pricing were, yes.

Q.   What components of pricing?

A.   Something that we called a special discount agreement which was essentially a discount for a particular job and it was used more on the window side of the business.  And then also at one point rebate agreements were held in the CRM.

Q.   And what about for like price increase notification letters or things like that?

A.   And the question is?  I'm sorry, what's the question?

Q.   Were those saved or contained in the CRM?

A.   Not, not the entire time, but there -- sometimes we would post the price increase letters to -- on salesforce.com in something called Chatter.  And, I'm sorry, the question was price

KIRK

increase letters, and what was the other piece of the question?

Q.    No, just whether or not they were saved or contained on the CRM.

A.    Yeah.  I would say yes, as I mention, but maybe not every single time.

Q.    Okay.  And then when you say "not every single time," when wouldn't they have been?

A.    Well, I'm just saying if we -- you know, when we instituted a price increase, we would typically put something in Chatter for the product group that the price increase was related to. And, you know, it may be a situation where it was sent in email as opposed to being put onto the CRM.  Or maybe it was sent in an email and, you know, just from a standpoint of process maybe it didn't get posted on the CRM.  That's what I mean by that.

Q.    Okay.  And so that's the second time that you said "Chatter," can you tell me what Chatter is?

A.    That Chatter is -- it's a communication tool that's part of the salesforce.com platform and it's essentially like a social media of sorts

                    KIRK

for business.  It's a -- I'll call it a business communication tool on the salesforce.com platform.

Q.   Okay.  And who would post on this social media platform?

A.   Anybody that had a license to salesforce.com could post on there.

Q.   From Jeld-Wen you mean, right?

A.   Correct.  And it's an internal facing tool.

Q.   You can go ahead, I didn't hear what you said.

A.   I said it's an internal facing tool the salesforce.com platform.

Q.   Okay.  And did everyone who was employed by Jeld-Wen have a salesforce.com account?

A.   No.

Q.   Who didn't have an account?

A.   It would be easier to name the people that did because Jeld-Wen has 20,000 plus employees and we probably had about 150 to 200 licenses.

Q.   Okay.  So let's do that then.  Then who did have licenses?

A.   It would be the sales team.  Anybody in

KIRK

the sales organization had those.  Some product line managers.  Some business unit managers.  And maybe a handful of other people.

Q.    And what about the CEO and CFO, did they have licenses?

A.    Maybe some of the time, but I can't be sure of all of the time if they did.

Q.    Let's be specific.  What about Mr. Hachigian?  How do you pronounce it?  Hachigian?

A.    Hachigian.

Q.    Mr. Hachigian, did he have a Salesforce license at any time?

A.    I don't know for sure.

Q.    Do you recall any time Mr. Hachigian logging on to the Salesforce Chatter function?

A.    I don't recall him logging on to it, no.

Q.    Okay.  What about Mr. Mallard?

A.    I don't -- Brooks Mallard, I don't remember him logging on to Salesforce either.

Q.    Okay.  And what about Mr. -- is it Michel or Michael?

A.    Gary Michel.  I don't, I don't -- I don't recall on him if he did or if he did not.

KIRK

Q. Okay. And the same question about Mr. Beck.

A. Mr. Beck did.

Q. You know for a fact that Mr. Beck did have access to the Chatter function?

A. I do know he did.

Q. Okay. And did this have an instant messenger type function where you could message other people who were on the system?

A. I don't recall specifically. I don't recall.

Q. So you don't know whether or not there was -- you couldn't just message someone on the system? No?

A. Well, you could message somebody on the system, but I'm not sure it's an instant, what you're referring to as an instant messenger capability. Because it's like a Twitter account or a, you know, a Facebook account where you can post something and you can use the @ symbol to call somebody out and it will ping them and get their attention and they can respond to it, or you can have just a general post.

Q. Okay. And then is there any ability to

Page 42

KIRK

specifically contact just one person?

A.   Yeah, I'm not sure about that.

Q.   Okay.  And then when you say it has a social media typeface like Twitter, were there different rooms in this Chatter function or was it just one place to post?

A.   There were not different rooms.

Q.   So there was just one, I'll just call it a wall like in Facebook, there was just one place and that's where everyone posted on Chatter?

A.   There is a general place that you can post, but there are also groups that you can create different groups.

Q.   Okay.  And let's just say in 2014, what were those -- what were some of those groups?

A.   I don't remember the specific groups in 2014.

Q.   Well, what about at any time?

A.   We had product manager groups set up that the product line managers, that the objective was for the product line managers to utilize that as a tool to place any communications relative to their specific product category into those groups whether it be sales aids, product announcements,

Page 43

KIRK

enhancements, the price increase letters that we referred to before, those types of material to communicate to the sales team so that they would have one place to be able to go get and get that information.

Q.   Okay.  And then, so you had said for each product.  So would there have been a Chatter for interior molded doors, for example?

A.   Perhaps.  It may have been more broad, it may have been doors, but it could have been deeper at some point.

Q.   Okay.  And that might have been different from, say, windows, that would have been a separate Chatter?

A.   Windows and doors would have been segregated, yes.

Q.   Okay.  Thank you.

And how often would people use the Chatter product here at Jeld-Wen?

A.   Not as often as I would have liked.

Q.   So it was your goal to get people to use it?

A.   Yes.

Q.   And there was some people that didn't

Page 44

KIRK

use it?

A.   I would say that's correct.

Q.   And why not?

A.   You'd have to ask them, I'm not quite sure.

Q.   Was it your, one of your job responsibilities to get people to use Chatter, is that something you were tasked with?

A.   I wouldn't say it was a specific objective or initiative or I was measured on it, I just saw the tool as having potential to enhance communications.

Q.   Okay.  Thank you.

So going back to your role as senior director of sales operations, who did you report to beginning in 2014?

A.   Bob Merrill.

Q.   Okay.  And then who did Mr. Merrill report to?

A.   He reported to the CEO.

Q.   Okay.  Which would have been Kirk Hachigian beginning in 2014, right?

A.   I'm not sure about the timing on that.

Q.   But do you recall that Mr. Hachigian

Page 45

KIRK

became CEO of Jeld-Wen in 2014?

A.    I can't speak to 2014, but I do know that Mr. Hachigian at one point was CEO.

Q.    Okay.  And you don't recall when that was?

A.    Not specifically.

Q.    Okay.  So he, Mr. Merrill, reported directly to the CEO regardless of who it was, though?

A.    Who did you say?

Q.    Mr. Merrill reported to the CEO regardless of who it was?

A.    That's correct.

Q.    And who else did you report to during your time at as a senior director of sales operations?

A.    I reported to Bob Merrill.  Marianne Thompson.  Bob Merrill again.  Bob Bender.  And Matt Garrett.

Q.    And what title did those individuals hold, was it the same title?

A.    It wasn't the same title throughout. Bob Merrill originally was senior vice president of sales and marketing and then he became senior

Page 145

KIRK

that -- I don't remember the specific names, but we discussed some meetings earlier that they may have participated in.

Q.   Okay.  Like the pricing strategy meeting?

A.   Yeah, that could have been in one of those meetings, as we discussed.

Q.   Okay.  And then while we're on this document, the date on this Masonite letter is December 1, 2014, correct?

A.   Yes.

Q.   You can put that document aside.

MR. CHRISTIE:  Mr. Kirk, we've gone about an hour since our break.  Do you want to keep going or would you like to take a short break now?

THE WITNESS:  No, we'll take a break.

MR. CHRISTIE:  Okay.

THE VIDEOGRAPHER:  Stand by.  Going off the record 2:09 p.m.  This is the end of Media Unit 3.

(Whereupon, off the record.)

(Whereupon, resumed.)

THE VIDEOGRAPHER:  Going back on the

Page 146

KIRK

record 2:20 p.m.   This is the beginning of Media Unit 4.

BY MR. CHRISTIE:

Q.   Mr. Kirk, are you aware that you're still under oath?

A.   I am.

Q.   Is there anyone else in the room there with you other than Mr. Kuppens?

A.   No.

MR. CHRISTIE:  Phil, can you introduce, it's Tab 18.

(Email Exchange with attached Interior Door Price Increase Letter, Bates JW-SEC-00245517 to JW-SEC-00245519, marked as Exhibit 68, as of this date.)

MR. KUPPENS:  You have to go left to right with whatever's on the screen.

MR. LEGGIO:  Introduced.

BY MR. CHRISTIE:

Q.   Mr. Kirk, I'm introducing a document that's being -- that's Plaintiffs Exhibit No. 68. It's an email from you to Bob Merrill, Jim Flickenger, Derek Brosterhous, Ken Hart, Bill Holt, Chris Mercier, Eric Ford, John Tracy, and

Page 147

KIRK

Mike Hill, dated December 3, 2014, with Bates numbers JW-SEC-00245517 --

A.    I see it.

Q.    -- through 19.

Mr. Kirk, would you agree that this email is dated December 3rd, which is two days after the Masonite price increase letter was dated, correct?

A.    That was December 1st.

Q.    Yes.  And this is December 3rd, right?

A.    That's what the date is, yes.

Q.    And this email was in regards to Jeld-Wen sending a price increase letter either this day or soon, correct?

A.    Yes.

Q.    Do you recall having any communications about the timing of sending this price increase letter from Jeld-Wen two days after the Masonite announcement?

A.    Let me just read this for a second.

I don't remember it up in my memory.  I can see what the email says here, and it clearly indicates that there's a communication plan to send out a letter, so.

Page 148

KIRK

Q.   Okay.  And who told you to initiate this communication plan?

A.   Does it say it someplace here?  I don't see it.  I don't remember.

Q.   Would it have been Bob Merrill who would have told you to begin initiating this communications plan?

A.   Again, I don't, I don't remember. Unless it's here someplace, I don't remember specifically.

Q.   So you don't remember who would tell you, "Tim, you know, we're issuing a price increase letter, please pull together a communications plan," you don't recall who would tell you that?

A.   Well, again, that's a broad question, so, you know, in this case it doesn't say specifically and I don't remember specifically.

Q.   What about other instances?  Do you know who told you to initiate the communications plan with respect to price increase letters?

A.   It would typically be my boss.

Q.   And your boss, as we've discussed earlier, was Bob Merrill during this time?

Page 149

KIRK

A.   Yes.

Q.   And later on it was Marianne Thompson?

A.   Yes.

Q.   Do I have that name right?

A.   Yes.

Q.   And then Bob Bender?

A.   Yeah, Bob Bender.  Bob Merrill was back in between.  So Bob Merrill, Marianne Thompson, Bob Merrill, Bob Bender, and Matt Garrett.

Q.   Matt Garrett?

A.   Right.

Q.   And so typically they would be the individuals who would tell you that you are going to be communicating a price increase letter to customers?

A.   That's typically the case.

Q.   And then if you look at the second email from the bottom, it's from Wednesday, December 3, 2014, at 4:57 p.m.

A.   Yes.

Q.   It attaches the final approved letter in generic form with Bob's signature.  "I will be posting to the SFDC Chatter Product Marketing Doors shortly."

Page 150

KIRK

Is that SFDC Chatter Product Marketing Doors one of the groups we were talking about?

A.    It is one of the Chatter groups that we discussed earlier.

Q.    And just so I'm clear.  Is it the Product Marketing Doors Group or is it just the Marketing Doors Group or is it just the Doors Group?

A.    Well, it says here that, in the email, it says Product Marketing Doors, so that would lead me to believe it's that group, but that name of the group may have changed multiple times and then labeled differently in different time periods.

Q.    Do you recall some of the other names that it may have been labeled?

A.    Well, initially we had two groups.  One was for windows and one was for doors, and it was based on the structure of the organization.  Then as we obtained additional product line managers, as I've mentioned before, we would have one set up for them to manage their different things that they wanted to communicate to the sales team.  And do I remember all of the specific names, I do not.

KIRK

Q.   Okay.  And when you say "product line managers," what is an example of a product line; I mean, what level of granularity are we talking about?

A.   Well, it really goes very similar to what I said before.  When we have product line managers we have -- I mean, going back to Derek Brosterhous and Elizabeth Souders.  We had one that represented doors and one that represented windows.  And their titles were product line managers, product marketing managers.  You know, I think they had varying titles but the role was the same.  And then the other groups, they expanded as we built that organization out to support different product categories.

Q.   Okay, yeah.  So that's what I'm trying to get at.  I'm sorry if I wasn't clear.

But what were some of those different product categories?  Are we talking about exterior doors versus interior doors?  Are we talking about vinyl compared to wood?  I'm just trying to get some understanding of --

A.   Yeah.

Q.   -- how, you know.

Page 152

KIRK

A.   What you just said would be a representation that would be correct.

Q.   Okay.  And then with respect to the SFDC Chatter, there would have been groups with respect to those product lines?

A.   Yeah, but in this case at the time it appears that the group was labeled Product Marketing Doors that it was posted to, so it wasn't -- so based on this it leads me to believe that it was not any more specific than the doors group.

Q.   At this time?

A.   At this time.

Q.   Right.  Okay.  Understood.  Thank you. That's very, very helpful.

If you'd go to the original email from you from 5:05 p.m.

A.   Yes.

Q.   And you already kind of explained this how it was a staged announcement depending on the type of customer and how your relationship with that customer, correct, and that's kind of set forth here?

A.   Yeah.  To be clear, you know, these