# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

-----------------------------x

IN RE: JELD-WEN HOLDINGS, INC.

SECURITIES LITIGATION

CIVIL ACTION NO.

3:20-cv-00112-JAG

-----------------------------x

VIDEOTAPE DEPOSITION OF

DANIEL R. FISCHEL

VIA ZOOM VIDEOCONFERENCE

February 26, 2021

10:00 a.m.

Reported by:

Maureen Ratto, RPR, CCR

DANIEL R. FISCHEL

opinion and what the company said after that. Again, there may very well be others but that's what comes to mind.

Q.    Okay. And then you also mentioned that you had extensive discussions with members of the staff at Compass?

A.    That's correct.

Q.    To whom did you speak from Compass?

A.    Primarily, Mike Keable and to a lesser extent Anne Marie Yale.

Q.    Was Mr. Keable involved in the -- strike that.

Did Mr. Keable assist you in preparing your report that you tendered on February 1st in this case?

A.    Yes.

Q.    And was Ms. Yale also involved in that?

A.    You know, it's possible but I primarily, you know, to the best of my recollection, I primarily interacted with Mr. Keable.

DANIEL R. FISCHEL

Q.    Do you know whether or not Mr. Keable had people assisting him to undertake whatever tasks you discussed he should --

A.    You know, again, I don't know specifically.  But the way our firm works in the ordinary course, there would be research assistants and other lower level personnel who may very well have been involved in gathering data, gathering articles, things of that nature.

Q.    And in your discussions with Mr. Keable in preparation for your deposition today, what did you guys discuss?

A.    We discussed everything relating to the case.

Q.    Did you discuss anything in particular that you can recall right now?

A.    Well, really the entire case. We discussed -- we had a number of discussion about Mr. Feinstein, particularly since we received Mr. Feinstein's rebuttal report

DANIEL R. FISCHEL

subsequent to the filing of my report, and he was also deposed, which I think either Mr. Keable attended or -- I think he attended, actually.

Q.    I'm sorry. I didn't mean to interrupt you.

A.    No, you didn't really. And, you know, we discussed my report as well and some of the issues that I discussed in my report. There is really nothing that I would say in the course of preparation that we didn't discuss in one way or another that we thought was relevant to the case.

Q.    Now, Dr. Feinstein's deposition was taken this past Monday. Have you read his transcript?

A.    No, I didn't -- I didn't even receive it until the middle of the day yesterday and I tried to skim it a little bit, but I wouldn't say I've read it or really reviewed it.

Q.    Okay.  And I think you also mentioned that you had a few discussions

DANIEL R. FISCHEL

about them and nobody has said anything to me.  So I assume they're relatively current but, again, I don't know.

Q.    And what is the total Compass has charged Defendants for your and your staff's work so far?

MS. HARRIS:  Objection.

A.    I don't know the answer to that and certainly the February bill wouldn't even have been sent yet.  So, you know, again, with respect to previous bills, you know, there's an answer to that question but I don't know.

Q.    If you turn back to your report, which is Exhibit 23, and let's go to Appendix B. Are you there?

A.    I have to take the clip off to -- yes. Materials Relied Upon?

Q.    Yes, sir.

A.    Yes, I got it.

Q.    Okay. So Appendix B is entitled Materials Relied Upon.  And does it list all the materials upon which your opinions rely in the report?

DANIEL R. FISCHEL

A.    It should. That's the intention.

Q.    And did you consider materials that you didn't rely on in forming the opinions in your report?

A.    That's very possible.

MS. HARRIS:  Objection.

Q.    Are all the materials that you considered, but maybe didn't rely on, listed in Appendix B?

A.    I don't believe --

MS. HARRIS:  Objection.

A.    I'm sorry. I'm answering too quickly. I don't believe so.

Q.    Okay. What other materials did you consider in forming your opinions that aren't listed on Exhibit B?

A.    I can't think of anything specific but just by virtue of the title of Exhibit B, it's limited to materials relied upon.

Q.    Is there any reason why you didn't list all the materials that you considered?

DANIEL R. FISCHEL

MS. HARRIS:  Objection.

A.    I think the only reason is I wanted to list materials relied upon.

Q.    And in forming your opinions in this case, did you talk to any press or former Jeld-Wen employees?

A.    Not to the best of my knowledge.

Q.    Do you know whether or not Mr. Keable or anybody else from the Compass staff did?

A.    I'm not aware of any such conversations but I can't say for sure because I don't have 100% familiarity with everybody who they spoke with.

Q.    But, you, yourself didn't have any conversations; is that right?

A.    I did not.

Q.    How did you determine what materials you needed to consider to form your opinions in this case?

A.    I think it's a combination of the background documents in the case, many of which were provided to us, such

DANIEL R. FISCHEL

Q. And that heading says, "Jeld-Wen's stock price decline on October 16, 2018 was not caused by the Steves litigation charge." Correct?

A. That's what it says.

Q. Is that statement a broad statement of your first opinion in this case?

MS. HARRIS: Objection.

A. It is my opinion. Are you referring to my first opinion on page 8?

Q. Yes.

A. I'm not sure what you're calling my "first opinion".

Q. That's what I'm referring to as your first opinion.

A. Well, I would say the language of the bold language in (a) tracks the language of the first bullet point on page 8.

Q. And as you said, that the language that I just read in bold (a), heading (a) is your -- one of your opinions in this case, right?

Page 78

DANIEL R. FISCHEL

A.    That's right.

Q.    Okay. In your report, the supporting paragraphs in your report for that opinion are shown between pages 13 and 27, correct?

MS. HARRIS:  Objection.

A.    I'm not sure I would isolate those pages as the sole support for that principle.

Q.    So the basis for your opinion is not shown just in those pages but in other portions of your report?

A.    I think the report has to be read in its totality as opposed to parsing it in an artificial way.

Q.    Mr. Fischel, you understand what a "corrective disclosure" means in a securities fraud context, right?

MS. HARRIS:  Objection.

A.    I generally I think I do.

Q.    And what is your definition of corrective disclosure?

A.    Well, I mean it's partly a legal question, so I just want to make

DANIEL R. FISCHEL

clear I'm not offering any legal opinions.  But I think in terms of how that term is usually used in securities fraud litigation, it's a disclosure that corrects a previous nondisclosure or a misrepresentation --

Q.    And that's how --

A.    -- frequently a material nondisclosure or misrepresentation, a material nondisclosure or misrepresentation.

Q.    And for the purposes of your analysis in this case, is that the definition you used to determine whether something was a corrective disclosure or not?

MS. HARRIS:  Objection.

A.    I didn't really conduct an abstract inquiry to what was a corrective disclosure. I analyzed the facts and circumstances, particularly in light of Dr. Feinstein's analysis and conclusions, and pointed out all the errors that Dr. Feinstein committed in his analysis or

DANIEL R. FISCHEL

assumptions.

The price reaction to the October 15th disclosure could accurately be referred to as a corrective disclosure, at least in part of any prior misrepresentations, alleged misrepresentations.

Q.    In your opinion, is the October 15th, 2018 preannouncement of the third quarter 2018 results a corrective disclosure?

MS. HARRIS:  Objection.

A.    A corrective disclosure of what?

Q.    A corrective disclosure of any prior omission, material omission or misstatement.

MS. HARRIS:  Objection.

A.    I think, again, my focus is on the actual facts and circumstances of this case and Dr. Feinstein's analysis, and in my opinion for the reasons that I stated in my report, I think Dr. Feinstein's entire analysis of the price

Page 81

DANIEL R. FISCHEL

decline and labeling it a corrective disclosure of any alleged prior misrepresentation, whether actual or assumed, is just fundamentally flawed for the reasons that I stated and, you know, one of the most egregious violations of the principles of an efficient market I can remember ever seeing in an expert report.

Q.    Turning to paragraph 24 of your report, which is on page 13, there is a subheading above it that says, "The 3Q '18 preannouncement does not admit guilt or disclose the alleged 'illegal anticompetitive behavior'."

Is it your opinion that the, as you call it the 3Q 2018 preannouncement, was not a corrective disclosure because the company didn't admit guilt?

MS. HARRIS:  Objection.

A.    Well, my opinions are what's stated in the report, you know, so I'm not sure how to answer that question.

DANIEL R. FISCHEL

Other than to say that the company's statement about its belief about whether it engaged in any unlawful conduct was asserted before October 15th in response -- in October 15th and subsequent to October 15th and that, again, is a point that was ignored really by Dr. Feinstein, the implications of it.

Q.    In your opinion, does a corrective disclosure need to admit the -- does it need to admit that the company was guilty of providing false information to its investors prior?

MS. HARRIS:  Objection.

A.    Well, again, that's a definition of a corrective disclosure. As I said earlier, that's a legal question and I'm not offering any legal opinions, but again I'm just repeating myself.

I don't think there is any basis to conclude, and a lot of bases to conclude the opposite, that anything that was disclosed on October 15th can

DANIEL R. FISCHEL

legitimate -- and the price reaction to it -- can legitimately be referred to as a corrective or "corrective disclosure" that justifies any portion of that price decline as a basis for calculating damages.

Q.   And is that because, as you say in paragraph 24 of your report, that, "The October 15th, 2018 disclosure did not even mention the potential doorskin plant divestiture, anything related to the alleged anticompetitive interior molded door price-fixing conduct or reduced pricing power?"

MS. HARRIS:  Objection.

A.   Again, I don't want to take little bits and pieces of my report in isolation.  I think the entire report provides a context of my opinions, including my analysis of the after-tax 55 cent litigation charge, which, you know, as I've already indicated in my opinion, Dr. Feinstein's treatment of that not only is wrong but one of the most

DANIEL R. FISCHEL

egregious violations of the principles of efficient markets that he purports to be relying on that I can ever remember in an expert report.

Q.    Is it your opinion that the Steves litigation charge is in no way, shape or form related to the alleged misrepresentations and omissions that that Plaintiffs have contained in their Complaint here?

MS. HARRIS:  Objection.

A.    It's not that they're not related, it's just that the information that the litigation charge refers to was the events in the disclosure ten days earlier on October 5th. And when I say that Dr. Feinstein's analysis of the litigation charge is one of the most egregious violations of efficient markets that I can ever remember seeing, particularly in an expert report that espouses and relies on the concept of efficient markets, is the remedy that's the basis for the accounting treatment of