UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Richmond Division)

| | | |
|---|---|---|
| In re JELD-WEN HOLDING, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. 3:20-cv-00112-JAG |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
THE REPORTS AND TESTIMONY OF DR. STEVEN FEINSTEIN

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   DR. FEINSTEIN'S OPINIONS ARE BASED ON RELIABLE, GENERALLY
      ACCEPTED METHODOLOGIES, AND ARE ADMISSIBLE UNDER
      RULE 702 ...........................................................................................................3

      A.    Dr. Feinstein's Loss Causation Opinions Are Admissible .....................4

            1.    Dr. Feinstein Used a Generally-Accepted and Reliable Loss
                  Causation Methodology ..............................................................4

                  a.    Dr. Feinstein Applied His Methodology in a Consistent
                        Manner ............................................................................5

                  b.    Dr. Feinstein's Methodology Sufficiently Disaggregates
                        Confounding Information to Arrive at the "Substantial
                        Cause" of Investors' Losses............................................8

            2.    Dr. Feinstein's Loss Causation Analysis Is Supported by the
                  Evidence.....................................................................................11

                  a.    Dr. Feinstein's Opinion that the Market Was "Stunned" by
                        Jeld-Wen's Disclosure of the *Steves* Litigation Contingency
                        Is Aptly Supported ........................................................12

                  b.    Dr. Feinstein's Opinion that the *Steves* Litigation
                        Contingency Informed the Market that Antitrust
                        Allegations Made Against the Company Had Merit Is
                        Supported by the Record................................................16

      B.    Dr. Feinstein's Damages Opinions Are Admissible.............................18

            1.    Dr. Feinstein Used a Generally-Accepted and Reliable Damages
                  Methodology ..............................................................................19

                  a.    Per Share Direct Impact of the Litigation Charge ........20

                  b.    Per Share Impact of the 3Q2018 Results and FY 2018
                        Guidance Reduction.......................................................20

                  c.    Per Share Impact of the CFO Change.............................21

                  d.    Per Share Valuation Impact of Lower EBITDA Estimates
                        and Valuation Multiple for 2019 and Beyond ...............22

                  e.    The Final Calculation.....................................................23

**Page**

2. Dr. Feinstein's Damages Opinions are Supported by Evidence in this Action, and the Reports and Testimony of Defendants' Experts........24

3. Defendants' Remaining Arguments Are Merely Dressed Up Challenges to Dr. Feinstein's Conclusions .................................................26

C. Dr. Feinstein's Declaration Should Not Be Stricken ............................................29

III. RULE 26 REQUIRES DR. FEINSTEIN TO SUPPLEMENT HIS LOSS CAUSATION OPINIONS, AND DAMAGE COMPUTATION, WITH NEW INFORMATION...............................................................................................................30

IV. CONCLUSION...........................................................................................................30

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)........................................................................................27

*Atanassova v. GM LLC*,
2021 WL 672929
(D.S.C. Feb. 22, 2021) ........................................................................................................4

*Attard Indus. v. United States Fire Ins. Co.*,
2010 WL 4670704
(E.D. Va. Nov. 9, 2010) ....................................................................................................18

*Belville v. Ford Motor Co.*,
919 F.3d 224 (4th Cir. 2019) .......................................................................................1, 16

*Boyett v. Cnty. of Washington*,
2006 WL 3422104
(D. Utah Nov. 28, 2006) ...................................................................................................16

*Bresler v. Wilmington Tr. Co.*,
855 F.3d 178 (4th Cir. 2017) ...........................................................................3, 12, 28, 30

*Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse First Boston*,
853 F. Supp. 2d 181 (D. Mass 2012) ........................................................................9, 10, 11

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................................................................................................16, 26

*Carlucci III v. Han*,
907 F. Supp. 2d 709 (E.D. Va. 2012) .................................................................................4

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .................................................................................18, 24

*City of Ann Arbor Employees' Retirement System v. Sonoco Products Co.*,
827 F. Supp. 2d 559 (D.S.C. 2011).....................................................................................11

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
322 F. Supp. 3d 676 (D. Md. 2018)...................................................................................19

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..........................................................................................1, 3, 7, 17

**Page**

*Doe v. Miles Laboratories, Inc., Cutter Laboratories Division*,
  927 F.2d 187 (4th Cir. 1991) ...............................................................................................28

*Finkelstein v. Liberty Digital, Inc.*,
  2005 WL 1074364
  (Del. Ch. Apr. 25, 2005) .........................................................................................................2

*GoDaddy.com LLC v. RPost Communications Ltd.*,
  2016 WL 2643003
  (D. Ariz. May 10, 2016), *aff'd*,
  685 F. App'x 992 (Fed. Cir. 2017) .......................................................................................27

*Hauser v. Powell*,
  2021 WL 409745
  (D. Md. Feb. 5, 2021) ...........................................................................................................15

*Herndon v. Huntington Ingalls Indus.*,
  2020 WL 5809965
  (E.D. Va. Aug. 28, 2020).................................................................................................16, 17

*In re Bausch & Lomb, Inc. Contact Lens Solution Products Liability Litigation*,
  2009 WL 2750462
  (D.S.C. Aug. 26, 2009) ....................................................................................................15, 26

*In re Countrywide Fin. Corp. Sec. Litig.*,
  273 F.R.D. 586 (C.D. Cal. 2009) ..........................................................................................19

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*,
  892 F.3d 624 (4th Cir. 2018) .............................................................................................1, 28

*In re REMEC Inc. Securities Litigation*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)..................................................................................10

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009)....................................................................................18

*KBC Asset Mgmt. NV v. 3d Sys. Corp.*,
  2017 WL 4297450
  (D.S.C. Sept. 28, 2017)..........................................................................................................19

*Kinlaw v. Nwaokocha*,
  2019 WL 2288445
  (E.D. Va. May 29, 2019).........................................................................................................30

**Page**

*Koenig v. Johnson*,
2020 WL 2308305
(D.S.C. May 8, 2020)..............................................................................................14, 18

*Kopf v. Skyrm*,
993 F.2d 374 (4th Cir. 1993) ...........................................................................................2

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)................................................................................... *passim*

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007)...........................................................................................18

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
923 F. Supp. 2d 511 (S.D.N.Y. 2013)............................................................................19

*Limelight Networks, Inc. v. XO Communications, LLC*,
2018 WL 678245
(E.D. Va. Feb. 2, 2018)..................................................................................................26

*Lord & Taylor, LLC v. White Flint, L.P.*,
849 F.3d 567 (4th Cir. 2017) ..........................................................................................1

*Lowes Foods, LLC v. Burroughs & Chapin Co.*,
2019 WL 2454570
(D.S.C. Apr. 17, 2019).....................................................................................................7

*Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC*,
423 F. App'x 274 (4th Cir. 2011) ..................................................................................18

*Miller v. Asensio & Co.*,
364 F.3d 223 (4th Cir. 2004) .....................................................................................4, 10

*Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*,
332 F.R.D. 370 (N.D. Ga. 2019).....................................................................................9

*Nationwide Mut. Fire Ins. Co. v. Bryant Thomas Heating & Cooling*,
2020 WL 5415659
(E.D. Va. June 26, 2020)................................................................................................15

*NetFuel, Inc. v. Cisco Systems Inc.*,
2020 WL 1274985
(N.D. Cal. Mar. 17, 2020)..............................................................................................27

**Page**

*Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*,
    2018 WL 3861840
    (N.D. Ohio Aug. 14, 2018) ........................................................................................2

*Price v. Mos Shipping Co.*,
    740 Fed. Appx. 781 (4th Cir. 2018).......................................................................12

*Smilovits v. First Solar, Inc.*,
    2019 WL 7282026
    (D. Ariz. Dec. 27, 2019) ........................................................................................11

*Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
    318 F.3d 592 (4th Cir. 2003) ................................................................................30

*United States v. Moreland*,
    437 F. 3d 424 (4th Cir. 2006) .................................................................................3

*Young v. Swiney*,
    23 F. Supp. 3d 596 (D. Md. 2014).........................................................................3

## STATUTES, RULES AND REGULATIONS

Federal Rule of Evidence
    Rule 702.................................................................................................................1, 2

Rule of Civil Procedure
    Rule 26....................................................................................................................30
    Rule 26(e)...............................................................................................................30

Lead Plaintiffs Public Employees' Retirement System of Mississippi, Plumbers and Pipefitters National Pension Fund, and Additional Plaintiff Wisconsin Laborers' Pension Fund ("Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Exclude the Reports and Testimony of Dr. Steven Feinstein (ECF No. 170, "Def. Br.").[1] Dr. Feinstein has been retained by Plaintiffs to provide expert witness opinion and testimony on market efficiency, loss causation and damages.

## I.    INTRODUCTION

Federal Rule of Evidence 702 entrusts the Court with an important "gatekeeping role" to make pretrial determinations "of whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). This gatekeeping role helps to ensure that the expert's testimony "rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 577 (4th Cir. 2017).[2]  However this "gatekeeping role" "is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 892 F.3d 624, 631 (4th Cir. 2018).

Defendants' motion does not challenge Dr. Feinstein's qualifications to offer the opinions he has reached.  Nor could they.  Dr. Feinstein received his Ph.D. in economics from Yale University.  Feinstein Rpt. Ex. 2,[3] attached as Ex. A to the Declaration of Debra J. Wyman, dated

---

[1]    While this motion was filed by the Jeld-Wen Defendants, the Onex Defendants have filed a Joinder.  ECF No. 177.

[2]    Indeed, the Fourth Circuit has recently emphasized that "the trial court's inquiry is a 'flexible one,' and it exercises 'broad discretion' in choosing which *Daubert* factors to apply and how to consider them." *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019).

[3]    "Feinstein Rpt." refers to the Report of Steven P. Feinstein, Ph.D, CFA, dated January 4, 2021.

March 19, 2021 (the "Wyman Decl."). Since 1990, Dr. Feinstein has been a full time faculty member in the Departments of Finance at Boston University and Babson College, teaching a variety of economic and finance topics, including graduate level courses in financial reporting, corporate finance, valuation and equity markets. *Id.* He has authored numerous articles published in peer-reviewed journals. *Id.* And he is a Chartered Financial Analyst. *Id.* Rule 702 and the Fourth Circuit require an expert to "have []either satisfactory knowledge, skill, experience, training []or education on the issue for which the opinion is proffered." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Dr. Feinstein's education and professional background well equip him to offer opinions in market efficiency, loss causation and damages.[4]

Defendants' motion also makes no argument that Dr. Feinstein's opinions and testimony are irrelevant to the issues in this case. And their arguments fail to show that Dr. Feinstein's opinions and testimony are unreliable. At bottom, they simply disagree with his conclusions which is an insufficient basis to exclude his opinions. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate

---

[4]   In a true "Hail Mary" attempt, Defendants cite two examples where Dr. Feinstein allegedly ignored "the facts" or "erroneously inflated" numbers to "suit his needs." Def. Br. at 1, 18, 30. Defendants attempt to sully Dr. Feinstein's reputation by citing two instances out of the over 100 cases he been involved in where his opinions were questioned. The concerns expressed in these cases are not present here. In *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *16 (Del. Ch. Apr. 25, 2005), the court found that Dr. Feinstein, in making his calculations, "originally took what he thought to be the appropriate . . . per subscriber revenue" to calculate revenues, but was later confronted **by an opposing expert** who demonstrated that there was a more appropriate number to use. *Id.* Dr. Feinstein stood fast by his original opinion, for reasons not detailed by the court. *Id.* Similarly, in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*, 2018 WL 3861840, at *7 (N.D. Ohio Aug. 14, 2018), Dr. Feinstein was confronted by two **opposing experts** regarding results for an event study. Again, for reasons unexplained by the court, Dr. Feinstein stood by his initial opinion. *Id.* But as explained herein, Dr. Feinstein considered all the relevant information available to him, utilized methodologies that Defendants do not challenge as unreliable and has not been confronted by an opposing expert who is challenging his damage calculations. Instead, he is being challenged because Defendants do not agree with his conclusions. Thus, Defendants' reliance on these cases fails.

means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. Moreland*, 437 F. 3d 424, 431 (4th Cir. 2006) (recognizing that "expert testimony is subject to testing by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'"). Defendants' motion improperly asks this Court to usurp the jury's function of weighing the credibility of witnesses and deciding among the competing expert evidence which is the most credible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). Defendants' motion should be denied.[5]

## II.    DR. FEINSTEIN'S OPINIONS ARE BASED ON RELIABLE, GENERALLY ACCEPTED METHODOLOGIES, AND ARE ADMISSIBLE UNDER RULE 702

Under *Daubert*, "courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017); *Young v. Swiney*, 23 F. Supp. 3d 596, 611 (D. Md. 2014) (courts "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate"). Moreover, expert testimony need not be "irrefutable or certainly correct" in order to be admissible. *Moreland*, 437 F.3d at 431.    Defendants do not take serious issue with Dr. Feinstein's methodologies in arriving at his loss causation and damages opinions.    Indeed, they make no argument that Dr. Feinstein failed to employ generally accepted methodologies required of an economist and financial analyst in assessing these issues.    They simply disagree with his conclusions.    That disagreement, however, is not a sufficient basis to find Dr. Feinstein's opinions and testimony inadmissible. *Daubert*, 509 U.S. at 596.

---

[5]    In passing, Defendants ask this Court to "reject" Dr. Feinstein's opinion that the market for Jeld-Wen stock was efficient during the "quiet period" as outlined in Defendants' Opposition to Plaintiffs' Motion for Class Certification.  Def. Br. at 4.  For the reasons outlined in Plaintiffs' Reply in Support of Class Certification (ECF No. 191), and for the reasons stated on the record at the March 4, 2021 hearing on that motion, Defendants' request is baseless and should be denied.

### A.      Dr. Feinstein's Loss Causation Opinions Are Admissible

Loss causation is the causal link between the alleged false and misleading statements, or material omissions, and the economic harm suffered by investors.  *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004).  The Fourth Circuit has held that proof of loss causation "does not require a plaintiff to prove that the defendant's fraud was the ***sole*** cause of the plaintiff's loss."  *Id.* Instead, the Fourth Circuit determined that "a plaintiff need only prove that defendant's misrepresentation was a ***substantial*** cause of the loss by showing '[a] direct or proximate relationship between the loss and the misrepresentation.'"  *Id.*[6]  *See also Carlucci III v. Han*, 907 F. Supp. 2d 709, 723 (E.D. Va. 2012) (same).  Dr. Feinstein's loss causation opinions and testimony utilize, and meet, this standard.  *See* Feinstein Rpt. ¶268 (summarizing loss causation methodology aimed at finding the "substantial cause of the security price decline").  Defendants' motion, however, ***ignores*** this standard entirely.

### 1.      Dr. Feinstein Used a Generally-Accepted and Reliable Loss Causation Methodology

Defendants accuse Dr. Feinstein of using a "results-driven approach" in his analysis of loss causation in this matter. Def. Br. at 20.  This contention is demonstrably false.  Dr. Feinstein outlined his loss causation methodology and analysis in painstaking detail in his Report.  *See* Feinstein Rpt. ¶¶265-300.    Indeed, Defendants make no argument that Dr. Feinstein's methodology does not follow generally-accepted procedures in the field of economics or finance – they simply disagree with his conclusions.  If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to decide among the conflicting views of different experts.  *Kumho Tire*, 526 U.S. at 153; *Atanassova v. GM LLC*, 2021 WL 672929, at *7 (D.S.C. Feb. 22, 2021) ("Simply stated, *Daubert* and its progeny does not

---

[6]     "As long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement."  *Id.* at 233.

eliminate the need for, or otherwise, prohibit, a 'battle of the experts' as long as each of the expert's reasoning and methodology is sound").

As explained in his Report, Dr. Feinstein began his loss causation analysis by conducting an event study – which Defendants have not challenged as unreliable – to isolate the statistical impacts of Jeld-Wen specific information on the price of its common stock.  Feinstein Rpt. ¶¶227-261.  Dr. Feinstein then undertook a valuation analysis by identifying the financial principles guiding his analysis, namely that "[a]nticompetitive behavior boosts profitability, but the benefit from illegal activity is generally not sustainable," and "[p]rofitability is a key determinant of value," and the published academic literature describing those principles.  *Id.* ¶¶274-276.  Next, Dr. Feinstein used those principles to: (1) analyze statements made by Jeld-Wen concerning the *Steves* litigation and the economic importance of pricing and profitability (*id.* ¶¶279-284); and (2) consider what securities analysts were saying about those same subject matters as it related to their valuations of Jeld-Wen's stock price (*id.* ¶¶285-289).  Dr. Feinstein then concluded, based upon his analysis and application of the financial principles he identified, that information disseminated on October 5, 2018 and October 15, 2018 were corrective disclosures of the allegedly false and misleading statements, and material omissions, Plaintiffs allege Defendants made during the Class Period, and were the substantial cause of the loss suffered by investors when Jeld-Wen's stock price fell.  *Id.* ¶¶290-300.  Thus, it is clear that Dr. Feinstein's conclusions followed his analysis, not the other way around as Defendants contend.

### a.    Dr. Feinstein Applied His Methodology in a Consistent Manner

In attacking Dr. Feinstein's loss causation opinions, Defendants, first, baselessly contend that Dr. Feinstein applied his loss causation analysis in an inconsistent manner and that, as a result, his opinions are unreliable.  Def. Br. at 4-10, 20-21.  In making this argument, Defendants accuse Dr. Feinstein of failing to consider statements of the Company's continued belief that it would

prevail in its appeal of the *Steves* jury's verdict and Judge Payne's October 5, 2018 Divestiture Order in the October 15, 2018 press release disclosing the *Steves* Litigation Contingency. *Id.* at 7-8, 20-21. Not so.

Following the October 5, 2018 Divestiture Order, Jeld-Wen issued a press release claiming – as it had throughout the Class Period – that "JELD-WEN firmly maintains that it has not violated any antitrust laws," and that the Divestiture Order was "incorrect due to multiple flawed rulings during the trial process." Feinstein Rpt. ¶291. These denials, Dr. Feinstein opines, maintained the artificial inflation in Jeld-Wen's stock price and "kept the stock price from falling as much as it otherwise would have." *Id.* ¶296. Defendants contend that Dr. Feinstein failed to consider the same type of denials included in the October 15, 2018 press release announcing the *Steves* Litigation Contingency (Def. Br. at 8, 20-21), an assertion that is belied by Dr. Feinstein's Report, and testimony given at his deposition.

In his Report, Dr. Feinstein opines that "on 15 October 2018, the Company retreated somewhat from its denials that it would suffer adverse consequences from the *Steves* litigation when it effectively acknowledged merit in the antitrust allegations and negative repercussions from the verdict and divestiture order." Feinstein Rpt. ¶297. Dr. Feinstein further testified[7] concerning his analysis of the impact of the Company's denials in the October 15, 2018 press release on the market's understanding of the *Steves* Litigation Contingency and valuation of Jeld-Wen's stock price as a result. When asked if, in his opinion, the market did not believe the Company's denials, Dr. Feinstein testified:

> A.     Again, it's not so black and white, all or nothing. I think the company – I think investors and analysts – and we should understand that it's reasonable that the company would make such denials in the face of an adverse decision like this. It serves their purposes to do so. But the marketplace is now informed that they should believe

---

[7]   "Feinstein Tr." refers to the Deposition Transcripts of Steven P. Feinstein, dated January 30, 2021 and February 22, 2021, attached to the Wyman Decl. as Ex. B.

> otherwise. I mean, not completely otherwise. I mean, the likelihood of negative ramifications spiked upward considerably because of this acknowledgment. It doesn't mean that everyone now believes with 100% certainty that there is going to be any particular outcome, except for that there is going to be what's reasonable is at least a $76.5 million lost.

Feinstein Tr. at 183:23-184:21. Therefore, it is simply untrue that Dr. Feinstein "inconsistently" applied his analysis by failing to consider the impact of the Company's denials of liability to the *Steves* in the October 15, 2018 press release.

Equally without merit is Defendants' contention that Dr. Feinstein failed to analyze "a more plausible explanation" – that the market had already accounted for the impact of the *Steves* litigation in Jeld Wen's stock price. Def. Br. at 6, 9, 21. The foundation of Defendants' argument is their disavowal of Dr. Feinstein's opinion that the disclosure of the *Steves* Litigation Contingency on October 15, 2018 was new, material information to investors. *Id.* (citing Fischel Rpt. ¶¶20, 35).[8] Dr. Feinstein's opinion that the disclosure of the *Steves* Litigation Contingency was new, material information to investors, and as a result, was a substantial cause of the loss in Jeld-Wen stock price, was reached through the application of the methodology described above in §II.A.1. Dr. Feinstein's analysis makes it clear that he considered all the available information holistically and came to his conclusion as a result of analyzing a wide breadth of information. *See* Feinstein Rpt. ¶¶265-300. That Defendants and their expert disagree with Dr. Feinstein's conclusion does not render it inadmissible. Those disagreements are appropriately addressed through cross-examination, not exclusion. *Daubert*, 509 U.S. at 596; *Lowes Foods, LLC v. Burroughs & Chapin Co.*, 2019 WL 2454570, at *2 (D.S.C. Apr. 17, 2019) (denying motion to

---

[8] "Fischel Rpt." refers to the Expert Report of Daniel R. Fischel, in Opposition to the Feinstein Report, dated February 1, 2021 (ECF No. 170-4). Ironically, in direct conflict with Mr. Fischel's opinion, ***Defendants other expert witness*** – Jason Flemmons – ***testified that the disclosure of the Steves Litigation Contingency was "new" information that the Company had not previously disclosed to investors***. *See* Wyman Decl Ex. C (Deposition Transcript of Jason Flemmons, dated February 5, 2021 ("Flemmons Tr.")) at 100:4-10; 104:20-105:7; 110:24-111:22. "Flemmons Rpt." refers to the Expert Report of Jason S. Flemmons, dated February 1, 2021 (Wyman Decl. Ex. D).

exclude plaintiff's damages expert holding that the expert's "alleged failure to consider Defendants' list of possible alternative causes affects only the weight the jury should give [the expert's] opinions, not the admissibility"). And it will be the jury's job to determine which explanation is "more plausible." *Kumho Tire*, 526 U.S. at 153.

### b. Dr. Feinstein's Methodology Sufficiently Disaggregates Confounding Information to Arrive at the "Substantial Cause" of Investors' Losses

Finally, Defendants' arguments that Dr. Feinstein's opinions and testimony be excluded because he failed to "disaggregate" "confounding information" in conducting his loss causation analysis also do not survive scrutiny. Def. Br. at 9-10, 21. Defendants: (1) conflate the need to "disaggregate" the "cause" of the loss with the disaggregation of the stock price decline for purposes of computing damages; (2) ignore Dr. Feinstein's Report; and (3) ignore controlling Fourth Circuit authority on loss causation, dooming their argument. Def. Br. at 9, 22-23.

Despite Defendants' protestations to the contrary, Dr. Feinstein performed the "disaggregation" they claim is absent. Dr. Feinstein states: "[b]ased on my review and analysis" of "Company announcements, Company conference call and presentation transcripts, news articles, press releases, equity analyst reports, SEC filings, and internal Company documents obtained through discovery," "corrective disclosures" were made through the October 5, 2018 Divestiture Order and the October 15, 2018 press release. Feinstein Rpt. ¶291. Dr. Feinstein then describes and isolates what information in the October 15, 2018 press release was "corrective" of the alleged misrepresentations and omissions:[9] (1) the $76.5 million *Steves* Litigation Contingency that Defendants told the market "'reflects the judgment anticipated to be entered against the company'" and that "'recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the appeal process is unsuccessful'"; and (2) "the Company

---

[9] Dr. Feinstein identified no confounding information in the October 5, 2018 Divestiture Order, and Defendants do not contend otherwise, therefore leaving nothing to "disaggregate."

disclosed that profitability going forward would be less than what was previously achievable and expected." *Id.* Dr. Feinstein concluded that this information in the October 15, 2018 press release "better informed analysts and investors that the allegations against it of illegal anticompetitive behavior had merit and would have serious business performance repercussions. Prior gains in profitability would likely be reversed." *Id.* Then, based upon his event study and statistical analysis – which Defendants do not challenge – Dr. Feinstein determined that the information in the October 5 and 15, 2018 disclosures impacted the price of Jeld-Wen stock. *Id.* ¶¶292-300.[10]

Defendants rely on two out-of-circuit district court decisions to support their contention that Dr. Feinstein failed to account for "confounding information" in reaching his loss causation conclusions, and as a result his opinions should be excluded. Def. Br. at 22-23. But this authority is entirely inapposite to the facts here. For instance, Defendants rely heavily on *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass 2012), which alleged that defendants – research analysts at Credit Suisse – made false or misleading statements about AOL in their research reports. *Id.* at 184. The expert in question's

---

[10] Dr. Feinstein's event study did not measure a statistically significant movement in Jeld-Wen's stock price on October 8, 2018 – the first trading day after the issuance of the October 5, 2018 Divestiture Order. Feinstein Rpt. ¶¶292-293. But the lack of statistical significance is not "critical" as Defendants contend. Def. Br. at 8. Many courts have held that "[i]n recognition of this basic truism of statistics, courts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact. . . . A non-statistically significant decline simply does not 'sever the link' between the alleged misrepresentations and corrective disclosures." *Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 394-395 (N.D. Ga. 2019) (collecting cases). While the price of Jeld-Wen's stock fell nearly 1% on October 8, 2018, and continued to fall between October 8 and October 15, 2018, Dr. Feinstein opined that while the October 5, 2018 Divestiture Order "reasonably negatively impacted the stock price," "the magnitude of the effect was not large enough to register as a statistically significant decline, one which indisputably must be attributed to the newly disclosed information." Feinstein Rpt. ¶296; Feinstein Tr. at 128:19-129:20. In keeping with well-regarded statistical analysis, Dr. Feinstein opines that "[t]he non-significance may have been due to the countervailing impact of the Company's denials, which would have maintained inflation in the stock price and kept the stock price from falling as much as it otherwise would have." Feinstein Rpt. ¶296.

event study sought to measure the impact of the alleged false information in these analyst reports on AOL's stock price, *id.* at 185, but failed to isolate whether the defendants' research reports, as opposed to AOL's statements themselves, caused the price of AOL's stock to move.  *Id.* at 191. The court held that the expert's opinions were inadmissible for their "failure to isolate the effect of defendants' alleged fraud from other industry- and company-specific news reported on event days," which the court found "confounds his event study and renders it unreliable."  *Id.*  Likewise, in *In re REMEC Inc. Securities Litigation*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010), the expert in question was excluded because he "makes no attempt to account for other possible causes, *i.e.*, industry-specific news . . . , market-specific news . . . , or other measurable macroeconomic variables. . . ."  *Id.* at 1273.  Dr. Feinstein's analysis does not suffer from these same failures and identifies the "substantial cause" of Jeld-Wen's stock price decline as required by *Miller*, 364 F.3d at 232 – ***a standard that Defendants' motion ignores***.

Defendants further claim that because Dr. Feinstein did not include in his "loss causation" section the numerical breakdown in dollars and cents of the corrective information he opined impacted Jeld-Wen's stock, that he did not identify the cause of the alleged loss and his loss causation opinions are unreliable as a result.  Def. Br. at 9, 22.  But this argument improperly conflates the requirement to isolate the substantial cause of the loss – which Dr. Feinstein did – with the quantification of the loss suffered.

As explained above, Dr. Feinstein ***first*** isolated the Jeld-Wen specific information that corrected the prior false and misleading statements, or material omissions, and determined that information was a substantial cause of the loss investors incurred as a result of the corrective disclosures as required by *Miller*, ***then*** determined the exact financial impact of each piece of information – including the confounding information released on October 15, 2018 – on Jeld-

Wen's stock price.  This is precisely the methodology the court in *City of Ann Arbor Employees'*

*Retirement System v. Sonoco Products Co.*, 827 F. Supp. 2d 559 (D.S.C. 2011), found "sufficiently

reliable and relevant as set forth in *Daubert*" in denying the defendants' motion to exclude the

plaintiff's loss causation and damages expert in a Section 10(b) class action.  *Id.* at 571.  There the

court found that the expert, like Dr. Feinstein: (1) "provides [a] detailed analysis and explanation

of how he determined that Defendants' alleged misrepresentations were a substantial cause of

Sonoco's stock price drops"; (2) "explains how he determined what portion of the price decline

was the result of Defendants' alleged misrepresentations"; (3) "account[s] for market and industry

factors that may have contributed to Sonoco's stock price drop"; and (4) "analyzed many, if not

all, of the news events released on [the corrective disclosure dates]."  *Id.*  Moreover, the court in

*Smilovits v. First Solar, Inc.*, 2019 WL 7282026 (D. Ariz. Dec. 27, 2019), denied a motion to

exclude Dr. Feinstein's loss causation opinions based on similar challenges, including reliance on

*Bricklayers*, 853 F. Supp. 2d at 191, that Defendants make here.  The court in *Smilovits*, finding

*Bricklayers* distinguishable, held that because "as part of his event study, and for each corrective

disclosure he identifies, Feinstein considers and accounts for potentially confounding

information," Dr. Feinstein's "methodology" "meets Rule 702's admissibility threshold."  *Id.* at

\*9.  This is the same reliable process Dr. Feinstein undertook here.

### 2.    Dr. Feinstein's Loss Causation Analysis Is Supported by the Evidence

Once again Defendants ignore Dr. Feinstein's ***actual*** opinions and testimony, and the cited

support for them, in accusing him of failing to properly support his loss causation opinions.  Def.

Br. at 5-8, 16-20.  Defendants' assertion that Dr. Feinstein conducted a "cursory review" of

"vaguely" described sources of information (*id.* at 16) is belied by the detailed listing of materials

he considered as well as the detailed description of specific pieces of information informing and

supporting his opinions contained in over 100 paragraphs of his Report.  *See* Feinstein Rpt.

¶¶48-150, 279-289; Ex. 1.  Indeed, Defendants make no argument that Dr. Feinstein did not consult or rely upon the kinds of information sources that are generally accepted in the field of economics and financial analysis.  Instead, their contention boils down to an insistence that Dr. Feinstein use and rely ***only*** on the pieces of information Defendants prefer, not the pieces of information Dr. Feinstein determined – after considering ***all*** pieces of relevant information available to him – compelled the conclusions he reached.  "To the extent [Dr. Feinstein's] testimony conflicted with some of the disputed evidence of record, 'questions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness' assessment, not its admissibility.'"  *Price v. Mos Shipping Co.*, 740 Fed. Appx. 781, 785 (4th Cir. 2018) (quoting *Bresler*, 855 F.3d at 195).

### a.    Dr. Feinstein's Opinion that the Market Was "Stunned" by Jeld-Wen's Disclosure of the *Steves* Litigation Contingency Is Aptly Supported

Defendants contend that Dr. Feinstein has no support for his opinion that the market was "stunned" by the disclosure of the *Steves* Litigation Contingency.  Def. Br. at 6-8, 17-18.  In making their arguments Defendants ignore Dr. Feinstein's Report, and now resort to misleadingly quoting his deposition testimony to suit their purposes.  Neither tactic wins them the day.

Dr. Feinstein's Report and testimony make clear that his opinion that the market was "stunned" by the October 15, 2018 disclosure of the *Steves* Litigation Contingency was not based ***only*** on commentary in analyst reports and news articles (as Defendants' motion claims) but on a variety of factors.  For instance, Dr. Feinstein's Report, ¶22 says:

> The Company misled the market, in part, by vehemently denying the validity of the antitrust charges against it, even after a jury in the *Steves* antitrust litigation rendered a verdict against it. However, on 15 October 2018 JELD-WEN stunned the market by disclosing that it would take a charge of $76.5 million that "reflects the judgment anticipated to be entered against the company" in the *Steves* antitrust litigation.

Dr. Feinstein's Report clearly states that Jeld-Wen's "vehement" denials of liability in the *Steves* case factored into his analysis and informed his conclusion that the market was stunned when the Company announced the *Steves* Litigation Contingency.  Indeed, Dr. Feinstein's Report spells out quite clearly how the Company's unequivocal denial of liability following the *Steves* jury verdict, made as late as October 6, 2018 – nine days before the *Steves* Litigation Contingency – influenced market participants opinions concerning the potential impact of the jury's verdict to the Company. *Id*. ¶¶92-93, 132-136.   And Dr. Feinstein testified his opinions concerning the information communicated by the announcement of the *Steves* Litigation Contingency were informed by "all the evidence in the case," he had reviewed to that point in time. Feinstein Tr. at 30:4-16.

> During his second deposition, Dr. Feinstein made the basis of his opinion even more clear:
>
> Q. In the testimony we just reviewed a minute ago you said that that was a conclusion you drew from explicit commentary in the analyst reports and in news articles as well but also in the price reaction, correct?
>
> A. I think I said more than that.  Also the nature of the announcement, itself, was stunning.
>
> Q. What was the explicit commentary in the analyst reports to which you were referring?
>
> A. Well, the announcement was made off-cycle.  It was an emergency profit warning type announcement and many analysts immediately responded with writing analyst reports.  The fact that they, you know, responded to writing analyst reports in reaction to this announcement, when most of the announcement was fairly benign or not really warranting a warning, is evidence that they were surprised by the announcement and stunned, in fact, by the announcement.  I mean, if you look at the elements of the announcement, that they're replacing the CFO in a seamless transition with someone highly qualified, that doesn't warrant an emergency announcement, that windows were having operational production issues just as they were in the last four or five quarters announced, they never had a surprise unexpected emergency announcement for that  before. If you look at the entire content of the report, the stunning, surprising justification for there even being an announcement off-cycle is the charge and analysts covered it.

Feinstein Tr. at 221:13-223:5.  Indeed, Dr. Feinstein testified that the Company's prior denials contributed to the market's surprise reaction to the *Steves* Litigation Contingency disclosure:

> What's going on here is the company – previously on October 6th the company vehemently denied that there was any merit to the Steves lawsuit and anticipated there would be no negative repercussions from it and that they would essentially have it overturned on appeal.  And then so that that's – well, it's alleged to be a misrepresentation and contain omissions, but it was,

- 13 -

you know, a very forceful statement, you know, company talking out of one side of its mouth. Now what you have on October 15th is the company on the one hand saying we still maintain we didn't do anything wrong but there could be negative repercussions, which it's like a mixed message now.  So the message went from being a straightforward denial to now being a mixed message that there would be repercussions.

Feinstein Tr. at 133:18-134:15.

Dr. Feinstein is a Yale-trained economist, a Chartered Financial Analyst, has 25 years of experience studying and analyzing market reactions to various types of information, and has published articles in peer-reviewed journal on the subject.  Feinstein Rpt. Ex. 2.  That Dr. Feinstein drew on his education, experience and expertise in analyzing the reactions of the market to information is unsurprising, and entirely proper.  The Supreme Court has made clear that a sufficiently reliable basis for admissible expert testimony can exist in a number of forms, including the expert's experience.  *Kumho Tire*, 526 U.S. at 156 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").  "Thus, the standard for reliability is not so rigid to require that every analytical step of an expert's opinion be based on objective data or scientific theory; gaps between objective data and an admissible expert testimony may be filled in by specialized knowledge the expert has garnered through years of experience."  *Koenig v. Johnson*, 2020 WL 2308305, at *9 (D.S.C. May 8, 2020).[11]

Additionally, Dr. Feinstein's Report also cites to and quotes analyst commentary made in reaction to the disclosure of the *Steves* Litigation Contingency.  Feinstein Rpt. ¶¶142-145.  When asked about an October 16, 2018 Deutsche Bank report he cited, Dr. Feinstein testified:

Q. And this analyst said that the company still believes in the merits of the case after the litigation contingency, correct?

A. Well, again, you are trying to make it black and white. The company said they believe in the merits of their case. They're speaking out of one side of their mouth when they say that but

---

[11]   Defendants again rely on distinguishable authority to support their argument.  Def. Br. at 17-18.  Unlike in each of the cases Defendants cite, Dr. Feinstein's methodology and analysis are anchored by the information he considered, his expertise in economics and finance in undertaking his analysis and the conclusions he made as a result.

then when they say it's probable that they're going to lose, and its therefore probable and appropriate that they take that charge, they're speaking out of the other side of their mouth. So before there was a more clear message from the company, plaintiffs say it was misleading but it was a clear message from the company that there was no merit to the case and there would be no negative repercussions. Now they're saying out of one side of their mouth there might not be and the other side they're saying there might yes. So that's new information and it's a turnaround for the company. I maintain that it's a stunning turnaround that informed the marketplace about the anticompetitive behavior, to some extent.

Feinstein Tr. at 289:9-290:11.   Were there analysts that did not mention the *Steves* Litigation Contingency in their reports?   Yes, and Dr. Feinstein acknowledges that fact.   Feinstein Tr. at 223:6-10 ("I mean, I know that Mr. Fischel found some examples of analysts that didn't but, you know, he's ignoring all the analysts that did and analysts mentioned it.").   However, because Dr. Feinstein relies on certain analyst reports, and not others, when he clearly considered all available information, is not a basis to exclude his opinions and testimony.   The court in *Hauser v. Powell*, 2021 WL 409745, at *6 (D. Md. Feb. 5, 2021), denied a motion to exclude the testimony of plaintiff's damages expert noting, "Defendant's criticisms of [expert's] testimony goes mainly to how he emphasizes or incorporates certain data points.   While that is valid fodder for cross examination, it is not grounds for exclusion." *See also Nationwide Mut. Fire Ins. Co. v. Bryant Thomas Heating & Cooling*, 2020 WL 5415659, at *3 (E.D. Va. June 26, 2020) (rejecting defendant's arguments that the plaintiff's expert's report was "conjecture" holding that "it is a jury, not this Court, who must assess the credibility of Klunk's conclusions and reach its own determinations regarding the strength of Plaintiff's case").[12]   The same is true here.[13]

---

[12]   Defendants' citation to *In re Bausch & Lomb, Inc. Contact Lens Solution Products Liability Litigation*, 2009 WL 2750462, at *14 (D.S.C. Aug. 26, 2009), (Def. Br. at 16), does not compel a different result.   Unlike Dr. Feinstein, the expert there failed entirely to address contradictory information in the record.

[13]   Defendants' argument that Dr. Feinstein "assumed" that the market was "stunned" by the *Steves* Litigation Contingency because the price of Jeld-Wen's stock dropped is a fallacy.   Def. Br. at 18.   Dr. Feinstein explained his analysis in great detail in his Report and both of his depositions.   At no point did he indicate that he "assumed" the market surprise because of the stock price reaction.   He clearly testified that once he had determined the market for Jeld-Wen stock to be efficient, "it's clear that when there is a known negative announcement the price will fall," and

**b.    Dr. Feinstein's Opinion that the *Steves* Litigation Contingency Informed the Market that Antitrust Allegations Made Against the Company Had Merit Is Supported by the Record**

Dr. Feinstein's opinion that the *Steves* Litigation Contingency informed the market that the "allegations of illegal anticompetitive conduct had merit" are likewise well-supported.  Def. Br. at 6-8, 18-20.  Defendants offer two reasons why Dr. Feinstein's opinions are lacking: (1) that he failed to consider the denials of liability to Steves in the October 15, 2018 press release; and (2) under Generally Accepted Accounting Principles ("GAAP"), a litigation contingency "is not an admission of ultimate liability or certain loss." *Id.* at 19.  Neither reason compels exclusion of Dr. Feinstein's opinion.

First, as discussed at length above in §II.A.1.a, it is simply untrue that Dr. Feinstein failed to consider the Company's continued denials of liability to Steves in the October 15, 2018 press release.  When asked at his deposition about the impact of the Company's denials in the October 15, 2018 press release on the market's understanding of the *Steves* Litigation Contingency, Dr. Feinstein testified:

> Q. You believe that this paragraph says that the allegations of anticompetitive behavior had merit?
>
> A. Again, you are kind of couching all these questions as black and white, all or nothing.  The company is now acknowledging that they're – that they may suffer repercussions, therefore, it's more – it's now probable that they will be adjudicated to have had merit or they have been adjudicated to have had merit, and they're accepting that there are going to be negative repercussions because of the allegations.  So, you know, they can protest all they want but they're now acknowledging to the marketplace that things are going to be different going forward than they were going backwards.

Feinstein Tr. at 182:5-23.  Defendants merely disagree with Dr. Feinstein's conclusion, which is no basis for exclusion.  *Herndon v. Huntington Ingalls Indus.*, 2020 WL 5809965, *9 (E.D. Va.

---

noted that he observed that the price fell.  Feinstein Tr. at 29:23-25.  For these reasons, Defendants' reliance on *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993), *Belville*, 919 F.3d at 229-30, 236 and *Boyett v. Cnty. of Washington*, 2006 WL 3422104, at *7 (D. Utah Nov. 28, 2006), Def. Br. at 16, is misplaced.

Aug. 28, 2020) (noting that *Daubert* neither eliminates nor prohibits a "battle of the experts" and that an expert's opinion "is not unreliable merely because he has a different opinion than that of [an opposing] expert").

Second, whether under GAAP, a litigation contingency is an admission of liability is irrelevant to an assessment of how the market understands and reacts to that information. Defendants offer the opinions of ***accountant*** Jason Flemmons to refute Dr. Feinstein's empirical, ***economic*** analysis that the October 15, 2018 disclosure was a "corrective disclosure" for purposes of market efficiency.[14]  However, Mr. Flemmons' opinions that Dr. Feinstein "mischaracterizes the nature and significance of a loss contingency," is based on his assessment of GAAP requirements, and is made from his perspective as an accountant. Flemmons Rpt. ¶¶21-52; Flemmons Tr. at 60:6-10, 65:10-19, 71:21-72:9.  At his deposition, Mr. Flemmons admitted that he conducted no analysis whatsoever to determine if the October 15, 2018 information impacted the price of Jeld-Wen stock.  Flemmons Tr. at 55:16-56:16, 111:6-112:9.

In contrast, Dr. Feinstein conducted an economic and financial analysis to reach his opinions on the market's understanding and reaction to the news – well within his area of expertise:

Q. What is your understanding of what a litigation contingency is?

A. My understanding is that according to accounting rules if a company believes a certain cost or charge is likely or probable, they have an obligation to declare it and if it hasn't actually been paid it, to reserve for it.

Q. What is the basis for your understanding of what a litigation contingency is?

A. Like I said, you know, I've a Doctorate in Financial Economics, I've -- in the course of my education, and I have the Chartered Financial Analyst degree, finance and accounting overlap. In the way I described earlier, financial analysts are consumers of accounting, not producers but we study what accounting means. And in order to know how to use accounting we have to understand something about what the rules are. So, again, I don't have the expertise to prepare financial accounting but I have the expertise to read and to interpret it from my education and professional work and my practitioner training and the practitioner designation that I have.

---

[14]  Dr. Feinstein's opinion that the October 15, 2018 disclosure was a "corrective disclosure" also applies to his opinions concerning loss causation.  Feinstein Rpt. ¶¶265-300

Feinstein Tr. at 31:6-32:11. This is an appropriate basis for Dr. Feinstein's opinion. *See Koenig*, 2020 WL 2308305, at *9 ("gaps between objective data and an admissible expert testimony may be filled in by specialized knowledge the expert has garnered through years of experience").

Mr. Flemmons' opinion that Dr. Feinstein is wrong that the market reacted to the news of the *Steves* Litigation Contingency in the manner Dr. Feinstein opines it did is based on no economic analysis of the market's reaction or understanding of the information, and is not based on any expertise in the assessment of a market's reaction to information. At the end of the day, it will be up to the jury to weigh this competing evidence. *Kumho Tire*, 526 U.S. at 153.

### B.    Dr. Feinstein's Damages Opinions Are Admissible

With respect to damages, a plaintiff need only "produce sufficient evidence for the fact finder to 'ascribe *some rough proportion* of the whole loss' to defendants' fraud." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009) (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007)). Indeed, courts in this circuit have found that "[a]bsolute certainty is not required." *Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC*, 423 F. App'x 274, 285 (4th Cir. 2011); *see also Attard Indus. v. United States Fire Ins. Co.*, 2010 WL 4670704, at *3 (E.D. Va. Nov. 9, 2010) ("The plaintiff has the burden of proving damages 'with reasonable, but not absolute, certainty.'"). As shown below, Dr. Feinstein has employed a detailed and consistent methodology with respect to his damages calculation. Any disagreement over Dr. Feinstein's particular application of his methodology, applied to the facts and circumstances of this Action, goes to the weight of his testimony, not its competence. *See supra* §II.A.1.a.

Moreover, that Dr. Feinstein's methodology required a certain level of subjectivity in disentangling the effects of the non-fraud related information disclosed in the October 15, 2018 press release, does not render his approach speculative or unreliable. *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) ("While [plaintiffs'

- 18 -

expert's] analysis is necessarily subjective, that does not mean his opinion is speculative or without any methodological constraints."); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) (recognizing that "identifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit rough) magnitude of positive or negative influence on price are all subjective determinations"). This is particularly true given courts' "repeated emphasis that losses resulting from securities fraud need not be proved with mathematical precision." *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 532 (S.D.N.Y. 2013).

### 1. Dr. Feinstein Used a Generally-Accepted and Reliable Damages Methodology

As explained in his Report, Dr. Feinstein applies the "out-of-pocket" measure of calculating damages per share, *see* Feinstein Rpt. ¶301, which has been accepted by numerous courts in this circuit. *See, e.g.*, *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 693 (D. Md. 2018); *KBC Asset Mgmt. NV v. 3d Sys. Corp.*, 2017 WL 4297450, at *7 (D.S.C. Sept. 28, 2017) (acknowledging that "[t]he Supreme Court long ago agreed with this approach"). Under this "traditionally applied" method, Dr. Feinstein measured the "difference between the actual purchase price of the security and what would have been the purchase price of the security had there been no alleged fraud." Feinstein Rpt. ¶301.

Dr. Feinstein first concluded, through his event study, that Company-specific information caused the Jeld-Wen stock price to decline $4.42 per share on October 16, 2018, the first trading day following the October 15, 2018 press release issued after the close of trading. Feinstein Rpt. ¶304. He then examined all the Company-specific news that came out between the close of trading on October 15 and the close of trading on October 16, to determine if any news, beside the corrective disclosures, could have contributed to the stock decline on October 16. *Id.* ¶307. To

- 19 -

that end, Dr. Feinstein identified four pieces of Company-specific news that were released on October 15: (i) the $76.5 million *Steves* Litigation Contingency; (ii) the 3Q2018 results and fiscal year ("FY") 2018 revenue growth guidance reduction; (iii) the departure of Defendant Mallard as CFO and the promotion of John Linker to that position; and (iv) analysts' downward adjustment of their Jeld-Wen valuations and consensus estimates for FY 2019 EBITDA. *Id.* Dr. Feinstein's calculations surrounding each piece of October 15, 2018 news are discussed below.

### a. Per Share Direct Impact of the Litigation Charge

Jeld-Wen announced it expected to book a charge of $76.5 million in 3Q2018 in connection with the *Steves* litigation. Feinstein Rpt. ¶309. Throughout the Class Period, the Jeld-Wen Defendants refused to take the charge, telling investors a loss was not "probable and estimable." *Id.* ¶310. Dr. Feinstein concluded the announcement of the litigation charge was an "unanticipated negative event," particularly in light of the Company's repeated assurances that the *Steves* ligation was without merit. *Id.* ¶312. By taking the litigation charge, Dr. Feinstein posits, the Company admitted that negative consequences were likely. *Id.* Dr. Feinstein calculated that, on a per share basis, the $76.5 million charge itself amounted to $0.55 after-tax (equal to the $76.5 million charge minus the $19.6 million tax benefit, divided by Jeld-Wen's 103.4 million shares outstanding). *Id.* ¶314. Tellingly, and further supporting his conclusion, Dr. Feinstein's per share quantification is the same per-share stock price impact that analysts attributed to the charge. *Id.* This decline was clearly fraud-related. *Id.* ¶315.

### b. Per Share Impact of the 3Q2018 Results and FY 2018 Guidance Reduction

The Company attributed the lower preliminary results for 3Q2018 and the FY 2018 guidance reduction "to a lack of focus on execution and process discipline in parts of our organization." Feinstein Rpt. ¶316. Defendant Michel blamed the cost side, as opposed to fraud-related pricing resistance, for the decelerated profitability in 3Q2018 and 4Q2018. *Id.* Upon

review, Dr. Feinstein concluded that the attribution of the 2018 performance issues to potentially non-fraud cost-side problems did not carry over into the Company's or analysts' forecasts for 2019 and beyond, however, because the Company stated that the 2018 cost-side problems were temporary and would be fixed. *Id.* ¶318. This was confirmed by Defendant Michel. *Id.* As a result, using valuation principles Dr. Feinstein concluded that the 2018 performance issues would have a limited impact on the Company's valuation. *Id.* And, any negative forecast for 2019 and beyond would have to be attributed to a persistent problem, *i.e.*, one continuing into the future – and the loss of pricing power was the persistent problem now facing the Company on account of the adverse outcome in the *Steves* litigation. *Id.*

To quantify the impact of these disclosures regarding the 2018 performance issues, Dr. Feinstein examined the change in analysts' consensus earnings estimates for Jeld-Wen, which showed a 2018 earnings per share reduction of $0.22. Feinstein Rpt. ¶320. Dr. Feinstein continued that, focusing only on the impact of 2018 performance, a decline of $0.22 per share in earnings translated into an equivalent $0.22 reduction in the stock price, which was entirely attributed to non-fraud related reasons. *Id.* ¶¶320, 322. He also found that applying a valuation multiple would only be appropriate if the reasons for the past performance disappointment were expected to impact future performance; but Defendant Michel indicated they would not. *Id.* ¶¶318, 320. To be conservative, Dr. Feinstein assumed that none of the disappointing 2018 performance issues could be related to the Company's curbing of anticompetitive behavior. *Id.* ¶321. Thus, this entire $0.22 reduction was attributed to non-fraud-related reasons, and excluded from damages. *Id.* ¶322.

### c.  Per Share Impact of the CFO Change

The Company also announced that Defendant Mallard would step down as CFO on November 8, 2018, and would be replaced by John Linker. Feinstein Rpt. ¶323. Because the Company stated that Mallard was leaving to pursue other career interest unrelated to the Company,

and because analysts commented on Linker's extensive experience, and how they expected a "seamless transition," Dr. Feinstein did not attribute any portion of Jeld-Wen's residual stock price decline on October 16, 2018 to the news surrounding the CFO change, and likewise did not attribute any damages to that news. *Id.* ¶¶324-325.

### d. Per Share Valuation Impact of Lower EBITDA Estimates and Valuation Multiple for 2019 and Beyond

Following the October 15, 2018 press release, analysts lowered their FY 2019 EBITDA estimates and valuation multiples for Jeld-Wen stock as follows: prior to October 15, 2018, the consensus estimate for FY 2019 EBITDA was $576.15 million; following the October 15, 2018 press release, the FY 2019 consensus EBITDA estimate fell by $44.36 million, to $531.79 million. Feinstein Rpt. ¶¶326-327. Analysts also lowered their valuation multiples for JELD-WEN, which reflected reduced long-term growth and higher risk. *Id*. ¶328.

Because a portion of the reduction in estimates and valuation multiple derives from factors unrelated to the Company's North America door business, where the illegal anticompetitive behavior allegedly took place, Dr. Feinstein estimated the valuation impact of factors outside the North America door business, and subtracted that portion of the stock price decline to exclude it from fraud-related losses. *Id.* ¶329. The entire residual stock price decline on October 16, 2018 was $4.42 per share. *Id.* ¶330. As shown above, $0.55 per share was the direct after-tax valuation impact of the $76.5 million *Steves* Litigation Contingency and $0.22 per share was the disappointing 2018 performance, which was excluded from damages. *Id.* Subtracting $0.55 and $0.22 per share from the total residual decline of $4.42 per share, leaves $3.65 per share attributable to the market's revised forecasts for 2019 and beyond – the only other news that affected the stock price on October 16, 2018. *Id*.

Dr. Feinstein then worked to determine how much of the $3.65 was attributable to fraud

vs. non-fraud related reasons.  First, because the Company attributed the lower 2018 guidance to inefficiencies in North America and Europe (leaving out Australasia), Dr. Feinstein apportioned on a pro rata basis, using the percentages of EBITDA generated by each respective segment in the last twelve months ("LTM") through the end of Q2 2018, the amounts for both North America and Europe.  Feinstein Rpt. ¶331.  According to that calculation, 34.2% came from Europe and 65.8% came from North America, and thus, applying these percentages to the $3.65 per share decline to be allocated across these segments, $1.25 per share is apportioned to Europe and is treated as non-fraud related.  *Id.* ¶332.  Dr. Feinstein then conservatively excluded this $1.25 per share from fraud-related losses and damages.  *Id.* ¶¶332-333.

Then, Dr. Feinstein took the remaining $2.40 ($4.42 residual decline, less $0.55 from the litigation charge, less $0.22 for the 2018 performance, less $1.25 for future Europe segment performance), and determined the respective declines for both North American Windows (non-fraud related) and North American Doors (fraud related).  Feinstein Rpt. ¶334.  Although the Company did not breakout its North American Doors vs. Windows EBITDA in its reported financials, during the Class Period, analysts estimated that door sales made up 60% of sales and North America segment EBITDA, and the remaining 40% was generated by windows and other services.  *Id.* ¶335.  Thus, Dr. Feinstein conservatively estimated that $0.96 per share of the remaining $2.40 price decline was attributable to the developments in the North America window and other services businesses, and excluded it from fraud-related losses and therefore damages.  The remaining $1.44 per share decline ($2.40 minus $0.96) was attributable to effects of the corrective disclosures on analysts' and investors' changed assessment of the North American door business, which was expected to become more competitive and less profitable.  *Id.* ¶337.

### e.    The Final Calculation

In total, the October 15, 2018 press release caused the price of Jeld-Wen stock to fall $4.42

- 23 -

per share on October 16, 2018.  Feinstein Rpt. ¶338.  Of this amount, $2.43 per share, or 54.98%, is conservatively attributed to confounding information unrelated to the alleged fraud: $0.22 per share regarding the 2018 performance; $1.25 per share regarding the Company's Europe segment; and $0.96 per share for the North America windows and other services business.  *Id*. ¶¶338-339.  The remaining $1.99 (residual decline of $4.42 minus the $2.43 related to non-fraud confounding factors) is a fraud-related loss, caused by the disclosures that corrected the alleged misrepresentations and omissions.  *Id*. ¶399.

### 2.    Dr. Feinstein's Damages Opinions are Supported by Evidence in this Action, and the Reports and Testimony of Defendants' Experts

While Dr. Feinstein's Report is grounded in facts and evidence, federal courts recognize that an expert's "analysis," when considering complex damages calculations is securities fraud actions, "is necessarily subjective."  *Barclays*, 310 F.R.D. at 90.  Defendants erroneously contend that Dr. Feinstein's damages conclusions are "nothing more than his say-so."  Def. Br. at 23.  This is not so.

*First*, Defendants argue that, Dr. Feinstein's "conclusion that the Litigation Contingency caused JELD-WEN's stock to drop by $0.55 contradicts his own opinion that JELD-WEN's stock traded in an efficient market and fundamental market efficiency principles."  Def. Br. at 23.  Defendants argue that Dr. Feinstein's conclusion is incorrect because the market already knew about the jury verdict and the Divestiture Decision, well before the *Steves* Litigation Contingency was announced.  Def. Br. at 24.  They go on to say that Dr. Feinstein has no support for his conclusion that it took the Company ten days to evaluate the Divestiture Decision and calculate its estimate of the impact.  *Id.*  Defendants are incorrect.

As discussed in detail in §II.B.1.a, Dr. Feinstein explained that the *Steves* Litigation Contingency should be considered fraud-related because it was new information to the market:

"the Company now admitted that negative consequences were likely." *Id.* ¶312; *see also* Feinstein Tr. at 289:13-290:11. Dr. Feinstein's conclusion is ***consistent*** with the stock impact that analysts attributed directly to the *Steves* Litigation Contingency. *Id.* ¶315. Thus, the *Steves* Litigation Contingency is properly included in Dr. Feinstein's damages calculation as fraud-related.

And Dr. Feinstein's conclusions regarding the ten days it took the Company to process the Divestiture Decision are consistent with the opinions of their own expert, Mr. Flemmons. In his report, Mr. Flemmons acknowledges that the Company learned of new information as the result of the Divestiture Decision, and after considering that information and undertaking the analysis required under GAAP, later issued a press release that admitted that a loss was now probable and estimable. Flemmons Rpt. ¶¶29, 50-55, 69-73. Further, during his deposition, he made clear that the Company was "performing ongoing assessments of the probability and estimability of a loss. And this ruling that occurred in October of 2018 provided additional information that led to a different conclusion based on a refreshed assessment." Flemmons Tr. at 100:4-10, 104:20:105:7, 110:24-111:22 (same).[15] Again, because Dr. Feinstein's conclusions concerning the *Steves* Litigation Contingency are consistent with the evidence, they are properly admitted.[16]

*Second*, Defendants argue that Dr. Feinstein "erroneously assumed that the market believed that the disappointing Q3 results and downgraded FY18 guidance would ***not*** impact JELD-WEN's future performance." Def. Br. at 25. But, again, Dr. Feinstein's conclusion that the disappointing 2018 performance issues would not bleed into 2019 are supported by the facts – here, ***Defendants' own words***. In his Report, Dr. Feinstein acknowledges that "the Company stated that the 2018 cost-side problems were temporary and would be fixed." Feinstein Rpt. ¶318; *see also* Feinstein

---

[15] Relatedly, Defendants and their experts fail to explain how something that took the Company ten days to analyze should have been understood by the market any time before that.

[16] Dr. Feinstein's testimony is further supportive of his conclusion that Jeld-Wen needed ten days to process the Divestiture Decision. Feinstein Tr. at 315:4-316:15; 318:25-320:21.

Tr. at 339:16-342:9. Indeed, Defendant Michel assured analysts that he viewed the Company's "2018 financial performance headwinds as temporary in nature, and I am encouraged about our future." *Id*.[17] Further, the $0.22 non-fraud related decline is ***consistent*** with the reduction in the analysts' consensus estimate for 2018 earnings per share. Feinstein Rpt. ¶320. Because Dr. Feinstein's conclusion regarding the 2018 performance issues are based on the evidence, the $0.22 decline is properly excluded from Dr. Feinstein's damages calculations. [18]

In sum, Defendants ***are not*** challenging the reliable methodology that Dr. Feinstein has employed, but rather, they disagree with the conclusions Dr. Feinstein draws from it. As a result, they are challenging the weight and credibility that should be afforded to Dr. Feinstein's conclusions. Such challenges are not a basis to exclude Dr. Feinstein's testimony.

### 3. Defendants' Remaining Arguments Are Merely Dressed Up Challenges to Dr. Feinstein's Conclusions

Cloaked as methodology arguments, Defendants raise additional challenges to Dr. Feinstein's damages conclusions which are not appropriate grounds to exclude his testimony. As shown below, each challenge fails.

First, Defendants argue that Dr. Feinstein did not attempt to directly measure the impact of the analysts' lowered FY19 EBITDA estimates and valuation multiples. Def. Br. at 26. In doing so, they attempt to criticize Dr. Feinstein for calculating that impact by subtracting the litigation contingency ($0.55) and the disappointing 2018 performance issues ($0.22) from the overall drop

---

[17] Defendants also argue that Defendant Michel "did not say that JELD-WEN could 'fix' these issues immediately." Def. Br. at 25. However, reviewing Defendant Michel's statement made in the middle of 4Q2018 again, he clearly indicates that the headwinds are "temporary" and that he is "encouraged about our future" – meaning looking forward to 2019.

[18] Dr. Feinstein's reliance on the evidence here distinguishes this case from the cases relied on by Defendants - *Brooke Group*, 509 U.S. at 242 (expert had no evidence to support conclusion), *Bausch & Lomb*, 2009 WL 2750462, at *14 (expert failed to address or consider four related published studies), *Limelight Networks, Inc. v. XO Communications, LLC*, 2018 WL 678245, at *3 (E.D. Va. Feb. 2, 2018) (expert opinion had "almost no basis in facts relevant to this case").

($4.42). *Id*. at 26-27. But Dr. Feinstein's Report clearly explains the methodology. Only four pieces of news could have impacted the stock price, one of which had no price impact. Feinstein Rpt. ¶¶304-308, 323-325. Because he was able to easily and accurately calculate the impact of two of the three remaining pieces of news (the litigation contingency and the disappointing 2018 performance issues), the remainder of the stock drop ($3.65) could *only* have been caused by the lowered FY19 EBITDA estimates and valuation multiples. *Id*. ¶¶326-337. What the Defendants are really complaining about is the value (*the conclusion*) Dr. Feinstein attributes to the lowered FY19 EBITDA estimates and valuation multiples.[19]

Relatedly, Defendants argue that Dr. Feinstein "arbitrarily apportioned the causes of this decline" and refer to Dr. Feinstein's *assumptions* as *guesses*. Def. Br. at 27. As an example, they say that Dr. Feinstein excluded Australasia from his calculations regarding the analysts' lowered FY19 EBITDA estimates and valuation multiples. *Id*. at 27-28. But experts are entitled to make assumptions, and any questions about such facts or assumptions are properly dealt with by cross-examining the expert. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc*., 694 F.3d 1312, 1333 (Fed. Cir. 2012) (finding that disagreements with an expert's conclusions and the legitimate factual assumptions and considerations underlying them affect the weight, not the admissibility, of the expert's testimony).[20] In any event, Dr. Feinstein *clearly* explains why he excluded

---

[19] *GoDaddy.com LLC v. RPost Communications Ltd.*, 2016 WL 2643003, at *6 (D. Ariz. May 10, 2016), *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017), is not helpful to the Defendants' cause. There, the expert testimony relied on evidence that was "irrelevant, conjectural, and simply not enough to satisfy *Daubert*." The court there *specifically found*, contrary to the Defendants' parenthetical, "[t]his is not a case where [the expert] relied on 'shaky' evidence that should be weighed by the jury—the evidence is completely irrelevant to the apportionment inquiry." *Id*. Thus, as Defendants' cases make clear, even when the evidence is "shaky" – which Dr. Feinstein's is clearly not – it should be weighed by the jury. *Id*.

[20] Defendants' reliance on *NetFuel, Inc. v. Cisco Systems Inc.*, 2020 WL 1274985, at *2 (N.D. Cal. Mar. 17, 2020) is unavailing. There, an expert "plucked" 33% to represent the partial value of an operating system with no basis, other than the expert's "experience." *Id*. at *7. But here, Dr. Feinstein carefully explains and details why and how he attributes all of the relevant

Australasia: ***the Company attributed no problems or surprises to the Australasia segment***.

Feinstein Rpt. ¶331; *see also* Feinstein Tr. at 352:16-353:9; 355:5-23. Thus, Dr. Feinstein properly

divided the change in FY 2019 consensus estimates between North America and Europe. *Id.*[21]

Next, Defendants challenge Dr. Feinstein's exclusion of the North American door business

from the effects of the disappointing 2018 performance from damages (Def. Br. at 29), again

claiming that his ***conclusion*** was without a basis. But as Dr. Feinstein's Report makes clear, Jeld-

Wen's CEO, Defendant Michel, attributed the problems to the cost side, rather than fraud-related

pricing resistance. Feinstein Rpt. ¶316. Further, while Dr. Feinstein acknowledged that Plaintiffs

may prove that some of the disappointing 2018 performance may be attributable to the Company's

curbing of its anti-competitive behavior, making it fraud-related, Dr. Feinstein aired on the side of

conservatism, and excluded the amount from his damage calculation. *Id.* ¶321.[22]

Finally, Defendants argue that Dr. Feinstein failed to account for the fact that the North

American door business compromises many sub-segments that are unrelated to the alleged fraud.

Def. Br. at 29. Without any expert opinion, and merely based on the Defendants' own *ipse dixit*,

they argue that he should have excluded exterior doors and interior doors, other than molded ones,

from his damage calculations. *Id*. at 29-30.[23] Dr. Feinstein explained, at his deposition, that he

---

assumptions and percentages. Feinstein Rpt. ¶¶309-337.

[21] Again, without the support of their own expert, Defendants argue that Dr. Feinstein's ***conclusion*** attributing 65.8% of Jeld-Wen's EBITDA to North America is too high, and that he should have concluded that 57% should have been attributed to North American EBITDA. Def. Br. at 28. This is not enough to strike Dr. Feinstein's testimony. *Bresler*, 855 F.3d at 195.

[22] Defendants reliance on *Lipitor*, 892 F.3d at 634, is misplaced. There, the court found that an expert "cherry-pick[ed]" his results when he chose "to include in his report the results of some tests he performed (which supported the plaintiffs' argument) but exclude the results of another (which did not)." *Id*. at 634-35. Here, Dr. Feinstein did not omit any of his calculations, and clearly explained and supported his methodology.

[23] *But see Doe v. Miles Laboratories, Inc., Cutter Laboratories Division*, 927 F.2d 187, 193 (4th Cir. 1991) ("Hindsight opinions . . . suggesting that more should have been done . . . are insufficient to discredit the conclusion" of an expert).

did not need to account for exterior doors because:

> [I]t's not clear that exterior doors are excluded from the allegations because they're related to the door business in which there are exposed facts of anticompetitive behavior. . . . [T]here is also no facts that say specifically that there were concerns about the exterior door business going forward.  There is some evidence that Europe was cited to have problems and North American windows was cited to have problems and financial principles inform us that interior molded doors would have problems with margins going forward.  There was no evidence from the case that any disappointment to the marketplace derived from the business on exterior doors.

Feinstein Tr. at 360:24-361:18.  As a result, Dr. Feinstein determined he did not need to apportion "any of the revision downward from the marketplace to exterior doors in North America."  *Id.* at 361:20-22.  Further, any such effect would be excluded because "it wasn't responsible for a stock price drop, according to the available evidence."  *Id.* at 362:11-13.

Dr. Feinstein also did not need to account for different types of interior doors because "[t]here is no indication that there was any problem with profitability going forward on types of doors that have – that are not – on types of doors that are not covered by the allegations in this case to have been affected previously by the company's alleged anticompetitive behavior.  Therefore, those other types of doors would not contribute to the stock price decline.  They are naturally excluded from any calculation of the – any portion of the residual price decline."  Feinstein Tr. at 365:17-366:5.[24]  Thus, again, Defendants are challenging the conclusions Dr. Feinstein reaches from the available evidence – an insufficient ground to exclude his testimony.

### C.     Dr. Feinstein's Declaration Should Not Be Stricken

Defendants ask that Dr. Feinstein's Declaration submitted with Plaintiffs' Reply in Support of their Motion for Class Certification be stricken because "Defendants had no ability to question Feinstein on these 'opinions' or respond to them."  Def. Br. at 14, 30.  Dr. Feinstein's Declaration

---

[24]   Dr. Feinstein's conclusion is based on the same information the market possessed as the Company does not publicly release the facts required to apportion each part of its North American door business on sales and EBITDA.  *See, e.g.*, Wyman Decl. Exs. E-F (Pls.' Exs. 113 and 114).

responded to arguments Defendants made in their Opposition to Class Certification – filed February 2, 2021 after Dr. Feinstein's Report and first deposition were completed – by correcting how his opinions and testimony were portrayed by Defendants.  *See* ECF No. 142-2.  Defendants took Dr. Feinstein's deposition for a second time on February 22, 2021, and could have asked him about his Declaration at that time.  Moreover, had they done so they could have responded to the information contained in the Declaration, and Dr. Feinstein's explanation for it, at the March 4, 2021 hearing on Plaintiffs' Motion for Class Certification.  They chose not so do so.

## III.   RULE 26 REQUIRES DR. FEINSTEIN TO SUPPLEMENT HIS LOSS CAUSATION OPINIONS, AND DAMAGE COMPUTATION, WITH NEW INFORMATION

Rule of Civil Procedure 26(e) requires a party to supplement information provided in its expert report and deposition testimony when the party "learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Bresler*, 855 F. 3d at 190; *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595-96 (4th Cir. 2003) ("court may exclude any new opinion offered by the expert" if party fails to supplement its expert reports and depositions when required by Rule 26(e)); *Kinlaw v. Nwaokocha*, 2019 WL 2288445, at *2-*3 (E.D. Va. May 29, 2019) (Payne, J.) (recognizing a "duty to supplement" in Rule 26(e)).  Attached as Exhibit G is the Supplemental Report of Dr. Steven Feinstein, dated March 19, 2021, which incorporates, as required by Rule 26 information received as a result of this Court's granting of Plaintiffs' challenges to Defendants' assertions of privilege (ECF No. 190) and deposition testimony of John Linker taken March 9, 2021, and exhibits thereto.

## IV.   CONCLUSION

For the above reasons, Defendants' Motion to Exclude Dr. Feinstein's Reports and Testimony should be denied.

DATED:  March 19, 2021                     Respectfully submitted,

                                           COHEN MILSTEIN SELLERS & TOLL PLLC
                                           STEVEN J. TOLL (VSB No. 15300)
                                           JOSHUA HANDELSMAN (Admitted *pro hac vice*)


                                           */s/ Steven J. Toll*
                                           STEVEN J. TOLL

                                           1100 New York Avenue, N.W.
                                           West Tower, Suite 500
                                           Washington, DC  20005
                                           Telephone: 202/408-4600
                                           202/408-4699 (fax)
                                           stoll@cohenmilstein.com
                                           jhandelsman@cohenmilstein.com

                                           *Liaison Counsel for Lead Plaintiffs*

                                           ROBBINS GELLER RUDMAN & DOWD LLP
                                           DEBRA J. WYMAN (Admitted *pro hac vice*)
                                           JOHN R. RIGBY (Admitted *pro hac vice*)
                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)
                                           debraw@rgrdlaw.com
                                           jrigby@rgrdlaw.com

                                           ROBBINS GELLER RUDMAN & DOWD LLP
                                           ROBERT M. ROTHMAN (Admitted *pro hac vice*)
                                           WILLIAM J. GEDDISH (Admitted *pro hac vice*)
                                           FRANCIS P. KARAM (Admitted *pro hac vice*)
                                           MAGDALENE ECONOMOU (Admitted *pro hac
                                           vice*)
                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)
                                           rrothman@rgrdlaw.com
                                           wgeddish@rgrdlaw.com
                                           fkaram@rgrdlaw.com
                                           meconomou@rgrdlaw.com

- 31 -

- 32 -

*Co-Lead Counsel for Plaintiff Plumbers and
Pipefitters National Pension Fund, Additional Plaintiff
Wisconsin Laborers' Pension Fund, and the Class*

LABATON SUCHAROW LLP
JAMES W. JOHNSON (Admitted *pro hac vice*)
MICHAEL H. ROGERS (Admitted *pro hac vice*)
JAMES T. CHRISTIE (Admitted *pro hac vice*)
PHILIP J. LEGGIO (Admitted *pro hac vice*)
140 Broadway
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
jjohnson@labaton.com
mrogers@labaton.com
jchristie@labaton.com
pleggio@labaton.com

*Co-Lead Counsel for Plaintiff Public Employees'
Retirement System of Mississippi and the Class*

## CERTIFICATE OF SERVICE

I, Steven J. Toll, hereby certify that on March 19, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

/s/ Steven J. Toll
STEVEN J. TOLL