# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION


-------------------------------x

IN RE: JELD-WEN HOLDING, INC.

SECURITIES LITIGATION

                    CIVIL ACTION NO.

                    3:20-cv-00112-JAG

-------------------------------x




VIDEOTAPE DEPOSITION OF

STEVEN P. FEINSTEIN

VIA ZOOM VIDEOCONFERENCE

January 30, 2021

10:00 a.m.






Reported by:

Maureen Ratto, RPR, CCR

Page 2

* * *

Videotape deposition of Steven P. Feinstein, held virtually via Zoom Teleconference, hosted from Veritext Legal Solutions, pursuant to notice, before Maureen Ratto, Certified Court Reporter, License No. XI01165, Registered Professional Reporter, License No. 817125, and Notary Public.

* * *

Page 3

A P P E A R A N C E S:


Counsel for the Plumbers and

Pipefitters National Pension Fun and

Wisconsin Laborers' Pension and the

Proposed Class:

    ROBBINS GELLER RUDMAN & DOWD, LLP

    655 West Broadway

    San Diego, California 92101

    (619) 231-1058

    BY:  ROBERT M. ROTHMAN, ESQ.

          rrothman@rgrdlaw.com

          DEBRA J. WYMAN, ESQ.

          DebraW@rgrdlaw.com

          FRANCIS P. KARAM, ESQ.

          fkaram@rgrdlaw.com


Counsel for Defendant Onex Corporation:

    FRIED FRANK HARRIS SHRIVER &

    JACOBSON, LLP

    One New York Plaza

    New York, New York 10004

    (212)859-8000

    BY:  PETER L. SIMMONS, ESQ.

          peter.simmons@friedfrank.com

Page 4

A P P E A R A N C E S, continued:

Counsel for Defendants Jeld-Wen

Holding, Inc., Mark A. Beck, L. Brooks

Mallard, Kirk S. Hachigian, and Gary S.

Michel:

    KIRKLAND & ELLIS, LLP

    601 Lexington Avenue

    New York, New York 10022

    (212) 446-4800

    BY:  LINDSEY WEISS HARRIS, ESQ.

        lindsey.harris@kirkland.com

        JACOB RAE, ESQ.

        jacob.rae@kirkland.com

        KELSEY DAVIS, ESQ.

        kelsey.davis@kirkland.com


     MCGUIRE WOODS, LLP

     800 East Canal Street

     Richmond, Virginia 23219-3916

     (804) 775-1000

      BY:  BRIAN E. PUMPHREY, ESQ.

        bpumphrey@mcguirewoods.com

A P P E A R A N C E S, continued:

ALSO PRESENT:

Josh Cohen, Legal Video Specialist

Peter Curran, Veritext Tech Concierge

Daniel Bettencourt, Crowninshield

Research Financial

Page 6

VIDEOGRAPHER: Good morning. We are going on the record at 10:02 a.m. Eastern, Saturday, January 30th, 2021.

Please note that the microphones are sensitive and may pick up whispering, private conversations and cellular interference. Please turn off all cellphones or place them away from the microphones as they can interfere with deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Steven P. Feinstein, In Re:  Jeld-Wen Holding, Inc. Securities Litigation, filed in the United States District Court, Eastern District of Virginia, Richmond Division. Case 3:20-cv-00112-JAG.

This deposition is being held via videoconference. My name is

Page 7

Josh Cohen from the firm Veritext Legal Solutions and I'm the videographer. The court reporter is Maureen Ratto, from the firm Veritext Legal Solutions.

I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record.

If there are any objections to the proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MS. HARRIS:  Lindsey Weiss Harris, Jacob Rae and Kelsey Davis of Kirkland & Ellis for the Jeld-Wen Defendants and also the individual Defendants.

Page 8

MR. PUMPHREY: Brian E. Pumphrey, McGuire Woods for the Jeld-Wen Defendants and the individual Defendants.

MR. SIMMONS: Peter Simmons from Fried Frank for the Onex Defendants.

MR. ROTHMAN: This is Robert Rothman from Robbins Geller Rudman & Dowd on behalf of the Plumbers and Pipefitters National Pension Fund, the Wisconsin Laborers and the Putative Class.

Pursuant to our agreement between the parties we've made Dr. Feinstein available for a deposition two times in this case, the first being limited to issues concerning class certification, and the second for the other issues in his report.

Today's deposition is for the class certification issues and Dr. Feinstein is prepared to testify about his opinions concerning

Page 9

STEVEN P. FEINSTEIN

market efficiency as well as the existence of a damage model.

We reserve our rights to object to any questions beyond the scope of those particular opinions in his report.

* * *

S T E V E N   P.   F E I N S T E I N, having been first duly sworn according to law by the Officer, testifies as follows:

DIRECT EXAMINATION BY MS. HARRIS:

Q.    Good morning.

A.    Good morning.

Q.    Is there any reason why you can't give complete, accurate and truthful answers today?

A.    No.

Q.    Have you been deposed before?

A.    Yes.

Q.    Many times?

A.    Yes.

Q.    Okay.  I will go through all the groundrules but please let me know if

                   STEVEN P. FEINSTEIN

you have any trouble hearing me or if you

don't understand any of my questions.

        A.     Okay.

        Q.     Did you prepare for your

deposition today?

        A.     I did.

        Q.     What did you do to prepare?

        A.     I read, reread my report,

reread the Judge's opinion in the Motion

to Dismiss, the Motion to Dismiss order,

skimmed through a variety of other

documents in my files and I met with

Plaintiffs' counsel virtually via Zoom

yesterday.

        Q.     Okay. And you just did the one

meeting with Plaintiffs' counsel?

        A.     In preparation for this

deposition, yes.

        Q.     Okay. And who from Plaintiffs'

counsel attended that prep session?

        A.     Debra Wyman and Rob Rothman.

        Q.     And you mentioned you reviewed

documents in preparation for today. Who

selected those documents?

Page 11

STEVEN P. FEINSTEIN

A.    I did.

Q.    Did you review any documents for the first time?

A.    No.

Q.    Did you review any documents not listed in Exhibit 1 of your report?

A.    No.

Q.    Is there anything else that you did to prepare for your deposition today?

A.    I had a couple of brief conversations with my staff about this case.

Q.    Okay. And is there anyone you spoke to about the deposition today, aside from your staff?

A.    My wife no.  One else besides her.

(Exhibit 1, Expert Report of Professor Steven P. Feinstein, dated January 4, 2021 was received and marked on this date for identification.)

Q.    Okay. We won't delve in a

Page 12

STEVEN P. FEINSTEIN

that.

We have premarked the January 4th, 2021 Expert Report of Professor Steven P. Feinstein. Hopefully you can open that.

A.    Okay.

Q.    For the record, what is this document?

A.    This is the report that I wrote and submitted on January 4th.  I submitted it on January 4th, 2021, just a few weeks ago, dealing with my analysis and conclusions related to market efficiency, loss causation and damages in this Jeld-Wen case.

Q.    Does it contain a complete statement of all the opinions you are offering in this case and the bases for them?

MR. ROTHMAN:  Objection.

A.    Well, let me qualify. I'd say yes. Although, depending on the questions you ask today and research I've done for this case and also research I've done in

Page 13

STEVEN P. FEINSTEIN

the course of just my professional work,
I may be offering more support as you ask
questions today and as I answer them.
But as of right now, yes.

Q.    Okay. Please turn to Exhibit 2
of the report, which is page 136.

A.    Okay.

Q.    This is your CV?

A.    Yes, it is.

Q.    Under Education is this a
complete and accurate list of your
degrees?

A.    Yes, it is.

Q.    And under Teaching, is that a
complete and accurate list of your
teaching experience?

A.    It's accurate. While I was
working at the Federal Reserve Bank of
Atlanta I was an adjunct at Georgia Tech.
That's not on the CV.  But you asked if
it's complete, so I imagine, you know,
that would complete it.

Q.    What did you teach at Georgia
Tech?

STEVEN P. FEINSTEIN

A.    Finance, finance courses. This is more than 20 years ago.

Q.    All right.  And if you turn the page or scroll to the next page under Business Experience, is that a complete and accurate list of your relevant experience?

A.    Yes, it is.

Q.    Okay. Do you consider yourself an expert in economics?

A.    Yes.

Q.    Do you consider yourself an expert in any other area?

MR. ROTHMAN:  Objection.

A.    Finance and many subfields within finance and economics.

Q.    Have you ever worked as a securities analyst?

A.    In a sense, yes. I do want to add to your last question, I want to add something to my answer.

In the course of 25 years doing of research and offering opinions on mostly in securities litigation cases

Page 15

STEVEN P. FEINSTEIN

I believe I've established expertise in damage models as well. I'm not a lawyer. I'm not putting myself out to be a legal expert, but I am an expert in securities -- class action security case damage models, based on my experience and training.

Q.    Okay. You said that you had worked as a securities analyst?

A.    Yeah. I ran the Babson College Fund Program at Babson College, where I trained students to be security analysts and we managed a real money portion of the college endowment, conducting security analysis and making selections and managing the portfolio.

So for Babson College, in the course of that program, I did work professionally as a security analysts.

Q.    Okay.  Have you worked at a brokerage firm?

A.    No -- well, yes. I mean, you ask me very generally.  So I mean, never full-time, but I've -- I've done

Page 16

STEVEN P. FEINSTEIN

consulting engagements for brokerage firms and after -- you know, between undergraduate and graduate school I did work at a brokerage firm.

Q.    Okay. Do you consider yourself an accounting expert?

A.    No.  Although, I want to be clear there. As a financial expert and as a financial analyst I have expertise in using accounting and understanding what accounting is supposed to mean.

So I'm an expert consumer of accounting but not an expert producer of accounting.  So I'm not a CPA or an accountant.

Q.    Okay. Do you have an accounting degree?

A.    No.

Q.    Do you have any type of accounting credential?

MR. ROTHMAN:  Objection.

A.    Well, there is a hefty portion of the Chartered Financial Analyst curriculum is on accounting, and I have

STEVEN P. FEINSTEIN

the Chartered Financial Analyst

designation.  And in many of the finance

courses I teach, including when I was

teaching Chartered Financial Analyst

review programs, I taught accounting.

Q.    Are you a Certified Public Accountant?

A.    I answered that already. The answer is no.

Q.    Are you a Chartered Global Management Accountant?

A.    No.

Q.    Are you a Certified Management Accountant?

A.    I am no accountant.  If the other questions are the types of accountants, I can tell you no, I am not an accountant.

Q.    Are you a Certified Fraud Examiner?

A.    No.

Q.    You are not offering any accounting opinions in this case, correct?

Page 18

STEVEN P. FEINSTEIN

MR. ROTHMAN:  Objection.

A.     Well, I'm not offering any opinion about appropriate accounting rules but I will offer opinions about how financial analysts interpret accounting that they receive and accounting reports that they read in the course of financial analyses, that I can offer.

Q.     Okay. Are you an antitrust expert?

MR. ROTHMAN:  Objection.

A.     I have some expertise in antitrust from my education and professional work. I'm not holding myself out in this case as being an antitrust expert.

Q.     Are you offering an expert opinion in antitrust in this case?

A.     No.

Q.     Are you a lawyer?

A.     No.

Q.     Do you have a law degree?

A.     No.

Q.     Are you licensed to practice

STEVEN P. FEINSTEIN

law?

A.      No.

Q.      Have you ever been retained to provide legal opinion?

MR. ROTHMAN:  Objection.

A.      Yes. Where those legal opinions overlap with financial economics.

For instance, on the topic of materiality where they overlap or on how to interpret the legal statutes with respect to damage formulas, statutory legal formulas.

For example, so I have offered what one may call legal opinions when they overlap with financial economics and I'm drawing on my financial economics expertise to offer those opinions.

Q.      Are you offering any legal opinions in this case?

MR. ROTHMAN:  Objection.

A.      I don't think my opinions are legal opinions. I guess, you know, we can flag that and think about it later as you

STEVEN P. FEINSTEIN

ask additional questions, but I think all of my opinions here are financial economics opinions, although, they may overlap with legal -- with areas of law. So someone might characterize some of them as being both, both economics opinions and legal opinion.

Q.    If you can get to page 4 of your report?

A.    Okay.

Q.    Look at paragraph 18 through 31. Is this a complete statement of all the opinions you intend to offer in this case?

MR. ROTHMAN:    Objection.

A.    Well, to be clear, paragraphs 18 through 27 is a complete list of opinions.

Q.    Oh, correct. Sorry about that. Yes.

A.    And that's as of right now. Those are the opinions that I formed and I have offered thus far.

Q.    Okay. Sitting here today, is

Page 21

STEVEN P. FEINSTEIN

there anything that you wish to correct in your report?

A.    There are some just minor typos but nothing of any substance.

Q.    And sitting here today, do you intend to make any changes to your report?

A.    No.

Q.    Do you intend to offer any -- sorry.

Do you intend to offer any other testimony that is not contained in your report?

A.    Only if asked to either by you or Plaintiffs' counsel. So far, no.

Q.    Did you perform any analyses that is not contained in your report?

A.    No.

Q.    Did you perform any calculations that are not contained in your report?

MR. ROTHMAN:  Objection.

A.    I'd have to say yes. I mean, and I want to clarify what it is, I mean,

Page 22

STEVEN P. FEINSTEIN

as I was doing the damage calculations I did some calculations that identified an error that I had made in the calculations and then corrected that error and redid the calculations. So the incorrect calculations are not included, obviously, just the corrections, I mean the correct calculations.

Q.    Okay. Thank you.

Did Plaintiffs' counsel ask you to consider any questions that did not make it into your report?

A.    No.

Q.    Who wrote your report?

A.    I did. I did, with assistance from my staff.

Q.    How did your staff assist you?

A.    Well, we have a process for how this -- I mean, this happens to me in every case.

On the financial and quantitative analysis side, I would direct a financial analyst at my firm to do certain tests.  There are certain

STEVEN P. FEINSTEIN

tests that they're trained to do and we've worked together long enough so they know exactly what I mean when I tell them what to do. So there are certain tests that they ran for me.

Certainly the downloading of data and the compiling of documents, such as analyst reports, news articles, SEC filings, I have a staff member who does that for me under my direction. I tell the staff what to get and they get that for me.

When it comes time to writing, I usually write with a partner. Sometimes I'll ask the partner to take certain sections that are common among other reports we've written and put them together in a template so that we can get started with something already on paper, put those template paragraphs or things I wrote myself in previous cases, and then I would draft and we would edit together. You didn't ask but the person I did this with was Daniel Bettencourt in this case.

STEVEN P. FEINSTEIN

Q.    Did Plaintiffs' counsel assist you in preparing your report?

A.    In the sense that they -- they would tell me if something didn't make sense. We would talk about what I was writing and if there was something that was not clear to them, they would say be sure to make sure it's clear so a reader can understand what you are saying.

So I got feedback prior to turning it in, but that was the only assistance that I would say I received from counsel.

Q.    Did Plaintiffs' counsel request any substantive changes to your report?

A.    No.

Q.    Did Plaintiffs' counsel provide you with any assumptions upon which to base your opinions?

A.    Yes, as they always do.  I mean, they didn't explicitly say; here are assumptions we want you to assume. But I always -- in a damages report the

Page 25

STEVEN P. FEINSTEIN

correct way for a financial expert to do a damages report is to assume that Plaintiffs' allegations are -- the factual allegations are correct, that they're true. And so because I read their Complaint and there were factual allegations related -- I mean, there were, there were factual allegations in the report, I assume that to be true for purposes of the calculations.

Q.    Are you making any assumptions other than those that you have in the Complaint?

MR. ROTHMAN:  Objection.

A.    I don't think so. As I sit here right now, I think the answer to your question is no. I'll let you know if any of your questions jog my memory otherwise later in the day.

Q.    If your assumptions regarding the Plaintiffs' allegations are false, would that change your opinion?

A.    Yes.

Q.    How would it change your

STEVEN P. FEINSTEIN

opinion?

MR. ROTHMAN:  Objection.

A.    Well, I assume liability. I assume they will be able to prove liability.  And if they don't prove liability, my understanding is there would be no damages under the statute, for example.

Q.    Is one of your assumptions that Jeld-Wen engaged in illegal anticompetitive conduct?

A.    No. The assumption is a little less than that.  The assumption is that they did, in fact, engage in unsustainable anticompetitive conduct.

Q.    And if that assumption were false would that change your opinion?

A.    Yes, it would.

Q.    Have you read --

A.    Let me add that if it's proved that they did nothing wrong, it would be hard to fathom they would be liable for damages. If it's proved that they didn't conceal or misrepresent anything then,

Page 27

STEVEN P. FEINSTEIN

again, I don't believe they'd be liable for the damages that are computed.

Q.    Okay. And you said you assumed that Jeld-Wen had not engaged in unsustainable anticompetitive conduct. What did you mean by "unsustainable"?

A.    First of all, I assumed that they did. The allegations from Plaintiffs is that they did engage in anticompetitive behavior that was improper and if discovered and if essentially punished they would have to curb. That's written about in the report.

So that's what I meant, that if the conduct proved to be the type of conduct that when brought to light they can no longer engage in, that would be unsustainable.

Q.    You say in paragraph 22, "The company misled the market", I quote, "vehemently denying the validity of the antitrust charges against it."

By "antitrust charges against it", which charges were you referring to?

Page 28

STEVEN P. FEINSTEIN

A.    The allegations in the Steves complaint.

Q.    And the Steves litigation concerns these claims against Jeld-Wen for allegedly overcharging it for door skins?

MR. ROTHMAN:  Objection for.

A.    I believe their allegations were more extensive than that, but that's included among them.

Q.    Are there other allegations you are thinking about?

A.    Yes.

Q.    What are those?

A.    Well, the Steves Complaint also alleged that there was breach of contract and there was some quality issues as well, that the company would either -- I'd have to look at the Steves Complaint to see for sure, but I read it and you read it.  We know what's in there.  It's more than that they overcharged.  It's that they were engaged in anticompetitive behavior that hurt

Page 29

STEVEN P. FEINSTEIN

Steves, breach of contract, overcharging, under-delivering, threatening, these sort of things.

Q.    Okay. You also say in paragraph 22, "The announcement of the $76.5 million charge stunned the market." Is that your -- is that your opinion or an assumption you relied on?

A.    That is a conclusion from the analyst reports.

Q.    Is there any other basis for that conclusion aside from the analyst reports?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    What are your other bases?

A.    Well, we have explicit commentary in the analyst reports and in news articles as well but also in the price reaction.

Once it's established that the market is efficient, it's clear that when there is a known negative announcement the price will fall.  So the price

Page 30

STEVEN P. FEINSTEIN

falling indicated that the market was surprised, the price of the stock.

Q.    You say in paragraph 23 that "$76.5 charge informed the market 'the allegations of anticompetitive behavior had merit and there were negative repercussions from that behavior.'"

Is that your opinion or an assumption that you relied on?

A.    It's a conclusion from all the evidence in the case. Of course, I'm, I don't want to say paraphrasing, I'm consolidating all the evidence but I'm expressing what is implicit in the market's reaction to that announcement.

Q.    Is that opinion --

A.    I do want to add, because you asked what are the bases for this opinion, there is a judge's order, which the judge concurred with my conclusions that there was a stunning revelation to the market that informed the market about unsustainable behavior.

Q.    Is that opinion based on your

STEVEN P. FEINSTEIN

understanding of what a litigation

contingency is?

MR. ROTHMAN:  Objection.

A.    In part, but only in part.

Q.    What is your understanding of what a litigation contingency is?

A.    My understanding is that according to accounting rules if a company believes a certain cost or charge is likely or probable, they have an obligation to declare it and if it hasn't actually been paid it, to reserve for it.

Q.    What is the basis for your understanding of what a litigation contingency is?

A.    Like I said, you know, I've a Doctorate in Financial Economics, I've -- in the course of my education, and I have the Chartered Financial Analyst degree, finance and accounting overlap.  In the way I described earlier, financial analysts are consumers of accounting, not producers but we study what accounting means.  And in order to know

Page 32

STEVEN P. FEINSTEIN

how to use accounting we have to understand something about what the rules are.

So, again, I don't have the expertise to prepare financial accounting but I have the expertise to read and to interpret it from my education and professional work and my practitioner training and the practitioner designation that I have.

Q.    Did you consult an accountant to inform your opinion in this case?

A.    No, not in this case. I'm sure somewhere along, you know, my 30-year career I've talked to accountant about contingencies and accounting for litigation contingencies but not in this case since I already understand the concept.

Q.    Do you know what accounting rules govern litigation contingency disclosures under GAAP?

A.    No.  I couldn't name chapter and verse but I understand the

STEVEN P. FEINSTEIN

principles.

Q. If your understanding of the nature of the litigation contingency is wrong, would that change your opinion?

A. No. Because like I said, there are multiple reasons why I drew that conclusion.

Q. What does it mean for a market in a particular stock be a --

(Reporter requests clarification.)

Q. What does it mean for a market in a particular stock to be efficient?

A. Well, I wrote about that in this report, I've testified about it in numerous cases and I've written about it in published articles. So we can look at -- I'm looking at the Table of Contents of my report to find exactly where I speak about it. Section 6A is Efficient Market Defined, page 53.

So I'm going to scroll forward to page 53. I remember it's the last paragraph of this section where I sum up

Page 34

STEVEN P. FEINSTEIN

what the literature says.  So it's page 158, "An efficient market, as defined and discussed by" -- and I name various sources -- "is a market in which available information is incorporated into the price of a security such that the trading price reflects available information with reasonable promptness."

The degree of efficiency that's usually addressed in a securities litigation case is an efficient market is one in which the market doesn't ignore important material valuation, relevant information but rather pays attention to it and that information then becomes reflected in the stock price.

Q.    Do you agree that an expected event will not impact the price of a stock trading in an efficient market?

A.    It depends how you define "expected". I mean, if it's somewhat expected and then it happens for sure it will effect -- it may effect the price. If it's -- well, I mean so it

STEVEN P. FEINSTEIN

really depends on what you mean by "expected".

Q.    If market participants are aware that a negative outcome will occur, will that negative outcome affect the stock, the price of the stock?

A.    Again, I need more clarification in the hypothetical.

So when you say "are aware", do you mean that they're aware that it may occur or that they are 100% certain that it will occur, and that they know when it will occur and they know the ramifications surrounding how it occurs and how it's announced?

Q.    If the market participants are aware of a risk that it will occur, would you expect to see less reaction in the stock price after that event occurs?

MR. ROTHMAN:   Objection.

A.    It really depends on the specific facts and circumstances. Sometimes the answer would be yes and sometimes the answer would be no. It

Page 36

STEVEN P. FEINSTEIN
really all depends on the probabilities associated and market participants priors about how certain they are.

Q.    Do you agree that a repetition of previously disclosed information will not impact the price of a stock trading in an efficient market?

A.    Well, not always. If it's -- if information is repeated by a more reliable source so the market is now better informed because they've got more confidence in the truthfulness and validity of that information, then the new reliable source repeating the information will have impact.

Q.    Would you expect the price of a stock trading in an efficient market to take a week to reflect information?

A.    Again, it depends on the type of information. There is a whole literature about the speed of adjustment.

The literature, summarizing the vast literature, says that for simple easy types of information to -- that are

STEVEN P. FEINSTEIN

easy to analyze, information that the market is used to analyzing, information that arrives on a known schedule, the reaction is very very quick.  The reaction will begin almost -- will begin immediately and might end within, frankly, even a matter of minutes if it's the easiest type of information to analyze.  But literature also says that more complex information that is unexpected and arrives unexpectedly may take longer.  And there is evidence that sometimes information can take a week. I mean --

Q.    In your report --

A.    -- the markets are populated by human beings. The market may be efficient but sometimes human beings can't complete their analysis instantaneously.  And that's why there may be a protracted reaction to a particular complicated, unexpected announcement.

Q.    In your report you offer an

Page 38

STEVEN P. FEINSTEIN

opinion regarding the efficiency of the market for Jeld-Wen securities, correct?

A.    Yes.

Q.    What is your opinion?

A.    That it was an informationally efficient market over the course of the class period.  Meaning, that at all points in the class period information, material valuation, relevant information was not being ignored by market participants and available information was impacting the price of the security of Jeld-Wen stock.

Q.    Have you ever offered an expert opinion that a market for a particular stock was inefficient?

A.    Well, if by offering an expert opinion you mean submitted a report to the court, the answer would be no.  But if you mean offered an expert opinion, by you mean that someone engaged me to look at a security and let them know whether the security reasonably traded in an efficient market, was efficient or

STEVEN P. FEINSTEIN

inefficient or whether one would be able

to prove that it was efficient, maybe

even for litigation purposes, I have

oftentimes in that context told people,

clients that a security either was not

efficient or that it would be impossible

to prove that it was.

Q.    In your report you rely on the

Cammer and Krogman factors to determine

market efficiency, correct?

A.    I do, and as well as a couple

of additional metrics.

Q.    You rely on the Cammer and

Krogman factors because these are the

factors that the court considered in

reaching a market efficiency

determination in security cases, right?

MR. ROTHMAN:  Objection.

A.    The answer to your question

is, in part, yes, but that's not the only

reason I relied on the Cammer -- I've

always called them Krogman factors.  But

there are other reasons I relied on the

Cammer and Krogman factors besides that.

Page 40

STEVEN P. FEINSTEIN

Courts have repeatedly relied on it and deemed these to be probative, if not dispositive factors.

Q.    Is any single one of the Cammer or Krogman factors dispositive?

A.    Again, it depends how you define the term "dispositive". I wouldn't rely on any single factor. I look at the factors holistically.

Q.    Are there any factors you can ignore?

A.    I don't ignore any of them and I wouldn't ignore any of them. I would consider all of them.

Occasionally, you'll have some of the factors pointing in one direction and other factors pointing in the other direction with respect to the conclusion on market efficiency.  And I wouldn't ignore the contrary evidence but I would dig deeper and try to find an explanation for why the factors are inconsistent. And if I find the explanation, usually finding that explanation tells you what

STEVEN P. FEINSTEIN

the meaning of the inconsistency is and whether, in fact, the security did trade efficiently or inefficiently.

Q.    Do you consider any of the factors more important than others in determining market efficiency?

A.    I don't consider them -- like I said, I consider them all holistically. So I don't throw any of them out.

I do -- every time I do an efficiency study I consider all of them. But, you know, there are some overlap. For instance, S3 registration has a market cap component and market capitalization is a separate Krogman factor.

So in that sense, and because there is overlap, like when I did my empirical work I looked at market cap and considered that to be a proxy for -- my empirical work for my academic research, I mean. You know, market cap was a pretty good proxy for what the courts were interested in when they talked about S3

STEVEN P. FEINSTEIN

registration, for example.

So I don't throw any of them out but, you know, sometimes you don't have to consider all of them independently because sometimes they do overlap.

Q.    Have you ever offered a report where you concluded the market was efficient without empirical evidence?

MR. ROTHMAN:  Objection.

A.    I believe I have.

Q.    And what case was that?

A.    I don't recall but sometimes when there is a case that has numerous securities, stocks and bonds, some of the bonds might have enough trading data to run the empirical test.  And I'll say that because there are conclusions from similar bonds issued by the company I can draw a conclusion about the bond for which I cannot run the empirical test. I'm quite sure I've done that before.

Q.    Have you ever found an event study in a report that did not support a

Page 43

STEVEN P. FEINSTEIN

finding of efficiency?

A.   Could you say that again, please?

Q.   Have you ever performed an event study in a report that did not support a finding of efficiency?

A.   Yes.

Q.   In what case was that?

A.   There are numerous cases where the event study, itself, was indecisive or indeterminate and wasn't evidence for efficiency, so it did not support, by itself, a finding of efficiency and I needed to do additional research to find out why that was the case.

Sometimes a stock might not move in a statistically significant fashion for other reasons that have nothing to do with efficiency. Maybe the event of issue -- at issue was not valuation relevant or was not valuation relevant to the extent where it would move the stock price by a significant amount. And in those cases,  where the

STEVEN P. FEINSTEIN

event study is indeterminate, it made sense to rely on the other factors, but also look for an explanation as to, what among many reasons, was the reason why the event study did not turn up statistically significant reactions to particular information events.

Q.   Do you recall what cases that occurred in?

A.   Not as I sit here now.

Q.   Have you previously testified that empirical evidence is the most important factor?

MR. ROTHMAN:   Objection.

A.   I have. That was my thinking and many people's thinking years ago. But I could explain if you ask why, you know, mine and the profession's thinking has advanced, I can answer that question.

Q.   Sure. Why have your opinions changed?

A.   Frankly, it's because of the kind of reports that and critiques that were coming in from Defendants, where the

Page 45

STEVEN P. FEINSTEIN

Defendants would hire Defendants' experts and they would find different ways of just raising uncertainties in the empirical work, in the empirical factor, things like event selection or the specification of their regression.  And they would arrive not at a conclusion that anything they did or any empirical work proved inefficiency, but they would show that under a variety of different assumptions you might end up with an indeterminate result.

So just because of all the disagreement there was between people's -- disagreements with respect to that specific factor, the empirical factor, it made sense for both courts and me and, frankly, also for defense experts to start focusing on the more indisputable factors where there wasn't so much room for potential disagreement about the specification of the test.

Q.    If you could look at paragraph 18 of your report, which is on page 4.

Page 46

STEVEN P. FEINSTEIN

A.    Okay.

Q.    In the first sentence there you state, "Jeld-Wen common stock traded in an efficient market over the course of the class period."  Correct?

A.    Yes.

Q.    Is it your opinion the market for Jeld-Wen's common stock was efficient at all times during that period?

A.    Yes.  Informationally efficient, with the definition that I explicitly offered and provided.

Let me clarify. So there is no point in the class period where market participants were ignoring material information that would affect the price and valuation of the security.

Q.    Is it your opinion the market for Jeld-Wen securities was efficient every single day of the class period?

A.    Yes.

Q.    The class period begins on January 26, 2017, correct?

A.    That's right.

Page 47

STEVEN P. FEINSTEIN

Q.     And Jeld-Wen had an Initial Public Offering on January 26, 2017, correct?

A.     That's right.

Q.     So it's your opinion the market for Jeld-Wen stock was efficient on January 26, 2017?

A.     Yes. Informationally to the extent that market participants on that day involved in the IPO were not ignoring available valuation relevant information in making their decisions about whether to participate in the IPO and buy the stock at the IPO price, so the IPO price and the decisionmaking had to be reflective of the available information on that day. That's the degree and form of efficiency that I've concluded for that first day.

Q.     What is an Initial Public Offering?

A.     That's when a stock is initially for the first time offered to the public. Insiders may have owned all

Page 48

STEVEN P. FEINSTEIN

the shares previously or the company might have been -- it would have been privately owned or privately or closely held. Initial Public Offering is where stocks and ownership shares are offered to the public to purchase.

Q.   I'm going to use the abbreviation IPO to refer to Initial Public Offering.  Does that make sense to you?

A.   It does.

Q.   Are you familiar with the concept of a primary market for a security?

A.   Yes.

Q.   Can you define it?

A.   Well, the primary market is the market for the IPO.  It's the market where the shares are being issued by the company via underwriters to the public. The secondary market is the trading of those same shares among investors and market participants subsequently.

Q.   You anticipated my question.

Page 49

STEVEN P. FEINSTEIN

Are you offering an opinion that the primary market for Jeld-Wen stock was efficient?

A. With the definition, yes, and given the definition I gave. It's given the Cammer and Krogman factors, given what we know about the nature of this security, the people that owned it, the information available about it, it's unfathomable that one might even suspect the market participants were ignoring the material valuation and relevant information on the IPO date. So because of that I conclude that the market was efficient even on that first day of the class period.

Q. What analyses did you do to support that opinion?

A. I looked at -- well, the Cammer factors. So we know that subsequently there was -- well, on the first day there is a tremendous amount of volume, by definition. I mean, the entire 600-million-plus new float was offered to

Page 50

STEVEN P. FEINSTEIN

the public.

So there is tremendous volume. There was tremendous institutional participation, as we know from looking at -- from knowing about how IPOs usually work and who the owners of the stock subsequently were.  There was analyst coverage, there was analyst coverage before the IPO there was analyst coverage in the IPO there was analyst coverage immediately after the IPO.  Analysts and investors were talking about stock, talking about the valuation, even talking about the company and its history and what made it valuable.  We know there were market makers, not only subsequently in the secondary market, but clearly there were underwriters there were market makers in the IPO, many of them sophisticated well known names.

We know that -- looking at S3 registration of course is the -- is the fourth Cammer factor and it's what would make S3 registration -- a company is

Page 51

STEVEN P. FEINSTEIN

eligible for S3 registration when there is a lot of shares out there, when it's a big company that draws a lot of attention and financial information is available. On the IPO date both of those were satisfied. I mean, S3 eligibility wasn't. But it was a big company with 600-million-plus dollars worth of shares issued and the registration documents gave the public years of prior financial data.

The float was substantial. You know, even though the market cap of the company was much much bigger, but the float alone was, you know, among the 20% biggest companies in the country.

So those are the factors. I mean, those are the all the factors that would indicate that it's just extremely unlikely that these sophisticated market participants were ignoring available information which is the definition, the operative definition of operational market efficiency.

Page 52

STEVEN P. FEINSTEIN

Q.    Have you previously offered an opinion regarding whether the primary market for the stock was efficient?

A.    I'm not sure. I don't think so.

Q.    Do you understand what a quiet period is following an IPO?

A.    I do.  It's written about in my report.

Q.    What is it?

A.    There is a regulation that the underwriters who were underwriting the IPO were prohibited from also issuing analyst reports during a certain period of time. I think it used to be longer but at least in the Jeld-Wen timeframe it was ten days.

Q.    Okay. And you refer to a longer period.  Are you referring to the 25 day customary quiet period?

A.    I recall seeing documentation that it sometimes was as much -- well, it was that or longer. I mean, what was relevant for this case is that I looked

Page 53

STEVEN P. FEINSTEIN

it up and it was considered to be ten days.

Q.    Does the quiet period have to meet qualities that make it different from the remainder of the class period?

A.    Only one. Only one quality, which is that certain analysts can't issue their reports, not all analysts but certain ones.  So there might be more analyst coverage after the quiet period.

For some stocks there is no analyst coverage during the class period but that didn't happen in the case of Jeld-Wen. There was analysis during the quiet period.

Q.    So insiders and underwriters do not issue forecasts and reports during quiet periods, correct?

A.    That's correct.

Q.    Can constraints on short selling suggest market inefficiency?

MR. ROTHMAN:  Objection.

A.    In some circumstances, possibly.  It depends on what those

Page 54

STEVEN P. FEINSTEIN

constraints are.

Q.     Which constraints suggest inefficiency?

A.     I mean, again, it depends on the specific facts and circumstances of the case.

I mean, I've heard sometimes people say that there is a great deal of short interest, there is a lot of short selling in the stock and because there's so much short selling it would be difficult for someone to come along and increase the short selling by -- you know, the shares are not available for borrowing to sell and, you know, I find that not a compelling argument.

If that's the constraint we're talking about, that's not compelling. Because that's like saying, you know, Yogi Berra had this quote that "Nobody goes to that restaurant anymore because it's too crowded." You can't say that there's an operative constraint on short selling because there is a lot of short

Page 55

STEVEN P. FEINSTEIN

selling.  It doesn't make sense to me.

So it depends what -- it depends on what the nature of the constraint is as to whether or not it can have any impact on the price.

Q.    Is there truth that there may be constraints in short selling early in the quiet period?

MR. ROTHMAN:  Objection.

A.    I'm not sure. It's something I would have to look further at specifically for this time period.

We have -- what's going on in the quiet period, though, is you got many many investors and many many institutions choosing to buy.  So choosing not to buy would have essentially the same effect as -- as -- any of those market participants who might otherwise choose to short sell would be able to essentially vote their opinion by choosing not to buy.

So I'll look at it further. I'll see what your -- it sounds like you got some argument that your expert is

STEVEN P. FEINSTEIN

going to try to develop.  When I have a chance to look at it I can critique it better and respond to it.

Q.    Did you analyze any short selling at all during the class period?

A.    I did not.

Q.    Have you offered an opinion before regarding whether a market was efficient during a quiet period following an IPO?

A.    I don't recall that I have. I may have but I don't recall that I've offered an affirmative opinion.

Q.    Are there situations in which it could take some time after an IPO for a stock to begin trading into efficient market?

MR. ROTHMAN:  Objection.

A.    Well, that, again, it depends what you mean by efficient. If by efficient you mean fundamentally efficient where there is an equilibrium where the stock price equals some agreed upon valuation formula, something like a

STEVEN P. FEINSTEIN

discounted cash flow formula, yeah, I would say that there may be some period of time before all liquidity effects are dissipated and the only thing affecting the stock price are certain -- certain fundamentals according to certain fundamental valuation principles and valuation models.  That's the concept of fundamental efficiency, but that's not the kind of market efficiency I'm opining about and is relevant in a securities case.

The kind of informational efficiency, which I am opining about and is relevant to a case, is about whether or not the market is ignoring available information or, alternatively, incorporating and digesting it and incorporating it and considering it. And I don't think there was any period of time in Jeld-Wen's proposed class period that you can say that that market was informationally inefficient, that market participants were either choosing to

STEVEN P. FEINSTEIN

ignore available information or unable to trade on it.

Q.    Are you aware that some courts have held that the primary market for IPO shares are inefficient as a matter of law?

A.    No.

Q.    Are you aware that some courts have held that an efficient market cannot be established during a quiet period?

A.    I'm not aware of that.

Q.    If you had known that would that have affected your opinion in any way?

MR. ROTHMAN:  Objection.

A.    Well, I'd investigate to see why those -- well, to see if, in fact, those were the opinions offered by a court, and what the facts were that the court considered, and whether they applied to a specific case or more generally to other cases.

I'm always open to considering other opinions. I saw no good reason to

Page 59

STEVEN P. FEINSTEIN

conclude other than what I did conclude

in this report in this case.

        Q.    Why didn't you look at the

quiet period separately from the rest of

the class period?

            MR. ROTHMAN:  Objection.

        A.    I did, and I mentioned that I

did. I looked to see what analyst

coverage there was during the quiet

period. That was an important

consideration in my drawing this

conclusion.

        Q.    So you think it is appropriate

to look at the quiet period separate from

the rest of the class period?

            MR. ROTHMAN:  Objection.

        A.    I think it's important to see

if there's analyst coverage throughout

the class period.  And if there is no

analyst coverage during the class period,

that would be an important consideration.

            Here there was analyst

coverage during the quiet period. It made

the quiet period not really that quiet.

Page 60

STEVEN P. FEINSTEIN

Q.    Why did you look at the analyst coverage point separate from the rest of the class period?

MR. ROTHMAN:  Objection.

A.    That's not what I said. Well, I know that what defines a quiet period is the lack of analyst coverage. And here, even though some underwriters -- underwriters were unable to issue reports, I looked to see if the quiet period was operatively quiet or not.  And when I saw there were analysts commenting on the company, analyzing the company, digesting information about the company, I realized that, whereas, in other cases maybe the quiet period is special, here it really wasn't.

Q.    Did you analyze average daily trading volumes during the quiet period?

A.    I looked -- my report has volume numbers in it.  I looked at volumes throughout and it's considerable.

There is nothing unusual -- there was plenty of volume during the

Page 61

STEVEN P. FEINSTEIN

quiet period -- during the so-called

quiet period in this case.

Q.    Did you focus on the averages

specifically during the quiet period as

compared to the entire class period?

A.    I'm looking on page -- to

answer your question, I'll tell you what

I did at the time.

If you look at page 151, you

could see that there's plenty of volume.

You can't say there is a dirth of volume

during the first ten days of Jeld-Wen's

trading. I didn't calculate or present a

different average for the first ten days

because I didn't see anything here that

indicated the market, the secondary

market was conceptually different or

qualitatively different from the averages

that I reported for the rest -- for the

entire class period.

I mean, you've got a million

shares plus on -- after the first day

you've got a million plus share on three

days and if you scroll down you see other

STEVEN P. FEINSTEIN

days with millions of shares and then you've got hundreds of thousands every day just like the rest of the class period. There is just no reason to provide a separate statistic.

Now, if -- if you have an expert who is going to try to make an argument that there was inefficiency during the class period, you know, I'll do additional analysis to investigate and decide.  But I saw nothing here -- everything I saw and all this evidence and this evidence that I'm showing you here right now points to that the quiet period in this case was not uniquely or was not different, it was not qualitatively different.

Q.    Does your event study contain any events that took place during the quiet period?

A.    The event study focuses on earnings announcements and the first earnings announcement was in February of 2017, February 22nd. So it's after the

Page 63

STEVEN P. FEINSTEIN

first ten days.

To answer your question succinctly, no. The event study focused on earnings announcements and earnings announcements were scheduled when they were. But I do want to add that the way this empirical test works is you draw inferences from what you see on the earnings announcement days that reasonably, according to statistical and financial principles, apply to all other days in the class period.

So there are in this case eight specific days that are good for experimentation that then tell you whether the market was developed enough such that investors were not ignoring information on all the other days as well. All the other days being those days that were not ideal candidates for an empirical test.

Q. Can you look at Exhibit 8, which is page 175, please?

A. Okay.

Page 64

STEVEN P. FEINSTEIN

Q.      This is your event study results, correct?

A.      Well, this is actually event study results for every day in the class period, not just the earnings announcement days.

Q.      If you look at the first column which is date.  The first date you include is January 27, 2017, correct?

A.      That's right.

Q.      Why didn't you include the first day of the class period January 26, 2017?

A.      Because that was -- the price that was available that day was the IPO price not a price from the New York Stock Exchange.

Q.      Okay. And the third column, Jeld-Wen prior day closing price, that shows Jeld-Wen's closing stock price on January 26, 2017, following the IPO is $23, correct?

A.      That's right.

Q.      And that's the IPO placement

Page 65

STEVEN P. FEINSTEIN

price.

        A.    Correct.

        Q.    The next day, January 27 was the first date of the secondary market, correct?

        A.    That's right. Yes.

        Q.    So on January 27 after the start of the secondary market the stock was at 26.12, correct?

        A.    At the close on January 27th it closed at 26.12, yes.

        Q.    And that's about a 13% increase over the IPO price?

                MR. ROTHMAN:  Objection.

        A.    Approximately.

        Q.    What could have caused that increase in the stock price?

                MR. ROTHMAN:  Objection.

        A.    Well, there is a literature that underwriters and issuers choose to price generally IPO's at a discount from what they anticipate will be the full information equilibrium price.

                They do it for a variety of

Page 66

STEVEN P. FEINSTEIN

reasons. There is a vast literature on those reasons. It serves them well to do that. They did do it here apparently.

The analysts -- I told you there was analyst coverage here, the analysts commented on it. The analysts said it was 14% intentional underpricing. But that's what's reflected here. They choose -- you know, it served their purposes to price it at 23, even though the information that was available in the market would push it up to 26.

Investors who bought the stock at 23 were providing liquidity to the underwriters and the company and they got compensated for what they sold to and provided to the marketplace, that liquidity.  That's the difference.

And I just want to add, my conclusion is that had there been full information rather than the alleged misinformation the full equilibrium but-for price would have been lower and, therefore, the IPO price would have been

Page 67

STEVEN P. FEINSTEIN

lower. So there is no evidence in these two columns that the market was informationally inefficient at the IPO or on the first day. In fact, it's all consistent with market efficiency.

Q.    Okay. I'm going to focus on the second Cammer factor. Why is analyst coverage important in determining whether the market for a stock is efficient?

MR. ROTHMAN:  Lindsey, is now a good time to take a break since you switched factors?

MS. HARRIS:  Absolutely.

MR. ROTHMAN:  You want him to answer that question and then we can come back or do you want to start fresh?

MS. HARRIS:  Why don't you answer that. I think he will be able to answer it.

MR. ROTHMAN:  I do too.

A.    Analysts have access to the company that the individual investors don't have and they have expertise that

Page 68

STEVEN P. FEINSTEIN individual investors don't have and their covering the company helps digest available information and disseminate available information and share with the marketplace what the benefits of their expertise and information.  They help to digest information which helps make the market efficient.

MS. HARRIS:  Thank you. We can take a break. You guys want to take five minutes or ten minutes?

MR. ROTHMAN:  I think -- how much time do you want to take.

THE WITNESS: Five is good.

MR. ROTHMAN:  Okay. Five minutes.

VIDEOGRAPHER:  We are going off the record. The time is 11:07 a.m. Eastern.

(Recess is taken.)

VIDEOGRAPHER:  We are back on the record. The time is 11:18 a.m. Eastern.

Q.    Is analyst commentary

Page 69

STEVEN P. FEINSTEIN

important for a stock to reflect --

sorry.

Is analyst commentary important for a stock to fully reflect information in a market?

A.    Empirical research on the subject says one or two analysts seems to suffice. That's in the Barber Lev article. The more analysts there are, the more people you have helping to digest the information.  But the empirical research says that one or two seems to be enough to make the market efficient.

Q.    Does it matter whether the analyst coverage is widely disseminated?

MR. ROTHMAN:  Objection.

A.    It's a matter of degree. I mean, this is not black or white. You know, more access is probably better but Seeking Alpha is available to everybody. There's no reason to believe that that's -- it's going to be helpful, it's not going to be unhelpful. The more availability the better, but it's not

Page 70

STEVEN P. FEINSTEIN

black or white, it's matters of degree.

Q.    And what matters isn't whether everybody accesses it but whether people actually review it, right?

MR. ROTHMAN:  Objection.

A.    I don't think literature goes that deeply into the question. And I've done research in this area myself. Analyst coverage seems to help and it's, therefore, an indicator of market efficiency. I really don't think that we can go deeper than that, at least right now.

Q.    Well, if an analyst issues a report and none reads it, is that --

(Reporter requests clarification.)

Q.    If an analyst publishes a report and nobody reads it, how does that help market efficiency?

MR. ROTHMAN:  Objection.

A.    Well, the question is why is no one reading it? I mean, I think you'd have to answer that question. We'd have

STEVEN P. FEINSTEIN

to know -- we'd have to know why no one is choosing to read it to know whether there is any effect on that factor being probative of efficiency or not.

Q.    How do you define a securities analyst?

A.    I mean, it's almost just plain English.  It's an analyst who analyzes securities. Generally, these are professionals who -- some work for sell-side banks.  I mean, I wrote in my report that sometimes you have buy-side analyst who work for the institutions, themselves, but it's a financial analyst who focuses on covering and evaluating a security or a group of securities.

Q.    Is anyone who writes about a stock a securities analyst?

A.    Clearly not. I mean, you can imagine a scenario, you know, ad absurdum scenario where someone with no training and no background and no understanding and no information will write some opinion and I wouldn't necessarily call

Page 72

STEVEN P. FEINSTEIN

that person a security analyst.  But that

doesn't mean that -- it just means there

is a range, there is a range of qualities

among security analysts.

Q.    How do you know if somebody

writes about a stock is a qualified

analyst?

MR. ROTHMAN:  Objection.

A.    There's a number of

indicators, who they work for and what

they've written about previously, and

what is the platform that they're

disseminating the writing on.  These are

all relevant or can be relevant.

Q.    If you look at paragraph 176

of your report, and that's on page 60.

A.    Yes.

Q.    You list 13 analysts firms

that published reports about Jeld-Wen

during the class period, correct?

MR. ROTHMAN:  Objection.

A.    Right. These are firms whose

analysts wrote and published reports.

That's right, but let me check something.

Page 73

STEVEN P. FEINSTEIN

Q.     That's in your report.

A.     Just one second.

       MR. ROTHMAN:  Objection.

A.     What paragraph is that again?  Sorry.

Q.     Paragraph 176.

A.     Okay. Fair enough.

Q.     Why did you obtain reports from those firms?

A.     I subscribe to a data service that allows me to download analyst reports and these are the firms that provided their reports to the service that allowed me to then download and review them.

Q.     Do you consider --

A.     As I mentioned in paragraph 177, some firms don't provide their reports on that platform but there are other ways of finding out they are also covering the stock.

Q.     Focusing on the firms listed in paragraph 176, do you consider those firms to be reputable sources for analyst

Page 74

STEVEN P. FEINSTEIN

reports?

A.    I'm not going to say I agree with everything that any analyst from any of those firms says but they're well known sell-side firms that provide analyst coverage. There's also analyst coverage coming from independent analysts that don't work for these firms.

Q.    And you mention paragraph 177, three additional analyst firms followed the question.  Do you consider those firms to be reputable sources?

MR. ROTHMAN:  Objection.

A.    How are you defining reputable?

Q.    How do you define reputable?

A.    Well, I think I would define it different ways in different contexts. Like I said before, I'm not going to say that I agree with everything that any analyst from any of these firms says all the time.

I would say that it's more likely than not that the people hired by

Page 75

STEVEN P. FEINSTEIN

these firms and working for these firms have experience and are -- and resources, so to that extent, I mean, and there's evidence that they have good lines of communication with knowledgeable parties at the company.  It's not to say that people who don't work for these firms don't also have good education, good training and good background and access to information. But if that's how you are defining reputable, then this is one indication of reputable, but it's not the only.

Q.    Okay. But you do think it's important that the people publishing these reports have experience and resources?

A.    No. I was trying to help you along with the definition for reputable when I gave that answer.

I asked you what you meant by it, you asked me what I meant by it and I offered that as a definition or as a characteristics that might be relevant to

Page 76

STEVEN P. FEINSTEIN

the definition.  Not even that, as
characteristics that would -- as a
non-exclusive list of characteristics
that would indicate that quality.

Q.    Is Seeking Alpha listed among
any of the firms listed in paragraphs 176
or 177 of your report?

A.    Seeking Alpha is a platform
for analysis. It's not a sell-side firm.
These are sell-side firms.

Q.    And what -- Seeking Alpha is a
financial blog?

A.    I would say it's a platform,
an information platform.  It's not a
blog.

Q.    What do you mean by
"information platform"?

A.    It's a website where research
can be acquired and provided.

Q.    Okay. Let's look at tab 1 of
your report. This contains a list of the
documents and other information you
considered in forming your opinions,
correct?

STEVEN P. FEINSTEIN

A.      Yes. Before we move on, though, I want to add one thing, which is what we talked about in paragraph 176 and 177 are just the buy-side analysts. We also have -- I'm sorry.  Those are the sell-side analysts.  And I notice on the heading above paragraph 184 I talk about buy-side analysis.

So we know that over the course of the class period 376 major institutions, these are like major investment companies that manage over $100 million for their clients, 376 of them own Jeld-Wen stock, and in some form or another they all have buy-side analysts, either a dedicated buy-side analyst or a portfolio manager doing analysis on the company as well.

So even though I identified 16 sell-side analysts firms, we also have 376 major institutions that are also providing analysis that goes into the decisionmaking of whether or not to buy or sell Jeld-Wen stock.

Page 78

STEVEN P. FEINSTEIN

All right. So section --

Q.    Can I draw your attention to 120?

A.    Sure.

Q.    How did you identify the analyst reports in this exhibit?

A.    Well, two or three different ways. It used to be that what we would do is just download from Thomson Eikon all the analysts that according to Thomson Eikon were covering a particular company.

Like I said, I rely on my staff to do the actual execution. My staff has discovered that a more cost effective way of doing it is to first ask the attorneys what reports they have, get them, get all those from the attorneys, and then fill in -- and then see which ones are available on Thomson Eikon that the attorneys couldn't provide.  And that way we have to -- we buy fewer, we spend less money and have to buy fewer analyst reports.

I think that's the process

Page 79

STEVEN P. FEINSTEIN

that was followed here, where we asked the client what they had and then we filled it in from everything that Thomson Eikon had on Jeld-Wen that the client didn't have, the attorneys, Plaintiffs' counsel.

But in addition, we looked to see what was being covered on Seeking Alpha, and we also noticed that Onex, the private equity firm that owned a substantial part, both before the IPO and after the IPO, substantial part of Jeld-Wen had its -- there was analyst coverage on it itself and that analyst coverage also covered Jeld-Wen during this so-called quiet period. So we got Onex reports both from the client and from Thomson Eikon.

Q.    And the Seeking Alpha reports you mentioned, did you receive those from Plaintiffs' counsel or your team found those?

A.    My team.

Q.    The last Seeking Alpha entry

Page 80

STEVEN P. FEINSTEIN

on this list is from January 31st, 2017. Were there no more Seeking Alpha articles after that date?

A.   I don't believe that's the case.

Q.   Why don't you list additional Seeking Alpha articles after that date?

A.   The search was for the initial period to see what was being said about Jeld-Wen during the so-called quiet period and whether there was coverage or not during that quiet period and we found there was.

Q.   What were the parameters you gave your team to look for the Seeking Alpha article?

A.   I don't recall specifically.

Q.   Why didn't you continue to consider Seeking Alpha after the initial period following the IPO?

A.   Well, like I said, the search was to see if there was analyst coverage during this initial period. So the parameters were likely confined to that

STEVEN P. FEINSTEIN

earlier period. They could have been expanded.

It wouldn't have changed the results as far as the early period, but that was what I was interested in; was there analyst coverage during this earlier period, and the answer is yes.

Q.    So did you look for Seeking Alpha reports during that time period because you hadn't received reports during that time period from Plaintiffs' counsel?

MR. ROTHMAN:  Objection.

A.    That's one of the reasons.

Q.    Do you agree that if only one analyst is reporting on a certain time period some important information could be overlooked?

MR. ROTHMAN:  Objection.

A.    Overlooked by whom?

Q.    The market.

MR. ROTHMAN:  Objection.

A.    Not this market. I don't believe that would happen with this

Page 82

STEVEN P. FEINSTEIN

market, with over 300 major institutions holding the stock, high volume, average market cap, over a billion dollars, $600 million IPO, many Wall Street underwriters.  No, I don't believe available information was being overlooked in this market or would have been overlooked even if under the hypothetical that there was only one analyst covering it but we know there is more than one analyst covering it, many more.

Q.    Let's look at paragraph 182. And you state, "Jeld-Wen enjoyed analyst coverage even immediately after the IPO during the SEC mandated quiet period." Correct?

A.    Yes.

Q.    As part of that conclusion you reference three Seeking Alpha entries and one report from Web Bush, correct?

A.    In part.  But notice that we also just looked at Canaccord coverage via its covering of Onex. We just looked

STEVEN P. FEINSTEIN

at that in the docs reviewed in the Relied Upon exhibit. So yes, this is what I wrote and there's additional support for this conclusion.

Q.    Would you have concluded the Cammer factor was met during the quiet period without the Seeking Alpha reports?

MR. ROTHMAN:  Objection.

A.    I think so because of the Canaccord and Web Bush coverage as well during that same period.

Q.    Okay. Do you know the criteria for creating a post on Seeking Alpha?

A.    I couldn't recite for you, no.

MS. HARRIS:  I'm going to mark as Exhibit 2 the Seeking Alpha report by The Value Investor dated January 31st, 2017.

(Exhibit 2, Seeking Alpha article dated January 31, 2017, was received and marked on this date for identification.)

Q.    Is this one of the Seeking Alpha posts you referenced in paragraph

Page 84

STEVEN P. FEINSTEIN

182?

A.    How do I see it?

Q.    If you click on marked exhibits, it should refresh and appear in the middle window.

MR. ROTHMAN:  I had to hit back and then hit Marked Exhibits and then go forward.

CONCIERGE:  You could also hit refresh in the Marked Exhibits and that should refresh, Dr. Feinstein.

THE WITNESS: Okay. Yes, it is.

Q.    Who is the author of this post?

A.    Well, an individual who goes by the name the Value Investor, who has 18,000 followers on Seeking Alpha.

Q.    Do you know his or her real name?

A.    I don't.

Q.    Do you know if The Value Investor is a professional analyst?

MR. ROTHMAN:  Objection.

A.    No.

Page 85

STEVEN P. FEINSTEIN

Q.    Do you know what The Value Investor does for a living?

A.    No.  But I know they have 18,000 followers on Seeking Alpha and the report was informative.

Q.    Do you know if The Value Investor has a college degree?

A.    I don't know.

Q.    Looking more closely at this blog post the title is Jeld-Wen:  Leave the Windows and Doors Shut For Now, correct?

MR. ROTHMAN:  Objection.

Q.    Is that the title of the article?

A.    I'm checking. I'm looking to see more. Yes. That is the title of the article.

Q.    And if you scroll down to the second page under Final Thoughts, the author of this post says, "There are few reasons to own the shares in my eyes." Correct?

MR. ROTHMAN:  Objection.

Page 86

STEVEN P. FEINSTEIN

A.    Yes, that's the last sentence. Yes. This -- I have to tell you the -- as a professor I would give a good grade if this were written by a student. This is a good -- this analyst -- this is good information, good coverage, good analysis and a well expressed opinion, a contrary opinion to what other people were saying but this is a good analyst report.

Q.    Do you agree that the view expressed in this report was that Jeld-Wen stock was not a sound investment opportunity?

A.    I don't think it said that. I think it said that it wasn't going to appreciate the way others thought it was going to appreciate, is what The Value Investor is saying, that caution is called for.  One moment.

The company has a nice market position, potential to increase margins and that's reflective of the alleged misrepresentations and omissions. Nonetheless, and he or she points out

Page 87

STEVEN P. FEINSTEIN

it's a premium valuation multiple, a description of the nature of the business, description of the IPO, correct facts that I can see.  And yet given the wide variety of other investment opportunities, this investor is saying he or she recommends passing on the IPO.

Q.    If the value investor's opinion was material to the market, would you expect to see an increase in short selling activity based on this opinion?

MR. ROTHMAN:  Objection.

A.    Well, not necessarily because it's not the only piece of information coming out at that time. There is other information that also has to be digested and that the market is going to consider, including company statements.

Q.    So back to paragraph 176 and 177. What sources did you use to gather the information in these paragraphs regarding these firms?

MR. ROTHMAN:  Objection.

A.    I already answered that. What

Page 88

STEVEN P. FEINSTEIN
was available from Robbins Geller, what they had, I asked them to provide all analyst reports about Jeld-Wen that they already had and then we compared to see what was available that they did not have, but was available from Thomson Eikon and downloaded everything from Thomson Eikon that Robbins Geller didn't have.

Q.   What is a consensus estimate?

A.   Which paragraph?  It's not in 176 or 177.

Q.   Do you know what a consensus estimate is?

MR. ROTHMAN:  Objection.

A.   I do.  I just want to know where you're reading from. I looked to see if it was providing consensus estimates at the time of the IPO. There are a couple of services that survey financial analysts, security analysts and ask them questions like; what do you expect earnings to be next quarter; what do you expect earnings to be next year;

Page 89

STEVEN P. FEINSTEIN

what do you expect revenue to be?  And

they average the -- they actually have an

averaging formula, these services.  They

average what's reported to them in the

surveys and publish them for everyone

else to see.

Q.    Okay. How does the market

learn about consensus estimates?

MR. ROTHMAN:  Objection.

A.    Well, they're covered in a

variety of information sources. I'm

pretty sure Bloomberg has a page where

you can see the consensus estimates. IVES

is a famous and well known provider of

consensus estimates, I-V-E-S.  And if you

subscribe to IVES or an information

source that contains IVES information you

can see the results of the consensus

estimate surveys.

Q.    And I was referring to

paragraph 182, if that's helpful.  You

mentioned there are consensus estimates

during the quiet period.

A.    Yes.  So FactSet provides

Page 90

STEVEN P. FEINSTEIN
consensus estimates.

Q.    And you mentioned you used Thomson Eikon to obtain institutional holdings data for your report, right?

MR. ROTHMAN:  Objection.

A.    Right.

Q.    Okay. And is Thomson Eikon a comprehensive database?

A.    It's Thomson Eikon, I expect they do their job. I mean, the institutional holdings data is provided -- is required from the institutions by the SEC. And so there are a number of services that simply gather up these, I think there are 13F reports that the institutions provide and tabulate it and sell it, that data.

Q.    Is Thomson Eikon a reliable database?

A.    Yes.

Q.    Why do you use FactSet instead of Thomson Eikon to gather consensus estimates for your efficiency opinion in paragraph 182 of your report?

STEVEN P. FEINSTEIN

MR. ROTHMAN:  Objection.

A.   I think we have a standard set of go-tos for certain type of information. It changes from time to time when we evaluate the cost of the data, contracts we have with data providers. But  based on cost and coverage, we make periodic reviews of who we are going to go to for what data and this was a decision, a business decision made independent of this case at some point in time.

Q.   Sorry. Does your firm not have access to consensus estimates from Thomson Eikon?

A.   I don't know. I mean, as I sit here now, I just don't know for sure. I know we do periodically review where we're going to get data and what we will have covered in each of our data contracts. I don't know if we had access to multiple sources for consensus estimates, as I sit here now.  But I know that we always do have at least some

Page 92

STEVEN P. FEINSTEIN

access and here we had access, we have FactSet.

At some point we made a decision for this case and all cases this year that this would be the go-to for our consensus estimates.

Q.   So do you know if you had used Thomson Eikon to gather consensus estimates whether your results would have been different?

MR. ROTHMAN:  Objection.

A.   Well, no. Since I didn't use Thomson Eikon for that purpose.  But I mean, it wouldn't have made a difference. I mean, if Thomson Eikon had more analysts that would be further support for the conclusion that there was coverage during the early portion of the class period, and if they had no coverage, according to Thomson Eikon, we still would have known that there was at least one analyst reporting to FactSet. So I don't see how it would make a difference.

Page 93

STEVEN P. FEINSTEIN

Q.    What would cause an analyst's consensus estimate to be picked up by FactSet but not Thomson Eikon?

MR. ROTHMAN:  Objection.

A.    I think you'd have to ask FactSet and Thomson Eikon. I'm pretty sure one of those actually gets their data from another service, IVES.  But as I sit here now, I just don't know. I know that these are reliable sources.  These are reliable sources that the money managers use for the same purpose. We have access to the same data generally that investment managers have.

I've never heard of anyone -- I haven't heard any severe criticism of any of these services.

Q.    If a consensus estimate was available through FactSet but not through other sources like Thomson Eikon or Capital IQ, did that demonstrate that the consensus estimate was not widely distributed?

MR. ROTHMAN:  Objection.

Page 94

STEVEN P. FEINSTEIN

A.    No, I don't think so. FactSet is widely used.

Q.    Okay.

A.    But again, it's not that -- not the distribution of the consensus estimate that's driving my -- that's driving support for my opinion here. It's that this is evidence that there's -- that there's an analyst following the stock even at the IPO. This is additional evidence. So we've got evidence from Seeking Alpha, we've got evidence from Conaccord, we've got evidence from the Web Bush analyst report and we also have evidence from FactSet consensus estimates reporting that there was analyst coverage at the IPO and immediately thereafter.

Q.    I'm going to mark as Exhibit 3 FactSet's forecast data for Jeld-Wen.

        (Exhibit 3, FactSet forecast data re: Jeld-Wen, was received and marked on this date for identification.)

Q.    This is a copy of Jeld-Wen's

Page 95

STEVEN P. FEINSTEIN

forecast data from FactSet for the class period that we pulled from the database. And this Excel explains the data, exactly how it's exported by FactSet, for the record.

Do you recall looking at this data in preparing your report?

MR. ROTHMAN:  Objection.

A.    I don't think it was exactly in this form but this is -- this is consistent with what I examined and considered.

Q.    Looking at cell G25.

A.    Got it.

Q.    The analyst estimate is listed as beginning on January 23rd, 2017, correct?

A.    Yes.

Q.    And that same estimate runs in the same column until January 31st, 2017?

A.    Say that again, please.

Q.    The same estimate runs in the same column through January 31st, 2017.

A.    Yes.

Page 96

STEVEN P. FEINSTEIN

Q.    And the information that's given about this estimate is restricted-1.33-01/23/2017, correct?

A.    If I heard you correctly, yes. I see what it says here. It says what it says.

Q.    Okay. Is this the consensus estimate that you reference in paragraph 182 of your report?

A.    Well, what I referenced was in column E, which said, according to FactSet there is an analyst covering, an analyst who reports to the consensus estimate survey that FactSet, who's reporting FactSet elicits -- solicits and that analyst provided -- was covering the stock from even before the IPO and continued to cover it after the IPO.

Q.    Okay. And what can you tell us about the identity of this analyst?

A.    I don't know. I don't know the identity. FactSet does but I don't. What I know is that this tells us that there was the analyst coverage at the IPO and

STEVEN P. FEINSTEIN

immediately thereafter.

Q.    Do you know whether a report underlies this estimate?

MR. ROTHMAN:  Objection.

A.    I knew there were reports issued at the IPO and immediately thereafter. I don't know if the reports that I have in that timeframe were produced by the analyst reporting to FactSet.

Q.    Is it possible that this consensus estimate is not part of a larger report?

MR. ROTHMAN:  Objection.

A.    A lot of things are possible. I'd say it's possible. But the estimate is provided for all the world to see here via FactSet.

Q.    If there is a report connected with this consensus estimate can you get a copy of it?

MR. ROTHMAN:  Objection.

A.    Possibly.  Possibly, yes. Possibly no. I mean, I don't have access

Page 98

STEVEN P. FEINSTEIN

-- as my report showed I don't have access to every investment bank's report.

Q.    And if a report exists, do you know who received it?

MR. ROTHMAN:  Objection.

A.    Well, I know that anyone received these estimates.  I mean, anybody who has access to FactSet will have access to this estimate the same way you and I do now. They would have had it realtime then.

Q.    Sorry. That was my dog.

What is EPS?

A.    EPS, earnings per share.

Q.    Does EPS have a strong impact on share price?

MR. ROTHMAN:  Objection.

A.    Sometimes.

Q.    When would EPS not have a strong impact on share price?

MR. ROTHMAN:  Objection.

A.    There are some companies that are valued other ways.  Certain startup companies without cash flow, without

STEVEN P. FEINSTEIN

earnings; pharmaceutical research companies, for example, are evaluated more on the prospects of their having successful tests for their drugs or treatments and other offering and the market is well aware that they don't have any earnings per share and might not have earnings per share for some time and in those cases earnings per share is not very relevant.

So for some companies it's extremely important and other companies it's not very important at all. Generally, it's important, but not always.

Q.    Let's switch gears. We talked about short selling earlier. And to confirm, you didn't address short sellers in this report, correct?

A.    No. I ran the standard background market efficiency test and saw that the structure of the market was such that there were -- that it indicated market efficiency. The short selling is

Page 100

STEVEN P. FEINSTEIN

not one of the Cammer or Krogman factors. There are good reasons, it could be an unreliable metric.

So the answer is I constrained the analysis to what my understanding and my research shows is reliable, reliable indicators of market efficiency, so I did not look at short selling.

Q.    Is short selling sometimes considered a part of factor 3 in the number of market makers?

MR. ROTHMAN:  Objection.

A.    Well, sometimes people will say the number of market makers or arbitragers in the market is something to look at.

So I'd have to say sometimes people look at it, but my experience and my research shows me that it's not reliable.  You know, I've seen people make the argument if there is a lot of short selling the market is not efficient and if there is not short selling the market is not efficient.

Page 101

STEVEN P. FEINSTEIN

So if the people arguing for market efficiency can't decide what metric, you know, what result for short selling is a probative indicator then it's not a reliable indicator.

Q.   In other cases you have analyzed short selling of a stock when opining on market efficiency?

A.   No. I haven't used short selling of a stock as an indicator of market efficiency. I don't believe it's a reliable indicator.

In this case if there were -- I mean, we've got over 300 maker institutions owning the stock according to the 13F data. If there was negative information you don't need the short sellers to bring that information to the market. You'd have these institutions who would themselves be able to sell out of their own portfolios to bring that negative information to the market price. You don't need short sellers in this case.

Page 102

STEVEN P. FEINSTEIN

Q.    Did you look at short selling in the Groupon case?

A.    I think I only looked at short selling in the Groupon case, because the -- I believe that was Paul Gompers thought that it was an important metric, but he couldn't decide whether -- what the metric meant. I mean, I think he said -- I don't even remember the whole case but that one I testified in court in Chicago so I remember something about it.

I think he was saying that there were so much short selling that the market couldn't have been efficient and that's just the illogic of saying no one goes to that restaurant anymore because also too crowded.

You can't say because there is a lot of short selling, there is no short selling. It wasn't clear whether he was arguing that a lot of short selling or a little short selling could indicate market efficiency.  And to this day I think it's an unreliable indicator

Page 103

STEVEN P. FEINSTEIN

because there's no standard for what the indicator values are supposed to mean.

Q.   Did you look at short selling in the World Acceptance Corporation case?

A.   The only time I've looked at short selling is to explain why it's an unreliable indicator, and I recall Groupon more specifically but I don't recall the one you just mentioned, the specifics.

Q.   Did Jeld-Wen conduct public quarterly earnings calls for the three years before it went public?

A.   No, because it wasn't public yet.  But at the time the company went public, throughout the entire span of the class period, at least three years of data, financial data were provided to the public. No conference call transcripts because there wasn't public yet but the data and all the financials were available.

Q.   Did it provide explanations of its financial performance each quarter

Page 104

STEVEN P. FEINSTEIN

during the three years before it went public?

MR. ROTHMAN:  Objection.

A.    To the extent that the information is in the financials that were provided in the course of the IPO, that information, explanation, management's opinions and notes were provided to the public.

Q.    Okay. I'm going to shift gears again. Would you like a break or does anybody else need a break? I can keep going.

MR. ROTHMAN:  If we take a break now will you eliminate some questions and use this time to shorten your outline?

MS. HARRIS:  If somebody needs a bathroom break I'm happy to give it to them, otherwise we can keep going.

THE WITNESS: I'm fine with continuing.

MS. HARRIS:  Okay.

Page 105

STEVEN P. FEINSTEIN

Q.      How does a collective event study demonstrate market efficiency?

A.      Collective event study proves that the security responds to information and that the market, therefore, is not ignoring information and, therefore, there are no information flow impediments or trading impediments that keep the market from responding to information because we have examples of the stock responding to information, and we have proof that the stock moves more on information days than on low information flow days.  It's a demonstration of the cause and effect relationship between information flow and stock price movements.

So it's a demonstration of informational efficiency, a collective event study that shows there is a significant difference in the dynamics between information days and non-information days.

Q.      And in your event study you

Page 106

STEVEN P. FEINSTEIN

used earning announcements days as news days, correct?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    Could you have used 8-K's instead of earnings announcements as news days?

A.    It's better to use earnings announcements. It's more standard nowadays to use earnings announcements for this test. Many 8-K days, even though there are 8-K's, when you analyze them individually you see that it's -- what's being reported in an 8-K is not the kind of information that would reasonably move the stock price a significant amount.

Q.    I think we talked earlier, but just to confirm, because you used the earnings announcement there was no news days during the quiet period, correct?

A.    There were no earnings announcements.

Well, how are you defining quiet period?  We have a number of ways

Page 107

STEVEN P. FEINSTEIN

to define it. Why don't we nail down which way we want to apply the term.

Q.    Let's use the 25 day customary.

A.    I'll write on a piece of paper 25. All right.

I want to go back to my report for a second. I just want to see the cutoff. The answer is -- I'm glad I checked. Let me check again. One second, please.

(Deponent reviews the document.)

A.    There is. February 22nd is within the first 25 trading days and February 22nd was included in the collective event study.  February 22nd was an annual earnings announcement, fourth quarter and fiscal year was reported and it was a statistically significant reaction, proving that the market reacted to information that day.

Q.    And what about in the first ten days of the statutory quiet period?

STEVEN P. FEINSTEIN

MR. ROTHMAN:  Objection.

A.    So we're changing the definition now. I'll write that on the paper too.

February 22nd, which is, as I mentioned, is within the first 25 days is not within the first ten days.  February 22nd was the first appropriate day to test.

Q.    Do you know if you had used 8-K announcements instead of earnings announcements whether there would have been news days during the ten day statutory quiet period?

MR. ROTHMAN:  Objection.

A.    I don't -- I think earnings announcements are the right event to focus on. That's why I ran this test using earnings announcements. There is a literature that says that earnings announcement days are higher information flow days than non-earnings announcement days generally. There is literature that says that a lot of the events that are

Page 109

STEVEN P. FEINSTEIN
reported in 8-K's are not really important news days.

So there was a reason why I choose earnings announcements and not 8-K's.  So I did not use 8-K's and, therefore, I did not run the test.  So therefore, the answer to your question is no. I don't know what the result would be to a test I never ran, and I don't think is the right test to run in this case.

Q.    Let's look at page 175 in Exhibit 8 of your report.

A.    Okay.

Q.    In the first row, third column, do you see the closing price for the day prior to January 27 was $23?

A.    I see it.

Q.    And then looking at the same row, second column closing price for January 27 was $26.12?

A.    Yes.

Q.    So the stock price increased by $3.12 during trading on January 27, 2017?

Page 110

STEVEN P. FEINSTEIN

A.    That's correct.

Q.    And that's about 13 and a half percent increase?

A.    I'll take your word for it. Yeah. About.

Q.    Okay. As we look at the T statistic column of statistically significant events are indicated with an asterisk for more, correct?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    And you indicated here there were two statistically significant events during the 25 day quiet period, correct?

MR. ROTHMAN:  Objection.

A.    I didn't label  -- I didn't label there being a 25 day quiet period here. But if we're going to define the first 25 days as being the quiet period, it appears that there are three, three days that are statistically significant at the 90% confidence level or above.

Q.    And would a 13.5% price increase be statistically significant?

STEVEN P. FEINSTEIN

A.    Yes.

Q.    And then that would be four days within the first 25 days.  Well, for the first 25 day trading period, I think the customary quiet period actually runs calendar days not trading days.  So if we go with the calendar, the calendar days, then there are -- that would be -- let me start over.

If we look at 25 day trading days, there are three listed and then the first day would be a fourth statistically significant day, correct?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    Okay. And if we looked at calendar days and not trading days, then there would be three, correct? I believe that the 21st is outside the customary time period because it's not a trading day time period; is that correct?

MR. ROTHMAN:  Objection.

A.    I'll take your word for it. I asked you how you want to define quiet

Page 112

STEVEN P. FEINSTEIN

period. I didn't -- based on the Cammer

Krogman characteristics, there was no

need to make that distinction.

Q.    Do you understand the

customary quiet period to be trading, 25

trading days or 25 days?

A.    I think the rule has changed

overtime. I recall at one point it was 30

days. Here I read that it was 10. So I

think it's somewhat case specific. I'd

have to review to know for sure what the

standard regulation is.

Q.    Okay. Let's talk about float.

What does calculating float tell us in

terms of market efficiency?

MR. ROTHMAN:  Objection.

A.    It tells you whether it's a

big company or not. It tells you whether

there is a lot of shares that are out in

the marketplace trading or a lot of

shares being issued to the marketplace.

It tells you whether it's a small obscure

company that might fly under the radar of

analysts and investors or, alternatively,

STEVEN P. FEINSTEIN

it's a very big important company that grabs the attention of investment professionals, investors and analysts. Large float has the market mentioned more than small float does. Therefore, you would expect large float would be an indicator that the stock price reflects information and the market doesn't ignore information.

Q.     Is float often looked at as a percentage because it tells you what percentage of the stock is held by insiders?

MR. ROTHMAN:  Objection.

A.     You can measure float both ways. They each are informative sometimes about some things.

Q.     How is the percentage of float informative?

A.     Well, what we saw in the dot-com era, like,  around 2000 there was a lot of very very large companies coming to market with IPO's but the amount of shares that were being issued was a tiny

Page 114

STEVEN P. FEINSTEIN

fraction of the total value -- the total number of shares that were -- that existed.  And so you might have a company with an enormous multibillion dollar market cap but the number of shares out in the marketplace was very small, you know, if you're talking a 5 or 10% float which is a lot of what of those dot-coms had around the year 2000, the number of shares trading would be 100 million or even less.

So you want to look at more than just market cap. You also want to have some idea of how many shares are out there floating, meaning that they're available for investors to trade.  And the more that they're out there for investors to trade the more attention the stock will grab.

So you can look at float two different ways.  You can look at it in terms of the absolute number of shares that are trading or a percentage of the large market cap that's been issued.

Page 115

STEVEN P. FEINSTEIN

Q.    And as a percentage what percent float would you need to see to believe that indicated market efficiency?

MR. ROTHMAN:  Objection.

A.    The way I do it is -- and I explained this in the report -- I measure how much float there is and then compare it to the entire market cap of all other stocks traded on American exchanges. And if the float alone is sizable compared to other companies' market caps I would characterize that as being a big company that garners attention and, therefore, is less likely to be inefficient, more likely to be efficient.

Q.    You mention with regards to the dot-com companies that a float of 5 or 10% indicated market inefficiency.

What's the upper bound of that percentage that you would think considered market inefficiency?

MR. ROTHMAN:  Objection.

A.    I didn't say the 5 or 10% alone would indicate inefficiency. I said

Page 116

STEVEN P. FEINSTEIN

if you only have a 5 or 10% float, it may be that even if it's a large market cap company, it's a small float company.

So the percentage will tell you. Once you know market cap, if you then know the percent. You have a good sense as to whether the float is large or small. But we have two ways of measuring. We can either measure market cap and the percentage or the direct dollar amount of the float and I've done it both ways in this case.

Float was -- you know, initially it was less than 50% but still it was 600-million-plus dollars, which is larger than most other publicly traded companies in the United States. I think it was third -- second decile or third decile from the top.

Q. Would you consider a float under 30% would indicate market efficiency?

MR. ROTHMAN: Objection.

A. I wouldn't draw a conclusion

Page 117

STEVEN P. FEINSTEIN

based on just the float metric and I also wouldn't -- and even looking at the float metric, I wouldn't draw a conclusion based on the percentage alone. I would look at the market cap, the percentage and the dollar amount of float. And if the dollar amount of float is large, certainly large -- well, in this case let's use actual numbers.

One moment. If it's large -- let me first say the statement. If it's large, regardless of the percentage, that's an indication of market efficiency. Large float companies get more analysts and investor attention and news media attention and, therefore, are less likely to trade inefficiently. I'm not done yet I want to look for something. Page 69.

MS. HARRIS:   Why don't we take a break?

THE WITNESS: I do want to finish my answer.

A.    So paragraph 212 points out

Page 118

STEVEN P. FEINSTEIN

that the float for Jeld-Wen on average over the course of the class period was 46.9% of shares outstanding and we know that at the start of the class period it was a lower percentage than that, but paragraph 211 points out that this average float was still larger than the total market capitalization of at least 72% of all other publicly traded companies in the United States. And even at the outset of the class period, we have over $600 million in float, which is large compared to other companies in the United States.

So that's why I concluded that notwithstanding the less than 50% average float, this stock satisfies the float Krogman factor. And it certainly satisfies the float Cammer factor in S3 registration eligibility.

Q.    Would your opinion change if during a sub-period of the class period the float was below 30%?

A.    No, for reasons I've already

STEVEN P. FEINSTEIN explained. I would look at the total dollar amount. I mean, the percentage would beckon me and any analyst to look at the total dollar amount.  That's what it does.  It would be a signal that you got to look at the total dollar amount and determine if it's high or low, and I've done that.  And even at its lowest percentage, which is at the start of the class period, we still had over 661 -- we had $661.3 million of public float in this company, which is larger than most other publicly traded companies, their entire market cap in the United States. This is a big company, it's not -- a big company like this is not likely to trade inefficiently.

MS. HARRIS:  Okay. Let's take a break. Let's do five minutes and, Bob, you'll be happy to hear we'll be finishing up shortly after that.

MR. ROTHMAN:  I'm very happy to hear that. Thank you, Lindsey.

VIDEOGRAPHER:  We're going off

Page 120

STEVEN P. FEINSTEIN

the record. The time is 12:21
Eastern.

(Recess is taken.)

VIDEOGRAPHER:  We are back on
the record. The time is 12:28 p.m.
Eastern.

Q.    In your report you identify
two corrective disclosures, correct?

MR. ROTHMAN:  Objection.

A.    No. No. The complaint
identifies two corrective disclosures. I
examined those corrective disclosures,
those two alleged purported corrective
disclosures, but I also point out that
there might have been more, which
depending on what might come up as the
record in this case develops or discovery
continues, there may have been additional
corrective disclosures, but you're right.
So for my analysis I worked with two
corrective disclosures.

Q.    And you conclude that Judge
Payne's decision on October 6, 2018 was a
corrective disclosure, correct?

Page 121

STEVEN P. FEINSTEIN

A.    Partially corrective disclosures.

Q.    I'm going to refer to that decision as the divestiture decision. Does that make sense to you?

A.    You can label it as you wish. But there is more, it's quite a lengthy decision with a lot more detail but we'll label it as you wish.

Q.    Okay. So your opinion, you just said your opinion is that that the divestiture opinion partially corrected some of Jeld-Wen's misstatements and omissions?

A.    Yes.

Q.    Did the divestiture decisions fully correct any of Jeld-Wen's misstatements and omissions?

MR. ROTHMAN:    Objection.

A.    No. No. There was more information that later came out and more stock price movement elicited by further corrective disclosure.

Q.    Okay. You also conclude that

Page 122

STEVEN P. FEINSTEIN

Jeld-Wen's disclosure of its $76.5 loss contingency is related to the Steves litigation on October 15, 2018 was a corrective disclosure, correct?

MR. ROTHMAN:  Objection.

A.    We're going to the loss causation and damages analysis now, aren't we?

MR. ROTHMAN:  Counsel, our agreement was that this deposition was going to be limited to class certification issues, specifically efficiency of the market as well as the existence of a damage model.

MS. HARRIS:  These questions to go the damage model. This is within our agreement.

MR. ROTHMAN:  Well, our agreement was the existence of a damage model not the calculation of damages.

MS. HARRIS:  You said class certification issues and this goes to Comcast issues that we will be

Page 123

STEVEN P. FEINSTEIN

raising in opposition to your class certification motion.

MR. ROTHMAN:  You can ask him questions about the existence of a model and the applicability of a model but not the specifics of the output of that model. That's what Comcast requires, not a computation, it's just the existence of a model.

MS. HARRIS:  I haven't asked any questions about that.

Is there a question pending?

Q.    You also concluded that Jeld-Wen's disclosure of a $76 million loss contingency related to the Steves litigation on October 15, 2018 was a corrective disclosure, correct?

A.    Yes. That's in paragraph 290.

Q.    And I'm going to refer to that last contingency as the Steves litigation contingency. Do you understand that?

A.    Okay. The Judge referred to the event as a liability announcement.

**Page 124**

STEVEN P. FEINSTEIN

You can call it either one.

Q.   Is it okay if I refer to it as the Steves litigation contingency?

A.   Okay.

Q.   Is it your opinion that the Steves litigation contingency corrected some of Jeld-Wen's alleged misstatements and omissions?

MR. ROTHMAN:   Objection.

A.   I just don't see how that's about the existence of the damage model. The damage model is that I conduct -- I will or the model -- the damage model is that according to the allegations the alleged misrepresentations and omissions inflated the stock price and corrective disclosures dissipated the inflation.  So if investors bought when the price was artificially inflated, at too high a price because of the artificial inflation and sold after a corrective disclosure, they would have suffered a loss that was caused by the misrepresentations and omissions and that loss could be

Page 125

STEVEN P. FEINSTEIN quantified by looking at the change in the artificial inflation.

So that is the damage model that exists. That is the damage model that's consistent with Plaintiffs' allegations and theory of liability.

What specifically happened on the corrective disclosure dates, which corrective disclosure dates I identified. That's all about the execution of the damage model, not the existence.

I'll answer the questions if counsel on both sides want me to, but I really do think we're into the execution of the damage model now, not just my opinion about the existence of the damage model.

MR. ROTHMAN:  I think it's beyond the scope of our agreement.

MS. HARRIS:  It's not --

MR. ROTHMAN:  You will have an opportunity to ask Dr. Feinstein about the application of the damage model when you take his deposition

Page 126

                    STEVEN P. FEINSTEIN

          about damages, but he's already

          testified about the existence of

          the damage model and the parameters

          of the damage model.

               MS. HARRIS:   I am entitled to

          determine which misstatements his

          damages model purportedly qualifies

          the lawsuit from, so I'm just

          trying to set that up. I only have

          a few questions.  If you are going

          to direct him not the to answer

          please do that.  Otherwise, I would

          like to ask my questions.

               MR. ROTHMAN:  If you only have

          a few questions I'll give you some

          leeway on this now but I reserve my

          right to cut this off as being

          beyond the scope of our agreement.

          Q.    Which of Jeld-Wens' alleged

     misstatements and omissions were

     corrected by the Steves litigation

     contingency?

          A.    The allegations are -- the

     allegations are that misrepresentations

STEVEN P. FEINSTEIN

and omissions at the start of and throughout the class period misled the market about whether or not Jeld-Wen was engaged in unsustainable anticompetitive behavior, whether the reasons and forces driving their success with respect to profitability, profits, growth were derived from expertise and strategic and -- strategic and expert management or alternatively to unsustainable anticompetitive behavior, and that they explicitly made statements throughout the class period that they were -- that it was a competitive market environment and that they were doing nothing wrong, and that they expected -- well, that they were doing nothing wrong and, therefore, their business practices were sustainable and could be projected forward.

So taken holistically, the market learned in increments that that just wasn't the case. They learned some of that on October 5th with the Steves verdict. They got, you know, the

STEVEN P. FEINSTEIN

probability that they would assign, the market would assign to the realization that what was driving Jeld-Wen's success was unsustainable, was informed by what came out on October 5th, but much more confidence in understanding the truth behind the company's condition and how they were operating in the market came out on October 15 with the company's admission that they were reserving for a loss.

Q.    Do you model damages based on the divestiture decision?

MR. ROTHMAN:  Objection.

A.    On what?

Q.    Do you model damages based on the divestiture decision?

A.    Well, I considered the divestiture decision and I saw that -- and it's reasonable that it was -- it was adverse news and -- I mean, it was adverse news and it's an efficient market.

So it was reasonable that it

STEVEN P. FEINSTEIN

had a negative impact on the price which caused losses, but there was not a statistically significant drop in the stock price on October 5th or 8th, rather, 5th or 8th.  So to be conservative I don't incorporate into my calculation of damages, my quantification of damages any loss that was sustained because of inflation dissipation on those days.

So I considered it, I analyzed it and I did statistical work around it and to be conservative did not include the drops that occurred on that day or the day after the 15 day slide following that day.  I didn't include those drops except -- any of those drops that occurred before the October 15th announcement.

Q.   Okay. I'm going to mark this is Exhibit 3, October 15, 2018 press release.  4.

(Exhibit 4, October 15, 2018 press release was received and

Page 130

STEVEN P. FEINSTEIN
marked on this date for
identification.)

A.    Should I look for a new exhibit?

Q.    Yes. If you click in the middle it should be there.

A.    I need to enlarge it a bit. Okay. That works.

Q.    And if you see in the paragraph, "Jeld-Wen announces that quote while the company" -- let me help you find it.

So about halfway down the first page it says, "Additionally, the company expects third quarter results to include a charge of $76.5 for litigation contingency." Do you see that language?

A.    I do.

Q.    Is that -- that's the litigation contingency you focused on on October 15th, 2018?

MR. ROTHMAN:   Objection.

A.    Can I hear the question again?

Q.    Is this the second corrective

Page 131

STEVEN P. FEINSTEIN

disclosure that you focus on in your report?

MR. ROTHMAN:  Objection.

A.    The entire announcement -- it's not the only component of the corrective disclosure, it's an important component of corrective disclosure but it's not the only component.

Q.    Okay. And at the end of that paragraph I just referenced it says, "While the company continues to maintain that it has not violated any antitrust laws and intends to appeal any adverse judgment, recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the appeals process is unsuccessful." Do you see that language?

A.    I do.

Q.    Do you cite this language in your report?

MR. ROTHMAN:  Objection.

A.    I don't remember whether I excerpted it or not but I certainly

Page 132

STEVEN P. FEINSTEIN

considered it. This is important language for my analysis. I reference this document. I don't remember whether I excerpted from it or not but I can look.

Q.    If we look at page 44 paragraph 137 to 141 you discuss the Steves litigation contingency in the background section of your report.

Do you quote that language here?

MR. ROTHMAN:  Objection.

A.    I quote some language from the press release in paragraph 139.

Q.    Right. Do you quote the language that "the company continues to maintain it has in the violated any antitrust laws"?

MR. ROTHMAN:  Objection.

(Deponent reviews the document.)

A.    On page 100, just paragraph 291, I quote from that paragraph that, "The charge reflects a judgment anticipated to be entered against the

Page 133

STEVEN P. FEINSTEIN

company.  Recent rulings --

Q.    Do you --

A.    I also quote, "Recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the -- if the appeal process is unsuccessful." And there in multiple places in the report I cite to that press release, but --

Q.    Do you cite the language, "The company continues to maintain that it has not violated any antitrust laws"?

A.    I don't.  I think the answer is no.

Q.    Okay. So did you consider that language when you prepared your report?

A.    Absolutely. What's going on here is the company -- previously on October 6th the company vehemently denied that there was any merit to the Steves lawsuit and anticipated there would be no negative repercussions from it and that they would essentially have it overturned on appeal. And then so that that's --

Page 134

STEVEN P. FEINSTEIN

well, it's alleged to be a misrepresentation and contain omissions, but it was, you know, a very forceful statement, you know, company talking out of one side of its mouth.

Now what you have on October 15th is the company on the one hand saying we still maintain we didn't do anything wrong but there could be negative repercussions, which it's like a mixed message now. So the message went from being a straightforward denial to now being a mixed message that there would be repercussions.

Q.   Well, it says "it has not violated any antitrust laws and intends to appeal any adverse judgment." Correct?

A.   It does say that.

MS. HARRIS:   Okay.   That's all I have.

MR. ROTHMAN:   Okay. Thank you.

VIDEOGRAPHER:   Will there be a redirect or shall we go off the record?

Page 135

STEVEN P. FEINSTEIN

MR. ROTHMAN:  No redirect, no cross.

VIDEOGRAPHER:  We are off the record at 12:47 p.m., and this concludes today's testimony given by Steven P. Feinstein.

The total number of Media Units used was three and will be retained by Veritext Legal Solutions.

(The proceedings were adjourned at 12:47 p.m.)

**Page 136**

C E R T I F I C A T E

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, STEVEN P. FEINSTEIN was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

MAUREEN M. RATTO, RPR

License No. 817125

Page 137

I N D E X

WITNESS:   STEVEN P. FEINSTEIN        9

DIRECT EXAMINATION BY MS. HARRIS 9


E X H I B I T S

Exhibit 1, Expert Report of        11

Professor Steven P. Feinstein,

dated January 4, 2021

Exhibit 2, Seeking Alpha article 83

dated January 31, 2017,

Exhibit 3, FactSet forecast data 94

re: Jeld-Wen,

Exhibit 4, October 15, 2018        129

press release

Page 138

J U R A T

I do hereby certify that I have read the foregoing transcript of my deposition.

_____
STEVEN P. FEINSTEIN

Sworn and subscribed before me
this _____ day of _____, 2021

_____
a Notary Public of the State of _____

Page 139

ERRATA SHEET

I WISH TO MAKE THE FOLLOWING CHANGES:

Page     Line         From              To

**[& - 859-8000]**

Page 1

| & |
|---|
| **&** 3:7,19 4:7 7:23 8:10 |

| 0 |
|---|
| **00112** 1:9 6:23 |

| 1 |
|---|

**1** 6:16 11:7,20 76:21 137:6
**1.33-01/23/2017** 96:4
**10** 112:10 114:8 115:19,24 116:2
**100** 35:12 77:14 114:11 132:22
**10004** 3:22
**10022** 4:9
**10:00** 1:17
**11** 137:6
**11:18** 68:23
**120** 78:4
**129** 137:13
**12:28** 120:6
**12:47** 135:5,13
**13** 65:13 72:19 110:3
**13.5** 110:24
**136** 13:7
**137** 132:7
**139** 132:14
**13f** 90:16 101:17
**14** 66:8
**141** 132:7
**15** 122:4 123:18 128:10 129:16,22 129:24 137:13
**151** 61:10
**158** 34:3
**15th** 129:19 130:22 134:8

**16** 77:20
**17425** 136:23
**175** 63:24 109:12
**176** 72:16 73:7,24 76:7 77:4 87:20 88:13
**177** 73:19 74:10 76:8 77:5 87:21 88:13
**18** 20:12,18 45:25
**18,000** 84:18 85:5
**182** 82:14 84:2 89:22 90:25 96:10
**184** 77:8

| 2 |
|---|

**2** 13:6 83:17,20 137:9
**20** 14:3 51:16
**2000** 113:22 114:10
**2017** 46:24 47:3,8 62:25 64:10,14,22 80:2 83:19,21 95:17,21,24 109:25 137:10
**2018** 120:24 122:4 123:18 129:22,24 130:22 137:13
**2021** 1:16 6:4 11:22 12:4,12 137:8 138:11
**211** 118:7
**212** 3:23 4:10 117:25
**21st** 111:20
**22** 27:20 29:6
**22nd** 62:25 107:15 107:17,18 108:6,9
**23** 30:4 64:23 66:11,15 109:17

**231-1058** 3:10
**23219-3916** 4:20
**23rd** 95:17
**25** 14:23 52:21 107:4,7,16 108:7 110:15,18,20 111:4,5,11 112:6,7
**26** 46:24 47:3,8 64:13,22 66:13
**26.12** 65:10,12 109:21
**27** 20:18 64:10 65:4,8 109:17,21 109:24
**27th** 65:11
**290** 123:20
**291** 132:23

| 3 |
|---|

**3** 94:19,21 100:11 129:22 137:11
**3.12** 109:24
**30** 1:16 32:15 112:9 116:22 118:24
**300** 82:2 101:15
**30th** 6:4
**31** 20:13 83:21 137:10
**31st** 80:2 83:19 95:21,24
**376** 77:11,14,22
**3:20** 1:9 6:23

| 4 |
|---|

**4** 11:22 20:9 45:25 129:23,24 137:8 137:13
**44** 132:6
**446-4800** 4:10
**46.9** 118:4

**4th** 12:4,11,12

| 5 |
|---|

**5** 114:8 115:18,24 116:2
**50** 116:15 118:17
**53** 33:22,24
**5th** 127:24 128:6 129:5,6

| 6 |
|---|

**6** 120:24
**60** 72:17
**600** 49:25 51:9 82:4 116:16 118:13
**601** 4:8
**619** 3:10
**655** 3:8
**661** 119:11
**661.3** 119:12
**69** 117:20
**6a** 33:21
**6th** 133:20

| 7 |
|---|

**72** 118:10
**76** 123:16
**76.5** 29:7 30:5 122:2 130:17
**775-1000** 4:21

| 8 |
|---|

**8** 63:23 106:6,12 106:13,15 108:12 109:2,6,6,13
**800** 4:19
**804** 4:21
**817125** 2:10 136:25
**83** 137:9
**859-8000** 3:23

**8th**  129:5,6

**9**

**9**  137:2,3
**90**  110:23
**92101**  3:9
**94**  137:11

**a**

**a.m.**  1:17 6:3
  68:20,23
**abbreviation**  48:9
**able**  26:5 39:2
  55:21 67:21
  101:21
**absolute**  114:23
**absolutely**  67:14
  133:18
**absurdum**  71:21
**academic**  41:22
**acceptance**  103:5
**access**  67:23 69:20
  75:10 91:15,22
  92:2,2 93:14
  97:25 98:3,9,10
**accesses**  70:4
**accountant**  16:16
  17:8,12,15,16,19
  32:12,16
**accountants**  17:18
**accounting**  16:7
  16:11,12,14,15,18
  16:21,25 17:6,24
  18:4,6,7 31:9,21
  31:23,25 32:2,6,17
  32:21
**accurate**  9:17
  13:12,16,18 14:7
  136:10
**acquired**  76:20
**action**  1:8 7:9 15:6
  136:18,21

**activity**  87:12
**actual**  78:14
  117:10
**ad**  71:21
**add**  14:21,21
  26:21 30:18 63:7
  66:20 77:3
**addition**  79:8
**additional**  20:2
  39:13 43:15 62:11
  74:11 80:7 83:4
  94:11 120:19
**additionally**
  130:15
**address**  99:19
**addressed**  34:11
**adjourned**  135:13
**adjunct**  13:20
**adjustment**  36:22
**administer**  7:7
**admission**  128:11
**advanced**  44:20
**adverse**  128:22,23
  131:14 134:18
**affect**  35:6 46:17
**affiliations**  7:14
**affirmative**  56:14
**ago**  12:13 14:3
  44:17
**agree**  6:15 34:18
  36:5 74:3,21
  81:16 86:11
**agreed**  56:24
**agreement**  8:14
  122:11,18,20
  125:20 126:19
**allegations**  25:4,5
  25:8,9,22 27:9
  28:2,9,12 30:6
  124:15 125:7
  126:24,25

**alleged**  28:17
  66:22 86:23
  120:14 124:8,16
  126:20 134:2
**allegedly**  28:6
**allowed**  73:15
**allows**  73:12
**alpha**  69:21 76:6,9
  76:12 79:10,20,25
  80:3,8,17,20 81:10
  82:21 83:8,14,17
  83:20,25 84:18
  85:5 94:13 137:9
**alternatively**
  57:18 112:25
  127:11
**american**  115:10
**amount**  43:25
  49:23 106:17
  113:24 116:12
  117:7,8 119:3,5,7
**analyses**  18:9
  21:17 49:18
**analysis**  12:13
  15:16 22:23 37:20
  53:15 62:11 76:10
  77:9,19,23 86:7
  100:6 120:21
  122:8 132:3
**analyst**  14:19
  15:10 16:10,24
  17:2,5 22:24 23:9
  29:11,13,19 31:20
  50:8,9,10,11 52:15
  53:11,13 59:9,19
  59:21,23 60:3,8
  66:6 67:8 68:25
  69:4,16 70:10,15
  70:19 71:7,9,14,15
  71:19 72:2,8
  73:12,25 74:4,7,7

  74:11,22 77:18
  78:7,23 79:14,15
  80:23 81:7,17
  82:11,12,15 84:23
  86:6,10 88:4
  92:23 94:10,15,17
  95:16 96:13,14,17
  96:21,25 97:10
  119:4
**analyst's**  93:2
**analysts**  15:13,20
  18:6 31:23 50:12
  53:8,9 60:13 66:5
  66:7,7 67:23 69:8
  69:10 72:5,19,24
  74:8 77:5,7,17,21
  78:11 88:22,22
  92:17 112:25
  113:4 117:16
**analyze**  37:2,10
  56:5 60:19 106:13
**analyzed**  101:8
  129:12
**analyzes**  71:9
**analyzing**  37:3
  60:14
**announced**  35:16
**announcement**
  29:6,24 30:16
  37:24 62:24 63:10
  64:7 106:20
  107:19 108:22,23
  123:25 129:20
  131:5
**announcements**
  62:23 63:5,6
  106:2,7,10,11,23
  108:12,13,18,20
  109:5
**announces**  130:11

**annual** 107:19
**answer** 13:4 14:22
17:10 25:17 35:24
35:25 38:20 39:20
44:20 61:8 63:3
67:16,20,21 70:25
75:21 81:8 100:5
107:10 109:8
117:24 125:13
126:12 133:14
**answered** 17:9
87:25
**answers** 9:18
**anticipate** 65:23
**anticipated** 48:25
132:25 133:22
**anticompetitive**
26:12,16 27:6,11
28:25 30:6 127:5
127:12
**antitrust** 18:10,14
18:16,19 27:23,24
131:13 132:18
133:13 134:17
**anybody** 98:9
104:13
**anymore** 54:22
102:17
**apparently** 66:4
**appeal** 131:14
133:7,25 134:18
**appeals** 131:18
**appear** 84:5
**appearance** 7:18
**appearances** 7:14
**appears** 110:21
**applicability**
123:6
**application** 125:24
**applied** 58:22

**apply** 63:12 107:3
**appreciate** 86:17
86:18
**appropriate** 18:4
59:14 108:9
**approximately**
65:16
**arbitragers**
100:16
**area** 14:14 70:9
**areas** 20:5
**arguing** 101:2
102:22
**argument** 54:17
55:25 62:9 100:22
**arrive** 45:8
**arrives** 37:4,12
**article** 69:10 80:17
83:21 85:16,19
137:9
**articles** 23:9 29:20
33:18 80:3,8
**artificial** 124:21
125:3
**artificially** 124:20
**aside** 11:17 29:13
**asked** 13:21 21:15
30:19 75:22,23
79:2 88:3 111:25
123:12
**assign** 128:2,3
**assist** 22:18 24:2
**assistance** 22:16
24:13
**associated** 36:3
**assume** 24:24 25:3
25:10 26:4,5
**assumed** 27:4,8
**assumption** 26:13
26:14,17 29:9
30:10

**assumptions** 24:20
24:24 25:12,21
26:10 45:12
**asterisk** 110:10
**atlanta** 13:20
**attended** 10:21
**attending** 7:12
**attention** 34:15
51:4 78:3 113:3
114:19 115:14
117:16,17
**attorney** 7:20
136:17,20
**attorneys** 78:17,18
78:21 79:6
**audio** 6:12,13
**author** 84:14
85:22
**authorized** 7:6
**availability** 69:25
**available** 8:16
34:6,8 38:12
47:12,17 49:10
51:5,22 54:15
57:17 58:2 64:16
66:12 68:4,5
69:21 78:20 82:7
88:2,6,7 93:20
103:23 114:17
**avenue** 4:8
**average** 60:19
61:15 82:3 89:3,5
118:2,8,17
**averages** 61:4,19
**averaging** 89:4
**aware** 35:5,10,11
35:18 58:4,9,12
99:7

**b**

**b** 137:5
**babson** 15:11,12
15:18
**back** 67:17 68:22
84:8 87:20 107:8
120:5
**background** 71:23
75:10 99:22 132:9
**bank** 13:19
**bank's** 98:3
**banks** 71:12
**barber** 69:9
**base** 24:21
**based** 15:7 30:25
87:12 91:8 112:2
117:2,5 128:13,17
**bases** 12:19 29:17
30:19
**basis** 29:12 31:14
**bathroom** 104:20
**beck** 4:4
**beckon** 119:4
**beginning** 7:19
95:17
**begins** 46:23
**behalf** 8:10
**behavior** 27:11
28:25 30:6,8,24
127:6,12
**beings** 37:18,19
**believe** 15:2 27:2
28:9 42:12 69:22
80:5 81:25 82:6
101:12 102:6
111:19 115:4
**believes** 31:10
**benefits** 68:6
**berra** 54:21
**bettencourt** 5:5
23:25

[better - cite]                                                                        Page 4

**better** 36:12 56:4
69:20,25 106:9
**beyond** 9:5 125:20
126:19
**big** 51:4,8 112:19
113:2 115:13
119:16,16
**bigger** 51:15
**biggest** 51:17
**billion** 82:4
**bit** 130:8
**black** 69:19 70:2
**blog** 76:13,16
85:11
**bloomberg** 89:13
**bob** 119:21
**bond** 42:21
**bonds** 42:16,17,20
**borrowing** 54:16
**bought** 66:14
124:19
**bound** 115:20
**bpumphrey** 4:23
**breach** 28:17 29:2
**break** 67:12 68:11
104:12,13,16,20
117:22 119:20
**brian** 4:22 8:1
**brief** 11:12
**bring** 101:19,22
**broadway** 3:8
**brokerage** 15:22
16:2,5
**brooks** 4:4
**brought** 27:17
**bush** 82:22 83:11
94:15
**business** 14:6 87:4
91:11 127:19
**buy** 47:14 55:17
55:17,22 71:13

77:5,9,16,17,24
78:22,23

**c**

**c** 3:1 4:1 5:1 136:1
136:1
**calculate** 61:14
**calculating** 112:15
**calculation** 122:21
129:8
**calculations** 21:21
22:2,3,4,6,7,9
25:11
**calendar** 111:7,8,8
111:18
**california** 3:9
**call** 19:16 71:25
103:20 124:2
**called** 39:23 61:2
79:17 80:11 86:20
**calls** 103:13
**cammer** 39:10,14
39:22,25 40:6
49:7,21 50:24
67:8 83:7 100:2
112:2 118:20
**canaccord** 82:24
83:11
**canal** 4:19
**candidates** 63:21
**cap** 41:15,20,23
51:14 82:4 114:6
114:14,25 115:9
116:3,6,11 117:6
119:15
**capital** 93:22
**capitalization**
41:16 118:9
**caps** 115:12
**career** 32:16
**case** 6:23 8:17
11:14 12:16,19,25

15:6 17:24 18:16
18:19 19:21 20:15
22:21 23:25 30:12
32:13,14,19 34:12
42:13,15 43:9,16
52:25 53:14 54:7
57:13,16 58:22
59:3 61:3 62:16
63:14 80:6 91:12
92:5 101:14,25
102:3,5,10 103:5
109:11 112:11
116:13 117:9
120:18 127:23
131:15 133:5
**cases** 14:25 23:22
33:17 39:18 43:10
43:25 44:9 58:23
60:16 92:5 99:10
101:7
**cash** 57:2 98:25
**causation** 12:15
122:8
**cause** 93:2 105:16
**caused** 65:17
124:24 129:3
**caution** 86:19
**ccr** 1:24
**cell** 95:14
**cellphones** 6:10
**cellular** 6:8
**certain** 22:25,25
23:5,17 31:10
35:12 36:4 52:15
53:8,10 57:6,6,7
81:17 91:4 98:24
**certainly** 23:7
117:9 118:19
131:25
**certification** 8:19
8:23 122:13,24

123:3
**certified** 2:7 17:7
17:14,20
**certify** 136:4,9,15
138:3
**chance** 56:3
**change** 25:23,25
26:18 33:5 118:22
125:2
**changed** 44:22
81:4 112:8
**changes** 21:7
24:16 91:5 139:1
**changing** 108:3
**chapter** 32:24
**characteristics**
75:25 76:3,4
112:3
**characterize** 20:6
115:13
**charge** 29:7 30:5
31:10 130:17
132:24
**charges** 27:23,24
27:25
**chartered** 16:24
17:2,5,11 31:20
**check** 72:25
107:11
**checked** 107:11
**checking** 85:17
**chicago** 102:12
**choose** 55:20
65:21 66:10 109:5
**choosing** 55:17,17
55:22 57:25 71:3
**circumstances**
35:23 53:24 54:6
**cite** 131:21 133:9
133:11

**[civil - consider]**                                                      Page 5

| | | | |
|---|---|---|---|
| civil  1:8 | columns  67:3 | company's  128:8 | conclude  49:15 |
| claims  28:5 | com  113:22 | 128:10 | 59:2,2 120:23 |
| clarification  33:12 | 115:18 | compare  115:8 | 121:25 |
| 35:9 70:18 | comcast  122:25 | compared  61:6 | concluded  42:9 |
| clarify  21:25 | 123:9 | 88:5 115:11 | 47:19 83:6 118:16 |
| 46:14 | come  54:13 67:17 | 118:14 | 123:15 |
| class  3:6 8:13,19 | 120:17 | compelling  54:17 | concludes  135:6 |
| 8:23 15:6 38:8,9 | comes  23:14 | 54:19 | conclusion  29:10 |
| 46:6,15,21,23 | coming  44:25 74:8 | compensated | 29:13 30:11 33:8 |
| 49:17 53:6,13 | 87:16 113:23 | 66:17 | 40:19 42:21 45:8 |
| 56:6 57:22 59:6 | commencement | competitive | 59:13 66:21 82:20 |
| 59:16,20,21 60:4 | 136:5 | 127:15 | 83:5 92:18 116:25 |
| 61:6,21 62:4,10 | commentary | compiling  23:8 | 117:4 |
| 63:13 64:5,13 | 29:19 68:25 69:4 | complaint  25:7,14 | conclusions  12:14 |
| 72:21 77:11 92:20 | commented  66:7 | 28:3,16,21 120:11 | 30:21 42:19 |
| 95:2 103:18 118:3 | commenting  60:13 | complete  9:17 | concurred  30:21 |
| 118:5,12,23 | common  23:17 | 12:17 13:12,16,22 | condition  128:8 |
| 119:11 122:12,23 | 46:4,9 | 13:23 14:6 20:13 | conduct  26:12,16 |
| 123:2 127:3,14 | communication | 20:18 37:20 | 27:6,16,17 103:12 |
| clear  16:9 20:17 | 75:6 | complex  37:11 | 124:13 |
| 24:8,9 29:23 | companies  51:17 | complicated  37:23 | conducting  15:15 |
| 102:21 | 77:13 98:23,25 | component  41:15 | conference  103:20 |
| clearly  50:18 | 99:3,12,13 113:23 | 131:6,8,9 | confidence  36:13 |
| 71:20 | 115:12,18 116:18 | comprehensive | 110:23 128:7 |
| click  84:4 130:6 | 117:15 118:11,14 | 90:9 | confined  80:25 |
| client  79:3,5,18 | 119:14 | computation | confirm  99:19 |
| clients  39:6 77:14 | company  27:21 | 123:10 | 106:19 |
| close  65:11 | 28:19 31:10 42:20 | computed  27:3 | connected  97:20 |
| closed  65:12 | 48:2,21 50:15,25 | coms  114:9 | consensus  88:11 |
| closely  48:4 85:10 | 51:4,8,15 60:14,14 | conaccord  94:14 | 88:14,19 89:9,14 |
| closing  64:20,21 | 60:15 66:16 67:24 | conceal  26:25 | 89:16,19,23 90:2 |
| 109:16,20 | 68:3 75:7 77:19 | concept  32:20 | 90:23 91:15,23 |
| cohen  5:3 7:1 | 78:12 86:21 87:19 | 48:14 57:9 | 92:7,9 93:3,19,23 |
| collective  105:2,4 | 103:16 112:19,24 | conceptually | 94:6,16 96:8,14 |
| 105:20 107:18 | 113:2 114:4 | 61:18 | 97:13,21 |
| college  15:11,12 | 115:13 116:4,4 | concerning  8:19 | conservative |
| 15:15,18 85:8 | 119:13,16,17 | 8:25 | 129:7,14 |
| column  64:9,19 | 130:12,16 131:12 | concerns  28:5 | consider  14:10,13 |
| 95:21,24 96:12 | 131:17 132:16 | concierge  5:4 | 16:6 22:12 40:15 |
| 109:16,20 110:8 | 133:2,6,12,19,20 | 84:10 | 41:5,8,9,12 42:5 |
| | 134:5,8 | | 73:17,24 74:12 |

[consider - damages]                                                        Page 6

80:20 87:18
116:21 133:16
**considerable**
60:23
**consideration**
59:12,22
**considered** 39:16
41:21 53:2 58:21
76:24 95:13
100:11 115:22
128:19 129:12
132:2
**considering** 57:20
58:24
**consistent** 67:6
95:12 125:6
**consolidating**
30:14
**constrained** 100:5
**constraint** 54:18
54:24 55:5
**constraints** 53:21
54:2,3 55:8
**consult** 32:12
**consulting** 16:2
**consumer** 16:13
**consumers** 31:23
**contain** 12:17
62:19 134:3
**contained** 21:13
21:18,21
**contains** 76:22
89:18
**contents** 33:19
**context** 39:5
**contexts** 74:19
**contingencies**
32:17,18
**contingency** 31:3
31:7,16 32:22
33:4 122:3 123:17

123:22,23 124:4,7
126:23 130:18,21
132:8
**continue** 6:14
80:19
**continued** 4:1 5:1
96:19
**continues** 120:19
131:12 132:16
133:12
**continuing** 104:24
**contract** 28:18
29:2
**contracts** 91:7,22
**contrary** 40:21
86:8
**conversations** 6:8
11:13
**copy** 94:25 97:22
**corporation** 3:18
103:5
**correct** 17:25
20:20 21:2 22:8
25:2,5 38:3 39:11
46:6,24 47:4
53:19,20 64:3,10
64:23 65:3,6,10
72:21 76:25 82:18
82:22 85:13,24
87:4 95:18 96:4
99:20 106:3,21
110:2,10,15
111:14,19,22
120:9,25 121:18
122:5 123:19
134:18
**corrected** 22:5
121:13 124:7
126:22
**corrections** 22:8

**corrective** 120:9
120:12,13,14,20
120:22,25 121:2
121:24 122:5
123:19 124:17,22
125:9,10 130:25
131:7,8
**correctly** 96:5
**cost** 31:10 78:15
91:6,8
**counsel** 3:3,18 4:3
7:11 10:14,17,21
21:16 22:11 24:2
24:14,15,19 79:7
79:22 81:13
122:10 125:14
136:17,20
**country** 51:17
**couple** 11:12
39:12 88:21
**course** 13:2 14:23
15:19 18:8 30:12
31:19 38:7 46:5
50:23 77:11 104:7
118:3
**courses** 14:2 17:4
**court** 1:1 2:7 6:21
7:3 38:20 39:16
58:20,21 102:11
**courts** 40:2 41:24
45:18 58:4,9
**cover** 96:19
**coverage** 50:9,9,10
50:11 53:11,13
59:10,19,21,24
60:3,8 66:6 67:9
69:16 70:10 74:7
74:8 79:15,16
80:12,23 81:7
82:16,24 83:11
86:7 91:8 92:19

92:21 94:17 96:25
**covered** 79:9,16
89:11 91:21
**covering** 68:3
71:16 73:22 78:12
82:11,12,25 96:13
96:17
**cpa** 16:15
**creating** 83:14
**credential** 16:21
**criteria** 83:13
**criticism** 93:17
**critique** 56:3
**critiques** 44:24
**cross** 135:3
**crowded** 54:23
102:18
**crowninshield** 5:5
**curb** 27:14
**curran** 5:4
**curriculum** 16:25
**customary** 52:21
107:5 111:6,20
112:6
**cut** 126:18
**cutoff** 107:10
**cv** 1:9 6:23 13:9,21

**d**

**d** 137:1
**daily** 60:19
**damage** 9:3 15:3,7
19:13 22:2 122:15
122:17,21 124:12
124:13,14 125:4,5
125:12,16,17,24
126:4,5
**damages** 12:15
24:25 25:3 26:8
26:24 27:3 122:8
122:22 126:2,8
128:13,17 129:8,9

**daniel** 5:5 23:25
**data** 23:8 42:17
 51:12 73:11 90:5
 90:12,18 91:6,7,10
 91:20,21 93:9,14
 94:20,22 95:2,4,8
 101:17 103:19,19
 103:22 137:11
**database** 90:9,20
 95:3
**date** 11:23 49:14
 51:6 64:9,9 65:5
 80:4,8 83:23
 94:23 130:2
 136:13
**dated** 11:22 83:18
 83:21 137:8,10
**dates** 125:9,10
**davis** 4:15 7:22
**day** 25:20 46:21
 47:11,18,20 49:16
 49:23 52:21 61:23
 62:4 64:5,13,16,20
 65:4 67:5 102:24
 107:4,23 108:9,14
 109:17 110:15,18
 111:5,11,13,14,22
 129:15,16,16,17
 138:11
**days** 52:18 53:3
 61:13,15,25 62:2
 63:2,10,13,15,19
 63:20,21 64:7
 105:14,15,23,24
 106:2,3,8,12,21
 107:16,25 108:7,8
 108:14,22,23,24
 109:3 110:20,22
 111:4,4,7,7,8,12
 111:18,18 112:7,7
 112:10 129:11

**deal** 54:9
**dealing** 12:13
**debra** 3:13 10:22
**debraw** 3:14
**decide** 62:12 101:3
 102:8
**decile** 116:19,20
**decision** 91:11,11
 92:5 120:24 121:5
 121:5,9 128:14,18
 128:20
**decisionmaking**
 47:16 77:24
**decisions** 47:13
 121:17
**declare** 31:12
**dedicated** 77:17
**deemed** 40:3
**deeper** 40:22
 70:13
**deeply** 70:8
**defendant** 3:18
**defendants** 4:3
 7:24,25 8:3,4,7
 44:25 45:2,2
**defense** 45:19
**define** 34:21 40:8
 48:17 71:6 74:17
 74:18 107:2
 110:19 111:25
**defined** 33:22 34:3
**defines** 60:7
**defining** 74:15
 75:12 106:24
**definition** 46:12
 49:5,6,24 51:23,24
 75:20,24 76:2
 108:4
**degree** 16:18
 18:23 31:20 34:10
 47:18 69:18 70:2

 85:8
**degrees** 13:13
**delivering** 29:3
**delve** 11:25
**demonstrate**
 93:22 105:3
**demonstration**
 105:15,19
**denial** 134:13
**denied** 133:20
**denying** 27:22
**depending** 12:23
 120:17
**depends** 34:21
 35:2,22 36:2,20
 40:7 53:25 54:5
 55:3,4 56:20
**deponent** 107:13
 132:20
**deposed** 9:20
**deposition** 1:13
 2:3 6:12,17,24
 8:17,22 10:6,19
 11:10,16 122:11
 125:25 138:4
**derived** 127:9
**described** 31:22
**description** 87:3,4
**designation** 17:3
 32:10
**detail** 121:9
 131:16 133:6
**determination**
 39:18
**determine** 39:10
 119:8 126:7
**determining** 41:7
 67:9
**develop** 56:2
**developed** 63:17

**develops** 120:18
**diego** 3:9
**difference** 66:19
 92:15,25 105:22
**different** 45:3,11
 53:5 61:15,18,19
 62:17,18 74:19,19
 78:8 92:11 114:22
**difficult** 54:13
**dig** 40:22
**digest** 68:3,8 69:11
**digested** 87:17
**digesting** 57:19
 60:15
**direct** 9:13 22:24
 116:11 126:12
 137:3
**direction** 23:11
 40:17,19
**dirth** 61:12
**disagreement**
 45:15,22
**disagreements**
 45:16
**disclosed** 36:6
**disclosure** 120:25
 121:24 122:2,5
 123:16,19 124:22
 125:9,10 131:2,7,8
**disclosures** 32:23
 120:9,12,13,15,20
 120:22 121:3
 124:18
**discount** 65:22
**discounted** 57:2
**discovered** 27:12
 78:15
**discovery** 120:18
**discuss** 132:7
**discussed** 34:4

**[dismiss - entire]**                                                  Page 8

dismiss  10:11,11
dispositive  40:4,6
  40:8
disseminate  68:4
disseminated
  69:16
disseminating
  72:14
dissipated  57:5
  124:18
dissipation  129:10
distinction  112:4
distributed  93:24
distribution  94:6
district  1:1,2 6:21
  6:22
divestiture  121:5
  121:13,17 128:14
  128:18,20
division  1:3 6:23
docs  83:2
doctorate  31:18
document  12:9
  107:14 132:4,21
documentation
  52:22
documents  10:13
  10:24,25 11:3,6
  23:8 51:10 76:23
dog  98:13
doing  14:24 22:2
  77:18 78:16
  127:16,18
dollar  114:5
  116:12 117:7,8
  119:3,5,7
dollars  51:9 82:4
  116:16
door  28:6
doors  85:12

dot  113:22 114:9
  115:18
dowd  3:7 8:10
download  73:12
  73:15 78:10
downloaded  88:8
downloading  23:7
dr  8:15,23 84:12
  125:23
draft  23:23
draw  42:21 63:8
  78:3 116:25 117:4
drawing  19:18
  59:12
draws  51:4
drew  33:7
driving  94:7,8
  127:7 128:4
drop  129:4
drops  129:15,17
  129:18
drugs  99:5
duly  9:10
dynamics  105:22

**e**

e  3:1,1 4:1,1,22 5:1
  5:1 8:1 9:9,9,9,9
  89:16 96:12 136:1
  136:1 137:1,5
earlier  31:22 81:2
  81:8 99:18 106:18
early  55:8 81:5
  92:19
earning  106:2
earnings  62:23,24
  63:5,5,10 64:6
  88:24,25 98:15
  99:2,8,9,10 103:13
  106:7,9,11,20,22
  107:19 108:12,17
  108:20,21,23

109:5
easiest  37:9
east  4:19
eastern  1:2 6:3,21
  68:20,24 120:3,7
easy  36:25 37:2
economics  14:11
  14:17 19:9,17,18
  20:4,7 31:18
edit  23:23
education  13:11
  18:14 31:19 32:8
  75:9
effect  34:24,24
  55:18 71:4 105:16
effective  78:16
effects  57:4
efficiency  9:2
  12:15 34:10 38:2
  39:11,17 40:20
  41:7,12 43:2,7,13
  43:14,20 47:19
  51:25 57:10,11,15
  67:6 70:12,21
  71:5 90:24 99:22
  99:25 100:8 101:3
  101:9,12 102:24
  105:3,20 112:16
  115:4 116:23
  117:15 122:14
efficient  29:23
  33:14,21 34:3,12
  34:20 36:8,18
  37:19 38:7,25,25
  39:3,7 42:10 46:5
  46:9,12,20 47:7
  49:4,16 52:4
  56:10,17,21,22,23
  58:10 67:10 68:9
  69:14 100:23,25
  102:15 115:16

128:23
efficiently  41:4
eight  63:15
eikon  78:10,12,20
  79:5,19 88:8,9
  90:4,8,10,19,23
  91:16 92:9,14,16
  92:21 93:4,7,21
either  21:15 28:20
  39:6 57:25 77:17
  116:10 124:2
elicited  121:23
elicits  96:16
eligibility  51:7
  118:21
eligible  51:2
eliminate  104:16
ellis  4:7 7:23
empirical  41:20
  41:22 42:10,18,22
  44:13 45:5,5,9,17
  63:8,22 69:7,12
employee  136:16
  136:19
endowment  15:15
engage  26:15
  27:10,18
engaged  26:11
  27:5 28:24 38:22
  127:5
engagements  16:2
english  71:9
enjoyed  82:15
enlarge  130:8
enormous  114:5
entered  132:25
entire  49:24 61:6
  61:21 103:17
  115:9 119:15
  131:5

[entitled - far]                                                                    Page 9

entitled   126:6
entries   82:21
entry   79:25
environment
  127:15
eps   98:14,15,16,20
equals   56:24
equilibrium   56:23
  65:24 66:23
equity   79:11
era   113:22
errata   139:1
error   22:4,5
esq   3:11,13,15,24
  4:11,13,15,22
essentially   27:13
  55:18,21 133:24
established   15:2
  29:22 58:11
estimate   88:11,15
  89:20 93:3,19,23
  94:7 95:16,20,23
  96:3,9,15 97:4,13
  97:17,21 98:10
  131:17 133:6
estimates   88:20
  89:9,14,16,23 90:2
  90:24 91:15,24
  92:7,10 94:16
  98:8
evaluate   91:6
evaluated   99:3
evaluating   71:16
event   34:19 35:20
  42:24 43:6,11,21
  44:2,6 45:6 62:19
  62:22 63:4 64:2,4
  105:2,4,21,25
  107:18 108:18
  123:25

events   44:8 62:20
  108:25 110:9,14
everybody   69:21
  70:4
evidence   30:12,14
  37:13 40:21 42:10
  43:12 44:13 62:13
  62:14 67:2 75:5
  94:9,12,12,13,14
  94:16
exactly   23:4 33:20
  95:4,10
examination   9:13
  136:5 137:3
examined   95:12
  120:13
examiner   17:21
example   19:15
  26:9 42:2 99:3
examples   105:11
excel   95:4
excerpted   131:25
  132:5
exchange   64:18
exchanges   115:10
exclusive   76:4
execution   78:14
  125:11,15
exhibit   11:7,20
  13:6 63:23 78:7
  83:3,17,20 94:19
  94:21 109:13
  129:22,24 130:5
  137:6,9,11,13
exhibits   84:5,8,11
existed   114:4
existence   9:3
  122:15,20 123:5
  123:11 124:12
  125:12,17 126:3

exists   98:4 125:5
expanded   81:3
expect   35:19 36:17
  87:11 88:24,25
  89:2 90:10 113:7
expected   34:18,22
  34:23 35:3 127:17
expects   130:16
experience   13:17
  14:6,8 15:7 75:3
  75:17 100:19
experimentation
  63:16
expert   11:20 12:4
  14:11,14 15:5,5
  16:7,9,13,14 18:11
  18:17,18 25:2
  38:16,18,21 55:25
  62:8 127:10 137:6
expertise   15:2
  16:10 18:13 19:19
  32:6,7 67:25 68:7
  127:9
experts   45:2,19
explain   44:18
  103:7
explained   115:7
  119:2
explains   95:4
explanation   40:22
  40:24,25 44:4
  104:8
explanations
  103:24
explicit   29:18
explicitly   24:23
  46:13 127:13
exported   95:5
expressed   86:8,12
expressing   30:15

extensive   28:10
extent   43:23 47:10
  75:4 104:5
extremely   51:20
  99:13
eyes   85:23

f

f   9:9 136:1
fact   26:15 41:3
  58:18 67:5
factor   40:9 41:17
  44:14 45:5,17,17
  50:24 67:8 71:4
  83:7 100:11
  118:19,20
factors   39:10,15
  39:16,23,25 40:4,6
  40:10,11,17,18,23
  41:6 44:3 45:21
  49:7,21 51:18,19
  67:13 100:2
facts   35:23 54:6
  58:20 87:5
factset   89:25
  90:22 92:3,23
  93:4,7,20 94:2,16
  94:21 95:2,5
  96:13,15,16,23
  97:11,19 98:9
  137:11
factset's   94:20
factual   25:5,7,9
fair   73:8
fall   29:25
falling   30:2
false   25:22 26:18
familiar   48:13
famous   89:15
far   20:24 21:16
  81:5

**[fashion - fraction]** Page 10

fashion 43:19
fathom 26:23
february 62:24,25
  107:15,17,18
  108:6,8
federal 13:19
feedback 24:11
feinstein 1:14 2:4
  6:18 8:16,24 9:1
  10:1 11:1,21 12:1
  12:5 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1
  81:1 82:1 83:1
  84:1,12 85:1 86:1
  87:1 88:1 89:1
  90:1 91:1 92:1
  93:1 94:1 95:1
  96:1 97:1 98:1
  99:1 100:1 101:1
  102:1 103:1 104:1

105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
125:23 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
135:7 136:6 137:2
137:7 138:6
fewer 78:22,23
filed 6:20
files 10:13
filings 23:10
fill 78:19
filled 79:4
final 85:21
finance 14:2,2,16
  14:17 17:3 31:21
financial 5:6 16:9
  16:10,24 17:2,5
  18:6,8 19:8,17,18
  20:3 22:22,24
  25:2 31:18,20,22
  32:6 51:5,11
  63:12 71:15 76:13
  88:22 103:19,25
financially 7:9
  136:21
financials 103:22
  104:6
find 33:20 40:22
  40:24 43:15 45:3
  54:16 130:13
finding 40:25 43:2
  43:7,14 73:21
fine 104:23

finish 117:24
finishing 119:22
firm 7:1,4 15:22
  16:5 22:24 76:10
  79:11 91:14
firms 16:3 72:19
  72:23 73:10,13,19
  73:23,25 74:5,6,9
  74:11,13,22 75:2,2
  75:8 76:7,11
  77:21 87:23
first 8:18 9:10
  11:4 27:8 46:3
  47:20,24 49:16,23
  61:13,15,23 62:23
  63:2 64:8,9,13
  65:5 67:5 78:16
  107:16,24 108:7,8
  108:9 109:15
  110:20 111:4,5,13
  117:12 130:15
fiscal 107:20
five 68:12,15,16
  119:20
fkaram 3:16
flag 19:25
float 49:25 51:13
  51:16 112:14,15
  113:5,6,7,11,16,19
  114:8,21 115:3,8
  115:11,18 116:2,4
  116:8,12,14,21
  117:2,3,7,8,15
  118:2,8,13,18,18
  118:20,24 119:12
floating 114:16
flow 57:2 98:25
  105:8,15,17
  108:23
fly 112:24

focus 61:4 67:7
  108:19 131:2
focused 63:4
  130:21
focuses 62:22
  71:16
focusing 45:20
  73:23
followed 74:11
  79:2
followers 84:18
  85:5
following 52:8
  56:10 64:22 80:21
  94:10 129:16
  139:1
follows 9:12
forceful 134:4
forces 127:6
forecast 94:20,21
  95:2 137:11
forecasts 53:18
foregoing 136:10
  138:3
form 47:18 77:15
  95:11
formed 20:23
forming 76:24
formula 56:25
  57:2 89:4
formulas 19:13,14
forth 136:14
forward 33:23
  84:9 127:20
found 42:24 79:22
  80:13
four 111:3
fourth 50:24
  107:20 111:13
fraction 114:2

[francis - ignoring]                                                    Page 11

francis  3:15
frank  3:19 8:6
frankly  37:8 44:23
  45:19
fraud  17:20
fresh  67:18
fried  3:19 8:6
friedfrank.com
  3:25
full  15:25 65:23
  66:21,23
fully  69:5 121:18
fun  3:4
fund  8:12 15:12
fundamental  57:8
  57:10
fundamentally
  56:22
fundamentals
  57:7
further  55:12,23
  92:17 121:23
  136:9,15
future  131:17
  133:6

**g**

g25  95:14
gaap  32:23
garners  115:14
gary  4:5
gather  87:21
  90:15,23 92:9
gears  99:17
  104:11
geller  3:7 8:9 88:2
  88:9
generally  15:24
  58:23 65:22 71:10
  93:14 99:15
  108:24

georgia  13:20,24
give  9:17 86:4
  104:20 126:16
given  49:6,6,7
  87:5 96:3 135:6
glad  107:10
global  17:11
go  6:15 9:24 70:13
  84:9 91:4,10 92:6
  107:8 111:8
  122:17 134:24
goes  54:22 70:7
  77:23 84:16
  102:17 122:24
going  6:2 33:23
  48:8 55:14 56:2
  62:8 67:7 68:18
  69:23,24 74:3,20
  83:16 86:16,18
  87:18 91:9,20
  94:19 104:11,14
  104:22 110:19
  119:25 121:4
  122:7,12 123:21
  126:11 129:21
  133:18
gompers  102:6
good  6:1 9:14,15
  41:24 58:25 63:15
  67:12 68:15 75:5
  75:9,9,10 86:4,6,6
  86:7,7,10 100:3
  116:7
govern  32:22
grab  114:20
grabs  113:3
grade  86:4
graduate  16:4
great  54:9
groundrules  9:25

group  71:17
groupon  102:3,5
  103:9
growth  127:8
guess  19:24
guys  68:11

**h**

h  137:5
hachigian  4:5
half  110:3
halfway  130:14
hand  134:8
happen  53:14
  81:25
happened  125:8
happens  22:20
  34:23
happy  104:20
  119:21,23
hard  26:23
harris  3:19 4:11
  7:21,22 9:13
  67:14,19 68:10
  83:16 104:19,25
  117:21 119:19
  122:16,23 123:12
  125:21 126:6
  134:20 137:3
heading  77:8
hear  119:21,24
  130:24
heard  54:8 93:16
  93:17 96:5
hearing  10:2
hefty  16:23
held  2:4 6:24 48:5
  58:5,10 113:13
help  68:7 70:10,21
  75:19 130:12
helpful  69:23
  89:22

helping  69:11
helps  68:3,8
hereinbefore
  136:14
high  82:3 119:8
  124:20
higher  108:22
hire  45:2
hired  74:25
history  50:15
hit  84:7,8,10
holding  1:6 4:4
  6:19 18:15 82:3
holdings  90:5,12
holistically  40:10
  41:9 127:21
hopefully  12:5
hosted  2:5
human  37:18,19
hundreds  62:3
hurt  28:25
hypothetical  35:9
  82:10

**i**

idea  114:15
ideal  63:21
identification
  11:24 83:23 94:24
  130:3
identified  22:3
  77:20 125:10
identifies  120:12
identify  78:6
  120:8
identity  96:21,23
ignore  34:13 40:12
  40:13,14,21 58:2
  113:9
ignored  38:11
ignoring  46:16
  47:11 49:12 51:22

57:17 63:18 105:7
illegal 26:11
illogic 102:16
imagine 13:22
   71:21
immediately 37:7
   50:12 82:16 94:18
   97:2,7
impact 34:19 36:7
   36:16 55:6 98:16
   98:21 129:2
impacting 38:13
impediments
   105:8,9
implicit 30:15
important 34:14
   41:6 44:14 59:11
   59:18,22 67:9
   69:2,5 75:16
   81:18 99:13,14,15
   102:7 109:3 113:2
   131:7 132:2
impossible 39:7
improper 27:12
include 64:10,12
   129:14,17 130:17
included 22:7
   28:11 107:17
including 17:4
   87:19
inconsistency 41:2
inconsistent 40:23
incorporate 129:7
incorporated 34:6
incorporating
   57:19,20
incorrect 22:6
increase 54:14
   65:14,18 86:22
   87:11 110:4,25

increased 109:23
increments 127:22
indecisive 43:11
independent 74:8
   91:12
independently
   42:6
indeterminate
   43:12 44:2 45:13
indicate 51:20
   76:5 102:23
   115:25 116:22
indicated 30:2
   61:17 99:24 110:9
   110:13 115:4,19
indication 75:13
   117:14
indicator 70:11
   101:5,6,11,13
   102:25 103:3,8
   113:8
indicators 72:11
   100:8
indisputable 45:20
individual 7:25
   8:4 67:24 68:2
   84:16
individually
   106:14
inefficiency 45:10
   53:22 54:4 62:9
   115:19,22,25
inefficient 38:17
   39:2 57:24 58:6
   67:4 115:15
inefficiently 41:4
   117:18 119:18
inferences 63:9
inflated 124:17,20
inflation 124:18
   124:21 125:3

129:10
inform 32:13
information 34:6
   34:9,15,16 36:6,10
   36:14,16,19,21,25
   37:2,3,9,11,14
   38:9,10,12 44:8
   46:17 47:12,17
   49:10,14 51:5,23
   57:18 58:2 60:15
   63:19 65:24 66:12
   66:22 68:4,5,7,8
   69:6,12 71:24
   75:11 76:15,18,23
   81:18 82:7 86:7
   87:15,17,22 89:12
   89:17,18 91:5
   96:2 101:18,19,23
   104:6,8 105:5,7,8
   105:10,12,14,14
   105:17,23,24
   106:16 107:23
   108:22 113:9,10
   121:22
informational
   57:14 105:20
informationally
   38:6 46:11 47:9
   57:24 67:4
informative 85:6
   113:17,20
informed 30:5,23
   36:12 128:5
initial 47:2,21 48:5
   48:9 80:9,20,24
initially 47:24
   116:15
insiders 47:25
   53:17 113:14
instance 19:10
   41:14

instantaneously
   37:21
institutional 50:4
   90:4,12
institutions 55:16
   71:14 77:12,22
   82:2 90:13,17
   101:16,20
intend 20:14 21:7
   21:10,12
intends 131:14
   134:17
intentional 66:8
interest 54:10
interested 7:10
   41:25 81:6 136:21
interfere 6:12
interference 6:9
interpret 18:6
   19:12 32:8
investigate 58:17
   62:11
investment 77:13
   86:13 87:6 93:15
   98:3 113:3
investor 83:18
   84:17,23 85:3,8
   86:19 87:7 117:16
investor's 87:9
investors 48:23
   50:13 55:16 63:18
   66:14 67:24 68:2
   112:25 113:4
   114:17,19 124:19
involved 47:11
ipo 47:11,14,15,15
   48:9,19 49:14
   50:10,11,12,20
   51:6 52:8,14
   56:11,16 58:5
   64:16,22,25 65:14

66:25 67:4 79:12
79:13 80:21 82:5
82:16 87:4,8
88:20 94:11,18
96:18,19,25 97:7
104:7
**ipo's** 65:22 113:24
**ipos** 50:6
**iq** 93:22
**issue** 43:21,21
53:9,18 60:10
**issued** 42:20 48:20
51:10 97:7 112:22
113:25 114:25
**issuers** 65:21
**issues** 8:18,20,23
28:19 70:15
122:13,24,25
**issuing** 52:14
**ives** 89:14,17,18
93:9

**j**

**j** 3:13 138:1
**jacob** 4:13 7:22
**jacob.rae** 4:14
**jacobson** 3:20
**jag** 1:9 6:23
**january** 1:16 6:3
11:22 12:3,11,12
46:24 47:3,8
64:10,13,22 65:4,8
65:11 80:2 83:19
83:21 95:17,21,24
109:17,21,24
137:8,10
**jeld** 1:6 4:3 6:18
7:24 8:3 12:16
26:11 27:5 28:5
38:3,14 46:4,9,20
47:2,7 49:3 52:17
53:15 57:22 61:13

64:20,21 72:20
77:15,25 79:5,14
79:16 80:11 82:15
85:11 86:13 88:4
94:20,22,25
103:12 118:2
121:14,18 122:2
123:16 124:8
126:20 127:4
128:4 130:11
137:12
**job** 90:11
**jog** 25:19
**josh** 5:3 7:1
**judge** 30:21
120:23 123:24
**judge's** 10:10
30:20
**judgment** 131:15
132:24 134:18

**k**

**k** 106:12,15
108:12
**k's** 106:6,13 109:2
109:6,6
**karam** 3:15
**keep** 104:13,21
105:9
**kelsey** 4:15 7:22
**kelsey.davis** 4:16
**kind** 44:24 57:11
57:14 106:15
**kirk** 4:5
**kirkland** 4:7 7:23
**kirkland.com** 4:12
4:14,16
**knew** 97:6
**know** 9:25 13:22
16:3 19:24 23:4
25:18 28:22 31:17
31:25 32:15,21

35:13,14 38:23
41:13,23 42:4
44:18 49:8,21
50:5,16,22 51:14
51:16 54:15,16,20
60:7 62:10 66:10
69:20 71:2,2,3,21
72:6 77:10 82:11
83:13 84:19,22
85:2,4,7,9 88:14
88:17 91:17,18,19
91:22,24 92:8
93:10,10 96:22,22
96:24 97:3,8 98:5
98:7 100:21 101:4
108:11 109:9
112:12 114:8
116:6,7,14 118:4
127:25 134:4,5
**knowing** 50:6
**knowledgeable**
75:6
**known** 29:24 37:4
50:21 58:13 74:6
89:15 92:22
**krogman** 39:10,15
39:23,25 40:6
41:16 49:7 100:2
112:3 118:19

**l**

**l** 3:24 4:4
**label** 110:17,18
121:7,10
**laborers** 3:5 8:12
**lack** 60:8
**language** 130:18
131:19,21 132:2
132:10,13,16
133:11,17
**large** 113:5,7,23
114:25 116:3,8

117:8,9,11,13,15
118:14
**larger** 97:14
116:17 118:8
119:13
**law** 9:11 18:23
19:2 20:5 58:7
**laws** 131:14
132:18 133:13
134:17
**lawsuit** 126:9
133:22
**lawyer** 15:3 18:21
**learn** 89:9
**learned** 127:22,23
**leave** 85:11
**leeway** 126:17
**legal** 2:6 5:3 7:2,5
15:4 19:5,7,12,14
19:16,20,24 20:5,8
135:10
**lengthy** 121:8
**lev** 69:9
**level** 110:23
**lexington** 4:8
**liabilities** 131:17
133:7
**liability** 26:4,6,7
123:25 125:7
**liable** 26:23 27:2
**license** 2:8,10
136:25
**licensed** 18:25
**light** 27:17
**limited** 8:18
122:12
**lindsey** 4:11 7:21
67:11 119:24
**lindsey.harris**
4:12

**line** 139:2
**lines** 75:5
**liquidity** 57:4
  66:15,19
**list** 13:12,16 14:7
  20:18 72:19 76:4
  76:22 80:2,7
**listed** 11:7 73:23
  76:6,7 95:16
  111:12
**literature** 34:2
  36:22,23,24 37:10
  65:20 66:2 70:7
  108:21,24
**litigation** 1:7 6:20
  14:25 28:4 31:2,7
  31:15 32:18,22
  33:4 34:12 39:4
  122:4 123:18,22
  124:4,7 126:22
  130:17,21 132:8
**little** 26:13 102:23
**living** 85:3
**llp** 3:7,20 4:7,18
**long** 23:3
**longer** 27:18 37:13
  52:16,20,24
**look** 20:12 28:20
  33:18 38:22 40:9
  44:4 45:24 55:12
  55:23 56:3 59:4
  59:15 60:2 61:10
  63:23 64:8 72:16
  76:21 80:16 81:9
  82:14 100:9,17,19
  102:2 103:4
  109:12 110:7
  111:11 114:13,21
  114:22 117:6,19
  119:2,4,7 130:4
  132:5,6

**looked** 41:20
  49:20 52:25 59:9
  60:11,21,22 79:8
  82:24,25 88:18
  102:4 103:6
  111:17 113:11
**looking** 33:19 50:5
  50:22 61:7 85:10
  85:17 95:7,14
  109:19 117:3
  125:2
**loss** 12:15 122:2,7
  123:17 124:23,25
  128:12 129:9
**losses** 129:3
**lot** 51:3,4 54:10,25
  97:16 100:22
  102:20,22 108:25
  112:20,21 113:23
  114:9 121:9
**low** 105:14 119:8
**lower** 66:24 67:2
  118:6
**lowest** 119:9

**m**

**m** 3:11 136:2,24
**maintain** 131:12
  132:17 133:12
  134:9
**major** 77:11,12,22
  82:2
**maker** 101:15
**makers** 50:17,20
  100:12,15
**making** 15:16
  25:12 47:13
**mallard** 4:5
**manage** 77:13
**managed** 15:14
**management**
  17:12,14 127:10

**management's**
  104:9
**manager** 77:18
**managers** 93:13
  93:15
**managing** 15:17
**mandated** 82:17
**margins** 86:22
**mark** 4:4 83:16
  94:19 129:21
**marked** 11:23
  83:22 84:4,8,11
  94:23 130:2
**market** 9:2 12:14
  27:21 29:7,23
  30:2,5,23,23 33:9
  33:13,22 34:3,5,12
  34:13,20 35:4,17
  36:3,8,11,18 37:3
  37:18 38:3,7,11,16
  38:25 39:11,17
  40:20 41:7,15,15
  41:20,23 42:9
  46:5,8,15,19 47:7
  47:10 48:14,18,19
  48:19,22,24 49:3
  49:12,15 50:17,18
  50:19 51:14,21,25
  52:4 53:22 55:19
  56:9,18 57:11,17
  57:23,24 58:5,10
  61:17,18 63:17
  65:5,9 66:13 67:3
  67:6,10 68:9 69:6
  69:14 70:11,21
  81:22,24 82:2,4,8
  86:21 87:10,18
  89:8 99:7,22,23,25
  100:8,12,15,16,23
  100:25 101:3,9,12
  101:20,23 102:15

102:24 105:3,6,10
  107:23 112:16
  113:5,9,24 114:6
  114:14,25 115:4,9
  115:12,19,22
  116:3,6,10,22
  117:6,14 118:9
  119:15 122:14
  127:4,15,22 128:3
  128:9,24
**market's** 30:16
**marketplace**
  66:18 68:6 112:21
  112:22 114:7
**markets** 37:17
**material** 34:14
  38:10 46:16 49:13
  87:10
**materiality** 19:11
**matter** 37:8 58:6
  69:15,18
**matters** 70:2,3
**maureen** 1:24 2:7
  7:4 136:2,24
**mcguire** 4:18 8:2
**mcguirewoods.c...**
  4:23
**mean** 15:23,24
  16:12 21:24,25
  22:8,20 23:4
  24:23 25:8 27:7
  33:9,13 34:22,25
  35:2,11 37:15
  38:19,21,22 41:23
  49:24 51:7,19
  52:24 54:5,8
  56:21,22 61:22
  69:19 70:24 71:8
  71:12,20 72:3
  75:4 76:17 90:11
  91:17 92:15,16

**[mean - objection]**                                                      Page 15

97:25 98:8 101:15 102:9 103:3 119:3 128:22
**meaning** 38:8 41:2 114:16
**means** 31:25 72:3
**meant** 27:15 75:22 75:23 102:9
**measure** 113:16 115:7 116:10
**measuring** 116:10
**media** 6:16 117:17 135:8
**meet** 53:5
**meeting** 10:17
**member** 23:10
**memory** 25:19
**mention** 74:10 115:17
**mentioned** 10:23 59:8 73:18 79:21 89:23 90:3 103:10 108:7 113:5
**merit** 30:7 133:21
**message** 134:12,12 134:14
**met** 10:13 83:7
**metric** 100:4 101:4 102:7,9 117:2,4
**metrics** 39:13
**michel** 4:6
**microphones** 6:6 6:11
**middle** 84:6 130:7
**million** 29:7 49:25 51:9 61:22,24 77:14 82:5 114:11 116:16 118:13 119:12 123:16

**millions** 62:2
**mine** 44:19
**minor** 21:4
**minutes** 37:8 68:12,12,17 119:20
**misinformation** 66:23
**misled** 27:21 127:3
**misrepresent** 26:25
**misrepresentation** 134:3
**misrepresentatio...** 86:24 124:16,24 126:25
**misstatements** 121:14,19 124:8 126:7,21
**mixed** 134:12,14
**model** 9:3 122:15 122:17,21 123:6,7 123:8,11 124:12 124:13,14,14 125:4,5,12,16,18 125:25 126:4,5,8 128:13,17
**models** 15:3,7 57:9
**moment** 86:20 117:11
**money** 15:14 78:23 93:12
**morning** 6:1 9:14 9:15
**motion** 10:10,11 123:3
**mouth** 134:6
**move** 43:18,24 77:2 106:16

**movement** 121:23
**movements** 105:18
**moves** 105:13
**multibillion** 114:5
**multiple** 33:7 87:2 91:23 133:9

**n**

**n** 3:1 4:1 5:1 9:9,9 9:9 137:1
**nail** 107:2
**name** 6:25 32:24 34:4 84:17,20
**names** 50:21
**national** 3:4 8:11
**nature** 33:4 49:8 55:4 87:3
**necessarily** 71:25 87:14
**need** 35:8 101:18 101:24 104:13 112:4 115:3 130:8
**needed** 43:15
**needs** 104:19
**negative** 29:24 30:7 35:5,6 101:17,23 129:2 133:23 134:11
**neither** 136:16,19
**never** 15:24 93:16 109:10
**new** 3:21,22,22 4:9 4:9 36:15 49:25 64:17 130:4
**news** 23:9 29:20 106:2,7,20 108:14 109:3 117:17 128:22,23
**nice** 86:21
**non** 76:4 105:24 108:23

**notary** 2:10 138:13
**note** 6:5
**notes** 104:9
**notice** 2:6 77:7 82:23
**noticed** 79:10
**noticing** 7:19
**notwithstanding** 118:17
**nowadays** 106:11
**number** 72:10 90:14 100:12,15 106:25 114:3,6,10 114:23 135:8
**numbers** 60:22 117:10
**numerous** 33:17 42:15 43:10

**o**

**oath** 7:7
**object** 9:5
**objection** 12:21 14:15 16:22 18:2 18:12 19:6,22 20:16 21:23 25:15 26:3 28:8 29:15 31:4 35:21 39:19 42:11 44:15 53:23 55:10 56:19 58:16 59:7,17 60:5 65:15,19 69:17 70:6,22 72:9,22 73:4 74:14 81:14 81:20,23 83:9 84:24 85:14,25 87:13,24 88:16 89:10 90:6 91:2 92:12 93:5,25 95:9 97:5,15,23 98:6,18,22 100:13

[objection - p]                                                                    Page 16

104:4 106:4 108:2
108:16 110:11,16
111:15,23 112:17
113:15 115:5,23
116:24 120:10
121:20 122:6
124:10 128:15
130:23 131:4,23
132:12,19
**objections** 7:16
**obligation** 31:12
**obscure** 112:23
**obtain** 73:9 90:4
**obviously** 22:7
**occasionally** 40:16
**occur** 35:5,12,13
  35:14,18
**occurred** 44:10
  129:15,19
**occurs** 35:15,20
**october** 120:24
  122:4 123:18
  127:24 128:6,10
  129:5,19,22,24
  130:22 133:20
  134:7 137:13
**offer** 18:5,9 19:19
  20:14 21:10,12
  37:25
**offered** 19:15
  20:24 38:15,21
  42:8 46:13 47:24
  48:6 49:25 52:2
  56:8,14 58:19
  75:24
**offering** 12:19
  13:3 14:24 17:23
  18:3,18 19:20
  38:18 47:3,22
  48:5,10 49:2 99:6

**officer** 9:11
**oftentimes** 39:5
**oh** 20:20
**okay** 9:24 10:4,16
  10:20 11:15,25
  12:7 13:6,8 14:10
  15:9,21 16:6,17
  18:10 20:11,25
  22:10 27:4 29:5
  46:2 52:19 63:25
  64:19 67:7 68:16
  73:8 75:15 76:21
  83:13 84:13 89:8
  90:8 94:4 96:8,20
  104:11,25 109:14
  110:7 111:17
  112:14 119:19
  121:11,25 123:24
  124:3,5 129:21
  130:9 131:10
  133:16 134:20,22
**omissions** 86:24
  121:15,19 124:9
  124:16,25 126:21
  127:2 134:3
**once** 29:22 116:6
**ones** 53:10 78:20
**onex** 3:18 8:6
  79:10,18 82:25
**open** 12:6 58:24
**operating** 128:9
**operational** 51:24
**operative** 51:24
  54:24
**operatively** 60:12
**opining** 57:11,15
  101:9
**opinion** 10:10 18:4
  18:19 19:5 20:8
  25:23 26:2,18
  29:8 30:9,17,20,25

32:13 33:5 38:2,5
38:16,19,21 46:8
46:19 47:6 49:2
49:19 52:3 55:22
56:8,14 58:14
71:25 86:8,9
87:10,12 90:24
94:8 118:22
121:11,12,13
124:6 125:17
**opinions** 8:25 9:6
  12:18 14:24 17:24
  18:5 19:8,16,19,21
  19:23,24 20:3,4,8
  20:14,19,23 24:21
  44:21 58:19,25
  76:24 104:9
**opportunities** 87:7
**opportunity** 86:14
  125:23
**opposition** 123:2
**order** 10:11 30:20
  31:25
**outcome** 7:10 35:5
  35:6
**outline** 104:18
**output** 123:8
**outset** 118:12
**outside** 111:20
**outstanding** 118:4
**overcharged**
  28:24
**overcharging** 28:6
  29:2
**overlap** 19:8,11,17
  20:5 31:21 41:13
  41:19 42:7
**overlooked** 81:19
  81:21 82:8,9
**overtime** 112:9

**overturned** 133:24
**owned** 47:25 48:4
  49:9 79:11
**owners** 50:7
**ownership** 48:6
**owning** 101:16

**p**

**p** 1:14 2:3 3:1,1,15
  4:1,1 5:1,1 6:18
  9:1,9 10:1 11:1,21
  12:1,5 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1
  81:1 82:1 83:1
  84:1 85:1 86:1
  87:1 88:1 89:1
  90:1 91:1 92:1
  93:1 94:1 95:1
  96:1 97:1 98:1
  99:1 100:1 101:1
  102:1 103:1 104:1

**[p - possible]**

105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1,7 136:6 137:2,7 138:6

**p.m.** 120:6 135:5 135:13

**page** 13:7 14:5,5 20:9 33:22,24 34:2 45:25 61:7 61:10 63:24 72:17 85:21 89:13 109:12 117:20 130:15 132:6,22 139:2

**paid** 31:13

**paper** 23:20 107:6 108:5

**paragraph** 20:12 27:20 29:6 30:4 33:25 45:24 72:16 73:5,7,18,24 74:10 77:4,8 82:14 83:25 87:20 88:12 89:22 90:25 96:9 117:25 118:7 123:20 130:11 131:11 132:7,14 132:22,23

**paragraphs** 20:17 23:21 76:7 87:22

**parameters** 80:15 80:25 126:4

**paraphrasing** 30:13

**part** 31:5,5 39:21 79:12,13 82:20,23 97:13 100:11

**partially** 121:2,13

**participants** 35:4 35:17 36:3 38:12 46:16 47:10 48:24 49:12 51:22 55:19 57:25

**participate** 47:14

**participation** 50:5

**particular** 9:6 33:10,14 37:23 38:17 44:8 78:12

**parties** 6:15 8:15 75:6 136:18

**partner** 23:15,16

**party** 7:8

**passing** 87:8

**paul** 102:6

**payne's** 120:24

**pays** 34:15

**pending** 123:14

**pension** 3:4,5 8:11

**people** 39:5 49:9 54:9 69:11 70:4 74:25 75:8,16 86:9 100:14,19,21 101:2

**people's** 44:17 45:15

**percent** 110:4 115:3 116:7

**percentage** 113:12 113:13,19 114:24 115:2,21 116:5,11 117:5,6,13 118:6 119:3,10

**perform** 21:17,20

**performance** 103:25

**performed** 43:5

**period** 38:8,9 46:6 46:10,15,21,23 49:17 52:8,15,20 52:21 53:4,6,11,13 53:16 55:9,13,15 56:6,10 57:3,21,22 58:11 59:5,6,11,15 59:16,20,21,24,25 60:4,7,12,17,20 61:2,3,5,6,21 62:5 62:10,16,21 63:13 64:6,13 72:21 77:11 79:17 80:10 80:12,13,21,24 81:2,5,8,10,12,18 82:17 83:8,12 89:24 92:20 95:3 103:18 106:21,25 107:25 108:15 110:15,18,20 111:5,6,21,22 112:2,6 118:3,5,12 118:23,23 119:11 127:3,14

**periodic** 91:9

**periodically** 91:19

**periods** 53:19

**person** 23:24 72:2

**peter** 3:24 5:4 8:5

**peter.simmons** 3:25

**pharmaceutical** 99:2

**pick** 6:7

**picked** 93:3

**piece** 87:15 107:6

**pipefitters** 3:4 8:11

**place** 6:10,14 62:20 136:13

**placement** 64:25

**places** 133:9

**plain** 71:8

**plaintiffs** 10:14,17 10:20 21:16 22:11 24:2,15,19 25:4,22 27:9 79:6,22 81:12 125:6

**platform** 72:13 73:20 76:9,14,15 76:18

**plaza** 3:21

**please** 6:5,9 7:17 9:25 13:6 43:4 63:24 95:22 107:12 126:13

**plenty** 60:25 61:11

**plumbers** 3:3 8:10

**plus** 49:25 51:9 61:23,24 116:16

**point** 46:15 60:3 91:12 92:4 112:9 120:15

**pointing** 40:17,18

**points** 38:9 62:15 86:25 117:25 118:7

**populated** 37:17

**portfolio** 15:17 77:18

**portfolios** 101:22

**portion** 15:14 16:23 92:19

**position** 86:22

**possible** 97:12,16 97:17

possibly 53:25 97:24,24,25
post 83:14 84:15 85:11,22
posts 83:25
potential 45:22 86:22
practice 18:25
practices 127:19
practitioner 32:9 32:10
premarked 12:3
premium 87:2
prep 10:21
preparation 10:18 10:24
prepare 10:5,8 11:10 32:6
prepared 8:24 133:17
preparing 24:3 95:8
present 5:2 7:11 61:14
press 129:22,25 132:14 133:10 137:14
pretty 41:23 89:13 93:7
previous 23:22
previously 36:6 44:12 48:2 52:2 72:12 133:19
price 29:21,25,25 30:3 34:7,8,17,19 34:24 35:7,20 36:7,17 38:13 43:24 46:17 47:15 47:15 55:6 56:24 57:6 64:15,17,17 64:20,21 65:2,14

65:18,22,24 66:11 66:24,25 98:17,21 101:23 105:17 106:17 109:16,20 109:23 110:24 113:8 121:23 124:17,19,21 129:2,5
primary 48:14,18 49:3 52:3 58:5
principles 33:2 57:8 63:12
prior 24:11 51:11 64:20 109:17 136:4
priors 36:3
private 6:7 79:11
privately 48:4,4
probabilities 36:2
probability 128:2
probable 31:11
probably 69:20
probative 40:3 71:5 101:5
proceeding 7:17
proceedings 135:12 136:11
process 22:19 78:25 131:18 133:8
produced 97:10
producer 16:14
producers 31:24
profession's 44:19
professional 2:9 13:2 18:15 32:9 84:23 136:3
professionally 15:20
professionals 71:11 113:4

professor 11:21 12:4 86:4 137:7
profitability 127:8
profits 127:8
program 15:12,19
programs 17:6
prohibited 52:14
projected 127:20
promptness 34:9
proof 105:13
proposed 3:6 57:22
prospects 99:4
protracted 37:22
prove 26:5,6 39:3 39:8
proved 26:21,24 27:16 45:10
proves 105:4
provide 19:5 24:20 62:6 73:19 74:6 78:21 88:3 90:17 103:24
provided 46:13 66:18 73:14 76:20 90:12 96:17 97:18 103:19 104:7,10 131:16 133:5
provider 89:15
providers 91:7
provides 89:25
providing 66:15 77:23 88:19
proving 107:22
proxy 41:21,24
public 2:10 17:7 47:3,21,25 48:5,7 48:10,21 50:2 51:11 103:12,14 103:15,17,20,21 104:3,10 119:12

138:13
publicly 116:17 118:10 119:14
publish 89:6
published 33:18 72:20,24
publishes 70:19
publishing 75:16
pulled 95:3
pumphrey 4:22 8:1,2
punished 27:13
purchase 48:7
purported 120:14
purportedly 126:8
purpose 92:14 93:13
purposes 25:11 39:4 66:11
pursuant 2:6 8:14
push 66:13
put 23:18,21
putative 8:13
putting 15:4

**q**

qualified 72:7
qualifies 126:8
qualify 12:22
qualitatively 61:19 62:18
qualities 53:5 72:4
quality 28:18 53:7 76:5
quantification 129:8
quantified 125:2
quantitative 22:23
quarter 88:24 103:25 107:20 130:16

**[quarterly - repeatedly]** Page 19

quarterly 103:13
question 14:21
  25:18 39:20 44:20
  48:25 61:8 63:3
  67:16 70:8,23,25
  74:12 109:8
  123:14 130:24
questions 9:5 10:3
  12:23 13:4 17:17
  20:2 22:12 25:19
  88:23 104:17
  122:16 123:5,13
  125:13 126:11,14
  126:16
quick 37:5
quiet 52:7,21 53:4
  53:11,16,19 55:9
  55:15 56:10 58:11
  59:5,10,15,24,25
  59:25 60:7,11,12
  60:17,20 61:2,3,5
  62:15,21 79:17
  80:11,13 82:17
  83:7 89:24 106:21
  106:25 107:25
  108:15 110:15,18
  110:20 111:6,25
  112:6
quite 42:23 121:8
quote 27:21 54:21
  130:11 132:10,13
  132:15,23 133:4

**r**

r 3:1 4:1 5:1 136:1
  138:1
radar 112:24
rae 4:13 7:22
raising 45:4 123:2
ramifications
  35:15

ran 15:11 23:6
  99:21 108:19
  109:10
range 72:4,4
ratto 1:24 2:7 7:4
  136:2,24
reaching 39:17
reacted 107:23
reaction 29:21
  30:16 35:19 37:5
  37:6,22 107:22
reactions 44:7
read 10:9 18:8
  25:6 26:20 28:21
  28:22 32:7 71:3
  112:10 138:3
reader 24:9
reading 70:24
  88:18
reads 70:16,20
real 15:14 84:19
realization 128:3
realized 60:16
really 35:2,22 36:2
  59:25 60:18 70:12
  109:2 125:15
realtime 98:12
reason 9:16 39:22
  44:5 58:25 62:5
  69:22 109:4
reasonable 34:9
  128:21,25
reasonably 38:24
  63:11 106:16
reasons 33:7 39:24
  43:19 44:5 66:2,3
  81:15 85:23 100:3
  118:25 127:6
recall 42:14 44:9
  52:22 56:12,13
  80:18 95:7 103:8

  103:10 112:9
receive 18:7 79:21
received 11:22
  24:13 81:11 83:22
  94:22 98:5,8
  129:25
recess 68:21 120:4
recite 83:15
recommends 87:8
record 6:2,15 7:15
  12:8 68:19,23
  95:6 120:2,6,18
  134:25 135:5
recorded 6:17
recording 6:13
redid 22:5
redirect 134:24
  135:2
refer 48:9 52:19
  121:4 123:21
  124:3
reference 82:21
  96:9 132:3
referenced 83:25
  96:11 131:11
referred 123:24
referring 27:25
  52:20 89:21
reflect 36:19 69:2
  69:5
reflected 34:17
  66:9
reflective 47:17
  86:23
reflects 34:8 113:8
  132:24
refresh 84:5,11,12
regarding 25:21
  38:2 52:3 56:9
  87:23

regardless 117:13
regards 115:17
registered 2:9
  136:3
registration 41:14
  42:2 50:23,25
  51:2,10 118:21
regression 45:7
regulation 52:12
  112:13
related 7:8 12:14
  25:8 122:3 123:17
relationship
  105:16
relative 136:16,19
release 129:23,25
  132:14 133:10
  137:14
relevant 14:7
  34:14 38:10 43:22
  43:23 47:12 49:13
  52:25 57:12,16
  72:15,15 75:25
  99:11
reliable 36:11,15
  90:19 93:11,12
  100:7,7,21 101:6
  101:13
relied 29:9 30:10
  39:22,24 40:2
  83:3
rely 39:9,14 40:9
  44:3 78:13
remainder 53:6
remember 33:24
  102:10,12 131:24
  132:4
remotely 7:13
repeated 36:10
repeatedly 40:2

[repeating - s3]                                                      Page 20

repeating  36:15
repercussions
   30:8 133:23
   134:11,15
repetition  36:5
report  8:21 9:7
   10:9 11:7,20 12:4
   12:10 13:7 20:10
   21:3,8,14,18,22
   22:13,15 24:3,17
   24:25 25:3,10
   27:14 33:16,20
   37:16,25 38:19
   39:9 42:8,25 43:6
   45:25 52:10 59:3
   60:21 70:16,20
   71:13 72:17 73:2
   76:8,22 82:22
   83:18 85:6 86:10
   86:12 90:5,25
   94:15 95:8 96:10
   97:3,14,20 98:2,3
   98:4 99:20 107:8
   109:13 115:7
   120:8 131:3,22
   132:9 133:9,17
   137:6
reported  1:23
   61:20 89:5 106:15
   107:21 109:2
reporter  2:8,9 7:3
   33:11 70:17 136:3
reporting  81:17
   92:23 94:17 96:16
   97:10
reports  18:7 23:9
   23:18 29:11,14,19
   44:24 52:15 53:9
   53:18 60:11 72:20
   72:24 73:9,13,14
   73:20 74:2 75:17

78:7,17,24 79:18
79:20 81:10,11
83:8 88:4 90:16
96:14 97:6,8
reputable  73:25
   74:13,16,17 75:12
   75:13,20
request  24:16
requests  33:11
   70:17
required  90:13
requires  123:9
reread  10:9,10
research  5:6 12:24
   12:25 14:24 41:22
   43:15 69:7,13
   70:9 76:19 99:2
   100:7,20
reserve  9:4 13:19
   31:13 126:17
reserving  128:11
resources  75:3,18
respect  19:13
   40:19 45:16 127:7
respond  56:4
responding  105:10
   105:12
responds  105:5
rest  59:5,16 60:4
   61:20 62:4
restaurant  54:22
   102:17
restricted  96:4
result  45:13 101:4
   109:9
results  64:3,5 81:5
   89:19 92:10
   130:16
retained  19:4
   135:10

revelation  30:22
revenue  89:2
review  11:3,6 17:6
   70:5 73:16 91:19
   112:12
reviewed  10:23
   83:2
reviews  91:9
   107:13 132:20
rgrdlaw.com  3:12
   3:14,16
richmond  1:3 4:20
   6:22
right  13:5 14:4
   20:22 25:17 39:18
   46:25 47:5 62:15
   64:11,24 65:7
   70:5,13 72:23,25
   78:2 90:5,7 107:7
   108:18 109:11
   120:20 126:18
   132:15
rights  9:4
risk  35:18
rob  10:22
robbins  3:7 8:9
   88:2,9
robert  3:11 8:8
room  7:12 45:21
rothman  3:11 8:8
   8:9 10:22 12:21
   14:15 16:22 18:2
   18:12 19:6,22
   20:16 21:23 25:15
   26:3 28:8 29:15
   31:4 35:21 39:19
   42:11 44:15 53:23
   55:10 56:19 58:16
   59:7,17 60:5
   65:15,19 67:11,15
   67:22 68:13,16

69:17 70:6,22
72:9,22 73:4
74:14 81:14,20,23
83:9 84:7,24
85:14,25 87:13,24
88:16 89:10 90:6
91:2 92:12 93:5
93:25 95:9 97:5
97:15,23 98:6,18
98:22 100:13
104:4,15 106:4
108:2,16 110:11
110:16 111:15,23
112:17 113:15
115:5,23 116:24
119:23 120:10
121:20 122:6,10
122:19 123:4
124:10 125:19,22
126:15 128:15
130:23 131:4,23
132:12,19 134:22
135:2
row  109:15,20
rpr  1:24 136:24
rrothman  3:12
rudman  3:7 8:9
rule  112:8
rules  18:5 31:9
   32:3,22
rulings  131:15
   133:2,4
run  42:18,22
   109:7,11
runs  95:20,23
   111:6

|     s     |
| :-------: |
s  3:1 4:1,5,5 5:1
   9:9,9 89:16 137:5
s3  41:14,25 50:22
   50:25 51:2,7

**[s3 - small]**                                                    Page 21

118:20
**san** 3:9
**satisfied** 51:7
**satisfies** 118:18,20
**saturday** 6:3
**saw** 58:25 60:13
  62:12,13 99:22
  113:21 128:20
**saying** 24:10 54:20
  86:9,19 87:7
  102:13,16 134:9
**says** 34:2 36:24
  37:10 69:8,13
  74:5,22 85:22
  96:6,6,7 108:21,25
  130:15 131:11
  134:16
**scenario** 71:21,22
**schedule** 37:4
**scheduled** 63:6
**school** 16:4
**scope** 9:6 125:20
  126:19
**scroll** 14:5 33:23
  61:25 85:20
**search** 80:9,22
**sec** 23:9 82:17
  90:14
**second** 8:20 67:8
  73:3 85:21 107:9
  107:11 109:20
  116:19 130:25
**secondary** 48:22
  50:18 61:17 65:5
  65:9
**section** 33:21,25
  78:2 132:9
**sections** 23:17
**securities** 1:7 6:19
  14:19,25 15:6,10
  34:11 38:3 42:16

46:20 57:12 71:6
  71:10,17,19
**security** 15:6,13
  15:16,20 34:7
  38:13,23,24 39:6
  39:18 41:3 46:18
  48:15 49:9 71:17
  72:2,5 88:22
  105:5
**see** 28:21 35:19
  55:24 58:17,18
  59:9,18 60:11
  61:11,16,25 63:9
  78:19 79:9 80:10
  80:23 84:3 85:18
  87:5,11 88:5,19
  89:7,14,19 92:24
  96:6 97:18 106:14
  107:9 109:16,18
  115:3 124:11
  130:10,18 131:19
**seeing** 52:22
**seeking** 69:21 76:6
  76:9,12 79:9,20,25
  80:3,8,16,20 81:9
  82:21 83:8,14,17
  83:20,24 84:18
  85:5 94:13 137:9
**seen** 100:21
**selected** 10:25
**selection** 45:6
**selections** 15:16
**sell** 54:16 55:20
  71:12 74:6 76:10
  76:11 77:7,21,25
  90:18 101:21
**sellers** 99:19
  101:19,24
**selling** 53:22 54:11
  54:12,14,25 55:2,8
  56:6 87:12 99:18

99:25 100:9,10,23
  100:24 101:5,8,11
  102:2,5,14,20,21
  102:22,23 103:4,7
**sense** 14:20 24:4,6
  41:18 44:3 45:18
  48:10 55:2 116:8
  121:6
**sensitive** 6:6
**sentence** 46:3 86:2
**separate** 41:16
  59:15 60:3 62:6
**separately** 59:5
**served** 66:10
**serves** 66:3
**service** 73:11,14
  93:9
**services** 88:21
  89:4 90:15 93:18
**session** 10:21
**set** 91:3 126:10
  136:14
**severe** 93:17
**share** 61:24 68:5
  98:15,17,21 99:8,9
  99:10
**shares** 48:2,6,20
  48:23 51:3,9
  54:15 58:6 61:23
  62:2 85:23 112:20
  112:22 113:25
  114:3,6,11,15,23
  118:4
**sheet** 139:1
**shift** 104:11
**short** 53:21 54:10
  54:10,12,14,24,25
  55:8,20 56:5
  87:11 99:18,19,25
  100:9,10,23,24
  101:4,8,10,18,24

102:2,4,14,20,20
  102:22,23 103:4,7
**shorten** 104:18
**shortly** 119:22
**show** 45:11
**showed** 98:2
**showing** 62:14
**shows** 64:21 100:7
  100:20 105:21
**shriver** 3:19
**shut** 85:12
**side** 22:23 71:12
  71:13 74:6 76:10
  76:11 77:5,7,9,16
  77:17,21 134:6
**sides** 125:14
**signal** 119:6
**signature** 136:23
**significant** 43:18
  43:24 44:7 105:22
  106:17 107:22
  110:9,14,22,25
  111:14 129:4
**similar** 42:20
**simmons** 3:24 8:5
  8:5
**simple** 36:24
**simply** 90:15
**single** 40:5,9 46:21
**sit** 25:16 44:11
  91:17,24 93:10
**sitting** 20:25 21:6
**situations** 56:15
**sizable** 115:11
**skimmed** 10:12
**skins** 28:7
**slide** 129:16
**small** 112:23
  113:6 114:7 116:4
  116:9

**[sold - sub]** Page 22

| | | | |
|---|---|---|---|
| **sold**  66:17 124:22 | **standard**  91:3 | 29:1 30:1 31:1 | 126:22 127:24 |
| **solicits**  96:16 | 99:21 103:2 | 32:1 33:1 34:1 | 132:8 133:21 |
| **solutions**  2:6 7:2,5 | 106:10 112:13 | 35:1 36:1 37:1 | **stock**  30:3 33:10 |
| 135:11 | **start**  45:20 65:9 | 38:1 39:1 40:1 | 33:14 34:17,20 |
| **somebody**  72:6 | 67:18 111:10 | 41:1 42:1 43:1 | 35:7,7,20 36:7,18 |
| 104:19 | 118:5 119:10 | 44:1 45:1 46:1 | 38:14,17 43:17,24 |
| **somewhat**  34:22 | 127:2 | 47:1 48:1 49:1 | 46:4,9 47:7,15,23 |
| 112:11 | **started**  23:20 | 50:1 51:1 52:1 | 49:4 50:7,13 52:4 |
| **sophisticated** | **startup**  98:24 | 53:1 54:1 55:1 | 54:11 56:17,24 |
| 50:21 51:21 | **state**  7:13,17 46:4 | 56:1 57:1 58:1 | 57:6 64:17,21 |
| **sorry**  20:20 21:11 | 82:15 138:13 | 59:1 60:1 61:1 | 65:9,18 66:14 |
| 69:3 73:6 77:6 | **statement**  12:18 | 62:1 63:1 64:1 | 67:10 69:2,5 |
| 91:14 98:13 | 20:13 117:12 | 65:1 66:1 67:1 | 71:19 72:7 73:22 |
| **sort**  29:3 | 134:5 | 68:1 69:1 70:1 | 77:15,25 82:3 |
| **sound**  86:13 | **statements**  87:19 | 71:1 72:1 73:1 | 86:13 94:11 96:18 |
| **sounds**  55:24 | 127:13 | 74:1 75:1 76:1 | 101:8,11,16 |
| **source**  36:11,15 | **states**  1:1 6:21 | 77:1 78:1 79:1 | 105:11,13,17 |
| 89:18 | 116:18 118:11,15 | 80:1 81:1 82:1 | 106:17 109:23 |
| **sources**  34:5 73:25 | 119:15 | 83:1 84:1 85:1 | 113:8,13 114:20 |
| 74:13 87:21 89:12 | **statistic**  62:6 | 86:1 87:1 88:1 | 118:18 121:23 |
| 91:23 93:11,12,21 | 110:8 | 89:1 90:1 91:1 | 124:17 129:5 |
| **span**  103:17 | **statistical**  63:11 | 92:1 93:1 94:1 | **stocks**  42:16 48:6 |
| **speak**  33:21 | 129:13 | 95:1 96:1 97:1 | 53:12 115:10 |
| **special**  60:17 | **statistically**  43:18 | 98:1 99:1 100:1 | **straightforward** |
| **specialist**  5:3 | 44:7 107:21 110:8 | 101:1 102:1 103:1 | 134:13 |
| **specific**  35:23 | 110:14,22,25 | 104:1 105:1 106:1 | **strategic**  127:9,10 |
| 45:17 54:6 58:22 | 111:13 129:4 | 107:1 108:1 109:1 | **street**  4:19 82:5 |
| 63:15 112:11 | **statute**  26:8 | 110:1 111:1 112:1 | **strong**  98:16,21 |
| **specifically**  55:13 | **statutes**  19:12 | 113:1 114:1 115:1 | **structure**  99:23 |
| 61:5 80:18 103:9 | **statutory**  19:13 | 116:1 117:1 118:1 | **student**  86:5 |
| 122:13 125:8 | 107:25 108:15 | 119:1 120:1 121:1 | **students**  15:13 |
| **specification**  45:7 | **stenographically** | 122:1 123:1 124:1 | **study**  31:24 41:12 |
| 45:23 | 136:12 | 125:1 126:1 127:1 | 42:25 43:6,11 |
| **specifics**  103:11 | **steven**  1:14 2:3 | 128:1 129:1 130:1 | 44:2,6 62:19,22 |
| 123:7 | 6:17 9:1 10:1 11:1 | 131:1 132:1 133:1 | 63:4 64:2,5 105:3 |
| **speed**  36:22 | 11:21 12:1,5 13:1 | 134:1 135:1,7 | 105:4,21,25 |
| **spend**  78:22 | 14:1 15:1 16:1 | 136:5 137:2,7 | 107:18 |
| **spoke**  11:16 | 17:1 18:1 19:1 | 138:6 | **stunned**  29:7 |
| **staff**  11:13,17 | 20:1 21:1 22:1 | **steves**  28:2,4,16,20 | **stunning**  30:22 |
| 22:17,18 23:10,12 | 23:1 24:1 25:1 | 29:2 122:3 123:17 | **sub**  118:23 |
| 78:14,15 | 26:1 27:1 28:1 | 123:22 124:4,7 | |

[subfields - time]                                                          Page 23

subfields  14:16
subject  69:8
submitted  12:11
  12:12 38:19
subscribe  73:11
  89:17
subscribed  138:10
subsequently
  48:24 49:22 50:8
  50:17
substance  21:5
substantial  51:13
  79:12,13
substantive  24:16
success  127:7
  128:4
successful  99:5
succinctly  63:4
suffered  124:23
suffice  69:9
sufficient  131:16
  133:5
suggest  53:22 54:3
sum  33:25
summarizing
  36:23
support  13:3
  42:25 43:7,13
  49:19 83:4 92:17
  94:8
supposed  16:12
  103:3
sure  24:9,9 28:21
  32:14 34:23 42:23
  44:21 52:5 55:11
  78:5 89:13 91:18
  93:8 112:12
surprised  30:3
surrounding
  35:15

survey  88:21
  96:15
surveys  89:6,20
suspect  49:11
sustainable  127:19
sustained  129:9
switch  99:17
switched  67:13
sworn  9:10 136:6
  138:10

**t**

t  9:9,9 110:7 136:1
  136:1 137:5 138:1
tab  76:21
table  33:19
tabulate  90:17
take  6:14 23:16
  36:19 37:13,14
  56:16 67:12 68:11
  68:11,14 104:15
  110:5 111:24
  117:21 119:19
  125:25
taken  68:21 120:4
  127:21 136:11
talk  24:6 77:8
  112:14
talked  32:16 41:25
  77:4 99:17 106:18
talking  50:13,14
  50:14 54:19 114:8
  134:5
taught  17:6
teach  13:24 17:4
teaching  13:15,17
  17:5
team  79:22,24
  80:16
tech  5:4 13:20,25
teleconference  2:5

tell  17:18 23:4,11
  24:5 61:8 63:16
  86:3 96:20 112:15
  116:5
tells  40:25 96:24
  112:18,19,23
  113:12
template  23:19,21
ten  52:18 53:2
  61:13,15 63:2
  68:12 107:25
  108:8,14
term  40:8 107:3
terms  112:16
  114:23
test  42:18,22 45:23
  63:8,22 99:22
  106:12 108:10,19
  109:7,10,11
testified  33:16
  44:12 102:11
  126:3
testifies  9:11
testify  8:24 136:6
testimony  21:13
  135:6
tests  22:25 23:2,5
  99:5
thank  22:10 68:10
  119:24 134:22
theory  125:7
thing  57:5 77:3
things  23:21 29:4
  45:6 97:16 113:18
think  19:23,25
  20:2 25:16,17
  52:5,16 57:21
  59:14,18 67:20
  68:13 70:7,12,24
  74:18 75:15 78:25
  83:10 86:15,16

90:16 91:3 93:6
  94:2 95:10 102:4
  102:9,13,25
  106:18 108:17
  109:10 111:5
  112:8,11 115:21
  116:18 125:15,19
  133:14
thinking  28:13
  44:16,17,19
third  64:19 109:15
  116:19,19 130:16
thomson  78:10,11
  78:20 79:4,19
  88:7,9 90:4,8,10
  90:19,23 91:16
  92:9,14,16,21 93:4
  93:7,21
thought  86:17
  102:7
thoughts  85:21
thousands  62:3
threatening  29:3
three  61:24 74:11
  78:8 82:21 103:13
  103:18 104:2
  110:21,21 111:12
  111:19 135:9
throw  41:10 42:3
time  7:18 11:4
  15:25 23:14 41:11
  47:24 52:16 55:13
  56:16 57:4,22
  61:9 67:12 68:14
  68:19,23 74:23
  81:10,12,17 87:16
  88:20 91:5,5,13
  99:9 103:6,16
  104:17 111:21,22
  120:2,6 136:13

**[timeframe - want]**                                                    Page 24

**timeframe** 52:17 97:9
**times** 8:17 9:22 46:10
**tiny** 113:25
**title** 85:11,15,18
**today** 9:18 10:6,24 11:11,16 12:24 13:4 20:25 21:6
**today's** 8:22 135:6
**told** 39:5 66:5
**top** 116:20
**topic** 19:10
**tos** 91:4
**total** 114:2,2 118:9 119:2,5,7 135:8
**trade** 41:3 58:3 114:17,19 117:18 119:17
**traded** 38:24 46:4 115:10 116:17 118:10 119:14
**trading** 34:8,20 36:7,18 42:17 48:22 56:17 60:20 61:14 105:9 107:16 109:24 111:5,7,11,18,21 112:6,7,21 114:11 114:24
**trained** 15:13 23:2
**training** 15:8 32:10 71:22 75:10
**transcript** 136:11 138:3
**transcripts** 103:20
**treatments** 99:6
**tremendous** 49:23 50:3,4
**trouble** 10:2

**true** 25:6,10 136:10
**truth** 55:7 128:7 136:7,7,8
**truthful** 9:18
**truthfulness** 36:13
**try** 40:22 56:2 62:8
**trying** 75:19 126:10
**turn** 6:9 13:6 14:4 44:6
**turning** 24:12
**two** 8:17 67:3 69:8 69:13 78:8 110:14 114:21 116:9 120:9,12,14,21
**type** 16:20 27:16 36:20 37:9 91:4
**types** 17:17 36:25
**typos** 21:5

**u**

**u** 138:1
**unable** 58:2 60:10
**uncertainties** 45:4
**undergraduate** 16:4
**underlies** 97:4
**underpricing** 66:8
**understand** 10:3 24:10 32:3,19,25 52:7 112:5 123:23
**understanding** 16:11 26:7 31:2,6 31:8,15 33:3 71:23 100:6 128:7
**underwriters** 48:21 50:19 52:13 53:17 60:9,10 65:21 66:16 82:6

**underwriting** 52:13
**unexpected** 37:12 37:23
**unexpectedly** 37:12
**unfathomable** 49:11
**unhelpful** 69:24
**uniquely** 62:16
**unit** 6:16
**united** 1:1 6:20 116:18 118:11,15 119:15
**units** 135:9
**unreliable** 100:4 102:25 103:8
**unsuccessful** 131:18 133:8
**unsustainable** 26:16 27:6,7,19 30:24 127:5,11 128:5
**unusual** 60:24
**upper** 115:20
**use** 32:2 48:8 87:21 90:22 92:13 93:13 104:17 106:9,11 107:4 109:6 117:10
**usually** 23:15 34:11 40:24 50:6

**v**

**v** 9:9 89:16
**validity** 27:22 36:14
**valuable** 50:16
**valuation** 34:14 38:10 43:22,22 46:18 47:12 49:13 50:14 56:25 57:8

57:9 87:2
**value** 83:18 84:17 84:22 85:2,7 86:18 87:9 114:2
**valued** 98:24
**values** 103:3
**variety** 10:12 45:11 65:25 87:6 89:12
**various** 34:4
**vast** 36:24 66:2
**vehemently** 27:22 133:20
**verdict** 127:25
**veritext** 2:5 5:4 7:1,5 135:10
**verse** 32:25
**video** 5:3 6:13,17
**videoconference** 1:15 6:25
**videographer** 6:1 7:3 68:18,22 119:25 120:5 134:23 135:4
**videotape** 1:13 2:3
**view** 86:11
**violated** 131:13 132:17 133:13 134:17
**virginia** 1:2 4:20 6:22
**virtually** 2:4 10:14
**volume** 49:24 50:3 60:22,25 61:11,12 82:3
**volumes** 60:20,23
**vote** 55:21

**w**

**wall** 82:5
**want** 14:20,21 16:8 21:25 24:24

30:13,18 63:7
66:20 67:15,17
68:11,14 77:3
88:17 107:3,8,9
111:25 114:13,14
117:19,23 125:14
**way**   25:2 31:22
58:15 63:7 78:16
78:22 86:17 98:10
107:3 115:6
**ways**   45:3 73:21
74:19 78:9 98:24
106:25 113:17
114:22 116:9,13
**we've**   8:15 23:3,18
94:12,13,14
101:15
**web**   82:22 83:11
94:15
**website**   76:19
**week**   36:19 37:14
**weeks**   12:13
**weiss**   4:11 7:21
**wen**   1:6 4:3 6:18
7:24 8:3 12:16
26:11 27:5 28:5
38:3,14 46:4,20
47:2,7 49:3 52:17
53:15 64:20 72:20
77:15,25 79:5,14
79:16 80:11 82:15
85:11 86:13 88:4
94:20,22 103:12
118:2 127:4
130:11 137:12
**wen's**   46:9 57:22
61:13 64:21 94:25
121:14,18 122:2
123:16 124:8
128:4

**wens**   126:20
**went**   103:14,16
104:2 134:12
**west**   3:8
**whispering**   6:7
**white**   69:19 70:2
**wide**   87:6
**widely**   69:16
93:23 94:3
**wife**   11:18
**window**   84:6
**windows**   85:12
**wisconsin**   3:5 8:12
**wish**   21:2 121:7,10
139:1
**witness**   68:15
84:13 104:23
117:23 137:2
**woods**   4:18 8:2
**word**   110:5 111:24
**work**   13:2 15:19
16:5 18:15 32:9
41:20,22 45:5,10
50:7 71:11,14
72:11 74:9 75:8
129:13
**worked**   14:18
15:10,21 23:3
120:21
**working**   13:19
75:2
**works**   63:8 130:9
**world**   97:18 103:5
**worth**   51:9
**write**   23:15 71:24
107:6 108:4
**writes**   71:18 72:7
**writing**   23:14 24:7
72:14
**written**   23:18
27:14 33:17 52:9

72:12 86:5
**wrong**   26:22 33:5
127:16,18 134:10
**wrote**   12:11 22:15
23:22 33:15 71:12
72:24 83:4
**wyman**   3:13 10:22

**x**

**x**   1:5,10 137:1,5
**xi01165**   2:8

**y**

**yeah**   15:11 57:2
110:6
**year**   32:15 88:25
92:6 107:20
114:10
**years**   14:3,23
44:17 51:11
103:14,18 104:2
**yesterday**   10:15
**yogi**   54:21
**york**   3:21,22,22
4:9,9 64:17

**z**

**zoom**   1:15 2:4
10:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                VERITEXT LEGAL SOLUTIONS
      COMPANY CERTIFICATE AND DISCLOSURE STATEMENT


  Veritext Legal Solutions represents that the
  foregoing transcript is a true, correct and complete
  transcript of the colloquies, questions and answers
  as submitted by the court reporter. Veritext Legal
  Solutions further represents that the attached
  exhibits, if any, are true, correct and complete
  documents as submitted by the court reporter and/or
  attorneys in relation to this deposition and that
  the documents were processed in accordance with
  our litigation support and production standards.

  Veritext Legal Solutions is committed to maintaining
  the confidentiality of client and witness information,
  in accordance with the regulations promulgated under
  the Health Insurance Portability and Accountability
  Act (HIPAA), as amended with respect to protected
  health information and the Gramm-Leach-Bliley Act, as
  amended, with respect to Personally Identifiable
  Information (PII). Physical transcripts and exhibits
  are managed under strict facility and personnel access
  controls. Electronic files of documents are stored
  in encrypted form and are transmitted in an encrypted
  fashion to authenticated parties who are permitted to
  access the material. Our data is hosted in a Tier 4
  SSAE 16 certified facility.

  Veritext Legal Solutions complies with all federal and
  State regulations with respect to the provision of
  court reporting services, and maintains its neutrality
  and independence regardless of relationship or the
  financial outcome of any litigation. Veritext requires
  adherence to the foregoing professional and ethical
  standards from all of its subcontractors in their
  independent contractor agreements.

  Inquiries about Veritext Legal Solutions'
  confidentiality and security policies and practices
  should be directed to Veritext's Client Services
  Associates indicated on the cover of this document or
  at www.veritext.com.
```

Page 140

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

-----------------------------x

IN RE: JELD-WEN HOLDING, INC.

SECURITIES LITIGATION

                    CIVIL ACTION NO.

                    3:20-cv-00112-JAG

-----------------------------x

VOLUME II

VIDEOTAPE DEPOSITION OF

STEVEN P. FEINSTEIN, Ph.D.

VIA ZOOM VIDEOCONFERENCE

February 22, 2021

10:00 a.m.

Reported by:

Maureen Ratto, RPR, CCR

**Page 141**

* * *

     Videotape deposition of Steven P.
Feinstein, Ph.D., held virtually via
Zoom Teleconference, hosted from
Veritext Legal Solutions, pursuant to
notice, before Maureen Ratto, Certified
Court Reporter, License No. XI01165,
Registered Professional Reporter,
License No. 817125, and Notary Public.

                    * * *

**Page 142**

A P P E A R A N C E S:

Counsel for the Plaintiff - Plumbers

and Pipefitters National Pension Fun

and Wisconsin Laborers' Pension and the

Proposed Class:

    ROBBINS GELLER RUDMAN & DOWD, LLP

    655 West Broadway

    San Diego, California 92101

    (619) 231-1058

    BY:   ROBERT M. ROTHMAN, ESQ.

          rrothman@rgrdlaw.com

          DEBRA J. WYMAN, ESQ.

          DebraW@rgrdlaw.com


Counsel for Defendant - Onex

Corporation:

    FRIED FRANK HARRIS SHRIVER &

    JACOBSON, LLP

    One New York Plaza

    New York, New York 10004

    (212)859-8000

    BY:   PETER L. SIMMONS, ESQ.

          peter.simmons@friedfrank.com

**Page 143**

A P P E A R A N C E S, continued:

Counsel for Defendants - Jeld-Wen Holding, Inc., Mark A. Beck, L. Brooks Mallard, Kirk S. Hachigian, and Gary S. Michel:

KIRKLAND & ELLIS, LLP

601 Lexington Avenue

New York, New York 10022

(212) 446-4800

BY: LINDSEY WEISS HARRIS, ESQ.

lindsey.harris@kirkland.com

GILAD BENDHEIM, ESQ.

gilad.bendheim@kirkland.com

KELSEY DAVIS, ESQ.

kelsey.davis@kirkland.com

JACOB RAE, ESQ.

jacob.rae@kirkland.com

-and-

MCGUIRE WOODS, LLP

800 East Canal Street

Richmond, Virginia 23219-3916

(804) 775-1000

BY: BRIAN C. RIOPELLE, ESQ.

briopelle@mcguirewoods.com

**Page 144**

A P P E A R A N C E S,  continued:


ALSO PRESENT:

DANIEL BETTENCOURT, Crowninshield

Research Financial

MICHAEL KEABLE, Compass Lexecon

CHRISTOPHER HANLON, Legal Video

Specialist

**Page 145**

VIDEOGRAPHER:  Good morning. We are going on the record the date.

(Interruption in proceedings.)

We are going on the record. The date today is February 22nd, 2021 and the time is 9:58 a.m. Eastern Time.

This is Media Unit 1 of the video-recorded deposition of Dr. Steven Feinstein taken in the matter of In Re:  Jeld-Wen Holding Incorporated Securities Litigation. This is filed in the U.S. District Court, for the Eastern District of Virginia, Civil Action No. 3:20-CV-00112.

This deposition is being held remotely in multiple locations. My name is Christopher Hanlon I'm the video technician today and the court reporter is Maureen Ratto. We are with Veritext, New York.

All attorney appearances will be noted on the stenographic

Page 146

STEVEN P. FEINSTEIN, Ph.D.

record.

At this time I would ask our court reporter to please administer the oath and we can proceed.

* * *

S T E V E N   P.   F E I N S T E I N, Ph.D., having been duly sworn according to law by the Officer, resumes:

DIRECT EXAMINATION BY MS. HARRIS:

Q.    Good morning. Is there any reason why you cannot give complete, accurate and truthful answers today?

A.    No.

Q.    Did you prepare for your deposition today?

A.    Yes.

Q.    What did you do?

A.    I reread case documents, my reports, Defendants' expert reports, reviewed the Complaint and I met virtually via Zoom with Plaintiffs' counsel.

Q.    Who did you meet with?

Page 147

STEVEN P. FEINSTEIN, Ph.D.

A.    Debra Wyman and Rob Rothman and Dan Bettencourt was with me on those meetings.

Q.    When did you meet with them?

A.    Two days ago and I think briefly yesterday as well.

Q.    Okay. And how long did you meet with them two days ago?

A.    I don't recall exactly. A couple hours.

Q.    And how long did you meet with them yesterday?

A.    Briefly, less than an hour.

Q.    You mention that you reviewed some documents. Who selected the documents that you reviewed?

A.    I did.

Q.    Did you review any documents for the first time?

A.    No.

Q.    Did you review any documents not listed in Exhibit 1 of your report or Exhibit 1 of your reply report, dated February 15, 2021?

Page 148

STEVEN P. FEINSTEIN, Ph.D.

A.    No.

Q.    Is there anything else you did to prepare for your deposition today?

A.    No.

Q.    Is there anyone else you spoke to about your deposition today?

A.    Besides the people I mentioned, no.

Q.    Okay. You use the term corrective disclosure throughout your report. What is a corrective disclosure?

MR. ROTHMAN:  Objection.

A.    A disclosure is a provision of information, it could be from a variety of sources but it's a provision of information to the marketplace and it corrects either misunderstanding or misleading or incorrect facts, replaces them with correct facts or it could -- or it could be corrective in the sense that it removes the artificial inflation that was instilled in a security price on account of misrepresentations and omissions.

Page 149

STEVEN P. FEINSTEIN, Ph.D.

Q.     Is a corrective disclosure a defined economic term?

A.     In the forensic economics world it is, yes.

Q.     Okay. How do you determine if the disclosure is corrective of a prior misstatement?

A.     There are numerous ways. One is to examine the content of the information in the disclosure and see if it relates to what has alleged to have been previously misrepresented or omitted.

Another way is to examine if the price response to the information pulls out of the stock price inflation that was caused by alleged misrepresentations and omissions.

There are other elements. I mean, to see that a disclosure is material and, therefore, it should be corrective of a valuation, you might look at company statements to see if the company considered the statements, the

Page 150

STEVEN P. FEINSTEIN, Ph.D.
economic material.  You might look at analysts reports to see if they considered the material to be economically material. You might look at financial principles to see if the content of the information is economically material and I did actually all of those analyses in the course of my work in this case.

Q.    Is there anything else?

A.    There may be, but my analysis was essentially those four prongs; examining the content of the information; examining company statements, analyst statements, financial principles; and conducting empirical work.

Sometimes -- within -- sometimes the news media will reflect whether or not information was material and corrective, so that's something I would examine.

Q.    So when determining whether a statement is a corrective disclosure, it is appropriate to consider whether the

**Page 151**

STEVEN P. FEINSTEIN, Ph.D.

company's stock dropped following a disclosure?

MR. ROTHMAN:  Objection.

A.    Well, that's one way. It's appropriate, to be a comprehensive analysis,  one would look at that. It's not the only way to prove that information; A, was corrective and -- A, was a disclosure related to prior misrepresentations and omissions; and B, served to correct the stock price to a correct level. There are other ways to determine that.

Q.    Okay. In your report you conclude that Judge Payne's decision on October 5th, 2018 was a corrective disclosure, correct?

A.    Yes.

Q.    I'm going to refer to that decision as the divestiture decision. Do you understand that?

A.    I didn't hear you.  As what decision?

Q.    As a divestiture decision.

STEVEN P. FEINSTEIN, Ph.D.

I'll refer to that as the divestiture decision.

A.    Can you spell that first one?

Q.    Divestiture decision.

A.    Oh, divestiture decision, okay.

Q.    That's okay.

A.    Well, I think -- well, different people refer to it as different things. You know, your expert, Mr. Fischel, said it was the remedy decision.  But sure, I mean there it could be a remedy decision, divestiture decision, Judge Payne's decision.

Q.    And you understand what I'm referring to when I refer to the divestiture decision?

A.    Well, I don't think that's necessarily accurate. I think the decision had far more in it than just an opinion about divestiture.  It also -- I mean, it included, as the judge in this case said, a detailed recitation of the facts and adjudicated detailed recitation

Page 153

STEVEN P. FEINSTEIN, Ph.D.

of the facts, in fact. But if you want to call it that, I'll -- for today we can call it that just so we know what we're talking about.

Q.    Okay. And you'll understand what I'm talking about?

A.    Right. I just want to caution that another name might be a more appropriate name for that corrective disclosure, but you can chose the terminology.

Q.    Your event study analysis found a decline in Jeld-Wen's stock on October 8th was not statistically significant, correct?

MR. ROTHMAN:  Which date did you say?  I couldn't hear you.

MS. HARRIS:  October 8th.

A.    Right. Alone, the October 8th decision, by itself -- I mean, there was a drop, the stock did fall, but the statistical event study did not indicate it to be over the threshold for statistical significance.  Which means

**Page 154**

STEVEN P. FEINSTEIN, Ph.D.

that that day, alone, although it experienced a drop after the decision came out and was known to the marketplace, we can't be absolutely sure that it was -- that volatility wasn't a factor as well.

Q.    Dr. Feinstein, I would appreciate if you answer the question that I'm asking.

My question was, your event study analysis found a decline in Jeld-Wen stock on October 8th was not statistically significant; is that correct?

A.    Yeah.  And I was putting that into context as to what "statistical significance" means, so that this can't be taken out of context and used to imply something other than what I'm testifying to.

Q.    If we look at paragraph 296 of your report --

A.    Where do I find that in the marked exhibits?

Page 155

STEVEN P. FEINSTEIN, Ph.D.

Q.      It should be marked Exhibit 1.

(Feinstein Exhibit 1, Reply Report of Steven P. Feinstein, having been previously marked, is shown to the Deponent.)

A.      I clicked on it and it's thinking. Okay. Exhibit 1 is my report on market efficiency, loss causation and damages and you asked me to turn to a particular paragraph, right?

Q.      If you go to page 102 and the first paragraph on that page is 296.

A.      You said page 102?

Q.      Yes.

A.      Paragraph 296.  But before you ask the next question, I just want to make sure, when I said that you can't be absolutely sure that the price reaction was a reaction to information rather than volatility, what I meant was you can't be absolutely sure from that test alone. There might be other ways to tell.

Okay. I'm on paragraph 296.

Q.      Okay. And you say, "The

STEVEN P. FEINSTEIN, Ph.D.

divestiture decision reasonably negatively impacted the stock price." Right?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    What is your basis for that statement?

A.    Numerous things. And I explain them in the report and in the reply report. Financial principles, based on financial principles what's well known and generally accepted about how securities are valued, that kind of information in an efficient market should cause the stock price to fall or should put -- should put downward pressure on the stock price and the price might not fall if there is something else holding it up, but it should push the price down, all else equal.

The company previously said that if there was -- well, the company said, in a number of ways, that the -- that if there would be legal

**Page 157**

STEVEN P. FEINSTEIN, Ph.D.

ramifications from the Steves lawsuit that they would be material.

Analysts said that that kind of information is material and this kind of disclosure would -- of a decision against the company would be adverse to the company. So I mean company statements, analyst statements, financial principles, the fact that the stock fell every single day for ten days after that, all indicate that it's reasonable that this information, this partial corrective disclosure negatively impacted the stock price that day.

Q. Okay. And you say, "The reason the stock did not experience a statistically significant decline may have been due to the countervailing impact of the company's denial." Right?

A. That's right.

Q. You say that's a possibility, right?

MR. ROTHMAN: Objection.

A. Yes.

Page 158

STEVEN P. FEINSTEIN, Ph.D.

Q. You don't actually know if that's the case, right?

A. I think that's fair to say.

Q. So it may have been due to countervailing, it may not -- sorry. I'll start over.

It may not have been due to the countervailing impact of the company's denial, right?

MR. ROTHMAN: Objection.

A. Well, the best explanation, given the facts and circumstances, is that what held the stock price up, what was, in fact, the countervailing impact of the company's denials, I haven't seen -- I mean, within -- the reason I say it's possible is, who knows what else we'll discover through discovery or who knows what else -- maybe I'll be presented with some very compelling argument.

I see no compelling argument, except for this explanation as to why the stock price declined, though, negative,

Page 159

STEVEN P. FEINSTEIN, Ph.D.
was not statistically significant that day. This is the best explanation and the most reasonable explanation.

Q.    But there may be other reasons the stock did not decline in a statistically significant way that day, right?

A.    Within the realm of possibility. I read Mr. Fischel's report and he offered no good explanation, no good alternative.

I see nothing in the record in this case or in the experience of the company that would provide a better explanation than that the market was influenced by the company's adamant denials that there would be negative repercussions.  And I should also say that, you know, when the company finally acknowledged that there would be negative repercussions and that kind of opened the floodgate to the floor dropping out of the stock, sorry to mix metaphors, but I think you understand what I'm saying

Page 160

STEVEN P. FEINSTEIN, Ph.D.
here, that provides more support for the hypothesis and I believe it's a essentially confirmed hypothesis that it was the company's denials that were holding the stock price up, notwithstanding the disclosure that day.

Q.    You say that, "Analysts lowered their valuation of Jeld-Wen in published equity reports following the divestiture decision."  Correct?

A.    Can you please say that again? I'm having a little trouble hearing you. I'll put the volume up. Okay.

Q.    You say, "Analysts lowered their valuation of Jeld-Wen in published equity research reports following the divestiture decision."  Correct?

A.    Yes.

Q.    These analysts lowered their valuations despite the company's denial, right?

A.    That's right.

Q.    Does that suggest those analysts did not believe Jeld-Wen's

STEVEN P. FEINSTEIN, Ph.D.

denial?

A.    No. No. I mean, "believe" --
there's "believe" and then there's
"believe".

I think everyone was
influenced by what the company was
saying. That's the primary source of
information when you are valuing a public
security.

So certainly what the company
was saying was influencing analysts and
what the company was saying was also
influencing investors who were not
analysts.

So I don't think you could say
it was all or nothing, they either
believed it or they didn't.

Q.    So it's your opinion that some
analysts believed their denials and some
analysts didn't believe the denials?

MR. ROTHMAN:  Objection.

A.    Well, that's how financial
markets work.  There is generally a --
there is not a unanimity of opinion.  I

**Page 162**

STEVEN P. FEINSTEIN, Ph.D.

think some analysts were influenced by the denials, though, also influenced by the disclosure, itself, so that they took down their price targets and revalued the stock lower, had lower price targets and others didn't.  And similarly, investors, there's a range of opinions among investors.

Investors -- look the stock price did fall so -- but it didn't fall by an amount that was over the threshold for significance. So it's reasonable that negative information entered the marketplace but it was muted by something, and it was pretty clear what the something was. There's no better explanation as to what that something was.

Q.    Do you agree that analysts' reports facilitate the flow of information and the digestion of information within the marketplace?

A.    They do, of course. I mean, but they're not the end-all. Investors

Page 163

STEVEN P. FEINSTEIN, Ph.D.
receive the information and process it too and buy-side analysts, whose reports we don't have, process the information too.

So we get a -- we get a snapshot of some participants' thinking in sell-side analyst reports, but there's a lot more opinion and digesting of information that goes out outside of those reports.

Q.   Do you agree analysts made information about Jeld-Wen readily available to market participants?

MR. ROTHMAN:   Objection.

A.   It facilitated doing that. There are other avenues by which information was readily available, but analyst reports helped.

Q.   What are the other ways that you're referring to?

A.   SEC 8-Ks, for example, company statements, press releases, conference calls, news media, and the like. I mean, there's a lot of sources of information

Page 164

STEVEN P. FEINSTEIN, Ph.D. about companies.  Analyst reports are important but they're just one of several.

Q.    You mentioned financial principles that you applied to determine if there was a corrective disclosure. What financial principles are you referring to?

MR. ROTHMAN:  Objection.

A.    Well, I spell it out in the report. The financial principles that say that revenue and earnings are important to a valuation, that a competitive -- the degree of competition in a marketplace impacts revenue and earnings and pricing, misrepresentations -- oh, there's the principle that sustained persistent issues have a bigger impact on security prices than transitory issues or one-time issues.

Those are the principles that indicate that if the company learns that what was previously represented to be the reasons for a company's past success were

Page 165

STEVEN P. FEINSTEIN, Ph.D.

not sustainable, then upon learning that the information that suggests that's the case will be material adverse information and it will have a negative impact on the stock price.

Q.    In your report you concluded that Jeld-Wen's disclosure of a $76.5 million loss contingency related to the Steves litigation was a corrective disclosure, correct?

A.    Yes.

Q.    I'm going to refer to the $76.5 million charge as the litigation contingency. Do you understand that?

A.    I prefer that you use the same terminology that the judge in this case used, which is the liability announcement.

Q.    I'm going to use the term litigation contingency. Will you understand what I'm referring to?

A.    I think so.

Q.    The company announced a litigation contingency in its Q3 2018

STEVEN P. FEINSTEIN, Ph.D.

pre-earnings release on October 15th, 2018, right?

A.      Please repeat the question.

Q.      The company announced the litigation contingency in its Q3 2018 pre-earnings press release on October 15th, 2018, correct?

A.      Yes.

Q.      I'm going to refer to the press release as the pre-earnings release. Will you understand that?

A.      Okay. Yes.

Q.      Okay. I'm going to show you what was previously marked as Exhibit 4 in your prior deposition. That should hopefully be available in the Marked Exhibits folder.

        (Feinstein Exhibit 4, Jeld-Wen Pre-Earnings Press Release, having been previously marked, is shown to the Deponent.)

A.      Okay. I'm there.

Q.      Okay. And this is the pre-earnings release, correct?

Page 167

STEVEN P. FEINSTEIN, Ph.D.

A.     Yes.

Q.     And you see about halfway down the page the paragraph that starts, "Additionally, the company expects third quarter results to include a charge of $76.5 million for a litigation contingency?"

A.     I see that.

Q.     Okay. That's the announcement of the litigation contingency that you concluded was a corrective disclosure, correct?

MR. ROTHMAN:  Objection.

A.     Yes.

Q.     And just so I understand, is that first sentence a corrective disclosure or is the entire paragraph a corrective disclosure?

A.     Well, I think the entire press release constitutes the corrective disclosure. Although, some areas are -- the most corrective section is that paragraph.

Q.     Are there other portions of

STEVEN P. FEINSTEIN, Ph.D.

the press release, besides that paragraph, that you believe are corrective as prior misstatements in this case?

A.    Well, yes. The context in which it was made. The company had never in its history issued a warning before or a pre-release of this sort.  Sort of like a news bureau interrupting their regularly scheduled programs to bring a special report.  I mean, there's something important.

So, you know, analysts and investors are looking at this and trying to figure out what was so important that the company had to pre-release. So I mean, the context in which the pre-release is being made, which is why the -- is also part of the corrective disclosure.

Q.    Is there any language outside of the paragraph we looked at that constitutes a corrective disclosure?

A.    Well, I just said, I consider

Page 169

STEVEN P. FEINSTEIN, Ph.D.

this entire press release, that corrective disclosure, you know, what the company felt was so important that they had to pre-release, it's not -- and then you know, these other bullet points that they add to the announcement, which aren't really all that unusual or all that important, places emphasis on that paragraph that you pointed out as being the key to why this was -- why this pre-release was felt to be necessary by the company.

Q.    Was the preliminary third quarter 2018 revenue announcement, was that a corrective disclosure?

A.    Well, like I said, I mean, the content of that is, in and of itself, not a corrective disclosure but, you know, that the company was still having trouble with some of its operational or production issues, just as they had announced in prior quarters for over a whole year, there's information conveyed by the company, adding that to this

STEVEN P. FEINSTEIN, Ph.D.

corrective disclosure press release. I mean, it focuses one's attention on what's really important and what's new and corrective, which is the litigation charge.

Q.    So is there any language in here that is not part of the corrective disclosure?

A.    I said the whole press release is the corrective disclosure.  The information content that's most corrective is the paragraph you highlighted.  And, frankly, I think investors and analysts understood that too that that's the paragraph to be highlighted.

Q.    Were there other corrective disclosures on October 15th, 2018, aside from those contained in this pre-earnings release?

MR. ROTHMAN:  Objection.

A.    Well, in my report I wrote that analysts' reaction to this release also is part of the corrective disclosure

Page 171

STEVEN P. FEINSTEIN, Ph.D.

process. The analysts reacted and wrote down 2019 forecasts, you know, well beyond the 2018 that the company said was essentially over and fixed.

So I think I would include the reaction of the public and -- the public reaction of some market participants as to be a component of the corrective disclosure for the marketplace.

Q.      Is there any information in the pre-earnings release that's corrective besides that contained in the litigation contingency paragraph?

MR. ROTHMAN:  Objection.

A.      I don't -- I don't -- are you saying you did not understand my prior answer or you want me to say the answer again?

Q.      No. I'm trying to understand -- this is a press release that is more than a page and there's a single paragraph that talks about the litigation contingency.

So I'm trying to understand if

STEVEN P. FEINSTEIN, Ph.D.

you're saying that the updated full year 2018 guidance was a corrective disclosure or if you're saying the only information that is corrected is from the litigation contingency paragraph?

MR. ROTHMAN:  Objection.

A.    Well, first of all, I said the entire press release, the way it's laid out, what the company decided to bundle together.  And companies don't have to bundle together all this news and this kind of news in essentially an emergency pre-release profit warning.  They dont' have to.

So the fact that they chose to bundle together this information tells the marketplace something about what's really important and what might be an intentional distraction.

On the other hand, with respect to -- you know, I did say in my report that 2018 may have been caused -- I mean, you know, may have been caused by a curbing of company price power, in

Page 173

STEVEN P. FEINSTEIN, Ph.D.

which case it reasonably could be taking -- you know, the drop that directly is caused by the 2018 component of the announcement reasonably could be fraud-related damages, but I said I don't know for sure. So to be conservative, I excluded that drop in the price that I can directly tie to the 2018 announcement from fraud-related damages.

So I chose to be conservative, to treat that as if it was not the corrective disclosure or a component of -- that that information wasn't corrective, specifically, of the fraud-related allegations. But it's not to say that it can't be and isn't. I mean, it's to say that depending on what else is discovered as more information emerges, it could be.

Q.     Is it your opinion that the updated full year 2018 guidance was corrective -- corrective of any of the alleged misstatements or omissions in this case?

STEVEN P. FEINSTEIN, Ph.D.

A.    Well, I think I wrote in my report that I can't really opine one way or the other.  But to be conservative, I treated it as if it were not a corrective disclosure that had caused fraud-related damages.

Q.    Let's look at your report, that's Exhibit 1, again, page 100.

A.    Okay.

Q.    In the first full bullet you talk about the October 15, 2018 corrective disclosure.  And about halfway down the paragraph you say, "The company disclosed that profitability going forward would be less than what was previously achieved and expected." Do you see that?

A.    Yes.

Q.    If we go back to Exhibit 4, the pre-earnings release, where does it say that?

A.    Well, that's the 2018 component.  In 2018 they said that the rest of 2018, which at that point had two

Page 175

STEVEN P. FEINSTEIN, Ph.D.

months left, the company would not be as profitable as it previously had been. So, you know, there's certainly some valuation and information importance there.

Q.    So you're referring to the information about fiscal '18 guidance. You're not referring to the information about the litigation contingency?

MR. ROTHMAN:  Objection.

A.    Well, analysts forecasted based on the litigation contingency that the company, going forward beyond 2018, would not be as profitable.

The company admitted that for the rest of 2018 they would not be as profitable. I analyzed that. I saw that the 2018 announcement may or may not be fraud-related, but I couldn't tell for sure, given the information available, given the lack of transparency into what made the company issue this announcement and issue it the way they did.

So I chose to treat it, the

STEVEN P. FEINSTEIN, Ph.D. 2018 component, as if it were not -- the dollar drop in losses caused by that component I took out from damages, excluded it from damages. Although, reasonably it could have been included, but to be very conservative I excluded it.

Q.    So it's not your opinion that the litigation contingency paragraph disclosed the profitability going forward would be less than what was previously achievable and expected?

MR. ROTHMAN:  Objection.

A.    It totally is my opinion. They did say that. They said that going forward --

Q.    Where does it say that?

A.    Where?

Q.    In the paragraph announcing the litigation contingency does the company disclose that profitability going forward would be less than what was previously achievable and expected?

MR. ROTHMAN:  Objection.

STEVEN P. FEINSTEIN, Ph.D.

A.    Well, essentially they do. That's economic principles combined with the company's statement. By saying that we now acknowledge that there is -- essentially saying to the marketplace that we acknowledge there is merit to those charges against us, such that it's probable there is going to be negative financial repercussions, they were informing the marketplace that the very reason for the company's high valuation historically was not sustainable.

So they were informing the marketplace in that paragraph that their profitability going forward would not be as high as it was.

Now, they explicitly quantified how much less profitable they would be in 2018, but I didn't have access to those calculations. So, you know, they gave an excuse. The company gave an excuse that it was because of production issues in windows.

I don't know whether to

**Page 178**

STEVEN P. FEINSTEIN, Ph.D.

believe the company or not, but I chose to, for the sake of a conservative estimate.

Q.    Can you point me to the language in the paragraph on the litigation contingency that you believe disclosed profitability going forward would be less than what was previously achievable and expected?

A.    Well, it's exactly the paragraph you highlighted. But by -- and I explain that in my report, you know, I did, by explaining to the marketplace, whereas, previously we said there was no merit whatsoever to the Steves allegations and there was --

Q.    Excuse me. I would appreciate if you would listen to my question.

A.    Okay.

MR. ROTHMAN:  I appreciate if you let the witness finish his answer before you interrupt him. Please continue, Dr. Feinstein, with your answer.

**Page 179**

STEVEN P. FEINSTEIN, Ph.D.

A.    It's the paragraph we highlighted. It starts with the word "additionally" and ends with the words "10-Q".  It is very informative to the marketplace about profitability going forward.

Q.    Okay. Does that paragraph discuss fiscal '19 and beyond?

A.    It addresses fiscal '19 and beyond.  It doesn't explicitly state it but it addresses it.

Q.    Where does it address it?

A.    The entire paragraph. They're basically admitting that the source of their profitability and margin growth historically is unsustainable or they're admitting -- that was a little too strong.

They're admitting that it is highly likely, highly likely that that source is unsustainable.

Q.    And you see the language in that paragraph that says, "The company continues to maintain that it has not

STEVEN P. FEINSTEIN, Ph.D. violated any antitrust laws and intends to appeal any adverse judgment", right?

A.    Sure.

Q.    And so you believe that that's part of the corrective disclosure?

A.    Yes.

Q.    You believe that that is part of the corrective disclosure, where the company is announcing that the case against it has merit?

A.    Yes.

Q.    Does that paragraph explicitly say anything about fiscal 2019 EPS?

A.    Well, depending how you are defining "explicit", I would think that it's more implicit than explicit, but it's there. It's implicitly there.

Q.    Is it explicitly there?

A.    They don't mention -- the 2019 year is -- I don't see the numbers "2019" in that paragraph, but this is financial analysis. You learn from what the company is saying, what information they have and what the outlook ought to be.

Page 181

STEVEN P. FEINSTEIN, Ph.D.

Q.    Where in this press release does the company disclose prior gains and profitability would likely be reversed?

A.    Right there. I mean, in that paragraph the company had previously said that the reasons for our profitability and our success was disciplined execution, and a variety of types of expertise, allegedly concealing that the true source was unsustainable anticompetitive behavior. And they coupled those representations, alleged to be misrepresentations, with denials, saying that there is absolutely no merit whatsoever to the Steves allegations.

Now, they're saying that it's -- and that there would be no negative repercussions in their opinion, in their outlook.  Now they're backing out and retreating from that, and they're saying there are going to be some negative repercussions.

As soon as you start backing off from your explanation as to why you

STEVEN P. FEINSTEIN, Ph.D.
were previously successful, you're
admitting to the marketplace that you
might not be as successful going forward.

Q.    You believe that this
paragraph says that the allegations of
anticompetitive behavior had merit?

A.    Again, you are kind of
couching all these questions as black and
white, all or nothing. The company is now
acknowledging that they're -- that they
may suffer repercussions, therefore, it's
more -- it's now probable that they will
be adjudicated to have had merit or they
have been adjudicated to have had merit,
and they're accepting that there are
going to be negative repercussions
because of the allegations.

So, you know, they can protest
all they want but they're now
acknowledging to the marketplace that
things are going to be different going
forward than they were going backwards.

Q.    In looking at the language in
that paragraph that says, "The company

Page 183

STEVEN P. FEINSTEIN, Ph.D.
continues to maintain that it has not
violated any antitrust laws and intends
to appeal any adverse judgment", is it
your expert opinion the market ignored
this sentence?

A.    No. They've heard it before
but now in this context, juxtaposed
against the liability announcement, it
just rings a little bit more hollow than
before.

I think, you know, the company
-- the analysts and investors reasonably
look and say, I'm sure the company wishes
it were the case that they didn't do
anything wrong and they wish it were the
case that they were not found to have
done anything wrong, but they're
acknowledging here that other people
disagree and that going forward there are
going to be negative repercussions, which
could even be catastrophic repercussions.

Q.    Is it your expert opinion the
market didn't believe the company's
denial?

Page 184

STEVEN P. FEINSTEIN, Ph.D.

MR. ROTHMAN:  Objection.

A.    Again, it's not so black and white, all or nothing. I think the company -- I think investors and analysts -- and we should understand that it's reasonable that the company would make such denials in the face of an adverse decision like this. It serves their purposes to do so.  But the marketplace is now informed that they should believe otherwise. I mean, not completely otherwise. I mean, the likelihood of negative ramifications spiked upward considerably because of this acknowledgment.  It doesn't mean that everyone now believes with 100% certainty that there is going to be any particular outcome, except for that there is going to be what's reasonable is at least a $76.5 million cost.

MS. HARRIS:  I'm going to mark the Feinstein reply report on and damages from February 15, 2021.

(Feinstein Exhibit 5,

Page 185

STEVEN P. FEINSTEIN, Ph.D.

Feinstein Reply Report, dated February 15, 2021, was received and marked on this date for identification.)

Q.    Let me know when you have the document, Dr. Feinstein.

A.    I just refreshed and it wasn't there yet. It's refreshing now. It's still not there.

MR. ROTHMAN:  I believe there are two folders with your deposition.

A.    Oh, yes. Is this Exhibit 5 you're directing me to?

Q.    Yes.

A.    It's opening. Yes. I'm here now.

Q.    And this is your reply report?

A.    It is on loss causation and damages.

Q.    If you look at page 38 -- sorry -- page 15, paragraph 38.

A.    Okay.

Q.    You say, "An economic analysis

Page 186

STEVEN P. FEINSTEIN, Ph.D.

of loss causation assumes Plaintiffs' factual allegations to be true and determines that the alleged misrepresentations or the alleged corrective disclosures affected the stock price." Correct?

A.    You left out a couple of words. You left out "and omissions", but I see where you're reading from.

Q.    Did you assume that Plaintiffs' allegations that their divestiture decision corrected the corrective disclosures and omissions was true?

MR. ROTHMAN:   Objection.

A.    No. I didn't accept Plaintiffs' interpretations. I accepted as assumptions their factual allegations. It was my determination that if -- okay.

What I assumed was that the things that are -- that are characterized as misrepresentations and omissions actually happened, that the company did say what it said and didn't say what they

Page 187

STEVEN P. FEINSTEIN, Ph.D.
didn't say and that they knew what they knew and the facts were -- and the concealed facts were as Plaintiffs allege them to be. So those are the assumptions.

Based on those assumptions, I determined that the liability announcement was a corrective disclosure.

Q.    And so did you assume that Plaintiffs' allegations that the litigation contingency corrected the alleged misstatements and omissions were true?

MR. ROTHMAN:  Objection.

A.    That's not something that I assumed. That's something -- well, it's not something -- maybe I need to hear your question again.

Q.    Did you assume that Plaintiffs' allegations that the litigation contingency corrected the alleged misstatements and omissions were true?

A.    I did not assume that. I concluded that from my own research and

STEVEN P. FEINSTEIN, Ph.D.
analysis.

Q.    Okay. Thank you.

Going back to your report, your original report, we're going to look at paragraph 268 and that's page 88.

A.    Okay.

Q.    An event study can be used to establish a company's specific security price reaction on a corrective disclosure date, correct?

MR. ROTHMAN:  Objection.

A.    I wouldn't -- I didn't and wouldn't say it quite that way.

Q.    So what you say here is, "Once an event study has established a company-specific security price reaction on a corrective disclosure date", right?

A.    I wrote that, yes.

Q.    Okay. So you agree that an event study can establish a company-specific price reaction on a corrective disclosure date, right?

A.    Yes.

Q.    Here your event study found a

STEVEN P. FEINSTEIN, Ph.D.
statistically significant stock price
movement on October 16, 2018, correct?

A.    Yes.

Q.    An event study doesn't tell
you whether an allegation-related -- I'll
start over.

An event study does not tell
you whether allegation-related
information, as opposed to other
unrelated company information was a
substantial cause of the security price
change, right?

MR. ROTHMAN:  Objection.

A.    Well, it depends, you know,
how much of the analysis around the
statistical work you consider to be part
of the event study or outside the event
study.

The statistical t-test, by
itself, will tell you that
company-specific information caused the
price movement. It can tell you -- it can
provide an indication that it was
company-specific information that caused

STEVEN P. FEINSTEIN, Ph.D.

the price movement. Additional analysis after that would be undertaken in order to determine which company information, if there was a mix of company information, and I did that analysis.

Q.   Right. So the event study alone doesn't tell you which company-specific information caused the drop, right?

A.   Well, like I said, let's say the regression component, the regression and t-test component of the event study won't tell you, but if the analysis of -- it's I think reasonable to say that the analysis of the news, the news analysis is part of the event study analysis.

If that's the case, then the event study does do that. The additional work beyond the t-test and the regression analysis is what helps you determine which company news caused the price movement, and that could be -- and that reasonably could be considered part of the event study.

Page 191

STEVEN P. FEINSTEIN, Ph.D.

Q.    But the regression analysis alone did not tell you that, right?

A.    Correct.

Q.    Okay. You say financial analysis, including valuation analysis, can account for and thus remove the effect of confounding information, right?

A.    Yes.

MR. ROTHMAN:  Objection.

Q.    How can financial analysis remove the effect of confounding information?

A.    Well, if there is a mix of information that's provided simultaneously, tools of financial analysis will indicate whether that other information is perhaps not even material, not economically material, not the kind of information that reasonably should cause a price movement, in which case you would exclude it from having had any impact on the stock price and that would focus the attribution of the price movement to remaining information.

STEVEN P. FEINSTEIN, Ph.D.

So some financial analysis tells you what's material and what's not material and some financial analysis will tell you if something is positive or negative.

Some be financial analysis would be to read the new disclosure in the context of the history of disclosures to see what's old versus what's new, which also helps assess whether information had an impact or not, different components of potentially confounding information whether they had an impact or not.

Q.   Did you use financial analysis to remove the effect of confounding information on October 16, 2018?

A.   Yes. Yes.

I mean, let me add to the prior answer.  I mean financial analysis can also be used to value what you determine to be material, present and economically material confounding information. Financial analysis can help

Page 193

STEVEN P. FEINSTEIN, Ph.D.

you value it so you can quantitatively deduct it from the total residual price movement.

Q.   What financial analysis did you do to remove the effect of confounding information on October 16, 2018?

A.   Well, essentially all the things I just said. So I looked at each piece of news, applied financial principles to determine whether it was economically material or not, and if so, whether it would have a positive or a negative impact.

I looked at -- I applied the financial principle that old expected news -- old or expected news has less impact or may be even no impact than new unexpected news. I applied the financial principle that transitory effects have little financial valuation effect, especially as compared to persistent ongoing changes and developments.

Q.   What confounding information

STEVEN P. FEINSTEIN, Ph.D.
did you account for in using that
financial analysis?

A.    Well, I took out the estimated
financial impact -- estimated valuation
impact of the 2018 guidance change and
quarters -- and third quarter surprise.
I measured it, evaluated it relative to
financial principles and excluded it from
damages.

I identified that it's
possible that some of the longer term
problems that could account for the stock
price drop might have had to do with
Europe, as the company said so, or
windows in North America as opposed to
doors in North America, used valuation
tools to value that information and
exclude it from the entire price drop.

So the entire price drop that
day -- well, I also separated out the
total, from the total drop, the drop that
was caused by company-specific
information.  And then from
company-specific information I subtracted

STEVEN P. FEINSTEIN, Ph.D.
-- that would have been $4.42.  I subtracted most of that by attributing it to non-fraud-related factors and ended up with a $1.99 that I determined was caused by the new corrective -- the new information that corrected at least partially some of the market's misunderstandings caused by the misrepresentations and omissions.

Q.    And this analysis that you're describing, that's in the damages section of your report?

A.    Yes.

MR. ROTHMAN:  Objection.

Q.    Is there any of that analysis in the loss causation section of your report?

A.    Probably.

Q.    Can you show me where?

A.    Well, loss causation --

Q.    Where did you remove the confounding effects of other information in your loss causation section?

MR. ROTHMAN:  Objection.

STEVEN P. FEINSTEIN, Ph.D.

A.    Well, the -- part of the attribution analysis is to determine what is economically material and what isn't. And starting on page 88, and all the way through page 99, I explain why what the market learned about the competitive environment and the company's behavior was economically material.

So that focuses -- I mean, that basically -- that's what a loss causation does. I mean, I proved that the corrective disclosure components, the non-confounding components were definitely economically material and would and should and did have a negative impact on the stock price that day.

As far as subtracting out the value attributed to the confounding information, well, that's really more appropriately in the damage section, but I think there may be some elements of that in loss causation. Let me check.

Yeah. All right. The loss causation section has the affirmative

Page 197

STEVEN P. FEINSTEIN, Ph.D.

analysis that proves that the corrective disclosure component was economically material. The determination of economic materiality of potentially confounding factors and quantifying the ones that were found to be economically material is in the damages section.

Q. Is there anything else you did to remove the effect of confounding information in order to determine whether the revelation of the allegedly fraudulently concealed facts were the substantial cause of the security price decline on October 16, 2018?

MR. ROTHMAN: Objection.

A. I mean, your question is baffling. You're saying is there anything else I did besides identifying it, measuring and excluding it? No. That's how you would deal with it.

I identified it, I measured it and if it was confounding information that had a price impact, I excluded it from the damage and inflation measure.

STEVEN P. FEINSTEIN, Ph.D.

Q.    How do you determine if a disclosure is economically material?

A.    You did ask that already. I think we should let the record speak for itself.

Q.    I have not and I would appreciate if you answer the question.

A.    That was one of the first questions asked today. It's economically material -- well, I'll say again.

I generally apply four prongs to my analysis. I look at whether in the context of financial principles the content is economically material, whether the content is identified as being economically material by company statements, I identify whether the content is identified as being economically material by analyst statements, and then I do empirical work to see if there's an identifiable measurable price movement when the information becomes available to the marketplace.

Page 199

STEVEN P. FEINSTEIN, Ph.D.

Q.    Is it your opinion that all of the company's statements about the Steves litigation were economically material?

MR. ROTHMAN:  Objection.

A.    So let's define "economically material". Economically material means that it -- it should cause a reasonable -- that it either has a valuation impact or that it has an impact on reasonable investors' decisions to transact, is what I mean by economically material, and it's consistent with how the term is often used.

I mean, I identified statements that were related to the Steves litigation and I found that they were economically material for the reasons I just described, applying all of that analysis.

I didn't go out of my way to look for non-economically material statements that would have no bearing on price movements or the valuation. I'm afraid that if I say yes or no, that, you

STEVEN P. FEINSTEIN, Ph.D.

know, I'll later think of an odd counter-example.

I think it's altogether possible that maybe if they say the same -- well, if they say -- okay. Something could be economically material maybe the first time they say it, but then nth time they say it, you know, if they say it multiple times subsequently, it no longer has a material impact because it's at that point old and stale.

So there's probably examples of that kind of information not being economically material and, therefore, would be an example based on which I can say, as an answer to your question, that some statements may not have been economically material when they were made.

Q.    Was the Steves jury verdict economically material?

MR. ROTHMAN:   Objection.

A.    I think it was.

Q.    Was the divestiture decision

Page 201

STEVEN P. FEINSTEIN, Ph.D.

economically material?

A.    Well, based on the analysis I did, I mean, looking at company statements, analyst statements, financial principles, the answer is yes. And the impact it may have had on the stock price, it may have been to maintain the inflation in the stock price on account of things that were also being said that would have muted its more observable movement in the price.

Q.    Did a statistically significant price reaction occur after either of those economically material disclosures?

MR. ROTHMAN:  Objection.

A.    On the day of the disclosure or if the announcements were made after the close the next trading day for each of those two, the price movement was not statistically significant, which does not prove that it was not economically material.

Q.    An economically material

STEVEN P. FEINSTEIN, Ph.D.

statement will not always cause a price reaction to the company stock, right?

MR. ROTHMAN:  Objection.

A.    Depends what you mean by "reaction". If by "reaction" you mean any sort of impact?  I mean, a reaction could be that the price doesn't move in the face of countervailing information.  But yes, I would say that economically material information does not always cause a statistically significant stock price movement. That's a true statement.

Q.    So if a price reaction follows an economically material statement, you still need to account for in your move the effect of the confounding information to determine whether or not the economically material statement caused the price reaction, right?

MR. ROTHMAN:  Objection.

A.    Well, you said "need to". It depends what kind of analysis you are doing. Is it market efficiency analysis? Loss causation analysis?  A damages

Page 203

STEVEN P. FEINSTEIN, Ph.D.

quantification?

Q.    Let's say a loss causation analysis.

A.    Well, I mean, if you've got multiple corrective disclosures and one of them proves loss causation, you probably don't need to analyze the others at all.

Q.    If you had multiple disclosures, how can a single disclosure prove loss causation if you haven't accounted for the confounding information?

MR. ROTHMAN:  Objection.

A.    Well, you need not look -- because there may be other disclosures that are cleaner. There may be other disclosures that are cleaner and more obvious that was causing the price movement is the corrective information.

Q.    If there is two economically material disclosures on a single day, how do you determine which one caused the stock to drop?

**Page 204**

STEVEN P. FEINSTEIN, Ph.D.

MR. ROTHMAN:   Objection.

A.     Okay. If that's your purpose, you want to determine which caused the drop or -- well, financial principles would tell you that they both contributed.

If, in fact, financial principles do tell you that they're both material and they're both new and they're both unexpected, they would both have some impact. That would be your conclusion.

If you see the price drop and there was two pieces of news and they're proved to be economically material, you would conclude that they both had an influence on the stock price.

MR. ROTHMAN:   When you get to an appropriate breaking time, I mean, I don't want to interrupt this line of questioning, but whenever you think it's appropriate.

MS. HARRIS:   I think there's a

**Page 205**

STEVEN P. FEINSTEIN, Ph.D.

good place to stop coming up.

MR. ROTHMAN:  Good.

Q.    Okay. We just discussed that economically material information does not always cause a stock to drop.

So if you have two pieces of economically material information on the same day, how can you be sure that they both caused the stock to drop?

MR. ROTHMAN:  Objection.

A.    Well, the reason why it might not be causing the stock to drop -- I mean, the reason why I agreed with your statement is there may have been countervailing news simultaneously released, you know, that pushed the stock price in the other direction.

If you discover that's not the case, then what's proved to be economically material reasonably can be concluded to have caused the price drop, at least a substantial portion of it.

So just to clarify, yeah, I agree that sometimes economically

STEVEN P. FEINSTEIN, Ph.D.

material information doesn't cause the stock price to drop. It could be because it's maintaining a stock price, it could be because of countervailing information. But if it's -- but if you see the stock price falling and you have identified that there is no countervailing information pushing up the price, then you can't conclude that it was that information.

Q.    Let's look at page 6, paragraph 25 of your report.

A.    But weren't we going to take a break now or no?

Q.    Not yet. Soon.

A.    Okay. What page?

Q.    Do you need a break?

A.    No.

Q.    Okay. Page 6, paragraph 25.

A.    Of the reply or the original loss causation?

Q.    Of your original report.

A.    Okay.  I'll take a couple of questions and then I'll need a break. So

Page 207

STEVEN P. FEINSTEIN, Ph.D.

page 6. I'm on page 6.

Q.   So paragraph 25.

A.   Yes.

Q.   You state that your loss causation conclusion is based on, among other things, internal company documents. Which internal company documents provide the basis for your loss causation conclusion?

MR. ROTHMAN:  Objection.

A.   I'm scrolling down to my list of documents.

Q.   That starts on page 118.

A.   The company, that one that comes to mind -- let me check for a moment, please.

(Deponent reviews the document.)  Go.

A.   Well, I tell you, as I sit here now, the company has had a note to file, dated I believe it's November 6th, 2018, where they explain that when they made the liability announcement that they had previously estimated zero cost --

Page 208

STEVEN P. FEINSTEIN, Ph.D.

Q.     Just answer my question. Did you review that document prior to --

MR. ROTHMAN:  Ms. Harris, please let the witness finish answering the question and then you can ask the next question.

MS. HARRIS: If he answered my questions, I'm happy to do that.

MR. ROTHMAN:  You can ask a question when he's done with his answer. Please continue, Dr. Feinstein.

A.     All right. Well, at least as I sit here now, that's a component of my opinion.

I know you're wondering and I'm wondering too if I read that at the time of the first report. I just don't recall. My memory is not perfect on when I read that document, but it certainly is an internal document that's informative of loss causation and damages.

Let me continue. I mean, I can speed things up by telling you that's

Page 209

STEVEN P. FEINSTEIN, Ph.D.

what comes to mind, as I sit here now. There may be something additional.

Q.    Do you think there is anything that you reviewed that was an internal company document that isn't listed in Exhibit 1?

A.    As I sit here now, I just don't recall.

MS. HARRIS:  Okay. Let's take a break.

VIDEOGRAPHER:  Thank you. This is the videographer. The time is 11:09. We're going off the record. This is the end of media file 1.

(Recess is taken.)

VIDEOGRAPHER:  We are back on the record. The time is 11:19 a.m. Eastern Time and this is the beginning of media file 2.

Q.    Dr. Feinstein, please turn to page 105 of Exhibit 1, that's your report.

A.    Okay.

Q.    Paragraph 307, for the

**Page 210**

STEVEN P. FEINSTEIN, Ph.D.

purposes of your damages analysis, you identify four pieces of company-specific information that were released on October 15, 2018 after the close of trading, correct?

A.    Yes.

Q.    The second of those is the Q3 2018 results and fiscal 2018 guidance, right?

MR. ROTHMAN:    Objection.

A.    Yes.

Q.    And you clarify the 2018 performance disclosures as non-fraud-related, correct?

A.    Not really. I explained that earlier.

For purposes of a conservative treatment I treated it as if the drop caused by that component was not a component of inflation or damages.

Q.    In paragraph 317 you say, "I conservatively classify the 2018 performance disclosures as not fraud-related and exclude the party's

Page 211

STEVEN P. FEINSTEIN, Ph.D.

impact of that portion of the impact from damages." Is that correct?

A.    Right.

Q.    So --

A.    But I just want to be clear, that was a conservative treatment. It wasn't based on a conclusion that it truly was non-fraud-related. It very well might be.

Q.    For the purposes of your analysis, though, because you clarify it as non-fraud-related, these disclosures were confounding information, right?

A.    Well --

MR. ROTHMAN:  Objection.

A.    -- they may have been. They may have been fraud-related disclosures.

In order to provide a conservative measure of damages, I treated them as if they were confounding information but I didn't conclude that they were.

Q.    And you conclude that these disclosures did cause Jeld-Wen's stock to

Page 212

STEVEN P. FEINSTEIN, Ph.D.

drop, right?

A.    Yes.

Q.    So you concluded the fiscal 2018 performance disclosures were economically material?

A.    I did.

Q.    If we look at paragraph 298 to 299 of your report, that's page 102 --

A.    Okay.

Q.    -- you conclude that there was a statistically significant drop on October 16th, 2018 that could not have been caused by random volatility, right?

A.    Yes.

Q.    And then in the next paragraph, 300, you conclude the alleged misrepresentations and omissions caused the stock drop on October 16th, 2018, right?

MR. ROTHMAN:   Objections.

A.    Yes.

Q.    Where did you remove the confounding effect of fiscal 2018 performance disclosures before reaching

Page 213

STEVEN P. FEINSTEIN, Ph.D.

that conclusion?

MR. ROTHMAN:  Objection.

A.    Do you mean temporally, as I was doing my analysis or where I put it in the report as I was sequentially writing my opinions?

Q.    I mean, in writing your opinion at 300 you make that loss causation conclusion, and I'm wondering where before paragraph 300 you removed the confounding effect of the fiscal 2018 performance disclosures?

A.    The 22 cents related to 2018 is described below. I mean, I did all of the analysis before writing the report. How I presented it is an organization that makes the most sense.

So to answer your question, it is in paragraphs 316 through 322.

Q.    Were the fiscal 2018 performance disclosures known negative announcements?

A.    I can't hear you. I couldn't hear you.

Page 214

STEVEN P. FEINSTEIN, Ph.D.

Q.      Were the fiscal 2018 performance disclosures known negative announcements?

MR. ROTHMAN:  Objection.

A.      What do you mean by "known"?

Q.      Let's take a look at your transcript from the first deposition.

A.      Which exhibit is this?

Q.      I think we're going to be marking it as Exhibit 6.

(Feinstein Exhibit 6, transcript of Dr. Feinstein, dated January 30, 2021 was received and marked on this date for identification.)

MR. ROTHMAN:  Can you let us know when it's up there so I don't have to keep hitting refresh?

MS. HARRIS:  Sorry. We're having some technical difficulties. Apparently our Exhibit Share is stuck. So let's move on and we'll come back to that.

Let's go off the record and

Page 215

STEVEN P. FEINSTEIN, Ph.D.

we'll get this fixed.

VIDEOGRAPHER:  The time is 11:26. We've going off the record.

(Discussion is held off the record.)

VIDEOGRAPHER:  We're back on the record. The time is 11:27.

Q.    Dr. Feinstein, are you now able to open Exhibit 6?

A.    Yes.

Q.    And this is the prior testimony you gave in this action, correct?

A.    Yes.

Q.    If you turn to page 29 --

A.    29, okay.

Q.    -- you'll see I'm asking about -- my question is, "You also say in paragraph 22 the announcement of the $76.5 million charge to send the market, is that an opinion or an assumption you relied on?  And you said, "That is a conclusion from the analyst report."  And I said, "Is there any other basis for

STEVEN P. FEINSTEIN, Ph.D.

that conclusion aside from the analyst reports?" And you said, "Yes." I said, "What are the other bases?" And you said, "Well, we have the explicit commentary in the analyst reports and news articles as well but also in price reaction. Once it was established the market is efficient it is clear when there is a known negative announcement the price will fall. So the price falling indicated that the market was surprised was the price of the stock."

Do you recall giving that testimony?

MR. ROTHMAN:  Objection.

A.    Not word-for-word verbatim, but that's still my opinion.

Q.    What did you mean when you said a "known negative announcement"?

A.    Something that is established as negative that's indisputably negative either upon the context of the facts and circumstances in the case or financial principles, something that is known to be

STEVEN P. FEINSTEIN, Ph.D.

negative.

If something is known to be negative and it's new and it's announced, it will have a negative impact on the stock price in an efficient market.

Q.    So were the fiscal 2018 performance disclosures known negative announcements?

A.    I'd say so. Known to be, that kind of announcement is known to be a negative announcement.

Q.    Is the price falling after the fiscal '18 performance disclosures so the market was surprised by those disclosures?

MR. ROTHMAN:   Objection.

A.    Yes. That's evidence in favor of the market being surprised by that new information. So you have empirical evidence and also principles.

Q.    You opine that it was ultimately revealed that Jeld-Wen's exceptional pricing and profit margins were achieved through the illegal

Page 218

STEVEN P. FEINSTEIN, Ph.D.

anticompetitive behavior, right?

A.      Where are you reading from?

Q.      If you look at your report, Exhibit 1, that's paragraph 40.

A.      Should I close the deposition or leave it open?

Q.      Yes. You can close that.

A.      And then go to Exhibit 1, my report and turn to what page?

Q.      Page 11.

A.      Okay.

Q.      You opine that it was ultimately revealed that Jeld-Wen's exceptional pricing and profit margins were achieved through illegal anticompetitive behavior, right?

MR. ROTHMAN:   Objection.

A.      Yes.

Q.      Did analysts ever report on Jeld-Wen's exceptional pricing and profit margins being achieved through illegal anticompetitive behavior?

A.      They didn't use those words, but they did cite to exceptional pricing

**Page 219**

STEVEN P. FEINSTEIN, Ph.D.

and profit margins.  They cited to exceptional pricing and profit margins as being the reason for the company's high valuation and attractiveness as an investment and after the corrective disclosures they took down price targets and forecasts.

Q.   Did the analyst reports discuss illegal anticompetitive behavior by Jeld-Wen?

MR. ROTHMAN:  Objection.

A.   I don't recall the word "illegal" being used. They did say that there would now be pricing headwinds and pricing pressure and uncertain asset-base, these sort of things that are, well, analyst-speak for changed circumstances going forward.

Q.   Are there specific reports you are referring to?

A.   Well, Deutsche Bank, Credit Suisse, RBC, among others, JPMorgan.

Q.   Please turn to paragraph 22, page 5.

Page 220

STEVEN P. FEINSTEIN, Ph.D.

A.    You can add Gabelli to the list. I was thinking of Gabelli.

What paragraph did you say to move to?

Q.    Paragraph 22.

A.    Okay.

Q.    And here you say, "On October 15th, 2018 Jeld-Wen stunned the market by disclosing that it would take a charge of $76.5 million that reflects a judgment anticipated to be entered the company in the Steves antitrust litigation." Do you see that?

A.    I do.

Q.    You don't cite any analyst reports there to support your conclusion the $76 million charge stunned the market, correct?

A.    Correct.

Q.    And let's turn to page 100 of your report, paragraph 291, and it's the first bullet that we were looking at before.

A.    Okay.

Page 221

STEVEN P. FEINSTEIN, Ph.D.

Q.     Here you repeat that statement, right?  You say, "Jeld-Wen stunned the market by disclosing that it would take a charge of $76.5 million that reflects a judgment anticipated to be against the company in the Steves antitrust litigation."  Right?

A.     That's on page 100, right.

Q.     You don't cite any analyst reports there either, do you?

A.     Correct.

Q.     In the testimony we just reviewed a minute ago you said that that was a conclusion you drew from explicit commentary in the analyst reports and in news articles as well but also in the price reaction, correct?

A.     I think I said more than that. Also the nature of the announcement, itself, was stunning.

Q.     What was the explicit commentary in the analyst reports to which you were referring?

A.     Well, the announcement was

Page 222

STEVEN P. FEINSTEIN, Ph.D.

made off-cycle.  It was an emergency profit warning type announcement and many analysts immediately responded with writing analyst reports. The fact that they, you know, responded to writing analyst reports in reaction to this announcement, when most of the announcement was fairly benign or not really warranting a warning, is evidence that they were surprised by the announcement and stunned, in fact, by the announcement.

I mean, if you look at the elements of the announcement, that they're replacing the CFO in a seamless transition with someone highly qualified, that doesn't warrant an emergency announcement, that windows were having operational production issues just as they were in the last four or five quarters announced, they never had a surprise unexpected emergency announcement for that before.

If you look at the entire

Page 223

STEVEN P. FEINSTEIN, Ph.D.
content of the report, the stunning,
surprising justification for there even
being an announcement off-cycle is the
charge and analysts covered it.

I mean, I know that
Mr. Fischel found some examples of
analysts that didn't but, you know, he's
ignoring all the analysts that did and
analysts mentioned it.

One of them said that they
thought the market's reaction was
overblown.  Well, that -- that -- you
know, that pre-supposes or basically
explains that the market did have, you
know, a negative reaction to the
disclosures that were coming out.

So the fact that they even
wrote analyst reports at all and covered
it, is justification for this
characterization.

Q.    Did you include the explicit
commentary in either of your reports?

MR. ROTHMAN:  Objection.

A.    Yes. I mean, I gave a couple

Page 224

STEVEN P. FEINSTEIN, Ph.D.

of examples. Let me find it.

(Deponent reviews the reports.)

All right. On page 46 and page 47 and page 48 I have examples.

Q.    And that's the explicit commentary you are referring to, to support your opinion that the market was stunned by the litigation contingency?

A.    Yes, among other reasons.

Q.    Can you turn to page 127 of your report?

A.    Page 127 is in the Documents Reviewed and Relied Upon list, right?

Q.    Correct. So in this list you've listed ten analyst reports covering Jeld-Wen that were issued on either October 15th or October 16th, 2018, correct?

A.    On the 15th or 16th?

Q.    Yes.

MR. ROTHMAN:  Objection.

A.    It's 11.  And then if you go to the 17th, we have two more and if you

Page 225

STEVEN P. FEINSTEIN, Ph.D.

go to the 18th we have two more.

Q.    I think you're counting the RBC Masonite analyst report on the 15th of October?

A.    Oh, yeah. Sure.

Q.    Are these the reports you considered in reaching your opinion the market was stunned by the litigation charge?

MR. ROTHMAN:  Objection.

A.    Yes.  And there's other reasons too, as I explained, for that conclusion.

MS. HARRIS:  Okay. I'm going to mark as Exhibit 6 the Barclays report dated October 15th -- Exhibit 7, the Barclays report dated October 15, 2018 on Jeld-Wen Holding, Inc. titled Windows Reset Remain OW.

(Feinstein Exhibit 7, Barclays report dated October 15, 2018 on Jeld-Wen Holding, Inc. was received and marked on this date for

Page 226

STEVEN P. FEINSTEIN, Ph.D.

identification.)

Q.     It should be there.

A.     Okay.

Q.     This is a report you considered in preparing your report?

A.     Yes.

Q.     And it's dated October 15, 2018, right?

A.     Yes.

Q.     So it was published just after the pre-earnings release, right?

MR. ROTHMAN:  Objection.

A.     Correct.

Q.     The first paragraph the heading says "Reducing price target to $23 remain OW." Do you see that?

A.     Yes.

Q.     And then the first sentence says, "We are lowering our price target to $23 after Jeld pre-announced 3Q and fiscal '18 guidance ranges for revenues and adjusted EBITDA along an announcement of a CFO change." Right?

A.     Yes.

Page 227

STEVEN P. FEINSTEIN, Ph.D.

Q.     It doesn't mention the litigation contingency there as a reason for lowering the price target, right?

MR. ROTHMAN:  Objection.

A.     Well, there is a reference to it here. It's implicit rather than explicit, which is what you'd expect from negative, perhaps embarrassing news to a company that an analyst is covering. They talk about inability to push pricing. But the litigation charge, itself, I would agree with you.

Q.     And analysts attribute the downward revision to fiscal '18 EBITDA to persistent operational issues in the North American business, right?

A.     No. I mean, look what they say. They also say on a forward-looking basis, however, we still view windows-related operational challenges as transitory, as impactful and disappointing as the issue has been.

You know, a transitory issue that's being reported on, again, for the

STEVEN P. FEINSTEIN, Ph.D.

fifth or sixth time even can't explain a 20% drop in the stock price.

So the fact that this analyst mentions inability to push pricing, that is allegation-related. And this analyst says that the issue -- you know, this third quarter issues, what the company said the third quarter issues were is transitory, yet there's a financial analysis, there's a science to how to read analyst reports. And you have to understand that analysts work for the company, I mean, just as you work for the company, and you want to say nice things about the company so as not to alienate them, you know, analysts also have that same need for tact.

So in order to understand what analysts are saying about a company it's to understand that context.

They do write that there is a -- the stock will be under pressure after this announcement, that there is an inability to push pricing that's

Page 229

STEVEN P. FEINSTEIN, Ph.D.
revealed, and that the explanation, the
rationalization that the company gave is
transitory.

That leaves the big
announcement, the reason for the
emergency pre-release as being why the
stock is going to be under pressure and
why the market is reacting so negatively
to Jeld-Wen.

Q.    So the language you just
pointed out it says, "We still view
windows-related operational challenges as
transitory".  They say "still", correct?

A.    Yes.

Q.    So that suggests they
previously viewed windows-related
operational challenges as transitory,
right?

A.    Right. And the company is
saying it's going to -- they said 2018
will be affected.  The rest of the third
quarter was affected, the rest of the
fourth quarter will be affected but the
company said it's fixable and would be

Page 230

STEVEN P. FEINSTEIN, Ph.D.

fixed.

Q.    Do you see a --

A.    You don't see a 20% drop in the price from a transitory factor.

Q.    Do you see where it says, the second sentence of that paragraph, "A 9% downward revision to fiscal year '18 adjusted EBITDA points largely to persistent operational issues, in our view."

MR. ROTHMAN:  Sorry. Where were you reading from?

MS. HARRIS:  I'm reading from the second sentence of the first paragraph.

A.    I see it.

Q.    And then it says, "Based on these operational issues and unfavorable home center mix this reports predicts a negative stock reaction tomorrow." Right?

A.    Well, you skipped a lot. Where did you read from? What line is the word "based" in?

Q.    If you like I can read the

Page 231

STEVEN P. FEINSTEIN, Ph.D.

whole thing.  "Our sense is lingering volume issues and Jeld-Wen's North American windows business manifested in a harsh combination of reduced cost leverage, inability to push pricing and failure to drive costs productivity. Unfavorable home center mix likely exacerbated these issues. We accordingly expect a negative stock reaction tomorrow." Do you see that?

A.    I do.

Q.    And where it's talking about inability to push pricing it's talking about the North American windows business, right?

A.    Oh, no.  I don't think that's the case.

Q.    The sentence says, "Our sense is a lingering volume issue in Jeld's North American windows business manifested in a harsh combination of reduced cost leverage, inability to push pricing, and failure to drive cost productivity."

STEVEN P. FEINSTEIN, Ph.D.

Is it your interpretation that does not refer to the North American windows business?

A.    I don't think it's exclusively the North American window business.

MR. ROTHMAN:  I think a word got nixed from your answer.

A.    I said I don't think it's exclusively. I think what they're saying is the company told them that there was an inability to push pricing, that north -- they're saying -- yes.  They're saying there is an inability to push pricing in the North American windows but they're not saying that explains the entirety of the inability to push pricing.

Q.    Is this analyst predicting on October 15th, 2018 that the stock will drop on October 16th, 2018 due to the reduced 3Q interest for fiscal '18 guidance ranges?

A.    I don't think you can read this, if you read it correctly, to suggest that the only reason for the drop

Page 233

STEVEN P. FEINSTEIN, Ph.D.
is that component of the announcement.

Q.    Okay. Let's look at the paragraph.  It's the third full one that starts "Lowering estimates".

A.    Okay.

Q.    And Barclays says it's reducing its fiscal '19 EBITDA estimate due to the topline reductions and more conservatism around the persistence of operational issues. Right?

MR. ROTHMAN:  Objection.

A.    They're saying that 2019 is being reduced due to topline reductions and they're going to reduce the EBITDA, which was close to bottom line on account of their reductions in topline.

Q.    And more conservatism around the persistence of operational issues, right?

A.    Right.

Q.    So this analyst does not believe that the fiscal '18 operational issues will be fixed before the beginning of fiscal '19, right?

**Page 234**

STEVEN P. FEINSTEIN, Ph.D.

MR. ROTHMAN:  Objection.

A.      Possibly. I mean, I also took out -- I took out and excluded from damages and inflation the effect on pessimism in 2019 of windows.  North American windows is quantified and excluded from damages for 2019.

I should say it another way. North American window forecast changes. The  North American window forecast for 2019, I quantified them and took them out of damages.

Q.    This report does not say that it is reducing its fiscal '19 EBITDA estimates because of the Steves litigation contingency, right?

A.    Correct.

Q.    It does not say that it's reducing its fiscal '19 EBITDA estimates because Jeld-Wen has conceded liability in Steves litigation, right?

MR. ROTHMAN:  Objection.

A.    Correct. This report focuses on other things.

STEVEN P. FEINSTEIN, Ph.D.

Q.      It does not say that it is reducing its fiscal '19 EBITDA estimates because Jeld-Wen is going to experience reduced pricing power in the North American interior doors market, right?

A.      No. That's where I disagree. You know, they do mention inability to push pricing. You know, the corrective disclosures aren't really complete, fulsome corrective disclosures. There is a lot of unknowns in the marketplace still.

Why the company is unable to push pricing is not yet understood, but they do mention that they're observing an inability to push pricing and that's fraud-related.

Q.      Do they mention the doors market where they mention the inability to push pricing?

A.      Not explicitly, but they don't exclude it.

Q.      Does this report contain the explicit commentary you relied on to

STEVEN P. FEINSTEIN, Ph.D.

reach your opinion that the market was stunned by the litigation contingency?

A.    I looked at all the reports. I understand some of the analysts chose not to focus on the somewhat negative, upsetting, embarrassing admission the company had to make, which is understandable, given what their jobs are, but other analysts did so.

This is an example of one trying to draw that fine line between being fair and honest with the readers but also trying to maintain a relationship with the company, seemed to be a little bit more swayed on the side of not doing anything to upset the company.

I mean, investment banks rely on repeat business from these firms and there was a lot of repeat business anticipated from Jeld-Wen given that Onex hadn't completely sold all of its shares, given that they had a lot of debt that would have to be rolled over. You are not

Page 237

STEVEN P. FEINSTEIN, Ph.D.

going to -- under those circumstances, analysts have to be tactful.

Q.   Okay. Answer my question. Does this report contain the explicit commentary you relied on to reach your opinion the market was stunned by the Steves litigation contingency?

A.   No. This report does not.

Q.   This report does not say that the Steves litigation contingency was an admission Jeld-Wen was engaging in anticompetitive conduct, does it?

A.   It does not say that. Correct.

Q.   This report does not even mention the Steves litigation contingency, right?

A.   There were a handful of reports that didn't mention it, that's true, and this is one of them.

Q.   It doesn't even mention the Steves litigation, right?

A.   Correct.

MS. HARRIS:  Okay. I'm going to mark as Exhibit 8 the Credit

**Page 238**

STEVEN P. FEINSTEIN, Ph.D.

Suisse report from October 15, 2018 for Jeld-Wen Holding, Inc.

(Feinstein Exhibit 8, Credit Suisse report dated October 15, 2018 was received and marked on this date for identification.)

Q.    Are you able to open it?

A.    Yeah. I need a minute, though. Okay.

Q.    And the title of this report is Shattered Glass, correct?

A.    That's right.

Q.    Is this the report you considered in preparing your report?

A.    One of them, yes.

Q.    And it was dated October 15, 2018, right?

A.    Yes.

Q.    So that's just after the pre-earnings release, right?

MR. ROTHMAN:  Objection.

A.    Right.  It is right after the pre-earnings release that they published it.

Page 239

STEVEN P. FEINSTEIN, Ph.D.

Q.      And here in the first paragraph of the report the analyst discusses ongoing operational efficiencies, channel mix, hit 3Q, right?

A.      Yes.

Q.      And you see in the middle of the paragraph it says, "Although its new management team is working to develop a detailed global plan to rationalize its manufacturing footprint, simplify operations and improve prove service levels and reduced fixed overhead, this will take time to execute and benefit results." Do you see where it says that?

A.      I do.

Q.      So this analyst thinks it will take some time for Jeld-Wen to fix these problems, right?

A.      Well, they don't quantify, but yes. I mean, the company said that Q3, Q4 would be affected and the problem was fixable.

Q.      And then it says, "As such, we are reducing our 2018 and 2019

Page 240

STEVEN P. FEINSTEIN, Ph.D. estimates." Do you see that?

MR. ROTHMAN:  Objection.

A.    Yes.

Q.    That paragraph we just looked at doesn't mention the Steves litigation contingency, right?

A.    Well, it does mention outstanding litigation, headwinds related to the outstanding litigation make for greater uncertainty around the path forward, a very tactful way to refer to the Steves litigation. That's what it refers to, the Steves litigation.

Q.    I'd appreciate if you answer my question. I am going to get to that paragraph.  But in the paragraph that we just looked at, that doesn't mention the Steves litigation contingency, correct?

A.    Correct.

Q.    And then we'll go ahead and look down at the third paragraph that you referenced. And the analyst discusses, fiscal '19 estimates and says, "Although we believe the opportunity for longer

STEVEN P. FEINSTEIN, Ph.D.

term margin expansion remains, operational challenges and headwinds related to the outstanding litigation make for greater uncertainty around the path forward", right?

A.    You read that correctly.

Q.    And based on that language you concluded in your report that this analyst was expressing surprise and disappointment over the company's turnabout regarding the Steves litigation, correct?

MR. ROTHMAN:  Objection.

A.    The timing of this report, the coverage, what it was responding to, that it was responding to a stunning surprising announcement, yes.

Q.    Does this report include the explicit commentary that led you to conclude the market was stunned by the Steves litigation contingency?

A.    In part, yes.

Q.    Does this report actually say the market was stunned by the Steves

Page 242

STEVEN P. FEINSTEIN, Ph.D.
litigation contingency?

A.    No. That's my conclusion but, no, it didn't use those words.

Q.    This report does not say that the Steves litigation contingency was an admission regarding anticompetitive conduct, does it?

A.    You know, I can't really agree with that. It's -- they correctly link in this report long-term margin expansion with the litigation. The litigation was about the reasons for the long-term margin expansion.

So the company is being -- the analyst is being optimistic, saying that they believe there is still an opportunity for longer term margin expansion but the headwinds from the outstanding litigation make for greater uncertainty around that. So they're linking -- the key story and the key point in the narrative, the history of this company is what they've been saying since they went public, margin expansion,

**Page 243**

STEVEN P. FEINSTEIN, Ph.D.

margin correction, margin repair is the word they often used. And so this analyst is pointing out that the litigation is about margins and margins are economically material.

Q.   Does the analyst reference the doors market there when it talks about margin expansion?

A.   I mean, if anyone is paying attention and reading the numbers, then implicitly they do because that was the lion's share of the business.

Q.   This report does not mention the Steves litigation contingency, right?

A.   Implicitly, yes.  Explicitly, no.

MS. HARRIS:  Okay. I'm going to mark as Credit Suisse report dated October 8th, 2019 as Exhibit 9.

(Feinstein Exhibit 9 Credit Suisse report dated October 8th, 2019 Bates was received and marked on this date for identification.)

**Page 244**

STEVEN P. FEINSTEIN, Ph.D.

Q.    Dr. Feinstein, are you able to open it?

A.    Yes.

Q.    Okay. This is a Jeld-Wen Holding, Inc. report that you considered in preparing your report, correct?

A.    Yes.

Q.    And this was published on October 8th, 2018, right?

A.    Correct.

Q.    And that's following the divestiture decision?

A.    Yes. That's what we're calling it, I guess, yes.

Q.    And this is also from Credit Suisse?

A.    Yes.

Q.    And if we look at the third bullet down where it says "maintain neutral rating" it says, "Although we believe the opportunity for longer term margin expansion remains, operational challenges and headwinds related to the outstanding litigation make for greater

Page 245

STEVEN P. FEINSTEIN, Ph.D.
uncertainty around the path forward." Do you see that?

A.    Yes.

Q.    That's the same language you identified in Credit Suisse's October 15th, 2018 report as showing that the analyst was expressing surprise and disappointment over the company's turnabout regarding the Steves litigation, correct?

A.    Essentially.

Q.    How can the repetition of this language published before the litigation contingency show surprise and disappointment at the announcement of the litigation contingency?

MR. ROTHMAN:   Objection.

A.    Well, I mean, they say -- they believe the stock is likely to be range bound, so they get greater clarity, and it wasn't range bound and the stock price fell significantly. So that indicates that they got greater clarity, that the market got greater clarity. That's one

STEVEN P. FEINSTEIN, Ph.D.

reason.

You know, they're not --
they're not explicitly posting the
probability assessments here but,
clearly, the nature of the announcement
increased the probability of negative
outcomes for the company.  At least the
company said so.

Q.    But given that they made the
exact same statement after the litigation
contingency that they had made ten days
earlier, seven days earlier, how does
that show they were surprised by the
litigation contingency?

MR. ROTHMAN:  Objection.

A.    Well, my conclusion is based
on all the analyst reports, and as I
mention the fact that they wrote those
analyst reports and when they wrote them
in response to what the company said.
But it does say that greater clarity --
until there is greater clarity, the stock
price will be range bound and the other
report said that they expect negative

**Page 247**

STEVEN P. FEINSTEIN, Ph.D.

pressure on the stock after the

announcement.

MS. HARRIS:  Okay.  I'm going

to mark as 9 --

MR. ROTHMAN:  I think that was

9.

MS. HARRIS:  Sorry. Okay.

Thank you. I'm going to mark as

Exhibit 10 a Jefferies report from

October 15, 2018 on Jeld-Wen.

(Feinstein Exhibit 10,

Jefferies report dated October 15,

2018, was received and marked on

this date for identification.)

Q.    Were you able to open that,

Dr. Feinstein?

A.    Yes.

Q.    Okay. And you see the title

says Pre-Announces 3Q cut fiscal guidance

and CFO departing.

A.    Yes.

Q.    Is this a report you

considered in preparing your report?

A.    I considered all of them.

Page 248

STEVEN P. FEINSTEIN, Ph.D.

Q.    And this report was dated October 15, 2018, right?

A.    Yes.

Q.    So that's just after the pre-earnings release, right?

A.    Yes.

Q.    Under the Key Takeaways, Jefferies mentions the Steves litigation contingency?

A.    Not explicitly. I mean, they do talk about pricing and margins and their inability to raise prices but, no, not explicitly the litigation as being the reason for that.

Q.    It talks about --

A.    They don't know. I mean, frankly, at this point the market -- with respect to the third quarter, the company gave one explanation but it's not entirely clear that is the correct explanation for why they couldn't increase prices in Q3 to offset inflationary headwinds.

Q.    It's talking about

Page 249

STEVEN P. FEINSTEIN, Ph.D.
disappointing Q3 results and downgraded Q4 guidance, right?

A.   Correct. And EBITDA margin decline.

Q.   And then the first paragraph the title is Operational Issues Continue to Weigh on Results. Do you see that?

A.   Yes.

Q.   Does that paragraph mention the Steves litigation contingency?

A.   The first paragraph? It does not mention the contingency. It does mention margins stalled, margin expansion stalled.

Q.   Well, where are you looking at that?

A.   In the first paragraph, yeah, "Jeld-Wen needed incremental pricing in 3Q to offset inflationary headwinds and get back to price. Costs neutral but the preliminary results imply EBITDA margin decline of 120 basis points."

Q.   Do you think that's a reference to the Steves litigation

Page 250

STEVEN P. FEINSTEIN, Ph.D.

contingency?

A.    Based on financial principles, it's a reasonable outcome of the company not being able to exercise its unsustainable pricing behavior now that there's more eyes on them, around them.

Q.    Does this report contain the explicit commentary you relied on to reach your opinion the market was stunned by the litigation contingency?

A.    I considered all the reports, including this one.

MR. ROTHMAN:    Lindsey, whenever you think it's an appropriate time to take a break, just let us know.

MS. HARRIS:    Sure. We can take one soon.

Q.    Just to be clear, this report has the explicit commentary you were referring to?

A.    No.

Q.    This report does not say that the market was stunned by the Steves

STEVEN P. FEINSTEIN, Ph.D.

litigation contingency, correct?

A.      They don't use those words and that's not how I meant it previously, but correct.

Q.      This report does not say that the Steves litigation contingency was an admission Jeld-Wen was engaging in anticompetitive conduct, right?

A.      No. This report does not say that. It's the company's admission that said that, that there was a higher probability of that.

Q.      This report does not explicitly mention the Steves litigation contingency at all, right?

A.      Explicitly, correct.

Q.      This report doesn't explicitly mention the Steves litigation at all, right?

A.      Didn't we just say that? Explicitly, no.

MS. HARRIS:  Okay. Let's take a break.

VIDEOGRAPHER:  This is the

**Page 252**

STEVEN P. FEINSTEIN, Ph.D.

videographer. The time is 12:09 and we're going off the record and this is the end of media file 2.

(Recess is taken.)

VIDEOGRAPHER:  We are back on the record. Time is 12:24. This is the beginning of media file 3.

Q.    I've just marked for the record Exhibit 11, which is a SunTrust report on Jeld-Wen Holding Inc., published on October 15, 2018 and the title is Severe Earnings Warning on Modest Volume Miss.

(Feinstein Exhibit 11, SunTrust report on Jeld-Wen Holding Inc., published on October 15, 2018 was received and marked on this date for identification.)

Q.    Dr. Feinstein, let me know when you can open that?

A.    I'm there.

Q.    Is this a report that you considered in preparing your report?

A.    I believe so.  I looked at all

Page 253

STEVEN P. FEINSTEIN, Ph.D.

of them.

Q.    And this was dated October 15, 2018, right?

A.    Yes.

Q.    And that's just after the pre-earnings release, right?

A.    Yes.

Q.    Under What's Incremental To Our View, does this report mention the Steves litigation contingency?

A.    This is one of the reports that doesn't.

Q.    And about halfway down that paragraph it says, "Jeld-Wen continues to have a" -- sorry. I'll start that over. "Jeld-Wen continues to have some of its products in very competitive businesses which makes organic growth challenging." Do you see that?

A.    I don't but I recall that language. Where is it?

Q.    If you go under What's Incremental To Our View, if you look at the beginning of the first -- of the

**Page 254**

STEVEN P. FEINSTEIN, Ph.D.

fifth line.

A.    I'm sorry. Are you on the first page still?

Q.    Yes. So the first page, it says What's Incremental" --

A.    Oh, first paragraph, sure.

Q.    And then the fifth line down, "Jeld-Wen continues to have some of its products in very competitive businesses which makes organic growth challenging." Do you see that?

A.    Yes.

Q.    This doesn't suggest that Jeld-Wen is engaging in anticompetitive conduct, right?

A.    Not explicitly.

Q.    Does this report contain the explicit commentary you relied on to reach your opinion the market was stunned by the Steves litigation contingency?

A.    I relied on all the reports.

Q.    Does it contain the explicit commentary that you relied on to reach your opinion?

Page 255

STEVEN P. FEINSTEIN, Ph.D.

A.    It was all the reports, what they covered, how many were printed and published, what they said, I considered all of it.

Q.    Does this report say that the market was stunned by the Steves litigation contingency?

A.    It doesn't explicitly say that but it's still my opinion that it was a stunning announcement and the analysts are responding by writing reports.

Q.    Does this report mention the Steves litigation contingency at all?

A.    You asked that. This is one that doesn't.

Q.    It doesn't even mention the Steves litigation, right?

A.    Correct.

MS. HARRIS:   Okay. I'm going to mark as Exhibit 12 a RBC report from October 16th, 2018, it's on Jeld-Wen Holding, Inc. and the title is Walking on Broken Glass Lowering PT on Guidance Cut.

Page 256

STEVEN P. FEINSTEIN, Ph.D.

(Feinstein Exhibit 12, RBC report dated October 16th, 2018 was received and marked on this date for identification.)

Q.    Let me know when you're able to open that.

A.    I have it open. I want to review it.

(Deponent reviews the document.)

A.    Okay.

Q.    This report is dated October 16, 2018, right?

A.    Yes.

Q.    So it was published after the pre-earnings release, right?

A.    That's right.

Q.    In the first summary paragraph with the heading Our View, does the analyst mention the Steves litigation contingency?

A.    Not explicitly. It mentions margin challenges again, acknowledging that the margin expansion the company had

Page 257

STEVEN P. FEINSTEIN, Ph.D.

experienced appears to have stalled.

Q.     Are you referring to the sentence that says "On continued margin challenges and lower sales primarily related to ongoing operational challenges in windows and price/cost"?

A.     I am. And that's the explanation the company gave.

Q.     Okay. But there is no explicit mention of the Steves litigation contingency, right?

A.     Correct.  In that paragraph.

Q.     Correct.

A.     Others, yes.

Q.     And then under Key Points the headings are -- the first heading is Lowering Estimates and Price Target, the second one is Windows Challenges Still Primarily to Blame, and the third is Continued Margin Headwinds, correct?

A.     Yes. But wait.  Okay. It's just the way it's organized.  The next section is Target Price, Base Case.

Q.     The paragraph that starts

Page 258

STEVEN P. FEINSTEIN, Ph.D.

Continued Margin Headwinds, the report says that, "Downgraded fiscal '19 EBITDA forecasts results due to continued market share challenges in windows cost pressures and channel mix." Right?

A.    That's what it says.

Q.    So this analyst thinks these operational issues will persist into fiscal '19, right?

MR. ROTHMAN:  Objection.

A.    Well, it doesn't say that. It says market share cost pressures and channel mix.

Q.    And it says it's lowering its fiscal '19 forecast because of those issues, right?

A.    Yes.

Q.    That paragraph does not say that it's reducing its fiscal '19 EBITDA estimates because of the Steves litigation contingency, right?

MR. ROTHMAN:  Objection.

A.    Correct.

Q.    It does not say that it's

**Page 259**

STEVEN P. FEINSTEIN, Ph.D.
using its fiscal '19 EBITDA estimates because Jeld-Wen has conceded liability in the Steves litigation, right?

A.    That's not in the paragraph, correct.

Q.    Is does not say that it's reducing its fiscal '19 EBITDA estimates because Jeld-Wen is going to experience reduced pricing power in the North American interior doors market, right?

MR. ROTHMAN:  Objection.

A.    That's in the next paragraph, but that last paragraph doesn't say that.

Q.    Okay. So let's turn the page to the next paragraph. And that says Target Price/Base Case is the title.

A.    Yes.

Q.    It says, the second sentence says, "Our multiple anticipates that the unfavorable litigation ruling will remain an overhang on Jeld's valuation."  Right?

A.    Yes.

Q.    And based on that language you concluded that this analyst was

Page 260

STEVEN P. FEINSTEIN, Ph.D. expressing surprise and disappointment over the company's turnabout regarding Steves litigation ruling, right?

A.   Well, I looked at all the analysts reports, what they all said, when they were published, how many were published, what the announcement was that they were responding to, and the rest of this paragraph as well.

Q.   So this includes the explicit commentary that led you to include the market was stunned by the Steves litigation contingency?

A.   By explicit commentary we're talking about, all the analyst reports published after the announcement.

Q.   This report does not say that the market was stunned by the Steves litigation contingency, right?

A.   It doesn't use the word "stunned". It does talk about how the market is exerting downward pressure on the stock price because of the litigation and on its face the announcement was

Page 261

STEVEN P. FEINSTEIN, Ph.D.

stunning and surprising, a complete

reversal.

Q.    Does it refer to the

litigation contingency or to the

unfavorable ruling?

MR. ROTHMAN:  Objection.

A.    Well, it says unfavorable --

okay. It talks about the unfavorable

ruling but the liability announcement was

a reaction to the unfavorable litigation

ruling. The company received the

unfavorable litigation ruling, digested

it and made a liability announcement. So

even the liability announcement is a

reaction to the unfavorable litigation

ruling.

Q.    So it's your opinion that this

language is talking about the litigation

contingency?

A.    I think this language includes

consideration of that, of that latest

development.

Q.    This report does not

explicitly mention the Steves litigation

Page 262

STEVEN P. FEINSTEIN, Ph.D.

contingency, correct?

A.      Again, implicitly I think, yes, that's my expert opinion. Explicitly, they don't use those words. It's one of the ones -- others do explicitly mention the litigation contingency and quantify it and others react more to the message sent by it.

MS. HARRIS:  I'm going to mark as Exhibit 13 a RBC Capital Markets report dated October 8, 2018 on Jeld-Wen Holding, Inc.  Please let me know when you can open it.

(Feinstein Exhibit 13, RBC Capital Markets report dated October 8, 2018 was received and marked on this date for identification.)

A.    Exhibit 13, did you say?

Q.    Yes.

A.    There it is. Okay.

Q.    Is this a report you considered in preparing your report?

A.    Yes.

Page 263

STEVEN P. FEINSTEIN, Ph.D.

Q.      And it was published on October 8, 2018, right?

A.      Yes.

Q.      That is shortly after the divestiture decision?

A.      Right.

Q.      And it also from RBC?

A.      Yes.

Q.      In the summary paragraph the analyst explains the court ruled that the divestiture of the company Towanda's facility was an appropriate remedy, correct?

A.      That's right.

Q.      And then it says, "We believe some of the recent weakness in the stock has been due to a growing belief/fear that this would be the outcome." Do you see that?

A.      Where did you just read that from? What line?

Q.      That's the second sentence in the first paragraph that's labeled "our view".

Page 264

STEVEN P. FEINSTEIN, Ph.D.

MR. ROTHMAN:   Objection.

A.     Yes, I see it.

Q.     So this analyst believed the market already priced in risk because of the divestiture, correct?

MR. ROTHMAN:   Objection.

A.     Some.   But this analyst says that the weakness in the stock is a function of the growing belief, the growing fear of the outcome. And it says the stock will come under pressure.

So clearly, this analyst is saying that the market is not done digesting this news, if there is an indication that fear or this growing belief are justified or have a higher probability the pressure will increase.

Q.     And you see it says, "However, we note that there should be no major financial impact before 2020"?

A.     It says that.   But it doesn't say that there won't be any stock price impact before 2020. There certainly would be stock impact even immediately upon new

Page 265

STEVEN P. FEINSTEIN, Ph.D.

news.

Q.    Right. And then the analyst says it's lowering its price target "as we anticipate that outcome will remain a headwinds to Jeld-Wen multiple."

A.    Right.

MR. ROTHMAN:  Objection.

Q.    Do you see that?

A.    Yes.

Q.    And if we turn the page, going to the third page, we have the same heading as the prior report, Target Price/Base Case.

A.    Yes.

Q.    And you see there the second sentence says, "Our lowered multiple anticipates that the unfavorable litigation ruling will remain an overhang on Jeld's valuation." Do you see that?

A.    Right. An overhang on Jeld's valuation means the market will continue to focus on this news and react accordingly.

Q.    And that language is the same

Page 266

STEVEN P. FEINSTEIN, Ph.D.
language in the October 16th report that caused you to conclude the analyst was showing surprise and disappointment regarding the litigation contingency, right?

A.   I just want to be clear.  It's not any -- it's the entire set of analysts reports and everything that they wrote, including that they wrote reports that they were responding to the announcement and that it was addressed by these analysts.

Q.   That's the same language, though, right?

A.   This analyst uses a -- well, we can compare them side by side. It's similar or the same sentence.

Q.   How can the repetition of language from a report published before the litigation contingency show surprise and disappointment at the announcement of the litigation contingency?

A.   Because the sentence that we're talking about says that this is

Page 267

STEVEN P. FEINSTEIN, Ph.D.

important news to investors and it's important news to the future of the company. And not only is it important news but that how negative the news should be received is a function of how likely the negative outcomes are.

I mean, this -- this report sets up that the announcement that came on October 15th was critical. I mean, whether the market was going to learn that negative outcomes were less likely or more likely is what this analyst is saying is very important news to investors.

So when the company comes out and says it's now more likely there will be negative outcomes, it's reports like this and commentary like this that tells me that that was economically material and stunning news.

Q.    But then the October 16th, 2018 report doesn't mention the litigation contingency, right?

A.    Let's go back to that report.

Page 268

STEVEN P. FEINSTEIN, Ph.D.

That was Exhibit 12?

Q.    I'm going to stay on this report. Please answer my question.

A.    Well, I think we established that --

MR. ROTHMAN:  Excuse me.  The witness asked to look at the report that you mentioned in your question. Are you prohibiting the witness from actually examining the report?

MS. HARRIS:  If the witness is unable to answer the question, then he can look at the report. If the witness can answer the question without going to other exhibits, I'd appreciate if he answered the question.

A.    There is implicit reference to the issue, to the central issue of the litigation here. There is a lot of discussion of margins and margin headwinds and new information that suggests there is -- that margin

**Page 269**

STEVEN P. FEINSTEIN, Ph.D.

headwinds are going to be a problem for the company.

Let me add, there is also -- it's couched among a discussion of explanations that the company offered. You know, I don't think anyone can be really 100% convinced the company was being completely honest with these explanations but, I mean, it makes sense that analysts are going to repeat some of the explanations that the company gave rather than -- well, period. So that's not surprising to me.

Q.    Would you have expected that the analyst would have said something more than what it said in the prior report?

MR. ROTHMAN:  Objection.

A.    Well, they did. They do talk about margin headwinds and where the -- where the pain will be felt to some extent, not as much as other reports but to some extent they do.

MS. HARRIS:  I'm going to mark

Page 270

STEVEN P. FEINSTEIN, Ph.D.
as Exhibit 14 a Wells Fargo report
from October 16th, 2018 on Jeld-Wen
Holding Inc. And the title is
Jeld-Wen Still Battling to Return
to Normal and Other Executive
Change.

(Feinstein Exhibit 14, Wells
Fargo report dated October 16th,
2018, was received and marked on
this date for identification.)

Q.     Are you able to open the
report, Dr. Feinstein?

A.     I see it.

Q.     Is this a report that you
considered in preparing your report?

A.     Yes.

Q.     And it's dated October 16,
2018?

A.     Yes. I'm sorry.  What?

Q.     It's dated October 16, 2018?

A.     Right. Okay. I thought you
said October 18 for a moment. Yes. That's
the date.

Q.     And that is just after the

Page 271

STEVEN P. FEINSTEIN, Ph.D.

pre-earnings release, right?

A.    Yes.

Q.    The first bullet paragraph discusses disappointing Q3 results, updated full year 2018 guidance and the departure of the CFO, right?

A.    It says that, yes.

Q.    THIS bolded paragraph doesn't mention the Steves litigation contingency, right?

A.    Correct.

Q.    I'm sorry. Did you answer?

A.    I did. I said correct.

Q.    In the middle of the paragraph it says, "We believe the equity will decline materially today as Jeld-Wen's operational improvement story has hit a serious snag the past year with little likely reprieve for the foreseeable future." Do you see that?

A.    No, I didn't. Where are you reading again?

Q.    If you look at the first bolded paragraph and you look at nine

**Page 272**

STEVEN P. FEINSTEIN, Ph.D.

lines down, the beginning of the line is, "130 GPS year-over-year", and then the next sentence is what I just read.

MR. ROTHMAN:  Objection.

A.     Yeah. They say it is a problem with the foreseeable future. That's what I concluded as well from the announcement, there is a problem for this company for the foreseeable future.

Q.     So Wells Fargo predicts Jeld's stock price will decline materially on October 2018 because of operational issues, right?

MR. ROTHMAN:  Objection.

A.     I don't think you can read it only that way. Equity will decline materially today.  The operational improvements story certainly could have an effect but there is little reprieve for the foreseeable future.  You know, the company didn't give -- the company gave explanations, but in my view and my analysis the best explanation for the foreseeable future was a deterioration of

Page 273

STEVEN P. FEINSTEIN, Ph.D.

the margin improvement story, which is an outcome of not being able to continue with unsustainable anticompetitive practices.

So, I mean, they talk about the foreseeable future. I don't think they're saying here that it's only operational improvement issues that are going to be the problem in the foreseeable future.

Q.    It doesn't predict a stock drop based on the Steves litigation contingency, right?

A.    Well, it says that basically the wind is being taken out of the sails of this company's growth story and this company's story has always been a margin growth story.

One moment. And there is discussions of margins throughout this report.

Q.    Is there somewhere that you are referring to that you think it refers to door margins?

Page 274

STEVEN P. FEINSTEIN, Ph.D.

A.     Well, they don't break it out. It's -- door margins are included. Hold on. That's my answer.

Q.     This report doesn't mention the Steves litigation contingency at all, right?

A.     Right. This is one of the ones that doesn't.

Q.     Does this report contain the explicit commentary you relied on to reach your opinion the market was stunned by the Steves litigation contingency?

A.     I looked at all the analyst coverage holistically and that's what I meant.

Q.     And does this report contain that explicit commentary?

A.     It's included. It's included among the things that I examined and considered.

Q.     This report does not say that the market was stunned by the Steves litigation contingency, right?

A.     I never said that any analyst

STEVEN P. FEINSTEIN, Ph.D.

said that explicitly. I said that it was my conclusion that analysts, because it was a stunning announcement, it would stun the market and it did stun the market.

Q.    This report does not say that the market was stunned by the Steves litigation contingency, correct?

A.    It doesn't have that language, correct.

Q.    In fact, this report doesn't mention the Steves litigation, right?

MR. ROTHMAN:  Objection.

A.    Correct.

MS. HARRIS:  Okay. I'm going to mark as Exhibit 15 the Citi report dated October 15, 2018 on Jeld-Wen Holding, Inc.  Please let me know when you're able to open that.

(Feinstein Exhibit 15, Citi report dated October 15, 2018 on Jeld-Wen Holding, Inc. was received and marked on this date for

Page 276

STEVEN P. FEINSTEIN, Ph.D.

identification.)

A.      Okay. Also open.

Q.      And the title of this report is, "Alert: More bad news.  CFO leaving. Preliminary 3Q '18 results, soft guidance cut."  Correct?

A.      That's the title. That's the subtitle.

Q.      Is this a report you considered in preparing your report?

A.      Yes.

Q.      And this was published just after the pre-earnings release, right?

A.      Right.

Q.      Under What's New it says, "Jeld-Wen announced the departure of its CFO and preliminary Q3 results."  Right?

A.      Yes.

Q.      That paragraph doesn't mention the Steves litigation contingency, right?

A.      No.

Q.      The next paragraph heading says Preliminary Results, right?

A.      Yes.

Page 277

STEVEN P. FEINSTEIN, Ph.D.

Q.    And it begins by discussing the disappointing Q3 results, right?

A.    Yes.

Q.    And then seven lines down it says, "The company expects 3Q '18 results to include a $76.5 million litigation contingency related to the Steves litigation."  Right?

A.    Yes.

Q.    That's all this report says about the Steves litigation contingency, right?

MR. ROTHMAN:  Objection.

A.    Looks like there's a hyperlink to something but in this -- well, it's only a one-page report. There is a table on the next page.  But correct, there is no more discussion.

Q.    It does not indicate that the Steves litigation contingency factors into Citi's valuation of Jeld-Wen's stock, right?

A.    One moment. Your question was?

Q.    It does not indicate that the

Page 278

STEVEN P. FEINSTEIN, Ph.D.

Steves litigation contingency factored into Citi's valuation of Jeld-Wen's stock, correct?

A.    I think in an efficient market they consider everything, especially sophisticated investors.

Q.    It doesn't say that, right?

A.    They -- they report the Steves litigation and the charge.

Q.    If you look at the paragraph starting, "Our initial thoughts:  Citi predicts Jeld-Wen's stock will drop because the news that operational issues still plague the company."  Right?

A.    It says that, "The stock will come under further pressure on the news." It doesn't say that it's only that news. It will come under further pressure, the stock will come under further pressure on the collection of news that was announced, which includes the Steves litigation.

Q.    The sentence just before that says, "Operational inefficiencies still

Page 279

STEVEN P. FEINSTEIN, Ph.D.
plague the company and although
management noted it has identified more
areas of process improvement we think the
current macro environment will heavily
penalize ongoing execution issues. Even
though the stock has underperformed we
believe the stock will come under further
pressure on the news." Correct?

A.    I don't think -- "news"
doesn't mean only one item from the
company's announcement.

Q.    This report does not say that
the market was stunned by the Steves
litigation contingency, right?

A.    It doesn't say it, explicitly.

MS. HARRIS:  I'm going to mark
as Exhibit 16 a Bank of America
Merrill Lynch report for Jeld-Wen,
Inc. dated October 16, 2018.

(Feinstein Exhibit 16, Bank of
America Merrill Lynch report dated
October 16, 2018, was received and
marked on this date for
identification.)

Page 280

STEVEN P. FEINSTEIN, Ph.D.

Q.    Let me know when you can access it?

A.    I'm there.

Q.    And the title of this report is Jeld Announces Challenging Preliminary 3Q.  John Linker to replace CFO Mallard. Right?

A.    Yes.

Q.    And this is a report that you considered?

A.    Yes.

Q.    If we look at the first bolded heading it says, "3Q preliminary results miss mark on topline and EBITDA", right?

A.    It does.

Q.    And the next bolded heading says "Full year EBITDA outlook cut. Litigation charge expected." Right?

A.    That's what it says.

Q.    Then in the second sentence in the paragraph below the heading it reads, "In addition, Jeld provided an updated regarding the ongoing Steves & Sons litigation and now expects the litigation

Page 281

STEVEN P. FEINSTEIN, Ph.D.
contingency related charge of $76.5 million in 3Q '18."  Correct?

A.    Yes.

Q.    That's all this report says about the Steves litigation contingency, correct?

A.    No.

Q.    What else does it say about the Steves litigation contingency?

A.    On the next page it lists as a downside risk a negative Steves & Sons outcome.

Q.    Does it mention the contingency, the decision to take the contingency?

MR. ROTHMAN:  Objection.

A.    Well, let me explain why -- the answer is yes, essentially.

I mean, again, the same as for the other reports, maybe explicitly for some of them, no.  But implicitly, yes. The company said on more than one occasion that there would be material adverse effect if there was to be a

Page 282

STEVEN P. FEINSTEIN, Ph.D.

charge recorded for a loss related to the litigation and that material adverse effect would be in the quarter, in the period reported.

Well, the announcement was in this period, and the stock -- and had a material adverse effect on the stock. The company said that there would be a material adverse effect in the period that such a charge would be recorded and then they're recording the charge in this period. And analysts like this one who cite that, yes, now there is being a material charge, there is being a litigation charge recorded, they're making note of what was the most important and stunning part of the announcement.

The other stuff is essentially the type of earnings announcement information that's analyzed each period. This is what's unexpected what motivated an off-cycle announcement.

Q.    Does the report say that this

STEVEN P. FEINSTEIN, Ph.D.

was unexpected?

A.      Implicitly, it does. I mean, the company had been saying no ramifications, no cost, no charge, no merit, and now they're saying we need to record a charge. And the company previously said that when they record a charge there would be a material adverse effect in the period recorded.

So, I mean, you are trying to downplay -- I see what you're doing. You're trying to downplay the significance and importance of the announcement, but it's here. I mean, the analyst -- you know, it's important for them to try not to embarrass the company or rub it in, but most of them do or many of them do report it.

Q.      This report does not say that booking the Steves litigation contingency was an admission of anticompetitive conduct, right?

MR. ROTHMAN:  Objection.

A.      The report doesn't say that,

**Page 284**

STEVEN P. FEINSTEIN, Ph.D.

but that combined with Judge Payne's order, that's the information being provided to the marketplace.

Q.   This report does not say that the market was stunned by the Steves litigation contingency, right?

A.   You asked that and I said it's not explicit in the report.

MS. HARRIS:  I'm going to mark as Exhibit 17.

(Feinstein Exhibit 17, BAML report dated October 8, 2018, was received and marked on this date for identification.)

MS. HARRIS:  Actually, there is another one there. I'm going to mark as Exhibit 18 the Deutsche Bank report from October 16th, 2018 titled, "17% reduction to '18 guidance may not be the end of Jeld-Wen's troubles."

MR. ROTHMAN:  Did you say 17?

MS. HARRIS:  We're going to skip 17 for now.

**Page 285**

STEVEN P. FEINSTEIN, Ph.D.

(Feinstein Exhibit 18, Deutsche Bank report dated October 16th, 2018 was received and marked on this date for identification.)

A.    So what am I looking for?

Q.    Exhibit 18.  Let me know when you have that open.

A.    Okay.

Q.    Is this a report that you considered in preparing your report?

A.    Yes.

Q.    And the heading on the first page says "Guidance now realistic but operational litigation market challenges remain." Right?

A.    Yes.

Q.    And then towards the end of that long paragraph it says, "Finally, the Steves legal provision puts a number on the cost of the legal action. However, it doesn't take into account the potentially serious disruption from the forced divestiture of the Towanda plant, a likely outcome given Steves recent

STEVEN P. FEINSTEIN, Ph.D.

press release."  Right?

          A.    Yes.

          Q.    All right.  Do you understand the reference to the "Steves press release" to be Steves October 5th press release.

          A.    I do. And Deutsche Bank, at least in the collection of reports I had, did not have a report written in response to that development but then this development of the company putting forth the liability announcement seems to have motivated Deutsche Bank to present this analysis of the litigation issue.

          Q.    The report then predicts Jeld-Wen's stock will drop based on decreased fiscal '18 guidance, right?

                    MR. ROTHMAN:  Objection.

          A.    I mean, I can't say that it doesn't. It says here that even the number that the company put out for the litigation contingency doesn't take into account serious -- the potentially serious disruption from the forced

Page 287

STEVEN P. FEINSTEIN, Ph.D.
divestiture of the Towanda plant and the likelihood of that is now much greater.

So it's there, it's in the report, maybe not as explicitly as, you know, some of the other discussion but it's there, that that's what the market learned, that a serious disruption to the company's business is now more likely. And Deutsche Bank responded by writing this report, they responded to the October 15th announcement from the company.  They didn't write a report like this, as far as I have -- sorry -- as far as I know from the collection I have, after October 5th.

Q.    And then the next sentence says, "We expect Jeld-Wen's stock to reach new lows on the guidance cut." Right?

A.    Yes.  And it says, "There are many potential challenges ahead."  And the many potential challenges include -- well, you know what they include.

They certainly can include the

Page 288

STEVEN P. FEINSTEIN, Ph.D. business ramifications of the litigation and the inability to continue with anticompetitive behaviors.

Q. And then if you turn the page, there is a paragraph titled Steves & Sons Litigation Charge Assumes Towanda's Divestiture. Do you see that paragraph?

A. It's puzzling, but I see it. It's puzzling because we know that the litigation charge did not include Towanda divestiture.

Q. And it says, "Following the October 5th ruling the company took a charge of $76.5 million," right?

A. Yes.

MR. ROTHMAN: Objection.

Q. This report does not say that the Steves litigation contingency was an admission of anticompetitive conduct, right?

A. Well, I think what's implicit in this report is that the company's announcement better informed the marketplace about anticompetitive

STEVEN P. FEINSTEIN, Ph.D.

conduct.

Q.      The report explicitly says, "The company still believes in the merits of the case."  Right?

A.      It does. But it also says that there would be serious disruption from divestiture.

Q.      And this analyst said that the company still believes in the merits of the case after the litigation contingency, correct?

A.      Well, again, you are trying to make it black and white. The company said they believe in the merits of their case. They're speaking out of one side of their mouth when they say that but then when they say it's probable that they're going to lose, and its therefore probable and appropriate that they take that charge, they're speaking out of the other side of their mouth.  So before there was a more clear message from the company, plaintiffs say it was misleading but it was a clear message from the company that

STEVEN P. FEINSTEIN, Ph.D.
there was no merit to the case and there would be no negative repercussions.

Now they're saying out of one side of their mouth there might not be and the other side they're saying there might yes. So that's new information and it's a turnaround for the company.  I maintain that it's a stunning turnaround that informed the marketplace about the anticompetitive behavior, to some extent.

MS. HARRIS:  Okay. I'm going to mark as Exhibit 19, a JPMorgan report from October 16, 2018 on Jeld-Wen titled 2018 Guidance Lowered 9% CFO Mallard to Exit Succeeded By SVP Corp. Development, IR Linker.

(Feinstein Exhibit 19, JPMorgan report dated October 16, 2018 was received and marked on this date for identification.)

THE WITNESS: I don't have it.

MR. ROTHMAN: 19.

Q.    Exhibit 18. Exhibit 19.  I

Page 291

STEVEN P. FEINSTEIN, Ph.D.

apologize.

A.      Now I have it. Now I'm opening it. Okay.

Q.      Is this a report you considered in preparing your report?

A.      Yes.

Q.      If we look at the first paragraph it discusses Q3 results and lowered 2018 guidance and then the underlying sentence says, "Net net we expect the stock to react negatively tomorrow." Correct?

A.      Yes.

Q.      And then the reason given is, "We view the guidance reduction as material."  And then it references uncertainty in the Steves litigation and the recent divestiture decision, correct?

MR. ROTHMAN:  Objection.

A.      It says, "Uncertainty from the Steves litigation and recent negative ruling.  See our recent note here." And then later it -- in that same paragraph -- well, let's read it. "Overall, we

Page 292

STEVEN P. FEINSTEIN, Ph.D.

remain comfortable being on the sidelines", that means don't buy, "along with maintaining our neutral rating on Jeld, as while the stock should remain under pressure in the near term and also highlight the continued uncertainty from the Steves litigation, at the same time we believe this is somewhat balanced over the medium term with other factors, potential material restructuring program."  But they highlight the continued uncertainty from the Steves litigation.  And the continued uncertainty from the Steves litigation was exacerbated significantly by the company's announcement. It had to be.

Q.    Does this paragraph actually mention the Steves litigation contingency?

MR. ROTHMAN:  Objection.

A.    The next paragraph does.

Q.    Does this paragraph --

A.    The next bullet --

Q.    -- reference the Steves

Page 293

STEVEN P. FEINSTEIN, Ph.D.
litigation contingency?

A. It's in the bullet point next, the details about what this litigation uncertainty and downward pressure is described next.

Q. Okay. So it's not in this first paragraph we were just talking about, correct?

A. I wouldn't say it's not. I mean, they're talking about the Steves litigation and how it's a negative effect on the stock. And then in the next bullet point they explicitly state that the company expects three quarters -- "3Q results to include a charge of $76.5 million for a litigation contingency related to the recent court rulings as part of its litigation with Steves & Sons."

Q. So in --

A. I'm not going to say it's not in that first paragraph at all. They're alluding to the Steves litigation in the first paragraph and they're writing the

Page 294

STEVEN P. FEINSTEIN, Ph.D.
report on October 16th, which is the day after the company made the announcement.

Q.   The first paragraph discusses the Steves litigation and the divestiture decision, correct?

A.   Say that again, please.

Q.   The first paragraph discusses the Steves litigation and the divestiture decision, correct?

MR. ROTHMAN:  Objection.

A.   The first bullet point paragraph does.

Q.   The first paragraph says, "While additionally it points to the continued uncertainty from the Steves litigation and the recent negative ruling."

Do you understand that to be a reference to the Steves litigation and the divestiture decision?

A.   Yes.

Q.   Okay.  And the first paragraph does not explicitly mention the litigation contingency, correct?

STEVEN P. FEINSTEIN, Ph.D.

A.     Not explicitly, but certainly the weight you would put on the divestiture decision is a function of how the company responds to it. And that's the latest news that as of the date of this report happened just yesterday.

Q.     So it's your opinion that the language, "While additionally points to continued uncertainty from the Steves litigation and recent negative ruling", that refers to the litigation contingency?

A.     In part, because the way the market would interpret the ruling has a lot to do with how the company reacts to the ruling.

For ten days they were denying, denying, denying and then yesterday, as of the date of this report they said, well, we better take a loss contingency for it because it's chargeable and estimable.

Q.     And then it says -- you pointed out, if you look at the first

STEVEN P. FEINSTEIN, Ph.D.

bullet point at the very bottom of that paragraph, it does mention the Steves litigation contingency, right?

A.    Right, explicitly.

Q.    And that's all that it says explicitly about the Steves litigation contingency, right?

A.    No. Again, it's -- the very last sentence of the -- well, no. The very next page where they talk about what goes into their price target of $21, they include uncertainty regarding the Steves litigation.

Q.    Right. That doesn't explicitly reference the litigation contingency, correct?

A.    Well --

MR. ROTHMAN:  Objection.

A.    -- implicitly. I mean, that's the news about that topic. They're admitting -- they're not admitting, they're analyzing and explaining that this is an important factor and they're also conveying what the latest news was

Page 297

STEVEN P. FEINSTEIN, Ph.D.

related to that important factor.

Q.    Does this report say that the market was stunned by the Steves litigation contingency?

A.    Same answer as for all the other reports. I mean, explicitly, no. But taken in context, yes, it was a stunning announcement.

Q.    It does not say that the Steves litigation contingency was an admission of anticompetitive conduct, does it?

A.    Not explicitly.

Q.    Okay. If we look at page 4, this is talking about the Steves litigation. It says --

A.    Page 3 and 4.

Q.    Pages 3 and 4 and it says, "Jeld intends to vigorously oppose the entry of and to appeal any potential adverse final judgment."

MR. ROTHMAN:  Objection.

A.    Where are you reading from?

Q.    If you look at the first line,

STEVEN P. FEINSTEIN, Ph.D.

"Jeld intends to vigorously oppose the entry of and to appeal any potential adverse final judgment."

MR. ROTHMAN:   Objection.

Q.    Is that what that says there?

A.    I think you need -- we both need to read the entire paragraph 4. It's all about the litigation contingency charge.

Q.    I'll get to the rest of the paragraph. Is that what that sentence says?

MR. ROTHMAN:   That's not what that sentence says. You're reading a portion of a sentence out of context. The witness would like to read the entire sentence in context.

Q.    Does the sentence begin, "Jeld intends to vigorously oppose the entry of and to appeal any potential adverse final judgment?"

MR. ROTHMAN:   Objection. The document speaks for itself.

STEVEN P. FEINSTEIN, Ph.D.

A.    Most of this paragraph 4 is about how much harm will be suffered by the company if -- if the judgment is against them, if the ultimate judgment is against them and it's pretty severe. And the latest news was that the probability of that happening is now significantly higher. The company, whereas, before was only denying it.  Now out of one side of their mouth they're saying it's probable. So you know, in this paragraph it says, you know -- this analyst, JPMorgan, is repeating back what the company told them that, "Jeld will vigorously oppose the entry of and to appeal any potential adverse final judgment", but the news yesterday, as of the date of this report, was that it's now probable that something like this will happen, and then this entire paragraph talks about how devastating that would be to Jeld-Wen's business.

Q.    Okay. And I believe this is the language that you were referring to,

Page 300

STEVEN P. FEINSTEIN, Ph.D.

I think.  Five lines down it says, "We believe the potential required sales of the Towanda facility to, as Jeld would expect an independent, third party buyer could result in a more competitive backdrop to the door industry and, in turn, could negatively impact both Jeld's and door's margins."  Correct?

MR. ROTHMAN:  Objection.

A.    That's part of the paragraph.

Q.    And you cite --

A.    They also talk about that Jeld-Wen -- that Towanda facility generated $120 million of external revenue in 2017.

Q.    That sentence I just read to you that begins, "We believe" you quoted that language in your report, correct?

A.    I don't recall but it's reasonable to.

Q.    And is it your opinion that language shows the analyst was surprised and disappointed by the Steves litigation contingency?

STEVEN P. FEINSTEIN, Ph.D.

A.      No. It just shows how devastating a negative ruling, a negative outcome can be in the news and the explicit news on its face is that that is now more probable.

Q.      And do you see the next sentence that says, "However, at the same time we do not view a more competitive backdrop as a foregone conclusion in the event of a required divestiture, given still positive industry demand, a pricing environment that has been stable and constructive for several years, which while arguably beginning with and due to Jeld's Craftmaster acquisition, nonetheless, benefits all owners of doorskins assets going forward"?

A.      Yeah. I mean, they're saying -- yes, I see that.  I considered that. They're saying that the Craftmaster acquisition was instrumental in creating an environment for their company that had positive pricing dynamics.  And then goes on to say that its divesting Towanda

Page 302

STEVEN P. FEINSTEIN, Ph.D.
would not be good for the company --
would not be good for the company, it
would hurt.

MS. HARRIS:  I'm going to mark
as Exhibit 20, the October 7, 2018
JPMorgan report.

(Feinstein Exhibit 20,
JPMorgan report dated October 7,
2018 was received and marked on
this date for identification.)

MR. ROTHMAN:  What time do you
want to take a break?

MS. HARRIS:  Do you want to
break at 1:30 and we can do a
lunch?

MR. ROTHMAN:  Is that okay
with you, Dr. Feinstein?

THE WITNESS: Sure.

Q.    Let me know when you're able
to open that document.

A.    Exhibit 20.

Q.    And this is the October 7,
2018 JPMorgan report on Jeld-Wen. Is this
a report that you considered in preparing

STEVEN P. FEINSTEIN, Ph.D.

your report?

A.    I believe so.

Q.    And if we go down to the second paragraph, the analyst emphasizes "A potential required sale of the Towanda facility too as Jeld would expect an independent third party buyer could result in a more competitive backdrop to the door industry and, in turn, could negatively impact both Jeld's and door's margins." Do you see that?

A.    Yes.

Q.    And this is the same language that we just looked at in the October 16, 2018 report, right?

A.    I'd have to compare them side by side, but same sentiment.

Q.    So when JPMorgan used this language on October 16, 2018 it was repeating its prior analysis from nine days earlier in response to the divestiture decision, right?

A.    Well, they're pointing out how important the news of October 15th is or

Page 304

STEVEN P. FEINSTEIN, Ph.D.

was. Here they're saying that a potential required sale would negatively impact Jeld. Then October 5th the news comes in that the company took the charge. It only follows that it's necessarily bad news for the company. If it's -- if probability of divestiture is harmful for the company, then news that increases that probability will be also harmful.

Q.    It's repeating its prior analysis, right?

A.    No.

MR. ROTHMAN:  Objection.

A.    There is more -- there was more in the October 15th article, report, much more.

Q.    Okay. Please turn to 118 of your report, which is Exhibit 1.

A.    What paragraph?

Q.    Page 118. Let me know when you're there.

A.    Paragraph or page?

Q.    Page 118.

A.    Okay.

STEVEN P. FEINSTEIN, Ph.D.

Q.     Under the heading News Articles/Press Releases in bullet 1, you cite Factiva news articles, 569 from the 26th of January 2017 to the 15th of October, 2018.

A.     Yes.

Q.     Did you review all 569 of these articles?

A.     I reviewed them. I didn't read them each carefully. That was more for the market efficiency report.  I counted them and then reviewed some of the articles more carefully.  And I want to point out while we're here, though, you asked earlier what internal documents I relied on and the deposition of Philip Orsino had internal documents as exhibits. They're not listed here explicitly but that is where I had access to some internal documents from the company that were considered when I wrote this report.

Q.     Okay. So that bullet should include the deposition transcript as well

STEVEN P. FEINSTEIN, Ph.D.

as the exhibits?

A.      I think the bullet does include that.

Q.      Okay. If you reviewed one of the articles in the Factiva search would it appear on this list of articles on 118 and 119?

MR. ROTHMAN:  Objection.

A.      Not necessarily. The ones that I excerpted and quoted are here in the list. Articles that weren't excerpted or quoted are not in the list, to the best of my knowledge.

Q.      If you look at page 119, at the bottom it only lists two articles from October 15th, 2018, right?

A.      Yes.

Q.      And those are just the company's press releases, right?

A.      Right.

Q.      Turning back to the Factiva search it ends October 15th, 2018, right?

A.      Yes.

Q.      Did you review any articles

Page 307

STEVEN P. FEINSTEIN, Ph.D.

after October 15th, 2018 that were?

A.    Only --

Q.    Did you review any news articles after that date?

A.    The ones that are cited explicitly.

Q.    And on page 119?

A.    Yes.

Q.    So you are referring to the company press releases?

A.    Right.

Q.    Did you review any of the articles in the Factiva search dated October 15, 2018?

A.    Yes. I reviewed -- like I said, I reviewed them to some extent, yes.

Q.    Which of those articles did you review?

A.    I mean, what's in the file. I don't have it committed to memory.

Q.    Do you know -- did you consider any of those articles in forming your opinions on loss causation and

Page 308

STEVEN P. FEINSTEIN, Ph.D.

damages?

A.      Well, everything that is considered to some extent influences my decision and opinions and conclusions. It was primarily for the market efficiency section of the report. Things that I strongly relied upon are explicitly cited, so...

Q.      Do any of these articles contain the explicit commentary you relied on to reach your conclusion that the litigation contingency stunned the market?

A.      I just don't recall. I don't have them committed to memory.

Q.      Do you know whether any of the articles from October 15th, 2018 said the market was deprived by the announcement of the litigation contingency?

A.      I'd have to review them again. I don't recall.

Q.      Do you know whether any of the articles from October 15th, 2018 attribute any changes to 2019 EBITDA

Page 309

STEVEN P. FEINSTEIN, Ph.D.
projections due to the Steves litigation contingency?

A.    Same answer.

Q.    Do you know whether any of the news articles from October 15th, 2018 say that the Steves litigation contingency was an admission regarding anticompetitive conduct?

A.    Like I said, same answer. I'd have to review them again.

Q.    Do you know whether any of these news articles from October 15th, 2018 say the market was stunned by the Steves litigation contingency?

A.    Same answer.

MS. HARRIS:   Okay. Let's take a break.

VIDEOGRAPHER:   Thank you. One second.  This is the videographer. Time is 1:30. We're going off the record. This is the end of media file 3.

(Lunch recess is taken.)

VIDEOGRAPHER:   We are back on

**Page 310**

STEVEN P. FEINSTEIN, Ph.D.

the record. Time is 2:03 p.m.  This is the beginning of media file 4.

Q.   Dr. Feinstein, are you aware that Jeld-Wen announced on February 15th, 2018 that it had been found liable for $12.2 million in past damages to Steves?

MR. ROTHMAN:  Objection.  And I think you're muted, Dr. Feinstein.

A.   In fact, I was. I was going to ask to hear the question again because the date --

Q.   Are you aware that the company announced on February 15, 2018 that it had been found liable for $12.2 million in past damages to Steves?

MR. ROTHMAN:  Objection.

A.   I believe so.

Q.   And the company also announced that those damages could be trebled since the jurors filed a Clayton Act violation.

A.   And the company took no charge, no liability contingency. So, you know, they said that was the decision.

Page 311

STEVEN P. FEINSTEIN, Ph.D.

They were going to fight it and the fact that they took no contingency charge conveyed information to the marketplace about the company's belief about what the facts were, what their behavior had been and what the potential ramifications could be.

Q.    Just to answer my question, though, you're aware that the company announced that the 12.2 million in past damages could be trebled since the jury finding included a Clayton Act violation?

A.    I know -- I know that Steves announced the verdict. Yeah, the company may have announced it too.

Q.    Okay. Are you aware that the company also announced that Jeld-Wen could owe Steves its attorneys' fees from the litigation?

A.    I'd have to look at the document. Could I see it, please?

Q.    Sure.

MS. HARRIS:  Let's mark as Exhibit 21, I'm showing you the

**Page 312**

STEVEN P. FEINSTEIN, Ph.D.

February 15, 2018 Jeld-Wen press release titled Jeld-Wen Announces Jury Verdict in Steves & Sons Lawsuit.

(Feinstein Exhibit 21, February 15, 2018 Jeld-Wen press release was received and marked on this date for identification.)

Q.     So my last question, if you look at the second to last line in the first paragraph it says, "In addition, if a judgment is entered under either theory in accordance with the verdict Steves will be entitled to an award of attorneys' fees." Do you see that?

A.     I do.

Q.     Is it your opinion, no market participant attributed any of those until October 15th, 2018?

A.     Any what? Attribute?

Q.     Sorry. Is it your opinion that no market participants attributed any value to those risks until October 15th, 2018?

Page 313

STEVEN P. FEINSTEIN, Ph.D.

A.     No.

MR. ROTHMAN:  Objection.

A.     No, that is not my opinion.

Q.     What value do you think market participants attributed to those risks before October 15th, 2018?

A.     I don't know for sure. I know that the impact on the market of these disclosures was muted by the company's denials, which, you know, are very specific.

I mean, they're not just -- liability they say -- what does it say here? "The company continues to believe that the facts underlying this dispute do not establish either a violation of the antitrust laws or a breach of contract."

It's only after the company took the brakes off its denials that the market impact on the price was felt. So I quantify it then, it was muted until then, by company denials.

Q.     Are you aware whether prior to October 15, 2018 analysts had estimated

**Page 314**

STEVEN P. FEINSTEIN, Ph.D.
the financial impact of the jury verdict on Jeld-Wen?

A.    Some had, some hadn't. The company said they could not. So it's reasonable that many market participants could not, if not most.

Q.    In your reply report you repeatedly state that the company needed ten days to undertake its evaluation of the divestiture decision and calculate the estimate of the impact, right?

MR. ROTHMAN:  Objection.

A.    That's in my -- that's in the loss causation report?

Q.    Yes.

A.    I just want to check and make sure you're reading me correctly. Which paragraph?

Q.    Exhibit 5, and you have that paragraph 53, in among other places?

A.    Exhibit 5? Not Exhibit 1?

Q.    Exhibit 5, it's in your reply report.

A.    Oh. You said paragraph 51?

Page 315

STEVEN P. FEINSTEIN, Ph.D.

Q.    53.

A.    53.

Q.    The one I'm referring to is the final clause in that paragraph that says, "Despite the fact that the company needed ten days to undertake its evaluation and calculate its estimate of the impact." Do you see that?

A.    I do. We know that because that's what the company did, they didn't announce until ten days.

Q.    So the basis of your statement is the fact that there were ten days between the divestiture decision and the pre-earnings release?

A.    Yes.

        MR. ROTHMAN:  Objection.

A.    Yes. And then the internal company document from October 7th, 2018 that said that their prior estimate was zero.

Q.    Do you know what the company was doing in those ten days?

A.    That's an odd question. I'm

Page 316

STEVEN P. FEINSTEIN, Ph.D.

sure they were making windows and doors.

No, I don't know everything they were doing in those ten days. I can only tell you what I observed, that they presented to the world what they were doing and had completed.

Q.    Is it possible that Jeld-Wen finished its accounting analysis earlier than October 15 and disclosed it in the pre-earnings release?

A.    It's possible. There is no indication that that's the case. They chose to tell the market on the tenth day.

Q.    Do you know whether the reasons for the pre-earnings release was the litigation contingency or whether it was the announcement of the Q3 -- Q3 results in fiscal -- sorry. I'll start again.

Do you know the reason that the company issued the pre-release was because of the announcement of the litigation contingency or because of the

STEVEN P. FEINSTEIN, Ph.D.
announcement of other issues in the release?

MR. ROTHMAN:  Objection.

A.    Well, the facts and circumstances that are evident indicate that it was the litigation contingency, because the other items were either not the kind of items that would motivate a pre-release and hadn't previously.

Q.    Have you reviewed internal documents to support that conclusion?

A.    I was not given internal documents. They were not available to me about the company's -- around the company's decision and their computations in the interim. I can only -- the best -- the best conclusion, the best analysis I can do is -- well, I did the best analysis I could do given the information that was provided and available, potentially, from your side.

Q.    Returning to paragraph 53, you say that, "Mr. Fischel erroneously assumed that market participants should

**Page 318**

STEVEN P. FEINSTEIN, Ph.D.

have been able to accurately estimate such figures simultaneously following the divestiture decision and the related press release."  Right?

A.    I wrote that.

Q.    Are you saying it was an error for Mr. Fischel to assume that Jeld-Wen's stock price would react promptly to any new information contained in the divestiture decision?

A.    Well, there's a little bit of a leak there. Can I hear that question again, maybe really slow?

Q.    Are you saying it was an error for Mr. Fischel to assume that Jeld-Wen's stock price would react promptly to any new information contained in the divestiture decision?

A.    No. But I am saying it's an error for him to equate "promptly" with "simultaneously".

Q.    And what is your definition of "promptly" then?

A.    I think we went through this

Page 319

STEVEN P. FEINSTEIN, Ph.D.
in the last deposition. It depends on the nature of the information and the literature supports that. Some information takes longer to process than others.  And that's why I use the company's length of time that they required as a yardstick to see what would be reasonable for the rest of the marketplace.  The company -- it's reasonable that the marketplace might take that or but for the company's later announcement maybe even longer.

Q.    Would your opinion change if the company did not take ten days?

MR. ROTHMAN:  Objection.

A.    Well, I would have to see how it changed, I mean, what the new set of facts is.

If there is a new set of facts, I'll consider them. There was nothing in the Fischel report -- I'm sure he had access to everything that Defendants could provide and there was nothing in his report that says that they

Page 320

STEVEN P. FEINSTEIN, Ph.D. took anything besides ten days. I had nothing that indicated either that they took anything less than ten days.

Q.    Is it your opinion that taking ten days to incorporate new information is consistent with the market being efficient?

MR. ROTHMAN:  Objection.

A.    Absolutely. Because we have a yardstick here for how complicated the information was and how long it would take to digest. The yardstick is how long the company took. The market turned out to be helped along when the company made its announcement, so that it was important information to the market.

I can't tell you how long it would have taken but for that event, but I can tell you how long it took given that event.

Q.    Is it your opinion that the litigation contingency acknowledged and quantified the market for the first time the consequences of the Steves

Page 321

STEVEN P. FEINSTEIN, Ph.D.

litigation?

MR. ROTHMAN:  Objection.

A.    It provided for the first time a quantification of some of the consequences of the Steves litigation.

Q.    Which of the consequences?

A.    Well, you know, it's interesting because I looked at the information that was contemporaneously supplied by the company and it was a little sparse. So some of what I know comes from information that was provided later.

For instance, in the November 7th internal memo, I think the market would have had a little bit of a hard time understanding what went into the company's litigation charge. I think it was pretty clear to the market that the ultimate charge could be much much higher than $76.5 million. And that's -- well, that's it.

I think it was pretty clear that the market -- that the probability

Page 322

STEVEN P. FEINSTEIN, Ph.D.

of a cost was much much higher now and

the potential of financial ramifications

to the company could be more severe than

76.5 million.

        Q.    If we look at page 96 of your

report, that's Exhibit 1, at paragraph

285, you quote from a June 4th 2018

Gabelli report which states, "A worst

case scenario would be to a divestment of

would have their doorskin plants (due to

current application issues)." And then it

goes on to say, "and would reduce the

company's valuation by $13.60 per share."

Do you see that?

                MR. ROTHMAN:   Objection.

        A.    Yes.

        Q.    The Gabelli analyst is talking

about the risk of divestiture in this

report, right?

        A.    Correct.

        Q.    This analyst Gabelli was aware

of the risk of divestiture on October 12,

2018, right?

        A.    Can you say that again,

STEVEN P. FEINSTEIN, Ph.D.

please? The analyst was aware that

divestiture was a possibility? Right?

Q.     Correct.

A.     Right. Yes. That's true.

MS. HARRIS:   I'm going to mark

as Exhibit 22 a Gabelli report from

June 11th, 2018.

(Feinstein Exhibit 22, Gabelli

& Company report dated June 11,

2018, was received and marked on

this date for identification.)

A.     Okay. It's open.

Q.     And this is a document that

you considered in preparing your report?

A.     Yes.

Q.     And in the second paragraph

down, it's three lines down, there is a

comment "Our view is that the stock fully

discounts potential for divestment." Do

you see that?

A.     Yes, I do.

Q.     Does Gabelli believe as of

June 11th, 2018 that the risk of

divestiture was fully accounted for in

Page 324

STEVEN P. FEINSTEIN, Ph.D.

the stock price, right?

A.    No. Given the probabilities
and information available at that time,
not ultimately what the truth turned out
to be. The market could only process at
that time the information that was
available to them.

So Gabelli is saying this is
extremely important information,
repercussions to the company can be
virtually catastrophic. At this time,
given the information we have, which I'm
saying includes the company's adamant
denials, the market is aware of the risk
and the market has quantified risks given
it's information available now, and the
quantified risk as of now with today's
information is assessed in the stock
price and impounded into the stock price.
That's what he's saying.

Q.    So it was Gabelli's view on
June 11, 2018 that the stock fully
discounted the potential for divestment,
correct?

**Page 325**

STEVEN P. FEINSTEIN, Ph.D.

MR. ROTHMAN:  Objection.

A.     Fully -- no. No. Fully -- I mean, it depends on what you mean by "fully". Fully, given -- fully conditional on what was available to the market then, for them to do their analysis, research and draw conclusions or fully based on the information set that you and I have now, knowing what's happened subsequently and what the company announced on October 15th?  Those are two different things.

Q.     So what I'm referring to is what the analyst believed and what the analyst wrote on June 11th, 2018.  And what the analyst wrote was, "Our view is the stock fully discounts the potential for divestment", right?

A.     Those are the words but I'm explaining to you what those words mean in this analyst report. "Fully" can only mean relative to what was available to investors at that time, which was -- which comprised, which included the

Page 326

STEVEN P. FEINSTEIN, Ph.D.

company's adamant denials and did not yet have the company's liability acknowledgment.

MS. HARRIS:  Okay. I'm going to mark as Exhibit 23, a Goldman Sachs report from October 8th, 2018.

(Feinstein Exhibit 23, Goldman Sachs report dated October 8th, 2018 was received and marked on this date for identification.)

A.    Okay.

Q.    And in the second paragraph here it says, "Based on our conversations with investors over the past week, hence our initiation report where we discuss the case and the potential EBIT sensitivity for Jeld we believe that outcome is largely expected but still may be somewhat disappointing." Do you see that?

A.    I see it.

Q.    So according to Goldman, the divestiture decision was largely expected

Page 327

STEVEN P. FEINSTEIN, Ph.D.

by investors, right?

            MR. ROTHMAN:  Objection.

     A.     The outcome as of that time, which it did not yet have the company's liability announcement.

     Q.     Right. But the divestiture decision, right, was expected by investors?

            MR. ROTHMAN:  Objection.

     A.     Well, if it was disappointing, it wasn't fully expected.  And as a binomial event analysts -- they're saying here investors are not entirely surprised by it but they're still somewhat disappointed by it.

     Q.     If investors largely expected a divestiture condition, could that be a reason that the stock price did not experience a statistically significant decline after that ruling?

     A.     Well, to the extent that they had -- to the extent that the change in their forecast, their understanding, was from having some expectations to having

Page 328

STEVEN P. FEINSTEIN, Ph.D. confirmation, the valuation impact would be less.

So it could explain why the stock price drop that did occur was below statistically significant in conjunction with the fact that the company was adamantly denying there would be any negative repercussions from the decision.

So a decision that the company would then successfully appeal is what -- is at issue here in this paragraph, not a decision that the company would ultimately concede has probable and estimable negative financial repercussions.

MS. HARRIS:  I'm going to mark as Exhibit 24 a Gabelli report dated February 22nd, 2018 on Jeld-Wen Holding, Inc.

(Feinstein Exhibit 24, Gabelli & Company report dated February 22, 2018, was received and marked on this date for identification.)

Q.    Are you able to open that?

Page 329

STEVEN P. FEINSTEIN, Ph.D.

A.    No. It's still refreshing. 24, February Gabelli report. I'm there.

Q.    Are you there?

A.    Yes.

Q.    Is this the report you considered in preparing your report?

A.    I believe so.

Q.    And this report is from February 22nd, 2018, right?

A.    Yes.

Q.    And that's about a week after the jury's verdict, right?

A.    Right.

Q.    In the paragraph beginning, "Reasons for comment", about four lines down it states, "As we think about our valuation we take into consideration the 25 million less EBITDA in 2019 and also assume a $75 million cash outlay related to the ongoing litigation. While our estimate of litigation costs in 2019 are a bit arbitrary, we do believe it's worth considering some monetary impact related to this item and as such not make this

Page 330

STEVEN P. FEINSTEIN, Ph.D.

adjustment until further clarity arises."

Do you see that?

    A.    I do.

    Q.    Here Gabelli is commenting on

Jeld-Wen's potential liability flowing

from the jury verdict, right?

            MR. ROTHMAN:  Objection.

    A.    Yes.

    Q.    And Gabelli is aware of the

risk of a cash outlay relating to the

Steves litigation, right?

    A.    Right. But they don't yet have

clarity on the probability or the

magnitude.

    Q.    Right. So they assume the $75

million cash outlay for the Steves

litigation, right?

    A.    No, not entirely. That's --

this is an estimation of what they

believe the cost will be in 2019. It's

not necessarily their estimate of the

total cost.

    Q.    Okay. And Jeld-Wen booked on

October 15, 2018 a $76.5 million

STEVEN P. FEINSTEIN, Ph.D. litigation contingency, right?

A.    Well --

MR. ROTHMAN:  Objection.

A.    -- yes. I mean, I would say yes.  I mean, it was earlier than what Gabelli was anticipating but it also opened the door to a much bigger potential cost because the 76.5 did not include -- it did not include the potential -- the potential future lost profits to Steves or the cost of divestiture or the tripling of potential lost profits to Steves.

So, whereas, Gabelli was assuming for the sake of a computation 75 million, the announcement by the company in October of 2018 made probable a much larger than $76.5 million cash outlay.

Q.    But the $75 million cash outlay predicted by Gabelli was very close to a $76.5 million litigation contingency that Jeld-Wen booked, correct?

MR. ROTHMAN:  Objection.

Page 332

STEVEN P. FEINSTEIN, Ph.D.

A.    Well, this is not a prediction by Gabelli. I wouldn't say they predicted $75 million. I would say they assumed this number for the sake of having some number to work with and they said it's an arbitrary number.

It is somewhat close to 76.5 but 76.5 is the tip of the iceberg is what people determined and learned from the company's announcement in October. That did not include future lost profits or the divestiture costs, which were known to be much much bigger, and were also much more probable after the October announcement, the October 15th announcement.

Q.    Let's turn to page 106 of your report. On pages 105 to 106, this is where you analyze the per share direct impact of the litigation charge, correct?

A.    Yes.

Q.    When you estimate --

A.    Wait. Wait. We're on page 106 -- it actually begins on page 105.

Page 333

STEVEN P. FEINSTEIN, Ph.D.

Q.      105 to 106, right.

When you estimate the impact on Jeld-Wen's stock from the booking of the $76.5 million charge, you assume that the stock drop was the same as the full after tax value of that charge, correct?

A.      Well, it's the -- the company realized a cost. They booked a charge. They booked a cost of 76.5 million which meant that the company would be worth less by 76.5 million. They said that this was now probable and estimable and so the company should be worth less by that amount going forward.

Q.      Did you account for any litigation outlays that the market hadn't anticipated?

A.      Yes.

Q.      How did you do that?

A.      I understood that the announcement wasn't just the quantification of 76.5, but the announcement that negative ramifications were now probable. So any risk overhang

**Page 334**

STEVEN P. FEINSTEIN, Ph.D.

that there was before was commensurate or even smaller than risk overhangs and expectations for further costs subsequently.

Q.    And where do you discuss that in your report?

A.    Here. This is -- this is the rationale for why 76.5 million should be divided into a per share basis and subtracted from the company.

What changed is anything that the company -- anything that market participants were assuming or thinking about was now exacerbated and there would be higher risks and higher -- higher risks, higher probabilities, higher costs going forward, but at a minimum, 76.5 on a per share basis needed to be removed from the value of the company.

Q.    Did you account for the potential damages Jeld-Wen disclosed on February 15, 2018 when it disclosed the jury verdict?

MR. ROTHMAN:    Objection.

Page 335

STEVEN P. FEINSTEIN, Ph.D.

A.    Of course. I accounted for all the information in the case.

Q.    And how did you account for the damages it had already disclosed?

A.    There weren't damages disclosed in February of -- you said February of 2017, right?

Q.    '18.

A.    No. February 2018, the company did not disclose that there would be damages, it did not disclose that it believed that they would have to pay a penny. They did not -- they do not have an emergency profit warning announcing a litigation charge at that point in time. They maintained they wouldn't have to pay anything.

Q.    The company disclosed the potential damages in the press release we just looked at, right?

A.    But they -- well, let's look at the press release. Let's look at the exact language. So what exhibit is that again?

Page 336

STEVEN P. FEINSTEIN, Ph.D.

Q.    I believe that's Exhibit 21.

A.    Third block down says, "The company continues to believe that the facts underlying this dispute did not establish either a violation of the antitrust laws or a breach of contract."

So it's the -- it's the anticompetitive behavior that was making Jeld-Wen liable that the company was denying. So by denying that behavior, by denying the liability, they're denying that they would have to pay anything and there was no litigation contingency reserve at that point in time.

If the company really believed that there would be damages or losses, they would have made the liability announcement then in February instead of in October.

Q.    Do you see the paragraph before that discloses the potential damages, though, correct?

MR. ROTHMAN:  Objection.

A.    Well, I don't see the word

Page 337

STEVEN P. FEINSTEIN, Ph.D.

"potential" in that paragraph anywhere. There is no word "potential".

Q.   It discloses what the verdict award is, right?

A.   It provides a number that they believe is not going to have to be paid, and they say it's not going to have to be paid.

I mean, it says, "Accordingly, the company does not believe that the ultimate outcome of this matter will have a material impact on its ability to operate in the ordinary course of business." Elsewhere they said that if there would be a charge and would be a cost, it would materially and adversely impact the company's operations.

So you put the two together and the company is clearly saying here they don't expect to pay anything.

Q.   The 55 cents that you calculated was not expected to be paid until the appeals process was exhausted, correct?

STEVEN P. FEINSTEIN, Ph.D.

A.      As a cash flow, yes. But as a charge against the value of the company, it was immediate. It took effect the next week.

Q.      Under the fundamental valuation principles shouldn't the market discount the value of the 55 cents that would be paid in the future?

A.      Not necessarily. Not necessarily in this particular case. Because what the company was doing also was opening the floodgates by acknowledging the probability of not only this payment but payments that are substantially larger. And as an accounting matter it goes right to the company's equity. It comes right out of the company's book equity that earnings had to be reported less by that amount on a -- by the after tax amount.

Q.      Okay. Let's turn to page 107, Exhibit 1.

A.      107 of my report?

Q.      Yes. We went over this

Page 339

STEVEN P. FEINSTEIN, Ph.D.
language previously. In paragraph 317 you say, "I conservatively classify the 2018 performance disclosures as not fraud-related and exclude the price impact of that portion of the announcement from damages." Correct?

A.   Right. So I want to emphasize here, we've been talking all day long about whether some of the price decline that occurred after October 15th was for non-fraud-related reasons, and I agree that it's true, some was. I quantified it and subtracted it. This is one of those steps.

Q.   And at 318 you say, "The attribution of 2018 performance issues does not carry over into the company's annual forecasts for 2019 and beyond, however, because the company stated that the 2018 cost side problems were temporary and would be fixed."  Right?

A.   Right. So it was other problems that were affecting 2019. I did acknowledge that there were

Page 340

STEVEN P. FEINSTEIN, Ph.D. non-fraud-related impairments or deficiencies in performance, expected performance in 2019 that I also had to quantify.

So it's -- so I did not have to separately calculate the impact of 2018's changed expectations on 2019 because I directly calculated the valuation effect of 2019 changed estimates.

Q.    And you quote the CEO here as saying he viewed "2018 financial performance headwinds of temporary in nature and I am encouraged about our future." Right?

A.    Yes. And that's not the only time. There are other quotes, some in the report, where the company characterized the problems, the production problems as transitory.

Q.    And based on that language, you say that, "Given that the CEO Michel expected 2018 cost problems to be temporary in nature, valuation principles

**Page 341**

STEVEN P. FEINSTEIN, Ph.D.
dictate that the Q3 results and fiscal
2018 guidance would have a limited impact
on the company's valuation." Right?

A.    Right. I didn't multiply them
by a valuation multiplier for that reason
but also because I directly calculated
the effect of non-fraud-related factors
on 2019 and beyond.

Q.    Does the company ever say that
2018 cost problems would be fixed by the
end of 2018?

MR. ROTHMAN:  Objection.

A.    Look, in April they said that.
In April they said that would be done by
the end of the year and then they had
updates a number of times in November --
rather, in October they said it was
fixable, transitory and fixable.

Q.    But they didn't say it would
be fixed by the end of 2018, right?

A.    They had said it would be
fixed by the end of 2018. They had said
that previously.

Q.    Did they say that in the

Page 342

STEVEN P. FEINSTEIN, Ph.D.

October 15th pre-release?

A.    I have some quotes in here. I know they say it was fixable and he also says it was transitory. Hold on one second, please.

Well, in May they said it, "transitory operational challenges in North American windows."

Q.    What are you looking at?

A.    That was paragraph 111. And analysts accepted that.

Q.    Did you look at analyst reports to confirm that they did not reduce their 2019 forecasts because of 2018 performance disclosures?

A.    Well, they did reduce their 2019 forecast and I determined that part of that was for non -- was affecting the non-fraud-related part of the business and part of that is the natural ramifications of not being able to sustain anticompetitive behavior.

Q.    So you agree that analysts stated that they were downgrading their

Page 343

STEVEN P. FEINSTEIN, Ph.D.

2019 forecast because of 2018's performance disclosures, in part?

MR. ROTHMAN:  Objection.

A.    No. What I -- what I found was that -- the decomposition I did was; what was the impact on the stock price of the 2018 disclosures in isolation?  Then I treated the 2019 separately.

Some of 2019 might have been informed by what happened in 2018 but I did the valuation separately from 2018.

Q.    If analysts stated they downgraded 2019 estimates because of 2018 performance issues, does that contradict your opinion?

A.    No, it doesn't.  And I excluded from damages most of the stock price drop because of exactly, what you just said, that some of the diminished outlook of the company going forward can't be tied with what we know to the alleged fraud.

Q.    Please turn to paragraph 320 of your report, Exhibit 1.

**Page 344**

STEVEN P. FEINSTEIN, Ph.D.

A.    I mean, just to make sure it's on the record, the order of magnitude is, the residual stock price drop on October 16th was $4.42. I excluded more than half of that, attributing it to all these other factors that you're raising now, asking if I considered and I considered everything except for $1.99.

Q.    Are you at paragraph 320?

A.    I'm on 320.

Q.    In your last sentence there you say, "Applying a valuation multiple would only be appropriate if the reasons for the past performance disappointment were expected to impact future performance and the Jeld CEO said it was not."

A.    That's right.

Q.    Did you consider anything other than what the Jeld-Wen CEO said in determining whether the 2018 underperformance would negatively impact Jeld-Wen's future performance?

A.    I did.

Page 345

STEVEN P. FEINSTEIN, Ph.D.

Q.      What else did you consider?

A.      Well, I mean, I considered that you either have to take the company at its word or not.

So essentially, there is two ways of reading and hearing what the company said. They said 2018 suffered margins were not what we hoped they'd be, profitability was down, but it wasn't because of curbing anticompetitive behavior, it was because of operational issues in the wood window business.  And then they say; but we can fix this problem.

So if you are going to believe them that it wasn't fraud-related, then I think you also -- it also makes sense that you have to believe them when they say the problem is fixable and will be solved and it's not a long-term persistent problem.

On the other hand, if you're not going to believe them and this is a persistent problem, the major persistent

STEVEN P. FEINSTEIN, Ph.D.

problem facing this company is that what it was built on could not be sustained. Margin repair, as they called it, and pricing discipline, as they called it and disciplining the market so that they would accept the company's price increases, that that would not be sustainable in disciplining Steves and other companies that they is supplied doorskins to, that that would not be sustainable.  So if that was the reason for 2018, then I would accept that it has implications for the long-term future beyond 2018 but that would mean that it was fraud-related.

So if you are going to take the company at its word and say it was not fraud-related, you also have to take them at their word that it's limited to 2018.

Q.    Would it have been appropriate to apply a valuation multiple of analysts expected 2018 underperformance to negatively impact future performance?

**Page 347**

STEVEN P. FEINSTEIN, Ph.D.

MR. ROTHMAN:  Objection.

A.    Not the way I did the analysis because I also separately valued the impact of all the new information on non-fraud-related segments of the business for 2019 and beyond.

You'd be double counting if you applied a multiple to the 2018 miss and took out value or price reaction for the non-fraud-related parts of the business in 2019 and beyond. And the only way to make sure you're not double counting is to do it separately, the way I did and it's also comprehensive.

Q.    If you turn to page 111 of your report, paragraph 330, you explain the amount of damages you attributed to the market to provide its forecasts for 2019 and beyond with the remainder of the total residual decline once you subtracted the 55 cents and 22 cents per share that you had already accounted for, right?

A.    Can you say that again,

Page 348

STEVEN P. FEINSTEIN, Ph.D.

please? It was a long question ending with right?

(Pending question is read back by the reporter.)

MR. ROTHMAN:   Objection.

A.    You're not going to like this, but I need to hear it again really slowly.

Q.    Let's read what you have written here. So paragraph 330 you say --

A.    Paragraph 330?

Q.    Yes. "The entire residual stock price decline on the 16th of October 2018 was $4.42 per share." Right?

A.    Yes.

Q.    "Of that decline 55 cents per share was the direct after tax valuation impact of the $76.5 million litigation charge. The disappointing Q3 and Q4 2018 performance accounted for 22 cents per share which I excluded from damages. Subtracting 55 cents and 22 cents per share from the total residual decline of 4.42 per share leads 3.65 per share

Page 349

STEVEN P. FEINSTEIN, Ph.D.

attributable to the market to provide

forecasts for 2019 and beyond." Is that

right?

A.     That's right.

Q.     So you did not directly

measure the amount of damages you

attributed to the market's revised

forecast for 2019, correct?

          MR. ROTHMAN:  Objection.

A.     Oh, well, I did use empirical

methods. I observed how much the stock

actually did fall from company-specific

information and then subtracted out two

pieces, the 55 cents and 22 cent pieces

that were identifiable and easily

quantified and that left 3.65 for

everything going forward from 2019

forward, which includes an alleged

fraud-related component and a

non-fraud-related component.

Q.     Did you perform a valuation

analysis on the impact of the alleged,

illegal anticompetitive behavior to

support your opinion that 1.44 is the

Page 350

STEVEN P. FEINSTEIN, Ph.D. appropriate value of that behavior throughout the class period?

MR. ROTHMAN:  Objection.

A.    I did a financial analysis, a valuation analysis. I divided up the 3.65 proportional to the shares of the business.

Q.    Is there any other type of valuation analysis you did?

A.    That's what I deem to be the most appropriate valuation or decomposition. One moment, please. Let me finish this sentence and I want to check something.

I did not see any other decomposition in Mr. Fischel's report. He had no alternative numbers to my numbers. But I need to check something. One moment, please.

Okay. I just wanted to refresh my memory on the math. So, I divided -- well, never mind. I'm sorry.

Q.    If we look at paragraph 111 of your report -- sorry -- page 111,

**Page 351**

STEVEN P. FEINSTEIN, Ph.D.

paragraph 331 you say, "The company attributed the lower 2018 guidance to inefficiencies in North America and Europe.  No problems or surprises were attributed to Australasia segment either for divided the change in fiscal 2019 consensus EBITDA estimates between North America and Europe." Do you see that?

A.    Yes.

Q.    What is the relationship between the lower 2018 guidance and the change in fiscal '19 consensus?

MR. ROTHMAN:  Objection.

A.    Well, the company did not provide a 2019 number. The market arrived at it independently based on the information that they were now given by the company, which included that they were acknowledging liability in the Steves case and that they had production inefficiencies and other inefficiencies they were still working on.

So the market arrived at the 2019 numbers from -- the market arrived

Page 352

STEVEN P. FEINSTEIN, Ph.D.

at 2019 revisions based on the negative news the company provided about 2018 and the Steves litigation.

Q.    So I believe it's your opinion that the 2018 underperformance was not expected to impact 2019 performance, correct?

MR. ROTHMAN:  Objection.

A.    Oh, it's conservative. I took -- the company said that it wouldn't. But to be conservative, I paired away a substantial amount of the valuation impact from the fiscal year 2019 change in estimated EBITDA from the marketplace.

Q.    So you excluded Australasia from your analysis in 2019 EBITDA because it didn't have anything to do with performance issues in 2018, right?

A.    And the company gave no indication that Australasia was a problem or surprise or a reason for revising downward profitability. There was no problems in the press release about Australasia that would cause Australasia

Page 353

STEVEN P. FEINSTEIN, Ph.D.
performance going forward to be anything less than what was previously expected.

Q.    You apportion the share price decline between North America and Europe based on their respective proportions of EBITDA generated in the last 12 months ending Q2 2018, right?

A.    Right.

MR. ROTHMAN:  Objection.

A.    The company said there were problems in North America and Europe, and they didn't quantify the breakdown between the two. So the most reasonable assumption is that the problems were commensurate with their prior contributions to EBITDA.

Q.    So what is your basis for assuming that the relationship between regional contributions to EBITDA -- let me start that over.

What is your basis for assuming the relationship between regional contributions to 2019 EBITDA forecast changes are proportional to

STEVEN P. FEINSTEIN, Ph.D.

regional contributions to revenue?

MR. ROTHMAN:  Objection.

A.   Well, I, as a financial -- as a forensic financial expert, I'm working with the same numbers that market participants were working with. And the market -- the company kept us all in the dark about the quantification of the problems and the attribution, the division between North America and Europe.

So I wasn't given that information by the company in the press release but neither were any of the market participants.  The most reasonable decomposition would be that if a segment has a small contribution to EBITDA it's going to have a small contribution to the surprise and to the revision. And if a company has a large -- not company -- if a segment has a large contribution typically to EBITDA, then it will make a larger contribution to the surprise. Given, you know, it's conditional on the

Page 355

STEVEN P. FEINSTEIN, Ph.D.
fact that we, "we" being me and analysts in realtime contemporaneously then, were not given a decomposition by the company.

Q.    Doesn't the fact that you give zero attribution to Australasia but Australasia revenues are not zero demonstrate that the relationship between the contribution to revenue and contribution to 2019 EBITDA forecast changes are not necessarily proportional?

MR. ROTHMAN:  Objection.

A.    Not at all. I calculated the ratios correctly. The company didn't say there were any problems in Australasia. The company did say there were problems in North America and Europe. It made sense to divide up the problems proportionate to their shares of contribution to EBITDA. So you add North America and Europe together and you divide -- you figure out the share of each based on its share of that pie.

Q.    You removed the 2019 effects of headwinds in Europe from your

Page 356

STEVEN P. FEINSTEIN, Ph.D.

insulation calculation.

What is your basis for believing that the market thought the North America door headwinds would not affect 2019 but Europe headwinds would affect 2019?

MR. ROTHMAN:  Objection.

A.    I don't think you're characterizing my opinion correctly.

North American door margins are what this case is about. I've concluded that if there is a problem with North American door margins it's because of the attention that it has received from the litigation and that the company could not sustain unsustainable practices.

Whereas, Europe has other reasons. They don't really have to be delved into, they just have to be paired away.

Q.    You apportion the 2.40 share price decline between North American windows and North American doors on the

Page 357

STEVEN P. FEINSTEIN, Ph.D.
basis of the estimated percentage of
sales by the respective segments,
correct?

A.     That's the data that I and
other analysts had available to us to
work with and it's the most reasonable
use of the available data.

Q.     But that's what you did,
correct?

A.     I based it on contributions to
revenue. This is in paragraph 334 --
no -- paragraph 335, contributions to
EBITDA. One moment. Sales, it's
contribution to sales to revenue is what
is explained in 335.

Those are the numbers we had
available. The company didn't break it
out to assist either me or investors and
analysts at the time.

Q.     Did you conduct any analysis
of whether the 2019 EBITDA forecast
reduction by analysts were related to the
North American windows or North American
doors segments of Jeld-Wen's business?

Page 358

STEVEN P. FEINSTEIN, Ph.D.

MR. ROTHMAN:  Objection.

A.    I looked to see what was
available in the data and there was
nothing that was a better basis for
decomposition than the numbers -- than
the ratios presented in 335, paragraph
335.

Q.    Did you consider what analysts
said about whether the 2019 EBITDA
forecast reduction was related to the
North America windows and North America
door segments of Jeld-Wen's business?

A.    I did.

Q.    Doorskins are a component used
to make --

A.    Sorry. Did you say doorskins
before or doors?

Q.    Doors.

A.    Okay. Thank you.

Q.    Doorskins are a component used
to make exterior molded doors, correct?

A.    Yes.

Q.    Do you know what percentage of
Jeld-Wen's sales in North America comes

Page 359

STEVEN P. FEINSTEIN, Ph.D.

from doorskins?

A.    Well, that's not as easy an analysis as just dividing up the sales. Because according to Judge Payne's opinion, doorskins were being used to capture more door sales.  So there is a relationship that goes beyond simply dividing up the numbers on the basis of, basically, invoices paid.

Q.    Paragraph 335 you estimated that door sales made up 60% of North America sales segment's EBITDA, correct?

MR. ROTHMAN:  Objection.

A.    Analysts did and I cite the analyst Gabelli, for example, said it was 60% doors, 40% windows.

Q.    Okay. And at 334, paragraph 334, you state that you excluded the other businesses from the fraud-related losses because the fraud allegations pertain only to North American doors, right?

A.    Right. Hey, when I said 40% was windows, I meant 40% was windows and

STEVEN P. FEINSTEIN, Ph.D.

those other services. I just want to make sure it's clear that I included them in what was being paired away from damages.

Q.    Okay. Within the doors business Jeld-Wen manufactures interior and exterior doors, right?

A.    Right.

Q.    Do any of the fraud allegation pertain to exterior doors?

A.    That's not entirely clear. The allegations I understand them specifically address interior molded doors but also killing off competitors in the door business. I didn't make an allocation in the types of doors.

Q.    So you did not apportion damages attributed to North American doors as between exterior and interior doors?

MR. ROTHMAN:  Objection.

A.    Correct.

Q.    Why didn't you?

A.    I just explained, it's not clear that exterior doors are excluded

Page 361

STEVEN P. FEINSTEIN, Ph.D.

from the allegations because they're related to the door business in which there are exposed facts of anticompetitive behavior. But there is also no facts that say specifically that there were concerns about the exterior door business going forward.

There is some evidence that Europe was cited to have problems and North American windows was cited to have problems and financial principles inform us that interior molded doors would have problems with margins going forward.

There was no evidence from the case that any disappointment to the marketplace derived from the business on exterior doors. So it just didn't make sense to apportion any of the disappointment, any of the revision downward from the marketplace to exterior doors in North America.

So basically that's -- there's a lot of evidence that says no amount of the stock price drop was caused by

Page 362

STEVEN P. FEINSTEIN, Ph.D.

exterior doors in North America.  So,
therefore, there was no reason to
attribute any of the price drop that did
occur to exterior North American doors.

Q.    But you didn't exclude
exterior doors from your proportional
analysis like you did for Australasia,
right?

A.    It's already excluded because
it wasn't responsible for a stock price
drop, according to the available
evidence.

Q.    Within its interior doors
business, do you understand that Jeld-Wen
manufactures various types of interior
doors?

MR. ROTHMAN:  Objection.

A.    They have a line of doors just
like any company would have a line of
products.

Q.    And one type of those doors
are interior molded doors, right?

A.    I think that's the major
product that they sold with respect to

Page 363

STEVEN P. FEINSTEIN, Ph.D.
interior doors.

Q.    Right. So my question is, that's one type, is that one type of doors were interior molded doors?

A.    I'd have to look further at that. I didn't see any analysis of any other decomposition of damage numbers by anybody else in this case to suggest that I did anything wrong here.

Q.    Are you aware that Jeld-Wen also manufactures flush doors?

A.    Flush doors?

Q.    Correct.

MR. ROTHMAN:  Objection.

A.    Not specifically, no.

Q.    Are you aware that Jeld-Wen also manufactures stile and rail doors?

MR. ROTHMAN:  Objection.

A.    I'm not well versed in the entire line of doors that Jeld-Wen manufactures, except to the extent that I carefully read the documents produced in this case.

Q.    What documents produced in

Page 364

STEVEN P. FEINSTEIN, Ph.D.

this case have you read?

A.    They're listed. I'm not going to go through the entire list but look at the Documents Reviewed and Relied Upon list in both of my reports.

Q.    I believe in your first report we saw the only document listed is the deposition of Philip Orsino, right?

A.    No. There was news articles and the Judge's opinion, Motion to Dismiss opinion, Judge Payne's opinion.

Q.    Right. But those documents weren't produced in this case, right?

A.    Oh, I'm sorry. I meant -- I guess my definition of "produced" is different from yours. I didn't mean produced from discovery. Available to me to rely on.

Q.    Okay. Do any of the fraud allegations pertain to these other types of interior doors?

MR. ROTHMAN:  Objection.

A.    I didn't -- I'm not entirely sure but to the extent that they don't,

Page 365

STEVEN P. FEINSTEIN, Ph.D.
that would mean that those doors don't have an identifiable persistent problem that's responsible for reduced profitability going forward and, therefore, didn't cause any of the stock price drop.

Q.      Did you apportion damages attributed to North American doors between interior molded doors and other categories of interior doors like flush doors and stile and rail doors?

MR. ROTHMAN:  Objection.

A.      No. No.

Q.      Why not?

A.      For the reason I just gave. There is no indication that there was any problem with profitability going forward on types of doors that have -- that are not -- on types of doors that are not covered by the allegations in this case to have been affected previously by the company's alleged anticompetitive behavior. Therefore, those other types of doors would not contribute to the stock

Page 366

STEVEN P. FEINSTEIN, Ph.D.
price decline. They are naturally
excluded from any calculation of the --
any portion of the residual price
decline.

MS. HARRIS:  Okay. Let's take
a break.

VIDEOGRAPHER:  Thank you. This
is the videographer. The time is
3:09. We're going off the record.
This will be the end of media file
4.

(Recess is taken.)

VIDEOGRAPHER:  We are back on
the record. The time is 3:22 p.m.
and this is the beginning of media
file 5.

Q.    You have testified in over 120
cases, correct?

MR. ROTHMAN:  You're muted.

A.    I think so. Yes.

Q.    Okay.

A.    More than 120.

Q.    Yes. And you testified for the
defense in securities cases only twice;

Page 367

STEVEN P. FEINSTEIN, Ph.D.

is that correct?

        A.    Approximately, yes.

        Q.    In your prior testimony have you ever concluded that investors did not suffer a loss?

            MR. ROTHMAN:  Objection.

        A.    Yes.  From certain alleged misrepresentations or corrective disclosures, yes.

        Q.    Have you ever concluded there was no loss in the case at all?

        A.    No, not that I can think of. Not a case that I've testified in. I mean, if that's what I find, I show that at an early stage to counsel.

        Q.    Have you ever calculated that there were no damages?

            MR. ROTHMAN:  Objection.

        A.    Again, from specific representations and corrective disclosures, yes.

        Q.    But not in the case -- in the case as a whole?

        A.    I'd have to look at all my

Page 368

STEVEN P. FEINSTEIN, Ph.D.
reports, but nothing comes to mind.

Q.    You work as a consultant, correct?

A.    And a professor.

Q.    And you provide litigation services as a consultant, correct?

A.    Well, I'm a financial analyst. I conduct financial analysis and with a specialty in financial analysis related to litigation.

Q.    What percentage of your consulting work in the past four years was devoted to litigation support?

A.    Most of it, more than 90%.

Q.    Over --

A.    More than 90% as a consultant.

Q.    Right. Devoted to litigation support?

A.    Well, by litigation support you mean forensic financial analysis that I then testify to or about?

Q.    Right, where you are hired by lawyers.

A.    Oh, if you define it that way,

Page 369

STEVEN P. FEINSTEIN, Ph.D.

half, where I'm hired by lawyers would be about half.

Q.    And what percentage of your income comes from providing opinions in litigation?

MR. ROTHMAN:  Objection.

A.    Well, I mean, less than 50%. I'm not sure. I don't have it calculated.

Q.    Approximately how much money do you make in a year from providing opinions in litigation?

A.    It varies widely from year to year.

Q.    How much would you estimate you made in 2019?

A.    I don't know. I'd have to look at my 2019 tax return.

Q.    How much would you estimate that you made last year?

A.    Less than 2019, that much I know. I don't know. Last year those taxes aren't even prepared yet.

Q.    Is it over $100,000?

A.    Yes.

**Page 370**

STEVEN P. FEINSTEIN, Ph.D.

Q.    Over $500,000?

A.    Yes.

Q.    Over $1 million?

A.    Possibly, but probably not.

Q.    You said that 90% of your consulting work relates to litigation support but only half being involved by being hired by lawyer.

What other percentage of your work did you classify as litigation support?

MR. ROTHMAN:  Objection.

A.    The firm I founded, we provide services to other experts and they provide opinions.

Q.    You are charging $895 per hour in this case, correct?

A.    That's right.

Q.    Is that your usual rate?

A.    Yes. For cases started in the last two years, until this year.

Q.    And you just mentioned Crowninshield Financial Research, Inc., you are the sole owner of that?

Page 371

STEVEN P. FEINSTEIN, Ph.D.

A.     That's right.

          MR. ROTHMAN:  Objection.

Q.     So in addition to your own rate, you earn money based on the work of analysts and other personnel who work for you and assist you?

A.     Yes.

Q.     How many people do you employ at Crowninshield Financial Research, Inc.?

          MR. ROTHMAN:  Objection.

A.     You mean full-time employees? I believe it's nine.

Q.     How much money do you earn from Crowninshield Financial Research's work each year?

          MR. ROTHMAN:  Objection.

A.     That's actually the number I was estimating before. It varies widely and last year, I mean, somewhere less than a million is my estimate. Taxes haven't been prepared yet.

Q.     Understood. When were you first contacted about being an expert in

Page 372

STEVEN P. FEINSTEIN, Ph.D.
this case?

A.    I just don't remember. I don't know.

Q.    Do you know who contacted you?

A.    Yes.

Q.    Who contacted you?

A.    The attorneys that are here with us, Plaintiffs' counsel, Debra Wyman and Rob Rothman.

Q.    Have you previously done work with Robbins Geller?

A.    Yes.

Q.    How many cases?

MR. ROTHMAN:   Objection.

A.    I don't know exactly. I'm not sure exactly.

Q.    Over ten?

A.    Oh, yes.

Q.    Over 30?

MR. ROTHMAN:   Objection.

A.    Yes. I mean, we're talking, well, Robbins Geller and the predecessor firm, so we're talking from 1996, that's 25 years. I don't know exactly.  Figure

Page 373

STEVEN P. FEINSTEIN, Ph.D.

two or three a year, maybe more, I don't know, as a rough estimate.

Q.    Okay.

A.    Probably more. Probably three or four a year on average over that period.

Q.    Do you know how much money you've made working for Robbins Geller over that time period?

A.    No.

Q.    Do you know how many times you issued reports for Robbins Geller?

MR. ROTHMAN:  Objection.

A.    Not precisely.

Q.    Do you know how many times you testified for Robbins Geller?

A.    Same answer. No.

Q.    Did you agree to provide an opinion for Plaintiff before or after you discussed the financial terms of your engagement with counsel?

MR. ROTHMAN:  Objection.

A.    I don't usually discuss the financial terms of the engagement. Other

**Page 374**

STEVEN P. FEINSTEIN, Ph.D.

people do that in the firm. So I would have to say that I never discuss the financial terms of the engagement.

Q.    Have you ever worked as a securities analyst as a brokerage firm?

MR. ROTHMAN:  Objection, asked and answered.

A.    No.

Q.    Your answer was "no"?

A.    Oh, I thought you heard. No, not at a brokerage firm.

Q.    When we were discussing analyst reports before, I believe you said that those reports can be biased in favor of the company; was that correct?

A.    There's rich literature on the subject and that is what the general consensus is in the literature. There is an inherent bias and conflict of interest in analyst reports that readers need to understand.

Q.    Is the same true --

A.    And there are disclosures about that generally in the analyst

STEVEN P. FEINSTEIN, Ph.D.

reports, themselves.

Q.    Is the same true of news articles?

A.    Not -- I mean, I'm not aware of literature on bias in news articles. There is literature on bias in analyst reports.

MS. HARRIS:  Okay.  I don't have any further questions.

MR. ROTHMAN:  We just have a few followup questions.

CROSS-EXAMINATION BY MR. ROTHMAN:

Q.    Dr. Feinstein, I want to direct your attention to Exhibit 13 that was marked earlier today. It is an October 8th, 2018 RBC Capital Markets analyst reports.

A.    I see it. Okay.

Q.    In particular, I wanted to direct your attention to the first paragraph after the words "Our view".  I believe it's the third sentence says "However, we know there should be no major financial impact before 2020." Do

Page 376

STEVEN P. FEINSTEIN, Ph.D.

you see that?

A.    Yes.

Q.    And that's referring to the impact from the Steves & Son litigation, correct?

A.    Right. Everything in that paragraph, up to that point, is about the Steves litigation.

Q.    And following the October 8th, 2018 analyst report, the company issued a statement on October 15, 2018, correct?

A.    That's right.

Q.    And in that statement on October 15th, 2018 the company disclosed that it was taking a $76.5 million litigation charge in 2018; isn't that correct?

MS. HARRIS:   Objection, leading.

A.    Yes.

Q.    Strike that.

What did the company announce on October 15, 2018?

A.    They announced a number of

**Page 377**

STEVEN P. FEINSTEIN, Ph.D.
things but among the things that they
announced were they were taking a $76.5
million litigation charge loss
contingency from the Steves litigation,
related to the Steves litigation.

Q.    I want to direct your
attention now to Exhibit 12, which is an
October 16th, 2018 RBC Capital Markets
analyst report.

A.    Okay.

Q.    Do you see that document?

A.    I do.

Q.    And this was issued after the
October 15th, 2018 litigation charge,
correct?

A.    Yes.

MS. HARRIS:  Objection.

Q.    Did the analyst at RBC Capital
Markets continue to state its opinion
that there should be no major financial
impact before 2020 as of October 16,
2018?

MS. HARRIS:  Objection.

A.    No. That's nowhere in the

Page 378

STEVEN P. FEINSTEIN, Ph.D.

report.

Q.    Why, in your view, did the analyst change its opinion regarding the potential for a major financial impact before 2020 resulting from the Steves litigation?

A.    The only reasonable explanation is the news, intervening news, which was that there was a charge taken by the company in 2018, which is before 2020.

Q.    And did that charge, in your expert opinion, change analysts' views regarding the valuation of Jeld-Wen Holding, Inc.?

A.    Yes --

MS. HARRIS:  Objection.

A.    -- it did.

Q.    I want to now direct your attention to Exhibit 17, which may have been marked but not shown to you.

A.    Okay. I'm there.

Q.    And Exhibit 17, for the record, is a Jeld-Wen Holding, Inc.

**Page 379**

STEVEN P. FEINSTEIN, Ph.D.

analyst report issued by Bank of America,

Merrill Lynch on October 8th, 2018,

correct?

MS. HARRIS:  Objection.

A.     That is correct.

Q.     I want to direct your

attention to the end of that analyst

report, it's page 2, and the second

paragraph talks about Upside Risks. Do

you see that?

A.     I see it.

Q.     And the first upside risk says

"One, a sooner than anticipated favorable

outcome in the Steves & Sons lawsuit." Do

you see that?

A.     Yes, I see it.

MS. HARRIS:  Objection.

Q.     And it also -- the analyst

report also talks about certain downside

risks, correct?

A.     Yes.

MS. HARRIS:  Objection. This

is your witness.

Q.     And the downside risks, as

Page 380

STEVEN P. FEINSTEIN, Ph.D.

number one says "a negative Steves & Sons outcome."  Do you see that?

MS. HARRIS:  Objection, leading.

A.    I do.

Q.    Do you see on under Downside Risks there is a number of 8 on the downside risks?

A.    I see that, "worse than expected pricing power."

MS. HARRIS:  Objection.

Q.    What does number 8 for the downside risk state?

A.    "Worse than expected pricing power."

Q.    Now, I want to direct your attention to Exhibit 16, which is a Bank of America Merrill Lynch analyst report dated October 16th, 2018. Do you see that?

MS. HARRIS:  Objection.

A.    Yes.

Q.    This report was issued after the October 15th, 2018 announcement of a

Page 381

STEVEN P. FEINSTEIN, Ph.D. litigation charge by the company, correct?

MS. HARRIS:  Objection.

A.     That's correct.

Q.     Under the upside risk, number one, did the analyst change the terms of the upside risk, number 1?

MS. HARRIS:  Objection.

A.     No.

Q.     And with respect to the downside risks number 1and 8, did the analyst change the way they phrased the downside risks following the October 15th, 2018 --

A.     No.

MS. HARRIS:  Objection.

Q.     -- litigation charge?

A.     No, they did not. Those downside risks are still listed here.

Q.     How would the October -- strike that.

Would the October 15th announcement of the litigation charge impact investors' view of the probability

STEVEN P. FEINSTEIN, Ph.D.

that the upside risks contained in the October 8th report and the October 16th report would come to pass?

A.    It absolutely would change the probabilities assigned to the upside risks and the downside risks. The announcement that the company was taking a litigation charge will definitely change the probabilities assigned to each of these risks.

Q.    And how would it change the probabilities assigned to each of the risks?

A.    Well, the downside risk is more probable. I mean, the company is now saying so. The company previously said they didn't think a negative outcome was probable and now they're saying it is. So market participants hear that and they would raise the probability associated with the downside risks, which include the negative Steves & Sons outcome and costs associated therewith and worse than expected pricing power, because allegedly

Page 383

STEVEN P. FEINSTEIN, Ph.D.

unsustainable anticompetitive behavior would no longer be available to the company.

So the downside risk probabilities would go up, did go up as a result of the company's announcement on October 15th, 2018.

Q.    And what would happen to the upside risks as a result of the announcement on October 15, 2018?

MS. HARRIS:  Objection.

A.    If the downside risks come to fruition, and are likely to, then the upside risks are now less likely to happen. So there was less likely to be not only a favorable outcome but a sooner than anticipated favorable outcome would be much less likely, if not impossible.

Q.    Would you expect the changes in the risks that you just -- the change in probability of the risks that you just discussed to impact the price of the stock?

A.    Absolutely.

**Page 384**

STEVEN P. FEINSTEIN, Ph.D.

MS. HARRIS:  Objection.

Q.    And what would your expectation be about the impact on the price of the stock resulting from the change in probability of the risks coming to fruition?

MS. HARRIS:  Objection.

A.    The stock price would go down. These are the fundamental financial principles. The stock price would go down, stock price did go down as a result of the change in probabilities associated with the upside and downside risks borne from the company's October 15th announcement related to the Steves litigation.

MR. ROTHMAN:  I have nothing further.

VIDEOGRAPHER:  Anything else for the record, Ms. Harris?

MS. HARRIS:  Just one question.

REDIRECT EXAMINATION BY MS. HARRIS:

Q.    If an analyst says one thing

Page 385

STEVEN P. FEINSTEIN, Ph.D. on October 7th and the same thing on October 15th, why would a reasonable investor believe that nothing -- wouldn't a reasonable investor believe that nothing had changed?

MR. ROTHMAN:  Objection.

A.    Not necessarily. A reasonable investor would not think that nothing has changed if it was obvious that something did change.

If the company makes an announcement that's an about-face from their previous position, that's a change that will affect investors and affect the stock price.

MS. HARRIS:  No more questions.

MR. ROTHMAN:  Thank you Dr. Feinstein.

VIDEOGRAPHER:  Thank you all very much. The time is 3:41 p.m. We're going off the record.  This is the end of media file number 5 and that includes this deposition.

Page 386

STEVEN P. FEINSTEIN, Ph.D.

Thank you.

(The proceedings were adjourned at 3:41 p.m.)

Page 387

C E R T I F I C A T E

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, STEVEN P. FEINSTEIN, Ph.D. was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

*Maureen Ratto*

MAUREEN M. RATTO, RPR

License No. 817125

Page 388

I N D E X

WITNESS:  STEVEN P. FEINSTEIN,    146

Ph.D.

DIRECT EXAMINATION BY MS. HARRIS 146

CROSS-EXAMINATION BY MR. ROTHMAN 375

REDIRECT EXAMINATION BY          384

MS. HARRIS


E X H I B I T S

Feinstein Exhibit 5, Feinstein    184

Reply Report, dated February 15,

2021,

Feinstein Exhibit 6, transcript   214

of Dr. Feinstein, dated January

30, 2021

Feinstein Exhibit 7, Barclays     225

report dated October 15, 2018 on

Jeld-Wen Holding, Inc.

Feinstein Exhibit 8, Credit       238

Suisse report dated October 15,

2018

Feinstein Exhibit 9 Credit        243

Suisse report dated October 8th,

2019 Bates

Feinstein Exhibit 10, Jefferies   247

Page 389

report dated October 15, 2018,

Feinstein Exhibit 11, SunTrust    252

report on Jeld-Wen Holding Inc.,

published on October 15, 2018

Feinstein Exhibit 12, RBC report 256

dated October 16th, 2018

Feinstein Exhibit 13, RBC          262

Capital Markets report dated

October 8, 2018

Feinstein Exhibit 14, Wells        270

Fargo report dated October 16th,

2018,

Feinstein Exhibit 15, Citi         275

report dated October 15, 2018 on

Jeld-Wen Holding, Inc.

Feinstein Exhibit 16, Bank of      279

America Merrill Lynch report

dated October 16, 2018,

Feinstein Exhibit 17, BAML         284

report dated October 8, 2018,

Feinstein Exhibit 18, Deutsche     285

Bank report dated October 16th,

2018

Feinstein Exhibit 19, JPMorgan     290

report dated October 16, 2018

Page 390

Feinstein Exhibit 20, JPMorgan    302
report dated October 7, 2018

Feinstein Exhibit 21, February    312
15, 2018 Jeld-Wen press release

Feinstein Exhibit 22, Gabelli &   323
Company report dated June 11,
2018,

Feinstein Exhibit 23, Goldman     326
Sachs report dated October 8th,
2018

Feinstein Exhibit 24, Gabelli &   328
Company report dated February
22, 2018,

PREVIOUSLY MARKED EXHIBITS:

Feinstein Exhibit 1, Reply        155
Report of Steven P. Feinstein,

Feinstein Exhibit 4, Jeld-Wen     166
Pre-Earnings Press Release,

Page 391

J U R A T

I do hereby certify that I have read the foregoing transcript of my deposition.

_____
STEVEN P. FEINSTEIN, Ph.D.

Sworn and subscribed before me
this _____ day of _____, 2021

_____
a Notary Public of the State of _____

Page 392

ERRATA SHEET

I WISH TO MAKE THE FOLLOWING CHANGES:

Page    Line        From            To

**[& - 2018]**                                                                    Page 1

**&**

**&** 142:6,17 143:7
  280:24 281:12
  288:6 293:19
  312:4 323:10
  328:22 376:5
  379:15 380:2
  382:23 390:5,11

**0**

**00112** 140:9
  145:17

**1**

**1** 145:9 147:23,24
  155:2,3,8 174:9
  209:7,15,22 218:5
  218:9 304:19
  305:3 314:22
  322:7 338:23
  343:25 370:4
  381:8 390:16
**1.44** 349:25
**1.99** 195:5
**1.99.** 344:9
**10** 179:5 247:10,12
  388:25
**100** 174:9 184:17
  220:21 221:9
  269:8
**100,000** 369:24
**10004** 142:20
**10022** 143:9
**102** 155:12,14
  212:9
**105** 209:22 332:19
  332:25 333:2
**106** 332:18,19,24
  333:2
**107** 338:22,24
**10:00** 140:17

**11** 218:11 224:24
  252:10,15 323:10
  324:23 389:2
  390:6
**111** 342:11 347:16
  350:24,25
**118** 207:14 304:18
  304:21,24 306:7
**119** 306:8,15 307:8
**11:09** 209:14
**11:19** 209:18
**11:26** 215:4
**11:27** 215:8
**11th** 323:8,24
  325:16
**12** 255:21 256:2
  268:2 322:23
  353:7 377:8 389:5
**12.2** 310:7,16
  311:11
**120** 249:23 300:15
  366:18,23
**127** 224:12,14
**12:09** 252:2
**12:24** 252:7
**13** 262:11,15,20
  375:15 389:7
**13.60** 322:14
**130** 272:3
**14** 270:2,8 389:10
**146** 388:2,4
**15** 147:25 174:12
  184:24 185:3,23
  210:5 225:19,23
  226:8 238:2,5,17
  247:11,13 248:3
  252:12,17 253:3
  275:17,18,22,23
  307:15 310:15
  312:2,7 313:25
  316:10 330:25

334:23 376:12,24
  383:11 388:11,17
  388:20 389:1,4,13
  389:14 390:4
**155** 390:16
**15th** 166:2,8
  170:19 220:9
  224:19,21 225:4
  225:17 232:19
  245:7 267:10
  287:12 303:25
  304:16 305:5
  306:17,23 307:2
  308:18,24 309:6
  309:13 310:5
  312:20,24 313:7
  325:12 332:16
  339:11 342:2
  376:15 377:15
  380:25 381:15,23
  383:8 384:15
  385:3
**16** 189:3 192:18
  193:7 197:15
  256:14 270:18,21
  279:18,20,21,23
  290:14,20 303:15
  303:20 377:22
  380:18 389:16,18
  389:25
**166** 390:18
**16th** 212:13,19
  224:19,21 232:20
  255:22 256:3
  266:2 267:22
  270:3,9 284:19
  285:4 294:2 344:5
  348:14 377:9
  380:20 382:3
  389:6,11,22

**17** 284:11,12,20,23
  284:25 378:21,24
  389:19
**17425** 387:23
**17th** 224:25
**18** 175:8 217:14
  226:22 227:15
  230:8 232:21
  233:23 270:23
  276:6 277:6 281:3
  284:18,20 285:2,7
  286:18 290:25
  335:9 389:21
**184** 388:10
**18th** 225:2
**19** 179:9,10 233:8
  233:25 234:15,20
  235:3 240:24
  258:3,10,16,20
  259:2,8 290:13,19
  290:24,25 351:13
  389:24
**1996** 372:24
**1:30** 302:15
  309:21
**1and** 381:12

**2**

**2** 209:20 252:4
  379:9
**2.40** 356:23
**20** 228:3 230:4
  302:6,8,22 390:1
**2017** 300:16 305:5
  335:8
**2018** 151:17
  165:25 166:3,6,8
  169:15 170:19
  171:4 172:3,23
  173:4,9,22 174:12
  174:23,24,25
  175:14,17,19

**[2018 - 3q]**

176:2 177:20
189:3 192:18
193:8 194:6
197:15 207:23
210:5,9,9,13,23
212:5,13,19,24
213:12,14,21
214:2 217:7 220:9
224:20 225:19,23
226:9 229:21
232:19,20 238:2,6
238:18 239:25
244:10 245:7
247:11,14 248:3
252:12,17 253:4
255:22 256:3,14
262:12,17 263:3
267:23 270:3,10
270:19,21 271:6
272:13 275:18,23
279:20,23 284:13
284:19 285:4
290:14,15,21
291:10 302:6,10
302:24 303:16,20
305:6 306:17,23
307:2,15 308:18
308:24 309:6,14
310:6,15 312:2,7
312:20,25 313:7
313:25 315:20
322:8,24 323:8,11
323:24 324:23
325:16 326:8,11
328:19,23 329:10
330:25 331:18
334:23 335:10
339:3,17,21
340:13,24 341:3
341:11,12,21,23
342:16 343:8,11

343:12,14 344:22
345:8 346:13,15
346:21,24 347:9
348:15,20 351:3
351:12 352:3,6,19
353:8 375:17
376:11,12,15,17
376:24 377:9,15
377:23 378:11
379:3 380:20,25
381:15 383:8,11
388:17,21 389:1,4
389:6,9,12,14,18
389:20,23,25
390:2,4,7,10,13
**2018's**  340:8 343:2
**2019**  171:3 180:14
180:20,21 233:13
234:6,8,12 239:25
243:20,24 308:25
329:19,22 330:21
339:19,24 340:4,8
340:10 341:9
342:15,18 343:2,9
343:10,14 347:7
347:12,20 349:3,9
349:18 351:7,16
351:25 352:2,7,14
352:17 353:24
355:10,24 356:6,7
357:22 358:10
369:16,18,21
388:24
**2020**  264:21,24
375:25 377:22
378:6,12
**2021**  140:16 145:7
147:25 184:24
185:3 214:14
388:12,15 391:11

**21**  296:12 311:25
312:6 336:2 390:3
**212**  142:21 143:10
**214**  388:13
**22**  140:16 213:14
215:20 219:24
220:6 323:7,9
328:22 347:22
348:21,23 349:15
390:5,13
**225**  388:16
**22nd**  145:6 328:19
329:10
**23**  226:17,21 326:6
326:9 390:8
**231-1058**  142:9
**23219-3916**
143:22
**238**  388:19
**24**  328:18,21 329:2
390:11
**243**  388:22
**247**  388:25
**25**  206:13,20 207:3
329:19 372:25
**252**  389:2
**256**  389:5
**262**  389:7
**268**  188:6
**26th**  305:5
**270**  389:10
**275**  389:13
**279**  389:16
**284**  389:19
**285**  322:8 389:21
**29**  215:16,17
**290**  389:24
**291**  220:22
**296**  154:22 155:13
155:16,24

**298**  212:8
**299**  212:9
**2:03**  310:2

|   3   |
|---|

**3**  252:8 297:18,19
309:23
**3.65**  348:25 349:17
350:6
**30**  214:14 372:20
388:15
**300**  212:17 213:9
213:11
**302**  390:1
**307**  209:25
**312**  390:3
**316**  213:20
**317**  210:22 339:2
**318**  339:16
**320**  343:24 344:10
344:11
**322**  213:20
**323**  390:5
**326**  390:8
**328**  390:11
**330**  347:17 348:11
348:12
**331**  351:2
**334**  357:12 359:18
359:19
**335**  357:13,16
358:7,8 359:11
**375**  388:5
**38**  185:22,23
**384**  388:6
**3:09**  366:10
**3:20**  140:9 145:17
**3:22**  366:15
**3:41**  385:22 386:4
**3q**  226:21 232:21
239:5 247:20
249:20 276:6

**[3q - additional]**

277:6 280:7,14 281:3 293:15

**4**

**4** 166:15,19 174:20 297:15,18,19 298:8 299:2 310:3 366:12 390:18
**4.42** 348:15,25
**4.42.** 195:2 344:5
**40** 218:5 359:17,24 359:25
**446-4800** 143:10
**46** 224:5
**47** 224:6
**48** 224:6
**4th** 322:8

**5**

**5** 184:25 185:14 219:25 314:20,22 314:23 366:17 385:24 388:10
**50** 369:8
**500,000** 370:2
**51** 314:25
**53** 314:21 315:2,3 317:23
**55** 337:22 338:8 347:22 348:17,23 349:15
**569** 305:4,8
**5th** 151:17 286:6 287:16 288:14 304:4

**6**

**6** 206:12,20 207:2 207:2 214:11,12 215:10 225:16 388:13
**60** 359:12,17

**601** 143:8
**619** 142:9
**655** 142:7
**6th** 207:22

**7**

**7** 225:18,22 302:6 302:9,23 388:16 390:2
**75** 329:20 330:16 331:16,20 332:4
**76** 220:18
**76.5** 165:8,14 167:7 184:21 215:21 220:11 221:5 277:7 281:2 288:15 293:16 321:22 322:5 330:25 331:9,19 331:22 332:8,9 333:5,10,12,23 334:9,18 348:19 376:16 377:3
**775-1000** 143:23
**7th** 315:20 321:16 385:2

**8**

**8** 163:22 237:25 238:4 262:12,17 263:3 284:13 380:8,13 381:12 388:19 389:9,20
**800** 143:21
**804** 143:23
**817125** 141:10 387:25
**859-8000** 142:21
**88** 188:6 196:5
**895** 370:17
**8th** 153:15,19,20 154:13 243:20,23

244:10 326:7,10 375:17 376:10 379:3 382:3 388:23 390:9

**9**

**9** 230:7 243:21,22 247:5,7 290:16 388:22
**90** 368:15,17 370:6
**92101** 142:8
**96** 322:6
**99** 196:6
**9:58** 145:7

**a**

**a.m.** 140:17 145:7 209:18
**ability** 337:13
**able** 215:10 238:8 244:2 247:16 250:5 256:6 270:12 273:3 275:20 302:20 318:2 328:25 342:22
**absolutely** 154:5 155:19,22 181:15 320:10 382:5 383:25
**accept** 186:17 346:7,13
**accepted** 156:13 186:18 342:12
**accepting** 182:16
**access** 177:21 280:3 305:20 319:23
**account** 148:24 191:7 194:2,13 201:9 202:16 233:16 285:22

286:24 333:16 334:21 335:4
**accounted** 203:13 323:25 335:2 347:23 348:21
**accounting** 316:9 338:17
**accurate** 146:14 152:20 387:10
**accurately** 318:2
**achievable** 176:13 176:24 178:10
**achieved** 174:17 217:25 218:16,22
**acknowledge** 177:5,7 339:25
**acknowledged** 159:21 320:23
**acknowledging** 182:11,21 183:19 256:24 338:14 351:20
**acknowledgment** 184:16 326:4
**acquisition** 301:16 301:22
**act** 310:22 311:13
**action** 140:8 145:16 215:13 285:21 387:18,21
**adamant** 159:17 324:14 326:2
**adamantly** 328:8
**add** 169:7 192:20 220:2 269:4 355:20
**adding** 169:25
**addition** 280:23 312:12 371:4
**additional** 190:2 190:19 209:3

**[additionally - analysts]**                                                                Page 4

| | | | |
|---|---|---|---|
| **additionally** 167:5 | **agreed** 205:14 | 356:11,14,24,25 | 225:4 227:10 |
| 179:4 294:15 | **ahead** 240:21 | 357:24,24 359:22 | 228:4,6,12 232:18 |
| 295:9 | 287:22 | 360:18 361:11 | 233:22 239:3,17 |
| **address** 179:13 | **alert** 276:5 | 362:5 365:9 | 240:23 241:10 |
| 360:13 | **alienate** 228:16 | **amount** 162:12 | 242:16 243:3,7 |
| **addressed** 266:12 | **allegation** 189:6,9 | 333:15 338:20,21 | 245:8 246:18,20 |
| **addresses** 179:10 | 228:6 360:9 | 347:18 349:7 | 256:21 258:8 |
| 179:12 | **allegations** 173:16 | 352:13 361:24 | 259:25 260:16 |
| **adjourned** 386:4 | 178:17 181:16 | **analyses** 150:9 | 263:11 264:4,8,13 |
| **adjudicated** | 182:6,18 186:3,12 | **analysis** 150:12 | 265:3 266:3,16 |
| 152:25 182:14,15 | 186:19 187:10,20 | 151:7 153:13 | 267:13 269:16 |
| **adjusted** 226:23 | 359:21 360:12 | 154:12 180:23 | 274:14,25 283:16 |
| 230:9 | 361:2 364:21 | 185:25 188:2 | 289:9 299:13 |
| **adjustment** 330:2 | 365:21 | 189:16 190:2,6,14 | 300:23 303:5 |
| **administer** 146:4 | **allege** 187:4 | 190:16,16,17,21 | 322:18,22 323:2 |
| **admission** 236:7 | **alleged** 149:12,18 | 191:2,6,6,11,17 | 325:15,16,17,22 |
| 237:12 242:7 | 173:24 181:13 | 192:2,4,7,16,21,25 | 342:13 359:16 |
| 251:8,11 283:22 | 186:4,5 187:12,22 | 193:5 194:3 | 368:8 374:6,14,21 |
| 288:20 297:12 | 212:17 343:23 | 195:11,16 196:3 | 374:25 375:7,18 |
| 309:8 | 349:19,23 365:23 | 197:2 198:13 | 376:11 377:10,19 |
| **admitted** 175:16 | 367:8 | 199:20 201:3 | 378:4 379:2,8,19 |
| **admitting** 179:15 | **allegedly** 181:10 | 202:23,24,25 | 380:19 381:7,13 |
| 179:18,20 182:3 | 197:12 382:25 | 203:4 210:2 | 384:25 |
| 296:22,22 | **allocation** 360:16 | 211:12 213:5,16 | **analysts** 150:3 |
| **adverse** 157:7 | **alluding** 293:24 | 228:11 272:24 | 157:4 160:8,15,20 |
| 165:4 180:3 183:4 | **alternative** 159:12 | 286:15 303:21 | 160:25 161:12,15 |
| 184:9 281:25 | 350:18 | 304:12 316:9 | 161:20,21 162:2 |
| 282:3,8,10 283:9 | **altogether** 200:4 | 317:18,20 325:8 | 162:20 163:3,12 |
| 297:22 298:4,22 | **america** 194:16,17 | 347:3 349:23 | 168:14 170:15,24 |
| 299:17 | 279:18,22 351:4,9 | 350:5,6,10 352:17 | 171:2 175:12 |
| **adversely** 337:17 | 353:5,12 354:11 | 357:21 359:4 | 183:13 184:6 |
| **affect** 356:6,7 | 355:17,21 356:5 | 362:8 363:7 368:9 | 218:20 222:4 |
| 385:15,15 | 358:12,12,25 | 368:10,21 | 223:5,8,9,10 |
| **affirmative** 196:25 | 359:13 361:22 | **analyst** 150:15 | 227:14 228:13,17 |
| **afraid** 199:25 | 362:2 379:2 | 157:9 163:8,19 | 228:20 236:5,10 |
| **ago** 147:6,9 221:14 | 380:19 389:17 | 164:2 198:20 | 237:3 255:11 |
| **agree** 162:20 | **american** 227:17 | 201:5 215:24 | 260:6 266:9,13 |
| 163:12 188:20 | 231:4,15,21 232:3 | 216:2,6 219:9,18 | 269:11 275:3 |
| 205:25 227:13 | 232:6,15 234:7,10 | 220:16 221:10,16 | 282:13 313:25 |
| 242:9 339:12 | 234:11 235:6 | 221:23 222:5,7 | 327:13 342:12,24 |
| 342:24 373:19 | 259:11 342:9 | 223:19 224:17 | 343:13 346:23 |

**[analysts - asking]** Page 5

355:2 357:6,20,23
358:9 359:15
371:6 378:14
**analyze** 203:8
332:20
**analyzed** 175:18
282:22
**analyzing** 296:23
**announce** 315:12
376:23
**announced** 165:24
166:5 169:23
217:4 222:22
226:21 276:17
278:22 310:5,15
310:20 311:11,15
311:16,18 325:12
376:25 377:3
**announcement**
165:19 167:10
169:7,15 173:5,9
175:19,23 183:9
187:8 207:24
215:20 216:10,20
217:11,12 221:20
221:25 222:3,8,9
222:12,13,15,19
222:24 223:4
226:23 228:24
229:6 233:2
241:18 245:16
246:6 247:3
255:11 260:8,17
260:25 261:10,14
261:15 266:12,22
267:9 272:9 275:4
279:12 282:6,19
282:21,24 283:15
286:13 287:12
288:24 292:17
294:3 297:9

308:19 316:19,24
317:2 319:13
320:16 327:6
331:17 332:11,16
332:17 333:22,24
336:19 339:7
380:25 381:24
382:8 383:7,11
384:16 385:13
**announcements**
201:19 213:23
214:4 217:9
**announces** 247:20
280:6 312:3
**announcing**
176:20 180:10
335:15
**annual** 339:19
**answer** 154:9
171:18,18 178:23
178:25 192:21
198:8 200:17
201:6 208:2,12
213:19 232:8
237:4 240:15
268:4,14,16
271:13 274:4
281:19 297:6
309:4,10,16 311:9
373:18 374:10
**answered** 208:8
268:18 374:8
**answering** 208:6
**answers** 146:14
**anticipate** 265:5
**anticipated** 220:12
221:6 236:22
333:18 379:14
383:18
**anticipates** 259:20
265:18

**anticipating** 331:7
**anticompetitive**
181:12 182:7
218:2,17,23
219:10 237:13
242:7 251:9
254:15 273:4
283:22 288:4,20
288:25 290:11
297:12 309:9
336:9 342:23
345:11 349:24
361:5 365:23
383:2
**antitrust** 180:2
183:3 220:13
221:8 313:18
336:7
**anybody** 363:9
**apologize** 291:2
**apparently** 214:22
**appeal** 180:3
183:4 297:21
298:3,22 299:16
328:11
**appeals** 337:24
**appear** 306:7
**appearances**
145:24
**appears** 257:2
**application** 322:12
**applied** 164:6
193:11,16,20
347:9
**apply** 198:12
346:23
**applying** 199:19
344:13
**apportion** 353:4
356:23 360:17
361:19 365:8

**appreciate** 154:9
178:18,21 198:8
240:15 268:18
**appropriate**
150:25 151:6
153:10 204:20,24
250:16 263:13
289:20 344:14
346:22 350:2,12
**appropriately**
196:21
**approximately**
367:3 369:10
**april** 341:14,15
**arbitrary** 329:23
332:7
**areas** 167:22
279:4
**arguably** 301:15
**argument** 158:22
158:23
**arises** 330:2
**arrived** 351:16,24
351:25
**article** 304:16
**articles** 216:7
221:17 305:3,4,9
305:14 306:6,7,12
306:16,25 307:5
307:14,19,24
308:10,18,24
309:6,13 364:10
375:4,6
**artificial** 148:22
**aside** 170:19 216:2
**asked** 155:10
198:10 255:15
268:8 284:8
305:16 374:7
**asking** 154:10
215:18 344:8

[assess - believe]                                                            Page 6

assess 192:11
assessed 324:19
assessments 246:5
asset 219:17
assets 301:18
assigned 382:6,10
  382:13
assist 357:19
  371:7
associated 382:21
  382:24 384:13
assume 186:11
  187:9,19,24 318:8
  318:16 329:20
  330:16 333:5
assumed 186:21
  187:16 317:25
  332:4
assumes 186:2
  288:7
assuming 331:16
  334:14 353:19,23
assumption
  215:22 353:15
assumptions
  186:19 187:5,6
attention 170:3
  243:11 356:15
  375:15,21 377:8
  378:21 379:8
  380:18
attorney 145:24
  387:17,20
attorneys 311:19
  312:16 372:8
attractiveness
  219:5
attributable 349:2
attribute 227:14
  308:25 312:21
  362:4

attributed 196:19
  312:19,23 313:6
  347:18 349:8
  351:3,6 360:18
  365:9
attributing 195:3
  344:6
attribution 191:24
  196:3 339:17
  354:10 355:6
australasia 351:6
  352:16,21,25,25
  355:6,7,15 362:8
available 163:14
  163:18 166:17
  175:21 198:24
  317:14,21 324:4,8
  324:17 325:6,23
  357:6,8,18 358:4
  362:12 364:18
  383:3
avenue 143:8
avenues 163:17
average 373:6
award 312:15
  337:5
aware 310:4,14
  311:10,17 313:24
  322:22 323:2
  324:15 330:10
  363:11,17 375:5

**b**

b 151:11 388:9
back 174:20 188:4
  209:17 214:24
  215:7 249:21
  252:6 267:25
  299:14 306:22
  309:25 348:4
  366:14

backdrop 300:7
  301:10 303:9
backing 181:20,24
backwards 182:23
bad 276:5 304:6
baffling 197:18
balanced 292:9
baml 284:12
  389:19
bank 219:22
  279:18,21 284:19
  285:3 286:8,14
  287:10 379:2
  380:18 389:16,22
banks 236:19
barclays 225:16
  225:18,22 233:7
  388:16
base 219:17
  257:24 259:17
  265:14
based 156:11
  175:13 187:6
  200:16 201:3
  207:6 211:8
  230:18,24 241:8
  246:17 250:3
  259:24 273:13
  286:17 325:9
  326:15 340:22
  351:17 352:2
  353:6 355:23
  357:11 371:5
bases 216:4
basically 179:15
  196:11 223:14
  273:15 359:10
  361:23
basis 156:7 207:9
  215:25 227:20
  249:23 315:13

334:10,19 353:18
  353:22 356:3
  357:2 358:5 359:9
bates 243:24
  388:24
battling 270:5
bearing 199:23
beck 143:4
beginning 209:20
  233:24 252:8
  253:25 272:2
  301:15 310:3
  329:15 366:16
begins 277:2
  300:18 332:25
behavior 181:12
  182:7 196:8 218:2
  218:17,23 219:10
  250:6 290:11
  311:6 336:9,11
  342:23 345:12
  349:24 350:2
  361:5 365:24
  383:2
behaviors 288:4
belief 263:18
  264:10,17 311:5
believe 160:3,25
  161:3,4,5,21 168:3
  178:2,7 180:5,8
  182:5 183:24
  184:12 185:11
  207:22 233:23
  240:25 242:17
  244:22 245:20
  252:25 263:16
  271:16 279:8
  289:15 292:9
  299:24 300:3,18
  303:3 310:19
  313:15 323:23

[believe - causation]                                                             Page 7

326:19 329:8,23
330:21 336:2,4
337:7,11 345:16
345:19,24 352:5
364:7 371:14
374:14 375:23
385:4,5
**believed** 161:18,20
264:4 325:15
335:13 336:16
**believes** 184:17
289:4,10
**believing** 356:4
**bendheim** 143:13
**benefit** 239:14
**benefits** 301:17
**benign** 222:9
**best** 158:12 159:3
272:24 306:13
317:17,18,18,19
**bettencourt** 144:4
147:3
**better** 159:15
162:17 288:24
295:21 358:5
**beyond** 171:4
175:14 179:9,11
190:20 339:19
341:9 346:15
347:7,12,20 349:3
359:8
**bias** 374:20 375:6
375:7
**biased** 374:15
**big** 229:5
**bigger** 164:19
331:8 332:14
**binomial** 327:13
**bit** 183:10 236:16
318:12 321:17
329:23

**black** 182:9 184:3
289:14
**blame** 257:20
**block** 336:3
**bolded** 271:9,25
280:13,17
**book** 338:19
**booked** 330:24
331:23 333:9,10
**booking** 283:21
333:4
**borne** 384:14
**bottom** 233:16
296:2 306:16
**bound** 245:21,22
246:24
**brakes** 313:20
**breach** 313:18
336:7
**break** 206:15,18
206:25 209:11
250:16 251:24
274:2 302:13,15
309:18 357:18
366:7
**breakdown**
353:13
**breaking** 204:20
**brian** 143:24
**briefly** 147:7,14
**bring** 168:11
**briopelle** 143:25
**broadway** 142:7
**broken** 255:24
**brokerage** 374:6
374:12
**brooks** 143:4
**built** 346:3
**bullet** 169:6
174:11 220:23
244:20 271:4

292:24 293:3,14
294:12 296:2
305:3,24 306:3
**bundle** 172:10,12
172:17
**bureau** 168:10
**business** 227:17
231:4,16,21 232:4
232:6 236:20,21
243:13 287:9
288:2 299:23
337:15 342:20
345:13 347:7,12
350:8 357:25
358:13 360:6,15
361:3,8,17 362:15
**businesses** 253:18
254:10 359:20
**buy** 163:3 292:3
**buyer** 300:5 303:8

**c**

**c** 142:1 143:1,24
144:1 387:1,1
**calculate** 314:11
315:8 340:7
**calculated** 337:23
340:9 341:7
355:13 367:17
369:9
**calculation** 356:2
366:3
**calculations**
177:21
**california** 142:8
**call** 153:3,4
**called** 346:4,5
**calling** 244:14
**calls** 163:24
**canal** 143:21
**capital** 262:11,16
375:17 377:9,19

389:8
**capture** 359:7
**carefully** 305:11
305:14 363:23
**carry** 339:18
**case** 146:20
150:10 152:24
158:3 159:14
165:4,17 168:5
173:2,25 180:10
183:15,17 190:18
191:21 205:20
216:24 231:18
257:24 259:17
265:14 289:5,11
289:15 290:2
316:13 322:10
326:18 335:3
338:11 351:21
356:12 361:16
363:9,24 364:2,14
365:21 367:12,14
367:23,24 370:18
372:2
**cases** 366:19,25
370:21 372:14
**cash** 329:20
330:11,17 331:19
331:20 338:2
**catastrophic**
183:22 324:12
**categories** 365:11
**causation** 155:9
185:20 186:2
195:17,21,24
196:12,23,25
202:25 203:3,7,12
206:22 207:6,9
208:23 213:10
307:25 314:15

**[cause - comes]**                                                                                     Page 8

**cause**  156:16
189:12 191:21
197:14 199:8
202:2,12 205:6
206:2 211:25
352:25 365:6
**caused**  149:18
172:23,24 173:4
174:6 176:3
189:22,25 190:9
190:22 194:23
195:5,9 202:19
203:24 204:4
205:10,22 210:20
212:14,18 266:3
361:25
**causing**  203:20
205:13
**caution**  153:8
**ccr**  140:24
**cent**  349:15
**center**  230:20
231:8
**central**  268:21
**cents**  213:14
337:22 338:8
347:22,22 348:17
348:21,23,23
349:15
**ceo**  340:12,23
344:17,21
**certain**  367:8
379:20
**certainly**  161:11
175:4 208:21
264:24 272:19
287:25 295:2
**certainty**  184:18
**certified**  141:7
**certify**  387:4,9,15
391:3

**cfo**  222:16 226:24
247:21 271:7
276:5,18 280:7
290:16
**challenges**  227:21
229:13,18 241:3
244:24 256:24
257:5,6,19 258:5
285:15 287:22,23
342:8
**challenging**
253:19 254:11
280:6
**change**  189:13
194:6 226:24
270:7 319:14
327:23 351:7,13
352:14 378:4,14
381:7,13 382:5,10
382:12 383:21
384:6,13 385:11
385:14
**changed**  219:18
319:18 334:12
340:8,10 385:6,10
**changes**  193:24
234:10 308:25
353:25 355:11
383:20 392:1
**channel**  239:5
258:6,14
**characterization**
223:21
**characterized**
186:22 340:19
**characterizing**
356:10
**charge**  165:14
167:6 170:6
215:21 220:10,18
221:5 223:5

225:10 227:12
278:10 280:19
281:2 282:2,11,12
282:15,16 283:5,7
283:9 288:7,11,15
289:20 293:16
298:10 304:5
310:24 311:3
321:19,21 332:21
333:5,7,9 335:16
337:16 338:3
348:20 376:17
377:4,15 378:10
378:13 381:2,18
381:24 382:9
**chargeable**  295:23
**charges**  177:8
**charging**  370:17
**check**  196:23
207:16 314:17
350:14,19
**chose**  153:11
172:16 173:11
175:25 178:2
236:5 316:14
**christopher**  144:7
145:20
**circumstances**
158:13 216:24
219:19 237:2
317:6
**cite**  218:25 220:16
221:10 282:14
300:12 305:4
359:15
**cited**  219:2 307:6
308:9 361:10,11
**citi**  275:17,22
278:12 389:13
**citi's**  277:22 278:3

**civil**  140:8 145:16
**clarify**  205:24
210:13 211:12
**clarity**  245:21,24
245:25 246:22,23
330:2,14
**class**  142:5 350:3
**classify**  210:23
339:3 370:11
**clause**  315:5
**clayton**  310:22
311:13
**cleaner**  203:18,19
**clear**  162:16 211:6
216:9 248:21
250:20 266:7
289:23,25 321:20
321:24 360:3,11
360:25
**clearly**  246:6
264:13 337:20
**clicked**  155:7
**close**  201:20 210:5
218:6,8 233:16
331:22 332:8
**collection**  278:21
286:9 287:15
**combination**
231:5,22
**combined**  177:3
284:2
**come**  214:24
264:12 278:17,19
278:20 279:8
382:4 383:13
**comes**  207:16
209:2 267:16
304:4 321:13
338:18 358:25
368:2 369:5

**comfortable** 292:2
**coming** 205:2
  223:17 384:6
**commencement**
  387:5
**commensurate**
  334:2 353:16
**comment** 323:19
  329:16
**commentary**
  216:6 221:16,23
  223:23 224:8
  235:25 237:6
  241:20 250:9,21
  254:19,24 260:12
  260:15 267:19
  274:11,18 308:11
**commenting** 330:5
**committed** 307:22
  308:16
**companies** 164:2
  172:11 346:10
**company** 149:24
  149:25 150:15
  156:22,23 157:7,8
  157:8 159:15,20
  161:7,11,13
  163:22 164:23
  165:24 166:5
  167:5 168:7,17
  169:4,13,20,25
  171:4 172:10,25
  174:14 175:2,14
  175:16,23 176:22
  177:22 178:2
  179:24 180:10,23
  181:3,6 182:10,25
  183:12,14 184:5,7
  186:24 188:17,22
  189:11,22,25
  190:4,5,9,22

194:15,23,25
198:17 201:4
202:3 207:7,8,15
207:21 209:6
210:3 220:12
221:7 227:10
228:8,14,15,16,20
229:3,20,25
232:11 235:14
236:8,15,18
239:21 242:15,24
246:8,9,21 248:19
250:4 256:25
257:9 261:12
263:12 267:4,16
269:3,6,8,12
272:10,22,22
277:6 278:15
279:2 281:23
282:9 283:4,7,17
286:12,22 287:13
288:14 289:4,10
289:14,23,25
290:8 293:15
294:3 295:5,16
299:4,9,14 301:23
302:2,3 304:5,7,9
305:22 307:11
310:14,20,23
311:10,15,18
313:15,19,23
314:5,9 315:6,11
315:20,23 316:23
319:10,15 320:14
320:15 321:11
322:4 323:10
324:11 325:12
328:7,10,13,22
331:17 333:8,11
333:14 334:11,13
334:20 335:10,19

336:4,10,16
337:11,20 338:3
338:12 339:20
340:19 341:10
343:21 345:4,8
346:2,18 349:13
351:2,15,19 352:3
352:11,20 353:11
354:8,14,21,21
355:4,14,16
356:16 357:18
362:20 374:16
376:11,15,23
378:11 381:2
382:8,16,17 383:4
385:12 390:6,12
**company's** 151:2
  157:20 158:10,16
  159:17 160:5,21
  164:25 177:4,12
  183:24 188:9
  196:8 199:3 219:4
  241:11 245:9
  251:11 260:3
  273:17,18 279:12
  287:9 288:23
  292:17 306:20
  311:5 313:10
  317:15,16 319:7
  319:12 321:19
  322:14 324:14
  326:2,3 327:5
  332:11 337:18
  338:18,19 339:18
  341:4 346:7
  365:23 383:7
  384:15
**compare** 266:17
  303:17
**compared** 193:23

**compass** 144:6
**compelling** 158:21
  158:23
**competition**
  164:15
**competitive**
  164:14 196:7
  253:18 254:10
  300:6 301:9 303:9
**competitors**
  360:14
**complaint** 146:22
**complete** 146:13
  235:10 261:2
**completed** 316:7
**completely** 184:13
  236:23 269:9
**complicated**
  320:11
**component** 171:9
  173:4,13 174:24
  176:2,4 190:12,13
  197:3 208:15
  210:20,21 233:2
  349:20,21 358:15
  358:21
**components**
  192:13 196:13,14
**comprehensive**
  151:6 347:15
**comprised** 325:25
**computation**
  331:16
**computations**
  317:16
**concealed** 187:4
  197:13
**concealing** 181:10
**concede** 328:14
**conceded** 234:21
  259:3

[concerns - continued]                                                      Page 10

concerns   361:7
conclude   151:16
  204:17 206:10
  211:22,24 212:11
  212:17 241:21
  266:3
concluded   165:7
  167:12 187:25
  205:22 212:4
  241:9 259:25
  272:8 356:13
  367:5,11
conclusion   204:13
  207:6,10 211:8
  213:2,10 215:24
  216:2 220:17
  221:15 225:14
  242:3 246:17
  275:3 301:10
  308:12 317:12,18
conclusions   308:5
  325:8
condition   327:18
conditional   325:6
  354:25
conduct   237:13
  242:8 251:9
  254:16 283:23
  288:20 289:2
  297:12 309:9
  357:21 368:9
conducting   150:17
conference   163:23
confirm   342:14
confirmation
  328:2
confirmed   160:4
conflict   374:20
confounding
  191:8,12 192:14
  192:17,24 193:7

193:25 195:23
  196:14,19 197:5
  197:10,23 202:17
  203:13 211:14,21
  212:24 213:12
conjunction   328:6
consensus   351:8
  351:13 374:19
consequences
  320:25 321:6,7
conservatism
  233:10,18
conservative
  173:7,11 174:4
  176:7 178:3
  210:18 211:7,20
  352:10,12
conservatively
  210:23 339:3
consider   150:25
  168:25 189:17
  278:6 307:24
  319:21 344:20
  345:2 358:9
considerably
  184:15
consideration
  261:22 329:18
considered   149:25
  150:4 190:24
  225:8 226:6
  238:15 244:6
  247:24,25 250:12
  252:24 255:4
  262:24 270:16
  274:21 276:11
  280:11 285:11
  291:6 301:20
  302:25 305:22
  308:4 323:15
  329:7 344:8,8

345:3
considering
  329:24
consistent   199:13
  320:7
constitutes   167:21
  168:24
constructive
  301:14
consultant   368:3,7
  368:17
consulting   368:13
  370:7
contacted   371:25
  372:5,7
contain   235:24
  237:5 250:8
  254:18,23 274:10
  274:17 308:11
contained   170:20
  171:13 318:10,18
  382:2
contemporaneou...
  321:10 355:3
content   149:10
  150:7,14 169:18
  170:12 198:15,16
  198:19 223:2
context   154:17,19
  168:6,18 183:8
  192:9 198:14
  216:23 228:21
  297:8 298:17,19
contingency   165:9
  165:15,21,25
  166:6 167:8,11
  171:14,24 172:6
  175:10,13 176:10
  176:21 178:7
  187:11,21 224:10
  227:3 234:17

236:3 237:8,11,17
  240:7,19 241:22
  242:2,6 243:15
  245:15,17 246:12
  246:15 248:10
  249:11,13 250:2
  250:11 251:2,7,16
  253:11 254:21
  255:8,14 256:22
  257:12 258:22
  260:14,20 261:5
  261:20 262:2,8
  266:5,21,23
  267:24 271:11
  273:14 274:6,13
  274:24 275:9
  276:21 277:8,12
  277:21 278:2
  279:15 281:2,6,10
  281:15,16 283:21
  284:7 286:23
  288:19 289:12
  292:20 293:2,17
  294:25 295:13,22
  296:4,8,16 297:5
  297:11 298:9
  300:25 308:13,20
  309:3,7,15 310:24
  311:3 316:18,25
  317:7 320:23
  331:2,23 336:14
  377:5
continue   178:24
  208:12,24 249:7
  265:22 273:3
  288:3 377:20
continued   143:1
  144:1 257:4,21
  258:2,4 292:7,13
  292:14 294:16
  295:10

[continues - damages]                                                    Page 11

**continues** 179:25 183:2 253:15,17 254:9 313:15 336:4
**contract** 313:18 336:7
**contradict** 343:15
**contribute** 365:25
**contributed** 204:7
**contribution** 354:18,19,22,24 355:9,10,20 357:15
**contributions** 353:17,20,24 354:2 357:11,13
**conversations** 326:15
**conveyed** 169:24 311:4
**conveying** 296:25
**convinced** 269:8
**corp** 290:17
**corporation** 142:16
**correct** 148:20 151:12,13,18 153:16 154:15 160:11,18 165:11 166:8,25 167:13 186:7 188:11 189:3 191:4 210:6 210:15 211:3 215:14 220:19,20 221:12,18 224:16 224:20 226:14 229:14 234:18,24 237:14,23 238:12 240:19,20 241:13 244:7,11 245:11 248:21 249:4

251:2,5,17 255:19 257:13,14,21 258:24 259:6 262:2 263:14 264:6 271:12,14 275:9,11,15 276:7 277:18 278:4 279:9 281:3,7 289:12 291:13,19 293:9 294:6,10,25 296:17 300:9,19 322:21 323:4 324:25 331:24 332:21 333:7 336:23 337:25 339:7 349:9 352:8 357:4,10 358:22 359:13 360:22 363:14 366:19 367:2 368:4,7 370:18 374:16 376:6,12,18 377:16 379:4,6,21 381:3,5
**corrected** 172:5 186:13 187:11,21 195:7
**correction** 243:2
**corrective** 148:11 148:12,21 149:2,7 149:23 150:21,24 151:9,17 153:10 157:13 164:7 165:10 167:12,17 167:19,21,23 168:4,20,24 169:3 169:16,19 170:2,5 170:8,11,13,18,25 171:9,13 172:3 173:13,15,23,23 174:5,13 180:6,9

186:6,14 187:8 188:10,18,23 195:6 196:13 197:2 203:6,21 219:6 235:9,11 367:9,21
**correctly** 232:24 241:7 242:10 314:18 355:14 356:10
**corrects** 148:18
**cost** 184:21 207:25 231:5,23,24 257:7 258:5,13 283:5 285:21 322:2 330:21,23 331:9 331:12 333:9,10 337:17 339:21 340:24 341:11
**costs** 231:7 249:21 329:22 332:13 334:4,17 382:24
**couched** 269:5
**couching** 182:9
**counsel** 142:2,15 143:3 146:24 367:16 372:9 373:22 387:17,20
**counted** 305:12
**counter** 200:3
**countervailing** 157:19 158:6,9,15 202:9 205:16 206:5,8
**counting** 225:3 347:8,14
**couple** 147:11 186:8 206:24 223:25
**coupled** 181:13

**course** 150:9 162:24 335:2 337:14
**court** 140:1 141:8 145:15,22 146:4 263:11 293:18
**coverage** 241:16 274:15
**covered** 223:5,19 255:3 365:21
**covering** 224:18 227:10
**craftmaster** 301:16,21
**creating** 301:22
**credit** 219:22 237:25 238:4 243:19,22 244:16 245:6 388:19,22
**critical** 267:10
**cross** 375:13 388:5
**crowninshield** 144:4 370:24 371:10,16
**curbing** 172:25 345:11
**current** 279:5 322:12
**cut** 247:20 255:25 276:7 280:18 287:19
**cv** 140:9 145:17
**cycle** 222:2 223:4 282:24

---

**d**

**d** 388:1
**damage** 196:21 197:25 363:8
**damages** 155:10 173:6,10 174:7 176:4,5 184:24

[damages - describing]                                                              Page 12

185:21 194:10
195:12 197:8
202:25 208:23
210:2,21 211:3,20
234:5,8,13 308:2
310:7,17,21
311:12 334:22
335:5,6,12,20
336:17,23 339:7
343:18 347:18
348:22 349:7
360:4,18 365:8
367:18
**dan** 147:3
**daniel** 144:4
**dark** 354:9
**data** 357:5,8 358:4
**date** 145:3,6
153:17 185:4
188:11,18,23
214:15 225:25
238:7 243:25
247:15 252:19
256:4 262:18
270:11,24 275:25
279:24 284:14
285:5 290:22
295:6,20 299:18
302:11 307:5
310:13 312:9
323:12 326:12
328:24 387:13
**dated** 147:24
185:2 207:22
214:13 225:17,19
225:23 226:8
238:5,17 243:20
243:23 247:13
248:2 253:3 256:3
256:13 262:12,16
270:9,18,21

275:18,23 279:20
279:22 284:13
285:3 290:20
302:9 307:14
323:10 326:10
328:19,22 380:20
388:11,14,17,20
388:23 389:1,6,8
389:11,14,18,20
389:22,25 390:2,6
390:9,12
**davis** 143:15
**day** 154:2 157:11
157:15 159:3,7
160:7 194:21
196:17 201:18,20
203:23 205:9
294:2 316:15
339:9 391:11
**days** 147:6,9
157:11 246:12,13
295:18 303:22
314:10 315:7,12
315:14,24 316:4
319:15 320:2,4,6
**deal** 197:21
**debra** 142:12
147:2 372:9
**debraw** 142:13
**debt** 236:24
**decided** 172:10
**decision** 151:16,21
151:21,24,25
152:3,5,6,13,14,15
152:15,18,21
153:21 154:3
156:2 157:6
160:11,18 184:9
186:13 200:25
244:13 263:6
281:15 291:19

294:6,10,21 295:4
303:23 308:5
310:25 314:11
315:15 317:16
318:4,11,19
326:25 327:8
328:9,10,13
**decisions** 199:11
**decline** 153:14
154:12 157:18
159:6 197:15
249:5,23 271:17
272:12,17 327:21
339:10 347:21
348:14,17,24
353:5 356:24
366:2,5
**declined** 158:25
**decomposition**
343:6 350:13,17
354:17 355:4
358:6 363:8
**decreased** 286:18
**deduct** 193:3
**deem** 350:11
**defendant** 142:15
**defendants** 143:3
146:21 319:24
**defense** 366:25
**deficiencies** 340:3
**define** 199:6
368:25
**defined** 149:3
**defining** 180:16
**definitely** 196:15
382:9
**definition** 318:23
364:16
**degree** 164:15
**delved** 356:21

**demand** 301:12
**demonstrate**
355:8
**denial** 157:20
158:10 160:21
161:2 183:25
**denials** 158:16
159:18 160:5
161:20,21 162:3
181:14 184:8
313:11,20,23
324:15 326:2
**denying** 295:19,19
295:19 299:10
328:8 336:11,11
336:12,12
**departing** 247:21
**departure** 271:7
276:17
**depending** 173:18
180:15
**depends** 189:15
202:5,23 319:2
325:4
**deponent** 155:6
166:22 207:18
224:3 256:10
**deposition** 140:13
141:3 145:10,18
146:17 148:4,7
166:16 185:13
214:8 218:6
305:17,25 319:2
364:9 385:25
391:4
**deprived** 308:19
**derived** 361:17
**described** 199:19
213:15 293:6
**describing** 195:12

despite  160:21 315:6
detailed  152:24,25 239:10
details  293:4
deterioration 272:25
determination 186:20 197:4
determine  149:6 151:14 164:6 190:4,21 192:23 193:12 196:3 197:11 198:2 202:18 203:24 204:4
determined  187:7 195:5 332:10 342:18
determines  186:4
determining 150:23 344:22
deutsche  219:22 284:18 285:3 286:8,14 287:10 389:21
devastating 299:22 301:3
develop  239:9
development 261:23 286:11,12 290:17
developments 193:24
devoted  368:14,18
dictate  341:2
diego  142:8
different  152:10 152:10 182:22 192:13 325:13 364:17

difficulties  214:21
digest  320:13
digested  261:13
digesting  163:9 264:15
digestion  162:22
diminished  343:20
direct  146:11 332:20 348:18 375:15,21 377:7 378:20 379:7 380:17 388:4
directing  185:15
direction  205:18
directly  173:3,9 340:9 341:7 349:6
disagree  183:20 235:7
disappointed 300:24 327:16
disappointing 227:23 249:2 271:5 277:3 326:21 327:11 348:20
disappointment 241:11 245:9,16 260:2 266:4,22 344:15 361:16,20
discipline  346:5
disciplined  181:8
disciplining  346:6 346:9
disclose  176:22 181:3 335:11,12
disclosed  174:15 176:11 178:8 316:10 334:22,23 335:5,7,19 376:15
discloses  336:22 337:4

disclosing  220:10 221:4
disclosure  148:11 148:12,14 149:2,7 149:11,21 150:24 151:3,10,18 153:11 157:6,14 160:7 162:4 164:7 165:8,11 167:12 167:18,19,22 168:21,24 169:3 169:16,19 170:2,9 170:11,25 171:10 172:3 173:13 174:6,13 180:6,9 187:8 188:10,18 188:23 192:8 196:13 197:3 198:3 201:18 203:11
disclosures  170:19 186:6,14 192:9 201:16 203:6,11 203:17,19,23 210:14,24 211:13 211:18,25 212:5 212:25 213:13,22 214:3 217:8,14,16 219:7 223:17 235:10,11 313:10 339:4 342:16 343:3,8 367:10,22 374:24
discount  338:8
discounted  324:24
discounts  323:20 325:18
discover  158:19 205:19
discovered  173:19

discovery  158:19 364:18
discuss  179:9 219:10 326:17 334:6 373:24 374:3
discussed  205:4 373:21 383:23
discusses  239:4 240:23 271:5 291:9 294:4,8
discussing  277:2 374:13
discussion  215:5 268:23 269:5 277:19 287:6
discussions  273:21
dismiss  364:12
dispute  313:16 336:5
disruption  285:23 286:25 287:8 289:7
distraction  172:20
district  140:1,2 145:14,15
divesting  301:25
divestiture  151:21 151:25 152:2,5,6 152:14,18,22 156:2 160:11,18 186:13 200:25 244:13 263:6,12 264:6 285:24 287:2 288:8,12 289:8 291:19 294:5,9,21 295:4 301:11 303:23 304:8 314:11 315:15 318:4,11 318:19 322:19,23

**[divestiture - economically]**                                    Page 14

323:3,25 326:25
327:7,18 331:13
332:13
**divestment** 322:10
323:20 324:24
325:19
**divide** 355:18,22
**divided** 334:10
350:6,22 351:7
**dividing** 359:4,9
**division** 140:3
354:11
**document** 185:7
207:19 208:3,21
208:22 209:6
256:11 298:25
302:21 311:22
315:20 323:14
364:8 377:12
**documents** 146:20
147:16,17,19,22
207:7,8,13 224:14
305:16,18,21
317:12,14 363:23
363:25 364:5,13
**doing** 163:16
202:24 213:5
236:17 283:12
315:24 316:4,7
338:12
**dollar** 176:3
**door** 273:25 274:3
300:7 303:10
331:8 356:5,11,14
358:13 359:7,12
360:15 361:3,8
**door's** 300:9
303:11
**doors** 194:17
235:6,19 243:8
259:11 316:2

356:25 357:25
358:18,19,22
359:17,22 360:5,7
360:10,14,16,19
360:20,25 361:13
361:18,22 362:2,5
362:7,14,17,19,22
362:23 363:2,5,5
363:12,13,18,21
364:22 365:2,9,10
365:11,12,12,19
365:20,25
**doorskin** 322:11
**doorskins** 301:18
346:11 358:15,17
358:21 359:2,6
**double** 347:8,13
**dowd** 142:6
**downgraded**
249:2 258:3
343:14
**downgrading**
342:25
**downplay** 283:12
283:13
**downside** 281:12
379:20,25 380:7,9
380:14 381:12,14
381:20 382:7,15
382:22 383:5,13
384:14
**downward** 156:17
227:15 230:8
260:23 293:5
352:23 361:21
**dr** 145:11 154:8
178:24 185:7
208:12 209:21
214:13 215:9
244:2 247:17
252:20 270:13

302:18 310:4,9
375:14 385:19
388:14
**draw** 236:12 325:8
**drew** 221:15
**drive** 231:7,24
**drop** 153:22 154:3
173:3,8 176:3
190:10 194:14,19
194:20,22,22
203:25 204:5,14
205:6,10,13,22
206:3 210:19
212:2,12,19 228:3
230:4 232:20,25
273:13 278:13
286:17 328:5
333:6 343:19
344:4 361:25
362:4,12 365:7
**dropped** 151:2
**dropping** 159:23
**due** 157:19 158:5
158:8 232:20
233:9,14 258:4
263:18 301:15
309:2 322:11
**duly** 146:8
**dynamics** 301:24

**e**

**e** 142:1,1 143:1,1
144:1,1 146:7,7,7
146:7 387:1,1
388:1,9
**earlier** 210:17
246:13,13 303:22
305:16 316:9
331:6 375:16
**early** 367:16
**earn** 371:5,15

**earnings** 164:13
164:16 166:2,7,11
166:20,25 170:20
171:12 174:21
226:12 238:21,24
248:6 252:13
253:7 256:17
271:2 276:14
282:21 315:16
316:11,17 338:19
390:19
**easily** 349:16
**east** 143:21
**eastern** 140:2
145:8,15 209:19
**easy** 359:3
**ebit** 326:18
**ebitda** 226:23
227:15 230:9
233:8,15 234:15
234:20 235:3
249:4,22 258:3,20
259:2,8 280:15,18
308:25 329:19
351:8 352:15,17
353:7,17,20,24
354:18,23 355:10
355:20 357:14,22
358:10 359:13
**economic** 149:3
150:2 177:3
185:25 197:4
**economically**
150:5,8 191:19
192:24 193:13
196:4,9,15 197:3,7
198:3,10,15,17,20
199:4,6,7,12,18,22
200:7,15,19,22
201:2,15,23,25
202:10,15,19

[economically - example]                                                    Page 15

203:22 204:16
205:5,8,21,25
212:6 243:6
267:20
**economics** 149:4
**effect** 191:8,12
192:17 193:6,22
197:10 202:17
212:24 213:12
234:5 272:20
281:25 282:4,8,10
283:10 293:12
338:4 340:10
341:8
**effects** 193:21
195:23 355:24
**efficiencies** 239:5
**efficiency** 155:9
202:24 305:12
308:7
**efficient** 156:15
216:9 217:6 278:5
320:8
**either** 148:18
161:17 199:9
201:15 216:23
221:11 223:23
224:19 312:13
313:17 317:8
320:3 336:6 345:4
351:6 357:19
**elements** 149:20
196:22 222:15
**ellis** 143:7
**embarrass** 283:17
**embarrassing**
227:9 236:7
**emergency** 172:13
222:2,18,23 229:7
335:15

**emerges** 173:20
**emphasis** 169:9
**emphasize** 339:8
**emphasizes** 303:5
**empirical** 150:17
198:21 217:20
349:11
**employ** 371:9
**employee** 387:16
387:19
**employees** 371:13
**encouraged**
340:15
**ended** 195:4
**ends** 179:4 306:23
**engagement**
373:22,25 374:4
**engaging** 237:12
251:8 254:15
**entered** 162:14
220:12 312:13
**entire** 167:18,20
169:2 172:9
179:14 194:19,20
222:25 266:8
298:8,18 299:21
348:13 363:21
364:4
**entirely** 248:21
327:14 330:19
360:11 364:24
**entirety** 232:16
**entitled** 312:15
**entry** 297:21
298:3,21 299:16
**environment**
196:8 279:5
301:13,23
**eps** 180:14
**equal** 156:21

**equate** 318:21
**equity** 160:10,17
271:16 272:17
338:18,19
**errata** 392:1
**erroneously**
317:24
**error** 318:7,15,21
**especially** 193:23
278:6
**esq** 142:10,12,22
143:11,13,15,17
143:24
**essentially** 150:13
160:4 171:5
172:13 177:2,6
193:9 245:12
281:19 282:20
345:6
**establish** 188:9,21
313:17 336:6
**established** 188:16
216:8,21 268:5
**estimable** 295:23
328:15 333:13
**estimate** 178:4
233:8 314:12
315:8,21 318:2
329:22 330:22
332:23 333:3
369:15,19 371:22
373:3
**estimated** 194:4,5
207:25 313:25
352:15 357:2
359:11
**estimates** 233:5
234:16,20 235:3
240:2,24 257:18
258:21 259:2,8
340:11 343:14

351:8
**estimating** 371:20
**estimation** 330:20
**europe** 194:15
351:5,9 353:5,12
354:12 355:17,21
355:25 356:6,19
361:10
**evaluated** 194:8
**evaluation** 314:10
315:8
**event** 153:13,23
154:11 188:8,16
188:21,25 189:5,8
189:18,18 190:7
190:13,17,19,25
301:11 320:19,21
327:13
**evidence** 217:18
217:21 222:10
361:9,15,24
362:13
**evident** 317:6
**exacerbated** 231:9
292:16 334:15
**exact** 246:11
335:24
**exactly** 147:10
178:11 343:19
372:16,17,25
**examination**
146:11 375:13
384:24 387:5
388:4,5,6
**examine** 149:10
149:15 150:22
**examined** 274:20
**examining** 150:14
150:15 268:11
**example** 163:22
200:3,16 236:11

359:16
examples  200:13
  223:7 224:2,6
exceptional
  217:24 218:15,21
  218:25 219:3
excerpted  306:11
  306:12
exclude  191:22
  194:19 210:25
  235:23 339:5
  362:6
excluded  173:8
  176:5,7 194:9
  197:24 234:4,8
  343:18 344:5
  348:22 352:16
  359:19 360:25
  362:10 366:3
excluding  197:20
exclusively  232:5
  232:10
excuse  177:22,23
  178:18 268:7
execute  239:14
execution  181:9
  279:6
executive  270:6
exercise  250:5
exerting  260:23
exhausted  337:24
exhibit  147:23,24
  155:2,3,8 166:15
  166:19 174:9,20
  184:25 185:14
  209:7,22 214:9,11
  214:12,22 215:10
  218:5,9 225:16,18
  225:22 237:25
  238:4 243:20,22
  247:10,12 252:10

252:15 255:21
256:2 262:11,15
262:20 268:2
270:2,8 275:17,22
279:18,21 284:11
284:12,18 285:2,7
290:13,19,25,25
302:6,8,22 304:19
311:25 312:6
314:20,22,22,23
322:7 323:7,9
326:6,9 328:18,21
335:24 336:2
338:23 343:25
375:15 377:8
378:21,24 380:18
388:10,13,16,19
388:22,25 389:2,5
389:7,10,13,16,19
389:21,24 390:1,3
390:5,8,11,16,18
exhibits  154:25
  166:18 268:17
  305:19 306:2
  390:15
exit  290:16
expansion  241:2
  242:11,14,19,25
  243:9 244:23
  249:14 256:25
expect  227:8
  231:10 246:25
  287:18 291:12
  300:5 303:7
  337:21 383:20
expectation  384:4
expectations
  327:25 334:4
  340:8
expected  174:17
  176:13,24 178:10

193:17,18 269:15
280:19 326:20,25
327:8,12,17
337:23 340:3,24
344:16 346:24
352:7 353:3
380:11,15 382:25
expects  167:5
  277:6 280:25
  293:15
experience  157:17
  159:14 235:4
  259:9 327:20
experienced  154:3
  257:2
expert  146:21
  152:11 183:5,23
  262:4 354:5
  371:25 378:14
expertise  181:10
experts  370:15
explain  156:9
  178:13 196:6
  207:23 228:2
  281:18 328:4
  347:17
explained  210:16
  225:13 357:16
  360:24
explaining  178:14
  296:23 325:21
explains  223:15
  232:16 263:11
explanation
  158:12,24 159:3,4
  159:11,16 162:18
  181:25 229:2
  248:20,22 257:9
  272:24 378:9
explanations
  269:6,10,12

272:23
explicit  180:16,17
  216:5 221:15,22
  223:22 224:7
  227:8 235:25
  237:5 241:20
  250:9,21 254:19
  254:23 257:10
  260:11,15 274:11
  274:18 284:9
  301:5 308:11
explicitly  177:18
  179:11 180:13,19
  235:22 243:16
  246:4 248:11,14
  251:15,17,18,22
  254:17 255:9
  256:23 261:25
  262:5,7 275:2
  279:16 281:21
  287:5 289:3
  293:14 294:24
  295:2 296:5,7,15
  297:7,14 305:20
  307:7 308:9
exposed  361:4
expressing  241:10
  245:8 260:2
extent  269:23,24
  290:11 307:17
  308:4 327:22,23
  363:22 364:25
exterior  358:22
  360:7,10,19,25
  361:7,18,21 362:2
  362:5,7
external  300:15
extremely  324:10
eyes  250:7

[f - feinstein]                                                    Page 17

| f | | | |
|---|---|---|---|
| **f** 146:7 387:1 | **falling** 206:7 | 193:1 194:1 195:1 | 297:1 298:1 299:1 |
| **face** 184:8 202:9 | 216:12 217:13 | 196:1 197:1 198:1 | 300:1 301:1 302:1 |
| 260:25 301:5 | **far** 152:21 196:18 | 199:1 200:1 201:1 | 302:8,18 303:1 |
| 385:13 | 287:14,14 | 202:1 203:1 204:1 | 304:1 305:1 306:1 |
| **facilitate** 162:21 | **fargo** 270:2,9 | 205:1 206:1 207:1 | 307:1 308:1 309:1 |
| **facilitated** 163:16 | 272:11 389:11 | 208:1,13 209:1,21 | 310:1,4,10 311:1 |
| **facility** 263:13 | **favor** 217:18 | 210:1 211:1 212:1 | 312:1,6 313:1 |
| 300:4,14 303:7 | 374:16 | 213:1 214:1,12,13 | 314:1 315:1 316:1 |
| **facing** 346:2 | **favorable** 379:14 | 215:1,9 216:1 | 317:1 318:1 319:1 |
| **fact** 153:2 157:10 | 383:17,18 | 217:1 218:1 219:1 | 320:1 321:1 322:1 |
| 158:15 172:16 | **fear** 263:18 264:11 | 220:1 221:1 222:1 | 323:1,9 324:1 |
| 204:8 222:5,12 | 264:16 | 223:1 224:1 225:1 | 325:1 326:1,9 |
| 223:18 228:4 | **february** 140:16 | 225:22 226:1 | 327:1 328:1,21 |
| 246:19 275:12 | 145:6 147:25 | 227:1 228:1 229:1 | 329:1 330:1 331:1 |
| 310:11 311:2 | 184:24 185:3 | 230:1 231:1 232:1 | 332:1 333:1 334:1 |
| 315:6,14 328:7 | 310:5,15 312:2,7 | 233:1 234:1 235:1 | 335:1 336:1 337:1 |
| 355:2,5 | 328:19,22 329:3 | 236:1 237:1 238:1 | 338:1 339:1 340:1 |
| **factiva** 305:4 | 329:10 334:23 | 238:4 239:1 240:1 | 341:1 342:1 343:1 |
| 306:6,22 307:14 | 335:7,8,10 336:19 | 241:1 242:1 243:1 | 344:1 345:1 346:1 |
| **factor** 154:7 230:5 | 388:11 390:3,12 | 243:22 244:1,2 | 347:1 348:1 349:1 |
| 296:24 297:2 | **fees** 311:19 312:16 | 245:1 246:1 247:1 | 350:1 351:1 352:1 |
| **factored** 278:2 | **feinstein** 140:14 | 247:12,17 248:1 | 353:1 354:1 355:1 |
| **factors** 195:4 | 141:4 145:11 | 249:1 250:1 251:1 | 356:1 357:1 358:1 |
| 197:6 277:21 | 146:1 147:1 148:1 | 252:1,15,20 253:1 | 359:1 360:1 361:1 |
| 292:10 341:8 | 149:1 150:1 151:1 | 254:1 255:1 256:1 | 362:1 363:1 364:1 |
| 344:7 | 152:1 153:1 154:1 | 256:2 257:1 258:1 | 365:1 366:1 367:1 |
| **facts** 148:19,20 | 154:8 155:1,3,4 | 259:1 260:1 261:1 | 368:1 369:1 370:1 |
| 152:25 153:2 | 156:1 157:1 158:1 | 262:1,15 263:1 | 371:1 372:1 373:1 |
| 158:13 187:3,4 | 159:1 160:1 161:1 | 264:1 265:1 266:1 | 374:1 375:1,14 |
| 197:13 216:23 | 162:1 163:1 164:1 | 267:1 268:1 269:1 | 376:1 377:1 378:1 |
| 311:6 313:16 | 165:1 166:1,19 | 270:1,8,13 271:1 | 379:1 380:1 381:1 |
| 317:5 319:19,21 | 167:1 168:1 169:1 | 272:1 273:1 274:1 | 382:1 383:1 384:1 |
| 336:5 361:4,6 | 170:1 171:1 172:1 | 275:1,22 276:1 | 385:1,20 386:1 |
| **factual** 186:3,19 | 173:1 174:1 175:1 | 277:1 278:1 279:1 | 387:6 388:2,10,10 |
| **failure** 231:7,24 | 176:1 177:1 178:1 | 279:21 280:1 | 388:13,14,16,19 |
| **fair** 158:4 236:13 | 178:24 179:1 | 281:1 282:1 283:1 | 388:22,25 389:2,5 |
| **fairly** 222:9 | 180:1 181:1 182:1 | 284:1,12 285:1,2 | 389:7,10,13,16,19 |
| **fall** 153:22 156:16 | 183:1 184:1,23,25 | 286:1 287:1 288:1 | 389:21,24 390:1,3 |
| 156:19 162:11,11 | 185:1,2,7 186:1 | 289:1 290:1,19 | 390:5,8,11,16,17 |
| 216:11 349:13 | 187:1 188:1 189:1 | 291:1 292:1 293:1 | 390:18 391:6 |
| | 190:1 191:1 192:1 | 294:1 295:1 296:1 | |

**[fell - founded]** Page 18

fell   157:10 245:23
felt   169:4,12
  269:22 313:21
fifth   228:2 254:2,8
fight   311:2
figure   168:16
  355:22 372:25
figures   318:3
file   207:22 209:15
  209:20 252:4,8
  307:21 309:23
  310:3 366:11,17
  385:24
filed   145:14
  310:22
final   297:22 298:4
  298:22 299:17
  315:5
finally   159:20
  285:19
financial   144:5
  150:6,16 156:11
  156:12 157:9
  161:23 164:5,8,12
  177:10 180:22
  191:5,11,16 192:2
  192:4,7,16,21,25
  193:5,11,17,20,22
  194:3,5,9 198:14
  201:5 204:5,8
  216:24 228:10
  250:3 264:21
  314:2 322:3
  328:15 340:13
  350:5 354:4,5
  361:12 368:8,9,10
  368:21 370:24
  371:10,16 373:21
  373:25 374:4
  375:25 377:21
  378:5 384:10

financially   387:21
find   154:24 224:2
  367:15
finding   311:13
fine   236:12
finish   178:22
  208:5 350:14
finished   316:9
firm   370:14
  372:24 374:2,6,12
firms   236:20
first   147:20 152:4
  155:13 167:17
  172:8 174:11
  198:9 200:8
  208:19 214:8
  220:23 226:15,19
  230:15 239:2
  249:6,12,18
  253:25 254:4,5,7
  256:19 257:17
  263:24 271:4,24
  280:13 285:13
  291:8 293:8,23,25
  294:4,8,12,14,23
  295:25 297:25
  312:12 320:24
  321:4 364:7
  371:25 375:21
  379:13
fiscal   175:8 179:9
  179:10 180:14
  210:9 212:4,24
  213:12,21 214:2
  217:7,14 226:22
  227:15 230:8
  232:21 233:8,23
  233:25 234:15,20
  235:3 240:24
  247:20 258:3,10
  258:16,20 259:2,8

286:18 316:20
  341:2 351:7,13
  352:14
fischel   152:12
  223:7 317:24
  318:8,16 319:22
fischel's   159:10
  350:17
five   222:21 300:2
fix   239:18 345:14
fixable   229:25
  239:23 341:19,19
  342:4 345:20
fixed   171:5 215:2
  230:2 233:24
  239:13 339:22
  341:11,21,23
floodgate   159:23
floodgates   338:13
floor   159:23
flow   162:21 338:2
flowing   330:6
flush   363:12,13
  365:11
focus   191:24 236:6
  265:23
focuses   170:3
  196:10 234:24
folder   166:18
folders   185:12
following   151:2
  160:10,17 244:12
  288:13 318:3
  376:10 381:14
  392:1
follows   202:14
  304:6
followup   375:12
footprint   239:11
forced   285:24
  286:25

forecast   234:10,11
  258:16 327:24
  342:18 343:2
  349:9 353:25
  355:10 357:22
  358:11
forecasted   175:12
forecasts   171:3
  219:8 258:4
  339:19 342:15
  347:19 349:3
foregoing   387:10
  391:3
foregone   301:10
forensic   149:4
  354:5 368:21
foreseeable   271:20
  272:7,10,21,25
  273:7,11
forming   307:24
forth   286:12
  387:14
forward   174:16
  175:14 176:11,17
  176:23 177:16
  178:8 179:7 182:4
  182:23 183:20
  219:19 227:19
  240:12 241:6
  245:2 301:18
  333:15 334:18
  343:21 349:18,19
  353:2 361:8,14
  365:5,18
found   153:14
  154:12 183:17
  188:25 197:7
  199:17 223:7
  310:6,16 343:5
founded   370:14

**[four - guidance]**

**four** 150:13 198:12 210:3 222:21 329:16 368:13 373:6
**fourth** 229:24
**frank** 142:17
**frankly** 170:14 248:18
**fraud** 173:6,10,16 174:6 175:20 195:4 210:15,25 211:9,13,18 235:18 339:5,12 340:2 341:8 342:20 343:23 345:17 346:16,19 347:6,11 349:20 349:21 359:20,21 360:9 364:20
**fraudulently** 197:13
**fried** 142:17
**friedfrank.com** 142:23
**fruition** 383:14 384:7
**full** 172:2 173:22 174:11 233:4 271:6 280:18 333:6 371:13
**fully** 323:19,25 324:23 325:3,3,5,5 325:5,9,18,22 327:12
**fulsome** 235:11
**fun** 142:3
**function** 264:10 267:6 295:4
**fundamental** 338:6 384:10

**further** 278:17,19 278:20 279:8 330:2 334:4 363:6 375:10 384:19 387:9,15
**future** 267:3 271:21 272:7,10 272:21,25 273:7 273:11 331:11 332:12 338:9 340:16 344:16,24 346:14,25

**g**

**gabelli** 220:2,3 322:9,18,22 323:7 323:9,23 324:9 328:18,21 329:3 330:5,10 331:7,15 331:21 332:3 359:16 390:5,11
**gabelli's** 324:22
**gains** 181:3
**gary** 143:5
**geller** 142:6 372:12,23 373:9 373:13,17
**general** 374:18
**generally** 156:13 161:24 198:12 374:25
**generated** 300:15 353:7
**gilad** 143:13
**gilad.bendheim** 143:14
**give** 146:13 272:22 355:5
**given** 158:13 175:21,22 236:9 236:22,24 246:10 285:25 291:15

301:11 317:13,20 320:20 324:3,13 324:16 325:5 340:23 351:18 354:13,25 355:4
**giving** 216:14
**glass** 238:12 255:24
**global** 239:10
**go** 155:12 174:20 199:21 207:19 214:25 218:9 224:24 225:2 240:21 253:23 267:25 303:4 364:4 383:6,6 384:9,11,12
**goes** 163:10 296:12 301:24 322:13 338:17 359:8
**going** 145:2,5 151:20 165:13,20 166:10,14 174:15 175:14 176:11,16 176:22 177:9,16 178:8 179:6 181:22 182:4,17 182:22,22,23 183:20,21 184:18 184:20,22 188:4,5 206:14 209:14 214:10 215:4 219:19 225:15 229:8,21 233:15 235:4 237:2,24 240:16 243:18 247:4,9 252:3 255:20 259:9 262:10 265:11 267:11 268:3,17

269:2,11,25 273:10 275:16 279:17 284:10,17 284:24 289:18 290:12 293:22 301:18 302:5 309:21 310:11 311:2 323:6 326:5 328:17 333:15 334:18 337:7,8 343:21 345:16,24 346:17 348:7 349:18 353:2 354:19 361:8,14 364:3 365:5,18 366:10 385:23
**goldman** 326:6,9 326:24 390:8
**good** 145:1 146:12 159:11,12 205:2,3 302:2,3
**gps** 272:3
**greater** 240:11 241:5 242:20 244:25 245:21,24 245:25 246:22,23 287:3
**growing** 263:18 264:10,11,16
**growth** 179:16 253:19 254:11 273:17,19
**guess** 244:15 364:16
**guidance** 172:3 173:22 175:8 194:6 210:9 226:22 232:22 247:20 249:3 255:25 271:6 276:6 284:21

**[guidance - immediately]**

285:14 286:18 287:19 290:15 291:10,16 341:3 351:3,12

**h**

**h** 388:9
**hachigian** 143:5
**half** 344:5 369:2,3 370:8
**halfway** 167:3 174:13 253:14
**hand** 172:21 345:23
**handful** 237:18
**hanlon** 144:7 145:20
**happen** 299:20 383:9,16
**happened** 186:24 295:7 325:11 343:11
**happening** 299:8
**happy** 208:9
**hard** 321:17
**harm** 299:3
**harmful** 304:8,10
**harris** 142:17 143:11 146:11 153:19 184:22 204:25 208:4,8 209:10 214:20 225:15 230:14 237:24 243:18 247:4,8 250:18 251:23 255:20 262:10 268:13 269:25 275:16 279:17 284:10,16 284:24 290:12 302:5,14 309:17 311:24 323:6

326:5 328:17 366:6 375:9 376:19 377:18,24 378:18 379:5,18 379:23 380:4,12 380:22 381:4,9,17 383:12 384:2,8,21 384:22,24 385:17 388:4,7
**harsh** 231:5,22
**heading** 226:16 256:20 257:17 265:13 276:23 280:14,17,22 285:13 305:2
**headings** 257:17
**headwinds** 219:15 240:9 241:3 242:19 244:24 248:24 249:20 257:21 258:2 265:6 268:24 269:2,21 340:14 355:25 356:5,6
**hear** 151:23 153:18 187:17 213:24,25 310:12 318:13 348:8 382:20
**heard** 183:7 374:11
**hearing** 160:13 345:7
**heavily** 279:5
**held** 141:4 145:18 158:14 215:5
**help** 192:25
**helped** 163:19 320:15
**helps** 190:21 192:11

**hereinbefore** 387:14
**hey** 359:24
**high** 177:12,17 219:4
**higher** 251:12 264:17 299:9 321:21 322:2 334:16,16,16,17 334:17
**highlight** 292:7,12
**highlighted** 170:14,17 178:12 179:3
**highly** 179:21,21 222:17
**hired** 368:23 369:2 370:9
**historically** 177:13 179:17
**history** 168:8 192:9 242:23
**hit** 239:5 271:18
**hitting** 214:19
**hold** 274:3 342:5
**holding** 140:6 143:4 145:12 156:19 160:6 225:20,24 238:3 244:6 252:11,16 255:23 262:13 270:4 275:19,24 328:20 378:16,25 388:18 389:3,15
**holistically** 274:15
**hollow** 183:10
**home** 230:20 231:8
**honest** 236:13 269:9

**hoped** 345:9
**hopefully** 166:17
**hosted** 141:5
**hour** 147:14 370:17
**hours** 147:11
**hurt** 302:4
**hyperlink** 277:15
**hypothesis** 160:3,4

**i**

**iceberg** 332:9
**identifiable** 198:22 349:16 365:3
**identification** 185:5 214:16 226:2 238:7 243:25 247:15 252:19 256:5 262:19 270:11 276:2 279:25 284:15 285:5 290:22 302:11 312:9 323:12 326:12 328:24
**identified** 194:11 197:22 198:16,19 199:15 206:7 245:6 279:3
**identify** 198:18 210:3
**identifying** 197:19
**ignored** 183:5
**ignoring** 223:9
**ii** 140:12
**illegal** 217:25 218:16,22 219:10 219:14 349:24
**immediate** 338:4
**immediately** 222:4 264:25

[impact - information]

**impact** 157:20 158:9,15 164:19 165:5 191:23 192:12,15 193:15 193:19,19 194:5,6 196:17 197:24 199:9,10 200:11 201:7 202:7 204:12 211:2,2 217:5 264:21,24 264:25 300:8 303:11 304:3 313:9,21 314:2,12 315:9 328:2 329:24 332:21 333:3 337:13,18 339:6 340:7 341:3 343:7 344:16,23 346:25 347:5 348:19 349:23 352:7,14 375:25 376:5 377:22 378:5 381:25 383:23 384:4
**impacted** 156:3 157:14
**impactful** 227:22
**impacts** 164:16
**impairments** 340:2
**implications** 346:14
**implicit** 180:17 227:7 268:20 288:22
**implicitly** 180:18 243:12,16 262:3 281:22 283:3 296:20
**imply** 154:19 249:22

**importance** 175:5 283:14
**important** 164:3 164:13 168:13,16 169:4,9 170:4 172:19 267:2,3,4 267:14 282:18 283:16 296:24 297:2 303:25 320:17 324:10
**impossible** 383:19
**impounded** 324:20
**improve** 239:12
**improvement** 271:18 273:2,9 279:4
**improvements** 272:19
**inability** 227:11 228:5,25 231:6,14 231:23 232:12,14 232:17 235:8,17 235:20 248:13 288:3
**include** 167:6 171:6 223:22 241:19 260:12 277:7 287:23,24 287:25 288:11 293:16 296:13 305:25 306:4 331:10,10 332:12 382:22
**included** 152:23 176:6 274:3,19,19 311:13 325:25 351:19 360:3
**includes** 260:11 261:21 278:22 324:14 349:19

385:25
**including** 191:6 250:13 266:10
**income** 369:5
**incorporate** 320:6
**incorporated** 145:13
**incorrect** 148:19
**increase** 248:23 264:18
**increased** 246:7
**increases** 304:9 346:8
**incremental** 249:19 253:9,24 254:6
**independent** 300:5 303:8
**independently** 351:17
**indicate** 153:23 157:12 164:23 191:17 277:20,25 317:6
**indicated** 216:12 320:3
**indicates** 245:23
**indication** 189:24 264:16 316:13 352:21 365:17
**indisputably** 216:22
**industry** 300:7 301:12 303:10
**inefficiencies** 278:25 351:4,22 351:22
**inflation** 148:22 149:17 197:25 201:9 210:21 234:5

**inflationary** 248:24 249:20
**influence** 204:18
**influenced** 159:17 161:7 162:2,3
**influences** 308:4
**influencing** 161:12 161:14
**inform** 361:12
**information** 148:15,17 149:11 149:16 150:7,14 150:20 151:9 155:20 156:15 157:5,13 161:9 162:14,22,23 163:2,4,10,13,18 163:25 165:3,4 169:24 170:12 171:11 172:4,17 173:14,19 175:5,8 175:9,21 180:24 189:10,11,22,25 190:4,6,9 191:8,13 191:15,18,20,25 192:12,14,18,25 193:7,25 194:18 194:24,25 195:7 195:23 196:20 197:11,23 198:24 200:14 202:9,11 202:17 203:14,21 205:5,8 206:2,5,9 206:11 210:4 211:14,22 217:20 268:24 282:22 284:3 290:7 311:4 317:20 318:10,18 319:3,5 320:6,12 320:17 321:10,13 324:4,7,10,13,17

324:19 325:9
335:3 347:5
349:14 351:18
354:14
**informative**  179:5
208:22
**informed**  184:11
288:24 290:10
343:11
**informing**  177:11
177:14
**inherent**  374:20
**initial**  278:12
**initiation**  326:17
**instance**  321:15
**instilled**  148:23
**instrumental**
301:22
**insulation**  356:2
**intends**  180:2
183:3 297:20
298:2,21
**intentional**  172:20
**interest**  232:21
374:20
**interested**  387:21
**interesting**  321:9
**interim**  317:17
**interior**  235:6
259:11 360:6,13
360:19 361:13
362:14,16,23
363:2,5 364:22
365:10,11
**internal**  207:7,8
208:22 209:5
305:16,18,21
315:19 317:11,13
321:16
**interpret**  295:15

**interpretation**
232:2
**interpretations**
186:18
**interrupt**  178:23
204:21
**interrupting**
168:10
**interruption**  145:4
**intervening**  378:9
**investment**  219:6
236:19
**investor**  385:4,5,9
**investors**  161:14
162:7,9,10,25
168:15 170:15
183:13 184:5
199:11 267:2,15
278:7 325:24
326:16 327:2,9,14
327:17 357:19
367:5 381:25
385:15
**invoices**  359:10
**involved**  370:8
**ir**  290:18
**isolation**  343:8
**issue**  175:23,24
227:23,24 228:7
231:20 268:21,21
286:15 328:12
**issued**  168:8
224:18 316:23
373:13 376:11
377:14 379:2
380:24
**issues**  164:19,20
164:21 169:22
177:24 222:20
227:16 228:8,9
230:10,19 231:3,9

233:11,19,24
249:7 258:9,17
272:14 273:9
278:14 279:6
317:2 322:12
339:17 343:15
345:13 352:19
**item**  279:11
329:25
**items**  317:8,9

**j**

**j**  142:12 391:1
**jacob**  143:17
**jacob.rae**  143:18
**jacobson**  142:18
**jag**  140:9
**january**  214:14
305:5 388:14
**jefferies**  247:10,13
248:9 388:25
**jeld**  140:6 143:3
145:12 153:14
154:13 160:9,16
160:25 163:13
165:8 166:19
211:25 217:23
218:14,21 219:11
220:9 221:3
224:18 225:19,24
226:21 229:10
231:3 234:21
235:4 236:22
237:12 238:3
239:18 244:5
247:11 249:19
251:8 252:11,16
253:15,17 254:9
254:15 255:23
259:3,9 262:13
265:6 270:3,5
271:17 275:19,24

276:17 277:22
278:3,13 279:19
280:6,23 284:22
286:17 287:18
290:15 292:5
297:20 298:2,20
299:15,22 300:4
300:14 302:24
303:7 304:4 310:5
311:18 312:2,3,7
314:3 316:8 318:8
318:16 326:19
328:20 330:6,24
331:23 333:4
334:22 336:10
344:17,21,24
357:25 358:13,25
360:6 362:15
363:11,17,21
378:15,25 388:18
389:3,15 390:4,18
**jeld's**  231:20
259:22 265:20,21
272:11 300:8
301:16 303:11
**jobs**  236:9
**john**  280:7
**jpmorgan**  219:23
290:13,20 299:13
302:7,9,24 303:19
389:24 390:1
**judge**  151:16
152:15,23 165:17
284:2 359:5
364:12
**judge's**  364:11
**judgment**  180:3
183:4 220:11
221:6 297:22
298:4,23 299:4,5
299:17 312:13

**[june - line]** Page 23

**june** 322:8 323:8
  323:10,24 324:23
  325:16 390:6
**jurors** 310:22
**jury** 200:21
  311:12 312:4
  314:2 330:7
  334:24
**jury's** 329:13
**justification** 223:3
  223:20
**justified** 264:17
**juxtaposed** 183:8

**k**

**keable** 144:6
**keep** 214:19
**kelsey** 143:15
**kelsey.davis**
  143:16
**kept** 354:8
**key** 169:11 242:22
  242:22 248:8
  257:16
**killing** 360:14
**kind** 156:14 157:4
  157:5 159:22
  172:13 182:8
  191:19 200:14
  202:23 217:11
  317:9
**kirk** 143:5
**kirkland** 143:7
**kirkland.com**
  143:12,14,16,18
**knew** 187:2,3
**know** 152:11
  153:4 158:2
  159:20 168:14
  169:3,6,19 171:3
  172:22,24 173:3,7
  175:4 177:22,25

178:13 182:19
183:12 185:6
189:15 200:2,9
205:17 208:17
214:18 222:6
223:6,8,14,16
227:24 228:7,17
235:8,9 242:9
246:3 248:17
250:17 252:20
256:6 262:14
269:7 272:21
275:20 280:2
283:16 285:7
287:6,15,24
288:10 299:12,13
302:20 304:21
307:23 308:17,23
309:5,12 310:25
311:14,14 313:8,8
313:11 315:10,23
316:3,16,22 321:8
321:12 342:4
343:22 354:25
358:24 369:17,22
369:22 372:4,5,16
372:25 373:3,8,12
373:16 375:24
**knowing** 325:10
**knowledge** 306:14
**known** 154:4
  156:12 213:22
  214:3,6 216:10,20
  216:25 217:3,8,10
  217:11 332:14
**knows** 158:18,20
**ks** 163:22

**l**

**l** 142:22 143:4
**labeled** 263:24

**laborers** 142:4
**lack** 175:22
**laid** 172:9
**language** 168:22
  170:7 178:6
  179:23 182:24
  229:11 241:8
  245:5,14 253:22
  259:24 261:19,21
  265:25 266:2,14
  266:20 275:10
  295:9 299:25
  300:19,23 303:14
  303:20 335:24
  339:2 340:22
**large** 354:21,22
**largely** 230:9
  326:20,25 327:17
**larger** 331:19
  338:16 354:24
**latest** 261:22
  295:6 296:25
  299:7
**law** 146:9
**laws** 180:2 183:3
  313:18 336:7
**lawsuit** 157:2
  312:5 379:15
**lawyer** 370:9
**lawyers** 368:24
  369:2
**leading** 376:20
  380:5
**leads** 348:25
**leak** 318:13
**learn** 180:23
  267:11
**learned** 196:7
  287:8 332:10
**learning** 165:2

**learns** 164:23
**leave** 218:7
**leaves** 229:5
**leaving** 276:5
**led** 241:20 260:12
**left** 175:2 186:8,9
  349:17
**legal** 141:6 144:7
  156:25 285:20,21
**length** 319:7
**level** 151:13
**levels** 239:13
**leverage** 231:6,23
**lexecon** 144:6
**lexington** 143:8
**liability** 165:18
  183:9 187:7
  207:24 234:21
  259:3 261:10,14
  261:15 286:13
  310:24 313:14
  326:3 327:6 330:6
  336:12,18 351:20
**liable** 310:6,16
  336:10
**license** 141:8,10
  387:25
**likelihood** 184:14
  287:3
**limited** 341:3
  346:20
**lindsey** 143:11
  250:14
**lindsey.harris**
  143:12
**line** 204:22 230:23
  233:16 236:12
  254:2,8 263:22
  272:2 297:25
  312:11 362:19,20
  363:21 392:2

[lines - lowering]                                                                                          Page 24

| | | | |
|---|---|---|---|
| **lines**  272:2 277:5 | 250:11 251:2,7,15 | 369:6,12 370:7,11 | 363:6 364:4 |
| 300:2 323:18 | 251:19 253:11 | 376:5,9,17 377:4,5 | 367:25 369:17 |
| 329:16 | 254:21 255:8,14 | 377:6,15 378:7 | **looked**  168:23 |
| **lingering**  231:2,20 | 255:18 256:21 | 381:2,18,24 382:9 | 193:10,16 236:4 |
| **link**  242:10 | 257:11 258:22 | 384:17 | 240:5,18 252:25 |
| **linker**  280:7 | 259:4,21 260:4,14 | **little**  160:13 | 260:5 274:14 |
| 290:18 | 260:20,24 261:5 | 179:18 183:10 | 303:15 321:9 |
| **linking**  242:22 | 261:11,13,16,19 | 193:22 236:16 | 335:21 358:3 |
| **lion's**  243:13 | 261:25 262:7 | 271:19 272:20 | **looking**  168:15 |
| **list**  207:12 220:3 | 265:19 266:5,21 | 318:12 321:12,17 | 182:24 201:4 |
| 224:15,16 306:7 | 266:23 267:24 | **llp**  142:6,18 143:7 | 220:23 227:19 |
| 306:12,13 364:4,6 | 268:22 271:10 | 143:20 | 249:16 285:6 |
| **listed**  147:23 | 273:13 274:6,13 | **locations**  145:19 | 342:10 |
| 209:6 224:17 | 274:24 275:9,13 | **long**  147:8,12 | **looks**  277:15 |
| 305:19 364:3,8 | 276:21 277:7,9,12 | 242:11,13 285:19 | **lose**  289:19 |
| 381:20 | 277:21 278:2,10 | 320:12,13,18,20 | **loss**  155:9 165:9 |
| **listen**  178:19 | 278:23 279:15 | 339:9 345:21 | 185:20 186:2 |
| **lists**  281:11 306:16 | 280:19,25,25 | 346:14 348:2 | 195:17,21,24 |
| **literature**  319:4 | 281:6,10 282:3,16 | **longer**  194:12 | 196:11,23,24 |
| 374:17,19 375:6,7 | 283:21 284:7 | 200:11 240:25 | 202:25 203:3,7,12 |
| **litigation**  140:7 | 285:15 286:15,23 | 242:18 244:22 | 206:22 207:5,9 |
| 145:13 165:10,14 | 288:2,7,11,19 | 319:5,13 383:3 | 208:23 213:9 |
| 165:21,25 166:6 | 289:11 291:18,22 | **look**  149:23 150:2 | 282:2 295:21 |
| 167:7,11 170:5 | 292:8,14,15,19 | 150:5 151:7 | 307:25 314:15 |
| 171:14,23 172:5 | 293:2,4,12,17,19 | 154:22 162:10 | 367:6,12 377:4 |
| 175:10,13 176:10 | 293:24 294:5,9,17 | 174:8 183:14 | **losses**  176:3 |
| 176:21 178:7 | 294:20,25 295:11 | 185:22 188:5 | 336:17 359:21 |
| 187:11,21 199:4 | 295:12 296:4,7,14 | 198:13 199:22 | **lost**  331:11,14 |
| 199:17 220:13 | 296:16 297:5,11 | 203:16 206:12 | 332:12 |
| 221:8 224:10 | 297:17 298:9 | 212:8 214:7 218:4 | **lot**  163:9,25 |
| 225:9 227:3,12 | 300:24 308:13,20 | 222:14,25 227:18 | 230:22 235:12 |
| 234:17,22 236:3 | 309:2,7,15 311:20 | 233:3 240:22 | 236:21,24 268:22 |
| 237:8,11,16,22 | 316:18,25 317:7 | 244:19 253:24 | 295:16 361:24 |
| 240:6,9,10,13,14 | 320:23 321:2,6,19 | 268:8,15 271:24 | **lower**  162:6,6 |
| 240:19 241:4,13 | 329:21,22 330:12 | 271:25 278:11 | 257:5 351:3,12 |
| 241:22 242:2,6,12 | 330:18 331:2,22 | 280:13 291:8 | **lowered**  160:9,15 |
| 242:12,20 243:4 | 332:21 333:17 | 295:25 297:15,25 | 160:20 265:17 |
| 243:15 244:25 | 335:16 336:14 | 306:15 311:21 | 290:16 291:10 |
| 245:11,14,17 | 348:19 352:4 | 312:11 322:6 | **lowering**  226:20 |
| 246:11,15 248:9 | 356:16 368:6,11 | 335:22,23 341:14 | 227:4 233:5 |
| 248:14 249:11,25 | 368:14,18,20 | 342:13 350:24 | 255:25 257:18 |

**[lowering - mcguirewoods.com]**                                        Page 25

258:15 265:4
**lows** 287:19
**lunch** 302:16 309:24
**lynch** 279:19,22 379:3 380:19 389:17

**m**

**m** 142:10 387:2,24
**macro** 279:5
**magnitude** 330:15 344:3
**maintain** 179:25 183:2 201:8 236:14 244:20 290:9
**maintained** 335:17
**maintaining** 206:4 292:4
**major** 264:20 345:25 362:24 375:25 377:21 378:5
**making** 282:17 316:2 336:9
**mallard** 143:5 280:7 290:16
**management** 239:9 279:3
**manifested** 231:4 231:22
**manufactures** 360:6 362:16 363:12,18,22
**manufacturing** 239:11
**margin** 179:16 241:2 242:11,14 242:18,25 243:2,2 243:9 244:23

249:4,14,22 256:24,25 257:4 257:21 258:2 268:23,25 269:21 273:2,18 346:4
**margins** 217:24 218:15,22 219:2,3 243:5,5 248:12 249:14 268:23 273:21,25 274:3 300:9 303:12 345:9 356:11,14 361:14
**mark** 143:4 184:22 225:16 237:25 243:19 247:5,9 255:21 262:10 269:25 275:17 279:17 280:15 284:10,18 290:13 302:5 311:24 323:6 326:6 328:17
**marked** 154:25 155:2,5 166:15,17 166:21 185:4 214:15 225:25 238:6 243:24 247:14 252:9,18 256:4 262:18 270:10 275:25 279:24 284:14 285:4 290:21 302:10 312:8 323:11 326:11 328:23 375:16 378:22 390:15
**market** 155:9 156:15 159:16 163:14 171:8 183:5,24 196:7

202:24 215:21 216:9,12 217:6,15 217:19 220:9,19 221:4 223:15 224:9 225:9 229:9 235:6,20 236:2 237:7 241:21,25 243:8 245:25 248:18 250:10,25 254:20 255:7 258:4,13 259:11 260:13,19,23 264:5,14 265:22 267:11 274:12,23 275:5,6,8 278:5 279:14 284:6 285:15 287:7 295:15 297:4 305:12 308:6,14 308:19 309:14 312:18,23 313:5,9 313:21 314:6 316:14 317:25 320:7,14,17,24 321:16,20,25 324:6,15,16 325:7 333:17 334:13 338:7 346:6 347:19 349:2 351:16,24,25 354:6,8,16 356:4 382:20
**market's** 195:8 223:12 349:8
**marketplace** 148:17 154:5 162:15,23 164:15 171:10 172:18 177:6,11,15 178:14 179:6 182:3,21 184:11

198:25 235:12 284:4 288:25 290:10 311:4 319:10,11 352:15 361:17,21
**markets** 161:24 262:11,16 375:17 377:9,20 389:8
**marking** 214:11
**masonite** 225:4
**material** 149:22 150:2,4,5,8,20 157:3,5 165:4 191:18,19 192:3,4 192:23,24 193:13 196:4,9,15 197:4,7 198:3,11,15,17,20 199:4,7,7,12,18,22 200:7,11,15,19,22 201:2,15,24,25 202:11,15,19 203:23 204:10,16 205:5,8,21 206:2 212:6 243:6 267:20 281:24 282:3,8,10,15 283:9 291:17 292:11 337:13
**materiality** 197:5
**materially** 271:17 272:12,18 337:17
**math** 350:22
**matter** 145:12 337:12 338:17
**maureen** 140:24 141:7 145:22 387:2,24
**mcguire** 143:20
**mcguirewoods.c...** 143:25

**[mean - motion]** Page 26

mean 149:21
152:13,23 153:21
157:8 158:17
161:3 162:24
163:24 168:12,18
169:17 170:3
172:24 173:18
181:5 184:12,13
184:16 192:20,21
196:10,12 197:17
199:12,15 201:4
202:5,6,7 203:5
204:21 205:14
208:24 213:4,8,15
214:6 216:19
222:14 223:6,25
227:18 228:14
234:3 236:19
239:21 243:10
245:19 248:11,17
267:8,10 269:10
273:6 279:11
281:20 283:3,11
283:15 286:20
293:11 296:20
297:7 301:19
307:21 313:13
319:18 325:4,4,21
325:23 331:5,6
337:10 344:2
345:3 346:15
364:17 365:2
367:15 368:21
369:8 371:13,21
372:22 375:5
382:16
means 153:25
154:18 199:7
265:22 292:3
meant 155:21
251:4 274:16

333:11 359:25
364:15
measurable
198:23
measure 197:25
211:20 349:7
measured 194:8
197:22
measuring 197:20
media 145:9
150:19 163:24
209:15,20 252:4,8
309:22 310:3
366:11,16 385:24
medium 292:10
meet 146:25 147:5
147:9,12
meetings 147:4
memo 321:16
memory 208:20
307:22 308:16
350:22
mention 147:15
180:20 227:2
235:8,16,19,20
237:16,19,21
240:6,8,18 243:14
246:19 249:10,13
249:14 251:15,19
253:10 255:13,17
256:21 257:11
261:25 262:7
267:23 271:10
274:5 275:13
276:20 281:14
292:19 294:24
296:3
mentioned 148:9
164:5 223:10
268:9 370:23

mentions 228:5
248:9 256:23
merit 177:7
178:16 180:11
181:15 182:7,14
182:15 283:6
290:2
merits 289:4,10,15
merrill 279:19,22
379:3 380:19
389:17
message 262:9
289:23,25
met 146:22
metaphors 159:24
methods 349:12
michael 144:6
michel 143:6
340:23
middle 239:7
271:15
million 165:9,14
167:7 184:21
215:21 220:11,18
221:5 277:7 281:3
288:15 293:17
300:15 310:7,16
311:11 321:22
322:5 329:19,20
330:17,25 331:17
331:19,20,22
332:4 333:5,10,12
334:9 348:19
370:4 371:22
376:16 377:4
mind 207:16 209:2
350:23 368:2
minimum 334:18
minute 221:14
238:9

misleading 148:19
289:24
misrepresentatio...
148:24 149:19
151:11 164:17
181:14 186:5,23
195:10 212:18
367:9
misrepresented
149:13
misstatement
149:8
misstatements
168:4 173:24
187:12,22
misunderstanding
148:18
misunderstandin...
195:9
mix 159:24 190:5
191:14 230:20
231:8 239:5 258:6
258:14
modest 252:14
molded 358:22
360:13 361:13
362:23 363:5
365:10
moment 207:17
270:23 273:20
277:24 350:13,20
357:14
monetary 329:24
money 369:10
371:5,15 373:8
months 175:2
353:7
morning 145:1
146:12
motion 364:11

**motivate** 317:9
**motivated** 282:23
  286:14
**mouth** 289:17,22
  290:5 299:11
**move** 202:8,16
  214:23 220:5
**movement** 189:3
  189:23 190:2,23
  191:21,25 193:4
  198:23 201:12,21
  202:13 203:21
**movements**
  199:24
**multiple** 145:19
  200:10 203:6,10
  259:20 265:6,17
  344:13 346:23
  347:9
**multiplier** 341:6
**multiply** 341:5
**muted** 162:15
  201:11 310:9
  313:10,22 366:20

**n**

**n** 142:1 143:1
  144:1 146:7,7,7
  388:1
**name** 145:20
  153:9,10
**narrative** 242:23
**national** 142:3
**natural** 342:21
**naturally** 366:2
**nature** 221:20
  246:6 319:3
  340:15,25
**near** 292:6
**necessarily** 152:20
  304:6 306:10
  330:22 338:10,11

355:11 385:8
**necessary** 169:12
**need** 187:17
  202:16,22 203:8
  203:16 206:18,25
  228:18 238:9
  283:6 298:7,8
  348:8 350:19
  374:21
**needed** 249:19
  314:9 315:7
  334:19
**negative** 158:25
  159:18,21 162:14
  165:5 177:9
  181:18,22 182:17
  183:21 184:14
  192:6 193:15
  196:16 213:22
  214:3 216:10,20
  216:22,22 217:2,4
  217:5,8,12 223:16
  227:9 230:21
  231:10 236:6
  246:7,25 267:5,7
  267:12,18 281:12
  290:3 291:22
  293:12 294:17
  295:11 301:3,3
  328:9,15 333:24
  352:2 380:2
  382:18,23
**negatively** 156:3
  157:14 229:9
  291:12 300:8
  303:11 304:3
  344:23 346:25
**neither** 354:15
  387:16,19
**net** 291:11,11

**neutral** 244:21
  249:21 292:4
**never** 168:7
  222:22 274:25
  350:23 374:3
**new** 142:19,20,20
  143:9,9 145:23
  170:4 192:8,10
  193:19 195:6,6
  204:10 217:4,19
  239:8 264:25
  268:24 276:16
  287:19 290:7
  318:10,18 319:18
  319:20 320:6
  347:5
**news** 150:19
  163:24 168:10
  172:12,13 190:16
  190:16,22 193:11
  193:18,18,20
  204:15 205:16
  216:7 221:17
  227:9 264:15
  265:2,23 267:2,3,5
  267:5,14,21 276:5
  278:14,17,18,21
  279:9,10 295:6
  296:21,25 299:7
  299:17 301:4,5
  303:25 304:4,6,9
  305:2,4 307:4
  309:6,13 352:3
  364:10 375:3,6
  378:9,10
**nice** 228:15
**nine** 271:25
  303:21 371:14
**nixed** 232:8
**non** 195:4 196:14
  199:22 210:15

211:9,13 339:12
  340:2 341:8
  342:19,20 347:6
  347:11 349:21
**normal** 270:6
**north** 194:16,17
  227:17 231:3,15
  231:21 232:3,6,12
  232:15 234:6,10
  234:11 235:5
  259:10 342:9
  351:4,8 353:5,12
  354:11 355:17,20
  356:5,11,14,24,25
  357:24,24 358:12
  358:12,25 359:12
  359:22 360:18
  361:11,22 362:2,5
  365:9
**notary** 141:10
  391:13
**note** 207:21
  264:20 282:17
  291:23
**noted** 145:25
  279:3
**notice** 141:7
**notwithstanding**
  160:7
**november** 207:22
  321:15 341:17
**nth** 200:9
**number** 156:24
  285:20 286:22
  332:5,6,7 337:6
  341:17 351:16
  371:19 376:25
  380:2,8,13 381:6,8
  381:12 385:24
**numbers** 180:21
  243:11 350:18,18

**[numbers - okay]**                                                        Page 28

351:25 354:6
357:17 358:6
359:9 363:8
**numerous**  149:9
  156:9

---

**o**

**oath**  146:5
**objection**  148:13
  151:4 156:5
  157:24 158:11
  161:22 163:15
  164:10 167:14
  170:22 171:15
  172:7 175:11
  176:14,25 184:2
  186:16 187:14
  188:12 189:14
  191:10 195:15,25
  197:16 199:5
  200:23 201:17
  202:4,21 203:15
  204:2 205:11
  207:11 210:11
  211:16 213:3
  214:5 216:16
  217:17 218:18
  219:12 223:24
  224:23 225:11
  226:13 227:5
  233:12 234:2,23
  238:22 240:3
  241:14 245:18
  246:16 258:11,23
  259:12 261:7
  264:2,7 265:8
  269:19 272:5,15
  275:14 277:14
  281:17 283:24
  286:19 288:17
  291:20 292:21
  294:11 296:19

297:23 298:5,24
300:10 304:14
306:9 310:8,18
313:3 314:13
315:18 317:4
319:16 320:9
321:3 322:16
325:2 327:3,10
330:8 331:4,25
334:25 336:24
341:13 343:4
347:2 348:6
349:10 350:4
351:14 352:9
353:10 354:3
355:12 356:8
358:2 359:14
360:21 362:18
363:15,19 364:23
365:13 367:7,19
369:7 370:13
371:3,12,18
372:15,21 373:14
373:23 374:7
376:19 377:18,24
378:18 379:5,18
379:23 380:4,12
380:22 381:4,9,17
383:12 384:2,8
385:7
**objections**  212:21
**observable**  201:11
**observed**  316:5
  349:12
**observing**  235:16
**obvious**  203:20
  385:10
**occasion**  281:24
**occur**  201:14
  328:5 362:5

**occurred**  339:11
**october**  151:17
  153:15,19,20
  154:13 166:2,7
  170:19 174:12
  189:3 192:18
  193:7 197:15
  210:4 212:13,19
  220:8 224:19,19
  225:5,17,19,23
  226:8 232:19,20
  238:2,5,17 243:20
  243:23 244:10
  245:6 247:11,13
  248:3 252:12,17
  253:3 255:22
  256:3,13 262:12
  262:17 263:3
  266:2 267:10,22
  270:3,9,18,21,23
  272:13 275:18,23
  279:20,23 284:13
  284:19 285:3
  286:6 287:12,16
  288:14 290:14,20
  294:2 302:6,9,23
  303:15,20,25
  304:4,16 305:6
  306:17,23 307:2
  307:15 308:18,24
  309:6,13 312:20
  312:24 313:7,25
  315:20 316:10
  322:23 325:12
  326:7,10 330:25
  331:18 332:11,15
  332:16 336:20
  339:11 341:18
  342:2 344:4
  348:15 375:17
  376:10,12,15,24

377:9,15,22 379:3
380:20,25 381:14
381:21,23 382:3,3
383:8,11 384:15
385:2,3 388:17,20
388:23 389:1,4,6,9
389:11,14,18,20
389:22,25 390:2,9
**odd**  200:2 315:25
**offered**  159:11
  269:6
**officer**  146:9
**offset**  248:23
  249:20
**oh**  152:6 164:17
  185:14 225:6
  231:17 254:7
  314:25 349:11
  352:10 364:15
  368:25 372:19
  374:11
**okay**  147:8 148:10
  149:6 151:15
  152:7,8 153:6
  155:8,24,25
  157:16 160:14
  166:13,14,23,24
  167:10 174:10
  178:20 179:8
  185:24 186:20
  188:3,7,20 191:5
  200:6 204:3 205:4
  206:17,20,24
  209:10,24 212:10
  215:17 218:12
  220:7,25 225:15
  226:4 233:3,6
  237:4,24 238:10
  243:18 244:5
  247:4,8,19 251:23
  255:20 256:12

**[okay - p]**

257:10,22 259:15 261:9 262:22 270:22 275:16 276:3 285:9 290:12 291:4 293:7 294:23 297:15 299:24 302:17 304:18,25 305:24 306:5 309:17 311:17 323:13 326:5,13 330:24 338:22 350:21 358:20 359:18 360:5 364:20 366:6,22 373:4 375:9,19 377:11 378:23

**old** 192:10 193:17 193:18 200:12

**omissions** 148:25 149:19 151:11 173:24 186:9,14 186:23 187:12,22 195:10 212:18

**omitted** 149:14

**once** 188:15 216:8 347:21

**one's** 170:3

**ones** 197:6 262:6 274:8 306:10 307:6

**onex** 142:15 236:22

**ongoing** 193:24 239:4 257:6 279:6 280:24 329:21

**open** 215:10 218:7 238:8 244:3 247:16 252:21 256:7,8 262:14 270:12 275:20

276:3 285:8 302:21 323:13 328:25

**opened** 159:22 331:8

**opening** 185:17 291:3 338:13

**operate** 337:14

**operational** 169:21 222:20 227:16,21 229:13 229:18 230:10,19 233:11,19,23 239:4 241:3 244:23 249:7 257:6 258:9 271:18 272:13,18 273:9 278:14,25 285:15 342:8 345:12

**operations** 239:12 337:18

**opine** 174:3 217:22 218:13

**opinion** 152:22 161:19,25 163:9 173:21 176:9,15 181:19 183:5,23 199:2 208:16 213:9 215:22 216:18 224:9 225:8 236:2 237:7 250:10 254:20,25 255:10 261:18 262:4 274:12 295:8 300:22 312:18,22 313:4 319:14 320:5,22 343:16 349:25 352:5 356:10 359:6 364:11,12

364:12 373:20 377:20 378:4,14

**opinions** 162:8 213:7 307:25 308:5 369:5,12 370:16

**opportunity** 240:25 242:18 244:22

**oppose** 297:20 298:2,21 299:15

**opposed** 189:10 194:16

**optimistic** 242:16

**order** 190:3 197:11 211:19 228:19 284:3 344:3

**ordinary** 337:14

**organic** 253:19 254:11

**organization** 213:17

**organized** 257:23

**original** 188:5 206:21,23

**orsino** 305:18 364:9

**ought** 180:25

**outcome** 184:19 250:4 263:19 264:11 265:5 273:3 281:13 285:25 301:4 326:20 327:4 337:12 379:15 380:3 382:18,23 383:17,18

**outcomes** 246:8 267:7,12,18

**outlay** 329:20 330:11,17 331:19 331:21

**outlays** 333:17

**outlook** 180:25 181:20 280:18 343:21

**outside** 163:10 168:22 189:18

**outstanding** 240:9 240:10 241:4 242:20 244:25

**overall** 291:25

**overblown** 223:13

**overhang** 259:22 265:19,21 333:25

**overhangs** 334:3

**overhead** 239:13

**ow** 225:21 226:17

**owe** 311:19

**owner** 370:25

**owners** 301:17

**p**

**p** 140:14 141:3 142:1,1 143:1,1 144:1,1 146:1,7 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 155:4 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1

**[p - participants]** Page 30

191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1

314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:6 388:2 390:17 391:6

**p.m.** 310:2 366:15 385:22 386:4

**page** 155:12,13,14 167:4 171:22 174:9 185:22,23 188:6 196:5,6 206:12,17,20 207:2,2,14 209:22 212:9 215:16 218:10,11 219:25 220:21 221:9 224:5,5,6,12,14 254:4,5 259:15 265:11,12 277:17 277:18 281:11

285:14 288:5 296:11 297:15,18 304:21,23,24 306:15 307:8 322:6 332:18,24 332:25 338:22 347:16 350:25 379:9 392:2

**pages** 297:19 332:19

**paid** 337:7,9,23 338:9 359:10

**pain** 269:22

**paired** 352:12 356:21 360:4

**paragraph** 154:22 155:11,13,16,24 167:4,18,24 168:3 168:23 169:10 170:13,16 171:14 171:23 172:6 174:14 176:10,20 177:15 178:6,12 179:2,8,14,24 180:13,22 181:6 182:6,25 185:23 188:6 206:13,20 207:3 209:25 210:22 212:8,17 213:11 215:20 218:5 219:24 220:4,6,22 226:15 230:7,16 233:4 239:3,8 240:5,17 240:17,22 249:6 249:10,12,18 253:15 254:7 256:19 257:13,25 258:19 259:5,13 259:14,16 260:10 263:10,24 271:4,9

271:15,25 276:20 276:23 278:11 280:22 285:19 288:6,8 291:9,24 292:18,22,23 293:8,23,25 294:4 294:8,13,14,23 296:3 298:8,12 299:2,12,21 300:11 303:5 304:20,23 312:12 314:19,21,25 315:5 317:23 322:7 323:17 326:14 328:12 329:15 336:21 337:2 339:2 342:11 343:24 344:10 347:17 348:11,12 350:24 351:2 357:12,13 358:7 359:11,18 375:22 376:8 379:10

**paragraphs** 213:20

**part** 168:20 170:8 170:25 180:6,8 189:17 190:17,24 196:2 241:23 282:18 293:19 295:14 300:11 342:18,20,21 343:3

**partial** 157:13

**partially** 195:8

**participant** 312:19

**participants** 163:7 163:14 171:8 312:23 313:6 314:6 317:25

334:14 354:7,16
382:20
**particular** 155:11
184:19 338:11
375:20
**parties** 387:18
**parts** 347:11
**party** 300:5 303:8
**party's** 210:25
**pass** 382:4
**path** 240:11 241:6
245:2
**pay** 335:13,17
336:13 337:21
**paying** 243:10
**payment** 338:15
**payments** 338:15
**payne's** 151:16
152:15 284:2
359:5 364:12
**penalize** 279:6
**pending** 348:4
**penny** 335:14
**pension** 142:3,4
**people** 148:8
152:10 183:19
332:10 371:9
374:2
**percentage** 357:2
358:24 368:12
369:4 370:10
**perfect** 208:20
**perform** 349:22
**performance**
210:14,24 212:5
212:25 213:13,22
214:3 217:8,14
339:4,17 340:3,4
340:14 342:16
343:3,15 344:15
344:17,24 346:25

348:21 352:7,19
353:2
**period** 269:13
282:5,7,10,13,22
283:10 350:3
373:7,10
**persist** 258:9
**persistence** 233:10
233:19
**persistent** 164:18
193:23 227:16
230:10 345:22,25
345:25 365:3
**personnel** 371:6
**pertain** 359:22
360:10 364:21
**pessimism** 234:6
**peter** 142:22
**peter.simmons**
142:23
**ph.d.** 140:14 141:4
146:1,8 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1

205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
322:1 323:1 324:1
325:1 326:1 327:1

328:1 329:1 330:1
331:1 332:1 333:1
334:1 335:1 336:1
337:1 338:1 339:1
340:1 341:1 342:1
343:1 344:1 345:1
346:1 347:1 348:1
349:1 350:1 351:1
352:1 353:1 354:1
355:1 356:1 357:1
358:1 359:1 360:1
361:1 362:1 363:1
364:1 365:1 366:1
367:1 368:1 369:1
370:1 371:1 372:1
373:1 374:1 375:1
376:1 377:1 378:1
379:1 380:1 381:1
382:1 383:1 384:1
385:1 386:1 387:6
388:3 391:6
**philip** 305:17
364:9
**phrased** 381:13
**pie** 355:23
**piece** 193:11
**pieces** 204:15
205:7 210:3
349:15,15
**pipefitters** 142:3
**place** 205:2 387:13
**places** 169:9
314:21
**plague** 278:15
279:2
**plaintiff** 142:2
373:20
**plaintiffs** 146:23
186:2,12,18 187:4
187:10,20 289:24
372:9

**plan**  239:10

**plant**  285:24 287:2

**plants**  322:11

**plaza**  142:19

**please**  146:4
160:12 166:4
178:24 207:17
208:5,12 209:21
219:24 262:13
268:4 275:19
294:7 304:18
311:22 323:2
342:6 343:24
348:2 350:13,20

**plumbers**  142:2

**point**  174:25 178:5
200:12 242:23
248:18 293:3,14
294:12 296:2
305:15 335:16
336:15 376:8

**pointed**  169:10
229:12 295:25

**pointing**  243:4
303:24

**points**  169:6 230:9
249:23 257:16
294:15 295:9

**portion**  205:23
211:2 298:16
339:6 366:4

**portions**  167:25

**position**  385:14

**positive**  192:5
193:14 301:12,24

**possibility**  157:22
159:10 323:3

**possible**  158:18
194:12 200:5
316:8,12

**possibly**  234:3
370:5

**posting**  246:4

**potential**  287:22
287:23 292:11
297:21 298:3,22
299:16 300:3
303:6 304:2 311:7
322:3 323:20
324:24 325:18
326:18 330:6
331:9,11,11,13
334:22 335:20
336:22 337:2,3
378:5

**potentially**  192:13
197:5 285:23
286:24 317:22

**power**  172:25
235:5 259:10
380:11,16 382:25

**practices**  273:5
356:18

**pre**  166:2,7,11,20
166:25 168:9,17
168:19 169:5,12
170:20 171:12
172:14 174:21
223:14 226:12,21
229:7 238:21,24
247:20 248:6
253:7 256:17
271:2 276:14
315:16 316:11,17
316:23 317:10
342:2 390:19

**precisely**  373:15

**predecessor**
372:23

**predict**  273:12

**predicted**  331:21
332:3

**predicting**  232:18

**prediction**  332:2

**predicts**  230:20
272:11 278:13
286:16

**prefer**  165:16

**preliminary**
169:14 249:22
276:6,18,24 280:6
280:14

**prepare**  146:16
148:4

**prepared**  369:23
371:23

**preparing**  226:6
238:15 244:7
247:24 252:24
262:24 270:16
276:11 285:11
291:6 302:25
323:15 329:7

**present**  144:3
192:23 286:14

**presented**  158:21
213:17 316:6
358:7

**press**  163:23 166:7
166:11,20 167:20
168:2 169:2 170:2
170:10 171:21
172:9 181:2 286:2
286:5,6 305:3
306:20 307:11
312:2,7 318:5
335:20,23 352:24
354:14 390:4,19

**pressure**  156:17
219:16 228:23
229:8 247:2

260:23 264:12,18
278:17,19,20
279:9 292:6 293:5

**pressures**  258:6
258:13

**pretty**  162:16
299:6 321:20,24

**previous**  385:14

**previously**  149:13
155:5 156:22
164:24 166:15,21
174:17 175:3
176:12,24 178:9
178:15 181:6
182:2 207:25
229:17 251:4
283:8 317:10
339:2 341:24
353:3 365:22
372:11 382:17
390:15

**price**  148:23
149:16,17 151:12
155:19 156:3,16
156:18,18,20
157:15 158:14,25
160:6 162:5,6,11
165:6 172:25
173:8 186:7
188:10,17,22
189:2,12,23 190:2
190:22 191:21,23
191:24 193:3
194:14,19,20
196:17 197:14,24
198:23 199:24
201:8,9,12,14,21
202:2,8,13,14,20
203:20 204:14,18
205:18,22 206:3,4
206:7,9 216:7,11

[price - provided]                                                                 Page 33

216:11,13 217:6
217:13 219:7
221:18 226:16,20
227:4 228:3 230:5
245:22 246:24
249:21 257:7,18
257:24 259:17
260:24 264:23
265:4,14 272:12
296:12 313:21
318:9,17 324:2,20
324:20 327:19
328:5 339:5,10
343:7,19 344:4
346:7 347:10
348:14 353:4
356:24 361:25
362:4,11 365:7
366:2,4 383:23
384:5,9,11,12
385:16
**priced** 264:5
**prices** 164:20
248:13,23
**pricing** 164:16
217:24 218:15,21
218:25 219:3,15
219:16 227:11
228:5,25 231:6,14
231:24 232:12,14
232:17 235:5,9,15
235:17,21 248:12
249:19 250:6
259:10 301:12,24
346:5 380:11,15
382:25
**primarily** 257:5
257:20 308:6
**primary** 161:8
**principle** 164:18
193:17,21

**principles** 150:6
150:16 156:11,12
157:10 164:6,8,12
164:22 177:3
193:12 194:9
198:14 201:6
204:5,9 216:25
217:21 250:3
338:7 340:25
361:12 384:11
**printed** 255:3
**prior** 149:7 151:10
166:16 168:4
169:23 171:17
181:3 192:21
208:3 215:12
265:13 269:17
303:21 304:11
313:24 315:21
353:16 367:4
387:4
**probabilities**
324:3 334:17
382:6,10,13 383:6
384:13
**probability** 246:5
246:7 251:13
264:18 299:7
304:8,10 321:25
330:14 338:14
381:25 382:21
383:22 384:6
**probable** 177:9
182:13 289:18,19
299:11,19 301:6
328:14 331:18
332:15 333:13,25
382:16,19
**probably** 195:19
200:13 203:8
370:5 373:5,5

**problem** 239:22
269:2 272:6,9
273:10 345:15,20
345:22,25 346:2
352:21 356:13
365:3,18
**problems** 194:13
239:19 339:21,24
340:20,20,24
341:11 351:5
352:24 353:12,15
354:10 355:15,16
355:18 361:10,12
361:14
**proceed** 146:5
**proceedings** 145:4
386:3 387:11
**process** 163:2,4
171:2 279:4 319:5
324:6 337:24
**produced** 363:23
363:25 364:14,16
364:18
**product** 362:25
**production** 169:22
177:24 222:20
340:20 351:21
**productivity**
231:7,25
**products** 253:18
254:10 362:21
**professional** 141:9
387:3
**professor** 368:5
**profit** 172:14
217:24 218:15,21
219:2,3 222:3
335:15
**profitability**
174:15 176:11,22
177:16 178:8

179:6,16 181:4,7
345:10 352:23
365:5,18
**profitable** 175:3
175:15,18 177:19
**profits** 331:12,14
332:12
**program** 292:12
**programs** 168:11
**prohibiting**
268:10
**projections** 309:2
**promptly** 318:9,17
318:21,24
**prongs** 150:13
198:12
**proportional**
350:7 353:25
355:11 362:7
**proportionate**
355:19
**proportions** 353:6
**proposed** 142:5
**protest** 182:19
**prove** 151:8
201:23 203:12
239:12
**proved** 196:12
204:16 205:20
**proves** 197:2
203:7
**provide** 159:15
189:24 207:8
211:19 319:24
347:19 349:2
351:16 368:6
370:14,16 373:19
**provided** 191:15
280:23 284:4
317:21 321:4,13
352:3

provides 160:2
337:6
providing 369:5
369:11
provision 148:14
148:16 285:20
pt 255:25
public 141:10
161:9 171:7,7
242:25 391:13
published 160:10
160:16 226:11
238:24 244:9
245:14 252:12,17
255:4 256:16
260:7,8,17 263:2
266:20 276:13
389:4
pulls 149:17
purpose 204:3
purposes 184:10
210:2,18 211:11
pursuant 141:6
push 156:20
227:11 228:5,25
231:6,14,23
232:12,14,17
235:9,15,17,21
pushed 205:17
pushing 206:9
put 156:17,17
160:14 213:5
286:22 295:3
337:19
puts 285:20
putting 154:16
286:12
puzzling 288:9,10

**q**

q2 353:8
q3 165:25 166:6
210:9 239:21
248:23 249:2
271:5 276:18
277:3 291:9
316:19,20 341:2
348:20
q4 239:22 249:3
348:20
qualified 222:17
quantification
203:2 321:5
333:23 354:9
quantified 177:19
234:7,12 320:24
324:16,18 339:13
349:17
quantify 239:20
262:8 313:22
340:5 353:13
quantifying 197:6
quantitatively
193:2
quarter 167:6
169:15 194:7
228:8,9 229:23,24
248:19 282:4
quarters 169:23
194:7 222:22
293:15
question 154:9,11
155:17 166:4
178:19 187:18
197:17 198:8
200:17 208:2,6,7
208:11 213:19
215:19 237:4
240:16 268:4,10
268:14,16,19

277:24 310:12
311:9 312:10
315:25 318:13
348:2,4 363:3
384:23
questioning
204:22
questions 182:9
198:10 206:25
208:9 375:10,12
385:18
quite 188:14
quote 322:8
340:12
quoted 300:18
306:11,13
quotes 340:18
342:3

**r**

r 142:1 143:1
144:1 387:1 391:1
rae 143:17
rail 363:18 365:12
raise 248:13
382:21
raising 344:7
ramifications
157:2 184:14
283:5 288:2 311:7
322:3 333:24
342:22
random 212:14
range 162:8
245:20,22 246:24
ranges 226:22
232:22
rate 370:20 371:5
rating 244:21
292:4
rationale 334:9

rationalization
229:3
rationalize 239:10
ratios 355:14
358:7
ratto 140:24 141:7
145:22 387:2,24
rbc 219:23 225:4
255:21 256:2
262:11,15 263:8
375:17 377:9,19
389:5,7
reach 236:2 237:6
250:10 254:20,24
274:12 287:19
308:12
reaching 212:25
225:8
react 262:9 265:23
291:12 318:9,17
reacted 171:2
reacting 229:9
reaction 155:19,20
170:24 171:7,8
188:10,17,22
201:14 202:3,6,6,7
202:14,20 216:8
221:18 222:7
223:12,16 230:21
231:10 261:11,16
347:10
reacts 295:16
read 159:10 192:8
208:18,21 228:12
230:23,25 232:23
232:24 241:7
263:21 272:4,16
291:25 298:8,18
300:17 305:10
348:4,10 363:23
364:2 391:3

**readers** 236:13 374:21

**readily** 163:13,18

**reading** 186:10 218:3 230:13,14 243:11 271:23 297:24 298:15 314:18 345:7

**reads** 280:22

**realistic** 285:14

**realized** 333:9

**really** 169:8 170:4 172:19 174:3 196:20 210:16 222:10 235:10 242:9 269:8 318:14 336:16 348:8 356:20

**realm** 159:9

**realtime** 355:3

**reason** 146:13 157:16 158:17 177:12 205:12,14 219:4 227:3 229:6 232:25 246:2 248:15 291:15 316:22 327:19 341:6 346:12 352:22 362:3 365:16

**reasonable** 157:12 159:4 162:13 184:7,20 190:15 199:8,10 250:4 300:21 314:6 319:9,11 353:14 354:16 357:7 378:8 385:3,5,8

**reasonably** 156:2 173:2,5 176:6 183:13 190:24

191:20 205:21

**reasons** 159:5 164:25 181:7 199:19 224:11 225:13 242:13 316:17 329:16 339:12 344:14 356:20

**recall** 147:10 208:20 209:9 216:14 219:13 253:21 300:20 308:15,22

**receive** 163:2

**received** 185:3 214:14 225:24 238:6 243:24 247:14 252:18 256:4 261:12 262:17 267:6 270:10 275:24 279:23 284:14 285:4 290:21 302:10 312:8 323:11 326:11 328:23 356:15

**recess** 209:16 252:5 309:24 366:13

**recitation** 152:24 152:25

**record** 145:2,5 146:2 159:13 198:5 209:14,18 214:25 215:4,6,8 252:3,7,10 283:7,8 309:22 310:2 344:3 366:10,15 378:25 384:21 385:23

**recorded** 145:10 282:2,11,16 283:10

**recording** 282:12

**redirect** 384:24 388:6

**reduce** 233:15 322:13 342:15,17

**reduced** 231:5,23 232:21 233:14 235:5 239:13 259:10 365:4

**reducing** 226:16 233:8 234:15,20 235:3 239:25 258:20 259:8

**reduction** 284:20 291:16 357:23 358:11

**reductions** 233:9 233:14,17

**refer** 151:20 152:2 152:10,17 165:13 166:10 232:3 240:12 261:4

**reference** 227:6 243:7 249:25 268:20 286:5 292:25 294:20 296:16

**referenced** 240:23

**references** 291:17

**referring** 152:17 163:21 164:9 165:22 175:7,9 219:21 221:24 224:8 250:22 257:3 273:24 299:25 307:10 315:4 325:14 376:4

**refers** 240:14 273:24 295:12

**reflect** 150:19

**reflects** 220:11 221:6

**refresh** 214:19 350:21

**refreshed** 185:8

**refreshing** 185:9 329:2

**regarding** 241:12 242:7 245:10 260:3 266:5 280:24 296:13 309:8 378:4,15

**regional** 353:20,24 354:2

**registered** 141:9 387:3

**regression** 190:12 190:12,20 191:2

**regularly** 168:11

**related** 151:10 165:9 173:6,10,16 174:6 175:20 189:6,9 195:4 199:16 210:15,25 211:9,13,18 213:14 227:21 228:6 229:13,17 235:18 240:9 241:4 244:24 257:6 277:8 281:2 282:2 293:18 297:2 318:4 329:20,24 339:5 339:12 340:2 341:8 342:20 345:17 346:16,19 347:6,11 349:20 349:21 357:23

[related - reporter]                                                                 Page 36

358:11 359:20
361:3 368:10
377:6 384:16
**relates** 149:12
370:7
**relating** 330:11
**relationship**
236:15 351:11
353:19,23 355:8
359:8
**relative** 194:8
325:23 387:16,19
**release** 166:2,7,11
166:12,20,25
167:21 168:2,9,17
168:19 169:2,5,12
170:2,10,21,24
171:12,21 172:9
172:14 174:21
181:2 226:12
229:7 238:21,24
248:6 253:7
256:17 271:2
276:14 286:2,6,7
312:3,8 315:16
316:11,17,23
317:3,10 318:5
335:20,23 342:2
352:24 354:15
390:4,19
**released** 205:17
210:4
**releases** 163:23
305:3 306:20
307:11
**relied** 215:23
224:15 235:25
237:6 250:9
254:19,22,24
274:11 305:17
308:8,12 364:5

**rely** 236:19 364:19
**remain** 225:21
226:17 259:21
265:5,19 285:16
292:2,5
**remainder** 347:20
**remaining** 191:25
**remains** 241:2
244:23
**remedy** 152:12,14
263:13
**remember** 372:3
**remotely** 145:19
**remove** 191:7,12
192:17 193:6
195:22 197:10
212:23
**removed** 213:11
334:19 355:24
**removes** 148:22
**repair** 243:2 346:4
**repeat** 166:4 221:2
236:20,21 269:11
**repeatedly** 314:9
**repeating** 299:14
303:21 304:11
**repercussions**
159:19,22 177:10
181:19,23 182:12
182:17 183:21,22
290:3 324:11
328:9,16
**repetition** 245:13
266:19
**replace** 280:7
**replaces** 148:19
**replacing** 222:16
**reply** 147:24 155:3
156:10 184:23
185:2,19 206:21
314:8,23 388:11

390:16
**report** 147:23,24
148:12 151:15
154:23 155:4,8
156:10,11 159:10
164:12 165:7
168:12 170:23
172:23 174:3,8
178:13 184:23
185:2,19 188:4,5
195:13,18 206:13
206:23 208:19
209:23 212:9
213:6,16 215:24
218:4,10,20
220:22 223:2
224:13 225:4,17
225:18,23 226:5,6
234:14,24 235:24
237:5,9,10,15
238:2,5,11,14,15
239:3 241:9,15,19
241:24 242:5,11
243:14,19,23
244:6,7 245:7
246:25 247:10,13
247:23,24 248:2
250:8,20,24 251:6
251:10,14,18
252:11,16,23,24
253:10 254:18
255:6,13,21 256:3
256:13 258:2
260:18 261:24
262:12,16,23,24
265:13 266:2,20
267:8,23,25 268:4
268:8,12,15
269:18 270:2,9,13
270:15,16 273:22
274:5,10,17,22

275:7,12,18,23
276:4,10,11
277:11,17 278:9
279:13,19,22
280:5,10 281:5
282:25 283:19,20
283:25 284:5,9,13
284:19 285:3,10
285:11 286:10,16
287:5,11,13
288:18,23 289:3
290:14,20 291:5,6
294:2 295:7,20
297:3 299:18
300:19 302:7,9,24
302:25 303:2,16
304:16,19 305:12
305:23 308:7
314:8,15,24
319:22,25 322:7,9
322:20 323:7,10
323:15 325:22
326:7,10,17
328:18,22 329:3,6
329:7,9 332:19
334:7 338:24
340:19 343:25
347:17 350:17,25
364:7 376:11
377:10 378:2
379:2,9,20 380:19
380:24 382:3,4
388:11,17,20,23
389:1,3,5,8,11,14
389:17,20,22,25
390:2,6,9,12,17
**reported** 140:23
227:25 282:5
338:20
**reporter** 141:8,9
145:22 146:4

**[reporter - right]** Page 37

348:5 387:3
**reports** 146:21,21
  150:3 160:10,17
  162:21 163:3,8,11
  163:19 164:2
  216:3,6 219:9,20
  220:17 221:11,16
  221:23 222:5,7
  223:19,23 224:4
  224:17 225:7
  228:12 230:20
  236:4 237:19
  246:18,20 250:12
  253:12 254:22
  255:2,12 260:6,16
  266:9,10 267:18
  269:23 281:21
  286:9 297:7
  342:14 364:6
  368:2 373:13
  374:14,15,21
  375:2,8,18
**representations**
  181:13 367:21
**represented**
  164:24
**reprieve** 271:20
  272:20
**required** 300:3
  301:11 303:6
  304:3 319:8
**reread** 146:20
**research** 144:5
  160:17 187:25
  325:8 370:24
  371:10
**research's** 371:16
**reserve** 336:15
**reset** 225:20
**residual** 193:3
  344:4 347:21

348:13,24 366:4
**respect** 172:22
  248:19 362:25
  381:11
**respective** 353:6
  357:3
**responded** 222:4,6
  287:10,11
**responding** 241:16
  241:17 255:12
  260:9 266:11
**responds** 295:5
**response** 149:16
  246:21 286:10
  303:22
**responsible**
  362:11 365:4
**rest** 174:25 175:17
  229:22,23 260:9
  298:11 319:9
**restructuring**
  292:11
**result** 300:6 303:9
  383:7,10 384:12
**resulting** 378:6
  384:5
**results** 167:6
  210:9 239:15
  249:2,8,22 258:4
  271:5 276:6,18,24
  277:3,6 280:14
  291:9 293:16
  316:20 341:2
**resumes** 146:10
**retreating** 181:21
**return** 270:5
  369:18
**returning** 317:23
**revalued** 162:5
**revealed** 217:23
  218:14 229:2

**revelation** 197:12
**revenue** 164:13,16
  169:15 300:16
  354:2 355:9
  357:12,15
**revenues** 226:22
  355:7
**reversal** 261:3
**reversed** 181:4
**review** 147:19,22
  208:3 256:9 305:8
  306:25 307:4,13
  307:20 308:21
  309:11
**reviewed** 146:22
  147:15,17 209:5
  221:14 224:15
  305:10,13 306:5
  307:16,17 317:11
  364:5
**reviews** 207:18
  224:3 256:10
**revised** 349:8
**revising** 352:22
**revision** 227:15
  230:8 354:20
  361:20
**revisions** 352:2
**rgrdlaw.com**
  142:11,13
**rich** 374:17
**richmond** 140:3
  143:22
**right** 153:8,20
  155:11 156:4
  157:20,21,23
  158:3,10 159:8
  160:22,23 166:3
  180:3 181:5
  188:18,23 189:13
  190:7,10 191:3,8

196:24 202:3,20
208:14 210:10
211:4,14 212:2,14
212:20 218:2,17
221:3,8,9 224:5,15
226:9,12,24 227:4
227:17 229:19,20
230:21 231:16
233:11,20,21,25
234:17,22 235:6
237:17,22 238:13
238:18,21,23,23
239:5,19 240:7
241:6 243:15
244:10 248:3,6
249:3 251:9,16,20
253:4,7 254:16
255:18 256:14,17
256:18 257:12
258:6,10,17,22
259:4,11,22 260:4
260:20 263:3,7,15
265:3,7,21 266:6
266:15 267:24
270:22 271:2,7,11
272:14 273:14
274:7,8,24 275:13
276:14,15,18,21
276:24 277:3,9,13
277:23 278:8,15
279:15 280:8,15
280:19 283:23
284:7 285:16
286:2,4,18 287:20
288:15,21 289:5
296:4,5,8,15
303:16,23 304:12
306:17,20,21,23
307:12 314:12
318:5 322:20,24
323:3,5 324:2

325:19 327:2,7,8
329:10,13,14
330:7,12,13,16,18
331:2 333:2 335:8
335:21 337:5
338:17,18 339:8
339:22,23 340:16
341:4,5,21 344:19
347:24 348:3,15
349:4,5 352:19
353:8,9 359:23,24
360:7,8 362:9,23
363:3 364:9,13,14
368:18,23 370:19
371:2 376:7,13
**rings** 183:10
**riopelle** 143:24
**risk** 264:5 281:12
322:19,23 323:24
324:15,18 330:11
333:25 334:3
379:13 380:14
381:6,8 382:15
383:5
**risks** 312:24 313:6
324:16 334:16,17
379:10,21,25
380:8,9 381:12,14
381:20 382:2,7,7
382:11,14,22
383:10,13,15,21
383:22 384:6,14
**rob** 147:2 372:10
**robbins** 142:6
372:12,23 373:9
373:13,17
**robert** 142:10
**rolled** 236:25
**rothman** 142:10
147:2 148:13
151:4 153:17

156:5 157:24
158:11 161:22
163:15 164:10
167:14 170:22
171:15 172:7
175:11 176:14,25
178:21 184:2
185:11 186:16
187:14 188:12
189:14 191:10
195:15,25 197:16
199:5 200:23
201:17 202:4,21
203:15 204:2,19
205:3,11 207:11
208:4,10 210:11
211:16 212:21
213:3 214:5,17
216:16 217:17
218:18 219:12
223:24 224:23
225:11 226:13
227:5 230:12
232:7 233:12
234:2,23 238:22
240:3 241:14
245:18 246:16
247:6 250:14
258:11,23 259:12
261:7 264:2,7
265:8 268:7
269:19 272:5,15
275:14 277:14
281:17 283:24
284:23 286:19
288:17 290:24
291:20 292:21
294:11 296:19
297:23 298:5,14
298:24 300:10
302:12,17 304:14

306:9 310:8,18
313:3 314:13
315:18 317:4
319:16 320:9
321:3 322:16
325:2 327:3,10
330:8 331:4,25
334:25 336:24
341:13 343:4
347:2 348:6
349:10 350:4
351:14 352:9
353:10 354:3
355:12 356:8
358:2 359:14
360:21 362:18
363:15,19 364:23
365:13 366:20
367:7,19 369:7
370:13 371:3,12
371:18 372:10,15
372:21 373:14,23
374:7 375:11,13
384:18 385:7,19
388:5
**rough** 373:3
**rpr** 140:24 387:24
**rrothman** 142:11
**rub** 283:18
**rudman** 142:6
**ruled** 263:11
**ruling** 259:21
260:4 261:6,10,12
261:13,17 265:19
288:14 291:23
294:18 295:11,15
295:17 301:3
327:21
**rulings** 293:18

**s**

**s** 142:1 143:1,5,5
144:1 146:7,7
388:9
**sachs** 326:7,10
390:9
**sails** 273:16
**sake** 178:3 331:16
332:5
**sale** 303:6 304:3
**sales** 257:5 300:3
357:3,14,15
358:25 359:4,7,12
359:13
**san** 142:8
**saw** 175:18 364:8
**saying** 159:25
161:8,12,13
171:17 172:2,4
177:4,6 180:24
181:15,17,21
197:18 228:20
229:21 232:10,13
232:13,16 233:13
242:16,24 264:14
267:14 273:8
283:4,6 290:4,6
299:11 301:20,21
304:2 318:7,15,20
324:9,14,21
327:13 337:20
340:13 382:17,19
**says** 179:24 182:6
182:25 226:16,20
228:7 229:12
230:6,18 231:19
233:7 239:8,15,24
240:24 244:20,21
247:20 253:15
254:6 257:4 258:3
258:7,13,15

259:16,19,20
261:8 263:16
264:8,11,19,22
265:4,17 266:25
267:17 271:8,16
273:15 276:16,24
277:6,11 278:16
278:25 280:14,18
280:20 281:5
285:14,19 286:21
287:18,21 288:13
289:3,6 291:11,21
294:14 295:24
296:6 297:17,19
298:6,13,15
299:12 300:2
301:8 312:12
315:6 319:25
326:15 336:3
337:10 342:5
361:24 375:23
379:13 380:2
384:25
**scenario** 322:10
**scheduled** 168:11
**science** 228:11
**scrolling** 207:12
**seamless** 222:16
**search** 306:6,23
 307:14
**sec** 163:22
**second** 210:8
 230:7,15 257:19
 259:19 263:23
 265:16 280:21
 303:5 309:20
 312:11 323:17
 326:14 342:6
 379:9
**section** 167:23
 195:12,17,24

196:21,25 197:8
257:24 308:7
**securities** 140:7
 145:13 156:14
 366:25 374:6
**security** 148:23
 161:10 164:19
 188:9,17 189:12
 197:14
**see** 149:11,21,24
 150:3,6 158:23
 159:13 167:3,9
 174:18 179:23
 180:21 186:10
 192:10 198:22
 204:14 206:6
 215:18 220:14
 226:17 230:3,4,6
 230:17 231:11
 239:7,15 240:2
 245:3 247:19
 249:8 253:20
 254:12 263:20
 264:3,19 265:9,16
 265:20 270:14
 271:21 283:12
 288:8,9 291:23
 301:7,20 303:12
 311:22 312:16
 315:9 319:8,17
 322:15 323:21
 326:21,23 330:3
 336:21,25 350:16
 351:9 358:3 363:7
 375:19 376:2
 377:12 379:11,12
 379:16,17 380:3,7
 380:10,20
**seen** 158:16
**segment** 351:6
 354:17,22

**segment's** 359:13
**segments** 347:6
 357:3,25 358:13
**selected** 147:16
**sell** 163:8
**send** 215:21
**sense** 148:21
 213:18 231:2,19
 269:10 345:18
 355:18 361:19
**sensitivity** 326:19
**sent** 262:9
**sentence** 167:17
 183:6 226:19
 230:7,15 231:19
 257:4 259:19
 263:23 265:17
 266:18,24 272:4
 278:24 280:21
 287:17 291:11
 296:10 298:12,15
 298:16,18,20
 300:17 301:8
 344:12 350:14
 375:23
**sentiment** 303:18
**separated** 194:21
**separately** 340:7
 343:9,12 347:4,14
**sequentially** 213:6
**serious** 271:19
 285:23 286:24,25
 287:8 289:7
**served** 151:12
**serves** 184:9
**service** 239:12
**services** 360:2
 368:7 370:15
**set** 266:8 319:18
 319:20 325:9
 387:14

**sets** 267:9
**seven** 246:13
 277:5
**severe** 252:13
 299:6 322:4
**share** 214:22
 243:13 258:5,13
 322:14 332:20
 334:10,19 347:23
 348:15,18,22,24
 348:25,25 353:4
 355:22,23 356:23
**shares** 236:23
 350:7 355:19
**shattered** 238:12
**sheet** 392:1
**shortly** 263:5
**show** 166:14
 195:20 245:15
 246:14 266:21
 367:15
**showing** 245:7
 266:4 311:25
**shown** 155:6
 166:21 378:22
**shows** 300:23
 301:2
**shriver** 142:17
**side** 163:3,8
 236:16 266:17,17
 289:16,21 290:5,6
 299:10 303:17,18
 317:22 339:21
**sidelines** 292:3
**signature** 387:23
**significance**
 153:25 154:18
 162:13 283:14
**significant** 153:16
 154:14 157:18
 159:2,7 189:2

[significant - steven]                                                    Page 40

| | | | |
|---|---|---|---|
| 201:14,22 202:12 | soon  181:24 | spell  152:4 164:11 | statistically |
| 212:12 327:20 | 206:16 250:19 | spiked  184:15 | 153:15 154:14 |
| 328:6 | sooner  379:14 | spoke  148:6 | 157:18 159:2,7 |
| significantly | 383:17 | stable  301:13 | 189:2 201:13,22 |
| 245:23 292:16 | sophisticated | stage  367:16 | 202:12 212:12 |
| 299:8 | 278:7 | stale  200:12 | 327:20 328:6 |
| similar  266:18 | sorry  158:6 | stalled  249:14,15 | stay  268:3 |
| similarly  162:7 | 159:24 185:23 | 257:2 | stenographic |
| simmons  142:22 | 214:20 230:12 | start  158:7 181:24 | 145:25 |
| simplify  239:11 | 247:8 253:16 | 189:7 253:16 | stenographically |
| simply  359:8 | 254:3 270:20 | 316:20 353:21 | 387:12 |
| simultaneously | 271:13 287:14 | started  370:21 | steps  339:15 |
| 191:16 205:16 | 312:22 316:20 | starting  196:5 | steven  140:14 |
| 318:3,22 | 350:23,25 358:17 | 278:12 | 141:3 145:11 |
| single  157:11 | 364:15 | starts  167:4 179:3 | 146:1 147:1 148:1 |
| 171:22 203:11,23 | sort  168:9,9 202:7 | 207:14 233:5 | 149:1 150:1 151:1 |
| sit  207:20 208:15 | 219:17 | 257:25 | 152:1 153:1 154:1 |
| 209:2,8 | source  161:8 | state  179:11 207:5 | 155:1,4 156:1 |
| sixth  228:2 | 179:15,22 181:11 | 293:14 314:9 | 157:1 158:1 159:1 |
| skip  284:25 | sources  148:16 | 359:19 377:20 | 160:1 161:1 162:1 |
| skipped  230:22 | 163:25 | 380:14 391:13 | 163:1 164:1 165:1 |
| slow  318:14 | sparse  321:12 | stated  339:20 | 166:1 167:1 168:1 |
| slowly  348:9 | speak  198:5 | 342:25 343:13 | 169:1 170:1 171:1 |
| small  354:18,19 | 219:18 | statement  150:24 | 172:1 173:1 174:1 |
| smaller  334:3 | speaking  289:16 | 156:8 177:4 202:2 | 175:1 176:1 177:1 |
| snag  271:19 | 289:21 | 202:13,15,19 | 178:1 179:1 180:1 |
| snapshot  163:7 | speaks  298:25 | 205:15 221:3 | 181:1 182:1 183:1 |
| soft  276:6 | special  168:12 | 246:11 315:13 | 184:1 185:1 186:1 |
| sold  236:23 362:25 | specialist  144:8 | 376:12,14 | 187:1 188:1 189:1 |
| sole  370:25 | specialty  368:10 | statements  149:24 | 190:1 191:1 192:1 |
| solutions  141:6 | specific  188:9,17 | 149:25 150:15,16 | 193:1 194:1 195:1 |
| solved  345:21 | 188:22 189:22,25 | 157:9,9 163:23 | 196:1 197:1 198:1 |
| somewhat  236:6 | 190:9 194:23,25 | 198:18,21 199:3 | 199:1 200:1 201:1 |
| 292:9 326:21 | 210:3 219:20 | 199:16,23 200:18 | 202:1 203:1 204:1 |
| 327:15 332:8 | 313:12 349:13 | 201:5,5 | 205:1 206:1 207:1 |
| son  376:5 | 367:20 | states  140:1 322:9 | 208:1 209:1 210:1 |
| sons  280:24 | specifically  173:15 | 329:17 | 211:1 212:1 213:1 |
| 281:12 288:6 | 360:13 361:6 | statistical  153:23 | 214:1 215:1 216:1 |
| 293:20 312:4 | 363:16 | 153:25 154:17 | 217:1 218:1 219:1 |
| 379:15 380:2 | speed  208:25 | 189:17,20 | 220:1 221:1 222:1 |
| 382:23 | | | 223:1 224:1 225:1 |

**[steven - stunned]** Page 41

| | | | |
|---|---|---|---|
| 226:1 227:1 228:1 | 349:1 350:1 351:1 | 288:6,19 291:18 | 273:12 277:23 |
| 229:1 230:1 231:1 | 352:1 353:1 354:1 | 291:22 292:8,13 | 278:4,13,16,20 |
| 232:1 233:1 234:1 | 355:1 356:1 357:1 | 292:15,19,25 | 279:7,8 282:7,8 |
| 235:1 236:1 237:1 | 358:1 359:1 360:1 | 293:11,19,24 | 286:17 287:18 |
| 238:1 239:1 240:1 | 361:1 362:1 363:1 | 294:5,9,16,20 | 291:12 292:5 |
| 241:1 242:1 243:1 | 364:1 365:1 366:1 | 295:10 296:3,7,13 | 293:13 318:9,17 |
| 244:1 245:1 246:1 | 367:1 368:1 369:1 | 297:4,11,16 | 323:19 324:2,19 |
| 247:1 248:1 249:1 | 370:1 371:1 372:1 | 300:24 309:2,7,15 | 324:20,23 325:18 |
| 250:1 251:1 252:1 | 373:1 374:1 375:1 | 310:7,17 311:14 | 327:19 328:5 |
| 253:1 254:1 255:1 | 376:1 377:1 378:1 | 311:19 312:4,14 | 333:4,6 343:7,18 |
| 256:1 257:1 258:1 | 379:1 380:1 381:1 | 320:25 321:6 | 344:4 348:14 |
| 259:1 260:1 261:1 | 382:1 383:1 384:1 | 330:12,17 331:12 | 349:12 361:25 |
| 262:1 263:1 264:1 | 385:1 386:1 387:5 | 331:14 346:9 | 362:11 365:6,25 |
| 265:1 266:1 267:1 | 388:2 390:17 | 351:21 352:4 | 383:24 384:5,9,11 |
| 268:1 269:1 270:1 | 391:6 | 376:5,9 377:5,6 | 384:12 385:16 |
| 271:1 272:1 273:1 | **steves** 157:2 | 378:6 379:15 | **stop** 205:2 |
| 274:1 275:1 276:1 | 165:10 178:16 | 380:2 382:23 | **story** 242:22 |
| 277:1 278:1 279:1 | 181:16 199:3,17 | 384:16 | 271:18 272:19 |
| 280:1 281:1 282:1 | 200:21 220:13 | **stile** 363:18 365:12 | 273:2,17,18,19 |
| 283:1 284:1 285:1 | 221:7 234:16,22 | **stock** 149:17 151:2 | **street** 143:21 |
| 286:1 287:1 288:1 | 237:8,11,16,22 | 151:12 153:14,22 | **strike** 376:22 |
| 289:1 290:1 291:1 | 240:6,13,14,19 | 154:13 156:3,16 | 381:22 |
| 292:1 293:1 294:1 | 241:12,22,25 | 156:18 157:10,14 | **strong** 179:19 |
| 295:1 296:1 297:1 | 242:6 243:15 | 157:17 158:14,25 | **strongly** 308:8 |
| 298:1 299:1 300:1 | 245:10 248:9 | 159:6,24 160:6 | **stuck** 214:23 |
| 301:1 302:1 303:1 | 249:11,25 250:25 | 162:6,10 165:6 | **study** 153:13,23 |
| 304:1 305:1 306:1 | 251:7,15,19 | 186:6 189:2 | 154:12 188:8,16 |
| 307:1 308:1 309:1 | 253:11 254:21 | 191:23 194:13 | 188:21,25 189:5,8 |
| 310:1 311:1 312:1 | 255:7,14,18 | 196:17 201:7,9 | 189:18,19 190:7 |
| 313:1 314:1 315:1 | 256:21 257:11 | 202:3,12 203:25 | 190:13,17,19,25 |
| 316:1 317:1 318:1 | 258:21 259:4 | 204:18 205:6,10 | **stuff** 282:20 |
| 319:1 320:1 321:1 | 260:4,13,19 | 205:13,17 206:3,4 | **stun** 275:5,5 |
| 322:1 323:1 324:1 | 261:25 271:10 | 206:6 211:25 | **stunned** 220:9,18 |
| 325:1 326:1 327:1 | 273:13 274:6,13 | 212:19 216:13 | 221:4 222:12 |
| 328:1 329:1 330:1 | 274:23 275:8,13 | 217:6 228:3,23 | 224:10 225:9 |
| 331:1 332:1 333:1 | 276:21 277:8,12 | 229:8 230:21 | 236:3 237:7 |
| 334:1 335:1 336:1 | 277:21 278:2,9,22 | 231:10 232:19 | 241:21,25 250:10 |
| 337:1 338:1 339:1 | 279:14 280:24 | 245:20,22 246:23 | 250:25 254:20 |
| 340:1 341:1 342:1 | 281:6,10,12 | 247:2 260:24 | 255:7 260:13,19 |
| 343:1 344:1 345:1 | 283:21 284:6 | 263:17 264:9,12 | 260:22 274:12,23 |
| 346:1 347:1 348:1 | 285:20,25 286:5,6 | 264:23,25 272:12 | 275:8 279:14 |

[stunned - ten]                                                               Page 42

284:6 297:4
308:13 309:14
**stunning**  221:21
223:2 241:17
255:11 261:2
267:21 275:4
282:18 290:9
297:9
**subject**  374:18
**subscribed**  391:10
**subsequently**
200:10 325:11
334:5
**substantial**  189:12
197:14 205:23
352:13
**substantially**
338:16
**subtitle**  276:9
**subtracted**  194:25
195:3 334:11
339:14 347:22
349:14
**subtracting**
196:18 348:23
**succeeded**  290:17
**success**  164:25
181:8
**successful**  182:2,4
**successfully**
328:11
**suffer**  182:12
367:6
**suffered**  299:3
345:8
**suggest**  160:24
232:25 254:14
363:9
**suggests**  165:3
229:16 268:25

**suisse**  219:23
238:2,5 243:19,23
244:17 388:20,23
**suisse's**  245:6
**summary**  256:19
263:10
**suntrust**  252:10
252:16 389:2
**supplied**  321:11
346:10
**support**  160:2
220:17 224:9
317:12 349:25
368:14,19,20
370:8,12
**supports**  319:4
**supposes**  223:14
**sure**  152:13 154:5
155:18,19,22
173:7 175:21
180:4 183:14
205:9 225:6
250:18 254:7
302:19 311:23
313:8 314:18
316:2 319:22
344:2 347:13
360:3 364:25
369:9 372:17
**surprise**  194:7
222:23 241:10
245:8,15 260:2
266:4,21 352:22
354:20,24
**surprised**  216:13
217:15,19 222:11
246:14 300:23
327:14
**surprises**  351:5
**surprising**  223:3
241:18 261:2

269:14
**sustain**  342:23
356:17
**sustainable**  165:2
177:13 346:9,12
**sustained**  164:18
346:3
**svp**  290:17
**swayed**  236:16
**sworn**  146:8 387:6
391:10

**t**

**t**  146:7,7 189:20
190:13,20 387:1,1
388:9 391:1
**table**  277:17
**tact**  228:18
**tactful**  237:3
240:12
**take**  206:14,24
209:10 214:7
220:10 221:5
239:14,18 250:16
250:18 251:23
281:15 285:22
286:23 289:20
295:21 302:13
309:17 319:12,15
320:13 329:18
345:4 346:17,19
366:6
**takeaways**  248:8
**taken**  145:11
154:19 209:16
252:5 273:16
297:8 309:24
320:19 366:13
378:11 387:11
**takes**  319:5
**talk**  174:12 227:11
248:12 260:22

269:20 273:6
296:11 300:13
**talking**  153:5,7
231:13,14 248:25
260:16 261:19
266:25 293:8,11
297:16 322:18
339:9 372:22,24
**talks**  171:23 243:8
248:16 261:9
299:21 379:10,20
**target**  226:16,20
227:4 257:18,24
259:17 265:4,13
296:12
**targets**  162:5,6
219:7
**tax**  333:7 338:21
348:18 369:18
**taxes**  369:22
371:22
**team**  239:9
**technical**  214:21
**technician**  145:21
**teleconference**
141:5
**tell**  155:23 175:20
189:5,8,21,23
190:8,14 191:3
192:5 204:6,9
207:20 316:5,14
320:18,20
**telling**  208:25
**tells**  172:17 192:3
267:19
**temporally**  213:4
**temporary**  339:22
340:14,25
**ten**  157:11 224:17
246:12 295:18
314:10 315:7,12

315:14,24 316:4
319:15 320:2,4,6
372:18
**tenth** 316:14
**term** 148:10 149:3
165:20 194:12
199:13 241:2
242:11,13,18
244:22 292:6,10
345:21 346:14
**terminology**
153:12 165:17
**terms** 373:21,25
374:4 381:7
**test** 155:22 189:20
190:13,20
**testified** 366:18,24
367:14 373:17
**testify** 368:22
387:7
**testifying** 154:20
**testimony** 215:13
216:15 221:13
367:4
**thank** 188:3
209:12 247:9
309:19 358:20
366:8 385:19,21
386:2
**theory** 312:13
**therewith** 382:24
**thing** 231:2 384:25
385:2
**things** 152:11
156:9 182:22
186:22 193:10
201:10 207:7
208:25 219:17
228:15 234:25
274:20 308:7
325:13 377:2,2

**think** 147:6 152:9
152:19,20 158:4
159:25 161:6,16
162:2 165:23
167:20 170:14
171:6 174:2
180:16 183:12
184:4,5 190:15
196:22 198:5
200:2,4,24 204:23
204:25 209:4
214:10 221:19
225:3 231:17
232:5,7,9,10,23
247:6 249:24
250:15 261:21
262:3 268:5 269:7
272:16 273:7,24
278:5 279:4,10
288:22 298:7
300:2 306:3 310:9
313:5 318:25
321:16,19,24
329:17 345:18
356:9 362:24
366:21 367:13
382:18 385:9
**thinking** 155:8
163:7 220:3
334:14
**thinks** 239:17
258:8
**third** 167:5 169:14
194:7 228:8,9
229:22 233:4
240:22 244:19
248:19 257:20
265:12 300:5
303:8 336:3
375:23

**thought** 223:12
270:22 356:4
374:11
**thoughts** 278:12
**three** 293:15
323:18 373:2,5
**threshold** 153:24
162:12
**tie** 173:9
**tied** 343:22
**time** 145:7,8 146:3
147:20 164:20
200:8,9 204:20
208:19 209:13,18
209:19 215:3,8
228:2 239:14,18
250:16 252:2,7
292:8 301:9
302:12 309:21
310:2 319:7
320:24 321:4,18
324:4,7,12 325:24
327:4 335:16
336:15 340:18
357:20 366:9,15
371:13 373:10
385:22 387:13
**times** 200:10
341:17 373:12,16
**timing** 241:15
**tip** 332:9
**title** 238:11 247:19
249:7 252:13
255:24 259:17
270:4 276:4,8
280:5
**titled** 225:20
284:20 288:6
290:15 312:3
**today** 145:6,21
146:14,17 148:4,7

153:3 198:10
271:17 272:18
375:16
**today's** 324:18
**told** 232:11 299:14
**tomorrow** 230:21
231:11 291:13
**tools** 191:16
194:18
**topic** 296:21
**topline** 233:9,14
233:17 280:15
**total** 193:3 194:22
194:22 330:23
347:21 348:24
**totally** 176:15
**towanda** 285:24
287:2 288:11
300:4,14 301:25
303:6
**towanda's** 263:12
288:7
**trading** 201:20
210:5
**transact** 199:11
**transcript** 214:8
214:13 305:25
387:11 388:13
391:3
**transition** 222:17
**transitory** 164:20
193:21 227:22,24
228:10 229:4,14
229:18 230:5
340:21 341:19
342:5,8
**transparency**
175:22
**treat** 173:12
175:25

[treated - value]                                                           Page 44

| | | | |
|---|---|---|---|
| **treated**  174:5 | **turning**  306:22 | 352:6 | **unusual**  169:8 |
| 210:19 211:21 | **twice**  366:25 | **underperformed** | **updated**  172:2 |
| 343:9 | **two**  147:6,9 | 279:7 | 173:22 271:6 |
| **treatment**  210:19 | 174:25 185:12 | **understand** | 280:23 |
| 211:7 | 201:21 203:22 | 151:22 152:16 | **updates**  341:17 |
| **trebled**  310:21 | 204:15 205:7 | 153:6 159:25 | **upset**  236:17 |
| 311:12 | 224:25 225:2 | 165:15,22 166:12 | **upsetting**  236:7 |
| **tripling**  331:13 | 306:16 325:13 | 167:16 171:17,20 | **upside**  379:10,13 |
| **trouble**  160:13 | 337:19 345:6 | 171:25 184:6 | 381:6,8 382:2,6 |
| 169:20 | 349:14 353:14 | 228:13,19,21 | 383:10,15 384:14 |
| **troubles**  284:22 | 370:22 373:2 | 236:5 286:4 | **upward**  184:15 |
| **true**  181:11 186:3 | **type**  222:3 282:21 | 294:19 360:12 | **use**  148:10 165:16 |
| 186:15 187:13,23 | 350:9 362:22 | 362:15 374:22 | 165:20 192:16 |
| 202:13 237:20 | 363:4,4 | **understandable** | 218:24 242:4 |
| 323:5 339:13 | **types**  181:9 360:16 | 236:9 | 251:3 260:21 |
| 374:23 375:3 | 362:16 364:21 | **understanding** | 262:5 319:6 |
| 387:10 | 365:19,20,24 | 321:18 327:24 | 349:11 357:8 |
| **truly**  211:9 | **typically**  354:23 | **understood** | **uses**  266:16 |
| **truth**  324:5 387:7 | | 170:15 235:15 | **usual**  370:20 |
| 387:7,8 | **u** | 333:21 371:24 | **usually**  373:24 |
| **truthful**  146:14 | **u**  391:1 | **undertake**  314:10 | **v** |
| **try**  283:17 | **u.s.**  145:14 | 315:7 | **v**  146:7 |
| **trying**  168:15 | **ultimate**  299:5 | **undertaken**  190:3 | **valuation**  149:23 |
| 171:20,25 236:12 | 321:21 337:12 | **unexpected** | 160:9,16 164:14 |
| 236:14 283:11,13 | **ultimately**  217:23 | 193:20 204:11 | 175:5 177:12 |
| 289:13 | 218:14 324:5 | 222:23 282:23 | 191:6 193:22 |
| **turn**  155:10 | 328:14 | 283:2 | 194:5,17 199:9,24 |
| 209:21 215:16 | **unable**  235:14 | **unfavorable** | 219:5 259:22 |
| 218:10 219:24 | 268:14 | 230:19 231:8 | 265:20,22 277:22 |
| 220:21 224:12 | **unanimity**  161:25 | 259:21 261:6,8,9 | 278:3 322:14 |
| 259:15 265:11 | **uncertain**  219:16 | 261:11,13,16 | 328:2 329:18 |
| 288:5 300:8 | **uncertainty** | 265:18 | 338:7 340:10,25 |
| 303:10 304:18 | 240:11 241:5 | **unit**  145:9 | 341:4,6 343:12 |
| 332:18 338:22 | 242:21 245:2 | **united**  140:1 | 344:13 346:23 |
| 343:24 347:16 | 291:18,21 292:7 | **unknowns**  235:12 | 348:18 349:22 |
| **turnabout**  241:12 | 292:13,15 293:5 | **unrelated**  189:11 | 350:6,10,12 |
| 245:10 260:3 | 294:16 295:10 | **unsustainable** | 352:13 378:15 |
| **turnaround**  290:8 | 296:13 | 179:17,22 181:11 | **valuations**  160:21 |
| 290:9 | **underlying**  291:11 | 250:6 273:4 | **value**  192:22 |
| **turned**  320:14 | 313:16 336:5 | 356:17 383:2 | 193:2 194:18 |
| 324:5 | **underperformance** | | 196:19 312:24 |
| | 344:23 346:24 | | |

[value - windows]                                                    Page 45

313:5 333:7
334:20 338:3,8
347:10 350:2
**valued** 156:14
347:4
**valuing** 161:9
**varies** 369:13
371:20
**variety** 148:15
181:9
**various** 362:16
**verbatim** 216:17
**verdict** 200:21
311:15 312:4,14
314:2 329:13
330:7 334:24
337:4
**veritext** 141:6
145:23
**versed** 363:20
**versus** 192:10
**video** 144:7
145:10,21
**videoconference**
140:15
**videographer**
145:1 209:12,13
209:17 215:3,7
251:25 252:2,6
309:19,20,25
366:8,9,14 384:20
385:21
**videotape** 140:13
141:3
**view** 227:20
229:12 230:11
253:10,24 256:20
263:25 272:23
291:16 301:9
323:19 324:22
325:17 375:22

378:3 381:25
**viewed** 229:17
340:13
**views** 378:14
**vigorously** 297:20
298:2,21 299:15
**violated** 180:2
183:3
**violation** 310:22
311:13 313:17
336:6
**virginia** 140:2
143:22 145:16
**virtually** 141:4
146:23 324:12
**volatility** 154:6
155:21 212:14
**volume** 140:12
160:14 231:3,20
252:14

---
**w**
---

**wait** 257:22
332:24,24
**walking** 255:24
**want** 153:2,8
155:17 171:18
182:20 204:4,21
211:6 228:15
256:8 266:7
302:13,14 305:14
314:17 339:8
350:14 360:2
375:14 377:7
378:20 379:7
380:17
**wanted** 350:21
375:20
**warning** 168:8
172:14 222:3,10
252:13 335:15

**warrant** 222:18
**warranting**
222:10
**way** 149:15 151:5
151:8 159:7 172:9
174:3 175:24
188:14 196:5
199:21 234:9
240:12 257:23
272:17 295:14
347:3,13,14
368:25 381:13
**ways** 149:9 151:13
155:23 156:24
163:20 345:7
**we've** 215:4 339:9
**weakness** 263:17
264:9
**week** 326:16
329:12 338:5
**weigh** 249:8
**weight** 295:3
**weiss** 143:11
**wells** 270:2,8
272:11 389:10
**wen** 140:6 143:3
145:12 154:13
160:9,16 163:13
166:19 219:11
220:9 221:3
224:18 225:19,24
229:10 234:21
235:4 236:22
237:12 238:3
239:18 244:5
247:11 249:19
251:8 252:11,16
253:15,17 254:9
254:15 255:23
259:3,9 262:13
265:6 270:3,5

275:19,24 276:17
279:19 290:15
300:14 302:24
310:5 311:18
312:2,3,7 314:3
316:8 328:20
330:24 331:23
334:22 336:10
344:21 360:6
362:15 363:11,17
363:21 378:15,25
388:18 389:3,15
390:4,18
**wen's** 153:14
160:25 165:8
211:25 217:23
218:14,21 231:3
271:17 277:22
278:3,13 284:22
286:17 287:18
299:22 318:8,16
330:6 333:4
344:24 357:25
358:13,25
**went** 242:25
318:25 321:18
338:25
**west** 142:7
**whatsoever**
178:16 181:16
**white** 182:10
184:4 289:14
**widely** 369:13
371:20
**wind** 273:16
**window** 232:6
234:10,11 345:13
**windows** 177:24
194:16 222:19
225:20 227:21
229:13,17 231:4

**[windows - zoom]**                                                    Page 46

231:15,21 232:4
232:15 234:6,7
257:7,19 258:5
316:2 342:9
356:25 357:24
358:12 359:17,25
359:25 361:11
**wisconsin**  142:4
**wish**  183:16 392:1
**wishes**  183:14
**witness**  178:22
208:5 268:8,11,13
268:16 290:23
298:17 302:19
379:24 388:2
**wondering**  208:17
208:18 213:10
**wood**  345:13
**woods**  143:20
**word**  179:3 216:17
216:17 219:13
230:23 232:7
243:3 260:21
336:25 337:3
345:5 346:18,20
**words**  179:4 186:9
218:24 242:4
251:3 262:5
325:20,21 375:22
**work**  150:10,17
161:24 189:17
190:20 198:21
228:13,14 332:6
357:7 368:3,13
370:7,11 371:5,6
371:17 372:11
**worked**  374:5
**working**  239:9
351:23 354:5,7
373:9

**world**  149:5 316:6
**worse**  380:10,15
382:24
**worst**  322:9
**worth**  329:23
333:11,14
**write**  228:22
287:13
**writing**  213:7,8,16
222:5,6 255:12
287:10 293:25
**written**  286:10
348:11
**wrong**  183:16,18
363:10
**wrote**  170:23
171:2 174:2
188:19 223:19
246:19,20 266:10
266:10 305:22
318:6 325:16,17
**wyman**  142:12
147:2 372:9

**x**

**x**  140:5,10 388:1,9
**xi01165**  141:8

**y**

**yardstick**  319:8
320:11,13
**yeah**  154:16
196:24 205:24
225:6 238:9
249:18 272:6
301:19 311:15
**year**  169:24 172:2
173:22 180:21
230:8 271:6,19
272:3,3 280:18
341:16 352:14
369:11,13,14,20

369:22 370:22
371:17,21 373:2,6
**years**  301:14
368:13 370:22
372:25
**yesterday**  147:7
147:13 295:7,20
299:18
**york**  142:19,20,20
143:9,9 145:23

**z**

**zero**  207:25
315:22 355:6,7
**zoom**  140:15
141:5 146:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.