# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

---------------------------------x

IN RE: JELD-WEN HOLDING, INC.

SECURITIES LITIGATION

Civil Action No.:

3:20-cv-00112-JAG

---------------------------------x

February 5, 2021

9:59 a.m.

VIDEOTAPED REMOTE DEPOSITION of JASON STEPHEN FLEMMONS, held at the above-mentioned date and time, before Judith Castore, a Certified Livenote Reporter and Notary Public of the State of New York.

Page 2

A P P E A R A N C E S

(ALL PARTIES APPEARED VIA ZOOM VIDEOCONFERENCE)

COUNSEL FOR THE PLUMBERS AND PIPEFITTERS
NATIONAL PENSION FUN AND WISCONSIN LABORERS'
PENSION AND THE PROPOSED CLASS:

ROBBINS GELLER RUDMAN & DOWD, LLP
655 West Broadway
San Diego, California 92101
BY:    DEBRA WYMAN, ESQ.
       debraw@rgrdlaw.com
       ROBERT ROTHMAN, ESQ.
       rrothman@rgrdlaw.com
       JOHN RIGBY, ESQ.
       jrigby@rgrdlaw.com
       FRANCIS P. KARAM, ESQ.
       fkaram@rgrdlaw.com

ON BEHALF OF DEFENDANT - Onex Corporation
FRIED FRANK HARRIS
SHRIVER & JACOBSON, LLP
One New York Plaza
New York, New York 10004
BY:    PETER L. SIMMONS, ESQ.
       peter.simmons@friedfrank.com
       COREY BARON, ESQ.
       corey.simmons@friedfrank.com

Page 3

A P P E A R A N C E S (cont'd)

ON BEHALF OF DEFENDANTS JELD-WEN HOLDING, INC.,
MARK A. BECK, L. BROOKS MALLARD, KIRK S.
HACHIGIAN, AND GARY S. MICHEL:
        KIRKLAND & ELLIS, LLP
        601 Lexington Avenue
        New York, New York 10022
        BY:   RACHEL FRITZLER, ESQ.
              rachel.fritzler@kirkland.com
              HANNAH GEIS, ESQ.
              hannah.geis@kirkland.com
              JENNY LEE, ESQ.
              jenny.lee@kirkland.com

ON BEHALF OF DEFENDANTS JELD-WEN HOLDING, INC.,
MARK A. BECK, L. BROOKS MALLARD, KIRK S.
HACHIGIAN, AND GARY S. MICHEL:
        MCGUIRE WOODS, LLP
        800 East Canal Street
        Richmond, Virginia 23219
        BY:   BRIAN D. SCHMALZBACH, ESQ.
              bschmalzbach@mcguirewoods.com

ALSO PRESENT:

        CHRIS HANLON, Legal Video Specialist
        Veritext Legal Solutions

**Page 4**

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except to the form of the question, shall be reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the court.

* * * *

Page 5

FLEMMONS

VIDEOGRAPHER:  Good morning. We are going on the record.

The date today is February 5, 2021, and the time is 9:59 a.m. Eastern time.  This is Media Unit No. 1 of the video-recorded -- hold on one second, sorry.  Just letting someone in.

This is Media Unit No. 1 of the video-recorded deposition of Mr. Jason S. Flemmons taken in the matter of In re Jeld-Wen Securities litigation.  This is filed in the U.S. District Court for the Eastern District of Virginia, Richmond division.

This is Case No. 3:20-CV-00112-JAG.  This deposition is being held remotely in multiple locations.

My name is Christopher Hanlon.  I'm the video technician today.  Our court reporter is Judy Castore.  And we're with Veritext

Page 6

FLEMMONS

New York.

At this time I would ask counsel to please state your appearances for the record, starting with the noticing attorney, please.

MS. WYMAN:  Debra Wyman of Robbins Geller Rudman & Dowd for plaintiffs and the proposed class. And with me is John Rigby from my office in San Diego.

VIDEOGRAPHER:  If we could try and go down the line, that would be great.

MR. ROTHMAN:  Also on behalf of plaintiff is Robert Rothman from Robbins Geller Rudman & Dowd. Again, on behalf of the lead plaintiffs and the punitive class.

MR. SIMMONS:  Peter Simmons and Corey Baron from Fried Frank on behalf of the Onex defendants.

MS. FRITZLER:  Rachel Fritzler from Kirkland & Ellis on

Page 7

FLEMMONS

behalf of defendant Jeld-Wen, Mark Beck, Kirk Hachigian, Brooks Mallard, Gary Michel.  And with me I have my colleagues Jenny Lee and Hannah Geis.

MR. SCHMALZBACH:  And Brian Schmalzbach of McGuire Woods LLP, also for the Jeld-Wen defendants.

VIDEOGRAPHER:  Thank you all very much.

At this time I would ask our court reporter to please administer the oath and we can proceed.

J-A-S-O-N  S-T-E-P-H-E-N  F-L-E-M-M-O-N-S,

Having been duly sworn by a Notary Public within and for the State of New York, stated an address as 2000 K Street, Washington DC 20006, was examined and testified as follows:

EXAMINATION BY MS. WYMAN:

Q    Good morning, Mr. Flemmons.

A    Good morning.

Q    I think that you have had your deposition taken before because

Page 8

FLEMMONS

you and I experienced that in the

American Realty case; is that right?

     A    That's correct.  And I had

not put two and two together until I

saw your face on this video.

     Q    So I'm going to dispense with

the rule statements, but I think that

because we're in kind of a unique

virtual platform that it's even more

important for you and I to try to not

interrupt each other so that our court

reporter can get a nice clear record.

          So I will try very hard not

to interrupt your answer, if you

promise to try very hard not to

interrupt my questions.

     A    I will do my best as well.

     Q    Okay.  And because everyone

is remote, where are you actually

taking the deposition today?

     A    I'm in my office in

Washington, DC.

     Q    And is there anyone else

present in the room with you?

Page 9

FLEMMONS

A    No.

Q    Okay.  Did you do anything to prepare for your deposition today?

A    I did.

Q    What did you do?

A    Well, on the days leading up to this deposition, I have reviewed my report that I submitted on Monday various times.  I have also reviewed selected materials that I cited in my report.  And I had a couple of meetings with counsel at Kirkland & Ellis.

Q    And how many meetings did you have with Kirkland?

A    I believe two.

Q    And when was the most recent of those meetings?

A    Yesterday.

Q    And how long did that meeting last?

A    Just under three hours; maybe two and a half hours.

Q    And besides yourself who participated in that meeting?

Page 10

FLEMMONS

A    Well, there were several folks from Kirkland & Ellis including Rachel Fritzler, Hannah Geis and Jenny Lee, and also one of my colleagues that worked with me on this matter, Sara Shaner.

Q    And is Ms. Shaner someone that's on your staff?

A    She is.

Q    Were there any other people besides those folks from Kirkland and Ms. Shaner from your staff that participate in the meeting yesterday?

A    I don't believe so.

Q    Okay.  And then I think you said there was another meeting.  When did that one occur?

A    I believe that was on Monday of this week.

Q    And were the same participants involved in that meetings that you just described for the meeting yesterday?

A    Yes.

FLEMMONS

Q    And approximately how long did you guys meet on Monday?

A    It was around the same amount of time; two and a half to three hours.

Q    Okay.  And I think you mentioned that in preparation for your deposition that you reviewed your report and materials that you had relied on or cited in your report; is that right?

A    I reviewed my report and reviewed selected materials that I had cited for -- were listed in my Documents Considered exhibit.

Q    Did you look at any documents or other materials that were not listed in your Documents Considered exhibit in your report?

A    There may have been an additional document that we went over with Kirkland.  It's the only one that comes to mind.

Q    And what document was that?

A    I believe it was an analyst

Page 12

FLEMMONS

report that I had not relied on or considered as part of my report.

Q    And do you remember which analyst report that is?

A    I think it was a Wells Fargo analyst report.

Q    And do you remember approximately what the date of that report was?

A    I believe it was sometime in 2018, but I don't remember the exact date.

Q    Do you know if it was after October 15, 2018?

A    I believe it was well before that.

Q    Okay.  And in reviewing the Wells Fargo report that you just described, has it impacted your opinions that you have provided in the report that you gave to plaintiffs?

A    Not whatsoever.

Q    So let's mark as -- I'm going to --

Page 13

FLEMMONS

MS. WYMAN:  Rachel, if it's okay with you, I'm going to start marking Plaintiff's Exhibit 1 and not call it Flemmons 1.  I would rather just do a chronological across depos, if that's acceptable.

MS. FRITZLER:  That's fine with me.

MS. WYMAN:  Okay.  So we're going to mark as Plaintiff's Exhibit 1 the expert report of Jason S. Flemmons, CPA, CFE, CFF, in Opposition to the Expert Report of Steven P. Feinstein, Ph.D., CFA dated, February 1, 2021.

And hopefully it will show up in the exhibit folder and we'll be off to the races here.

(Expert Report of Jason S. Flemmons, CPA, CFE, CFF, in Opposition to the Expert Report of Steven P. Feinstein, Ph.D., CFA, February 1, 2021, was marked

Page 14

FLEMMONS

Flemmons Exhibit 1, for identification, as of this date.)

Q    So I'm told that the document should be in your Marked Exhibit folder.  So if you click on that, it should be there and you can open it.

A    Yes, it's working for me.  And I should also just for the record make sure it's clear I do have a hard copy of my report with me.

Q    You anticipated my next question.  Your counsel did tell me that you were going to have a hard copy of your report for use in the deposition, which I understand is a little more convenient than trying to manage the screens.  I just need to ask you if you have made any notations or -- of any kind on the copy of the report that you are using?

A    No.

Q    Okay.  So there is no highlighting or tabs or anything like that?

Page 15

FLEMMONS

A    No.

Q    And it's the same version of the report that was produced to plaintiffs on February 1; is that right?

A    Yes.

Q    Okay.  Now looking at Exhibit 1, which is your report, if you turn to page 34, do you see your signature?

A    Yes.

Q    And are all the opinions you have formed in this case contained within your report that we've marked at Exhibit 1?

A    Yes.

Q    And if you would please turn to page 4 of your report, you see toward the bottom of the page there is a header that says Summary of Opinions?

A    Yes.

Q    And paragraphs 13 and 14 under that header, are those the -- your summary of the two opinions that

Page 16

FLEMMONS

you are providing in this case?

A    Yes.   They are summaries, and just add a little additional color on the nature of the opinions, but the actual opinions themselves are listed in the bold A and bold B under the Summary of Opinion section.

Q    Okay.  Have you been asked to form any new opinions since you issued your report?

A    I have not.

Q    Have your opinions changed as a result of any new information that you have received since you issued your report?

A    No.

Q    And did you draft your report?

A    Yes, and I also had assistance.

Q    And from whom did you have assistance?

A    Mostly with one of my colleagues; Sara Shaner, who I

Page 17

FLEMMONS

mentioned earlier who assisted with drafting certain portions.  We work closely together in putting together the report.

Q    And which portions of the report was Ms. Shaner primarily involved in drafting?

A    I don't believe there was any specific portion that was really assigned.  It was very sporadic.  And again, we were working very closely in drafting it together.

So to the extent that she keystroked the words into the Word document, I would have been involved in reviewing and approving anything that went into the report.

Q    Did you receive any input from counsel for Jeld-Wen to your report before it was provided to plaintiffs?

A    Kirkland & Ellis did review the report.

Q    And who from Kirkland & Ellis

FLEMMONS

reviewed the report, do you know?

    A    I don't know who specifically.  I would imagine that three individuals that I mentioned before that attended my -- the meetings that I described would have reviewed it.  Beyond that, I don't know.

    Q    Did the Kirkland lawyers provide you any input to your report?

    A    We discussed the report a number of times, and they certainly provided some suggestions and some input that I either accepted or rejected.

    Q    If you would please turn to Exhibit 2 of your report.

        Are you there?

    A    I am.  And it just dawned on me, I should add there was someone other individual that joined the meeting from Kirkland yesterday.  Her name is Lindsey Harris Weiss [sic].

    Q    Okay.  Thank you.

        If, during the course of the

FLEMMONS

deposition, you need to amend any

answers, something comes to mind, just

mention it like you did just now.

That's fine.  Thank you.

A     Sure.

Q     So you are on Exhibit 2.

This is your Documents Material and

Data Considered listing; is that right?

A     Yes.

Q     And how did you determine

what you needed to consider to form the

opinions in this case?

A     Well, as a combination of

things, I think one of the categories

of materials were items that were cited

in the amended complaint.

Another category of items

were documents that were cited by

Mr. Feinstein in his report.

And then thirdly there were

documents that, just based on my

expertise on the subject matter, that I

knew that we would need to refer to,

including the accounting standards and

Page 20

FLEMMONS

the relevant filings made with the SEC by Jeld-Wen.

Q    Were you asked to make any assumptions in forming your opinions?

A    No, I wasn't asked to make assumptions.

Q    Did you make any assumptions in forming your opinions?

A    I mean, the only assumption I could think of would be the materials that were provided to me or that I considered as part of my report were true and accurate documents.

Q    By "true and accurate documents," do you mean that they are true and accurate copies of the SEC filings that were made by Jeld-Wen at whatever particular time?

A    Yes, but also that the contents were true and accurate.

Q    And why did you make the assumption that the contents of the documents that you considered were true and accurate?

Page 21

FLEMMONS

A    I had no reason to not assume that those were true and accurate documents.

Q    Was that a necessary assumption for you to do the analysis that you did in forming your opinions?

A    I don't know how else I would go about in forming my opinions if I did not assume that the documents that I was considering were true and accurate.

Q    Did you do anything to investigate whether or not the content of the documents that you were reviewing were true and accurate?

A    I don't believe that we performed any kind of investigation in this matter.

Q    And as part of your process in forming your opinions, did you talk to any present or former employee of Jeld-Wen?

A    No.

Q    And in -- as part of your

FLEMMONS

process of in forming your opinions in this case, did you talk to any present or former employee of Jeld-Wen's external auditor, which I think was PricewaterhouseCoopers?

    A    I did not.

    Q    So you conducted no interviews or -- of any kind to help you form your opinions in this case; is that right?

    A    That's correct.

    Q    Did you review any kind of interview memoranda that purported to record and interview with any particular person as part of the process of forming your opinions in this days?

    A    I don't believe so.  The only thing that would come remotely close to that would be the earnings call transcripts, and I think that's outside of what you are asking.

    Q    So every source of information that you considered is

Page 23

FLEMMONS

listed on your Exhibit 2; is that right?

        A    That's correct.

        Q    Okay.  If you would please turn to Exhibit 1 to your report, which I think is your CV.

             Are you there?

        A    I am.

        Q    Okay.  And on the first Exhibit 1 is your current CV; is that right?

        A    Yes, I believe so.

        Q    And are there any additions that need to be made to it since Monday when you provided the report to plaintiffs?

        A    No, I don't believe so.

        Q    Okay.  On the first page of your CV, it lists your education as a BBA of accounting from the college of William and Mary; is that right?

        A    That's correct.

        Q    What year did you graduate?

        A    I'm sorry, there was some

Page 24

FLEMMONS

interference on the --

Q    I'm sorry.  That was me.  I what flipping a page.

What year did you get your degree?

A    1994.

Q    And you have no postgraduate degrees; is that right?

A    That's correct.

Q    And it also lists on your CV that you are a certified public accountant.

A    Yes.

Q    When did you become a CPA?

A    I don't remember the exact year, but it was shortly after graduating from William and Mary.

Q    So somewhere roughly around the middle of the 1990s, right?

A    Yes.

Q    And in what jurisdiction are you a CPA?

A    Virginia.

Q    Any other states?

Page 25

FLEMMONS

A    I don't believe so.

Q    And is your CPA active and in good standing currently?

A    Yes.

Q    And so you don't have a degree in finance, right?

A    I do not.

Q    And you don't have a degree in economics?

A    No.

Q    No degree in statistics, right?

A    Correct.

Q    And it doesn't look like you are a chartered financial analyst, at least from your CV.

You are not a chartered financial analyst, are you?

A    No, I am not.

Q    And you don't have any experience working as an economist?

A    No.

Q    And you have no experience working as a financial analyst, right?

Page 26

FLEMMONS

A     Yeah.  As I said, I am not a CFA, so no.

Q     And you don't have any experience working as a market analyst, do you?

A     I do not.

Q     Do you know what Cammer factors are?

A     Can you repeat the question?

Q     Sure.  Do you know what Cammer factors are?  C-A-M-M-E-R.

A     I do not.

Q     So then would I be correct in understanding that you don't have any experience evaluating Cammer factors as a part of a market efficiency analysis in a securities fraud action?

A     I do not.

Q     Do you know what Krogman factors are?

A     No.

Q     And would I also be correct in understanding that you don't have any experience evaluating Krogman

Page 27

FLEMMONS

factors as part of a market efficiency analysis in a securities fraud action?

A    I do not.

Q    And you don't have any experience conducting statistical analysis examining the empirical behavior of a stock or bond of a company in a securities fraud class action, do you?

A    No, I do not.

Q    Do you know what an event study is as it relates to the analysis of market efficiency in the securities fraud class action?

A    Yes, I am familiar with the term.

Q    What's your understanding of what an event study is in the context that I asked you about?

A    Well, generally speaking, my understanding is that an event study takes a look at events that are occurring after a certain -- a certain event, and seeking to ascertain whether

Page 28

FLEMMONS

the initiating event caused certain -- or had certain effects on the market shortly thereafter.

Q    Have you ever conducted an event study for the purpose of testing whether a security was traded in an efficient market?

A    I have not performed one, but I have certainly worked on engagements where colleagues at my firm or other firms have done just that.  So I'm familiar with what it entails, but I have never done one myself.

Q    Okay.  Do you have an understanding of what confounding information is as it relates to an event study analysis in a securities fraud class action?

        MS. FRITZLER:  Objection to form.

A    Could you repeat that again, please.

Q    Sure.

        Do you have an understanding

FLEMMONS

of what confounding information is as it relates to an event study analysis in a securities fraud class action?

A    I'm not familiar with the phrase confounding information in this context.

Q    Okay.  And am I correct that you have no expertise conducting statistical analysis examining the empirical behavior of a stock price of a company in a securities fraud class action?

A    I have not performed such statistical analyses.

Q    And you have no experience evaluating damages in a securities fraud class action, right?

A    I don't believe I have performed or quantified damages in that context.

Q    And you, therefore, have no expertise in evaluating damages in a securities fraud class action, correct?

MS. FRITZLER:  Objection to

Page 30

FLEMMONS

form.

A      I hesitate only because that's a very broad question.  I think there are certain types of damages that I either have been involved in quantifying; for example, profit disgorgement and those kinds of things that could be part of a securities litigation.

With that qualification, I don't -- I have not done, as I said before, any kinds of event studies or the like related to damages in securities cases.

Q      And, therefore, you have no experience calculating damages in a securities fraud class action.

And by "damages," I mean damages to investors from their investment in the particular security at issue.

A      I don't believe so.

Q      Okay.  And then you have no expertise in that area either, right?

FLEMMONS

MS. FRITZLER:  Objection to form.

A    Can you clarify what you mean by "that area"?

Q    Sure.

You don't have any expertise in calculating damages in a securities fraud class action?

And by "damages," I mean damages to investors from their investment in the particular security at issue.

MS. FRITZLER:  Same objection.

A    If you are referring, again, to event studies, as I said before, I have not performed those kinds of event studies to evaluate damages.

Q    Okay.  And you have no experience evaluating loss causation in a securities fraud class action, right?

A    I'm not sure.  I'm not -- I have heard that phrase before.  I'm not sure if any of my work in the past

Page 32

FLEMMONS

would have been used in connection with loss causation.

I've never opined specifically on loss causation. But it seems like a broad area and question, so I'm just not sure.

Q    Do you have an understanding of what "loss causation" in the context of the securities fraud class action is?

A    I'm not a lawyer, so I am not sure that I could define that.

Q    Do you know what it is from an economic perspective?

A    I do not.

Q    Okay. And I apologize if you included this in one of your answers before, but just so that we're clear.

Is it my understanding -- is my understanding correct that you've never offered an expert opinion on whether a market for a given security was efficient in a securities fraud class action?

Page 33

FLEMMONS

A    I don't believe I have.

Q    Okay.  And you have never

offer an expert opinion about what the

correct measure of damages is in a

securities fraud class action, right?

A    I don't believe so.

Q    And you have never offered an

expert opinion reflecting financial or

statistical analysis about whether the

price of a company's stock was inflated

by defendant's misrepresentation or

omission to the market, correct?

A    I don't believe so.

Q    Okay.  If you would please

turn to paragraph 21 in your report,

which is on page 8.

Are you at paragraph 21?

A    Yes.

Q    And in this paragraph, you

state -- the last sentence of the

paragraph, you say:  ASC 450 governs

the required accounting treatment of

loss contingencies under GAAP,

including litigation contingencies.

Page 34

FLEMMONS

Did I read that right?

A    Yes.

Q    And what is ASC 450?

A    ASC 450 refers to the accounting standards codification, which is the specific provision ASC 450 under GAAP that pertains to loss contingencies.

Q    I'm going to, in a moment, pull up Exhibit 2, which should show up in your folder in a second.

Exhibit 2 is a copy of ASC 450.

(ASC 450, was marked Flemmons Exhibit 2, for identification, as of this date.)

A    I have it.

Q    It should be there.

Okay.  Great.  So have you been able to open up Exhibit 2?

A    Yes.

Q    And if you need to take a minute to look it over, it's rather long.  But does this appear to be a

Page 35

FLEMMONS

printout of ASC 450 as you have described?

A    I believe it is.

Q    And if you would please turn to paragraph 24 of your report, which I think is on the same page.

In paragraph 24, you articulate with ASC 450 requires before a company recognizes it as a loss contingency, right?

A    Yes, by outline in paragraph 24, excerpts from ASC 450, and specifically the two primary conditions for recognizing a loss contingency.

Q    And the first primary condition that you outline in paragraph 24 is that it is, quote: Probable that future events will confirm that a loss has been incurred.

Is that the first condition?

A    That's the first one that I listed in paragraph 24.

Q    Okay.  And if you turn the

Page 36

FLEMMONS

page of your report to page 9 and look at footnote 7 -- 17, pardon me.

In that footnote, you GAAP's definition of "probable," right?

A    Correct.

Q    And in that footnote, you define GAAP.  You say:  GAAP defines probable as, quote, the future event or events are likely to occur, unquote.

Is that GAAP's definition of probable?

A    Yes.

Q    And in that same footnote, you go on to say that, while GAAP doesn't define likely that, quote:  In my experience, the SEC and the accounting professional typically consider the incurrence of a loss to be likely if, based on an assessment of relevant facts and the expected resolution of future events, there is at least a 75 percent probability that a liability has been incurred.

Correct?

Page 37

FLEMMONS

A    Yes.

Q    Okay.  That's your understanding of what "likely" means under GAAP, based on your experience as an accountant, right?

A    That's correct.

Q    And going back to paragraph 24, the second condition you outline is that such a loss is, quote, reasonably estimable, end quote.

Correct?

A    Yes.

Q    And sorry to keep making you flip.  But if you go paragraph 25, which is on page 9 of your report, there you describe that GAAP requires a company to recognize a, quote:  Best estimate or range based on available information to arrive at this reasonably estimable determination. Right?

MS. FRITZLER:  Objection to form.

A    Yes.  Specifically, in my

FLEMMONS

report, I do say that GAAP requires companies to recognize the best estimate.  And if no amount within a range is better than any other amount, GAAP requires recognition of the lowest amount in the range.

Q    Okay.  So GAAP requires an estimate to either be a certain number or a range of numbers; is that right?

MS. FRITZLER:  Objection to form.

A    Well, to be clear, you used the word "certain number."  And by definition, ASC 450 and the assessment of loss contingencies are estimates. And it inherently subsumes the concept of uncertainty.

So there's -- any amount that is estimated in connection with ASC 450 is just that; it's an estimate, and it's not a certain number.

Q    Okay.  That was probably a poor choice of words on my behalf.

What I was getting at is that

Page 39

FLEMMONS

GAAP requires the company to provide an estimate that is a number, like, for example, in this case, $76.5 million. Right?

MS. FRITZLER:  Objection.

A     Well, just to be clear, I mean, GAAP requires a company to assess whether an amount is estimable and is reasonably estimable.

And in that assessment, companies are seeking to identify whether there is a better estimate or whether there is a range of values that may reflect the exposure of that loss contingency.

Q     I think we might be talking over one another.

I just -- what I'm really trying to understand is so when a company provides notice to its investors that it is booking a loss contingency, can the company say our estimate is X, or can the company say our estimate is X to Y?

Page 40

FLEMMONS

MS. FRITZLER:  Objection.

A    Well, in the situation where a company is actually recognizing a loss contingency in its financial statements, if it believes that it has developed a best estimate, then it would accrue or recognize that amount. And there may not be a range, then, to disclose from X to Y.

However, if a company recognizes a number within a range or is at the bottom end of a range, a company could then disclose the X to Y, in addition to recognizing the lower end of the range.

Q    That was my question.  I just wasn't sure if it had to be, you know, one number, or they could say a range is this.  So I appreciate the clarification.

If you would please turn to page 11 of your report, paragraph 29.

A    I'm there.

Q    Okay.  In this paragraph, you

Page 41

FLEMMONS

articulate several factors that GAAP instructs management to consider in assessing the propriety of taking a litigation contingency, right?

A     I'm sorry.  Could you repeat that one more time?

Q     Sure.

In this paragraph, you articulate several factors that GAAP instructs management to consider in assessing the propriety of taking a litigation contingency, correct?

A     Yes.

Q     And in paragraph 29, I think you showed six factors, right?

A     Yes.

Q     And factor C, in -- under paragraph 29, indicates that one of the factors that GAAP suggests the company use is to consider giving the opinions or view of legal counsel and other advisors concerning the outcome of the litigation, correct?

MS. FRITZLER:  Objection.

FLEMMONS

A     Yes, that's a portion of C.

Q     Yeah.  So that's one of many different factors.

The six that you have outlined here that are part of a company's assessment about whether a litigation contingency is appropriate in their particular litigation; is that correct?

A     Yes.

Q     And in paragraph 29, I think the first sentence says because it is -- sorry, let me -- strike that.

So paragraph 29 you say:  It is inherently difficult to predict did the outcome of litigation.  Right?

A     Yes.

Q     And then you go on to say that GAAP has addressed this difficulty and has instructed management to consider certain issues to assist it in coming to a conclusion about the propriety of taking a litigation contingency, correct?

Page 43

FLEMMONS

A    I don't believe I used those exact words or that formulation.  But I do say in paragraph 29 that GAAP addresses the difficulty in predicting future events in the outcome of litigation, and, therefore, provides considerations for companies to consider when assessing litigation contingencies.

Q    Okay.  We're going to jump ahead to page 18 of your report.  Top of that page should say Roman Numeral V, Opinions and Analysis.

Are you there on that page?

A    Yes.

Q    And underneath that is a subheading A.  And it says:  Feinstein Mischaracterizes the Nature and Significance of a Loss Contingency.

Do you see that?

A    Yes.

Q    And under that is another header that says:  Jeld-Wen's Recognition of a Loss Contingency is

Page 44

FLEMMONS

Not a Reflection of Certain Liability.

Is that a statement of your first opinion?

MS. FRITZLER:  Objection.

A      No.  My first opinion was the first sentence that you read, which is Feinstein mischaracterizes the nature and significance of a loss contingency.

Q      Okay.

A      That line that you read are subsections reflecting the supporting analysis for that opinion.

Q      Okay.  And the supporting paragraphs for Opinion 1 are shown on pages 18 through 21 of your report, right?

MS. FRITZLER:  Objection.

A      Yes, but also would say that the background section of my report is certainly part of the support as well.

And specifically Roman Numeral IV of my report starting on page 8.

Q      And Roman Numeral IV is the

FLEMMONS

Relevant Accounting Standards that we were talking about just a moment ago, right?

A    Yes.  And this was all important background that is also subsumed as being supportive of my opinions.

Q    Okay.  If you look at paragraph 45, which is on page 18 of your report, in this paragraph, you say; According to Feinstein, Jeld-Wen's October 15, 2018, announcement regarding the loss contingency informed the market that Steves allegations, quote, had merit and that there would be negative repercussions from that behavior, closed quote.  It is an inaccurate, however, to characterize the loss contingency as a statement of certain liability.

Did I read that right?

A    Correct.

Q    And there is a footnote 43 contained within that part of your

Page 46

FLEMMONS

paragraph that I just read that offers some citations to Dr. Feinstein's report, correct?

A     Yes.

MS. WYMAN:  John, can you please pull up tab 7.

In the Marked Exhibits folder, I'm going to put Feinstein Exhibit 1, which is a copy of Dr. Feinstein's report that was marked at his deposition.

Q     It should be there so let me know when you have that open.

A     I have it.

Q     And you considered Dr. Feinstein's report that I have given you as Exhibit 1 here in forming your opinions in this case, right?

A     Well, yeah, insofar as I was asked to evaluate and respond to specific portions of his report.  I did not evaluate many, many aspects of what was contained in his report.

Q     What specific portions of his

Page 47

FLEMMONS

report were you asked to evaluate and respond to?

    A    If I could refer you to paragraph 3 of my report.  This is where I mention Mr. Feinstein.

          And in the second sentence of that paragraph, I say that I have been asked by counsel for Jeld-Wen to review and analyze and to render opinions in response to the Feinstein report as it relates to Feinstein's conclusions concerning and characterizations of Jeld-Wen's accounting and disclosure of his potential exposure arising from the Steves litigation, as reported to the press releases and timing from the SEC during the class period.

    Q    So did you, as part of that assignment, review the entirety of Dr. Feinstein's report or just portions of it?

    A    I believe I read most of it. I may have skimmed through certain portions.  But I certainly read every

Page 48

FLEMMONS

aspect of his report that related to what I just read to you as to what I was asked to do in this matter.

Q   Okay.  If you turn, please, to -- in Dr. Feinstein's report, which is Feinstein Exhibit 1, turn to page 6 of his report and to paragraph 23.

A   I'm there.

Q   Okay.  Paragraph 23 is one of the paragraphs that you cite in your report in paragraph 45; is that right?

A   Yes.

Q   And Feinstein's paragraph says:  With this corrective disclosure provided by the company itself, investors and analysts were now informed that the allegation that the illegal anticompetitive behavior had merit and that there would be a negative repercussions from that behavior.  That same day in the same press release, the company disclosed that profitability was and would be less than what was previously

FLEMMONS

achievable and expected.

Did I read that correctly?

A   I believe so.

Q   In that paragraph, Dr. Feinstein does not opine that the October 15, 2018, announcement by Jeld-Wen was a statement of certain liability, does he?

A   I'm sorry, I'm just reading back in his report and a couple of the other surrounding paragraphs.

If you give me one moment.

Q   Sure.

A   So I would say that he does not use those specific words.

That said, in paragraph 23, by saying that the purported corrective disclosure meant that the company believed that the allegations had merit and that there would be negative repercussions from that behavior, to me, is synonymous with him saying that Jeld-Wen was acknowledging certain liability.

FLEMMONS

And I would also like to check the other references that I have in my footnote to other portions of his report to see if that exact wording was used.  But -- because right now, we're focused on just one report.

Q   Right.  We're going to visit those other paragraphs here in a secretary.

In your answer, you said that "To me, his words were synonymous with him saying that Jeld-Wen was acknowledging certain liability."

Did I get your testimony correct?

MS. FRITZLER:  Objection.

A   I probably won't repeat it word for word the way I did it before.  But what I'm basically saying is that in paragraph 23, that his description of -- of the corrective disclosure and by referring to that as being reflective of the company acknowledging that the allegations had merit and that

Page 51

FLEMMONS

there would be negative repercussions, that that suggests that he is saying that there is -- that the company's statement reflected an acknowledgment of certain liability.

Q    And your understanding of that is from a perspective of GAAP, or what?

A    Well, in part, my understanding of the English language, but also coupled with my experience with GAAP.

Q    And your conclusion that -- that Dr. Feinstein was making a statement that the company had acknowledged, quote, certain liability is not based on any analysis you did of the market's understanding of the information the company provided on October 15, 2018, right?

MS. FRITZLER:  Objection.

A    I'm sorry, could you repeat that one more time.

Q    Sure.  It's a long question,

Page 52

FLEMMONS

so I will take it slow.

Your conclusion that the --
that Dr. Feinstein's statement that the
company had acknowledged quote, certain
liability, is not based on any analysis
you did of the market's understanding
of the information the company provided
on October 15, 2018, right?

MS. FRITZLER:  Objection.

A    I believe I said before, I
did not perform any kind of market
analysis or trading analysis.

Q    Okay.  And if you would
please turn to -- in Dr. Feinstein's
report, to paragraph 297, which is on
page 102.

That's the second reference
that you have included in your footnote
in your report that I think you
mentioned you wanted to check out.

So let's look at paragraph
297.

A    I'm there.

Q    Okay.  And in Dr. Feinstein's

FLEMMONS

paragraph 297, he says:  Nine days later, on 15 October 2018, the company retreated somewhat from its denials that it would suffer adverse consequences from the Steves litigation when it effectively acknowledged merit in the antitrust allegations and negative repercussions from the verdict and divestiture order.

Did I read that correctly?

A    I believe so.

Q    And in that paragraph, Dr. Feinstein does not opine that the October 15, 2018, announcement by Jeld-Wen was a statement of certain liability, right?

A    Once again, he does not use those exact words.  But as I said before, and I think the prior paragraph is consistent with this one, that his reference to the October 15, 2018, announcement by Jeld-Wen being reflective of Jeld-Wen believing that it would suffer adverse consequences

Page 54

FLEMMONS

from the Steves litigation, and the reference that he says that they acknowledged merit in the antitrust allegations, that those two things together, to me, are the exact same thing as saying that Mr. Feinstein is asserting that Jeld-Wen was acknowledging certain liability.

And I'm sure we could get into this later, but that is not what ASC 450 requires, and it's certainly not -- it's entirely inconsistent with the founding principles of GAAP.

Q    And as we discussed before, I think you testified that you did not form any kind of market analysis or trading analysis to determine what the market's understanding of the information from the company was that it provided on October 15, 2018, right?

MS. FRITZLER:  Objection.

A    Well, to be clear, when you're saying market analysis, I certainly did review the SEC filings

Page 55

FLEMMONS

that were made by Jeld-Wen that would have been made available to the market, the disclosures that were made throughout the course of the litigation.  But in terms of -- what I should also add, I also reviewed the analyst reports that were cited in Mr. Feinstein's report.

I just want to be clear that those may have some overlap with market information and analysis, but beyond that, I did not -- I don't believe I did any further analysis of market trading or otherwise.

Q    And so, then, I'm correct in understanding that apart from referencing and reviewing the materials that you just described that you didn't perform any kind of, you know, statistical analysis to determine whether or how the market may have responded to Jeld-Wen's information that it provided on October 15, 2018, right?

Page 56

FLEMMONS

A    I did not perform any
statistical analysis.

Q    And I'm also correct in
understanding that apart from
referencing the -- and reviewing the
materials that you described, that you
didn't apply any economic valuation
principals to determine what the market
understood the information from the
company to be; is that right?

MS. FRITZLER:  Objection to
form.

A    I don't believe I applied any
economic or valuation principles in new
analysis.

Q    Okay.  I think that you also
cite to one more paragraph in
Dr. Feinstein's report, which is
paragraph 343, which is on page 114 of
his report.  If you could please turn
there.

A    I'm there.

Q    Okay.  Paragraph 343 in
Dr. Feinstein's report says:  From the

FLEMMONS

corrective disclosures, the market learned that the previously concealed truth about the company's profitability, growth prospects, and condition.  Investors and analysts learned that the allegations of illegal anticompetitive behavior have merit and that there would be negative repercussions.

Had analysts and investors been fully and honestly informed by the company at the start of the class period rather than misled by alleged misrepresentations and omissions, they would not have been surprised by the subsequent adverse announcements.  The stock price would have been lower at the start of the class period and throughout the class period to reflect the adverse information, including the foreseeable consequences, rather than following when the truth later emerged.

Did I read that correctly?

A     I believe so.

Page 58

FLEMMONS

Q    And in there again, Dr. Feinstein does not opine that the October 15, 2018, announcement by Jeld-Wen was a, quote, statement of certain liability, right?

A    Once again, he does not use those exact words, but he uses similar words.

If you refer to the second sentence of paragraph 343 where he states that:  Investors and analysts learned that the allegations of illegal anticompetitive behavior had merit and that there would be negative repercussions.

That is the same thing as saying that he believes and he is asserting that the disclosure that the company made was a -- essentially, an admission of certain liability.

And, once again, that is not what these kinds of announcements and recognition of loss contingencies mean.

And what I mean by that is

Page 59

FLEMMONS

specifically when companies make assessments and determine that a loss contingency should be recorded, that those reflect a point-in-time estimate of a potential loss and not an indication that there is a certain loss or certain liability.

Q    Again, as with the other two paragraphs we talked about before, you didn't do any statistical analysis to determine what the market understood that information to mean, right?

MS. FRITZLER:   Objection.

A    Aside from what I have talked about before with regard to the analyst reports and the information that was disclosed by the company in its public filings, I don't believe I analyzed other information.  But I have to go back through my Exhibit 2 to make sure.

Q    And you didn't apply any economic valuing principals to determine what the market understood the October 15, 2018, announcement from

Page 60

FLEMMONS

Jeld-Wen to mean, right?

MS. FRITZLER:  Objection.

A    I don't believe I applied any economic valuation principles.

Q    So your opinions are purely based on your understanding of GAAP and your expertise as an accountant; is that right?

A    That's correct.

Q    Okay.  You can close Dr. Feinstein's report and turn back to yours, please.

Are you ready?

A    Yes.

Q    Okay.  If you would please turn to paragraph 32 of your report, which is on page 12.

And toward the bottom of page 12 in your report, there is a sentence that starts with:  I discuss in more detail later.

Do you see that sentence?

A    Yes.

Q    Okay.  I'm going to start

FLEMMONS

reading from there.

It says, in paragraph 32, you say:  I discuss in more detail later in my report in connection with Feinstein's false characterization of Jeld-Wen's recognition of a contingent loss of $76.5 million and related disclosure in the third quarter of 2018 as being reflective of, quote, corrective discloser.  This characterization is wrong as a matter of accounting and wrong as a factual matter because recognizing the loss contingency did not render Jeld-Wen's prior accounting determinations or disclosures related to the litigation erroneous.

Did I read that right?

A     Yes.

Q     I want to focus your attention, please, to the last sentence of paragraph 32, which is:  This characterization is wrong as a matter of accounting and wrong as a factual

Page 62

FLEMMONS

matter because recognizing the loss contingency did not render Jeld-Wen's prior accounting determinations or disclosures related to the litigation erroneous.

With that in mind, can you please provide me the basis for your statement that Feinstein's determination that the October 15, 2018, announcement -- that -- pardon me -- strike that.

Can you provide me the basis for your statement that Feinstein's determination that the October 15, 2018, announcement was a, quote, corrective disclosure is wrong as a factual matter?

MS. FRITZLER:  Objection.

A    Well, again, the basis for this sentence is my expertise in accounting.  And Mr. Feinstein characterized that announcement and the recognition of the loss contingency as being a, quote, corrective disclosure,

Page 63

FLEMMONS

which I took and take significant issue with because it's incorrect.

And it's incorrect because that disclosure and that decision to recognize the loss contingency was not a correction of an error under the accounting standards, as I discuss in detail in my report.

And by disclosing and recognizing the loss contingency, that did not suggest that the prior disclosures made by the company were erroneous.

Q    Do you understand what a corrective disclosure is for purposes for a loss causation analysis in a securities fraud transaction?

MS. FRITZLER:  Objection.

A    If there is a legal connotation of that phrase "corrective disclosure," I'm not a lawyer and I'm not equipped to define that.

My reference to -- in my analysis of Mr. Feinstein's reference

**Page 64**

FLEMMONS

to corrective disclosure was from an accounting perspective.

Q    Is there any place in Dr. Feinstein's report where he opines that the company violated GAAP by this corrective disclosure?

MS. FRITZLER:  Object.

A    No.  And, quite frankly, that was very surprising to me to assert that the disclosure and the recognition of the loss contingency constituted a corrective disclosure, or suggested in any way that it was a correction, without considering the accounting aspects to support that assertion.

Q    You understand that Dr. Feinstein is not an accountant, right?

A    I don't believe he is.

Q    You understand that Dr. Feinstein is an economist, correct?

A    I believe so.

Q    And do you have an understanding of what it means in terms

Page 65

FLEMMONS

of economics to say that something is a corrective disclosure?

MS. FRITZLER:  Objection.

A    I think I said before that that I'm not an economist.  So if there is a definition in the world of economics or in law, that's outside the scope of my expertise.

Q    And so when you say that the October 15, 2018, announcement of a loss contingency was not a corrective disclosure, you are speaking entirely in terms of whether it is a correction under GAAP; is that right?

MS. FRITZLER:  Objection to form.

A    Once again, my opinions are based on my expertise as an accountant, which is very relevant to the issues here, given that the determination of whether or not a loss contingency should be recognized.  And the disclosure requirements around that are very reliant on the rules under GAAP.

FLEMMONS

Q    So is it fair to say, then, that your opinions are limited to whether or not something was appropriately a correction pursuant to GAAP's requirements?

MS. FRITZLER:  Objection.

A    Can you repeat that, please.

Q    Sure.

So is it fair to say, then, that your opinions are limited to whether or not something was appropriately a correction pursuant to GAAP's requirements?

MS. FRITZLER:  Same objection.

A    And to be clear, I have two opinions.  And one of those opinions relates to my view and opinion that the loss contingency did not constitute a correction.  And there are other parts of that opinion as well.

And then I have another opinion related to Mr. Feinstein's mischaracterization of the nature and

Page 67

FLEMMONS

significance of the loss contingency.

So my opinions are not limited to the portion that you were focused on in your question.

Q    Right.  So the first opinion that we've been talking about is that the loss contingency was not a correction under GAAP, right?

A    Can you repeat that, please.

Q    Sure.

So pursuant to the first opinion that we've been talking about here, your opinion is limited to whether or not the loss contingency announcement was a correction under GAAP, correct?

A    Well, with regard to the first portion of my second opinion as listed on page 5 of my report, where I say Jeld-Wen's recognition of the loss contingency did not constitute a correction of an error, that portion of the opinion is based on my expertise as an accountant.

Page 68

FLEMMONS

Q    It has nothing to do with whatsoever with any kind of economic analysis, economic valuation principles, statistical analysis, or market analysis that you undertook?

MS. FRITZLER:  Objection.

A    Again, I did not perform any economic analysis as part of my opinions.

MS. WYMAN:  Okay.  Rachel, I'm getting ready to transition, so it might be a good time for a 10-minute break.

MS. FRITZLER:  Sounds good.

MS. WYMAN:  Okay.  Let's go off the record for about 10 minutes or so.

VIDEOGRAPHER:  Thank you. This is the videographer.  The time is 11:07.  We are going off the record.  This is the end of Media File 1.

(Whereupon, a brief recess was taken.)

Page 69

FLEMMONS

VIDEOGRAPHER:  We are back on the record.  The time is 11:20 a.m. Eastern Time, and this is the beginning of Media File 2.

Q    Welcome back, Mr. Flemmons.

A    Hello.

Q    If you would please turn to page 21 of your report.

A    I'm there.

Q    Okay.  On page 21, there is a header sort of about two-thirds of the way down that says:  Jeld-Wen's Recognition of the Loss Contingency Did Notes Constitute a Correction of an Error, and its Accounting and Disclosures Related to this Steves Litigation Were Reasonable Under GAAP.

Is that a statement of your second opinion?

A    Yes.

Q    Okay.  And there are a number of paragraphs.

Understanding, of course, what you said before about the

Page 70

FLEMMONS

Background section, there is a number of paragraphs that go from page 21 through 33 that appear to support that opinion statement; is that right?

MS. FRITZLER:  Objection.

A    Yes.  Everything that follows that opinion in this report serves to provide the analysis and support for that opinion, in addition to the Background section that you just referenced.

Q    Okay.  If you look please at paragraph 53, which is on page 21.

The third line from the bottom of page 21, there is a sentence that begins with:  Feinstein characterizes.

Do you see that sentence?

A    Yes.

Q    It says:  Feinstein characterizes this October 15, 2018, disclosure as a, quote, corrective disclosure that, quote, effectively acknowledged merits in the antitrust

FLEMMONS

litigations, closed quote.  This suggests that Jeld-Wen should have recognized the loss contingency as soon as the lawsuit was filed or after the jury verdict was issued.  But as discussed above, this is not what the accounting standards require.

Did I read that right?

A    Yes.

Q    Why have you said that Dr. Feinstein's characterization of the October 15, 2018, disclosure, quote, suggests that the loss contingency should have been filed or taken sooner?

A    Because, by definition, as an accounting matter, reference to that disclosure as corrective would indicate that prior disclosures or prior accounting was erroneous.

Q    And that's getting back to our discussion that we had just before the break about a corrective disclosure for economic purposes versus a correction of an error under GAAP,

Page 72

FLEMMONS

right?

MS. FRITZLER:  Objection.

A    Yeah.  My statement here and my opinions in my report are not based on economic analysis, but rather the nature of the loss contingency and the related announcement, you know, being reflective of an accounting event.

Q    Okay.  And you reviewed plaintiff's complaints in this case as part of the documents you considered in forming your opinions, correct?

A    Yes, I reviewed the amended complaint.

Q    Yes.  And I could bring it up for you, but plaintiffs don't allege that Jeld-Wen violated GAAP by accruing the loss contingencies at the wrong time, right?

A    I don't recall there being any references to GAAP or GAAP citations.  But, again, that is surprising given that this loss contingency and the related disclosure

Page 73

FLEMMONS

is inherently an accounting event.

Q    Do you want to look at the complaint just to make sure that there aren't any GAAP-related allegations in it, or are you confident that you don't recall seeing anything like that?

A    I'm confident I don't recall, but I'm not confident if they don't exist in the complaint.

Q    Okay.  Then, I'm going to show you what was marked at a different deposition.  It's called Schmitt Exhibit 8.  It is a copy of the amended complaint in this case.

It should be in your folder, so let me know when you have got it.

A    I see it.

Q    Okay.  And if you want to take a minute to look through there and identify for me any place in there where there are allegations that plaintiffs have made that Jeld-Wen violated GAAP by accruing the loss contingency at the wrong time.

Page 74

FLEMMONS

A    Let me ask, is this document, by chance, searchable?

Q    You know, I don't know the answer to that question.  I honestly don't know.

There is a table of contents, I know that.  But I don't know if that's going to help you at all.  But I honestly have no idea whether it's searchable.

MS. WYMAN:  John, can you figure that out?

MR. RIGBY:  I don't believe it is on Exhibit Share.

MS. WYMAN:  My associate, John here, he said -- he was just trying -- he doesn't think it's searchable on Exhibit Share, which is unfortunate.

A    That would have helped shortcut getting an answer to your question here.  I will take a look at the table of contents.

MR. SCHMALZBACH:  Debra, you

Page 75

FLEMMONS

might try downloading the exhibit from Exhibit Share, and then it should just pop up as a PDF.

MR. RIGBY:  Yeah, he can download it to his own computer, and he might be able to search it, then.

MS. WYMAN:  I'm told because -- and I'm like the worst techy person ever.  But you can download it from Exhibit Share. You should be able to save it on your computer and then you should be able to search it.

THE WITNESS:  Okay.  I will.

MS. WYMAN:  So I guess we could go that route and see what happens.

A    Okay.  I ran a search for "GAAP," which yielded no hits.

And "450" yielding no hits, or "ASC 450" I should say.

And "accounting," which yielded a few hits that were not

Page 76

FLEMMONS

relevant.

Q    And in your review, you recall not seeing any specific allegations that plaintiffs have made that defendants have violated GAAP by failing to accrue the loss contingency at the right time, correct?

A    The searches that I just mentioned are consistent with my recollection that the complaint does not specifically allege a GAAP violation, but it does reference throughout the notion of corrective disclosures similar to how Mr. Feinstein referenced them.

And, again, my analysis was related to that concept from an accounting perspective.

Q    Okay.  And speaking of Dr. Feinstein's report, it also contains no opinion that Jeld-Wen should have accrued the loss contingency at some other date, apart from October 15, 2018, right?

Page 77

FLEMMONS

A    I don't recall if he says that, specifically.  But, again, by referencing the recognition and the disclosure of a loss contingency as a corrective disclosure, that he is inherently suggesting that there was something erroneous with the company's prior accounting and disclosure.

Q    Do you want to go through the same process by downloading his report and doing some searches to satisfy yourself that there is no opinion in there concerning a GAAP violation?

A    No, I am pretty confident he does not cite GAAP in his report.

Q    Okay.

You reviewed the disclosures concerning the Steves matter in the company's SEC filings that it made during the class period, right?

A    Yes.

Q    And those were in the company's form 10-Qs and 10-Ks that you listed on your Exhibit 2, correct?

Page 78

FLEMMONS

MS. FRITZLER:  Objection.

A    The 10-Ks and 10-Qs were part of the disclosures and filings that I reviewed.  In addition, I reviewed certain 8-Ks and the company's amended S-1s as part of its IPO process, and also certain SEC correspondence between the company and the division of corporation finance.

Q    And starting with the prospectus for the IPO, I think that you reference that in paragraph 56 of your report, which is on page 23.

A    Yes.

Q    You reviewed the operative form S-1 for the IPO, right?

A    Yes, I reviewed -- there were multiple S-1s because they were amended a number of times.  And then I also reviewed the prospectus.

Q    And the prospectus is what you are quoting in paragraph 56 in your report, correct?

A    Yes.

Page 79

FLEMMONS

Q    And in that prospectus for the IPO, the company did not inform investors that it was incurring a loss contingency with respect to the Steves matter, right?

A    The company, at this point in time, had not recorded a loss contingency.

There was no statement, I don't believe, saying that they were not disclosing a loss contingency.  I think this was -- these were very early stages of the litigation.

Q    Do you want to look at the IPO prospectus and search it to see if there is any disclosure in there that the company has taken a loss contingency for the -- related to the Steves matter?

A    I'm confident that the company did not recognize a loss contingency at this point in time. What I don't recall is whether or not they, at this point, had made any

Page 80

FLEMMONS

statements about the fact that such a contingency was not probable or estimable, like they did in later filings.

MS. WYMAN:  Okay.  Will you pull up tab 10.  And we'll mark that as Exhibit 3.

(Jeld-Wen IPO Prospectus dated January 30, 2017, was marked Flemmons Exhibit 3, for identification, as of this date.)

Q    Exhibit 3 is going to be a copy of the prospectus pursuant to Rule 424(b)(4) filed on January 30, 2017, by Jeld-Wen.

A    I have it open.

Q    Okay.  You might want to do the download routine so that you can search it.

A    Okay.

Q    Thankfully Brian was able to point that out for all are of us.

So thank you, Brian.

A    I have the document open.

FLEMMONS

Can you please refresh me on the question.

Q    Sure.

What I wanted to know is in that prospectus, the company did not inform investors that it was accruing a loss contingency with respect to the Steves matter.  And I think that you testified that you couldn't remember specifically if they had that kind of a disclosure in the prospectus and wanted to look.

MS. FRITZLER:  Objection.

A    I think I said before I was confident that the company had not recorded a loss contingency at this point in time.

And having done a quick skim-through again, that is consistent with my previous view.

Q    Okay.  You can close that document.

I think your report also indicates in paragraph 57 that you

Page 82

FLEMMONS

reviewed the 10-K for the 2016 fiscal year-end, right?

A    Yes.

Q    And in that 10-K the company also didn't inform investors that it was accruing for a loss contingency with respect to the Steves matter, did it?

A    So similarly at this point in time, the company had not recorded a loss contingency.

But as I lay out in my report, you know, throughout the time period of the litigation, company continued to provide updates and disclosures and quantifications related to the litigation.

But there was not a loss contingency recorded until October of 2018.

Q    What kind of quantifications did the company provide during the litigation period that you are recalling?

Page 83

FLEMMONS

A   Well, I could refer you to paragraph 58 of my report.

I may be jumping ahead in your sequencing here.  But in the third quarter of 2017 in the company's form 10-Q, they disclosed that Steves experts had quantified damages of 36 to $60 million, a portion of which was subject to trebling.  And that did not include also that Steves were seeking recovery of attorneys' fees.

And the first part of that paragraph, that Steves was also seeking divestiture of assets.  In terms of quantifications, the 36 to $60 million that was based on Steves experts was disclosed.

And later in time when the jury verdict was rendered, the company disclosed what the jury had identified as damages, and that was also promptly disclosed in the public filings.

Q   And we could go through every one of the public filings, if need be.

FLEMMONS

But it's your recollection from reviewing them that prior to October 15, 2018, the company did not inform its investors that it was taking a loss contingency related to the Steves litigation, right?

MS. FRITZLER:  Objection.

A     The company did not record a loss contingency until on or around October 15 of 2018.

But, again, prior to that time, there was substantial disclosure about the events occurring in the litigation including quantification of potential damages and different categories of damages that could be incremental to that.

Q     That's not what my question was.

My question was, prior to October 15, 2018, the company did not disclose to investors that it had accrued a loss contingency related to the Steves litigation, did it?

Page 85

FLEMMONS

A    Well, my understanding is that they had not recognized a loss contingency prior to October 15, 2018. So there would be nothing in that regard to disclose to the public because it was not recorded until October 15.

Q    And is it also your understanding from reviewing the public filings that prior to October 15, 2018, that Jeld-Wen had consistently told its investors that it believed a loss on the Steves matter was not probable?

MS. FRITZLER:    Objection.

A    I think we have to go back and look at the exact wording that was in those filings.  But I think it's fair to say that prior to October 15 of 2018, you know, Jeld-Wen did not believe that a loss contingency as defined under GAAP met the probable or reasonably estimable requirements for recognition of a loss.

Q    Right.  But my question

Page 86

FLEMMONS

wasn't focused on what Jeld-Wen believed.  My question was focused on Jeld-Wen told its investors.

So before October 15, 2018, Jeld-Wen told its investors that it did not believe that a loss from the Steves matter was probable, right?

MS. FRITZLER:  Objection to form.

A    Yes.  So in paragraph 63 of my report, as an example in the company's form 10-K for the year 2017, I have an excerpt from that filing and have some language in that excerpt that I have bolded and underlined that states:  Accordingly, we do not believe that a loss in this matter is probable and estimable, and, therefore, we have not accrued a reserve for this loss contingency.

Q    And is it your -- is it your testimony that that is the disclosure that the company provided to its investors prior to October 15, 2018,

Page 87

FLEMMONS

when it informed investors at that point in time that the company had changed its viewpoint, and that the loss concerning the Steves matter was probable and estimable?

MS. FRITZLER:  Objection to form.

A    Could you please repeat that?

Q    Sure.  I should break it down because that was a lot.

So is it your testimony that the disclosure that you have quoted and just pointed to that's in paragraph 63 of your report is the disclosure that the company had provided to its investors prior to October 15, 2018, concerning a loss contingency as it related to the Steves matter?

MS. FRITZLER:  Objection to form.

A    So this example disclosure that I just identified was contained in the company's form 10-K for December 31, 2017, which was prior to

Page 88

FLEMMONS

the October 15, 2018, disclosure.

I think there were also similar disclosures like this, like the one contained in the 2017 10-K and other filings, including some of the 10-Qs.  But we have to go through each of them to see the exact language.

Q     Okay.

MS. WYMAN:  Pull up tab 11, please.

I'm going to mark as Exhibit 4, the form 10-Q for the first quarter of 2018.

(Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the quarterly period ended March 31, 2018, for Jeld-Wen, was marked Flemmons Exhibit 4, for identification, as of this date.)

A     I apologize.  I clicked out of the Exhibit Share accidentally.

VIDEOGRAPHER:  This is the

Page 89

FLEMMONS

videographer.  The same link you used previously should still work.

A    Okay.  I'm back in.

Q    That's the perils of this remote deposition.  Never know what's going to happen when you click on something wrong.

So Exhibit 4 should be in there.

A    I see it.

Q    And Exhibit 4 is the form 10-Q for the first quarter of 2018.  That is a document that's listed on your Exhibit 2 of Materials Considered, right?

A    Yes, the document is listed on my Documents Considered.

Q    And in the Exhibit 4, which is the first quarter 2018 form 10-Q, is the company's disclosure to its investors concerning its potential loss contingency with regard to the Steves matter that it is not probable and estimable, at least as of that point in

Page 90

FLEMMONS

time?

A   If you can give me one moment, I'm going to download it and utilize it in that format.

Q   Sure.

A   So on page 34 of this exhibit, in the first full paragraph in the middle, it says:  Accordingly, we do not believe that a loss in this matter is probable and estimable, and, therefore, we have not accrued a reserve for this loss contingency.

Q   Okay.  You can close that one.  I'm going to -- there should be in the exhibit folder Exhibit 5.

(Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the quarterly period ended June 30, 2018, for Jeld-Wen, was marked Flemmons Exhibit 5, for identification, as of this date.)

Q   It is the form 10-Q for the second quarter of 2018.

FLEMMONS

Let me know when you have that.

A    And before I switch off this document, I apologize.  They have -- there was a similar disclosure, if not identical to what I just read, on page 48 of the same form 10-Q.  Just in the interest of completeness, I wanted to highlight that.

Q    Okay.  Thank you.

So in Exhibit 5, my question is the company did not inform its investors that it was accruing a loss contingency with respect to the Steves matter in that form 10-Q for the second quarter of 2018, correct?

MS. FRITZLER:  Objection.

A    I want to make sure I understand the premise of your question that -- are you saying that the company was accruing a loss contingency at this point in time, and you are asking if there was disclosure to that effect?

Q    No, what I'm asking you is,

Page 92

FLEMMONS

is did the company inform its investors
that it was accruing for a loss
contingency related to the Steves
matter in the second quarter 10-Q?

A    Well, I think, like the
language that we saw in the first
quarter of 2018, 10-Q, in this second
quarter 10-Q, I believe they're using
the same disclosure that they used
before on page 34, for example, of this
exhibit.

They disclosed at the very
bottom of that page, it states:
Accordingly, we do not believe that a
loss in this matter is probable and
estimable, and, therefore, we have not
accrued a reserve for this loss
contingency.

Q    And the company filed the
second quarter 2018 form 10-Q on
August 7, 2018; is that right?

A    I'm not sure the way it was
physically filed.

Q    But is your understanding

Page 93

FLEMMONS

that the second quarter -- the second

quarter ended on June 30, 2018?

    A    Yes.

    Q    So the form 10-Q would have

been filed at some point in time after

that, right?

    A    Yes.

    Q    If you look to paragraph 71

of your report, which is on page 30 --

you can close the second quarter form

10-Q.  I don't think we're going to

look at that again.

    A    Paragraph 71 of my report?

    Q    Yes.

    A    Okay.

    Q    In paragraph 71, you make

reference to Jeld-Wen's press release

on October 15, 2018, concerning its

third quarter 2018 earnings, right?

    A    Yes.

    Q    I'm going to bring up another

exhibit that was previously marked

Exhibit 4 to Dr. Feinstein's

deposition.  It should be in your

Page 94

                        FLEMMONS

exhibit folder momentarily.

MR. RIGBY:  Sorry, having trouble with the stamp.  It will be two stamps.

MS. WYMAN:  It doesn't need to be remarked.

MR. RIGBY:  I was just asking --

MS. WYMAN:  We're having some technical issues with the Exhibits Share.  So sorry.

THE WITNESS:  Glad it's not just me.

MS. WYMAN:  No.  And I promise you we'll be having more if I was responsible for what John's doing right now.

Q    It should be in there now.

A    Which exhibit?

Q    It should be Feinstein Exhibit 4.

MS. FRITZLER:  I think in the list it's going to be Exhibit 04, and then the file name is tab 6.

Page 95

FLEMMONS

THE WITNESS:  That is right.

Got it.  Thank you.

Q    Do you have that one open, Mr. Flemmons?

A    Yes.

Q    And this is a copy of the October 15, 2018, press release made by Jeld-Wen, right?

A    Yes, it appears to be.

Q    And you reviewed this press release as part of your workup for the opinions that you have made in this case, correct?

A    Yes.

Q    And this the announcement that the company made to its investors that it was accruing for a loss contingency related to the Steves action, correct?

A    Yes.

Q    This was the first time that the company had informed its investors that it was accruing a loss contingency concerning the Steves matter, right?

**Page 96**

FLEMMONS

A     Yes, I believe so.

Q     If you look to paragraph 72 of your report.  Are you with me?

A     Yes.

Q     You cite to an internal Jeld-Wen memo, which you indicate provides Jeld-Wen's, quote, rationale supporting this decision to recognize the loss contingency, correct?

A     Yes.

MS. WYMAN:  I'm going to put up Exhibit -- I think 6, we're up to.

(Jeld-Wen Accounting Topic Discussion Paper dated November 6, 2018, was marked Flemmons Exhibit 6, for identification, as of this date.)

A     Can I close the press release?

MS. WYMAN:  Yes, you can.

I'm sorry, it's tab 3, John.

A     Which exhibit should I be pulling up?

Page 97

FLEMMONS

Q    You should be pulling up Exhibit 6 in just a minute.  I don't know if it's in there yet.

A    Oh, okay.

MR. RIGBY:  There we go.

Q    It should be in there now.

A    I have it.

Q    Okay.  Is Exhibit 6 listed on your list of Materials Considered?

A    Yes, it's on the last page of my Exhibit 2, under the category of Other, and it's the second document listed.

Q    And in working up your opinions in this case, did you read Exhibit 6?

A    Yes.

Q    And Exhibit 6 is the memorandum that you are making reference to in your paragraph 72, right?

A    Yes.

Q    If you please turn to -- this is the first document that we have

Page 98

FLEMMONS

that's Bates-numbered.  So for our record, I probably should be thorough.

Exhibit 6 is a memorandum dated November 6, 2018, to The Files-Jeld-Wen from Scott Vining, SVP, and Chief Accounting Officer.

It bears a Bates number of JW-SEC-01109346, and it goes through 9348.

What I would like for you to do, please, Mr. Flemmons, is turn to the second page of the document, which is the Bates stamp that ends in 347.

A    Okay.

Q    And the second paragraph from the bottom of the page that starts with, In October 2018, can you read that paragraph to yourself, please, and let me know when you are done.

A    Sure.

Okay.

Q    Having read that paragraph, is it a fair summary to say that that paragraph is recounting rulings that

FLEMMONS

the court in the Steves matter had made during October of 2018?

A    Yes, I believe so.

Q    And the very last sentence of this paragraph reads:  Based on these rulings, the company believes a loss on this contingency is now probable, and if estimable, should be recorded.

Is that right?

A    That's what it says.

Q    And why did the company do an evaluation after the receiving of these rulings in October of 2018, if you know?

MS. FRITZLER:  Objection to form.

A    I don't know specifically, but I would say that based on the company's prior disclosures in its earlier filings leading up to this particular ruling, the company had disclosed, as we went through, that they had assessed whether or not a loss contingency was probable and estimable

FLEMMONS

and concluded that it was not.

So I would infer, based on that, that they were performing ongoing assessments of the probability and estimability of a loss. And this ruling that occurred in October of 2018 provided additional information that led to a different conclusion based on a refreshed assessment.

Q    So then the information from these court rulings in October of 2018 that this paragraph describes was new information to the company that it needed to use in its assessment of whether a loss contingency was appropriate on a GAAP, at this point in time, correct?

MS. FRITZLER: Objection.

A    Well, I think the ruling that occurred in October of 2018 was new, if that's what you are asking.

Q    Right. And so because there was new information to the company, GAAP required that they reassess

Page 101

FLEMMONS

whether or not a loss contingency was appropriate; is that right?

MS. FRITZLER:  Objection.

A    Well, I think the company was exercising their judgment here based on the issuance of the ruling in October of 2018 and assessing its impact on the company's considerations of whether a loss contingency was probable and estimable.

Q    So the -- prior to October 15, 2018, the company had made an assessment that there was no loss contingency that was probable and estimable based on the information it had, right?

MS. FRITZLER:  Objection to form.

A    I think as we went over before in the prior filings and disclosures, the company had performed assessments and concluded that a loss contingency was deemed not to be probable or estimable.

Page 102

FLEMMONS

Q    And GAAP is a company required to change its assessments if it gets new information that bear upon its assessment whether a loss is probable or estimable?

MS. FRITZLER:  Objection.

A    Bear with me one minute, please.

Q    Sure.

A    Yeah.  So we went over this a little bit earlier.  But in paragraph 29 of my report, I identify the specific considerations that ASC 450 lays out with regard to litigation contingencies, and some of the factors that should be considered in assessing whether or not a litigation contingency should be recognized.

And one of those relates to the progress of the case, which is the second item on that list.  So I think that would subsume, as the case is progressing and there are rulings and new information that is coming out,

Page 103

FLEMMONS

that companies would assess those items in assessing whether or not a loss contingency should be recorded.

Q    If you look at paragraph 31 of your report, it says:  GAAP acknowledges that estimate are, by nature, expected to change as new information is obtained and updated assessments are performed; is that right?

A    Correct.

Q    And you have got a block quote that has some bolded and underlined text in it toward the top of the page.

And the last line that is bolded and underlined, says:  Changes in accounting estimates result from new information.

Is that your understanding of what GAAP requires?

MS. FRITZLER:  Objection to form.

A    So this paragraph is an

Page 104

FLEMMONS

excerpt from GAAP specifically from the definition of a change in accounting estimate within GAAP.

Q    And it requires an estimate to be -- well, it says -- strike that.

So GAAP says that changes in accounting estimates result from new information.

That's a correct statement, right?

A    That's correct.

Q    And because Jeld-Wen changed its accounting estimate in this case, it was because it received new information through these October 2018 rulings, right?

MS. FRITZLER:  Objection to form.

A    Well, once again, I think the ruling itself was new information, and within it, it did contain some new items that I think formed the basis for the company's conclusion.

And it's that kind of new

Page 105

FLEMMONS

information that is contemplated in the GAAP that we're looking at right now with regard to changes in estimates, which is very different from the guidance related to correction of errors.

Q   Okay.  Turning back to Exhibit 6, which is the Jeld-Wen memorandum.  If you look, please, on the last page of the document, which is Bates-stamped ending 348.

A   Okay.

Q   Do you see a heading toward the bottom of the page that says Estimated Loss?

A   Yes.

Q   And the company determined that at this point in time a loss was estimable with regard to the Steves matter, right?

A   Yes.  I think -- I'm sorry. At this point in time, they had determined that at least some portion of a potential loss was estimable.

FLEMMONS

Q    Okay.  And in this memorandum, it outlines the components of what the company believes are reasonable estimate of the loss on the matter is, correct?

A    Can you repeat that, please?

Q    Sure.

In the memorandum, the company outlines a breakdown of what it believes a reasonable estimate of the loss on the Steves matter is, right?

A    Yes.  This memorandum outlines the -- I believe the two categories of items that are comprising the $76-and-a-half-million loss contingency that the company recorded at this time.

Q    In the memorandum, there are four bullet points that break down the $76.5 million loss contingency that the company reported on October 15, 2018, right?

A    It's really just the first two bullets that are the components of

Page 107

FLEMMONS

the 76.5 million.

Q    Okay.  Pardon me.  You are correct.

    And the third bullet says: Divestiture of Towanda fiber plant.

    And in parenthesis, it says, Not estimable; is that right?

A    Yes.

Q    So what is your understanding as an accountant pursuant to GAAP, what does that bullet point mean?

A    My understanding of that bullet point relates to one of the potential remedies that were at issue in the case.  The jury had awarded future profits as one of the types of damages.  But my understanding is that that was an open item because, to the extent that divestiture of the Towanda plant was a possible remedy, that that would potentially supersede the future profits portion of the verdict.

    And I also understand that the divestiture of the plant and

Page 108

FLEMMONS

whether that even could be a remedy was an open question and the subject of briefings and hearings between the parties.

Q    And so because of the uncertainty concerning the divestiture, the company determined that it wasn't an estimable portion of any loss contingency that they were booking at that time, right?

A    That's my understanding.

Q    Okay.  Now turning back to Feinstein Exhibit 4, which is the October 15, 2018, press release.

In this press release, the company says -- do you have that open by chance?

A    I'm looking for it again.

Q    I think it says tab 604 Feinstein, or something.

MR. RIGBY:  Should be just Feinstein 4, tab 6, yeah.

It should be at the bottom.

MS. FRITZLER:  It says

Page 109

FLEMMONS

Exhibit tab 6.

MS. WYMAN:  Okay.

A     Thank you.  I have it.

The titles on my screen that list the exhibits are abbreviated.  I can't expand it to really see the full title, so pardon my delay here.

Q     That's okay.  We're all sort of tripping over ourselves trying to get used to this remote thing.  It's not a problem whatsoever.

So if you look, please, at Feinstein Exhibit 4 for the middle of the page, there is a paragraph that starts with the word Additionally.

Do you see that paragraph?

A     Yes.

Q     It says:  Additionally, the company expects third quarter results to include a charge of $76.5 million for a litigation contingency related to a recent court ruling in its ongoing antitrust secrets litigation with Steves & Sons, Inc.  The charge

Page 110

FLEMMONS

reflects the judgment anticipated to be entered against the company, including the trebling of $12.2 million of past damages under the Clayton Act and estimated legal fees.

While the company continues to maintain that has not violated any antitrust laws and intends to appeal any adverse judgment, recent rulings in the case have now provided sufficient detail for the company to estimate future liabilities if the appeal process is unsuccessful.  Further details on this litigation contingency will be disclosed in the company's next quarterly report on form 10-Q.

This was the first time that Jeld-Wen had told investors that a loss with regard to the Steves matter was probable and estimable, correct?

MS. FRITZLER:  Objection to form.

A    I believe this was the first time that the company had disclosed the

Page 111

FLEMMONS

results of its updated assessment in light of the October 2018 ruling that resulted in the company recording the $76.5 million litigation contingency.

Q    So then this October 15, 2018, announcement provided new information to investors concerning the company's belief on whether or not a loss contingency regarding the Steves matter was probable and estimable, right?

MS. FRITZLER:  Objection to form.

A    The company's determination at this time to record a loss contingency effectively constituted a change in estimate, which by virtue of being a change in estimate was new because previously the company had determined that such a loss contingency was not probable nor estimable.

Q    Okay.  And you didn't do any statistical analysis to determine whether or not this new estimate, this

Page 112

FLEMMONS

new information that Jeld-Wen provided to the market on October 15, 2018, impacted the price of its stock, right?

MS. FRITZLER:  Objection to form.

A    I did not evaluate the impact of this announcement on the company's stock price.

Q    Okay.  You can close Feinstein Exhibit 4.

And if you would please turn back to your report and look at paragraph 69.

A    Okay.

Q    In paragraph 69, you make mention of an October 5, 2018, ruling right?

A    Yes.  It's the same ruling that we've been talking about.

Q    Okay.  And I'm going to bring up tab 5, please which is Schmitt Exhibit 9.

I'm bring up a previously marked exhibit called Schmitt

FLEMMONS

Exhibit 9, which is a copy of the October 5, 2018 order.

It should be there.

A    I have it.

Q    Okay.  And you refer to this ruling as making a number of factual findings that further supported the basis for the unfavorable jury verdict and concluded that divestiture of CMI was an appropriate remedy; is that right?

A    Yes, I state that in paragraph 69.

Q    And you reviewed this October 5, 2018, order in formulating and arriving at the opinions that you have offered in this case, right?

A    I did review the ruling.  I'm not sure if it was in exactly this same format.  The version I had was many pages, if not close to 200 pages, but the content hopefully is the same.

Q    Okay.  That was my next question was.  It's a rather long and question was.  It's a rather long and

**Page 114**

FLEMMONS

dense document; is that right?

    A    Yes.

    Q    Contains a lot of information, correct?

    A    Yes.

    Q    You can close this document. I'm going to mark as our next exhibit, which is Exhibit 7, a October 6, 2018, press release made by Jeld-Wen.  That's tab 16.

            (October 6, 2018, Jeld-Wen press release, was marked Flemmons Exhibit 7, for identification, as of this date.)

    A    Which tab?

    Q    It should be Exhibit 7.  It says tab 16, Exhibit 7, I guess.

    A    I have it.

    Q    Okay.  You have that open?

    A    Yes.

    Q    And is this a copy of the October 6, 2018, Jeld-Wen press release that you refer to in paragraph 70 in your report?

Page 115

FLEMMONS

A    Yes.

Q    And this is a document that you reviewed and considered as part of the formulation of your opinions in this case, right?

A    Yes.

Q    And in this press release Jeld-Wen does not inform investors that it is taking a loss contingency concerning the Steves matter, right?

A    That's correct.  This press release appears to have been issued the day after the October 2018 ruling that I described in my report, and appears to be providing just an update on some of the aspects of that ruling.

Q    Why didn't the company announce the loss contingency accrual in this press release?

        MS. FRITZLER:  Objection to form.

A    Well, given the timing of when the company recorded and disclosed the loss contingency, which was on

FLEMMONS

October 15 of 2018, it appears that the company had not made that determination yet. Again, this press release we're looking at here was within a day of the ruling itself and which, as we discussed, contained a lot of information and was very lengthy. And I would imagine it took some time to work through and assess the impact on the company's accounting determinations.

Q So in other words, the company needed time to digest it and do the analysis under ASC 450 that we've been talking about today; is that right?

MS. FRITZLER: Objection to form.

A Well, I would say it's customary in the accounting industry for the need to have time to perform accounting analyses and evaluate the facts, particularly new facts that occur. And it could inform and serve

Page 117

FLEMMONS

as the basis for either additional disclosure or recognition of a loss contingency.

Again, as I said before, I have not spoken to anyone at the company. So I don't know for a fact that that was why there was a -- that there was -- that the loss contingency was not disclosed in this press release. But it stands to reason given how those determinations are assessed in practice.

MS. WYMAN: You can close this one up.

Why don't we a take about a five-minute break or so? I think I'm getting close to being done. I just want to go over my notes. Okay?

VIDEOGRAPHER: Thank you. This is the videographer.

The time is 12:17. We're going off the record. This is the end of Media File 2.

**Page 118**

FLEMMONS

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  The time is 12:25.  We're back on the record.  This is the beginning of Media File 3.

MS. WYMAN:  Mr. Flemmons, I have gone through my notes.  And as of this moment, I have no other questions for you.  I want to thank you very much for your time this morning.

THE WITNESS:  Thank you.

MS. WYMAN:  I don't know if anybody else has any questions.

MS. FRITZLER:  I have just one or two questions that I would like to ask.

EXAMINATION BY MS. FRITZLER:

Q    Mr. Flemmons, earlier today you were asked about your understanding of the term "corrective disclosure," correct?

A    Yes.

Page 119

FLEMMONS

Q    Are you offering an opinion as to whether the October 15, 2018, press release was a corrective disclosure?

MS. WYMAN:    Objection.

A    No, I am not offering an opinion on whether it was a corrective disclosure.    Rather, my opinions are specifically responding to Mr. Feinstein's conclusions that the disclosure constituted a corrective disclosure because of the linkage to the loss contingency.

MS. FRITZLER:    Thank you.    I have no further questions.

MS. WYMAN:    I have no follow-up.    Thank you.

VIDEOGRAPHER:    Thank you. This the videographer.

The time is 12:26.    We're going off the record.    This is the end of Media File 3, and that concludes this deposition.

(Time noted:  12:26 p.m.)

Page 120

A C K N O W L E D G E M E N T

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NEW YORK  )

I, JASON STEPHEN FLEMMONS, certify, I have read the transcript of my testimony taken under oath in my deposition of February 5, 2021; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

- - - - - - - - - - - - - - - - -
                    JASON STEPHEN FLEMMONS

Sworn and subscribed to before me

this_____ day of_____, _____.

_____
     Notary Public

Page 121

C E R T I F I C A T I O N

STATE OF NEW YORK  )

                   ) ss.:

COUNTY OF NEW YORK )

          I, JUDITH CASTORE, Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

          That JASON STEPHEN FLEMMONS, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

          I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

          IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of February, 2021.

                    _Judith Castore_

                    JUDITH CASTORE

Page 122

                              I N D E X
WITNESS                                                 PAGE
JASON STEPHEN FLEMMONS
        Examination by:
                MS. WYMAN                                  7

                            * * *
                        E X H I B I T S
            (Retained by Veritext Legal Solutions)
FLEMMONS                                                PAGE
Exhibit 1    Expert Report of Jason S.                    14
             Flemmons, CPA, CFE, CFF, in
             Opposition to the Expert Report
             of Steven P. Feinstein, Ph.D.,
             CFA, February 1, 2021
Exhibit 2    ASC 450                                      34
Exhibit 3    Jeld-Wen IPO Prospectus dated               80
             January 30, 2017
Exhibit 4    Form 10-Q Quarterly Report                  88
             Pursuant to Section 13 or 15(d)
             of the Securities Exchange Act of
             1934, for the quarterly period
             ended March 31, 2018, for
             Jeld-Wen
Exhibit 5    Form 10-Q Quarterly Report                  90
             Pursuant to Section 13 or 15(d)
             of the Securities Exchange Act of
             1934, for the quarterly period
             ended June 30, 2018, for Jeld-Wen
Exhibit 6    Jeld-Wen Accounting Topic                   96
             Discussion Paper dated November
             6, 2018
Exhibit 7    October 6, 2018, Jeld-Wen press            114
             release

Page 123

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.   You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty(30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

**Page 124**

                          **E R R A T A**

              I wish to make the following changes,

          for the following reasons:


PAGE LINE

___  ___  CHANGE:_____

REASON:_____

___  ___  CHANGE:_____

REASON:_____

___ ___  CHANGE:_____

REASON:_____

___ ___  CHANGE: _____

REASON:_____

___ ___  CHANGE: _____

REASON:_____

___ ___  CHANGE: _____

REASON:_____


_____     _____

      WITNESS' SIGNATURE                  DATE

**[& - 6]**

**&**

**&**   2:5,13 3:5 6:9
6:18,25 9:13 10:3
17:23,25 109:25

**0**

**00112**   1:8 5:19
**01109346**   98:9
**04**   94:24

**1**

**1**   5:7,10 13:4,5,13
13:17,25 14:2
15:5,9,16 23:6,11
44:15 46:10,18
48:7 68:23 78:17
122:8,10
**10**   68:14,18 77:24
77:24 78:3,3 80:7
82:2,5 83:7 86:13
87:24 88:5,7,13,15
89:13,20 90:17,24
91:8,16 92:5,8,9
92:21 93:5,12
110:17 122:12,15
**10004**   2:14
**10022**   3:6
**102**   52:17
**11**   40:23 88:10
**114**   56:20 122:19
**11:07**   68:21
**11:20**   69:4
**12**   60:18,20
**12.2**   110:4
**12:17**   117:23
**12:25**   118:5
**12:26**   119:21,25
**13**   15:23 88:16
90:18 122:13,16
**14**   15:23 122:8
**15**   12:15 45:13
49:7 51:21 52:9

53:3,15,22 54:21
55:24 58:4 59:25
62:10,15 65:11
70:22 71:13 76:25
84:4,11,22 85:4,8
85:11,19 86:5,25
87:17 88:2,16
90:18 93:19 95:8
101:13 106:22
108:15 111:6
112:3 116:2 119:3
122:13,16
**16**   114:11,18
**17**   36:3
**17436**   121:23
**18**   43:12 44:16
45:10
**1934**   88:18 90:20
122:14,17
**1990s**   24:20
**1994**   24:7
**1s**   78:7,19

**2**

**2**   18:17 19:7 23:2
34:11,13,16,21
59:21 69:5 77:25
89:15 97:12
117:25 122:11
**200**   113:22
**2000**   7:19
**20006**   7:19
**2016**   82:2
**2017**   80:10,16 83:6
86:13 87:25 88:5
122:12
**2018**   12:12,15
45:13 49:7 51:21
52:9 53:3,15,22
54:21 55:24 58:4
59:25 61:9 62:11
62:16 65:11 70:22

71:13 76:25 82:21
84:4,11,22 85:4,11
85:20 86:5,25
87:17 88:2,14,19
89:13,20 90:21,25
91:17 92:8,21,22
93:3,19,20 95:8
96:17 98:5,18
99:3,14 100:7,12
100:21 101:8,13
104:16 106:22
108:15 111:3,7
112:3,17 113:3,16
114:9,12,23
115:14 116:2
119:3 122:14,17
122:19,19
**2021**   1:10 5:5
13:17,25 120:9
121:22 122:10
**21**   33:16,18 44:16
69:9,11 70:3,14,16
**23**   48:8,10 49:17
50:21 78:14
**23219**   3:13
**24**   35:6,8,13,19,24
37:9
**25**   37:15
**29**   40:23 41:15,19
42:12,15 43:4
102:13
**297**   52:16,23 53:2

**3**

**3**   47:5 80:8,11,13
96:23 118:7
119:23 122:11
**30**   80:10,15 90:21
93:3,10 122:12,17
123:14
**31**   87:25 88:19
103:5 122:14

**32**   60:17 61:3,23
**33**   70:4
**34**   15:10 90:7
92:11 122:11
**343**   56:20,24 58:11
**347**   98:14
**348**   105:12
**36**   83:8,16
**3:20**   1:8 5:19

**4**

**4**   15:19 80:15
88:13,21 89:9,12
89:19 93:24 94:22
108:14,23 109:14
112:11 122:12
**424**   80:15
**43**   45:24
**45**   45:10 48:12
**450**   33:22 34:4,5,7
34:14,15 35:2,9,13
38:15,20 54:12
75:22,23 102:14
116:15 122:11
**48**   91:8

**5**

**5**   1:10 5:4 67:20
90:16,22 91:12
112:17,22 113:3
113:16 120:8
122:15
**53**   70:14
**56**   78:13,23
**57**   81:25
**58**   83:3

**6**

**6**   48:7 94:25 96:13
96:16,18 97:3,9,17
97:19 98:4,5
105:9 108:23
109:2 114:9,12,23

**[6 - answered]**                                                                        Page 2

122:18,19,19
**60**  83:9,16
**601**  3:6
**604**  108:20
**63**  86:11 87:14
**655**  2:6
**69**  112:14,16
113:14

**7**

**7**  36:3 46:7 92:22
114:9,14,17,18
122:4,19
**70**  114:24
**71**  93:9,14,17
**72**  96:3 97:21
**75**  36:23
**76**  106:16
**76.5**  39:4 61:8
106:21 107:2
109:21 111:5
**7th**  121:21

**8**

**8**  33:17 44:24
73:14 78:6
**80**  122:11
**800**  3:13
**88**  122:12

**9**

**9**  36:2 37:16
112:23 113:2
**90**  122:15
**92101**  2:6
**9348**  98:10
**96**  122:18
**9:59**  1:11 5:5

**a**

**a.m.**  1:11 5:5 69:4
**abbreviated**  109:6

**able**  34:21 75:7,13
75:15 80:22
**acceptable**  13:8
**accepted**  18:14
**accidentally**  88:24
**accountant**  24:13
37:6 60:8 64:18
65:19 67:25
107:11
**accounting**  19:25
23:21 33:23 34:6
36:18 45:2 47:14
61:13,16,25 62:4
62:22 63:8 64:3
64:15 69:16 71:8
71:17,20 72:9
73:2 75:24 76:19
77:9 96:15 98:7
103:19 104:3,8,14
116:11,21,23
122:18
**accrual**  115:19
**accrue**  40:8 76:7
**accrued**  76:23
84:24 86:20 90:12
92:18
**accruing**  72:18
73:24 81:7 82:7
91:14,22 92:3
95:18,24
**accurate**  20:14,15
20:17,21,25 21:3
21:12,16 123:16
**achievable**  49:2
**acknowledged**
51:17 52:5 53:7
54:4 70:25
**acknowledges**
103:7
**acknowledging**
49:24 50:14,24

54:9
**acknowledgment**
51:5
**act**  88:17 90:19
110:5 122:13,16
**action**  1:8 26:18
27:3,10,15 28:19
29:4,13,18,24
30:18 31:9,22
32:10,25 33:6
95:20 121:17
**active**  25:3
**actual**  16:6
**add**  16:4 18:20
55:7
**addition**  40:15
70:10 78:5
**additional**  11:21
16:4 100:8 117:2
**additionally**
109:16,19
**additions**  23:14
**address**  7:19
**addressed**  42:20
**addresses**  43:5
**administer**  7:14
**admission**  58:21
**adverse**  53:5,25
57:17,21 110:10
**advisors**  41:23
**ago**  45:3
**agreed**  4:2,7,10
**ahead**  43:12 83:4
**allegation**  48:18
**allegations**  45:15
49:20 50:25 53:8
54:5 57:7 58:13
73:5,22 76:5
**allege**  72:17 76:12
**alleged**  57:14

**amend**  19:2
**amended**  19:17
72:14 73:14 78:6
78:19
**american**  8:3
**amount**  11:4 38:4
38:5,7,19 39:9
40:8
**analyses**  29:15
116:23
**analysis**  21:6
26:17 27:3,7,13
28:18 29:3,10
33:10 43:14 44:13
51:18 52:6,13,13
54:17,18,24 55:12
55:14,21 56:3,16
59:11 63:17,25
68:4,5,6,9 70:9
72:6 76:17 111:24
116:15
**analyst**  11:25 12:5
12:7 25:16,19,25
26:5 55:8 59:16
**analysts**  48:17
57:6,11 58:12
**analyze**  47:10
**analyzed**  59:19
**announce**  115:19
**announcement**
45:13 49:7 53:15
53:23 58:4 59:25
62:11,16,23 65:11
67:16 72:8 95:16
111:7 112:8
**announcements**
57:17 58:23
**answer**  8:15 50:11
74:5,22
**answered**  120:11

**[answers - block]**

answers  19:3 32:18 120:12
anticipated  14:12 110:2
anticompetitive  48:19 57:8 58:14
antitrust  53:8 54:4 70:25 109:24 110:9
anybody  118:16
apart  55:17 56:5 76:24
apologize  32:17 88:23 91:5
appeal  110:9,13
appear  34:25 70:4
appearances  6:5
appeared  2:3
appears  95:10 115:13,15 116:2
applied  56:14 60:4
apply  56:8 59:22
appreciate  40:20
appropriate  42:8 100:17 101:3 113:11 123:5
appropriately  66:5,13
approving  17:17
approximately  11:2 12:9
area  30:25 31:5 32:6
arising  47:15
arrive  37:20
arriving  113:17
articulate  35:9 41:2,10
asc  33:22 34:4,5,7 34:14,15 35:2,9,13 38:15,20 54:12

75:23 102:14 116:15 122:11
ascertain  27:25
aside  59:15
asked  16:9 20:4,6 27:20 46:21 47:2 47:9 48:4 118:22 120:11
asking  22:23 91:23,25 94:9 100:22
aspect  48:2
aspects  46:23 64:16 115:17
assert  64:10
asserting  54:8 58:19
assertion  64:16
assess  39:8 103:2 116:10
assessed  99:24 117:12
assessing  41:4,12 43:9 101:8 102:17 103:3
assessment  36:20 38:15 39:11 42:7 100:10,15 101:14 102:5 111:2
assessments  59:3 100:5 101:23 102:3 103:10
assets  83:15
assigned  17:11
assignment  47:20
assist  42:22
assistance  16:21 16:23
assisted  17:2
associate  74:16

assume  21:2,10
assumption  20:10 20:23 21:6
assumptions  20:5 20:7,8
attached  123:11
attended  18:6
attention  61:22
attorney  6:7 123:13
attorneys  83:12
auditor  22:5
august  92:22
available  37:19 55:3
avenue  3:6
awarded  107:16

**b**

b  16:7 80:15 122:7
back  37:8 49:11 59:21 60:12 69:2 69:6 71:21 85:16 89:4 105:8 108:13 112:13 118:5
background  44:20 45:6 70:2,11
baron  2:15 6:22
based  19:22 36:20 37:5,19 51:18 52:6 60:7 65:19 67:24 72:5 83:17 99:6,19 100:3,9 101:6,16
basically  50:20
basis  62:8,13,20 104:23 113:9 117:2
bates  98:2,8,14 105:12
bba  23:21

bear  102:4,8
bears  98:8
beck  3:4,11 7:3
beginning  69:5 118:6
begins  70:17
behalf  2:12 3:4,11 6:16,19,23 7:2 38:24
behavior  27:8 29:11 45:18 48:19 48:22 49:22 57:8 58:14
belief  111:9
believe  9:16 10:15 10:19 11:25 12:11 12:16 17:9 21:17 22:19 23:13,18 25:2 29:19 30:23 33:2,7,14 35:4 43:2 47:23 49:4 52:11 53:12 55:13 56:14 57:25 59:19 60:4 64:20,23 74:14 79:11 85:21 86:7,17 90:10 92:9,15 96:2 99:4 106:14 110:24
believed  49:20 85:13 86:3
believes  40:6 58:18 99:7 106:4 106:11
believing  53:24
best  8:18 37:18 38:3 40:7
better  38:5 39:13
beyond  18:8 55:12
bit  102:12
block  103:13

**[blood - company]**                                                                                       Page 4

blood   121:17
bold   16:7,7
bolded   86:16
  103:14,18
bond   27:8
booking   39:22
  108:10
bottom   15:20
  40:13 60:19 70:16
  92:14 98:17
  105:15 108:24
break   68:14 71:23
  87:10 106:20
  117:17
breakdown
  106:10
brian   3:14 7:7
  80:22,24
brief   68:24 118:2
briefings   108:4
bring   72:16 93:22
  112:21,24
broad   30:4 32:6
broadway   2:6
brooks   3:4,11 7:3
bschmalzbach
  3:14
bullet   106:20
  107:5,12,14
bullets   106:25

**c**

c   2:2 3:2 26:12
  41:18 42:2 120:2
  121:2,2
calculating   30:17
  31:8
california   2:6
call   13:5 22:21
called   73:13
  112:25

cammer   26:8,12
  26:16
canal   3:13
carefully   123:4
case   5:18 8:3
  15:14 16:2 19:13
  22:3,10 39:4
  46:19 72:11 73:15
  95:14 97:16
  102:21,23 104:14
  107:16 110:11
  113:18 115:6
cases   30:15
castore   1:15 5:25
  121:6,24
categories   19:15
  84:17 106:15
category   19:18
  97:12
causation   31:21
  32:3,5,9 63:17
caused   28:2
certain   17:3 27:24
  27:24 28:2,3 30:5
  38:9,14,22 42:22
  44:2 45:21 47:24
  49:8,24 50:14
  51:6,17 52:5
  53:16 54:9 58:6
  58:21 59:7,8 78:6
  78:8
certainly   18:12
  28:10 44:21 47:25
  54:12,25
certification   4:4
certified   1:15
  24:12
certify   120:6
  121:8,15
cfa   13:16,24 26:3
  122:10

cfe   13:14,22 122:9
cff   13:14,22 122:9
chance   74:3
  108:18
change   102:3
  103:8 104:3
  111:18,19 124:7,9
  124:11,13,15,17
changed   16:13
  87:4 104:13
changes   103:18
  104:7 105:4
  123:10 124:3
characterization
  61:6,12,24 71:12
characterizations
  47:13
characterize   45:19
characterized
  62:23
characterizes
  70:18,22
charge   109:21,25
chartered   25:16
  25:18
check   50:3 52:21
chief   98:7
choice   38:24
chris   3:16
christopher   5:22
chronological   13:6
citations   46:3
  72:23
cite   48:11 56:18
  77:16 96:6
cited   9:11 11:10
  11:14 19:16,19
  55:8
civil   1:8
clarification   40:21

clarify   31:4
class   2:5 6:10,20
  27:9,15 28:19
  29:4,12,18,24
  30:18 31:9,22
  32:10,25 33:6
  47:18 57:13,19,20
  77:21
clayton   110:5
clear   8:13 14:10
  32:19 38:13 39:7
  54:23 55:10 66:17
click   14:6 89:7
clicked   88:23
close   22:20 60:11
  81:22 90:14 93:11
  96:20 112:10
  113:22 114:7
  117:14,18
closed   45:18 71:2
closely   17:4,12
cmi   113:10
codification   34:6
colleagues   7:5
  10:5 16:25 28:11
college   23:21
color   16:4
combination
  19:14
come   22:20
comes   11:23 19:3
coming   42:23
  102:25
companies   38:3
  39:12 43:8 59:2
  103:2
company   27:9
  29:12 35:10 37:18
  39:2,8,21,23,24
  40:4,11,14 41:20
  48:16,23 49:19

**[company - correct]**                                                                     Page 5

50:24 51:16,20
52:5,8 53:3 54:20
56:11 57:13 58:20
59:18 63:13 64:6
78:9 79:3,7,18,22
81:6,16 82:5,11,15
82:23 83:20 84:4
84:9,22 86:24
87:3,16 91:13,21
92:2,20 95:17,23
99:7,12,22 100:14
100:24 101:5,13
101:22 102:2
105:18 106:4,10
106:17,22 108:8
108:17 109:20
110:3,7,12,25
111:4,20 115:18
115:24 116:3,14
117:7
**company's** 33:11
42:7 51:4 57:4
77:8,20,24 78:6
83:6 86:13 87:24
89:21 99:20 101:9
104:24 110:16
111:9,15 112:8
116:11
**complaint** 19:17
72:15 73:4,10,15
76:11
**complaints** 72:11
**complete** 120:10
**completeness** 91:9
**components** 106:3
106:25
**comprising** 106:15
**computer** 75:6,14
**concealed** 57:3
**concept** 38:17
76:18

**concerning** 41:23
47:13 77:14,19
87:5,18 89:22
93:19 95:25 108:7
111:8 115:11
**concluded** 100:2
101:23 113:10
**concludes** 119:24
**conclusion** 42:23
51:14 52:3 100:9
104:24
**conclusions** 47:12
119:11
**condition** 35:18,22
37:9 57:6
**conditions** 35:15
**conducted** 22:8
28:5
**conducting** 27:6
29:9
**confident** 73:6,8,9
77:15 79:21 81:16
**confirm** 35:21
**confounding**
28:16 29:2,6
**connection** 32:2
38:20 61:5
**connotation** 63:21
**consequences** 53:6
53:25 57:22
**consider** 19:12
36:19 41:3,11,21
42:22 43:9
**considerations**
43:8 101:9 102:14
**considered** 11:15
11:18 12:3 19:9
20:13,24 22:25
46:16 72:12 89:15
89:18 97:10
102:17 115:4

**considering** 21:11
64:15
**consistent** 53:21
76:10 81:20
**consistently** 85:12
**constitute** 66:20
67:22 69:15
**constituted** 64:12
111:17 119:12
**cont'd** 3:2
**contain** 104:22
**contained** 15:14
45:25 46:24 87:23
88:5 116:7
**contains** 76:22
114:4
**contemplated**
105:2
**content** 21:14
113:23
**contents** 20:21,23
74:7,24
**context** 27:19 29:7
29:21 32:9
**contingencies**
33:24,25 34:9
38:16 43:10 58:24
72:19 102:16
**contingency** 35:11
35:16 39:16,23
40:5 41:5,13 42:8
42:25 43:20,25
44:9 45:14,20
59:4 61:15 62:3
62:24 63:6,11
64:12 65:12,22
66:20 67:2,8,15,22
69:14 71:4,14
72:7,25 73:25
76:7,24 77:5 79:5
79:9,12,19,23 80:3

81:8,17 82:7,12,20
84:6,10,24 85:4,21
86:21 87:18 89:23
90:13 91:15,22
92:4,19 95:19,24
96:10 99:8,25
100:16 101:2,10
101:15,24 102:18
103:4 106:17,21
108:10 109:22
110:15 111:5,10
111:17,21 115:10
115:19,25 117:4,9
119:14
**contingent** 61:7
**continued** 82:16
**continues** 110:7
**convenient** 14:17
**copies** 20:17
**copy** 14:11,14,20
34:13 46:10 73:14
80:14 95:7 113:2
114:22
**corey** 2:15 6:22
**corey.simmons**
2:16
**corporation** 2:12
78:10
**correct** 8:4 22:12
23:4,23 24:10
25:14 26:14,23
29:8,24 32:21
33:5,13 36:6,25
37:7,12 41:13,24
42:10,25 45:23
46:4 50:16 55:16
56:4 60:10 64:22
67:17 72:13 76:8
77:25 78:24 91:17
95:14,20 96:10
100:18 103:12

[correct - disclosures]                                                                Page 6

104:10,12 106:6
107:4 110:21
114:5 115:12
118:24 120:10,14
**correction** 63:7
64:14 65:14 66:5
66:13,21 67:9,16
67:23 69:15 71:25
105:6
**corrections** 123:4
123:6
**corrective** 48:15
49:18 50:22 57:2
61:11 62:17,25
63:16,21 64:2,7,13
65:3,12 70:23
71:18,23 76:14
77:6 118:23 119:4
119:8,12
**correctly** 49:3
53:11 57:24
**correspondence**
78:8
**counsel** 2:4 4:3 6:4
9:13 14:13 17:20
41:22 47:9
**county** 120:4
121:4
**couple** 9:12 49:11
**coupled** 51:12
**course** 18:25 55:5
69:24
**court** 1:2 4:13
5:15,24 7:13 8:12
99:2 100:12
109:23 123:17
**cpa** 13:14,22 24:15
24:23 25:3 122:9
**current** 23:11
**currently** 25:4

**customary** 116:21
**cv** 1:8 5:19 23:7,11
23:20 24:11 25:17

**d**

**d** 3:14 88:16 90:18
120:2 122:2,13,16
**damages** 29:17,20
29:23 30:5,14,17
30:19,20 31:8,10
31:11,19 33:5
83:8,22 84:16,17
107:18 110:5
**data** 19:9
**date** 1:14 5:4 12:9
12:13 14:3 34:17
76:24 80:12 88:22
90:23 96:19
114:15 123:8
124:21
**dated** 13:17 80:10
96:16 98:5 122:11
122:18
**dawned** 18:19
**day** 48:22 115:14
116:5 120:19
121:21
**days** 9:7 22:18
53:2 123:14
**dc** 7:19 8:23
**debra** 2:7 6:8
74:25
**debraw** 2:7
**december** 87:25
**decision** 63:5 96:9
**deemed** 101:24
123:16
**defendant** 2:12
7:2
**defendant's** 33:12
**defendants** 3:4,11
6:23 7:9 76:6

**define** 32:13 36:8
36:16 63:23
**defined** 85:22
**defines** 36:8
**definition** 36:5,11
38:15 65:7 71:16
104:3
**degree** 24:6 25:7,9
25:12
**degrees** 24:9
**delay** 109:8
**denials** 53:4
**dense** 114:2
**depos** 13:7
**deposing** 123:13
**deposition** 1:13
4:5,11 5:11,20
7:25 8:21 9:4,8
11:8 14:16 19:2
46:12 73:13 89:6
93:25 119:24
120:8,12 121:10
123:3,11,14,16
**describe** 37:17
**described** 10:23
12:20 18:7 35:3
55:19 56:7 115:15
**describes** 100:13
**description** 50:21
**detail** 60:22 61:4
63:9 110:12
**details** 110:15
**determination**
37:21 62:10,15
65:21 111:15
116:3
**determinations**
61:16 62:4 116:12
117:12
**determine** 19:11
54:18 55:21 56:9

59:3,12,24 111:24
**determined**
105:18,24 108:8
111:21
**developed** 40:7
**diego** 2:6 6:12
**different** 42:4
73:12 84:16 100:9
105:5
**difficult** 42:16
**difficulty** 42:20
43:5
**digest** 116:14
**disclose** 40:10,14
84:23 85:6
**disclosed** 48:23
59:18 83:7,18,21
83:23 92:13 99:23
110:16,25 115:24
117:10
**discloser** 61:11
**disclosing** 63:10
79:12
**disclosure** 47:14
48:15 49:19 50:22
58:19 61:9 62:17
62:25 63:5,16,22
64:2,7,11,13 65:3
65:13,24 70:23,24
71:13,18,23 72:25
77:5,6,9 79:17
81:12 84:13 86:23
87:13,15,22 88:2
89:21 91:6,24
92:10 117:3
118:23 119:5,9,12
119:13
**disclosures** 55:4
57:2 61:17 62:5
63:13 69:17 71:19
76:15 77:18 78:4

**[disclosures - exchange]** Page 7

82:17 88:4 99:20
101:22
**discuss** 60:21 61:4
63:8
**discussed** 18:11
54:15 71:7 116:7
**discussion** 71:22
96:16 122:18
**disgorgement** 30:8
**dispense** 8:7
**district** 1:2,3 5:15
5:16
**divestiture** 53:10
83:15 107:6,20,25
108:7 113:10
**division** 1:4 5:17
78:9
**document** 11:21
11:24 14:4 17:16
74:2 80:25 81:23
89:14,17 91:5
97:13,25 98:13
105:11 114:2,7
115:3
**documents** 11:15
11:16,18 19:8,19
19:22 20:14,16,24
21:4,10,15 72:12
89:18
**doing** 77:12 94:18
123:7
**dowd** 2:5 6:9,18
**download** 75:6,12
80:19 90:4
**downloading** 75:2
77:11
**dr** 46:3,11,17
47:21 48:6 49:6
51:15 52:4,15,25
53:14 56:19,25
58:3 60:12 64:5

64:18,22 71:12
76:21 93:24
**draft** 16:18
**drafting** 17:3,8,13
**duly** 7:17 121:11

**e**

**e** 2:2,2 3:2,2 7:16
7:16,16 26:12
120:2,2,2 121:2
122:2,7 124:2
**earlier** 17:2 99:21
102:12 118:21
**early** 79:13
**earnings** 22:21
93:20
**east** 3:13
**eastern** 1:3 5:6,16
69:4
**economic** 32:15
56:8,15 59:23
60:5 68:3,4,9
71:24 72:6
**economics** 25:10
65:2,8
**economist** 25:22
64:22 65:6
**education** 23:20
**effect** 4:12 91:24
**effectively** 53:7
70:24 111:17
**effects** 28:3
**efficiency** 26:17
27:2,14
**efficient** 28:8
32:24
**either** 18:14 30:6
30:25 38:9 117:2
**ellis** 3:5 6:25 9:13
10:3 17:23,25
**emerged** 57:23

**empirical** 27:7
29:11
**employee** 21:22
22:4
**ended** 88:19 90:21
93:3 122:14,17
**ends** 98:14
**engagements**
28:10
**english** 51:11
**entails** 28:13
**entered** 110:3
**entirely** 54:13
65:13
**entirety** 47:20
**equipped** 63:23
**errata** 123:6,7,10
123:13
**erroneous** 61:18
62:6 63:14 71:20
77:8
**error** 63:7 67:23
69:16 71:25
**errors** 105:7
**esq** 2:7,8,9,10,14
2:15 3:7,8,9,14
**essentially** 58:20
**estimability** 100:6
**estimable** 37:11
37:21 39:9,10
80:4 85:23 86:19
87:6 89:25 90:11
92:17 99:9,25
101:11,16,25
102:6 105:20,25
107:8 108:9
110:21 111:11,22
**estimate** 37:19
38:4,9,21 39:3,13
39:24,25 40:7
59:5 103:7 104:4

104:5,14 106:5,11
110:12 111:18,19
111:25
**estimated** 38:20
105:16 110:6
**estimates** 38:16
103:19 104:8
105:4
**evaluate** 31:19
46:21,23 47:2
112:7 116:23
**evaluating** 26:16
26:25 29:17,23
31:21
**evaluation** 99:13
**event** 27:12,19,22
27:25 28:2,6,18
29:3 30:13 31:17
31:18 36:9 72:9
73:2
**events** 27:23 35:20
36:10,22 43:6
84:14
**exact** 12:12 24:16
43:3 50:5 53:19
54:6 58:8 85:17
88:8
**exactly** 113:20
**examination** 7:21
118:20 121:12
122:4
**examined** 7:20
**examining** 27:7
29:10
**example** 30:7 39:4
86:12 87:22 92:11
**excerpt** 86:14,15
104:2
**excerpts** 35:13
**exchange** 88:17
90:19 122:13,16

**[exercising - flemmons]**                                                                    Page 8

exercising  101:6
exhibit  11:15,18
  13:4,13,19 14:2,5
  15:9,16 18:17
  19:7 23:2,6,11
  34:11,13,16,21
  46:10,18 48:7
  59:21 73:14 74:15
  74:19 75:2,3,12
  77:25 80:8,11,13
  88:13,21,24 89:9
  89:12,15,19 90:8
  90:16,16,22 91:12
  92:12 93:23,24
  94:2,20,22,24
  96:13,17,24 97:3,9
  97:12,17,19 98:4
  105:9 108:14
  109:2,14 112:11
  112:23,25 113:2
  114:8,9,14,17,18
  122:8,11,11,12,15
  122:18,19
exhibits  46:8
  94:11 109:6
exist  73:10
expand  109:7
expected  36:21
  49:2 103:8
expects  109:20
experience  25:22
  25:24 26:5,16,25
  27:6 29:16 30:17
  31:21 36:17 37:5
  51:12
experienced  8:2
expert  13:13,15,21
  13:23 32:22 33:4
  33:9 122:8,9
expertise  19:23
  29:9,23 30:25

31:7 60:8 62:21
  65:9,19 67:24
experts  83:8,17
exposure  39:15
  47:15
extent  17:14
  107:20
external  22:5

**f**

f  7:16 121:2
face  8:6
fact  80:2 117:7
factor  41:18
factors  26:9,12,16
  26:21 27:2 41:2
  41:10,16,20 42:4
  102:16
facts  36:21 116:24
  116:24
factual  61:13,25
  62:18 113:7
fail  123:15
failing  76:7
fair  66:2,10 85:19
  98:24
false  61:6
familiar  27:16
  28:13 29:5
fargo  12:6,19
february  1:10 5:4
  13:17,25 15:5
  120:8 121:21
  122:10
fees  83:12 110:6
feinstein  13:16,24
  19:20 43:18 44:8
  45:12 46:9 47:6
  47:11 48:7 49:6
  51:15 53:14 54:7
  58:3 62:22 64:18
  64:22 70:17,21

76:16 94:21
  108:14,21,23
  109:14 112:11
  122:10
feinstein's  46:3,11
  46:17 47:12,21
  48:6,14 52:4,15,25
  55:9 56:19,25
  60:12 61:6 62:9
  62:14 63:25 64:5
  66:24 71:12 76:21
  93:24 119:11
fiber  107:6
figure  74:13
file  68:23 69:5
  94:25 117:25
  118:7 119:23
filed  5:15 71:5,15
  80:15 92:20,24
  93:6
files  98:5
filing  4:4 86:14
filings  20:2,18
  54:25 59:19 77:20
  78:4 80:5 83:23
  83:25 85:11,18
  88:6 99:21 101:21
finance  25:7 78:10
financial  25:16,19
  25:25 33:9 40:5
findings  113:8
fine  13:9 19:5
firm  28:11
firms  28:12
first  23:10,19
  35:17,22,23 42:13
  44:4,6,7 67:6,12
  67:19 83:13 88:14
  89:13,20 90:8
  92:7 95:22 97:25
  106:24 110:18,24

fiscal  82:2
five  117:17
fkaram  2:10
flemmons  1:14 5:1
  5:12 6:1 7:1,22
  8:1 9:1 10:1 11:1
  12:1 13:1,5,14,22
  14:1,2 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1,15
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1,6 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1,11 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1,20
  89:1 90:1,22 91:1
  92:1 93:1 94:1
  95:1,5 96:1,17
  97:1 98:1,12 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1
  109:1 110:1 111:1
  112:1 113:1 114:1

114:13 115:1 116:1 117:1 118:1 118:8,21 119:1 120:6,16 121:9 122:3,8,9

**flip** 37:15

**flipping** 24:4

**focus** 61:21

**focused** 50:7 67:5 86:2,3

**folder** 13:19 14:6 34:12 46:9 73:16 90:16 94:2

**folks** 10:3,12

**follow** 119:18

**following** 57:23 124:3,4

**follows** 7:20 70:7

**footnote** 36:3,4,7 36:14 45:24 50:4 52:19

**force** 4:12

**foreseeable** 57:22

**form** 4:8 16:10 19:12 22:10 28:21 30:2 31:3 37:24 38:12 54:17 56:13 65:17 77:24 78:17 83:6 86:10,13 87:8,21,24 88:13 88:15 89:12,20 90:17,24 91:8,16 92:21 93:5,11 99:17 101:19 103:24 104:19 110:17,23 111:14 112:6 115:22 116:19 122:12,15

**format** 90:5 113:21

**formed** 15:14 104:23

**former** 21:22 22:4

**forming** 20:5,9 21:7,9,21 22:2,17 46:18 72:13

**formulating** 113:16

**formulation** 43:3 115:5

**forth** 121:11

**founding** 54:14

**four** 106:20

**francis** 2:10

**frank** 2:12 6:22

**frankly** 64:9

**fraud** 26:18 27:3,9 27:15 28:19 29:4 29:12,18,24 30:18 31:9,22 32:10,24 33:6 63:18

**fried** 2:12 6:22

**friedfrank.com** 2:15,16

**fritzler** 3:7 6:24,25 10:4 13:9 28:20 29:25 31:2,14 37:23 38:11 39:6 40:2 41:25 44:5 44:18 50:17 51:22 52:10 54:22 56:12 59:14 60:3 62:19 63:19 64:8 65:4 65:16 66:7,15 68:7,15 70:6 72:3 78:2 81:14 84:8 85:15 86:9 87:7 87:20 91:18 94:23 99:16 100:19 101:4,18 102:7 103:23 104:18

108:25 110:22 111:13 112:5 115:21 116:18 118:17,20 119:15

**full** 90:8 109:7

**fully** 57:12

**fun** 2:4

**further** 4:7,10 55:14 110:14 113:8 119:16 121:15

**future** 35:20 36:9 36:22 43:6 107:17 107:22 110:13

### g

**g** 120:2

**gaap** 33:24 34:8 36:8,8,15 37:5,17 38:2,6,8 39:2,8 41:2,10,20 42:20 43:4 51:8,13 54:14 60:7 64:6 65:15,25 67:9,17 69:18 71:25 72:18 72:22,22 73:5,24 75:21 76:6,12 77:14,16 85:22 100:17,25 102:2 103:6,22 104:2,4,7 105:3 107:11

**gaap's** 36:4,11 66:6,14

**gary** 3:5,12 7:4

**geis** 3:8 7:6 10:4

**geller** 2:5 6:9,18

**generally** 27:21

**getting** 38:25 68:12 71:21 74:22 117:18

**give** 49:13 90:3

**given** 32:23 46:18 65:21 72:24 115:23 117:11 120:13 121:13

**giving** 41:21

**glad** 94:13

**go** 6:14 21:9 36:15 37:15 42:19 59:20 68:16 70:3 75:18 77:10 83:24 85:16 88:7 97:6 117:19

**goes** 98:9

**going** 5:3 8:7 12:24 13:3,12 14:14 34:10 37:8 43:11 46:9 50:8 60:25 68:21 73:11 74:9 80:13 88:12 89:7 90:4,15 93:12,22 94:24 96:12 112:21 114:8 117:24 119:22

**good** 5:2 7:22,23 25:4 68:13,15

**governs** 33:22

**graduate** 23:24

**graduating** 24:18

**great** 6:15 34:20

**growth** 57:5

**guess** 75:17 114:18

**guidance** 105:6

**guys** 11:3

### h

**h** 7:16 122:7

**hachigian** 3:5,12 7:3

**half** 9:23 11:5 106:16

hand   121:21
hanlon   3:16 5:23
hannah   3:8 7:6
   10:4
hannah.geis   3:8
happen   89:7
happens   75:19
hard   8:14,16
   14:10,14
harris   2:12 18:23
header   15:21,24
   43:24 69:12
heading   105:14
heard   31:24
hearings   108:4
held   1:14 5:20
hello   69:7
help   22:9 74:9
helped   74:21
hereinbefore
   121:10
hereto   4:3
hereunto   121:20
hesitate   30:3
highlight   91:10
highlighting   14:24
hits   75:21,22,25
hold   5:8
holding   1:6 3:4,11
honestly   57:12
   74:5,10
hopefully   13:18
   113:23
hours   9:22,23 11:5

### i

idea   74:10
identical   91:7
identification   14:3
   34:16 80:12 88:21
   90:23 96:18
   114:14

identified   83:21
   87:23
identify   39:12
   73:21 102:13
illegal   48:19 57:7
   58:13
imagine   18:4
   116:9
impact   101:8
   112:7 116:10
impacted   12:20
   112:4
imperative   123:12
important   8:11
   45:6
inaccurate   45:19
include   83:11
   109:21
included   32:18
   52:19
including   10:3
   19:25 33:25 57:21
   84:15 88:6 110:3
inconsistent   54:13
incorrect   63:3,4
incremental   84:18
incurred   35:21
   36:24
incurrence   36:19
incurring   79:4
indicate   71:18
   96:7
indicates   41:19
   81:25
indication   59:7
individual   18:21
individuals   18:5
industry   116:21
infer   100:3
inflated   33:11

inform   79:3 81:7
   82:6 84:5 91:13
   92:2 115:9 116:25
information   16:14
   22:25 28:17 29:2
   29:6 37:20 51:20
   52:8 54:20 55:12
   55:23 56:10 57:21
   59:13,17,20 100:8
   100:11,14,24
   101:16 102:4,25
   103:9,20 104:9,16
   104:21 105:2
   111:8 112:2 114:5
   116:8
informed   45:14
   48:18 57:12 87:2
   95:23
inherently   38:17
   42:16 73:2 77:7
initiating   28:2
input   17:19 18:10
   18:14
insofar   46:20
instructed   42:21
instructions   123:2
instructs   41:3,11
intends   110:9
interest   91:9
interested   121:18
interference   24:2
internal   96:6
interrupt   8:12,15
   8:17
interview   22:14,15
interviews   22:9
investigate   21:14
investigation
   21:18
investment   30:21
   31:12

investors   30:20
   31:11 39:22 48:17
   57:6,11 58:12
   79:4 81:7 82:6
   84:5,23 85:13
   86:4,6,25 87:2,17
   89:22 91:14 92:2
   95:17,23 110:19
   111:8 115:9
involved   10:22
   17:8,16 30:6
ipo   78:7,12,17
   79:3,16 80:9
   122:11
issuance   101:7
issue   30:22 31:13
   63:2 107:15
issued   16:10,15
   71:6 115:13
issues   42:22 65:20
   94:11
item   102:22
   107:19
items   19:16,18
   103:2 104:23
   106:15
iv   44:23,25

### j

j   7:16
jacobson   2:13
jag   1:8 5:19
january   80:10,15
   122:12
jason   1:13 5:12
   13:14,21 120:6,16
   121:9 122:3,8
jeld   1:6 3:4,11
   5:13 7:2,9 17:20
   20:3,18 21:23
   22:4 43:24 45:12
   47:9,14 49:8,24

**[jeld - loss]**                                                                       Page 11

50:13 53:16,23,24
54:8 55:2,23 58:5
60:2 61:7,15 62:3
67:21 69:13 71:3
72:18 73:23 76:22
80:9,16 85:12,20
86:2,4,6 88:20
90:21 93:18 95:9
96:7,8,15 98:6
104:13 105:9
110:19 112:2
114:10,12,23
115:9 122:11,15
122:17,18,19
**jenny** 3:9 7:5 10:4
**jenny.lee** 3:9
**john** 2:9 6:11 46:6
74:12,17 96:23
**john's** 94:18
**joined** 18:21
**jrigby** 2:9
**judgment** 101:6
110:2,10
**judith** 1:15 121:6
121:24
**judy** 5:24
**jump** 43:11
**jumping** 83:4
**june** 90:21 93:3
122:17
**jurisdiction** 24:22
**jury** 71:6 83:20,21
107:16 113:9
**jw** 98:9

**k**

**k** 7:19 82:2,5
86:13 87:24 88:5
120:2
**karam** 2:10
**keep** 37:14

**keystroked** 17:15
**kind** 8:9 14:20
21:18 22:9,13
52:12 54:17 55:20
68:3 81:11 82:22
104:25
**kinds** 30:8,13
31:18 58:23
**kirk** 3:4,11 7:3
**kirkland** 3:5 6:25
9:13,15 10:3,12
11:22 17:23,25
18:9,22
**kirkland.com** 3:7
3:8,9
**knew** 19:24
**know** 12:14 18:2,3
18:8 21:8 26:8,11
26:20 27:12 32:14
40:18 46:14 55:20
72:8 73:17 74:4,4
74:6,8,8 81:5
82:14 85:20 89:6
91:2 97:4 98:20
99:15,18 117:7
118:15
**krogman** 26:20,25
**ks** 77:24 78:3,6

**l**

**l** 2:14 3:4,11 7:16
120:2
**laborers** 2:4
**language** 51:11
86:15 88:8 92:7
**law** 65:8
**laws** 110:9
**lawsuit** 71:5
**lawyer** 32:12
63:22
**lawyers** 18:9

**lay** 82:13
**lays** 102:15
**lead** 6:19
**leading** 9:7 99:21
**learned** 57:3,7
58:13
**led** 100:9
**lee** 3:9 7:5 10:5
**legal** 3:16,17 41:22
63:20 110:6 122:7
**lengthy** 116:8
**letting** 5:9
**lexington** 3:6
**liabilities** 110:13
**liability** 36:24
44:2 45:21 49:9
49:25 50:14 51:6
51:17 52:6 53:17
54:9 58:6,21 59:8
**light** 111:3
**limited** 66:3,11
67:4,14
**lindsey** 18:23
**line** 6:14 44:11
70:15 103:17
124:6
**link** 89:2
**linkage** 119:13
**list** 94:24 97:10
102:22 109:6
**listed** 11:14,17
16:6 23:2 35:24
67:20 77:25 89:14
89:17 97:9,14
**listing** 19:9
**lists** 23:20 24:11
**litigation** 1:7 5:14
30:10 33:25 41:5
41:13,24 42:8,9,17
42:24 43:7,9
47:16 53:6 54:2

55:6 61:17 62:5
69:18 79:14 82:15
82:18,24 84:7,15
84:25 102:15,18
109:22,24 110:15
111:5
**litigations** 71:2
**little** 14:17 16:4
102:12
**livenote** 1:15
**llp** 2:5,13 3:5,12
7:8
**locations** 5:21
**long** 9:20 11:2
34:25 51:25
113:25
**look** 11:16 25:15
27:23 34:24 36:2
45:9 52:22 70:13
73:3,20 74:23
79:15 81:13 85:17
93:9,13 96:3
103:5 105:10
109:13 112:13
**looking** 15:8 105:3
108:19 116:5
**loss** 31:21 32:3,5,9
33:24 34:8 35:10
35:15,21 36:19
37:10 38:16 39:15
39:22 40:5 43:20
43:25 44:9 45:14
45:20 58:24 59:3
59:6,7 61:8,14
62:2,24 63:6,11,17
64:12 65:12,22
66:20 67:2,8,15,21
69:14 71:4,14
72:7,19,24 73:24
76:7,23 77:5 79:4
79:8,12,18,22 81:8

**[loss - new]**                                                                                      Page 12

81:17 82:7,12,19
84:6,10,24 85:3,13
85:21,24 86:7,18
86:20 87:5,18
89:22 90:10,13
91:14,22 92:3,16
92:18 95:18,24
96:10 99:7,24
100:6,16 101:2,10
101:14,23 102:5
103:3 105:16,19
105:25 106:5,12
106:16,21 108:9
110:19 111:10,16
111:21 115:10,19
115:25 117:3,9
119:14
**lot** 87:11 114:4
116:7
**lower** 40:15 57:18
**lowest** 38:6

**m**

**m** 7:16,16 26:12
26:12 120:2
**maintain** 110:8
**making** 37:14
51:15 97:20 113:7
**mallard** 3:4,11 7:4
**manage** 14:18
**management** 41:3
41:11 42:21
**march** 88:19
122:14
**mark** 3:4,11 7:2
12:24 13:12 80:7
88:12 114:8
**marked** 13:25
14:5 15:15 34:15
46:8,12 73:12
80:10 88:20 90:22
93:23 96:17

112:25 114:13
**market** 26:5,17
27:2,14 28:3,8
32:23 33:13 45:15
52:12 54:17,24
55:3,11,14,22 56:9
57:2 59:12,24
68:6 112:3
**market's** 51:19
52:7 54:19
**marking** 13:4
**marriage** 121:17
**mary** 23:22 24:18
**material** 19:8
**materials** 9:11
11:9,13,17 19:16
20:11 55:18 56:7
89:15 97:10
**matter** 5:13 10:6
19:23 21:19 48:4
61:12,14,24 62:2
62:18 71:17 77:19
79:6,20 81:9 82:8
85:14 86:8,18
87:5,19 89:24
90:11 91:16 92:5
92:16 95:25 99:2
105:21 106:6,12
110:20 111:11
115:11 121:19
**mcguire** 3:12 7:8
**mcguirewoods.c...**
3:14
**mean** 20:10,16
30:19 31:4,10
39:8 58:24,25
59:13 60:2 107:12
**means** 37:4 64:25
**meant** 49:19
**measure** 33:5

**media** 5:6,10
68:23 69:5 117:25
118:6 119:23
**meet** 11:3
**meeting** 9:20,25
10:14,17,23 18:22
**meetings** 9:12,14
9:18 10:22 18:6
**memo** 96:7
**memoranda** 22:14
**memorandum**
97:20 98:4 105:10
106:3,9,13,19
**mention** 19:4 47:6
112:17
**mentioned** 1:14
11:7 17:2 18:5
52:21 76:10
**merit** 45:16 48:20
49:20 50:25 53:7
54:4 57:8 58:14
**merits** 70:25
**met** 85:22
**michel** 3:5,12 7:4
**middle** 24:20 90:9
109:14
**million** 39:4 61:8
83:9,16 106:16,21
107:2 109:21
110:4 111:5
**mind** 11:23 19:3
62:7
**minute** 34:24
68:14 73:20 97:3
102:8 117:17
**minutes** 68:18
**mischaracterizat...**
66:25
**mischaracterizes**
43:19 44:8

**misled** 57:14
**misrepresentation**
33:12
**misrepresentatio...**
57:15
**moment** 34:10
45:3 49:13 90:4
118:10
**momentarily** 94:2
**monday** 9:9 10:19
11:3 23:15
**morning** 5:2 7:22
7:23 118:13
**multiple** 5:21
78:19

**n**

**n** 2:2 3:2 7:16,16
7:16 120:2,2
121:2 122:2
**name** 5:22 18:23
94:25
**national** 2:4
**nature** 16:5 43:19
44:8 66:25 72:7
103:8
**necessary** 21:5
123:4
**need** 14:18 19:2,24
23:15 34:23 83:25
94:6 116:22
**needed** 19:12
100:15 116:14
**negative** 45:17
48:21 49:21 51:2
53:9 57:9 58:15
**never** 28:14 32:4
32:22 33:3,8 89:6
**new** 1:16 2:13,14
2:14 3:6,6 6:2
7:18 16:10,14
56:15 100:13,21

**[new - overlap]**                                                                    Page 13

100:24 102:4,25
103:8,19 104:8,15
104:21,22,25
111:7,19,25 112:2
116:24 120:3,4
121:3,4,8
**nice**  8:13
**nine**  53:2
**notary**  1:16 4:11
7:17 120:22 121:7
**notations**  14:19
**noted**  119:25
123:10
**notes**  69:15 117:19
118:9
**notice**  39:21
**noticing**  6:6
**notion**  76:14
**november**  96:16
98:5 122:18
**number**  18:12
38:9,14,22 39:3
40:12,19 69:22
70:2 78:20 98:8
113:7
**numbered**  98:2
**numbers**  38:10
**numeral**  43:14
44:23,25

**o**

**o**  7:16,16 120:2
121:2
**oath**  7:14 120:8
**object**  64:8
**objection**  28:20
29:25 31:2,15
37:23 38:11 39:6
40:2 41:25 44:5
44:18 50:17 51:22
52:10 54:22 56:12
59:14 60:3 62:19

63:19 65:4,16
66:7,16 68:7 70:6
72:3 78:2 81:14
84:8 85:15 86:9
87:7,20 91:18
99:16 100:19
101:4,18 102:7
103:23 104:18
110:22 111:13
112:5 115:21
116:18 119:6
**objections**  4:8
**obtained**  103:9
**occur**  10:18 36:10
116:25
**occurred**  100:7,21
**occurring**  27:24
84:14
**october**  12:15
45:13 49:7 51:21
52:9 53:3,15,22
54:21 55:24 58:4
59:25 62:10,15
65:11 70:22 71:13
76:25 82:20 84:4
84:11,22 85:4,8,11
85:19 86:5,25
87:17 88:2 93:19
95:8 98:18 99:3
99:14 100:7,12,21
101:7,13 104:16
106:22 108:15
111:3,6 112:3,17
113:3,16 114:9,12
114:23 115:14
116:2 119:3
122:19
**offer**  33:4
**offered**  32:22 33:8
113:18

**offering**  119:2,7
**offers**  46:2
**office**  6:12 8:22
**officer**  98:7
**oh**  97:5
**okay**  8:19 9:3
10:16 11:6 12:18
13:3,11 14:23
15:8 16:9 18:24
23:5,10,19 28:15
29:8 30:24 31:20
32:17 33:3,15
34:20 35:25 37:3
38:8,23 40:25
43:11 44:10,14
45:9 48:5,10
52:14,25 56:17,24
60:11,16,25 68:11
68:16 69:11,22
70:13 72:10 73:11
73:19 75:16,20
76:20 77:17 80:6
80:18,21 81:22
88:9 89:4 90:14
91:11 93:16 97:5
97:9 98:15,22
105:8,13 106:2
107:3 108:13
109:3,9 111:23
112:10,15,21
113:6,24 114:20
117:20
**omission**  33:13
**omissions**  57:15
**once**  53:18 58:7,22
65:18 104:20
**onex**  2:12 6:23
**ongoing**  100:4
109:23
**open**  14:7 34:21
46:14 80:17,25

95:4 107:19 108:3
108:17 114:20
**operative**  78:16
**opine**  49:6 53:14
58:3
**opined**  32:4
**opines**  64:5
**opinion**  16:8 32:22
33:4,9 44:4,6,13
44:15 66:19,22,24
67:6,13,14,19,24
69:20 70:5,8,10
76:22 77:13 119:2
119:8
**opinions**  12:21
15:13,21,25 16:5,6
16:10,13 19:13
20:5,9 21:7,9,21
22:2,10,17 41:21
43:14 45:8 46:19
47:10 60:6 65:18
66:3,11,18,18 67:3
68:10 72:5,13
95:13 97:16
113:17 115:5
119:9
**opposition**  13:15
13:23 122:9
**order**  53:10 113:3
113:16
**original**  123:13
**outcome**  41:23
42:17 43:6 121:18
**outline**  35:12,18
37:10
**outlined**  42:6
**outlines**  106:3,10
106:14
**outside**  22:22 65:8
**overlap**  55:11

**[p - press]** Page 14

**p**

**p** 2:2,2,10 3:2,2 7:16 13:16,24 122:10
**p.m.** 119:25
**page** 15:10,19,20 23:19 24:4 33:17 35:7 36:2,2 37:16 40:23 43:12,13,15 44:24 45:10 48:7 52:17 56:20 60:18 60:20 67:20 69:9 69:11 70:3,14,16 78:14 90:7 91:8 92:11,14 93:10 97:11 98:13,17 103:16 105:11,15 109:15 122:3,8 124:6
**pages** 44:16 113:22,22
**paper** 96:16 122:18
**paragraph** 33:16 33:18,20,22 35:6,8 35:13,19,24 37:9 37:15 40:23,25 41:9,15,19 42:12 42:15 43:4 45:10 45:11 46:2 47:5,8 48:8,10,12,14 49:5 49:17 50:21 52:16 52:22 53:2,13,20 56:18,20,24 58:11 60:17 61:3,23 70:14 78:13,23 81:25 83:3,14 86:11 87:14 90:8 93:9,14,17 96:3 97:21 98:16,19,23 98:25 99:6 100:13

102:12 103:5,25 109:15,17 112:14 112:16 113:14 114:24
**paragraphs** 15:23 44:15 48:11 49:12 50:9 59:10 69:23 70:3
**pardon** 36:3 62:11 107:3 109:8
**parenthesis** 107:7
**part** 12:3 20:13 21:20,25 22:16 26:17 27:2 30:9 42:6 44:21 45:25 47:19 51:10 68:9 72:12 78:3,7 83:13 95:12 115:4
**participants** 10:22
**participate** 10:14
**participated** 9:25
**particular** 20:19 22:16 30:21 31:12 42:9 99:22
**particularly** 116:24
**parties** 2:3 4:3 108:5 121:16
**parts** 66:21
**pdf** 75:4
**pension** 2:4,5
**people** 10:11
**percent** 36:23
**perform** 52:12 55:20 56:2 68:8 116:22
**performed** 21:18 28:9 29:14,20 31:18 101:22 103:10

**performing** 100:4
**perils** 89:5
**period** 47:18 57:14,19,20 77:21 82:15,24 88:18 90:20 122:14,17
**person** 22:16 75:11
**perspective** 32:15 51:8 64:3 76:19
**pertains** 34:8
**peter** 2:14 6:21
**peter.simmons** 2:15
**ph.d.** 13:16,24 122:10
**phrase** 29:6 31:24 63:21
**physically** 92:24
**pipefitters** 2:4
**place** 64:4 73:21
**plaintiff** 6:17
**plaintiff's** 13:4,12 72:11
**plaintiffs** 6:10,20 12:22 15:5 17:22 23:17 72:17 73:23 76:5
**plant** 107:6,21,25
**platform** 8:10
**plaza** 2:13
**please** 6:4,7 7:13 15:18 18:16 23:5 28:23 33:15 35:5 40:22 46:7 48:5 52:15 56:21 60:13 60:16 61:22 62:8 66:8 67:10 69:8 70:13 81:2 87:9 88:11 97:24 98:12 98:19 102:9

105:10 106:7 109:13 112:12,22 123:3,7
**plumbers** 2:4
**point** 59:5 79:7,23 79:25 80:23 81:18 82:10 87:3 89:25 91:23 93:6 100:17 105:19,23 107:12 107:14
**pointed** 87:14
**points** 106:20
**poor** 38:24
**pop** 75:4
**portion** 17:10 42:2 67:4,19,23 83:9 105:24 107:23 108:9
**portions** 17:3,6 46:22,25 47:21,25 50:4
**possible** 107:21
**postgraduate** 24:8
**potential** 47:15 59:6 84:16 89:22 105:25 107:15
**potentially** 107:22
**practice** 117:13
**predict** 42:16
**predicting** 43:5
**premise** 91:20
**preparation** 11:7
**prepare** 9:4
**present** 3:15 8:25 21:22 22:3
**press** 47:17 48:23 93:18 95:8,11 96:20 108:15,16 114:10,13,23 115:8,12,20 116:4 117:10 119:4

**[press - realty]**

122:19
**pretty** 77:15
**previous** 81:21
**previously** 48:25
  57:3 89:3 93:23
  111:20 112:24
**price** 29:11 33:11
  57:18 112:4,9
**pricewaterhouse...**
  22:6
**primarily** 17:7
**primary** 35:14,17
**principals** 56:9
  59:23
**principles** 54:14
  56:15 60:5 68:5
**printout** 35:2
**prior** 53:20 61:16
  62:4 63:12 71:19
  71:19 77:9 84:3
  84:12,21 85:4,11
  85:19 86:25 87:17
  87:25 99:20
  101:12,21
**probability** 36:23
  100:5
**probable** 35:20
  36:5,9,12 80:3
  85:14,22 86:8,18
  87:6 89:24 90:11
  92:16 99:8,25
  101:10,15,25
  102:6 110:21
  111:11,22
**probably** 38:23
  50:18 98:3
**problem** 109:12
**proceed** 7:15
**process** 21:20 22:2
  22:17 77:11 78:7
  110:14

**produced** 15:4
**professional** 36:18
**profit** 30:7
**profitability** 48:24
  57:5
**profits** 107:17,23
**progress** 102:21
**progressing**
  102:24
**promise** 8:16
  94:16
**promptly** 83:22
**proposed** 2:5 6:10
**propriety** 41:4,12
  42:24
**prospects** 57:5
**prospectus** 78:12
  78:21,22 79:2,16
  80:9,14 81:6,12
  122:11
**provide** 18:10
  39:2 62:8,13 70:9
  82:16,23
**provided** 12:21
  17:21 18:13 20:12
  23:16 48:16 51:20
  52:8 54:21 55:24
  86:24 87:16 100:8
  110:11 111:7
  112:2
**provides** 39:21
  43:7 96:8
**providing** 16:2
  115:16
**provision** 34:7
**public** 1:16 4:12
  7:17 24:12 59:18
  83:23,25 85:6,10
  120:22 121:7
**pull** 34:11 46:7
  80:7 88:10

**pulling** 96:25 97:2
**punitive** 6:20
**purely** 60:6
**purported** 22:14
  49:18
**purpose** 28:6
**purposes** 63:16
  71:24
**pursuant** 66:5,13
  67:12 80:14 88:16
  90:18 107:11
  122:13,16
**put** 8:5 46:9 96:12
**putting** 17:4

**q**

**qs** 77:24 78:3 88:7
**qualification**
  30:11
**quantification**
  84:15
**quantifications**
  82:17,22 83:16
**quantified** 29:20
  83:8
**quantifying** 30:7
**quarter** 61:9 83:6
  88:14 89:13,20
  90:25 91:17 92:5
  92:8,9,21 93:2,3
  93:11,20 109:20
**quarterly** 88:15
  88:18 90:17,20
  110:17 122:12,14
  122:15,17
**question** 4:8 14:13
  26:10 30:4 32:6
  40:17 51:25 67:5
  74:5,23 81:3
  84:19,21 85:25
  86:3 91:12,20
  108:3 113:25

**questions** 8:17
  118:11,16,18
  119:16
**quick** 81:19
**quite** 64:9
**quote** 35:19 36:9
  36:16 37:10,11,18
  45:16,18 51:17
  52:5 58:5 61:10
  62:16,25 70:23,24
  71:2,13 96:8
  103:14
**quoted** 87:13
**quoting** 78:23

**r**

**r** 2:2 3:2 26:12
  121:2 124:2,2
**races** 13:20
**rachel** 3:7 6:24
  10:4 13:2 68:11
**rachel.fritzler** 3:7
**ran** 75:20
**range** 37:19 38:5,7
  38:10 39:14 40:9
  40:12,13,16,19
**rationale** 96:8
**read** 34:2 44:7,11
  45:22 46:2 47:23
  47:25 48:3 49:3
  53:11 57:24 61:19
  71:9 91:7 97:16
  98:18,23 120:7
  123:3
**reading** 49:10
  61:2
**reads** 99:6
**ready** 60:14 68:12
**really** 17:10 39:19
  106:24 109:7
**realty** 8:3

**reason** 21:2
  117:11 123:5
  124:8,10,12,14,16
  124:18
**reasonable** 69:18
  106:5,11
**reasonably** 37:11
  37:21 39:10 85:23
**reasons** 124:4
**reassess** 100:25
**recall** 72:21 73:7,8
  76:4 77:2 79:24
**recalling** 82:25
**receipt** 123:14
**receive** 17:19
**received** 16:15
  104:15
**receiving** 99:13
**recess** 68:24 118:2
**recognition** 38:6
  43:25 58:24 61:7
  62:24 64:11 67:21
  69:14 77:4 85:24
  117:3
**recognize** 37:18
  38:3 40:8 63:6
  79:22 96:9
**recognized** 65:23
  71:4 85:3 102:19
**recognizes** 35:10
  40:12
**recognizing** 35:15
  40:4,15 61:14
  62:2 63:11
**recollection** 76:11
  84:2
**record** 5:3 6:5
  8:13 14:9 22:15
  68:17,22 69:3
  84:9 98:3 111:16
  117:24 118:5

119:22 120:10,13
  121:13
**recorded** 5:7,11
  59:4 79:8 81:17
  82:11,20 85:7
  99:9 103:4 106:17
  115:24
**recording** 111:4
**recounting** 98:25
**recovery** 83:12
**refer** 19:24 47:4
  58:10 83:2 113:6
  114:24
**reference** 52:18
  53:22 54:3 63:24
  63:25 71:17 76:13
  78:13 93:18 97:21
**referenced** 70:12
  76:16
**references** 50:3
  72:22
**referencing** 55:18
  56:6 77:4
**referring** 31:16
  50:23
**refers** 34:5
**reflect** 39:15 57:20
  59:5
**reflected** 51:5
**reflecting** 33:9
  44:12
**reflection** 44:2
**reflective** 50:24
  53:24 61:10 72:9
**reflects** 110:2
**refresh** 81:2
**refreshed** 100:10
**regard** 59:16
  67:18 85:6 89:23
  102:15 105:4,20
  110:20

**regarding** 45:14
  111:10
**rejected** 18:15
**related** 30:14 48:2
  61:8,17 62:5
  66:24 69:17 72:8
  72:25 73:5 76:18
  79:19 82:17 84:6
  84:24 87:19 92:4
  95:19 105:6
  109:22 121:16
**relates** 27:13
  28:17 29:3 47:12
  66:19 102:20
  107:14
**release** 48:23
  93:18 95:8,12
  96:21 108:15,16
  114:10,13,23
  115:8,13,20 116:4
  117:11 119:4
  122:20
**releases** 47:17
**relevant** 20:2
  36:21 45:2 65:20
  76:2
**reliant** 65:25
**relied** 11:10 12:2
**remarked** 94:7
**remedies** 107:15
**remedy** 107:21
  108:2 113:11
**remember** 12:4,8
  12:12 24:16 81:10
**remote** 1:13 8:20
  89:6 109:11
**remotely** 5:20
  22:20
**render** 47:10
  61:15 62:3

**rendered** 83:20
**repeat** 26:10 28:22
  41:6 50:18 51:23
  66:8 67:10 87:9
  106:7
**repercussions**
  45:17 48:21 49:22
  51:2 53:9 57:10
  58:16
**report** 9:9,12 11:9
  11:10,12,19 12:2,3
  12:5,7,10,19,22
  13:13,15,21,23
  14:11,15,21 15:4,9
  15:15,19 16:11,16
  16:19 17:5,7,18,21
  17:24 18:2,10,11
  18:17 19:20 20:13
  23:6,16 33:16
  35:6 36:2 37:16
  38:2 40:23 43:12
  44:16,20,23 45:11
  46:4,11,17,22,24
  47:2,5,11,21 48:2
  48:6,8,12 49:11
  50:5,7 52:16,20
  55:9 56:19,21,25
  60:12,17,20 61:5
  63:9 64:5 67:20
  69:9 70:8 72:5
  76:21 77:11,16
  78:14,24 81:24
  82:14 83:3 86:12
  87:15 88:15 90:17
  93:10,14 96:4
  102:13 103:6
  110:17 112:13
  114:25 115:15
  122:8,9,12,15
**reported** 47:16
  106:22

[reporter - securities]                                                                    Page 17

reporter   1:15 5:24
  7:13 8:13 121:6
reports   55:8 59:17
require   71:8
required   33:23
  100:25 102:3
requirements
  65:24 66:6,14
  85:23
requires   35:9
  37:17 38:2,6,8
  39:2,8 54:12
  103:22 104:5
reserve   86:20
  90:13 92:18
reserved   4:9
resolution   36:22
respect   79:5 81:8
  82:8 91:15
respective   4:3
respond   46:21
  47:3
responded   55:23
responding   119:10
response   47:11
responsible   94:17
result   16:14
  103:19 104:8
resulted   111:4
results   109:20
  111:2
retained   122:7
retreated   53:4
return   123:12
review   17:23
  22:13 47:9,20
  54:25 76:3 113:19
reviewed   9:8,10
  11:8,12,13 18:2,7
  55:7 72:10,14
  77:18 78:5,5,16,18

78:21 82:2 95:11
  113:15 115:4
reviewing   12:18
  17:17 21:16 55:18
  56:6 84:3 85:10
rgrdlaw.com   2:7,8
  2:9,10
richmond   1:4 3:13
  5:17
rigby   2:9 6:11
  74:14 75:5 94:3,8
  97:6 108:22
right   8:3 11:11
  15:6 19:9 22:11
  23:3,12,22 24:9,20
  25:7,13,25 29:18
  30:25 31:22 33:6
  34:2 35:11 36:5
  37:6,22 38:10
  39:5 41:5,16
  42:17 44:17 45:4
  45:22 46:19 48:12
  50:6,8 51:21 52:9
  53:17 54:21 55:25
  56:11 58:6 59:13
  60:2,9 61:19
  64:19 65:15 67:6
  67:9 70:5 71:9
  72:2,20 76:8,25
  77:21 78:17 79:6
  82:3 84:7 85:25
  86:8 89:16 92:22
  93:7,20 94:18
  95:2,9,25 97:22
  99:10 100:23
  101:3,17 103:11
  104:11,17 105:3
  105:21 106:12,23
  107:8 108:11
  111:12 112:4,18
  113:12,18 114:2

115:6,11 116:17
robbins   2:5 6:9,18
robert   2:8 6:17
roman   43:13
  44:22,25
room   8:25
rothman   2:8 6:16
  6:17
roughly   24:19
route   75:18
routine   80:19
rrothman   2:8
rudman   2:5 6:9,18
rule   8:8 80:15
rules   65:25
ruling   99:22 100:7
  100:20 101:7
  104:21 109:23
  111:3 112:17,19
  113:7,19 115:14
  115:17 116:6
rulings   98:25 99:7
  99:14 100:12
  102:24 104:17
  110:10

|   |
| --- |
| **s** |

s   2:2 3:2,4,5,11,12
  5:12 7:16,16,16
  13:14,21 78:7,17
  78:19 122:7,8
san   2:6 6:12
sara   10:6 16:25
satisfy   77:12
save   75:13
saw   8:6 92:7
saying   49:18,23
  50:13,20 51:3
  54:7,24 58:18
  79:11 91:21
says   15:21 42:13
  43:18,24 48:15

53:2 54:3 56:25
  61:3 69:13 70:21
  77:2 90:9 99:11
  103:6,18 104:6,7
  105:15 107:5,7
  108:17,20,25
  109:19 114:18
schmalzbach   3:14
  7:7,8 74:25
schmitt   73:13
  112:22,25
scope   65:9
scott   98:6
screen   109:5
screens   14:18
sealing   4:4
search   75:7,15,20
  79:16 80:20
searchable   74:3
  74:11,19
searches   76:9
  77:12
sec   20:2,17 36:17
  47:17 54:25 77:20
  78:8 98:9
second   5:8 34:12
  37:9 47:7 52:18
  58:10 67:19 69:20
  90:25 91:16 92:5
  92:8,21 93:2,2,11
  97:13 98:13,16
  102:22
secretary   50:10
secrets   109:24
section   16:8 44:20
  70:2,11 88:16
  90:18 122:13,16
securities   1:7 5:14
  26:18 27:3,9,14
  28:18 29:4,12,17
  29:24 30:9,15,18

31:8,22 32:10,24 33:6 63:18 88:17 90:19 122:13,16
**security** 28:7 30:21 31:12 32:23
**see** 15:10,19 43:21 50:5 60:23 70:19 73:18 75:18 79:16 88:8 89:11 105:14 109:7,17
**seeing** 73:7 76:4
**seeking** 27:25 39:12 83:11,14
**selected** 9:11 11:13
**sentence** 33:21 42:13 44:7 47:7 58:11 60:21,23 61:22 62:21 70:16 70:19 99:5
**sequencing** 83:5
**serve** 116:25
**serves** 70:8
**set** 121:11,21
**shaner** 10:7,8,13 16:25 17:7
**share** 74:15,19 75:3,12 88:24 94:12
**sheet** 123:6,8,10 123:13
**shortcut** 74:22
**shorthand** 121:6
**shortly** 24:17 28:4
**show** 13:18 34:11 73:12
**showed** 41:16
**shown** 44:15
**shriver** 2:13
**sic** 18:23

**sign** 123:7
**signature** 15:11 121:23 124:21
**signed** 4:11,12
**significance** 43:20 44:9 67:2
**significant** 63:2
**signing** 123:9
**similar** 58:8 76:15 88:4 91:6
**similarly** 82:10
**simmons** 2:14 6:21,21
**situation** 40:3
**six** 41:16 42:5
**skim** 81:20
**skimmed** 47:24
**slow** 52:2
**solutions** 3:17 122:7
**somewhat** 53:4
**sons** 109:25
**soon** 71:4
**sooner** 71:15
**sorry** 5:8 23:25 24:3 37:14 41:6 42:14 49:10 51:23 94:3,12 96:23 105:22
**sort** 69:12 109:9
**sounds** 68:15
**source** 22:24
**space** 123:5
**speaking** 27:21 65:13 76:20
**specialist** 3:16
**specific** 17:10 34:7 46:22,25 49:16 76:4 102:14
**specifically** 18:4 32:5 35:14 37:25

44:22 59:2 76:12 77:3 81:11 99:18 104:2 119:10
**spoken** 117:6
**sporadic** 17:11
**ss** 120:4 121:4
**staff** 10:9,13
**stages** 79:14
**stamp** 94:4 98:14
**stamped** 105:12
**stamps** 94:5
**standards** 19:25 34:6 45:2 63:8 71:8
**standing** 25:4
**stands** 117:11
**start** 13:3 57:13,19 60:25
**starting** 6:6 44:23 78:11
**starts** 60:21 98:17 109:16
**state** 1:16 6:4 7:18 33:21 113:13 120:3 121:3,7 123:5
**stated** 7:18
**statement** 44:3 45:20 49:8 51:5 51:16 52:4 53:16 58:5 62:9,14 69:19 70:5 72:4 79:10 104:10
**statements** 8:8 40:6 80:2
**states** 1:2 24:25 58:12 86:17 92:14
**statistical** 27:6 29:10,15 33:10 55:21 56:3 59:11 68:5 111:24

**statistics** 25:12
**stephen** 1:13 120:6,16 121:9 122:3
**steven** 13:16,24 122:10
**steves** 45:15 47:16 53:6 54:2 69:17 77:19 79:5,20 81:9 82:8 83:7,11 83:14,17 84:7,25 85:14 86:7 87:5 87:19 89:23 91:15 92:4 95:19,25 99:2 105:20 106:12 109:25 110:20 111:10 115:11
**stipulated** 4:2,7,10
**stock** 27:8 29:11 33:11 57:18 112:4 112:9
**street** 3:13 7:19
**strike** 42:14 62:12 104:6
**studies** 30:13 31:17,19
**study** 27:13,19,22 28:6,18 29:3
**subheading** 43:18
**subject** 19:23 83:10 108:3 123:9
**submitted** 9:9
**subscribed** 120:18
**subsections** 44:12
**subsequent** 57:17
**substantial** 84:13
**subsume** 102:23
**subsumed** 45:7
**subsumes** 38:17

**[suffer - trying]**                                                                                Page 19

suffer  53:5,25
sufficient  110:11
suggest  63:12
suggested  64:13
suggesting  77:7
suggestions  18:13
suggests  41:20
  51:3 71:3,14
summaries  16:3
summary  15:21
  15:25 16:8 98:24
supersede  107:22
support  44:21
  64:16 70:4,9
supported  113:8
supporting  44:12
  44:14 96:9
supportive  45:7
sure  14:10 19:6
  26:11 28:24 31:6
  31:23,25 32:7,13
  40:18 41:8 49:14
  51:25 54:10 59:21
  66:9 67:11 73:4
  81:4 87:10 90:6
  91:19 92:23 98:21
  102:10 106:8
  113:20
surprised  57:16
surprising  64:10
  72:24
surrounding
  49:12
svp  98:6
switch  91:4
sworn  4:13 7:17
  120:18 121:11
synonymous
  49:23 50:12

**t**

t  7:16 120:2 121:2
  121:2 122:7 124:2
tab  46:7 80:7
  88:10 94:25 96:23
  108:20,23 109:2
  112:22 114:11,16
  114:18
table  74:7,24
tabs  14:24
take  34:23 52:2
  63:2 73:20 74:23
  117:16
taken  5:12 7:25
  68:25 71:15 79:18
  118:3 120:7
takes  27:23
talk  21:21 22:3
talked  59:10,15
talking  39:17 45:3
  67:7,13 112:20
  116:16
technical  94:11
technician  5:23
techy  75:11
tell  14:13
term  27:17 118:23
terms  55:6 64:25
  65:14 83:15
testified  7:20
  54:16 81:10
testimony  50:15
  86:23 87:12 120:7
  121:13
testing  28:6
text  103:15
thank  7:10 18:24
  19:5 68:19 80:24
  91:11 95:3 109:4
  117:21 118:12,14
  119:15,18,19

thankfully  80:22
thing  22:20 54:7
  58:17 109:11
things  19:15 30:8
  54:5
think  7:24 8:8
  10:16 11:6 12:6
  19:15 20:11 22:5
  22:22 23:7 30:4
  35:7 39:17 41:15
  42:12 52:20 53:20
  54:16 56:17 65:5
  74:18 78:12 79:13
  81:9,15,24 85:16
  85:18 88:3 92:6
  93:12 94:23 96:13
  100:20 101:5,20
  102:22 104:20,23
  105:22 108:20
  117:17
third  61:9 70:15
  83:5 93:20 107:5
  109:20
thirdly  19:21
thirds  69:12
thirty  123:14
thorough  98:3
three  9:22 11:5
  18:5
time  1:14 4:9 5:5,6
  6:3 7:12 11:5
  20:19 41:7 51:24
  59:5 68:13,21
  69:3,4 72:20
  73:25 76:8 79:8
  79:23 81:18 82:11
  82:14 83:19 84:13
  87:3 90:2 91:23
  93:6 95:22 100:18
  105:19,23 106:18
  108:11 110:18,25

  111:16 116:9,14
  116:22 117:23
  118:4,12 119:21
  119:25
times  9:10 18:12
  78:20
timing  47:17
  115:23
title  109:8
titles  109:5
today  5:4,24 8:21
  9:4 116:16 118:21
told  14:4 75:9
  85:12 86:4,6
  110:19
top  43:12 103:15
topic  96:15 122:18
towanda  107:6,20
traded  28:7
trading  52:13
  54:18 55:15
transaction  63:18
transcript  120:7,9
  121:12 123:15,16
transcripts  22:22
transition  68:12
treatment  33:23
trebling  83:10
  110:4
trial  4:9
tripping  109:10
trouble  94:4
true  20:14,15,17
  20:21,24 21:3,11
  21:16 120:9,13
  121:13
truth  57:4,23
try  6:14 8:11,14
  8:16 75:2
trying  14:17 39:20
  74:18 109:10

**[turn - words]**

turn   15:10,18
18:16 23:6 33:16
35:5,25 40:22
48:5,7 52:15
56:21 60:12,17
69:8 97:24 98:12
112:12
turning   105:8
108:13
two   8:5,5 9:16,23
11:5 15:25 35:14
54:5 59:9 66:17
69:12 94:5 106:14
106:25 118:18
types   30:5 107:17
typically   36:18

**u**

u.s.   5:15
uncertainty   38:18
108:7
underlined   86:16
103:15,18
underneath   43:17
understand   14:16
39:20 63:15 64:17
64:21 91:20
107:24
understanding
26:15,24 27:18,22
28:16,25 32:8,20
32:21 37:4 51:7
51:11,19 52:7
54:19 55:17 56:5
60:7 64:25 69:24
85:2,10 92:25
103:21 107:10,13
107:18 108:12
118:22
understood   56:10
59:12,24

undertook   68:6
unfavorable   113:9
unfortunate   74:20
unique   8:9
unit   5:6,10
united   1:2
unquote   36:10
unsuccessful
110:14
update   115:16
updated   103:9
111:2
updates   82:16
use   14:15 41:21
49:16 53:18 58:7
100:15
uses   58:8
utilize   90:5

**v**

v   43:14
valuation   56:8,15
60:5 68:4
values   39:14
valuing   59:23
various   9:10
verdict   53:9 71:6
83:20 107:23
113:9
veritext   3:17 5:25
122:7
version   15:3
113:21
versus   71:24
video   3:16 5:7,11
5:23 8:6
videoconference
2:3
videographer   5:2
6:13 7:10 68:19
68:20 69:2 88:25
89:2 117:21,22

118:4 119:19,20
videotaped   1:13
view   41:22 66:19
81:21
viewpoint   87:4
vining   98:6
violated   64:6
72:18 73:24 76:6
110:8
violation   76:13
77:14
virginia   1:3 3:13
5:17 24:24
virtual   8:10
virtue   111:18
visit   50:8

**w**

w   120:2
waived   4:6
want   55:10 61:21
73:3,19 77:10
79:15 80:18 91:19
117:19 118:11
wanted   52:21 81:5
81:12 91:9
washington   7:19
8:23
way   50:19 64:14
69:13 92:23
121:18
we've   15:15 67:7
67:13 112:20
116:15
week   10:20
weiss   18:23
welcome   69:6
wells   12:6,19
wen   1:6 3:4,11
5:13 7:2,9 17:20
20:3,18 21:23
47:9 49:8,24

50:13 53:16,23,24
54:8 55:2 58:5
60:2 71:3 72:18
73:23 76:22 80:9
80:16 85:12,20
86:2,4,6 88:20
90:21 95:9 96:7
96:15 98:6 104:13
105:9 110:19
112:2 114:10,12
114:23 115:9
122:11,15,17,18
122:19
wen's   22:4 43:24
45:12 47:14 55:23
61:7,15 62:3
67:21 69:13 93:18
96:8
went   11:21 17:18
99:23 101:20
102:11
west   2:6
whatsoever   12:23
68:3 109:12
whereof   121:20
william   23:22
24:18
wisconsin   2:4
wish   124:3
witness   75:16
94:13 95:2 118:14
121:10,14,20
122:3 123:2
124:21
woods   3:12 7:8
word   17:15 38:14
50:19,19 109:16
wording   50:5
85:17
words   17:15 38:24
43:3 49:16 50:12

**[words - zoom]**                                                                 Page 21

|  |  |
|---|---|
| 53:19 58:8,9 116:13 | **z** |
| **work** 17:3 31:25 89:3 116:10 | **zoom** 2:3 |
| **worked** 10:6 28:10 |  |
| **working** 14:8 17:12 25:22,25 26:5 97:15 |  |
| **workup** 95:12 |  |
| **world** 65:7 |  |
| **worst** 75:10 |  |
| **wrong** 61:12,13,24 61:25 62:17 72:19 73:25 89:8 |  |
| **wyman** 2:7 6:8,8 7:21 13:2,11 46:6 68:11,16 74:12,16 75:9,17 80:6 88:10 94:6,10,15 96:12,22 109:3 117:14 118:8,15 119:6,17 122:4 |  |

|  |
|---|
| **x** |
| **x** 1:5,9 39:24,25 40:10,14 122:2,7 |

|  |
|---|
| **y** |
| **y** 39:25 40:10,14 |
| **yeah** 26:2 42:3 46:20 72:4 75:5 102:11 108:23 |
| **year** 23:24 24:5,17 82:3 86:13 |
| **yesterday** 9:19 10:14,24 18:22 |
| **yielded** 75:21,25 |
| **yielding** 75:22 |
| **york** 1:16 2:13,14 2:14 3:6,6 6:2 7:18 120:3,4 121:3,4,8 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.