**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

|  |  |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | ) ) ) Civil Action No. 3:20-cv-00112-JAG |
| This Document Relates To: | ) ) CLASS ACTION ) ) REDACTED |
| ALL ACTIONS. | ) ) ) ) |

**MEMORANDUM IN OPPOSITION TO JELD-WEN DEFENDANTS' MOTION TO
EXCLUDE THE REPORTS AND TESTIMONY OF DR. RUSSELL LAMB**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND ........................................................................................................ 2

III.    LEGAL STANDARD................................................................................................. 5

IV.     ARGUMENT.............................................................................................................. 6

        A.      DEFENDANTS' RELEVANCE ARGUMENTS FAIL ...................................... 6

                1.      Dr. Lambs' Analysis of the of Price Fixing Conspiracy Allegations
                        in the Complaint are Admissible.................................................................. 6

                2.      Dr. Lamb's Opinions Regarding Jeld-Wen's Collusion With
                        Masonite are Relevant and Admissible........................................................ 7

        B.      DR. LAMB'S QUALITATIVE ANALYSIS IS ADMISSIBLE............................ 9

                1.      Dr. Lamb Was Allowed to Consider Communications between
                        Jeld-Wen and Masonite................................................................................. 9

                2.      Dr. Lamb Does Not Opine on Jeld-Wen's Intent, Motives, and
                        Knowledge ................................................................................................... 14

                3.      Dr. Lamb's Opinion About Market Structure, Conduct, and
                        Performance Should Not be Excluded......................................................... 14

                4.      Dr. Lamb Properly Analyzed the Structure of the IMD and
                        Doorskin Markets........................................................................................ 15

                5.      Dr. Lamb's Conclusions Concerning Parallel Price Increase
                        Announcements Should Not be Excluded .................................................. 16

        C.      DR. LAMB'S REGRESSION ANALYSIS IS RELEVANT AND
                RELIABLE ................................................................................................... 18

                1.      Dr. Lamb's Regression Is Relevant to His Task of Assessing
                        Whether Jeld-Wen Engaged in Anticompetitive Behavior........................ 19

                2.      Dr. Lamb's Regression Analysis Is Robust and Reliable.......................... 24

                        a.      The Methodology Utilized by Dr. Lamb in the IMD Litigation
                                are Not Applicable to His Opinions Here Regarding Jeld-Wen's
                                Anticompetitive Behavior.................................................................. 24

b.  Defendants' Attacks on Dr. Lamb's Reply Report
Regressions Fail ................................................................... 26

V.    CONCLUSION ................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Woody*,
  2018 WL 2452177 (E.D. Va. May 31, 2018) ...........................................................................15

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................................................8

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209, 227 (1993).............................................................................................................8

*Coleman v. Tyson Farms, Inc.*,
  2011 WL 1833301 (E.D. Va. Apr. 13, 2011) ...........................................................................27

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...........................................................................................................5, 6, 19

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
  245 F. Supp. 3d 1343 (N.D. Ga. 2017),
  *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*,
  714 F. App'x 986 (11th Cir. 2018) ...........................................................................................10

*In re Disposable Contact Lens Antitrust*,
  329 F.R.D. 336 (M.D. Fla. 2018).............................................................................................10

*Hyland v. HomeServices of America, Inc.*,
  771 F.3d 310 (6th Cir. 2014) .....................................................................................................7

*Kennedy v. Joy Technologies, Inc.*,
  269 F. App'x 302 (4th Cir. 2008). .............................................................................................11

*Kleen Products LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) .....................................................................................................8

*Maryland Casualty Co. v. Therm-O-Disc, Inc.*,
  137 F.3d 780 (4th Cir. 1998) .....................................................................................................5

*Nease v. Ford Motor Co.*,
  848 F.3d 219 (4th Cir. 2017) .....................................................................................................5

*Oglesby v. General Motors Corp.*,
  190 F.3d 244 (4th Cir. 1999) .....................................................................................................5

*In re: Pella Corp. Architect & Designer Series Windows*
    *Marketing, Sales Practices & Prods. Liab. Litig.*,
    214 F. Supp. 3d 478 (D.S.C. 2016)....................................................................12

*In re Polypropylene Carpet Antitrust Litig.*,
    93 F. Supp. 2d 1348 (N.D. Ga. 2000)................................................................10

*In re Prempro Prods. Liab. Litig.*,
    554 F. Supp. 2d 871 (E.D. Ark. 2008),
    *aff'd in part, rev'd in part*,
    586 F.3d 547 (8th Cir. 2009) .............................................................................13

*In re Processed Egg Prods. Antitrust Litig.*,
    81 F. Supp. 3d 412 (E.D. Pa. 2015) ..............................................................13, 14

*Pugh v. Louisville Ladder, Inc.*,
    361 F. App'x 448 (4th Cir. 2010) .......................................................................5

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................................13

*Roberts v. Sunbelt Rentals, Inc.*,
    2016 WL 1259414 (W.D. Va. Mar. 30, 2016).....................................................11

*Sardis v. Overhead Door Corp.*,
    2019 WL 560273 (E.D. Va. Feb. 12, 2019) .......................................................13

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015),
    *as amended on reh'g in part* (Oct. 29, 2015) ......................................................8

*SEC v. Lucent Techs., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ...............................................................12, 15

*Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*,
    927 F. Supp. 2d 1069 (D. Or. 2013) ..................................................................12

*Slavin v. Garrison Property & Casualty Insurance. Co.*,
    2017 WL 2928030 (D. Colo. July 10, 2017),
    *aff'd*, 805 F. App'x 561 (10th Cir. 2020).........................................................11

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) ..............................................................................8

*U.S. Information Systems, Inc. v.*
    *Int'l Brotherhood of Electrical Workers Local Union No. 3*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004)..........................................................13, 14

iv

*Westberry v. Gislaved Gummi AB*,
     178 F.3d 257 (4th Cir. 1999) ...........................................................................................12

**Other Authorities**

58 C.J.S. Monopolies § 84 .....................................................................................................8

James F. Nieberding, *Estimating Overcharges in Antitrust Cases Using a*
     *Reduced-Form Approach: Methods and Issues*,
     9 J. Applied Econ., No. 2,  November 2006, at 361 ...............................................27

I.    **INTRODUCTION**

Defendants' motion to exclude Plaintiffs' antitrust and economic expert, Dr. Russell Lamb rests on a series of flawed legal premises and selective interpretations of the facts of this case. In an attempt to exclude Dr. Lamb's well-supported and sound economic analysis finding that Jeld-Wen engaged in anticompetitive conduct in the Interior Molded Door ("IMD") and doorskin markets, Defendants resort to cherry-picking data, misconstruing Dr. Lamb's testimony, and egregiously conflating his opinions in the IMD antitrust litigation with his opinions here to create the appearance of flaws in his analyses when, in reality there are none. As discussed below, all of Defendants' arguments easily fail when stripped of their self-serving treatment.

Defendants erroneously argue that Dr. Lamb's analysis of the alleged price-fixing conspiracy is irrelevant to Plaintiffs' claims, and that even if it were relevant, Dr. Lamb could not distinguish between innocent and anticompetitive conduct. To the contrary, not only does Dr. Lamb's analysis relate directly to Defendants' underlying fraud, but Dr. Lamb opines that there is evidence of collusive behavior, explicit or otherwise, that support a finding of anticompetitive conduct. Further, Dr. Lamb's testimony and analyses demonstrate that Jeld-Wen's price fixing conspiracy with Masonite was more than the innocent "conscious parallelism" Defendants claim.

Next, Defendants argue that it was inappropriate for Dr. Lamb to consider the communications and conduct between Jeld-Wen and Masonite surrounding Jeld-Wen's price increases. While Jeld-Wen would prefer Dr. Lamb to ignore the fact that their CEO communicated with the CEO of Masonite, Fred Lynch, on multiple occasions around the same time the two competitors issued parallel price increases, the very fact of such communications is nonetheless part of the record. Indeed, courts regularly allow economic experts to consider communications and conduct that is consistent with a finding of anticompetitive conduct. In any event, Defendants' argument fails because it goes to the weight of Dr. Lamb's opinion, not admissibility. Defendants

1

also incorrectly argue that Dr. Lamb opined on Jeld-Wen's state of mind. To the contrary, Dr. Lamb supported his opinions of the IMD and doorskins market structure, Jeld-Wen's anticompetitive conduct, and the Company's financial performance attributable to anticompetitive conduct with record evidence supporting his conclusions.

Defendants then argue that Dr. Lamb's opinions regarding the IMD and doorskins market structures should be excluded because he purportedly failed to consider factors that would encourage competitiveness. However, these arguments also should be rejected because Dr. Lamb's opinions explicitly considered such factors and adequately addressed them based on sound economic principles and the relevant market conditions at issue.

Finally, Defendants argue that Dr. Lamb's overcharge opinion and regression analysis should be excluded because it does not fit the facts of the case and is unreliable. In support, Defendants cherry-picked variables from Dr. Lamb's regression analysis from the IMD litigation and argued that Dr. Lamb's analyses are inconsistent. What Defendants fail to comprehend, however, is that Dr. Lamb was assigned a completely separate task in this action, which required him to perform a different analysis—rendering Defendants' point wholly irrelevant. As such, the Court should deny Defendants' motion to exclude Dr. Lamb.

## II.    BACKGROUND

Plaintiffs retained Dr. Russell Lamb, an antitrust and economics expert, who rendered opinions concerning Jeld-Wen's anticompetitive conduct prior to and during the Class Period. Specifically, Dr. Lamb was asked to evaluate: (i) whether the structure of the molded doorskins and IMD markets were conducive to anticompetitive behavior; (ii) whether Jeld-Wen's acquisition of CMI gave Jeld-Wen increased market power in the molded doorskins and IMD markets such that it could harm its competitors via unilateral and coordinated actions; (iii) whether Jeld-Wen's conduct in the IMD and molded doorskins markets following its acquisition of CMI was consistent

2

with a firm operating in a highly competitive environment free of anticompetitive conduct; and (iv) whether Jeld-Wen's economic performance in the molded doorskins and IMD markets is consistent with Jeld-Wen operating in a competitive marketplace free of anticompetitive conduct. Def. Ex. 2 ("Lamb Rpt.") ¶8, ECF No. 174-1.

Based on Dr. Lamb's knowledge and expertise in antitrust economics and his review of documents and testimony produced in discovery, Dr. Lamb concluded that: (i) the structural characteristics of the molded doorskins and IMD markets facilitated anticompetitive conduct; (ii) the molded doorskins and IMD markets became more concentrated following Jeld-Wen's acquisition of CMI such that Jeld-Wen was able to exercise market power to increase profitability; (iii) Jeld-Wen's conduct following the acquisition of CMI is consistent with a firm exercising both unilateral and coordinated market power; and (iv) Jeld-Wen's economic performance in the molded doorskins and IMD markets, both before and during the Class Period, is consistent with the alleged anticompetitive conduct and inconsistent with a firm unilaterally maximizing profits in a competitive market free of anticompetitive conduct. *Id.* ¶10. Further, to determine whether Jeld-Wen's economic performance was attributable to anticompetitive conduct, Dr. Lamb analyzed the economic performance of the doorskins and interior molded doors markets and observed that prices for these products rose despite market fundamentals not supporting price increases. *Id.* ¶¶92–101. Dr. Lamb also set forth a multiple regression analysis which compared the prices of IMDs during the period the anticompetitive conduct was alleged to have occurred versus a benchmark period free of the alleged anticompetitive conduct, and established that IMD prices were inflated by 4–4.6%. *Id.* ¶¶108–109.

Dr. Johnson submitted a report in opposition to Dr. Lamb's opinions, claiming to find flaws in the way Dr. Lamb conducted his analysis. Dr. Johnson was "█████████████████████

3



." Def. Ex. 3 ("Johnson Rpt.") ¶5, ECF No. 174-2. Dr. Johnson's report sets forth the following opinions, which he contends show the errors in Dr. Lamb's report: (i) that " ████████████████ [;]" (ii) that "████████████████ [;]" and (iii) that Dr. Lamb's "████████████████." *Id.* ¶13. In criticizing Dr. Lamb's regression analysis, Dr. Johnson applied some of the control variables and data controls that Dr. Lamb utilized in his regression analysis in the IMD antitrust litigation where he was asked to establish a damages model for common classwide damages. *Id.* ¶¶91-97.

Dr. Lamb subsequently submitted a report replying to Dr. Johnson and refuting his flawed criticisms. In his reply report, Dr. Lamb explained how Dr. Johnson's opinions were flawed because they failed to adequately consider, *inter alia*: (1) the doorskins market or Defendants' anticompetitive conduct and performance with respect to doorskins; (2) Jeld-Wen and Masonite's communications; and (3) Masonite's decision to exit the doorskins market. Def. Ex. 5 ("Lamb Reply Rpt.") ¶¶5–15, ECF No. 174-3. Dr. Lamb also explained why Dr. Johnson's analysis failed to provide credible evidence that Jeld-Wen's conduct could be explained by non-cooperative oligopolistic interdependence. *Id.* ¶¶16–36. Dr. Lamb further addressed market characteristics Dr. Johnson claimed he ignored and explained why such criticisms did not change his opinions. *Id.* ¶¶ 37–56. Finally, Dr. Lamb conducted another regression analysis to correct the flaws in Dr. Johnson's analysis and, in doing so, applied *all* of the control variables and data controls present

4

in his IMD report and still found a statistically significant overcharge. *Id.* ¶¶68–69. In contrast, as Dr. Lamb points out, when Dr. Johnson performed his own regression analysis in an attempt to point to inconsistencies between Dr. Lamb's analyses in this case and the IMD litigation, he used "███████████████████████████████████████████████ ████" in an effort arrive at his own preconceived result. *Id.* ¶70.

## III.    LEGAL STANDARD

The inquiry required to determine the admissibility of expert testimony under *Daubert* is not a demanding one. Rather, "*Daubert* is a flexible test[,]" *Nease v. Ford Motor Co.,* 848 F.3d 219, 232 (4th Cir. 2017), and as such, "the district court is afforded broad latitude" in determining whether to exclude an expert. *Pugh v. Louisville Ladder, Inc.,* 361 F. App'x 448, 452 (4th Cir. 2010). Indeed, in keeping with the "liberal thrust" of the Federal Rules of Evidence, the Fourth Circuit has held that expert testimony must "merely be reliable and helpful[.]" *Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998) (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 588 (1993)). To be considered helpful, an expert's testimony must only have a "a valid scientific connection to the pertinent inquiry[.]" *Nease,* 848 F.3d at 229. And, to be reliable, an expert's opinion "must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999).

Further, while the district court must determine reliability and relevance it "need not determine that the proffered expert testimony is irrefutable or certainly correct[.]" *Pugh,* 361 F. App'x at 452. Rather, the Supreme Court has stressed that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the

5

traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## IV.   ARGUMENT

### A.   DEFENDANTS' RELEVANCE ARGUMENTS FAIL

Defendants' relevance arguments fail because they erroneously presume unsupported and unproven legal conclusions (and defenses) that are yet to be decided; and when they are decided, should be done by the finder of fact, not Defendants.  Accordingly, Defendants' claims that Dr. Lamb's opinions are irrelevant because they: (1) address price fixing which **they** say is not related to Plaintiffs' damages theory; and (2) do not fit into **Defendants' own** self-serving definition of what type of collusion is or is not anticompetitive fail.  Def. Br. 7.  The Court should reject Defendants' attempts to exclude Dr. Lamb because his opinions do not comport with Defendants' self-serving theory of the case.

#### 1.   Dr. Lambs' Analysis of the of Price Fixing Conspiracy Allegations in the Complaint are Admissible

Defendants argue that Dr. Lamb's opinion must be categorically excluded because they are not related to Plaintiffs' damages theory.[1]  Def. Br. 7–8.  However, Defendants' argument presupposes that their interpretation of Plaintiffs' theory of loss causation and damages is correct. In reality, consistent with Dr. Lamb's opinions, Plaintiffs' theory of loss causation and damages addresses both price fixing and Jeld-Wen's unilateral raising of doorskin prices because both anticompetitive behaviors contributed to the financial success the Company touted to the market. Specifically, Plaintiffs' allegations and theory of damages allege that the corrective disclosures "revealed some of the relevant truth concealed and/or obscured by Defendants' prior

---

[1] Defendants' arguments ignore the fact the Dr. Lamb's opinions also cover Jeld-Wen's anticompetitive conduct with respect to doorskins.  Def. Br. at 7–8.  On this alone, Defendants' argument that Dr. Lamb should be "categorically" excluded should be denied.

misstatements and omissions surrounding the source of the Company's financial success, including that the cause of that success was not 'pricing optimization' and 'pricing discipline,' as Defendants claimed, but was rather due to that anticompetitive conduct." *See* Compl. ¶¶254, 260–261. Dr. Lamb was asked to assess whether or not Jeld-Wen's financial performance was attributable to the anticompetitive conduct alleged in the Complaint, which includes **both** Jeld-Wen's unilateral and extra-contractual raising of doorskin prices (*id.* ¶¶84–91) and the Company's conspiracy with Masonite to raise IMD prices (*id.* ¶¶92–100). *See* Lamb Rpt. ¶8. Accordingly, Defendants' claims that Dr. Lamb's opinions are irrelevant based on their own, selective interpretation of what the corrective disclosures revealed should be denied.

### 2. Dr. Lamb's Opinions Regarding Jeld-Wen's Collusion With Masonite are Relevant and Admissible

Similarly, Defendants argue that Dr. Lamb's opinions must be excluded because he cannot distinguish between innocent and anticompetitive conduct. Def. Br. 8–11. However, again, Defendants' argument presumes the incorrect legal conclusion that Plaintiffs are required to establish explicit coordination between Jeld-Wen and Masonite when such a presumption is simply not supported by the facts of this case or well-settled antitrust law principles.

Defendants claim that parallel behavior without explicit coordination— sometimes called "oligopolistic interdependence," "conscious parallelism," or "tacit collusion,"—is perfectly legal behavior and cannot be anticompetitive. Def. Br. 8–9. But this fails to address the well settled antitrust jurisprudence that *tacit collusion can be anticompetitive when certain other "plus factors" are present*, many of which Dr. Lamb analyzed in his expert reports and testimony and demonstrated that Jeld-Wen's conduct was, in fact, anticompetitive. *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 319–20 (6th Cir. 2014) (stating that "[e]vidence of 'conscious parallelism,' also referred to as 'oligopolistic price coordination,' can support such a claim based

7

upon circumstantial evidence" and setting out plus factors sufficient to demonstrate anticompetitive conduct); s*ee also SD3, LLC v. Black & Decker (U.S.) Inc*., 801 F.3d 412, 424 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) (antitrust claim sufficiently pled where there are allegations of parallel conduct *and* something "more"); 58 C.J.S. Monopolies § 84 ("A price-fixing contract, combination, or conspiracy may exist regardless of whether the price fixing is accomplished by express contract or by some more subtle means . . . . The fixing of prices by one member of a group pursuant to express delegation, acquiescence, or understanding is just as illegal as the fixing of prices by direct, joint action."). Thus, Defendants' arguments rely on an incomplete and misleading portrayal of the law applicable to tacit collusion while simultaneously failing to address the fact that Dr. Lamb's report analyzes many of the factors courts consider when assessing the existence of a conspiracy. *See* Lamb Rpt. §§ II–IV.[2]

Indeed, Dr. Lamb's analysis contains a detailed analysis of direct and circumstantial evidence that Jeld-Wen engaged in anticompetitive conduct prior to and during the Class Period including, *inter alia*, the highly-concentrated IMD and doorskin markets, the lack of economic substitutes, product uniformity, Jeld-Wen and Masonite's direct and indirect communications, and

---

[2] A review of the authority Defendants selectively cite for the proposition that tacit collusion cannot be anticompetitive absent an explicit agreement, all agree that plaintiffs in an antitrust case can establish that tacit collusion was an antitrust violation if they demonstrate evidence "that would allow a trier of fact to nudge the ball over the 50-yard line and rationally to say that the existence of an agreement is more likely than not." *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 934 (7th Cir. 2018); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (emphasis added) ("***Without more***, parallel conduct does not suggest conspiracy[.]"); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015) (quoting previous decision noting: "Direct evidence of conspiracy is not a sine qua non, however. Circumstantial evidence can establish an antitrust conspiracy."). Finally, Defendants' reliance on *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) is entirely misplaced because the anticompetitive behavior (and purported tacit collusion) at issue there was price discrimination (*i.e.*, cutting prices) under section 2 of the Clayton Act.

the parallel price increases issued by the two companies. *See* Lamb Rpt. ¶¶36–90.  Furthermore,

Dr. Lamb's regression analysis establishes that the prices Jeld-Wen charged for IMDs "███

████████████████████████████████████████████████" *Id.* ¶¶91–111.

Stripped of the flawed legal premise that tacit collusion can **never** be considered

anticompetitive, Defendants' arguments regarding the relevance of Dr. Lamb's testimony fail.

Accordingly, Defendants' argument that Dr. Lamb should be excluded on relevance grounds

should be denied.

### B.     DR. LAMB'S QUALITATIVE ANALYSIS IS ADMISSIBLE

#### 1.     Dr. Lamb Was Allowed to Consider Communications between Jeld-Wen and Masonite

Defendants argue that Dr. Lamb's opinion should be excluded because part of his

analysis considered communications that took place between Jeld-Wen and Masonite executives

beginning in March 2014.  Def. Br. 11.  Defendants contend that it was inappropriate for Dr.

Lamb to rely on such communications because Dr. Lamb had no expertise, evidentiary basis or

methodology to conclude that the communications involved price-fixing.  Def. Br. 12.  Yet,

contrary to Defendants' assertions, Dr. Lamb's opinion explained that the communications

between Jeld-Wen and Masonite were appropriate to consider as part of the overall analysis

because of the "████████████████████████████."  Lamb Rpt. ¶70.

For example, among other evidence, Dr. Lamb's report explains that during the same

month that Defendant Hachigian and Masonite's former president and CEO Fred Lynch began

exchanging emails and phone calls (*i.e.*, March 2014), Mr. Lynch emailed his leadership team

about Jeld-Wen's management changes and instructed them to "████████████████████

████████" and to ████████████████████████████████ — ████!" *Id.* ¶71.  Similarly, Dr.

Lamb's report relies on the fact that "████████████████████████████████████████████████

9

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████.ˮ *Id.* Furthermore, Dr.

Lamb also cited the fact that, according to Tim Kirk, it was Defendant Hachigian's intention that

Jeld-Wen should be in a position to "███████████████████████████████████████████

█████████ˮ with a primary focus on interior doors. *Id.* Dr. Lamb also relied on notes from

an August 2014 meeting between Steves and Sons and Jeld-Wen, which provided that Defendant

Hachigian expressed annoyance at Mr. Lynch for only increasing prices by 8% while Jeld-Wen

increased by 9.5% in an effort to help the industry. *Id.* ¶72.

Thus, Defendants' argument that Dr. Lamb had lacked an evidentiary basis to determine

that the communications between Defendant Hachigian and Mr. Lynch involved pricing

discussions is unsupported by the record in this case. Furthermore, it was well within Dr.

Lamb's purview to consider the conduct and communications surrounding the price increases,

and to thus opine that such conduct and communications support his finding of anticompetitive

behavior. *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 361, 372 (M.D. Fla. 2018)

(analysis of "nature, timing, and communications surrounding resale price maintenance"

considered relevant economic analysis at class certification stage in antitrust action). Indeed,

courts regularly consider conduct or evidence that is "consistent with a finding that Defendants

engaged in a conspiracy to fix prices." *Id.* at 372; *In re Delta/Airtran Baggage Fee Antitrust

Litig.*, 245 F. Supp. 3d 1343, 1359 (N.D. Ga. 2017) (same), *aff'd sub nom. Siegel v. Delta Air

Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018); *In re Polypropylene Carpet Antitrust Litig.*, 93 F.

Supp. 2d 1348, 1355 (N.D. Ga. 2000) (same). Therefore, Dr. Lamb's opinion—that "██████

████████████████████████████████████████████████████

10

█████████████████████████████████████████████████████████████

██████," Lamb Rpt. ¶90—should not be excluded.

Moreover, while Defendants criticize Dr. Lamb for supposedly "interpreting facts and documents" to form an opinion about Defendants' anticompetitive behavior, Defendants cite to factual snippets from the record about the communications between Jeld-Wen and Masonite, arguing that such communications were not about price-fixing.  Def. Br. 12–14.[3]  But as Defendants themselves acknowledge, it is the fact-finder's role to weigh the evidence in the record and come to an ultimate determination as to the meaning of the available facts.  That does not preclude Dr. Lamb, however, from considering and relying on evidence in the record to form his opinions.

Even if Dr. Lamb did not cite to every single fact from the record related to the communications, Dr. Lamb's opinion should still not be excluded because those criticisms go to the weight of Dr. Lamb's testimony, not its admissibility.  *Roberts v. Sunbelt Rentals, Inc.*, 2016

---

[3] Defendants' argument that Dr. Lamb may not rely on communications between corporate executives as part of his analysis of anticompetitive behavior ignores the fact that these types of communications are routinely seen as indicia of anticompetitive behavior.  *See* Lamb Reply Rpt. ¶13 n.45 (citing William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L. White, "Plus Factors and Agreement in Antitrust Law," Michigan Law Review, Vol. 110, No. 3, 2011, 393–436).  Further, Defendants' authority on this point is inapposite because they rely on cases excluding experts whose entire opinions rest solely on their non-scientific understanding of the facts, whereas, here, Dr. Lamb used these communications as only one factor in his economic analysis of Jeld-Wen's anticompetitive conduct.  *See Slavin v. Garrison Prop. & Cas. Ins. Co.*, 2017 WL 2928030, at *9 (D. Colo. July 10, 2017) (excluding expert because his report was "based on an inapplicable standard of care," relied on "an implausible interpretation of [defendant's] obligations under the applicable insurance policy," and "expressed opinions[that were] replete with legal opinion and conclusions"), *aff'd*, 805 F. App'x 561 (10th Cir. 2020); *Kennedy v. Joy Techs., Inc.*, 269 F. App'x 302, 312 (4th Cir. 2008) (excluding expert because his report was merely a summary of documents produced by defendants without "any specific scientific gloss or expertise"  and "most of the conclusions of his report were apparently adopted from [a government agency's] [r]eport").

11

WL 1259414, at *8–9 (W.D. Va. Mar. 30, 2016) (criticisms about whether expert gave proper consideration to all relevant facts "go to the weight, not admissibility, of the testimony. [The opposing party] will have a chance to challenge the testimony at trial through cross-examination and contrary evidence from [opposing party's] experts, and then it will be for the jury to decide what, if any, weight to give the testimony."); *Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1074 (D. Or. 2013) ("[t]o the extent [d]efendant believes [plaintiff's expert report] and testimony construes the information erroneously in [p]laintiff's favor, that is an issue for cross examination"); *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 352 (D.N.J. 2009) ("disregard[ing] certain testimony the defendants find particularly helpful to their cause is not a cognizable basis to exclude [the] expert reports").

Similarly, Defendants criticize Dr. Lamb for not investigating or "attempt[ing] to test the plausibility of any alternative" reason for communications between Jeld-Wen and Masonite executives. Def. Br. 14–15. But as already discussed, Dr. Lamb provided reasonable explanations for why he believed the communications were related to price-fixing and thus ruled out alternative reasons, and why that in turn supported his opinion that the doorskins and IMD markets were anticompetitive in nature. Dr. Lamb was not required to conduct any further investigation into the record, and to the extent he should have, any failure to do so "affects the weight of the evidence," not admissibility. *In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig.*, 214 F. Supp. 3d 478, 484 (D.S.C. 2016) (if experts "provide a reasonable explanation for dismissing specific alternate factors," "then the failure to investigate potential alternative causes simply affects the weight of the evidence"). Indeed, "an expert need not 'rule out every potential cause.'" *Id.* at 483–84; *see also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265–66 (4th Cir. 1999) (citations omitted) ("The

12

alternative causes suggested by a defendant 'affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony,' unless the expert can offer '*no* explanation for why she has concluded [an alternative cause offered by the opposing party] was not the sole cause.'").  Because Dr. Lamb *did* offer an explanation for why the communications between Jeld-Wen and Masonite were for non-legitimate purposes, Dr. Lamb's opinion should not be excluded.

Defendants further argue that it is not the role of an economist to rely on the conduct and communications of Defendants to determine that collusive behavior existed as "[n]one of this is scientific expert opinion." Def. Br. 13–15.[4]  However, such evidence is appropriately considered in this context.  *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 424 (E.D. Pa. 2015) ("An economic expert may permissibly testify as to whether certain conduct is consistent with collusion[.]"); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 240 (S.D.N.Y. 2004) ("Economists often explain whether conduct is indicative of collusion.").

---

[4] Again, the authority upon which Defendants rely is irrelevant to the case at hand because in each case the expert at issue performed no scientific analysis, unlike Dr. Lamb whose qualitative analysis served as only one part of his scientific analysis.  *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008) (excluding expert who "testified as to the bottom line without any explanation, failed to provide expert analysis, testified beyond limitations established by pretrial orders, testified in areas beyond her expertise, and invaded areas that required no expert testimony"), *aff'd in part, rev'd in part*, 586 F.3d 547 (8th Cir. 2009); (*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (excluding expert opinion because "opinions of these witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise"); *Sardis v. Overhead Door Corp.*, 2019 WL 560273, at *3 (E.D. Va. Feb. 12, 2019) (internal quotation omitted) (excluding "grief expert" proffered to opine on mental health injury and future mental healthcare needs because courts have held that "[t]hese matters can be left to turn mainly upon the good sense and deliberate judgment of the trier").

### 2. Dr. Lamb Does Not Opine on Jeld-Wen's Intent, Motives, and Knowledge

Defendants further assert that Dr. Lamb opines on Jeld-Wen's intent, motives and knowledge, and that such opinions are inadmissible. Def. Br. 16. But Defendants' arguments are misplaced because Dr. Lamb does not opine on Jeld-Wen's state of mind as Defendants contend. *Id.* Instead, Dr. Lamb opines on whether Defendants' conduct and communications are consistent with anticompetitive conduct. For instance, Defendants take issue with Dr. Lamb's opinion that the communications between Jeld-Wen and Masonite "███████████████████████ ███████████████████████████████████████████████ ███████████████████████████." *Id.*; Lamb Rpt. ¶32. But Dr. Lamb is simply opining on the existence of collusive behavior and thus anticompetitive conduct by Jeld-Wen, which certainly is within the purview of an expert. Indeed, "[a]n economic expert may permissibly testify as to whether certain conduct is consistent with collusion or an entity or individual's self-interest." *In re Processed Egg Prods.*, 81 F. Supp. 3d at 424.

### 3. Dr. Lamb's Opinion About Market Structure, Conduct, and Performance Should Not be Excluded

Defendants also argue that "[Dr.] Lamb's analysis of the structure of the IMD and doorskins markets, and JELD-WEN's IMD pricing behavior, should be excluded." Def. Br. 17. In furtherance of their argument, Defendants assert that Dr. Lamb improperly became a "vehicle for factual narrative" when he discussed market structure and price increase announcements. *Id.* To the contrary, Dr. Lamb did not serve as a mere conduit of the factual story; instead, he studied Defendants' conduct and the market structure, and applied those facts to his overall analysis to determine whether any collusive behavior existed. This is the exact type of analysis courts expect of economic experts. *U.S. Info. Sys.*, 313 F. Supp. 2d at 240 (emphasis added)

14

("Economists often explain whether conduct is indicative of collusion.  For example, courts have held that an expert is permitted to testify that the *'climate'* of a specific market was consistent with a conspiracy.").  Nor are Dr. Lamb's opinions rendered inadmissible simply because his opinion includes a discussion of the background facts that are necessary to put his opinions in their appropriate context.  *See, e.g.*, *Lucent Techs.*, 610 F. Supp. 2d at 350–52 (denying motion to exclude accountant's testimony where accountant "relied on the factual record and applied sound accounting principles to reach her opinion").  Each of Defendants' points in support of their meritless argument similarly fails. [5]

### 4.    Dr. Lamb Properly Analyzed the Structure of the IMD and Doorskin Markets

Defendants contend Dr. Lamb's opinion—that the structure of IMD and doorskins markets supports the conclusion that Jeld-Wen engaged in anticompetitive conduct—is flawed because Dr. Lamb purportedly failed to account for (1) "large buyers with significant negotiating power," such as Home Depot and Lowes; (2) the "effect that value-added services, such as pre-hung doors, could have on IMD prices;" and (3) variations in the IMD industry by region.  Def. Br. 18–19.  However, Defendants' assertions are either irrelevant or simply wrong.

***First***, as Dr. Lamb explained in his reply, just because "," does not mean that they actually did prevent Jeld-Wen from engaging in such conduct.  Lamb Reply Br. ¶49.  In fact, because Jeld-

---

[5] Defendants' reliance on *Andrews v. Woody*, 2018 WL 2452177 (E.D. Va. May 31, 2018), for this argument is misplaced.  There, the court excluded an expert who "simply state[d] in a conclusory manner that his . . . opinions are based on a review of relevant materials" and whose report "contain[ed] no explanation of how his review of such material resulted in his opinions, or any methods on which he relied in conducting that review."  *Id.* at *5.  In contrast, here, Dr. Lamb engaged in a lengthy explanation of his analyses of the structure of the IMD and doorskins markets and Jeld-Wen's IMD pricing behavior,  using the documents produced in this case to support those analyses, rather than merely summarizing them.

Wen dominated the molded doorskins market and Jeld-Wen and Masonite dominated the IMD market, it would have been difficult for Home Depot and Lowes to switch suppliers. *Id.* In fact, Dr. Lamb's regression analysis in the IMD antitrust litigation found that Home Depot and Lowe's both paid artificially inflated prices as a result of the alleged anticompetitive conduct. *Id.* Additionally, large buyers existed both in the anticompetitive period and benchmark period of Dr. Lamb's regression analyses, and Dr. Lamb still found that IMD prices during the anticompetitive period were artificially inflated—evidencing that large buyers did little to nothing to prevent Jeld-Wen's anticompetitive behavior. *Id.* ¶50.

*Second*, with respect to Defendants' point about value added services (such as pre-hung doors) not being subject to parallel price increases, Dr. Lamb explained that value-added services are "████████████████████████████████████████████████████ ████████████████████," which limited Jeld-Wen's ability to raise prices for those services beyond competitive increases. *Id.* ¶47.

*Third*, contrary to Defendants' assertion that Dr. Lamb should have analyzed the IMD market at the regional level instead of the national level, Dr. Lamb explained that the relevant geographic market is the national market because Jeld-Wen and Masonite operate nationwide and the "████████████████████████████████████████████████████ ████████████████████████████████████████████████." *Id.* ¶55.

### 5. Dr. Lamb's Conclusions Concerning Parallel Price Increase Announcements Should Not be Excluded

Defendants also contend that Dr. Lamb's "conclusion that JELD-WEN's and Masonite's parallel price-increase announcements suggest a conspiracy" should be excluded. Def. Br. 19.

*First*, Defendants argue that Dr. Lamb could not distinguish parallel pricing behavior from prior to 2014 compared to after 2014, and that the increases pre-2014 were on average larger than

16

during the conspiracy period. *Id.* However, that is simply not true. In rejecting this very idea, Dr. Lamb clarified that Defendants could only reach that conclusion by "███████████ ████████████████." Lamb Reply Rpt. ¶29. For instance, Defendants "pre-2014 period" consists of less than a two-year period from October 2012 to February 2014, while the anticompetitive period is about a four-year period from March 2014 to October 2018. Def. Br. 19. Thus, when using the proper time period prior to 2014 (*i.e.*, beginning in January 2010), "█ ████████████████████████████████████████████ ████████████████████████." Lamb Reply Rpt. ¶30. Dr. Lamb further distinguished the different periods by explaining that the price increases announced prior to the anticompetitive period "████████████████████████," but the price increases during the anticompetitive period "████████████████." *Id.*

    *Second*, Defendants argue that Dr. Lamb "could not explain why post-2014 parallel IMD pricing suggests conspiracy by JELD-WEN and Masonite but not Steves." Def. Br. 20. But as Dr. Lamb explained, Steves' "████████" strategy was consistent with and in fact expected under Jeld-Wen's collusive behavior. Lamb Reply Rpt. ¶32. Indeed, if Steves did *not* follow, it risked a price war with Jeld-Wen, as made clear by Defendant Hachigian's remarks that Jeld-Wen would "█████" against any competitor that does not follow Defendants' increases. *Id.*

    *Third*, Defendants argue that Dr. Lamb "also failed to account for the similarity between JELD-WEN and Masonite's parallel price announcements for *IMDs* and their parallel price announcements for *flush doors*." Def. Br. 21 (emphasis in original). In other words, Defendants assert that Jeld-Wen's increasing prices for other products (which were not alleged as anticompetitive), undermines the fact that the price increases for IMDs were caused by

17

anticompetitive behavior.  However, because Defendants attempted to justify their IMD price increases by changes in raw materials and manufacturing processes, it was necessary for Defendants to likewise raise prices of flush doors since flush doors used mostly the same raw materials and manufacturing process.  Lamb Reply Rpt. ¶31.  The same logic applies even if some of the flush door price increases were larger than IMD price increases, despite Defendants' contention otherwise.  Def. Br. 21.

*Fourth*, Defendants argue that Dr. Lamb "ignored the fact that the price increase announcements did not reflect the prices that JELD-WEN's wholesale customers actually paid." Def. Br. 22.  However, contrary to Defendants' stance, Dr. Lamb in fact did not ignore such facts.  Lamb Reply Rpt. ¶35; Lamb Rpt. ¶¶68–69.  Furthermore, Defendants' criticism that Dr. Lamb provided no basis to assume that the negotiated price increases were the same as the announced price increases misses the point.  Def. Br. 22.  It is irrelevant whether some customers received a negotiated price increase less than the announced increase because, as Dr. Lamb explained, this goes to the "███████████████████████████████████████████ ███████████████████████████████████████████."  Lamb Reply Rpt. ¶36.  In fact, when Dr. Lamb analyzed via his regression analysis the behavior of prices after controlling for supply and demand factors, Dr. Lamb found that "████████████████████████ ███████████████████████."  *Id*.

### C.    DR. LAMB'S REGRESSION ANALYSIS IS RELEVANT AND RELIABLE

Defendants' attacks of Dr. Lamb's regression analyses fail because they are based on a unilateral reframing of the facts of the case and erroneous attempts to undercut Dr. Lamb's assessment of *anticompetitive behavior in the IMD and doorskins markets* by conflating it with his assessment of *common class-wide damages at class certification* in the IMD antitrust litigation—a *different case with different standards*.  Notably, however, Defendants fail to

18

mention that in ***both*** cases Dr. Lamb's regression analysis established a statistically significant overcharge in IMD prices, evidencing Jeld-Wen's anticompetitive behavior. The ***only way*** Defendants (and their expert Dr. Johnson) are able to manufacture a non-statistically significant overcharge is by inconsistently cherry-picking ***some*** of the variables and data controls from Dr. Lamb's IMD damages regression analysis and applying it to his anticompetitive regression analysis here. Yet, when Dr. Lamb consistently applies ***all*** the relevant variables and data controls from the IMD antitrust action to the regression analyses here, he once again finds a statistically significant overcharge. Next, knowing that Dr. Lamb's analyses across both cases uniformly demonstrate that Jeld-Wen engaged in competitive behavior, Defendants turn to criticizing the regressions Dr. Lamb sets forth in his reply report that were done ***to correct the egregious errors committed by Defendants' expert Dr. Johnson***. But as set forth below, Defendants' criticisms are easily dispelled with consistent application of sound economic principles. Accordingly, Dr. Lamb's regression analysis is robust and reliable and should not be excluded.

### 1. Dr. Lamb's Regression Is Relevant to His Task of Assessing Whether Jeld-Wen Engaged in Anticompetitive Behavior

Defendants argue that Dr. Lamb's regression analysis is "disconnected to the facts of this case" for three reasons. Def. Br. 22-26. But none of the three reasons Defendants assert are supported by the Complaint's allegations, the discovery record to date, or Dr. Lamb's opinions and testimony. At best, Defendants' relevance arguments amount to their insistence that Dr. Lamb accept a narrative that suits their self-serving merits and *Daubert* arguments even though that narrative is not supported by the record evidence here and the sound economic principles Dr. Lamb applied.

***First***, Defendants argue that Dr. Lamb "did not study the time period at issue in the Complaint." Def. Br. 22-23. Specifically, Defendants argue that based on their self-serving

19

interpretation of the allegations, "[Dr.] Lamb *should have begun* the alleged anticompetitive period in October 2012 (the time of the CMI merger) and used an earlier period not alleged to be infected with anticompetitive behavior as a benchmark." Def. Br. 23 (emphasis added). Defendants base this argument, not on a reading of the actual allegations of the Complaint, but on the language contained in one heading in the introduction of the Complaint. *See id.* (citing Compl. § I.A. ("Beginning in 2012, Jeld-Wen Has Been Engaging in Anticompetitive Conduct")).[6] Setting aside whether Defendants' self-serving interpretation of the language in the heading is even accurate—it is not—Dr. Lamb's opinions assess the substantive allegations of *anticompetitive behavior* that took place as alleged in the Complaint and as set forth in the discovery record.

A simple reading of the Complaint explains that while Jeld-Wen had the *ability* to exercise increased market power beginning in 2012 after the CMI acquisition, the Company did not begin *exercising* that power to anticompetitive ends until 2014, after Defendant Kirk Hachigian was named CEO and Masonite announced that it would no longer sell doorskins to independent door manufacturers. *See* Compl. ¶¶9–11, 81–83. It was only then that Defendants began taking the undisclosed anticompetitive actions that form the basis of this Complaint. *See id.* ¶¶84–89 (exploiting market power by extra-contractually raising prices of doorskins and breaking doorskin contracts and issuing "capital charges" to customers following Masonite exit from market); ¶¶90–91 (in 2014, Jeld-Wen adopted policy change to no longer reimburse independent door manufacturers for full cost for defective doorskins as it had in the past); ¶¶92–95 (along with

---

[6] Notably, Defendants blatantly ignore the fact  that immediately following the heading they rely on, the Complaint unequivocally states that "Jeld-Wen and then CEO, Defendant Hachigian began to engage in anticompetitive conduct" "following the CMI Acquisition and Masonite's exit from the doorskins market"—which did not happen until "2014." Compl. ¶¶9–11.

Masonite, Jeld-Wen issued parallel price increases that were approved by CEO Hachigian, Beck and Michel).[7]

Consistent with the Complaint, Dr. Lamb's report and testimony set forth that while Jeld-Wen had the ability to exercise increased market power beginning in 2012 after the CMI acquisition, the Company did not begin exercising that power to anticompetitive ends until 2014, after Defendant Hachigian was named CEO and Masonite announced that it would no longer sell doorskins to independent door manufacturers.  Lamb Rpt. ¶¶68–69, 81–84, 100–101; Rogers Ex. A ("Lamb Dep.") 205:3–206:9, 207:24–208:10.  Moreover, with respect to price fixing, Dr. Lamb also considered evidence of communications and conduct related to price increases in early 2014 that occurred between the CEO of Jeld-Wen, Kirk Hachigian, and the CEO of Masonite, Fred Lynch.  Lamb Rpt. ¶71, Lamb Dep. 85:7–19.  Further, Dr. Lamb's reports are replete with documentary evidence from the discovery record supporting his opinions regarding Jeld-Wen's anticompetitive conduct beginning in 2014.  *See* Lamb Rpt. ¶¶70–75 (citing documents and testimony regarding price fixing); ¶¶ 76–87 (raising prices of doorskin customers and changing behavior).  Accordingly, Dr. Lamb's regression analysis, which measures anticompetitive conduct beginning in 2014, is entirely consistent with the Complaint's allegations and the discovery record in this case, and will aid the jury in understanding how IMD prices were elevated above competitive levels from March 2014 through the end of the Class Period in October 2018.

***Second***, Defendants argue that Dr. Lamb "failed to isolate the effects of any unilateral conduct by JELD-WEN or to perform any econometric analysis whatsoever of the doorskins market."  Def. Br. 24 (emphasis omitted).  But again, Defendants' argument is fundamentally

---

[7] Of the CEO Defendants referenced in the Complaint for approving price increases, Defendant Hachigan was the earliest and was not appointed as CEO until March 2014 further supporting that Jeld-Wen's anticompetitive behavior did not begin until then.

flawed because it assumes Dr. Lamb was required to perform an econometric regression analysis akin to a class certification common damages model in order to establish that Jeld-Wen engaged in anticompetitive conduct with respect to doorskins. Not so. Dr. Lamb's expert reports and testimony explained, *inter alia*: (1) the structural characteristics of the molded doorskins and IMD market made it susceptible to anticompetitive behavior; (2) that Jeld-Wen's conduct prior to and during the Class Period related to doorskins was consistent with Plaintiffs' allegations (and the findings of by the Judge and Jury in the *Steves* litigation) of anticompetitive conduct; and (3) that the price of doorskins increased by 11% from 2014 through the end of the Class Period despite only moderately increasing demand, excess capacity, stable or declining costs, and significant quality issues. Lamb Rpt. ¶¶10, 59, 91–101, 112; Lamb Dep. 35:15–36:20, 144:14–145:13, 314:3–6. Based on these opinions, Dr. Lamb concluded "███████████████████████████████████████████████████████████████████████████████████████████████████████" Lamb Rpt. ¶112. Defendants' attempts to add a regression analysis where none is needed should be rejected by the Court.

**Third**, Defendants argue that Dr. Lamb ***should have used*** different data in his regression analysis. Def. Br. 24–26. Specifically, Defendants seem to be arguing that because Dr. Lamb used transactional-level data to establish a 9.5% overcharge on IMDs purchased by Direct Purchaser plaintiffs at class certification in the IMD antitrust litigation, he ***should have*** used the same data here. However, because this is a different case with completely different allegations, Dr. Lamb was asked to perform a different analysis than he was in the IMD litigation. Lamb Rpt. ¶8; Lamb Reply Rpt. ¶¶68–69; *see also* Def. Ex. 1 ("Lamb IMD Rep.") ¶11, ECF No. 176-2.

Specifically, Defendants claim Dr. Lamb's regression analysis is "unreliable" because he utilizes a government-reported price index called "Wood Door PPI" as the dependent variable in

22

his analysis.[8]  Def. Br. 24-26.  For example, Defendants argue that the Wood Door PPI includes wood doors with glass but Dr. Lamb did not control for the cost of glass in his regression analysis, but they ignore that at least 87% of costs in Dr. Lamb's cost index related to wood, resin, steel, freight, and labor apply to all doors in the Wood Door PPI. Moreover, Defendants' expert, Dr. Johnson failed to perform any analysis whatsoever to establish that the cost measure Dr. Lamb used was unreliable.

But Defendants' arguments fail because they cherry-pick the aspects of the Wood Door PPI that suit their arguments and omit critical facts about the index that support why Dr. Lamb used it to demonstrate that IMD prices were not consistent with competitive conduct.  Specifically, Defendants fail to mention that IMDs represent over 70% of Jeld-Wen's sales of doors by unit and 50% of door sales by value and that, according to the Company's own internal analyses, IMDs accounted for approximately 67% of the door labs produced annually.  Accordingly, the Wood Door PPI primarily measures the prices of IMDs, which renders it as a reliable measure to show Jeld-Wen's anticompetitive behavior with respect to doorskins and IMDs.[9]  *See* Lamb Reply Rpt. ¶¶60–67.  Likewise, while Defendants attack Dr. Lamb's use of the Wood Door PPI because it includes other types of non-IMD wood doors, they ignore the fact that there is no anticompetitive conduct alleged with respect to any non-IMD that could explain the 4.6% overcharge Dr. Lamb finds.  *Id.* ¶67.  Nor do Defendants address the fact that Dr. Lamb's Wood Door PPI regression used cost and demand control variables that controlled for any price movements in non-IMD wood

---

[8] Notably, Jeld-Wen used Wood Door producer price indices to calculate the price increases it forced on its interior molded door customers operating under the long-term supply agreements. *See* Lamb Reply Rpt. ¶60.

[9] Indeed, this is supported by the fact that the 4–4.6% overcharge that Dr. Lamb established using the Wood Door PPI is lower than the overcharge found when using transactional-level data in the IMD antitrust litigation.  *See* Lamb Reply Rep. ¶¶64–67.

23

doors that are also largely manufactured from identical cost inputs as IMDs and derive their demand from the exact same source as IMDs—new home construction and remodeling and repair of existing homes. *Id.* Accordingly, Dr. Lamb's regression analysis reliably controlled for price movements in non-IMD wood doors.

### 2. Dr. Lamb's Regression Analysis Is Robust and Reliable

Defendants' next criticize Dr. Lamb's regression analysis for not being reliable. Def. Br. 26–30. Yet, Defendants' arguments are essentially just the same recycled arguments set forth elsewhere in their motion to exclude Dr. Lamb and are easily dismissed for the same underlying reasons. Namely, that Dr. Lamb was asked to perform a completely different analysis here than he was in the IMD antitrust litigation. Therefore, Defendants' attempts to attack Dr. Lamb's regression analysis based on certain, cherry-picked aspects of his regression analysis in the IMD litigation must be rejected. Indeed, as Dr. Lamb's reply report demonstrates, when all the relevant variables from the IMD litigation are applied correctly to his Wood Door PPI regression analysis here, it still results in prices that were elevated to a statistically significant degree attributable to Jeld-Wen's anticompetitive conduct.

### a. The Methodology Utilized by Dr. Lamb in the IMD Litigation are Not Applicable to His Opinions Here Regarding Jeld-Wen's Anticompetitive Behavior

Defendants again claim Dr. Lamb's failure to use "the same techniques" that he used to measure common classwide damages in the IMD litigation renders his analysis unreliable. Def. Br. 27–28. However, it is Defendants' asymmetrical application of cherry-picked variables from an antitrust class certification damages analysis to Dr. Lamb's opinions on Jeld-Wen's anticompetitive behavior in a securities fraud case that is unreliable. Indeed, in both cases, Dr. Lamb concluded that there was a statistically significant overcharge. Dr. Lamb's Wood Door PPI regression analysis in this case found that IMD prices were elevated by a statistically significant

24

4–4.6% due to Jeld-Wen's anticompetitive behavior.  Likewise, in the IMD litigation, Dr. Lamb's regression analysis on nearly 11 million transaction-level prices found a statistically significant 9.5% overcharge on IMD prices paid by direct purchasers.  Lamb IMD Rep. ¶¶187, 213.  The ***only*** time any of Dr. Lamb's regression analyses in either case result in a non-statistically significant increase in IMD prices due to anticompetitive behavior is when Defendants selectively apply certain transformations of variables from the IMD litigation to Dr. Lamb's analysis here.

Moreover, the only example Defendants rely on in support of their argument is that Dr. Lamb did not "adjust IMD prices for lagged demand and cost effects" in the same way he did in the IMD litigation.  Def. Br. 27.  But Dr. Lamb explained the demand variables in the Lamb Report are seasonally adjusted whereas the demand variables in the Lamb IMD Report were not.  *See* Lamb Reply Rep. ¶72.  And while Defendants argued that adding back the controls from Dr. Lamb's IMD regression results in no statistically significant evidence of an overcharge, they fail to mention that such a manipulation only adds back one of the many controls from Dr. Lamb's IMD report that were necessary to control for the variation in millions of transaction level prices in that case.[10]  Specifically, Dr. Lamb's IMD regression also applied a 12-month trailing mortgage rate; incorporated thousands of fixed effects to control for regional factors, product characteristics and customer size factors; and transformed the control and dependent variables into natural logs.  *See* Lamb Reply Rpt. ¶¶71–76.  Unsurprisingly, when ***all*** the appropriate variables and controls

---

[10] For this reason, Defendants' claims that they "fully reconstructed" Dr. Lamb's demand and cost variables is misleading because applying only some but not all of the data manipulations required render their reconstruction "partial" at best.  Def. Br. 28 n.8. The same applies to Defendants' misleading description of the mortgage rate control variable as "new" when attacking the regression in the Lamb Reply Report.  Def. Br. at 28.  While it may be more convenient for them to ignore Dr. Lamb's use of a mortgage rate control variable because they do not apply it in their purportedly "fully reconstructed" counter-analysis, there is no dispute that Dr. Lamb applied such a variable in his IMD regression analysis.  *See* Lamb IMD Rep. ¶¶203, 260, Table 3, nn. 460, 461, 464, 465, 472.

are applied to the Wood Door PPI analysis and the data is treated ***consistently*** with the way Dr. Lamb analyzed it in the IMD litigation, his regression once again demonstrated a statistically significant overcharge. *See Id.*

> **b.     Defendants' Attacks on Dr. Lamb's Reply Report Regressions Fail**

As discussed above, Defendants (and their expert Dr. Johnson) attacked Dr. Lamb's Wood Door PPI regression analysis in this action by self-servingly applying only selected variables and data controls that Dr. Lamb applied in the IMD litigation. *See* Def. Br. 26–28; Johnson Rpt. ¶¶94 n.199, 94–96. In response, Dr. Lamb performed a sensitivity analysis called the "Corrected Johnson Reconstructed" regression where he corrected Defendants' failure to apply all the applicable variables and data controls he utilized in the IMD litigation even though the Wood Door PPI data used here is fundamentally different—and useful for measuring different things—than the transactional data used in the IMD litigation. *See* Lamb Reply Rpt. ¶74. Recognizing that Dr. Lamb's affirmative regression analyses in both litigations consistently result in a statistically significant overcharge due to anticompetitive conduct (and that consistently applying all the variables and data controls from the IMD regression analysis to the Wood Door PPI analysis also results in a statistically significant overcharge), Defendants' motion to exclude turns to criticizing Dr. Lamb's sensitivity analyses in a last-ditch attempt to somehow argue that his regressions are unreliable. Def. Br. 28–30. Specifically, despite the fact that Dr. Lamb's sensitivity analyses still demonstrate a statistically significant increase in IMD prices during the anticompetitive period— and thereby demonstrate that Jeld-Wen engaged in anticompetitive conduct—Defendants argue that Dr. Lamb's regression analysis is unreliable because of the mortgage rate and Pre-CMI Period control variables. *Id*. But Defendants' arguments miss the point on both.

*First*, Defendants argue that the fact that the mortgage rate variable reacted differently in the IMD litigation than in Dr. Lamb's Corrected Johnson Reconstructed regression on reply renders his model "unstable." Def. Br. 28–29. But as Dr. Lamb testified, it is unremarkable that a control variable might react differently when applied to different data and volumes (106 monthly Wood Door PPI observations here v. 11 million transactions in the IMD litigation).[11] *See* Lamb Dep. 272:19–275:21. Indeed, Defendants' unsupported assertion that the sign on the mortgage variable is "wrong" is simply incorrect. In reduced form models such as the one employed by Dr. Lamb, different data may reflect or emphasize a myriad of different aspects of a complex control variable such as the 30-year mortgage rate that affects both the demand and supply of IMDs and how it interacts with prices in a marketplace, especially when comparing it to a smaller number of observations as was done on reply in the Corrected Johnson Reconstructed regression. *Id.*; *see also* Rogers Ex. B, James F. Nieberding, *Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues*, 9 J. Applied Econ., No. 2, November 2006, at 361, 365–66. In any event, such observations by Defendants about a corrected sensitivity analysis at best go to credibility and are insufficient to exclude Dr. Lamb's regressions in their entirety. *Coleman v. Tyson Farms, Inc.*, 2011 WL 1833301, at *3 (E.D. Va. Apr. 13, 2011) ("[t]he asserted fallibility of [an] expert's assumptions affect[ ] the weight of his testimony, not its admissibility")

---

[11] Dr. Lamb explained in the IMD Reply Report that the "mortgage rate variable measures the macroeconomic conditions of the IMD market and as such impacts both supply and demand. For instance, higher interest rates are reflective of macroeconomic growth, so a positive mortgage rate may indicate higher IMD prices. At the same time, higher interest rates may have a negative effect on demand for housing, thereby having a negative effect on IMD prices." *See* Rogers Ex. C ("Lamb IMD Reply Rep.") ¶53 n.181. Dr. Lamb's IMD regression also applied thousands of fixed effects to the data to control for variations in IMD prices for region, customer and product characteristics. *See* Lamb Reply Rep. ¶71.

(alterations in original) (quoting *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1144 (4th Cir. 1980)).

***Second***, Defendants argue that Dr. Lamb's inclusion of a control variable to control for the change in market structure for the time period prior to Jeld-Wen's acquisition of CMI in October 2012 in the Corrected Johnson Reconstructed regression somehow makes Dr. Lamb's model unreliable. Def. Br. 29–30. But Defendants' arguments are unavailing.

As an initial matter, the Corrected Johnson Reconstructed regression includes two analyses that compare the anticompetitive period (March 2014 through October 2018) to ***two*** different benchmark periods (1) January 2010 through February 2014 and (2) October 2012 through February 2014). *See* Lamb Reply Rpt. ¶¶74–76, Table 3. However, Defendants omit the fact that the pre-CMI period variable only applies to one of the two regression analyses leaving the other analysis with the October 2012 through February 2014 benchmark, and its finding of a statistically significant IMD overcharge unchallenged. *Id.*

Moreover, Defendants completely ignore Dr. Lamb's substantive analysis of why applying the pre-CMI period control variable was necessary for his development of a robust and reliable regression model that accounts and controls for the macroeconomic and microeconomic conditions impacting the market during the January 2010–September 2012 part of the benchmark period including, *inter alia*, the fact that the market structure had changed following the CMI acquisition; the impact of the Great Recession; Masonite's bankruptcy in 2009; Jeld-Wen's financial problems; and the change in ownership following Onex's acquisition of Jeld-Wen in October 2011. *See* Lamb Reply Rpt. ¶75. Therefore, contrary to Defendants' arguments, Dr. Lamb's consideration of the pre-CMI period and accounting for it in his regression support the ***soundness*** of Dr. Lamb's economic analysis, not the unreliability of it.

## V.     CONCLUSION

The Court should deny Defendants' motion to exclude Dr. Lamb's opinions.

DATED: March 19, 2021                     Respectfully submitted,

COHEN MILSTEIN SELLERS & TOLL PLLC
STEVEN J. TOLL (VSB No. 15300)
JOSHUA HANDELSMAN (Admitted *pro hac vice*)

*/s/ Steven J. Toll*
_____
Steven J. Toll

1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
Telephone: 202/408-4600
202/408-4699 (fax)
stoll@cohenmilstien.com
jhandelsman@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*


LABATON SUCHAROW LLP
JAMES W. JOHNSON (Admitted *pro hac vice*)
MICHAEL H. ROGERS (Admitted *pro hac vice*)
JAMES T. CHRISTIE (Admitted *pro hac vice*)
PHILIP J. LEGGIO (Admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
jjohnson@labaton.com
mrogers@labaton.com
jchristie@labaton.com
pleggio@labaton.com

*Counsel for Co-Lead Plaintiff Public Employees'*
*Retirement System of Mississippi and the Class*

29

ROBBINS GELLER RUDMAN &
   DOWD LLP
ROBERT M. ROTHMAN (Admitted *pro hac vice*)
MARK T. MILLKEY (Admitted *pro hac vice*)
WILLIAM J. GEDDISH (Admitted *pro hac vice*)
VINCENT M. SERRA (New York Bar only)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
mmillkey@rgrdlaw.com
wgeddish@rgrdlaw.com
vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DEBRA J. WYMAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com

*Counsel for Co-Lead Plaintiff Plumbers and
Pipefitters National Pension Fund and additional
Plaintiff Wisconsin Laborers' Pension Fund, and
the Class*

30

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2021, I caused a copy of the foregoing document and attachments thereto to be filed with the Clerk of the Court via CM/ECF, which will send a notice of electronic filing to all registered users.

 */s/ Steven J. Toll*
Steven J. Toll
VA Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005

*Liaison Counsel for Lead Plaintiffs*

31