# Exhibit C

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF VIRGINIA

# RICHMOND DIVISION

| | |
|---|---|
| **IN RE: INTERIOR MOLDED DOORS ANTITRUST LITIGATION** | **CASE NO. 3:18-CV-00718-JAG** |

**Class Certification and Trial Expert Reply Report of Dr. Russell L. Lamb**

President

Monument Economics Group

1530 Wilson Blvd, Suite 560

Arlington, Virginia 22209

June 9, 2020

**EXPERT REPLY REPORT OF RUSSELL L. LAMB**
**CASE NO. 3:18-CV-00718-JAG**                     **HIGHLY CONFIDENTIAL**

HIGHLY CONFIDENTIAL                                    JW-SEC-01101856

HIGHLY CONFIDENTIAL

## TABLE OF CONTENTS

I.     Summary of Opinions, Assignment, and Conclusions ........................................................1

    A.   Summary of opinions from the Lamb Report...................................................................1

    B.   Assignment .......................................................................................................................6

    C.   Conclusions........................................................................................................................6

II.    Defendants' Economists Fail to Consider, Explain, or Refute Important Evidence that Contradicts Their Opinions .......................................................................................................14

III.   Dr. Carlton Presents No Credible Economic Evidence that Either Defendants' Conduct or the Economic Performance of the IMD Industry were the Result of Oligopolistic Interdependence Acting Absent a Cartel ..................................................................................15

    A.   Oligopolistic interdependence and tacit collusion...........................................................17

    B.   Dr. Carlton's analysis of oligopolistic interdependence ignores several features of the IMD industry that would make tacit collusion difficult to achieve ..................................19

    C.   Dr. Carlton's opinion that Defendants' conduct is indistinguishable from oligopolistic interdependence is unmoored from record evidence .......................................................24

        1.   Dr. Carlton's assessment of the importance of communications in distinguishing between oligopolistic and cartel behavior is wrong.......................................................24

        2.   Economic literature confirms the importance of communications between would-be competitors in defining cartel behavior .................................................................27

        3.   Dr. Carlton's analysis of Defendants' price increase announcements fails to consider relevant market conditions and is therefore unreliable.................................28

        4.   Dr. Carlton's conclusion that Masonite's announcement regarding Doorskins was "perfectly consistent with non-conspiratorial conduct" is flawed and economically irrelevant ............................................................................................................32

    D.   Comparing the Benchmark Period with the Effective Cartel Period is an appropriate way to distinguish between oligopolistic interdependence and the effects of the Cartel because it controls for the oligopolistic interdependent aspects of the IMD market and the firms involved...........................................................................................................................36

    E.   Dr. Carlton's assertion that my analysis has "three serious flaws" is incorrect and misleading ........................................................................................................................36

IV.    Defendants' Economists' Criticisms of My Overcharge Regression Model Are Flawed....39

HIGHLY CONFIDENTIAL

JW-SEC-01101857

**HIGHLY CONFIDENTIAL**

A.  Defendants' economists' opinions that my Overcharge Regression Analysis is flawed and unreliable are not based on sound econometric analysis ...................................................41

B.  Drs. Carlton's and Johnson's flawed analyses that purport to find "no overcharges" do not make sense as a matter of economics. ........................................................46

    1.  It is unsurprising that there is no evidence of overcharges when the Cartel Period is expanded to include a period when the Cartel was not effective and an inappropriate benchmark period is selected ...........................................................46

    2.  Dr. Carlton's exclusion of the "Orsino tenure" is fatally flawed and produces unreliable results. ..................................................................................49

C.  Dr. Johnson's other criticisms of the performance of my Overcharge Regression Analysis are flawed. .........................................................................................52

    1.  Dr. Johnson's finding of an "overcharge" within the Benchmark Period does not prove that there are omitted variables in my Overcharge Regression Analysis ......................56

    2.  Dr. Johnson's criticism of the explanatory value of the time-varying variables in my model is wrong as a matter of econometrics................................................61

    3.  Dr. Johnson's claim that the predicted prices from my Overcharge Regression Analysis purportedly reveals the unreliable nature of my analysis is without merit....................62

    4.  Dr. Johnson's criticism that the Overcharge Regression Analysis omits regional controls is without merit .............................................................................67

    5.  Dr. Johnson's claim that my model fails to control for competition among IMD manufacturers is without merit and does not make sense as a matter of economics. ....74

D.  A flexible model that controls for all of Defendants' economists (incorrect) criticisms reaffirms the findings of my Overcharge Regression Analysis .......................................75

V.  Dr. Johnson Offers No Valid Criticisms to Refute My Conclusion That Class-Wide Evidence Demonstrates Injury to All, or Nearly All, Class members.................................76

A.  Dr. Johnson's conclusion that the Overcharge Regression Analysis cannot, along with other evidence and analyses, assess the question of common antitrust impact is flawed.79

    1.  My Overcharge Regression Analysis, combined with other evidence and analyses, demonstrates all, or nearly all, Class members were subject to an overcharge.............83

    2.  Dr. Johnson does not refute that my Predicted But-For Price Analysis demonstrates that all, or nearly all, Class members were impacted by the Cartel...............................90

JW-SEC-01101858

**HIGHLY CONFIDENTIAL**

B.   Dr. Johnson's argument that the Pricing Structure Analysis in the IMD industry is incapable of establishing class-wide impact is wrong and irrelevant ..............................94

   1.   Dr. Johnson fails to refute that my Price Correlation Analysis is evidence of a pricing structure................................................................................................................96

   2.   Dr. Johnson's criticism of my Product Characteristic Regression is irrelevant and does not refute that common characteristics explain nearly all of the variation in IMD prices ..........................................................................................................................97

C.   Common evidence confirms that Home Depot and Lowe's were impacted by the Cartel99

VI.   Conclusions ..........................................................................................................102

HIGHLY CONFIDENTIAL

JW-SEC-01101859

HIGHLY CONFIDENTIAL

## I.    Summary of Opinions, Assignment, and Conclusions

1.    I am the same Russell L. Lamb who submitted an expert report in the above captioned matter on January 31, 2020.[1] After filing the Lamb Report, I was deposed by counsel for Defendants on March 4, 2020.[2] Subsequently, on March 10, 2020, Defendants produced reports by Dr. Dennis W. Carlton ("Carlton Report") and Dr. John H. Johnson, IV ("Johnson Report") (collectively, "Defendants' experts").[3] An updated copy of my C.V., including a list of the matters in which I have submitted expert testimony in the past four years, is attached to this report as Appendix A.

### A.    Summary of opinions from the Lamb Report

2.    In the Lamb Report, I concluded using common evidence and methods that the economic evidence and the relevant economic characteristics of the Interior Molded Door ("IMD") industry are consistent with the existence of the Cartel alleged by Plaintiffs during the Cartel Period.[4] Furthermore, in the Lamb Report, I concluded that economic evidence, common to the proposed Class as a whole, establishes both that 1) the Cartel[5] resulted in artificially-inflated prices for IMDs, and 2) the Cartel caused all, or nearly all, members of the proposed Class[6] to pay these artificially-inflated prices. These conclusions were based on my analysis of the IMD industry, my review of relevant economic literature, and my training and experience in economics. Specifically, I concluded that:

---

[1] Class Certification and Trial Expert Report of Dr. Russell L. Lamb, January 31, 2020 (hereafter "Lamb Report").

[2] Videotaped Deposition of Russell L. Lamb, March 4, 2020 (hereafter "Lamb Deposition").

[3] Expert Rebuttal Report of Dennis W. Carlton, March 10, 2020 (hereafter "Carlton Report"); Expert Report of Dr. John H. Johnson, IV, March 10, 2020 (hereafter "Johnson Report"). I refer to Dr. Carlton and Dr. Johnson collectively as "Defendants' economists." Defendants also produced reports by Rene Befurt (Declaration of Rene Befurt, Ph. D., March 10, 2020) and by James A. Levinsohn (Expert Report of James A. Levinsohn, Ph. D., March 10, 2020) that only address issues raised by the Indirect Purchaser Plaintiffs ("IPPs").

[4] In the Lamb Report, I make reference to five periods: 1) the Cartel Period (March 2014 to the present), 2) the Effective Cartel Period (August 11, 2014 to December 31, 2018), 3) the Class Period (October 19, 2014 to December 31, 2018), 4) the Damages Period (October 19, 2014 to the present), and 5) the Benchmark Period (October 24, 2012 to August 10, 2014). *See* Lamb Report at ¶10.

[5] In the Lamb Report, I referred to the anticompetitive conspiracy that Plaintiffs contend began on March 2014 as the "Cartel" or the "alleged Cartel"). I use the same terminology in this reply report. See Lamb Report at ¶ 6.

[6] See Lamb Report at ¶ 8. It is my understanding that Direct Purchaser Plaintiffs ("DPPs") intend to seek the dismissal of JELD-WEN Holding, Inc. ("JWH") from the case and that purchases from "affiliates" of Defendants should not be included in the Class. Therefore, my understanding is that the Class should be defined as persons or entities who purchased IMDs in the United States directly from Defendants (no longer including JWH), their subsidiaries or joint-ventures during the period from October 19, 2014 to December 31, 2018. These modifications do not affect my analyses or change any of my opinions and conclusions. In this reply report, I refer to the proposed Class as the "Class."

1

JW-SEC-01101860

**HIGHLY CONFIDENTIAL**

a. The structural characteristics of the IMD industry demonstrate that it was conducive to the formation and operation of the Cartel. These characteristics include:

   i. Defendants'[7] collective dominance of the U.S. market for IMDs, such that they could artificially increase prices of IMDs through coordinated actions;[8] moreover, Defendants also collectively dominated the U.S. market for Doorskins—the most significant input to IMDs—such that they could constrain the ability of non-vertically integrated IMD manufacturers to compete on price in the IMD market;[9]

   ii. The significant barriers to entry in the market for IMDs.[10] As I discussed in the Lamb Report, the presence of significant entry barriers facilitates the operation of anticompetitive agreements such as the one alleged here because it makes it difficult or impossible for new suppliers to enter the market to compete by undercutting Defendants' prices that resulted from collusive activities;

   iii. That IMDs are commodity-like products that are interchangeable across manufacturers.[11] When products are interchangeable across suppliers for the same dimensions and design, the primary way companies can win business is by competing on price, so that avoiding price-based competition is a primary motivation for forming a cartel.[12] Economic theory also demonstrates that this characteristic facilitates the cartelization of an industry because it makes it easier for co-conspirators to track prices for each other's products and thus monitor compliance with (or cheating from) an anticompetitive agreement;

   iv. The generally inelastic demand for IMDs.[13] When demand for a good is inelastic, that means that suppliers of the good can increase prices without losing significant sales volume;

---

[7] In the Lamb Report, the term "Defendants" referred to Masonite Corporation ("Masonite"); and JELD-WEN, Inc. ("Jeld-Wen") and JWH. *See* Lamb Report at fn. 3. As noted in fn. 5 above, JWH will be dismissed from this case, and is therefore not included in "Defendants" as used in this Report.

[8] Lamb Report at ¶¶ 14a, 48-54.

[9] Lamb Report at ¶¶ 14b, 48-54.

[10] Lamb Report at ¶¶ 14c, 55-68.

[11] Lamb Report at ¶¶ 14d, 69-78.

[12] *See, e.g.,* Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?," *Journal of Economic Literature*, Vol. 44, March 2006 at p. 43.

[13] Lamb Report at ¶¶ 14e, 79-92.

HIGHLY CONFIDENTIAL                    JW-SEC-01101861

HIGHLY CONFIDENTIAL

v.  There are no economic substitutes for IMDs, so Defendants' customers could not have avoided increased prices by switching to other products;

vi.  That there are many buyers of IMDs, making cheating on the Cartel less likely since Defendants have little incentive to cheat on the Cartel, and thus the gains from capturing a customer are small; this means that Defendants are unlikely to undercut artificially-inflated prices;[14]

vii.  Prices of IMDs had been steady or declining leading up to the start of the Cartel Period, which increases the incentive to form the Cartel in order to raise price and increase profits;[15]

viii.  That Defendants had numerous opportunities to engage in collusive communications during the Cartel Period, making it easier to form and maintain the Cartel.[16]

b.  Defendants' conduct during the Cartel Period was inconsistent with each firm maximizing profits individually in an environment free of collusive behavior. This conduct included:

i.  Defendants' numerous high-level communications, which provided opportunities to form and maintain the Cartel.[17] As I discussed in the Lamb Report, Defendants' communications, including between its CEOs, occurred in close temporal proximity to each firm's formation of strategic pricing decisions and appeared to inform those strategic pricing decisions;

ii.  Defendants' communications with financial market analysts, which are also suggestive of anticompetitive conduct;[18]

iii.  Defendants announcing and implementing very similar and at times nearly identical price increases, which succeeded in raising prices across the board.[19] These announced price increases cannot be explained by supply and demand forces, exhibited characteristics commonly found in collusive price increase announcements, and contained very similar language from both Defendants;

---

[14] Lamb Report at ¶¶ 14f, 99-101.
[15] Lamb Report at ¶¶ 14g, 93-98.
[16] Lamb Report at ¶¶ 14h, 102-122.
[17] Lamb Report at ¶¶ 15a, 123-127.
[18] Lamb Report at ¶¶ 128-129.
[19] Lamb Report at ¶¶ 15b, 130-152.

3

HIGHLY CONFIDENTIAL

JW-SEC-01101862

HIGHLY CONFIDENTIAL

    iv.   Masonite's public announcement that it would not sell Doorskins to third parties, which record evidence demonstrates represented a significant departure from prior practice and which did not make economic sense in the absence of the Cartel.[20]

c.  Common evidence demonstrates that Defendants' economic performance in the IMD industry during the Effective Cartel Period, in the form of prices paid by Class members for IMDs, is consistent with the existence of the Cartel and inconsistent with a marketplace free of the Cartel. That is because:

    i.   Defendants were able to implement significant price increases in a period of flat or declining costs, modest demand increases, ample capacity, and significant quality problems;[21]

    ii.   My multiple regression analysis (the "Overcharge Regression Analysis" or "Overcharge Model") - which appropriately and sufficiently controls for the possibility that oligopolistic interdependence may have led to higher prices in the Effective Cartel Period by comparing it to a Benchmark Period characterized by the same oligopolistic structure - demonstrates that prices in the IMD market during the Effective Cartel Period cannot be explained by demand, supply, and other competitive factors;[22] and

    iii.   The results of my Overcharge Regression Analysis demonstrate that IMD prices were 9.5% higher during the Effective Cartel Period than they would have been in the absence of the Cartel.[23]

d.  Common evidence and methods demonstrate that the Cartel artificially inflated prices for IMDs paid by all or nearly all members of the Class. My conclusion that all or nearly all Class members were overcharged on purchases of IMDs is based on:

    i.   Common evidence demonstrating that there is a structure to prices for IMDs.[24] This common evidence includes statistical analyses (correlation analyses and a product regression analysis), which confirm that prices of the products bought by Class members tend to move together over time and that prices paid by Class members at

---

[20] Lamb Report at ¶¶ 15c, 153-168.
[21] Lamb Report at ¶¶ 16a, 170-186.
[22] Lamb Report at ¶¶ 16b, 187.
[23] Lamb Report at ¶¶ 188-215.
[24] Lamb Report at ¶¶ 17a, 220-239.

HIGHLY CONFIDENTIAL

JW-SEC-01101863

HIGHLY CONFIDENTIAL

any point in time can be principally explained by a handful of common characteristics. Where there is a pricing structure, any factor (such as the Cartel at issue here) that raises prices generally would result in higher prices that are broadly paid by all or nearly all purchasers. Thus, because there is a structure to prices for IMDs, the artificially inflated prices that arose as a result of the Cartel were paid by all or nearly all members of the Class.

ii. Common evidence in the form of certain market factors also establishes that all, or nearly all, Class members paid higher prices for IMDs as a result of the Cartel.[25] The common market factors that establish that these higher prices would have been widely paid by all or nearly all Class members include: Defendants' collective domination of the IMD market; the commodity-like nature of IMDs; and the presence of significant barriers to entry.

iii. Common evidence demonstrating that members of the Class could not have avoided paying artificially inflated prices for IMDs because of Defendants' strict enforcement of the announced price increases;[26]

iv. Evidence from implementing a second step in my Overcharge Regression Analysis, which finds a class-wide overcharge, to predict but-for prices for each transaction and then comparing those predicted but-for prices to actual prices Class members paid for the corresponding transaction, which also demonstrates that all or nearly all Class members paid artificially inflated prices for IMDs as a result of the Cartel.[27]

e. There is a common, reliable, standard methodology which may be used to calculate damages on a class-wide basis:

i. In the Lamb Report, I implemented a class-wide method (my Overcharge Regression Analysis), based on reliable, standard and widely accepted economic and statistical principals (including a multiple regression analysis) to calculate the damages suffered by the Class as a whole during the Class Period.[28]

---

[25] Lamb Report at ¶¶ 17b, 240-241.
[26] Lamb Report at ¶¶ 242-252.
[27] Lamb Report at ¶¶ 17c, 253-258.
[28] Lamb Report at ¶¶ 18, 260-263.

5

JW-SEC-01101864

HIGHLY CONFIDENTIAL

    ii.    Based on this analysis, I determined that aggregate class-wide damages suffered by Class members during the Class Period (from October 19, 2014 to December 31, 2018) are $243.7 million.[29]

### B. Assignment

3.    Since preparing the Lamb Report, I was asked by Counsel for DPPs in this matter to review the March 10 reports prepared for Defendants by Drs. Carlton and Johnson as well as their depositions.[30] In particular, I was asked to evaluate the opinions and conclusions I reached in the Lamb Report in light of Dr. Carlton's and Dr. Johnson's criticisms in order to determine whether anything in their reports would cause me to change my conclusions. Finally, I was asked to prepare this Expert Reply Report to present my findings regarding the opinions expressed by Drs. Carlton and Johnson. A complete list of the additional materials I relied upon in forming my opinions is contained in Appendix B.

### C. Conclusions

4.    Based on my review of the Carlton and Johnson Reports and further analysis and research into the IMD industry I undertook in responding to Dr. Carlton's and Dr. Johnson's opinions, as well as my training and experience in economics and econometrics, I have reaffirmed the conclusions set forth in the Lamb Report and summarized above. That is, nothing in Dr. Carlton's and Dr. Johnson's reports, back-up materials, or deposition testimony causes me to change these opinions or my general conclusions that economic evidence and the relevant economic factors are consistent with the existence of the Cartel, and inconsistent with each Defendant having acted according to its unilateral self-interests. Furthermore, I have not changed my opinion that economic evidence, common to the Class as a whole, establishes that (i) the Cartel resulted in artificially-inflated prices for IMDs, and (ii) the artificially-inflated prices resulting from the Cartel were paid by all, or nearly all, members of the Class. In particular, I have concluded the following:

a.    Drs. Carlton and Johnson fail to consider, explain, or refute important common, economic evidence that contradicts their opinions, including, but not limited to, structural characteristics of the IMD industry indicating that it was susceptible to the Cartel; evidence

---

[29] Before trebling, I understand that DPPs will seek damages to proposed Class members up to the trial date.

[30] Deposition of Dennis W. Carlton, May 28, 2020 (hereafter "Carlton Deposition"); Deposition of John H. Johnson, IV, June 3, 2020 (hereafter, "Johnson Deposition").

HIGHLY CONFIDENTIAL

JW-SEC-01101865

HIGHLY CONFIDENTIAL

of the economic performance of the industry being consistent with the Cartel; and evidence that it was unlikely that members of the Class could have avoided paying the artificially-inflated prices resulting from the Cartel.

b. Dr. Carlton's contention that each Defendant's conduct (and the resulting artificially-inflated prices observed during the Effective Cartel Period) can be explained by non-collusive oligopolistic interdependence is flawed and unsupported by sound economic analysis.[31] In claiming that my analysis is incapable of distinguishing between the Cartel and oligopolistic interdependence, Dr. Carlton not only ignores the evidence of communications immediately preceding historically large price increase announcements and rising actual IMD prices, but also fails to offer sound, reliable or reasonable economic proof that the difference between the IMD prices paid by Class members during the Effective Cartel Period and those predicted by market conditions of demand and supply can be explained by non-collusive oligopolistic interdependence.

    i. Dr. Carlton's cursory discussion of oligopolistic interdependence ignores many characteristics of the IMD industry that would have made tacit collusion and parallel conduct in the absence of communication and explicit coordination difficult to implement and sustain.

    ii. Dr. Carlton's opinion that Defendants' conduct is indistinguishable from oligopolistic interdependence is flawed:

        a) Parallel price increases during the Cartel Period exhibited characteristics of collusive price increases and were effective at raising prices above the level predicted by demand and supply in a market absent the Cartel, in contrast to price increases attempted during the Benchmark Period, when the IMD industry had the same near-duopoly market structure;

        b) Dr. Carlton ignores evidence that communication between Defendants, including their CEOs, occurred when Defendants were preparing to announce and then implement the largest industry-wide price increases in history of the IMD industry;

        c) Dr. Carlton's analysis of Masonite's conduct with respect to sales of Doorskins is flawed because he ignores or fails to consider important evidence

---

[31] Carlton Report at ¶ 59.

7

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

that Defendants leveraged the announcements to raise Doorskins prices to their competitors.[32] In particular, he ignores evidence that prior to Masonite's May and June 2014 public announcements of its decision not to sell Doorskins to independent IMD manufacturers,[33] Masonite competed to win Steves and Sons' ("Steves") Doorskin supply agreement amongst other third party Doorskins business, whereas after the announcements, it did not, despite the fact that at that time, Jeld-Wen's Doorskins suffered from quality problems and that sales of Doorskins were more profitable than sales of IMDs. Further, Dr. Carlton fails to provide a plausible motivation for Masonite's announcements, which coincided with communications between Defendants' CEOs and Jeld-Wen's attempt to renegotiate its supply contract with Steves and ignores evidence that Jeld-Wen used the information conveyed by Masonite to raise Doorskin prices to independent IMD manufacturers.

iii.    Because the market structure and the firms in the market were the same during the Benchmark Period and the Effective Cartel Period, it makes no sense as a matter of economics to claim that oligopolistic interdependence can explain why actual prices were higher than levels predicted by supply and demand during the Effective Cartel Period but not during the Benchmark Period. As I discussed in the Lamb Report, prices of IMDs rose during the Effective Cartel Period despite declining costs, moderately increasing demand, excess capacity, and Jeld-Wen's significant quality problems.[34] Dr. Carlton fails to address or analyze how his attempted explanation for higher prices is consistent with the underlying market characteristics.

iv.    As I discuss below, my findings are confirmed by multiple regression analysis, which accounts for the oligopolistic structure of the market, and demonstrates that the price increases during the Effective Cartel Period cannot be explained by changes in cost and demand or oligopolistic interdependence alone.

---

[32] Carlton Report at ¶¶ 92-95.
[33] Lamb Report at ¶¶ 40-41.
[34] Lamb Report at ¶¶ 170-185.

8

   c.  Dr. Carlton's discussion of his alleged "three major flaws" in the Lamb Report is irrelevant and misleading.[35]

      i.  Contrary to Dr. Carlton's assertion, there is no inconsistency between my analysis and conclusions and DPPs' claims. As reflected in DPPs' class certification brief,[36] DPPs now allege that the Cartel started in March 2014.[37]

      ii.  Dr. Carlton's claim that I did not address the Cartel's lack of features purportedly important to a successful price-fixing agreement is irrelevant because my econometric analyses show artificially inflated prices, which they would not do if the Cartel were not effective.[38]

      iii.  Similarly, Dr. Carlton's erroneous claim that Jeld-Wen's loss of market share refutes the Cartel ignores two critical components.[39] First, as discussed in the Lamb Report, Jeld-Wen's share loss was largely attributable to its significant quality and service problems during the Cartel Period. Second, Dr. Carlton overstates Jeld-Wen's market share "loss" because he ignores that independent IMD manufacturers, who had to procure Doorskins from Jeld-Wen to make their IMDs, captured most of Jeld-Wen's "share loss." Because (1) Jeld-Wen sold Doorskins to these independent IMD manufacturers, and (2) Doorskins are more profitable than IMDs, Jeld-Wen was able to profit from independent IMD manufacturers' increased market share.

   d.  Drs. Carlton's and Johnson's criticisms of my overcharge analysis are without merit and do not cause me to change my conclusion that IMD prices were artificially inflated as a result of the Cartel.

      i.  Defendants' economists' claims that my Overcharge Regression Analysis is not "structurally stable" are not based on sound econometric analysis.[40] My Benchmark Period was carefully selected to control for market structure (the structural characteristics of the IMD industry do not change over the course of the Benchmark and Effective Cartel Periods, and neither period was also affected by an exogenous

---

[35] Carlton Report at ¶¶ 9, 96-114.
[36] United States District Court for the Eastern District of Virginia – Richmond Division, *In re: Interior Molded Doors Antitrust Litigation*, Memorandum of Law in Support of Direct Purchaser Plaintiffs' Motion for Class Certification, 3:18-cv-00718-JAG, February 21, 2020 (hereafter "DPPs' Class Certification Brief").
[37] DPPs' Class Certification Brief at fn. 3.
[38] Carlton Report at ¶¶ 99-111.
[39] Carlton Report at ¶¶ 112-114.
[40] Carlton Report at ¶¶ 10, 115-122; Johnson Report at ¶¶ 2, 122-124.

9

    JW-SEC-01101868

HIGHLY CONFIDENTIAL

shocks like the Great Recession) and provides a reliable estimate of competitive prices in the "but-for" world (the world "but-for" or in the absence of the Cartel). Defendants' economists' findings that the Benchmark Period has statistically different properties are perfectly consistent with the existence of the Cartel. Furthermore, my use of an indicator-variable model across the Benchmark and Effective Cartel Periods is supported by the academic literature and does not lead to a misestimation of overcharges. Moreover, when my Overcharge Regression Analysis is solely applied to the Benchmark Period, the coefficients in the demand and supply variables are consistent with the theory of oligopolistic competition and therefore not evidence that my model is not properly modeling prices in the Benchmark Period. Indeed, when I perform a sensitivity test using a flexible model (which allows for different estimated relationships between IMD price and supply and demand factors in the Benchmark and the Effective Cartel Periods), it reaffirms my finding of a class-wide overcharge.

ii.  Drs. Carlton's and Johnson's findings of no overcharges when they use their own flawed benchmark period are irrelevant and make no sense as a matter of economics.[41] As Dr. Carlton explains, he includes 22 months of IMD sales that DPPs claim were not impacted by the Cartel in his modified cartel period.[42] As such, Defendants' experts' findings of "no systemic overcharges" are unsurprising. Moreover, Defendants' experts' proposed benchmark period exists entirely and improperly before the structural market change caused by Jeld-Wen's acquisition of CMI, the third vertically-integrated competitor in both the upstream Doorskins market and the downstream IMD market.[43] In addition, the use of 2010 and 2011 as part of their benchmark period is unreliable as it includes the ongoing effects of the Great Recession, immediately follows Masonite's emergence from bankruptcy and predates Onex's acquisition of Jeld-Wen, a time when Jeld-Wen was still a family run business with no professional management and was in a weak position financially.

---

[41] Johnson Report ¶ 130; Carlton Report ¶¶ 123-124.

[42] Carlton Report ¶¶ 123-124.

[43] Carlton Deposition at 213:10-17 ("Q. Would you view the change from three vertically integrated producers to two vertically integrated producers a significant change in market structure? THE WITNESS: It's changed certainly in market structure. I certainly agree with that.").

10

HIGHLY CONFIDENTIAL

JW-SEC-01101869

HIGHLY CONFIDENTIAL

Further, their analyses fail to refute my findings that prices during the Effective Cartel Period were artificially inflated as a result of the Cartel.

iii.    Dr. Carlton's analysis in which he purports to exclude the "Orsino tenure" from the benchmark is flawed and unreliable.[44] First, Dr. Carlton fails to provide an adequate basis for excluding the "Orsino tenure," which includes – as Dr. Carlton admits in his Report – a period where both Jeld-Wen and Masonite attempted to raise prices. Second, as Dr. Carlton concedes, when he excludes only the "Orsino" period from the benchmark, he finds evidence of significant overcharges. Instead, Dr. Carlton excludes from his proposed benchmark period almost three years of sales data (from August 25th, 2011 to August 10th, 2014),[45] including an approximately five month period when Kirk Hachigian was leading Jeld-Wen (and was not employing a "market share" strategy) during the Benchmark Period. Third, Dr. Carlton's exclusion of three years of data, which he admitted he has not done before, is arbitrary and inappropriate.[46] Fourth, the benchmark period Dr. Carlton uses for this analysis suffers from the same flaws as the benchmark period in Dr. Carlton's analysis discussed above.

iv.    Dr. Johnson's opinion that my Overcharge Regression Analysis fails to model the economic factors that determine IMD prices properly is meritless.

   a)    Dr. Johnson's criticism of the performance of my Overcharge Regression Analysis is without merit. Dr. Johnson specifies a flawed and incomplete analysis to conclude that my "time-varying" factors explain less than 2% of the variation in prices.[47] However, when I control for the time-invariant factors, my time-varying factors explain approximately 96% of the variation in monthly IMD prices. Dr. Johnson's criticism of the predicted prices from my model is not based on well-accepted measures of model performance (like the R-squared) but rather through visual inspection of unrepresentative price charts and flawed analyses.

---

[44] Carlton Report at ¶¶ 125-127.
[45] Carlton Report at n. 208.
[46] Carlton Deposition at 355:11-356:4.
[47] Johnson Report at ¶ 65.

HIGHLY CONFIDENTIAL

JW-SEC-01101870

HIGHLY CONFIDENTIAL

b)   Dr. Johnson claims that my model omits relevant economic factors that affect IMD prices over time, which purportedly "confound" or "bias" the finding of overcharge. [48] However, when I test the effects of including any of these supposedly "missing" time-varying factors, such as regional measures of demand, cost, and mortgage rates, I observe almost identical overcharge results. Further, his finding that my model generates a small "overcharge" of 1.05% in the first half of my Benchmark Period compared to a 9.5% overcharge during the Effective Cartel Period is evidence that the effect of any missing factor that was purportedly omitted is *de minimis*.

c)   Dr. Johnson's claim that my model fails to control for the evolution of competition among IMD manufacturers during the Benchmark and Effective Cartel Period makes no sense as a matter of economics.[49] Dr. Johnson proposes that the higher prices observed in the Effective Cartel Period may be due to *lower* industry concentration, which is contrary to standard economic theory. Moreover, the change in independent IMD manufacturers' collective market share during the relevant period from 20% to 24% is small and does not represent a material change to the industry structure.[50] Further, when I test the effect of including a measure of changes to industry concentration in my multiple regression analysis, I observe very similar overcharge results to those I found in the Lamb Report.

e.   Dr. Johnson's criticisms of my common impact analysis are also flawed and unreliable.

i.    Dr. Johnson incorrectly claims that some members of the Class would have been able to avoid paying any artificially-inflated prices for IMDs.[51] But Dr. Johnson performs no analysis and offers no empirical evidence actually demonstrating that any members of the Class were unimpacted by the Cartel. This includes Home Depot and Lowe's.

---

[48] Johnson Report at ¶¶ 61-63.
[49] Johnson Report at ¶¶ 126-127.
[50] Carlton Report Table 1; Lamb Report Table 1.
[51] Johnson Report at ¶¶ 4, 35, 88-91, 106-124.

HIGHLY CONFIDENTIAL

JW-SEC-01101871

**HIGHLY CONFIDENTIAL**

ii.    Dr. Johnson bases his claim about uninjured Class members instead on several flawed criticisms of my Overcharge Regression Analysis, in addition to certain flawed analyses of the role of customer negotiations in price setting, his inaccurate critique of my use overcharge prediction model, and his inappropriate denial of the pricing structure in the IMD industry.[52]

iii.    Further, the purported individualized issues Dr. Johnson raises are controlled for in my Overcharge Regression Analysis. For instance, my Overcharge Regression Analysis controls for the effect of customer size (and thus negotiating leverage) on IMD price by using thousands of fixed effects variables. Additionally, because the relative differences in negotiating leverage between large and small customers exist in both the Benchmark and the Effective Cartel Periods, my regression controls for the effects of such differences in buyer power across the two periods. All things equal, a larger class member will be able to get a better price than a small class member either with or without a conspiracy, but Dr. Johnson provides no evidence (and there is none) that the negotiating leverage of large Class members would improve relative to small Class members in the presence of the Cartel. Thus, there is no economic reason to believe that the buying power of large Class members would permit them to entirely avoid paying the artificially-inflated prices arising from the Cartel.

iv.    Further, a test of measuring customer-specific overcharge effects with regional determinants of demand and supply on my Overcharge Regression Analysis reaffirms my conclusion that all, or nearly all, members of the Class are impacted by the Cartel. That is, Dr. Johnson overstates the idiosyncratic aspects to pricing IMDs and the significance of customers' ability to negotiate prices.

v.    Dr. Johnson's assertion that my predicted but-for price analysis cannot assess impact to any individual class member is without merit, as it is a well-established methodology used by economists to test model performance, and can reliably be used to assess class-wide impact. Indeed, Dr. Johnson himself uses predicted but-for prices in his report as an analytical tool to criticize my model (incorrectly), and can reliably be used to assess class-wide impact.

---

[52] Johnson Report at ¶¶ 4, 35, 88-91, 106-124.

HIGHLY CONFIDENTIAL

JW-SEC-01101872

HIGHLY CONFIDENTIAL

vi.   Dr. Johnson's criticism that my pricing structure analysis cannot establish class-wide impact is misleading.[53] The existence of a pricing structure in the IMD market means that IMD prices react to the same economic forces in a common manner so that the effects of the Cartel would be felt by all, or nearly all, members of the Class. As I demonstrated in the Lamb Report, my Overcharge Regression Analysis, the structural characteristics of the IMD industry, and the existence of a pricing structure, together, support my conclusion that few, if any, members of the Class could have avoided paying the artificially-inflated IMD prices.

vii.  Dr. Johnson's analysis of exemptions, discounts, or bundling arrangements does not refute the conclusion that price increase announcements during the Cartel were widely disseminated and that Class members were near-universally overcharged.[54] As I discussed in the Lamb Report, these are properties that would have existed in the actual and but-for world. Additionally, Dr. Johnson testified that his analysis of price increase delays and exemptions does not identify any customers who did not receive a at least one price increase. My statistical analysis of customer-level impact similarly confirms that the arrangements or exemptions Dr. Johnson cites did not result in class-members avoiding an overcharge.

viii. Statistical and documentary evidence demonstrates that Home Depot and Lowe's could not and did not avoid paying artificially inflated prices during the Effective Cartel Period.

f.  Nothing in Dr. Johnson's and Dr. Carlton's reports causes me to change the opinions I reached in the Lamb Report. If anything, the sensitivity tests they employed, when properly carried out, serve to enhance the robustness of my measure of overcharges and my finding of common impact, and therefore reinforce my conclusions.

## II.   Defendants' Economists Fail to Consider, Explain, or Refute Important Evidence that Contradicts Their Opinions

5.   In the Lamb Report, I demonstrated that there was class-wide evidence to supported my conclusion that all, or nearly all, Class members paid higher prices as a result of the Cartel.[55] I

---

[53] Johnson Report at ¶¶ 106-124.
[54] Johnson Report at ¶¶ 88-95
[55] Lamb Report at ¶¶ 216-259.

14

based this conclusion in part on my analysis of the structure of the IMD market and on the economic performance of the IMD industry during the Effective Cartel Period, which cannot be explained by economic factors, such as demand and supply, alone. Defendants' experts either agree with or fail to explain or refute a substantial amount of the factual evidence that I relied upon, including, but not limited to, evidence demonstrating that (1) the structural characteristics of the made it conducive to the formation of the Cartel; and (2) IMD prices rose despite falling costs, ample excess capacity, and quality problems.

6.      The structural characteristics of the IMD industry, together with the strictly-enforced, widely-disseminated price increases (that even the largest customers were unable to avoid) all support my conclusion that the price increases imposed by Defendants adversely impacted all, or nearly all, Class members. Almost none of the foregoing analyses is discussed or rebutted in Drs. Carlton's and Johnson's reports. Indeed, Dr. Johnson's criticisms are based on a perfunctory review of the documentary evidence and include unreliable and flawed analyses.[56]

7.      I expand on these topics in Appendix C of this report.

### III.    Dr. Carlton Presents No Credible Economic Evidence that Either Defendants' Conduct or the Economic Performance of the IMD Industry were the Result of Oligopolistic Interdependence Acting Absent a Cartel

8.      In the Lamb Report, I concluded that Defendants' conduct and the economic performance of the IMD industry were consistent with the existence of the Cartel and inconsistent with Defendants' acting in their unilateral self-interest in the absence of the Cartel.[57] Dr. Carlton argues that even though Defendants' conduct during the Cartel Period and the elevated IMD prices during the Effective Cartel Period may be consistent with the Cartel, they do not "prove" the existence of the Cartel because Defendants' conduct was also consistent with "oligopolistic interdependence" (or "conscious parallelism").[58] Dr. Carlton contends that in concentrated industries, "supracompetitive" pricing can be achieved without "explicit communication," so that evidence of elevated prices alone cannot prove the existence of a cartel.[59]

9.      Dr. Carlton wrongly claims that my analysis suffers from the following limitations:

---

[56] Johnson Report at ¶¶ 18-44.
[57] Lamb Report at ¶¶ 123-168.
[58] Carlton Report at ¶¶ 8, 59-60, 70-95.
[59] Carlton Report at ¶¶ 59-69. As I discuss below, this outcome is referred to as tacit collusion.

15

- I purportedly fail to distinguish between interdependent competitive conduct and anti-competitive collusion; and

- I purportedly ignore the difficulties Defendants would face in reaching an agreement on pricing and monitoring each other's prices.[60]

10.     In the Lamb Report, I discuss Defendants' communications among their CEOs at the time each company was formulating historically large price increase announcements, evidence of parallel price increase announcements, evidence that Jeld-Wen centralized pricing decisions and limited discounting, and evidence that Masonite's public announcements that it intended to stop selling Doorskins to independent IMD manufacturers was inconsistent with its unilateral self-interest in the absence of the Cartel. Dr. Carlton incorrectly dismisses my analysis of Defendants' conduct by considering individual strands of evidence in isolation, and arguing, that each individual act or factor does not by itself, or collectively, "prove" that the Cartel existed. This mischaracterizes the Lamb Report. My opinion is not based on any one piece of evidence or factor in isolation, but rather all of the identified actions, taken together, in conjunction with IMD prices that cannot be explained by supply and demand factors. As I show in the Lamb Report, the above evidence is consistent with the existence of the Cartel and inconsistent with mere oligopolistic interdependence.

11.     Moreover, my analysis was designed to separate the impact of the Cartel from oligopolistic interdependence by focusing on the contrast in conduct and performance of the IMD industry during the Benchmark Period versus the Cartel Period.[61] As I discuss further below, because the Benchmark and Effective Cartel Periods have identical market structures, that market structure cannot explain *differences* in prices between the two periods. Dr. Carlton, on the other hand, speculates that Defendants' conduct during the Cartel Period is indistinguishable from oligopolistic interdependence, but he fails to analyze how Defendants would have been able to tacitly coordinate to successfully raise prices. The theoretical economic models that undergird Dr. Carlton's conclusion depend on strict assumptions regarding the market at issue, the number of competitors, buyer behavior, and the information available to those participants--assumptions

---

[60] Carlton Report at ¶¶ 99-111.
[61] Lamb Report at ¶ 206. As I discussed in the Lamb Report, I selected the period of October 24, 2012 to August 10, 2014 as the Benchmark Period in part because the market structure in that period was the same as it was during the Effective Cartel Period.

16

JW-SEC-01101875

HIGHLY CONFIDENTIAL

that Dr. Carlton has not shown apply here. As I discuss below, when industries fail to meet those criteria, it becomes difficult, if not impossible, to achieve the kind of supracompetitive pricing I found in the IMD industry without explicit communication or coordination.

12.    Further, Dr. Carlton makes no effort to determine whether the elevated prices may be attributable to the Cartel or to oligopolistic interdependence, but merely asserts that oligopolistic interdependence is possible. But Dr. Carlton's opinion, as it relates to the IMD industry at issue (and not as a simple academic exercise) is flawed and disconnected from the structural characteristics of the IMD industry and the evidence in this case. Dr. Carlton ignores evidence about the structural characteristics of the IMD industry that would inhibit collusive outcomes absent express communication and coordination, including evidence I presented in the Lamb Report that explained why the observed higher prices during the Effective Cartel Period are consistent with the existence of a Cartel rather than from oligopolistic interdependence. Moreover, as I demonstrate below, Dr. Carlton's argument that I ignore the difficulties in reaching an agreement on price is circular and self-defeating, because conditions that make reaching an agreement difficult would make reaching agreements in the absence of communication, *i.e.*, tacitly, significantly more difficult to achieve.

### A. *Oligopolistic interdependence and tacit collusion*

13.    Oligopolistic interdependence can arise when firms in an oligopoly that produce a homogenous product act strategically and according to the predicted actions of their rivals.[62] Interdependence among rival firms is possible in an oligopolistic market, and, in theory, it can result in a wide range of equilibria from perfectly competitive to monopolistic outcomes.[63] Economists have studied the possible equilibria that may arise in oligopoly models, which analyze interdependent behavior of firms in oligopoly markets, but these purely theoretical models offer little guidance as to the equilibrium outcome in any actual market, such as the IMD market. For example, Scherer and Ross state that theoretical models of oligopoly behavior have

---

[62] F. M. Scherer and David Ross, *Industrial Market Structure and Economic Performance*. Houghton Mifflin, 1990 (hereafter "Scherer and Ross") at pp. 205-206; Robert C. Marshall and Leslie M. Marx, *The Economics of Collusion: Cartels and Bidding Rings*. Cambridge, MA: MIT Press, 2012 (hereafter "Marshall and Marx") at p. 9; 149-150. Posner at pp. 55-56; Keith N. Hylton, *Antitrust Law and Economics*. Edward Elgar Publishing Limited, 2010 (hereafter "Hylton") at p. 24.

[63] Marshall and Marx at p. 9.

17

JW-SEC-01101876

HIGHLY CONFIDENTIAL

"yet to yield compelling mechanistic solutions to the oligopoly problem."[64] Tacit collusion is a possible outcome of oligopolistic interdependence in which oligopoly gives rise to behavior that results in higher prices compared with a perfectly competitive market, as a result of repeated price interaction rather than communication.[65] In contrast, cartel behavior involves firms entering into a collusive agreement to avoid competition, including, as alleged here, price fixing.[66]

14.    One difference between the kind of cartel behavior alleged in this case and oligopolistic interdependence is whether there were communications between rival firms. In a cartel, firms will communicate with each other to reach an agreement on output or prices. In contrast, tacit collusion involves firms that do not explicitly communicate, but firms will nonetheless take into account their mutual interdependence and their rivals' likely reactions in making price and output decisions.[67] In his report, Dr. Carlton also discusses a related topic, conscious parallelism, which refers to a situation in which a group of oligopolists behave in an identical manner (e.g., changing prices by the same amount and around the same time) without entering into an agreement. [68]

15.    Dr. Carlton presents a gas station example in which the two hypothetical gas station owners have transparent prices and no other competitors, and demand is generally fixed, so that any price cutting action by one owner in an attempt to win market share would be quickly

---

[64] Scherer and Ross at p. 220.

[65] Marshall and Marx at p. 9 ("Economists label collusive equilibria that do not require direct interaction between the firms, such as communications or transfers, as *tacit* rather than *explicit* collusion.").

[66] "Producers in a *cartel* explicitly agree to cooperate in setting prices and output levels." Robert Pindyck and Daniel Rubinfeld, *Microeconomics*. Eighth Edition, Upper Saddle River, N.J.: Pearson Prentice Hall, 2013 (hereafter "Pindyck and Rubinfeld") at p. 477 (emphasis original). "The most extreme form of explicit collusion is the creation of a **cartel**—a group of firms that tries to maximize the total profits of the group as a whole. To do this, the group of firms behaves as if it were a monopoly, treating the market demand curve as the 'monopoly's' demand curve." Robert E. Hall and Marc Lieberman, *Microeconomics: Principles and Applications*, Fifth Edition, Mason, OH: South-Western, Cengage Learning, 2010 (hereinafter "Hall & Lieberman") at p. 342.

[67] Peter Davis and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*. Princeton, NJ: Princeton University Press, 2009 (hereafter "Davis and Garces") at p. 315.

[68] Carlton Report at ¶ 60; George Norman and Darlene C. Chisholm, *Dictionary of Industrial Organization*. Cheltenham, UK: Edward Elgar Publishing, 2014 at p.74. Oligopolistic interdependence and tacit collusion (or conscious parallelism) can be thought of as equivalent for the purposes of analyzing the IMD industry. This is reflected in the view offered by Judge Posner, an authority on antitrust, that "in some circumstances competing sellers might be able to coordinate their pricing without conspiring in the usual sense of the term — that is, without any overt or detectable acts of communication. This is the phenomenon that lawyers call 'conscious parallelism' and some economists term 'oligopolistic interdependence,' but which I prefer to call 'tacit collusion' in contrast to the explicit collusion of the formal cartel or its underground counterpart." *See* Posner at pp. 52-53.

HIGHLY CONFIDENTIAL    JW-SEC-01101877

HIGHLY CONFIDENTIAL

matched by its competitor, and thus would almost always result in lower prices and profits.[69] In such a scenario, because each gas station owner can tell exactly what its competitor is doing, each gas station owner may, in theory, refrain from cutting prices to avoid a price war without having to reach an agreement. However, if the posted gas station prices are merely suggested prices (such as the MSRP for cars) that are open to negotiation, each gas station owner will have reasons to doubt that its competitor is really raising prices. If one gas station owner begins to lose sales, it may attribute its losses to competition (even if it is due to random chance) and lower prices as a result. Moreover, when prices are negotiable, strategic customers may play one gas station against the other to get a better deal--something Dr. Johnson suggests is pervasive in the IMD industry.[70] If some of those customers are large and make infrequent purchases (or do not switch between suppliers regularly), the opportunity cost of losing that sale may incentivize the gas station owners to win the business by discounting. Also, if demand is increasing and suppliers have excess capacity, it can be more economically profitable to cut prices to increase output. So, when information becomes less certain, competitors have a much more difficult time maintaining elevated prices without communication.[71]

16.      An important step in assessing whether behavior is consistent with oligopolistic interdependence is to analyze the IMD industry to see if effective tacit collusion is likely. In the IMD market, oligopolistic interdependence that results in higher pricing (*i.e.*, tacit collusion) is difficult to achieve. As I discuss below, Dr. Carlton reaches his flawed conclusions only by ignoring the evidence I present in the Lamb Report that actual prices in the marketplace are consistent with the Cartel, but inconsistent with each firm's individual self-interest absent the Cartel.

### B. Dr. Carlton's analysis of oligopolistic interdependence ignores several features of the IMD industry that would make tacit collusion difficult to achieve

17.      Dr. Carlton contends that my analysis of Defendants' conduct fails to distinguish "non-conspiratorial oligopoly conduct from conspiratorial oligopoly conduct," and that instead,

---

[69] Carlton Report at ¶¶ 61-63.
[70] Johnson Report at ¶¶ 31-40.
[71] Marshall and Marx at p. 16 ("[W]hen purchases are sufficiently large and infrequent, or demand is sufficiently uncertain, or buyers are strategic, it may not be possible for firms to elevate prices with only tacit collusion...even though firms are engaged in repeated interactions over time, they may not be able to accomplish fully collusive outcomes.").

19

HIGHLY CONFIDENTIAL

oligopolistic interdependence can be used to explain (1) Defendants' parallel actions during the Cartel Period, and (2) the supracompetitive IMD prices experienced during the Effective Cartel Period.[72] But Dr. Carlton's opinion that the elevated IMD prices could have been due to parallel conduct in the absence of the Cartel is speculative and he fails to provide a basis for ruling out the Cartel as the cause of the elevated prices.[73] As Dr. Carlton acknowledges, Defendants may have engaged in parallel conduct before the start of the Cartel,[74] but that conduct did not result in elevated prices. As an initial matter, Dr. Carlton ignores evidence that the characteristics of the IMD industry render collusive outcomes difficult to achieve without *explicit* communication, *i.e.* tacitly. Moreover, Dr. Carlton does not analyze the structure of the IMD industry to establish whether tacit collusion, and the resulting elevated prices above competitive levels, are feasible absent explicit cartel behavior in the IMD industry. It is well understood by economists that reaching a supracompetitive price equilibrium without communication is very difficult. Scherer and Ross, for example, state that "[c]oordinating pricing … in the absence of communication is much more difficult."[75] Similarly, in a paper on tacit coordination and imperfect competition, Michael Spence concludes that "randomness and imperfect monitoring interact to make collusion difficult."[76] Dr. Carlton merely speculates that the outcomes observed in the IMD industry are consistent with oligopolistic interdependence *alone* and he ignores whether it was even feasible for Defendants to coordinate without communication. Moreover, as I discuss further below, Dr. Carlton also ignores or dismisses evidence that Defendants communicated before they engaged in a series of coordinated actions that resulted in higher prices.

18.     Dr. Carlton claims that when "there are only a few major firms in an industry, reduction or elimination of price competition can occur without any explicit communication."[77] As an illustration of this contention, he presents the simplistic example of two competing gas stations with publicly posted prices (discussed earlier) to show how two competitors *may* opt not to compete and obtain higher prices without reaching an explicit agreement.[78] But, as he himself

---

[72] Carlton Report at ¶ 69.
[73] Carlton Report at ¶¶ 59-95.
[74] Carlton Report at ¶ 71.
[75] Scherer and Ross at p. 206.
[76] Michael Spence, "Tacit Co-Ordination and Imperfect Information," *The Canadian Journal of Economics*, Vol. 11, No. 3 (August 1978), pp. 490-505 (hereafter "Spence") at p. 491.
[77] Carlton Report at ¶ 64.
[78] Carlton Report at ¶¶ 61-63.

HIGHLY CONFIDENTIAL

JW-SEC-01101879

HIGHLY CONFIDENTIAL

admits, Dr. Carlton's gas station example is not analogous to the IMD industry, for at least two obvious reasons: (1) gas station prices are perfectly transparent, and (2) gas buyers do not negotiate prices, while he claims that IMD buyers do.[79] Indeed, Jeld-Wen's August 2012 presentation to the Department of Justice ("DOJ") in support of its acquisition of CMI specifically highlights the lack of transparent pricing and customer negotiation as factors that make tacit collusion unlikely in the IMD industry.[80]

19.    Dr. Carlton does not explain how Defendants would have been able to bypass these obstacles to achieve elevated IMD prices without explicit communication (especially as each company's CEO appears to have communicated). As Dr. Carlton discusses in his paper on communication, the information communicated via public declarations is non-binding and can simply be what economists refer to as "cheap talk."[81] In the same article, Dr. Carlton speculates that a solution to the "cheap talk" problem is for the sender of information to develop "a reputation for truthfulness."[82] It is unclear—and Dr. Carlton makes no attempt to explain—how Defendants would overcome this lack of information to change the price equilibrium without explicit communication, especially with a new Jeld-Wen CEO who was brought in with a mandate to improve profits by, principally, cutting costs.[83] As I discussed in the Lamb Report, one way a firm can cut costs when it has a high fixed-to-variable cost ratio and excess capacity is to increase output.[84]

20.    The economic models of oligopoly behavior that support Dr. Carlton's claim that supracompetitive pricing is possible in the IMD industry without explicit collusion require restrictive assumptions that Dr. Carlton himself concedes are not present in the IMD industry. First, Dr. Carlton argues that in the IMD industry "there [are] many (sic) products" with disparate pricing such that it is "harder to reach agreements on prices."[85] In such an environment,

---

[79] Carlton Report at n. 129.
[80] JELD-WEN-00000289 at slide 44.
[81] Dennis W. Carlton, Robert H. Gertner, and Andrew M. Rosenfield, "Communication Among Competitors: Game Theory and Antitrust," George Mason Law Review, Vol. 5, Issue 3, 1996, pp. 423-44 (hereafter "Carlton Gertner Rosenfield") at p. 435.
[82] Carlton Gertner Rosenfield at pp. 435-436.
[83] Ross Deposition at 143:21-144:4 ("Q. Why did you decide to replace Mr. Orsino with Mr. Hachigian? A. Kirk convinced us, and we were convinced that Kirk could – was better positioned, better capable to execute on the margin improvement, and specifically the cost reduction opportunity within JELD-WEN.").
[84] Lamb Report at ¶¶ 60, 156.
[85] Carlton Report at ¶ 102.

21

HIGHLY CONFIDENTIAL

it would be much more difficult for elevated prices to exist without explicit communication.[86] Dr. Carlton also argues that each firm has different costs to serve customers, that pricing is negotiated individually by customer and prices "differ significantly across customer for the same product."[87] Under the conditions that Dr. Carlton claims apply to the IMD market, participants do not have significant information about each other's prices to coordinate absent direct communication.[88] Moreover, economists recognize that buyers who act strategically by playing one supplier against the other can effectively thwart collusion in the absence of explicit agreements.[89]

21.    Finally, as a matter of economics, raising prices via tacit collusion is more difficult to achieve than cartel behavior; were it not, there would be little reason for firms to ever violate antitrust laws and risk prosecution in order to engage in illegal cartel behavior.[90] The economic literature shows that it is true because, absent communication, unilateral self-interested behavior often leads firms to undercut price increases of rivals by seeking to take share. And, of course, that is what was observed during the Benchmark Period: Defendants' attempts to raise prices were undercut by competition, which ultimately resulted in an inability to maintain prices.[91]

---

[86] Marshall and Marx at 16-17.

[87] Carlton Report at ¶¶ 104, 106.

[88] Spence at p. 504 ("With full information, policeability represents very little problem for firms in an industry. But with imperfect information, outcomes that would have been equilibria with full information may no longer be policeable. The difficulty sometimes results from observation and reaction lags. It may also result from the interaction of randomness and an inability to monitor rivals choices.") See also Spence at p. 496 ("To summarize briefly, the detectability of deviations from collusive outcomes is hampered by reaction lags; it is also hampered by the simultaneous presence of randomness and an inability to monitor rivals' strategies directly. This pair of conditions impedes inferences from observable outcomes back to behaviour. The randomness is important because, without it, indirect inferences from adverse outcomes to cheating can be made, even when rival behaviour is not directly observable. The greater the randomness, the weaker the link between behaviour and payoffs. A failure to react to adverse events creates incentives to cheat, and reacting to them creates a situation in which nature can cause collusive outcomes to dissolve.").

[89] Marshall and Marx at p. 15; Edward J. Green, Robert C. Marshall, Leslie M. Marx, "Tacit Collusion in Oligopoly," February 12, 2013 (hereafter "Green, Marshall, and Marx") at pp. 4, 10.

[90] Michael L. Katz and Harvey S. Rosen, *Microeconomics*. Third Edition, Boston, MA: McGraw-Hill, 1997 (hereafter "Katz and Rosen") at p. 514 ("When firms must tacitly collude rather than reach a formal agreement, increased complexity gives rise to more chances for mistakes and makes it difficult for firms to be sure that their tacit understandings are correct"); Green, Marshall, and Marx at p. 32 ("[B]ecause most market environments are sufficiently complex that there are numerous possible ways to collude, none of which will work unless it is adopted by all of the significant market participants, that view suggests that it is difficult, and probably rare, for successful collusion to obtain in the absence of explicit communication."); See also Margaret Levenstein and Valerie Suslow, "Cartels and Collusion – Empirical Evidence," *Ross School of Business Working Paper*, Working Paper No. 1182, 2012 (hereafter "Levenstein and Suslow 2012") at p. 2.

[91] *See* Lamb Report at ¶¶ 95-97.

HIGHLY CONFIDENTIAL

JW-SEC-01101881

HIGHLY CONFIDENTIAL

Moreover, far from arguing that the conditions for tacit collusion were enhanced during the Cartel Period, Dr. Carlton argues to the contrary. For instance, he opines that coordination is more difficult to achieve in periods with "rapid demand changes" and also that "[d]emand and quantity sold increased rapidly during the alleged conspiracy period."[92] The economic literature provides that where firms' uncertainty about their rivals is enhanced—as it was during the Cartel Period—tacit collusion is less likely to succeed in elevating prices.[93] Firms would need communication and agreement, in other words, during times of fundamental change in order to achieve coordinated outcomes. Thus, the fact that prices rose substantially during the Effective Cartel Period, even when controlling for changes in supply and demand, is inconsistent with a marketplace absent the Cartel.

22.    The Cartel would have been more successful in raising prices than tacit collusion because without communication and agreement facilitated by the explicit communication of the Cartel, Defendants would not have had sufficient information about each other's actions and intentions. This lack of certainty is likely what undermined the price increase attempts during the Benchmark Period. That is also why the evidence of Defendants' communication at the time each company was designing its pricing strategy in March to June 2014 is important. Indeed, the evidence of communication leading up to the historically large June 2014 price increase announcement distinguishes that price increase announcement from those that came before.

23.    Taking all of this into account, Dr. Carlton's own analysis of the IMD industry conditions (1) demonstrates the flaws in his conclusion that conscious parallelism without explicit communication could have artificially inflated prices successfully in the manner the Cartel did, and (2) effectively rules out conscious parallelism as an explanation for actual pricing in the marketplace. If conditions do not exist for interdependent conduct to succeed, then it cannot explain the results of my Overcharge Regression Analysis, which show that the price level during the Effective Cartel Period is artificially inflated above the levels that prevailed in the Benchmark Period, while controlling for supply and demand variables.

---

[92] Carlton Report at ¶ 105.
[93] Michael Spence, "Tacit Co-Ordination and Imperfect Information" *The Canadian Journal of Economics*, Vol. 11, No. 3, August 1978, pp. 490 – 505 (hereafter "Spence").

HIGHLY CONFIDENTIAL

JW-SEC-01101882

HIGHLY CONFIDENTIAL

### C. Dr. Carlton's opinion that Defendants' conduct is indistinguishable from oligopolistic interdependence is unmoored from record evidence

24.    To support his erroneous and flawed conclusion that I fail to distinguish oligopolistic interdependence from the Cartel, Dr. Carlton criticizes some of the evidence regarding Defendants' conduct that I discussed in the Lamb Report. For instance, Dr. Carlton incorrectly claims that:

- Parallel price increase announcements are consistent with firm's maximizing their individual economic profits in a non-conspiratorial market;[94]

- Monitoring rivals' announced price increases is consistent with non-conspiratorial conduct;[95]

- Communications between rivals are consistent with non-conspiratorial conduct;[96]

- A change in pricing strategy is consistent with non-conspiratorial conduct;[97] and

- Masonite's conduct with respect to sales of Doorskins is consistent with non-conspiratorial conduct.[98]

25.    As an initial matter, because Dr. Carlton's opinion that conscious parallelism alone in the IMD industry could artificially inflate prices to the same degree as the Cartel is flawed; as I demonstrated above, his analysis of Defendants' conduct suffers from the same fundamental flaw. Moreover, as I discuss below, particularly with regards to Defendants' communications and Masonite's Doorskin announcement, Dr. Carlton ignores significant evidence consistent with anticompetitive conduct when he concludes that Defendants' conduct was consistent with mere oligopolistic interdependence.

### 1. Dr. Carlton's assessment of the importance of communications in distinguishing between oligopolistic and cartel behavior is wrong

26.    As I discussed above, in contrast to non-collusive oligopolistic interdependence, cartel behavior involves communications between competitors for the purpose of entering into or

---

[94] Carlton Report at ¶¶ 8, 70-79.
[95] Carlton Report at ¶¶ 8, 80-81.
[96] Carlton Report at ¶¶ 8, 82-86.
[97] Carlton Report at ¶¶ 8, 87-91.
[98] Carlton Report at ¶¶ 8, 92-95.

24

JW-SEC-01101883

maintaining collusive agreements to fix prices and avoid competition.[99] That is, collusive behavior of the sort alleged here is distinguished from oligopolistic interdependence by firms' directly or indirectly communicating, during their strategic interactions. In a cartel, firms will communicate with each other as a means of reaching an agreement on output or prices. In contrast, tacit collusion (or conscious parallelism) is not predicated on communication amongst competitors or the exchange of competitively sensitive information. Rather, mere tacit collusion exists when firms take only their competitors' inferred or predicted reactions into account when deciding on output or prices.[100]

27.     In the Lamb Report, I discuss extensive evidence that Defendants had opportunities to meet through trade shows and associations and that Defendants' executives communicated with each other on numerous occasions, in particular in the period leading up to each company announcing the largest price increases on IMDs in recent history.[101] In particular, I discussed evidence that Masonite's President and CEO, Fred Lynch, held a series of calls with Onex (the private equity majority owner of Jeld-Wen) and with Kirk Hachigian, who became Jeld-Wen's CEO in April 2014.[102] In the midst of these communications, Masonite's Fred Lynch circulated a document (which was prepared on March 21, 2014, just after the March 19 call and Match 19-20 emails between CEOs Lynch and Hachigian) internally entitled "Reactions to JW Management Changes" with the second bullet point in the agenda directing that Masonite "Start September/October price increase—Now!"[103] In April 2014, a Masonite strategy document highlighted the "[s]trong belief that new leadership at JW will follow" a Masonite price increase announcement.[104] In the Lamb Report, I also discuss evidence that Mr. Lynch and Mr. Hachigian

---

[99] Pindyck and Rubinfeld at p. 477; Hall & Lieberman at p. 342.
[100] Davis and Garcés at p. 315.
[101] Lamb Report at ¶¶ 102-120. In ¶ 106 of the Lamb Report, I included the line, "Mr. Lynch also called Bob Merrill, Jeld-Wen's VP of Sales, three times in February 2017 and once in July 2017." I now realize that those calls took place in 2012, not 2017, and will not rely on that evidence to support my conclusions regarding Defendants' communications during the Cartel Period. Those conclusions, however, remain the same.
[102] Lamb Report at ¶¶ 104-105.
[103] Repar Deposition Exhibit 167 at MAS-0000657574.
[104] Deposition of James Hair, January 10, 2020 (hereafter "Hair Deposition") Exhibit 223 at p. 61.

25

HIGHLY CONFIDENTIAL

spoke on May 15, 2014,[105] the same day that Jeld-Wen held a pricing strategy meeting where its June 2014 IMD price increase announcement was discussed.[106]

28.     Other evidence in the record also suggests that Defendants may have shared information. For instance, in the Lamb Report I discuss evidence that employees at Masonite (who announced its June 2014 price increase after Jeld-Wen) communicated their expectation that Jeld-Wen would be issuing a price increase announcement soon.[107] In the Lamb Report, I also discussed evidence that Defendants appeared to use communications with analysts and investors as a means to transmit information.[108] Some of the information communicated via analysts or in investor conferences involved disclosures on price raising strategies and the companies' commitment to price discipline.[109] Also of note, Masonite communicated its plan to stop selling Doorskins to competitors in the U.S. in a series of analyst conference calls around the same time that Mr. Hachigian and Mr. Lynch communicated.

29.     Dr. Carlton either ignores or dismisses this evidence without analysis. In claiming that my analysis is incapable of distinguishing between the Cartel and oligopolistic interdependence, he ignores the timing of the communications and the events surrounding the communications. Moreover, Dr. Carlton ignores that the communications between CEOs surrounding the implementation of the historically large June 2014 price increase announcements resulted in prices elevated above the levels that would be expected by supply and demand factors alone, as my multiple regression analysis demonstrates.

---

[105] Hachigian Deposition Exhibit 366.

[106] JELD-WEN-00791395 ("Yesterday we held a pricing strategy meeting to discuss potential pricing actions for 2H 2014. In attendance were all members of the Ops, finance, sourcing, sales and product management teams, including Mark and Scott. Attached is the guideline I sent out in advance for the discussion as well as the meeting notes distilling the input from all involved. We had a good, open discussion and vetted all of the issues related to implementing the needed prices as soon as possible. In general, some of the sales VP's are still cautious due to the quality and service problems we had last year in vinyl, and are experiencing this year in interior doors. You will see at the end of the notes the distilled consensus of the team, which is to wait until July to announce the selected price increases and make it effective in September. However, it is up to senior management to take the input and then make the call looking at the broader picture, the competitive landscape and our corporate needs.").

[107] Lamb Report at ¶ 126.

[108] Lamb Report at ¶¶ 128-129.

[109] Linker Deposition Exhibit 115.

HIGHLY CONFIDENTIAL

JW-SEC-01101885

HIGHLY CONFIDENTIAL

## 2. Economic literature confirms the importance of communications between would-be competitors in defining cartel behavior

30.    As demonstrated by the relevant academic literature, it is more difficult for firms to achieve coordinated outcomes tacitly and without agreement because, absent communication, unilateral self-interested behavior often leads firms to undercut their rivals' price increases by seeking to take market share.[110] The observed behavior of Defendants during the Benchmark Period illustrates this point as attempts to raise prices ultimately failed despite the same market structure that prevailed during the Cartel Period.[111] Thus, that prices rose substantially during the Effective Cartel Period to levels that cannot be explained by supply and demand alone is inconsistent with a marketplace absent the Cartel.

---

[110] Katz and Rosen at p. 514 ("When firms must tacitly collude rather than reach a formal agreement, increased complexity gives rise to more chances for mistakes and makes it difficult for firms to be sure that their tacit understandings are correct"); Green, Marshall, and Marx at p. 32 ("[B]ecause most market environments are sufficiently complex that there are numerous possible ways to collude, none of which will work unless it is adopted by all of the significant market participants, that view suggests that it is difficult, and probably rare, for successful collusion to obtain in the absence of explicit communication."); *See also* Levenstein and Suslow 2012 at pp. 2, 12, 22. See Matthew Bennett and Philip Collins, "The Law and Economics of Information Sharing: The Good, the Bad, and the Ugly," *European Competition Journal*, Vol. 6 No. 2, August 2010 at pp. 320 – 321 ("[T]here are an infinite number of different prices which may make up a jointly profit maximizing price structure. This means that, in order to coordinate, firms have to determine which of the many equilibria is most mutually beneficial and sustainable. This plethora of possible equilibria makes coordination without communication much more difficult, as choosing an incorrect equilibrium may trigger a price war or result in coordination at a suboptimal level."). *See* Margaret Levenstein and Valerie Suslow, "Cartel bargaining and monitoring: The role of information sharing," Konkurrensverket - Swedish Competition Authority, 2006 at p. 31 ("Information exchanges in explicit cartels differ significantly from the signaling and focal points that tacitly colluding firms must employ to move the industry from a non-cooperative to a cooperative equilibrium. It is in fact these differences that demarcate explicit collusion from tacit cooperation. [...] The fact that multilateral face-to-face cartel meetings were regularly supplemented by bilateral meetings, as well as phone conversations and memos, shows how much communication was generally necessary to sustain these collusive conspiracies. Although this does not prove that explicit communication is either necessary or sufficient to sustain a collusive equilibrium, it does suggest that the inability to communicate may prove a significant impediment to the effectiveness of tacit cooperation.").

[111] Lamb Report at ¶¶ 95-97; *see also* Spence at pp. 490 – 505 ("Cartel members also find direct communication and accurate information exchange necessary because it reduces uncertainty and builds trust, both of which make collusion more stable."); Margaret Levenstein and Valerie Suslow, "Cartel bargaining and monitoring: The role of information sharing," 2006 at p. 31; Federal Trade Commission and the U.S. Department of Justices, "Antitrust Guidelines for Collaborations Among Competitors," April 2000 at p. 6 ("Competitor collaborations also may facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure of competitively sensitive information.")

HIGHLY CONFIDENTIAL

JW-SEC-01101886

HIGHLY CONFIDENTIAL

### 3. Dr. Carlton's analysis of Defendants' price increase announcements fails to consider relevant market conditions and is therefore unreliable

31. In the Lamb Report, I concluded based on class-wide evidence that Defendants' price increase announcements during the Cartel Period were consistent with collusion, inconsistent with competition, and represented a departure from prior practice.[112] My conclusion was based on the following factors:

- Contemporaneous documents show that the first announced price increases after the outset of the Cartel Period was historically large and that follow-on announced increases were very similar and at times nearly identical for both Masonite and Jeld-Wen.[113] Further, the price increase announcements issued during the Cartel Period were more frequent than what had occurred before the start of the Cartel.[114]

- Evidence shows that Defendants' price increase announcements during the Cartel Period cannot be explained by demand and supply conditions and exhibited characteristics found in collusive price increase announcements;[115] and

- Evidence demonstrates that Jeld-Wen and Masonite closely monitored and followed each other's price increases and used nearly identical language in their announcements.[116]

32. Dr. Carlton presents the following criticisms of my analysis of Defendants' price increase announcements:

- That parallel price increase announcements are consistent with oligopolistic interdependence;[117]

---

[112] Lamb Report at ¶¶ 130-147.

[113] Lamb Report at ¶ 132.

[114] Lamb Report at ¶ 135 ("For example, in a 2011 Masonite price increase announcement letter, Masonite described price increases in the door industry as an uncommon practice, stating that "[a]n annual price increase is a common practice with many building products, yet has not been a normal practice within the door industry." Record evidence also shows that Masonite attempted to implement a 1.75 percent IMD price increase effective on January 16, 2012 but withdrew it because other IMD manufacturers did not follow.") .

[115] Lamb Report at ¶¶ 138-144.

[116] Lamb Report at ¶¶ 145-147.

[117] Carlton Report at ¶ 71.

28

JW-SEC-01101887

HIGHLY CONFIDENTIAL

- That Defendants' price increase announcements during the Cartel Period were not more frequent and were less effective than prior price increase announcements;[118] and

- The price increase announcements were not always identical.[119]

33.    Dr. Carlton's analysis suffers from several flaws. First, he ignores evidence I present in the Lamb Report that Defendants' price increase announcements were consistent with explicitly collusive announcements (as opposed to conscious parallelism).[120] Second, Dr. Carlton's analysis of "take rates" ignores that prices realized from the price increase announcements during the Effective Cartel Period cannot be explained by supply and demand factors alone when compared with prices realized during the Benchmark Period.[121] His analysis of the frequency and magnitude of the announcements is also misleading because it fails to control for costs and yet includes Defendants' price increase announcements during a period in which costs were falling significantly. As I discussed in the Lamb Report—and Defendants' economists' did not challenge—the cost to manufacturer IMDs decreased significantly from 2014 through late 2016 and, even after rebounding, did not reach pre-Effective Cartel Period levels until 2018.[122]

   a.  **Dr. Carlton ignores evidence that Defendants' price increase announcements during the Cartel Period are consistent with collusive price increase announcements and inconsistent with competitively issued announcements.**

34.    In the Lamb Report, I discussed evidence that Defendants' price increase announcements issued during the Cartel Period were inconsistent with each Defendant acting in its unilateral economic self-interest in the absence of the Cartel.[123] As part of that discussion, I observed that:

> When price increase announcements come on the heels of communications among firms, especially among high-level executives, they are more likely to reflect the coordination of pricing strategy among cartel members and to reflect the result of communications about price, production, market share or other key strategic variables. To an economist, such price increase announcements are particularly suspicious. The price increase announcements by Defendants, beginning in June

---

[118] Carlton Report ¶¶ 72-75.
[119] Carlton Report ¶¶ 72-76.
[120] Lamb Report at ¶¶ 130-147.
[121] Carlton Report at ¶¶ 72-76.
[122] *See* Lamb Report ¶¶ 29, 175, 203, Figure 15.
[123] Lamb Report at ¶¶ 130-147.

HIGHLY CONFIDENTIAL

JW-SEC-01101888

HIGHLY CONFIDENTIAL

2014 and following a series of high-level communications between company CEOs, are exactly the type of price increases that raise concerns.[124]

35.    I also discussed evidence that Defendants' price increase announcements were (1) larger in magnitude than prior price increase announcements,[125] and (2) could not be explained by supply and demand factors.[126] Dr. Carlton ignores or cursorily dismisses most of the evidence I discussed, which includes evidence from a 2011 Masonite price increase announcement letter where Masonite described price increases in the door industry as an uncommon practice, stating that "[a]n annual price increase is a common practice with many building products, yet has not been a normal practice within the door industry."[127] Other evidence in the record shows that Masonite attempted to implement a 1.75% IMD price increase effective on January 16, 2012 (*i.e.*, before the Cartel Period) but withdrew it because other IMD manufacturers did not follow.[128] Rather than focus on Defendants' historical attempts to raise prices, Dr. Carlton focuses only on the three announcements prior to the start of the Cartel that in his opinion demonstrate that there was no change to the nature of price increase announcements. But that analysis is incomplete because contemporaneous evidence shows that Defendants' price increase announcements during this pre-period were not effective in raising prices.[129] Moreover, Dr. Carlton's analysis ignores contemporaneous documents and testimony from Defendants showing that the June 2014 price increase announcement (during the Cartel Period) represented a significant departure from past practices.[130] In fact, as I discuss below, the documentary evidence discussed in this section is consistent with the empirical results from my multiple regression analysis from the Lamb Report, which demonstrates that price increase announcements implemented before the start of the Cartel Period were less effective in raising prices above levels consistent with market supply and demand conditions compared to the price increase announcements issued during the Cartel Period.

---

[124] Lamb Report at ¶ 131.
[125] Lamb Report at ¶ 135-137.
[126] Lamb Report at ¶ 138-143.
[127] MAS-0000049088-89 at 88.
[128] STEVES-IMD-006768-778 at 768-771.
[129] Lamb Report at ¶ 96-97.
[130] Lamb Report at ¶¶ 136-137.

30

    JW-SEC-01101889

HIGHLY CONFIDENTIAL

### b. Dr. Carlton's analysis of the effectiveness of price increase announcements is irrelevant.

36.    To support his claim that price increase announcements during the Cartel Period were neither larger nor more effective that what had come before, Dr. Carlton specifies a regression analysis that purports to measure the aggregate "take rates" over multiple increases (that is, what portion of an announced price increases were actually realized).[131] However, his analysis fails to take into consideration the changing supply and demand conditions. Marshall and Marx, for example, explain that "tacitly colluding oligopolists will likely be cautious in advancing price increases that are not rooted in economic fundamentals."[132] Analyzing take rates in a vacuum, as Dr. Carlton does, (1) ignores the magnitude of the price increases (for example, a 90% take rate on a 4% announced increase would result in a 3.6% price increase across the board, whereas as 70% take rate on a 9.5% announced increase would raise prices across the board by 6.7%); and (2) does not take into consideration whether the prices can be explained by supply and demand factors alone. But the *magnitude* and *effectiveness* of price increase announcements in raising prices above supply and demand conditions are important to analyze whether the Cartel was successful in raising IMD prices.[133] Thus, it is not surprising that Dr. Carlton's assessment of the success of the price increases prior to the Cartel Period is inconsistent with Defendants' own assessment reflected in the contemporaneous evidence.

37.    As I explained in my deposition, my multiple regression analysis can be used to assess whether Defendants' attempts to raise prices were more effective in the Effective Cartel Period than in the Benchmark Period.[134] As the results of my multiple regression analysis show, Defendants were able to raise prices by 9.5% above the competitive levels in the Benchmark Period. Of note, the Benchmark Period included the price increase announcements that Dr. Carlton claims were more effective than during the Cartel Period. In short, my Multiple Regression Analysis confirms that the price increase announcements issued during the Cartel

---

[131] Carlton Report at ¶ 75, Table 4.

[132] Marshall and Marx at p. 114.

[133] Lamb Deposition at 188:12-190:7.

[134] Lamb Deposition at 92:4-92:10 ("Q. Did you assess take rates in this case? A. I discuss the evidence with respect to take rates . . . in my report. I'd say the regression analysis is a sort of summary of what portion of announced price increases that are in excess of any effective demand supply conditions affect the market.").

31

JW-SEC-01101890

**HIGHLY CONFIDENTIAL**

Period were more effective in raising prices above levels that can be explained by competitive factors alone.

38.     Dr. Carlton also argues that some of the price increase announcements issued by Defendants during the Cartel Period were not identical, which he claims is evidence of undercutting. But as I explain in the Lamb Report, Masonite's decision to increase prices by 8% instead of 9.5% appears to have been based on Masonite's assessment that its prices were "a few points" higher than Jeld-Wen's.[135] The follow-up price increases, where Masonite came in between 1 and 2 percentage points higher than Jeld-Wen would equilibrate any imbalance from the initial price increase. Notably, Dr. Carlton does not identify any discrepancies in the levels of subsequent price increases.

### 4.     Dr. Carlton's conclusion that Masonite's announcement regarding Doorskins was "perfectly consistent with non-conspiratorial conduct" is flawed and economically irrelevant

39.     In the Lamb Report, I concluded that Masonite's public statements in May 2014 and June 2014 investor conferences and meetings (the "Doorskins Announcements") that it would stop selling Doorskins "into a competition" (*i.e.*, independent IMD manufacturers) was against its economic self-interest in the absence of the Cartel.[136] My conclusion was based on the following factors:

- Doorskins production has high fixed costs and low variable costs, so that Masonite would be rewarded from increasing Doorskin sales;

- Doorskins are more profitable than IMDs;

- At the time of Masonite's announcement, Masonite had excess Doorskins capacity;

- At the time of Masonite's announcement, Jeld-Wen had significant quality problems;

- Prior to Masonite's announcement, Masonite was perceived to be an active participant in the Doorskins market. By publicly announcing that it would not

---

[135] Lamb Report at ¶ 137.
[136] Lamb Report at ¶¶ 40-41, 153-168.

32

compete for Doorskins business, it gave Jeld-Wen the ability to raise Doorskin costs to its competitors.

40.     Dr. Carlton claims that I "mischaracterized" Masonite's policy because Masonite's Doorskins sales to external customers represented a small share of its total Doorskins production before and after Masonite's Doorskins Announcements.[137] Dr. Carlton also claims that I "cite no evidence showing that Masonite in fact stopped selling doorskins to third parties."[138] However, in the Lamb Report, I specifically discuss evidence that independent IMD manufacturers approached Masonite after its Doorskins Announcements to engage in supply agreements and Masonite rebuffed them (or quoted them unreasonably high prices).[139] For example, after Kirk Hachigian, Jeld-Wen's former CEO and Executive Chairman, sent a letter to Steves in September 2014 of Jeld-Wen's intent to terminate its long-term supply agreement with Steves, Steves approached Masonite to inquire about Doorskins supply.[140] Before Steves could even ask Masonite to supply it,  Masonite told Steves that it would not sell Doorskins to Steves.[141] In March 2015, in response to a renewed request by Steves for Doorskins supply, Masonite sent Steves a price list that reflected a 42% increase on the Doorskins prices Steves had been paying Jeld-Wen. In addition, Masonite refused to enter a supply agreement with Steves and would only agree to sell to Steves on a spot basis.[142] Similarly, Excel Door, another independent IMD manufacturer approached Masonite after Jeld-Wen raised its Doorskins costs by 20% (following Masonite's announcement).[143] Again, Masonite did not engage with Excel Door even though an internal Masonite analysis estimated that Excel Door's proposal would have been expected to "generate $2 million in EBITDA annually and possibly as high as $3 million."[144] Contrary to Dr. Carlton's claims, I did discuss specific evidence of Masonite refusing to engage with the

---

[137] Carlton Report at ¶¶ 8, 93.
[138] Carlton Report at ¶ 92.
[139] Lamb Report at ¶¶ 161-166.
[140] Lamb Report at ¶ 161.
[141] Lamb Report at ¶ 161.
[142] Lamb Report at ¶ 161; Deposition of Fred Lynch (*Steves*), July 17, 2017 (hereafter "Lynch (*Steves*) Deposition") at 85:1-85:14 ("Q. And then as you testified, in 2015 you told Mr. Steves that you were willing to sell doorskins at the prices reflected on your then current pricelist; correct? A. Yes. Q. Mr. Steves had asked you if you were willing to enter into a new long-term supply agreement; correct? A. Yes. Q. And you said No, Masonite won't do that but we will sell to you off of our current pricelist; correct? A. Yes, if we had the product and they sent a purchase order.").
[143] Lamb Report at ¶¶ 163, 166.
[144] Lamb Report at ¶ 166; MAS-0000134111-12 at 11.

33

HIGHLY CONFIDENTIAL

independents after its Doorskins Announcements. This is in contrast to Masonite's efforts to sign Steves and Sons to a long-term supply agreement in 2011 and 2012.

41.    Dr. Carlton also claims that Masonite sold "a relatively small number of doorskins" to Steves in 2011 and 2012. However, Dr. Carlton ignores that Masonite was also attempting to sign Steves to a long-term supply agreement in 2012.[145] For instance, in October 2011, Larry Repar emailed Edward and Sam Steves from Steves to relay notes from a discussion of a proposed five year long-term supply agreement.[146] Fred Lynch, Masonite's then-President and CEO, testified in the *Steves* case that Masonite sent Steves a proposal for a long-term supply agreement, which ultimately was not signed because Steves opted to sign with Jeld-Wen.[147] As Dr. Carlton's market share estimates show, Steves is the largest independent IMD manufacturer with over 10% market share over the period of 2013 to 2018.[148]

42.    In addition to ignoring evidence that Masonite competed to sign Steves and Sons to a long-term supply agreement before the Doorskins Announcements, Dr. Carlton's discussion of Masonite's Doorskins Announcements also ignores important evidence discussed in the Lamb Report that Masonite's competitors, including Jeld-Wen, and Masonite's potential Doorskins customers viewed the Doorskins Announcements as reflecting a new policy and not merely "description of a statement of a long-standing" policy *vis a vis* Doorksins sales to third parties.[149] As I discussed in the Lamb Report, Masonite's competitors were surprised by Masonite's Doorskins Announcements. For example, Bob Merrill, Jeld-Wen's former EVP of Sales and former CEO of CMI, testified that Masonite's announcement "was a fairly new revelation" and that during his time at CMI, Masonite "had very aggressively gone after two of my customers, actually three of my customers for skins…."[150] Mr. Merrill also stated in May 2014 email to Kirk Hachigian that "[o]nly 18 months ago they were selling a significant portion to Steve's [sic], and

---

[145] Carlton Report at ¶ 93. Lynch (*Steves*) Deposition at 69:12-69:20 (Q. And before Steves signed with Jeld-Wen, you were trying to get Steves to sign a long-term agreement with Masonite; correct? A. We were negotiating one. I will say that as we came to the end of that timeframe and our business development team was negotiating it, it was probably clear -- it was clear to me as we came to the end that we would not come to an agreement.").

[146] Deposition of Sam Steves. January 17, 2020 ("Sam Steves Deposition") Exhibit 42.

[147] Lynch (*Steves*) Deposition at 72:5-72:16.

[148] Carlton Report Table 1.

[149] Carlton Report at ¶ 94.

[150] Deposition of Robert Merrill (*Steves*), May 10, 2017 (hereafter "Merrill (*Steves*) Deposition") at 273:6-274:14.; *See also* Deposition of Robert Merrill December 12, 2019 (hereafter "Merrill Deposition") at 117:22-118:21.

34

HIGHLY CONFIDENTIAL    JW-SEC-01101893

HIGHLY CONFIDENTIAL

they took some business from Towanda this year at ABS on price."[151] Sam Steves, President of Steves and Sons, similarly testified that Masonite's announcement marked a change in Masonite's Doorskins practice.[152] None of this information is captured in Dr. Carlton's analysis or in the reported Masonite Doorskins sales data.[153] Dr. Carlton only observes Masonite's Doorskins sales, but not how it competed  for (and stopped competing for) Doorskins business. Because he is unable to assess whether Masonite changed its policy regarding business it pursued, Dr. Carlton's analysis is incomplete and misleading.

43.    To the extent that the Doorskins Announcements merely articulated a long-standing Masonite policy, the other participants in the marketplace viewed the Doorskins Announcements as a change in policy and acted accordingly. But making such announcements would not make sense based on unilateral self-interest. As one academic paper put it, "[f]or one seller to know information about a rival is to give that seller a competitive advantage. A competitor has no unilateral interest in disadvantaging itself relative to its rivals."[154] Record evidence discussed in the Lamb Report, for instance, shows that Jeld-Wen used the information conveyed in Masonite's Doorskins Announcements to terminate the Steves agreement and to initiate price increases to its independent Doorskins manufacturers.[155] Jeld-Wen also applied capital charges to some customers that had long-term agreements.[156] The record evidence I have reviewed establishes that Masonite's Doorskin Announcements that it would no longer compete in the Doorskins market was an effective way to signal to market participants, including third-party IMD suppliers, but also proposed Class members, that it would no longer enable independent IMD manufacturers to provide competitive pricing discipline.  Further, this signaled to Jeld-Wen that it could raise its Doorskins prices, furthering their mutual interest in raising IMD prices in the market. This reduction in competition directly benefited Masonite.

---

[151] Carlton Deposition Plaintiffs Exhibit 52 at Reproduction-ThirdParty-0049123.
[152] Deposition of Sam Steves, January 17, 2020 (hereafter "Sam Steves Deposition") at 44:15-45:5.
[153] Carlton Report Table 6.
[154] William E. Kovacic, Robert C. Marshall, Leslie M. Marx, and Halbert L. White, "Plus Factors and Agreement in Antitrust Law," *Michigan Law Review*, Volume 110, Issue 3 (2011), pp. 393-435 at p. 423.
[155] Lamb Report at ¶¶ 161, 163.
[156] Lamb Report at ¶167.

35

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

**D. *Comparing the Benchmark Period with the Effective Cartel Period is an appropriate way to distinguish between oligopolistic interdependence and the effects of the Cartel because it controls for the oligopolistic interdependent aspects of the IMD market and the firms involved***

44.      In addition to the evidence of Defendants' conduct described above that supports my conclusion that the conduct of the IMD industry is consistent with the Cartel and inconsistent with each Defendant acting in its unilateral self-interest, the Cartel can also be distinguished from oligopolistic interdependence (or conscious parallelism) by comparing Defendants' conduct and performance during the implementation of the Cartel (*i.e.*, in what I refer to as the Effective Cartel Period) with their conduct and performance during the Benchmark Period. Given that the market structure and the firms in the market were the same during the Benchmark and the Effective Cartel Periods, merely pointing to oligopolistic interdependence as an explanation for why actual prices rose significantly in the Effective Cartel Period but not in the Benchmark Period makes no sense as a matter of economics. This finding is confirmed by my Overcharge Regression Analysis, which accounts for the oligopolistic structure of the industry (by holding the structure constant across the Benchmark and Effective Cartel Periods), and demonstrates that the price increases observed beginning in August 2014 cannot be explained by changes in demand and supply alone. It shows that even after controlling for changes in costs and demand, prices were artificially inflated during the Effective Cartel Period above the level predicted by market forces of demand and supply and also above any price inflation that might have been due to oligopolistic interdependence.[157] Thus, the Overcharge Regression Analysis results are inconsistent with oligopolistic interdependence and market forces absent the Cartel.

**E. *Dr. Carlton's assertion that my analysis has "three serious flaws" is incorrect and misleading***

45.      Dr. Carlton purports to identify "three serious flaws" in Plaintiffs' claims and my analysis: (1) that DPPs claim the Cartel began on October 24, 2012, but I assume the Cartel began in March 2014; (2) that Plaintiffs and I fail to explain how the Cartel dealt with the

---

[157] Marshall and Marx at p. 215 and fn. 6 ("The noncollusive benchmark is a period during which firms would be assumed to take into account their mutual interdependence. Thus, changes relative to this benchmark period would be attributed to explicit collusion.").

36

JW-SEC-01101895

HIGHLY CONFIDENTIAL

agreement to set prices, the monitoring of the agreement, and the enforcement of the agreement; and (3) that I ignore evidence of competition.[158]

46.     Contrary to Dr. Carlton's assertion, there is no inconsistency or mismatch between my analysis and conclusions and DPPs' claims. As reflected in DPPs' class certification brief, DPPs have "now determined that the alleged Conspiracy started in March 2014."[159] Moreover, as I explained in the Lamb Report, "[w]hile the Complaint alleges the Cartel started 'at least as early as 2012' (Complaint at ¶¶ 83, 116), based on discussions with counsel, my review of the record evidence, and in conjunction with my economic analysis, we have determined that the Cartel started in March 2014."[160]

47.     Dr. Carlton's claim that I did not address how the Cartel addressed certain supposed features of a successful price-fixing agreement is irrelevant because my econometric analysis of transaction-level prices takes into account any purported problems with enforcing the agreement at issue. For instance, Dr. Carlton states that a successful price-fixing conspiracy requires firms to "(1) reach agreement on prices; (2) monitor each other's pricing to determine whether a member of the conspiracy is 'cheating' on the agreement; and (3) be able to enforce the agreement by punishing a firm that cheats."[161] The issues Dr. Carlton raises go to the question of the *effectiveness* of the Cartel. My Overcharge Regression Analysis tests the effectiveness of the Cartel in raising prices above competitive levels, and finds that it was. Thus, given that the Cartel

---

[158] Carlton Report at ¶¶ 96-114.

[159] DPPs Class Certification Brief at n. 3. Dr. Carlton testified that he had not reviewed the DPPs Class Certification Brief prior to his deposition.  Carlton Deposition at 32:16-33:8.

[160] Lamb Report n. 13. *See also* Lamb Deposition at 60:22 to 61:20 ("Q. The Complaint states there, 'Beginning in at least 2012 and continuing through the present, defendants have engaged in a continuing agreement, understanding and conspiracy and a restraint of trade to artificially raise, fix, maintain or stabilize the prices of interior molded doors in the United States.' Do you see that? A. I do. Q. And you don't include the period of 2012 to March 2014 in your cartel period in this case. Is there a reason for that? A. It's not my understanding of when the alleged anticompetitive behavior began. I just note for the record and generally, ma'am, this document is dated April 10, 2019, which is early in the course of litigation. It's been my experience that Complaints are filed before discovery. And as one looks at discovery materials, counsel often change their understanding of the nature of the alleged anticompetitive conduct. So, it wouldn't surprise me that, in the Complaint, there's a different period referred to for the beginning of any anticompetitive cartel."). Both Dr. Carlton and Dr. Johnson agreed that it was not only appropriate for an expert to update his or her analysis and opinions when he or she learn of new facts or evidence, but that it was obligatory for that expert to do so. Carlton Deposition at 161:1-20; Johnson Deposition at 26:19-28:12; *See also* Johnson Report at n. 12.

[161] Carlton Report at ¶ 99.

HIGHLY CONFIDENTIAL

JW-SEC-01101896

was indeed effective in artificially inflating prices, it necessarily follows that the features Dr. Carlton identifies are either not necessary for a successful cartel or that they in fact exist.

48.     Moreover, as I discuss above, the characteristics of the IMD industry that Dr. Carlton contends would make it "harder for firms in a cartel to reach an agreement on price" would also make it more difficult for firms to engage in oligopolistic interdependent behavior, and such oligopolistic interdependence has a more difficult time achieving monopoly profits under any set of circumstances. For instance, Dr. Carlton states that "it is harder to reach an agreement on prices when there are many products,"[162] when companies have different "costs to serve a customer,"[163] or in a "period with rapid demand changes."[164] However, as I explained above, when markets have these conditions, reaching *tacit* agreements of the sort that Dr. Carlton speculates occur in this case are much more difficult to accomplish. Indeed, that these conditions exist in the IMD industry, but the elevated prices did not begin until after Defendants' executives communicated as discussed above, supports my conclusion that the performance of the IMD industry is due to the Cartel.

49.     Dr. Carlton's third claim, that Jeld-Wen's loss of market share is due to competition, including competition with Masonite, ignores two critical issues. First, as discussed in the Lamb Report, Jeld-Wen experienced significant quality and service problems during the Cartel Period.[165] Indeed, as I discussed in the Lamb Report, Jeld-Wen's former Executive Chairman, President and CEO Kirk Hachigian, testified in the *Steves* case that Jeld-Wen's loss of market share in the doors industry was due to a "combination of quality, service."[166] Mr. Hachigian also testified that Jeld-Wen's market share loss was not due to aggressive competition.[167] Second, Dr. Carlton overstates Jeld-Wen's market share "loss" because he ignores that independent IMD manufacturers, who procured Doorskins from Jeld-Wen, captured a large portion of Jeld-Wen's "share loss." For instance, Dr. Carlton's IMD share table shows that independent IMD manufacturers' market share grew from approximately 20% in 2013 to 24% in 2018.[168] This also

---

[162] Carlton Report at ¶ 102.
[163] Carlton Report at ¶ 104.
[164] Carlton Report at ¶ 105.
[165] Lamb Report at ¶¶ 176-178.
[166] Lamb Report n. 112. *See also* Deposition of Kirk Hachigian (Steves), May 16, 2017 (hereafter "Hachigian May 16 (Steves) Deposition") at 96:7-21; 103:6-104:6.
[167] Hachigian May 16 (*Steves*) Deposition at 96:7-21; 104:7-16.
[168] Carlton Report Table 1.

HIGHLY CONFIDENTIAL

JW-SEC-01101897

HIGHLY CONFIDENTIAL

means that Jeld Wen's loss of IMD sales did not represent additional competitive pressure, since those sales merely shifted to independent IMD manufacturers who purchased Jeld Wen's Doorskins. Since Doorskin sales were more profitable than sales of IMDs, such a shift cannot be viewed as indicative of competitive pressure on Jeld Wen.

## IV.    Defendants' Economists' Criticisms of My Overcharge Regression Model Are Flawed

50.    In the Lamb Report, I used multiple regression analysis to measure the impact of the Cartel on IMD prices paid by members of the Class. As I explained in the Lamb Report, the Overcharge Regression Analysis of prices for IMDs sold by the Defendants is based on standard, reliable, and widely accepted econometric techniques.[169] My Overcharge Regression Analysis demonstrates that IMD prices were artificially elevated during the Effective Cartel Period, and cannot be explained by competitive factors alone.[170] These findings were further corroborated by an extensive analysis of the economic performance of the IMD industry, which showed that IMD prices rose despite moderately increasing demand, excess capacity, stable or declining costs, and Jeld-Wen's significant quality issues.[171] Notably, Defendants' economists do not challenge these findings.

51.    Drs. Carlton's and Johnson's criticisms of my Overcharge Regression Analysis are based on the following erroneous claims: (1) the Benchmark Period and the Effective Cartel Period are not "structurally stable" and the model fails several "sensitivity tests;"[172] (2) my Overcharge Regression Analysis would fail to find overcharges if the cartel period as originally alleged in the Complaint is used;[173] (3) my Overcharge Regression Analysis would fail to find overcharges if specified using a benchmark period that excludes the "Orsino tenure;"[174] (4) my Overcharge Regression Analysis fails to predict prices accurately; [175] and (5) my Overcharge Regression

---

[169] Lamb Report at ¶¶ 188-192.
[170] Lamb Report at ¶¶ 188-215.
[171] Lamb Report at ¶¶ 170-186.
[172] Carlton Report at ¶¶ 115-122; Johnson Report at ¶¶ 55-60.
[173] Carlton Report at ¶¶ 123-124; Johnson Report at ¶¶ 128-132.
[174] As I discuss below, Dr. Carlton claims that he excludes the "Orsino tenure" to control for his "volume-chasing" strategy, but he only finds evidence of no overcharges when he also removes approximately five months of Kirk Hachigian's tenure as Jeld-Wen CEO, a period Dr. Carlton does not claim was characterized by a "volume-chasing" strategy. See Carlton Report at ¶¶ 122-127.
[175] Johnson Report at ¶¶ 112-117, Exhibit 26.

HIGHLY CONFIDENTIAL                          JW-SEC-01101898

HIGHLY CONFIDENTIAL

Analysis omits variables.[176] Dr. Johnson's criticisms collectively amount to an argument that IMD prices are set by a combination of individualized economic factors (such as customer bargaining power), as well as regional supply and demand factors, that all vary differently over time, and that purportedly not taking into account that these factors that vary differently over time, makes my class-wide Overcharge Regression Analysis purportedly unreliable.[177] As I demonstrate below, Dr. Carlton's and Dr. Johnson's criticisms of my Overcharge Regression Analysis are without merit and do not cause me to change my conclusions that IMD prices were artificially inflated as a result of the Cartel and that all, or nearly all, members of the Class paid artificially inflated prices as a result of the Cartel.

52.    Contrary to Dr. Carlton's and Dr. Johnson's claims, the econometric tests they perform suffer from serious flaws, and thus have no bearing on my overall conclusions. Indeed, as I discuss in detail in this section, Dr. Carlton and Dr. Johnson fail to identify any problems with my Overcharge Regression Analysis capable of refuting my findings that there were class-wide overcharges and that all, or nearly all, members of the proposed Cass were impacted by the Cartel. My Overcharge Regression Analysis also properly reflects the experience of Class members, including the comparison between actual prices and predicted prices. While Dr. Johnson asserts that regional factors matter for determining IMD prices and overcharges, he fails to test whether including regional factors impacts my finding of class-wide overcharges at all. Indeed, Dr. Johnson's own test, which he puzzlingly limits to only the Benchmark Period, suggests that any regional factors, to the extent they explain prices at all, do not add additional explanatory power to my model. Moreover, when I include Dr. Johnson's suggested regional factors in my model (which Dr. Johnson pointedly fails to do), I find that the results confirm the findings of my Overcharge Regression Analysis. In short, none of Drs. Carlton's and Johnson's criticisms undermines or refutes the results of my Overcharge Regression Analysis.

---

[176] Johnson Report at ¶¶ 61-63, 78-87, 91, 126-127.

[177] Dr. Johnson refers to this as modeling economic processes in his report. See Johnson Report at ¶¶ 55-60. I note here and discuss in the detail below that my analysis does take into account how customer buyer-power affects IMD prices, as well as how regional factors and product differences affect IMD prices, so the dispute with Dr. Johnson is over the ways in which these factors change (*i.e.*, whether these factors change in a different way over time or if they are properly captured with the explanatory variables I include in my Overcharge Regression Analysis).

40

### A. Defendants' economists' opinions that my Overcharge Regression Analysis is flawed and unreliable are not based on sound econometric analysis

53.    In the Lamb Report, I measured overcharges by comparing Class members' IMD prices in the Effective Cartel Period to those in the Benchmark Period after controlling for supply, demand, and macroeconomic factors that may affect changes in IMD prices.[178] My Overcharge Regression Analysis measured the relationship between IMD prices and supply and demand factors over the period of October 24, 2012 to December 31, 2018 (the Benchmark and Effective Cartel Periods combined)—a little over six years. Importantly, I carefully selected the Benchmark Period so that it had the same competitive market structure as the Effective Cartel Period.[179] As I discuss in the Lamb Report, over the six years for which I was able to study the relationship between IMD prices and supply and demand factors, I found economically sensible positive relationships between IMD prices and my measures of supply and demand.[180] As I explain in the Lamb Report: "The supply and demand variables also have a positive, directionally correct relationship, meaning that, all else equal, when costs and/or demand increase, the prices of IMDs would be expected to increase."[181]

54.    Dr. Carlton and Dr. Johnson criticize my Overcharge Regression Analysis by asserting that certain tests show that the relationship between IMD prices and supply and demand factors are not "structurally stable." In doing so, both Dr. Carlton and Dr. Johnson perform a series of tests intended to assess whether structural characteristics of the IMD industry were different in

---

[178] Lamb Report at ¶¶ 188-215.

[179] Lamb Report at ¶ 206.

[180] Lamb Report at ¶ 212; Lamb Deposition at 257:4-20 (Q. You're right. There was data that was produced previous to that going back to 2009, in fact. Did you review any of the data from Masonite and Jeld-Wen, the transaction-level data from 2009 through October 23, 2012, in conducting your multiple regression analysis? A. I didn't use any of that data in conducting my multiple regression analysis because it wasn't appropriate to do so, for the reasons I testified to earlier. The structure of the market was different during that time period. That was a period of time when there were more than two firms – independent firms supplying door skins and doors to the marketplace. And so, the way the market would have worked was different.").

[181] Lamb Report at ¶ 212. Dr. Johnson also implies that the sign of my mortgage rate variable is "incorrect" (See Johnson Report at ¶¶ 55-58). He is wrong. The mortgage rate variable measures the macroeconomic conditions of the IMD market and as such impacts both supply and demand. For instance, higher interest rates are reflective of macroeconomic growth, so a positive mortgage rate may indicate higher IMD prices. At the same time, higher interest rates may have a negative effect on demand for housing, thereby having a negative effect on IMD prices. But my Overcharge Regression Analysis already includes a measure of IMD door demand. So it is unsurprising, and not incorrect, that the coefficient on the mortgage rate variable is positive. At his deposition, Dr. Johnson acknowledged that the sign on the coefficient of the mortgage variable could reflect these macroeconomic factors. See Johnson Deposition at 188:5-190:10.

41

HIGHLY CONFIDENTIAL

the Benchmark Period versus the Effective Cartel Period.[182] The purported aim of these tests is to determine if my Overcharge Regression Analysis is "stable" across the two periods, with each defense economist claiming that if it is not "stable" across the two periods, then the overcharge estimate is not reliable. To test whether the periods are different, each expert performs a "Chow test"—a test intended to identify structural breaks but subject to criticism in the economics literature.[183] Drs. Carlton and Johnson find that the results of their Chow tests support the conclusion that the statistical model should distinguish the relationship between IMD prices and supply and demand variables in the Benchmark Period and in the Effective Cartel Period. In addition, when Dr. Carlton and Dr. Johnson measure the relationship between IMD prices and supply and demand factors over the 22-month Benchmark Period, they find a *negative* relationship between IMD prices and demand (that is, when demand increases, prices decrease).[184] They also find a *positive* relationship between IMD prices and IMD manufacturing costs. Drs. Carlton and Johnson claim that these results are contrary to economic theory and demonstrate a flaw in imposing a uniform relationship between IMD prices and supply and demand factors during both the Benchmark Period and the Effective Cartel Period.[185] Moreover, Dr. Carlton claims an indicator-variable model that is not structurally stable may be unable to distinguish the Cartel's effect on prices from other changes.[186] Dr. Carlton at deposition also testified that the results of this test indicate that one cannot use an indicator variable model.[187] Dr. Carlton and Dr. Johnson are wrong.

55.    There are two prevailing regression analysis methodologies for estimating overcharges using reduced form models: the indicator-variable model I employed in this case and the forecasting model.[188] The main difference between the two methodologies is that the indicator-variable model estimates the relationship between prices and supply and demand factors in both

---

[182] Carlton Report at ¶¶ 115-122; Johnson Report at ¶¶ 55-60.

[183] Jeffrey Wooldridge, *Introductory Econometrics: A Modern Approach*. Fifth Edition, South-Western, 2012 (hereafter "Wooldridge") at p. 453.

[184] Carlton Report ¶122; Johnson Report at ¶57.

[185] Carlton Report at ¶ 120; Johnson Report at ¶¶ 57, 60.

[186] Carlton Report at ¶ 120.

[187] Carlton Deposition at 379:17-380:17.

[188] James F. Nieberding, "Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues," *Journal of Applied Economics*, Vol 9, No. 2 (November 2006), 361-380 (hereafter "Nieberding") at pp. 367-371; Daniel Rubinfeld, "Quantitative Methods in Antitrust," Issues in Competition Law and Policy, 2008 (hereafter "Rubinfeld (2008)"); See also Daniel L. Rubinfeld, "Antitrust Damages," *Research Handbook on the Economics of Antitrust Law*, Ed. Einer Elhauge, November 21, 2009, 1-23 (hereafter "Rubinfeld - Antitrust Damages") at pp. 5-11.

HIGHLY CONFIDENTIAL                                                    JW-SEC-01101901

HIGHLY CONFIDENTIAL

the benchmark and the cartel period whereas the forecasting model estimates the relationship between prices and supply and demand factors solely in the benchmark period and uses those coefficients to predict but-for prices in the cartel period. Both models allow for the cartel effect, which represents a structural change, to be measured. In the Lamb Report, I employed an indicator-variable approach which I find to reliably estimate the relationship between IMD prices and its explanatory factors over the Benchmark and Effective Cartel Periods to isolate the effect of the Cartel on prices.

56.     Dr. Carlton is wrong to claim that his test of structural stability shows that it is inappropriate to rely on an indicator-variable model to measure overcharges. He is also incorrect in asserting that the indicator variable approach does not enable one to distinguish the Cartel's effect on prices from other factors. Academic studies have shown that the indicator-variable model may be superior to the forecasting model, even if the relationship between prices and explanatory factors is different in the benchmark and the cartel periods under study. The theoretical and practical support for a pooled (*i.e,* estimated across both the benchmark and cartel period) indicator-variable model without interaction variables demonstrates that the indicator-variable  model provides an appropriate measure of overcharges in price-fixing cases regardless of the "structurally unstable" relationship between the benchmark and cartel periods.[189] For example, one approach for modeling prices whose relationship with time-varying control variables changes between the Benchmark and Effective Cartel Periods is to interact these variables with the Effective Cartel Period indicator variable. Another approach, the one I use, omits the Effective Cartel Period interactions so that the full effect of the Cartel on prices is estimated by the Cartel Period dummy variable. The overall effect of the Cartel on prices will be more precisely measured by the indicator-variable that I used than it would be if the interaction terms had been included.[190] These studies further confirm that my methodology for estimating class-wide overcharges is appropriate.

---

[189] John D. Jackson and Sarah J. Skinner, "On Valuing the Price Effect of a Conspiracy in Price-Fixing Cases," *Journal of Forensic Economics*, Vol. 17, No. 2 (Spring/Summer 2004) pp. 185-202 (hereafter ("Jackson and Skinner") at p. 201. ("[T]he coefficient on the group dummy in a pooled data model with no other interaction variables is an excellent measure of damages in price-fixing cases in both a theoretical and a practical sense.")
[190] Richard S Higgins and Paul A. Johnson, "The mean effect of structural change on the dependent variable is accurately measured by the intercept change alone," Economics Letters 80: 255-259 (hereafter "Higgins and Johnson") at p. 256. ("[T]he overall effect of the structural change at issue is correctly measured by the intercept

HIGHLY CONFIDENTIAL

JW-SEC-01101902

HIGHLY CONFIDENTIAL

57.     Drs. Carlton and Johnson also incorrectly assert that the demonstrated relationship between IMD prices and supply and demand factors in the Benchmark Period indicates some problem in my Overcharge Regression Analysis methodology. For instance, Dr. Carlton states "[t]he negative coefficient on demand in the benchmark period is the opposite of what would generally be expected...."[191] Dr. Johnson similarly asserts that the negative and statistically significant coefficient on my demand variable when solely applied to the Benchmark Period is "contrary to basic economic principles."[192] But economic research on reduced-form price models of the sort that I estimate here confirms that supply and demand variables having "counterintuitive" signs is not a flaw. For example, James Nieberding states, "[w]hen interpreting reduced-form regression coefficients [...] one needs to remember that these parameters are a function of those from the underlying structural model."[193] He goes on to say "[t]herefore, while the expected sign of a reduced-form regression coefficient is informed by economic theory, it also is dependent on the underlying structural regression coefficients (some of which may have opposing effects on equilibrium price)."[194] So, given the nature of reduced form models, Drs. Carlton and Johnson are incorrect in concluding that the coefficient in my demand variable when applied solely to the Benchmark Period is a sign that the model is misspecified.

58.     More importantly, Dr. Carlton's and Dr. Johnson's assertion that in competitive markets one would expect a positive relationship between prices and demand does not necessarily apply to non-collusive oligopolistic markets, such as the Benchmark Period, which is how Dr. Carlton characterizes the IMD industry.[195] That is because some oligopolistic models of competition predict that, in periods of demand growth, an increase in demand leads to a *decrease* in price, and an increase in supply leads to an *increase* in price, *i.e.*, a "counter-cyclical" price

---

coefficient alone when the model excludes slope-change dummies. Moreover, the overall effect of structural change on the dependent variable will be measured more precisely than it would be if interaction terms were included."); Nieberding at n. 19 ("Higgins and Johnson (2003) argue (and theoretically prove) that under certain assumptions and in certain instances, the DV approach that does not control for the different effects that independent variables have on the dependent variable between the benchmark and cartel periods (when in fact they exist), will result in an unbiased estimated overcharge that is more precisely estimated than if a more complex model with "slope-changing" dummy variables were estimated.").

[191] Carlton Report at ¶ 122.
[192] Johnson Report at ¶ 57.
[193] Nieberding at pp. 365-366.
[194] Nieberding at pp. 365-366.
[195] Carlton Report at ¶ 8.

44

HIGHLY CONFIDENTIAL

movement.[196] The intuition for why prices are expected to decrease in response to a demand increase is described by Rotemberg and Saloner as follows: "Suppose the oligopoly were to keep its prices constant and only increase output in response to higher demand. Then industry profits would increase when demand goes up. However, in this case, a deviating firm can capture the entire industry profits by shading its price slightly. Therefore, constant prices would increase the incentive to deviate. Reductions in price are needed to maintain implicit collusion."[197] More recent research that relaxed some assumptions still concluded that the basic predictions regarding the relationship between shifts in supply and demand and the resulting change in price hold.[198] Econometric analyses of oligopoly models support the finding that periods of increasing demand may result in lower prices as demonstrated by Rotemberg and Saloner in study discussed above.[199]

59.     Static models of oligopolistic competition find that an increase in supply (*e.g.,* an increase in input costs) leads to an increase in price.[200] Further, an increase in demand (*e.g.,* an increase in income or purchasing power) has an *ambiguous* effect on price – price may either

---

[196] Julio J. Rotemberg and Garth Saloner, "A Supergame-Theoretic Model of Price Wars during Booms," *The American Economic Review*, Vol. 76, No. 3 (June 1986), pp. 390-407 (hereafter "Rotemberg and Saloner"); *see also* Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition, Reading, MA: Addison Wesley, 2005 (hereafter "Carlton and Perloff") at p. 168 ("Other economists argue that price wars should occur in periods of high demand (Rotemberg and Saloner, 1986). They reason that the benefit from undercutting the cartel price is greatest during booms.").

[197] Rotemberg and Saloner at p. 391.

[198] *See e.g.*, John Haltiwanger and Joseph E. Harrington, Jr., "The impact of cyclical demand movements on collusive behavior." *The RAND Journal of Economics*, Vol. 22, No. 1, 1991, pp. 89-106 (hereafter "Haltiwanger and Harrington"); Rotemberg, Julio J. and Michael Woodford, "Oligopolistic pricing and the effects of aggregate demand on economic activity," *Journal of Political Economy*, Vol. 100, No. 6, 1992 (hereafter "Rotemberg and Woodford 1992"), pp. 1153-1207; Warner, Elizabeth J. and Barsky, Robert B, "The Timing and Magnitude and Retail Store Markdowns: Evidence from Weekends and Holidays," *Quarterly Journal of Economics*, Vol. 110, No. 2, 1995 ("Warner and Barsky"), pp. 321–352.

[199] Douglas B. Bernheim,and Michael D. Whinston, "Multimarket contact and collusive behavior," *The RAND Journal of Economics*, Vol. 21, No.1, 1990 (hereafter "Bernheim and Whinston"), pp. 1-26; Severin Borenstein and Andrea Shepard, "Dynamic pricing in retail gasoline markets," *The RAND Journal of Economics*, Vol. 27, No. 3, 1996 (hereafter "Borenstein and Shepard"), pp. 429-451.Judith A. Chevalier, Anil K. Kashyap, and Peter E. Rossi, "Why don't prices rise during periods of peak demand? Evidence from scanner data," *American Economic Review*, Vol. 93, No. 1, 2003 (hereafter "Chevalier, Kashyap and Rossi"), pp. 15-37.James M. MacDonald, "Demand, Information, and Competition: Why Do Food Prices Fall at Seasonal Demand Peaks?," *Journal of Industrial Economics*, Vol. 48, No. 1, 2000 (hereafter "MacDonald"), pp. 27–45;Christian Rojas, "The role of demand information and monitoring in tacit collusion," *RAND Journal of Economics*, Vol. 43, No. 1, 2012 (hereafter "Rojas") pp. 78-109.

[200] Avinash Dixit, "Comparative statics for oligopoly," *International Economic Review*, Vol. 27, No. 1, 1986, pp. 107-122 (hereafter, "Dixit").

45

HIGHLY CONFIDENTIAL

increase or decrease depending on the market conditions.[201] For instance, Quimbach finds that when demand rises in an oligopoly market, marginal revenue may rise less than demand or even fall, thus leading to a decrease in price.[202] This does not occur under perfect competition.

60.     In Defendants' economists' analyses of the relationship between IMD prices and demand and supply factors in the Benchmark Period, the sign of the demand coefficient is negative, and the sign of the supply coefficient is positive. This indicates counter-cyclical price movement and is consistent with the theory of Rotemberg and Saloner, as well as a large body of empirical evidence.[203] So Defendants' economists' findings about the relationship between IMD prices and supply and demand variables in the Benchmark Period are consistent with an oligopoly market and thus contradict Drs. Carlton's and Johnson's assertions that the statistical relationship estimated over the Benchmark Period is a sign that my model is unreliable.

### B. Drs. Carlton's and Johnson's flawed analyses that purport to find "no overcharges" do not make sense as a matter of economics.

61.     Dr. Carlton and Dr. Johnson claim that my Overcharge Regression Analysis is sensitive to the choice of benchmark period and purport to present analyses that show that my Overcharge Regression Analysis finds no systematic evidence of overcharges as a result of these "sensitivity analyses."[204] But neither of the analyses presented by Dr. Carlton or Dr. Johnson is a standard econometric sensitivity analysis. Instead, each effectively amounts to improper data mining as a results-oriented means to attempt to "break" my model.

### 1. It is unsurprising that there is no evidence of overcharges when the Cartel Period is expanded to include a period when the Cartel was not effective and an inappropriate benchmark period is selected

62.     Both Dr. Carlton and Dr. Johnson specify regression models that change the beginning of the benchmark period to January 2010 (so that it runs from January 1, 2010 to October 23, 2012) and assuming the Cartel Period begins on October 24, 2012 (in my model, the Effective Cartel Period begins on August 11, 2014, the date the first allegedly collusive price increase

---

[201] Herman C. Quirmbach, "Comparative statics for oligopoly: Demand shift effects," *International Economic Review*, Vol. 29, No. 3, 1988, pp. 451-459 (hereafter, "Quirmbach").
[202] Quirmbach at pp. 451-459.
[203] The results can be further reconciled with the more basic, static oligopoly model. See Quirmbach, pp. 451-459.
[204] Carlton Report at ¶¶ 123-127; Johnson Report at ¶¶128-132.

HIGHLY CONFIDENTIAL

JW-SEC-01101905

HIGHLY CONFIDENTIAL

announcement went into effect).[205] Dr. Carlton claims that he performs this analysis "to estimate the effect of the Cartel if the alleged conspiracy begins in October 2012 instead of March 2014."[206] But as I discuss above, Plaintiffs' Class Certification Brief states that based on Plaintiffs' review of the record evidence, they now allege that the alleged Cartel started in March 2014.[207] Dr. Carlton testified that it is proper for an expert's analysis of a conspiracy to be grounded in the evidence, which is precisely what I have done.[208] Dr. Johnson concurred.[209] Accordingly, Dr. Carlton and Dr. Johnson have reasonable or valid basis to perform this "sensitivity" except to show that when they include a period that Plaintiffs now maintain was not impacted by the Cartel, their modified overcharge regressions find no evidence of impact.[210] As a general matter, it is hardly surprising that including nearly 22 months of sales that were not allegedly impacted (and indeed could not be impacted by the Cartel), in the Cartel period, that an economic model of overcharges would find no overcharges.

63.    Defendants' economists' use of an alternative benchmark period of January 2010 to October 23, 2012 also suffers from fundamental flaws that their analyses do not address. Unlike my Benchmark Period (which was carefully chosen to reflect the same market structure as the Effective Cartel Period), the benchmark period selected by Defendants' economists did not reflect the same market structure as the Effective Cartel Period. In particular, Defendants' economists' benchmark period solely consists of the period before Jeld-Wen acquired CMI, the third vertically-integrated IMD supplier—a period where independent IMD manufacturers had a third option for the supply of Doorskins and IMD customers had another viable supplier of IMDs. This difference in market structure (unlike with my Benchmark Period) may result in a

---

[205] Carlton Report at ¶ 124; Johnson Report at ¶130; Lamb Report at ¶ 7.

[206] Carlton Report at ¶ 123.

[207] DPPs Class Certification Brief at n. 3.

[208] Carlton Deposition at 161:6-20 (Q. As an expert, have you changed your opinions in the past or your models pursuant to things you learned in discovery? A. Well, I think more generally as you learn things, regardless of whether it's in litigation or not, you could alter your opinion as you learn new things. Q. Would you agree that an expert is obligated to alter his opinions based on information learned in discovery? A. I believe an expert is obligated to reflect his current knowledge. And to the extent that has changed from what it was two years ago, he should update his knowledge and update his analysis.").

[209] Johnson Deposition at 292:7-11.

[210] In rationalizing performing this test, Dr. Carlton ignores the evidence of Defendants' communication and other challenged conduct that corresponds with the Cartel beginning in March 2014. Dr. Johnson simply claims that he is performing a "sensitivity test" to see how the model performs over the alleged cartel period as alleged in the operative complaint. *See* Johnson Report at ¶¶ 128-129.

47

HIGHLY CONFIDENTIAL

meaningfully different relationship between IMD prices and market supply and demand, causing a comparison between that period and the Effective Cartel Period to produce ambiguous results. Moreover, as discussed in the Lamb Report, record evidence shows that the period of 2010 to 2011 was still affected by the Great Recession, which affected the building industry significantly.[211] In addition, Defendants' economists' benchmark period exists substantially before Onex acquired a controlling equity stake in Jeld-Wen in October 2011, a time when Dr. Carlton stated that Jeld-Wen was operating like a "family-run business."[212] Masonite was also impacted by the Great Recession and underwent bankruptcy restructuring in 2009, closing several facilities and reducing its workforce as a result.[213] The restructuring that each Defendant underwent following the Great Recession (including debt restructuring, closing facilities, and reducing work force) indicate that the relationship between IMD prices and the cost to supply IMDs in this 2010-2011 period may be meaningfully different than in the October 24, 2012 – December 2018 period that forms the basis for my analysis and represents Defendants' economists' alleged cartel period. Dr. Johnson testified that he did not take these factors into account when developing his alternative benchmark period.[214] I note that Dr. Carlton does not dispute that his chosen benchmark period is not structurally the same as the Effective Cartel Period and that he does not endorse his own analysis.[215]

64.     For these reasons, the benchmark period Defendants' economists selected is not an appropriate benchmark. As I discuss above, when selecting a benchmark period, it is important to select a period where the structural conditions in a market are the same, but-for the challenged conduct, and to control for factors that may affect the variable of interest (*i.e.*, the IMD price).[216] This is important in the before-during-after overcharge analysis Defendants' experts employ.[217] In his deposition, Dr. Carlton acknowledged that the acquisition of CMI represented a change in

---

[211] Ross Deposition Exhibit 285 at Reproduction -ThirdParty- 0114378.

[212] Ross Deposition Exhibit 285 at Reproduction -ThirdParty- 0114376; Carlton Report at ¶ 23.

[213] Lamb Report at ¶ 37; Carlton Report at ¶ 58.

[214] Johnson Deposition at 292:12-19, 299:6-301:20.

[215] Carlton Deposition at 377:23-380:17; Carlton Report at n. 205.

[216] Rubinfeld - Antitrust Damages at p. 5 ("This requires that one take into account any cost, demand, or competitive differences between the non-impact behavior and the impact period, but for the wrongful behavior.").

[217] ABA, Proving Antitrust Damages, at p. 58 ("Because the before-during-after approach looks outside the damages period, changes over time in economic conditions, the plaintiff's circumstances, and a host of other variables must be examined.").

HIGHLY CONFIDENTIAL

JW-SEC-01101907

HIGHLY CONFIDENTIAL

market structure,[218] yet neither he nor Dr. Johnson controls in any way for the different market structure (due to the acquisition of CMI) nor does either control for any effects the Great Recession or Defendants' financial distress had on the market prices for IMDs. Taken together, the structural characteristics of the period Defendants' economists treat as a benchmark are different than those prevailing during the cartel period used in their analyses. This mismatch in market structures, which they do not control for, compounds the serious flaws in their analyses.

## 2. Dr. Carlton's exclusion of the "Orsino tenure" is fatally flawed and produces unreliable results.

65.    Dr. Carlton also performs a second regression analysis that purports to investigate "the effect of including Mr. Orsino's tenure as President and CEO of JELD-WEN in the benchmark period."[219] In this analysis, Dr. Carlton uses the period before Philip Orsino became President of Jeld-Wen (on August 25, 2011) as his benchmark, *i.e.*, from January 2010 to August 24, 2011, and compares IMD prices in this pre-"Orsino" period with those in the Effective Cartel Period (from August 11, 2014 to December 31, 2018), after controlling for supply and demand factors.[220] By dropping three years of IMD sales activity and using the January 2010 to August 24, 2011 period as his benchmark, Dr. Carlton finds "no" systemic evidence of overcharge. But, as I discuss below, his analysis is misleading and flawed due to many of the same problems as his regression analysis that uses a pre-CMI acquisition benchmark period.

66.    As an initial matter, dropping three years of sales records from a before-during benchmark analysis so that there is a three-year gap between the benchmark period and the Effective Cartel Period, is highly unconventional and contrary to standard practice in econometrics.[221] Indeed, Dr. Carlton testified that he does not recall ever performing an analysis in which there was a three-year gap between his benchmark and cartel periods.[222] Dr. Carlton

---

[218] Carlton Deposition at 213:2-213:17 (Q. -- CMI was also a vertically integrated producer of IMDs. Correct? A. That is my understanding. Q. So after the sale of CMI to JELD-WEN, there were only the two vertically integrated producers, JELD-WEN and Masonite. Correct? A. Yes. Q. Would you view the change from three vertically integrated producers to two vertically integrated producers a significant change in market structure? THE WITNESS: It's changed certainly in market structure. I certainly agree with that.").

[219] Carlton Report at ¶ 126.

[220] Carlton Report at ¶¶ 125-127.

[221] Robert M. Lloyd, "Proving Damages for Lost Profits: The Before-and-After Method," *College of Law Faculty Scholarship*, 2014, at p. 3.

[222] Carlton Deposition at 355:21-356:8.

HIGHLY CONFIDENTIAL

JW-SEC-01101908

HIGHLY CONFIDENTIAL

also claims not to endorse his own analysis contained in his report.[223] Moreover, Dr. Carlton's rationale (that Mr. Orsino's tenure represents "an inappropriate benchmark" because he pursued a "volume-chasing" strategy)[224] for excluding this three-year period from his analysis does not make economic sense.[225]

67.    My Benchmark Period includes the period from October 24, 2012 through August 10, 2014, and thus encompasses the second half of Mr. Orsino's tenure as President and CEO of Jeld-Wen and the first five months of Kirk Hachigian's tenure as CEO of Jeld-Wen.[226] The portion of Mr. Orsino's tenure that is included in my Benchmark Period includes a period in which both Jeld-Wen and Masonite attempted to raise IMD prices and issued price increase announcements.[227] The record evidence does not show that in the October 24, 2012 to August 10, 2014 period, Jeld-Wen was pursuing a unilateral "volume-chasing" strategy or acting in a way that is inconsistent with a firm trying to unilaterally maximize profits.[228] As I discussed above, in a period with increasing demand, oligopoly theory demonstrates that participants may not increase prices to capture extra sales. Indeed, the comparison of a period where two competitors are attempting to raise prices unilaterally to a period where two competitors are allegedly coordinating their attempts to raise prices is appropriate to an overcharge analysis. As Figure 1 below shows, Jeld-Wen's prices during the Orsino period are not lower than prices in the period Dr. Carlton uses as his benchmark.

---

[223] Carlton Report at n. 209.
[224] Carlton Report at ¶¶ 122, 125-126.
[225] Dr. Carlton excludes the three-year period because, according to Dr. Carlton, Mr. Orsino was pursuing a volume-chasing strategy and because of the results of a test for structural breaks known as the Chow test.A above are unreliable. *See* Carlton Report at ¶¶ 125-126.
[226] Mr. Hachigian officially became CEO of Jeld-Wen on April 1, 2014.
[227] Dr. Carlton discusses in his report Defendants attempts to raise prices in the Benchmark Period. *See* Carlton Report at ¶¶ 26, 72-79.
[228] In the Lamb Report, I discussed how Defendants attempted to raise IMD prices during this period but were thwarted due to competitive pressure. See Lamb Report at ¶¶ 93-98.

50

    JW-SEC-01101909

HIGHLY CONFIDENTIAL



Figure 1: Jeld-Wen's Quarterly Weighted Average Gross Price (1/2010 - 8/2014)

Source: Defendants' transaction data.

68.    Having provided no reasonable basis for excluding Mr. Orsino's tenure as the President and CEO of Jeld-Wen, Dr. Carlton also fails to articulate any reason for also excluding the period where Mr. Hachigian led Jeld-Wen from his benchmark. Indeed, his own analysis shows that had Dr. Carlton only excluded the "Orsino tenure" (from August 25, 2011 to March 31, 2014) but kept the period encompassing Mr. Hachigian's tenure as CEO of Jeld-Wen (from April 1, 2014 to August 10, 2014), his analysis would find overcharges of more than 6%.[229] But Dr. Carlton provides no basis for excluding the Hachigian period and his explanation that prices during Mr. Hachigian's first five months leading Jeld-Wen were lower than prices in the pre-Orsino period is unsupported by the data on IMD prices.[230] So Dr. Carlton's analysis fails in two significant ways: (1) rather than attempt to model the effect of the "Orsino tenure" on IMD prices, he drops three years of data; and (2) it purports to account for Mr. Orsino's "volume-

---

[229] Dr. Carlton reports that if he includes the period from March 2014 to August 10, 2014 in his benchmark, he finds an overcharge of 6.59%. When I specific his analysis to including the period from April 1, 2014 (in order to exclude the last month of Orsino's tenure) to August 10, 2014 in the benchmark, I find an overcharge of 6.3%. See Carlton Report n. 208.

[230] Dr. Carlton claims that prices during Mr. Hachigian's first five months "were unusually low." See Carlton Report n. 208.

51

HIGHLY CONFIDENTIAL

JW-SEC-01101910

chasing" strategy but only finds negative overcharges by excluding both the period within the Benchmark Period where Defendants attempted to raise IMD prices and the first approximately five months of Mr. Hachigian's tenure, where no such strategy was in place. Thus, the results of his analysis amount to no more than cherry-picking, *i.e.*, his analysis reflects an unprincipled exercise in searching for periods that, if used in a regression, produce no overcharges.

69.    Dr. Carlton's analysis suffers from another major flaw. As I discussed above in reference to Dr. Carlton's other analysis, it is inappropriate to use data prior to the CMI acquisition, and during the Great Recession, without properly controlling for the significant structural changes that occurred in the IMD industry between 2010 and October 2012. Yet, Dr. Carlton limits his benchmark period to January 2010 to August 2011, fully within the Great Recession, a period that predates Onex's investment in Jeld-Wen. The use of this period as his benchmark further renders his analysis flawed and unreliable.

### C. *Dr. Johnson's other criticisms of the performance of my Overcharge Regression Analysis are flawed.*

70.    Dr. Johnson's overarching claim regarding my Overcharge Regression Analysis is that I purportedly failed to "model the economic processes" that determine IMD prices in assessing antitrust impact.[231] In Section IV.A above, I explained that Dr. Johnson's claim that about my Overcharge Regression Analysis failed to properly measure the relationship between IMD prices and supply and demand factors during the Benchmark Period was flawed. Dr. Johnson similarly performs a series of other "tests" that, in his telling, demonstrate that overcharges from my Overcharge Regression Analysis may be biased due to supposedly omitted other factors. In particular, Dr. Johnson makes the following incorrect or irrelevant claims:

- That my Overcharge Regression Analysis, if it were specified to include only the Benchmark Period, purportedly would find an "overcharge" of about 1.05% in the first half of the Benchmark Period (when compared to the second half of the benchmark), which, Dr. Johnson claims, implies there may be some omitted factors;[232]

---

[231] Johnson Report at ¶¶ 55-56.
[232] Johnson Report at ¶¶ 62-63.

JW-SEC-01101911

HIGHLY CONFIDENTIAL

- That explanatory variables in my Overcharge Regression Analysis purportedly do not explain well the movement of IMD prices over time;[233]

- That the predicted prices from my Overcharge Regression Analysis purportedly reveal that my analysis is unreliable;[234] and

- That my Overcharge Regression Analysis purportedly fails to account for important geographic components.[235]

71.     Dr. Johnson asserts that there are relevant economic factors that I omitted from my analysis (namely, time-varying regional supply and demand factors), which omissions he claims may "confound" (or "bias") my finding of an overcharge—that is, the regression may attribute to the Effective Cartel Period indicator variable explanatory power of prices that should be attributed to a factor not included in the regression.[236] However, by his own admission, he does not test how these "omitted" factors impact my overcharge estimate.[237] But for omitted factors to bias the measured overcharge, they must be correlated to the variable of interest (*i.e.*, the Cartel indicator variable) and they need to not be correlated to the other explanatory variables already included in the regression analysis. In fact, as I discuss below, Dr. Johnson's analyses are flawed, unreliable, and suffer from elemental mistakes. When properly analyzed, contrary to Dr. Johnson's claim, my time-varying variables explain almost all of the variation in IMD prices over time. Additionally, he finds that my model generates a small "overcharge" of about 1.05% when he constrains my model to run only in the Benchmark Period. When that result is compared to my finding of a 9.5% overcharge during the Effective Cartel Period, that is evidence that the effect of any purportedly missing factor is necessarily small and immaterial. That he finds a small "effect" in the benchmark where there are millions of transactions is common and

---

[233] Johnson Report at ¶ 65.

[234] Johnson Report at ¶¶ 67, 69, Exhibit 9.

[235] Johnson Report at ¶¶78-87.

[236] Johnson Report at ¶¶ 61-63; For discussion a more detailed discussion on omitted variables, *see* Wooldridge at pp. 88-92.; *see also* Rubinfeld (2008) at p. 738 ("However, failure to include an important major explanatory variable that accounts for factors that differ between the period of alleged wrongdoing and other time periods can cause the measured effect of the dummy variable of interest to be biased, which in turn could lead to an invalid conclusion on liability.").

[237] Johnson Deposition at 207:8-207:15 (Q. It's fair to say that you did not test your hypothesis that relevant factors have been omitted from plaintiffs' model by adding any supposedly omitted variables to either of the models. Correct? A. That is true. That is not the only way that one has submitted [sic] variables is putting in other variables, of course.")

53

HIGHLY CONFIDENTIAL

JW-SEC-01101912

**HIGHLY CONFIDENTIAL**

not problematic (as I discuss below regarding the Chow test). Critically, unless those factors influence the measure of the overcharge, they will not bias it. Moreover, if I were to accept his criticisms (which I do not) and add his "omitted" factors to my Overcharge Regression Analysis, I nevertheless find that the overcharge remains virtually unchanged. Thus, his supposedly "confounding" factors do not, in fact, eliminate or even materially change my overcharge findings.

72.    The reason that Dr. Johnson finds evidence that there may be some meaningful omitted economic factor (yet when that factor is tested in my Overcharge Regression Analysis my finding of an overcharge remains unchanged) is that Dr. Johnson relies on a Chow test ( also known as an F-test ) of structural differences between two data sets (or subsets of a data set) that is notoriously prone to identifying structural breaks where none exists, especially where, as here, there are a large number of observations.[238] The Chow test used by Dr. Johnson (and by Dr. Carlton as well) is a joint hypothesis test. In a regression model, one can test a hypothesis on a single regression coefficient to determine whether that coefficient is equal to a specified value.[239] Similarly, instead of testing a hypothesis involving a single coefficient, it is possible to test hypotheses about more than one coefficient in a multiple regression model.[240] Dr. Johnson finds that his Chow test rejects the hypothesis that the relationship between IMD prices and supply and demand variables is the same across regions, or within the Benchmark Period. But the results of his tests do not demonstrate that there are important factors that are omitted from my analysis.

73.    As an initial matter, when there is enough data (like the millions of observations in Defendants' transactional databases), the test that Dr. Johnson performs is prone to identifying structural breaks, even when none exist, which is why practitioners suggest that there should be

---

[238] Economic literature cautions that a Chow test should only be used to test for structural breaks when there is good reason to believe, based on economic theory or *a priori* understanding, that one exists. *See* Damodar N. Gujarati, *Basic Econometrics*. Fourth Edition, New York, NY: McGraw-Hill, 2004 at pp. 277 – 278 ("The Chow test assumes that we know the point(s) of structural break. ... However, if it is not possible to determine when the structural change actually took place, we may have to use other methods."). *See also* Peter Kennedy, "Sinning in the Basement: What Are the Rules? The Ten Commandments of Applied Econometrics," *Journal of Economic Surveys*, Vol. 16, No. 4, 2002 (hereafter "Kennedy") at p. 580 ("Very large sample sizes, such as those that have become common in cross-sectional data, thanks to the computer revolution, can give rise to estimated coefficients with very small standard errors. A consequence of this is that coefficients of trivial magnitude may test significantly different from zero.").

[239] In this regard, when one talks about statistical significance of a regression coefficient, it involves testing the hypothesis that the true value of that coefficient is equal to zero.

[240] F-tests can be used to test joint hypotheses. Orley Ashenfelter, Phillip B. Levine, and David J. Zimmerman, *Statistics and Econometrics Methods and Application*. Hoboken, NJ: John Wiley & Sons, Inc., 2003, at p. 178.

54

JW-SEC-01101913

an *a priori* reason to expect a structural break before one tests for one using a Chow test. In formal statistical terms, as the number of observations grows larger, the "Power" of the test – that is, its ability to identify statistically even miniscule differences between two parameters of interest – grows to be nearly 100 percent. While this may seem like a positive feature, it can lead to identifying as statistically "different" two periods of time or two sets of data that *practically* are nearly identical. For example, if the response of price to demand is 0.50 in one time period, but 0.51 in another, economists would not consider this difference to be economically meaningful, but when a regression analysis has millions of observations, the Chow test might say that those two time periods are statistically "different." This characteristic is well known in econometrics, and economists therefore avoid over-reliance on mechanical applications of the test such as Dr. Johnson imposed here.

74.    As Table 1 below shows, the Chow test suggests there is a "structural" difference in the relationship between IMD prices and supply and demand factors for all but one quarter between October 2012 and December 2018. It is implausible that structural breaks occur this regularly in the IMD industry notwithstanding what the test supposedly shows, and neither Dr. Carlton nor Dr. Johnson suggests that there are structural breaks at every quarter. Thus, the Chow test here, as it has been known to do in other cases where large amounts of data are being analyzed, in fact shows structural breaks where none exist.

55

JW-SEC-01101914

HIGHLY CONFIDENTIAL

**Table 1**
Chow Test Results by Quarter

| Quarter | P-Value | F-Statistic | Quarter | P-Value | F-Statistic |
|---|---|---|---|---|---|
| 2012Q4 | 0.00 | 71.73 | 2016Q1 | 0.00 | 40.36 |
| 2013Q1 | 0.00 | 27.09 | 2016Q2 | 0.00 | 27.76 |
| 2013Q2 | 0.00 | 24.03 | 2016Q3 | 0.00 | 11.07 |
| 2013Q3 | 0.00 | 299.38 | 2016Q4 | 0.07 | 2.40 |
| 2013Q4 | 0.00 | 210.77 | 2017Q1 | 0.00 | 41.61 |
| 2014Q1 | 0.00 | 69.62 | 2017Q2 | 0.00 | 12.30 |
| 2014Q2 | 0.00 | 44.00 | 2017Q3 | 0.00 | 21.52 |
| 2014Q3 | 0.00 | 225.34 | 2017Q4 | 0.00 | 118.64 |
| 2014Q4 | 0.00 | 189.20 | 2018Q1 | 0.00 | 15.42 |
| 2015Q1 | 0.00 | 325.30 | 2018Q2 | 0.00 | 23.39 |
| 2015Q2 | 0.00 | 271.43 | 2018Q3 | 0.00 | 58.28 |
| 2015Q3 | 0.00 | 242.24 | 2018Q4 | 0.00 | 73.13 |
| 2015Q4 | 0.00 | 96.64 | | | |
| Joint Significance Test | | | | 0.00 | 407.31 |

Sources: Defendants' transaction data; Lamb Report work papers.

### 1. Dr. Johnson's finding of an "overcharge" within the Benchmark Period does not prove that there are omitted variables in my Overcharge Regression Analysis

75.     Dr. Johnson attempts to discredit my Overcharge Regression Analysis by testing whether he could find an "overcharge" during my Benchmark Period, where he says none should exist. Dr. Johnson first restricts the regression analysis to run over the Benchmark Period and tests whether the regression explains the variation in prices between the first and second half of the Benchmark Period.[241] Dr. Johnson reports that the regression fails the test because, when he applies an indicator variable to the first half of the Benchmark Period, he finds a statistically significant "overcharge" of 1.05% relative to the second half of the Benchmark Period.[242] Dr. Johnson concludes that his finding of a 1.05% "overcharge" where there should not be one is evidence that the 9.5% overcharge that I find during the Effective Cartel Period is confounded with other factors and thus unreliable. Dr. Johnson further claims that his test is evidence that my

---

[241] Johnson Report at ¶ 62. Dr. Johnson referring to his finding as an "overcharge" is a misnomer and misleading. What Dr. Johnson purportedly finds is an unexplained factor that may impact IMD prices in the first half of the Benchmark Period relative to the second half of the Benchmark Period.

[242] Johnson Report at ¶ 63.

56

HIGHLY CONFIDENTIAL

JW-SEC-01101915

HIGHLY CONFIDENTIAL

Overcharge Regression Analysis "risks mis-attributing effects of the omitted ordinary economic factors to the estimated overcharge."[243] In other words, Dr. Johnson supposes that there may be some omitted variable that may be confounding my measurement of overcharges. He is wrong.

76.    As an initial matter, his finding of a small 1.05% "effect" when he compares two sub-periods (the first half with the second half) of the Benchmark Period is a typical finding when a structural break is run comparing two periods with millions of observations.[244] But it is incorrect to assume from these findings that (1) there is an omitted factor in the model; and (2) that the omitted factor biases the measured overcharge. Instead, given the small magnitude of the within-benchmark period "overcharge," it is likely that this finding of an "effect" is due to simply analyzing a large data sample.[245]

77.    Moreover, for there to be a "confounding" effect to this supposed omitted (but unidentified) variable, it would have to be correlated with the dependent variable (that is, with IMD prices) and the independent variable of interest (that is, the overcharge indicator variable).[246] Dr. Johnson identifies no such omitted variable or any correlation therefrom, so his (incorrect) supposition about a phantom omitted variable is irrelevant to the question of whether my Overcharge Regression Analysis properly controls for the factors that determine IMD prices over time. Moreover, as shown below, his test of purported "overcharges" in the Benchmark Period is not stable and thus undermines the reliability of his test.

78.    Dr. Johnson also suggests incorrectly that "[t]here cannot exist an 'overcharge' during the period when no anticompetitive conduct is alleged, meaning that what these models are attributing to 'overcharges' are the effects of relevant economic factors that explain IMD prices but are omitted from their regressions."[247] But Dr. Johnson's statement is a *non sequitur*. What Dr. Johnson is finding is not an "overcharge." Assuming there is a very small unidentified

---

[243] Johnson Report at ¶ 61.

[244] Kennedy at p. 580 ("Very large sample sizes, such as those that have become common in cross-sectional data, thanks to the computer revolution, can give rise to estimated coefficients with very small standard errors. A consequence of this is that coefficients of trivial magnitude may test significantly different from zero.").

[245] Rubinfeld (2008) at p. at p. 738 ("However, it is possible with a large data set to find statistically significant coefficients that are practically insignificant.").

[246] David H. Kaye, and David A. Freedman, *Reference Guide on Statistics*. Reference Manual on Scientific Evidence, Third Edition, Washington, D.C.: National Academies Press, 2011 (hereafter "Reference Manual on Scientific Evidence") at p. 285 ("A confounder is correlated with the independent variable and the dependent variable. An association between the dependent and independent variables in an observational study may not be causal but may instead be due to confounding.").

[247] Johnson Report at ¶¶ 61 63,

57

JW-SEC-01101916

HIGHLY CONFIDENTIAL

omitted factor as Dr. Johnson claims, Dr. Johnson provides no evidence showing that this omitted factor results in mis-attributing some omitted effect to the measurement of overcharges. Indeed, Professor Rubinfeld, who Dr. Johnson elsewhere cites approvingly, undermines Dr. Johnson's analysis:

> Omitting variables that are not correlated with the variable of interest is, in general, less of a concern, since the coefficient that measures the effect of the variable of interest on the dependent variable is estimated without bias. Even if bias is thought to be a risk, it may nevertheless be possible to account for bias qualitatively if one has knowledge about the relationship between the omitted variable and the explanatory variable.[248]

79.     I understand that Dr. Carlton, when he was retained as a Plaintiffs expert in *Daniel v. Am. Bd of Emergency Medicine,* made a similar point:

> However, the failure to include all such potential variables does not render the results of Dr. Carlton's proposed regression analysis invalid. Carlton Dep. at 219, 220. Specifically, in Dr. Carlton's opinion, the absence in the regression model of every variable that may correlate with the dependent variable of a physician's annual income does not render the model useless. *Id.* at 194. "[I]t's routine and statistical [sic] in economic modeling that you ... do not have every single factor that effects every single dependent variable, yet these models have turned out to have great usefulness. *Id.*[249]

80.     As the unidentified "omitted" factor Dr. Johnson purports to find is neither practically significant, nor has it been identified to be something that changes between the Benchmark and Effective Cartel Periods, nor shown when added to the model to change the results in a material way, there is no evidence of misattributing some unexplained economic factor to the overcharge.[250] What Dr. Johnson suggests, but does not say explicitly, is that my Overcharge Regression suffers from omitted variable bias. In econometrics, "omitted variable bias" has a

---

[248] Rubinfeld (2008) at p. 738.
[249] United States District Court for the Western District of New York, *In re: Daniel v. American Bd. Of Emergency Medicine*, 269 F. Supp. 2d 159 (W.D.N.Y. 2003).
[250] At his deposition. Dr. Johnson agreed that it may not be possible to include all relevant explanatory variables and that an expert must make a principled decision as to what explanatory variables to include. See Johnson Deposition at 184:9-185:3.

HIGHLY CONFIDENTIAL                                      JW-SEC-01101917

precise meaning and can be established using statistical tests of model performance.[251] But Dr. Johnson performs no statistical tests to determine whether my Overcharge Regression Analysis suffers from omitted variable bias. As explained in one standard econometric textbook, a "properly specified econometric model" should incorporate explanatory variables that economic theory dictates would be expected to have an effect on the dependent variable.[252] The same publication notes that the question of which explanatory variables to include in the model should "begin with economic theory combined with qualitative knowledge about the industry."[253] It is thus improper to conclude that there is some important omitted factor that affects the performance of the model based solely on the finding of a small, even if statistically significant, effect (the 1.05% "overcharge" in the first half of the Benchmark Period). Indeed, the finding of such effects is common when sample sizes are large (as is the case here) and not probative.

81.    In this analysis, the Benchmark Period that Dr. Johnson analyzes has over 2.8 million observations, so the small effect he finds when arbitrarily comparing the first half of the period to the second half may appear significant when it is likely spurious. Dr. Johnson had no *a priori* reason to make the comparison between the subsections of the Benchmark Period. In his report, he did not identify any structural differences between the two periods or reason to believe there would be such a difference. When the sample size is large, what appears to be a real effect could actually be the result of spurious correlation, especially where the economist running the test has no *a priori* reason to make the comparison. As an example, butter prices in Bangladesh might have a positive and statistically significant relationship to the U.S. stock market. But just because the data might "demonstrate" this relationship, it does not mean that it is meaningful and should be included in an analysis of expected stock returns.[254] In fact, it is widely explained in the academic econometric literature that with a large enough sample, any variable can be statistically significant even if it lacks practical significance.[255] What this feature of regression analysis

---

[251] *See* Wooldridge at pp. 88-92.
[252] *See* ABA, Proving Antitrust Damages at p. 131.
[253] ABA, Proving Antitrust Damages at p. 147.
[254] See Charles Sizemore, "The Bangladesh Butter Indicator Says Buy!" *Forbes*, March 4, 2015. Available at: https://www.forbes.com/sites/moneybuilder/2015/03/04/the-bangladesh-butter-indicator-says-buy/#c953be61df85.
[255] As explained in a publication by the American Statistical Association, "[a]ny effect, no matter how tiny, can produce a small *p*-value if the same size or measurement precision is high enough." See Ronald L. Wasserstein and Nicole A. Lazar, "The ASA Statement on p-Values: Context, Process, and Purpose," *The American Statistician*, Vol. 70, No. 2, 2016 at p. 132. See also, Neil A. Weiss, *Introductory Statistics*. Ninth Edition, Boston, Massachusetts: Addison Wesley, 2012 at p. 386. See also, Stephen Zilliak and Deirdre McCloskey, "The Cult of Statistical

JW-SEC-01101918

**HIGHLY CONFIDENTIAL**

means is that, by virtue of having a large number of observations, a variable may be assigned a coefficient that is precise but that does not actually result in the variable contributing much to the model's ability to explain changes in the dependent variable. Thus, if one wants a reliable and meaningful result, an economist must have a good reason to include a variable in a model.[256] Here, Dr. Johnson fails to articulate a reason why there would be an overcharge during my Benchmark Period, or to justify how the 1.05% difference between two parts of the Benchmark Period invalidates my measurement of overcharges in this case.

82.    Although I believe Dr. Johnson's criticisms are without merit, even if I granted Dr. Johnson's 1.05% finding any weight, my measure of overcharges is robust to including a control for his supposed 1.05% "effect." When I include an indicator variable in my Overcharge Regression Analysis to control for Dr. Johnson's supposed "omitted variable" effect in the first half of the Benchmark Period (that is, I include the same "overcharge" indicator variable that Dr. Johnson includes in the first half of the Benchmark Period), my overcharge percentage changes from 9.5% to 9.2% - meaning that the measured overcharge is practically unchanged.

83.    Dr. Johnson performs the same test using different periods within the Benchmark Period as a "sensitivity" check, and concludes that other breakpoints showed "similar results."[257] However, from Dr. Johnson's backup materials, the test results suggest just what my critique above indicates: that if his test is run by randomly comparing one portion of the Benchmark Period to another with no rationale other than data mining results (as Dr. Johnson apparently did) the result will be random "noise," rather than the identification of some missing variable. For example, when he changes the "overcharge" period during the Benchmark by one month (from October 24, 2012-September 16, 2013 to October 24, 2012-October 17, 2013), the "overcharge" changes from positive 1.05 to negative 1.53. These results illustrate the flaws in Dr. Johnson's approach; it is nothing more than "junk science" masquerading as econometrics and is without the mainstream of standard econometric practice.

---

Significance," *Joint Statistical Meetings*, August 3, 2009 (hereafter "Zilliak and McCloskey") at pp. 2302-2316. "Peter Kennedy, in his A Guide to Econometrics (1985), briefly mentions that a large sample always gives 'significance.'" See Zilliak and McCloskey at p. 2309.
[256] Wooldridge at p. 88.
[257] Johnson Report at n. 174.

60

JW-SEC-01101919

HIGHLY CONFIDENTIAL

## 2. Dr. Johnson's criticism of the explanatory value of the time-varying variables in my model is wrong as a matter of econometrics

84. As explained in the Lamb Report, using multiple regression analysis, I am able to control for variables that would affect IMD prices, including changes in demand over time, changes in manufacturing costs, customer characteristics, product characteristics, and other factors.[258] As explained in the Lamb Report, some of the factors, like the supply and demand and macroeconomic conditions variables vary over time and some, like customer characteristics, do not.[259] Dr. Johnson purports to perform an analysis in which he removes the time-varying factors used in my Overcharge Regression Analysis from the model and finds that the R-squared statistic does not change significantly.[260] Dr. Johnson concludes from this analysis that "the time-varying economic factors in these models have minimal explanatory power," causing the model to attribute "almost all difference in prices to an 'overcharge.'"[261] As a matter of econometrics, Dr. Johnson's approach is fundamentally flawed and yields no reliable information about the performance of my econometric analysis.

85. As Dr. Johnson admits, IMD prices are determined by a combination of time-invariant factors, like product characteristics, geography and purchasing power, and time-variant factors, such as the macroeconomic environment, supply, and demand.[262] Thus, to explain IMD prices in any regression model properly when using disaggregated transaction-level data as I do, a sound econometric analysis must control for both types of factors. Indeed, excluding the time-invariant control variables would leave an incomplete model that suffers from omitted variables bias. Had I failed to control for the effect that, say, customer size has on price, Dr. Johnson surely would have identified that as an omitted variable. Dr. Johnson's claim that the time-varying factors "only" explain 2% of the IMD price variation is irrelevant and misleading, and yields no useful insight into the performance of the model. First, the time-variant factors, like supply and demand, are statistically significant, which means that they meaningfully explain the movement of IMD prices. Second, one would not expect the demand or supply of IMDs to explain the price difference at any given point in time between, say, a hollow core IMD and a solid core IMD

---

[258] Lamb Report at ¶¶ 193-196.
[259] Lamb Report at ¶¶ 199-206.
[260] Johnson Report at ¶ 65.
[261] Johnson Report at ¶ 65.
[262] Johnson Report at ¶¶ 18-21, 31-40 Johnson Deposition at 216:4-8, 308:7-309:11.

61

HIGHLY CONFIDENTIAL                                    JW-SEC-01101920

HIGHLY CONFIDENTIAL

because the type of product plays a large role in the price of an IMD at a given point in time. Thus, Dr. Johnson's claim here is simply the obvious point that variables intended to explain how prices change over time do not explain the difference between prices of different products to different customers at any given point in time. This "finding" says nothing of the explanatory power of the time-varying variables.

86.    One appropriate way to test the explanatory power of my time-varying variables on IMD prices is to control for cross-sectional variation (*i.e.*, to control for the time-invariant factors that affect pricing) and then look at whether the time-variant controls (such as demand, cost, and interest rates) explain the behavior of price over time. I do this by aggregating observations into a time series before running the regression. By consolidating IMD transactions into a time series, I control for any time-invariant variation to prices and allow the time-varying factors to explain the variation in IMD prices over time. The R-squared for this model, using the same time-varying control variables as the Overcharge Regression Analysis, is 0.96, meaning that my time-varying factors explain *96%* of the variation in IMD prices over time. Dr. Johnson's claim with respect to my time-varying explanatory variables is wrong as a matter of econometrics and irrelevant.

### 3. Dr. Johnson's claim that the predicted prices from my Overcharge Regression Analysis purportedly reveals the unreliable nature of my analysis is without merit

87.    Dr. Johnson claims that my Overcharge Regression Analysis is "unreliable" because it does not predict prices that are "close" to the actual transaction prices paid.[263] Dr. Johnson begins his critique of the performance of the Overcharge Regression Analysis by criticizing the reliance on the R-squared statistic.[264] He further supports his claim with a series of graphs that purport to show that my Overcharge Regression Analysis does not accurately predict prices for certain customers buying certain products in certain regions.[265] He then argues that my Overcharge Regression Analysis also does not properly predict the directional change in actual prices.[266] Dr. Johnson concludes from these charts that my Overcharge Regression Analysis does not properly model the "economic processes" that determine IMD prices. I disagree. My

---

[263] Johnson Report at ¶¶ 66-67.
[264] Johnson Report at ¶ 64.
[265] Johnson Report at ¶¶ 69-70, Exhibit 9, Appendix I.
[266] Johnson Report at ¶¶ 75-76, Exhibit 15.

HIGHLY CONFIDENTIAL                                                JW-SEC-01101921

Overcharge Regression Analysis accurately predicts Class members' IMD prices (as evidenced, among other factors, by the near universality of Class members who show evidence of impact under my but-for predicted price analysis).

88.    As an initial matter, Dr. Johnson's evaluation of my Overcharge Regression Analysis is subjective and misleading. My regression methodology fits the predicted value across all transactions of all customers. The value of my method is that it uses all the relevant available data from the appropriate time periods (*i.e.*, the Benchmark and Effective Cartel Periods) on all of the purchases by all of the customers to explain the relationship between IMD prices and supply and demand factors in order to isolate the effect of the Cartel on IMD prices. As I explained in the Lamb Report, standard measures of model performance (the R-squared) show that my Overcharge Regression Analysis explains over 91% of the variation on IMD prices during the Benchmark and Effective Cartel Period,[267] and, as I discussed in Section IV.C.2 above, my demand, cost, and mortgage rate variables explain 96% of the time-series variation in monthly time series of IMD prices. Figure 2 below shows the actual and predicted price values for all transactions. In Appendix D, I present the analogous comparisons of actual versus predicted price values, but by customer. Those graphs also show that my Overcharge Regression Analysis accurately predicts Class members' average IMD prices.

89.    Dr. Johnson cites a few sources that purport to demonstrate that the R-squared statistic is "not a meaningful measure of regression reliability."[268]  But the articles cited by Dr. Johnson do not criticize the reliability of the R-squared statistic nor do they suggest that it is "not a meaningful measure of regression reliability." Instead, they caution that one should not rely solely on the R-squared statistic or to add explanatory variables to a model with the goal of maximizing the R-squared.[269] I do neither. I use economic and econometric theory and

---

[267] Lamb Report at ¶ 212.

[268] Johnson Report at ¶ 64.

[269] Johnson Report at ¶ 64 ("It follows as a corollary that a high R2 does not by itself mean that the variables included in the model are the appropriate ones…;" "Choosing a set of explanatory variables based on the size of the R-squared can lead to nonsensical models;" "…a high R2 does not by itself mean that the variables actually included in the model are the appropriate ones;" "…choosing the model that gives the highest R2…may be dangerous, for in regression analysis our objective is not to obtain a high R2 per se but rather to obtain dependable estimates of the true population regression coefficients…[A] high R2 is not evidence in favor of the model and a low R2 is not evidence against it;" "Students who are first learning econometrics tend to put too much weight on the size of the R-squared in evaluating regression equations. For now, be aware that using R-squared as the main gauge of success for an econometric analysis can lead to trouble.").

HIGHLY CONFIDENTIAL                                                                      JW-SEC-01101922

**HIGHLY CONFIDENTIAL**

information about the IMD market to inform the construction of my pricing regression models. When assessing the reliability of my regression model, I considered the kind of statistical tests an economist would look at to determine if a multiple regression analysis was properly specified. The tests I have considered in determining the reliability of my multiple regression analysis include the R-squared of the multiple regression equation, t-tests for the statistical significance of each of the coefficients, and an F-test of the overall significance of the variables in my regression. Like Dr. Johnson, I also analyze the residuals to assess the fit of the model (*i.e.*, residual analysis). My regression passes all these standard model specification thresholds.



Figure 2: Average Prices Across All IMD Customers
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)

Source: Defendants' transaction data.

90.    Dr. Johnson does not rely on conventional measures of model performance and instead relies on the visual inspection of selected predicted price graphs, which paint a misleading picture of the Overcharge Regression Analysis' overall performance. These visual inspections do not have probative value for assessing how a model with millions of transactions performs. Dr. Johnson also relies on a measure of the mean absolute predicted error for the six largest

64

HIGHLY CONFIDENTIAL

customers for their five largest selling products.[270] For each customer, he predicts IMD prices for each of that customer's top five products and calculates the difference between the actual and predicted prices. Because predicted prices can either over- or under-estimate actual prices, he takes the absolute value of each deviation and calculates the average percent deviation. As an example, suppose an IMD costs $19, $21 $19, and $21 in four consecutive months and a regression model predicted prices of $20, $20, $20, and $20. The average error over those four months would be 0, but the mean absolute error would be $1 (or 5% of the average price). Dr. Johnson may conclude based on this evidence that the model may perform poorly, but that is not an objective determination.

91.     Indeed, that is what he appears to have done with his analysis in Exhibit 12 of some customers and some products.  Dr. Johnson only analyzes seven customers and five products for each of those seven customers to assert that my Overcharge Regression Analysis does not predict the levels of prices accurately. But his analysis is results driven and misleading  As an initial matter, when I calculate the mean absolute percent error across all customers who purchased IMDs during the Benchmark and/or Effective Cartel Periods, I find that it is approximately 5.3%--that is, the customer-wide average is lower than only a handful of his reported mean absolute percent errors.[271] That low level of error given all the purportedly omitted factors Dr. Johnson claims afflict my model. But my finding of a absolute percent variation is consistent with my Overcharge Regression Analysis explaining most of the variation of IMD prices over time with accuracy.

92.     Dr. Johnson's analysis of price directions is similarly misleading. Dr. Johnson predicts transaction-level prices and then aggregates these transaction-level predictions into monthly average prices by customer and product. He then considers any time these aggregated monthly weighted average prices increased or decreased by at least one cent for a given customer and product and assesses whether the predicted price changed in sync. Based on this analysis, Dr. Johnson claims that my Overcharge Regression Analysis does not properly capture the time-

---

[270] Johnson Report at Exhibit 12.

[271] I calculate each customer's mean absolute percent error (excluding all instances where the residual is zero) and calculate the average across all customers.

65

HIGHLY CONFIDENTIAL

**HIGHLY CONFIDENTIAL**

varying effects.[272] But his criteria for determining what constitutes a change in price shows that Dr. Johnson's analysis is designed to show "poor" performance.

93.    Dr. Johnson also claims via visual inspection, which he limits only to the predicted-prices for a handful of customers, that my Overcharge Regression Analysis does not properly account for customer differences.[273] But his visual inspection of predicted prices only (without comparing them to the actual prices) cannot tell one whether my Overcharge Regression Analysis appropriately measures how customer-specific prices move over time. Figure 3 below modifies Dr. Johnson's Exhibit 15 to include both the actual and predicted prices and to plot the national average IMD price for each of the six customer's top product. Contrary to Dr. Johnson's claims, my predicted prices properly model how customers' actual prices in the IMD industry move over time.

### Figure 3: Predicted and Actual Prices for the Top 6 Customers, For their Highest Volume Product.



Source  Defendants' transaction data, Johnson Report work papers
Dropping months with fewer then 25 units of the top product sold

94.    Dr. Johnson's focus on the pin-point precision of the predicted prices is also irrelevant to the question of whether my Overcharge Regression Analysis is measuring the class-wide overcharge accurately. That the variables I include in my model control for and explain over

---

[272] Johnson Report at ¶ 75.
[273] Johnson Report at ¶ 76.

HIGHLY CONFIDENTIAL

JW-SEC-01101925

HIGHLY CONFIDENTIAL

91% of the variation in IMD prices during the Benchmark and Effective Cartel Period is important in order to accurately measure the overcharge. As explained by Dr. Nieberding: "[t]he ability to measure the overcharge accurately depends upon how reliably and precisely the analysis can distinguish the collusive effect on prices from other influences that are unrelated to the anticompetitive conduct."[274] None of Dr. Johnson's analyses is probative on the question of whether the class-wide overcharge was properly measured.

### 4. Dr. Johnson's criticism that the Overcharge Regression Analysis omits regional controls is without merit

95.    Dr. Johnson claims that because my Overcharge Regression Analysis relies on a nation-wide measures of supply and demand (*i.e.*, my cost, demand, and mortgage rate variables), it is "incapable of accounting for differences in economic conditions across regions" and "incapable of distinguishing the *difference* between these factors and the effects of the alleged conduct."[275] To support his claim that there are regional time-varying components, he estimates the relationship between IMD prices and my national demand, cost, and mortgage rate variables for six regions.[276] Dr. Johnson then tests whether the supposed "overcharge" he estimated in the first half of the Benchmark Period (when measured against the second half of the Benchmark Period) varied by region.[277] Dr. Johnson concludes from these sensitivity tests that my Overcharge Regression Analysis cannot distinguish between economic factors omitted from my model and the effects of the Cartel.[278] Setting aside the fact that his focus on his purported finding of an effect in the Benchmark Period is misguided, nothing in Dr. Johnson's discussion of regional variables is relevant to my measure of the overcharge or sufficient to cause me to change my opinion.

96.    The overarching problem with Dr. Johnson's analysis is that even if he were correct that there are "regional economic processes" that determine IMD prices, he fails to establish that if these "regional processes" are omitted, they will lead to a positive bias in my measure of overcharge. As I explain above, for an omitted variable to confound the measure of the

---

[274] Nieberding at p. 363.
[275] Johnson Report at ¶¶ 27, 78 (emphasis original).
[276] Johnson Report at ¶¶ 79-83, n. 200.
[277] Johnson Report at ¶84. In Section IV.C.1 above I explained the myriad of flaws with Dr. Johnson's placebo test. Those same flaws apply to this analysis as well.
[278] Johnson Report at ¶83, 85.

HIGHLY CONFIDENTIAL                                    JW-SEC-01101926

HIGHLY CONFIDENTIAL

overcharge, it must be correlated with the IMD prices and with the overcharge variable. A simple and direct test of the importance of time-variant regional demand and supply variables is to include such variables in the analysis to determine if they result in lower measures of the overcharge. Dr. Johnson could have tested whether including time-variant regional factors would affect the measurement of overcharges by implementing this approach, but he either did not, or if he did he failed to report the results.[279] Dr. Johnson also performed no analysis as to determine how to properly partition regions, which highlights the speculative nature of his analysis.[280]Accordingly, his "tests" are invalid and irrelevant, and fail in establishing the importance of regional variations in demand and supply condition. For example, Dr. Johnson quotes Professor Rubinfeld, who says:

> *Are the damage estimates robust?* It is essential to evaluate the reliability of any estimate of antitrust impact and/or damages. Specifically, one should ask whether the results are unusually sensitive to slight modifications of the assumptions that underlie the model and of the data itself. It is especially important to check to see if the data are themselves reliable, and if reliable, whether any regression results are highly sensitive to one or a few data points. If the assumptions of the model are valid and the data are reliable, a damage study can be highly probative, even if the results are highly sensitive. However, when the assumptions of the model are not valid, standard tests can overstate or understate the significance of the results.[281]

97.    Another reason to doubt his claim is that my analysis does, in fact, control for regional variation in price levels with Class member location fixed effects (specifically, the ship to state). For there to be a meaningful change to my overcharge measure, given that I already control for regional price variation through my Class member location fixed effects, the regional supply and demand factors would have to *change* differently over time than my nationwide supply and demand variables (*i.e.*, be uncorrelated with the nation-wide supply and demand factors).[282] My analysis shows that regional supply and demand factors do not vary differently over time from

---

[279] Johnson Deposition at 244:7-17.
[280] Johnson Deposition at 130:1-12; 239:4-240:9.
[281] Rubinfeld (2008) at p. 741 (emphasis original).
[282] See my discussion on omitted variables and confounding factors in Section IV.C.1 above.

68

HIGHLY CONFIDENTIAL

the national supply and demand factors, thus demonstrating that my model satisfactorily controls for regional variation.

98.    Exhibits 16, 17, and 18 of the Johnson Report show the results of Dr. Johnson's regional "test," where he measures the relationship between IMD prices in a given region with my nation-wide cost, demand, and mortgage rate variables during the Benchmark Period. Dr. Johnson claims that he finds statistically different relationships between regional IMD prices and national demand, cost, and mortgage rates.[283] But the regional differences that Dr. Johnson identifies are not economically substantial—as I explain below, they do not lead to economically meaningful differences in the overcharge, which is the only coefficient of interest in my analysis. This highlights the problem with inferring structural differences from structural break tests implemented in an *ad hoc* manner and thus biased towards finding structural breaks even if they are irrelevant or unimportant, especially when there are millions of observations, as there are here.

99.    Dr. Johnson also revisits his flawed within-Benchmark Period "overcharge" analysis and claims that it finds statistically different "overcharges" across the six regions he analyzes.[284] I previously discussed the flaws in Dr. Johnson's within-Benchmark Period overcharge analysis. Those apply to this analysis as well. Like the results for the regional tests of differences in the supply and demand variables, Dr. Johnson's benchmark "overcharge" test reported in Exhibit 19 shows that four of the regional "overcharge" indicators are not statistically different from each other and a fifth regional indicator is not statistically different from zero. So the results of Dr. Johnson's own tests of the relationship between regional IMD prices and national demand and supply factors shows that controlling for regional time-varying factors is unlikely to add significant explanatory power to the Overcharge Regression Analysis and do not refute or disprove my finding of an overcharge.

   a.    **Regional factors do not vary meaningfully from each other and the national-average over time**

100.    As discussed above, my Overcharge Regression Analysis appropriately includes controls to capture regional effects on IMD prices. If regional demand and supply factors change

---

[283] Johnson Report at ¶¶ 80-83.
[284] Johnson Report at ¶¶ 84-85.

69

HIGHLY CONFIDENTIAL

JW-SEC-01101928

HIGHLY CONFIDENTIAL

differently over time from the nation-wide supply and demand factors I included in my Overcharge Regression Analysis, it could mean that my Overcharge Regression Analysis could benefit from incorporating regional measures of demand or supply. On the other hand, if the regional supply and demand factors are correlated with the nation-wide supply and demand factors, then including regional variables may have little incremental effect to the explanatory power of my Overcharge Regression Analysis. Dr. Johnson does not actually test whether these regional measures of demand (or supply) confound the overcharge measure, but merely asserts that it is so.[285] Moreover, as Dr. Johnson testified at deposition, he did not assess how demand for IMDs varied across regions, or how the costs to manufacture and supply IMDs varied across regions.[286]

101.    To test this proposition, I construct regional demand indices based on regional demand measures for new home construction and repair and remodeling activity based on the U.S. Census regions.[287] I note that Dr. Johnson, at this deposition, testified that despite asserting that there were important regional factors that were omitted from my analysis, he did not construct his own regional demand and supply variables or form an opinion as to what constitutes a "region."[288] Table 2 below shows the correlations between the regional demand indices, which range between 0.7 to 0.86. The regional demand indices are also highly correlated with the demand index I constructed in the Lamb Report, which range from 0.84 to 0.95. These findings show that regional demand factors are highly correlated with each other and with the nation-wide measure of demand I used in the Lamb Report, so that the additional explanatory power that regional time-varying factors may provide to my Overcharge Regression Analysis will not be significant. I note here that with regard to costs, my analysis of costs in the Lamb Report (which Defendants' economists did not criticize) shows that the regional component to costs (labor and

---

[285] Johnson Deposition at 132:7-134:1, 243:6-22.

[286] Johnson Deposition at 140:19-141:5; 130:23-132:22.

[287] There are four Census Regions: (1) Northeast: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, New Jersey, New York, Pennsylvania; (2) Midwest: Indiana, Illinois, Michigan, Ohio, Wisconsin, Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, South Dakota; (3) South: Delaware, Washington D.C., Florida, Georgia, Maryland, North Carolina, South Carolina, Virginia, West Virginia, Alabama, Kentucky, Mississippi, Tennessee, Arkansas, Louisiana, Oklahoma, Texas; and (4) West: Arizona, Colorado, Idaho, New Mexico, Montana, Utah, Nevada, Wyoming, Alaska, California, Hawaii, Oregon, Washington. See U.S. Department of Commerce, Economics and Statistics Administration, and U.S. Census Bureau, "Census Regions and Divisions of the United States." Accessed May 14th, 2020. Available at: https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf.

[288] Johnson Deposition at 244:7-17, 130:1-12.

70

JW-SEC-01101929

freight) account for approximately 20 to 30% of the cost to manufacture IMDs, while all other costs are national. That means that, at a minimum, 70% of the cost to manufacture IMDs will be nearly identical across all regions. It is therefore unlikely that the effect of any regional differences to labor or shipping costs would meaningfully impact the relationship between costs and IMD prices for each region. That regional measures of supply and demand are highly correlated with my nation-wide measure of supply and demand indicates that the addition of regional supply and demand factors to the Overcharge Regression Analysis will not meaningfully change my results.

**Table 2**

| Regional Demand Correlations[1,2] | | | | | |
|---|---|---|---|---|---|
| | Northeast | South | Midwest | West | Lamb Demand[3] |
| Northeast | 1.000 | 0.713 | 0.834 | 0.703 | 0.838 |
| South | 0.713 | 1.000 | 0.808 | 0.859 | 0.952 |
| Midwest | 0.834 | 0.808 | 1.000 | 0.792 | 0.924 |
| West | 0.703 | 0.859 | 0.792 | 1.000 | 0.926 |
| Lamb Demand[3] | 0.838 | 0.952 | 0.924 | 0.926 | 1.000 |

Source: Census Bureau; Department of Housing and Urban Development; National Association of Realtors; Lamb Report work papers.

Notes:

[1]Regional indices are constructed from region-specific housing starts and existing home sales data.

[2]Regions are based on U.S. Census Regions.

[3]Lamb Demand is the national demand measure from the Lamb Report.

### b. My overcharge estimate is robust to regional time-varying factors

102.    To assess whether regional economic factors impact on my overcharge analysis, I re-estimate my Overcharge Regression Analysis including regional measures of demand, which allows for IMD prices in a given region to be explained by time-varying regional demand. I also interact regions with my costs indices and with mortgage rates to also allow IMD prices in a given region to have their own estimated relationship with explanatory supply and demand factors also that vary across regions over time. In addition to using the U.S. Census regions, I also test whether allowing the relationship between IMD prices and economic factors to vary by

71

JW-SEC-01101930

the ship-to-state for each IMD sold and by the six regions Dr. Johnson relied on in his report to incorrectly claim that there were important regional factors that were omitted. Figure 4 below shows the results of including different regional controls to my class-wide overcharge measure from my Overcharge Regression Analysis. These robustness tests demonstrate that, contrary to Dr. Johnson's opinion, controlling for the regional factors does not impact the class-wide overcharge estimate. For example, the percentage overcharge from the Overcharge Regression Analysis is 9.5%; when I add different regional controls, the overcharge estimate ranges from 9.2% to 9.9%. These results demonstrate that Dr. Johnson's claim that omitted factors affect my overcharge analysis is without merit and that the overcharge from my Overcharge Regression Analysis is not biased by the supposedly regional factors Dr. Johnson identified.



Figure 4
Overcharge Estimates when Controlling for Regional Factors

Source  Defendants' transaction data. Johnson Report work papers

Notes
Lamb Report  Overcharge percent from Lamb Report.
Regional Demand  Uses four separate regional demand variables constructed from census regions
Regional Demand. Region Interactions  Uses these regional demand variables and interacts costs and mortgage rates by census region
Ship-to-State Interactions  Interacts demand. cost and mortgage rates by ship-to-state
Johnson Region Interactions  Interacts demand. cost and mortgage rates by Johnson's six regions

103.    As an additional test, I show that controlling for regional factors does not suggest the presence of meaningful regional variation in the overcharge. That is, I find persistent regional overcharges that are similar in size to the class-wide overcharge estimate from my previous report. Figure 5 below shows my measure of regional overcharges based on U.S. Census regions.

72

JW-SEC-01101931

HIGHLY CONFIDENTIAL



**Figure 5**
**Regional Overcharge Estimates Using Census Regions**



Source  Defendants' transaction data

Notes
Regional Demand  Uses four separate regional demand variables based on census regions
Regional Demand, Region Interactions  Uses these regional demand variables and interacts costs and mortgage rates by census region
Region Interactions  Interacts demand, cost, and mortgage rates by census region

104.    In the first set of results, I use the regional demand indices constructed using the four Census regions and regional housing starts and existing home sales. For the second set of results, I use the regional demand indices constructed using the four Census regions and interact cost and mortgage rates by each of the four Census regions. In the final set of results, I interact demand, cost, and mortgage rates by each of the four Census regions. While the regional overcharge estimates vary (as one might expect), they are distributed around the class-wide overcharge estimate presented in the Lamb Report. These results further confirm that the overcharge was broadly felt across Class members and that Dr. Johnson's confounding factors did not, in fact, result in mismeasurement of the overcharge. This analysis is a further robustness test of my Overcharge Regression Analysis.

HIGHLY CONFIDENTIAL    JW-SEC-01101932

**HIGHLY CONFIDENTIAL**

## 5. Dr. Johnson's claim that my model fails to control for competition among IMD manufacturers is without merit and does not make sense as a matter of economics.

105.    Dr. Johnson also incorrectly suggests that another omitted factor is the "nature of competition" among IMD manufacturers during the Benchmark and Effective Cartel Period.[289] Dr. Johnson asserts that I do not control for the changing nature of competitive position during the Benchmark and Effective Cartel Periods.[290] This argument is without merit for several reasons. First, as I discuss above, I specifically control for the competitive market structure in my analysis by tailoring my Benchmark Period to mimic the same market structure as during the Effective Cartel Period by excluding the period prior to Jeld-Wen's acquisition of CMI. Further, Dr. Johnson exaggerates the so-called changing nature of competition. The HHI—a widely used measure of industry concentration—for the IMD market shows that the it only changed by 9% during most of the relevant period, *i.e.*, from 2013 to 2018.[291] This is strong evidence that the competitive landscape was similar across the period I analyzed. Moreover, Dr. Johnson's suggested omitted variable could not explain why IMD prices were *higher* during Effective Cartel Period (from August 11, 2014 to December 31, 2018) than they were during the Benchmark Period (October 24, 2012 to August 10, 2014) given that the IMD market was "less" concentrated in the Effective Cartel Period than the Benchmark Period (the HHI is lower in 2018 than in 2013). Dr. Johnson is suggesting, in effect, that there is more vigorous competition such that the higher prices observed in the Effective Cartel Period would be explained by *lower* industry concentration and more competition, which is economically nonsensical.

106.    While Jeld-Wen's acquisition of CMI represented a meaningful structural change to the industry, the change in independent IMD manufacturers' collective market share is small and unlikely to represent a significant change to the competitive landscape.[292] As I discussed in the Lamb Report, Defendants supply Doorskins to the independents, and thus a loss of share to the independents does not imply that Defendants are forgoing revenues. Finally, Dr. Johnson does not test the impact of this purely speculative omitted variable to see what effect, if any, it would have on my finding of overcharges. I did. In fact, when I modify my Overcharge Regression

---

[289] Johnson Report at ¶126.
[290] Johnson Report at ¶¶ 126-127.
[291] Lamb Report backup to ¶49.
[292] MAS-0000005613 at 5697; MAS-0000005761 at 5822; Lamb Report at Table 1; JELD-WEN-00689388.

74

    JW-SEC-01101933

HIGHLY CONFIDENTIAL

Analysis to control for independents' market share by including a measure of HHI, I observe very similar overcharge results to those in the Lamb Report.[293] This further confirms that Dr. Johnson's claims are without merit.

### D.  *A flexible model that controls for all of Defendants' economists (incorrect) criticisms reaffirms the findings of my Overcharge Regression Analysis*

107.  In Section IV.A-C, I addressed Dr. Carlton's and Dr. Johnson's criticisms of my Overcharge Regression Analysis and found all of their criticisms to be without merit. Nevertheless, in this section, I present a sensitivity analysis where I modify my Overcharge Regression Analysis to: (1) allow for the structure of the IMD market to change between periods; (2) incorporate transactional data for January 2010 to October 24, 2012; (3) control for regional variation in time-varying factors; and (4) allow for the estimated relationship between IMD prices and regional supply and demand factors to vary by customer type (wholesalers, Home Depot, and Lowe's).[294]

108.  To address the possibility that that the relationship between price and supply and demand factors may change for different market structures, I allow my Overcharge Regression Model to be flexible in terms of defining these relationships. This type of modeling specification is employed is consistent with the program evaluation literature concerned with identifying the causal effects of policies or practices, such as a Cartel. The regression model specifications include interactions of the Effective Cartel Period indicator (overcharge) and (demeaned)[295] supply and demand values. This allows for a proper interpretation of the Effective Cartel Period indicator as the effect of the Cartel on prices.[296]

109.  Furthermore, I allow for the supply and demand relationships with price to move based on potential market structure changes across the following four periods: (1) the period before Onex acquired a controlling stake in Jeld-Wen (January 2010 – October 2011); (2) the period

---

[293] I find a very similar overcharge of 8.7%. I note that I do not endorse this analysis for the reasons stated above. Unsurprisingly, the coefficient on the HHI variable is negative because rising IMD prices have coincided with lower industry concentration. I also note that the HHI variable is highly *negatively* correlated with the demand variable.

[294] I use indicator variables for whether a transaction is for Home Depot, Lowe's, or wholesalers. Allowing for these differences allows for the relationship between prices and regional supply and demand to be different for Home Depot, Lowe's, and wholesalers.

[295] Here, "demeaned" means that each variable's "mean" or average value was subtracted from the variable.

[296] Mathematically, interaction of the Effective Cartel Period indicator on supply and demand variables adjusts for the fact that the Cartel changes both the unconditional mean as well as the effects of the control variables on the prices. For more on regression adjustments, see, Jeffrey Wooldridge, *Econometric Analysis of Cross Section and Panel Data*, Second Edition. Cambridge and London: MIT Press, 2010, p. 919.

HIGHLY CONFIDENTIAL

JW-SEC-01101934

HIGHLY CONFIDENTIAL

since Onex's acquisition of Jeld-Wen until Jeld-Wen's acquisition of CMI (October 2011 – October 23, 2012); (3) the Benchmark Period (October 24, 2012 – August 10, 2014); and (4) the Effective Cartel Period (August 11, 2014 – December 31, 2018). By allowing the model to estimate different relationships between IMD prices and the supply and demand factors over the four periods, I can address the issues with those versions of Dr. Carlton's and Dr. Johnson's analyses which incorporate inappropriate Benchmark Periods. Further, this, flexible model also addresses the criticisms raised by Dr. Carlton and Dr. Johnson regarding the supposed change in the relationships between IMD prices and supply and demand factors between the Benchmark and the Effective Cartel Periods.

110.    Although my analyses in Section IV.C above demonstrate that my Overcharge Regression Analysis does not need regional time-varying factors, I also include the same supply, cost, and mortgage regional interactors that Dr. Johnson included in his analyses for Exhibits 16-19 of his report. I further include customer type identifiers to control for different relationships between IMD prices, periods, and regional supply and demand factors based on customer type.[297] As a sensitivity test, I also estimate a version of this model with national supply and demand factors.

111.    The results of these analyses are overcharge findings of 14.1% for the flexible model that incorporates regional supply and demand factors by customer type (Home Depot, Lowe's, wholesalers) and 13.7% for the flexible model that incorporates national supply and demand variable, as a sensitivity. Although for reasons stated in Section IV.A above, I believe the pooled estimate from my Overcharge Regression Analysis to be the superior measure of class-wide overcharges, these analyses reaffirm that my finding of an overcharge was not due to the use of a structurally "unstable" model or due to omitting any of the factors identified (but not tested) by Dr. Johnson.

**V.    Dr. Johnson Offers No Valid Criticisms to Refute My Conclusion That Class-Wide Evidence Demonstrates Injury to All, or Nearly All, Class members**

112.    In the Lamb Report, I demonstrate that there is class-wide evidence to support my conclusion that all, or nearly all, Class members paid higher prices for IMDs as a result of the

---

[297] Dr. Johnson asserts that I failed to model the unique position of retailers so I include customer type identifiers for wholesalers, for Home Depot, and for Lowe's. *See* Johnson Report at ¶ 36.

76

HIGHLY CONFIDENTIAL

Cartel. This analysis proceeded in two steps. First, I demonstrate using class-wide evidence that the Cartel artificially-inflated prices for IMDs, *i.e.* that there was a successful cartel in the IMD market.[298] Having concluded that class-wide evidence establishes that the Cartel successfully and substantially artificially inflated prices generally, I then used other class-wide evidence and analysis to show that not more than a *de minimis* number of Class members could have avoided paying the higher prices that resulted from the Cartel.[299] Dr. Johnson dismisses or ignores much of this analysis. He also fundamentally mischaracterizes my analysis in arguing that, standing alone, the Overcharge Regression Analysis is incapable of demonstrating class-wide impact.[300] While the Overcharge Regression Analysis is reliable evidence of a successful cartel operating in the IMD market during the Effective Cartel Period, and the presence of a successful cartel itself makes it unlikely that many Class members could have avoided its effects, I did not rely solely upon the Overcharge Regression Analysis (or any single piece of evidence) to demonstrate class-wide impact. That is, to reach my common impact conclusion, in addition to the Overcharge Regression (and other evidence capable of showing the Cartel was very likely to have a widespread impact on Class members), I conducted four separate analyses to evaluate whether the impact of the Cartel would have had widespread effects: (1) an analysis of market characteristics; (2) an analysis of how price increases issued during the Effective Cartel Period were widespread and strictly enforced; (3) an analysis of pricing structure, including the Price Correlation Analysis and Product Characteristics Regression Analysis; and (4) an analysis of the predicted but-for prices of individual Class members (the "Predicted But-For Price Analysis"), which analyzes the impact on individual purchasers for individual transactions using my Overcharge Regression Model. Although I considered (1) - (3) sufficient to establish that all, or nearly all, members of the Class were impacted by the Cartel, I also performed the fourth analysis (4) to further support my conclusion. Based on the results of these analyses, I concluded that all, or nearly all, Class members paid artificially-inflated prices resulting from the Cartel. These analyses are summarized below.

---

[298] Lamb Report at ¶¶ 42-215.
[299] Lamb Report at ¶¶ 216-259.
[300] Johnson Report at ¶¶ 48, 53 ("I note that this construction—i.e., Dr. Lamb's assumption that the overcharge is common—precludes the model from assessing impact to individual direct purchasers. That is, the average 9.5 percent overcharge estimate is not evidence for the assertion that all individual direct purchasers were overcharged.").

77

HIGHLY CONFIDENTIAL

113.    After using class-wide evidence in the form of the Overcharge Regression Analysis to demonstrate that the Cartel artificially-inflated prices for IMDs,[301] I began my analysis of common impact by examining the structure of the IMD market and whether that would have led to widespread artificially-inflated prices across the Class.[302] This analysis included a review of record evidence demonstrating that that the allegedly anticompetitive price increases issued during the Effective Cartel Period applied to all, or nearly, all members of the Class.[303] I then analyzed market factors and data to determine if the IMD market could be characterized by a pricing structure—meaning that all pricing across the market is governed by common demand and supply factors and that prices move together over time.[304] To bolster my finding of a pricing structure, I conducted two empirical analyses based on actual transactional prices to see whether the price increases that occurred during the Effective Cartel Period beginning in August 2014 would have been likely to affect all, or nearly all, members of the Class. As I describe below, I conducted several price correlation analyses (sometimes described as "co-movement" analyses) to test whether prices actually moved together across customers and products through the Effective Cartel Period.[305] My Price Correlation Analysis supports my conclusion regarding pricing structure because it show that Class members' prices generally moved together in response to common forces, such as the Cartel. Moreover, the product characteristics regression analysis (also referred to as a "hedonic" analysis) includes monthly regressions showing common characteristics explain almost all of the variation in transaction prices, such that any price increase imposed due to the Cartel would have been experienced class-wide, regardless of the regional location, supplier, product, or size of purchaser.[306] Throughout his report, Dr. Johnson asserts incorrectly that not including individualized determinants to pricing renders my class-wide overcharge measure unreliable;[307] however, the results of my Product Characteristic Regression Analysis show that common characteristics (such as product features) explain on average over 88% of the variation in IMD prices. That is, the individualized components that Dr. Johnson asserts are needed to determine if there was impact to all, or nearly all, members of the

[301] Lamb Report at ¶¶ 42-215.
[302] Lamb Report at ¶¶ 220-227, 240-241.
[303] Lamb Report at ¶¶ 242-252.
[304] Lamb Report at ¶¶ 220-227.
[305] Lamb Report at ¶¶ 228-231.
[306] Lamb Report at ¶¶ 232-239.
[307] *See* e.g., Johnson Report at ¶¶ 1, 63, 66, 77, 85, 101, 132.

HIGHLY CONFIDENTIAL                                        JW-SEC-01101937

Class account for a small proportion of the price setting determinants at any given point in time.[308]

114.    To further confirm and bolster my finding of common impact, using the model estimates from the Overcharge Regression Analysis, I compare the actual prices to the predicted but-for prices to determine transactions where prices paid were above the predicted prices but-for the conspiracy behavior (the "Predicted But-For Price Analysis"). The results of the Predicted But-For Price Analysis confirmed that over 99% of Class members paid net overcharges on IMD transactions and every single class member was overcharged on at least one transaction during the Effective Cartel Period.[309] This too is strong evidence, common to the Class as a whole, demonstrating that all, or nearly all, Class members paid higher prices as a result of the Cartel.[310]

115.    As an additional piece of confirmatory analysis, I also modify my Overcharge Regression Model to estimate customer-specific impact for 225 large customers that account for over 98 percent of class-wide sales. This analysis focuses on the largest customers with frequent purchases, the same customers Dr. Johnson believes have sufficient buyer power to be able to negotiate away an overcharge than smaller customers.[311]   As I discuss below, my analysis finds evidence under this methodology that 95 percent of these larger customers, who were the most likely to be unimpacted, were impacted at a statistically significant level by the Cartel.

### A. Dr. Johnson's conclusion that the Overcharge Regression Analysis cannot, along with other evidence and analyses, assess the question of common antitrust impact is flawed

116.    In the Lamb Report, I explained that, as part of my assignment, I was asked to determine whether there is a sound and reliable method for (1) assessing whether the Cartel artificially inflated prices for the vast majority of Class members; and (2) calculating aggregate damages to

---

[308] I also discussed in Section IV.C.4 Dr. Johnson's flawed claim that the time-varying effects are highly regional and thus not captured my Overcharge Regression Analysis. In fact, when I include these regional time-varying controls in my analysis, I find almost identical overcharges. That is because my Overcharge Regression Analysis, which includes customer and regional controls already accounts for the most important variation in prices from these characteristics. And, as I also showed above, the movement in time of these characteristics is highly related to the movement in time of the supply and demand factors (which, as I described above, explain 96% of the variation in prices over time), so these factors that Dr. Johnson claims were omitted from my analysis do not improve the performance of my model in a meaningful way.

[309] Lamb Report at ¶ 257.

[310] Lamb Report at ¶¶ 258-259.

[311] Johnson Deposition at 98:18-101:20.

JW-SEC-01101938

the Class as a whole. I concluded then and still conclude that I have satisfied both prongs of my assignment.

117.    As shown in Section IV.C. above, all of Dr. Johnson's claims regarding the alleged presence of omitted factors that bias my finding of an overcharge are without merit. Indeed, as I discuss above, when I take *all* of Dr. Johnson's criticisms into account, my Overcharge Regression Analysis produces nearly identical measures of the class-wide overcharge. These robustness tests are further, class-wide evidence, that Defendants successfully raised prices across the board during the Effective Cartel Period.

118.    Dr. Johnson, however, suggests that my Overcharge Regression Analysis is incapable of showing common impact because it fails to address whether:

- "Some customers… faced individualized economic conditions," and

- The Cartel "did not affect all direct purchasers identically."[312]

119.    Dr. Johnson claims that because my Overcharge Regression Analysis does not distinguish between certain "kinds of customer-specific factors," it cannot study impact to all Class members.[313] But that is not accurate. My Overcharge Regression Analysis controls thousands of effects specific to individual Class members by including variables to measure every customer, to account for buyer power, a variable that accounts for the location of each shipment, to account for any regional differences in IMD prices, a variable to distinguish which supplier sold the IMD, to account for price differences among suppliers, and a product ID field that is constructed from the product characteristics of an IMD (including the design, its dimensions, the core type, etc.).[314] As Dr. Johnson recognizes, these factors explain 90% of the variation in IMD prices.[315]

120.    Second, as explained above, I do not rely on my Overcharge Regression Analysis alone to show common impact. Instead, I show common impact by combining the results of my Overcharge Regression Analysis with other supportive evidence and analyses, including, e.g.: (i) Class members' prices are influenced by the same forces of supply and demand and move together over time; (ii) prices at any given point in time are explained by common characteristics

---

[312] Johnson Report at ¶ 97.
[313] Johnson Report at ¶ 97.
[314] Lamb Report at ¶ 205.
[315] Johnson Report at ¶ 65; Johnson Deposition at 176:5-177:23, 181:23-182:3.

HIGHLY CONFIDENTIAL

JW-SEC-01101939

HIGHLY CONFIDENTIAL

as opposed to individualized factors; and (iii) my Predicted But-For Price Analysis which uses my Overcharge Regression Analysis to predict the but-for price for each and every transaction, and, in a second step, compares each predicted transaction price to the actual price paid in each transaction. All the class-wide evidence together demonstrates common impact. Dr. Johnson's discussion of my class-wide Overcharge Regression Analysis and its implications for the assessment of common-impact is erroneous in several respects, as I discuss below.

121.   First, Dr. Johnson's analysis fundamentally misunderstands the purpose of the Overcharge Regression Analysis and the validity of its use here, which is one piece of evidence I consider. Second, Dr. Johnson's analyses do not show that any Class members were unimpacted by the Cartel.[316] Indeed, he admitted he has no opinion about whether any class member was or was not injured or did or did not suffer damages as a result of the alleged Cartel.[317] For instance, Dr. Johnson points to instances where some customers negotiated smaller price increases, or delayed to the implementation of price increase, or "bundled" the price increases on IMDs with some discount on another product, but that is not evidence that the Class members were not overcharged, as discussed in the Lamb Report.[318] This included significant class-wide evidence that Defendants' price increases were communicated to all wholesale customers and were strictly enforced, leading to generally higher prices.[319] In other words, even if there were evidence that some Class members may have paid a different overcharge would not refute that there was common impact (which, as I understand the term, simply means that the challenged conduct caused at least some level of overcharge in a widespread way across the Class). Indeed, Dr. Johnson testified at deposition that he had not seen any evidence or performed any analysis that showed that any class member avoided paying higher prices during the Effective Cartel Period.[320]

122.   Based on my experience in economics, econometric and statistical analysis, the best measure of the overcharge paid by any individual Class member is the single overcharge I calculated from the Overcharge Regression Analysis. I do not base this opinion on the Overcharge Regression Analysis standing alone, but instead, on the results of that analysis

---

[316] Johnson Deposition at 252:16-253:20.
[317] Johnson Deposition at 76:9-78:2.
[318] Lamb Report at ¶¶ 242-252.
[319] Lamb Report at ¶¶ 244-252.
[320] Johnson Deposition at 256:12-18.

81

HIGHLY CONFIDENTIAL

JW-SEC-01101940

combined with abundant additional evidence demonstrating that the effects of the Cartel were likely to have been experienced market-wide (*i.e.*, evidence of market characteristics likely to lead to common effects; evidence of a price structure with common factors governing prices across the Class; and other empirical analyses bolstering my conclusion that Class members' prices are likely to be similarly affected by the Cartel).[321] In other words, where (as is the case here) there is evidence that a successful cartel is likely to have had common effects across a class, as a statistical matter, it is my opinion that the Overcharge Regression Analysis, utilizing all the reliable and appropriate transaction data for all Class members, is the best estimate of any single individual Class member's overcharge. This is true as a matter of statistics and econometrics because the Overcharge Regression Analysis uses all the available reliable data during the Benchmark and Effective Cartel Period, thus maximizing the statistical precision of the overcharge it estimates.[322]

123.    As a matter of econometric practice, pooling reliable data for the relevant time period being analyzed will generally yield more robust statistical results.[323] Indeed, pooling observations from all Class members results in a measure of the overcharge that is subject to less variability and less error than other methods. In particular, my Overcharge Regression Analysis would involve far less error than would result if one used only a single Class member's purchases to measure its overcharge. In fact, the advantages of pooling data across all Class member transactions over time is widely recognized in the econometrics literature.[324] As explained in one authoritative academic textbook, "[b]y pooling [data] drawn from the same population, but at different points in time, we can get more precise estimators and test statistics with more power."[325] In other words, by combining data reflecting multiple transactions from

---

[321] I use the term "best" here not in a general way, but as a term of art in statistical analysis. A statistical estimate is "best" when it reduces the uncertainty surrounding the measure or estimate of the variable in question. That is, the "best" estimate, among three to be considered, is the one which reduces the statistical variance, or uncertainty in the estimate. (Wooldridge at pp. 320.) This requires an estimate to incorporate available reliable information about the market structure and the factors affecting price. But in the context of measuring the effect of an alleged cartel, that means incorporating an understanding of how the cartel was alleged to have operated, *i.e.* were there product-specific price increase announcements? Were price increase announcements regional or national? Is the market one in which non-price factors predominate, meaning price increases per se are more likely to be bid away?

[322] ABA Section of Antitrust Law, Econometrics. 2005 (hereafter "ABA Econometrics"), at p. 223.

[323] Wooldridge at pp. 54, 174-175.

[324] Cheng Hsiao, *Analysis of Panel Data*, 2nd Edition, Cambridge, UK: Cambridge University Press, 2003, Chapter 1; Jackson Skinner at pp. 198-201.

[325] Wooldridge at p. 449.

82

    JW-SEC-01101941

HIGHLY CONFIDENTIAL

hundreds of different purchasers across multiple regions over time in the Overcharge Regression Analysis, I am able to generate a more statistically robust measure of the overcharge.

1. **My Overcharge Regression Analysis, combined with other evidence and analyses, demonstrates all, or nearly all, Class members were subject to an overcharge**

124.    Dr. Johnson argues that because the members of the Class varied in size and by sector they serviced (retail vs wholesale), their different abilities to negotiate prices and discounts implies that the impact from the Cartel would not have been experienced identically for all Class members.[326] The fundamental problem with Dr. Johnson's assertion is straightforward: a class member's ability to negotiate discounts and rebates (including from bundling products) relative to its buyer power and market factors exists in both the actual and but-for worlds. A large powerful member of the Class will, presumably, be interested in maximizing its buyer power to negotiate the lowest price it can, relative to smaller purchasers in a world with or without the Cartel. Dr. Johnson offers no economic basis to believe that the presence of an effective cartel – one that caused prices to increase substantially over levels that would have prevailed in its absence for a substantial period of time – would somehow only extract surplus from small buyers and not large buyers. As a matter of economics, this makes no sense given that raising the costs to only small buyers would likely disadvantage and potentially drive the Defendants' higher paying buyers out of business.

125.    Indeed, the record evidence demonstrates that Defendants were concerned with that very issue and attempted to ensure that price increases were widespread and uniform. For example, in March 2018, Paul Conley from El & El Wood, a direct purchaser of Masonite, messaged Masonite's John Beeken in response to price increase letter. In response to Mr. Conley's clarification that its competitors had not received price increases, Mr. Beeken wrote:

> **WE [sic] will continue to be even handed in how we approach pricing in markets. We can't provide exceptions to one customer and not another**. Its particularly important in markets like Phoenix where we now have three interior door distributors. I can't comment on Huttig's pricing practices but obviously you can't make a business run on cost in the long run, however I know their manager's MO is to be driven by volume. Having a meeting with the New Western VP when I am out there next week. At the same time both Huttig and

---

[326] Johnson Report at ¶¶ 36, 41.

HIGHLY CONFIDENTIAL

JW-SEC-01101942

HIGHLY CONFIDENTIAL

Rugby continue to claim you guys are driving the market down. It's really turned into a very ugly situation in both markets everyone seems to want to point fingers at each other. **I believe our best and only course of action in the market is to deliver the pricing as stated across the board and let the volume cards fall where they may**. You guys should have incredible pricing power based on your inventory commitment and should certainly be paid accordingly. Hopefully James has been discussing with you our pricing approach with you all in doing something different with Warehouse pricing to put you in a position that allows you to make some more margin there under the air cover of the broader increase and protect your bottom line should we mutually leak some busines[sic].[327]

126.    In another email between El & El Wood and Masonite, Mr. Beeken confirmed to Mr. Conley that BMC Stock Holdings, Inc. – the second largest class member based on purchase volume[328] – "took the price increase and its effective July 1 with the exception of Atlanta and Salt Lake effective Aug 1."[329] Mr. Beeken concludes the email chain stating that it "[w]ouldn't have been much of a price increase without BMC," which confirms that it would not have been in Defendants' interest to not increase IMD prices to all of their customers, including in particular the largest ones from whom they extract most of their revenues.[330]

127.    I discuss below a series of sensitivity tests of my Overcharge Regression Analysis that further demonstrate that all, or nearly, all members of the class were impacted by the Cartel: (i) an analysis that shows overcharges were experienced across all regions and all years; and (ii) an analysis that shows measures of individual overcharges for the largest customers that had sufficient data to be analyzed. Although for the reasons discussed above I do not think these analyses are necessary to prove class-wide impact, they demonstrate that even after taking Dr. Johnson's criticisms into account—however unnecessary—I still find evidence that all, or nearly all, members of the Class were impacted by the Cartel.

---

[327] Conley Deposition Exhibit 273 (emphasis added).
[328] Johnson Report Exhibit E1; *see also*, Appendix E.
[329] Conley Deposition Exhibit 274.
[330] Conley Deposition Exhibit 274.

84

JW-SEC-01101943

HIGHLY CONFIDENTIAL

**a. My Overcharge Regression Analysis can be used to show that the overcharge was pervasive across all regions and all years the Cartel was alleged to be in effect**

128.    In Section IV.C.4, I demonstrated that robustness tests of my Overcharge Regression Analysis show that, when controlling for regional time-varying factors, my analysis shows that purchasers from all regions were overcharged by the Cartel. The findings from the robustness tests to my Overcharge Regression Analysis further demonstrate that my measurement of class-wide overcharges, taken together with the other evidence discussed above, is sufficient to show common impact.   One additional test of the robustness of my model is to assess whether the class-wide overcharge is sensitive to time and region. If I find overcharges for every region and for every year, this would be further evidence that all, or nearly all, members of the Class were impacted by the Cartel. Figure 6 shows the results of my Overcharge Regression Analysis by region and year, which further confirm that all, or nearly all, members of the Class were impacted by the Cartel. In these models I modify the Overcharge Regression Analysis from the Lamb Report to allow for different time-varying regional demand, cost, and mortgage effects, and to allow the overcharge to be estimated by region and by year.[331] That my model finds evidence of systemic class-wide overcharges for each year and for each region in Dr. Johnson's analysis is further evidence that all, or nearly all, members of the Class were impacted by the Cartel.

---

[331] I use the regional controls that Dr. Johnson employs in Exhibits 16-19.

85

HIGHLY CONFIDENTIAL

JW-SEC-01101944



Figure 6
Overcharges by Year and Region Using Regional Supply & Demand

Source: Defendants' transaction data; Johnson Report work papers.

### b.  A Customer-specific overcharge regression analysis for a sample of the 225 largest customers provides further proof of class-wide impact

129.    Dr. Johnson argues that because (i) customers negotiate prices bilaterally; and (ii) there are regional economic factors that determine IMD prices, it is imperative that any overcharge analysis of impact be on a Class member by Class member basis.[332] As I have demonstrated in the Lamb Report, this is not so. First, as a practical matter, I have presented a series of analyses that take into effect the regional time-varying factors that Dr. Johnson contends are missing from my analysis and found his claim that omitting those factors confounds the overcharge to be

---

[332] Johnson Report at ¶¶ 95, 102 ("Second, the approach assumes that the single 9.5 percent 'overcharge' adequately represents the experiences of individual direct purchasers. I have discussed how the product line review process for retail customers, the individualized bilateral negotiations, as well as the practice of price announcement exceptions all result in individualized IMD prices. All this evidence demonstrates that the experiences of hundreds of proposed Class members cannot be captured with a single overcharge.").

86

JW-SEC-01101945

HIGHLY CONFIDENTIAL

meritless. More importantly, I also found that my measure of overcharges is robust to these regional factors.

130.    Furthermore, with reference to estimating a customer-specific overcharge, statistical theory dictates that when looking at subsamples of a broader dataset (which is what the customer-specific overcharges measured here represent), coefficient estimates from a multiple regression analysis will show some variation as a matter of statistical inference and estimation. This is because all statistical analysis is based on data that exhibits some randomness around the true relationship. I explain above why, as a matter of statistics, the single overcharge arising from the Overcharge Regression Analysis provides a superior measure of each Class member's overcharge compared to the individual overcharges measured by a customer-specific regression model. This conclusion neither invalidates the utility of the customer-specific regression model for confirming common impact, nor does it imply that each Class member actually suffered the exact same overcharge.

131.    Below, I present the customer-specific overcharge estimates corresponding to the Overcharge Regression Analysis modified to incorporate Dr. Johnson's regional time-varying factors.[333] This customer-specific Overcharge Regression Analysis takes as true for the purposes of this analysis Dr. Johnson's main criticisms of my Overcharge Regression Analysis (which I do not accept, for the reasons outlined in this report). I specified the customer-specific Overcharge Regression Analysis on a set of the 225 largest customers that met the following criteria: (1) they are one of the 200 largest customers by sales dollars during both the Benchmark and Effective Cartel Periods; and/or (2) the customer has more than 350 observations. The reason I limited my analysis to these 225 customers are the following: (i) as I explained above, the precision of an overcharge estimate decreases as the sample size gets smaller, and these 225 customers represent 98% of class-wide purchases; (ii) Dr. Johnson criticizes an analysis put forth by Dr. Mangum because it has "as few as 347 observations,"[334] so my analysis was designed to analyze customers with more observations than that; and (iii) Dr. Johnson suggests in his report

---

[333] I use the same interaction of the national supply and demand variables by the six regions Dr. Johnson uses in Exhibits 16-18 of his report.

[334] Johnson Report at ¶¶ 117. Dr. Johnson criticizes Dr. Mangum's analysis because it is "based on running separate regressions for the top 100 customers—some on as few as 347 observations." I note that Dr. Johnson's criticism of Dr. Mangum's analysis supports using a pooled class-wide model.

87

JW-SEC-01101946

HIGHLY CONFIDENTIAL

that an individual customer's buying power would enable them to "avoid" an overcharge.[335] As such, limiting this test to these 225 customers enables me to test his hypothesis that the largest customers, with a sufficient number of transactions, could potentially avoid paying overcharges entirely. I find that the statistical evidence from this analysis confirms my conclusion that all, or nearly all, members of the Class were impacted by the Cartel and contradicts Dr. Johnson's untested hypothesis that large customers would have been able to avoid paying an overcharge.

132.    Table 3 summarizes the results of my customer-specific overcharge analysis. For the 225 customers I analyzed, I find that 95.6% of the customers (or 215 customers out of 225), representing 97.9% of sales to the 225 customers I analyzed, had customer-specific overcharges that were positive (i.e., were impacted). I also find that 213 of the 225 customers (94.7% of the 225 customers I analyzed), representing 97.5% of sales to the 225 customers I analyzed, had evidence of overcharges that were statistically significant at the 5% confidence level.[336] I note that this analysis, which specifically and separately evaluates Lowe's and Home Depot, confirms that both paid overcharges. These findings of near universal impact for the largest 225 further supports my conclusion that all, or nearly all, Class members were impacted by the Cartel for two reasons. First, that this test of impact fails to find additional statistical evidence of impact for a handful of customers is consistent with statistical properties and within the statistical margin of error that implies that this finding is due to random noise.[337] [338] Second, because there was evidence of near-universal impact for the largest customers, who possess greater buyer power, one can infer (given the evidence of class-wide overcharges, the pricing structure to IMDs, and my Predicted But-For Price Analysis) that all other Class members were impacted by the Cartel.[339] This finding directly contradicts Dr. Johnson's untested assertions that "[m]any large purchasers were able to negotiate unique arrangements and individualized discounts, sometimes avoiding allegedly conspiratorial price increases entirely" and "[r]etailers would leverage their bargaining power to avoid price increases from Defendants."[340]

---

[335] Johnson Report, ¶¶4, 35, 91.

[336] Both named plaintiffs, Grubb Lumber and Philadelphia Reserve Supply Co. ("PRSCO"), have statistically significant overcharge coefficients under this analysis.

[337] There are 2% (or 5 out of 225) customer-specific overcharge estimates that are negative and statistically significant. These results found fewer "uninjured" than one would expect to find due to random chance.

[338] The customers for whom this analysis does not add additional support that they were impacted by the Cartel can be identified based on the transactional data used in this analysis.

[339] Johnson Deposition at 101:6-16.

[340] Johnson Report at ¶¶ 4, 35.

HIGHLY CONFIDENTIAL                                                    JW-SEC-01101947

HIGHLY CONFIDENTIAL

**Table 3**

**Overcharge Regression Analysis with Customer-Specific Overcharges and Regional Economic Factors[1]**

|  | Top Purchasers[2] | 5% Level[3] |
|---|---|---|
| Impacted Class Members | 215 | 213 |
| Share of Class Members Impacted[4] | 95.6% | 94.7% |
| Impacted Dollars | $ 2,709,077,519 | $ 2,696,757,132 |
| Share of Dollars Impacted[4] | 97.9% | 97.5% |

Source: Defendants' transaction data; Johnson Report work papers.

Notes:

[1] Regions are Central, Mid-South, Northeast, South Central, Southeast, and West as used in the Johnson Report.

[2] Top Purchasers refer to the top 200 customers with the highest net sales during the combined benchmark and class period, and 25 additional customers who had more then 350 transactions during the benchmark and class period, and at least one transaction in each period.

[3] Overcharges are significant at the 5% level.

[4] Share is calculated based on the 225 Top Purchasers.

133.    The results of customer-specific Overcharge Regression Analysis for 225 of the largest customers are consistent with the pooled overcharge estimate (my Overcharge Regression Analysis) from the Lamb Report.[341] The results from this analysis, along with the discussion in Section IV.A above, confirm my use of the pooled class-wide overcharge estimate to conclude that all, or nearly all, members of the Class were impacted by the Cartel. Figure 7 below shows the distribution of the 225. These results confirm my class-wide overcharge of 9.5% is representative of customer-specific overcharge estimates from the Overcharge Regression Model.

---

[341] Lamb Report at ¶¶ 211-215.

HIGHLY CONFIDENTIAL

JW-SEC-01101948

HIGHLY CONFIDENTIAL



Figure 7
Distributions of Overcharges for Customer - Specific Overcharge Analysis

Source: Defendants' transaction data; Lamb Report work papers.

> Note: Each bar shows the percentage of the 225 customer-specific overcharge estimates (along the Y-axis) according to the size of the overcharge estimate (along the X-axis).

**2. Dr. Johnson does not refute that my Predicted But-For Price Analysis demonstrates that all, or nearly all, Class members were impacted by the Cartel**

134.    My analysis of predicted "but-for" prices (prices that would have been paid "but-for" the Cartel) confirms my conclusion that all, or nearly all, members of the Class paid the higher price that arose as a result of the alleged Cartel.[342] For this analysis, I started with the same model used for my Overcharge Regression Analysis and used the model to as the first step, and then after having found a substantial and significantly significant overcharge, implemented a second step to predict but-for prices for each transaction during the Class Period (from October 19, 2014 to December 31, 2018). From there, compared the but-for price that the model predicted for that transaction to the price the Class member actually paid in that transaction. If the actual price exceeded the but-for price, then I considered that transaction as having been subject to an

---

[342] Lamb Report at ¶ 253.

90

HIGHLY CONFIDENTIAL

JW-SEC-01101949

overcharge (*i.e.*, impacted by the Cartel).[343] This type of analysis, where the actual and predicted prices are compared to evaluate model performance, is called a residual analysis because it uses the residuals from the model, or the difference between actual and predicted values, as a means to assess the transaction-level overcharge.[344] This analysis can serve to measure how systematically different a class member's overcharge is from the class-wide measure. One way to evaluate this analysis is posited by Dr. Johnson. If my Overcharge Regression Analysis does not predict Class members' actual prices well, then it will have large residuals and show that many Class members are not impacted. But my analysis finds the opposite. Figure 8 below shows the distribution of the Class members' net overcharges based on predicted but-for prices.



Figure 8
Distribution of Customer Overcharges from the Predicted But-for Analysis

Source: Defendants' transaction data; Lamb Report work papers.

---

[343] Lamb Report at ¶¶ 254-256.

[344] Residual analysis is where residuals are examined for individual observations. See Wooldridge at p. 211. Dr. Wooldridge states, "[i]t is useful to examine individual observations to see whether the actual value of the dependent variable is above or below the predicted value; that is, to examine the residuals for the individual observations" and this process, called residual analysis, "plays a role in legal decisions."

91

JW-SEC-01101950

135.    Dr. Johnson purports to assess my Predicted But-For Price Analysis as "predisposed to find what it labels 'impact'" and therefore unreliable for "assessing impact to the proposed Class."[345] To support his claim, he purports to identify the proportions of transactions or purchasers that he believes appear to be unimpacted by the Cartel which he claims demonstrate that the experience of all Class members cannot be captured with "a single overcharge."[346] For example, Dr. Johnson claims that my Predicted But-For Price Analysis finds that 16.4% of transactions during the Class Period were "unimpacted" and that 317 out of 463 Class members had at least one transaction that was not impacted.[347] Dr. Johnson also performs a series of tests that purport to show that customers were overcharged when the aggregate measure of overcharges is zero. In one test, he predicts "but-for" prices only on the Benchmark Period and finds that 25% of customers have a net positive "overcharge."[348] In his second test, he first removes the class-wide overcharge percentage (9.5%) from the actual prices paid by Class members and compares these actual prices less 9.5% with the but-for predicted prices from my But-For Predicted Price Analysis.[349] By removing 9.5% across all actual prices, he fixes the net "overcharge" at zero. Under this test, Dr. Johnson finds that 49% of customers have a net positive "overcharge." Dr. Johnson's findings neither refute my analysis nor find that any Class members were not impacted by the Cartel.

136.    As an initial matter, Dr. Johnson's findings that 16.4% of transactions were unimpacted in the Class Period means that approximately 83.6% of transactions were impacted during the Class Period. These impacted transactions were distributed across all Class members. As I discussed above, my Predicted But-For Price Analysis does not identify a single Class member that did not have at least one unimpacted transaction. If there were in fact *no* overcharge in the first step, a prediction model would be likely to find that 50% of transactions have an impact with a net average overcharge of zero.[350] A statistical analysis of my findings (that over 83% of transactions, representing 6.4 million out of 7.6 million transactions, were impacted)

---

[345] Johnson Report at ¶ 105.
[346] Johnson Report at ¶¶ 102-103.
[347] Johnson Report at ¶ 103.
[348] Johnson Report at ¶ 105.
[349] Johnson Report at ¶ 105.
[350] ABA, Proving Antitrust Damages at p. 141; Wooldridge at p. 24.

92

JW-SEC-01101951

**HIGHLY CONFIDENTIAL**

demonstrates that it is very unlikely that my finding of class-wide impact is due to randomness.[351]

137.    Dr. Johnson's second set of analyses misapplies my Predicted But-For Price Analysis to show that my analysis finds impact where there is none. As I explained in the Lamb Report, the Predicted But-For Price Analysis proceeds in two steps:[352]

1)  I determine whether my Overcharge Regression Model produces a material and statistically significant overcharge; then

2)  I calculate the but-for prices for each transaction and compare the predicted but-for prices to the prices actually paid in each transaction. Transactions where the actual price is greater than the but-for predicted price are considered overcharged.

138.    Dr. Johnson misapplies the Predicted But-For Price Analysis. As I stated above, the analysis proceeds in two steps, and one only moves to the second step if the first step produces an economically substantial and statistically significant overcharge in the first step. Here, I found a 9.5% overcharge in the first step, and so it made sense to determine how widespread that overcharge was likely to be across transactions and class members. Dr. Johnson's tests of my prediction model, however, are implemented assuming that the first step is not satisfied, i.e., that the model produces no overcharge at all. That is an improper use of the model. If there is no overcharge in the first step, it makes no sense to see how widespread it would be across the class. So Dr. Johnson's analyses are all wrong from their inception. He then uses those incorrect analyses to claim that my prediction model is biased towards finding an overcharge, because his improper use of my test finds that 49% of customers (when 9.5% is subtracted from the actual price) in his analysis have a net positive overcharge.[353] Dr. Johnson is wrong and fails to support his assertion. As an initial matter, my analysis, when applied to the Effective Cartel Period, find that over 99% of Class members (including Home Depot and Lowe's) were impacted by the

---

[351] Dr. Johnson reports that 1.2 million out of 7.6 million transactions were unimpacted (or 6.4 million transactions were impacted). see Johnson Report at ¶ 103. Assuming there is no overcharge, then I assume that all transactions have an equal probability of 0.5 that the actual price would be below the predicted price. Using the binomial distribution, where each transaction is interpreted as an independent Bernoulli trial, the likelihood of having 6.4 million or more overcharged transactions out of the total 7.6 million total transactions is 0.000. We would reject the null hypothesis that there was no overcharge or that the probability of there being an overcharge is greater than 0.5.
[352] Lamb Report at ¶ 255.
[353] Johnson Report at ¶ 105.

93

    JW-SEC-01101952

**HIGHLY CONFIDENTIAL**

Cartel. Dr. Johnson's finding (of 49% "impact") is evidence that my finding of near-universal impact is not due to random chance.

139.    Overlooking the impropriety of Dr. Johnson comparing his analysis to my Predicted But-For Price Analysis, Dr. Johnson's "finding" does not demonstrate that my analysis is tilted towards finding impact nor does it disprove my conclusion. Indeed, because the predicted prices from a regression have an average residual of zero, it implies that approximately 50 percent of transactions over-estimate the actual price and 50 percent under-estimate the actual price. Under the proposition that there are no class-wide overcharges, the probability of finding that more than 99% of 463 Class members were overcharged on net due to random chance is near zero. Indeed, my finding of near universal impact under this methodology is consistent with my finding of near universal class-wide impact when I estimate Class-member specific overcharge coefficients for the 225 large Class members. Therefore, these results bolster my conclusion that all, or nearly all, Class members were impacted by the Cartel.

### B. Dr. Johnson's argument that the Pricing Structure Analysis in the IMD industry is incapable of establishing class-wide impact is wrong and irrelevant

140.    As a general matter, a pricing structure exists in a market when prices are determined by common demand and supply factors so that prices move together in response to changes in those factors. Dr. Johnson's attempt to refute my pricing structure analysis as having an "inherent lack of objective basis" is without merit.[354] Dr. Johnson bases his specious claim that "pricing structure" is not a valid economic concept on a single self-authored article published in *Antitrust Magazine*.[355] *Antitrust Magazine* is not a peer-reviewed academic journal in the field of economics, and it is not a scholarly economics journal.[356] This article contains no statistical test, no formal hypothesis at all, and is merely a "thought piece;" it is not authoritative and it is not economic research. As I clearly state in the Lamb Report, "establishing that there is a pricing structure in the IMD market…means that the prices paid by members of the proposed Class tend

---

[354] Johnson Report at ¶ 107.

[355] John H. Johnson and Gregory K. Leonard, "In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings," *Antitrust Magazine*. Summer 2008.

[356] RePEc, a service hosted by the Economic Research Division of the Federal Reserve Bank of St. Louis, does not list Antitrust Magazine anywhere in its list of 1,000 of the top research publications in Economics and related fields, based on the number of citations a publication receives within the economics literature. See RePEc, "RePEc/IDEAS rankings." Accessed on: June 5, 2020. Available at: http://ideas.repec.org/top/.

HIGHLY CONFIDENTIAL

JW-SEC-01101953

HIGHLY CONFIDENTIAL

to move together in response to market forces… Prices for a given product are determined by the relative levels of supply and demand in the market…by the same market forces, thus creating a pricing structure."[357]

141.    Contrary to Dr. Johnson's article, pricing structure is a concept that is firmly grounded in economic theory. Pricing structure is merely the generalization of the Law of One Price, which says that the price for a commodity product at the same point in the distribution chain, or for the same commodity product at the same place and the same time, must be the same across suppliers because otherwise there are arbitrage opportunities (a customer buying a product for less could sell it to another customer for more, thereby making risk-free profits).[358] This fundamental principle of economics means that prices in a market must be determined by the same economic forces. Pricing structure, properly understood, represents the extension of the Law of One Price to more realistic market settings in which customers differ by size, bargaining power, demand for certain product features and where products reflect differing characteristics. A pricing structure is especially likely to exist in markets for commodity products such as IMDs, where the features of the product can be reduced to an identifiable and limited number, and competition is principally based on price. Courts in cases in which I have testified have routinely relied on my own pricing structure analysis in class certification in matters.[359]

142.    If prices were not subject to pricing structure, then controlling for customer-level differences, differences in product, and systematic differences in manufacturer, the Overcharge Regression Analysis of IMD prices would show a very low R-squared, statistically insignificant demand and cost coefficients, and no effect from the Cartel. But this is not the case, as I explained in Section IV.C above. In addition, if there was no pricing structure, the Price Correlation Analysis would not have shown that prices paid by large purchasers, which would be able to exercise buyer power in customer-specific ways, are highly correlated.[360] Further, the

---

[357] Lamb Report at ¶¶ 220-221.

[358] Walter Nicholson, *Microeconomic Theory*, Seventh Edition, Orlando, FL: The Dryden Press/Harcourt Brace College Publishers, 1998 at p. 460.

[359] United States District Court Central District of California, *In re: Aftermarket Automotive Lighting Products Antitrust Litigation*, 2:09-ml-02007, 2011; United States District Court District of Maryland, *In re: Titanium Dioxide Antitrust Litigation*, 10-cv-0318 (RDB), 2013; United States District Court Eastern District of Pennsylvania, *In re: Domestic Drywall Antitrust Litigation*, 2015; United States District Court Northern District of Ohio, *In re: Polyurethane Foam Antitrust Litigation*, 1:10-md-02196, 2016.

[360] Lamb Report at ¶¶ 228-231.

HIGHLY CONFIDENTIAL

JW-SEC-01101954

HIGHLY CONFIDENTIAL

Product Characteristics Regression Analysis confirms the existence of a pricing structure: it shows that common characteristics explain on average more than 88% of the variation in transaction-level prices in a given month.[361]

143.    Moreover, as discussed in the Lamb Report, pricing structure tends to be present in markets where firms and their customers are influenced by a common set of factors affecting demand and supply.[362] When firms face common supply factors, especially when marginal costs are driven by the same factors, they tend to price their products similarly. Cartel behavior is like a supply factor, which has market consequences on prices and quantities supplied to the market.[363] Buyers can be likewise affected by the same economic factors, and their willingness to purchase a good at a given price, *i.e.* demand, will tend to create a structure to the prices they pay in the market. As I state in my previous report, if there is a pricing structure, it is unlikely that any member for the Class could have avoided paying a least some prices that were artificially inflated by the Cartel during the Effective Cartel Period.[364]

### 1. Dr. Johnson fails to refute that my Price Correlation Analysis is evidence of a pricing structure

144.    As discussed in the Lamb Report, I performed a Price Correlation Analysis to test existence of a pricing structure.[365] Specifically, my Price Correlation Analysis tested whether, and then showed that, prices for IMDs sold by different suppliers to different members of the Class were highly correlated.[366] Because the Price Correlation Analysis shows that the largest Class members' prices and the prices of IMD products tend to move together over time, they also serve to show that an economic force, such as the Cartel, would have applied to all Class members. The only counterargument Dr. Johnson provides to my Price Correlation Analysis is

---

[361] Lamb Report at ¶¶ 232-239.
[362] Lamb Report at ¶ 216.
[363] Dr. Johnson testified that a cartel could operate like a supply factor, See Johnson Deposition at 98:3-17.
[364] Lamb Report at ¶216.
[365] Lamb Report at ¶¶ 228-231.
[366] Lamb Report at ¶¶ 229-230.

HIGHLY CONFIDENTIAL                    JW-SEC-01101955

**HIGHLY CONFIDENTIAL**

that I only applied them to 20 (of over 450) Class members, and thus in his view that are not representative.[367] Dr. Johnson is wrong.

145.    As an initial matter, the Price Correlation Analysis directly refutes Dr. Johnson's assertion that my Overcharge Regression Analysis needs to account for individual negotiations to demonstrate common impact, due to differences between retailers (of which there are only two: Home Depot and Lowe's) and wholesalers and differences due to buying power and bundling IMD with non-IMD products.[368] Dr. Johnson emphasizes these differences to diminish my model and infer that a pricing structure could not exist. However, the correlation analyses show that even the prices of the largest retailers (Home Depot and Lowe's) and wholesalers, with the most buying power, are subject to a common supply and demand forces—which directly supports the existence of a pricing structure. Similarly, the high correlations of prices for even the products that are the most popular show these prices are subject to a common supply and demand— further supporting the existence of a pricing structure.

146.    To refute these findings, Dr. Johnson performs a highly implausible "analysis" that shows how one impacted customer can have highly correlated prices with an unimpacted customer under a long-term contract.[369] This hypothetical exercise is irrelevant to my Price Correlation Analysis, which is grounded on actual prices paid by Class members over time and where customers were not subject to long-term contracts so the changes in customers' prices over time reflect economic forces.

## 2. **Dr. Johnson's criticism of my Product Characteristic Regression is irrelevant and does not refute that common characteristics explain nearly all of the variation in IMD prices**

147.    As discussed in the Lamb Report, I performed a Product Characteristic Regression analysis (also referred to as a "hedonic" regression"), which demonstrated that IMD prices at any given time are explained by common factors, such as product characteristics, shipping location,

---

[367] Johnson Report at ¶ 113. Dr. Johnson insists that the Price Correlation Analysis need show impact. However, in the Lamb Report the Price Correlation Analysis is used to support the existence of a pricing structure, in the absence and during the existence of a Cartel.

[368] Johnson Report at ¶ 3.

[369] Johnson Report at ¶¶ 115-116.

HIGHLY CONFIDENTIAL                    JW-SEC-01101956

HIGHLY CONFIDENTIAL

and distribution channel.[370] The results of the product characteristic regressions demonstrate that common factors explain, on average, over 88% of the variation in IMD prices at any given point in time.[371] These regressions purposefully omit customer-specific effects to assess what portion of transaction-prices are determined by common factors versus individualized factors. If IMD prices at any given point in time are largely determined by common factors and how prices vary over time is largely determined by common economic factors (as the Price Correlation Analysis shows) then that means that factor artificially inflating IMD prices (such as the Cartel) would result in injury to all, or nearly all, members of the Class.

148.    Dr. Johnson does not directly refute my analysis; in fact, he acknowledges that common factors explain "so much of the variation in IMD prices."[372] Instead he focuses on two unrelated and irrelevant critiques: (1) that my Product Characteristic Regression do not study how prices paid move over time;[373] and (2) they do not study how customer-specific factors affect prices paid.[374] But Dr. Johnson's critiques are irrelevant. My Price Correlation Analysis and analysis of pricing structure (including price graphs) establish that Class members' prices move together over time and are impacted by the same supply and demand forces. My Product Characteristic Regression, on the other hand, establishes that common factors (as opposed to individualized customer-specific factors) explain the vast majority of the variation in IMD prices at a given point in time.

149.    To attempt to support his unrelated and irrelevant criticisms, Dr. Johnson presents a "falsifiability" test, where he subtracts the overcharge from a randomly selected subset of customers' transaction prices and reruns the hedonic pricing model.[375] Dr. Johnson suggests a robust R-squared statistic discredits the analysis's ability to establish the existence of a pricing structure.[376] However, Dr. Johnson fails to consider how the model coefficients adjust to fit the falsified data—that is, manipulating the data makes it impossible to isolate the effect of the falsifiability test on the R-squared statistic. Therefore, Dr. Johnson does not offer any meaningful

---

[370] Lamb Report at ¶ 232-239.
[371] Lamb Report at ¶ 238.
[372] Johnson Report at ¶ 121.
[373] Johnson Report at ¶ 119.
[374] Johnson Report at ¶ 122.
[375] Johnson Report at ¶ 123.
[376] Johnson Report at ¶ 124.

98

HIGHLY CONFIDENTIAL

JW-SEC-01101957

HIGHLY CONFIDENTIAL

criticism of the Product Characteristics Regression and provides no reason to change my opinion regarding the existence of a pricing structure in the IMD industry.

### C. Common evidence confirms that Home Depot and Lowe's were impacted by the Cartel

150. Defendants' economists criticize my finding of class-wide impact because my analysis did not, in their telling, expressly address how the two major retailers (Home Depot and Lowe's) would have been impacted by the Cartel.[377] Drs. Johnson and Carlton makes the following criticisms:

    a.  Home Depot and Lowe's had a different pricing process unrelated to Defendants' parallel price increase announcements;[378]

    b.  Retailers exerted their buyer power through product line review and across different types of products (IMDs and non IMDs);[379]

    c.  That Home Depot and Lowe's leverage pricing and purchases of multiple products;[380] and

    d.  My analysis does not allow for the possibility of different "pricing dynamics" for Home Depot and Lowe's.[381] That is, that I should have independently analyzed Home Depot and Lowe's overcharges.

151. As I discuss below, despite Defendants' economists' assessment of Home Depot and Lowe's bargaining power and competitive procurement process, the structural characteristics of the IMD industry (in particular the concentration) made it so that Home Depot and Lowe's had no choice but to accept price increases during the Effective Cartel Period. Moreover, Defendants circulated the traditional-channel price increase letters in the process of negotiating prices with Home Depot and Lowe's, which confirms that Home Depot and Lowe's prices were not

---

[377] I understand that Defendants echo the same criticisms in their opposition brief to Class Certification. See generally United States District Court for the Eastern District of Virginia – Richmond Division, *In re: Interior Molded Doors Antitrust Litigation*, Defendants' Memorandum in Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, 3:18-cv-00718-JAG, May 19, 2020.

[378] Carlton Report at ¶ 50; Johnson Report at ¶¶ 4.

[379] Carlton Report at ¶ 50; Johnson Report at ¶¶ 3, 22, 31-34.

[380] Johnson Report at ¶ 41.

[381] Johnson Report at ¶ 36.

HIGHLY CONFIDENTIAL

JW-SEC-01101958

HIGHLY CONFIDENTIAL

negotiated independently of the traditional-channel Class members' price increases. Finally, my empirical analyses from the Lamb Report and this report indicate that Home Depot and Lowe's were impacted by the Cartel.

152.    Home Depot and Lowe's are Defendants' largest and third largest customers, respectively, collectively representing over 21% of class-wide purchases during the Class Period,[382] In the Lamb Report, I observed that Home Depot and Lowe's appeared to be in different price-increase schedules than traditional-channel customers, but I also discussed evidence that both retailers saw price increases during the Effective Cartel Period and showed that their prices increased over the Effective Cartel Period.[383] That their prices increased during the Effective Cartel Period, a period characterized by declining costs, is consistent with the opinion I offered in the Lamb Report that certain structural characteristics of the IMD industry made it unlikely that individual Class members would be able to avoid being overcharged.[384]

153.    Record evidence confirms that to be the case. Redacted - Third Party Confidentiality

**Redacted - Third Party Confidentiality**

Redacted - Third Party Confidentiality [385] **Redacted - Third Party Confidentiality**

**Redacted - Third Party Confidentiality**

Redacted - Third Party Confidentiality [386] **Redacted - Third Party Confidentiality**

**Redacted - Third Party Confidentiality** [387] Taken together, the record evidence demonstrates that Home Depot and Lowe's had numerous price increases during the Effective

---

[382] Johnson Report at Exhibit E1; Appendix E.
[383] Lamb Report at ¶¶ 132-134. Dr. Johnson does not dispute that Home Depot and Lowe's prices rose during the Effective Cartel Period. See Johnson Deposition at 150:12-152:10
[384] Lamb Report at ¶¶ 240-241.
[385] Lowe's Written Responses to Subpoena Request, January 31, 2020 at p. 1.
[386] Lowe's Written Responses to Subpoena Request, January 31, 2020 at p. 2.
[387] Lowe's Written Responses to Subpoena Request, January 31, 2020 at p. 2.

HIGHLY CONFIDENTIAL

JW-SEC-01101959

HIGHLY CONFIDENTIAL

Cartel Period in part due to the structural characteristics of the IMD industry that I concluded would lead to class-wide impact.

154. Other evidence indicates that Defendants leveraged the traditional channel price increases to gain pricing concessions from Home Depot and Lowe's. For instance, on December 18, 2015, Jeld-Wen's Robert DiPangrazio emailed Jeld-Wen's October 2015 price increase letter announcing IMD price increases of 3-5% effective February 1, 2016 to Home Depot.[388] I understand that Home Depot's IMD prices increased by 2.3%, effective March 2016.[389] Additionally, while retailers did not receive price increase letters in the same format as wholesalers, price increases to both types of purchasers sometimes occurred at or about the same time. A 2014 Masonite presentation referencing their price increases showed an 8% increase on IMDs for wholesalers taking effect on August 18th, and an identical 8% increase for retailers taking effect September 1st.[390]

155. Dr. Carlton also discusses an example where Jeld-Wen approached Lowe's to initiate a 5% price in 2016. Lowe's internal analysis showed that due to declining costs, Lowe's should be entitled to a 5% *discount*.[391] The two parties ultimately agreed to no price increase. Dr. Carlton suggests that this evidence is indicative of Lowe's buyer power. However, Lowe's failure to obtain a discount during a period of declining costs is an example not of buyer power negotiating away an overcharge but the opposite. As I show in the Lamb Report, Jeld-Wen approached Lowe's at a time when IMD manufacturing costs were decreasing,[392] as Lowe's correctly asserted in unsuccessfully seeking a discount. Thus, Lowe's not getting the discount it sought is consistent with its answer its interrogatory response: that Defendants' domination of the IMD industry made it difficult to negotiate price discounts.

156. My empirical analyses also demonstrate that Home Depot and Lowe's were impacted by the Cartel. As I discussed in the Lamb Report, my analysis of pricing structure taken together with the results from the Overcharge Regression Analysis demonstrate that Home Depot and Lowe's were impacted by the Cartel. My Price Correlation analysis, for one, shows that Home

---

[388] JELD-WEN-01019022, JELD-WEN-01019024.
[389] JELD-WEN-00982164
[390] Hair Deposition Plaintiffs' Exhibit 213 at MAS-0000040302..
[391] Carlton Report at ¶ 52; Merrill Deposition Plaintiffs Exhibit 84.
[392] *See* Lamb Report Figure 17.

101

 JW-SEC-01101960

HIGHLY CONFIDENTIAL

Depot and Lowe's prices are highly correlated to other Class members' prices, a sign that they respond to the same economic forces (such as the Cartel).[393] Home Depot and Lowe's also represent over 20% of class-wide purchases. Taking that into account, it is unlikely that my analysis would find a class-wide overcharge of 9.5% when nearly 20% of class-wide purchases were not impacted (as Defendants claim). But this conclusion can be tested. My Predicted But-For Price Analysis presented in the Lamb Report (which showed that 99.8% of Class members had a net positive overcharge and every Class member had at least one transaction with an overcharge) showed that Home Depot and Lowe's were impacted by the Cartel.[394]

157.    The results of the customer-specific overcharge regression for the 225 large customers provide further evidence that Home Depot and Lowe's were impacted by the Cartel. The results show that Home Depot was overcharged 6% and Lowe's was overcharged 7.8%, both of which results are statistically significant. That is, in neither case does the model imply that Home Depot and Lowe's were not overcharged.

## VI.    Conclusions

158.    As demonstrated in the Lamb Report, the economic evidence is consistent with the existence of the Cartel in the IMD industry and inconsistent with each alleged Co-Conspirator's unilateral economic self-interest absent the Cartel during the Effective Cartel Period. Furthermore, economic evidence, common to the Class as a whole, establishes both that the Cartel resulted in artificially inflated prices for IMDs, and that the Cartel caused all, or nearly all, members of the Class to pay these artificially-inflated prices.

159.    None of Dr. Carlton's nor Dr. Johnson's opinions or analyses has caused me to change my conclusions, nor have they caused me to change any aspects of the Overcharge Regression Analysis. I evaluated Defendants' economists' criticisms of my Overcharge Regression Analysis and found that none of the criticisms refute my finding of substantial class-wide overcharges. Moreover, Dr. Johnson's assertion that my Overcharge Regression Analysis fails to account for customer-specific and regional time-varying factors refutes the class-wide overcharges and measurement of class-wide damages. In fact, when I take all of Defendants' economists' criticisms into account I find that my measure of class-wide overcharges are virtually unchanged.

---

[393] Lamb Report Table 5.
[394] Lamb Report at ¶¶ 243, 257.

102

HIGHLY CONFIDENTIAL

JW-SEC-01101961

**HIGHLY CONFIDENTIAL**

160.    As I explain in the Lamb Report, the Overcharge Regression Analysis can reliably be used to measure damages to the Class as a whole on a formulaic basis. My regression analysis finds that the prices Defendants charged to members of the Class were inflated 9.5% during the Class Period of October 19, 2014 to December 31, 2018, above levels that would have otherwise existed in the market. Based on these estimated overcharges and Defendants' Class Period sales, I have estimated damages to be $243.7 million during the Class Period.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of June 2020, at *Arlington VA*

Russell L. Lamb, Ph. D.

103

JW-SEC-01101962

# Appendix A

HIGHLY CONFIDENTIAL

JW-SEC-01101963



# Russell Lamb, Ph.D.

President
Monument Economics Group
Phone: (703) 615-3474
Email: rlamb@megconsulting.com

## Professional Summary

Russell Lamb is an expert in antitrust economics and has testified concerning antitrust liability, impact, and damages.  He has an extensive background in applied econometrics and has developed econometric models to measure damages in a number of matters involving allegations of horizontal price fixing.  He has provided expert testimony in State and Federal Courts in the United States and in Canada on a range of issues including class-certification and economic damages in antitrust, RICO and consumer fraud matters.  In addition, he has provided expert advice to client attorneys at all levels of the litigation.  Dr. Lamb has an extensive background in the analysis of domestic and international agricultural markets and has authored more than 50 articles in peer-reviewed economics journals, trade press, and major newspapers.

Dr. Lamb's work has been cited by courts in certifying classes in the United States and Canada.  For example, in In re Aftermarket Automotive Lighting Products Antitrust Litigation, the court held that his analysis provided "a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid."  In certifying the Class in In re: Titanium Dioxide Antitrust Litigation, the Court said, "This Court finds that Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case."  In In Re: Domestic Drywall Antitrust Litigation, the Court cited extensively to Dr. Lamb's analysis in its decision to certify the Class: "Dr. Lamb's expert opinion fits the facts of the case, is relevant, and is therefore admissible to show classwide injury and measurable damages in support of Plaintiffs' Motion for Class Certification. [...]

1

HIGHLY CONFIDENTIAL

JW-SEC-01101964

The Court [...] has thoroughly considered Dr. Lamb's opinion in its decision on the DPPs' Class Certification Motion." In the Canadian LCD Competition Act Class Action, the Court held that Dr. Lamb's analysis provided "evidence of a viable methodology for the determination of loss on a class-wide basis." In In re: Puerto Rican Cabotage Litigation, the Court held that "Dr. Lamb [had] set forth a reputable and workable model for determining damages as to individual class members." In certifying the class in Clarke and Rebecca Wixon, et al. v. Wyndham Resort Development Corp., et al., the Court held that "Dr. Lamb [had] presented a plausible class-wide method of proof." In certifying the class in Eugene Allan, et al., v. Realcomp II, Ltd., et al., the Court held that "the Plaintiffs have produced sufficient evidence that common proofs will yield a finding of class-wide damages that predominates over any specific individualized damages. The Lamb Report and Lamb Reply are sufficient to establish this fact." Furthermore, Dr. Lamb was the Indirect Purchaser Plaintiffs' expert in the In re: Polyurethane Foam Antitrust Litigation matter, which was certified by the Court in April 2014.

With regard to agricultural economics, Dr. Lamb has a particular expertise in agricultural markets and has undertaken extensive original research and econometric analysis on markets for agricultural commodities. His articles on agricultural economics have been published in peer-reviewed journals, trade press, and major newspapers. Dr. Lamb regularly presents at conferences on topics including the state of the U.S. Economy and farm policy.

Prior to co-founding Monument Economics Group, Dr. Lamb was a Senior Vice President at Nathan Associates Inc., where he directed the firm's litigation consulting practice nationally. Dr. Lamb previously served as a Principal at AACG in Arlington, VA, and as Managing Director and DC Office Head at Econ One Research. He earlier served as an Assistant Professor of Agricultural Economics and faculty member of the Graduate Group in Economics at North Carolina State University and as an Economist and Senior Economist in the Federal Reserve System of the United States, at the Federal Reserve Board and the Federal Reserve Bank of Kansas City.

HIGHLY CONFIDENTIAL                                      JW-SEC-01101965

**Education**

- Ph.D., Economics, University of Pennsylvania, 1994
- M.A., Economics, The University of Maryland, 1989
- B.A., Economics, The University of Tennessee, 1987

HIGHLY CONFIDENTIAL                                        JW-SEC-01101966

**Expert Testimony Offered**

**2020**  *In Re: Interior Molded Doors Antitrust Litigation*

- United States District Court for the Eastern District of Virginia Richmond Division
- Case No. 3:18-CV-00718-JAG
- Class Certification and Trial Expert Report, January 31, 2020
- Testified at deposition, March 4, 2020
- Opinion concerning class certification and damages issues
- Retained by Spector Roseman Kodroff & Willis, P.C., and Berger & Montague, P.C.

**2019**  *In Re Zetia (Ezetimibe) Antitrust Litigation*

- United States District Court for the Eastern District of Virginia Norfolk Division
- Case No. 2:18-MD-02836-RBS-DEM
- Expert Declaration, November 18, 2019
- Testified at deposition, December 20, 2019
- Expert Trial Declaration, January 13, 2020
- Expert Reply Declaration, February 20, 2020
- Testified at class certification hearing, May 1, 2020
- Expert Trial Reply Declaration, May 8, 2020
- Expert Supplemental Declaration, May 15, 2020
- Testified at deposition, June 9, 2020
- Opinion concerning class certification and damages issues
- Retained by Miller Law LLC and Motley Rice LLC

*GAËTAN ROY c. JTEKT Corporation & al. (Bearings/Roulements)*

- Cour Supérieure District de Québec
- Case No. 200-06-000159-130
- Expert Report, November 12, 2019
- Opinion concerning class certification issues
- Retained by Siskinds LLP, Sotos LLP

*First Impressions Salon, Inc., et al., v. National Milk Producers Federation, et al.*

- United States District Court for the Southern District of Illinois
- Case No. 3:13-cv-00454-NJR-SCW
- Expert Report, January 4, 2019
- Testified at deposition, February 13, 2019
- Expert Reply Report, May 3, 2019
- Testified at deposition, May 17, 2019
- Opinion concerning class certification and damages issues
- Retained by Barrett Law Group, NastLaw LLC, and Roberts Law Firm

4

HIGHLY CONFIDENTIAL                                                JW-SEC-01101967

*Sheridan Chevrolet Cadillac Ltd., et al., v. JTEKT Corporation, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-478644-00CP
- Expert Report, January 2, 2019
- Opinion concerning class certification issues
- Retained by Sotos LLP

**2018** *Sheridan Chevrolet Cadillac Ltd., et al., v. Hitachi Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-14-506683-00CP
- Expert Report, October 4, 2018
- Opinion concerning class certification issues
- Retained by Sotos LLP

*In Re Suboxone Direct Purchaser Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- Case No. 2:13-MD-02445-MSG
- Expert Report, September 18, 2018
- Testified at deposition, October 30, 2018
- Merits Expert Report, November 30, 2018
- Expert Rebuttal Report, January 11, 2019
- Testified at deposition, January 17, 2019
- Expert Merits Rebuttal Report, April 26, 2019
- Testified at deposition, June 12, 2019
- Opinion concerning class certification, merits, and damages issues
- Retained by Berger & Montague, P.C.; Garwin Gerstein & Fisher LLP; and Faruqi & Faruqi LLP

*William Rushing, et al. v. Williams-Sonoma, Inc., et al.*

- United States District Court Northern District of California, San Francisco Division
- Case No. 3:16-cv-01421-WHO
- Expert Report, July 25, 2018
- Opinion concerning class certification issues
- Retained by Rose Law Group, PC

*The Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee, et al. v. Momenta Pharmaceuticals, Inc., et al.*

- United States District Court Middle District of Tennessee Nashville Division
- Civil Action No. 15-cv-1100
- Testified at deposition, October 10, 2018
- Expert Report, June 22, 2018
- Expert Reply Report, September 21, 2018
- Testified at class certification hearing, May 13, 2019

5

HIGHLY CONFIDENTIAL

JW-SEC-01101968

- Declaration, May 21, 2019
- Expert Merits Report, May 24, 2019
- Declaration, June 18, 2019
- Expert Report, July 5, 2019
- Expert Supplemental Reply Report, July 5, 2019
- Testified at hearing, July 12, 2019
- Expert Merits Reply Report, July 29, 2019
- Testified at deposition, August 13, 2019
- Opinion concerning class certification and damages issues regarding indirect purchasers
- Retained by Lieff Cabraser Heimann & Bernstein, LLP

**2017** *Fady Samaha and Urlin Rent a Car Ltd. v. Yamashita Rubber Co., Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-472262-00CP
- Expert Report, December 4, 2017
- Supplemental Report, July 13, 2018
- Expert Reply Report, January 23, 2020
- Testified at deposition, April 20, 2020
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*In Re Lamictal Direct Purchaser Antitrust Litigation*

- United States District Court New Jersey
- Case No. 1 2-95 -WHW-MCA
- Expert Report, November 6, 2017
- Revised Expert Reply Report, April 16, 2018
- Testified at deposition, June 6, 2018
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.

*In Re Namenda Direct Purchaser Antitrust Litigation*

- United States District Court Southern District of New York
- Case No. 1:15-CV- 07488
- Expert Report, September 15, 2017
- Amended Expert Report, September 20, 2017
- Expert Reply Report, October 25, 2017
- Amended Expert Reply Report November 9, 2017
- Testified at deposition, October 6, 2017
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.; and Garwin Gerstein & Fisher LLP

*In Re Capacitors Antitrust Litigation*

- United States District Court Northern District of California San Francisco Division

6

HIGHLY CONFIDENTIAL

JW-SEC-01101969

- Case No. 3:14-CV-03264 -JD
- Expert Declaration, February 24, 2017
- Expert Reply Declaration, April 28, 2017
- Testified at deposition, May 17, 2017
- Expert Trial Declaration, November 30, 2018
- Expert Trial Reply Declaration, April 19, 2019
- Testified at deposition, May 23, 2019
- Opinion concerning class certification issues regarding indirect purchasers
- Retained by Cotchett, Pitre & McCarthy, LLP

**2016** *Deere Construction, LLC, v. Cemex Construction Materials Florida, LLC, et al.*

- United States District Court Southern District of Florida
- Case No. 15-24375-CIV-ALTONAGA/O'Sullivan
- Expert Report, September 14, 2016
- Testified at deposition, September 27, 2016
- Opinion concerning class certification issues
- Retained by Kozyak Tropin & Throckmorton, LLP; Harke Clasby & Bushman, LLP; and McCallum, Methvin & Terrell, P.C.

*Luke Begonja v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-010943)*

*Gerrit Brouwer, Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008533)*

*Gary Gottschalk, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001957)*

*Susan Hatzipetro, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-007996)*

*Shelly Keegan, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001953)*

*Yvonne Klebba, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008535)*

*Adriane McConville, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001960)*

*Ernest W. Yeager Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008054)*

- In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida
- Expert Report, September 14, 2016
- Testified at deposition, October 27-28, 2016
- Testified at deposition, March 2-3, 2017
- Expert Report, May 19, 2017
- Testified at deposition, August 29, 2017
- Opinion concerning damages issues

7

HIGHLY CONFIDENTIAL    JW-SEC-01101970

- Retained by Badham & Buck, LLC

*In Re: Evanston Northwestern Healthcare Corporation Antitrust Litigation*

- United States District Court for the Northern District of Illinois Eastern Division
- No. 07-C-4446
- Expert Report, July 28, 2016
- Expert Reply Report, January 25, 2017
- Testified at deposition, September 20, 2016
- Testified at deposition, February 22, 2017
- Opinion concerning damages issues
- Retained by Miller Law LLC

*In Re: Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation*

- United States District Court for the District of New Jersey
- Civ. No. 12-711 (AET)(LHG)
- Declaration, May 27, 2016
- Reply Declaration, March 31, 2017
- Testified at deposition, July 8, 2016
- Opinion concerning class certification, merits, and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; and Kaplan Fox & Kilsheimer LLP

*Nestlé Purina Petcare Company v. Blue Buffalo Company, Ltd.*

*Blue Buffalo Company, Ltd. v. Nestlé Purina Petcare Company, et al.*

*Blue Buffalo Company, Ltd. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Custom AG Commodities, LLC, et al.*

- United States District Court for the Eastern District of Missouri Eastern Division
- Cause No.: 4:14-CV-00859 RWS
- Affidavit, March 17, 2016
- Opinion concerning pricing issues
- Retained by Lashly & Baer, P.C.

*In Re: Cast Iron Soil Pipe and Fittings Antitrust Litigation*

- United States District Court Eastern District of Tennessee at Chattanooga
- Case No.: 1:14-md-2508
- Declaration, March 4, 2016
- Testified at deposition, May 19, 2016
- Opinion concerning class certification and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; Cera LLP; and Kaplan Fox & Kilsheimer LLP

8

HIGHLY CONFIDENTIAL

JW-SEC-01101971

*Darren Ewert v. Denso Corporation, et al.*

- Supreme Court of British Columbia
- Case No. S-135610
- Expert Report, February 12, 2016
- Expert Reply Report, January 5, 2017
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman

*Serge Asselin v. Hitachi, LTD & al.*

- Cour Supérieure Disctirct de Québec
- Case No. 200-06-000180-144
- Expert Report, February 11, 2016
- Opinion concerning class certification issues
- Retained by Siskinds LLP

**2015** *Thomas Mervyn v. Atlas Van Lines, Inc., et al.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:13-CV-03587
- Expert Declaration, September 3, 2015
- Expert Report, February 4, 2016
- Opinion concerning data issues
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Thomas Mervyn v. Nelson Westerberg, Inc.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:11-CV-06594
- Expert Report, July 27, 2015
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Lane's Gifts and Collectibles, LLC v. Microsoft Online, Inc.*

- United States District Court Western District of Washington at Seattle
- No. 2:12-cv-01181-BJR
- Expert Report, March 23, 2015
- Testified at deposition, May 21, 2015
- Opinion concerning damages issues
- Retained by Nix, Patterson & Roach, L.L.P.; and Kessler Topaz Meltzer & Check, LLP

*BlueCross BlueShield of Tennessee, Inc., et al. v. King Pharmaceuticals, Inc., et al.*

- In the Circuit Court for Cocke County, Tennessee
- Civil Action No. 32941-II
- Expert Report, January 23, 2015

9

HIGHLY CONFIDENTIAL

JW-SEC-01101972

- Opinion concerning impact and damages issues
- Retained by Miller Law LLC

*In Re: Domestic Drywall Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2437 13-MD-2437
- Trial Expert Report, January 23, 2015
- Reply Expert Report, April 23, 2015
- Expert Report concerning class certification, August 3, 2016
- Expert Reply Report concerning class certification, January 9, 2017
- Affidavit, July 11, 2019
- Testified at deposition, February 25, 2015
- Testified at deposition, August 30, 2016
- Testified at deposition, February 17, 2017
- Testified at class certification hearing, April 27, 2017
- Expert Supplemental Report, July 31, 2017
- Opinion concerning merits issues regarding direct purchasers
- Opinion concerning class certification issues, impact and damages regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC; Berger & Montague, P.C.; and Spector Roseman Kodroff & Willis, P.C.

*In Re: Processed Egg Products Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2002
- Expert Declaration, January 22, 2015
- Expert Reply Declaration, April 3, 2015
- Testified at deposition, May 7, 2015
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Straus & Boies, LLP

**2014**  *In Re: Class 8 Transmission Indirect Purchaser Antitrust Litigation*

- United States District Court for the District of Delaware
- Civil Action No. 11-cv-00009 (SLR)
- Declaration, November 3, 2014
- Reply Declaration, March 6, 2015
- Trial Declaration, March 27, 2015
- Trial Reply Declaration, July 2, 2015
- Testified at deposition, December 17, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues regarding indirect purchasers

10

HIGHLY CONFIDENTIAL

JW-SEC-01101973

- Retained by Glancy Binkow & Goldberg LLP

*Mark S. Wallach, et al., v. Eaton Corporation, et al.*

- United States District Court District of Delaware
- Civil Action No. 10-260-SLR
- Expert Report, November 3, 2014
- Expert Reply Report, March 6, 2015
- Trial Expert Report, March 27, 2015
- Trial Expert Reply Report, July 2, 2015
- Testified at deposition, December 16, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding direct purchasers
- Opinion concerning merits and damages issues regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC

*Sheridan Chevrolet Cadillac Ltd., et al., v. Furukawa Electric Co. Ltd., et al.*

*Sheridan Chevrolet Cadillac Ltd., et al., v. Mitsubishi Electric Corporation, et al.*

- Ontario Superior Court of Justice
- Court File Nos. CV-12-446737-00CP / CV-14-496994-00CP
- Expert Report, April 15, 2016
- Expert Report, October 14, 2014
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*Resco Products, Inc., v. Bosai Minerals Group Co., Ltd., et al.*

- United States District Court for the Western District of Pennsylvania
- Civil Action No.: 2:06-cv-235-JFC
- Expert Report, September 24, 2008
- Expert Report, September 29, 2014
- Supplemental Expert Report, December 15, 2014
- Testified at deposition, February 13, 2015
- Opinion concerning damages
- Retained by Boies, Schiller & Flexner LLP

*Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.*

- United States District Court Eastern District of Wisconsin
- Case No.: 2:09-cv-00852-LA
- Affidavit, August 1, 2014
- Affidavit, November 4, 2014
- Declaration, April 24, 2015
- Expert Report, July 15, 2015
- Expert Reply Report, November 24, 2015

11

HIGHLY CONFIDENTIAL

JW-SEC-01101974

- Expert Surreply Report, January 15, 2016
- Expert Trial Report, August 18, 2016
- Expert Trial Reply Report, December 20, 2016
- Testified at deposition, October 1, 2015
- Testified at deposition, February 13, 2017
- Opinion concerning class certification and damages issues
- Opinion concerning Defendants' replacement data
- Opinion concerning Defendant and LKQ transaction-level data
- Opinion concerning merits and damages issues
- Retained by Stueve Siegel Hanson, LLP

*Meredith Corporation, et al., v. SESAC, LLC, et al.*

- United States District Court for the Southern District of New York
- 09 Civ. 9177 (PAE)
- Expert Report, July 10, 2014
- Opinion concerning class certification issues
- Retained by Weil, Gotshal & Manges LLP

*Janet Skold, et al., v. Intel Corporation, et al.*

- Superior Court of the State of California for the County of Santa Clara
- Case No. 1-05-CV-039231
- Expert Report, June 14, 2007
- Testified at deposition, August 31, 2007
- Testified at deposition, January 10, 2014
- Opinion concerning class certification issues
- Opinion concerning damages issues
- Retained by Girard Gibbs LLP

*In Re: Polyurethane Foam Antitrust Litigation*

- United States District Court Northern District of Ohio Western Division 8
- MDL No. 2196
- Declaration, June 11, 2013
- Reply Declaration, October 23, 2013
- Trial Declaration, March 18, 2014
- Reply Trial Declaration, June 30, 2014
- Testified at deposition, August 20, 2013
- Testified at deposition, November 20, 2013
- Testified at class certification hearing, January 15, 2014
- Testified at deposition, April 14, 2014
- Testified at deposition, July 14, 2014
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues
- Retained by Miller Law LLC

12

HIGHLY CONFIDENTIAL

JW-SEC-01101975

**Professional Experience**

**Economic Consulting Positions**

**Monument Economics Group**, Oct. 11, 2016 - Present

**Nathan Associates, Inc.**, Arlington, VA, *Senior Vice President*, Jan. 2013 – Sep. 20, 2016

**Advanced Analytical Consulting Group, Inc.**, Washington, DC, *Principal*, Mar. 2011– Jan. 2013

**Econ One Research, Inc.**, Washington, DC, Managing Director and DC Office Head, Jul. 2006 – Mar. 2011

- Opened and staffed the DC office; managed office affairs on a daily basis

- Retained as an expert witness for damages and class certification issues in antitrust, breach of contract, product liability and RICO cases; representative testimony includes determination of liability and damages in a case involving resale price maintenance in consumer products, class certification in a horizontal price-fixing case involving international travel in the airline industry, class certification in a consumer class action involving RICO claims in state court

- Industry pre-litigation analyses for consumer products, chemicals, and other industries

**Navigant Consulting, Inc.**, Washington, DC, *Associate Director*, Feb. 2006 – Jul. 2006

- Case manager for damages analysis in asbestos litigation and personal injury claims

**Nathan Associates, Inc.**, Arlington, VA, *Managing Economist*, Jul. 2004 – Feb. 2006

- Case manager for economic analysis of class certification and damages issues in antitrust and RICO cases involving the chemical, consumer products, and tobacco industries

- Retained as expert on damages for direct purchasers of NBR in the Crompton Global Settlement; submitted an Affidavit on damages and appeared before the Special Master for the Crompton Global Settlement (the Hon. Kenneth Feinberg)

**Board Membership**

- Board of Advisors, American Antitrust Institute, Washington, DC

- Department of Economics Advisory Council, University of Tennessee, Knoxville, Chairman, Spring 2006 – April 2011

**Teaching Positions**

- The University of Tennessee, Knoxville, *Adjunct Professor*, Spring 2019 – present

- The George Washington University, Washington, DC, *Adjunct Assistant Professor of Economics*, Fall 2004 – present

- North Carolina State University (NCSU), *Assistant Professor* (Department of Agricultural and Resource Economics), Fall 1999 – Spring 2004

13

HIGHLY CONFIDENTIAL

JW-SEC-01101976

- The University of Pennsylvania, *Adjunct Instructor*, Summer 1990 – Spring 1994

## Additional Teaching Experience

- The Wharton School Evening Division, Philadelphia, PA, summer 1993
- Rutgers University, Camden, NJ, summer 1993
- Philadelphia College of Textiles and Science, Philadelphia, PA, fall 1992
- The Pennsylvania State University, Media, PA, 1991
- St. Mary's College of Maryland, St. Mary's City, MD, summer 1989
- The University of Maryland University College, College Park, MD, 1988-1989

## Courses Taught

- Managerial Economics for MBA students (George Washington University)
- Law and Economics (George Washington University)
- Intermediate Microeconomics – graduate level (George Washington University)
- Latin American Economic Development (George Washington University)
- International Trade: Theory and Policy (George Washington University)
- International Finance: Theory and Policy (George Washington University)
- Agricultural Production and Supply – Ph.D. field course (North Carolina State University)
- U.S. Agricultural Policy (North Carolina State University)
- Microfinance: Theory, Practice and Regulation (Superintendencia de Banca y Seguros)
- Statistical Analysis for Economics (University of Pennsylvania)
- Principles of Microeconomics (University of Maryland, St. Mary's College of Maryland)
- Principles of Macroeconomics (University of Pennsylvania, The Wharton School, Penn State University)
- Fundamentals of Micro/Macro Economics (University of Maryland)
- Environmental and Natural Resource Economics (Rutgers)

## Federal Reserve Experience

Federal Reserve Bank of Kansas City, *Senior Economist* Jan. 1998 – Aug. 1999; *Economist*, Jan. – Dec. 1997

- Analysis of regional, macroeconomic developments in agriculture, and energy
- Research on public policy towards agriculture in the U.S., especially the impact of farm policy reform

14

HIGHLY CONFIDENTIAL

JW-SEC-01101977

- Briefings to the Bank president and outside groups on the regional economy, agriculture, agricultural trade

Board of Governors of the Federal Reserve System, *Economist*, Jun. 1994 – Dec. 1996

- Analysis of macroeconomic conditions, commodity markets, and prices (CPI, PPI, Core prices)
- Forecasting of agricultural output, prices, and income
- Briefings to the Board of Governors on agriculture and food-price developments

**Other Consulting Experience**

World Perspectives, Inc., 2003 - 2004

- Analysis of trade barriers for U.S. exports of feed ingredients, pet food ingredients, and food ingredients
- Analysis of the impact of a Free Trade Area of the Americas on U. S. soybean producers
- Analysis of the potential for U.S. Halal-certified meat exports to the Middle East

Womble Carlyle Sandridge & Rice, LLP, 2003 - 2004

- Provided expert testimony related to the estimation of business profitability Smith-Moore, 2002 - 2003
- Provided economic analysis of the U.S. Tobacco Program

Superintendencia de Banca y Seguros (Lima, Peru), 1998 - 2000

- Developed and taught a class on Microfinance issues (in English) to students enrolled in a training program for bank examiners; the program was sponsored by the Inter-American Development Bank.

World Bank, Africa Technical Department, 1992 – 1993

- Summarized and provided an overview of data available on African economic and social indicators

ACG-Afrique, January 1993

- Provided critical review of a study document outlining the impact of structural adjustment on African agriculture

**Professional Organizations**

- National Association for Business Economics
- American Economic Association

15

HIGHLY CONFIDENTIAL

JW-SEC-01101978

**Papers, Publications, and Speeches**

**Papers Published in Refereed Journals**

- "Government Regulation and Quality in the U.S. Beef Market," (with Peyton Ferrier) *Food Policy*, Vol. 32, No. 1, February 2007, 84-97

- "Rent-seeking in U.S.-Mexican Avocado Trade," *Cato Journal*, Vol. 26, No. 1, December 2006, 159-177

- "Consolidation in U.S. Agriculture and the Role of Public Policy," *The ICFAI Journal of Agricultural Economics,* Vol. 1, 2004, 7-16

- "Fertilizer Use, Risk, and Off-farm Labor Markets in the Semi-Arid Tropics of India," *American Journal of Agricultural Economics,* Vol. 85, No. 2, May 2003, 359-371

- "Inverse Productivity: Land Quality, Labor Markets, and Measurement Error," *Journal of Development Economics,* Vol. 71, No. 1, June 2003, 71-95

- "A Market-Forces Policy for the New Farm Economy?" *Review of Agricultural Economics,* Vol. 24, No. 1, 1 March 2002, 15-30

- "Food Crops, Exports, and the Short-run Policy Response of Agriculture in Africa," *Agricultural Economics,* Vol. 22, No. 3, April 2000, 271-298

- "FAIR Act Implications for Land Values in the Corn Belt," (with Jason Henderson) *Review of Agricultural Economics,* Vol. 22, No. 1, Summer – Spring 2000, 102-119

- "Why are Estimates of Agricultural Supply Response So Variable?" (with Francis X. Diebold) *Journal of Econometrics,* Vol. 76, No. 1-2, January – February 1997, 367-373

**Non-refereed Publications, Articles, and Editorials**

- "The Predominance Requirement for Antitrust Class Actions – Can Relevant Market Analysis Help?" (with Jeffrey Leitzinger) American Bar Association – Section of Antitrust Law, *Economics Committee Newsletter*, Vol. 7, No. 1, Spring 2007, 17-22

- "Reform of U.S. Farm Policy in an Integrating World Economy," *Developing Countries in the WTO System*, 2006

- "New Farm Economy," *Regulation*, Winter 2003-2004, Cato Institute for Public Policy Research, 2003

- "What Road Will U.S. Economy Take in 2003?" *Southeast Farm Press*, 5 February 2003

- "Fast Track for the Tax Cuts," guest editorial, *News and Observer*, 18 January 2003

- "The 2002 Farm Bill," (with Blake Brown and Michele Marra) *NC State Economist,* November – December 2002

- "Economy-minded Tax Cuts: Bush's Reductions Provided the Boost to Lift U.S. From Recession," guest editorial, *News and Observer*, 2 July 2002

- "Policy Only Effective if Farm Economy is Recognized," special report to *Feedstuffs*, 5 June 2000

16

HIGHLY CONFIDENTIAL                                    JW-SEC-01101979

- "Aid During Crisis of Little Long-term Help to Farmers," guest editorial, *Kansas City Star*, 23 August 1999
- "Survey of Agricultural Credit Conditions," Federal Reserve Bank of Kansas City," *Regional Economic Digest*, various issues, 1997-1999
- "U.S. Agriculture at the Crossroads in 1999," *Economic Review*, Federal Reserve Bank of Kansas City, Vol. 84, No. 1, 1999, 73-91
- "Can U.S. Oil Production Survive the 20th Century?" *Economic Review*, Federal Reserve Bank of Kansas City, Vol. 84, Quarter I, 1999
- "Will the Tenth District Catch the Asian Flu?" (with Ricardo Gazel) *Economic Review*, Federal Reserve Bank of Kansas City, Vol. 83, Quarter II, 1998, 9-26
- "From the Plains to the Plate: Can the Beef Industry Regain Market Share?" (with Michelle Beshear) *Economic Review*, Federal Reserve Bank of Kansas City, Vol. 83, Quarter IV, 1998, 49-66
- "U.S. Agriculture: Another Solid Year in 1998?" (with Mark Drabenstott) *Economic Review*, Federal Reserve Bank of Kansas City, Vol. 83, No. 1, Quarter I, 1998, 55-74
- "How Will the 1996 Farm Bill Affect the Outlook for District Farmland Values?" *Economic Review*, Federal Reserve Bank of Kansas City, Vol. 82, Quarter IV, 1997, 85-101
- "Food Prices and the Farm Sector," monthly *Greenbook*, Federal Reserve Board of Governors, various issues 1994-1996
- "Hedge to Arrive Contracts," Memo to the Board of Governors, Federal Reserve Board of Governors, 5 June 1996
- "Prices in the May Greenbook," Federal Reserve Board of Governors, 19 May 1996
- "Prices in the March Greenbook," Federal Reserve Board of Governors, 24 March 1996
- "Commodity Price Developments," Weekly memo to the Board of Governors, Federal Reserve Board of Governors, August 1994 – December 1996

## Conference Presentations

- "Class Action Developments," panelist at the American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC: 4 December 2012
- "Consequences for Antitrust Thought and Practice," presented at the American Antitrust Institute Invitational Symposium: Antitrust Challenge of Multi-Channel Distribution in the Internet Age, Washington, DC: 22 June 2011
- "The U.S. Economy in the Year Ahead," presented at the Long Company Annual Conference, Chicago, IL: 11 September 2009 and 19 September 2008
- "The U.S. Economic Outlook," presented at the Industry Outlook Conference, Chicago, IL: 17 October 2006 and 18 October 2005

17

HIGHLY CONFIDENTIAL

- "How Will the Economy Impact Your Business?" presented at the Long Company Annual Conference, Las Vegas, NV: 14 August 2004
- "Focus on The Economy" presented at *Milling and Baking News* Annual Purchasing Managers' Conference, Kansas City, MO: 14 June 2004, 10 June 2003 and 11 June 2002
- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Chicago, IL: October 2003
- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Breckenridge, CO: 7 April 2002
- "The U.S. Economic Outlook: The Cost of Terror," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 24 September 2001
- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 5 June 2001
- "The Great American Growth Machine," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 27 September 2000
- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 6 June 2000
- "The Outlook for the U.S. Pork Sector," presented to the Industry Outlook Conference, Las Vegas, NV: 17 April 2000
- "The National Economic Outlook: The Road Ahead," presented to the Food Industry Outlook Conference, Breckenridge, CO: 11 April 1999
- "Farm Policy for the New Millennium," presented to Federal Reserve Bank of Kansas City, Division of Bank Supervision and Regulation, Bank Examiners' Annual Training Conference, 7 January 1999
- "The Impact of the 1996 Farm Bill on Farmland Values," (with Jason Henderson) first place poster presentation at the annual meetings of the American Agricultural Economics Association, Salt Lake City, UT: 4 August 1998
- "A Note on the Inverse Productivity Relationship," presented at the annual meetings of the Western Economic Association International, Seattle, WA: July 1997
- "Off-farm Labor Supply and Fertilizer Use in the Semi-Arid Tropics of India," presented at the annual meetings of the American Agricultural Economics Association, August 1995
- "Prices for Food-Away-From-Home and Core Inflation: Some Empirical Relationships," (with James E. Kennedy) presented at the Federal Reserve System Committee on Agriculture, Richmond, VA: October 1995
- "Some Simple Dynamics of Farming," presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL: August 1993

18

HIGHLY CONFIDENTIAL                                                    JW-SEC-01101981

- "Structural Adjustment and Food Security," (with W. Graeme Donovan), presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL: August 1993

- "Structural Adjustment and African Agricultural Supply Response to Exchange Rate and Price Movements," (with W. Graeme Donovan), presented at the annual meetings of the Southern Agricultural Economics Association, Tulsa, OK: January 1993

## Other Presentations

- Panelist, "Antitrust Class Actions – Where Are We? A 360 Degree Perspective," NYSBA Annual Antitrust Law Section Meeting," 30 January 2014

- Panelist, Retrospective on the Baby Products Litigation, ABA Section of Antitrust Law: Pricing Conduct Committee, 31 July 2013

- Panelist, Economic Forecasting Summit, Northern Indiana Workforce Investment Board, Inc., 29 March 2007

- "The Welfare Benefits of USDA Beef Quality Certification Programs" (with Peyton Ferrier), presentation memo, 2007

- "Reform of U.S. Farm Policy in an Integrating World Economy," presented to the Cordell Hull Institute, Trade Policy Roundtable on Reform of U.S. Farm Policy and the WTO System, Washington, DC: 31 March 2006

- "The Case for a Market-forces Farm Policy in the U.S." presented at the Cordell Hull Institute Trade Policy Roundtable, Washington DC: 26 May 2005

- "How Will the Economy Impact Your Business?" presented at the Apple Processors Association annual meeting, Homewood Resort, 20 June 2004

- "The U.S. and International Economic Outlook," presented at the AgFirst Loan Officer's Seminar, Atlanta, GA: 30-31 October 2002

- "Will the U.S. Economy Bounce or Crawl?" presented to the Eastern Bankruptcy Institute, North Myrtle Beach, SC: 1 June 2002

- "The U.S. Economic Outlook and Agriculture," presented to the National Pork Producers Pork Action Group, Washington, DC: 10 April 2002

- "The U.S. Economic Outlook" presented to the Risk Management Associates, Raleigh, NC: 7 February 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the National Pork Producers Pork Action Group, Marco Island, FL: 14 November 2001

- "Consolidation in Agriculture and the Role of Public Policy," paper presented to the Southern Extension Meetings, Williamsburg, VA: 13 June 2000

- "The New Farm Economy," presented at the annual meetings of the National Association of County Agricultural Agents, Omaha, NE: 14 September 1999

19

HIGHLY CONFIDENTIAL

JW-SEC-01101982

- "Regional Economic Update," presented to bankers in Kansas, Nebraska, Missouri, and Oklahoma as part of the Regulatory Update Seminar, Federal Reserve Bank of Kansas City, April 1999

- "The National Economic Outlook," presented to Oklahoma State University Advanced Cattle Management Seminar, Stillwater, OK: 11 March 1999

- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 November 1998

- "Can the Tenth District Survive the Asian Flu?" The Federal Reserve Bank of Kansas City Economic Forums, nine presentations to bankers in Wyoming, Oklahoma, and New Mexico, 21 September – 21 October 1998

- "The Impact of Asian Economic Developments on Tenth District Agriculture," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 30 January 1998

- "The Outlook for the Nebraska Economy," The Federal Reserve Bank of Kansas City: Nebraska Economic Forums, six presentations to bankers in Nebraska, 6-15 October 1997

- "Update on the Macroeconomy and Special Briefing on Forecast Performance at the Kansas City Fed," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 August 1997

- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 14 May 1997 and 21 March 1997

- "Producer Prices, Retail Sales, and Agricultural Commodity Markets," presented to the Board of Governors of the Federal Reserve System, 15 July 1996

**Referee Experience**

**Referee for the Following Academic Journals**

- World Development, 1993

- Journal of Development Economics, 1994, 1995

- International Economic Review, 1995

- Journal of Human Resources, 1997

- Journal of Business and Economics Statistics, 1997

- American Journal of Agricultural Economics, 1999, 2001, 2002

- Agricultural Economics, 2000, 2001, 2004

- Agricultural Finance Review, 2000, 2004

- Review of Agricultural Economics, 2000, 2002, 2004

- Journal of Agricultural and Resource Economics, 2000, 2001, 2002

- Emerging Markets Review, 2001

HIGHLY CONFIDENTIAL                    JW-SEC-01101983

- Contemporary Economic Policy, 2004

## Fellowships, Honors, and Awards

### Fellowships

- Departmental Fellowship, University of Pennsylvania, 1989-1990
- Dean's Fellowship, University of Pennsylvania, 1991-1992
- Graduate School Fellowship, University of Maryland, College Park, 1987-1989

### Honor Societies and Professional Organizations

- Phi Eta Sigma National Honor Society
- Mortar Board National Honor Society
- Golden Key National Honor Society
- Vice President for Professional Activities, Delta Sigma Pi

### Awards

- Top Graduate in Liberal Arts, University of Tennessee, Knoxville, Spring 1987
- Chancellor's Citation for Extraordinary Professional Promise, University of Tennessee, Knoxville
- Chancellor's Citation for Outstanding Academic Achievement, University of Tennessee, Knoxville
- First place poster presentation, American Agricultural Economics Association annual meetings, August 1998 (with Jason Henderson)
- Honorable mention, American Agricultural Economics Association, Essay for the 21st Century, 2001, "A Market Forces Policy for the New Farm Economy"
- Honorable mention, American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work on *In Re Titanium Dioxide Antitrust Litigation matter*)
- American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work on *In Re Domestic Drywall Antitrust Litigation matter*)

### External Funding

- "Unmanufactured Flue-Cured Tobacco Exports and the Export Component of the Quota Formula." $13,890 NC Tobacco Foundation. With Blake Brown 2000 – 2001.

## Professional Activities and Services

### Graduate Student Advising

M.A. degree, North Carolina State University

21

HIGHLY CONFIDENTIAL

JW-SEC-01101984

- Joe Weinberg (Political Science)

Master of Economics, North Carolina State University

- William Pole (2000)
- Dwight Wilder (Chairman, 2002)
- Adrian Atkeson (2002)
- Sarah Spivey
- Li Zhang (Chairman, 2003)
- Nia Atmadja (2003)

Doctor of Philosophy, North Carolina State University

- William Deese (2003)
- Peyton Ferrier (Chairman, 2004)
- Yang Wang (2003)
- Bobby Huggett (2003)
- Syed Wadood (Chairman, 2004)
- Henry Kuo

## Economic and Statistical Modeling Skills

- Experience with all major statistical software including SAS, STATA, LIMDEP and C++; applied econometric modeling skills in damage analysis of consumer industries, chemicals industries, and agricultural markets, correlation analysis for class certification.

22

HIGHLY CONFIDENTIAL                                                JW-SEC-01101985

# Appendix B

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Materials Relied Upon

*In addition to all materials listed in Appendix B to the Lamb Report dated January 31, 2020 and in the footnotes and working papers of the Lamb Reply Report dated June 9, 2020:*

### Expert Reports

Class Certification and Trial Expert Report of Dr. Russell L. Lamb, January 31, 2020.

Expert Rebuttal Report of Dennis W. Carlton, March 10, 2020.

Expert Report of Dr. John H. Johnson, IV, March 10, 2020.

Expert Report of James A. Levinsohn, Ph. D., March 10, 2020.

### Pleadings and Legal Correspondence

Lowe's, Written Responses to Subpoena Requests, January 31, 2020.

United States District Court for the Eastern District of Virginia – Richmond Division, In re: Interior Molded Doors Antitrust Litigation, Memorandum of Law in Support of Direct Purchaser Plaintiffs' Motion for Class Certification, 3:18-cv-00718-JAG, February 21, 2020.

United States District Court for the Eastern District of Virginia – Richmond Division, In re: Interior Molded Doors Antitrust Litigation, Defendants' Memorandum in Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, 3:18-cv-00718-JAG, May 19, 2020.

United States District Court Central District of California, In re: Aftermarket Automotive Lighting Products Antitrust Litigation, 2:09-ml-02007, 2011.

United States District Court District of Maryland, In re: Titanium Dioxide Antitrust Litigation, 10-cv-0318 (RDB), 2013.

United States District Court Eastern District of Pennsylvania, In re: Domestic Drywall Antitrust Litigation, 2015.

United States District Court Northern District of Ohio, In re: Polyurethane Foam Antitrust Litigation, 1:10-md-02196, 2016.

United States District Court for the Western District of New York, Daniel v. American Bd. Of Emergency Medicine, 269 F. Supp. 2d 159 (W.D.N.Y. 2003).

### Depositions and Declarations

Deposition and Exhibits of Dennis W. Carlton, May 28, 2020.

Deposition and Exhibits of John H. Johnson, IV, June 3, 2020.

Deposition and Exhibits of Paul Conley, February 6, 2020.

Videotaped Deposition and Exhibits of Russell L. Lamb, March 4, 2020.

Declaration of Rene Befurt, Ph. D., March 10, 2020.

### Bates-Stamped Materials

Documents

JELD-WEN-01019022

MAS-0000040297

JELD-WEN-01019024

### Third Party Materials

1

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL
Subject to Protective Order

Academic Literature

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*. Second Edition, 2010.

Ashenfelter, Orley, Phillip B. Levine, and David J. Zimmerman, *Statistics and Econometrics Methods and Applications*, 2003.

Dixit, Avinash, "Comparative statics for oligopoly," *International Economic Review*, Vol. 27, No. 1, 1986.

Bennett, Matthew and Philip Collins, "The Law and Economics of Information Sharing: The Good, the Bad, and the Ugly," *European Competition Journal*, Vol. 6 No. 2, August 2010.

Bernheim, B. Douglas and Michael D. Whinston, "Multimarket contact and collusive behavior," *The RAND Journal of Economics*, Vol. 21, No.1, 1990.

Borenstein, Severin and Andrea Shepard, "Dynamic pricing in retail gasoline markets," *The RAND Journal of Economics*, Vol. 27, No. 3, 1996.

Chevalier, Judith A., Anil K. Kashyap, and Peter E. Rossi, "Why don't prices rise during periods of peak demand? Evidence from scanner data," *American Economic Review*, Vol. 93, No. 1, 2003.

Hall, Robert E. and Marc Lieberman, Microeconomics: Principles and Applications, Fifth Edition, Mason, OH: South-Western, Cengage Learning, 2010.

Rubinfeld, Daniel L., "Antitrust Damages," *Research Handbook on the Economics of Antitrust Law*, Ed. Einer Elhauge, Northampton, MA: Edward Elgar, 2012, 378-394.

Rubinfeld, Daniel L., "Quantitative Methods in Antitrust," *Issues in Competition Law and Policy*, 2008.

Carlton, Dennis W., Robert H. Gertner, and Andrew M. Rosenfield, "Communication Among Competitors: Game Theory and Antitrust," *George Mason Law Review*, Vol. 5, Issue 3, 1996.

Scherer, F. M., and David Ross, *Industrial Market Structure and Economic Performance*, Houghton Mifflin, 1990.

Norman, George, and Darlene C. Chisholm, *Dictionary of Industrial Organization*, Edward Elgar Publishing, 2014.

Green, Edward J., Robert C. Marshall, Leslie M. Marx, "Tacit Collusion in Oligopoly," February 12, 2013.

Gujarati, Damodar N., *Basic Econometrics*, Fourth Edition, New York, New York: McGraw-Hill, 2004.

Haltiwanger, John and Joseph E. Harrington Jr., "The impact of cyclical demand movements on collusive behavior." *The RAND Journal of Economics*, Vol. 22, No. 1, 1991.

Hsiao, Cheng, *Analysis of Panel Data*, 2nd Edition, Cambridge, UK: Cambridge University Press, 2003, Chapter 1.

Quirmbach, Herman C., "Comparative statics for oligopoly: Demand shift effects," *International Economic Review*, Vol. 29, No. 3, 1988.

Nieberding, James F., "Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues," Journal of Applied Economics, Vol 9, No. 2, November 2006, 361-380.

Jackson, John D., and Sarah J. Skinner, "On Valuing the Price Effect of a Conspiracy in Price-Fixing Cases," Journal of Forensic Economics, Vol. 17, No. 2, Spring/Summer 2004, 185-202 .

Johnson, John H., and Gregory K. Leonard, "In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings," *Antitrust Magazine*. Summer 2008.

Hylton, Keith N., *Antitrust Law and Economics*. Cheltenham, UK: Edward Elgar Publishing Limited, 2010.

MacDonald, James M., "Demand, Information, and Competition: Why Do Food Prices Fall at Seasonal Demand Peaks?," *Journal of Industrial Economics*, Vol. 48, No. 1, 2000.

Ivaldi, Marc, Bruno Jullien, Patrick Rey, Paul Seabright, and Jean Tirole, "The Economics of Tacit Collusion: Implications for Merger Control," *Contributions to Economic Analysis*, eds. Roberto Cellini and Lucas Lambertini, Volume 286, 2007.

Levenstein, Margaret, and Valerie Suslow, "Cartel bargaining and monitoring: The role of information sharing," 2006.

2

HIGHLY CONFIDENTIAL

JW-SEC-01101988

HIGHLY CONFIDENTIAL
Subject to Protective Order

Levenstein, Margaret, and Valerie Suslow, "Cartels and Collusion – Empirical Evidence," *Ross School of Business Working Paper*, Working Paper No. 1182, 2012.

Katz, Michael L., and Harvey S. Rosen, *Microeconomics*, 3rd Ed., McGraw- Hill/Irwin, 1997.

Spence, Michael, "Tacit Co-Ordination and Imperfect Information," The Canadian Journal of Economics, Vol. 11, No. 3, August 1978.

Davis, Peter and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2009.

Kennedy, Peter, "Sinning in the Basement: What Are the Rules? The Ten Commandments of Applied Econometrics," *Journal of Economic Surveys*, Vol. 16, No. 4, 2002.

Higgins, Richard S., Paul A. Johnson, "The mean effect of structural change on the dependent variable is accurately measured by the intercept change alone," Economics Letters, Vol. 80, 255-259.

Marshall, Robert C., and Leslie M. Marx, *The Economics of Collusion: Cartels and Bidding Rings*. Cambridge, MA.

Kaye, David H., and David A. Freedman, *Reference Guide on Statistics*, Reference Manual on Scientific Evidence, Third Edition, Washington, D.C., National Academies Press, 2011.

Lloyd, Robert M., "Proving Damages for Lost Profits: The Before-and-After Method," *College of Law Faculty Scholarship*, 2014.

Nicholson, Walter, *Microeconomic Theory*, Seventh Edition, Orlando, FL: The Dryden Press/Harcourt Brace College Publishers, 1998.

Rojas, Christian, "The role of demand information and monitoring in tacit collusion," *RAND Journal of Economics*, Vol. 43, No. 1, 2012.

Rotemberg, Julio J., and Michael Woodford, "Oligopolistic pricing and the effects of aggregate demand on economic activity," *Journal of Political Economy*, Vol. 100, No. 6, 1992.

Rotemberg, Julio J., and Garth Saloner, "A Supergame-Theoretic Model of Price Wars during Booms," *The American Economic Review*, Vol. 76, No. 3, 1986.

Zilliak, Stephen, and Deirdre McCloskey, "The Cult of Statistical Significance," *Joint Statistical Meetings*, August 3, 2009.

Warner, Elizabeth J. and Robert B. Barsky, "The Timing and Magnitude and Retail Store Markdowns: Evidence from Weekends and Holidays," *Quarterly Journal of Economics*, Vol. 110, No. 2, 1995.

Kovacic, William E., Robert C. Marshall, Leslie M. Marx, and Halbert L. White, "Plus Factors and Agreement in Antitrust Law," Michigan Law Review, Volume 110, Issue 3, 2011.

Wasserstein, Ronald L., and Nicole A. Lazar, "The ASA's Statement on p-Values: Context, Process, and Purpose," *The American Statistician*, 2016.

Wooldridge, Jeffrey, *Econometric Analysis of Cross Section and Panel Data*, Second Edition. Cambridge and London: MIT Press, 2010, p. 919.

News Articles & Press Releases

Sizemore, Charles, "The Bangladesh Butter Indicator Says Buy!" Forbes, March 4, 2015. Available at: https://www.forbes.com/sites/moneybuilder/2015/03/04/the-bangladesh-butter-indicator-says-buy/#c953be61df85.

Government Agency Publications

U.S. Department of Commerce, Economics and Statistics Administration, and U.S. Census Bureau, "Census Regions and Divisions of the United States." Accessed May 14th, 2020. Available at: https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf.

Federal Trade Commission and the U.S. Department of Justice, "Antitrust Guidelines for Collaborations Among Competitors," April 2000.

3

HIGHLY CONFIDENTIAL

JW-SEC-01101989

HIGHLY CONFIDENTIAL
Subject to Protective Order

Publicly Available Data

National Association of Realtors, "Existing Home Sales Midwest NSA", accessed on Bloomberg on December 20, 2019, Ticker: ETSLMWNS.

National Association of Realtors, "Existing Home Sales NE NSA", accessed on Bloomberg on December 20, 2019, Ticker: ETSLNENS.

National Association of Realtors, "Existing Home Sales South NSA", accessed on Bloomberg on December 20, 2019, Ticker: ETSLSONS.

National Association of Realtors, "Existing Home Sales West NSA", accessed on Bloomberg on December 20, 2019, Ticker: ETSLWENS.

RePEc, "RePEc/IDEAS rankings." Accessed on: June 5, 2020. Available at: http://ideas.repec.org/top/.

U.S. Census Bureau and U.S. Department of Housing and Urban Development, "Housing Starts in Midwest Census Region [HOUSTMWNSA]". Accessed on December 21, 2019. Available at: https://fred.stlouisfed.org/series/HOUSTMWNSA.

U.S. Census Bureau and U.S. Department of Housing and Urban Development, "Housing Starts in Northeast Census Region [HOUSTNENSA]". Accessed on December 21, 2019. Available at: https://fred.stlouisfed.org/series/HOUSTNENSA.

U.S. Census Bureau and U.S. Department of Housing and Urban Development, "Housing Starts in South Census Region [HOUSTSNSA]". Accessed on December 21, 2019. Available at: https://fred.stlouisfed.org/series/HOUSTSNSA.

U.S. Census Bureau and U.S. Department of Housing and Urban Development, "Housing Starts in West Census Region [HOUSTWNSA]". Accessed on December 21, 2019. Available at: https://fred.stlouisfed.org/series/HOUSTWNSA.

HIGHLY CONFIDENTIAL

JW-SEC-01101990

# Appendix C

HIGHLY CONFIDENTIAL

JW-SEC-01101991

HIGHLY CONFIDENTIAL
Subject to Protective Order

## APPENDIX C

**Defendants' Economists Fail to Consider, Explain, or Refute Important Evidence that Contradicts Their Opinions**

### A. Drs. Carlton and Johnson do not challenge common evidence that the structural characteristics of the IMD industry made it susceptible to the formation of the Cartel and that the effects of the Cartel were likely to have been experienced by essentially all members of the Class

1.      In the Lamb Report, I demonstrated that the structure of the IMD industry was conducive to the formation of the Cartel.[1] Defendants' economists neither address nor criticize my findings concerning the structure of the industry, including my finding that (1) Defendants dominated the IMD industry; (2) there are high barriers to entry in the IMD market; (3) IMDs are commodity-like products; (4) there are no substitutes for IMDs; (5) prices of IMDs had generally been flat or declining leading up to the start of the Cartel; (6) Defendants had many customers;[2] and (7) Defendants had many opportunities to engage in collusive communications, including via private telephone calls between their respective CEOs. Moreover, as a matter of economics, the presence of these structural characteristics in the IMD industry makes it unlikely that a material cohort of members of the Class could have avoided paying artificially-inflated prices resulting from the Cartel. Although Defendants' economists do not dispute these market characteristics, I briefly discuss several of them below, including how they demonstrate that the IMD industry was conducive to the formation of the Cartel and support my conclusion that all, or nearly all, members of the Class paid artificially-inflated prices for IMDs.

### 1. Defendants' economists do not challenge my conclusion that Defendants dominated the market for IMDs and the upstream market for Doorskins

2.      In the Lamb Report, I discussed class-wide evidence that Defendants controlled over 74% of the U.S. IMD market and controlled nearly 100% of the U.S. Doorskins market during the Benchmark and the Effective Cartel Periods.[3] Defendants' collective control of the IMD

---

[1] Lamb Report at ¶¶ 46-122.
[2] Dr. Carlton concurs: "Defendants sell to over one thousand distributors." *See* Carlton Report at ¶41.
[3] Lamb Report at ¶¶ 48-54.

HIGHLY CONFIDENTIAL

JW-SEC-01101992

HIGHLY CONFIDENTIAL
Subject to Protective Order

industry facilitated not only the formation and maintenance of the Cartel, but also the Cartel's ability to impose the artificially-inflated prices on all, or nearly all, members of the Class.[4]

3.    Drs. Carlton and Johnson do not dispute that the Defendants dominated the upstream Doorskin market and the downstream IMD market, and as a result, fail to refute the underpinnings of my conclusion that this market feature makes it more likely that all, or nearly all, members of the Class paid the higher prices that arose as a result of the Cartel. Indeed, Dr. Carlton's own market share analysis confirms that Defendants dominated the IMD industry.[5]

# Redacted - Third Party Confidentiality

Redacted - Third Party Confidentiality [6]

### 2.    **Defendants' economists do not challenge my conclusion that there were high barriers to entry in the IMD industry**

4.    In the Lamb Report, I concluded that common evidence is available to demonstrate the existence of significant barriers to entry in the IMD market.[7] For instance, I discussed common evidence demonstrating that the high level of capital investment, costs of environmental compliance, economies of scale, and excess capacity constitute barriers to entry into this market. As I explained in the Lamb Report, barriers to entry make a market susceptible to cartel behavior because cartel members can raise prices above competitive levels without the threat of a new supplier entering the marketplace and undercutting them on price. This means that artificially-inflated prices resulting from the Cartel would not have been disciplined or undermined by new entrants. Moreover, because there are high barriers to entry, it would have been nearly impossible for members of the Class to have avoided the effects of the Cartel by purchasing from

---

[4] Lamb Report at ¶¶ 240-242.
[5] Carlton Report Table 1.
[6] Redacted - Third Party Confidentiality    Redacted - Third Party Confidentiality *See* Lowe's, Written Responses to Subpoena Requests, January 31, 2020 at p. 1.
[7] Lamb Report at ¶¶ 55-68.

2

JW-SEC-01101993

HIGHLY CONFIDENTIAL
Subject to Protective Order

a new entrant.[8] Neither Dr. Carlton nor Dr. Johnson disputes my conclusion regarding the presence of barriers to entry into the IMD market.[9]

### 3. Defendants' economists fail to refute my conclusion that IMDs are commodity-like products

5.    As I discussed in the Lamb Report, IMDs are commodity-like products characterized by a high-level of interchangeability.[10] In a market with commodity products, competition occurs primarily on the basis of price, rather than other factors.[11] In commodity markets, price coordination is easier because cartel members can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices are more likely to reflect cheating on the conspiracy than some kind of custom arrangement or differences in product characteristics. Moreover, because IMDs are a commodity product, the higher prices that would have arisen from the Cartel would likely have been paid by all, or nearly all, Class members. As Onex executive and Jeld-Wen board member Matt Ross testified, "in a rational marketplace a customer isn't going to pay more for something they can get down the street for less."[12] That is, in commodity markets, persistent price differences for the same product, other than those that account for transaction costs (such as for large volume versus small volume purchases), create the potential for arbitrage by "buying at a low price in one location and selling at a higher price somewhere else."[13] For commodity products, it is well-accepted in economics that price increases tend to be widely imposed on the market, given that competition is primarily price-based.[14]

6.    In the Lamb Report, I discussed industry studies that described IMDs as commodity products that were "very similar across manufacturers" with only 10% considered

---

[8] Lamb Report at ¶¶ 240-242.
[9] Carlton Deposition at 92:20-93:15.
[10] Lamb Report at ¶¶ 69-78.
[11] Richard A. Posner, *Antitrust Law*, Second Edition, Chicago: University of Chicago Press, 2001 (hereafter "Posner") at pp. 76 – 77. *See also* George A. Hay and Daniel Kelley, "An Empirical Survey of Price Fixing Conspiracies," *Journal of Law & Economics*, Vol. 17, No. 1, 1974 at p. 15. "Product homogeneity is among the characteristics frequently cited as facilitating collusive behavior [...]. One way to define homogeneity is linked to the elasticity of substitution between competitors' products. If the products (or product lines) of two competitors are perfect substitutes for each other, then the 'product' is homogeneous."
[12] Deposition of Matt Ross, January 17, 2020 (hereafter "Ross Deposition") at 307:7-308:5.
[13] Robert Pindyck and Daniel Rubinfeld, *Microeconomics*. Eighth Edition, Upper Saddle River, N.J.: Pearson Prentice Hall, 2013 (hereafter "Pindyck and Rubinfeld") at p. 8 (emphasis in original).
[14] Posner pp. 76 – 77; Pindyck and Rubinfeld, p. 8.

3

HIGHLY CONFIDENTIAL

JW-SEC-01101994

**HIGHLY CONFIDENTIAL**
**Subject to Protective Order**

"differentiated."[15] I also discussed analyst reports that explained that "almost 80% of doors sold at Home Depot are hollow 6-panel doors which is a commoditized door and sells for $30-$40 at retail."[16] I also discussed Defendants' documents and testimony, which confirmed that competition is principally based on price. This includes a 2011 email from Home Depot to Jeld-Wen, in which Home Depot's Marty Gallagher explained his opposition to Jeld-Wen's proposed price increases because "we do not believe it is justified as current pricing is higher than where we can buy same/like product elsewhere."[17] Similarly, in the wholesale channel, Masonite executive John Beeken explained in an email to Fred Lynch, Masonite's former President and CEO, that the "taking of interior door business is almost entirely price driven ...."[18] I also cited deposition testimony from (1) Lawrence ("Larry") Repar, Masonite's former EVP and COO of the Door division; (2) Kirk Hachigian, Jeld-Wen's former Executive Chairman and CEO; and (3) Matt Ross, Onex Managing Director and Jeld-Wen board member, all of whom confirmed that IMDs are commodity-like products.[19]

7.      Documents produced by Defendants in this litigation support my finding that IMDs are interchangeable across suppliers. For instance, several "crosswalk" documents in the record allow both manufacturers and purchasers to determine which IMDs are interchangeable across Defendants. As one example, a CMI document compares IMD models for Masonite, Jeld-Wen, and CMI based on design and product characteristics.[20]

8.      While Defendants' economists do not directly challenge my opinion that IMDs are commodity-like products, they each attempt to imply a greater degree of product differentiation and purportedly resulting complexity to pricing. Dr. Carlton asserts that Defendants "sell a large number of products" and that both Masonite and Jeld-Wen introduced new products during the

---

[15] MAS-0000005613-5700 at 5618, 5621. *See also* Deposition of Paul Conley, February 6, 2020 at 99:9-21 ("Q And about what percentage of your Masonite interior molded door sales would these unique designs comprise? A I don't know specifically, but I would say probably five percent of that -- of the molded volume, that five percent. Q Understood. So the other 95 percent, JELD-WEN has a comparable product on the market to the Masonite product? THE WITNESS: I don't know JELD-WEN's entire line, but I'm assuming, yes.").

[16] MAS-0000019770-72 at 71.

[17] JELD-WEN-00647723.

[18] MAS-0000019469.

[19] See Lamb Report at ¶¶ 70-73; Deposition of Lawrence Repar, January 8, 2020 (hereafter "Repar Deposition") at 39:2-41:10; Deposition of Kirk Hachigian, January 23, 2020 (hereafter "Hachigian Deposition") at 178:19-179:15; Ross Deposition at 120:24-121:11, 280:23-281:16.

[20] JELD-WEN-00311986-87. *See also* Deposition of Derek Brosterhous, January 8, 2020 (hereafter "Brosterhous Deposition") at 62:23-63:8; Brosterhous Deposition Exhibit 192.

4

JW-SEC-01101995

**HIGHLY CONFIDENTIAL**
**Subject to Protective Order**

Cartel Period.[21] Dr. Johnson, for his part, agrees that IMD products with the same set of characteristics are highly interchangeable, but claims that "IMDs are differentiated by their look and feel" and that Defendants sell a "wide range of products."[22] Regardless of whether Defendants sell a wide-range of products, all products have standard characteristics and fall into standard categories. Defendants do not dispute the key points that (1) IMD products with similar product characteristics are interchangeable, and (2) each Defendant sells in each category. In other words, there is no dispute that there is a great deal of substitutability and interchangeability across Defendants' IMDs. Defendants' transactional data confirms that the designs that are common across Defendants (such as the six-panel textured IMD) account for approximately 98% of IMDs sold during the combined Benchmark and Effective Cartel Period. Moreover, while Defendants may offer a "wide range of products" as Dr. Johnson claims, some of which were sold only in the Benchmark or in the Class Period, products sold in both the Benchmark and Class Periods account for approximately 98% of IMD sales (in units) (see Figure C1 below).[23]

---

[21] Carlton Report at ¶¶ 102-103.
[22] Johnson Report at ¶¶ 20-21.
[23] Johnson Report at ¶ 21.

HIGHLY CONFIDENTIAL

JW-SEC-01101996

**HIGHLY CONFIDENTIAL**
**Subject to Protective Order**

### Figure C1
### Johnson's Exhibit 2 Weighted by Volume



- Volume from Products Sold Only in Benchmark Period
- Volume from Products Sold Only in Proposed Class Period
- Volume from Products Sold in both Benchmark and Proposed Class Periods

Source: Defendants' transactional data; Johnson Report work papers.

9.      Dr. Carlton performs an analysis of transaction prices that "confirms that prices paid by distributors vary widely for a single door."[24] But this analysis does not refute either the commodity-like nature of IMDs or that competition is principally based on price. Indeed, as my product characteristic regression in the Lamb Report demonstrated, pricing variation at any given point in time can be explained by product characteristics, customer location, and distribution channel.[25] As I discuss in my Reply Report, the characteristics that drive these differences in price (1) can be explained on a common basis; and (2) are equally present and thus cannot explain differences in IMD prices in the actual and but-for worlds.

---

[24] Carlton Report at ¶ 46, Figures 11 and 12.
[25] Lamb Report at ¶¶ 232 – 239.

6

JW-SEC-01101997

**HIGHLY CONFIDENTIAL**
**Subject to Protective Order**

### 4. Defendants' economists do not challenge my conclusion that there are no economic substitutes for IMDs

10.     In the Lamb Report, I concluded that class-wide evidence establishes demand for IMDs is inelastic and that there are no economic substitutes for IMDs and for Doorskins.[26] I based this finding on my review of Defendants' own documents and deposition testimony, which contain numerous references to the lack of available economic substitutes for Doorskins and IMDs. Dr. Carlton and Dr. Johnson do not make reference to or dispute my conclusion that there is a lack of available economic substitutes for IMDs.[27] Further, because there are no economic substitutes for Defendants' Doorskins, independent IMD manufacturers are limited in their ability to undercut Defendants' IMD prices. Moreover, the lack of available IMD substitutes facilitates the formation and maintenance of an effective Cartel, as well as Defendants' ability to impose the artificially-inflated prices resulting from that Cartel on all, or nearly all, members of the Class. Class members could not have turned to other types of interior doors to satisfy their requirements, nor could they have threatened to do so as a means to negotiate away the artificially-inflated prices that arose from the Cartel.

11.     As referenced above, neither Dr. Carlton nor Dr. Johnson comments on or disputes my analysis of the structural characteristics of the IMD industry. As I explained in the Lamb Report, in a market for a commodity product, where a cartel controls a dominant share of the market, there are few economic substitutes, and barriers to entry limit competition, a cartel such as the one alleged here is likely to result in artificially-inflated prices for all, or nearly all, Class members.[28] The artificially-inflated prices that arise can be imposed on all purchasers more easily where market characteristics limit the ability of buyers to negotiate away price increases by threatening to purchase the product from an alternative supplier or to purchase a different product. In the market for a commodity product, there is little opportunity to negotiate based on non-price characteristics of the transaction, making the price increase more likely to be widespread. Moreover, given the size of the price increases at issue here, the prospect that Class

---

[26] Lamb Report at ¶¶ 79-92.
[27] At his deposition, Dr. Carlton testified that while he had not studied the issue, he would agree that demand for IMDs is inelastic. Carlton Deposition at 66:19-67:3.
[28] Lamb Report at ¶¶ 240-242.

7

HIGHLY CONFIDENTIAL                                      JW-SEC-01101998

members (let alone a significant share of the Class) would have been entirely unaffected by the Cartel's price increases is highly unlikely.

### B. Defendants' economists do not refute my finding that the economic performance of the IMD industry cannot be explained by supply and demand factors alone

12.    In the Lamb Report, I analyzed the economic performance of the IMD industry and determined that IMD prices rose in a manner that cannot be explained by supply and demand factors alone.[29] My analysis detailed evidence that (1) IMD prices rose despite only moderately increasing demand, up from near-historically low levels, excess production capacity, and declining costs; and that (2) Jeld-Wen's prices rose despite significant quality problems. In determining that IMD prices during the Effective Cartel Period cannot be explained by supply and demand factors alone, I relied on documents produced in discovery and deposition testimony.[30] I also relied on evidence from my Overcharge Regression Analysis, which demonstrated that IMD prices during the Effective Cartel Period were inflated above competitive levels.

13.    While Dr. Carlton's discussion of IMD demand in his report recognizes that IMD demand has not reached pre-Great Recession levels by 2018, Defendants' economists fail to discuss, let alone refute, the other ways in which the performance of the IMD industry was inconsistent with higher prices for IMDs.[31] While Defendants' economists do criticize my Overcharge Regression Analysis (I discuss their flawed criticisms in my Reply Report), Drs. Carlton and Johnson do not dispute that IMD prices rose during the Effective Cartel Period despite decreasing costs, excess capacity, demand levels that had yet to recover from historical lows, and quality problems. As a result, they fail to refute significant evidence that IMD prices during the Effective Cartel Period were inconsistent with a market operating free of a cartel

14.    Moreover, in markets characterized by excess capacity, declining costs, and demand below historical levels, economic theory predicts that, absent a Cartel or other anomaly, prices in the marketplace should decrease rather than increase. Thus, the fact that IMD prices increased rather than decreased during the Effective Cartel Period in the face of these market factors is

---

[29] Lamb Report at ¶ 169.
[30] Lamb Report ¶¶ 170-186.
[31] Carlton Report at ¶¶ 57-58, Figures 16-17.

8

**HIGHLY CONFIDENTIAL**
**Subject to Protective Order**

evidence not only of the presence of the Cartel, but also that it was likely effective in artificially inflating IMD prices.

### C. *Defendants' economists' failure to address these market characteristics means that they also fail to refute a significant amount of evidence supporting my conclusion that all, or nearly all, Class members were injured*

15.     As I discussed above, the structural characteristics of the IMD industry, together with the strictly-enforced, widely-disseminated price increases (that even the largest customers were unable to avoid) all support my conclusion that the price increases imposed by Defendants adversely impacted all, or nearly all, Class members. Almost none of the foregoing analyses is discussed or rebutted in Drs. Carlton's and Johnson's reports. Indeed, Dr. Johnson's criticisms are based on a perfunctory review of the documentary evidence and include unreliable and flawed analyses. [32]

---

[32] Johnson Report at ¶¶ 18-44.

HIGHLY CONFIDENTIAL    JW-SEC-01102000

# Appendix D

HIGHLY CONFIDENTIAL

JW-SEC-01102001

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D1
## HOME DEPOT
## Actual Prices vs. Prices Predicted by Lamb Model
## (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 1 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102002

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D2
### BMC STOCK HOLDINGS, INC.
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 2 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102003

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix D3
LOWES CO IN PARENT
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 3 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102004

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D4
## HUTTIG BUILDING PRODUCTS
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 4 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102005

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D5
## BUILDERS FIRSTSOURCE BFS
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 5 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102006

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix D6
DYKE INDUSTRIES
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 6 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102007

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D7
## LUMBERMANS MERCHANDISING
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 7 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102008

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D8
## RUGBY APD HQ
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 8 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102009

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D9
## DW DISTRIBUTION
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

HIGHLY CONFIDENTIAL                                                JW-SEC-01102010

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix D10
TUCKER DOOR AND TRIM
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 10 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102011

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix D11
MENARDS
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 11 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102012

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix D12
BROCKWAY SMITH
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 12 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102013

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix D13
OREPAC CORPORATE
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 13 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102014

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix D14
US LBM LLC
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 14 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102015

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D15
## NVR HOMES INC
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 15 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102016

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D16
### MID-AM BUILDING SUPPLY INC.
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

HIGHLY CONFIDENTIAL                                    JW-SEC-01102017

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D17
## 84 LUMBER
## Actual Prices vs. Prices Predicted by Lamb Model
## (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 17 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102018

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D18
## PATRICK INDUSTRIES INC
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 18 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102019

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D19
## CARTER-JONES COMPANIES, INC.
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 19 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102020

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D20
## DO IT BEST
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

HIGHLY CONFIDENTIAL

JW-SEC-01102021

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D21
## HD SUPPLY
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 21 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102022

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D22
## ANDERCO
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 22 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102023

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix D23
CENTRAL WOODWORK
Actual Prices vs. Prices Predicted by Lamb Model
(10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 23 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102024

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D24
## J&O DOORS
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

Page 24 of 25

HIGHLY CONFIDENTIAL

JW-SEC-01102025

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Appendix D25
## SHUSTERS
### Actual Prices vs. Prices Predicted by Lamb Model
### (10/2012 - 12/2018)



Source: Defendants' transaction data.

HIGHLY CONFIDENTIAL

JW-SEC-01102026

# Appendix E

HIGHLY CONFIDENTIAL

JW-SEC-01102027

HIGHLY CONFIDENTIAL
Subject to Protective Order

Appendix E
Class Members' IMD Purchases from Defendants during the Class Period
(10/19/2014 - 12/31/2018)

| Customer | Slab Volume | Slab Sales ($ Dollars) | Bifold Volume | Bifold Sales ($ Dollars) | Total Volume | Total Sales ($ Dollars) |
|---|---|---|---|---|---|---|
| 1. HOME DEPOT PARENT | 9,434,850 | $ 245,669,992 | 4,155,563 | $ 126,176,374 | 13,590,413 | $ 371,846,366 |
| 2. BMC STOCK HOLDINGS, INC. | 8,629,514 | $ 255,043,961 | 66,849 | $ 3,191,259 | 8,696,363 | $ 258,235,220 |
| 3. LOWES CO IN PARENT | 6,951,211 | $ 164,573,252 | 2,609,409 | $ 74,706,187 | 9,560,620 | $ 239,279,438 |
| 4. BUILDERS FIRSTSOURCE BFS | 6,629,360 | $ 191,937,067 | 162,498 | $ 6,879,609 | 6,791,858 | $ 198,816,676 |
| 5. HUTTIG BUILDING PRODUCTS | 5,540,441 | $ 177,008,695 | 494,522 | $ 19,400,619 | 6,034,963 | $ 196,409,315 |
| 6. DYKE INDUSTRIES | 3,233,305 | $ 97,721,957 | 260,904 | $ 9,644,709 | 3,494,209 | $ 107,366,665 |
| 7. LUMBERMANS MERCHANDISING | 2,831,595 | $ 88,801,923 | 74,908 | $ 3,675,122 | 2,906,503 | $ 92,477,045 |
| 8. RUGBY APD HQ | 2,511,347 | $ 82,722,199 | 70,569 | $ 3,525,889 | 2,581,916 | $ 86,248,088 |
| 9. DW DISTRIBUTION | 1,965,934 | $ 59,894,099 | 19,797 | $ 1,123,252 | 1,985,731 | $ 61,017,351 |
| 10. MENARDS | 1,309,833 | $ 23,767,315 | 797,041 | $ 28,626,257 | 2,106,874 | $ 52,393,571 |
| 11. TUCKER DOOR AND TRIM | 1,619,396 | $ 50,414,380 | 33,271 | $ 1,560,840 | 1,652,667 | $ 51,975,220 |
| 12. BROCKWAY SMITH | 928,020 | $ 40,877,189 | 59,686 | $ 3,267,932 | 987,706 | $ 44,145,121 |
| 13. OREPAC CORPORATE | 1,115,709 | $ 36,524,997 | 60,322 | $ 2,069,154 | 1,176,031 | $ 38,594,151 |
| 14. US LBM LLC | 1,078,012 | $ 29,405,161 | 92,013 | $ 2,908,324 | 1,170,025 | $ 32,313,485 |
| 15. CARTER-JONES COMPANIES, INC. | 1,123,978 | $ 29,703,429 | 19,422 | $ 1,014,306 | 1,143,400 | $ 30,717,735 |
| 16. PATRICK INDUSTRIES INC | 1,106,861 | $ 29,479,738 | 6,036 | $ 376,327 | 1,112,897 | $ 29,856,066 |
| 17. NVR HOMES INC | 1,283,055 | $ 29,074,449 | 17,566 | $ 501,041 | 1,300,621 | $ 29,575,490 |
| 18. MID-AM BUILDING SUPPLY INC. | 961,694 | $ 27,125,294 | 43,894 | $ 2,263,729 | 1,005,588 | $ 29,389,023 |
| 19. 84 LUMBER | 1,153,002 | $ 28,593,065 | 5,484 | $ 322,808 | 1,158,486 | $ 28,915,872 |
| 20. HD SUPPLY | 517,473 | $ 13,080,304 | 360,224 | $ 11,011,447 | 877,697 | $ 24,091,751 |
| 21. ANDERCO | 777,087 | $ 23,673,377 | 1,357 | $ 83,138 | 778,444 | $ 23,756,515 |
| 22. DO IT BEST | 660,960 | $ 20,007,974 | 91,399 | $ 3,506,112 | 752,359 | $ 23,514,086 |
| 23. EL & EL WOOD PRODUCTS | 579,826 | $ 22,597,879 | 9,188 | $ 566,228 | 589,014 | $ 23,164,107 |
| 24. CENTRAL WOODWORK | 713,554 | $ 21,920,720 | 16,678 | $ 671,706 | 730,232 | $ 22,592,426 |
| 25. J&O DOORS | 499,736 | $ 21,343,805 | 3,899 | $ 299,832 | 503,635 | $ 21,643,637 |
| 26. CLAY INGELS/CADIZ DOOR | 714,536 | $ 20,718,705 | 10,116 | $ 519,564 | 724,652 | $ 21,238,270 |
| 27. SHUSTERS | 591,816 | $ 17,937,050 | 59,146 | $ 2,684,382 | 650,962 | $ 20,621,433 |
| 28. HERITAGE ONE | 510,241 | $ 19,714,779 | 638 | $ 53,146 | 510,879 | $ 19,767,925 |
| 29. CLEARY NAMCO | 439,183 | $ 18,476,443 | 23,513 | $ 1,085,637 | 462,696 | $ 19,562,080 |
| 30. MILLWORK PRODUCTS | 530,036 | $ 14,570,937 | 22,504 | $ 1,137,553 | 552,540 | $ 15,708,490 |
| 31. TEXAS PLYWOOD | 621,022 | $ 15,522,474 | 67 | $ 7,167 | 621,089 | $ 15,529,642 |
| 32. WARREN BROTHERS SASH & DOOR | 473,128 | $ 14,526,182 | 9,678 | $ 449,006 | 482,806 | $ 14,975,188 |
| 33. YBL, LLC | 375,240 | $ 14,806,480 | 291 | $ 39,680 | 375,531 | $ 14,846,160 |
| 34. CAMERON ASHLEY BUILDING PRODUCTS | 425,678 | $ 13,447,763 | 22,968 | $ 1,148,055 | 448,646 | $ 14,595,817 |
| 35. SOUTHWEST MOULDING CO, LP | 422,367 | $ 13,269,383 | 3,226 | $ 191,167 | 425,593 | $ 13,460,551 |
| 36. THE CLEM LUMBER AND DISTRIBUTING COMPANY | 348,825 | $ 10,609,423 | 31,856 | $ 1,451,366 | 380,681 | $ 12,060,789 |
| 37. RAYMART | 425,808 | $ 11,808,432 | 1,628 | $ 111,561 | 427,436 | $ 11,919,993 |
| 38. WOOLF DISTRIBUTING | 222,705 | $ 10,643,483 | 20,121 | $ 1,018,584 | 242,826 | $ 11,662,066 |
| 39. RIVER CITY | 224,050 | $ 9,054,301 | 35,308 | $ 1,389,728 | 259,358 | $ 10,444,028 |
| 40. BOISE BUILDING SOLUTIONS DISTRIBUTION | 314,465 | $ 9,996,633 | 9,737 | $ 374,954 | 324,202 | $ 10,371,588 |
| 41. WESTERN BUILDING PRODUCTS | 232,223 | $ 9,627,971 | 11,246 | $ 457,528 | 243,469 | $ 10,085,499 |
| 42. BADGER CORRUGATING CO | 223,977 | $ 8,248,403 | 26,964 | $ 1,460,275 | 250,941 | $ 9,708,678 |
| 43. INTERLINE | 254,638 | $ 5,092,643 | 176,100 | $ 4,540,930 | 430,738 | $ 9,633,573 |
| 44. WILSON PLYWOOD | 200,122 | $ 9,282,049 | 3 | $ 275 | 200,125 | $ 9,282,324 |

HIGHLY CONFIDENTIAL

JW-SEC-01102028

HIGHLY CONFIDENTIAL
Subject to Protective Order

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 45. TOLL BROS INC | 324,942 | $ | 8,758,519 | 375 | $ | 20,757 | 325,317 | $ | 8,779,276 |
| 46. TRIMCO THE MILLWORK PEOPLE | 227,627 | $ | 8,166,380 | 8,053 | $ | 384,186 | 235,680 | $ | 8,550,566 |
| 47. NORTH CASCADE | 231,269 | $ | 7,289,489 | 22,186 | $ | 1,047,622 | 253,455 | $ | 8,337,111 |
| 48. BUILDING CENTER | 285,398 | $ | 8,230,323 | 647 | $ | 32,218 | 286,045 | $ | 8,262,541 |
| 49. BAYER BUILT | 187,398 | $ | 6,608,067 | 36,763 | $ | 1,272,703 | 224,161 | $ | 7,880,770 |
| 50. MCCRAY LUMBER CO. INC. | 249,110 | $ | 7,217,424 | 2,302 | $ | 146,103 | 251,412 | $ | 7,363,527 |
| 51. NORTHWEST RIDOUT DOOR | 261,899 | $ | 6,998,008 | 2,437 | $ | 177,617 | 264,336 | $ | 7,175,625 |
| 52. RESDOOR | 260,268 | $ | 7,134,655 | 320 | $ | 29,379 | 260,588 | $ | 7,164,035 |
| 53. BLUELINX CORPORATION | 273,284 | $ | 6,762,873 | 96 | $ | 6,839 | 273,380 | $ | 6,769,712 |
| 54. COLONIAL SASH AND DOOR, INC. | 200,956 | $ | 6,382,525 | 1,684 | $ | 103,012 | 202,640 | $ | 6,485,537 |
| 55. NATIONAL MILLWORK INC. | 174,383 | $ | 5,861,181 | 14,521 | $ | 617,857 | 188,904 | $ | 6,479,038 |
| 56. BROAD BUILDING SUPPLY COMPANY | 194,840 | $ | 6,061,615 | 5,174 | $ | 306,900 | 200,014 | $ | 6,368,515 |
| 57. TRIMPAC | 170,372 | $ | 5,402,851 | 23,364 | $ | 960,758 | 193,736 | $ | 6,363,609 |
| 58. TRU-FIT FRAME & DOOR | 132,380 | $ | 6,222,233 | 1,784 | $ | 136,972 | 134,164 | $ | 6,359,205 |
| 59. BUILDING PRODUCTS INC | 138,124 | $ | 5,252,984 | 17,773 | $ | 1,000,423 | 155,897 | $ | 6,253,407 |
| 60. NORTH STATE MILLWORK INC | 210,020 | $ | 6,076,206 | 2,890 | $ | 139,467 | 212,910 | $ | 6,215,673 |
| 61. SHELTER PRODUCTS | 242,413 | $ | 6,166,862 | 119 | $ | 8,641 | 242,532 | $ | 6,175,503 |
| 62. ASA BUILDERS SUPPLY CO | 180,496 | $ | 4,737,006 | 25,198 | $ | 1,224,204 | 205,694 | $ | 5,961,209 |
| 63. KEYSTONE DISTRIBUTION, LLC | 190,256 | $ | 5,732,253 | 3,016 | $ | 213,336 | 193,272 | $ | 5,945,588 |
| 64. MILL CREEK LUMBER & SUPPLY | 191,947 | $ | 5,767,484 | 1,680 | $ | 127,970 | 193,627 | $ | 5,895,453 |
| 65. JOFFE LUMBER & SUPPLY COMPANY, INC | 163,641 | $ | 5,534,640 | 1,348 | $ | 97,673 | 164,989 | $ | 5,632,313 |
| 66. JONES DOORS & WINDOWS, INC. | 175,907 | $ | 5,553,127 | 521 | $ | 54,396 | 176,428 | $ | 5,607,523 |
| 67. TEEM WHOLESALE | 141,440 | $ | 5,047,588 | 10,668 | $ | 448,287 | 152,108 | $ | 5,495,874 |
| 68. WHOLESALE HARDWOOD INTERIORS | 139,850 | $ | 5,156,680 | 2,249 | $ | 103,338 | 142,099 | $ | 5,260,018 |
| 69. QUALITY WHOLESALE MILLWORK | 165,124 | $ | 5,180,065 | 376 | $ | 29,016 | 165,500 | $ | 5,209,081 |
| 70. WHOLESALE SUPPLY | 170,006 | $ | 5,029,029 | 3,122 | $ | 165,387 | 173,128 | $ | 5,194,416 |
| 71. PACIFIC MUTUAL DOOR | 166,635 | $ | 4,917,848 | 4,329 | $ | 243,248 | 170,964 | $ | 5,161,097 |
| 72. DARPET, INC. | 122,066 | $ | 4,529,574 | 20,461 | $ | 627,930 | 142,527 | $ | 5,157,504 |
| 73. AMERICA BUILDING PRODUCTS | 145,087 | $ | 4,723,936 | 6,890 | $ | 362,460 | 151,977 | $ | 5,086,396 |
| 74. KOETTER WOODWORKING, INC. | 94,699 | $ | 5,002,808 | 670 | $ | 52,178 | 95,369 | $ | 5,054,986 |
| 75. F P G WHOLESALE | 97,854 | $ | 3,356,212 | 27,582 | $ | 1,275,034 | 125,436 | $ | 4,631,245 |
| 76. ADAM | 99,075 | $ | 3,902,438 | 15,081 | $ | 641,961 | 114,156 | $ | 4,544,398 |
| 77. SANTREE SUPPLY CORP | 140,090 | $ | 4,278,119 | 3,543 | $ | 134,548 | 143,633 | $ | 4,412,668 |
| 78. ALLIED BUILDING STORES | 104,758 | $ | 3,977,938 | 3,395 | $ | 222,251 | 108,153 | $ | 4,200,188 |
| 79. MCCOY CORPORATION | 137,888 | $ | 4,114,218 | 1,151 | $ | 50,361 | 139,039 | $ | 4,164,579 |
| 80. MG BUILDING MATERIALS | 172,652 | $ | 4,114,234 | 403 | $ | 26,358 | 173,055 | $ | 4,140,592 |
| 81. HEISTER HOUSE MILLWORKS, INC. | 109,866 | $ | 3,496,615 | 11,013 | $ | 631,953 | 120,879 | $ | 4,128,568 |
| 82. VICTOR S. BARNES CO. | 98,294 | $ | 3,069,179 | 18,980 | $ | 962,365 | 117,274 | $ | 4,031,544 |
| 83. MCMAHON & COMPANY | 86,432 | $ | 3,650,849 | 9,863 | $ | 358,890 | 96,295 | $ | 4,009,739 |
| 84. FACETIME INC. | 150,451 | $ | 3,980,432 | - | $ | - | 150,451 | $ | 3,980,432 |
| 85. DOORSCAPES, INC. | 183,013 | $ | 3,912,746 | 20 | $ | 1,698 | 183,033 | $ | 3,914,444 |
| 86. O B BUILDERS INC | 112,512 | $ | 3,784,995 | 506 | $ | 39,113 | 113,018 | $ | 3,824,108 |
| 87. SSI MILLWORK, LLC | 109,909 | $ | 3,587,085 | 2,010 | $ | 146,950 | 111,919 | $ | 3,734,036 |
| 88. MOBILE LUMBER & BLDG MATERIALS | 133,687 | $ | 3,604,664 | 1,559 | $ | 104,756 | 135,246 | $ | 3,709,420 |
| 89. TAGUE LUMBER, INC. | 95,368 | $ | 3,546,923 | 2,575 | $ | 140,884 | 97,943 | $ | 3,687,806 |
| 90. SMITH MOULDING INC | 115,467 | $ | 3,464,352 | 1,727 | $ | 100,345 | 117,194 | $ | 3,564,697 |
| 91. KANSAS CITY BUILDING SUPPLY | 106,581 | $ | 3,474,251 | 1,291 | $ | 45,469 | 107,872 | $ | 3,519,720 |
| 92. 3-G TRIM, INC. | 96,078 | $ | 3,442,482 | 163 | $ | 13,521 | 96,241 | $ | 3,456,003 |
| 93. UNIFIED DOOR & HARDWARE GROUP, LLC | 78,933 | $ | 3,328,640 | 1,375 | $ | 95,590 | 80,308 | $ | 3,424,230 |

HIGHLY CONFIDENTIAL

JW-SEC-01102029

HIGHLY CONFIDENTIAL
Subject to Protective Order

| # | Name | | | | | | | | |
|---|------|---|---|---|---|---|---|---|---|
| 94. | U.S. LUMBER GROUP | 104,235 | $ | 3,224,309 | 4,784 | $ | 188,283 | 109,019 | $ 3,412,592 |
| 95. | AMERICAN BUILDERS SUPPLY | 97,234 | $ | 3,282,750 | 3,914 | $ | 95,923 | 101,148 | $ 3,378,673 |
| 96. | SOUTHERN PACIFIC SUPPLY COMPANY, INC. | 125,088 | $ | 3,095,319 | 2,397 | $ | 99,417 | 127,485 | $ 3,194,736 |
| 97. | THE WINDOW DEPOT | 129,504 | $ | 2,984,577 | 5,275 | $ | 159,399 | 134,779 | $ 3,143,976 |
| 98. | AMERICAN OPENINGS, INC. | 107,208 | $ | 2,846,044 | 3,607 | $ | 157,153 | 110,815 | $ 3,003,197 |
| 99. | BARNETT MILLWORK | 91,872 | $ | 2,946,886 | 139 | $ | 12,118 | 92,011 | $ 2,959,004 |
| 100. | MINOT BUILDERS SUPPLY | 65,048 | $ | 2,330,996 | 10,851 | $ | 585,400 | 75,899 | $ 2,916,396 |
| 101. | CHADWELL SUPPLY INC | 42,403 | $ | 1,210,702 | 57,076 | $ | 1,694,650 | 99,479 | $ 2,905,353 |
| 102. | UBI PRODUCTS | 50,439 | $ | 2,838,281 | 452 | $ | 39,315 | 50,891 | $ 2,877,596 |
| 103. | TRIM-A-DOOR, INC. | 66,307 | $ | 2,307,923 | 8,358 | $ | 456,166 | 74,665 | $ 2,764,089 |
| 104. | JEFFERSON DOOR COMPANY, INC. | 51,994 | $ | 2,578,130 | 1,981 | $ | 136,323 | 53,975 | $ 2,714,453 |
| 105. | DIRECT MILLWORK LLC | 67,102 | $ | 2,667,924 | 476 | $ | 28,136 | 67,578 | $ 2,696,060 |
| 106. | BUILDING SUPPLIES OUTLET INC. | 52,231 | $ | 2,436,787 | 4,918 | $ | 190,157 | 57,149 | $ 2,626,944 |
| 107. | EMPIRE BUILDING MAT | 52,835 | $ | 2,236,080 | 8,381 | $ | 352,007 | 61,216 | $ 2,588,087 |
| 108. | TEXAS DOOR AND TRIM | 55,273 | $ | 2,556,305 | 123 | $ | 12,795 | 55,396 | $ 2,569,100 |
| 109. | BURTON WINDOW & DOOR COMPANY | 88,157 | $ | 2,440,601 | 1,877 | $ | 85,664 | 90,034 | $ 2,526,265 |
| 110. | PREHUNG DOORS INC. | 38,828 | $ | 2,294,133 | 2,675 | $ | 211,434 | 41,503 | $ 2,505,567 |
| 111. | OZARK SASH & DOOR | 82,226 | $ | 2,411,144 | 1,016 | $ | 57,435 | 83,242 | $ 2,468,579 |
| 112. | NEWCO DEALERS WHOLESALE | 72,664 | $ | 2,248,393 | 2,385 | $ | 137,257 | 75,049 | $ 2,385,650 |
| 113. | D & M INDUSTRIES | 46,658 | $ | 2,193,283 | 4,654 | $ | 190,735 | 51,312 | $ 2,384,017 |
| 114. | TRI-COUNTY MILLWORK LLC | 50,703 | $ | 2,195,721 | 3,819 | $ | 155,668 | 54,522 | $ 2,351,389 |
| 115. | LUMBERYARD SUPPLIERS INC | 68,182 | $ | 2,008,884 | 8,090 | $ | 245,453 | 76,272 | $ 2,254,337 |
| 116. | LIGHTEN UP, LLC | 32,222 | $ | 1,144,974 | 24,741 | $ | 1,070,976 | 56,963 | $ 2,215,950 |
| 117. | CAULKTITE CORP | 69,003 | $ | 2,100,300 | 2,403 | $ | 81,775 | 71,406 | $ 2,182,075 |
| 118. | SCHAAF WINDOW CO., INC. | 28,711 | $ | 1,690,157 | 6,400 | $ | 424,773 | 35,111 | $ 2,114,930 |
| 119. | ACADIAN MILLWORK & SPLY | 38,893 | $ | 2,014,115 | 588 | $ | 56,678 | 39,481 | $ 2,070,793 |
| 120. | WILSON LUMBER | 81,138 | $ | 2,024,801 | 918 | $ | 42,347 | 82,056 | $ 2,067,148 |
| 121. | BEISSER'S INC. | 48,082 | $ | 1,879,415 | 4,446 | $ | 182,241 | 52,528 | $ 2,061,656 |
| 122. | RANDOLPH BUNDY | 53,349 | $ | 1,857,857 | 2,379 | $ | 130,864 | 55,728 | $ 1,988,721 |
| 123. | LAUDERBACH BUILDERS SUPPLY, INC. | 57,662 | $ | 1,983,237 | 25 | $ | 2,371 | 57,687 | $ 1,985,608 |
| 124. | DEFORD LUMBER COMPANY | 57,812 | $ | 1,981,048 | 2 | $ | 123 | 57,814 | $ 1,981,172 |
| 125. | CUMBERLAND MILLWORK & SUPPLY, INC | 41,036 | $ | 1,924,718 | 492 | $ | 30,250 | 41,528 | $ 1,954,968 |
| 126. | ADVANCE MILLWORK | 42,000 | $ | 1,644,539 | 2,958 | $ | 210,850 | 44,958 | $ 1,855,388 |
| 127. | VAN METRE BASE LLC | 60,241 | $ | 1,848,158 | - | $ | - | 60,241 | $ 1,848,158 |
| 128. | SOUTHERN DOOR & TRIM INC. | 58,465 | $ | 1,814,463 | - | $ | - | 58,465 | $ 1,814,463 |
| 129. | AAA BUILDING | 39,029 | $ | 1,455,392 | 3,977 | $ | 303,088 | 43,006 | $ 1,758,480 |
| 130. | EXCLUSIVE DOOR | 30,730 | $ | 1,737,222 | 8 | $ | 943 | 30,738 | $ 1,738,166 |
| 131. | NORTHWEST MILLWORK | 28,484 | $ | 1,639,148 | 1,521 | $ | 92,595 | 30,005 | $ 1,731,744 |
| 132. | STANDALE LUMBER CO | 42,135 | $ | 1,350,822 | 8,501 | $ | 366,324 | 50,636 | $ 1,717,146 |
| 133. | STEWARD STEEL, INC. | 47,633 | $ | 1,676,885 | 531 | $ | 39,646 | 48,164 | $ 1,716,531 |
| 134. | CHASE MANUFACTURING | 50,991 | $ | 1,656,681 | 580 | $ | 59,548 | 51,571 | $ 1,716,228 |
| 135. | WOODCRAFTERS LUMBER SALES OF SALEM, INC. | 44,225 | $ | 1,475,829 | 3,459 | $ | 230,951 | 47,684 | $ 1,706,780 |
| 136. | FRONTIER DOOR & CABINET, LLC | 47,489 | $ | 1,551,072 | 2,434 | $ | 117,839 | 49,923 | $ 1,668,912 |
| 137. | VAN LUMBER INC | 36,507 | $ | 1,562,344 | 1,346 | $ | 63,397 | 37,853 | $ 1,625,741 |
| 138. | BEACON ROOFING SUPPLY, INC. | 52,185 | $ | 1,538,774 | 356 | $ | 26,053 | 52,541 | $ 1,564,827 |
| 139. | CENTRAL WHOLESALERS LLC | 29,539 | $ | 905,777 | 13,855 | $ | 579,348 | 43,394 | $ 1,485,125 |
| 140. | TEAGUE LUMBER CO | 46,307 | $ | 1,390,157 | 408 | $ | 30,518 | 46,715 | $ 1,420,675 |
| 141. | ISLAND POND MILLWORK , INC. | 32,544 | $ | 1,234,189 | 2,975 | $ | 186,364 | 35,519 | $ 1,420,553 |
| 142. | PHOENIX DOOR INC | 38,883 | $ | 1,406,017 | 2 | $ | 276 | 38,885 | $ 1,406,293 |

HIGHLY CONFIDENTIAL

JW-SEC-01102030

HIGHLY CONFIDENTIAL
Subject to Protective Order

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 143. LUMBER ONE HOME CENTER OF STUTTGART, INC | 36,039 | $ | 1,375,411 | 242 | $ | 16,595 | 36,281 | $ | 1,392,005 |
| 144. ACCENT MILLWORK AND SUPPLY, L.C. | 41,016 | $ | 1,361,304 | 419 | $ | 26,321 | 41,435 | $ | 1,387,626 |
| 145. LAMAR & WALLACE, INC. | 44,675 | $ | 1,313,628 | 1,518 | $ | 72,437 | 46,193 | $ | 1,386,065 |
| 146. HAWKEYE BUILDING DIST | 32,254 | $ | 1,200,188 | 3,870 | $ | 160,884 | 36,124 | $ | 1,361,072 |
| 147. CREATIVE WINDOW & DOOR, INC. | 26,029 | $ | 1,226,672 | 1,879 | $ | 127,196 | 27,908 | $ | 1,353,868 |
| 148. BURKS DOOR & SASH | 33,880 | $ | 1,248,192 | 317 | $ | 24,252 | 34,197 | $ | 1,272,444 |
| 149. THE DOOR & WINDOW STORE, INC. | 26,303 | $ | 1,268,178 | 77 | $ | 3,761 | 26,380 | $ | 1,271,939 |
| 150. BUCKEYE PARTS SERVICES | 39,965 | $ | 986,192 | 2,430 | $ | 131,753 | 42,395 | $ | 1,117,945 |
| 151. CROWN MILL WORK CORP. | 27,403 | $ | 1,095,415 | 10 | $ | 1,360 | 27,413 | $ | 1,096,775 |
| 152. WELLCO HOLDINGS, INC. | 34,812 | $ | 1,052,880 | 107 | $ | 6,776 | 34,919 | $ | 1,059,657 |
| 153. CAPITAL COMPONENTS | 33,321 | $ | 1,043,542 | 64 | $ | 3,327 | 33,385 | $ | 1,046,869 |
| 154. FASKE WOOD MOULDING INC | 34,844 | $ | 983,911 | 501 | $ | 27,323 | 35,345 | $ | 1,011,234 |
| 155. JAMAICA MILLWORK, LLC | 24,103 | $ | 766,231 | 2,492 | $ | 153,686 | 26,595 | $ | 919,917 |
| 156. KIRSCH BUILDERS SUPPLY | 15,124 | $ | 609,288 | 5,075 | $ | 296,080 | 20,199 | $ | 905,368 |
| 157. K HOVNANIAN SUMMIT HOMES LLC | 34,294 | $ | 758,192 | 3,159 | $ | 126,820 | 37,453 | $ | 885,012 |
| 158. TWP ENTERPIRSES, INC. | 21,623 | $ | 835,153 | 612 | $ | 32,700 | 22,235 | $ | 867,853 |
| 159. TRU-DOOR HAWAII | 23,550 | $ | 813,270 | 408 | $ | 17,289 | 23,958 | $ | 830,559 |
| 160. BERKS PRODUCTS CORP | 29,232 | $ | 732,944 | 1,551 | $ | 89,011 | 30,783 | $ | 821,955 |
| 161. A.D. MOYER LUMBER KUTZTOWN, INC. | 25,652 | $ | 737,963 | 1,089 | $ | 76,210 | 26,741 | $ | 814,172 |
| 162. J.J. MCILWEE COMPANY | 12,454 | $ | 769,270 | 261 | $ | 21,942 | 12,715 | $ | 791,212 |
| 163. KENT DOOR & SPECIALITY, INC | 16,125 | $ | 738,282 | 749 | $ | 33,636 | 16,874 | $ | 771,918 |
| 164. K-D FRAME & DOOR CORP. | 20,626 | $ | 666,753 | 88 | $ | 5,251 | 20,714 | $ | 672,005 |
| 165. WOODGRAIN MILLWORK, INC. | 4,559 | $ | 270,902 | 5,528 | $ | 395,028 | 10,087 | $ | 665,929 |
| 166. UFP NEW WAVERLY, LLC | 9,689 | $ | 659,400 | - | $ | - | 9,689 | $ | 659,400 |
| 167. HIGHMARK DIGITAL INC | 13,558 | $ | 531,207 | 1,144 | $ | 105,717 | 14,702 | $ | 636,924 |
| 168. ENNIS DOOR & TRIM, INC. | 12,633 | $ | 624,387 | - | $ | - | 12,633 | $ | 624,387 |
| 169. ELITE DOORS CORP | 13,062 | $ | 620,584 | - | $ | - | 13,062 | $ | 620,584 |
| 170. BOSTON LUMBER | 10,880 | $ | 553,049 | 1,073 | $ | 59,240 | 11,953 | $ | 612,289 |
| 171. GUY C. LEE | 20,848 | $ | 587,474 | 260 | $ | 14,055 | 21,108 | $ | 601,529 |
| 172. GROSS AND YOWELL AND CO INC | 14,992 | $ | 568,552 | 58 | $ | 4,862 | 15,050 | $ | 573,413 |
| 173. MCKINNEY DOOR | 8,220 | $ | 567,957 | - | $ | - | 8,220 | $ | 567,957 |
| 174. FOXWORTH-GALBRAITH LUMBER CO | 15,945 | $ | 548,436 | 84 | $ | 6,003 | 16,029 | $ | 554,439 |
| 175. WINDOR | 9,286 | $ | 489,345 | 190 | $ | 11,910 | 9,476 | $ | 501,254 |
| 176. BUILDERS MILLWORK-WI | 6,219 | $ | 497,838 | 37 | $ | 2,960 | 6,256 | $ | 500,799 |
| 177. PACIFIC INTERNATIONAL ASSOC. | 11,667 | $ | 287,337 | 6,763 | $ | 197,162 | 18,430 | $ | 484,499 |
| 178. TREE COURT BUILDERS | 12,875 | $ | 447,805 | 719 | $ | 34,941 | 13,594 | $ | 482,746 |
| 179. IPT-SUPPLY, LLC | 18,829 | $ | 459,233 | 468 | $ | 20,280 | 19,297 | $ | 479,513 |
| 180. H.W. JENKINS COMPANY | 14,946 | $ | 473,538 | 22 | $ | 2,379 | 14,968 | $ | 475,917 |
| 181. RUFFIN & PAYNE, INC. | 11,992 | $ | 434,302 | 469 | $ | 27,306 | 12,461 | $ | 461,608 |
| 182. RIVER VALLEY DOOR | 11,361 | $ | 426,922 | 217 | $ | 18,992 | 11,578 | $ | 445,914 |
| 183. WOODWORK SPECIALTIES | 7,624 | $ | 386,852 | 661 | $ | 49,255 | 8,285 | $ | 436,107 |
| 184. GRUBB LUMBER COMPANY, INC | 16,235 | $ | 402,385 | 764 | $ | 24,216 | 16,999 | $ | 426,601 |
| 185. AUBURN MILLWORK | 16,281 | $ | 422,688 | - | $ | - | 16,281 | $ | 422,688 |
| 186. ZIEGLER LUMBER | 10,680 | $ | 362,761 | 1,346 | $ | 45,273 | 12,026 | $ | 408,034 |
| 187. OKLAHOMA HOME CENTER | 11,351 | $ | 399,919 | 2 | $ | 120 | 11,353 | $ | 400,040 |
| 188. CUSTOM-BILT CABINET & SUPPLY INC | 11,026 | $ | 384,263 | 85 | $ | 6,280 | 11,111 | $ | 390,542 |
| 189. NORTH COUNTRIES SUPPLY | 8,512 | $ | 327,258 | 1,689 | $ | 61,631 | 10,201 | $ | 388,889 |
| 190. MINNESOTA VALLEY MILLWORK INC | 8,263 | $ | 303,665 | 899 | $ | 68,421 | 9,162 | $ | 372,086 |
| 191. DOORS WEST | 9,665 | $ | 361,397 | 26 | $ | 2,677 | 9,691 | $ | 364,074 |

HIGHLY CONFIDENTIAL

JW-SEC-01102031

HIGHLY CONFIDENTIAL
Subject to Protective Order

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 192. SUTHERLAND BUILDING MATERIALS | 12,891 | $ | 309,632 | 1,213 | $ | 50,292 | 14,104 | $ | 359,923 |
| 193. J MAX AMERICA INC | 7,228 | $ | 221,500 | 3,882 | $ | 128,327 | 11,110 | $ | 349,827 |
| 194. AMERICAN DIRECT PROCUREMENT | 3,007 | $ | 342,072 | - | $ | - | 3,007 | $ | 342,072 |
| 195. NEVAMAR COMPANY, LLC | 8,146 | $ | 335,484 | 11 | $ | 2,029 | 8,157 | $ | 337,512 |
| 196. UNIVERSAL FOREST PRODUCTS | 9,924 | $ | 332,292 | - | $ | - | 9,924 | $ | 332,292 |
| 197. PINE CREEK LUMBER | 10,959 | $ | 318,688 | 160 | $ | 6,629 | 11,119 | $ | 325,318 |
| 198. CLOUD BROTHER'S WHOLESALE, LLC | 10,076 | $ | 273,262 | 896 | $ | 48,925 | 10,972 | $ | 322,187 |
| 199. LUMBER YARD SUPPLY | 8,518 | $ | 257,296 | 1,705 | $ | 58,280 | 10,223 | $ | 315,576 |
| 200. AUGUSTA SASH & DOOR CO. | 12,995 | $ | 311,843 | 32 | $ | 2,003 | 13,027 | $ | 313,846 |
| 201. LAFAYETTE CAPITAL MANAGEMENT, LLC | 9,662 | $ | 312,286 | 10 | $ | 868 | 9,672 | $ | 313,154 |
| 202. ALL SEASONS | 10,279 | $ | 308,906 | 6 | $ | 465 | 10,285 | $ | 309,371 |
| 203. FORD LUMBER CO., INC. | 10,039 | $ | 291,940 | 217 | $ | 11,613 | 10,256 | $ | 303,553 |
| 204. M & M LUMBER COMPANY | 8,383 | $ | 293,865 | 85 | $ | 7,330 | 8,468 | $ | 301,195 |
| 205. BUILDERS SURPLUS INC | 7,819 | $ | 256,414 | 1,347 | $ | 42,392 | 9,166 | $ | 298,806 |
| 206. TULL BROTHERS PARENT | 7,628 | $ | 290,617 | 35 | $ | 2,244 | 7,663 | $ | 292,861 |
| 207. B & B WOOD PRODUCTS, INC | 4,854 | $ | 242,655 | 594 | $ | 36,526 | 5,448 | $ | 279,181 |
| 208. WHOLESALE BUILDING PRODUCTS LLC | 6,795 | $ | 129,032 | 4,706 | $ | 134,653 | 11,501 | $ | 263,685 |
| 209. HOTEL RESOURCES | 1,637 | $ | 262,681 | - | $ | - | 1,637 | $ | 262,681 |
| 210. LA FORCE INC | 2,287 | $ | 249,578 | 15 | $ | 1,804 | 2,302 | $ | 251,382 |
| 211. MAINTENANCE SUPPLY HEADQUARTERS | 6,783 | $ | 171,610 | 2,643 | $ | 79,652 | 9,426 | $ | 251,262 |
| 212. EAST COAST MILLWORK LLC | 7,789 | $ | 230,511 | 80 | $ | 4,991 | 7,869 | $ | 235,501 |
| 213. GEORGIA DOOR AND PLYWOOD | 1,594 | $ | 53,891 | 7,670 | $ | 181,398 | 9,264 | $ | 235,289 |
| 214. ACA QUALITY BUILDING PRODUCTS LLC | 8,498 | $ | 215,928 | 452 | $ | 14,375 | 8,950 | $ | 230,304 |
| 215. ZESKIND'S HARDWARE, INC. | 7,751 | $ | 229,020 | - | $ | - | 7,751 | $ | 229,020 |
| 216. MPC CASHWAY LUMBER COMPANY INC | 7,002 | $ | 169,234 | 1,099 | $ | 58,220 | 8,101 | $ | 227,454 |
| 217. HOUSE OF DOORS-CT | 4,829 | $ | 201,630 | 689 | $ | 24,241 | 5,518 | $ | 225,871 |
| 218. MEEK'S BUILDING CENTERS | 7,017 | $ | 219,506 | 40 | $ | 2,654 | 7,057 | $ | 222,159 |
| 219. CHESTER CONSTRUCTION SUPPLY INC | 6,003 | $ | 197,779 | 346 | $ | 20,909 | 6,349 | $ | 218,688 |
| 220. THE A G MAURO COMPANY | 1,633 | $ | 215,381 | - | $ | - | 1,633 | $ | 215,381 |
| 221. PLATINUM DOORS, LLC | 8,118 | $ | 214,757 | 7 | $ | 556 | 8,125 | $ | 215,313 |
| 222. BEE BUILDERS | 3,752 | $ | 214,230 | - | $ | - | 3,752 | $ | 214,230 |
| 223. B & B MILLWORK & DOORS, INC. | 4,975 | $ | 213,533 | 3 | $ | 133 | 4,978 | $ | 213,666 |
| 224. DEALERS SUPPLY & LUMBER | 4,476 | $ | 162,312 | 902 | $ | 45,483 | 5,378 | $ | 207,794 |
| 225. COKERS DOORS AND MOULDINGS INC | 7,049 | $ | 207,774 | - | $ | - | 7,049 | $ | 207,774 |
| 226. CREATIVE ASSOCIATES | 6,093 | $ | 191,966 | 183 | $ | 12,455 | 6,276 | $ | 204,421 |
| 227. HERITAGE MILLWORK | 3,901 | $ | 159,657 | 952 | $ | 38,901 | 4,853 | $ | 198,558 |
| 228. ALLEN MILLWORK | 5,768 | $ | 194,504 | 59 | $ | 3,804 | 5,827 | $ | 198,307 |
| 229. HAWAII WESTERN | 3,967 | $ | 180,497 | 197 | $ | 14,804 | 4,164 | $ | 195,300 |
| 230. LINCOLN LUMBER COMPANY | 4,525 | $ | 145,066 | 769 | $ | 49,450 | 5,294 | $ | 194,516 |
| 231. FUNCTIONAL BUILDING SUPPLY | 1,715 | $ | 189,999 | - | $ | - | 1,715 | $ | 189,999 |
| 232. INTERRA USA INC | 2,695 | $ | 84,020 | 2,962 | $ | 103,524 | 5,657 | $ | 187,545 |
| 233. QUAKER MILLWORK | 2,692 | $ | 151,595 | 672 | $ | 35,683 | 3,364 | $ | 187,278 |
| 234. STYLECREST PRODUCTS | 5,656 | $ | 186,669 | - | $ | - | 5,656 | $ | 186,669 |
| 235. AMERICAN LUMBER CORPORATION | 4,841 | $ | 181,369 | - | $ | - | 4,841 | $ | 181,369 |
| 236. MARIOTTI BUILDING PRODUCTS | 4,357 | $ | 143,329 | 457 | $ | 29,255 | 4,814 | $ | 172,584 |
| 237. CONWOOD PRODUCTS | 5,189 | $ | 141,044 | 696 | $ | 23,210 | 5,885 | $ | 164,253 |
| 238. THE T.H. ROGERS LUMBER COMPANY | 5,461 | $ | 148,089 | 150 | $ | 8,896 | 5,611 | $ | 156,985 |
| 239. S & S BUILDERS HARDWARE | 1,893 | $ | 124,839 | 370 | $ | 26,348 | 2,263 | $ | 151,187 |
| 240. CUSTOM MILLWORK INC | 2,349 | $ | 147,952 | 47 | $ | 3,004 | 2,396 | $ | 150,956 |

HIGHLY CONFIDENTIAL

JW-SEC-01102032

HIGHLY CONFIDENTIAL
Subject to Protective Order

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 241. BUSINESS DEVELOPMENT RETAIL | 2,270 | $ | 56,643 | 3,166 | $ 94,103 | 5,436 | $ 150,746 |
| 242. COOK & BOARDMAN | 1,275 | $ | 144,678 | 10 | $ 1,505 | 1,285 | $ 146,182 |
| 243. MAC WINDOW SYSTEMS | 2,879 | $ | 132,277 | 197 | $ 10,578 | 3,076 | $ 142,855 |
| 244. YUMA LUMBER COMPANY | 4,143 | $ | 131,436 | 217 | $ 11,370 | 4,360 | $ 142,806 |
| 245. PINNACLE DOOR & HARDWARE | 1,513 | $ | 141,843 | - | $ - | 1,513 | $ 141,843 |
| 246. SOUTHERN SUPPLY COMPANY | 4,380 | $ | 140,327 | 7 | $ 485 | 4,387 | $ 140,812 |
| 247. WINDOOR BUILDING SUPPLY & SALVAGE, LLC | 4,119 | $ | 126,151 | 298 | $ 14,331 | 4,417 | $ 140,482 |
| 248. ISLAND POND INDUSTRIES, INC. | 2,801 | $ | 120,373 | 241 | $ 18,026 | 3,042 | $ 138,399 |
| 249. LUMBER ONE, LLC | 4,466 | $ | 130,311 | 38 | $ 2,615 | 4,504 | $ 132,927 |
| 250. MARWIN | 6 | $ | 118 | 6,532 | $ 130,008 | 6,538 | $ 130,126 |
| 251. ARCHITECTURAL DOOR & HARDWARE | 1,332 | $ | 126,719 | - | $ - | 1,332 | $ 126,719 |
| 252. BUILDERS HARDWARE AND SPECIALTY | 1,270 | $ | 124,167 | - | $ - | 1,270 | $ 124,167 |
| 253. LAVALLEY GROUP | 2,030 | $ | 92,178 | 425 | $ 31,572 | 2,455 | $ 123,750 |
| 254. PREMIERE DOOR & SUPPLY, INC | 1,320 | $ | 123,601 | - | $ - | 1,320 | $ 123,601 |
| 255. PIXLEY LUMBER COMPANY | 3,100 | $ | 122,734 | 9 | $ 687 | 3,109 | $ 123,422 |
| 256. SCHECK LUMBER | 1,552 | $ | 113,562 | 129 | $ 7,954 | 1,681 | $ 121,516 |
| 257. FOREST LUMBER COMPANY GROUP, LLC | 3,453 | $ | 118,983 | 2 | $ 130 | 3,455 | $ 119,113 |
| 258. TWIN CITY HARDWARE | 1,641 | $ | 93,638 | 221 | $ 17,337 | 1,862 | $ 110,975 |
| 259. CONTRACT HARDWARE INC. | 1,212 | $ | 110,655 | - | $ - | 1,212 | $ 110,655 |
| 260. INTERNATIONAL DOORS | 4,041 | $ | 98,647 | 270 | $ 8,330 | 4,311 | $ 106,977 |
| 261. HULL DOORS OF SAN ANTONIO | 623 | $ | 105,817 | - | $ - | 623 | $ 105,817 |
| 262. GATOR DOOR EAST | 2,735 | $ | 78,792 | 470 | $ 25,788 | 3,205 | $ 104,579 |
| 263. WINDOWS AND DOORS NOGALES | 3,335 | $ | 104,553 | - | $ - | 3,335 | $ 104,553 |
| 264. SAVAGE WHOLESALE BLDG. MATERIALS, INC. | 1,457 | $ | 99,848 | 8 | $ 1,269 | 1,465 | $ 101,116 |
| 265. CONTRACT HARDWARE CO INC | 843 | $ | 93,757 | - | $ - | 843 | $ 93,757 |
| 266. DAVIS & SONS DOORS, LLC | 2,082 | $ | 93,716 | - | $ - | 2,082 | $ 93,716 |
| 267. SOULT WHOLESALE COMPANY | 2,089 | $ | 64,186 | 584 | $ 27,833 | 2,673 | $ 92,018 |
| 268. SR MINNESOTA LLC | 2,079 | $ | 84,751 | 121 | $ 6,100 | 2,200 | $ 90,851 |
| 269. WHOLESALE DOORS INC | 1,498 | $ | 89,015 | - | $ - | 1,498 | $ 89,015 |
| 270. PRESTO MAINTENANCE SUPPLY, INC | 1,452 | $ | 46,476 | 900 | $ 40,611 | 2,352 | $ 87,087 |
| 271. CONTRACT HARDWARE OF FLORIDA, INC. | 581 | $ | 80,767 | - | $ - | 581 | $ 80,767 |
| 272. ONE TIME TRANSACTION-RETAIL | 2,501 | $ | 77,115 | 56 | $ 2,461 | 2,557 | $ 79,576 |
| 273. EAST CHATTANOOGA LUMBER | 2,509 | $ | 73,849 | 64 | $ 4,381 | 2,573 | $ 78,230 |
| 274. BRIDGEWELL RESOURCES, LLC | 2,503 | $ | 75,519 | 44 | $ 2,557 | 2,547 | $ 78,076 |
| 275. DESIGN WEST WINDOW & DOOR, LLC | 1,902 | $ | 73,322 | 59 | $ 3,700 | 1,961 | $ 77,022 |
| 276. IN AND OUT DOOR SHOP, INC | 1,715 | $ | 69,566 | 97 | $ 5,569 | 1,812 | $ 75,135 |
| 277. KAPER'S BUILDING MATERIAL, INC. | 2,311 | $ | 65,578 | 253 | $ 9,553 | 2,564 | $ 75,132 |
| 278. TELL MANUFACTURING INC | 1,234 | $ | 74,406 | 2 | $ 514 | 1,236 | $ 74,920 |
| 279. C AND S SUPPLY OF ORLANDO | 389 | $ | 40,632 | 311 | $ 33,731 | 700 | $ 74,363 |
| 280. BUILDERS HARDWARE & HOLLOW METAL, INC. | 517 | $ | 73,128 | - | $ - | 517 | $ 73,128 |
| 281. CASH SALES | 2,259 | $ | 58,375 | 401 | $ 12,571 | 2,660 | $ 70,946 |
| 282. NISBET, INC. | 2,796 | $ | 69,264 | 36 | $ 1,633 | 2,832 | $ 70,897 |
| 283. TIBBETTS HOLDINGS, LLC | 1,947 | $ | 59,651 | 239 | $ 9,846 | 2,186 | $ 69,497 |
| 284. WESCO DISTRIBUTION, INC. | 2,193 | $ | 67,803 | 13 | $ 1,318 | 2,206 | $ 69,121 |
| 285. PETE'S PREHUNGS & MILLWORK LLC | 2,278 | $ | 68,160 | - | $ - | 2,278 | $ 68,160 |
| 286. QUEST HOSPITALITY SUPPLIERS LLC | 596 | $ | 58,307 | - | $ - | 596 | $ 58,307 |
| 287. OVERHEAD DOOR OF KY | 414 | $ | 58,077 | - | $ - | 414 | $ 58,077 |
| 288. MIDWEST MILLWORK, INC | 1,527 | $ | 45,096 | 109 | $ 6,964 | 1,636 | $ 52,060 |
| 289. COLORADO DOORWAYS, INC. | 454 | $ | 51,127 | - | $ - | 454 | $ 51,127 |

HIGHLY CONFIDENTIAL                    JW-SEC-01102033

HIGHLY CONFIDENTIAL
Subject to Protective Order

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 290. DOOR & MILLWORK COMPANY LLC | 2,177 | $ | 50,891 | - | $ | - | 2,177 | $ | 50,891 |
| 291. SAHR BUILDING SUPPLY INC | 365 | $ | 48,857 | - | $ | - | 365 | $ | 48,857 |
| 292. DIAMOND Y DOOR SOLUTIONS | 153 | $ | 48,602 | - | $ | - | 153 | $ | 48,602 |
| 293. PHILADELPHIA RESERVE SUPPLY | 1,624 | $ | 40,208 | 231 | $ | 7,954 | 1,855 | $ | 48,161 |
| 294. HARDWARE HAWAII LTD | 1,391 | $ | 46,572 | 21 | $ | 872 | 1,412 | $ | 47,444 |
| 295. RAYHAVEN EQUIPMENT CO | 227 | $ | 34,001 | 133 | $ | 13,141 | 360 | $ | 47,142 |
| 296. SECURITY DOOR & HARDWARE | 223 | $ | 46,715 | - | $ | - | 223 | $ | 46,715 |
| 297. KENNETH FORRESTER | 1,440 | $ | 45,364 | 16 | $ | 988 | 1,456 | $ | 46,352 |
| 298. ACCURATE DOOR AND HARDWARE | 290 | $ | 44,779 | - | $ | - | 290 | $ | 44,779 |
| 299. D & L WOOD PRODUCTS, INC. | 317 | $ | 44,391 | - | $ | - | 317 | $ | 44,391 |
| 300. WESTERN DOOR AND MOLDING | 2,061 | $ | 41,794 | 24 | $ | 1,279 | 2,085 | $ | 43,073 |
| 301. SOUTHERN WHOLESALE, LLC | 1,600 | $ | 41,160 | - | $ | - | 1,600 | $ | 41,160 |
| 302. CENTURY PLUMBING WHOLESALE | 1,278 | $ | 34,412 | 90 | $ | 5,679 | 1,368 | $ | 40,091 |
| 303. E.C. BARTON & COMPANY | 756 | $ | 7,372 | 991 | $ | 26,730 | 1,747 | $ | 34,102 |
| 304. MANIONS WHOLESALE BLDG | 603 | $ | 24,515 | 199 | $ | 9,024 | 802 | $ | 33,540 |
| 305. CHE MID-ATLANTIC | 94 | $ | 33,318 | - | $ | - | 94 | $ | 33,318 |
| 306. NEXT DOOR DISTRIBUTING CO. | 269 | $ | 33,056 | - | $ | - | 269 | $ | 33,056 |
| 307. AL AND SONS MILLWORK | 1,119 | $ | 31,967 | - | $ | - | 1,119 | $ | 31,967 |
| 308. LANG DOOR & HARDWARE LLC. | 170 | $ | 31,697 | - | $ | - | 170 | $ | 31,697 |
| 309. ROYAL ARCHITECTURAL PRODUCTS | 331 | $ | 31,638 | - | $ | - | 331 | $ | 31,638 |
| 310. ALLIED MODULAR BUILDING SYSTEMS, INC. | 720 | $ | 31,115 | - | $ | - | 720 | $ | 31,115 |
| 311. EDEN, INC. | 1,090 | $ | 28,015 | 51 | $ | 2,956 | 1,141 | $ | 30,970 |
| 312. KAMCO SUPPLY CORP | 212 | $ | 30,201 | - | $ | - | 212 | $ | 30,201 |
| 313. DOORS INC | 329 | $ | 30,149 | - | $ | - | 329 | $ | 30,149 |
| 314. N.A. MANS & SONS, INC. | 448 | $ | 21,140 | 176 | $ | 8,749 | 624 | $ | 29,888 |
| 315. CARDINAL DOOR AND HARDWARE | 275 | $ | 29,512 | - | $ | - | 275 | $ | 29,512 |
| 316. LARRY DAY, INC | 426 | $ | 27,874 | 8 | $ | 1,062 | 434 | $ | 28,935 |
| 317. WILLIS KLEIN COMMERCIAL SALES | 88 | $ | 28,614 | - | $ | - | 88 | $ | 28,614 |
| 318. KELLEY BROTHERS | 197 | $ | 28,023 | - | $ | - | 197 | $ | 28,023 |
| 319. SPECIALIZED ARCHITECTURAL PRODUCTS | 355 | $ | 27,751 | - | $ | - | 355 | $ | 27,751 |
| 320. ORTIZ DOUBLE H, LLC | 779 | $ | 19,140 | 122 | $ | 7,547 | 901 | $ | 26,688 |
| 321. MULHERIN LUMBER COMPANY | 982 | $ | 24,847 | 9 | $ | 524 | 991 | $ | 25,371 |
| 322. NORWOOD HARDWARE & SUPPLY CO. | 198 | $ | 24,836 | - | $ | - | 198 | $ | 24,836 |
| 323. FERGUSON PREHUNG DOORS, INC. | 463 | $ | 23,011 | 29 | $ | 1,498 | 492 | $ | 24,509 |
| 324. ACD LIQUIDATORS LLC | 3,473 | $ | 22,910 | 138 | $ | 847 | 3,611 | $ | 23,757 |
| 325. MIDWOOD DOOR & MILLWORK INC | 277 | $ | 23,679 | - | $ | - | 277 | $ | 23,679 |
| 326. WM S TRIMBLE CO. INC. | 218 | $ | 23,454 | - | $ | - | 218 | $ | 23,454 |
| 327. INLAND BUILDERS SUPPLY, INC | 623 | $ | 22,020 | 25 | $ | 1,430 | 648 | $ | 23,449 |
| 328. METRIE | 370 | $ | 23,120 | - | $ | - | 370 | $ | 23,120 |
| 329. CALEXICO DOOR & MOLDING | 4,885 | $ | 22,224 | 127 | $ | 597 | 5,012 | $ | 22,821 |
| 330. MAC PRODUCTS INC | 316 | $ | 22,406 | 4 | $ | 354 | 320 | $ | 22,760 |
| 331. MCCARTHY INC | 275 | $ | 20,967 | - | $ | - | 275 | $ | 20,967 |
| 332. TRIAD SPECIALTIES | 137 | $ | 20,490 | - | $ | - | 137 | $ | 20,490 |
| 333. SUNCOAST CONTRACTORS SUPPLY INC | 313 | $ | 20,111 | 2 | $ | 200 | 315 | $ | 20,311 |
| 334. OPTION SUPPLY | 83 | $ | 20,086 | - | $ | - | 83 | $ | 20,086 |
| 335. HITCHCOCK DOOR LLC | 193 | $ | 19,764 | - | $ | - | 193 | $ | 19,764 |
| 336. CENTRAL INDIANA HARDWARE | 266 | $ | 16,670 | 20 | $ | 2,359 | 286 | $ | 19,029 |
| 337. KENDELL DOORS AND HARDWARE INC | 121 | $ | 18,901 | - | $ | - | 121 | $ | 18,901 |
| 338. DOOR & HARDWARE OPENINGS | 278 | $ | 18,472 | 4 | $ | 150 | 282 | $ | 18,622 |

HIGHLY CONFIDENTIAL

JW-SEC-01102034

HIGHLY CONFIDENTIAL
Subject to Protective Order

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 339. AMERICAN INDUSTRIAL DOOR CO | 200 | $ | 18,552 | - | $ | - | 200 | $ | 18,552 |
| 340. ACE INTERNATIONAL | 572 | $ | 16,709 | 52 | $ | 1,816 | 624 | $ | 18,525 |
| 341. ARCHITECTURAL CONCEPTS LLC | 252 | $ | 18,185 | - | $ | - | 252 | $ | 18,185 |
| 342. A.L. THOMPSON BUILDING SUPPLIES LTD | 101 | $ | 9,307 | 151 | $ | 7,822 | 252 | $ | 17,129 |
| 343. EMPIRE LUMBER & MILLWORK | 144 | $ | 16,886 | - | $ | - | 144 | $ | 16,886 |
| 344. AMERICAN MOBILE HOME SUPPLY | 339 | $ | 16,511 | - | $ | - | 339 | $ | 16,511 |
| 345. HOME CENTER SUPPLY, LLC | 351 | $ | 13,301 | 51 | $ | 3,188 | 402 | $ | 16,489 |
| 346. COLUMBUS DOOR | 191 | $ | 15,939 | 3 | $ | 497 | 194 | $ | 16,436 |
| 347. ERICKSON FRAMING AZ, LLC | 620 | $ | 16,415 | - | $ | - | 620 | $ | 16,415 |
| 348. CRAFTY BEAVER HOME CENTER | 123 | $ | 3,455 | 228 | $ | 12,809 | 351 | $ | 16,264 |
| 349. CONTRACTORS DOOR AND MILLWORK, INC. | 397 | $ | 15,450 | 11 | $ | 657 | 408 | $ | 16,107 |
| 350. ARCHITECTURAL PRODUCTS OF VA | 148 | $ | 16,064 | - | $ | - | 148 | $ | 16,064 |
| 351. BEN BRYAN | 2,750 | $ | 14,983 | 28 | $ | 152 | 2,778 | $ | 15,135 |
| 352. LOCAL CUST - N. AMER DIST. | 292 | $ | 9,397 | 120 | $ | 4,872 | 412 | $ | 14,269 |
| 353. BIRDSONG, INC | 104 | $ | 13,824 | - | $ | - | 104 | $ | 13,824 |
| 354. GLOBAL ONE FOREST PRODUCTS, INC. | 199 | $ | 13,310 | 5 | $ | 449 | 204 | $ | 13,759 |
| 355. FREEDOM DOORS, LLC | 254 | $ | 13,143 | - | $ | - | 254 | $ | 13,143 |
| 356. BLOCK IRON AND SUPPLY | 141 | $ | 12,960 | - | $ | - | 141 | $ | 12,960 |
| 357. NORTH CENTRAL WOOD PRODUCTS | 147 | $ | 11,119 | 18 | $ | 1,221 | 165 | $ | 12,340 |
| 358. CAPITAL FINISHING | 238 | $ | 7,481 | 48 | $ | 3,822 | 286 | $ | 11,303 |
| 359. SOUTHERN DOOR & PLYWOOD, INC. | 180 | $ | 5,346 | 197 | $ | 5,944 | 377 | $ | 11,290 |
| 360. LOGICAR, INC. | 119 | $ | 4,880 | 165 | $ | 5,598 | 284 | $ | 10,478 |
| 361. PIKESVILLE LUMBER CO | 123 | $ | 6,318 | 95 | $ | 3,899 | 218 | $ | 10,217 |
| 362. ARCHITECTURAL OPENINGS & ACCESS, INC. | 147 | $ | 10,202 | - | $ | - | 147 | $ | 10,202 |
| 363. GARDNER METALS, INC. | 171 | $ | 6,727 | 54 | $ | 3,041 | 225 | $ | 9,768 |
| 364. MAKO MILLWORK INC | 285 | $ | 9,572 | - | $ | - | 285 | $ | 9,572 |
| 365. CAPITOL DOOR & HARDWARE CO. | 68 | $ | 9,275 | - | $ | - | 68 | $ | 9,275 |
| 366. ORGILL, INC. | 243 | $ | 9,261 | - | $ | - | 243 | $ | 9,261 |
| 367. MCBRIDE DOOR & HARDWARE INC | 80 | $ | 8,880 | - | $ | - | 80 | $ | 8,880 |
| 368. CALDER DOOR & SPECIALTY COMPANY | 106 | $ | 8,748 | - | $ | - | 106 | $ | 8,748 |
| 369. HKS HARDWARE AND HOLLOW METAL | 84 | $ | 8,584 | - | $ | - | 84 | $ | 8,584 |
| 370. TAYLOR COTTON AND RIDLEY | 94 | $ | 7,967 | - | $ | - | 94 | $ | 7,967 |
| 371. UNIVERSAL BUILDING SUPPLY, INC. | 128 | $ | 3,214 | 79 | $ | 4,567 | 207 | $ | 7,781 |
| 372. GLACIER DRS INC | 250 | $ | 7,562 | - | $ | - | 250 | $ | 7,562 |
| 373. PACIFIC NORTHWEST INTERNATIONAL, INC. | 150 | $ | 3,704 | 100 | $ | 3,731 | 250 | $ | 7,435 |
| 374. WILLS MILLING & HARDWOOD INC | 267 | $ | 6,870 | 8 | $ | 499 | 275 | $ | 7,369 |
| 375. B.R. JOHNSON, INC. | 76 | $ | 7,075 | 1 | $ | 84 | 77 | $ | 7,159 |
| 376. SIERRA REMODELING & HOMEBUILDERS, INC. | 43 | $ | 1,569 | 97 | $ | 5,448 | 140 | $ | 7,017 |
| 377. THE ISLANDOOR COMPANY | 37 | $ | 6,669 | - | $ | - | 37 | $ | 6,669 |
| 378. KAY SUPPLY, INC. | 142 | $ | 6,014 | 12 | $ | 605 | 154 | $ | 6,620 |
| 379. PINAL LUMBER, INC. | 167 | $ | 5,770 | 20 | $ | 845 | 187 | $ | 6,615 |
| 380. CRESCENT DOOR & HARDWARE, INC. | 38 | $ | 6,384 | - | $ | - | 38 | $ | 6,384 |
| 381. THE GOOD COMPANY, INC. | 66 | $ | 6,336 | - | $ | - | 66 | $ | 6,336 |
| 382. KELLEHER CORPORATION | 120 | $ | 5,568 | 8 | $ | 728 | 128 | $ | 6,295 |
| 383. S A MORMAN CO. | 200 | $ | 6,160 | - | $ | - | 200 | $ | 6,160 |
| 384. CONTRACTORS SERVICE | 140 | $ | 4,507 | 28 | $ | 1,629 | 168 | $ | 6,136 |
| 385. THE SANDERS CO | 121 | $ | 6,002 | 1 | $ | 114 | 122 | $ | 6,116 |
| 386. THE DOOR SHOP, INC. | 92 | $ | 5,960 | - | $ | - | 92 | $ | 5,960 |
| 387. AMERICAN BUILDING SERVICES, LLC | 43 | $ | 5,757 | - | $ | - | 43 | $ | 5,757 |

HIGHLY CONFIDENTIAL

JW-SEC-01102035

HIGHLY CONFIDENTIAL
Subject to Protective Order

| | | | | | | | |
|---|---:|---|---:|---:|---|---:|---:|---|---:|
| 388. DOORS & MORE | 47 | $ | 5,529 | - | $ | - | 47 | $ | 5,529 |
| 389. REEB MILLWORK | 120 | $ | 5,348 | - | $ | - | 120 | $ | 5,348 |
| 390. VALLEY NORTH DISTRIBUTING | 28 | $ | 2,999 | 16 | $ | 2,081 | 44 | $ | 5,080 |
| 391. BRABNER & HOLLON INC. | 53 | $ | 4,784 | - | $ | - | 53 | $ | 4,784 |
| 392. HONEY STRUCTERIAL CORP | 107 | $ | 4,038 | 7 | $ | 679 | 114 | $ | 4,717 |
| 393. HOME IMPROVEMENT OUTLET | 295 | $ | 4,633 | - | $ | - | 295 | $ | 4,633 |
| 394. BOULEVARD GLASS, LLC | 81 | $ | 3,459 | 13 | $ | 760 | 94 | $ | 4,218 |
| 395. TRUE VALUE | - | $ | - | 136 | $ | 4,199 | 136 | $ | 4,199 |
| 396. LARRY C. DAVIS | 82 | $ | 3,068 | 8 | $ | 908 | 90 | $ | 3,976 |
| 397. BURLEY WHOLESALE | 204 | $ | 3,765 | - | $ | - | 204 | $ | 3,765 |
| 398. TAW'S GROUP LLC | - | $ | - | 112 | $ | 3,640 | 112 | $ | 3,640 |
| 399. AMERICAN DOOR AND HARDWARE | 52 | $ | 3,519 | - | $ | - | 52 | $ | 3,519 |
| 400. AMERICAN EXPORT & CO, INC | 53 | $ | 2,878 | 7 | $ | 383 | 60 | $ | 3,261 |
| 401. JONAS, BROWNE & HUBBARD (G'DA) LTD | 75 | $ | 2,410 | 18 | $ | 696 | 93 | $ | 3,106 |
| 402. MILLWORK SALES & SALVAGE, INC. | 47 | $ | 2,429 | 16 | $ | 629 | 63 | $ | 3,058 |
| 403. ALLEN SUPPLY COMPANY | - | $ | - | 16 | $ | 2,979 | 16 | $ | 2,979 |
| 404. CDS LOGISTICS | 26 | $ | 1,931 | 6 | $ | 879 | 32 | $ | 2,809 |
| 405. KAIKANE USA INC | 31 | $ | 2,571 | 2 | $ | 129 | 33 | $ | 2,700 |
| 406. GENEVA SUPPLY | 9 | $ | 2,403 | - | $ | - | 9 | $ | 2,403 |
| 407. STAN GREER MILLWORK | 22 | $ | 1,726 | 8 | $ | 651 | 30 | $ | 2,376 |
| 408. SMITH & DESHIELDS INC. | 44 | $ | 2,330 | - | $ | - | 44 | $ | 2,330 |
| 409. SQUARED AWAY ENTERPRISES, INC. | 37 | $ | 2,223 | - | $ | - | 37 | $ | 2,223 |
| 410. ITG EXPORT, INC | 20 | $ | 2,172 | - | $ | - | 20 | $ | 2,172 |
| 411. DOORCRAFT CORP. | 19 | $ | 2,052 | - | $ | - | 19 | $ | 2,052 |
| 412. LOTSPEICH CO. OF FLORIDA INC. | 24 | $ | 2,028 | - | $ | - | 24 | $ | 2,028 |
| 413. UNITED UNLIMITED SALES, INC. | 89 | $ | 1,958 | - | $ | - | 89 | $ | 1,958 |
| 414. DOOR PRODUCTS | 20 | $ | 1,563 | 6 | $ | 333 | 26 | $ | 1,897 |
| 415. GROSSO DOOR & HARDWARE, INC. | 9 | $ | 1,810 | - | $ | - | 9 | $ | 1,810 |
| 416. DORMAKABA USA LLC | 11 | $ | 1,791 | - | $ | - | 11 | $ | 1,791 |
| 417. TRENDEX CORP | 24 | $ | 1,022 | 11 | $ | 734 | 35 | $ | 1,756 |
| 418. R.E. FRIEDRICHS CO., INC. | 17 | $ | 1,601 | - | $ | - | 17 | $ | 1,601 |
| 419. GRIFFITH LUMBER CO., INC. | 10 | $ | 1,370 | - | $ | - | 10 | $ | 1,370 |
| 420. TENNESSEE DOOR & HARDWARE INC. | 12 | $ | 1,321 | - | $ | - | 12 | $ | 1,321 |
| 421. BENAMI INTERNATIONAL, LLC | 50 | $ | 1,225 | - | $ | - | 50 | $ | 1,225 |
| 422. RIVERWOODS MILL, INC. | 14 | $ | 1,132 | - | $ | - | 14 | $ | 1,132 |
| 423. TARGET DOOR AND SUPPLY INC | 6 | $ | 1,097 | - | $ | - | 6 | $ | 1,097 |
| 424. VALLEY ALUMINUM PRODUCTS | 4 | $ | 952 | - | $ | - | 4 | $ | 952 |
| 425. DIVERSIFIED CONTRACTOR'S INC. | 11 | $ | 930 | - | $ | - | 11 | $ | 930 |
| 426. ISLAND PLUMBING DISTRIBUTORS LLC | 30 | $ | 882 | - | $ | - | 30 | $ | 882 |
| 427. PRESTIGE TECHNOLOGY CORPORATION | 25 | $ | 825 | - | $ | - | 25 | $ | 825 |
| 428. INTERNATIONAL HARDWARE LIQUIDATORS, LLC | 81 | $ | 810 | - | $ | - | 81 | $ | 810 |
| 429. CARIBBEAN TRADING CO | 6 | $ | 779 | - | $ | - | 6 | $ | 779 |
| 430. MERIDIAN WORLDWIDE TRANSPORTATION GROUP | - | $ | - | 5 | $ | 779 | 5 | $ | 779 |
| 431. THE HALLGREN CO | 9 | $ | 770 | - | $ | - | 9 | $ | 770 |
| 432. ISLA TRADE CORPORATION | 16 | $ | 750 | - | $ | - | 16 | $ | 750 |
| 433. SNEAD WHOLESALE, LLC | 20 | $ | 629 | 10 | $ | 107 | 30 | $ | 736 |
| 434. JW WERNTZ | 3 | $ | 673 | - | $ | - | 3 | $ | 673 |
| 435. ATLASS HARDWARE CORPORATION | 6 | $ | 645 | - | $ | - | 6 | $ | 645 |
| 436. BILL THROWER | 4 | $ | 623 | - | $ | - | 4 | $ | 623 |

HIGHLY CONFIDENTIAL

JW-SEC-01102036

HIGHLY CONFIDENTIAL
Subject to Protective Order

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 437. CHEYENNE LOG HOMES, INC. | 16 | $ | 616 | - | $ | - | 16 | $ | 616 |
| 438. J & J'S TRI-STATE DELIVERY SERVICE, INC. | 8 | $ | 607 | - | $ | - | 8 | $ | 607 |
| 439. J & G CARPENTRY, INC | 10 | $ | 241 | 12 | $ | 355 | 22 | $ | 595 |
| 440. JOHN OTALEY BUILDERS HARDWARE | 8 | $ | 547 | - | $ | - | 8 | $ | 547 |
| 441. MR. FIX IT OF SIERRA VISTA, LLC | 4 | $ | 146 | 3 | $ | 375 | 7 | $ | 521 |
| 442. CORRECT DOOR CORP | 12 | $ | 518 | - | $ | - | 12 | $ | 518 |
| 443. M & D FIRE DOOR INC. | 4 | $ | 513 | - | $ | - | 4 | $ | 513 |
| 444. HOUSING PRODUCTS INC. | 4 | $ | 497 | - | $ | - | 4 | $ | 497 |
| 445. SEDONA WINDOW & DOOR LLC | 4 | $ | 435 | - | $ | - | 4 | $ | 435 |
| 446. CARTER COMPANIES | 14 | $ | 417 | - | $ | - | 14 | $ | 417 |
| 447. WASHBURN BUILDING PRODUCTS, LLC | 2 | $ | 223 | 1 | $ | 136 | 3 | $ | 359 |
| 448. SCHILLER HARDWARE-PARENT | 4 | $ | 292 | - | $ | - | 4 | $ | 292 |
| 449. CONTRACTORS WARDROBE | 9 | $ | 270 | - | $ | - | 9 | $ | 270 |
| 450. ISLAND GREEN BUILDING SUPPLY, LLC | - | $ | - | 5 | $ | 235 | 5 | $ | 235 |
| 451. ARCHITECTURAL HARDWARE OF VA | 2 | $ | 223 | - | $ | - | 2 | $ | 223 |
| 452. HOME LIQUIDATION CENTERS AND DISCOUNT DOORS INC | 8 | $ | 141 | 2 | $ | 61 | 10 | $ | 203 |
| 453. FOUNDATION BUILDING MATERIALS | 2 | $ | 195 | - | $ | - | 2 | $ | 195 |
| 454. BUCK LUMBER INC | 2 | $ | 167 | - | $ | - | 2 | $ | 167 |
| 455. MADIKATE, INC. | 4 | $ | 127 | - | $ | - | 4 | $ | 127 |
| 456. UNIVERSAL WINDOW SOLUTIONS LLC | 1 | $ | 125 | - | $ | - | 1 | $ | 125 |
| 457. CROSSROADS DOOR & HARDWARE | 1 | $ | 98 | - | $ | - | 1 | $ | 98 |
| 458. GRANVILLE LUMBER COMPANY | 2 | $ | 98 | - | $ | - | 2 | $ | 98 |
| 459. JOYNER LUMBER & SUPPLY CO. | - | $ | - | 2 | $ | 75 | 2 | $ | 75 |
| 460. B A HOFT & ASSOCIATES INC | 1 | $ | 64 | - | $ | - | 1 | $ | 64 |
| 461. OHIO PRODUCTION PAINT & ASSEMBLY CORP | 2 | $ | 56 | - | $ | - | 2 | $ | 56 |
| 462. DONNA'S DOOR & WINDOW COMPANY | 1 | $ | 55 | - | $ | - | 1 | $ | 55 |
| 463. STAR DOOR & SASH CO. | 2 | $ | 54 | - | $ | - | 2 | $ | 54 |
| 464. BUILDING MATERIALS OUTLET, INC. | 22 | $ | 44 | - | $ | - | 22 | $ | 44 |

HIGHLY CONFIDENTIAL

JW-SEC-01102037