IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

In Re:  JELD-WEN, Holding, Inc.,

Securities Litigation        3:20CV112

Before:  HONORABLE JOHN A. GIBNEY, JR.
United States District Judge

ZOOM

Motions hearing

March 17, 2021

Richmond, Virginia

GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

APPEARANCES


COHEN MILSTEIN SELLERS & TOLL

by: Steven Jeffrey Toll, Esq.

LABATON SUCHAROW LLP

by: James Thomas Christie, Esq.

James William Johnson, Esq.

ROBBINS GELLER RUDMAN & DOWD

by: Debra Wyman, Esq.

for the plaintiffs


McGUIRE WOODS LLP

by: Brian Charles Riopelle, Esq.

KIRKLAND & ELLIS

by: Rachel Fritzler, Esq.

CHRISTIAN & BARTON LLP

by: Roman Lifson, Esq.

for the defendants

THE COURT:  Good morning.

THE CLERK:  Good morning, Judge.

MS WYMAN:  Good morning, Your Honor.

THE COURT:  I apologize for keeping everybody waiting.

All right.  Do you want to call the case, please.

THE CLERK:  Yes, sir.

Case number 3:20 CV 112.

In re: JELD-WEN Holding, Inc. Securities Litigation.

Mr. Steven Toll, Ms Debra Wyman, Mr. James Johnson, Mr. James Christie represent the plaintiffs.

Mr. Brian Riopelle, Ms Rachel Fritzler, Mr. Ramon Lifson represent the defendant.

Are counsel ready to proceed?

MR. CHRISTIE:  We are, Your Honor.

THE COURT:  Good morning, everyone.

Thank you for assembling on such short notice today.  We are here today on the motion for, I guess, an emergency motion to compel in this case.

Well, actually it is called a motion for expedited hearing, which I guess I have granted by having the hearing.  And we will take up the motion

to compel the production of certain documents and the defense of privilege to the production of those documents, plus the production of some materials that are at least thought to be in some sort of internal communication at JELD-WEN.

All right. So let's take up the latter question first, because I think that was a little easier.

JELD-WEN wants to force -- sorry. The plaintiff wants to force JELD-WEN to produce what amounts to e-mails or electronic chats or tweets or something that are on a platform that JELD-WEN has for internal communication, which is part of something called FSDC, and specifically are what is called "chatter."

And JELD-WEN says they don't have any responsive documents.

So, JELD-WEN, let me hear from the plaintiff, whoever is going to handle this.

If they don't have it, what is the point of all this?

MR. CHRISTIE: This is James Christie on behalf of the plaintiffs. I will be handling this issue today.

So just to kind of clarify a couple of issues

there.  FSDC is a cloud-based platform that JELD-WEN uses.  It is called a CRM, which is a customer relationship management software.  So essentially what the company uses it for is to track and essentially post documents and things related to its certain customers.  Again, we are kind of operating at a bit of a disadvantage from an information standpoint because we have only learned about this last week when we deposed one of JELD-WEN's former employees who told us about the fact that this source of information existed.  And in doing so explained that this was a tool that the company used to track its customers, its communications with its customers, and as well as internal communications with each other at JELD-WEN about that customer.

So to give you an idea what our understanding is on that system is, there might be meeting minutes about pay.  We met with the guy from Steves this week, and they said that they don't want to have to deal with the capital charges, or something like that.  That is our understanding of the type of information that might be on there.  And they may include updates on that.  Said, I just got off the phone and they told us they are rejecting our offer, et cetera, et cetera.

THE COURT:  So, Mr. Christie, the lawyers on the other side say there is none of that kind of information on it.  What do you say about that?  Do you think they are lying?  Do you think they are lying?

Do you think they are lying?  Yes or no?

MR. CHRISTIE:  I think with respect to the --

THE COURT:  I am sorry.  Obviously, Mr. Christie, I am not making myself clear.

Do you think they are lying to you?  Yes or no?

MR. CHRISTIE:  I don't think they are lying, no.

THE COURT:  If they are not lying to you there comes a point in discovery where if the other side says they don't have something, they don't have it.

MR. CHRISTIE:  Yes, Your Honor.  I understand that.

Our concern is that the information that they say they don't have is a very limited set of information, and that is chatter messages, and I will refer you to exhibit 21 in defendants' opposition from their IP professional that only talks about chatter accounts.  It is our understanding that chatter is only one source of information on the sales force platform, and yet

there are other sources of information that don't pertain to just chatter messages.  So while I understand your question, Your Honor, and with respect to chatter messages, these messages specifically, I do believe defendants that they don't have information, but there is a lot more information on the sales force platform, which is separate and apart from chatter, which is only one function of sales force, that they haven't made any representation about whatsoever.  I refer you to --

THE COURT:  Let me hear from the other side.

Who is handling this or for the other side?

MS WYMAN:  Good morning, Your Honor, this is Rachel Fritzler with Kirkland Ellis.

THE COURT:  Ms Fritzler, have you all checked throughout this FSDC to see if there is other information in there that pertains to the issues in this case?

MS FRITZLER:  Yes, Your Honor, I believe we have.  And it is possible that there is some ambiguity in the declaration -- I'm sorry -- the affidavit by Mr. Romerage based on the short turnaround that we had to respond yesterday.

But one thing I want to point out is that when, you know, plaintiffs say that Mr. Kirk testified to

the company using this platform, the part they are leaving out is that Mr. Kirk actually said that 20,000 --

THE COURT:  Ms Fritzler, you are doing pretty well on this motion right now.  So, this is what I suggest, Ms Fritzler.  If you believe you have checked with this FSDC pretty -- the company has checked this FSDC pretty thoroughly, so here is what I suggest that you do.  This will be more than a suggestion.  Here is what I will order you to do.  Why don't you go and check with whoever does this search and have them do a thorough search of FSDC and report to the other side within seven days of whether you found anything.  Okay?

MS FRITZLER:  Yes, Your Honor.

THE COURT:  Thank you.  All right.

Now, let's move on to -- Mr. Christie, if you don't get that in seven days we will all get back on the phone and have another powwow about this and try to resolve this issue.  Okay?

MR. CHRISTIE:  Thank you, Your Honor.

THE COURT:  You know, one of the problems with electronic discovery is that there is, you know, there is just so much of it, and you can always find, possibilities of finding more.  And at some

stage you do.  Fortunately, as members of the bar, we are allowed to rely on each other's word.  So, if Ms Fritzler says that, her word is her bond.  All right.

Now, let's move on to the other issues.

Now there are unusual documents that up want to compel.

Mr. Toll, are you going to handle this?

MR. TOLL:  No, Your Honor, Ms Wyman from Robbins Geller is going to handle the privilege issue.

THE COURT:  Mr. Toll, you contacted us yesterday regarding the appropriate attire for a meeting of this sort and indicated that you did not have a clean shirt or jacket or tie with you.  Yet here you are today dressed like the doorman at a fancy New York hotel.  Did you have an emergency shopping trip to Brooks Brothers last night?

MR. TOLL:  No, Your Honor.  I was out of town when this hearing came up.  It was not appropriate attire for court.  And luckily my brother lives not too far away, so I was able to drive over there last night and grab a jacket, an old jacket, and tie from him.

THE COURT:  Well, you be sure to give him part

of whatever fees you get in this case.

Who will handle this?

Ms Wyman, are you doing this?

MS WYMAN:  Yes, Your Honor, I am.  Good morning.  Thank you for seeing us so quickly.

So two separate documents that the defendants have attempted to claw back.

One set of documents relates to a draft op ed piece that ultimately was published on the web site.

THE COURT:  Do you know who --

MS WYMAN:  Pardon me?

THE COURT:  Do you know who wrote this?

MS WYMAN:  It was received in the senior vice-president of investor relations files at JELD-WEN.  So I believe that he wrote it, and if he didn't, he definitely provided some edits and comments to it.

THE COURT:  That is Mr. Linker, is that right?

MS WYMAN:  Mr. Linker, yes.

THE COURT:  You know -- what is the name of that guy -- some sort of expert on risk management published this on -- here we go -- named John Burnett, published this on (inaudible) and at the end of the article Mr. Burnett says that he wrote this article himself and expresses his own opinion,

and he is not receiving compensation for it, and has no relationship with any company.

So, did Mr. Burnett not write this?

MS WYMAN:  It appears to us that Mr. Burnett did not write this.  Mr. Burnett's version of the article is substantially similar to the version that was on Mr. Linker's computer.  Identical in some places.  So, no, we do not believe that Mr. Burnett wrote the article.  We subpoenaed Mr. Burnett to ask him for documents and potentially take his deposition about the process he went through to actually publish this article, but when I introduced exhibit B at Mr. Linker's deposition last week that is when we first learned that the defendants were claiming it was privileged.  What the representation at the deposition was that it related to work that a PR firm was doing that had been hired by JELD-WEN's outside counsel.

So when you look at exhibit B I did not ask the question, the witness any substantial questions about exhibit B based on the privilege.

THE COURT:  I read the deposition.

MS WYMAN:  Oh, you did.  Okay.

So but when you look at exhibit B it is clear that Mr. Linker is providing edits and comments that

go to the messaging around it.  He says things like, this is too strong a word, or this isn't too exiting, or leads to -- makes (inaudible) to introduction.  Those aren't things about legal advice.  That is messaging about what the article should say and how it should portray JELD-WEN and the issue by divestiture to investors.

So, you know, the defendants have not identified the PR firm that was involved in this process.  But it is plainly clear that the involvement of the PR firm wasn't to facilitate any kind of legal advice or legal strategy for JELD-WEN's outside counsel, but to help the company manage the information that was in the market about this Steves jury verdict, and Judge Payne's potential divestiture order.  Nothing about the divestiture.

THE COURT:  Let me hear from JELD-WEN about this.

Are you going to do this, Ms Fritzler?

MS FRITZLER:  Yes, Your Honor.

THE COURT:  Let me ask you first.  Do you contend that the comment that Mr. Linker made on exhibit B, as in baseball, are privileged?

MS FRITZLER:  Yes, Your Honor.  I think they

fall within the work product privilege.

THE COURT:  Okay.

Okay.  Go ahead.  I would like to hear this.

MS FRITZLER:  Sure.  So, Your Honor, we submitted a number of documents for The Court's in-camera review, and we actually submitted all of the documents that were listed on the preliminary privilege log that we provided the plaintiffs in the context of this dispute.  The documents that came up in the context of Mr. Linker's deposition had been saved locally to a computer.  So we didn't have the benefit of the transmittal e-mail showing where they came from.  As The Court has probably seen in the, in-camera documents which we provided, this draft was sent to Mr. Linker from JELD-WEN's current, then current general counsel, Laura Gory, for his comment and review.  And he sent his comments back to JELD-WEN's general counsel.

Now, of course none of the firms that are currently representing JELD-WEN at today's hearing were involved in the Steves litigation at that point.  But our understanding is that this was in the context of work being done by a public relations firm that was retained by JELD-WEN then outside counsel, Latham and Watkins and worked at the

direction of outside counsel and the general counsel to support the company's legal strategy.

THE COURT:  Well, if you -- you can hire a law firm to do something that is not legal work, right? And you can hire them to do legal work.  And you can hire them to do them both, right?

MS FRITZLER:  Yes, Your Honor.

I think in this instance they have -- again, based on what we know, our understanding is that this was work that was done to support the company's legal strategy, not a sort of general public relations, public facing strategy.  And in that sense it is exactly on all fours with the grand jury case that we submitted where this is in aid of a legal strategy.  We didn't have an opportunity to submit a declaration from Latham and Watkins prior to our response deadline yesterday, but we are happy to do that if that would aid The Court in this matter.

THE COURT:  So, well, your word is your bond. If you say Latham and Watkins hired these people, I believe that.  I am not sure that Mr. Burnett has quite the credibility he once had as an independent voice of reason in the media, but that is for him to deal with.

Your opponents say that you didn't do a timely privilege log on this.  And you, of course, in your brief tried to put the blame on them for that by saying that they are just far too demanding.

Doesn't the failure to list the documents as required in the rules kind of sink your claim of privilege?

MS FRITZLER:  Well, Your Honor, respectfully, no, because I think that plaintiffs left out some of the key aspects of the time line here.

JELD-WEN substantially completed its production of new documents responsive to the plaintiffs' current request on March 5.  We have informed plaintiffs that they are going to receive our full privilege log by the end of this week, which is less than two weeks after substantial completion.  Given the complexity of this case and the number of documents that we had to review, there is absolutely no delay or sort of obstruction here at all.  We have been working diligently to try to get it to the plaintiffs as quickly as possible.  And that is why when this dispute came up we gave them a preliminary privilege log on these specific documents while we continued to try to provide them a full log. Especially in this case were the plaintiffs'

allegations specifically touch on what the company believes and what it thought about on-going litigation, it is not a surprise that there are thousands of documents that need to be reviewed in the course of preparing this privilege log.

THE COURT: Well, okay.

Go ahead. What else do you have to say about this John Burnett editorial?

MS FRITZLER: Again, I don't have all the facts here, because I wasn't involved at the time. But what I can say is that plaintiffs' suggestion that JELD-WEN was in any way trying to manipulate analysts' reports in any way similar to the SEC enforcement examples that they gave, is completely untrue. And I think if you look at the article that was published, that had to to do with a commentary on the legal issues that were pending before Judge Payne.

It was in no way trying to reduce JELD-WEN's stock price or otherwise manipulate the market.

THE COURT: Well, I don't know how you can say that, but all right.

So, when is the discovery cutoff in this case?

MS FRITZLER: March 29, Your Honor.

THE COURT: So you are going to give them your

privilege log on the 19th?

MS FRITZLER:  Yes, Your Honor.

THE COURT:  You haven't given them a privilege log for -- you have been producing documents for how long?

MS FRITZLER:  We started producing documents in the beginning of February, two weeks after we actually agreed to the terms.  We have reviewed 270,000 -- sorry -- we have reviewed 170,000 documents in the course of this review.  And we began making rolling productions as quickly as possible.  We have made those throughout.  As I said, we believe we have substantially completed it on March 5th, and we anticipate providing them the full privilege by this Friday at the outset.  Sooner if we can.

THE COURT:  All right.

Let's move on to the Steves accounting treatment option.

Let me ask you a question, Ms Fritzler, before we hear from Ms Wyman about that.

Before we get any further in this, let me ask another question about Linker's deposition.

I don't know who the lawyer was in this, but they kept making, kept saying, "objection."  I

didn't quite understand.  What are all those objections about?

Have you read this, Ms Fritzler?

MS FRITZLER:  Yes, Your Honor, I have.

My understanding is that the practice in the district is that their objections are only as to form and --

THE COURT:  Well, that is what the rule is, but, okay, so then is that an objection to form?

MS FRITZLER:  It is, Your Honor.  I believe that has been a practice of on both sides throughout the depositions in order to be as unobtrusive in our objections as possible.

THE COURT:  Boy.  So this is -- here is a question:  "Is there anything about this analyst report that you believe is inaccurate?

"Objection."

What is the objection to that?

MS FRITZLER:  I would have to look at the full question and answer.

THE COURT:  I read the full question.

MS FRITZLER:  I mean, what preceded that question and answer.

THE COURT:  Talking about the article that Mr. Burnett allegedly cut out of hole cloth.

MS FRITZLER:  It may have been an objection as to foundation, Your Honor, I am not sure exactly.

THE COURT:  Okay.

All right.

So, Okay, Ms Wyman, let's hear from you.

Ms Fritzler, one other question before we get to Ms Wyman, who is chomping at the bit over there.

I thought you said earlier that how JELD-WEN booked the contingency in its accounting record was simply a matter of generally-accepted accounting principles, GAAP.

But yet I read these documents as saying it looks like generally accepted accounting principles are a little more malleable than I would have thought.

MS FRITZLER:  Your Honor, it is an application of those generally accepted accounting principles, but this standard is in terms of booking a contingent liability.  Looks at two things.  It looks at whether the liability is both probable and reasonably estimable.  The estimation part involves accounting judgments, but when you are looking at litigation, it also includes legal counsel talking about potential damages.

The probable question is very much informed by

legal counsel in terms of balancing what the likelihood of the outcomes are, whether it is on appeal, or whether request for a rehearing, whatever it is.  Setting aside a judgment.

So, there is absolutely legal advice that played a role in the accounting determination, but when the company books the charge that is just an application of the accounting principles.  And where that is important is realizing that it is an accounting decision and in no way an admission of liability, which is what plaintiffs have suggested that it is.

THE COURT:  Well, it looks to me like you are trying to have it both ways on this.  On the one hand it is some sort of accounting thing, and on the other hand some sort of a legal analysis.

Ms Wyman, let's hear from you on this.

MS WYMAN:  To sort of continue that point, Your Honor, one of the things that strikes me about the slide is that it isn't talking just about, you know, the impact that booking a charge may have on the company's position (inaudible).  It is talking about what the market is going to think about it.  That is not legal advice.

And I will say another thing.  The accountant

that testified that he drew up these slides is the same accountant that is the chief accounting officer of the company, and he wrote a memo to file that went through the company's analysis of GAAP to determine whether or not they should book this charge.  It went through the probable and estimable analysis.

THE COURT:  He is what officer with the company?

MS WYMAN:  Chief accounting officer of JELD-WEN.  What they have done is, they produced the Mr. Vining's memo to file that outlines his analysis with, according to Ms Fritzler, consultation with counsel about the probableness and estimableness of booking this charge.  They produced that.  One of the experts relied on that.  So, they are trying to use this privilege as a sort of shield.  They used the document when it suites them and now trying to claw back the slides that arguably don't have any legal advice on them to protect themselves from being exposed by making contradictory arguments.

THE COURT:  Well, it does have some legal advice on the analysis.  For instance, it says, well, if we book it one way Steves will view this as a floor for settlement discussions, but if we book

it a different way Steves won't be likely to settle the case.  And if we book it a different way it talks about how it affects their ability to argue certain things.

MS WYMAN:  I understand that.  Being generous to that viewpoint, there are things on these slides that don't speak to the issues.  For example, investors may see this is an admission of guilt. That is exactly what our economist said that the market understood when it learned that the company was now saying that it was probable and estimable at least to 76.5 million dollars that the company was going to have exposure of because of the Steves litigation.  Nothing to do with Steves or litigation with Steves.  It also said investors looking at the size of the accrual may be seen as an admission of guilt.  Those things are -- this is a business person's observations of what the market may do. This is something that companies all the time undertake to discuss, but it doesn't necessarily mean it is privileged.  And in this case it is absolutely not.

So at the absolute least these slides need to be redacted.

THE COURT:  Okay.

Ms Fritzler?

MS FRITZLER:  Your Honor, I think if we look at the slides, and again, the transmittal e-mails which we submitted to The Court for in-camera review, these are conversations between JELD-WEN executives and general counsel.  The subject line is privileged and confidential.  The discussion is about this is essentially peeking behind the curtain because of the inadvertent production.  This is providing advice to JELD-WEN's board of directors.  It is not the accounting analysis itself.  It is talking about the impact on litigation strategy.  It is talking about the impact on settlement prospects in the Steves litigation.  And it is absolutely a privileged conversation.  Just because the executives and legal counsel were thinking through and working through what the advice, ultimate advice to the board would be in the form of a Power Point, that does not mean it is not privileged.

THE COURT:  Thank you.

With respect to these Power Point slides, they are not quite identical, but have many -- but they all have essentially the same points in them.

I am going to hold that the Power Point slides, exhibits D, E, F, and G, to, I guess to the

plaintiff's motion, are not privileged except to the extent that they touch on settlement discussions. So that part needs to be redacted out of these. And you all can work together on that and come up with versions that you agree on, and if you can't agree on them, come back to me.

With respect to the op ed piece, that is not legal advice, and it is not protected in any way. It's a draft PR piece that does not involve anything other than a report on what management wants the public to know about what happened in court. So it is not protected at all. So I will order that those documents -- I will find them not privileged, and they are to be produced to the plaintiffs in this case.

All right.

Thank all very much.

MS WYMAN: Thank you, Your Honor.

THE COURT: If you have any questions, let me know and we will try to get it straight. Okay?

Thank you very much. Good bye.

                    HEARING ADJOURNED.

        THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.


                GILBERT FRANK HALASZ, OCR
                  Official Court Reporter