# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION


--------------------------------X

IN RE:  JELD-WEN HOLDING, INC.   : Civil Action No.

SECURITIES LITIGATION            : 3:20-cv-00113-JAG

--------------------------------X



        Videotaped Rule 30(b)(6) Deposition of

               SEGALL BRYANT & HAMILL

        By and through its designated representative,

                     Jeffrey Paulis

                  Conducted Virtually

                Tuesday, January 26, 2021

                    12:06 p.m. EST






Job No.:  348077

Pages 1 - 177

Reported by:  Helen B. Yarbrough, RPR, CCR

A P P E A R A N C E S


ON BEHALF OF PLAINTIFFS PLUMBERS &

PIPEFITTERS AND WISCONSIN LABORERS' PENSION FUND:

WILLIAM GEDDISH, ESQUIRE

ROBBINS GELLER RUDMAN & DOWD LLP

58 South Service Road, Suite 200

Melville, New York 11747

631-637-7100


ON BEHALF OF DEFENDANTS JELD-WEN HOLDING,

INC., MARK A. BECK, L. BROOKS MALLARD, KIRK S.

HACHIGIAN, AND GARY S. MICHEL:

BRIAN SCHMALZBACH, ESQUIRE

LINDSAY JAKUBOWITZ, ESQUIRE

McGUIREWOODS LLP

800 East Canal Street

Richmond, Virginia 23219

804-775-1000

A P P E A R A N C E S  (Continued)


ON BEHALF OF DEFENDANTS JELD-WEN HOLDING,

INC., MARK A. BECK, L. BROOKS MALLARD, KIRK S.

HACHIGAN, AND GARY S. MICHEL:

     GILAD BENDHEIM, ESQUIRE

     KIRKLAND & ELLIS LLP

     601 Lexington Avenue

     New York, New York 10022

     212-446-4800


ON BEHALF OF ONEX DEFENDANTS:

     COREY BARON, ESQUIRE

     FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

     One New York Plaza

     New York, New York 10004

     212-859-8027

A P P E A R A N C E S  (Continued)


ON BEHALF OF SEGALL BRYANT & HAMILL AND THE

WITNESS:

DAVID PORTEOUS, ESQUIRE

FAEGRE DRINKER BIDDLE & REATH LLP

311 South Wacker Drive, Suite 4300

Chicago, Illinois 60606

312-212-6500

and

MICHAEL JAEGER, ESQUIRE

FAEGRE DRINKER BIDDLE & REATH LLP

1800 Century Park East, Suite 1500

Los Angeles, California 90067

310-203-4000




ALSO PRESENT:

Robert Leonard, Videographer

Alex Sussman, Audiovisual Technician

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                      6

                      I N D E X

                                              PAGE

EXAMINATION OF JEFFREY PAULIS

   By Mr. Schmalzbach                          10

   By Mr. Baron                               169

                    E X H I B I T S

                                              PAGE

Exhibit A    Subpoena                          19

Exhibit B    WLPF Investment Policy            74

             Guidelines, Beginning with

             Bates No. Segall 017

Exhibit C    E-mail Correspondence, Bates No.  101

             Segall 113

Exhibit D    E-mail Correspondence, Bates No.  108

             Segall 195

Exhibit E    E-mail Correspondence, Beginning  120

             with Bates No. Segall 199

E X H I B I T S (Cont'd)

NUMBER                                          PAGE

Exhibit F   E-mail Correspondence, Beginning    130

            with Bates No. Segall 211

Exhibit G   E-mail Correspondence, Bates No.    135

            Segall 225

Exhibit H   E-mail Correspondence, Beginning    141

            with Bates No. Segall 262

Exhibit I   Consolidated Class Action           116

            Complaint

Exhibit K   Jeld-Wen Financial Disclosure       153

            Information

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                54

A    He might.  I don't know.    13:22:30

Q    In your experience, what is discussed    13:22:39
at an in-person meeting when one takes place    13:22:42
before Segall Bryant signs an agreement to become    13:22:45
an investment manager for an institutional client?    13:22:48

MR. JAEGER:  Objection.    13:22:53

A    In my experience, we're talking about    13:22:53
the investment strategy, our philosophy, and our    13:22:56
process, and historical performance, as well as    13:23:01
our firm.    13:23:15

Q    Is it fair to say that the investment    13:23:16
process is a strategy-by-strategy process?  So for    13:23:19
example, might there be a different investment    13:23:28
process for small cap core versus SMID cap core,    13:23:29
or do all strategies use the same general process?    13:23:33

MR. JAEGER:  Objection.    13:23:39

A    Our Small Cap ROIC Team uses primarily    13:23:39
the same process.    13:23:44

Q    What is your -- what is Segall Bryant's    13:23:46
small cap ROIC investment process?    13:23:49

MR. JAEGER:  Objection.    13:23:53

A    It's four-phased.  It starts with idea    13:23:59

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                    55

discovery or idea generation.  It moves to due                  13:24:04

diligence, then risk mitigation, and then final                 13:24:08

determination by ourself.                                       13:24:16

        Q    So the final determination for the                 13:24:26

small cap core would rest with you, right?                      13:24:28

        A    Yes.                                               13:24:36

        Q    And what sources of information do you             13:24:39

consult for idea discovery or generation?                       13:24:42

        A    That's typically screening and what I              13:24:50

call "grass roots research," just knowing your                  13:24:55

sector and researching companies in those sectors               13:24:58

and going out and seeing companies' facilities,                 13:25:02

things like that.                                               13:25:07

        Q    And what sources does the Small Cap                13:25:13

ROIC Team use for due diligence?                                13:25:16

        A    That would be (indiscernible) internal             13:25:27

proprietary research.                                           13:25:27

            THE COURT REPORTER:  Repeat, please.                13:25:27

Repeat, please, Mr. --                                          13:25:27

        Q    I'm not asking for anything                        13:25:27

proprietary.  But generally, what sources of                    13:25:32

information does that entail?                                   13:25:35

what type of upside potential a stock has and the

downside potential a stock has with that

information that you got.

Q    Do Segall Bryant's clients ever require

Segall Bryant to invest in a specific company?

MR. GEDDISH:  Objection.

A    I don't know.

Q    Has that ever happened, in your

experience?

MR. GEDDISH:  Objection.

A    It has not to me.

Q    Are you aware of it happening to anyone

else at Segall Bryant?

A    I don't recall.

Q    So Wisconsin Laborers, to your

knowledge, never instructed Segall Bryant to

invest in a particular company, right?

A    Yes.  They never instructed -- to be

clear, they never instructed, yes.

Q    Right.  And Wisconsin Laborers never

instructed you not to invest in a specific

company, correct?

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                    60

A    Can you repeat that or rephrase?                    13:30:40

Q    Wisconsin Laborers never instructed you            13:30:45
to avoid a specific company, right?                        13:30:47

A    That's correct.                                     13:30:51

Q    And Wisconsin Laborers never instructed            13:30:56
you to sell stock in a particular company, right?         13:30:57

A    That's correct.                                     13:31:04

Q    Are you aware of any other client that             13:31:13
has directed Segall Bryant to sell a particular           13:31:16
stock?                                                     13:31:19

MR. JAEGER:  Objection.                                    13:31:21

A    I am not.  Personally, I am not.                    13:31:23

Q    Has Wisconsin Laborers ever given                   13:31:36
Segall Bryant advice on whether to invest in a            13:31:39
particular company?                                        13:31:44

A    Not that I'm aware of, no.                          13:31:47

Q    Any other institutional investor client            13:31:52
that you're aware of ever give Segall Bryant              13:31:56
advice to invest in a particular company?                 13:31:58

MR. JAEGER:  Objection.                                    13:32:01

A    No.                                                 13:32:02

Q    How often did Segall Bryant communicate            13:32:15

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                                     61

with Wisconsin Laborers about their investments?                    13:32:18

          MR. JAEGER:  Objection.                                   13:32:29

     A    I don't know.                                             13:32:30

     Q    Is there a periodic report that goes                     13:32:31
out to separately managed account holders?                         13:32:33

     A    There would be account statements that                   13:32:37
would go out from Segall Bryant to the client.                     13:32:39

     Q    Are those monthly?  Quarterly?                            13:32:43

     A    I believe it can be both.  I believe                     13:32:47
the client may have a choice whether they want                     13:32:48
them monthly or quarterly.  I'm not a hundred                      13:32:51
percent sure.                                                      13:32:54

     Q    Do you know which one -- do you know                     13:32:55
whether Wisconsin Laborers has requested them                      13:32:58
monthly or quarterly?                                              13:33:01

     A    I do not.  I do not know.                                13:33:05

     Q    Has Wisconsin Laborers ever asked                        13:33:16
Segall Bryant specific questions about particular                  13:33:17
stock purchases?                                                   13:33:20

          MR. JAEGER:  Objection.                                  13:33:23

     A    Not that I'm aware of.                                   13:33:24

     Q    So, I want to run through a few                          13:33:57

A   I don't -- you're asking me to put myself back in 2018 when I'm reading this?   16:30:18 16:30:20

Q   Please.   16:30:25

A   I'm sorry.  You want to know how it would have changed my investment thesis?   16:30:29 16:30:32

Q   Right; for Jeld-Wen.   16:30:36

A   I don't know that the overall thesis would have been all that affected by this in particular; but again, it's hard to target, hard to tell.   16:30:39 16:30:41 16:30:45 16:30:51

Q   If you already knew that there was a jury verdict against Jeld-Wen in the Steves litigation, do you think that the information in this paragraph would have changed your investment thesis?   16:30:52 16:30:54 16:30:58 16:31:00 16:31:03

MR. JAEGER:  Objection.   16:31:05

A   Changing the investment thesis has to do with looking longer -- longer term than the term (indiscernible).   16:31:07 16:31:10 16:31:15

THE COURT REPORTER:  I'm sorry; looking longer -- I'm sorry; I didn't understand.  Longer term than . . .   16:31:21 16:31:21 16:31:21

Transcript of Jeffrey Paulis, Designated Representative
Conducted on January 26, 2021                                   157

THE WITNESS:  Give me just one minute, please.

I don't know that it would have violated the investment thesis.  While -- while the -- you never want to see a court order like this or any type of charge for a company of Jeld-Wen's size.  I think that -- that size of a charge, while you never want to see it and it likely would have some impact of value to the stock, it's something that Jeld-Wen probably could have overcome just based on its size and financial resources.

Q   So you don't think this -- the information in this paragraph starting with "Additionally" would have changed your investment decisions about Jeld-Wen?

MR. JAEGER:  Objection.

A   It wouldn't have helped -- it wouldn't have helped it, but I don't know that it would have, you know, severely damaged it.

Q   Based on that paragraph starting with "Additionally," do you understand that Jeld-Wen

was admitting that it engaged in anticompetitive conduct?

MR. JAEGER:  Objection.  Calls for a legal conclusion.

A    I don't recall -- I don't recall the management team ever admitting that they had engaged in illegal conduct.

Q    And nothing in that paragraph starting with "Additionally" suggests to you that management is doing that here, right?

MR. GEDDISH:  Objection.

A    Yeah, it says the company maintained that it has not violated any antitrust laws, according to the company.

Q    So this paragraph does not change your view that Jeld-Wen management has never admitted to anticompetitive conduct, right?

MR. JAEGER:  Objection.  Asked and answered.  Counsel, can we start to move forward, please.

MR. SCHMALZBACH:  He hasn't answered it.  That's why I asked the question.

16:32:59
16:33:05
16:33:06
16:33:07
16:33:10
16:33:12
16:33:15
16:33:19
16:33:22
16:33:27
16:33:31
16:33:43
16:33:45
16:33:50
16:33:58
16:34:00
16:34:07
16:34:10
16:34:10
16:34:14
16:34:14
16:34:15

A    Can you repeat the question?

MR. SCHMALZBACH:  Yeah, Helen, can you read it back, please.

(Pending question read.)

THE WITNESS:  Yeah, it does not change my view that they had not admitted -- I don't believe that they had admitted to antitrust conduct.

Q    Mr. Paulis, can you remind me -- do you believe that you did actually read this press release when it came out in October 2018?

A    There's no reason to believe that I did not.

Q    And this is the sort of information you typically would read about companies you had invested in?

A    Yes.

Q    Do you have any reason to think that when you read this information, you believed that Jeld-Wen had lied to investors about its pricing strategy?

MR. JAEGER:  Objection.

A    I don't -- I don't recall what -- I don't recall what I thought.

Q    Have you ever held the view that Jeld-Wen lied to investors about its pricing strategy?

MR. JAEGER:  Objection.

A    I don't recall thinking that.

Q    And so fair to say you don't recall ever believing that Jeld-Wen had lied to its investors about the competitiveness of the door and window industry?

MR. GEDDISH:  Objection.

A    Can you ask that again, please.

Q    Yeah.  The question is about whether you have ever held a specific belief.  And the question is, did you ever believe that Jeld-Wen had lied to investors about the competitiveness of the door and window industry?

A    I don't believe that I would have, no.

Q    If you -- so this is a counterfactual. If you had believed that Jeld-Wen had misled investors about its pricing strategy or the