IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION | Civil Action No. 3:20-cv-112-JAG |

## **OPINION**

The plaintiffs[1]—investors in Jeld-Wen Holding, Inc. ("Jeld-Wen")—allege that Jeld-Wen manipulated its stock price by failing to disclose anticompetitive conduct that in violated federal antitrust law. The plaintiffs say this manipulation breached Sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission Rule 10b-5. The plaintiffs seek to represent a class of investors who bought Jeld-Wen stock between January 26, 2017, and October 15, 2018.

The defendants, Mark A. Beck, L. Brooks Mallard, Kirk S. Hachigian, and Gary S. Michel (the "Individual Defendants"), Jeld-Wen, and Onex,[2] oppose class certification, arguing that the plaintiffs cannot satisfy the predominance or typicality requirements set forth in Federal Rule of Civil Procedure 23.[3] Both arguments fail. Because the plaintiffs satisfy Rule 23's class certification requirements, the Court will grant the plaintiffs' motion for class certification.

---

[1] The "plaintiffs" or "proposed class representatives" refers to the Public Employees' Retirement System of Mississippi ("PERS of Mississippi"), the Plumbers & Pipefitters National Pension Fund ("PPNPF"), and the Wisconsin Laborers' Pension Fund ("WLPF").

[2] Onex refers to Onex Corporation, Onex Partners Manager LP, Onex Partners III LP, Onex Partners III GP LP, Onex US Principals LP, Onex Partners III PV LP, Onex Partners III Select LP, Onex BP Co-Invest LP, Onex American Holdings II LLC, BP EI II LLC, BP EI LLC, OAH Wind LLC, and Onex Advisor Subco III LLC.

[3] Onex joined Jeld-Wen's and the Individual Defendants' opposition to the plaintiffs' motion for class certification. (ECF No. 137.)

# I. BACKGROUND[4]

The plaintiffs allege that they bought Jeld-Wen stock at an inflated price because the defendants lied about Jeld-Wen's anticompetitive conduct and the legal risks that conduct posed to Jeld-Wen. Specifically, the plaintiffs allege that the defendants publicly stated that Jeld-Wen operated in a competitive market and faced a meritless antitrust lawsuit when, in fact, they knew that Jeld-Wen had violated federal antitrust laws and, therefore, faced significant liability for that behavior. The plaintiffs' expert, Steven P. Feinstein, concluded that these lies cost the plaintiffs "up to $1.99 per share" depending on when they bought Jeld-Wen's stock. (ECF No. 122-1 ¶ 27.)

On March 4, 2021, the Court held a hearing on the plaintiffs' motion for class certification. Upon due consideration, the Court will certify the following class: "[A]ll persons and entities, who or which, during the period from January 26, 2017[,] through October 15, 2018, inclusive (the 'Class Period'), purchased the publicly traded common stock of" Jeld-Wen. (ECF No. 121, at 1.)[5] The class excludes (1) the defendants;

> (2) members of the immediate family of any Defendant who is an individual; (3) any person who was an officer or director of Jeld-Wen . . . Onex Corporation ('Onex'), or any Onex affiliated fund during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) Jeld-Wen's or Onex's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

(*Id.* at 1 n.1.)

---

[4] The Court detailed the plaintiffs' factual allegations and the background of this case in its Opinion on the defendants' motion to dismiss the amended complaint. (*See* ECF No. 103, at 2-4.)

[5] The Court will also appoint (1) PERS of Mississippi, PPNPF, and WLPF as class representatives; (2) Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as class counsel; and (3) Cohen Milstein Sellers & Toll PLLC as liaison counsel.

## II. <u>DISCUSSION</u>[6]

Federal Rule of Civil Procedure 23 governs class actions, including class certification. As relevant in this case, the party seeking certification must satisfy seven requirements. Under Rule 23(a), the plaintiff must show (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. Fed. R. Civ. P. 23(a). Under Rule 23(b)(3), the type of class action at issue here, the plaintiffs must also demonstrate (5) predominance and (6) superiority. Fed. R. Civ. P. 23(b)(3). Finally, Rule 23 requires (7) ascertainability, meaning that "the members of a proposed class [must] be 'readily identifiable.'" *Adair*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)).

The defendants contest only whether the plaintiffs have satisfied the predominance and typicality requirements. (ECF No. 134, at 15.) Nevertheless, the Court must analyze all seven

---

[6] The party seeking class certification bears the burden of proof. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). When evaluating a motion for class certification, "'the trial court [must be] satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' . . . Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff[s'] underlying claim." *Dukes*, 564 U.S. at 350-51 (internal citations omitted) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)). Nevertheless, "[t]he likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). Finally, district courts should "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (quoting *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 740 (4th Cir. 1989)). This rule of liberal construction applies with increased force in securities fraud cases. *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) ("[I]t is important to bear in mind that '[i]n light of the importance of the class action device in securities fraud suits,' the requirements of Rule 23 'are to be construed liberally.' . . . Thus, any doubts about the propriety of certification should be resolved in favor of certification." (internal citation omitted)).

factors to determine if it should certify the proposed class. *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 405-06 (E.D. Va. 2015) (analyzing all Rule 23 requirements even though the defendants principally challenged the predominance requirement).

### A. Numerosity

The proposed class must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specified number is needed to maintain a class action under [Rule 23]; application of the rule is to be considered in light of the particular circumstances of the case and generally, unless abuse is shown, the trial court's decision on this issue is final." *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). Here, the proposed class includes potentially thousands of investors in Jeld-Wen, which satisfies the numerosity requirement under Rule 23(a)(1). *See Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (finding that a class size of seventy-four satisfied the numerosity requirement); *Cypress*, 375 F.2d at 653 (finding that a class size of eighteen satisfied the numerosity requirement).

### B. Commonality

Because the plaintiffs satisfy the more stringent predominance requirement for the reasons stated below, they also satisfy the commonality requirement. *In re Willis Towers Watson PLC Proxy Litig.*, No: 1:17cv1338, 2020 WL 5361582, at *13 (E.D. Va. Sept. 4, 2020). ("In a class action brought under Rule 23(b)(3), as here, 'the "commonality" requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions.'" (quoting *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001))).

### *C. Typicality*

Here, the plaintiffs' claims "are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). In other words, the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006).

In this case, the proposed class representatives and class members all contend that they purchased Jeld-Wen stock at an artificially inflated price because the defendants lied about Jeld-Wen's anticompetitive behavior and the liability to which that behavior exposed the company. In other words, the plaintiffs "claims arise out of the same alleged course of conduct undertaken by the defendants." *City of Ann Arbor Emps. Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 251 (D.S.C. 2010). "The information that the plaintiff[s] assert[] is materially false and misleading is the same information that would be used by other class members to prove their case." *Id.* at 251-52. In addition, all the plaintiffs would recover for purported violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission Rule 10b-5. The plaintiffs, therefore, have satisfied the typicality requirement. *Id.* at 252.

The defendants say that, "[t]o the extent Plaintiffs argue that the knowledge of their investment advisors is atypical of the class, the class cannot be certified because Plaintiffs cannot demonstrate typicality." (ECF No. 134, at 29.) The proposed class representatives do not argue, however, that their investment advisors had information atypical of the class. And the defendants

5

do not cite *any* evidence to support their claim that the proposed class representatives' investment advisors had such atypical information. Thus, this argument fails.

### D. Adequacy

Turning to adequacy, the plaintiffs must prove that both the representative parties and class counsel will fairly and adequately protect the class's interests. *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 212 (E.D. Va. 2015). Here, the representative parties "'possess the same interest and suffer the same injury'" as the proposed class members and "possess undivided loyalties" to them. *Broussard*, 155 F.3d at 338 (quoting *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Indeed, they have vigorously and competently represented the interests of the proposed class members throughout this litigation. In addition, class counsel and liaison counsel have experience in class actions and other complex civil litigation, including in securities fraud cases. Accordingly, the plaintiffs meet Rule 23's adequacy requirement.

### E. Predominance

As common in securities fraud cases, the defendants' argument against class certification focuses on the predominance requirement. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*") ("In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3).").

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "For this reason, courts must concentrate on the issue of liability rather than damages, 'and if the liability issue is common to the class, common questions are held to predominate over individual ones.'" *In re NII Holdings*, 311 F.R.D. at 408 (quoting *In re BearingPoint*, 232 F.R.D. at 542). "Securities fraud cases are particularly appropriate candidates

6

for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *In re BearingPoint*, 232 F.R.D. at 542; *see also In re NII Holdings*, 311 F.R.D. at 408.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the representation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).[7] The defendants argue that the plaintiffs do not have a common method of proving reliance or damages.

### 1. Reliance

The reliance element of a securities fraud case "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Amgen*, 568 U.S. at 461 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*")). Plaintiffs can prove reliance directly by showing that they knew about a company's misrepresentation and transacted based on that misrepresentation. *See id.* But "requiring proof of direct reliance 'would place an unnecessarily unrealistic evidentiary burden on [a] plaintiff who has traded on an impersonal market.'" *Id.* at 461 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988)). Thus, in *Basic*, the Supreme Court "held that securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b-5 action by invoking a rebuttable

---

[7] To state a claim under Section 20(a), a plaintiff "must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 129-30 (4th Cir. 2009), *rev'd on other grounds sub nom. Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). The defendants do not contest the plaintiffs' ability to prove its Section 20(a) claim using a common method.

7

presumption of reliance, rather than proving direct reliance on a misrepresentation." *Halliburton II*, 573 U.S. at 268. The *Basic* presumption rests "on what is known as the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Id.* (quoting *Basic*, 485 U.S. at 246.)

For the *Basic* presumption to apply, the plaintiffs must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* At the class certification stage, "a plaintiff need only demonstrate by a preponderance of the evidence that the alleged misrepresentations were publicly known and that the stock traded in an efficient market." *In re NII Holdings*, 311 F.R.D. at 409.

Here, the defendants argue that the plaintiffs have not proven that Jeld-Wen's stock traded in an efficient market for the entire class period. The defendants also argue that they have rebutted the *Basic* presumption.

### a. Market Efficiency

"In the Fourth Circuit, the standard for determining whether a security trades in an efficient market is determined by considering: 'factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals [("analyst coverage")]. . . .'" *Id.* (quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004)).[8] "[N]o one factor is more important than another when a court undertakes the holistic

---

[8] Courts refer to these as the *Cammer* factors. *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

8

and fact-intensive inquiry of determining whether a market is efficient." *Id.* The plaintiffs' expert, Steven P. Feinstein, analyzed these factors[9] and determined that Jeld-Wen "stock traded in an efficient market throughout the Class Period." (ECF No. 122-1 ¶ 264.)

The defendants argue that the plaintiffs cannot show that the market for Jeld-Wen stock "was efficient throughout the class period" because, for the 25-day quiet period following Jeld-Wen's initial public offering ("IPO"), the market "is inefficient as a matter of law." (ECF No. 134, at 3, 21.)[10] Thus, the defendants argue the Court "should limit the class period to purchases of JELD-WEN securities made *after* the quiet period, meaning on or after February 21, 2017." (ECF No. 134, at 26 (emphasis in original).)

As an initial matter, the defendants "go[] too far" when contending that "a market for securities during the so-called 'quiet period' is inherently inefficient as a matter of law." *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 575 (S.D.N.Y. 2008). Rather, there is "a *rebuttable presumption* that the market for securities issued by a company not previously subject to the reporting requirements of the securities laws is not efficient during the quiet period." *Id.* (emphasis added). Feinstein's expert report and declaration demonstrates market efficiency throughout the entire class period. (*See* ECF No. 142-2 ¶¶ 4-13.) Because the defendants do not offer an expert report of their own to discredit Feinstein's evaluation, the plaintiffs have rebutted the presumption of inefficiency.

---

[9] Feinstein also analyzed the so-called *Krogman* factors, which include "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')." *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001).

[10] The plaintiffs note that, in 2015, the Financial Industry Regulatory Authority ("FINRA") reduced the quiet period to ten days. (ECF No. 141, at 7 n.5 (citing FINRA R. 2241(b)(2)(I)(i)).) During the quiet period, FINRA members "must not publish or otherwise distribute research reports, and research analysts must not make public appearances, . . . if the member has participated as an underwriter or dealer in the" IPO. FINRA R. 2241(b)(2)(I).

The defendants claim that Feinstein did not separately analyze the *Cammer* and *Krogman* factors during the quiet period. (ECF No. 134, at 23-24.) And they suggest that he admitted as much during his deposition. (*Id.* at 23.) But Feinstein testified that he analyzed the quiet period separately from the rest of the class period. (ECF No. 141-1, at 59:4-13.) And he concluded that Jeld-Wen's stock traded in an efficient market during the quiet period. (*Id.* at 47:2-20.)

Moreover, the defendants only criticize what they see as Feinstein's inadequate analysis of the analyst coverage factor. Even if the Court credited that argument, such a finding would not undermine Feinstein's conclusion that Jeld-Wen stock traded in an efficient market during the quiet period because "no one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining whether a market is efficient." *In re NII Holdings*, 311 F.R.D. at 409. Thus, one factor weighing against market efficiency would not overcome all the other factors supporting it. Accordingly, the plaintiffs have proven market efficiency throughout the entire class period.

### b. Rebutting the *Basic* Presumption

"Even if plaintiffs show they are entitled to the *Basic* presumption," the defendants argue that they have rebutted that presumption because its announcement on October 15, 2018, that it expected to incur $76.5 million in liability due to the verdict in *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Civil Case No. 3:16cv545, (the "Liability Announcement" or "*Steves* Litigation Contingency") "disclosed no new information regarding the merits of the Steves Litigation, JELD-WEN's liability, or its alleged anticompetitive conduct." (ECF No. 134, at 26, 29.) The defendants argue that testimony from the plaintiffs' investment advisors support this view. (ECF No. 134, at

10

13 (claiming that the plaintiffs' investment advisors' testimony shows that "the market saw the Steves Litigation Contingency as a *non-event*" (emphasis in original)).)[11]

The defendants auditioned this argument at the motion to dismiss stage. (*See* ECF No. 78, at 28-29.) The argument fell flat then;[12] and it fails now for the same reason—the Liability Announcement disclosed new information to the market. Specifically, it revealed that Jeld-Wen expected the *Steves* litigation to cause significant liability for the company.[13] Feinstein reflects this understanding of the Liability Announcement when he opines that it "constituted a corrective disclosure," which caused a "steep stock price decline" that "could not have been caused by random volatility." (ECF No. 122-1 ¶ 299.) To counter Feinstein's conclusion, the defendants

---

[11] This argument mischaracterizes the plaintiffs' investment advisors' testimony. Two of the plaintiffs' investment advisors testified that they did not perceive the Liability Announcement as an admission of liability by Jeld-Wen. But one of the advisors, Wellington Management Co., LLP, testified that the Liability Announcement revealed that Jeld-Wen had "on the margin" changed it position "regarding the merits of the *Steves* litigation" because its "fear of a bad outcome had increased." (ECF No. 134-4, at 140:15-141:3.) This resulted in "an accounting change," if not necessarily "an actual change in the thought process." (*Id.* at 141:3-5.) The other advisor, Segall Bryant & Hamill, said that it did not know that the Liability Announcement "would have . . . severely damaged" its investment decisions about Jeld-Wen. (ECF No. 134-3, at 157:13-20.) At the same time, however, it "wouldn't have helped." (*Id.*) In any event, this testimony certainly does not show that the *entire market* saw the Liability Announcement as a non-event.

[12] (ECF No. 103, at 20 ("The Liability Announcement also disclosed *new facts* to the market—namely, that JELD-WEN expected to incur a $76.5 million loss from the *Steves* litigation. Before then, JELD-WEN maintained that it did not expect Steves to succeed in its lawsuit. Like [United States District Court Judge Robert E. Payne's Opinion making detailed factual findings about Jeld-Wen's anticompetitive behavior and ordering divestiture of Jeld-Wen's doorskins manufacturing facility in Towanda, Pennsylvania (the 'Divestiture Decision')], this *new fact* altered the risk calculus for investors buying and selling JELD-WEN stock." (emphasis added)).

[13] (*Cf.* ECF No. 134-2 ¶¶ 72-73 (describing a memorandum prepared by Jeld-Wen's Chief Accounting Officer explaining that the company should record its estimated losses related to the *Steves* case because the "District Court's orders, especially its fact findings and ruling on quality claims, make[] overcoming antitrust liability (in its entirety) on appeal less probable and gives certainty around contract damages").)

11

offer inconclusive testimony of two investment advisors; this testimony does not nullify Feinstein's finding.

### 2. *Damages*

Although the predominance inquiry focuses on liability, not damages, *see Gunnells*, 348 F.3d at 427-28,[14] the defendants argue that the plaintiffs cannot satisfy the predominance requirement because they lack common proof of damages. This argument rests on a misrepresentation of the plaintiffs' amended complaint and the Court's ruling on the defendants' motion to dismiss.

The defendants incorrectly claim that the plaintiffs "advanced two [separate] theories of liability" to survive the defendants' motion to dismiss. (ECF No. 134, at 1.) Under the first theory, the plaintiffs "allege that beginning on January 26, 2017, JELD-WEN made statements about its pricing practices and the competitiveness of the doors and windows markets (the 'Pricing and Competitiveness Statements'), which were false or misleading because JELD-WEN engaged in anticompetitive conduct." (*Id.*) According to the defendants, the Divestiture Decision corrected the Pricing and Competitiveness Statements.

Under the second theory, the plaintiffs allege that "beginning on February 15, 2018, JELD-WEN made statements about whether it would prevail" in the *Steves* case (the "*Steves* Litigation Statements"), which "were false or misleading because JELD-WEN knew the litigation had merit

---

[14] *See also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 686 (D. Md. 2018) ("'[C]ourts generally find the predominance standard of Rule 23(b)(3) to be satisfied,' even when individualized damages determinations are required, if common questions still predominate as to liability." (quoting *id.*).)

12

and would cause [Jeld-Wen] negative repercussions." (*Id.* at 2.) According to the defendants, the Liability Announcement corrected these statements.[15]

The defendants claim that "[d]iscovery has shown Plaintiffs' first theory of liability is a dead end" because Feinstein "has conceded that he cannot show the Divestiture Decision impacted JELD-WEN's stock price." (*Id.*) Thus, the plaintiffs should pursue only their second liability theory and "narrow the class period so it starts on February 15, 2018 (the date of the first alleged Steves Litigation Statement)." (*Id.*)[16]

The plaintiffs do not pursue two separate liability theories, however. Instead, they advance a "***unified, single*** theory of liability." (ECF No. 141, at 1 (emphasis in original).) The plaintiffs allege that both the Pricing and Competitiveness Statements and the *Steves* Litigation Statements were false for the same reason—the defendants knew that Jeld-Wen "engaged in anticompetitive conduct," and, therefore, they "knew the litigation has merit and would cause [Jeld-Wen] negative

---

[15] The defendants' theory ignores the obvious link between the so-called Pricing and Competitiveness Statements and the *Steves* Litigation Statements. Jeld-Wen knew the *Steves* case had merit and would expose it to liability *because* it knew it engaged in anticompetitive conduct. Indeed, the defendants' argument that the Divestiture Decision *in the* Steves *case* corrected the Pricing and Competitiveness Statements tacitly acknowledges the link between the Pricing and Competitiveness Statements and the *Steves* case. Stated differently, if factual findings in the *Steves* case correct the Pricing and Competitiveness Statements, then what severs the link between the Pricing and Competitiveness Statements and the *Steves* Litigation Statements? The defendants never answer that question.

[16] The defendants base this argument on the Supreme Court's holding in, *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), an antitrust case in which the Court held that a district court may certify a class action only when a plaintiff provides evidence of damages attributable exclusively to *viable* liability theories. *See id.* at 35.

13

repercussions." (ECF No. 134, at 1-2.)[17] The Court's Opinion on the defendants' motion to dismiss confirms this understanding of the case.[18]

In addition, the plaintiffs allege that the Divestiture Decision only partially corrected the defendants' misrepresentations about Jeld-Wen's anticompetitive conduct and the merits of the *Steves* litigation. (*See* ECF No. 73, at 64 (labeling the Divestiture Decision as the "first partial disclosure").) They allege that Jeld-Wen did not completely correct its misstatements until it issued the Liability Announcement. (*See id.* at 67 (labeling the Liability Announcement as the "final partial disclosure").) The Court acknowledged this theory in its Opinion on the defendants' motion to dismiss.[19] And the plaintiffs' damages model reflects this theory, too.[20]

---

[17] (*See also* ECF No. 141, at 4 ("Defendants simply ignore that the Complaint alleges that what they categorize as the 'Pricing and Competitiveness Statements' and 'the *Steves* Litigation Statements and Omissions' were ***both*** false for the ***same unified***, underlying reason: Defendants' concealment of the actual source of their apparent success, *i.e.*, their undisclosed anticompetitive conduct." (emphasis in original)).)

[18] (*See* ECF 103, at 8-9 ("The amended complaint alleged that JELD-WEN made false or misleading statements by (1) crediting its market success to its pricing strategy and quality products, not its anticompetitive conduct; (2) characterizing the door and window market as competitive while simultaneously engaging in an anticompetitive conspiracy; and (3) describing the *Steves* litigation as meritless when it resulted in a $176 million verdict for Steves and the divestiture of JELD-WEN's Towanda plant."); *see also id.* at 11 n.11 ("Contrary to the defendants' characterization, the plaintiffs do not allege only that the defendants failed to disclose what Judge Payne would decide in the future [regarding the *Steves* case]. Rather, the plaintiffs allege that the defendants did not disclose their anticompetitive scheme to the public even though they knew about it before Steves sued JELD-WEN."), 12, 18-20.)

[19] (*See* ECF No. 103, at 17-18 ("[T]he Divestiture Decision revealed the true basis of JELD-WEN's profitability and that the Court would require JELD-WEN to divest itself of its Towanda plant." But "[o]nly after the [Liability Announcement and the announcement that CFO L. Brooks Mallard would resign] did the market finally realize that JELD-WEN had failed to disclose the threat its anticompetitive practices posed to its financial outlook.").)

[20] (*See* 122-1 ¶¶ 294, 296 (concluding that Divestiture Decision "did constitute a partially corrective disclosure" that "reasonably negatively impacted" Jeld-Wen's stock price, even though "the magnitude of the effect was not large enough to register as a statistically significant decline");

14

The plaintiffs' amended complaint and expert report advance a single, unified theory of liability. The Court recognized this single, unified theory in its Opinion on the defendants' motion to dismiss. The defendants' transparent attempt to reframe the plaintiffs' allegations to its liking fails. This dooms its argument that the plaintiffs have no common proof of damages.

\* \* \*

For the reasons stated above, the plaintiffs have common evidence to prove both reliance and damages. Accordingly, they have satisfied Rule 23(b)(3)'s predominance requirement.

### F. Superiority

The plaintiffs have shown "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "In determining whether the class mechanism is truly superior, the court should consider '(1) the interest in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of concentrating the litigation in the forum; and (4) manageability.'" *Soutter*, 307 F.R.D. at 217-18 (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997)). Phrased more generally, the superiority requirement compares class action litigation to possible alternatives "to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010) (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005)).

---

*id.* ¶ 339 (finding that the Liability Announcement caused a "$1.99 per share decline on 16 October 2018"); ECF No. 141, at 5-6; ECF No. 142-2 ¶¶ 14-20.)

A class action is superior in this case. Other litigation related to this case is currently pending in this jurisdiction, and the parties have litigated this case for over a year. This makes Richmond a convenient forum. The Court does not foresee difficulty in managing this case as a class action. Moreover, a class action serves the interests of economy and efficiency. Thus, the plaintiffs meet the superiority requirement.

### G. *Ascertainability*

"Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable'" by use of "objective criteria"—an "ascertainability" requirement. *Adair*, 764 F.3d at 358 (quoting *Hammond*, 462 F.2d at 1055). In other words, if "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). Conversely, "[w]here a plaintiff proposes objective criteria capable of identifying those individuals described in the class definition, the ascertainability requirement is satisfied." *Soutter*, 307 F.R.D. at 199. The plaintiffs need not "identify every class member at the time of certification." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *Adair*, 764 F.3d at 358), *cert. denied*, 140 S.Ct. 676 (2019). Instead, they must merely "ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Id.*

Here, objective data about who bought and sold Jeld-Wen stock during the class period provides an administratively feasible way to ascertain the class. Thus, the plaintiffs satisfy the ascertainability requirement.

## III. CONCLUSION

The plaintiffs have satisfied the requirements for class certification under Rule 23(a) and 23(b)(3). Accordingly, the Court will grant their motion for class certification. The Court will also appoint PERS of Mississippi, PPNPF, and WLPF as class representatives; Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as class counsel; and Cohen Milstein Sellers & Toll PLLC as liaison counsel.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 29 March 2021
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge