No. _____

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

IN RE: JELD-WEN HOLDING, INC. SECURITIES LITIGATION

_____

JELD-WEN HOLDING, INC., MARK A. BECK, L. BROOKS MALLARD, and
GARY S. MICHEL,

*Petitioners*,

v.

PLUMBERS AND PIPEFITTERS NATIONAL PENSION FUND, et al.,

*Respondents*.

_____

On Petition to Appeal from the United States District Court for the
Eastern District of Virginia, Hon. John A. Gibney, Jr.
No. 3:20-cv-112-JAG

_____

## PETITION FOR PERMISSION TO APPEAL UNDER RULE 23(f)

_____

| | |
|---|---|
| SANDRA GOLDSTEIN | PAUL D. CLEMENT |
| RACHEL FRITZLER | *Counsel of Record* |
| LINDSEY WEISS HARRIS | ERIN E. MURPHY |
| JACOB RAE | C. HARKER RHODES IV |
| KIRKLAND & ELLIS LLP | KIRKLAND & ELLIS LLP |
| 601 Lexington Avenue | 1301 Pennsylvania Avenue, NW |
| New York, New York 10022 | Washington, DC 20004 |
| (212) 446-4800 | (202) 389-5000 |
| sandra.goldstein@kirkland.com | paul.clement@kirkland.com |

*Counsel for Petitioners*

April 12, 2021

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), JELD-WEN Holding, Inc. certifies that it is a publicly traded company that owns 100% of the stock of JELD-WEN, Inc.  Onex Corporation, through its subsidiaries and affiliate entities, owns 10% or more of the stock of JELD-WEN Holding, Inc.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES.......................................................................... iii

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS ............................................................................ 4

      A.     The *Steves* Litigation ................................................................ 4

      B.     Plaintiffs' Complaint and JELD-WEN's Motion to Dismiss............... 7

      C.     The Certification Decision ......................................................... 10

QUESTION PRESENTED ........................................................................... 13

STANDARD OF REVIEW .......................................................................... 13

ARGUMENT .......................................................................................... 14

I.      Predominance Is Lacking Because Plaintiffs Have No Viable Common Theory Of Reliance........................................................... 15

II.     Predominance Is Lacking Because Plaintiffs Have No Viable Common Theory Of Damages And Face An Insurmountable *Comcast* Problem................................................................... 20

CONCLUSION AND RELIEF SOUGHT ......................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ATTACHMENT 1: OPINION GRANTING CLASS CERTIFICATION

ATTACHMENT 2: ORDER GRANTING CLASS CERTIFICATION

## TABLE OF AUTHORITIES

**Cases**

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)....................................................................................3, 16

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..................................................................................9

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................... *passim*

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014).............................................................................14

*Freeman v. Laventhol & Horwath*,
    915 F.2d 193 (6th Cir. 1990).............................................................................19

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015).............................................................................21

*GO Computer, Inc. v. Microsoft Corp.*,
    508 F.3d 170 (4th Cir. 2007)...............................................................................9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)............................................................................ 15, 16, 19

*In re Intelligroup Sec. Litig.*,
    527 F.Supp.2d 262 (D.N.J. 2007) ....................................................................20

*In re IPO Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ........................................................................ 19, 20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ..........................................................................14

*Lienhart v. Dryvit Sys., Inc.*,
    255 F.3d 138 (4th Cir. 2001).............................................................................14

*Longman v. Food Lion, Inc.*,
    197 F.3d 675 (4th Cir. 1999)...............................................................................9

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021)...............................................................7

*Teachers' Ret. Sys. of L.A. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007)...............................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...........................................................................15

**Rules**

Fed. R. Civ. P. 23...................................................................................14

Fed. R. Civ. P. 23, Adv. Comm. Note to 1998 Amend................................13

## INTRODUCTION

This petition seeks review of a class that should never have been certified in a novel securities case that is too deeply flawed to proceed as a class action. Petitioner JELD-WEN Holding, Inc. is a publicly traded company whose subsidiary JELD-WEN, Inc. (together "JELD-WEN") makes doors and windows. Since 2016, JELD-WEN, Inc. has been defending itself against breach-of-contract and antitrust claims in hard-fought litigation brought by its customer and competitor Steves & Sons, Inc., who claims that JELD-WEN's 2012 acquisition of a former competitor's plant was anticompetitive. In February 2018, a jury ruled for Steves on those claims and awarded tens of millions in damages; in response, JELD-WEN's stock price barely budged. In October 2018, the judge in the same litigation issued a decision granting Steves' request to require JELD-WEN to divest the plant; once again, JELD-WEN's stock price did not significantly change. Ten days later, however—well after the divestiture decision became public, and eight months after the jury's verdict finding antitrust violations—JELD-WEN released disappointing third-quarter financial results, and its stock price dropped significantly.

A group of disgruntled investors then brought this putative securities class action, advancing two equally remarkable claims. First, according to Plaintiffs, the district court's divestiture decision constituted a "corrective disclosure" of generic representations JELD-WEN had made to the effect that the markets in which it

operates are competitive, and that its success was owing to its pricing strategies.  In Plaintiffs' view, by ordering the additional remedy of divestiture for antitrust violations that a jury had found in a public trial eight months earlier, the court revealed to the market for the first time the purportedly "new" information that those markets are actually not competitive, and that JELD-WEN's success was actually the product of anticompetitive behavior (including some alleged conduct that was not adjudicated in the Steves litigation or discussed in the divestiture opinion).

Second, Plaintiffs contend that, by announcing the litigation contingency charge it would book to cover the *Steves* judgment in the event its appeal was unsuccessful, JELD-WEN "corrected" its earlier representations that Steves' claims were meritless.  In other words, Plaintiffs claim that by disclosing a reasonable possibility that it might not prevail on appeal, JELD-WEN implicitly conceded that its defense had been meritless from the start.  Plaintiffs advanced that novel theory even though the press release announcing the litigation contingency—which just so happened to be the same press release that announced the *genuinely* new information that JELD-WEN had poor third quarter earnings—explicitly stated that JELD-WEN "continue[d] to maintain that it has not violated any antitrust laws and intend[ed] to appeal any adverse judgment," which JELD-WEN did with at least some success.

Instead of rejecting those untenable theories at the threshold, the district court embraced them.  In the court's view, the federal securities laws required JELD-WEN

2

to "confess to the wrongdoing alleged in *Steves* while that litigation was ongoing" or face an automatic follow-on securities fraud lawsuit if its defenses failed. Dkt.103 ("MTD.Op.") 7. Adding insult to injury, the court then certified a class based on that mystifying theory.

That certification, like Plaintiffs' entire case, is fatally flawed. Rule 23(b)(3) permits certification only when common questions predominate over individual ones—i.e., when class-wide theories of liability and damages will allow efficient resolution of an action on a class-wide basis. This class fails that requirement twice over. First, Plaintiffs have no viable class-wide theory of liability because they cannot show class-wide reliance on any purported misrepresentations. While they invoke the presumption of reliance recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), that presumption cannot apply when (as here) the only purported "corrective" disclosure revealed no new material information, or when (as here) class members purchased shares in an initial public offering ("IPO"), which as a matter of law is not an efficient market. Without the benefit of that presumption, individual issues of reliance plainly predominate.

Second, Plaintiffs have no viable class-wide model of damages because their damages model does not align with their class definition or their liability case. *See Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Because their own expert conceded that he could not show that the divestiture decision had any significant effect on

3

JELD-WEN's stock price, Plaintiffs' damages model relies solely on measuring the price decline after JELD-WEN announced its litigation contingency. Even if that could conceivably be understood as "correcting" JELD-WEN's previous statements that it believed its defenses to *Steves*' claims were viable, it cannot possibly be understood as "correcting" JELD-WEN's generic statements about its pricing and the competitiveness of the markets—the only statements at issue for more than half of the class period. That mismatch made certification plainly inappropriate and inconsistent with *Comcast*.

Put simply, common issues cannot predominate when, as here, plaintiffs cannot prove either liability or damages on a class-wide basis. This Court should grant permission to appeal and reverse.

## STATEMENT OF FACTS

### A. The *Steves* Litigation

Most interior doors in American homes are "interior molded doors," made by sandwiching a wood frame and core between two fibrous "doorskins" that provide paneled designs and textures. JELD-WEN manufactures doorskins, which it uses to manufacture and sell doors. JELD-WEN also sells doorskins to other door manufacturers, including Steves. Dkt.73 ("Am.Compl.") 1-2.

In 2016, Steves filed a lawsuit in the Eastern District of Virginia, assigned to Judge Payne, alleging that JELD-WEN had breached its doorskin supply agreement

with Steves.  Steves also alleged that the same conduct violated the federal antitrust laws, premising its antitrust claims on the fact that, four years earlier, JELD-WEN had acquired doorskin manufacturer Craftmaster International ("CMI"). Am.Compl.22-23, 28-29.  Steves' complaint was filed publicly, and JELD-WEN disclosed the litigation, including the substance of Steves' allegations, in its prospectus for its January 2017 IPO.  *See* Dkt.79-4 at 110.  JELD-WEN also disclosed its belief that Steves' claims lacked merit, and its intent to defend vigorously against them.  *Id.*  JELD-WEN continued to provide additional disclosures about the litigation to investors over the ensuing years as the litigation developed, and repeatedly reiterated its belief that Steves' claims were meritless. *See, e.g.*, Dkt.79-9 at 36; Dkt.79-12 at 26; Dkt.79-21 at 30.

In February 2018, after a public trial, a jury awarded Steves over $12 million in past antitrust damages and over $46 million in future antitrust damages.  Dkt.79-24.  The following day, JELD-WEN issued a press release disclosing the unfavorable verdict, that the damages could be trebled under antitrust law, and that Steves might be entitled to attorney's fees.  Dkt.79-25.  JELD-WEN also disclosed that it disagreed with the verdict and intended to file post-trial motions and appeal.  *Id.* JELD-WEN did not book any litigation contingency at that point, however, because Steves had indicated that it intended to seek the equitable remedy of divestiture, and it was unclear whether that request would succeed or, if it did, whether Steves would

5

choose divesture in lieu of the more than $140 million in trebled future lost profits available under the jury's verdict. *See id.*

On October 5, 2018, Judge Payne issued a decision ordering JELD-WEN to divest the doorskin plant it had acquired from CMI. Am.Compl.36-37. JELD-WEN promptly issued a press release disclosing that adverse decision, and noted its continued disagreement with the jury verdict and Judge Payne's rulings and its intent to appeal. Dkt.79-34. Over the next two days, JELD-WEN's share price declined by slightly less than 5%.

On October 15, 2018—ten days after Judge Payne's decision—JELD-WEN issued a press release announcing its preliminary third-quarter fiscal results. Dkt.79-35. It reported "lower than expected revenues and related operational inefficiencies," as well as "unfavorable channel mix impacting price realization," lowering its adjusted EBITDA projection for 2018 from $500-520 million down to $455-470 million. *Id.*

In the same press release, JELD-WEN announced it would book a $76.5 million litigation contingency charge for the *Steves* litigation. *Id.* As JELD-WEN explained, the divestiture decision "provided sufficient detail for the company to estimate future liabilities if the appeal process is unsuccessful"—in particular, by ordering divestiture in place of the jury's award of future lost profits, which would have required a higher contingency. *Id.* But JELD-WEN "continue[d] to maintain

6

that it has not violated any antitrust laws and intend[ed] to appeal any adverse judgment." *Id.*

In another press release issued that same day, JELD-WEN announced its CFO L. Brooks Mallard was departing to pursue other interests, while making clear his departure was "not based on any disagreement with the company or based on any accounting or financial reporting matters." Dkt.79-36. Following these announcements, JELD-WEN's share price declined approximately 19%. Am.Compl.39.

JELD-WEN appealed the *Steves* judgment, and, two months ago, this Court affirmed in part, vacated in part, and remanded. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021). While the Court affirmed the liability determination, it vacated the future damages award as premature. And while the Court affirmed Judge Payne's divestiture order, it noted that he "may have to revisit [that] ruling" if an appropriate buyer cannot be found. *Id.* at 724. JELD-WEN sought rehearing en banc, which this Court denied.

## B.    Plaintiffs' Complaint and JELD-WEN's Motion to Dismiss

Plaintiffs filed this putative securities class action in February 2020. Their amended complaint alleges that, from its IPO in January 2017 through October 2018, JELD-WEN misled investors by asserting on various occasions that it operated in a competitive market and owed its success to legitimate pricing strategies.

7

Am.Compl.1-2, 5-6. To support its claim that those representations were false, the complaint relies primarily on Steves' claims of anticompetitive conduct in the doorskin market arising out of the CMI acquisition, Am.Compl.16-26, but briefly suggests that JELD-WEN also engaged in the entirely separate conduct of price-fixing in the *interior molded door* market, which was never adjudicated in the *Steves* litigation, Am.Compl.26-28. The complaint further alleges that JELD-WEN misled investors by asserting that Steves' claims were meritless and that the jury's verdict was erroneous. Am.Compl.6. Even though JELD-WEN has continued to defend itself against Steves' claims to this day, the complaint asserts those statements were revealed to be misrepresentations through two purported "corrective disclosures": Judge Payne's October 5, 2018 divestiture decision and JELD-WEN's October 15, 2018 press release noting the litigation contingency it was booking to cover the expected judgment if its appeal did not succeed. Am.Compl.7-9.

JELD-WEN moved to dismiss. It explained that Plaintiffs' claims fail for multiple reasons, including that JELD-WEN satisfied its disclosure obligations under the securities laws by disclosing Steves' allegations and the progress of the lawsuit; that the statements Plaintiffs challenged were not false (let alone intentionally or recklessly false); and that JELD-WEN could not be held liable for simply (and, in JELD-WEN's view to this day, correctly) defending itself against Steves' allegations. Dkt.78 at 10-24. As this Court has observed, "wrongdoing is

8

not a straightforward matter of fact, and it is not fraud to deny it." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007); *see, e.g., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014); *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684-85 (4th Cir. 1999).

JELD-WEN also explained that Plaintiffs' claims fail because neither of their two purported "corrective disclosures"—the divestiture decision and the litigation contingency—revealed any new information showing that JELD-WEN had made any misrepresentation. Dkt.78 at 24-29. For one thing, neither said anything about alleged price-fixing in the interior molded doors market. *Id.* at 25-26. Moreover, the divestiture order showed only that, based on the already-public evidence, Judge Payne disagreed with JELD-WEN's views on the merits of Steves' claims. *Id.* at 27-28. And far from revealing JELD-WEN's efforts to defend itself "to have been fraudulent," *Teachers' Ret. Sys. of L.A. v. Hunter*, 477 F.3d 162, 187-88 & n.3 (4th Cir. 2007), the press release noting the litigation contingency explicitly confirmed that JELD-WEN continued to defend the legality of its conduct. Dkt.78 at 26-29.

The district court denied the motion. In the court's view, the federal securities laws required JELD-WEN to literally "confess to the wrongdoing alleged in *Steves* while that litigation was ongoing" or face an automatic follow-on securities fraud lawsuit should it not prevail. MTD.Op.7. The court also held Judge Payne's divestiture decision was a "corrective disclosure" because "the confirmation" of

9

Steves' "unproven, untested allegations" "by an unbiased source—Judge Payne—constitutes a disclosure of new *facts* that an investor could reasonably rely on." MTD.Op.20-21. The court did not explain why the jury's verdict in February 2018—eight months before the divestiture decision—did not provide the market adequate "confirmation of [Steves'] allegations by an unbiased source." *Id.* The court also inexplicably held that the divestiture decision revealed new information about the purported "price-fixing conspiracy related to" interior molded doors—which Judge Payne never mentioned—because it agreed with the jury's finding that JELD-WEN's acquisition of CMI's *doorskin* plant was anticompetitive. MTD.Op.18-19. As to the litigation contingency, the court held it disclosed new facts to the market by showing JELD-WEN "expected to incur a $76.5 million loss from the *Steves* litigation" whereas JELD-WEN previously "maintained that it did not expect Steves to succeed in its lawsuit." MTD.Op.20.

### C. The Certification Decision

After discovery began, Plaintiffs' liability theory shifted dramatically. Despite their earlier reliance on the divestiture decision as a "corrective disclosure," their expert conceded that he could not show that the divestiture decision had any statistically significant effect on JELD-WEN's stock price. Dkt.122-1 at 101. Thus, the only remaining "corrective disclosure" on which Plaintiffs could rely to prove damages was JELD-WEN's press release ten days later announcing that, in light of

10

the certainty the divestiture decision created about what remedies Steves would select under the (already-public) jury verdict, JELD-WEN would book a $76.5 million litigation contingency.  Plaintiffs claimed that the contingency "finally admitted" that JELD-WEN had engaged in anticompetitive conduct, Dkt.121 at 9—despite JELD-WEN's explicit statement in the very same paragraph that it "continues to maintain that it has not violated any antitrust laws and intends to appeal any adverse judgment," Dkt.79-35, which it did.  Plaintiffs further claimed that the litigation contingency, not the disappointing financial results disclosed in the same press release, caused JELD-WEN's stock to fall 19%.  Dkt.121 at 9.

Based on these allegations, Plaintiffs moved to certify a class under Rule 23(b)(3) of persons who purchased JELD-WEN stock between its IPO on January 26, 2017 and October 15, 2018, claiming that all those persons were injured by JELD-WEN's purported misrepresentations that (1) it operated in a competitive market and owed its success to its pricing strategies and (2) Steves' claims were meritless.  Dkt.121 at 1, 7-9.

JELD-WEN opposed certification, explaining that individual issues would predominate over any common issues.  First, Plaintiffs have not presented any viable common theory of reliance.  Dkt.136 at 20-29.  While Plaintiffs invoke the *Basic* presumption, that presumption is defeated by the fact that the sole purported "corrective disclosure" on which they relied (the litigation contingency) provided no

11

new information to the market revealing any prior misrepresentation, and because the putative class members who bought JELD-WEN stock during its IPO and subsequent quiet period were not trading in an efficient market. *Id.* Second, Plaintiffs failed to present any viable common theory of damages because their damages model conflated any loss from JELD-WEN's statements about pricing and competitiveness with any loss from JELD-WEN's statements about the *Steves* litigation—and only the latter were even arguably "corrected" by the litigation contingency announcement. Dkt.136 at 16-20; *see Comcast*, 569 U.S. at 35 (common damages model "must measure only those damages attributable to [plaintiffs'] theory" of liability).

The district court nevertheless certified the class. Dkt.233 ("Cert.Op.") (attached). As to reliance, reiterating its reasons for denying JELD-WEN's motion to dismiss, the court held that Plaintiffs could invoke the *Basic* presumption because the litigation contingency purportedly "revealed that JELD-WEN expected the *Steves* litigation to cause significant liability for the company." Cert.Op.11. The court also held that Plaintiffs had adequately shown the market was efficient *during the quiet period*, without addressing JELD-WEN's argument that no efficient market existed *during the IPO*. Cert.Op.8-10. As to damages, the court held that Plaintiffs had put forward an adequate common damages model because they asserted that *both* JELD-WEN's statements about pricing and competitiveness *and* its statements

12

about the *Steves* litigation were not "completely correct[ed]" until JELD-WEN announced the litigation contingency. Cert.Op.13-15. The court did not explain how that announcement—which specifically reaffirmed that JELD-WEN "continue[d] to maintain that it has not violated any antitrust laws and intends to appeal any adverse judgment," Dkt.79-35—could plausibly be understood as "correct[ing]" any prior JELD-WEN statements about its pricing strategies or market competitiveness. Cert.Op.13-14.[1]

## QUESTION PRESENTED

Whether the certification order must be vacated because Plaintiffs' putative class action, which asserts that JELD-WEN revealed new information to the market by booking a litigation contingency based on an already-public jury verdict and judicial decision, presents no viable common theory of reliance or damages.

## STANDARD OF REVIEW

This Court has "unfettered discretion" to allow an appeal from an order granting class certification based on "any consideration that [it] finds persuasive." Fed. R. Civ. P. 23(f), Adv. Comm. Note to 1998 Amend. When conducting a Rule 23(f) inquiry, the Court considers "whether the certification ruling is likely

---

[1] Plaintiffs have since—post-certification—asserted another purported "corrective disclosure" based on an August 2018 stock analyst email. The district court did not rely on that purported disclosure, and JELD-WEN has moved to strike Plaintiffs' expert report relying on it. Dkt.217.

13

dispositive," whether it "contains a substantial weakness," whether "appeal will permit the resolution of an unsettled legal question of general importance," "the nature and status of the litigation," and "the likelihood that future events will make appellate review more or less appropriate." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 144 (4th Cir. 2001). The "substantial weakness" factor "operates on a sliding scale to determine the strength of the necessary showing regarding the" other factors. *Id.* at 145-46. The weaker the order, the less important the other factors become. *Id.* "The court should grant the petition, notwithstanding the other factors, where a district court's certification decision is manifestly erroneous and virtually certain to be reversed on appeal." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (brackets and internal quotation marks omitted).

## ARGUMENT

Rule 23(b)(3) allows certification only if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). That standard demands a "rigorous analysis" of whether plaintiffs have identified a reliable means of proving liability and damages on a class-wide basis, *Comcast*, 569 U.S. at 33-34, since if "individual trials are necessary to establish whether a particular [plaintiff] suffered harm," then individual questions necessarily predominate, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013). That analysis "will frequently entail 'overlap with the

14

merits of the plaintiff's underlying claim,'" since determining whether plaintiffs have viable class-wide theories of liability or damages "'generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Comcast*, 569 U.S. at 33-34 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

Plaintiffs plainly fail the predominance bar twice over. First, they cannot prove liability on a class-wide basis because they cannot satisfy the standard to presume class-wide reliance. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281-82 (2014) ("*Halliburton II*") ("without the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action" because "[e]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones"). Second, Plaintiffs cannot prove damages on a class-wide basis because their damages model is not "consistent with [their] liability case" and therefore "cannot possibly establish that damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. Given these fatal flaws, the certification order cannot stand.

## I. Predominance Is Lacking Because Plaintiffs Have No Viable Common Theory Of Reliance.

*Basic* establishes a rebuttable presumption that a "public, material misrepresentation will distort the price of stock traded in an efficient market," such that "anyone who purchases the stock at the market price may be considered to have

15

done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283-84. That presumption, however, is subject to strict limits. Among other requirements, it cannot apply unless the alleged misrepresentation and subsequent corrective disclosure actually affected the market price, and all class members purchased the stock in an efficient market. *Id.* at 268-69; *see Basic*, 485 U.S. at 248 & n.27. Neither element is present here.

The *Basic* presumption allows plaintiffs to establish reliance on a purported misrepresentation "indirectly"—but it does not allow courts to ignore "direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price." *Halliburton II*, 573 U.S. at 282. That dooms Plaintiffs' reliance on *Basic* for a simple reason: JELD-WEN's litigation contingency did not reveal any new material information at all, let alone "correct" any purported misrepresentations. The market was already fully aware of Steves' allegations of anticompetitive conduct, which were publicly made and which JELD-WEN had routinely disclosed for well over a year. *See* Dkt.79-4 at 110; Dkt.79-9 at 36; Dkt.79-12 at 26; Dkt.79-21 at 30. The market was likewise fully aware that, eight months earlier, a jury had accepted those allegations and awarded Steves tens of millions of dollars in damages, with the possibility of further court-ordered remedies. Dkt.79-24; Dkt.79-25. And the market was fully aware that, ten days earlier, Judge Payne had granted the additional remedy of divestiture for Steves' already-adjudicated

16

antitrust claims, a decision that resulted in no statistically significant drop in JELD-WEN's stock price. Dkt.122-1 at 99-101. Put simply, all the information reflected in the litigation contingency—which simply booked an accounting charge for the amount of the expected judgment in light of the divestiture decision—was already firmly in the market's hands. That destroys Plaintiffs' attempt to prove class-wide reliance by claiming that the litigation contingency "corrected" some alleged misrepresentation.

In fact, the record shows precisely why JELD-WEN's stock price dropped on October 15, 2018—and it has nothing to do with JELD-WEN's litigation contingency. The headline item of the press release on which Plaintiffs rely was not the litigation contingency; it was JELD-WEN's announcement that it had recorded disappointing third-quarter financial results and downgraded its fiscal-year 2018 adjusted EBITDA guidance by some 10%. Dkt.79-35. Unsurprisingly, most analyst reports reacting to JELD-WEN's press release focused on that downgraded guidance (and the departure of JELD-WEN's CFO), and ignored the litigation contingency entirely. *See, e.g.*, Dkt.136-5; Dkt.136-6; Dkt.136-7. Plaintiffs' own investment advisors—who had full autonomy with respect to Plaintiffs' JELD-WEN investments, and made all of Plaintiffs' JELD-WEN trades based on their own research and analysis—agreed that the contingency was a non-event, testifying that they understood it simply reflected the accounting impact of Judge Payne's

17

divestiture decision ten days earlier.  Dkt.134-3 at 59-60, 157-59, 168; Dkt.134-4 at 31-33, 133-37, 139-44; *see* Dkt.134-5 at 60; Dkt.134-6 at 49-50; Dkt.134-7 at 70-72; *cf.* Cert.Op.11 n.11.  Indeed, one of Plaintiffs' own advisors bought *more* JELD-WEN stock after JELD-WEN announced the contingency, *see* Dkt.134-4 at 136-37, 142-43, thoroughly undermining any suggestion that the announcement "corrected" some longstanding misrepresentation.

The district court's reasons for concluding otherwise are unsustainable.  Citing its decision denying JELD-WEN's motion to dismiss, the court accepted Plaintiffs' assertion that the litigation contingency "disclosed new information to the market" by "revealing that [JELD-WEN] expected the *Steves* litigation to cause significant liability."  Cert.Op.11 & n.12.  That theory fails at the threshold because it would put securities law at war with itself.  It simply cannot be that, by requiring companies to disclose any reasonable possibility that their defenses to litigation claims may fail, the securities laws require companies to implicitly concede that those defenses are and always have been meritless.  Nor can a litigation contingency plausibly be deemed a tacit confession of guilt when, as here, it was accompanied by an express statement that the company continued to maintain its innocence and pursue its appeal rights.  Indeed, if that theory were viable, then a defendant could still be deemed guilty of securities fraud even if its defenses *prevailed* on appeal.

18

But even assuming Plaintiffs' novel theory could survive a motion to dismiss notwithstanding those glaring legal defects, the "rigorous analysis" demanded by Rule 23 required much more. *Comcast*, 569 U.S. at 33. And the certification record—including unrebutted evidence from JELD-WEN's accounting expert, Dkt.136-3 at 18-22—plainly showed that this litigation contingency was simply an accounting charge reflecting the amount of the expected judgment in light of the already-public jury verdict and divestiture decision. Because that contingency revealed no new material information (let alone any information correcting any alleged misrepresentations), Plaintiffs cannot rely on the subsequent price drop to show class-wide reliance under *Basic*.

Plaintiffs also cannot show class-wide reliance under *Basic* because the class includes members who bought shares in JELD-WEN's IPO, which by definition is not an efficient market. It is settled that "to invoke the *Basic* presumption, a plaintiff must prove that … the stock traded in an efficient market." *Halliburton II*, 485 U.S. at 277-78. And it is equally settled that as a matter of law, "the market for IPO shares is not efficient." *In re IPO Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). That is for good reason: Because "the price of newly issued securities is set primarily by the underwriter and the offeror, not by the market," their price cannot be "relied on reasonably as an accurate reflection of their true value." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990). Accordingly, "IPO cases fall outside

19

the presumption of reliance enunciated in *Basic*." *In re Intelligroup Sec. Litig.*, 527 F.Supp.2d 262, 309 (D.N.J. 2007); *see IPO*, 471 F.3d at 42-43. Neither Plaintiffs nor the district court cited any case holding otherwise. Indeed, the district court ignored the issue entirely; it rejected JELD-WEN's argument that the market was inefficient during the post-IPO quiet period, but never addressed its argument that the market was inefficient during the IPO itself. Cert.Op.8-10. The court plainly erred by certifying a putative class with members who bought their shares in JELD-WEN's IPO.

## II. Predominance Is Lacking Because Plaintiffs Have No Viable Common Theory Of Damages And Face An Insurmountable *Comcast* Problem.

Even if Plaintiffs could prove class-wide reliance, certification would still be improper because they failed to present a viable class-wide damages model. To certify a class under Rule 23(b)(3), a plaintiff must "establish that damages are susceptible of measurement across the entire class," since without a class-wide damages model "[q]uestions of individual damages calculations will inevitably overwhelm" any common issues. *Comcast*, 569 U.S. at 34-35. To be viable, moreover, the model "must measure only those damages attributable to" the plaintiffs' theory of liability. *Id.* at 35. If plaintiffs could rely on a methodology that generates class-wide awards at the expense of "identif[ying] damages that are not the result of the wrong," that would permit certification based on "*any* method of measurement [that] can be applied classwide, no matter how arbitrary the

20

measurements may be"—an approach that "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 36-37.

Plaintiffs claim that all class members are entitled to damages because they purchased JELD-WEN stock at prices inflated by the alleged misrepresentations. *See* Am.Compl.63. To establish damages on that theory, Plaintiffs seek to measure the inflation caused by the alleged misrepresentations by measuring the decrease in price caused by a disclosure that (they claim) corrected them. Am.Compl.63-64; *see Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed"). That methodology hinges critically, however, on identifying a disclosure that corrects the misrepresentations on which Plaintiffs rely. A disclosure that corrects different misrepresentations—or only a subset of the misrepresentations—cannot provide a viable class-wide damages model because it is not "consistent with [plaintiffs'] liability case." *Comcast*, 569 U.S. at 35.

That is precisely the problem here. Plaintiffs seek to hold JELD-WEN liable for a variety of purported misrepresentations, including statements dating back to January 2017 about its pricing practices; statements dating back to January 2017 about the competitiveness of the doors and windows markets; and statements beginning much later, in February 2018, about the *Steves* litigation. Am.Compl.39-61. Plaintiffs accordingly proposed, and the district court certified, a class of persons

who purchased JELD-WEN stock between January 2017 and October 2018, and therefore (according to Plaintiffs) relied on *any* of the alleged misrepresentations. Cert.Op.2 (class definition). That class includes numerous members who purchased stock between January 2017 and February 2018 (the first year of the class period)— before JELD-WEN made any alleged misrepresentations about the *Steves* litigation—and who therefore can have relied (if at all) only on JELD-WEN's statements about its pricing strategies and competitive markets. Am.Compl.40-54.

Plaintiffs' damages model, however, relies entirely on measuring the price drop following a single purported "corrective disclosure": JELD-WEN's announcement that it would book a litigation contingency for the *Steves* litigation. *See* Dkt.122-1 at 101-04. But even assuming the litigation contingency could be understood as "correcting" JELD-WEN's prior statements about the Steves' litigation claims, it has no relevance whatsoever to the alleged statements about pricing and competitiveness—the only alleged misrepresentations at issue for more than half of the class period and many class members. The "disclosure" that Plaintiffs initially claimed "corrected" those misrepresentations was the divestiture decision itself, but their own damages expert disavowed that theory. The result is a striking mismatch between Plaintiffs' liability case and class definition, which rely on *both* the pricing and competitiveness statements *and* the *Steves* litigation statements, and Plaintiffs' damages model, which relies on a disclosure that at the

22

very most "corrected" only the latter. Because of that mismatch, Plaintiffs' damages model cannot satisfy Rule 23(b)(3). *Comcast*, 569 U.S. at 37-38.

Once again, the district court's reasons for concluding otherwise are untenable. Rather than confront that mismatch, the court reconceptualized Plaintiffs' complaint as "advanc[ing] a single, unified theory of liability … that both the Pricing and Competitiveness Statements and the *Steves* Litigation Statements were false for the same reason"—namely, because (according to Plaintiffs) JELD-WEN knew all along that it was engaged in some amorphous and as-yet-undefined (let alone conceded) "anticompetitive conduct." Cert.Op.13-15. But the question for Plaintiffs' damages model is not what JELD-WEN knew; it is what the "corrective disclosure" on which Plaintiffs rely actually corrected. The court made no attempt to address that question, or to explain how the litigation contingency could possibly be understood as "correcting" any statements about pricing strategies and market competitiveness—especially when Plaintiffs claim those prior statements were false based in part on an alleged price-fixing conspiracy unrelated to the *Steves* litigation. Am.Compl.26-28. Because Plaintiffs' damages model fails to match their theory of liability—and indeed, bears no relation to the only statements at issue for more than half the class period—the court plainly erred by granting certification.

23

## CONCLUSION AND RELIEF SOUGHT

This Court should grant permission to appeal and vacate the class certification order.

Respectfully submitted,

s/Paul D. Clement

SANDRA GOLDSTEIN
RACHEL FRITZLER
LINDSEY WEISS HARRIS
JACOB RAE
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
sandra.goldstein@kirkland.com

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
C. HARKER RHODES IV
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Petitioners*

April 12, 2021

24

## CERTIFICATE OF COMPLIANCE

1.  This petition complies with the type-volume limitation of Fed. R. App. P.

5(c)(1) because this petition contains 5,198 words, excluding the parts of the petition

exempted by Fed. R. App. P. 32(f).

2.  This petition complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has

been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-

point Times New Roman type.

Date: April 12, 2021

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I further certify that copies were sent to the following via U.S. First Class Mail and electronic mail:

Susan Rebecca Podolsky
The Law Offices of Susan R. Podolsky
1800 Diagonal Road
Suite 600
Alexandria, VA 22314
(571) 366-1702
spodolsky@podolskylaw.com

Steven Jeffrey Toll
Cohen Milstein Sellers & Toll PLLC
(DC)
1100 New York Ave NW
Suite 500, West Tower
Washington, DC 20005-3965
(202) 408-4600
stoll@cohenmilstein.com

Brielle Marie Hunt
Phelan Petty PLC
6641 West Broad Street
Suite 406
Richmond, VA 23230
(804) 980-7100
bhunt@phelanpetty.com

Debra Wyman
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
(619) 744-4920
debraW@rgdlaw.com

Francis Paul Karam
Robbins Geller Rudman & Dowd LLP
30 Vesey Street,
Suite 200
New York, NY 10007
(212) 489-3900
Fax: (631) 367-1173
Email: FKaram@rgrdlaw.com

John Rigby
Robbins, Geller, Rudman & Dowd, LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
JRigby@rgrdlaw.com

Jonathan Monroe Petty
Phelan Petty PLC
6641 West Broad Street
Suite 406

Magdalene Economou
Robbins Gellar Rudman & Dowd LLP
(NY-NA)
58 South Service Road, Ste 200

Richmond, VA 23230
(804) 980-7100
jpetty@phelanpetty.com

Mark T Millkey
Robbins Gellar Rudman & Dowd LLP
(NY-NA)
58 South Service Road, Ste 200
Melville, NY 11747
(631) 454-7702
mmillkey@rgrdlaw.com

Robert Michael Rothman
Robbins Gellar Rudman & Dowd LLP
(NY-NA)
58 South Service Road, Ste 200
Melville, NY 11747
(631) 454-7777
rrothman@rgrdlaw.com

Francis P. McConville
Labaton Sucharow LLP
140 Broadway
New York, NY 10005-1108
(212) 907-0650
fmcconville@labaton.com

James Thomas Christie
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
(212) 907-0781
jchristie@labaton.com

Melville, NY 11747
(631) 454-7709
MEconomou@rgrdlaw.com

Michael G. Phelan
Phelan Petty PLC
3315 West Broad Street
Richmond, VA 23230
(804) 980-7100
mphelan@phelanpetty.com

William Geddish
Robbins Gellar Rudman & Dowd LLP
(NY-NA)
58 South Service Road, Ste 200
Melville, NY 11747
(631) 454-7716
wgeddish@rgrdlaw.com

Irina Vasilchenko
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
(212) 907-0848
ivasilchenko@labaton.com

James William Johnson
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
(212) 907-0859
jjohnson@labaton.com

Margaret Anne Schmidt
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
(212) 907-0846
mschmidt@labaton.com

Philip James Leggio
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
(212) 907-0646
pleggio@labaton.com

Warren David Harless
Christian & Barton LLP
909 E Main St
Suite 1200
Richmond, VA 23219-3095
(804) 697-4100
wharless@cblaw.com

Peter Lawrence Simmons
Fried Frank Harris Shriver & Jacobson
1 New York Plaza
New York, NY 10004
(212) 859-8455
peter.simmons@friedfrank.com

Roman Lifson
Christian & Barton LLP
909 E Main St
Suite 1200
Richmond, VA 23219-3095
(804) 697-4100
rlifson@cblaw.com

Michael Howard Rogers
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
(212) 907-0814
mrogers@labaton.com

Shannan Marie Fitzgerald
Christian & Barton LLP
909 E Main St
Suite 1200
Richmond, VA 23219
(804) 697-4158
sfitzgerald@cblaw.com

Corey Franklin Baron
Fried Frank Harris Shriver & Jacobson
1 New York Plaza
New York, NY 10004
(212) 859-8027
corey.baron@friedfrank.com

Renee Eula Turner
Fried Frank Harris Shriver & Jacobson
1 New York Plaza
New York, NY 10004
(212) 859-8536
renee.turner@friedfrank.com

s/Paul D. Clement
Paul D. Clement

# ATTACHMENT 1

Case 3:20-cv-00112-JAG   Document 253-1   Filed: 03/24/21   Page 1 of 5 PageID# 8812

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE: JELD-WEN HOLDING, INC.
SECURITIES LITIGATION

Civil Action No. 3:20-cv-112-JAG

## OPINION

The plaintiffs[1]—investors in Jeld-Wen Holding, Inc. ("Jeld-Wen")—allege that Jeld-Wen manipulated its stock price by failing to disclose anticompetitive conduct that in violated federal antitrust law. The plaintiffs say this manipulation breached Sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission Rule 10b-5. The plaintiffs seek to represent a class of investors who bought Jeld-Wen stock between January 26, 2017, and October 15, 2018.

The defendants, Mark A. Beck, L. Brooks Mallard, Kirk S. Hachigian, and Gary S. Michel (the "Individual Defendants"), Jeld-Wen, and Onex,[2] oppose class certification, arguing that the plaintiffs cannot satisfy the predominance or typicality requirements set forth in Federal Rule of Civil Procedure 23.[3] Both arguments fail. Because the plaintiffs satisfy Rule 23's class certification requirements, the Court will grant the plaintiffs' motion for class certification.

---

[1] The "plaintiffs" or "proposed class representatives" refers to the Public Employees' Retirement System of Mississippi ("PERS of Mississippi"), the Plumbers & Pipefitters National Pension Fund ("PPNPF"), and the Wisconsin Laborers' Pension Fund ("WLPF").

[2] Onex refers to Onex Corporation, Onex Partners Manager LP, Onex Partners III LP, Onex Partners III GP LP, Onex US Principals LP, Onex Partners III PV LP, Onex Partners III Select LP, Onex BP Co-Invest LP, Onex American Holdings II LLC, BP EI II LLC, BP EI LLC, OAH Wind LLC, and Onex Advisor Subco III LLC.

[3] Onex joined Jeld-Wen's and the Individual Defendants' opposition to the plaintiffs' motion for class certification. (ECF No. 137.)

# I. <u>BACKGROUND</u>[4]

The plaintiffs allege that they bought Jeld-Wen stock at an inflated price because the defendants lied about Jeld-Wen's anticompetitive conduct and the legal risks that conduct posed to Jeld-Wen. Specifically, the plaintiffs allege that the defendants publicly stated that Jeld-Wen operated in a competitive market and faced a meritless antitrust lawsuit when, in fact, they knew that Jeld-Wen had violated federal antitrust laws and, therefore, faced significant liability for that behavior. The plaintiffs' expert, Steven P. Feinstein, concluded that these lies cost the plaintiffs "up to $1.99 per share" depending on when they bought Jeld-Wen's stock. (ECF No. 122-1 ¶ 27.)

On March 4, 2021, the Court held a hearing on the plaintiffs' motion for class certification. Upon due consideration, the Court will certify the following class: "[A]ll persons and entities, who or which, during the period from January 26, 2017[,] through October 15, 2018, inclusive (the 'Class Period'), purchased the publicly traded common stock of" Jeld-Wen. (ECF No. 121, at 1.)[5] The class excludes (1) the defendants;

> (2) members of the immediate family of any Defendant who is an individual; (3) any person who was an officer or director of Jeld-Wen . . . Onex Corporation ('Onex'), or any Onex affiliated fund during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) Jeld-Wen's or Onex's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

(*Id.* at 1 n.1.)

---

[4] The Court detailed the plaintiffs' factual allegations and the background of this case in its Opinion on the defendants' motion to dismiss the amended complaint. (*See* ECF No. 103, at 2-4.)

[5] The Court will also appoint (1) PERS of Mississippi, PPNPF, and WLPF as class representatives; (2) Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as class counsel; and (3) Cohen Milstein Sellers & Toll PLLC as liaison counsel.

USCA4 Appeal: 21-159   Doc: 2   Filed: 04/12/2021   Pg: 37 of 54
Case 3:20-cv-00112-JAG   Document 264-1   Filed: 03/24/14   Page 137 of 54   PageID#
8814

## II. __DISCUSSION__[6]

Federal Rule of Civil Procedure 23 governs class actions, including class certification. As relevant in this case, the party seeking certification must satisfy seven requirements. Under Rule 23(a), the plaintiff must show (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. Fed. R. Civ. P. 23(a). Under Rule 23(b)(3), the type of class action at issue here, the plaintiffs must also demonstrate (5) predominance and (6) superiority. Fed. R. Civ. P. 23(b)(3). Finally, Rule 23 requires (7) ascertainability, meaning that "the members of a proposed class [must] be 'readily identifiable.'" *Adair*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)).

The defendants contest only whether the plaintiffs have satisfied the predominance and typicality requirements. (ECF No. 134, at 15.) Nevertheless, the Court must analyze all seven

---

[6] The party seeking class certification bears the burden of proof. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). When evaluating a motion for class certification, "'the trial court [must be] satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' . . . Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff[s'] underlying claim." *Dukes*, 564 U.S. at 350-51 (internal citations omitted) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)). Nevertheless, "[t]he likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). Finally, district courts should "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (quoting *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 740 (4th Cir. 1989)). This rule of liberal construction applies with increased force in securities fraud cases. *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) ("[I]t is important to bear in mind that '[i]n light of the importance of the class action device in securities fraud suits,' the requirements of Rule 23 'are to be construed liberally.' . . . Thus, any doubts about the propriety of certification should be resolved in favor of certification." (internal citation omitted)).

factors to determine if it should certify the proposed class. *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 405-06 (E.D. Va. 2015) (analyzing all Rule 23 requirements even though the defendants principally challenged the predominance requirement).

## A. Numerosity

The proposed class must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specified number is needed to maintain a class action under [Rule 23]; application of the rule is to be considered in light of the particular circumstances of the case and generally, unless abuse is shown, the trial court's decision on this issue is final." *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). Here, the proposed class includes potentially thousands of investors in Jeld-Wen, which satisfies the numerosity requirement under Rule 23(a)(1). *See Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (finding that a class size of seventy-four satisfied the numerosity requirement); *Cypress*, 375 F.2d at 653 (finding that a class size of eighteen satisfied the numerosity requirement).

## B. Commonality

Because the plaintiffs satisfy the more stringent predominance requirement for the reasons stated below, they also satisfy the commonality requirement. *In re Willis Towers Watson PLC Proxy Litig.*, No: 1:17cv1338, 2020 WL 5361582, at *13 (E.D. Va. Sept. 4, 2020). ("In a class action brought under Rule 23(b)(3), as here, 'the "commonality" requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions.'" (quoting *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001))).

4

## C. Typicality

Here, the plaintiffs' claims "are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). In other words, the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006).

In this case, the proposed class representatives and class members all contend that they purchased Jeld-Wen stock at an artificially inflated price because the defendants lied about Jeld-Wen's anticompetitive behavior and the liability to which that behavior exposed the company. In other words, the plaintiffs "claims arise out of the same alleged course of conduct undertaken by the defendants." *City of Ann Arbor Emps. Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 251 (D.S.C. 2010). "The information that the plaintiff[s] assert[] is materially false and misleading is the same information that would be used by other class members to prove their case." *Id.* at 251-52. In addition, all the plaintiffs would recover for purported violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission Rule 10b-5. The plaintiffs, therefore, have satisfied the typicality requirement. *Id.* at 252.

The defendants say that, "[t]o the extent Plaintiffs argue that the knowledge of their investment advisors is atypical of the class, the class cannot be certified because Plaintiffs cannot demonstrate typicality." (ECF No. 134, at 29.) The proposed class representatives do not argue, however, that their investment advisors had information atypical of the class. And the defendants

5

do not cite *any* evidence to support their claim that the proposed class representatives' investment advisors had such atypical information. Thus, this argument fails.

### D. *Adequacy*

Turning to adequacy, the plaintiffs must prove that both the representative parties and class counsel will fairly and adequately protect the class's interests. *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 212 (E.D. Va. 2015). Here, the representative parties "'possess the same interest and suffer the same injury'" as the proposed class members and "possess undivided loyalties" to them. *Broussard*, 155 F.3d at 338 (quoting *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Indeed, they have vigorously and competently represented the interests of the proposed class members throughout this litigation. In addition, class counsel and liaison counsel have experience in class actions and other complex civil litigation, including in securities fraud cases. Accordingly, the plaintiffs meet Rule 23's adequacy requirement.

### E. *Predominance*

As common in securities fraud cases, the defendants' argument against class certification focuses on the predominance requirement. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*") ("In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3).").

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "For this reason, courts must concentrate on the issue of liability rather than damages, 'and if the liability issue is common to the class, common questions are held to predominate over individual ones.'" *In re NII Holdings*, 311 F.R.D. at 408 (quoting *In re BearingPoint*, 232 F.R.D. at 542). "Securities fraud cases are particularly appropriate candidates

for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *In re BearingPoint*, 232 F.R.D. at 542; *see also In re NII Holdings*, 311 F.R.D. at 408.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the representation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).[7] The defendants argue that the plaintiffs do not have a common method of proving reliance or damages.

### 1. Reliance

The reliance element of a securities fraud case "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Amgen*, 568 U.S. at 461 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*")). Plaintiffs can prove reliance directly by showing that they knew about a company's misrepresentation and transacted based on that misrepresentation. *See id.* But "requiring proof of direct reliance 'would place an unnecessarily unrealistic evidentiary burden on [a] plaintiff who has traded on an impersonal market.'" *Id.* at 461 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988)). Thus, in *Basic*, the Supreme Court "held that securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b-5 action by invoking a rebuttable

---

[7] To state a claim under Section 20(a), a plaintiff "must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 129-30 (4th Cir. 2009), *rev'd on other grounds sub nom. Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). The defendants do not contest the plaintiffs' ability to prove its Section 20(a) claim using a common method.

7

presumption of reliance, rather than proving direct reliance on a misrepresentation." *Halliburton II*, 573 U.S. at 268. The *Basic* presumption rests "on what is known as the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Id.* (quoting *Basic*, 485 U.S. at 246.)

For the *Basic* presumption to apply, the plaintiffs must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* At the class certification stage, "a plaintiff need only demonstrate by a preponderance of the evidence that the alleged misrepresentations were publicly known and that the stock traded in an efficient market." *In re NII Holdings*, 311 F.R.D. at 409.

Here, the defendants argue that the plaintiffs have not proven that Jeld-Wen's stock traded in an efficient market for the entire class period. The defendants also argue that they have rebutted the *Basic* presumption.

### a. Market Efficiency

"In the Fourth Circuit, the standard for determining whether a security trades in an efficient market is determined by considering: 'factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals [("analyst coverage")]. . . .'" *Id.* (quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004)).[8] "[N]o one factor is more important than another when a court undertakes the holistic

---

[8] Courts refer to these as the *Cammer* factors. *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

8

and fact-intensive inquiry of determining whether a market is efficient." *Id.* The plaintiffs' expert, Steven P. Feinstein, analyzed these factors[9] and determined that Jeld-Wen "stock traded in an efficient market throughout the Class Period." (ECF No. 122-1 ¶ 264.)

The defendants argue that the plaintiffs cannot show that the market for Jeld-Wen stock "was efficient throughout the class period" because, for the 25-day quiet period following Jeld-Wen's initial public offering ("IPO"), the market "is inefficient as a matter of law." (ECF No. 134, at 3, 21.)[10] Thus, the defendants argue the Court "should limit the class period to purchases of JELD-WEN securities made *after* the quiet period, meaning on or after February 21, 2017." (ECF No. 134, at 26 (emphasis in original).)

As an initial matter, the defendants "go[] too far" when contending that "a market for securities during the so-called 'quiet period' is inherently inefficient as a matter of law." *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 575 (S.D.N.Y. 2008). Rather, there is "a *rebuttable presumption* that the market for securities issued by a company not previously subject to the reporting requirements of the securities laws is not efficient during the quiet period." *Id.* (emphasis added). Feinstein's expert report and declaration demonstrates market efficiency throughout the entire class period. (*See* ECF No. 142-2 ¶¶ 4-13.) Because the defendants do not offer an expert report of their own to discredit Feinstein's evaluation, the plaintiffs have rebutted the presumption of inefficiency.

---

[9] Feinstein also analyzed the so-called *Krogman* factors, which include "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')." *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001).

[10] The plaintiffs note that, in 2015, the Financial Industry Regulatory Authority ("FINRA") reduced the quiet period to ten days. (ECF No. 141, at 7 n.5 (citing FINRA R. 2241(b)(2)(I)(i)).) During the quiet period, FINRA members "must not publish or otherwise distribute research reports, and research analysts must not make public appearances, . . . if the member has participated as an underwriter or dealer in the" IPO. FINRA R. 2241(b)(2)(I).

The defendants claim that Feinstein did not separately analyze the *Cammer* and *Krogman* factors during the quiet period. (ECF No. 134, at 23-24.) And they suggest that he admitted as much during his deposition. (*Id.* at 23.) But Feinstein testified that he analyzed the quiet period separately from the rest of the class period. (ECF No. 141-1, at 59:4-13.) And he concluded that Jeld-Wen's stock traded in an efficient market during the quiet period. (*Id.* at 47:2-20.)

Moreover, the defendants only criticize what they see as Feinstein's inadequate analysis of the analyst coverage factor. Even if the Court credited that argument, such a finding would not undermine Feinstein's conclusion that Jeld-Wen stock traded in an efficient market during the quiet period because "no one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining whether a market is efficient." *In re NII Holdings*, 311 F.R.D. at 409. Thus, one factor weighing against market efficiency would not overcome all the other factors supporting it. Accordingly, the plaintiffs have proven market efficiency throughout the entire class period.

### b. Rebutting the *Basic* Presumption

"Even if plaintiffs show they are entitled to the *Basic* presumption," the defendants argue that they have rebutted that presumption because its announcement on October 15, 2018, that it expected to incur $76.5 million in liability due to the verdict in *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Civil Case No. 3:16cv545, (the "Liability Announcement" or "*Steves* Litigation Contingency") "disclosed no new information regarding the merits of the Steves Litigation, JELD-WEN's liability, or its alleged anticompetitive conduct." (ECF No. 134, at 26, 29.) The defendants argue that testimony from the plaintiffs' investment advisors support this view. (ECF No. 134, at

13 (claiming that the plaintiffs' investment advisors' testimony shows that "the market saw the Steves Litigation Contingency as a *non-event*" (emphasis in original)).)[11]

The defendants auditioned this argument at the motion to dismiss stage. (*See* ECF No. 78, at 28-29.)  The argument fell flat then;[12] and it fails now for the same reason—the Liability Announcement disclosed new information to the market. Specifically, it revealed that Jeld-Wen expected the *Steves* litigation to cause significant liability for the company.[13]  Feinstein reflects this understanding of the Liability Announcement when he opines that it "constituted a corrective disclosure," which caused a "steep stock price decline" that "could not have been caused by random volatility." (ECF No. 122-1 ¶ 299.)  To counter Feinstein's conclusion, the defendants

---

[11] This argument mischaracterizes the plaintiffs' investment advisors' testimony. Two of the plaintiffs' investment advisors testified that they did not perceive the Liability Announcement as an admission of liability by Jeld-Wen. But one of the advisors, Wellington Management Co., LLP, testified that the Liability Announcement revealed that Jeld-Wen had "on the margin" changed it position "regarding the merits of the *Steves* litigation" because its "fear of a bad outcome had increased." (ECF No. 134-4, at 140:15-141:3.)  This resulted in "an accounting change," if not necessarily "an actual change in the thought process." (*Id.* at 141:3-5.)  The other advisor, Segall Bryant & Hamill, said that it did not know that the Liability Announcement "would have . . . severely damaged" its investment decisions about Jeld-Wen. (ECF No. 134-3, at 157:13-20.)  At the same time, however, it "wouldn't have helped." (*Id.*)  In any event, this testimony certainly does not show that the *entire market* saw the Liability Announcement as a non-event.

[12] (ECF No. 103, at 20 ("The Liability Announcement also disclosed *new facts* to the market—namely, that JELD-WEN expected to incur a $76.5 million loss from the *Steves* litigation. Before then, JELD-WEN maintained that it did not expect Steves to succeed in its lawsuit. Like [United States District Court Judge Robert E. Payne's Opinion making detailed factual findings about Jeld-Wen's anticompetitive behavior and ordering divestiture of Jeld-Wen's doorskins manufacturing facility in Towanda, Pennsylvania (the 'Divestiture Decision')], this *new fact* altered the risk calculus for investors buying and selling JELD-WEN stock." (emphasis added)).

[13] (*Cf.* ECF No. 134-2 ¶¶ 72-73 (describing a memorandum prepared by Jeld-Wen's Chief Accounting Officer explaining that the company should record its estimated losses related to the *Steves* case because the "District Court's orders, especially its fact findings and ruling on quality claims, make[] overcoming antitrust liability (in its entirety) on appeal less probable and gives certainty around contract damages").)

11

offer inconclusive testimony of two investment advisors; this testimony does not nullify Feinstein's finding.

### 2. Damages

Although the predominance inquiry focuses on liability, not damages, *see Gunnells*, 348 F.3d at 427-28,[14] the defendants argue that the plaintiffs cannot satisfy the predominance requirement because they lack common proof of damages.   This argument rests on a misrepresentation of the plaintiffs' amended complaint and the Court's ruling on the defendants' motion to dismiss.

The defendants incorrectly claim that the plaintiffs "advanced two [separate] theories of liability" to survive the defendants' motion to dismiss. (ECF No. 134, at 1.) Under the first theory, the plaintiffs "allege that beginning on January 26, 2017, JELD-WEN made statements about its pricing practices and the competitiveness of the doors and windows markets (the 'Pricing and Competitiveness Statements'), which were false or misleading because JELD-WEN engaged in anticompetitive conduct." (*Id.*) According to the defendants, the Divestiture Decision corrected the Pricing and Competitiveness Statements.

Under the second theory, the plaintiffs allege that "beginning on February 15, 2018, JELD-WEN made statements about whether it would prevail" in the *Steves* case (the "*Steves* Litigation Statements"), which "were false or misleading because JELD-WEN knew the litigation had merit

---

[14] *See also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 686 (D. Md. 2018) ("'[C]ourts generally find the predominance standard of Rule 23(b)(3) to be satisfied,' even when individualized damages determinations are required, if common questions still predominate as to liability." (quoting *id.*).)

12

and would cause [Jeld-Wen] negative repercussions." (*Id.* at 2.) According to the defendants, the Liability Announcement corrected these statements.[15]

The defendants claim that "[d]iscovery has shown Plaintiffs' first theory of liability is a dead end" because Feinstein "has conceded that he cannot show the Divestiture Decision impacted JELD-WEN's stock price." (*Id.*) Thus, the plaintiffs should pursue only their second liability theory and "narrow the class period so it starts on February 15, 2018 (the date of the first alleged Steves Litigation Statement)." (*Id.*)[16]

The plaintiffs do not pursue two separate liability theories, however. Instead, they advance a "***unified, single*** theory of liability." (ECF No. 141, at 1 (emphasis in original).) The plaintiffs allege that both the Pricing and Competitiveness Statements and the *Steves* Litigation Statements were false for the same reason—the defendants knew that Jeld-Wen "engaged in anticompetitive conduct," and, therefore, they "knew the litigation has merit and would cause [Jeld-Wen] negative

---

[15] The defendants' theory ignores the obvious link between the so-called Pricing and Competitiveness Statements and the *Steves* Litigation Statements. Jeld-Wen knew the *Steves* case had merit and would expose it to liability *because* it knew it engaged in anticompetitive conduct. Indeed, the defendants' argument that the Divestiture Decision *in the* Steves *case* corrected the Pricing and Competitiveness Statements tacitly acknowledges the link between the Pricing and Competitiveness Statements and the *Steves* case. Stated differently, if factual findings in the *Steves* case correct the Pricing and Competitiveness Statements, then what severs the link between the Pricing and Competitiveness Statements and the *Steves* Litigation Statements? The defendants never answer that question.

[16] The defendants base this argument on the Supreme Court's holding in, *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), an antitrust case in which the Court held that a district court may certify a class action only when a plaintiff provides evidence of damages attributable exclusively to *viable* liability theories. *See id.* at 35.

13

repercussions." (ECF No. 134, at 1-2.)[17]  The Court's Opinion on the defendants' motion to dismiss confirms this understanding of the case.[18]

In addition, the plaintiffs allege that the Divestiture Decision only partially corrected the defendants' misrepresentations about Jeld-Wen's anticompetitive conduct and the merits of the *Steves* litigation.  (*See* ECF No. 73, at 64 (labeling the Divestiture Decision as the "first partial disclosure").)  They allege that Jeld-Wen did not completely correct its misstatements until it issued the Liability Announcement.  (*See id.* at 67 (labeling the Liability Announcement as the "final partial disclosure").)  The Court acknowledged this theory in its Opinion on the defendants' motion to dismiss.[19]  And the plaintiffs' damages model reflects this theory, too.[20]

---

[17] (*See also* ECF No. 141, at 4 ("Defendants simply ignore that the Complaint alleges that what they categorize as the 'Pricing and Competitiveness Statements' and 'the *Steves* Litigation Statements and Omissions' were **both** false for the **same unified**, underlying reason: Defendants' concealment of the actual source of their apparent success, *i.e.*, their undisclosed anticompetitive conduct." (emphasis in original)).)

[18] (*See* ECF 103, at 8-9 ("The amended complaint alleged that JELD-WEN made false or misleading statements by (1) crediting its market success to its pricing strategy and quality products, not its anticompetitive conduct; (2) characterizing the door and window market as competitive while simultaneously engaging in an anticompetitive conspiracy; and (3) describing the *Steves* litigation as meritless when it resulted in a $176 million verdict for Steves and the divestiture of JELD-WEN's Towanda plant."); *see also id.* at 11 n.11 ("Contrary to the defendants' characterization, the plaintiffs do not allege only that the defendants failed to disclose what Judge Payne would decide in the future [regarding the *Steves* case].  Rather, the plaintiffs allege that the defendants did not disclose their anticompetitive scheme to the public even though they knew about it before Steves sued JELD-WEN."), 12, 18-20.)

[19] (*See* ECF No. 103, at 17-18 ("[T]he Divestiture Decision revealed the true basis of JELD-WEN's profitability and that the Court would require JELD-WEN to divest itself of its Towanda plant."  But "[o]nly after the [Liability Announcement and the announcement that CFO L. Brooks Mallard would resign] did the market finally realize that JELD-WEN had failed to disclose the threat its anticompetitive practices posed to its financial outlook.").)

[20] (*See* 122-1 ¶¶ 294, 296 (concluding that Divestiture Decision "did constitute a partially corrective disclosure" that "reasonably negatively impacted" Jeld-Wen's stock price, even though "the magnitude of the effect was not large enough to register as a statistically significant decline");

14

Case 3:20-cv-00112-JAG   Document 364   Filed 08/20/14/Page Page 49 of 54 PageID# 183
8826

The plaintiffs' amended complaint and expert report advance a single, unified theory of liability. The Court recognized this single, unified theory in its Opinion on the defendants' motion to dismiss. The defendants' transparent attempt to reframe the plaintiffs' allegations to its liking fails. This dooms its argument that the plaintiffs have no common proof of damages.

*    *    *

For the reasons stated above, the plaintiffs have common evidence to prove both reliance and damages. Accordingly, they have satisfied Rule 23(b)(3)'s predominance requirement.

### F. Superiority

The plaintiffs have shown "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "In determining whether the class mechanism is truly superior, the court should consider '(1) the interest in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of concentrating the litigation in the forum; and (4) manageability.'" *Soutter*, 307 F.R.D. at 217-18 (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997)). Phrased more generally, the superiority requirement compares class action litigation to possible alternatives "to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010) (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005)).

---

*id.* ¶ 339 (finding that the Liability Announcement caused a "$1.99 per share decline on 16 October 2018"); ECF No. 141, at 5-6; ECF No. 142-2 ¶¶ 14-20.)

15

Case 3:20-cv-00112-JAG   Document 364   Filed 03/29/21   Page 50 of 54 PageID# 8827

A class action is superior in this case. Other litigation related to this case is currently pending in this jurisdiction, and the parties have litigated this case for over a year. This makes Richmond a convenient forum. The Court does not foresee difficulty in managing this case as a class action. Moreover, a class action serves the interests of economy and efficiency. Thus, the plaintiffs meet the superiority requirement.

### G. Ascertainability

"Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable'" by use of "objective criteria"—an "ascertainability" requirement. *Adair*, 764 F.3d at 358 (quoting *Hammond*, 462 F.2d at 1055). In other words, if "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). Conversely, "[w]here a plaintiff proposes objective criteria capable of identifying those individuals described in the class definition, the ascertainability requirement is satisfied." *Soutter*, 307 F.R.D. at 199. The plaintiffs need not "identify every class member at the time of certification." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *Adair*, 764 F.3d at 358), *cert. denied*, 140 S.Ct. 676 (2019). Instead, they must merely "ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Id.*

Here, objective data about who bought and sold Jeld-Wen stock during the class period provides an administratively feasible way to ascertain the class. Thus, the plaintiffs satisfy the ascertainability requirement.

16

## III. CONCLUSION

The plaintiffs have satisfied the requirements for class certification under Rule 23(a) and

23(b)(3). Accordingly, the Court will grant their motion for class certification. The Court will

also appoint PERS of Mississippi, PPNPF, and WLPF as class representatives; Robbins Geller

Rudman & Dowd LLP and Labaton Sucharow LLP as class counsel; and Cohen Milstein Sellers

& Toll PLLC as liaison counsel.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: __29__ March 2021
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

17

# ATTACHMENT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE: JELD-WEN HOLDING, INC.
SECURITIES LITIGATION

Civil Action No. 3:20-cv-112-JAG

## ORDER

This matter comes before the Court on the plaintiffs'[1] motion for class certification and appointment of class representatives and class counsel. (ECF No. 120.) For the reasons stated in the accompanying Opinion, the Court GRANTS the motion. Specifically, the Court ORDERS as follows:

1.    Pursuant to Federal Rule of Civil Procedure 23(c)(1)(B), the Court CERTIFIES the following Class:

All persons and entities, who or which, during the period from January 26, 2017, through October 15, 2018, inclusive (the "Class Period"), purchased the publicly traded common stock of Jeld-Wen Holding, Inc. ("Jeld-Wen").

The class excludes:

(1) the defendants;[2]
(2) members of the immediate family of any defendant who is an individual;
(3) any person who was an officer or director of Jeld-Wen, the Onex Corporation, or any Onex affiliated fund during the Class Period;
(4) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest;

---

[1] The "plaintiffs" refers to the Public Employees' Retirement System of Mississippi ("PERS of Mississippi"), the Plumbers & Pipefitters National Pension Fund ("PPNPF"), and the Wisconsin Laborers' Pension Fund ("WLPF").

[2] The defendants refers to Mark A. Beck, L. Brooks Mallard, Kirk S. Hachigian, Gary S. Michel, Jeld-Wen, and the Onex defendants, which include Onex Corporation, Onex Partners Manager LP, Onex Partners III LP, Onex Partners III GP LP, Onex US Principals LP, Onex Partners III PV LP, Onex Partners III Select LP, Onex BP Co-Invest LP, Onex American Holdings II LLC, BP EI II LLC, BP EI LLC, OAH Wind LLC, and Onex Advisor Subco III LLC (collectively, "Onex").

(5) Jeld-Wen's or Onex's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and

(6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

2.    Pursuant to Rule 23(a)(3), the Court APPROVES the following as Class Representatives: PERS of Mississippi, PPNPF, the WLPF.

3.    Pursuant to Rule 23(c)(1)(B) and Rule 23(g), the Court APPOINTS Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as Class Counsel and Cohen Milstein Sellers & Toll PLLC as Liaison Counsel.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 29 March 2021
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

2